ACCEPTED
15-25-00221-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/26/2025 3:13 PM
CHRISTOPHER A. PRINE
CLERK

No. _____

_____

IN THE FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/26/2025 3:13:06 PM
CHRISTOPHER A. PRINE
Clerk

_____

*In re* The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc.,

*Relators*

_____

Original Proceeding Arising From the
Business Court of the State of Texas, First Division
Cause No. 25-BC01B-0027
Honorable William Whitehill, Judge of the Texas Business Court

_____

**PETITION FOR WRIT OF MANDAMUS—MANDAMUS RECORD**

_____

**MCCARTY LAW PLLC**
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street, Suite 400
Austin, Texas 78701
512-827-2902

**DUANE MORRIS LLP**
Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Benjamin L. Warden
State Bar No. 24115926
bwarden@duanemorris.com
200 Crescent Court, Suite 900
Dallas, Texas 75201
(214) 257-7213 -Telephone
(214) 292-8442 -Facsimile

*Counsel for Relators*
Oral Argument Requested

MR 0001

## Certificate of Service

I hereby certify that a true and correct copy of this Mandamus Record was served on counsel of record by using the Court's e-filing system and on the Honorable William Whitehill via email and mail to his Staff Attorney and Court Manager on the 26th day of November, 2025, addressed as follows:

**Brian P. Shaw**
Texas Bar No. 24053473
Email: bshaw@ccsb.com
**Monica E. Gaudioso**
Texas Bar No. 24084570
Email: mgaudioso@ccsb.com
**Brent M. Rubin**
Texas Bar No. 24086834
Email: brubin@ccsb.com
**Joshua D. Kipp**
Texas Bar No. 24078793
Email: jkipp@ccsb.com
**Andrea C. Reed**
Texas Bar No. 24121791
Email: areed@ccsb.com
**Emily H. Owen**
Texas Bar No. 24116865
Email: eowen@ccsb.com
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

*Counsel for Real Parties in Interest*

The Honorable Bill Whitehill
Texas Business Courts—Dallas, Division 1B
8080 Park Lane, Suite 500
Dallas, Texas 75231
BCDivision1B@txcourts.gov


*Respondent*

/s/ *Craig M. Warner*
Craig M. Warner

# INDEX OF MANDAMUS RECORD

| | |
|---|---|
| Plaintiffs' Original Petition, Application for TRO and Injunctive Relief, and Emergency Request for Appointment Receiver | Tab 1 |
| Plaintiffs' Statement on the Basis of the Court's Subject Matter Jurisdiction and Supplement to Jurisdictional Statement | Tab 2 |
| July 2nd Hearing Transcript | Tab 3 |
| Defendants' Motion to Dismiss and Plea to the Jurisdiction | Tab 4 |
| Plaintiffs' First Amended Petition | Tab 5 |
| Plaintiffs' Response to Defendants' Motion to Dismiss and Plea to the Jurisdiction | Tab 6 |
| August 4th Hearing Transcript | Tab 7 |
| Order on Additional Briefing | Tab 8 |
| Notice of Related Proceedings | Tab 9 |
| Defendants' Supplemental Brief and Alternative Motion to Abate | Tab 10 |
| Defendants' Answer to Question Presented by Court on Aug. 5 | Tab 11 |
| Plaintiffs' Position on Who is Allowed to Change the Benefitting Organizations | Tab 12 |
| Plaintiffs' Response to Defendants' Supplemental Brief and Alternative Motion to Abate | Tab 13 |
| Plaintiffs' letter to TBC regarding Foreign Authorities | Tab 14 |
| Defendants' Appendix of Foreign Authority | Tab 15 |
| Defendants' Reply in Support of their Supplemental Brief and Alternative Motion to Abate | Tab 16 |
| Notice of Pleading filed in the Cayman Liquidation Matter | Tab 17 |

Plaintiffs' Sur-Reply to Defendants' Supplemental Brief and Alternative Motion to Abate — Tab 18

Response to "Notice of Pleading Filed in the Cayman Liquidation Matter" — Tab 19

Plaintiffs' Second Amended Petition — Tab 20

September 18th Order — Tab 21

Plaintiffs' Motion for Leave to File Motion for Reconsideration as to Complete Relief — Tab 22

Plaintiffs' Motion for Reconsideration as to Complete Relief — Tab 23

Oct. 31st Order — Tab 24

July 11th Rule 11 Agreement — Tab 25

Docket — Tab 26

## SWORN CERTIFICATION PURSUANT TO TEXAS RULE OF APPELLATE PROCEDURE 52.7

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared Craig M. Warner, known to me to be the person whose name is signed to this affidavit, and having been duly sworn, upon his oath, stated as follows:

"My name is Craig M. Warner. I am over the eighteen years of age, and I reside in Dallas, Texas. I am one of the attorneys representing Relators The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc., and have represented Relators throughout the entirety of the proceedings giving rise to Relator's Petition for Mandamus, which is styled *The Highland Dallas Foundation, Inc., et al. v. Mark Patrick, et al.,* Cause No. 25-BC01B-0027, in the Texas Business Court—Division 1B, Dallas, ("Trial Court Proceeding"). As one of the attorneys representing Relators in the Trial Court Proceeding, I have personal knowledge of the filings made and orders issued in the Trial Court Proceeding. I am fully competent to execute this Certification, have personally reviewed each of the items listed in the Index of Mandamus Record referenced in this filing and contained in the Mandamus Record, and hereby certify and declare

under penalty of perjury that each document attached hereto as the Mandamus Record is:

1) A true and correct copy of an original pleading or filing in the Trial Court Proceeding;

2) A true and correct copy of transcripts of hearings in the Trial Court Proceeding, at which no testimony from any fact witness was adduced in connection with the matter complained, and the records only consist of statements and arguments of counsel and statements by the trial court; and

3) Each document is material to Relators' claim for relief in its Petition for Writ of Mandamus.

I further declare under penalty of perjury that Tabs 21 and 24 are true and correct copies of the Respondent's September 18, 2025 and October 31, 2025 orders on which Relator's Petition for Writ of Mandamus is based."

Further affiant sayeth not.

_____
Craig M. Warner

SIGNED AND SWORN TO BEFORE ME, a Notary Public, on this 26 day of November, 2025.

DENISE SOTO
Notary ID #133880255
My Commission Expires
July 27, 2026

_____
Notary Public, State of Texas
Printed Name: Denise Soto
My Commission Expires: July 27, 2026

# Tab 1

E-filed in the Office of the Clerk
for the Business Court of Texas
7/1/2025 9:35 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

25-BC01B-0027

CAUSE NO. _____

| | |
|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | IN THE TEXAS BUSINESS COURT |
| *Plaintiffs*, | |
| v. | 1ST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | DALLAS, TEXAS |
| *Defendants.* | |

**PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY <u>REQUEST FOR APPOINTMENT OF RECEIVER</u>**

**TO THE HONORABLE JUDGE OF SAID COURT:** The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs" or "Supporting Organizations") file this Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver, and in support thereof, respectfully show the Court as follows:

## I.      PRELIMINARY STATEMENT

1.1      Defendant, Mark Patrick, through a host of corporate manipulations, took over $270 million in cash and assets that supported some of the most important community-based

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 1**

MR 0009

charities in the country. In Patrick's own testimony from just last Wednesday, June 25th, the Supporting Organizations, plaintiffs here, were left with "nothing."[1]

1.2     Through the mechanism of Charitable DAF GP, LLC (organized in Delaware) and later via a secretly incorporated entity, CDH GP, Ltd., Mark Patrick held the sole control position of what was a $270 million charitable fund (Charitable DAF Fund, LP) that four charities and the Supporting Organizations relied on to perform vital and sustained philanthropic work in specific communities in the United States.  Patrick flagrantly violated both his express and implied fiduciary duties to the Supporting Organizations. He did so in order to redirect the fund's beneficial ownership to a brand-new sham charitable organization controlled by him, DFW Charitable Foundation. These actions come against a backdrop and pattern of sustained self-aggrandizement by Patrick using the fund's resources and his technical authority over them.  If the Defendants here are not immediately prevented from taking further adverse actions, then placed into receivership and subjected to judicial scrutiny, the Plaintiffs will be cut off from the lifeblood of their charitable work by the very person whose duty was to act in their interests.  Accordingly, Plaintiffs seek a Temporary Restraining Order and Temporary Injunction freezing the funds, followed by the appointment of a Receiver over the funds and the organization holding them.

## II.     DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1     Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

---

[1] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200)

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 2**

MR 0010

2.2     Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

### III.     PARTIES

3.1     T**he Highland Dallas Foundation, Inc. ("HDF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HDF provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of public needs.

3.2     **The Highland Kansas City Foundation, Inc. ("HKCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HKCF provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $7 billion in in charitable grants that support a broad range of public needs.

3.3     **The Highland Santa Barbara Foundation, Inc. ("HSBF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HSBF provides funding to the Santa Barbara Foundation, established in 1928, that supports a broad range of public needs.

3.4     **DFW Charitable Foundation ("DFWCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.  It was organized on December 9, 2024, with Defendant Mark Patrick as DFWCF's sole member.  It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes.  DFWCF is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254.  DFWCF maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, where it may be served with process.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 3**

MR 0011

3.5     **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Fund structure, as explained more thoroughly below. Patrick resides and may be served with process at 6716 Glenhurst Drive, Dallas, Texas 75254, or served anywhere he may be found.

3.6     **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at 6716 Glenhurst Drive, Dallas, Texas 75254.  It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.7     **CDH GP, Ltd**. is a Cayman Island limited company with its registered office at Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman Ky1-9010. It may be served with process through Patrick, its 100% owner and sole director, at 6716 Glenhurst Drive, Dallas, Texas 75254, or anywhere he may be found.

3.8     **CHARITABLE DAF GP, LLC** is a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## IV.     JURISDICTION AND VENUE

4.1     Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd;

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 4**

MR 0012

- and is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P.;

- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith.

4.2    The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3    The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4    Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident,

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 5**

MR 0013

Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5     Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, DFWCF, CDH GP, Ltd. and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

## V.     FACTUAL BACKGROUND

### A. *The Fund Structure*

5.1     James Dondero was the President of Highland Capital Management, L.P. ("**Highland**"), an SEC registered investment advisor. At Mr. Dondero's direction, in 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States.

5.2     To that end, in 2011, "Charitable DAF Fund, L.P. ("**Charitable DAF Fund**") was formed to hold the donated assets.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**          **PAGE 6**

MR 0014

5.3    The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4    At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, Ltd ("**Charitable DAF HoldCo**"), a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5    The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities and their supporting organizations in California, Kansas, and Texas. Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo. The four Supporting Organization held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the four Supporting Organizations owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Supporting Organizations are the Plaintiffs in this Lawsuit.

5.6    In turn and as intended, the funds provided to the Plaintiff Supporting Organizations from the Charitable DAF Fund empowered them to provide funding directly to charitable foundations in three regions of the United States. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Supporting Organizations and receive regular grants for charitable work ultimately funded by Charitable DAF Fund.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 7**

MR 0015

5.7     Since the Charitable DAF Fund's inception, the Supporting Organizations have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Supporting Organizations and the charitable organizations perform irreplaceable philanthropic work in their respective communities, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

**B.  *Control of the Fund***

5.8     The founders of the Charitable DAF Fund and of Charitable DAF HoldCo wanted to ensure that the fund assets were professionally managed by experts. So, although the Supporting Organizations were the sole beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it, management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those organizations but rather in "Management Shares," with general partner status. These "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations.

5.9     So, the "Management Shares" exercised control over the assets and over the operations of Charitable DAF HoldCo, even though they conveyed no economic benefit. In the interest of efficient management, the Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the "**Control Position**."  The Control Position was therefore responsible to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of their economic beneficiaries—the "Supporting Organizations," which held their "Participating Shares."  The Control Position therefore owed the

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                     **PAGE 8**

MR 0016

Supporting Organizations fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10    In essence, the governing documents of Charitable DAF HoldCo grant complete control of Charitable DAF Fund structure to the holder of the 100 Management Shares in Charitable DAF HoldCo. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Charitable DAF Fund structure.

5.11    The Charitable DAF Fund, however, is also expressly, separately controlled by the Control Position. Similar to control over Charitable DAF HoldCo, control over the Charitable DAF Fund is separate from the beneficial economic ownership of the Charitable DAF Fund (which belongs entirely to the Supporting Organizations). Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC[2] (the "**Delaware GP**"). The Delaware GP was the managing general partner in the Charitable DAF Fund.

5.12    The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund, dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. The ARLPA makes it clear the Control Position is to exercise his powers for the sole benefit of the Supporting Organizations.

5.13    For example, the Preamble to the ARLPA states: "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code

---

[2] The Charitable DAF GP, LLC, held all the general partnership shares in Charitable DAF Fund, which provided all management control over the Charitable DAF Fund, but conveyed no beneficial economic interest.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 9**

MR 0017

of 1986, as amended and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein[.]"

5.14 Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*."[3]

5.15 Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*."[4]

5.16 The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Indirect Charitable Owners" and contemplates the engagement of investment (and other service) advisors to achieve this. In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support. The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Supporting Organizations.

5.17 Grant Scott was initially selected for the Control Position. Mr. Scott was a longtime friend of Mr. Dondero's and a lawyer in North Carolina. Mr. Dondero knew and trusted Mr. Scott.

---

[3] Emphasis added.
[4] Emphasis added.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 10**

MR 0018

Mr. Scott effectively served the Supporting Organizations' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of decade. During this time, the Supporting Organizations and their respective charitable foundations made great strides in creating philanthropic, and charitable, work that was efficient, that was steady and reliable, and that grew and built on their progress year after year.

### C. *Mark Patrick's Assumption of Control*

5.18    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.19    Mark Patrick, a tax attorney and employee of Mr. Dondero who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested to Mr. Scott and Mr. Dondero that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.  At the time, Patrick was an employee of Mr. Dondero's enterprises and was serving as Mr. Dondero's attorney and Mr. Dondero had no objection to Mr. Scott transferring the Control Position to Patrick. As a result of his attorney and employee status, Mr. Patrick owed significant fiduciary duties to Mr. Dondero's entities and to the Charitable DAF Fund structure—fiduciary duties that he has violated in a series of self-serving and self-dealing transactions.

5.20    On March 25, 2021, Mr. Scott resigned and appointed Patrick as director of DAF HoldCo, transferring all his management shares and membership interest to Patrick for nominal consideration. Patrick therefore assumed the Control Position from that date. Patrick then hired

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 11**

MR 0019

Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

5.21 At the time Patrick assumed the Control Position, he was employed at Skyview Partners, a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest. As an employee of Skyview, he owed fiduciary duties to his employer.

### D. *Patrick's Breaches of Fiduciary Duty*

5.22 In 2023, while still employed by Dondero entities, and as the sole fiduciary for the Charitable DAF Fund and DAF HoldCo, Patrick initiated a two-year pattern of malfeasance all culminating in his current effort to abscond with $270 million. His initial small infidelities quickly blossomed into a brazen, fraudulent play for the Charitable DAF Fund and its $270 million in holdings, putting at risk the charitable works supported by the Supporting Organizations.

### E. *Undisclosed Self-Dealing*

5.23 In June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity, which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

### F. *Attempted Fraudulent Kickback Scheme*

5.24 In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 12**

MR 0020

the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.25    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.26    Mr. Dondero ensured that Supporting Organizations were also informed about Patrick's kickback scheme. Despite significant concern, the Supporting Organizations had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

### G. *Insider Trading*

5.27    In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview to advise The Dallas Foundation to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

5.28    Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.29    Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

### H. *Financial Irregularities and Lack of Transparency*

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 13**

MR 0021

5.30    After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Supporting Organizations were essentially cut off from any view into the financial transactions and soundness of the fund. As of September 2024, the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Supporting Organizations and ultimately their supported Charities.

5.31    But a review of the Charitable DAF Fund's last accessible financial records showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.32    Despite repeated requests from the Supporting Organizations and their counsel and counsel for the Charitable DAF Fund, Patrick and Murphy have ignored and refused to provide requested financial information or explanations for these dramatic expenditure increases.

5.33    Patrick must have personally benefited from the dramatic increases in director's fees and, given Patrick's prior attempt to implement a kickback scheme through Mr. Cronin, the other remarkable increases in expenses raise deep concerns about potential self-dealing.

I.    *Patrick Ignores the Supporting Organizations Concerns*

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 14**

MR 0022

5.34    On November 11, 2024, given what the Supporting Organizations already knew, the three major Supporting Organizations drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[5]

5.35    The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."[6]

5.36    Patrick and Murphy never responded to the letter, other than a threat that if the Supporting Organizations did not withdraw it, then Patrick and Murphy would embark on an effort at the Internal Revenue Service to revoke the Supporting Organizations' charitable status.

5.37    In January 2025, the Supporting Organizations demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. Murphy responded via email to this request stating that he and Patrick would "present directly to the foundations/supporting organi[z]ations" to address some of the concerns in the No Confidence Letter. Murphy never did.[7]

---

[5] *See* Ex. 4-A, Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)
[6] *Id.*
[7] *See* Ex. 4-B, Email chain ending Jan. 23, 2025 (Appx. Pg. 171)

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 15**

MR 0023

5.38    Counsel for the Supporting Organizations and for the Charitable DAF Fund exchanged further communications, but Patrick, Murphy, and the Charitable DAF Fund's counsel never provided answers and information in response to the Supporting Organizations' basic requests. Instead, they wrapped all their future communications in half-truths and subterfuge.[8] At the same time, they offered the Supporting Organizations vague assurances that all their maneuvers were to improve the structure, focus, and performance of the fund, for the benefit of the Supporting Organizations.

5.39    The Charitable DAF Fund's counsel promised a meeting to address the Supporting Organizations' concerns, but after the Supporting Organizations' counsel suggested dates, the Charitable DAF Fund and its counsel delayed and delayed until it eventually went silent.[9]

5.40    In the interim, Patrick accelerated his multi-year fraud.

### J. *Dilution Scheme and Liquidation Maneuver*

5.41    Between December 2024 and the present, Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund, and alienate those same assets entirely away from them. The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets. In short, he stole them.

5.42    In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself in a brazen act of self-dealing. He never notified the Supporting Organizations of this massive

---

[8] *See* Exs. 4-A, Ltr. of Feb. 14, 2025 & Ex. 4-C Ltr. of Feb. 27, 2025 (Appx. Pg. 162-182).
[9] *See* Ex. 4-C, Email chain ending April 9, 2025 (Appx Pg. 179-182).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 16**

MR 0024

reorganization of the Charitable DAF Fund. Indeed, the Supporting Organizations found out about this monumental reorganization only when Patrick and his counsel had to admit it in a Cayman court as part of the Supporting Organization's successful effort to appoint Cayman Liquidators to unravel Patrick's fraud in that jurisdiction.

5.43    In a move that would make most fraudsters blanch, and certainly continued to violate all his fiduciary duties, on December 9, 2024, Patrick formed Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and its registered address was Patrick's home. Patrick then issued his charity a fifty-one percent (51%) interest in the charitable assets. In essence, Patrick awarded himself the ability to distribute over half of the Charitable DAF Fund's $270 million in economic interest to his own entity, from his living room in Dallas.

5.44    Three days later, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.45    In secret, and without notice to the Supporting Organizations, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100 percent of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100 percent of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick ensured a different and new entity (CDMCFAD) held Charitable DAF Fund.

5.46    Patrick's fraud continued to evolve in February 2025. On February 7, 2025, again without notice to the Supporting Organizations, DAF HoldCo (in an *ultra vires act)* allotted 318

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 17**

MR 0025

participating shares to DFWCF, the Sham Charity controlled by Patrick. This sham dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[10] interest was diluted from 1.639% to 0.80%. Said another way, Patrick absconded with over half of the participating interest of the Supporting Organizations and other charitable funds. Before, during, and after this action—and at all times it was contemplated and executed—Patrick and Charitable DAF HoldCo still owed fiduciary duties to the Supporting Organizations.

5.47    In February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Patrick's complete control of the assets of Charitable DAF Fund.

5.48    On March 27, 2025, Patrick caused CDMCFAD (the holder of $270 million in assets) to issue shares to the Sham Charity, *and only to the Sham Charity*. He issued no shares in CDMCFAD to the Supporting Organizations. His fraudulent scam was nearly complete. Now, Patrick's Sham Charity controlled all the direct economic interest in the entity Patrick had inserted between Charitable DAF HoldCo and the assets in Charitable DAF Fund, and the Supporting Organizations were left out in the cold.

5.49    On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6

---

[10] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**          **PAGE 18**

MR 0026

million, a ridiculous transaction bereft of reasonably equivalent value.[11] After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[12]

5.50    Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Patrick allegedly distributed a paltry portion of $1.6 million to the Supporting Organizations, receipt of those funds has yet to be verified. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Supporting Organizations' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Supporting Organizations.

### K.  *The Cayman Island Proceedings*

5.51    On April 2, 2025, again unbeknownst to the Supporting Organizations, Patrick placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.52    But the Supporting Organizations already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Supporting Organizations well-

---

[11] *See* Ex. 3, p. 5, Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[12] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, CaseNo. 19-34054-sgj-11; (Appx. Pg. 200).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 19**

MR 0027

founded concerns including their expression of no-confidence; (3) engaged in a pattern of fraudulent self-dealing; (4) taken all participating ownership from the Supporting Organizations without any approval or appropriate compensation; and (5) and restructured the underlying funds. This was enough to convince the Supporting Organizations to take action.

5.53    The Supporting Organizations filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Supporting Organizations would not have learned about Patrick's voluntary liquidation.

5.54    Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFWCF and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.55    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[13]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

---

[13] Ex. 8, Supervision Order (Appx. Pg. 244-246)

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 20**

MR 0028

6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.56    While the Cayman Islands-appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick, DFWCF, and CDMCFAD (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the Charitable DAF Fund and DAF HoldCo.  In the meantime, the rightful beneficial owners, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the Charitable DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that rely on funding from the Charitable DAF Fund.

## VI.    CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty Against Patrick,  CDH GP, Ltd., and Charitable DAF GP, LLC

6.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

6.2     In "a limited partnership, the general partner stands in the same fiduciary capacity to the limited  partners as a trustee stands to the beneficiaries of a trust." *Hughes v. St. David's Support Corp.,* 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (There "has never been any serious doubt that

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 21**

MR 0029

the general partner of a Delaware limited partnership owes fiduciary duties."). Likewise, under traditional principles of equity, and various statutes generally hold that a manager of an LLC would qualify as a fiduciary of that LLC and its members. *Auriga Capital Corp. v. Gatz Properties,* 40 A.3d 839, 850 (Del. Ch. 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. 2012), aff'd, 59 A.3d 1206 (Del. 2012); *Davis v. Crawford*, 700 S.W.3d 438, 449 (Tex. App.—Eastland 2024, no pet.) ("[T]he relationship between a managing member of an LLC and a nonmanaging member is similar to that of a general partner/limited partner relationship, and that such an arrangement thereby creates a fiduciary obligation on the part of the managing member.").

6.3     By virtue of Patrick's Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, Patrick owed fiduciary duties to the Plaintiffs.

6.4     Patrick breached his fiduciary duties to the Plaintiffs by stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.5     Patrick breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.6     Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 22**

MR 0030

6.7    Patrick breached his fiduciary duty by successfully soliciting a charitable contribution ultimately from a Supporting Organization to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.8    The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support. Plaintiffs have suffered damages as a result of Patrick's breach of his fiduciary duties.

## Count II - Constructive Fraud Against Patrick

6.9    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.10    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied). "[I]n a claim for constructive fraud, the actor's intent is irrelevant." *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 879 (Tex. App.—El Paso 2021, pet. denied). "[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

6.11    As a fiduciary, Patrick's conduct in diluting the Plaintiffs' interests, selling assets at below-market values to undisclosed parties, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.12    Patrick injured public interests by his conduct. Plaintiffs have suffered damages as a result of Patrick's fraud.

## Count III - Unjust Enrichment Against Patrick, CDMCFAD, and DFWCF

6.13    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 23**

MR 0031

6.14    A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.15    Patrick and DFWCF stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.16    Patrick and DFWCF took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with DFWCF.

6.17    Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.18    Patrick and DFWCF have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damages by Patrick's unjust enrichment.

### Count IV – Conversion Against Patrick, CDMCFAD, and DFWCF

6.19    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.20    Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused the plaintiff's demand for return of the property. *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 24**

MR 0032

6.21     The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.22     Patrick with DFWCF has unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFWCF.

6.23     The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which Patrick and now, DFWCF, have ignored and refused. Plaintiffs have been damages as a result of these conversions.

**Count V – Imposition of Constructive Trust Against Patrick, CDMCFAD, and DFWCF**

6.24     Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.25     "A constructive trust is considered a legal fiction and is a creation of equity to prevent a wrongdoer from profiting from his wrongful acts." *In re Harding*, 563 S.W.3d 366, 372 (Tex. App.—Texarkana 2018, no pet.). "[T]o obtain a constructive trust, [a party] must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Id.* (cleaned up).

6.26     Patrick through DFWCF has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of DFWCF and Patrick.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 25**

MR 0033

6.27    All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

## VII.    EMERGENCY APPLICATION FOR RECEIVERSHIP

7.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

7.2    The Plaintiffs seek the immediate appointment of a receiver over Defendants DFWCF and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code §§ 64.001(a)(3), (7), Texas Business and Organizations Code § 11.410, and the Court's inherent equitable powers.

### A. *Texas Civil Practice & Remedies Code*

7.3    [U]nder section 64.001 of the Texas Civil Practice and Remedies Code ("**CPRC**"), a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," CPRC §§ 64.001(a)(3) or "in any case in which a receiver may be appointed under the rules of equity." CPRC §§ 64.001(a)(7); *Elliott v. Weatherman*, 396 S.W.3d 224, 228 (Tex. App.—Austin 2013, no pet.).

7.4    A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. CPRC § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5    A probable interest exists by statute in actions between partners and in actions between joint owners of property. CPRC § 64.001(a)(3).

7.6    One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM*

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**          **PAGE 26**

MR 0034

*Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App. – Dallas 2024, pet. denied, reh'g denied).

## B. *Texas Business and Organizations Code*

7.7     Like CPRC § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." Tex. Bus. & Orgs. Code § 11.403(a)(3).

7.8     Additionally, under Section 11.410 of the Texas Business and Organizations Code ("TBOC"), a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. TBOC § 11.410(a).

## C. *Rules of Equity*

7.9     In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. The CPRC, § 64.004 makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision.

## D. *Receivership Standards Under Texas Law and Equity*

7.10     "The appointment of a receiver lies within the sound discretion of the trial court." *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). "The appointment of a receiver, either as authorized by statute or usages of equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *O & G Carriers, Inc. v. Smith Energy 1986-A P'ship*, 826 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1992, no writ).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 27**

MR 0035

7.11    The party submitting an application for appointment of a receiver bears the burden of proof to present evidence justifying the appointment. *Furgerson v. First Nat'l Bank*, 218 S.W.2d 1019, 1020 (Tex. Civ. App. – Texarkana 1949, no writ). The party can meet that burden by submitting a sworn verification supporting the claimed grounds for the appointment, *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App. – Corpus Christi 1999, no pet.), and a court may consider oral testimony as evidence in support of an application. *See Furgerson*, 218 S.W.2d at 1020.

7.12    An application seeking a receivership pursuant to a statutory provision must allege facts that meet the elements of the provision. *Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 748 (Tex. Civ. App. – Corpus Christi 1970, no writ). The facts alleged in the application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.], no writ).

7.13    Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

E.  ***The Supporting Organizations are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities***

7.14    The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.15    Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.16    Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure. The Plaintiffs have not received any

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 28**

MR 0036

just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17 Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.18 Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.19 The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.20 The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.21 The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.22 The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 29**

MR 0037

the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.23     Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

**Count VI – APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP**

8.1.     Plaintiffs seek immediate injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund as of the instant date of this filing, regardless of where they are presently held.  If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.2.     A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code § 65.011.  "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties.'" *Lometa Bancshares, Inc. v. Potts*, 952 S.W.2d 631, 633 (Tex. App.-Austin 1997) (*quoting Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966)). "In cases like the present, an applicant for the writ must show (1) a probable right to

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                              **PAGE 30**

MR 0038

recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued." *Lometa*, 952 S.W.2d at 633 (citing Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West 1997); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968)).

8.3. Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending. In other words, "the adequacy of an available legal remedy must be judged in the circumstances of the particular case[,]" and "[i]n such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety[.]" *Lometa*, 952 S.W.2d at 633; *see also Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters.*, 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.4. The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.5. Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**      **PAGE 31**

MR 0039

limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.6.    Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Restraining Order ("**TRO**") is not granted against the Defendants. Accordingly, Plaintiffs request the Court issue a TRO that freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.7.    The harm to Plaintiffs is imminent, and if the Court does not issue a TRO and injunctive relief, it will be irreparably injured, as set forth herein. Conversely, the granting of a TRO will merely require Defendants to refrain from doing anything with the funds for two weeks. If the Defendants prevail on the merits, the funds will still be available to them for their use in future.  The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent immediate injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.8.    The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants due to the entry of a TRO, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                **PAGE 32**

MR 0040

scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

8.9.    A temporary restraining order is necessary to maintain the *status quo* during the pendency of this action. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("defining the status quo as "the last, actual, peaceable, non-contested status which preceded the pending controversy.") The facts above establish the required elements for Plaintiffs to obtain a TRO against Defendant, specifically: (1) a cause of action against Defendants with a probable right to relief; (2) a probable, imminent, and irreparable injury to Plaintiffs in the interim; (3) the threatened injury outweighs any damage the injunction might cause the opposing party; and (4) the injunction will not disserve the public interest. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198. 204 (Tex. 2002).

**A.    *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10.    Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 597 (Tex. App.— Amarillo 1995, no writ). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58; *see also Gryphon Master Fund, L.P. v. Path 1 Network Technologies, Inc.*, No. 3:06 CV 0107 D, 2007 WL 1723703, at *5 (N.D. Tex., Jun. 14, 2007) (citing *Metcalfe*).

8.11.    Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 33**

MR 0041

above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that forms the lifeblood of vital philanthropic efforts relied upon by key communities across the nation. The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B. *Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12. Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above. Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *Lometa*, 952 S.W.2d at 633; see also *Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters*., 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.13. Plaintiffs have no adequate remedy at law. Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds. These losses, as well as others which will inevitably occur if Defendants are not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**          **PAGE 34**

MR 0042

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seeks a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

## VIII.   PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A.   Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B.   Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C.   Require the reversal of the dilution scheme and unauthorized asset transfers;

D.   Impose a constructive trust over the res of DAF HoldCo, CDMCFAD, LLC and the Charitable DAF Fund wrongfully taken from the Plaintiffs;

E.   Award actual damages in an amount to be proven at trial;

F.   Award exemplary damages as permitted by law;

G.   Award attorneys' fees and costs;

H.   Grant such other and further relief as the Court deems just and proper.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 35**

MR 0043

Respectfully submitted,

**McCarty Law PLLC**

*/s/ Darren L. McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street
Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, July 1, 2025, on all counsel or parties of record.

*/s/ Darren L. McCarty*
Darren L. McCarty

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 36**

MR 0044

## VERIFICATION

I, Julie Diaz, Vice President of Highland Dallas Foundation, Inc., and President of The Dallas Foundation, have read the above and foregoing Petition and the facts stated therein are true and correct to the best of my knowledge and belief.

_Julie Diaz_
Julie Diaz

My name is Julie Diaz, my date of birth is _3/23/64_, and my address is _5711 Prestwick Lane_. I declare under penalty of perjury that the foregoing is true and correct. _Dallas_

Executed in _Barnstable_ County, State of _MA_, on the _1_ day of _July_, 2025

_Julie Diaz_
Julie Diaz

## The Business Court of Texas,
## First Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § § § § § | |
| *Plaintiffs*, | § § § | Cause No. _____ |
| v. | § § § | |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | § § § § § § § § | |
| *Defendants*. | § § | |

## Table of Contents—Exhibits

| Exhibit | Document | Appx. Page Nos. |
|---|---|---|
| Exhibit 1-A | DFW Charitable Foundation Formation Documents (12/9/2024) | 40-42 |
| Exhibit 1-B | CDMCFAD, LLC Formation Documents (12/12/2024) | 43 |
| Exhibit 1-C | CDH GP, Ltd. Formation Documents | 44-45 |
| Exhibit 2-A | Nov. 7, 2011, Amended and Restated Exempted Limited Partnership Agreement | 46-66 |

| Exhibit 2-B | Jan. 19, 2025, Amended and Restated Memorandum and Articles of Association | 67-96 |
|---|---|---|
| Exhibit 3 | Sykes Affidavit Exhibit GS-I | 97-161 |
| Exhibit 4-A | Nov. 11, 2024, No Confidence Letter | 162-163 |
| Exhibit 4-B | Jan. 23-Feb. 7, 2025, Emails Julie Diaz, Mark Partick, Paul Murphy, and Michael Stockham | 164-177 |
| Exhibit 4-C | Feb 14-April 3, 2025, Letters and Emails between David Rosenberg, Paul Murphy, Michael Stockham, and Douglas Mancino | 178-182 |
| Exhibit 5 | Hearing Transcript (Patrick Testimony) | 183-209 |
| Exhibit 6 | Dondero Declaration | 210-221 |
| Exhibit 7 | Diaz Declaration | 222-243 |
| Exhibit 8 | Supervision Order | 244-246 |

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937



## CERTIFICATE OF INCORPORATION
### OF
## DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

### I.

The name of the Corporation is DFW Charitable Foundation.

### II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

### III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

### IV.

A.      The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person.  It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B.      In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

### V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

### VI.

A.      No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

315132803v.2

B.     Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

## VII.

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person.  Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

## VIII.

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

## IX.

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

2

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

     **IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

315132803v.2



**CERTIFICATE OF FORMATION**

**OF**

**CDMCFAD, LLC**

This Certificate of Formation of CDMCFAD, LLC (the "Company"), is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del. C.* § 18-101 *et seq.*) (the "Act").

1. <u>Name</u>. The name of the limited liability company formed hereby is CDMCFAD, LLC.

2. <u>Registered Office</u>. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

3. <u>Registered Agent</u>. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation in accordance with the Act.

Name: Mark Patrick
Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:33 AM 12/12/2024
FILED 11:33 AM 12/12/2024
SR 20244471736 - File Number 10035168


EXHIBIT
1-C



# Search Report

| | |
|---|---|
| **Entity Name :** | CDH GP, Ltd. |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 407515 |
| **Registration Date :** | 27th February 2024 |
| **Entity Type :** | EXEMPT |
| **Registered Office :** | CAMPBELLS CORPORATE SERVICES LIMITED |
| | Floor 4 |
| | Willow House, Cricket Square |
| | Grand Cayman  KY1-9010 |
| | Cayman Islands |
| **Initial Subscriber:** | |
| **Authorised Share Capital:** | CI$41,000.00 |
| **Nature of Business:** | General Partner |
| **Financial Year End:** | 31st December |

| | |
|---|---|
| **Status :** | ACTIVE |
| **Status Date :** | 27th February 2024 |

- INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE NOT AVAILABLE FOR PUBLIC INSPECTION

- THIS REPORT DOES NOT CONFIRM THE ENTITY IS IN GOOD STANDING

Authorisation Code : 379989138381
www.verify.gov.ky
10 February 2025

# Director Details

Entity Name: **CDH GP, LTD.**

**Director Name**

Mark E. Patrick



**DATED NOVEMBER 7, 2011**

**AMENDED AND RESTATED**

**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF**

**CHARITABLE DAF FUND, LP**

**WARNING**

**THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY**

**TABLE OF CONTENTS**

PAGE

ARTICLE I      GENERAL PROVISIONS; COMPENSATION AND EXPENSES..................2
     1.1      Continuation..............................................................................................2
     1.2      Name ........................................................................................................2
     1.3      Purpose and Powers .................................................................................2
     1.4      Registered Office .....................................................................................2
     1.5      Partners....................................................................................................2
     1.6      Powers. ....................................................................................................2
     1.7      Term ........................................................................................................3
     1.8      Admission of New Partners .....................................................................3
     1.9      Taxable Year ...........................................................................................3
     1.10      Liability of Partners.................................................................................3
     1.11      Limitation on Assignability of Partners' Interests. ................................3
     1.12      Definitions...............................................................................................4
     1.13      Service Providers ....................................................................................4
     1.14      Partnership Expenses ..............................................................................4
     1.15      Withdrawal of Initial Limited Partner....................................................5

ARTICLE II      POWERS .......................................................................................................5
     2.1      Partnership Powers...................................................................................5
     2.2      Rights, Powers, Limitations on Liability and Indemnification of General
             Partner. ....................................................................................................6

ARTICLE III      CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES........9
     3.1      Capital Contributions. .............................................................................9
     3.2      Capital Account; Allocation of Profits and Losses.................................9

ARTICLE IV      LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL
             WITHDRAWALS FROM CAPITAL ACCOUNT.........................................9
     4.1      Legal Interest...........................................................................................9
     4.2      Distributions..........................................................................................10
     4.3      Withdrawal ............................................................................................10

ARTICLE V      DURATION OF PARTNERSHIP..............................................................10
     5.1      Termination............................................................................................10
     5.2      Winding Up............................................................................................11

ARTICLE VI      MISCELLANEOUS ....................................................................................11
     6.1      Tax Matters Partner...............................................................................11
     6.2      Right to Hire...........................................................................................11
     6.3      Applicable Law, etc ...............................................................................12
     6.4      Power of Attorney .................................................................................12
     6.5      Tax Elections Under the Internal Revenue Code...................................12
     6.6      Amendments to Partnership Agreement ................................................12

i

6.7      Investment Representation ..................................................................13
6.8      Notices .................................................................................................13
6.9      General Partner Determinations ..........................................................14
6.10    Dispute Resolution ..............................................................................14
6.11    Successors and Assigns .......................................................................16
6.12    Severability .........................................................................................16
6.13    No Third Party Rights .........................................................................16
6.14    No Right to Partition ...........................................................................16

ii

# AMENDED AND RESTATED
# EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
# CHARITABLE DAF FUND, LP

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1)     Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2)     Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3)     Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4)     Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I
## GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1  Continuation.  The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2  Name.  The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3  Purpose and Powers.  The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments.  At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4  Registered Office.  The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5  Partners.  The name and addresses of the Partners are as follows:

| Name | Address |
|---|---|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6  Powers.

(a)  Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and

2

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b)     Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7     <u>Term</u>. The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8     <u>Admission of New Partners</u>. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9     <u>Taxable Year</u>. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10    <u>Liability of Partners</u>.

(a)     The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b)     Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11    <u>Limitation on Assignability of Partners' Interests</u>.

(a)     A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

<div align="center">3</div>

(b)     The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners.  Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12    Definitions.  For the purpose of this Agreement, unless the context otherwise requires:

(a)     General Partner.  The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement.  The General Partner shall give each Limited Partner notice of any change in control of the General Partner.  The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b)     Indirect Charitable Owners.  The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c)     Limited Partner.  The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d)     Partner.  The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13    Service Providers.  The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14    Partnership Expenses.  The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses.  In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses.  The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

4

MR 0060

1.15 <u>Withdrawal of Initial Limited Partner</u>. The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

## ARTICLE II
## POWERS

2.1 <u>Partnership Powers</u>. The Partnership shall have the following powers:

(a) To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

5

(b)     To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c)     To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d)     To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e)     To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f)     To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g)     To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2     <u>Rights, Powers, Limitations on Liability and Indemnification of General Partner</u>.

(a)     Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b)     To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the

6

MR 0062

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)     Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)     To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).   The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f)     The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

7

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred.  In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.  No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i)     **WAIVER OF CONSUMER RIGHTS:  The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person.  Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k)     This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

8

# ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1    Capital Contributions.

(a)    Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2    Capital Account; Allocation of Profits and Losses.

(a)    There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(b)    Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(c)    For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(d)    To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(e)    Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

# ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT

4.1    Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

9

MR 0065

4.2     Distributions.

    (a)     Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

    (b)     The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

        For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3     Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

**ARTICLE V**
**DURATION OF PARTNERSHIP**

5.1     Termination. The Partnership shall be required to be wound up and dissolved upon:

    (a)     the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

10

(b)     the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c)     the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2     <u>Winding Up</u>.  Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law.  Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement.  The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

## ARTICLE VI
## MISCELLANEOUS

6.1     <u>Tax Matters Partner</u>.  The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership.  In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith.  All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2     <u>Right to Hire</u>.

(a)     Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b)     Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

11

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c)     The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3     Applicable Law, etc.  This Limited Partnership Agreement:  (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require.  The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4     Power of Attorney.  Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.  This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5     Tax Elections Under the Internal Revenue Code.  The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6     Amendments to Partnership Agreement.  The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect

12

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect:  a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7     Investment Representation.  Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8     Notices.  All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI.  Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

13

MR 0069

6.9    General Partner Determinations.   Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10   Dispute Resolution.  The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person.  If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    Mediation.

(1)    Any Dispute shall be submitted to mediation by written notice to the other party or parties.  In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.  The mediator will be selected by agreement of the parties.  If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2)    The mediation will be conducted as specified by the mediator and agreed upon by the parties.  The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3)    The mediation will be treated as a settlement discussion and therefore will be confidential.  The mediator may not testify for either party in any later proceeding relating to the dispute.  No recording or transcript shall be made of the mediation proceedings.

(4)    Each party will bear its own costs in the mediation.  The fees and expenses of the mediator will be shared equally by the parties.

(b)    Arbitration.  If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.  A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed.  Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein.   The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**").  In the event of a conflict, the provisions of this document will control.

(1)    The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

14

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The

15

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5) All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6) The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11 <u>Successors and Assigns</u>. Subject to the limitations set forth in <u>Section 1.11</u>, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12 <u>Severability</u>. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13 <u>No Third Party Rights</u>. Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14 <u>No Right to Partition</u>. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

16

## SIGNATURE PAGE FOR AMENDED AND RESTATED
## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
## CHARITABLE DAF FUND, LP

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____

     James D. Dondero

     Managing Member

Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: _____

     Name: Grant Scott

     Title: Director

Witnessed By: _____

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: _____

     Name:

     Title:

Witnessed by: _____

MR 0073

## SIGNATURE PAGE FOR AMENDED AND RESTATED
## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
## CHARITABLE DAF FUND, LP

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____
    James D. Dondero
    Managing Member

Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: _____
    Name: Grant Scott
    Title: Director

Witnessed By: _Candi L. Riggs_
    Candi L. Riggs

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: _____
    Name: ROD PALMER
    Title:

Witnessed by: _Graeme O Clay_



THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

 WALKERS

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100   F +1 345 949 7886   www.walkersglobal.com

**REF: SSJ/VT/H0851-120776**



AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

### (ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



1

AMER_Docs  11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

# TABLE OF CONTENTS

| CLAUSE | PAGE |
| --- | --- |

TABLE A ........................................................................................................................ 1

INTERPRETATION .......................................................................................................... 1

PRELIMINARY ................................................................................................................. 4

SHARES .......................................................................................................................... 4

MANAGEMENT SHARES ................................................................................................ 5

PARTICIPATING SHARES .............................................................................................. 6

MODIFICATION OF RIGHTS .......................................................................................... 6

CERTIFICATES ............................................................................................................... 7

FRACTIONAL SHARES ................................................................................................... 7

TRANSFER OF SHARES ................................................................................................ 7

TRANSMISSION OF SHARES ........................................................................................ 7

ALTERATION OF SHARE CAPITAL ............................................................................... 8

REDEMPTION, PURCHASE AND SURRENDER OF SHARES ...................................... 8

TREASURY SHARES ...................................................................................................... 9

GENERAL MEETINGS .................................................................................................... 9

NOTICE OF GENERAL MEETINGS .............................................................................. 10

PROCEEDINGS AT GENERAL MEETINGS ................................................................. 10

VOTES OF SHAREHOLDERS ...................................................................................... 11

CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS .......................... 12

DIRECTORS .................................................................................................................. 12

ALTERNATE DIRECTOR .............................................................................................. 13

POWERS AND DUTIES OF DIRECTORS ..................................................................... 13

BORROWING POWERS OF DIRECTORS .................................................................... 15



AMER_Docs  11255406.3 H0851.120776

i

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

THE SEAL .......................................................................................................................... 15

DISQUALIFICATION OF DIRECTORS........................................................................... 15

PROCEEDINGS OF DIRECTORS.................................................................................. 16

DIVIDENDS ....................................................................................................................... 18

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION........................ 18

CAPITALISATION OF RESERVES ................................................................................ 19

SHARE PREMIUM ACCOUNT ....................................................................................... 20

NOTICES............................................................................................................................ 20

NON-RECOGNITION OF TRUSTS ................................................................................ 21

WINDING UP..................................................................................................................... 21

AMENDMENT OF ARTICLES OF ASSOCIATION...................................................... 22

CLOSING OF REGISTER OR FIXING RECORD DATE ............................................. 22

REGISTRATION BY WAY OF CONTINUATION .......................................................... 22

MERGERS AND CONSOLIDATION............................................................................... 22

DISCLOSURE ................................................................................................................... 23

INDEMNITY ....................................................................................................................... 23

DISPUTE RESOLUTION................................................................................................. 24



AMER_Docs   11255406.3 H0851.120776

ii

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

### (ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

### TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

### INTERPRETATION

1.  In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

    "**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

    "**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

    "**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

    "**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

    "**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

    "**Law**" means the Companies Law (as amended) of the Cayman Islands.

    "**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Law and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

    "**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.



AMER_Docs 11255406.3 H0851.120776

1

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a)     passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Law and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "**Participating Shares**" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require.  For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Restricted Person**" means any Person holding Participating Shares:

(a)     in breach of the law or requirements of any country or governmental authority;

(b)     that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the US Internal Revenue Code of 1986, as amended (the "**Code**") or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)     in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.



AMER_Docs   11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

Appendix Page 72

MR 0080

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)     passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)     words importing the singular number shall include the plural number and vice versa;

(b)     words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)     the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)     reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)     reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;



AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

2.     Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

3.     The business of the Company may be commenced at any time after incorporation.

4.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.     The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

## SHARES

7.     Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)     issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)     grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8.     The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions,



AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MANAGEMENT SHARES

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

12. Any Management Shares held by Grant Scott will be automatically redeemed by the Company upon his death or upon the Company receiving written notice from two board certified physicians confirming that he is of unsound mind or otherwise incapacitated ("**Automatic Redemption**").

13. If at the time of an Automatic Redemption, Grant Scott is the sole Director of the Company, such office will be automatically vacated by Grant Scott.

14. Upon an Automatic Redemption, the Company shall issue 100 Management Shares to a successor management shareholder ("**Successor Management Shareholder**") designated by James Dondero ("**Designator**"), or, if he is unable or declines to act, by an individual or individuals designated by James Dondero ("**Successor Designator**"), in either case within 15 days of the Automatic Redemption. If the Designator is:

    (a) deceased and has not named a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made in accordance with the provisions of the Designator's will, or if his will contains no such provisions, by the qualified personal representative of his estate (the "**Designator's Personal Representative**"); or

    (b) otherwise incapacitated and has not previously designated a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made by the Designator's attorney-in-fact appointed for such purpose, under a valid, effective power of attorney instrument (the "**Designator's Attorney**").

15. Any designation of a Successor Management Shareholder must be notified to the Company in writing and signed by either the Designator, the Successor Designator, the Designator's Personal Representative, or the Designator's Attorney, as appropriate, and accompanied by a consent to become a Shareholder signed by the Successor Management Shareholder ("**Issue Notice**"). The issue of the 100 Management Shares to the Successor Management Shareholder shall take effect upon receipt by the Company of the Issue Notice and the Register will be updated accordingly.



5

AMER_Docs   11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

16. The Designator may name a Successor Designator (including an individual, or a series of individuals) at any time pursuant to a written notice delivered to the Company during his lifetime or by a provision in his will. Each Successor Designator upon succeeding and replacing the Designator or a prior Successor Designator, may in the same manner as set out above, designate an individual, or a series of individuals, to succeed him as Successor Designator. In the event of a conflict between such instruments, the one bearing the latest date shall control. A Successor Designator will assume such office upon consenting to so act.

17. The Successor Management Shareholder may not be a "disqualified person" (as that term is defined in Section 4946 of the United States Internal Revenue Code of 1986, as amended), other than a foundation manager, with respect to Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., or Highland Kansas City Foundation, Inc.

18. In connection with the appointment of the Successor Management Shareholder, the Company and its registered office service provider will be entitled to rely on the advice of counsel confirming that the designation of the Successor Management Shareholder has been made in accordance with the procedures set out in these Articles.

## PARTICIPATING SHARES

19. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

20. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

21. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.



AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

## CERTIFICATES

22. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

23. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## TRANSFER OF SHARES

24. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

25. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

26. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

27. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

28. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

29. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

30. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person

7

AMER_Docs 11255406.3 H0851.120776



*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

31.     A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

32.     The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

33.     The Company may by Ordinary Resolution:

    (a)     consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

    (b)     convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

    (c)     subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

    (d)     cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

34.     The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

35.     Subject to the Law, the Company may:

    (a)     issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

    (b)     purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

    (c)     make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

    (d)     accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.



8

AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

36. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

37. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

38. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## TREASURY SHARES

39. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

40. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

41. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

    (a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

    (b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

42. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

43. The Directors may, whenever they think fit, convene a general meeting of the Company.

44. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

45. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the

9

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

46. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

47. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

48. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

49. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

50. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

51. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

52. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.



10

AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

53. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

54. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

55. The chairman may adjourn a meeting from time to time and from place to place either:

   (a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

   (b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

      (i) secure the orderly conduct or proceedings of the meeting; or

      (ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

   but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

56. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

57. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

58. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

59. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

60. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of



11

AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

61. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

62. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

63. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

64. On a poll votes may be given either personally or by proxy.

65. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

66. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

67. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

68. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

69. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

### CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

70. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

### DIRECTORS

71. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.



12

AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

72. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

73. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

74. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

75. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

76. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

77. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

78. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

79. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

80. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.



13

AMER_Docs 11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

81. The Directors may from time to time appoint any natural person or corporation, whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

82. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

83. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

84. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

85. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

86. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

87. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.



14

AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

88. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

89. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

90. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

91. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

92. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

93. The office of Director shall be vacated, if the Director:

    (a)    becomes bankrupt or makes any arrangement or composition with his creditors;

    (b)    dies or is found to be or becomes of unsound mind;

    (c)    resigns his office by notice in writing to the Company;

    (d)    is removed from office by Ordinary Resolution;

    (e)    is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

AMER_Docs   11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

(f)     is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

94.     The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit.  Questions arising at any meeting shall be decided by a majority of votes.  In case of an equality of votes the chairman shall have a second or casting vote.  A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

95.     A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

96.     The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one.  A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

97.     A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors.  A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made.  A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

98.     A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established.  A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

99.     Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.



16

AMER_Docs   11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

100. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

    (a)    all appointments of officers made by the Directors;

    (b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

    (c)    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

101. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

102. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

103. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

104. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

105. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

106. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

107. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

AMER_Docs  11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

## DIVIDENDS

108.    Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

109.    Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

110.    The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

111.    Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

112.    The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

113.    Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

114.    If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

115.    No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

116.    The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

117.    The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

118.    The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not



18

AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

119. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

120. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

121. Subject to the Law and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares,



19

AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

122. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

123. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

124. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

125. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

126. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.



AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

127. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

128. Notice of every general meeting of the Company shall be given to:

   (a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

   (b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

   No other Person shall be entitled to receive notices of general meetings.

## NON-RECOGNITION OF TRUSTS

129. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

130. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

   (a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

   (b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such

AMER_Docs 11255406.3 H0851.120776



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

133. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

134. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

135. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

136. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

137. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

138. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.



22

AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

## DISCLOSURE

139. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

## INDEMNITY

140. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or Gross Negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

141. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

142. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

143. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



23

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

144. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

145. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

    (a)    Mediation:

        (i)    any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

        (ii)    the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

        (iii)    the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

        (iv)    each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

    (b)    Arbitration:

if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in these Articles and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

        (i)    the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any



24

AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST

Filed: 04-Feb-2015 09:13 EST

issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a



25

AMER_Docs 11255406.3 H0851.120776

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)    the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.



26

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*

Appendix Page 96

MR 0104



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO:   FSD 99 OF 2025 (JAJ)

IN THE MATTER OF:   SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF:   CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)

BETWEEN   (1) THE HIGHLAND DALLAS FOUNDATION, INC.

(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.

(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.

(4) THE HCMLP CHARITABLE FUND

**PLAINTIFFS**

and

CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)

**DEFENDANT**

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

Fiona MacAdam
Notary Public in and for the Cayman Islands
My commission expires January 31, 20 26

Date: 27 April 2025 .

_____

NOTARY PUBLIC



36068395.1.C8689.187150



# JOHNSTONE
## LAW

24 April 2025

Charitable DAF HoldCo Ltd
c/o Campbells Corporate Services Limited
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

Dear Sir or Madam

**In the matter of Charitable DAF HoldCo Ltd | FSD No. 99 of 2025 | Service of Documents**

We act for the participating shareholders of the Charitable DAF HoldCo Ltd (*Company*), namely: (i) Highland Dallas Foundation, Inc., (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) HCMLP Charitable Fund (*Supporting Organisations*) which presented a winding up petition in relation to the Company (*Petition*), and a summons dated 10 April 2025 (*Summons*).

The Summons is listed for hearing before Justice Asif at 2pm on 28 April 2025.

Please find enclosed by way of service copies of the following:

1.      The Petition (including Notice of Hearing)
2.      The Summons
3.      Affirmation of Julie Diaz and Exhibit JD-1
4.      Affirmation of James Dondero and Exhibit JDD-1
5.      Consent to act of Margot MacInnis and Exhibit MM-1
6.      Consent to act of Sandipan Bhowmik and Exhibit SB-1

*Acknowledgment of Service*

I _____ am duly authorised to accept service of the enclosed documents, which were served at _____ pm on 24 April 2025.

_____
**Signed**

If you have any questions in relation to the above, please contact our office.

Yours faithfully

*Johnstone Law*

**Johnstone Law**

Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman
PO Box 926, 10 Market St, Grand Cayman, KY1-9006
345 929 3000 | info@j-law.ky | www.j-law.ky | LinkedIn
Appendix Page 98

MR 0106



25 April 2025                                                   Our Ref: PP/PA/187150

Johnstone Law
10 Market Street, PO Box 926
Grand Cayman KY1-9006

Dear Mr Johnstone

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

1.      We act as Cayman Islands counsel to the Company.

2.      We refer to the documents served yesterday by your firm on the Company at its registered office, which include a winding up petition ("**Petition**"), an application for the appointment of provisional liquidators ("**PL Application**"), and a cover letter of service ("**Service Letter**").

**The Company is already in Voluntary Liquidation**

3.      Please note the following (all documents enclosed):

   (a)    On 29 March 2025, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd executed a consent to act as joint voluntary liquidators of the Company ("**JVLs**").

   (b)    On 2 April 2025: (i) the directors of the Company executed written resolutions including to recommend to the management shareholder that the Company be wound up voluntarily and the JVLs be appointed; (ii) the management shareholder executed special resolutions that the Company be wound up voluntarily and the JVLs be appointed; and (iii) the directors of the Company executed a declaration of solvency.

   (c)    On 14 April 2025, Gazette Issue No. 8/2025 was published, which included notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the JVLs appointed.

4.      Further, please see enclosed:

   (a)    The current Memorandum and Articles of the Company, dated 20 February 2025 ("**M&A**").

(b) The current Register of Members of the Company, dated 25 April 2025.

(c) An email chain between your firm and our firm dated 23-24 April 2025.

5. As outlined above, the Company is in Voluntary Liquidation.

6. That fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice referred to at paragraph 3(c) above.

7. Further, the email chain referred to at paragraph 4(c) above is all that we received from your firm by way of pre-action correspondence. We enquired as to the nature of the proceedings to be served, and had we been informed that it was a winding up petition and application for the appointment of provisional liquidators (rather than simply that the proceedings were in the process of being served on the Company's registered office), we would have informed you that the Company was already in Voluntary Liquidation.

8. There is nothing in the M&A which entitles your clients to receive notice from the Company of its entry into Voluntary Liquidation.

**The appropriate course of action**

9. As the Company is already in Voluntary Liquidation, the Petition and PL Application are plainly redundant, and we invite your clients to withdraw them without delay.

10. If the JVLs (or your clients) consider it appropriate that the Voluntary Liquidation be brought under the supervision of the court, any of them may make an application for a supervision order pursuant to the Companies Act section 131. If your clients would like to discuss such an application with the JVLs, including in respect of funding, please let us know.

11. In the event that the Petition and PL Application are not withdrawn, or at the very least the hearing of the PL Application (which we understand from your firm's Service Letter is listed on Monday 28 April 2025 at 2pm) is not adjourned, this letter must be brought to the attention of the Court, and we will appear on behalf of the Company.

12. If it becomes appropriate to do so, we will put this letter before the Court including on the question of costs.

Yours faithfully

*Walkers (Cayman) LLP*

**WALKERS (CAYMAN) LLP**

Direct Tel: +1 345 914 6365
Email: Barnaby.Gowrie@walkersglobal.com

**THE COMPANIES ACT (AS AMENDED)**

**JOINT VOLUNTARY LIQUIDATORS' CONSENT TO ACT**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

To:     The Registrar of Companies

**TAKE NOTICE** that we, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, hereby consent to act as Joint Voluntary Liquidators of the above-named Company with effect from the commencement of the liquidation.

**DATED** this 29th day of March, 2025.

_____

**Mitchell Mansfield**
**Joint Voluntary Liquidator**

E: mitchell.mansfield@kroll.com
T: +1 345 743 8805

_____

**William Clarke**
**Joint Voluntary Liquidator**

E: will.clarke@kroll.com
T: +1 345 623 9905

## CHARITABLE DAF HOLDCO, LTD.
## (THE "COMPANY")

## WRITTEN RESOLUTIONS OF THE
## DIRECTORS OF THE COMPANY DATED 2 APRIL 2025

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025), unless the context otherwise requires.

The undersigned, being all the Directors of the Company for the time being, hereby take the following actions and adopt the following resolutions.

1.      **VOLUNTARY LIQUIDATION**

1.1      **IT IS NOTED** that:

(a)      the Company's sole investment, being 100% of the limited liability company interests in CDMCFAD, LLC, a Delaware limited liability company, was redeemed on 27 March 2025 (the "**CDMCFAD Redemption**");

(b)      proceeds lawfully available for distribution from the CDMCFAD Redemption in the amount of $1,612,192 were distributed to holders of Participating Shares of the Company by way of a cash dividend paid on April 2;

(c)      the Company will not be engaging in any further business or investment activity and the operations of the Company have been fully wound down;

(d)      the Company has no assets and no liabilities;

(e)      in the circumstances, there is no reason for the Company to continue as a going concern and the Directors are of the view that the Company should therefore be wound up voluntarily;

(f)      Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands have indicated that they consent to act as joint voluntary liquidators of the Company (the "**JVLs**") if so appointed;

(g)      the Directors have received and reviewed a liquidation proposal from the JVLs, together with its terms and conditions (the "**Liquidation Proposal**");

(h)      the Directors have conducted a full enquiry into the Company's affairs and to the best of the Directors' knowledge and belief the Company will be able to pay its debts in full together with interest at the prescribed rate within twelve-month period from the commencement of the voluntary winding up; and

(i)      the Directors have received a form of the declaration of solvency for execution pursuant to section 124 of the Companies Act (as amended) (the "**Declaration of Solvency**").

1.2 **IT IS RESOLVED** that:

    (a)    the Liquidation Proposal be approved;

    (b)    the Directors recommend to Mark Patrick, being the only Shareholder having the right to receive notice of, attend, speak at and vote at general meetings of the Company, that:

        (i)    the Company be wound up voluntarily; and

        (ii)    Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company; and

    (c)    if the Company is wound up voluntarily, each Director execute the Declaration of Solvency.

## 2. GENERAL AUTHORISATION

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively), and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

## 3. RATIFICATION OF PRIOR ACTIONS

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

_____
Mark Patrick
**Director**

_____
Paul Murphy
**Director**

2

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE VOTING SHAREHOLDER
OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025) (the "**Articles**"), unless the context otherwise requires.

The undersigned, being the only Shareholder of the Company having the right to receive notice of, attend, speak at and vote at general meetings and having considered the written resolutions of the Directors dated 2 April 2025 which state that the Directors recommend that the Company be wound up voluntarily and that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands be appointed as the joint voluntary liquidators of the Company (the "**JVLs**"), hereby consents to the following actions and adopts the resolutions set out below.

1. **VOLUNTARY LIQUIDATION**

1.1 **IT IS RESOLVED BY SPECIAL RESOLUTION** that:

(a) the Company be wound up voluntarily; and

(b) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company.

1.2 **IT IS RESOLVED BY ORDINARY RESOLUTION** that:

(a) the JVLs be authorised, in accordance with Article 123 of the Articles, to divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for that purpose, set such value as they deem fair upon any property to be divided as aforesaid and may determine how such division will be carried out as between the Participating Shareholders or different Classes; and

(b) the JVLs shall have the power to retain the Company's administrator, manager or such other person as determined by the JVLs to assist them in discharging any registration and notification obligations and any obligation to complete the Company's final filings and retain records pursuant to the US Foreign Account Tax Compliance Act and/or Common Reporting Standard and/or Economic Substance Reporting.

_Mark Patrick_
Mark Patrick

35895767.2.C8689.187150

# THE COMPANIES ACT (AS AMENDED)

## DECLARATION OF SOLVENCY

### CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")

### REGISTRATION NO: 263805

We, Mark Patrick and Paul Murphy, being the Directors of the Company do solemnly and sincerely declare that we have made a full inquiry into the affairs of the Company and that, having done so, we believe that the Company will be able to pay its debts in full, together with interest at the prescribed rate within a period of twelve (12) months from the commencement of the winding up.

**Mark Patrick**

6716 Glenhurst Drive, Dallas, Texas, TX 75254, United States

Date of signature: 4/2/2025

Date of appointment as Director: 25 March 2021

**Paul Murphy**

Windsor Village, Unit 24, South Sound, Grand Cayman, Cayman Islands

Date of signature: 2nd April 2025

Date of appointment as Director: 22 April 2021

**Contacts for enquiries:**
Bryce Doran or Zhouming Kang
Telephones: (345) 949 7576 or +852 2583 1167
Emails: BDoran@RHRestructuring.com
or zhouming.kang@acclime.com

### GATN FINANCE LIMITED
### Notice of Voluntary Winding Up (O.13, r.2)
### (In Voluntary Liquidation)
### The Companies Act (As Amended)

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman, KY1-1102 Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

### AMP FUNDING LIMITED
### (In Voluntary Liquidation)
### The Companies Act (As Amended)
### Notice of Voluntary Winding Up (O.13, r.2)

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman KY1-1102, Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

### CHARITABLE DAF HOLDCO, LTD.
### (In Voluntary Liquidation)
### ("The Company")
### The Companies Act (As Amended)
### Notice Of Voluntary Winding Up
### Registration No: 263805

TAKE NOTICE that the Company was put into liquidation on 2 April 2025 by a special resolution passed by written resolution of the sole voting shareholder of the Company, executed on 2 April 2025.

AND FURTHER TAKE NOTICE that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, have been appointed as joint voluntary liquidators of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice and to establish any title they may have under the Companies Act (as amended) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of

any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated this 14th day of April 2025**

MITCHELL MANSFIELD AND WILLIAM CLARKE
Joint Voluntary Liquidators

**Contact for enquiries:**
William Clarke
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman KY1-1204
Cayman Islands
E: will.clarke@kroll.com
T: +1 345 623 9905

**Address for service:**
Kroll (Cayman) Ltd
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman, KY1-1204
Cayman Islands

**AARO DIRECTIONAL CRYPTO MULTIFUND LIMITED**
**(In Voluntary Liquidation)**
**(the Company)**
**Notice Of Voluntary Winding Up**
**Registration No: 390083**

TAKE NOTICE that the Company was placed into voluntary liquidation on 28 March 2025 by a special resolution passed by written resolution of the voting shareholder of the Company.

AND FURTHER TAKE NOTICE that R&H Restructuring VL Services Ltd. of Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands has been appointed voluntary liquidator of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice to establish any title they may have under the Companies Act (as revised) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of any distribution made before such debts and/or claims

are proved or from objecting to the distribution.

**Dated: 03 April 2025**

OWEN WALKER
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator
MARTIN TROTT
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator

**Contact for Enquiries:**
Robert Knight
Telephone: +1 (345) 949 7576
Email: RKnight@RHRestructuring.com

**XP PHALANX CT FUND**
**(In Voluntary Liquidation)**
**(the "Company")**
**The Companies Act (as amended)**
**Notice of Voluntary Winding Up**
**Registration No: 391110**

TAKE NOTICE that the above-named Company was put into liquidation on 26 March 2025 by a Special Resolution passed by the sole voting shareholder by way of a written resolution in lieu of a meeting.

AND FURTHER TAKE NOTICE that FFP Limited of 2nd Floor Harbour Centre, 159 Mary Street, George Town, Grand Cayman, Cayman Islands has been appointed Voluntary Liquidator of the Company.

CREDITORS OF THE COMPANY are to prove their debts or claims within 21 days of the publication of this notice, and to establish any title they may have under the Companies Act (as amended) or are to be excluded from the benefit of any distribution made before the debts are proved or from objecting to the distribution.

**Dated this 3rd day of April 2025**

FFP LIMITED
Voluntary Liquidator

**Contact for enquiries:**
James Allen
FFP Limited
2nd Floor Harbour Centre
159 Mary Street
George Town, Grand Cayman
Cayman Islands

**CHARITABLE DAF HOLDCO, LTD**

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

# Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)

Appendix Page 108



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

35631852.5.C8689.187150

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1.  The name of the Company is Charitable DAF HoldCo, Ltd.

2.  The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3.  The objects for which the Company is established are:

    (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

    (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4.  The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5.  The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6.  The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7.  The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power

1

35631852.5.C8689.187150

www.verify.gov.ky File#: 263805
MR 0117

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.   The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

35631852.5.C8689.187150

www.verify.gov.by File#: 263805
MR 0118

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**TABLE OF CONTENTS**

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 5 |
| SHARES | 6 |
| MANAGEMENT SHARES | 6 |
| PARTICIPATING SHARES | 7 |
| MODIFICATION OF RIGHTS | 7 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 8 |
| TRANSMISSION OF SHARES | 8 |
| ALTERATION OF SHARE CAPITAL | 9 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 9 |
| TREASURY SHARES | 10 |
| GENERAL MEETINGS | 11 |
| NOTICE OF GENERAL MEETINGS | 11 |
| PROCEEDINGS AT GENERAL MEETINGS | 11 |
| VOTES OF SHAREHOLDERS | 13 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 14 |
| DIRECTORS | 14 |
| POWERS AND DUTIES OF DIRECTORS | 15 |

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

MR 0119

**BORROWING POWERS OF DIRECTORS** ....................................................................... 17

**THE SEAL** ................................................................................................................. 17

**DISQUALIFICATION OF DIRECTORS** ......................................................................... 17

**PROCEEDINGS OF DIRECTORS** .................................................................................. 18

**DIVIDENDS** ............................................................................................................... 21

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION** ......................... 21

**CAPITALISATION OF RESERVES** ............................................................................. 22

**SHARE PREMIUM ACCOUNT** .................................................................................. 23

**NOTICES** ................................................................................................................... 23

**NON-RECOGNITION OF TRUSTS** ............................................................................. 24

**WINDING UP** ............................................................................................................ 25

**AMENDMENT OF ARTICLES OF ASSOCIATION** ..................................................... 25

**CLOSING OF REGISTER OR FIXING RECORD DATE** ............................................... 25

**REGISTRATION BYWAY OF CONTINUATION** ......................................................... 26

**MERGERS AND CONSOLIDATION** ............................................................................ 26

**DISCLOSURE** ........................................................................................................... 26

**INDEMNITY** .............................................................................................................. 27

**DISPUTE RESOLUTION** ............................................................................................. 28

**AEOI** ........................................................................................................................ 30



Filed: 21-Feb-2025 09:26 EST

Auth Code: E90228166495

www.verify.gov.ky File#: 263805

MR 0120

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1.  In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

    "**Act**" means the Companies Act (as amended) of the Cayman Islands.

    "**AEOI**" means:

    (i)   sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

    (ii)  the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

    (iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in

35631852.5.C8689.187150

www.verify.gov.ky File#: 263805

MR 0121

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*



order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv)     any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a)     passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a

35631852.5.C8689.187150

2

Appendix Page 114

www.verify.gov.ky File#: 263805

MR 0122

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)    approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

**"paid up"** means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

**"Participating Share"** means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

**"Person"** means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

**"Principal Register"**, where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

**"Register"** means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

**"Restricted Person"** means any Person holding Participating Shares:

(a)    in breach of the law or requirements of any country or governmental authority;

(b)    that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)    in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

www.verify.gov.ky File#: 263805

MR 0123

Filed: 21-Feb-2025 09:26 EST

Auth Code: E90228166495



"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a)     passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)      approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)     words importing the singular number shall include the plural number and vice versa;

(b)     words importing the masculine gender only shall include the feminine gender and any Person as the context may require;



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

www.verify.gov.ky File#: 263805
MR 0124

(c)    the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)    reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)    reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f)    reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g)    reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h)    any requirements as to execution or signature under the Articles including the execution  of the Articles themselves can be satisfied in the form of an electronic signature as  defined in the Electronic Transactions Act; and

(i)    sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2.    Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

3.    The business of the Company may be commenced at any time after incorporation.

4.    The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.    The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company.  Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.    The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office.  The Directors may



35631852.5.C8689.187150

5

www.verify.gov.ky File#: 263805
MR 0125

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

## SHARES

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

    (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

    (b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

    and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MANAGEMENT SHARES

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.



www.verify.gov.ky File#: 263805

MR 0126

*Filed: 21-Feb-2025 09:26 EST*

*Auth Code: E90228166495*

## PARTICIPATING SHARES

12.   Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13.   Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting.  To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him.  For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14.   The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15.   No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16.   The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share.  If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*
www.verify.gov.ky File#: 263805
MR 0127

## TRANSFER OF SHARES

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the

www.verify.gov.ky File#: 263805

MR 0128

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

   (a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

   (b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

   (c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

   (d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

28. Subject to the Act, the Company may:

   (a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

www.verify.gov.ky File#: 263805
MR 0129

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



(b)　　purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c)　　make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d)　　accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29.　　Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30.　　The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31.　　The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## TREASURY SHARES

32.　　Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act.  In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33.　　No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34.　　The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a)　　 the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b)　　a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

35631852.5.C8689.187150



www.verify.gov.ky File#: 263805

MR 0130

Filed: 21-Feb-2025 09:26 EST

Auth Code: E90228166495

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



www.verify.gov.ky File#: 263805
MR 0131

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43.     If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44.     If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45.     The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46.     If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47.     The chairman may adjourn a meeting from time to time and from place to place either:

(a)     with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b)     without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i)      secure the orderly conduct or proceedings of the meeting; or

(ii)     give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48.     At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



www.verify.gov.ky File#: 263805
MR 0132

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49.     If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50.     In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51.     A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

52.     On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53.     In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54.     A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55.     No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56.     On a poll votes may be given either personally or by proxy.

57.     The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised.  A proxy need not be a Shareholder.



www.verify.gov.by File#: 263805
MR 0133

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

www.verify.gov.ky File#: 263805

MR 0134



Filed: 21-Feb-2025 09:26 EST

Auth Code: E90228166495

69.    The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70.    The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

### POWERS AND DUTIES OF DIRECTORS

71.    Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72.    The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or



*Filed: 21-Feb-2025 09:26 EST*

*www.verify.gov.ky File#: 263805*          *Auth Code: E90228166495*

MR 0135

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



*Filed: 21-Feb-2025 09:26 EST*

*www.verify.gov by File#: 263805*

*Auth Code: E90228166495*

MR 0136

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

www.verify.gov.ky File#: 263805
MR 0137

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



(b)     dies or is found to be or becomes of unsound mind;

(c)     resigns his office by notice in writing to the Company;

(d)     is removed from office by Ordinary Resolution;

(e)     is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

(f)     is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

85.     The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86.     A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87.     The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88.     A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89.     A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director

www.verify.gov.ky File#: 263805
MR 0138



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

   (a)    all appointments of officers made by the Directors;

   (b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

   (c)    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



www.verify.gov.ky File#: 263805
MR 0139
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

95.     The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96.     Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97.     A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98.     All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



www.verify.gov.ky File#: 263805

MR 0140

Filed: 21-Feb-2025 09:26 EST

Auth Code: E90228166495

**DIVIDENDS**

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION**

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

35631852.5.C8689.187150

21



www.verify.gov.ky File#: 263805
MR 0141
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or

www.verify.gov.ky File#: 263805
MR 0142



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

  (i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

  (ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

  (iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

## NOTICES

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



www.verify.gov.ky File#: 263805

MR 0143

Filed: 21-Feb-2025 09:26 EST

Auth Code: E90228166495

117. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

## NON-RECOGNITION OF TRUSTS

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*



interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

121. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

    (a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

    (b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

124. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

125. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,

www.verify.gov.ky File#: 263805
MR 0145

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495



attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BYWAY OF CONTINUATION

128. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

129. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

## DISCLOSURE

130. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

35631852.5.C8689.187150

26

Appendix Page 138



www.verify.gov.ky File#: 263805
MR 0146

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

## INDEMNITY

131.    To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132.    Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133.    To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).  The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134.    Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



www.verify.gov.ky File#: 263805
MR 0147

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

    (a)    Mediation:

        (i)    subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

        (ii)    the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

        (iii)    the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

        (iv)    each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

    (b)    Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

        (i)    the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue

www.verify.gov.ky File#: 263805
MR 0148
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii)     the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii)    the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv)    no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v)     all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable

Filed: 21-Feb-2025 09:26 EST

www.verif.gov.ky File#: 263805          Auth Code: E90228166495

MR 0149

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)     the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c)     Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

## AEOI

137.     Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138.     In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a)     compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b)     deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i)     comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii)     allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;

35631852.5.C8689.187150

30

Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
MR 0150
Auth Code: E90228166495

     (iii)     ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139.     In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

     (a)     create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

     (b)     may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

     (c)     allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

     (d)     adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



*Filed: 21-Feb-2025 09:26 EST*

*www.verify.gov.ky File#: 263805*     *Auth Code: E90228166495*

MR 0151

**Annexure**

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.

www.verify.gov.ky File#: 263805

MR 0152



*Filed: 21-Feb-2025 09:26 EST*

*Auth Code: E90228166495*

Register of Members of

# Charitable DAF HoldCo, Ltd

**Registration No: 263805**

**Share Class: Management**

**Authorised Capital of USD 1.00 divided into 100.00 Management shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **WNL Limited** 190 Elgin Avenue George Town Grand Cayman KY1-9001 Cayman Islands | 7-Nov-2011 | | 1.00 | 0.01 | In Full | 7-Nov-2011 : Allotment of 1.00 Management share(s) | 7-Nov-2011 | 1.00 | | 0.00 | 7-Nov-2011 : Repurchase of 1.00 Management share(s) |
| 2 | **Grant James Scott** Highland Capital Managment, L.P. 13455 Noel Road, Suite 800 Dallas, TX 75240 USA | 7-Nov-2011 | | 100.00 | 1.00 | In Full | 7-Nov-2011 : Allotment of 100.00 Management share(s) | 25-Mar-2021 | 100.00 | | 0.00 | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick |
| 3 | **Mark E. Patrick** 6716 Glenhurst Dr Dallas, TX 75254 USA | 25-Mar-2021 | | 100.00 | 1.00 | In Full | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick | | 0.00 | | 100.00 | |

Notes

1    Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.

**CONFIDENTIAL**
Printed on 25 April 2025

# Charitable DAF HoldCo, Ltd

**Registration No: 263805**

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Mark E. Patrick | 100.00 | Management |
| | | |
| **Total Management Shares outstanding: 100.00** | | |
| **Total Management Shares remaining unissued: 0.00** | | |

**CONFIDENTIAL**
Printed on 25 April 2025

Register of Members of

# Charitable DAF HoldCo, Ltd

**Registration No: 263805**

**Share Class: Participating**

**Authorised Capital of USD 49,999.00 divided into 4,999,900.00 Participating shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **The Highland Capital Management Partners CharitableTrust #2** Highland Capital Management, L.P 13455 Noel Rd, Suite 800 TX 75240 Dallas Texas USA | 7-Nov-2011 | | 300.00 | 3.00 | In Full | 7-Nov-2011 : Allotment of 300.00 Participating share(s) | 30-Nov-2011 | 300.00 | | 0.00 | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc  30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc  30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc |
| 2 | **Highland Kansas City Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc | | 0.00 | | 100.00 | |
| 3 | **Highland Dallas Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc | | 0.00 | | 100.00 | |
| 4 | **Highland Santa Barbara Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc | | 0.00 | | 100.00 | |

Appendix Page 147

**CONFIDENTIAL**
Printed on 25 April 2025

MR 0155

# Charitable DAF HoldCo, Ltd
**Registration No: 263805**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Forth Worth TX 76102 USA | 13-Aug-2015 | | 5.00 | 0.05 | In Full | 13-Aug-2015 : Allotment of 5.00 Participating share(s) | | 0.00 | | 5.00 | |
| 6 | **DFW Charitable Foundation** The Corporation Trust Company 1209 Orange Street Wilmington, DE 19801 United States | 7-Feb-2025 | | 318.00 | 3.18 | In Full | 7-Feb-2025 : Allotment of 318.00 Participating share(s) | | 0.00 | | 318.00 | |

Notes

1    Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.

## Summary

| Name | Number and Class of Shares Held | |
|---|---|---|
| Highland Kansas City Foundation, Inc | 100.00 | Participating |
| Highland Dallas Foundation, Inc | 100.00 | Participating |
| Highland Santa Barbara Foundation, Inc | 100.00 | Participating |
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5.00 | Participating |
| DFW Charitable Foundation | 318.00 | Participating |
| **Total Participating Shares outstanding: 623.00** | | |
| **Total Participating Shares remaining unissued: 4,999,277.00** | | |

## Geoffrey Sykes

| | |
|---|---|
| **From:** | Andrew Johnstone <aj@j-law.ky> |
| **Sent:** | 24 April 2025 11:46 AM |
| **To:** | Geoffrey Sykes; Barnaby Gowrie |
| **Cc:** | Rhiannon Zanetic; Philip Aubry; Nicholas Geldard; Chris Beck |
| **Subject:** | Re: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181] |

**[this message is from an external sender]**

Hi Geoff

Given your failure to respond yesterday, we are in the course of serving on Charitable DAF HoldCo Ltd at its registered office.

Best

AJ

**Andrew Johnstone**
Founder | Partner



**+1 (345) 929-3000**
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 April 2025 11:35
**To:** Andrew Johnstone <aj@j-law.ky>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181]

Dear Mr Johnstone

Please could you confirm the nature of the proceeding to be served.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Andrew Johnstone <aj@j-law.ky>
**Sent:** 23 April 2025 13:42
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>
**Subject:** Charitable DAF HoldCo, Ltd

**[this message is from an external sender]**

Dear Colleagues

We act for the Participating Shareholders of Charitable DAF HoldCo, Ltd (the **Company**).

Please can you confirm whether you are instructed to act for and accept service on behalf of the Company.

Best

AJ

## Andrew Johnstone
Founder | Partner



**+1 (345) 929-3000**
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

# Geoffrey Sykes

| | |
|---|---|
| **From:** | Brandon R. Schaller <bschaller@shieldslegal.com> |
| **Sent:** | 24 April 2025 4:52 PM |
| **To:** | Barnaby Gowrie; Philip Aubry; Geoffrey Sykes; Chris Beck |
| **Cc:** | mpatrick@dafholdco.com; Paul Murphy; sraver@dafholdco.com; Bart Higgins |
| **Subject:** | FW: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232] |
| **Attachments:** | 2025 24 04 - Charitable DAF HoldCo Ltd.zip |

| | |
|---|---|
| **Importance:** | High |

**[this message is from an external sender]**

FYI

## Brandon R. Schaller
**ATTORNEY**

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

**From:** Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 4:45 PM
**To:** Michelle Richie | Campbells <MRichie@campbellslegal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]
**Importance:** High

> CAUTION: This email originated from outside of the organization.

All

Johnstone law, who are acting for the participating shareholders of Charitable DAF HoldCo Ltd, served the following documents this afternoon (via Campbells, as we remain Charitable DAF's registered office):

- A Petition seeking orders that Charitable DAF be wound up and that joint official liquidators be appointed.
- A Summons seeking an order appointing joint provisional liquidators over Charitable DAF.
- Supporting affirmations of Julie Diaz (of The Dallas Foundation) and James Dondero.
- Consent to acts as a liquidator from Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton.

The Summons seeking the appointment of joint provisional liquidators over Charitable DAF has been listed for hearing before Justice Asif at 2pm on **Monday, 28 April 2025**.

We will forward copies of the attached materials to Kroll, as the voluntary liquidators of Charitable DAF. Our understanding is that Kroll will be taking point on next steps as the voluntary liquidators, but we will review and are available to assist. We will also forward these materials onto Walkers, who have requested a copy.

Kind regards

**Matheo Vinciullo**
Associate

E mvinciullo@campbellslegal.com
T +1 345 949 2648   D +1 345 914 6931   C +1 345 327 6931

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman  KY1-9010, Cayman Islands

campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

**From:** Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 1:00 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]

Brandon

We have not received anything as yet but will provide copies when we do.  We have received a similar request from Walkers attached.  Do we have authorisation to provide the same to them?

**Michelle Richie**
Partner

E mrichie@campbellslegal.com
T  +1 345 949 2648   D +1 345 914 6933   C +1 345 525 6933

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman  KY1-9010, Cayman Islands

campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Thursday, April 24, 2025 12:48 PM
**To:** Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Charitable DAF HoldCo, Ltd.

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

Campbells team,

We heard that Johnstone law is attempting service on Charitable DAF HoldCo, Ltd. as its registered office. Can you please advise if you have received anything, and if not, provide us a copy when you do?

Thanks,
Brandon

**Brandon R. Schaller**
**ATTORNEY**

16400 Dallas Parkway, Suite 300
Dallas, TX 75248

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message.  You should not copy it or disclose its contents to any other person.  Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses.  This e-mail message does not contain or constitute legal advice and/or federal tax advice.  The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

# Geoffrey Sykes

| | |
|---|---|
| **From:** | Mark Patrick <mpatrick@dafholdco.com> |
| **Sent:** | 27 April 2025 12:51 AM |
| **To:** | Mansfield, Mitchell |
| **Cc:** | Paul Murphy |
| **Subject:** | Voluntary Liquidators |

**[this message is from an external sender]**

Dear Voluntary Liquidators

I write to you in my capacity as the management shareholder and director of the company. My fellow director, Paul Murphy, is copied to this email and agrees with its contents.

Please note the following:

The management shareholder of the company and its directors intend in providing cooperation to the voluntary liquidators in accordance with Cayman law.
The management shareholder has no intention of taking any steps to remove the voluntary liquidators from office.
Assuming the voluntary liquidators consider it appropriate having consulted with relevant stakeholders of the company, the management shareholder and the directors have no objections to the voluntary liquidators making the necessary court application to have the voluntary liquidation brought under the supervision of the Cayman Court.
If you have any questions, please do not hesitate to contact me.

Kind regards.

Mark Patrick
Management Shareholder

# Before



Appendix Page 155

MR 0163

# Current – DAF Holdco



The Dallas Foundation (nonprofit)

Greater Kansas City Community Foundation (nonprofit)

Santa Barbara Foundation (nonprofit)

The Community Foundation of North Texas (nonprofit)

DFW Charitable Foundation (nonprofit)

Highland Dallas Foundation, Inc. (nonprofit)

Highland Kansas City Foundation, Inc. (nonprofit)

Highland Santa Barbara Foundation, Inc. (nonprofit)

.80%    5 Participating Shares

51.04%    318 Participating Shares

16.05%    100 Participating Shares

16.05%    100 Participating Shares

16.05%    100 Participating Shares

Mark Patrick

Management Shares

Charitable DAF HoldCo, Ltd. (Cayman Islands)



1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO:   FSD 99 OF 2025 (JAJ)**

**IN THE MATTER OF:**    **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF:**  **CHARITABLE  DAF  HOLDCO,  LTD  (IN  VOLUNATRY LIQUIDATION)**

**BETWEEN**    **(1) THE HIGHLAND DALLAS FOUNDATION, INC.**
**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**
**(3) THE  HIGHLAND  SANTA  BARBARA  FOUNDATION, INC.**
**(4) THE HCMLP CHARITABLE FUND**

<u>**PLAINTIFFS**</u>

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

<u>**DEFENDANT**</u>

---

**FIRST AFFIDAVIT OF GEOFFREY SYKES**

---

36068369.1.C8689.187150                                                      1

I, **GEOFFREY SYKES**, of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands being duly sworn **MAKE OATH and SAY** as follows:

**Preliminary**

1. I am an Attorney-at-Law and Associate in the Insolvency and Dispute Resolution Group at Walkers (Cayman) LLP ("**Walkers**"), and I act for Charitable DAF HoldCo, Ltd (in Voluntary Liquidation) (the "**Company**").

2. I make this Affidavit in response to the winding up petition by which Cause No. FSD 99 of 2025 was commenced, and the summons listed in that proceeding seeking, among other things, "*An order appointing joint provisional liquidators over Charitable DAF HoldCo…*".

3. There is now shown to me a bundle of documents marked Exhibit "**GS-1**" and references to page numbers herein are to pages of that Exhibit. For the avoidance of doubt, no privilege is waived by the inclusion of the information set out herein.

4. Save where the contrary is stated to be the case, the facts and matters to which I depose are within my own knowledge and are true. Where the facts and matters are not within my own knowledge, they derive from my instructions by the company, acting either through its directors or the Joint Voluntary Liquidators (defined below) as the case may be at the relevant time, or I identify the source of my knowledge and confirm that those facts and matters are true to the best of my knowledge and belief.

**Recent events and documents**

5. On 24 April 2025, Johnstone Law served on the Company at its registered office a bundle of documents including the winding up petition and the summons referred to above. A copy of the cover letter to this bundle of documents is at

**page 1** (noting that the remainder of the documents will already be before the Court).

6.      On 25 April 2025, Walkers sent to Johnstone Law a letter enclosing the following documents:

(a)      A consent to act as joint voluntary liquidators of the Company by Mitchell Mansfield and William Clarke of Kroll Cayman Ltd (the "**Joint Voluntary Liquidators**"), dated 29 March 2025;

(b)      Written resolutions of the directors of the Company including to recommend to the management shareholder that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(c)      Special resolutions of the management shareholder of the Company that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(d)      A declaration of solvency by the directors of the Company, dated 2 April 2025;

(e)      An extract from Gazette Issue No. 8/2025, which includes notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the Joint Voluntary Liquidators were appointed, dated 14 April 2025;

(f)      The current Memorandum and Articles of the Company, dated 20 February 2025;

(g)      The current Register of Members of the Company, dated 25 April 2025; and

(h)   An email chain between Walkers and Johnstone law, dated 23-24 April 2025.

7.   That letter and its enclosures are at **pages 2 – 53**.

8.   On 24 April 2025, emails were exchanged between Campbells LLP as the registered office of the Company, and Shields Legal (acting for the directors of the Company), in respect of the bundle of documents served by Johnstone Law. A copy of that email chain is at **pages 54 – 56**.

9.   On 27 April 2025, Mark Patrick (in his capacity as the management shareholder and a director of the Company) sent an email to the Joint Voluntary Liquidators in respect of the joint voluntary liquidation. A copy of that email is at **page 57**.

10.   A copy of the structure chart of the Company prior to 27 March 2025 is at **page 58**. A copy of the current structure chart Company as of 27 March 2025 is at **page 59**.

**SWORN** at George Town, )
)
Grand Cayman )
)
) _GEOFFREY SYKES_____
on the 27th day of April 2025 )
before me )
)
)
)
)
_NOTARY PUBLIC_ )

Fiona MacAdam
Notary Public in and for the Cayman Islands
My commission expires January 31, 20 26
Date: 27th April 2025 .

This **AFFIDAVIT** is filed by Walkers (Cayman) LLP, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Applicant whose address for service is care of said Attorneys-at-Law.

36068369.1.C8689.187150                                                                                                      4

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 99 OF 2025 (JAJ)

IN THE MATTER OF:     SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF:     CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)

BETWEEN

(1) THE HIGHLAND DALLAS FOUNDATION, INC.
(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.
(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.
(4) THE HCMLP CHARITABLE FUND

**PLAINTIFFS**

and

CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)

**DEFENDANT**

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025



_____

NOTARY PUBLIC

Fiona MacAdam
Notary Public in and for the Cayman Islands
My commission expires January 31, 20 26
Date: 27 April 2025 .

Docusign Envelope ID: 11CD8132-6630-49A0-A1FE-D8548E9451F8



EXHIBIT
4-A

November 11, 2024

**From**: Highland Dallas Foundation, Inc.
Highland Kansas City Foundation, Inc.
Highland Santa Barbara Foundation, Inc.

**To**:  Mr. Paul Murphy
Director of Charitable DAF HoldCo, Ltd.
and Charitable DAF Holdings Corp.
paul@gkmanagement.com.ky


Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1.  Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2.  Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3.  Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner

Mr. Paul Murphy
November 11, 2024
Page 2

workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

By: _____
　　Julie Diaz
　　Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

By: _____
　　Debbie Wilkerson
　　Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

By: _____
　　Jacqueline M. Carrera
　　Secretary and Treasurer

cc:　David M. Rosenberg
　　(via email at david.rosenberg@hklaw.com)

　　Michael Stockham
　　(via email at michael.stockham@hklaw.com)

**Subject:**          [EXTERNAL]-RE: DAFHoldCo information request

**From:** Michael.Stockham@hklaw.com
**Date:** February 7, 2025 at 12:43:56 PM CST
**To:** Paul Murphy
<paul@gkmanagement.com.ky>, Julie Diaz
<jdiaz@dallasfoundation.org>,
mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson
<wilkerson@growyourgiving.org>, Jackie Carrera
<jcarrera@sbfoundation.org>,
David.Rosenberg@hklaw.com,
DMancino@seyfarth.com
**Subject: [EXTERNAL]-RE: DAFHoldCo
information request**

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Paul-

I appreciate your email, and your willingness to find a framework to resolve the concerns, but am flummoxed by your, "struggle" to understand our growing frustration.

I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees. If I'm wrong, please educate me.

Your failure to be forthcoming about the underlying assets, the investment philosophy of the fund, and the "revised" governance, have caused me to start digging. I am not only a lawyer but also a Certified Fraud Examiner and a Certified Compliance & Ethics

Professional, and what I have found is nothing short of alarming.

- As I mentioned, director fees for 2024 appeared to be on track to exceed $5 million, which was an over 12,000 percent increase—up from zero. It is hard to fathom what you and Mr. Patrick have changed or contributed to the funds to warrant such a drastic change in director fees. I could be wrong, but if so, then tell me why. What is the dramatic value add?

- As I understand it, the annualized expenses of the funds were on pace to outstrip the actual return on the investments. So I am at a loss as to how you can justify running the fund at a loss while apparently paying the directors handsomely and freezing Supporting Organizations (the shareholders) out of basic information.

On November 6, 2024, we had an introductory video call with Doug Mancino, who announced himself as Compliance Counsel. But no details of the assets or financial condition of the funds were communicated.

On November 20, 2024, we had another video call with folks from your side, including ValueScope, and it was informative; however, the thrust of the presentation was why you refused proposed investments from NexPoint. It had nothing to do with the underlying assets and financial conditions of the fund. This was perplexing as ValueScope has been the valuation firm for the fund for years; yet they were silent about the condition of the fund.

On December 11, 2024, we had a video call with you, Doug Mancino, and your Cayman counsel. The thrust of that discussion was your vision of running the fund more as an institutional investment vehicle and a promise to provide financial information in the future. But the presentation again lacked any information on the underlying assets and financial conditions of the fund. It did, however, include a discussion that the Supporting Orgs had no right to information under the structure of the funds.

Shortly after the December 11 call, we received your first demand to withdraw our concerns about the governance of the funds, and it also advanced that if the Supporting Organizations wanted more

2

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

**Michael Stockham, JD, CFE, CCEP | Holland & Knight**

Partner

Holland & Knight LLP

One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201

Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435

michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

*Licensed to practice law in Texas, Kansas, and New York
 CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com
  CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Mike,
We remain open to finding a framework within which we can resolve your clients' concerns.
I don't want to repeat points already made in my email dated 30th January 2025, but our understanding was that we were to prepare a presentation for the Foundations to address these concerns. This was a course of action suggested by you in our call last year and one which we thought was very sensible.
We are struggling to understand what happened between 21st January (when David Rosenburg, from your firm, confirmed a video conference would be acceptable) and 23rd January when an email was sent to Mark's old email address repeating various allegations that we were going to address in the presentation.

We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com <Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

*Licensed to practice law in Texas, Kansas, and New York
 CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com
  CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

7

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

> The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman KY1-1007
Cayman Islands
Phone: +1 345 946 3459
Mobile: +1 345 324 1121
Fax: +1 345 946 3493
E-mail : paul@gkmanagement.com.ky

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Michael.Stockham@hklaw.com; Rosenberg, David M (DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests below have not been acknowledged. This failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF HoldCo under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo.  We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:
- **Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses
- **Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.
- **Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.
- **Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations.  We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make

additional meaningful contributions to our respective communities.

Please let us know your ability to get this information to us by Feb. 10, 2025.

Thank you and happy New Year.

---



**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

f

in

o

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything

in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park
Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg>  <~WRD0000.jpg>  <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Skyview Group. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Skyview Group.


EXHIBIT
4-C

February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

Sincerely yours,

Michael W. Stockham

cc:    David Rosenberg

**Rhiannon Zanetic**

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 18 March 2025 09:27 |
| **To:** | Mancino, Douglas; Michael.Stockham@hklaw.com |
| **Cc:** | Paul Murphy |
| **Subject:** | RE: Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this. |

Doug, we are available on:

- Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.

- Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.

- Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

_____

Add to address book | View professional biography

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

_____

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

# Rhiannon Zanetic

**From:** David.Rosenberg@hklaw.com
**Sent:** 03 April 2025 09:51
**To:** Mancino, Douglas
**Cc:** Michael.Stockham@hklaw.com; Paul Murphy
**Subject:** RE: Zoom call with Paul Murphy

Doug, no such call is on our calendar, so I am not sure of the source of the confusion. We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

------------------------------------------

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

------------------------------------------

MR 0189

| | |
|---|---|
| **From:** | Rosenberg, David M (DAL - X61508) |
| **Sent:** | Wednesday, April 9, 2025 11:40 AM |
| **To:** | Mancino, Douglas |
| **Cc:** | Stockham, Michael W (DAL - X62515) |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, here is our availability beginning April 16 and for the next week:

April 16 - available after 2:30 p.m.

April 17 - available between 10:00 a.m. and noon and after 1:30 p.m.

April 21 - generally available after 1:30 p.m.

April 22 - available after 2:00 p.m.

April 23 - generally available except between 11:00 a.m. and 12:30 p.m.

All times are CDT.  Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
Cc: Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Paul Murphy
<paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar.
Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week
leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom
meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

EXHIBIT

5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
|  | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) June 25, 2025 |
|  | ) 9:30 a.m. Docket |
| Reorganized Debtor. | ) |
|  | ) - MOTION TO EXTEND DURATION OF |
|  | ) TRUSTS (4213) |
|  | ) - MOTION TO APPROVE SETTLEMENT |
|  | ) (4216) |
|  | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Highland Capital          John A. Morris
Management Claimant Trust:   PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7760

For the Highland Capital          Hayley R. Winograd
Management Claimant Trust:   Gregory V. Demo
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            1700 Broadway, 36th Floor
                            New York, NY  10019
                            (212) 561-7732

For the Highland Capital          Jeffrey N. Pomerantz
Management Claimant Trust:   PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                              13th Floor
                            Los Angeles, CA  90067
                            (310) 277-6910

For Marc S. Kirschner,            Robert Scott Loigman
Litigation Trustee:          QUINN EMANUEL URQUHART & SULLIVAN,
                              LLP
                            295 5th Avenue
                            New York, NY  10016
                            (212) 849-7000

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Hunter Mountain Entities: | Louis M. Phillips<br>Amelia L. Hurt<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA  70801<br>(225) 381-9643 |
| For the Dugaboy Investment Trust: | Deborah Rose Deitsch-Perez<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX  75201<br>(214) 560-2201 |
| For the Dugaboy Investment Trust: | Michael Justin Lang<br>CRAWFORD WISHNEW & LANG, PLLC<br>1700 Pacific Avenue, Suite 2390<br>Dallas, TX  75201<br>(214) 817-4500 |
| For Crown Global Life Insurance, Ltd. and The Dallas Foundation: | David L. Curry, Jr.<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX  77002<br>(713) 228-4100 |
| For Patrick Daugherty: | Andrew K. York<br>Drake Rayshell<br>Joshua Smeltzer<br>GRAY REED & MCGRAW, LLP<br>1601 Elm Street, Suite 4600<br>Dallas, TX  75201<br>(214) 954-4135 |
| For the U.S. Trustee: | Erin Marie Schmidt<br>OFFICE OF THE UNITED STATES<br>  TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX  75242-1496<br>(214) 767-1075 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX  75242<br>(214) 753-2062 |

3

Transcribed by:          Kathy Rehling
                         311 Paradise Cove
                         Shady Shores, TX   76208
                         (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

THE WITNESS:  My bad.

THE COURT:  -- call my attention to it when you find it.

THE WITNESS:  All right.

(The witness steps down.)

THE COURT:  All right.  Your next witness?

MR. YORK:  I believe we're calling Mark Patrick.

THE COURT:  All right, Mr. Patrick.  All right. Please raise your right hand.

MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT:  All right.  Please be seated.

And, Courtney, you're going to start the clock going.  I show 2:12.  I don't know if my clock's right.

You may proceed.

MR. LANG:  And, Your Honor, may I hand the witness -- this is from Mr. Morris' opening.  May I use this as Exhibit 3?

THE COURT:  Oh, okay.  You're talking about the back page of his PowerPoint?

MR. LANG:  Yes.  Org chart.

THE COURT:  Yes.  I've got it in front of me.  And for the record, I'm going to put this PowerPoint, even though it's not an exhibit *per se*, as a demonstrative aid in the file for this matter.  And so it's the last item of the Highland PowerPoint.  All right.

MR. LANG:  Yes.

DIRECT EXAMINATION

BY MR. LANG:

Q   Mr. Patrick, does this Hunter Mountain Investment Trust org chart that I just handed you accurately reflect the structure of the Hunter Mountain Investment Trust ownership today?

A   Just give me a few moments to review.

Q   Sure.

MR. LEWIS:  Your Honor, I had mentioned early on that we object to this whole line of questioning because it's outside the scope of the objection of Dugaboy.  And I don't want to interrupt, but I want to make sure that my objection is continuing, because this has nothing to do with the objection presented by Dugaboy.

THE COURT:  All right.

MR. PHILLIPS:  So we object to the question.

THE COURT:  Okay.  So the record will reflect basically a running objection from Hunter Mountain?

MR. PHILLIPS:  We would appreciate that, Your Honor.

THE COURT:  Okay.  In light of the failure of Dugaboy to disclose Mark Patrick as a witness, as well as the failure to challenge in a written objection his authority.  Okay.  So I recognized that this was quite a persuasive objection, but given the magnitude, I would say, of what is going on here,

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this. All right. But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS: And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT: Okay. Understood.

MR. PHILLIPS: Thank you very much, Your Honor.

THE COURT: All right.

BY MR. LANG:

Q   Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A   Yes, I have.

Q   And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A   I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q   Did you help prepare this chart?

A   No.

Q   No? Okay. So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A   Yes.

Q   And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

correct?

A     Correct.

Q     And CLO Holdco, LLC is owned by CLO Holdco, Limited?

A     That's correct.

Q     And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?

A     Correct.

Q     And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

A     The ultimate beneficial owner is DFW Charitable Foundation.  To my -- to the best of my recollection, I would say that appears accurate.  I'm just not a hundred percent.

Q     Okay.  And --

A     But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner.  And I'm a hundred percent that Dugaboy Investment Trust has no interest in it.  And I'm also a hundred percent that The Dallas Foundation or any --

          MR. LANG:  Judge, I haven't asked --

          THE WITNESS:  -- or any other nonprofit has any --

          MR. LANG:  -- any of these questions.

          THE COURT:  Okay.  There's an objection, nonresponsive.  I sustain.

BY MR. LANG:

Q     Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?

A     (Pause.)  I'm just waiting for a relevancy.  I don't

understand how that's relevant to my authority --

THE COURT: Okay. You're not allowed to make a relevancy objection. Okay.

MR. PHILLIPS: Your Honor, I think the problem is that, if I could, we have made an objection. And our objection, our running objection is founded on relevancy and founded on improper process. So I would like to just tell the Court, and so my client representative can hear it, that the fact that I'm not standing up every time there's a problematic question, --

THE COURT: Okay.

MR. PHILLIPS: -- because every question is problematic, my objection is being maintained to every question that's being asked.

THE COURT: Okay. You understand that, right?

THE WITNESS: I --

THE COURT: There's a running relevancy objection. You're the witness. You can't make the objection. But it's on the record for whatever use it might have down the road.

MR. PHILLIPS: I have objected to every question that's coming in connection with this line of questioning on the basis of relevance.

THE COURT: I got it. I think we all have it.

MR. PHILLIPS: I'm just --

MR. LANG: Understood.

THE COURT:  Yes.  And you're thinking he's eating into your 30 minutes?

MR. LANG:  Yes.

THE COURT:  Okay.  We've got it.

THE CLERK:  I stopped the time.

MR. LANG:  So -- thank you.

THE COURT:  Did you stop the time for a minute?

THE CLERK:  Yes, I did.

MR. LANG:  Thank you.

THE COURT:  Okay.

BY MR. LANG:

Q    So, to my question, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct? Charitable DAF Holdco, Limited?

A    And where is that on the chart?

Q    I'm asking, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, Limited.

A    Can you show me a corporate document so I know the precise corporation you're referring to?

Q    You're the -- you are the manager of -- or the control person of CDHGP Limited, correct?

A    Again, I'd have to refresh my recollection, but I am the control person over CDMC.

Q    Okay.  And CDMC --

A    As well as Charitable DAF Fund.  I'll represent that to

you.

Q   Okay.  Was there a transaction in December of 2024 where Charitable DAF Holdco, Limited sold its interest or transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A   I know you're trying to help other litigation and --

MR. PHILLIPS:  Mark.

THE COURT:  Okay.  Nonresponsive.

THE WITNESS:  Your Honor, he's using your time to fish for other litigation to support that --

THE COURT:  Okay.  Okay.  We have a running objection to relevance.  I'm going to say that one more time.  Okay.  Just answer the question as best you can.

THE WITNESS:  I'd have to review the corporate documents to refresh my recollection for that time period.

BY MR. LANG:

Q   Up until December of 2024, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF Holdco, Limited, wasn't it?

A   I don't know what entity you're referring to without a refreshment of corporate documents of that entity.  There could be a lot of entities called that.

Q   You're aware that there is a proceeding in the Caymans investigating the December 2024 transaction that sold -- where Charitable DAF Holdco, Limited sold its interest in -- and or

transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A   There are several parts to that question.  So the answer is no.

Q   Are you aware of a proceeding pending in the Caymans involving Charitable DAF Holdco, Limited?

A   Again, I don't know what entity you're referring to.  Show me a -- show me a corporate document.

MR. LANG:  Your Honor, this was on the Foundation's exhibit list.  We cross-designated any document designated as an exhibit by any other party in this case.  And I'd like to hand this to the witness.

MR. MORRIS:  Which exhibit is it?

THE COURT:  Which is -- yes.

MR. LANG:  It was on the -- it was on the DAF -- or, the Foundation's exhibit list.

MR. MORRIS:  They haven't been admitted into evidence and they've withdrawn their objection.  We object, Your Honor.

THE COURT:  Yes, they've not been admitted.

MR. LANG:  Okay.  Well, can I --

MR. PHILLIPS:  We object to that, Your Honor.  We object to any witness --

MR. LANG:  We cross-designated every --

THE COURT:  I already discussed at the beginning what we were admitting and that was not disclosed.

MR. LANG: Okay.

THE COURT: As I recall, I said you've only designated the plan and settlement agreement, and the answer was yes.

MR. LANG: Okay.

BY MR. LANG:

Q   And we're aware that the Joint Official -- are you aware that there is a Joint Official Liquidator appointed over a Charitable DAF entity in the Cayman Islands?

MR. PHILLIPS: Objection to form.

THE WITNESS: Again, without more specific --

THE COURT: Overruled. Yes.

THE WITNESS: -- specificity, there could be a thousand different actions that you're referring to, in my mind.

BY MR. LANG:

Q   Are you aware that the Joint Official Liquidators in the Caymans are investigating transactions involving Charitable DAF Fund, LP and Charitable DAF Holdco, Limited?

A   Again, again, I don't specifically know what you're referring to.

MR. PHILLIPS: Your Honor, may I -- excuse me. I don't know that my running objection includes an objection to form for each of the questions. This objection is to form of the questions about, quote, --

THE COURT:  What's wrong with the form?

MR. PHILLIPS:  -- investigation.

THE COURT:  What is wrong with the form of that question?  I'm not clear.

MR. PHILLIPS:  My objection to form is that the question is an open-ended question with an undefined term, investigation.

THE COURT:  Overruled.  I don't think that's a vague term.  So you may answer.

THE WITNESS:  If you show me some document, some complaint or something, I'll be very happy to verify whatever questions related to that.  But just giving me verbal words of entities and names and actions, I don't know precisely what you are talking about.

BY MR. LANG:

Q    Mr. Patrick, who set up the entities in the Hunter Mountain Investment Trust org chart that is sitting in front of you?

A    I'm sorry.  Repeat the question?

Q    Who set up the various entities that are in the org chart that is on your -- on the stand?

MR. PHILLIPS:  Objection to form.  Set up.  What does that mean?

THE WITNESS:  It -- yeah, it's very --

THE COURT:  I think we know what it means.  Creating,

perhaps.

BY MR. LANG:

Q    Created?

A    Who?  Are you asking if I created it?

Q    Did you participate in creating them?

A    Did I participate?  In which ones?

Q    CDMC FAD, LLC.

A    What do you mean by participate?

Q    Were you involved in creating -- did you initiate the creation of CDMC FAD, LLC?

A    Lawyers were.

Q    Did you engage in any capacity on behalf of any entity?  Were you involved in engaging the lawyers to set up CDMC FAD, LLC?

A    Yes, I engaged lawyers to set up entities.

          MR. LANG:  Objection.  Nonresponsive.

          THE COURT:  Sustained.

          MR. LANG:  Did you --

          THE COURT:  He asked about this one particular entity, I think.

BY MR. LANG:

Q    Did you --

A    Which entity, again, did you ask?

Q    CDMC FAD, LLC.

A    Yes, I believe I hired a lawyer.

Q    And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?

A    Around the end of March of 2025. I believe.

Q    And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?

A    What do you mean by involved? How?

THE COURT: Okay. I can see what's happening here or I have an impression of what's happening here. I feel like you're slowing down this process where I've given 30 minutes to this lawyer. Okay? And I feel like you're feigning confusion. I don't mean to be insulting, but that's how it comes across. Okay? So I need you to speed up your answers and not be confused about things you shouldn't be confused about. Okay?

THE WITNESS: Okay.

THE COURT: I feel like it's late 1980s *Dondi*. Does anyone know what I mean by that? Okay. We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling. That's what they did in *Dondi*. Confusion. Delay. Okay?

So I don't mean to chastise you. I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this. Okay?

THE WITNESS: Understood.

THE COURT: Thank you.

BY MR. LANG:

Q   Okay. So you were involved in the transaction in which CDMC FAD, LLC acquired 100 percent ownership interest in Charitable DAF Fund, LP in or around March of 2025, correct?

A   Correct.

Q   Who did CDMC FAD, LLC obtain its interests in Charitable DAF Fund, LP from in March of 2025?

A   From an -- from an entity called Charitable DAF Holdco, Ltd.

Q   Charitable DAF Holdco, Ltd., the entity that I asked about earlier, correct?

A   Of the same name.

Q   Yes. And Charitable DAF Holdco, Ltd. has had Joint Liquidated -- Liquidators, Joint Official Liquidators appointed over it in the Cayman Islands, correct?

A   Yes.

Q   And those Joint Official Liquidators were appointed over Charitable DAF Holdco, Limited in or around May 6th, 2025?

A   In May is what I recall.

MR. LANG: Your Honor, we'll pass the witness.

THE COURT: All right. Do we have any questions?

MR. YORK: No questions, Your Honor.

THE COURT: Okay. Any cross?

MR. MORRIS:  Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q    Mr. Patrick, do you know who initiated the proceedings to get the appointment of the Joint Official Liquidators in the Cayman Islands?

A    The director and myself, we initially filed for a voluntary joint liquidation in May.

Q    And did there come a time when the Cayman court appointed the Joint Official Liquidators?

A    Yes.

Q    Do you know who asked the court to appoint the Joint Official Liquidators?

A    We did, as well as other -- it was an agreement with the participation holders of that entity.

Q    And who are the participation holders of that entity?

A    It was the DFW Charitable Foundation as a 51 percent holder as well as the Highland Dallas Foundation, Highland Santa Barbara Foundation, and the Highland Kansas City Foundation.

Q    And those three foundations that you just mentioned, do you know who controls them?

A    Jim Dondero.

Q    Is it your understanding that Mr. Dondero was funding the litigation in the Cayman Islands?

A    Yes.

Q    The Joint Official Liquidators, are you aware of any statement that they've ever made that you are not authorized to act on behalf of any of the HMIT entities?

A    Yeah, they've never made a statement that I'm not authorized to act under any of those entities.

Q    Okay.  Did you receive a letter last night that was purportedly authored by the Joint Official Liquidators?

A    Yes.

Q    Did you review that letter?

A    Yes.

Q    Did that letter refer to today's hearing?

A    Yes.

Q    Are you aware of the Joint Official Liquidators making any appearance in this proceeding?

A    No, I'm not aware they made any appearance in this proceeding.

Q    Based on your recollection of the contents of that letter, did the Joint Official Liquidators challenge your authority to enter into the settlement agreement on behalf of the HMIT entities?

A    No, they did not, because there's no ownership interest.

Q    Okay.  And what do you mean by that?

A    The entity in liquidation owns nothing.  And the DFW Charitable Foundation is the ultimate beneficial owner.

Q    Are you aware that The Dallas Foundation filed an objection to the settlement agreement on behalf of Empower Dallas Foundation, the Okada Family Foundation, and Crown Global?

A    Yes.

Q    Are you aware that that objection was withdrawn?

A    Yes.

Q    Was the withdrawal of that objection the product of negotiations that your counsel had with lawyers for The Dallas Foundation and Crown Global?

A    Yes, it was.

Q    Did The Dallas Foundation or Crown Global require you to surrender your control position of the HMIT entities as a condition to the withdrawal of their objection?

A    To give up my control?  No.

Q    They didn't ask you to do that, did they?

A    No.  No.

Q    You are the control person for each of the HMIT entities that are party to the settlement agreement, correct?

A    That is correct.

Q    Are you aware of any requirement in any of the governance documents --

MR. CURRY:  Your Honor, I'm not questioning, but I'm going to object to the line of questioning here about what was asked and what was not received into negotiations, because,

frankly, you're getting an imperfect picture there. And I don't think it should be misrepresented. The communications didn't happen with Mr. Patrick.

THE COURT: Okay. I don't know if that objection was a confidential settlement communications.

MR. CURRY: It's a combination of foundation and that he's going into confidential settlement discussions.

MR. MORRIS: Your Honor, it's a very simple question. I'll ask it again.

THE COURT: Okay. We'll let --

BY MR. MORRIS:

Q   To the best of best of your knowledge, Mr. Patrick, did The Dallas Foundation or any of the entities on whose behalf it filed its objection require you to surrender your position as the control person of the HMIT entities in exchange for the withdrawal of their objection?

A   No, they did not.

Q   Thank you. Are you aware -- are you familiar with the governance documents for the HMIT entities?

A   Yes, I am.

Q   Are you aware of any restriction on your ability to act on behalf of those HMIT entities with respect to -- withdrawn. Are you required to obtain the consent of anyone in order to enter into the settlement agreement on behalf of the HMIT entities?

A    No, I am not.   I'm the sole authority and control person for that entity.

Q    And do you believe that you're entering into the settlement agreement on behalf of the HMIT entities in good faith?

A    Yes, I do.

Q    Have you received legal counsel before entering into the agreement?

A    Yes, I have.

Q    Do you believe that you've negotiated the best terms that you could get on behalf of the HMIT entities?

A    Yes, I do.

Q    Do you believe that you received the information that you believed you required in order to make an informed decision before you entered into the settlement agreement on behalf of the HMIT entities?

A    Yes, I did.

           MR. MORRIS:  I have no further questions, Your Honor.

           THE COURT:  All right.  Mr. Phillips, anything from you?

           MR. PHILLIPS:  No questions.

           THE COURT:  Okay.  Any redirect?

           MR. LANG:  Briefly.

           THE COURT:  Uh-huh.

           MR. LANG:  Your Honor, because they mentioned the

letter of last night from Grant Thornton, the Liquidators, I'm going to offer that into evidence as the letter that we talked about this morning.  But Mr. Morris directly asked him if he reviewed it and asked him questions about it.

THE COURT:  Response?

MR. MORRIS:  No objection, Your Honor.  Go right ahead.

THE COURT:  I'll admit it.

MR. LANG:  This is --

THE COURT:  Do I have it in my notebook?

MR. LANG:  -- Dugaboy --

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. LANG:

Q   Mr. Patrick, I've handed you --

THE COURT:  We're going to call this Dugaboy 3?

MR. LANG:  Dugaboy 3.

THE COURT:  Okay.

(Dugaboy Investment Trust's Exhibit 3 is admitted into evidence.)

BY MR. LANG:

Q   Mr. Patrick, I've handed you a letter.  It's from Grant Thornton dated June 24th, 2025.  Do you see that?

A   Yes.

Q   And is this a true and correct copy of the letter that you

received or that you reviewed from the Joint Liquidators that you referred to in your answers to Mr. Morris' questions?

A    Well, it's a PDF.  I mean, I'm assuming it's from the Official Liquidators.

Q    But this is the letter you were referring to in your testimony a few minutes ago?

A    Yes.

Q    And do you see on the second paragraph it says that, on May 6th, 2025, the Grand Court of Cayman Islands Financial Services Division appointed Margot MacInnis and Sandipan Bhowmik, each of Grant Thornton Special Services (Cayman) Limited, as the Joint Official Liquidators of the company.  Do you see that?

A    Yes.

Q    And do you see on the second page, it says:  Since our appointment, we have been diligently investigating these transactions, including a corporate transaction that occurred in or around December 2024 where the company transferred a hundred percent of its interest in the Fund to CDMC FAD, LLC, which resulted in the company being the sole member of CDM and subsequent redemptions of the company's interests in CDM.

     Do you see that?

A    Yes.

Q    Is that your understanding of what is happening in the Caymans right now, is investigating these transactions?

A    Correct.

MR. LANG:  Pass the witness.

MR. MORRIS:  May I just have that letter, please?

THE COURT:  Any recross?

MR. MORRIS:  Yeah, just real brief.

RECROSS-EXAMINATION

BY MR. MORRIS:

Q    None of the transactions that you were just asked about has anything to do with any of the HMIT entities, correct?

A    That's absolutely correct.

Q    Okay.  And now that we have the letter in the record, if you could look at the third paragraph.  Do you see --

A    Yeah.

Q    Do you see it refers to the Highland Dallas Foundation, Highland Santa Barbara Foundation, and Highland Kansas City Foundation?

A    Yes.

Q    Are those the three entities that you referred to earlier that are, to the best of your understanding, controlled by Mr. Dondero?

A    Yes.

Q    Okay.  And this is the letter that you said you reviewed and concluded that the Joint Official Liquidators weren't challenging your authority to enter into the agreement on behalf of the HMIT entities; do I have that right?

A    Yes.  Yes, you do.

MR. MORRIS:  I have no further questions, Your Honor.

THE COURT:  Okay.  I have a question or two.

EXAMINATION BY THE COURT

THE COURT:  And again, I apologize if I sounded harsh earlier.  I recognize different people present different ways when they testify.  It just appeared to me that maybe we were slowing things down unnecessarily.  All right?

THE WITNESS:  I apologize, too.  I'm just a little emotionally upset they're using this proceeding for a benefit someplace else.

THE COURT:  Okay.  My question, very general question:  Do you think this settlement is fair and equitable as far as HMIT is concerned?

THE WITNESS:  Absolutely.

THE COURT:  And could you tell me why?

THE WITNESS:  Yeah.  There was no obvious pathway for HMIT to, in my mind, to receive the residual interest of the bankruptcy estate without a settlement with the Debtor.  Otherwise, it just seemed to me that it would go on forever.  And then I balanced that against the existing litigation and the probability of the outcome weighted against the costs, and determined that it made sense from HMIT's perspective to enter into the settlement agreement.

THE COURT:  Okay.  And you understand that, as part

of this, you're giving up some litigation claims that have been waged now for a couple of years or more?

THE WITNESS:  That is correct, but I'm also receiving the Kirschner Litigation, which I did negotiate to receive.

THE COURT:  Okay.  And there was a note that the estate -- I've heard it called at some point the $57 million note that HMIT owed Highland, a December 2015 note -- that basically gets credited against the capital account.  You understand that?

THE WITNESS:  Yes, I do.

THE COURT:  Okay.  And then you understand that if I approve this deal, I'm not sure why there's going to be $500,000 to HMIT and then also another $10 million to HMIT, but subsequent payments could get held up if there are litigation threats to the Highland Claimant Trust.  You understand that, correct?

THE WITNESS:  Yes, I do.

THE COURT:  Okay.  I just, I have to ask.  I'm confused about what's going on here.  I thought that -- well, let me just ask this:  Would you consider yourself crossways with Mr. Dondero now?

THE WITNESS:  No, but I'll answer the question.  Upon advice of counsel, I quit Skyview Group.  And upon advice of counsel, I terminated the back office services that Skyview Group was providing to the DAF.

THE COURT: Okay. Well, you said you're getting maybe a little emotional because of other litigation. I'm just trying -- I don't understand what all that other --

THE WITNESS: Unrelated -- well, unrelated to that. They're clearly trying to use this forum to benefit their Cayman actions. They hired U.S. counsel called Reed Smith, and they've been begging for an organization chart to issue a variety of frivolous lawsuits against the operating DAF entities. So I do apologize, but that's a little upsetting to me because I know we're going to -- that I've just fed them a list of targets in another unrelated matter.

THE COURT: Okay. Reed Smith. Here we go again with -- they've made an appearance for Mr. Seery in this litigation.

MR. MORRIS: Exactly. And we have raised that issue.

THE COURT: Okay.

MR. MORRIS: And I'm surprised to hear that they think they still have the ability to do this. But we will pursue that later.

THE COURT: Okay. All right. I had nothing further. Thank you, Mr. Patrick.

(The witness steps down.)

THE COURT: All right. So where are we now? I said that, again, just trying to balance the playing field, if Dugaboy was given the ability to question Mr. Patrick, then I

EXHIBIT
6

CAUSE NO. _____

THE HIGHLAND DALLAS
FOUNDATION, INC.,
et al.,

*Plaintiffs*,

v.

MARK PATRICK, et al.,

*Defendants.*

IN THE TEXAS BUSINESS COURT

1ST DIVISION

DALLAS, TEXAS

## DECLARATION OF JAMES DAVID DONDERO

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, DECLARE under penalty of perjury:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

3. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding $16 billion in value. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or

my affiliates. In December 2015, I divested my majority stake of Highland (*2015 Transaction*).

## THE FUND

4. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

5. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the *Supporting Organizations*) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the *Charities*).

6. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (*ARLPA*), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (*Articles*), govern the Fund and its partners.

7. The LP held 100% of the economic interest in the Fund. The Fund's general partner, Charitable DAF GP, LLC (the *GP*), a Delaware company incorporated on 25 October 2011, held management shares.

8. The LP issued 100 management shares (the *Management Shares*) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in

the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the **Control Position**).

9. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

10. The governing documents of the Fund plainly state in multiple places that all of the powers of the Control Position exist solely for the purpose of benefitting the Supporting Organizations and their Charities. This ubiquitous language was created for an express purpose. The expectation by the founders of the Fund (myself included) at the time it was formed was that the governing documents would ensure that the Control Position would be bound through his or her fiduciary obligations to safeguard and advance the interests of the charitable organizations that held actual beneficial ownership of the Fund.

**GRANT SCOTT**

11. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

12. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr. Scott as the Control Person. However, Mr. Scott had complete discretion in adopting or rejecting the

investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr. Scott was paid $60,000 per annum.

13. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

## MARK PATRICK

14. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax- deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr. Patrick served that role at Highland from 2008 until his departure in February 2021.

15. In March 2021, Mr. Patrick was hired by Skyview as Tax Counsel and continued to perform substantially similar tax counsel duties for me. At Mr. Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

16. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr. Patrick working with outside counsel. Mr. Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

17. In March 2021, Mr. Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the bankruptcy of Highland filed in 2019, and he did not believe he was equipped to handle those disputes. Mr. Patrick suggested to Mr. Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr. Patrick was my attorney and Mr. Scott was my trusted friend, and I was happy for Mr. Scott to pass the Control Position to Mr. Patrick.

18. On 25 March 2021, Mr. Scott: (i) resigned as director of the LP, (ii) appointed Mr. Patrick as director of the LP, and (iii) transferred to Mr. Patrick the Management Shares for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

19. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr. Murphy, Mr. Patrick's vote counts as the tiebreaker for corporate voting.

**MR. PATRICK'S CONTROL OF THE FUND**

20. In the initial period following Mr. Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr. Patrick was free (as Mr. Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

21. Subsequently, however, communications between Mr. Patrick, Skyview, and me began to become less frequent, and over time I came to suspect that Mr. Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the

Fund, but rather for his own personal enrichment.

22. On 28 June 2023, Mr. Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms. Short learned that the directors of the entity were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick had made the grant request without disclosing his and/or his family's involvement.

23. Ms. Short discussed the matter with Mr. Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms. Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms. Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely. I was informed of this process by Ms. Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

24. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr. Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

25. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr. Cronin was known to me personally. In September 2023, Mr. Cronin and I met, and he informed me that he had been approached by Mr. Patrick with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick as a supplement to Mr. Patrick's compensation. Mr. Cronin informed me that he had asked Mr. Patrick if this arrangement would amount to fraud, and that Mr. Patrick's response had been: "*you can't steal from yourself.*"

26. Mr. Cronin informed me that he understood from this statement that Mr. Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr. Cronin further informed me that he was uncomfortable about Mr. Patrick's proposal and that he subsequently communicated this to Mr. Patrick, whereupon Mr. Patrick cut off all further communications between them.

27. Mr. Cronin's allegations that Mr. Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my attorneys in the United States that, had Mr. Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr. Cronin contacted me, I met with Mr. Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations about the matter and Mr. Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr. Patrick's powers or remove him from his position.

28. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr. Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the *Expense Summary*) which indicated substantial increases in expenditures during Mr. Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

    (a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023 – and increased even further to around $2.25 million in the first half of 2024 alone.

    (b) Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

29. The Expense Summary reinforced my concern that Mr. Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

30. In August 2024, I became aware of yet another issue concerning Mr. Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (*MNPI*) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (*Compliance Policy*). NexPoint and its affiliates, and Skyview, require their employees to abide by the

Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr. Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

31. I was informed that my director of charitable giving had been contacted by Ms. Diaz, the CEO of the Highland Dallas Foundation, Inc. (**Dallas Foundation**), one of the Charities. Ms. Diaz stated that on August 28, 2024, Mr. Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI, which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr. Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr. Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr. Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

32. Upon receipt of the allegations against Mr. Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr. Patrick's knowledge, so as to avoid potentially tipping off Mr. Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr. Patrick's actions constituted a serious breach of his compliance and employee obligations. On October 1, 2024, as part of the finalization of the investigation report, Skyview's chief compliance officer interviewed Ms. Diaz about the allegations against Mr. Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on October 11,

2024 and concluded that Mr. Patrick had attempted a serious breach of U.S. securities laws.

33. On October 2, 2024, Mr. Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr. Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr. Patrick became aware of the investigation into his behavior and resigned before the report was published.

34. On the same day that Mr. Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr. Patrick as my counsel, I believe that Mr. Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

## FUNDING OF PROCEEDINGS

35. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations for the purpose of understanding how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. I am only one of three votes, and the other two votes on each board are held by the respective Charity. Historically, the boards have had no hesitation in exercising their powers to chart

independent courses even if those decisions differ from my preferences.

36. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

***************REMAINER OF PAGE INTENTIONALLY LEFT BLANK***************

My name is James David Dondero, my date of birth is June 29, 1962, and my address is 300 Crecent Court, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing is true and correct. Executed in Dallas County, State of Texas, on the 1st day of July 2025.

_____
**JAMES DAVID DONDERO**

EXHIBIT

7

CAUSE NO. _____

| | |
|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | IN THE TEXAS BUSINESS COURT |
| *Plaintiffs*, | |
| v. | 1ST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION,CDMCFAD, LLC, CDH GP, Ltd., and CHARITABLE DAF FUND, LP | |
| *Defendants*. | DALLAS, TEXAS |

## DECLARATION OF JULIE DIAZ

I, **JULIE DIAZ**, of 3000 Pegasus Park Dr, Suite 930, Dallas, Texas 75247, declare under penalty of perjury as follows:

1. I am the President and Chief Executive Officer of The Dallas Foundation, an exempt charitable organization based in Dallas, Texas which partners with donors and works with the community to support various philanthropic causes in Greater Dallas.

2. I am also a Director of the Highland Dallas Foundation Inc., an exempt charitable entity incorporated in Delaware as a supporting organization to provide funding directly to The Dallas Foundation.

3. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

MR 0230

4. This Declaration is presented in support of Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver in the above-captioned case. I verify that, to the best of my knowledge, information, and belief, the statements in it are true.

## PROFESSIONAL EXPERIENCE

5. I hold a Bachelor's Degree in Arts Management from Salem College, and a Masters Degree in Business Administration from Boston University.

6. I joined The Dallas Foundation in 2019 as Vice President, Philanthropic Partnerships. I was appointed as President and CEO in 2024.

7. I have extensive nonprofit experience in strategy, governance, and revenue growth, having led resource development teams at the Perot Museum, Greenhill School and Southern Methodist University, and having held leadership roles at the Philadelphia Orchestra, the Boston Symphony Orchestra, and GBH Public Television and Radio in Boston.

8. I am an active member of The Dallas Assembly and Charter 100, organizations which champion collaboration in community development and philanthropy.

9. I also served in 2018 as an adjunct professor at SMU Meadows School for the Arts.

## THE FUND

10. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Walkers Corporate Services Ltd, Walker House, 87 Mary St, George Town, Grand Cayman, KY1-9005, Cayman Islands.

11. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the **ARLPA**).

12. From approximately its inception until approximately March 2025, the sole limited partner of the Fund (the LP) was a Cayman Islands exempt company incorporated on 27 October 2011

(registration number 263805) called Charitable DAF Holdco, Ltd.

13. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the *Articles*)**.**

14. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the *GP*), a Delaware company incorporated on 25 October 2011.

Ownership and Management

15. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the Code) … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" (ARLPA, Recitals).

16. From my experience in nonprofit entities, I understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organizations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities. The relationship between a supporting organization and its supported charity is sometimes described as similar to that of a parent and subsidiary.

17. In this context:

   (a) The LP holds or held  all of the economic interest in the Fund. The GP held control shares, but had no economic interest.

   (b) The LP issued 305 participation shares (the *Participation Shares*), 300 of which are held by three Delaware corporate entities (together, the *Supporting Organizations* and/or *Petitioners*). Each Supporting Organization provides funding to its respective U.S.-charitable foundation (together, the *Charities*) which are the ultimate beneficial

owners of the Fund's entire economic interest. These Supporting Organizations are the Plaintiffs in the above-captioned litigation.

(c) The LP also issued 100 management shares (the ***Management Shares***) which attach the only voting rights for all shareholders of the LP. The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the entire issued share capital in the GP (the ***Membership Interest***).

18. The Management Shares and Membership Interest have at all material times been held by a single individual who as a result has substantial control of the Fund structure (the ***Control Position***). In this regard, the relevant terms of the ARLPA and Articles are as follows.

(a) **The ARLPA**

Clause 1.12

(a) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

Clause 1.6

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have

full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

(b) **The Articles**

Article 11

The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. *Management Shares confer no other right to participate*

*in the profits or assets of the Company*.

Article 19

Participating Shares … shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## SUPPORTING ORGANIZATIONS

19. The Supporting Organizations provide funding directly to the Charities as follows:

(a) Prior to the events at issue in this Action, The Highland Dallas Foundation, Inc. (**HDF**) held 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1.2 billion in charitable grants that support a broad range of public needs and manages over $650 million in assets.

(b) Prior to the events at issue in this Action, The Highland Kansas City Foundation, Inc. (**HKCF**) held 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants that support a broad range of public needs and currently manages over $5 billion in assets.

(c) Prior to the events at issue in this Action, The Highland Santa Barbara Foundation, Inc. (**HSBF**) held 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d) Prior to the events at issue in this Action, HCMLP Charitable Fund (**HCMLP**) held 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million that support a broad

range of public needs and donated $38.9 million to local nonprofits in 2023.

20. Since the Fund's inception in 2011, the Supporting Organizations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

## BACKGROUND

21. As stated in paragraph 6 above, I joined The Dallas Foundation in 2019 and do not therefore have direct personal knowledge of any factual matters, including regarding the formation of the Fund and/or the Fund's operations, prior to that time. I understand these matters are covered in the declaration of James Dondero.

22. A summary of those matters that I understand to be most relevant to this application are accurately summarized as follows:

    (a) **Control Position**. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr. Scott: (i) resigned as director of the Fund and LP (ii) appointed Mark Patrick as director of the Fund and LP; and (iii) transferred to Mr. Patrick the Management Shares in the LP and Management Interest in the GP for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

    (b) **Mark Patrick**. From 2008 to 2021, Mr. Patrick was employed as tax counsel by Highland Capital Management, LP (**Highland**), an investment advisor founded by Mr. Dondero. From March 2021 to October 2024, Mr. Patrick was employed as tax counsel at Skyview Group (**Skyview**). In both positions, Mr. Patrick acted as an advisor to Mr. Dondero. Mr. Patrick played a significant role in developing the overall Charitable DAF Fund structure.

## CONCERNS ABOUT MR. PATRICK'S CONDUCT

23. I became aware that in June 2023, Mr. Patrick made a grant request to the Highland Dallas Foundation in relation to 'Creative HEARTS TX', an entity of which Mr. Patrick and his family

were directors, without disclosing this information. I became aware of this situation contemporaneously with its occurrence and it caused me concern regarding Mr. Patrick.

24. I understand from the Dondero Declaration (not my personal knowledge) that in September 2023, Mr. Patrick approached Kevin Cronin of Fortaris with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick. I became aware of this situation shortly after its occurrence and it caused me concern regarding Mr. Patrick.

25. In August 2024, I personally became aware of the potential disclosure of material non-public information (*MNPI*) to the Highland Dallas Foundation (*HDF*). On 28 August 2024, I was informed by David Rosenberg of Holland & Knight (*H&K*), the Charities' US-attorneys, that Mr. Douglas Mancino, an attorney with Seyfarth Shaw LLP (*Seyfarth*) in Los Angeles, California, had called Mr. Rosenberg, identified himself as Mr. Patrick's "*outside compliance counsel*" and recommended that Mr. Rosenberg advise HDF to exercise put-options over units it holds in the NexPoint Hospitality Trust (*NHT*). Mr. Rosenberg reported this to me. I was very concerned by this information and therefore immediately contacted Lucy Bannon, an employee of NexPoint and someone I have known in a professional capacity for many years, to inform her of the situation.

26. I have since become aware through my position at The Dallas Foundation and role as a board member of HDF, that the information Mr. Mancino provided to H&K could have constituted MNPI. This matter is discussed in more detail in paragraphs 33-35 of Dondero 1.

### FINANCIAL IRREGULARITIES

27. In or around August 2024, NexPoint provided the Charities with a financial analysis of the Fund's annual expenses (the *Expense Summary*) which appeared to indicate substantial

increases in expenditures in recent years.

28.  As stated in paragraph 31 of Dondero 1, the Expense Summary indicated as follows:

(a)  Directors' fees increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, directors' fees increased further to around US$2.25 million.

(b)  Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount had been spent in2023 (i.e. US$18.6 million). I was not aware of any basis for this extraordinary legal expenditure in a period of just 18 months.

29.  The Charities were concerned by the Expense Summary and considered it was necessary to seek to verify and/or understand the apparent increases in expenditure. Accordingly, in October 2024, the Charities made a reasonable request to Mr. Patrick for financial information about the Fund, which Mr. Patrick failed to provide at that time, or any time thereafter.

30.  On 11 November 2024, the Charities' US-attorneys, Holland & Knight (*H&K*), conveyed a letter to Mr. Murphy from the Charities (the *No Confidence Letter*) advising that the Charities no longer have confidence in the governance of the Fund and consider a reorganization is required:

"Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. **The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed**. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts**.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

31. The Charities did not receive a response to the No Confidence Letter. Accordingly, on 23 January 2025, I sent an email to Mr. Murphy (a director that Mr. Patrick appointed in the Cayman Islands) stating that the Charities wished to better understand the Fund's asset position and requesting that the Fund provide certain information by 10 February 2025, including: (i) income statements for the past four years, (ii) listing of underlying assets, (iii) audited financial statements, and (iv) the current structure of the LP's operations.

32. On 28 January 2025, I sent a further email to Mr. Patrick and Mr. Murphy expressing serious concern that the Charities' requests continued to be disregarded, reflecting an ongoing lack of transparency about the Fund:

"...These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the

assets further".

33. On 30 January 2025, I received a response from Mr. Murphy stating that neither he nor Mr. Patrick received my 23 January 2025 email, and that he understood the next step was that he and Mr. Patrick would "present directly to the foundations/supporting organizations" to address some of the concerns in the No Confidence Letter:

> "…**we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets.** As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control … any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero …
>
> …**We note that your communications to date contain several misstatements of fact and we reject all of your allegations**. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.
>
> **Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so** (which is not disputed).

In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies."

34. I understand (and as stated in paragraph 12 of Dondero 1) the Control Position to be responsible for governance and management functions to enable the Fund to carry out its sole purpose of benefiting its ultimate beneficial owners (i.e. the Charities). In this context, the Charities were very surprised and concerned by Mr. Patrick and Mr. Murphy's responses to requests for information and the lack of transparency regarding the Fund's financial position. It remains unclear to the Charities the basis upon which access to such information was (and continues to be) restricted.

35. On 31 January 2025, H&K responded to Mr. Murphy's email as follows:

"As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions

...

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024, before Mr. Patrick shut down [communication] **showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022.** If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. **Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024.** Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. **Yet, no information has been provided by you and Mr. Patrick,**

MR 0241

**no clarity given.** It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10% on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. **If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns**…

36. On 4 February 2025, Mr. Murphy responded that while open to resolving the concerns, they were struggling to understand the Charities' change in position.

37. On 7 February 2025, H&K responded as follows:

"I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees.

…

Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted."

38. On 14 February 2025, H&K received a fax from Seyfarth which rejected the reported increases

in legal and directors' fees and sent a further email on 18 February 2025 which attached a valuation of the Fund from 2020 in support of his suggestion that similar information was provided to the Charities when Mr. Scott was in the Control Position. Copies are at **Tabs 15** and **16**, respectively.

39. On 27 February 2025, H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund.

40. On 17 March 2025, Seyfarth sent an email to H&K requesting available dates for Mr. Murphy to make a presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth replied, stating they had just learned of a call arranged for the following day, and seeking to reschedule. H&K responded that they had no knowledge of the purported call and would revert with available dates from 16 April 2025. On 9 April 2025, HK responded with its availability.

41. At the date of this declaration, none of the financial information requested by the Charities has been provided by Mr. Patrick or Mr. Murphy.

**MR. PATRICK DILUTES THE SUPPORTING ORGANIZATION'S INTERESTS IN THE CHARITABLE DAF FUND.**

42. I am aware that between December 2024 and the present, Mr. Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund and then to entirely alienate those assets. Mr. Patrick's acted to eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets, while awarding ownership to at least one purported charitable entity that he personally controls.

43. I have come to know now that Mr. Patrick held the controlling general partner shares in the

Charitable DAF Fund via the Delaware GP. Without any prior notice or even disclosure to the Supporting Organizations, in February 2024, Mr. Patrick incorporated CDH GP, Ltd in the Cayman Islands, with Mr. Patrick as the sole director. He used this newly created Cayman Islands entity to replace and redomicile Delaware GP. CDH GP became the general partner holding all the controlling shares in the DAF Fund. The Supporting Organizations only found out about the replacement and redomicile of the Delaware GP in February 2025, through independent investigation.

44. On December 9, 2024, Mr. Patrick created Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Mr. Patrick was named the Sham Charity's sole member and sole director; its registered address is Mr. Patrick's home address. The apparent purpose and the clear effect of forming DFWCF was to create a facsimile of the Charitable DAF Fund beneficiaries—the nonprofit charities and their Supporting Organizations—but in the form of a "charitable" entity controlled by Mr. Patrick.

45. I learned that Mr. Patrick later incorporated CDMCFAD, LLC, a Delaware limited liability company.

46. Without notice to the Supporting Organizations or to me, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. The Supporting Organizations' technical interest was in Charitable DAF Holdco. As a result, CDMCFAD effectively was inserted as a company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets in Charitable DAF Fund. Instead, a different and new entity (CDMCFAD) held the assets in Charitable DAF Fund; the Supporting Organizations only held shares in an

entity (Charitable DAF Holdco) that notionally held that new entity.

47. On February 7, 2025, again without notice to the Supporting Organizations or to me, DAF HoldCo allotted 318 participating shares to DFWCF, the Sham Charity controlled by Mr. Patrick himself. This dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF Holdco from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; and (iii) HSBFI's interest was diluted from 32.787% to 16.05%.

48. I now know that in February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Mr. Patrick's complete control of the assets of DAF Fund.

49. And I now know that on March 27, 2025, Mr. Patrick caused CDMCFAD to issue shares to the Sham Charity, and only to the Sham Charity. None of the Supporting Organizations were issued shares in CDMDFAD. Now, the sham charity controlled by Mr. Patrick held a direct economic interest in the entity that Mr. Patrick had newly inserted between Charitable DAF Holdco and the assets in Charitable DAF Fund. Meanwhile, the two direct beneficial owners of CDMCFAD were (1) Charitable DAF Holdco—in which the Supporting Organizations still held a minority beneficial interest; and (2) Mr. Patrick's new sham charity, which he controlled.

50. On April 2, 2025, Mr. Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million, after which Charitable DAF Holdco purportedly had no assets and no remaining interest in Charitable DAF Fund at all. Needless to say, a one-time $1.6 Million payment for the release of the beneficial ownership of more than

$270 Million in the Fund—held entirely for the benefit of the Supporting Organizations as late as December 2024—is not an exchange that I or any other person with fiduciary loyalty to the Supporting Organizations would ever have approved, had we known it was happening at the time. As a result, Mr. Patrick's Sham Charity, Defendant DFWCF, was the sole remaining limited partner and beneficial owner of Charitable DAF Fund, through its 100% ownership of the fund by CDMCFAD. The effect of this final step was to consummate the complete severance of the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund.

51. Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned more than 98% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Mr. Patrick purportedly caused $1.6 million to be distributed to the Supporting Organizations receipt of those funds have yet to be verified.

## REPLACEMENT OF GP

52. For the first time, in February 2025, I learned that Mr. Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior. This information was, I understand, obtained via background checks into the various parties.

53. I understand that on 27 February 2024, CDH GP, Ltd (the *New GP*) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

54. I also understand that Mr. Patrick is the sole director of the New GP.

55. It is unclear to the Charities on what basis Mr. Patrick and/or Mr. Murphy removed and redomiciled the general partner of the Fund, nor the reason the Charities were not notified of

this change.

## PURPOSE OF APPLICATION

56. It is clear the Fund's assets are being diminished for the benefit of Mr. Patrick and Mr. Murphy; and in any case, the Defendants in this Action are engaged in a series of secretive transactions intended to completely alienate from the Supporting Organizations more than $270 Million that was held for their benefit, and upon which their charitable activities depend. These are the sole motivations of the Charities in bringing this application.

57. Unless enjoined, Mr. Patrick and the other Defendants will cause and continue to cause irreparable harm to the Charities including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $250 Million that can never be replaced because the Defendants lack the means. In addition to the permanent loss of funds in the future, the immediate continuation of key programs at the Charities is imperiled by the conduct at issue here and the reality that the Charities, as of this moment, are cut off from the funds intended for their support. Moreover, the conduct of the Defendants to date creates a pattern suggesting that further creative transfers, alienation, spending, and dissipation of the monies in the fund are likely to be imminent. If this happens, it is likely they will never be recovered.

58. The harm to the Charities is imminent if the Defendants are not enjoined. Enjoining the Defendants will merely require them to refrain from doing anything with the Funds for two weeks. If the Defendants are not acting adversely to the Charities, the Funds will still be available to them for their use in future. The Charities suffer a greater burden as they stand to lose everything.

59. Enjoining the Defendants will not disserve the public interest as without the injunction, there is significant potential for irreparable harm to the Charities and the Defendants will not be harmed

if enjoined. Freezing the funds to ensure that Mr. Patrick's scheme is not hurting charitable interests vital to key communities serves the public interest.

## ARGUMENTS THAT MAY BE MADE BY THE RESPONDENT

60. I draw attention to the following matters which the Defendants may raise by way of attempted defense against the application.

61. The Defendants may assert (as they have repeatedly suggested in correspondence) that the Charities are acting on the instructions of Mr. Dondero and that we are being used as a proxy for his own disputes with Mr. Patrick. Any suggestion of that nature is entirely rejected. On the contrary, the Charities have at all times taken steps to independently verify information provided to them by Mr. Dondero and entities associated with him, have taken advice solely from their own attorneys in the US and Cayman, and have required Mr. Dondero to recuse himself from board meetings of the Supporting Organisations at which decisions as to whether to bring these proceedings were discussed. The Charities have no interest in any dispute there may be between Mr. Patrick and Mr. Dondero.

62. The Defendants also may assert that the Charities are not entitled to any information regarding the Fund, and that the structure was designed specifically to exclude the Charities from information or control rights. Whether that is true or not, the Charities are the sole economic beneficiaries of the Fund's activities, and Defendants owed and owe them fiduciary duties of care, loyalty, and candor. If the Fund is being used for a purpose other than that for which it was established, that cannot be allowed to continue to the detriment of the charitable causes and in violation of those duties. The Fund would otherwise be an unsupervised vehicle susceptible to being used for the wishes and benefit of the individual holding the Control Position, to the detriment of the Charities and the express purposes of the governing documents.

63. The Defendants may deny that the expenditures are as significant as that appearing from the documents. If that is the case, the Defendants have had ample opportunity to correct this, but have chosen not to do so.

64. I am not aware of any other points that the Defendants have made or alluded to in correspondence which could materially affect this application.

<div align="center">

**THE CAYMAN ISLANDS PROCEEDINGS**

</div>

65. Given Patrick's pattern of malfeasance the Supporting Organizations filed an involuntary Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*

66. Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, DFWCF as a Delaware entity was not expressly named in the Grand Court proceedings.

67. The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

68. While the Cayman Islands appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick and DFWCF (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the DAF Fund and DAF HoldCo. In the meantime, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that relief on funding from the DAF Fund.

69. Further, while Defendants Patrick and DFWCF wrongfully remain in control of the participation shares that rightfully belong to the Supporting Organizations, the Defendants wrongfully hold a seat on the liquidators' committee.

## ORDERS SOUGHT

70. Given the refusal of the Defendants to answer legitimate questions raised by the Charities and the weight of evidence that suggests that the Defendants are dealing with or spending the assets of the Fund in a manner that is not in the best interest of the Charities, the Charities respectfully seek orders placing the Fund, its Limited Partner, and its General Partner under the control of an independent Receiver who can investigate the affairs of the Fund and the decisions taken by management, and manage those affairs for the benefit of the intended beneficiaries, under the supervision of the Court. The Charities have no confidence in the current management to provide this information themselves without independent oversight.

71. Until such time as a Receiver may be appointed, the Charities further seek a temporary

restraining order and temporary injunction to prevent the Defendants from the use, transfer, dispersal, and/or alienation of any interests or assets, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment.

My name is Julie Diaz, my date of birth is ___3/23/64___, and my address is ___5711 Prestuick Lane___. I declare under penalty of perjury that the foregoing is true and
___Dallas, TX 75252___
correct.

Executed in ___Burnstable___ County, State of ___MA___,

on the ___1___ day of ___July___, ___2025___.

/s/ _Julie Diaz_
**JULIE DIAZ**

EXHIBIT
**8**



**FSD NO. 116 OF 2025 (JAJ)**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

---
**SUPERVISION ORDER**
---

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1.  The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

2.    The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588 margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588 sandipan.bhowmik@uk.gt.com |

3.    The joint official liquidators may act jointly and severally.

4.    The joint official liquidators are not required to give security for their appointment.

5.    The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

   a)    the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

   b)    the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6.    The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

   a)    the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

   b)    the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

   c)    the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7.    The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8.    The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9.    The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

10.    The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**
Filed    6  May 2025

_____
**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 102670163
Filing Code Description: Petition
Filing Description: PLAINTIFFS ORIGINAL PETITION, APPLICATION FOR TRO AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER
Status as of 7/2/2025 8:08 AM CST

Associated Case Party: The Highland Dallas Foundation, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/1/2025 9:35:25 PM | SENT |

# Tab 2

Case No. 25-BC-01B-0027

The Highland Dallas Foundation, Inc., et al v. Patrick et al

Plaintiffs' Statement on the Basis of the Court's Subject Matter Jurisdiction

## Statement

In accordance with Sec. 25A.004 of the Texas Government Code, Plaintiffs allege jurisdiction in this Business Court as follows and as set forth in their Original Petition at Paragraph 4.1, pages 4-5:

1. This lawsuit is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd (*See,* 25A.004(b)(2));

2. This lawsuit is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P. (*See,* 25A.004(b)(4)); and

3. This lawsuit is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith (*See,* 25A.004(b)(5)).

**Case No. 25-BC-01B-0027**
**The Highland Foundation, et al. v. Patrick et al.**


Plaintiffs' Supplement to Jurisdictional Statement


This Court has jurisdiction in this case because:

- the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs, TEX. GOV'T CODE § 25.004(b);

- it includes an action regarding the governance, governing documents, or internal affairs of an organization, *id*. § 25.004(b)(2);

- it includes an action by an organization, or an owner of an organization, and is brought against the owner, controlling person, or managerial official of the organization and alleges an act or omission by the person in the person's capacity as an owner, controlling person, or managerial official of the organization, *id*. § 25.004(b)(4);

- it involves an action alleging that an owner, controlling person, or managerial official breached a duty owed to an organization or an owner of an organization by reason of the person's status as an owner, controlling person, or managerial official, including the breach of a duty of loyalty or good faith, *id*. § 25.004(b)(5); and

- it includes an action seeking to hold an owner or governing person of an organization liable for an obligation of the organization, other than on account of a written contract signed by the person to be held liable in a capacity other than as an owner or governing person, *id*.§ 25.004(b)(6);

- furthermore, it seeks injunctive relief, *id*. § 25.004(e).

Tab 3

**REPORTER'S RECORD**

**VOLUME 1 OF 1 VOLUMES**

**TRIAL COURT CAUSE NO. 25-BC01B-0027**

| | |
|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | TEXAS BUSINESS COURT |
| Plaintiffs, | DIVISION 1B |
| VS. | |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | |
| Defendants. | DALLAS COUNTY, T E X A S |

**PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

On July 2nd, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bill Whitehill, Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by computerized stenographic machine shorthand.

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

**A P P E A R A N C E S**

APPEARING FOR THE PLAINTIFFS:

    HON. CRAIG M. WARNER
    State Bar No. 24084158
    cmwarner@duanemorris.com
    HON. JOSEPH M. COX
    State Bar No. 04950200
    jmcox@duanemorris.com
    DUANE MORRIS, LLP
    100 Crescent Court, Suite 1200
    Dallas, Texas  75201
    (214) 257-7200


APPEARING FOR THE DEFENDANTS:

    HON. BRIAN PATRICK SHAW, JR.
    State Bar No. 24053473
    HON. MONICA GAUDIOSO
    State Bar No. 24084570
    HON. ANDREA REED
    State Bar No.24121791
    CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP
    901 Main Street, Suite 5500
    Dallas, Texas  75202-3767
    (214) 855-3120

    HON. SAWNIE E. McENTIRE
    State Bar No. 13590100
    PARSONS MCENTIRE MCCLEARY, PLLC
    1700 Pacific Ave, Suite 4400
    Dallas, Texas  75201-7324
    (214) 237-4300

    HON. MATTHEW MURPHY

    HON. REED COX

    HON. MARK GOODMAN

    HON. JENNIFER COLGATE

ALSO PRESENT:

    Shawn Raver, Client Representative/Counsel
    Philip Spears, Division 1B Staff Attorney
    Susan Fox Bowen, Court Administrator
    Andrea Anderson, Legal Intern

*** **CHRONOLOGICAL INDEX** ***

**VOLUME 1 OF 1**

**(July 2nd, 2025)**

|                                      | PAGE | VOL |
|--------------------------------------|------|-----|
| Case called/appearances              | 4    | 1   |
| Opening statement by Mr. Warner      | 8    | 1   |
| Statement by Mr. Cox                 | 15   | 1   |
| Statement by Mr. Shaw                | 17   | 1   |
| Statement by Mr. McEntire            | 21   | 1   |
| Proposal by The Court                | 22   | 1   |
| Statement by Mr. McEntire            | 24   | 1   |
| Response by Mr. Warner               | 24   | 1   |
| Statement by Mr. Goodman             | 26   | 1   |
| Statement argument by Mr. Shaw       | 29   | 1   |
| Statement by Mr. Warner              | 30   | 1   |
| Statement by Mr. McEntire            | 32   | 1   |
| Statement by Mr. Raver               | 33   | 1   |
| Statement by Mr. Murphy              | 35   | 1   |
| Statement by Mr. Warner              | 38   | 1   |
| Statement by Ms. Colgate             | 39   | 1   |
| Rule 11 agreement by Mr. Shaw        | 47   | 1   |
| Adjournment                          | 55   | 1   |
| Certificate of Court Reporter        | 56   | 1   |

Donna A. Goree, CSR, RPR, CRR   (979) 533-0422

*** **P R O C E E D I N G S** ***

THE COURT: All right, everybody. We'll call Cause No. 25-BC01B-0027, the Highland Dallas Foundation, Inc., et al versus Mark Patrick, et al. Let's go around the table and take appearances. Please go slow.

MR. WARNER: I'm Craig Warner, for plaintiffs.

THE COURT: Okay.

MR. COX: Joe Cox.

THE COURT: Mr. Cox. All right.

MR. COX: Here for the plaintiffs along with Mr. Warner.

MR. McENTIRE: Saul McEntire on behalf of the defendants.

MR. SHAW: Brian Shaw on behalf the defendants. I have Mr. Shawn Raver, who is our client representative. He's the chief operating officer and general counsel. I also have my colleagues Monica Gaudioso and --

MS. GAUDIOSO: I'll spell it for you. Actually Brian always did that. G-A-U-D as in David, I-O-S as in Sam, O.

MR. SHAW: And also from my firm, Andrea Reed.

THE COURT: With me is Philip Spears, staff attorney which y'all have met before; Adreana Anderson our intern from SMU. Not in the room, but certainly participating, is Susan Fox Bowen, court manager. Susan is going to be your

best friend in this case because everything is going to run through her. If not through her, it's going to run through Philip.

You all may or may not have had an opportunity yet to view the Court guidelines. We'll go through those more thoroughly at a later point in time when we have a scheduling conference to do that. But we're here today on an emergency application for temporary restraining order and appointment of a receiver.

**MR. COX:** It's Joe Cox. We're not going to go through the receiver today, Judge. We're just here for the restraining order. We'll pick up the receiver at a later hearing.

**THE COURT:** Okay. Good. That would have been my inclination based upon what I've read.

**MR. COX:** Yes.

**MR. SHAW:** Judge, we have a few lawyers that are appearing virtually, as well.

**THE COURT:** That's true. Let's get that on the record.

**MR. MURPHY:** Good afternoon, Your Honor. Matthew Murphy of Richards, Layton & Finger in Delaware on behalf of CDMCFAD, LLC; and my partner, Reed Cox, is also online.

**THE COURT:** Fantastic. Anybody else?

**MR. GOODMAN:** Mark Goodman from Campbell's in the Cayman Islands on behalf of the same companies.

**MS. COLGATE:** Jennifer Colgate on behalf of DFW Charitable Foundation from Baker & Partners in the Cayman Islands. Thank you.

**THE COURT:** Can we have the admonishments, please?

**THE COURT ADMINISTRATOR:** We are conducting this hearing both in person and via electronic means. You are participating both in person and in a virtual courtroom and should treat this hearing as though you were in a real courtroom. Conduct yourself in the same manner that you would in a real courtroom.

The same rules of decorum apply, and the local rules are still in effect. The hearing is open to the public via live streaming on YouTube and it is currently being live streamed.

Recording this proceeding is prohibited without the express permission of the Court; and this applies to all participants of the hearing, including anyone who may be watching on the live stream.

The official recording of any proceeding is the court reporter's record, and the chat function has been disabled by the Court on all platforms. This proceeding is not being recorded for any public use, and the live stream

recording will be deleted at the conclusion of these proceedings and will not be available for reply. Thank you, Judge.

**THE COURT:** Okay. I think we need a few more acronyms in this case.

**MR. COX:** Judge, could I make one request? Currently, one of our lawyers is having cataract surgery right now; and he would like to see it later on when he can see. Is there a way to do that?

**THE COURT:** Susan, are you still there?

**THE COURT ADMINISTRATOR:** Yes, Judge, I'm here.

**THE COURT:** Mr. Cox, could you hit that okay button, please? Thanks.

So, we have a request to record it. I don't think our rules allow us to do that.

**THE COURT ADMINISTRATOR:** They do not, Judge.

**THE COURT:** We have a reporter here. So, we can do that. But I don't think -- you know, we have been doing this almost a year; and nobody has ever asked.

**MR. WARNER:** Once his eye surgery is over, he would like to review.

**THE COURT:** I'm sure if you want a rush copy, Donna will be happy to prepare one for you. But, yeah, there is an official transcript of that. It doesn't appears to be an issue in this case, but it has come up in the past about AI

note-taking functions participating in these hearings. And it has been the position of the Court that, no, y'all take all of the notes that you want for your own purposes; but we have one official recording. And that's going to be that.

**MR. SHAW:** One other thing. We have not been served with an answer, and we have not filed answers in this case. We want to make sure that the record is clear that we are not generally appearing by opposing this temporary restraining order. And just for the record, we are not waiving the jurisdiction, personal jurisdiction of the defendants because we have not, again, been served a citation, had an opportunity to file an answer or to challenge the personal jurisdiction of the Court.

**THE COURT:** Okay. All three of us have read what was submitted. I appreciate the opportunity to do that. What I'm going to suggest is why don't respective sides take up to, but no more than, ten minutes to just give me the lowdown of what you are thinking; and then we'll pick up from there and see where we go, if that works. Go ahead.

### OPENING STATEMENT

**MR. WARNER:** Thank you, Your Honor. First, Mr. McCarty extends his apologies for not being here because of his eye surgery.

Your Honor, we represent Supporting Organizations. We need a TRO today to freeze that fraud in

place and prevent further waste, transfer, and dissipation of more than $270 million dollars in charitable assets. Now, in a blink of an eye ago our clients were the beneficial owners of a holding company, a holding company that has seen $270 million in fund for their benefit.

Mr. Patrick was charged to manage that holdco and that fund for their economic benefit. He was essentially a trustee for the interests of the independent charitable organizations, how they are referred to in the governing document, for the Supporting Organizations that were benefiting from the fund. He had basic fiduciary duties arising under common law and supported by the governing documents of the fund which repeatedly and clearly spelled out that all his powers would be exercised for their economic benefit.

Today these same clients who held interest in $270 million of this fund are the beneficial owners of a diluted portion of that same holdco, but that holdco now possesses nothing. Mr. Patrick used a sophisticated series of transactions to lift $270 million out from under them.

I will explain a brief overview of that strategy and what happened in a moment. I have an illustrative explanation. Mr. Patrick, it was argued, that each step in the fraud was an exercise of power to affect the independence of authority. The problem with that is that you can't use lawful means to achieve an unlawful end.

MR 0268

A state official or senator may have power to do many things. He orders to an agency to cast a vote, what have you, but not in exchange for a bribe or as part of a kickback, being some other scheme.

So, here's the key. When Mr. Patrick took the first step towards the pathway we will outline in a moment, as it is spelled out in the papers, he owed a fiduciary duty at that time to the plaintiffs in this action. And the first step that he took and every subsequent one violated that duty.

Mr. Patrick gained control of the fund in 2021. And there are a lot of entities here; and you are right, a lot of acronyms. Effectively, Mr. Patrick controlled seats in these various organizations.

Since then he's created a pattern of self-dealing that provides critical content for subsequent events. Those are also spelled out in the paper. Directors fees increased from $40,000 in 2022, to almost $600,000 in 2023, and to 2.25 million in the first half of 2024. So, 12,400 percent increase from 2022 in payments.

Legal expenses lept from 6 million in the first six months of 2024 compared to 4 million for all of 2022, 300 per cent increase. Overall expenses for the first half of 2024 were about $18.3 million compared to $18.6 million for all of 2023. So, that's gone up.

But now we had more specific incidents. In

June of 2023 Mr. Patrick requested that one of the Supporting Organizations direct money to an entity, a nonprofit entity that he formed in 2023, expecting it to be an annual donation; but he failed to disclose he and his wife and daughter were the directors of the entity that he created two weeks earlier. So, he got the contribution, but not the recurring contribution.

In September 2023, there is evidence in the filing of the papers, testimony establishing that in 2023 Mr. Patrick approached someone in order to try to obtain a kickback on funds paid by the DAF fund to them. That didn't happen because the person was righteous and declined and reported it; and now we know that that occurred.

There is a variety of self-dealing conduct that precedes the main conduct in this case that paints a pattern against which we have to see the subsequent events. Against that backdrop, over the past year, Mr. Patrick engaged in a scheme that was secret from the plaintiffs to alienate the plaintiffs from the 270-million-dollar fund in favor of a new organizational structure owned entirely by him.

It's five key steps in this scheme. First, Mr. Patrick created a new purported charity, DFW Foundation -- that's one of the defendants -- created by him and controlled by him. So, now we have a new entity up on top to go along with the plaintiffs' charitable organizations.

Second, remember that the holdco is the

governing entity that holds the beneficial interests in the fund. There is another entity, through which Mr. Patrick exercises control that goes through management shares of the fund. Okay. So, the plaintiffs, our clients, at this point before this conduct, they hold a little over 98 percent of the beneficial interest in the holdco, which holds the $270 million in funds.

**THE COURT:** Repeat that last part for me.

**MR. WARNER:** Our clients, the plaintiffs, they hold over 98 percent of the beneficial ownership interests in the holdco. The holdco holds the fund.

**THE COURT:** All right.

**MR. WARNER:** All right. So, $270 million in charitable assets in the fund. And to be clear again, circle back on what the task is for Mr. Patrick in his management. Stomping all over the governing documents of the fund when his job is to use his powers for the economic benefit of the independent charitable organizations. That's all.

So, second step, Mr. Patrick reports the issue of 51 percent of new shares in holdco. That's the company that holds the fund -- previously that's owned 98 percent by our client -- through his newly created charity that he controls. So, this dilutes the plaintiffs' ownership of holdco from more than 98 percent to less than 50 percent, now the 50-percent-plus beneficial owner of holdco in Mr. Patrick's new

charity. So, the plaintiffs suddenly own less than 50 percent of holdco; and Patrick is effectively on both sides of the charitable organizations, the manager and the grantee charity, precisely what the structure was trying to avoid.

Third, Mr. Patrick creates essentially a new holdco called CDMCFAD. That's an event. Then using his management powers, the management seat over the fund, he has the existing holdco -- still owned 49 percent by the plaintiffs but controlled by Patrick. We only have beneficial ownership. We don't have control. He has the existing holdco transfer all of his interest in the fund to his new holdco, CDMCFAD. In exchange for that, the holdco gets an interest in CDMCF. So, now there is essentially a blocking company between the holdco, which is still partially held by our client and the fund. CDMCFAD is between. Well, maybe not now. That's coming.

So, he has the existing holdco transfer all of its interest in the fund and its $270 million to the new holdco, CDMCFAD. So, now the entity that holds the fund is CDMCFAD, which was just created by Mr. Patrick.

THE COURT: I want to see if I can take this to a broader level. So, the allegation is that there was a fund created to fund this other organization. Mr. Patrick was put in charge over that fund, and he has essentially created a different organization to control those funds and use them for a different purpose than original credit folio, for lack of a

better word, intended. Is that where we are?

MR. WARNER: That's a start. That's about where we are right now.

THE COURT: In essence, he's done some self-dealing and attempted inappropriate transactions.

MR. WARNER: That's definitely happened at this point, but right now --

THE COURT: What's in the fire is if I don't do something today, what's going to happen tomorrow?

MR. WARNER: As far as the TRO request, Your Honor?

THE COURT: Yes.

MR. WARNER: We will get to that in a moment. I'll get as far as I can, but I have to get to the end of this structure of transactions. And so it happened in five key steps.

The fourth key step is Mr. Patrick issued shares directly in CDMCFAD, his new charity DFW Foundation, okay, but now to the plaintiffs. So, now DFW Foundation has an interest in CDMCFAD and, through that, in the fund directly. Plaintiffs only have an indirect interest in the fund for holdco.

Now, here is the situation. CDMCFAD, created by Patrick, holds the fund. DFW Foundation, created by Patrick, holds CDMCFAD directly. The plaintiffs hold an interest in CDMCFAD at this point through their -- only through their

remaining diluted shares of the original holdco.  Okay?

The fifth and final step, using his management powers, Mr. Patrick has the original holdco redeem its entire interest in CDMCFAD -- which again holds a 270-million-dollar charitable fund -- for $1.6 million.  So, holdco's interest in the fund at this point is set.  Now, the only DFW has an interest in the fund because it is the only entity that has an interest in CDMCFAD.  And CDMCFAD is only --

**THE COURT:**  I think all of that is in the petition.  There is no way I can digest all of that in ten minutes.

**MR. WARNER:**  Understood.  We're working on that.

**THE COURT:**  I'm trying to get to a level that I can understand in a short time period.

**MR. COX:**  Let me interrupt.  The issue is this: Our plaintiffs had a right to these -- to the general interest in the $270 million.  Now they don't.  It's as simple as that.

And Mr. Patrick took it; and just now he runs it on his own?  No.  If it wasn't filtered money, he could not take it.

Just overnight he can move it to a Swiss bank account or somewhere remote and we would never get it again or never even see it.  That's why we need a TRO.  It's the fact that he has now taken everything behind the charitable organizations' backs and done all this stuff, and we can't

trust him.

And we asked for the financials from him, and the organization has asked for their financials. He said: I'm not going to give them to you. He said he's never used to that.

We have never gotten the financials. They just left us in the dark. Now we don't know where the money is going to go. It was funded a long time ago by Dondero. Everybody knows that. Mr. Patrick and Mr. Dondero have some sort of beef with each other that goes way back to who knows what. I don't know. But be it as it may, Mr. Patrick cannot take these funds that were intended for the charitable organizations and now move them to his own means.

THE COURT: What's going on in the Cayman Islands?

MR. COX: So, the Cayman Islands, there was a lawsuit. There was something going on over there that relates to two of these entities or Cayman Island entities. Mr. Patrick put his in voluntary bankruptcy over there to be done with it. And then the entities powers yield with respect to the fund. So, then the --

MR. WARNER: So, the original holdco.

MR. COX: The original holdco. He said let's just get rid of it. We then filed an interest to put it in involuntary bankruptcy over there. And now that Court, as we

put in our papers, said, you know, y'all can make a choice. You can file suit over there in the United States, over here in the Caymans. We've now chosen to file suit over here in the United States and take it up from there.

THE COURT: Isn't it something that should be part of, should be brought up in the Cayman Islands instead of here?

MR. COX: No, because the entities that you see here are not Cayman entities.

MR. WARNER: This Court has jurisdiction over entities that the Caymans allow jurisdiction of people we have the jurisdiction of.

MR. SHAW: Judge, this is, as Yogi Berra says, deja vu all over again. I think you were referring to that. I was in the TRO with you the day before Thanksgiving.

THE COURT: Well, you did not come from the golf course today.

MR. SHAW: I did not come from the golf course today, but this time I left the office and was able to get a suit on quickly. You know, I have been trying to convince my friends this is not normal and this is not the way it's supposed to happen, but I'm having a hard time convincing them about that.

There has been a lot of noise, a lot of allegations. But, you know, when you get down to the basics,

what we look at when we're looking at a temporary restraining order, application for that, is what evidence do they have to support that is extraordinary request for relief? So, I think that's what we need to emphasize.

I remember being in one county one time and looking at a judge while she was reviewing, and she went right to those affidavits. And that was really kind of a learning experience for me that it's all about the evidence.

But I'm going to take one step back from that, which is one step that is more important than that, which is jurisdiction. And this Court, you know, rightly pointed to jurisdiction as an initial issue.

Ms. Reed is becoming an expert on this Court's jurisdiction through the other related cases that we have. You have a seen us in this room before with Mr. Raver here on that. But none of the plaintiffs own any interest in any of the defendant entities. Let me repeat that. None --

**THE COURT:** Well, that was my question.

**MR. SHAW:** They don't. They don't have an ownership interest in any of the named defendants, none. And so are they -- is this an action in regarding the governance, governing documents, or internal affairs of an organization? They are strangers to those governing documents.

Is this an action by an owner of an organization? No. They are not an owner of this organization.

MR 0277

You know, they talk about the fact that they had an interest in Charitable DAF HoldCo, but not any of these entities.  So, they don't get past go on jurisdiction right out of the gate.  So, that's the first point.  They don't have standing, and this Court does not have jurisdiction over this particular dispute.

Then we look at the TRO, and we go to the evidence.  And what does the evidence say?  We look at this extraordinary relief.  The rule says you have got to define the injury -- quote, unquote, define the injury and state why it is irreparable, why the harm is irreparable.

The affidavits -- I was so surprised that Mr. Dondero put it in his affidavit, although he is not here today.  And by the way, Mr. Patrick wishes he was here.  He's out of town, obviously, on the 4th of July holiday.  But we have Mr. Raver here in his stead.

But Mr. Dondero's affidavit, you've reviewed that affidavit; and what it says is extraordinary in my mind.  He talks about how the fact that Mr. Patrick is the controlling person and has the authority to do these things.  He talks about how Mr. Patrick is a great tax lawyer.  He talks about how he's funding this litigation.

So, you know, they can make arguments all they want to about what this case is and that Mr. Patrick has engaged in all sorts of wrongdoing; but their client really is Mr. Dondero.  And what he says is nothing about irreparable

harm. He talks about actions that happened in 2020. He doesn't talk about anything being imminent. And that's the key under a TRO, is that you show immediate, imminent, and irreparable harm.

You can look at the affidavit of Ms. Diaz. Again, it talks about things that happened in 2023. She hasn't talked about the burning house or what happens tomorrow or on July 4th that necessitates us all being here on July 2nd, not a word of that. And their allegations about irreparable harm are simply allegations. There are no facts about how the harm here is irreparable.

Then you look at the scope of this proposed temporary restraining order. I've never seen anything like it. You might as well just have one sentence that says you can't do anything, because that's what it is. It is so overbroad and so out of touch with the facts that they presented through the affidavit of James Dondero and Ms. Diaz that the Court just cannot -- cannot grant that relief. So, we would ask the Court to deny the temporary restraining order.

There is not a burning house. There is not a building about to be crashed. These are monetary dangers that they are alleging. And we are happy to get in when we can have these arguments before a jury about whether Mr. Patrick breached judiciary duties or what this is really about, which is Mr. Dondero trying to control this organization.

**MR. McENTIRE:** Sonny McEntire for the record. One week ago today there was a hearing in the United States Bankruptcy Court before the Judge Jernigan. Jim Dondero took the stand. Almost verbatim all of the allegations that are perhaps financial were basically advanced one way or the other in that hearing.

Bruce Springboat, Judge, who owns Highland Capital -- Highland Capital has in connection with a settlement from Hunter Mountain Investment Trust, which is one of my clients; and Highland Capital got Jim Dondero attempting to mark Patrick as a control person for Hunter Mountain. He raised many, if not all, of these same allegations during the course of that hearing. His objection was overruled.

Julie Diaz, who verified this petition, she had also filed on behalf The Dallas Foundation an objection to that settlement containing most, if not all, of the allegations in this petition. And on the eve of the hearing, she withdrew those allegations, unbeknownst to Mr. Dondero, the same one who verified this petition.

The objection was withdrawn because you are not going to overrule the objections of Mr. Dondero in advance during the course of the hearing. This is forum shopping on steroids.

And Mark Goodman is very familiar with what is going on down in the Cayman Islands, and that's why he's

participating here. They already have proceedings going forward down there that address many of these same issues.

They are coming to you to try to have a multi-front war. And what this really is, is Mr. Jim Dondero doesn't like what happened in the bankruptcy court; and I don't think he's liking what is going on in the Cayman Islands. And that's why this proceeding was initiated. And what this really is, is tortious interference with Mr. Mark Patrick and the controlling entity of the DAF Fund, which none of the plaintiffs have an interest. It's really tortious interference with his ability to conduct business, which is ultimately to provide funds for charitable foundations.

THE COURT: Okay. So, a couple of thoughts. One, I have a question about jurisdiction which we need to address first. I hate to enter or do things if I don't have jurisdiction. Never a good idea. So, let's -- what I want to do is, as much as possible in the adversarial context, come up with a plan that we can all agree to do that will help solve some of these problems on an efficient economic basis.

One of the things that I want to do is quickly and efficiently resolve jurisdictional questions.

Two, I would be concerned if I had evidence indicating that this money is about to go somewhere irreparably if I don't do something today. I'm not sure I have seen that yet. I'm a little concerned that it's taken a while to get

this dispute going with some of these things going on back in 2023.

So, what can we do in terms of creating a workable plan to (A) make sure that nothing bad happens to the money -- although, I do notice that each of the substantive counts all end with a request for damages -- to make sure money doesn't go hide somewhere in the Caribbean, where it shouldn't be; but at the same time make sure that we're getting the jurisdictional issue done correctly.

I have some basic understanding of how foundations work and supporting organizations work. What I have read in this petition seems a little different than what my understanding is. One idea I might throw out is -- and just throwing it out as an idea to get feedback from you all. Do any of y'all know Steve Gillis? Steve is a well-recognized state-wide, if not a national, expert on 501(c)(3) and foundations and management control and all that stuff. He could be very helpful to me in making sure I'm understanding the issues, the organizations correctly, and make recommendation to see me, (A) helping me understand the issues; and (B) making sure that if you all's clients wanted to spend money and distribute money, that that was an appropriate use of funds, with an opportunity for you all to comment on that. So, I throw that out as an idea.

Is there an agreement that we can reach until we

can have a TI hearing, if we need a TI hearing, to make sure that the funds are safe in the interim?

MR. McENTIRE: I want to supplement what I said. As part of the withdrawal of the objection, Dallas Foundation, which is above, I think, what we call the Supporting Organizations -- The Dallas Foundation, that filed the objection, withdrew their objection. And one of the portions of the agreement was that Mr. Shawn Raver -- and this may be subject to Rule 408. There is an understanding in the agreement that they would participate in ongoing dialogue; and there was a dialogue this morning, specifically.

And Mr. Diaz, who verified this complaint, as I believe it, attended. I don't know the details, and I'm not sure if it's something that may be subject to Rule 408 exemption; but I think a mechanism has already been created.

THE COURT: Let's get a response to that.

MR. WARNER: We are not on that case, Your Honor. I believe there are proceedings in the Caymans. Those proceedings are ongoing. My understanding is -- a limited understanding is that we discovered these facts about the alienation of this ordinary knowledge only very recently. And I understand the objection with --

THE COURT: Wait, wait. Morris or Mr. Dondero?

MR. WARNER: Neither. We don't represent Mr. Dondero.

Donna A. Goree, CSR, RPR, CRR   (979) 533-0422

THE COURT: Who is the person or people that you report to as your client?

MR. WARNER: We report to the three plaintiffs' shareholders.

THE COURT: Yeah, I mean but who are the people, the individuals?

MR. WARNER: There is a Mr. Atkins, Ms. Diaz, the presidents and COEs of the two other organizations. I believe counsel -- I think you will hear something from the counsel, kind of standby outside counsel.

THE COURT: Well, I'm interested in how long they have known some of these facts that y'all are complaining about.

MR. WARNER: I understand that it was very recent. Now, some of them are more longstanding in nature. Of course, the background allegations are owner and the owner fund; but what we are focused on and the reason I call them background is the alienation Ms. Diaz had to know about powers and structure and just the structural steps that were taken to accomplish it. My understanding is that that is all very new.

MR. COX: Judge, the one thing that came out during these Cayman proceedings, and it's my understanding we put it out petition here, is that on the stand down in the Caymans, Mr. Patrick had said that now these plaintiffs in this case, the injured means that they thought they had interest in,

that we'll get them the funds and then it's just worth nothing. It has no value whatsoever. That's what -- that's when the alarm went off. He said it down there in those proceedings. We have a copy of the transcript we attached as an exhibit here, in the bankruptcy, wherever it was.

THE COURT: Why is house burning down now?

MR. COX: We're worried that if you don't enter into a TRO today, he can take the money and the fund that he controls and take it anywhere he wants, put it in a bank in Cypress. He can put it in a Russian bank. He can put it anywhere he wants. We have no idea where he can put it. That's what the issue is. That's what's scary.

THE COURT: I understand that.

MR. McENTIRE: Ms. Diaz is the vice-president of the Houston-Dallas foundation. She met with this gentleman this morning concerning where the money is going, how it's standing.

And, Your Honor, Mark Goodman is here. He is actually our client's counsel in the Caymans. And perhaps it would benefit the Court if he could give a status report on what is actually happening on this.

THE COURT: Sure. Mr. Goodman?

MR. GOODMAN: What I can tell you, Your Honor, is that in terms of oversight of the --

THE COURT: Is he a witness?

**MR. COX:** I don't need a witness. Okay.

**MR. GOODMAN:** In terms of the oversight of the financial dealings of the new structure, the outcome displacement's explanation on the 2nd of April, 2025, voluntarily. An independent firm Kroll were appointed. There was then that application to bring that under court supervision with the firm Grant Thornton replacing the liquidators. That is now under court supervision. It has been since the 2nd of May.

We, on the 6th of May -- sorry -- on the 16th of May, offered voluntarily a transaction reporting protocol where we gave the liquidators in the Caymans a reporting of all the financial transactions, all material transactions, so that they would have oversight of what was happening with the money.

There was no engagement with that offer. It was repeated on the 30th of May, on the 9th of May, and on the 19th -- sorry -- on the 9th of June and on the 19th of June. And this is the first time there has been any kind of engagement by the liquidators in agreeing the terms of protocol so that oversight would be given.

It's simply not correct to say that there is just no way of understanding what is happening here. The liquidators in Cayman are court-appointed and court-supervised, and they have control of the old structure. So, to the extent that there is anything improper in the way the assets were

transferred away is incumbent upon those liquidators to take steps to recover the assets; and that process is ongoing in Cayman. And this suggestion that there is no control and no oversight of where the money might go is just inconsistent with the record in Cayman how this case has developed.

THE COURT: And so let me ask a question. Who has control of the $270 million? Is it under the control of the liquidators in Cayman?

MR. COX: No.

MR. GOODMAN: No, it's apparently -- sorry. I thought it was a question to me.

THE COURT: It was a question.

MR. GOODMAN: There is -- if someone has a copy of the structure, it would sure be helpful for the Judge to see that. But the MCI represents CDMCFAD, LLC, as a Delaware entity which owns in turn a Charitable DAF Fund, LP, in the Cayman Islands, which then in turn owns the structure of asset holding companies.

And so those companies are all currently under the control of CDMCFAD, LLC, the Deleware entity. It's that entity which has offered the reporting protocol to the liquidators. The liquidators are collecting the information about the transaction by which the assets were moved; and the liquidators, if they believe there was some reason to question the proprietary of what would be done, would be duty bound to

take action to recover that.  They can seek recognition in the U.S. through Chapter 15 of the bankruptcy code.

(Crosstalk.)

MR. GOODMAN:  It is routinely done from the Cayman liquidators.

MR. COX:  They don't hold in the Caymans.

THE COURT:  Okay.  So, let me ask a question. Are there any creditors that have to be paid in the next 14 days?

MR. McENTIRE:  I don't know the answer to that question.

MR. SHAW:  We do.  We have obligations.

THE COURT:  That are due in the next 14 days?

MR. RAVER:  I would have to look to see what specifically the payment terms are; but, generally, it's law firms and then the payroll.

THE COURT:  Payroll is one thing.  Law firms are accustomed to having payment.

MR. SHAW:  Judge, if I may, they talk about the sophisticated and malicious fraud.  I mean, to your point, we have been -- Carrington, Coleman, Sloman & Blumenthal has been representing the DAF for a year and a half.  The DAF is represented by Doug Mancino of Seyfarth Shaw.  He is one the preeminent nonprofit organization lawyers.

We have ValueScope (sic.) as a financial

advisor, FTI Consulting as a financial advisor, Weaver & Tidwell as a financial advisor. We have Cayman counsel, Walkers, Maples Group, Gary Olsen, Campbell's. We have Delaware counsel, Dorsey & Whitney; Richards, Layton & Finger.

There is not some fraud afoot. The idea -- and they certainly have not presented evidence, evidence, which is what this Court is relied upon to substantiate that there is a fraud afoot and that any injunctive relief is warranted here.

So, I hear your question, and I'm anticipating where you are going; but the fact of facts are what we have to rely on that are sworn to. And there are no facts that are sworn to that there is imminent irreparable harm. And there is no basis to impose some kind of oversight on these organizations, certainly if we don't even know if this Court has jurisdiction.

MR. WARNER: If I may, Your Honor?

THE COURT: Sure.

MR. WARNER: Two points, maybe three. First, the entity that was referred to before as the one that holds the coal over the money, CDMCFAD, that's Mr. Patrick. Okay? So, the answer to your question who has control of the funds now, the answer to that question is Patrick.

THE COURT: Okay.

MR. McENTIRE: That's not part of the Cayman proceedings.

**MR. WARNER:** Nobody else at this point in time, and that is why we're here. It may be that in three or four weeks the Cayman the liquidator will do something great.

**THE COURT REPORTER:** The reporter cannot hear.

**MR. WARNER:** I said that it may be that at some point -- it may be that at some point the Cayman liquidator will do something helpful; but that's not right now. We can't see into the future. And right now the only person who has control of these funds is Mr. Patrick.

Second, we can talk all we want on what law firms are involved; but I don't think we should care. I don't think we should make these decisions on the basis of invoking a bunch of law firm names.

What matters here fundamentally, from the plaintiffs' perspective, is about six months ago they had a clear beneficial interest in $270 million in this fund; and now they have nothing. That happened with astonishing, incredible speed through, I'm sure, the direction of some very sophisticated business people and lawyers. That doesn't change the fact that Mr. Patrick owed a fiduciary duty to our clients. At the outset of that conduct, maybe he convinced some people that he didn't. I don't know.

But the question for a TRO is: Do we have a likelihood of success showing this person owed a fiduciary duty to our fund? The answer is yes. They were the sole

beneficiaries or near the sole beneficiaries, 98 percent plus of this 270-million-dollar fund for years.

The governing documents of the fund expressly state that duties of Mr. Patrick in his organization are to exercise his power for the economic benefit of those organizations, our plaintiffs.

Now we are holding 49 percent of an empty bag; and what we are asking is that we make sure that before all of that can be untangled, that the rapidity with which all of that happened does not happen again, because it's been demonstrated very clearly that Mr. Patrick is capable of some very impressive machinations to make money go away. We just want the money frozen so that the issue can be addressed.

MR. McENTIRE: Your Honor, I think we are conflating ownership with something else.

THE COURT REPORTER: The reporter cannot hear.

MR. McENTIRE: Yes, ma'am. And that is a failing deficiency in their application of the law. By what we just heard here, these proceedings have been underway for almost two months. Where is the irreparable harm? Where is the emergency? Mr. Goodman has explained this has all began in early May of this year.

And, lastly, Ms. Diaz, who verified the petition, the application -- the petition and their application, it was met with this gentleman this morning.

There is already a mechanism in place.

MR. RAVER: I presented balance sheets to them from 9-30-2024, 3-31-25, May 31st, '25. And I explained to them all the assets that have been disposed of, what was done with the proceeds. And then there was also part of the spreadsheet that we had agreed to that was part of the bankruptcy settlement, that money that Hunter Mountain received.

We were told that we would just be paying general legal expenses for outstanding matters that Hunter Mountain had ongoing. So, I just explained it in detail or just kind of in general what those proceedings are and gave them kind of a quarterly budget through, I guess, September 30th, 2025, what the estimated legal fees were that would be paid.

THE COURT: And what's that number?

MR. RAVER: It was -- one firm did not give me a total budget on one of the litigations; but the other two, I think it was approximately 275,000.

THE COURT: When you say litigations, what --

MR. McENTIRE: I represent CLOH HoldCo, which is in the DAF chain currently in proceedings in New York. I was successful in having them dismissed, but it's subject to appeal. Like the law offices on the other side, UBS is the plaintiff. Mr. Dondero's case is over, and I was the only one

who was dismissed.

I'm representing Hunter Mountain Investment Trust, which is in this chain, as of perhaps today or, if not today, then tomorrow when they are taking an assignment from the Highland Capital Group of the Kirschner litigation. And I will be lead counsel in that matter, and that is a very substantial amount.

THE COURT: So, that's why these attorneys' fees are going up, is there is a lot of litigation going on.

MR. McENTIRE: Yes, sir.

MR. WARNER: Your Honor, while we're inquiring about that, I also ask if every item that was matching to see perhaps more pressing than attorneys' fees was payback. I'm just interested to know what that is. Does that involve anyone other than Mr. Raver and Mr. Patrick?

MR. RAVER: Does not.

MR. WARNER: So, we're just talking about Mr. Raver and Mr. Patrick then. I don't mean to target the witness.

THE COURT: No, we're having a conversation. We're all adults having a conversation, trying to come up with a commonsense resolution to several problems.

MR. COX: I'll just add everybody in the group -- this is Joe Cox. Everybody knows this. Mr. Dondero does not run Highland Capital anymore. When he says Highland

Capital will be doing this and that, it's not Dondero. It's whoever is running Highland Capital. Everyone wants to point a finger at Dondero. I get that he's not loved, but he does some things that are right from time to time.

THE COURT: Mr. Dondero is as welcome and respected in this Court as everybody else.

MR. WARNER: Your Honor, as far as our deal, our object is on behalf of these three charities, period. Our object is to ensure that this can be unraveled and that these moneys are safe.

THE COURT: All right. So, here is kind of what I'm thinking. I'm thinking we're going to take a ten-minute break; and I'm going to consult my colleagues.

MR. MURPHY: Your Honor, can we interrupt? I'll try to be very brief, Your Honor. Again, I'm Mat Murphy from Richards Layton in Delaware. If we only represent CDMCFAD, LLC, which I'll just -- for ease of reference, I'll refer to as CDM, if that's okay with Your Honor.

THE COURT: Are you on the Joe Cox side or the other side?

MR. MURPHY: We're on --

MR. SHAW: I object to him appearing on a TRO. Then I will request temporary pro hac admission just pending that.

(Multi-crosstalk.)

**THE COURT:** That's fine.

**MR. COX:** Listen, it's not my law license. I teach professional responsibility at SMU, and you cannot practice law in another state without -- I'm being honest trying to make everybody aware of it. If he wants to speak on his own, that's fine.

**THE COURT:** Okay. You are not speaking on behalf of any particular client. You are an amicus curiae before this Court.

**MR. MURPHY:** Understood, Your Honor. I would just like you to know, Your Honor, what plaintiffs are challenging here in this action and what they are seeking the TRO, the basis for that, is a redemption that plaintiffs seem to be referring to as the alienation, which was authorized by the member of CDM in his sole discretion of the CDM membership units that were previously held by non-party charitable DAF HoldCo, Ltd. which is a Cayman entity.

Now, you know, we've heard about consideration or concern about whether CDM became parties per this structure. That occurred in December of 2024. I would just like to note, Your Honor, that CDM is named as a defendant. There are three counts that are purportedly asserted against CDM, although it's not actually alleged to have done anything wrong.

The petition is flawed in several ways, I suggest, Your Honor. The plaintiffs here were not

stockholders. The stockholders were Charitable DAF HoldCo. They are not members of CDM. They have no legal rights with respect to CDM.

As my friends on Mr. Patrick's side noted, Charitable DAF HoldCo is currently in restructuring proceedings in the Caymans and a liquidator is appointed over that entity. To the extent that there is any party that has standing to bring any challenge regarding this redemption, it would be the liquidators on behalf of Charitable DAF holdco, not the plaintiffs here.

Plaintiffs have said on several occasions that Mr. Patrick owed fiduciary duties; and they cite in their petition to case law that indicates that they're default fiduciary duties for members related to LLCs. But that's only true if you ignore the black letter Delaware law that says that LLCs can eliminate fiduciary duties, which is exactly what happened in Section 6.5 of the CDM, LLC, agreement. CDM, as the entity, obviously, also doesn't owe fiduciary duties to Charitable DAF HoldCo, let alone plaintiffs here.

The LLC agreement contemplates and authorized the unilateral redemption of CDM's membership units by the manager, who is Mr. Patrick, through his, quote, unquote, sole discretion. The redemption must have been for fair market value; but to the extent that there is a claim that their redemption did not meet that standard, that claim would be

brought by the liquidators, not by the plaintiffs here. It's also not clear if that claim would be brought in this Court or would be brought in the Caymans or in Delaware.

The plaintiffs also seek monetary damages, as your Court noted, which did not seem to support the extreme injunctive relief that they seek here. And the timing element, as I know Mr. Patrick's comments had pointed out, also doesn't support the injunctive relief that they are seeking here, particularly to the extent that it imposes grave restrictions on CDM and essentially locks it up and prevents it from operating.

**MR. WARNER:** Your Honor, if I may.

**THE COURT:** Only if you speak up so Donna can hear.

**MR. WARNER:** Yes. Sorry. I have such a loud voice. Thank you.

Your Honor, first of all, to be clear, here is the point. CDMCFAD is the entity that I was talking about at the beginning, the new holdco that was formed through Patrick, through him. So, sure, he wrote a lot of stuff into it that gave him a lot of exculpation; but he wrote that for him.

Fiduciary duties that we're talking about right here in this case preceded the formation of CDMCFAD. Formation of CDMCFAD is part of a malicious scheme that, itself, violates those fiduciary duties toward the first client.

Our clients, the independent charitable organization, were owed a fiduciary duty by Mr. Patrick that precedes the formation of CDMCFAD and any exculpation provisions that were written as edits. And he can't equal redemption between an entity of CDMCFAD and the holdco and an interest in $270 million for 1.6 that we get 49 percent of because he's diluted us down. Granted, I'm sure there will be a lot of testimony about valuation at trial on this, but that does not pass the smell test that a TRO can.

Again, what we are after is something that will protect our ability, as these three charitable organizations, to have the potential to unwind this corrupt scheme before this very rapid course of conduct that took us from beneficial interest in $270 million to zero in six months. That's all we asking for.

**MS. COLGATE:** And, Your Honor, apologies. If I may interject on behalf of DFW, I'm Jennifer Colgate with Baker & Partners in the Cayman Islands. And if I can just address a few points relevant to the proceedings today that arise in Cayman, I would be grateful for the opportunity.

**THE COURT:** Sure.

**MS. COLEGATE:** Thank you, Your Honor.

Firstly, the assertion that's been repeatedly made as to the beneficial interest in the $270 million-odd assets is simply incorrect and so excepted. That is a matter

for the foundations to establish.

But, firstly, as Mr. Matthew has alluded to, any claims that the foundations may have to any interest in the structure for those firstly has got to be determined during the course of the liquidation by the liquidators.

The liquidation proceedings are ongoing and they are continuing. There was recently a hearing before the judge that's presiding over those proceedings here. The purpose of that hearing was to sanction certain actions of the liquidators.

One of the issues that was raised before the Court where they were not decided, it was the protocol to be entered into, that Mr. Goodman has already spoken to. Whilst that was not directed at that hearing and the Judge there indicated that it was a sensible way for the liquidators to proceed with regard to the management and the ongoing interest in the CDM entities, to the extent that there were any concerns about those assets.

And I know the point has already been made regarding that the liquidation has been on foot and voluntarily since the 2nd of April and under the supervision of the Court of the Cayman Islands since the 6th of May; and the assets have not been disposed of or otherwise dissipated, which seems to be the allegation that has been made repeatedly this afternoon.

The protocol, My Lord, Your Honor, we would

suggest is the appropriate way to go and is being progressed in the Cayman Islands. The assertion is that -- the pattern that's being painted here and through various legal steps to thwart unlawful means is a point that was being excepted. The steps that were taken in the Cayman Islands are matters that will be dealt with by the Cayman court. The question there is how.

Mr. Matthew is quite right in saying that these are firstly matters for the liquidators to look at during the course of the liquidation. And DFW, on the 9th of June, in fact, filed a summons before the Court; and that was provided to the Highland Foundations. And they are invited to be a part of those proceedings to bring on -- which the Court has seized of in Cayman, to determine the validity of each of the steps that have been complained of and justify -- and seek to justify the basis for the TRO today. That remains a matter for the Court's direction as to how that is taken forward, but the issues are before the Cayman Court and the right to be determined during the course of the liquidation of Charitable DAF.

In any event -- and I think Mr. Brian mentioned it -- the restructuring, itself, was carried out with independent advice, had the benefit of an independent director overseeing the steps and various valuation reports, both from FTI and ValueScape.

There will, should this become a contempt issue and should this proceed to a trial, and then we say that takes place in the Cayman Islands, it's going to require significant evidence. But the matter is before the Cayman Court. It was filed on the 9th of June. And the object of that, Your Honor, would be that we see no basis for the TRO from the DFW's point of view, as the majority participating shareholder, to be issued today.

THE COURT: Okay. Let's come back like at ten after 3:00.

(Break.)

THE COURT: So, here is kind of what I'm thinking. Two thoughts, just thoughts. They are not rulings, decisions, or anything.

I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to confirm it away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that.

On the other hand, other than paying bills that come due in the ordinary course of business, I don't see an immediate need for the money that -- and it's certainly bills that come due in the ordinary course of business need to be paid, payroll and lawyers' fees. Anything due, they need to be

paid.

It would be great if we could reach some form of agreement to carry us through to a TI hearing to happen next week, which we could do on the 11th for sure. So, I don't know if y'all can reach some form of agreement along those lines.

In the meantime, I would really like to get all the players before me, Mr. Dondero, Mr. Patrick, Ms. Diaz, and get a better understanding of why the events that have happened, why the money moved from one place to the other, what the need for that -- what business purpose behind that was. You know, there may be perfectly great reasons for it. Maybe it's business judgment. Maybe it doesn't matter.

But I do want to pin down jurisdiction. I'm still a little bit concerned about that. I think Mr. Spears has helped me understand that question better; but I still have some reservations of mine.

Is there any possibility of y'all reaching that kind of agreement to get us through to the 11th?

MR. COX: Judge, I think if they would agree for them not to move the money from the company except to pay for ordinary business expenses, we can live with that.

THE COURT: Is there any problem?

MR. SHAW: Well, the question is what -- we have active investments that we don't know what we have. So, if there is an investment opportunity, we need to be able to take

it. We need to be able to take the deal. We actually actively, you know, manage this money and these assets. So, like it's not just about paying law firms. It's not as simple as that. It's not like what the DAF does. It manages -- actively manages this money.

THE COURT: Is it a day trading firm?

MR. SHAW: It's not a day trading firm; but they do have a lot of investments, some of which include Dondero affiliated entities, right?

THE COURT: Do any of the investments mature in the next ten days?

MR. SHAW: Not that I'm aware of, but there might be opportunities that do. And I guess my point is that's not the standard for a TRO. It's not like: Hey, well, if I enter one, it's not going to hurt you. That's not the standard.

THE COURT: I'm just asking if y'all can reach an agreement. I'm throwing out an idea.

MR. COX: I'm just saying if they don't want to, they won't.

MR. SHAW: Yeah, I would have to talk to -- I would have to talk to my client about it before. So, I can't commit to that without authority.

THE COURT: Can you get the authority as a client to --

MR. SHAW: I'm not going to do that in front of counsel.

THE COURT: Go out in the hallway and have a conversation and come back.

MR. SHAW: Yeah, we can do that.

THE COURT: Okay. Let's do that.

MR. SHAW: And the proposal is that -- I don't know exactly. The proposed TRO says we can't do anything. So, I guess I want to understand what exactly is being proposed.

MR. COX: That the money doesn't go anywhere. You can't move it, dispose of it, buy anything, or sell anything unless it relates to the normal course of business, payroll and --

THE COURT: Well, for example, if there is policies that come due, if they need to reinvest the money, for sure they need to make prudent investment decisions. I'm sure they are under some form of a UPF.

MR. SHAW: Well, if the question is will we refrain from taking actions outside of the ordinary course of business, I mean I can pitch that to my client.

THE COURT: Pitch that to your client. Y'all can go somewhere so there is no question of ex parte or anything going on.

MR. SHAW: Okay. Thank you, Judge.

(Break.)

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

THE COURT: And the idea is we are going to try and come back on the 11th and try to get more people here and have more time to digest what is going on. I am a visual learner. So, the more charts and backgrounds you have to put up, the better you are going to be.

MR. COX: Is it possible to have it in a courtroom downtown somewhere?

THE COURT: If you can get me one. Dallas County has no room for me.

(Discussion off the record.)

THE COURT: Listen. So, something occurred that was talked about Business Court. We're all about business. Okay? Bill has been all about business since the first day he set foot on the University of Texas campus, Court of Appeals six years, three and a half years at Condon Tobin where we had a national practice in the course of litigation disputes.

I like a different approach to how we are going to do things in the Business Court. We have professional business people. Everybody is professional. Our No. 1 job is to be fair and efficient and treat everybody fairly. We have got that.

The next job is to help people solve their problem. If it takes a trial to solve the problem, great, we're happy to do that. I promise you I will make decisions. I'm in the decision-making business. But if we can find a way

to solve problems short of that, then great, I want to do that, too.

So, we're going to, at 9:00 o'clock on Friday, July 11th, meet at the conference room in the Carr Collins building and have a noticed temporary injunction hearing.

MR. COX: Judge, I think they need some more time, and somebody is out of town. If we can strike an agreement, which I think we will, we may be able to push that out a little bit.

THE COURT: Sure, that's fine. I'm happy to do that. I want to -- listen. This is you all's case, you all's clients. Y'all know the web in English better than I ever will. And so I want to facilitate as much cooperation as humanly possible to do that.

So, if y'all can reach an agreement that everybody can live with -- nobody is going to be perfectly happy with it -- to get us to a TI hearing, then great. If not, I will make a decision. I'm happy to make a decision. That's my job. But if y'all can reach an agreement, then great. Let's do that.

MR. SHAW: Are we on the record?

THE COURT: Donna?

(Reporter indicates affirmatively.)

MR. SHAW: I announce, I believe, the terms of a Rule 11 agreement, not an agreed temporary restraining order.

I want to note that we still reserve our rights to contest personal subject matter jurisdiction. But until a temporary injunction hearing is held, the named defendants will agree to operate in the ordinary course, No. 1; will not engage in any corporate restructuring transactions; and 3, if there are any sales of assets, the sale proceeds will stay in the entity that sold the asset, and the sale proceeds may be used to buy other assets within that same entity. And I believe that is the extent of our agreement.

THE COURT: Plaintiffs?

MR. COX: We say yes. I think we agree that they can make payments out of the ordinary course of business, that's fine; and that the other entity issue regarding no restructuring, that's good; and then the third one was if they sell any of the assets inside of whatever fund that has it, they will leave the money there or just use the money in that entity. And if they buy something, they value that asset. I will just add that it will have to be on reasonable value and things. It's got to be in the normal course of business. It can't be a fire sale or sell off an asset.

MR. SHAW: One clarification, Mr. Cox. You said ordinary course of making payments. It's not just as to making payments. We need to operate in the ordinary course of business.

MR. COX: In the ordinary course of business.

MR. SHAW: So, stipulated.

MR. COX: So, no restructuring, no investments that you manage to either in or out. They can do that in exchange for reasonable value.

MR. SHAW: Agreed.

THE COURT: Anybody else have any comments on that? Hearing none, okay, we'll accept that as -- Mr. McEntire?

MR. McENTIRE: No, I agree.

THE COURT: Okay. We'll accept that as the parties' agreement. It's on the record. It's a Rule 11 agreement.

What date do y'all want to get back together?

MR. SHAW: We were looking at the week of the 21st, I believe.

MR. McENTIRE: I will be out of the country for two weeks. I return on the 19th.

THE COURT: Okay. I assume there may be depositions and whatnot that happen in the meantime.

MR. McENTIRE: Yes, I understood that will happen; and I probably will not be involved. If I am, I will be remote.

THE COURT: Okay. We're not going to get a last minute motion to quash?

MR. McENTIRE: No, I can handle that.

MR. COX: Y'all saying the week of the 21st?

MR. McENTIRE: Yes, sir.

MR. COX: The 24th works for me; 23, 24, 25 are good for me.

THE COURT: Okay. Well, is a day going to be enough?

MR. COX: Maybe not.

MR. McENTIRE: I think I'll defer to Andrea. I think a day is fine.

MS. REED: I think a day is enough.

MR. COX: You said you want to hear from Dondero, Patrick, Diaz.

THE COURT: They don't have to testify. I'm really trying to get a sense of what's going on here.

MR. WARNER: Your Honor, I want to be respectful of all of your time limits. So, I think we should block out more time than less.

THE COURT: It is that. Just getting all of the acronyms is complicated.

MR. WARNER: I suggest that we schedule it for two days.

THE COURT: All right. So, let's look at the week of the 28th. What are y'all doing the 28th, 29th?

MR. WARNER: I have a temporary injunction hearing with Judge Novak on the 29th.

THE COURT: Twenty-fourth, 25th?

MR. WARNER: That works.

THE COURT: We have a 10:00 o'clock status conference on the 25th, but we can push that.

MR. COX: Judge, we need have a communication with Mr. Dondero. We need to find out if he's available. I don't know. But they need to find out if Mr. Patrick is available. I don't know.

MR. WARNER: If we have a major problem, Your Honor, we'll let you know.

THE COURT: Listen, pencil in for the 24th and 25th. It will still be in the conference room at Carr Collins Hall. Let's try to have a narrow presentation.

Feel free to do some briefs on jurisdiction in the meantime. You all believe there is jurisdiction. So, why don't you do a short brief, let's say, by the 11th; and you guys can respond by the 18th. I'll see you all on the 24th and 25th.

Anything else that we need to do?

MR. McENTIRE: We want to address our personal jurisdiction, not subject matter jurisdiction.

THE COURT: Well, I was thinking of subject matter jurisdiction; but if we have personal jurisdiction questions, you need special appearance.

MR. SHAW: Judge, the only thing I was thinking

about timing on that is that, you know, for example, we had an Atlas case.  We have, I think, we have a temporary for temporary injunction set.  But I believe what will happen is we have response of the 18th.  I don't know that that gives you enough time between then and the 24th.  Maybe it does, but we're all getting ready for a TI hearing that maybe doesn't happen.  I just maybe suggest that we move up the briefing schedule on jurisdiction so that we can get you more time.

THE COURT:  Sure.  Well, nobody is going to work over the 4th of July.

MR. COX:  We can have our brief on the 11th, no problem, or sooner.

THE COURT:  Sooner.  Then let's do it on the 9th, and then you guys respond by the 14th.  File special appearances, if you want to file a special appearance.  Under the guidelines, we come up with a separate plan for anyone making a special appearance.  Folks that may be pursuing a special appearance maybe want to think about whether they want to show up at a preliminary injunction hearing and ask for relief from the Court.  In my view, nobody who might be filing a special appearance asked for relief from me today.

MR. COX:  That asked for relief, that's true.

THE COURT:  Nobody asked for relief from me today.  Listen, this TRO --

MR. COX:  I understood.  We're not insinuating a

thing.

MR. WARNER: We have a discovery motion that we haven't finished (undiscernible).

THE COURT: I'm happy to do that. One, we don't have discovery disputes in here. I can't, by rule, disallow them; but what we could do under our guidelines is, other than a motion to quash that has to be filed within three days, before you get into expensive email campaigns and motions, call Susan; and if I'm available, we'll be on the phone and talk about it right then and there. If I'm not available, the first available opportunity, we'll get together and work through that.

Business Court local rule is what we don't resolve there goes into the 700-page letter funding campaign. If we can't resolve it there, then we get into motions.

All right. Listen, I know both firms. I have known both firms or at least the lawyers in both firms for over 40 years. High quality people everywhere. And so I know that, as professionals, the odds of an unworkable discovery dispute are slim; and if there is one, we'll resolve it promptly.

MR. COX: I think what Mr. Warner is saying --

This is Joe Cox. I'm talking. I think Mr. Warner is saying we filed a motion for expedited discovery during pendency. I'm happy to work with Mr. Shaw and see if we can figure this out. Like they got some stuff from us --

THE COURT: Yeah, I got that. I'm just giving you advance information because we haven't had a scheduling conference.

MR. WARNER: We will work it out.

THE COURT: You are perfectly clear. I was just giving everybody the introduction of how we do things in the Division 1B. They heard this before. Ask your friends the lengths to which we will go to help people resolve their positions.

We had a temporary injunction come up. Both sides said it's urgent and we have to get this thing resolved immediately. This was two weeks before Memorial Day weekend. But they couldn't come to agreement on a date. I said, okay, fine. We'll do it Saturday morning, Memorial Day weekend.

So, you know, I'm familiar with working nights. I'm familiar with working weekends. I did it for many decades. I will do whatever I can do to help you all resolve your problems.

MR. SHAW: Did y'all end up having a hearing on Saturday?

THE COURT: No, they settled the case. We did our job. We helped these people solve their problem, and they did.

MR. COX: One more procedural thing for Mr. Shaw. Will he accept service for the defendants if they

are going to file special appearances?

MR. SHAW: Okay. Well, we can talk about that.

MR. COX: You talking about filing a special appearance. We haven't served anybody. I was just trying to make it easy.

MR. SHAW: We can talk about that.

THE COURT: That's it. I know you all are professionals and do things in a professional manner.

MR. SHAW: Thank you for your time, Judge, counsel.

THE COURT: We are in the service business.

(Hearing adjourned.)

MR 0314

**THE STATE OF TEXAS:**

**TEXAS BUSINESS COURTS:**

### CERTIFICATE OF COURT REPORTER

I, DONNA A. GOREE, Official Court Reporter in and for the Texas Business Courts, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court in-person and by videoconference and were stenographically reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 12th day of July, 2025.

/s/ *Donna Goree*

_____
DONNA A. GOREE, CSR, RPR, CRR
Official Court Reporter
Texas Business Courts
3721 Carmen Avenue
Rancho Viejo, Texas  78575
(979) 533-0422
donna.goree.csr3909@gmail.com
Texas Certification No. 3909
Expiration Date: 07/31/2025

**MR. COX: [35]** 4/8 4/10 5/10 5/16 7/6 15/15 16/16 16/23 17/8 25/21 26/7 27/1 28/9 29/6 34/23 36/2 43/19 44/19 45/10 46/6 47/6 48/11 48/25 49/2 50/1 50/3 50/7 50/11 51/5 52/11 52/22 52/25 53/21 54/24 55/3

**MR. GOODMAN: [6]** 6/1 26/23 27/2 28/10 28/13 29/4

**MR. McENTIRE: [17]** 4/12 21/1 24/3 26/14 29/10 30/24 32/14 32/17 33/21 34/10 49/9 49/16 49/20 49/25 50/2 50/8 51/20

**MR. MURPHY: [4]** 5/21 35/14 35/21 36/10

**MR. RAVER: [4]** 29/14 33/2 33/17 34/16

**MR. SHAW: [30]** 4/14 4/21 5/17 8/5 17/13 17/18 18/19 29/12 29/19 35/22 43/23 44/7 44/12 44/21 45/1 45/5 45/7 45/18 45/24 47/21 47/24 48/21 49/1 49/5 49/14 51/25 54/19 55/2 55/6 55/9

**MR. WARNER: [33]** 4/6 7/20 8/21 12/9 12/13 14/2 14/6 14/10 14/13 15/12 16/22 17/10 24/17 24/24 25/3 25/7 25/14 30/16 30/18 31/1 31/5 34/11 34/17 35/7 38/12 38/15 50/15 50/20 50/24 51/2 51/9 53/2 54/4

**MS. COLEGATE: [1]** 39/22

**MS. COLGATE: [2]** 6/3 39/16

**MS. GAUDIOSO: [1]** 4/18

**MS. REED: [1]** 50/10

**THE COURT ADMINISTRATOR: [3]** 6/8 7/11 7/16

**THE COURT REPORTER: [2]** 31/4 32/16

**THE COURT: [92]**

**$**

**$1.6 [1]** 15/5
**$1.6 million [1]** 15/5
**$18.3 [1]** 10/23
**$18.3 million [1]** 10/23
**$18.6 [1]** 10/23
**$18.6 million [1]** 10/23
**$270 [14]** 9/2 9/4 9/16 9/19 12/6 12/13 13/17 15/17 28/7 31/16 39/6 39/14 39/24 42/17
**$270 million [11]** 9/2 9/16 9/19 12/6 12/13 13/17 15/17 28/7 39/6 39/14 42/17
**$270 million-odd [1]** 39/24
**$40,000 [1]** 10/17
**$600,000 [1]** 10/17

**'**

**'25 [1]** 33/3

**/**

**/s [1]** 56/18

**0**

**0027 [2]** 1/3 4/3
**0422 [1]** 56/22
**04950200 [1]** 2/5
**07/31/2025 [1]** 56/23

**1**

**1.6 [1]** 39/6
**100 [1]** 2/6
**10:00 o'clock [1]** 51/3
**11 [2]** 47/25 49/11
**11th [6]** 43/4 43/18 46/2 47/4 51/16 52/11
**12,400 percent [1]** 10/19
**1200 [1]** 2/6
**12th [1]** 56/16
**13590100 [1]** 2/16
**14 [2]** 29/8 29/13
**14th [1]** 52/14
**15 [1]** 29/2
**16th [1]** 27/10
**1700 [1]** 2/17
**18th [2]** 51/17 52/4
**19th [3]** 27/17 27/17 49/17

**1B [3]** 1/8 2/24 54/7

**2**

**2.25 million [1]** 10/18
**2020 [1]** 20/1
**2021 [1]** 10/10
**2022 [3]** 10/17 10/19 10/21
**2023 [8]** 10/18 10/24 11/1 11/3 11/7 11/8 20/6 23/2
**2024 [5]** 10/18 10/21 10/22 33/3 36/20
**2025 [6]** 1/20 3/3 27/4 33/14 56/17 56/23
**214 [3]** 2/7 2/14 2/18
**21st [2]** 49/15 50/1
**23 [1]** 50/3
**237-4300 [1]** 2/18
**24 [1]** 50/3
**24053473 [1]** 2/10
**24084158 [1]** 2/3
**24084570 [1]** 2/11
**24th [4]** 50/3 51/11 51/17 52/5
**25 [2]** 33/3 50/3
**25-BC01B-0027 [1]** 1/3
**257-7200 [1]** 2/7
**25th [4]** 51/1 51/4 51/12 51/18
**270-million-dollar [3]** 11/18 15/4 32/2
**275,000 [1]** 33/19
**28th [2]** 50/23 50/23
**29th [2]** 50/23 50/25
**2nd [6]** 1/20 3/3 20/8 27/4 27/8 40/21

**3**

**3-31-25 [1]** 33/3
**300 [1]** 10/21
**30th [2]** 27/16 33/14
**3120 [1]** 2/14
**31st [1]** 33/3
**3721 [1]** 56/21
**3767 [1]** 2/14
**3909 [1]** 56/23
**3:00 [1]** 42/10

**4**

**4 million [1]** 10/21
**40 [1]** 53/18
**408 [2]** 24/9 24/14
**4300 [1]** 2/18
**4400 [1]** 2/17
**49 percent [3]** 13/8

**4**

**49 percent... [2]** 32/7 39/6

**4th [3]** 19/14 20/8 52/10

**5**

**50 percent [2]** 12/24 13/1

**50-percent-plus [1]** 12/25

**501 [1]** 23/16

**51 percent [1]** 12/20

**533-0422 [1]** 56/22

**5500 [1]** 2/13

**6**

**6 million [1]** 10/20

**6.5 [1]** 37/17

**6th [2]** 27/10 40/22

**7**

**700-page [1]** 53/14

**7200 [1]** 2/7

**7324 [1]** 2/17

**75201 [1]** 2/7

**75201-7324 [1]** 2/17

**75202-3767 [1]** 2/14

**78575 [1]** 56/21

**8**

**855-3120 [1]** 2/14

**9**

**9-30-2024 [1]** 33/3

**901 [1]** 2/13

**979 [1]** 56/22

**98 percent [5]** 12/5 12/10 12/21 12/24 32/1

**9:00 o'clock [1]** 47/3

**9th [5]** 27/16 27/17 41/10 42/5 52/14

**A**

**ability [2]** 22/11 39/11

**able [4]** 17/19 43/25 44/1 47/8

**about [48]** 7/25 10/23 14/2 17/23 18/8 19/1 19/18 19/20 19/20 19/23 19/25 20/1 20/2 20/6 20/7 20/9 20/10 20/21 20/23 20/24 22/14 22/23 24/20 25/13 25/18 28/23 29/19 31/15 34/12 34/17 36/18 36/19 38/18 38/22 39/8 40/18 43/14 44/3 44/22 46/12 46/12 46/13 52/1 52/18 53/10 55/2 55/3 55/6

**above [4]** 1/21 24/5 56/6 56/9

**above-entitled [2]** 1/21 56/9

**accept [3]** 49/7 49/10 54/25

**accomplish [1]** 25/20

**account [1]** 15/22

**accustomed [1]** 29/18

**achieve [1]** 9/25

**acronyms [3]** 7/5 10/12 50/19

**action [5]** 10/8 18/21 18/24 29/1 36/12

**actions [3]** 20/1 40/9 45/19

**active [1]** 43/24

**actively [2]** 44/2 44/5

**actually [5]** 4/18 26/19 26/21 36/23 44/1

**add [2]** 34/23 48/18

**address [4]** 22/2 22/15 39/18 51/20

**addressed [1]** 32/13

**adjourned [1]** 55/12

**Administrator [1]** 2/25

**admission [1]** 35/23

**admitted [1]** 56/15

**admonishments [1]** 6/6

**Adreana [1]** 4/23

**adults [1]** 34/21

**advance [2]** 21/21 54/2

**advanced [1]** 21/5

**adversarial [1]** 22/17

**advice [1]** 41/23

**advisor [3]** 30/1 30/1 30/2

**affairs [1]** 18/22

**affect [1]** 9/23

**affidavit [5]** 19/12 19/16 19/17 20/5 20/17

**affidavits [2]** 18/7 19/11

**affiliated [1]** 44/9

**affirmatively [1]** 47/23

**afoot [2]** 30/5 30/8

**after [2]** 39/10 42/10

**afternoon [2]** 5/21 40/24

**again [9]** 8/11 12/14 15/4 15/22 17/14 20/6 32/10 35/15 39/10

**against [3]** 11/15 11/15 36/22

**agency [1]** 10/2

**ago [4]** 9/3 16/8 21/2 31/15

**agree [5]** 22/18 43/19 48/4 48/11 49/9

**agreed [3]** 33/6 47/25 49/5

**agreeing [1]** 27/19

**agreement [17]** 23/25 24/8 24/10 37/17 37/20 43/3 43/5 43/18 44/18 47/8 47/15 47/19 47/25 48/9 49/11 49/12 54/13

**ahead [1]** 8/19

**AI [1]** 7/25

**al [2]** 4/4 4/4

**alarm [1]** 26/3

**alienate [1]** 11/17

**alienation [3]** 24/21 25/18 36/14

**all [59]**

**all's [3]** 23/21 47/11 47/11

**allegation [2]** 13/21 40/24

**allegations [8]** 17/25 20/9 20/10 21/4 21/12 21/16 21/18 25/16

**alleged [1]** 36/23

**alleging [1]** 20/22

**allow [2]** 7/15 17/11

**alluded [1]** 40/2

**almost [4]** 7/19 10/17 21/4 32/20

**alone [1]** 37/19

**along [3]** 4/10 11/23 43/5

**already [5]** 22/1 24/15 33/1 40/13 40/19

**also [12]** 2/23 4/16 4/21 5/23 10/16 21/15 33/5 34/12 37/18 38/2 38/4 38/7

**although [3]** 19/12 23/5 36/22

**always [1]** 4/19

**am [2]** 46/3 49/21

**amicus [1]** 36/8

**amount [1]** 34/7

**A**

Anderson [2]  2/25 4/23
ANDREA [4]  2/12 2/25 4/21 50/8
announce [1]  47/24
annual [1]  11/3
another [2]  12/2 36/4
answer [6]  8/6 8/12 29/10 30/21 30/22 31/25
answers [1]  8/6
anticipating [1]  30/9
any [26]  6/22 6/25 18/16 18/16 18/20 19/2 23/15 27/18 29/8 30/8 36/8 37/7 37/8 39/3 40/2 40/3 40/17 41/21 43/17 43/22 44/10 48/5 48/6 48/15 49/6 56/14
anybody [3]  5/25 49/6 55/4
anymore [1]  34/25
anyone [3]  6/20 34/14 52/16
anything [13]  20/2 20/13 20/15 27/25 36/23 42/14 42/18 42/25 45/8 45/11 45/12 45/23 51/19
anywhere [3]  26/9 26/11 45/10
apologies [2]  8/22 39/16
apparently [1]  28/10
appeal [1]  33/24
Appeals [1]  46/14
appearance [6]  51/24 52/15 52/17 52/18 52/21 55/4
appearances [3]  4/5 52/15 55/1
appearing [5]  2/2 2/9 5/18 8/8 35/22
appears [2]  7/24 42/17
application [7]  1/16 5/8 18/2 27/6 32/18 32/24 32/25
applies [1]  6/19
apply [1]  6/14
appointed [3]  27/5 27/23 37/6
appointment [2]  1/17 5/8
appreciate [1]  8/15
approach [1]  46/17

approached [1]  11/9
appropriate [2]  23/22 41/1
approximately [1]  33/19
April [2]  27/4 40/21
are [88]
argued [1]  9/22
arguments [2]  19/22 20/23
arise [1]  39/19
arising [1]  9/11
around [1]  4/4
as [58]
ask [6]  20/18 28/6 29/7 34/12 52/19 54/7
asked [6]  7/19 16/2 16/3 52/21 52/22 52/23
asking [3]  32/8 39/15 44/17
asserted [1]  36/22
assertion [2]  39/23 41/2
asset [4]  28/17 48/7 48/17 48/20
assets [13]  9/2 12/14 27/25 28/2 28/23 33/4 39/25 40/18 40/22 44/2 48/6 48/8 48/15
assignment [1]  34/4
assume [1]  49/18
astonishing [1]  31/17
Atkins [1]  25/7
Atlas [1]  52/2
attached [1]  26/4
attempted [1]  14/5
attempting [1]  21/10
attended [1]  24/13
attorney [2]  2/24 4/23
attorneys' [2]  34/8 34/13
authority [4]  9/24 19/19 44/23 44/24
authorized [2]  36/14 37/20
available [6]  7/2 51/6 51/8 53/9 53/10 53/11
Ave [1]  2/17
Avenue [1]  56/21
avoid [1]  13/4
aware [2]  36/5 44/12
away [3]  28/1 32/12 42/18

**B**

back [8]  12/15 16/10 18/9 23/1 42/9 45/4 46/2 49/13
backdrop [1]  11/16
background [2]  25/16 25/18
backgrounds [1]  46/4
backs [1]  15/25
bad [1]  23/4
bag [1]  32/7
Baker [2]  6/4 39/17
balance [1]  33/2
bank [3]  15/21 26/9 26/10
bankruptcy [7]  16/19 16/25 21/3 22/5 26/5 29/2 33/7
Bar [6]  2/3 2/5 2/10 2/11 2/12 2/16
BARBARA [1]  1/7
based [1]  5/15
basic [2]  9/11 23/10
basically [1]  21/5
basics [1]  17/25
basis [6]  22/19 30/13 31/12 36/13 41/16 42/6
BC01B [2]  1/3 4/3
be [80]
became [1]  36/19
because [11]  5/1 8/11 8/22 11/11 15/7 17/8 20/15 21/20 32/10 39/7 54/2
become [1]  42/1
becoming [1]  18/13
beef [1]  16/10
been [24]  5/14 6/23 7/18 8/2 8/5 8/11 17/20 17/24 24/15 27/8 27/18 29/21 29/21 32/10 32/19 33/4 37/23 39/23 40/19 40/20 40/23 40/24 41/15 46/13
before [21]  1/21 4/23 12/5 17/15 18/15 20/23 21/3 30/19 32/8 36/9 39/12 40/7 40/11 41/11 41/18 42/4 43/7 44/22 53/8 54/7 54/12
began [1]  32/21
beginning [1]  38/19
behalf [10]  4/12 4/14 5/23 6/2 6/3 21/15

**B**

behalf... [4]   35/8
36/8 37/9 39/17
behind [2]   15/24 43/10
being [12]   6/16 6/25
8/22 10/4 18/5 20/2
20/8 36/4 41/1 41/3
41/4 45/9
believe [9]   24/13
24/18 25/9 28/24 47/24
48/8 49/15 51/15 52/3
beneficial [10]   9/3
9/16 12/1 12/6 12/10
12/25 13/9 31/16 39/13
39/24
beneficiaries [2]   32/1
32/1
benefit [7]   9/5 9/7
9/14 12/17 26/20 32/5
41/23
benefiting [1]   9/10
Berra [1]   17/13
best [1]   5/1
better [5]   14/1 43/8
43/15 46/5 47/12
between [4]   13/13
13/15 39/5 52/5
Bill [2]   1/22 46/13
bills [2]   42/21 42/23
bit [2]   43/14 47/9
black [1]   37/15
blink [1]   9/3
block [1]   50/16
blocking [1]   13/13
BLUMENTHAL [2]   2/13
29/21
both [8]   6/9 6/10 13/2
41/24 53/16 53/17
53/17 54/10
bound [1]   28/25
Bowen [2]   2/25 4/25
breached [1]   20/24
break [3]   35/13 42/11
45/25
BRIAN [4]   2/10 4/14
4/19 41/21
bribe [1]   10/3
brief [4]   9/20 35/15
51/16 52/11
briefing [1]   52/7
briefs [1]   51/14
bring [3]   27/6 37/8
41/13
broader [1]   13/21
brought [4]   17/6 38/1

38/2 38/3
Bruce [1]   21/7
budget [2]   33/13 33/18
building [2]   20/21
47/5
bunch [1]   31/13
burning [3]   20/7 20/20
26/6
business [25]   1/5
22/11 31/19 42/22
42/24 43/10 43/12
43/21 45/12 45/20
46/12 46/12 46/13
46/18 46/19 46/25
48/12 48/19 48/24
48/25 53/13 55/11 56/2
56/5 56/20
button [1]   7/13
buy [3]   45/11 48/8
48/17

**C**

call [4]   4/2 24/5
25/17 53/8
called [1]   13/6
came [2]   1/20 25/21
campaign [1]   53/14
campaigns [1]   53/8
Campbell's [2]   6/1
30/3
campus [1]   46/14
can [56]   6/6 7/8 7/17
13/20 14/14 15/10
15/14 15/21 17/1 17/2
19/22 20/5 20/22 22/18
23/3 23/25 24/1 26/8
26/10 26/10 26/11
26/23 29/1 31/10 32/9
32/13 35/9 35/14 37/16
38/13 39/9 39/18 43/5
43/21 44/17 44/24 45/5
45/20 45/22 46/8 46/25
47/7 47/15 47/16 47/19
48/12 49/3 49/25 51/4
51/17 52/8 52/11 53/25
54/17 55/2 55/6
can't [11]   9/24 15/25
20/14 31/7 39/4 44/22
45/8 45/11 48/20 53/5
53/15
cannot [6]   16/11 20/18
20/18 31/4 32/16 36/3
capable [1]   32/11
Capital [7]   21/8 21/8
21/10 34/5 34/25 35/1

35/2
care [1]   31/11
Caribbean [1]   23/7
Carmen [1]   56/21
Carr [2]   47/4 51/12
carried [1]   41/22
CARRINGTON [2]   2/13
29/21
carry [1]   43/3
case [15]   5/1 7/5 7/25
8/7 11/14 19/23 24/17
25/25 28/5 33/25 37/13
38/23 47/11 52/2 54/21
cases [1]   18/14
cast [1]   10/2
cataract [1]   7/7
cause [4]   1/3 1/21 4/3
56/10
Cayman [31]   6/2 6/4
16/14 16/16 16/18 17/6
17/9 21/25 22/6 25/22
27/23 28/3 28/5 28/8
28/17 29/5 30/2 30/24
31/3 31/6 36/17 39/18
39/20 40/22 41/2 41/5
41/6 41/14 41/18 42/3
42/4
Caymans [9]   17/3 17/11
24/18 25/24 26/19
27/12 29/6 37/6 38/3
CDH [1]   1/12
CDM [12]   35/18 36/15
36/15 36/19 36/21
36/22 37/2 37/3 37/17
37/17 38/10 40/17
CDM's [1]   37/21
CDMCF [1]   13/12
CDMCFAD [24]   1/11 5/23
13/6 13/11 13/15 13/18
13/19 14/18 14/20
14/22 14/24 14/25 15/4
15/8 15/8 28/15 28/20
30/20 35/16 38/18
38/23 38/24 39/3 39/5
cent [1]   10/22
certain [1]   40/9
certainly [4]   4/24
30/6 30/14 42/23
CERTIFICATE [1]   56/3
Certification [1]
56/23
certify [2]   56/5 56/13
chain [2]   33/22 34/3
challenge [2]   8/12
37/8

**C**

**challenging [1]** 36/12
**change [1]** 31/19
**Chapter [1]** 29/2
**charge [1]** 13/23
**charged [1]** 9/6
**charitable [23]** 1/11
 1/11 6/4 9/2 9/8 11/24
 12/14 12/18 13/3 15/5
 15/24 16/12 19/2 22/12
 28/16 36/16 37/1 37/5
 37/9 37/19 39/1 39/11
 41/19
**charities [1]** 35/8
**charity [5]** 11/21
 12/22 13/1 13/3 14/18
**charts [1]** 46/4
**chat [1]** 6/23
**chief [1]** 4/16
**choice [1]** 17/1
**chosen [1]** 17/3
**CHRONOLOGICAL [1]** 3/1
**circle [1]** 12/14
**citation [1]** 8/11
**cite [1]** 37/12
**CITY [1]** 1/6
**claim [3]** 37/24 37/25
 38/2
**claims [1]** 40/3
**clarification [1]**
 48/21
**clear [6]** 8/7 12/14
 31/16 38/2 38/17 54/5
**clearly [2]** 9/13 32/11
**client [12]** 2/24 4/15
 12/22 13/14 19/24 25/2
 36/8 38/25 44/22 44/25
 45/20 45/21
**client's [1]** 26/19
**clients [9]** 9/3 9/15
 12/4 12/9 21/10 23/21
 31/20 39/1 47/12
**CLOH [1]** 33/21
**cmwarner [1]** 2/4
**coal [1]** 30/20
**code [1]** 29/2
**COEs [1]** 25/8
**COLEMAN [2]** 2/13 29/21
**COLGATE [3]** 2/22 6/3
 39/17
**colleagues [2]** 4/17
 35/13
**collecting [1]** 28/22
**Collins [2]** 47/4 51/12
**come [14]** 7/25 17/16

 17/18 22/17 34/21 42/9
 42/22 42/24 45/4 45/15
 46/2 52/16 54/10 54/13
**coming [2]** 13/15 22/3
**comment [1]** 23/23
**comments [2]** 38/7 49/6
**commit [1]** 44/23
**common [1]** 9/12
**commonsense [1]** 34/22
**communication [1]** 51/5
**companies [3]** 6/2
 28/18 28/19
**company [5]** 9/4 9/4
 12/20 13/13 43/20
**compared [2]** 10/21
 10/23
**complained [1]** 41/15
**complaining [1]** 25/12
**complaint [1]** 24/12
**complicated [1]** 50/19
**computerized [1]** 1/24
**concern [2]** 36/19
 42/17
**concerned [3]** 22/22
 22/25 43/14
**concerning [1]** 26/16
**concerns [1]** 40/17
**conclusion [1]** 7/1
**Condon [1]** 46/15
**conduct [7]** 6/12 11/13
 11/14 12/5 22/11 31/21
 39/13
**conducting [1]** 6/8
**conference [5]** 5/7
 47/4 51/4 51/12 54/3
**confirm [1]** 42/18
**conflating [1]** 32/15
**connection [1]** 21/8
**consideration [1]**
 36/18
**consult [1]** 35/13
**Consulting [1]** 30/1
**containing [1]** 21/16
**contains [1]** 56/6
**contemplates [1]** 37/20
**contempt [1]** 42/1
**content [1]** 10/15
**contest [1]** 48/2
**context [1]** 22/17
**continuing [1]** 40/7
**contribution [2]** 11/6
 11/6
**control [14]** 10/10
 12/3 13/10 13/24 20/25
 21/11 23/17 27/24 28/3

 28/7 28/7 28/20 30/21
 31/9
**controlled [3]** 10/12
 11/22 13/9
**controlling [2]** 19/18
 22/9
**controls [2]** 12/22
 26/9
**conversation [3]** 34/20
 34/21 45/4
**convince [1]** 17/20
**convinced [1]** 31/21
**convincing [1]** 17/22
**cooperation [1]** 47/13
**copy [3]** 7/22 26/4
 28/13
**corporate [1]** 48/5
**correct [2]** 27/21 56/6
**correctly [3]** 23/9
 23/19 56/14
**corrupt [1]** 39/12
**could [8]** 7/6 7/12
 15/19 23/18 26/20 43/2
 43/4 53/6
**couldn't [1]** 54/13
**counsel [12]** 2/24 4/16
 25/9 25/10 25/10 26/19
 30/2 30/4 34/6 45/2
 55/10 56/8
**country [1]** 49/16
**counts [2]** 23/6 36/22
**county [4]** 1/13 1/23
 18/5 46/9
**couple [1]** 22/13
**course [20]** 17/17
 17/18 21/13 21/22
 25/16 39/13 40/5 41/10
 41/19 42/22 42/24
 45/12 45/19 46/16 48/4
 48/12 48/19 48/22
 48/23 48/25
**court [46]** 1/3 1/5 2/6
 2/25 4/25 5/5 6/19
 6/23 6/24 8/2 8/13
 16/25 17/10 18/11 19/5
 20/17 20/18 21/3 22/5
 26/20 27/6 27/8 27/23
 27/23 30/7 30/14 35/6
 36/9 38/2 38/5 40/12
 40/21 41/6 41/11 41/13
 41/18 42/4 46/12 46/14
 46/18 52/20 53/13 56/3
 56/4 56/10 56/20
**Court's [2]** 18/13
 41/17

**C**

**court-appointed [1]**
27/23
**court-supervised [1]**
27/23
**courtroom [4]**  6/10
6/12 6/13 46/7
**COURTS [3]**  56/2 56/5
56/20
**COX [11]**  2/4 2/20 4/8
4/9 5/10 5/23 7/12
34/24 35/19 48/21
53/22
**CRAIG [2]**  2/3 4/6
**crashed [1]**  20/21
**created [11]**  10/14
11/5 11/21 11/22 12/22
13/19 13/22 13/23
14/22 14/23 24/15
**creates [1]**  13/5
**creating [1]**  23/3
**credit [1]**  13/25
**creditors [1]**  29/8
**Crescent [1]**  2/6
**critical [1]**  10/15
**crosstalk [2]**  29/3
35/25
**CRR [1]**  56/19
**CSR [1]**  56/19
**curiae [1]**  36/8
**currently [5]**  6/16 7/7
28/19 33/22 37/5
**Cypress [1]**  26/10

**D**

**DAF [15]**  1/11 11/10
19/2 22/9 28/16 29/22
29/22 33/22 36/16 37/1
37/5 37/9 37/19 41/20
44/4
**DALLAS [13]**  1/5 1/13
1/22 1/23 2/7 2/14
2/17 4/3 21/15 24/4
24/6 26/15 46/8
**damages [2]**  23/6 38/4
**dangers [1]**  20/21
**dark [1]**  16/7
**date [3]**  49/13 54/13
56/23
**daughter [1]**  11/4
**David [1]**  4/19
**day [10]**  17/15 44/6
44/7 46/13 50/5 50/9
50/10 54/12 54/14
56/16

**days [5]**  29/9 29/13
44/11 50/21 53/7
**deal [2]**  35/7 44/1
**dealing [3]**  10/15
11/13 14/5
**dealings [1]**  27/3
**dealt [1]**  41/6
**decades [1]**  54/16
**December [1]**  36/20
**December of [1]**  36/20
**decided [1]**  40/12
**decision [3]**  46/25
47/18 47/18
**decision-making [1]**
46/25
**decisions [4]**  31/12
42/14 45/16 46/24
**declined [1]**  11/11
**decorum [1]**  6/14
**default [1]**  37/13
**defendant [2]**  18/17
36/21
**defendants [9]**  1/13
2/9 4/13 4/14 8/10
11/22 18/20 48/3 54/25
**defer [1]**  50/8
**deficiency [1]**  32/18
**define [2]**  19/8 19/9
**define the [1]**  19/9
**definitely [1]**  14/6
**deja [1]**  17/14
**Delaware [6]**  5/22
28/15 30/4 35/16 37/15
38/3
**deleted [1]**  7/1
**Deleware [1]**  28/20
**demonstrated [1]**  32/10
**deny [1]**  20/19
**depositions [1]**  49/19
**detail [1]**  33/11
**details [1]**  24/13
**determine [1]**  41/14
**determined [2]**  40/4
41/19
**developed [1]**  28/5
**DFW [9]**  1/10 6/3 11/21
14/18 14/19 14/23 15/6
39/17 41/10
**DFW's [1]**  42/6
**dialogue [2]**  24/10
24/11
**Diaz [10]**  20/5 20/17
21/14 24/12 25/7 25/18
26/14 32/23 43/7 50/12
**did [10]**  4/19 17/16

17/18 33/17 37/25 38/5
54/16 54/19 54/21
54/23
**didn't [2]**  11/10 31/22
**different [4]**  13/24
13/25 23/12 46/17
**digest [2]**  15/10 46/3
**diluted [3]**  9/17 15/1
39/7
**dilutes [1]**  12/23
**direct [1]**  11/2
**directed [1]**  40/14
**direction [2]**  31/18
41/17
**directly [3]**  14/18
14/20 14/24
**director [1]**  41/23
**directors [2]**  10/16
11/5
**disabled [1]**  6/24
**disallow [1]**  53/5
**disclose [1]**  11/4
**discovered [1]**  24/20
**discovery [4]**  53/2
53/5 53/19 53/23
**discretion [2]**  36/15
37/23
**Discussion [1]**  46/10
**dismissed [2]**  33/23
34/1
**displacement's [1]**
27/4
**dispose [1]**  45/11
**disposed [2]**  33/4
40/23
**dispute [3]**  19/5 23/1
53/19
**disputes [2]**  46/16
53/5
**dissipated [1]**  40/23
**dissipation [1]**  9/1
**distribute [1]**  23/22
**DIVISION [3]**  1/8 2/24
54/7
**do [52]**  5/7 7/9 7/15
7/16 7/18 8/15 10/1
14/8 18/2 19/19 20/14
22/15 22/17 22/18
22/20 22/24 23/3 23/5
23/14 29/12 31/3 31/7
31/23 43/4 43/13 44/8
44/10 44/13 45/1 45/5
45/6 45/8 46/18 46/24
47/1 47/10 47/14 47/20
49/3 49/13 51/14 51/16

**D**

**do... [10]** 51/19 52/13 53/4 53/6 54/6 54/14 54/17 54/17 55/8 56/5

**document [1]** 9/10

**documents [5]** 9/12 12/16 18/22 18/23 32/3

**does [10]** 19/5 19/7 32/10 34/14 34/16 34/25 35/3 39/9 44/4 52/5

**doesn't [10]** 7/24 20/2 22/5 23/7 31/19 37/18 38/7 43/12 45/10 52/6

**doing [3]** 7/18 35/1 50/23

**dollar [3]** 11/18 15/4 32/2

**dollars [1]** 9/2

**don't [39]** 7/14 7/18 8/16 13/10 14/8 15/17 16/7 16/11 18/19 18/19 19/3 19/4 22/5 22/15 22/24 24/13 24/24 26/7 27/1 29/6 29/10 30/14 31/11 31/11 31/22 34/18 42/18 42/22 43/4 43/24 44/19 45/7 50/13 51/7 51/8 51/16 52/4 53/4 53/13

**donation [1]** 11/3

**Dondero [21]** 16/8 16/9 19/12 19/25 20/17 20/25 21/3 21/10 21/18 21/21 22/4 24/23 24/25 34/24 35/1 35/3 35/5 43/7 44/8 50/12 51/6

**Dondero's [2]** 19/16 33/25

**done [8]** 14/4 15/25 16/20 23/9 28/25 29/4 33/4 36/23

**Donna [6]** 7/23 38/13 47/22 56/4 56/18 56/19

**donna.goree.csr3909 [1]** 56/22

**Dorsey [1]** 30/4

**Doug [1]** 29/23

**down [8]** 17/25 21/25 22/2 25/23 26/3 26/6 39/7 43/13

**downtown [1]** 46/7

**DUANE [1]** 2/6

**duanemorris.com [2]** 2/4 2/5

**due [5]** 29/13 42/22 42/24 42/25 45/15

**during [7]** 21/12 21/22 25/22 40/4 41/9 41/19 53/24

**duties [9]** 9/11 20/24 32/4 37/12 37/14 37/16 37/18 38/22 38/25

**duty [6]** 10/7 10/9 28/25 31/20 31/24 39/2

**E**

**each [4]** 9/22 16/10 23/5 41/14

**earlier [1]** 11/5

**early [1]** 32/22

**ease [1]** 35/17

**easy [1]** 55/5

**economic [5]** 9/7 9/14 12/17 22/19 32/5

**edits [1]** 39/4

**effect [1]** 6/15

**effectively [2]** 10/12 13/2

**efficient [2]** 22/19 46/20

**efficiently [1]** 22/21

**either [1]** 49/3

**electronic [1]** 6/9

**element [1]** 38/6

**eliminate [1]** 37/16

**else [6]** 5/25 31/1 32/15 35/6 49/6 51/19

**email [1]** 53/8

**emergency [3]** 1/16 5/7 32/21

**emphasize [1]** 18/4

**empty [1]** 32/7

**end [4]** 9/25 14/14 23/6 54/19

**engage [1]** 48/4

**engaged [2]** 11/16 19/24

**engagement [2]** 27/15 27/19

**English [1]** 47/12

**enough [3]** 50/6 50/10 52/5

**ensure [1]** 35/9

**enter [3]** 22/15 26/7 44/15

**entered [1]** 40/13

**entire [1]** 15/3

**entirely [1]** 11/19

**entities [11]** 10/11

16/18 16/18 16/20 17/8 17/9 17/11 18/17 19/2 40/17 44/9

**entitled [2]** 1/21 56/9

**entity [22]** 11/2 11/2 11/5 11/23 12/1 12/2 13/18 15/7 22/9 28/16 28/20 28/21 30/19 36/17 37/6 37/18 38/18 39/5 48/7 48/8 48/13 48/17

**equal [1]** 39/4

**essence [1]** 14/4

**essentially [5]** 9/7 13/5 13/13 13/23 38/10

**establish [1]** 40/1

**establishing [1]** 11/8

**estimated [1]** 33/14

**et [2]** 4/4 4/4

**eve [1]** 21/17

**even [2]** 15/23 30/14

**event [2]** 13/6 41/21

**events [3]** 10/16 11/15 43/8

**ever [2]** 7/19 47/12

**every [2]** 10/9 34/12

**everybody [10]** 4/2 16/9 34/23 34/24 35/6 36/5 46/19 46/20 47/16 54/6

**Everyone [1]** 35/2

**everything [2]** 5/1 15/24

**everywhere [1]** 53/18

**evidence [11]** 11/7 18/2 18/8 19/7 19/7 22/22 30/6 30/6 42/4 42/15 56/7

**ex [1]** 45/22

**exactly [3]** 37/16 45/8 45/9

**example [2]** 45/14 52/1

**except [1]** 43/20

**excepted [2]** 39/25 41/4

**exchange [3]** 10/3 13/12 49/4

**exculpation [2]** 38/21 39/3

**exemption [1]** 24/15

**exercise [2]** 9/23 32/5

**exercised [1]** 9/14

**exercises [1]** 12/3

**exhibit [1]** 26/4

**exhibits [1]** 56/14

**E**

existing [3]   13/8 13/10 13/16
expecting [1]   11/3
expedited [1]   53/23
expenses [4]   10/20 10/22 33/10 43/21
expensive [1]   53/8
experience [1]   18/8
expert [2]   18/13 23/16
Expiration [1]   56/23
explain [1]   9/20
explained [3]   32/21 33/3 33/11
explanation [2]   9/22 27/4
express [1]   6/19
expressly [1]   32/3
extends [1]   8/22
extent [6]   27/24 37/7 37/24 38/9 40/17 48/9
extraordinary [3]   18/3 19/8 19/17
extreme [1]   38/5
eye [3]   7/20 8/23 9/3

**F**

facilitate [1]   47/13
fact [6]   15/23 19/1 19/18 30/10 31/20 41/11
facts [6]   20/10 20/16 24/20 25/12 30/10 30/11
failed [1]   11/4
failing [1]   32/18
fair [2]   37/23 46/20
fairly [1]   46/20
familiar [3]   21/24 54/15 54/16
Fantastic [1]   5/25
far [3]   14/10 14/14 35/7
favor [1]   11/18
feedback [1]   23/14
Feel [1]   51/14
fees [5]   10/17 33/14 34/8 34/13 42/25
few [3]   5/17 7/4 39/19
fiduciary [11]   9/11 10/7 31/20 31/24 37/12 37/14 37/16 37/18 38/22 38/25 39/2
fifth [1]   15/2
figure [1]   53/25

file [6]   8/12 17/2 17/3 52/14 52/15 55/1
filed [8]   8/6 16/24 21/15 24/6 41/11 42/5 53/7 53/23
filing [3]   11/8 52/20 55/3
filtered [1]   15/19
final [1]   15/2
financial [6]   21/5 27/3 27/13 29/25 30/1 30/2
financials [3]   16/2 16/3 16/6
find [4]   42/15 46/25 51/6 51/7
fine [6]   36/1 36/6 47/10 48/13 50/9 54/14
finger [3]   5/22 30/4 35/3
finished [1]   53/3
fire [2]   14/8 48/20
firm [7]   4/21 27/5 27/7 31/13 33/17 44/6 44/7
firms [7]   29/16 29/17 31/11 44/3 53/16 53/17 53/17
first [15]   8/21 10/6 10/8 10/18 10/20 10/22 11/20 19/4 22/15 27/18 30/18 38/17 38/25 46/13 53/10
firstly [4]   39/23 40/2 40/4 41/9
five [2]   11/20 14/15
flawed [1]   36/24
focused [1]   25/17
folio [1]   13/25
Folks [1]   52/17
following [1]   1/20
foot [2]   40/20 46/14
foregoing [1]   56/6
form [3]   43/2 43/5 45/17
formation [3]   38/23 38/23 39/3
formed [2]   11/3 38/19
forum [1]   21/22
forward [2]   22/2 41/17
foundation [14]   1/5 1/6 1/7 1/11 4/3 6/4 11/21 14/18 14/19 14/23 21/15 24/4 24/6 26/15

foundations [6]   22/12 23/11 23/17 40/1 40/3 41/12
four [1]   31/2
fourth [2]   14/17 51/1
Fox [2]   2/25 4/25
fraud [5]   8/25 9/23 29/20 30/5 30/8
free [1]   51/14
freeze [1]   8/25
Friday [1]   47/3
friend [1]   5/1
friends [3]   17/21 37/4 54/7
front [2]   22/4 45/1
frozen [1]   32/13
FTI [2]   30/1 41/25
function [1]   6/23
functions [1]   8/1
fund [38]   9/5 9/7 9/11 9/12 9/16 10/10 11/10 11/18 12/2 12/4 12/11 12/14 12/16 12/21 13/7 13/11 13/14 13/17 13/18 13/21 13/22 13/23 14/20 14/21 14/23 15/5 15/6 15/7 16/21 22/9 25/17 26/8 28/16 31/16 31/25 32/2 32/3 48/15
fundamentally [1]   31/14
funded [1]   16/8
funding [2]   19/21 53/14
funds [10]   11/10 12/7 13/24 16/12 22/12 23/23 24/2 26/1 30/21 31/9
further [2]   9/1 56/13
future [1]   31/8

**G**

G-A-U-D [1]   4/19
gained [1]   10/10
Gary [1]   30/3
gate [1]   19/3
GAUDIOSO [2]   2/11 4/17
gave [3]   27/12 33/12 38/21
general [4]   4/16 15/16 33/10 33/12
generally [2]   8/8 29/15
gentleman [2]   26/15

**G**

**gentleman... [1]** 32/25
**get [32]** 5/19 14/13
14/14 14/14 15/13
15/22 16/24 17/19
17/25 19/3 20/22 22/25
23/14 24/16 26/1 35/3
39/6 43/6 43/8 43/18
44/24 46/2 46/8 47/17
49/13 49/23 50/14 52/8
53/8 53/11 53/15 54/11
**gets [1]** 13/12
**getting [3]** 23/8 50/18
52/6
**Gillis [1]** 23/15
**give [4]** 8/17 16/4
26/20 33/17
**given [1]** 27/20
**gives [1]** 52/4
**giving [2]** 54/1 54/6
**gmail.com [1]** 56/22
**go [19]** 4/4 4/5 5/5
5/10 8/19 8/19 11/23
16/8 19/3 19/6 22/23
23/7 28/4 32/12 41/1
45/3 45/10 45/22 54/8
**goes [3]** 12/3 16/10
53/14
**going [39]** 4/25 5/1
5/2 5/10 8/4 8/16 14/9
16/4 16/8 16/14 16/17
18/9 21/21 21/25 22/1
22/6 23/1 23/1 26/16
30/10 34/9 34/9 35/12
35/13 42/3 44/15 45/1
45/23 46/1 46/3 46/5
46/17 47/3 47/16 49/23
50/5 50/14 52/9 55/1
**golf [2]** 17/16 17/18
**gone [2]** 10/24 42/17
**good [5]** 5/14 5/21
22/16 48/14 50/4
**GOODMAN [7]** 2/21 6/1
21/24 26/18 26/22
32/21 40/13
**GOREE [3]** 56/4 56/18
56/19
**got [8]** 11/6 19/8
21/10 40/4 46/21 48/19
53/25 54/1
**gotten [1]** 16/6
**governance [1]** 18/21
**governing [7]** 9/9 9/12
12/1 12/16 18/22 18/23
32/3

**GP [2]** 1/12 1/12
**grant [2]** 20/18 27/7
**Granted [1]** 39/7
**grantee [1]** 13/3
**grateful [1]** 39/20
**grave [1]** 38/9
**great [8]** 19/20 31/3
43/2 43/11 46/23 47/1
47/17 47/20
**group [3]** 30/3 34/5
34/24
**guess [3]** 33/13 44/13
45/9
**guidelines [3]** 5/5
52/16 53/6
**guys [2]** 51/17 52/14

**H**

**hac [1]** 35/23
**had [20]** 5/4 8/11 9/11
10/25 15/16 19/1 21/14
22/22 25/18 25/24
25/25 31/15 33/6 33/11
38/7 41/23 46/15 52/1
54/2 54/10
**half [4]** 10/18 10/22
29/22 46/15
**Hall [1]** 51/13
**hallway [1]** 45/3
**hand [2]** 42/21 56/16
**handle [1]** 49/25
**happen [9]** 11/11 14/9
17/22 32/10 43/3 49/19
49/21 52/3 52/7
**happened [10]** 9/21
14/6 14/15 20/1 20/6
22/5 31/17 32/10 37/17
43/9
**happening [3]** 26/21
27/14 27/22
**happens [2]** 20/7 23/4
**happy [8]** 7/23 20/22
46/24 47/10 47/17
47/18 53/4 53/24
**hard [1]** 17/22
**harm [8]** 19/10 20/1
20/4 20/9 20/10 30/12
32/20 42/16
**has [47]** 6/23 7/19
7/25 8/2 9/4 13/7
13/10 13/16 13/23
14/19 15/3 15/6 15/7
15/24 16/3 17/10 17/24
19/19 19/23 21/8 24/15
26/2 27/8 27/18 28/5

28/7 28/13 28/21 29/21
30/15 30/21 31/8 32/21
32/21 37/7 40/2 40/4
40/13 40/19 40/20
40/24 41/13 43/15 46/9
46/13 48/15 53/7
**hasn't [1]** 20/6
**hate [1]** 22/15
**have [106]**
**haven't [3]** 53/3 54/2
55/4
**having [7]** 7/7 17/22
29/18 33/23 34/20
34/21 54/19
**he [57]**
**he's [11]** 4/15 10/14
14/4 16/4 19/13 19/21
21/25 22/6 35/3 39/7
51/6
**hear [6]** 25/9 30/9
31/4 32/16 38/14 50/11
**heard [4]** 1/21 32/19
36/18 54/7
**hearing [25]** 5/13 6/9
6/11 6/15 6/20 21/2
21/6 21/13 21/17 21/22
24/1 24/1 40/7 40/9
40/14 43/3 47/5 47/17
48/3 49/7 50/25 52/6
52/19 54/19 55/12
**hearings [1]** 8/1
**held [5]** 1/22 9/15
13/14 36/16 48/3
**help [4]** 22/18 46/22
54/8 54/17
**helped [2]** 43/15 54/22
**helpful [3]** 23/18
28/14 31/7
**helping [1]** 23/20
**her [2]** 5/2 5/2
**here [43]** 4/10 5/7
5/11 7/11 7/17 8/22
10/11 14/22 17/2 17/3
17/7 17/9 18/15 19/12
19/13 19/15 20/8 20/10
22/1 25/23 26/5 26/18
27/22 30/8 31/2 31/14
32/19 35/11 36/12
36/25 37/10 37/19 38/1
38/6 38/8 38/17 38/23
40/8 41/3 42/12 46/2
50/14 53/5
**here's [1]** 10/5
**hereby [1]** 56/5
**Hey [1]** 44/14

**H**

**hide [1]**   23/7
**High [1]**   53/18
**HIGHLAND [12]**   1/5 1/6 1/7 4/3 21/7 21/8 21/10 34/5 34/25 34/25 35/2 41/12
**him [9]**   11/19 11/22 11/23 16/1 16/2 35/22 38/20 38/21 38/21
**his [26]**   7/20 8/22 8/23 9/13 11/4 12/15 12/16 12/17 12/22 13/6 13/11 13/11 14/18 15/2 15/19 16/13 16/19 19/12 19/15 21/13 22/11 32/4 32/5 36/6 36/15 37/22
**hit [1]**   7/12
**hold [4]**   12/5 12/10 14/24 29/6
**holdco [33]**   9/6 9/17 9/17 11/25 12/6 12/11 12/11 12/20 12/23 12/25 13/2 13/6 13/8 13/10 13/11 13/12 13/13 13/16 13/18 14/21 15/1 15/3 16/22 16/23 19/2 33/21 36/17 37/1 37/5 37/9 37/19 38/19 39/5
**holdco's [1]**   15/5
**holding [4]**   9/4 9/4 28/18 32/7
**holds [9]**   12/1 12/6 12/11 12/21 13/18 14/23 14/24 15/4 30/19
**holiday [1]**   19/14
**HON [10]**   2/3 2/4 2/10 2/11 2/12 2/15 2/19 2/20 2/21 2/22
**honest [1]**   36/4
**Honor [26]**   5/21 8/21 8/24 14/11 24/18 26/18 26/23 30/16 32/14 34/11 35/7 35/14 35/15 35/18 36/10 36/11 36/21 36/25 38/12 38/17 39/16 39/22 40/25 42/5 50/15 51/10
**Honorable [1]**   1/22
**house [3]**   20/7 20/20 26/6
**Houston [1]**   26/15
**Houston-Dallas [1]**   26/15

**how [13]**   9/9 19/18 19/20 19/21 20/10 23/10 25/11 26/16 28/5 41/7 41/17 46/17 54/6
**humanly [1]**   47/14
**Hunter [5]**   21/9 21/11 33/7 33/10 34/2
**hurt [1]**   44/15

**I**

**I'll [8]**   4/18 14/14 34/23 35/14 35/17 35/17 50/8 51/17
**I'm [46]**   4/6 7/11 7/22 8/16 15/13 16/3 17/22 18/9 22/24 22/25 23/18 24/13 25/11 30/9 31/18 34/2 34/13 35/12 35/12 35/13 35/15 36/4 39/7 39/17 42/12 42/15 42/18 43/13 44/12 44/17 44/18 44/19 45/1 45/16 46/25 47/10 47/18 50/13 53/4 53/9 53/10 53/22 53/24 54/1 54/15 54/16
**I've [2]**   5/15 20/13
**I-O-S [1]**   4/19
**idea [8]**   22/16 23/13 23/14 23/24 26/11 30/5 44/18 46/1
**ignore [1]**   37/15
**illustrative [1]**   9/21
**immediate [4]**   20/3 42/16 42/19 42/23
**immediately [1]**   54/12
**imminent [3]**   20/2 20/3 30/12
**important [1]**   18/10
**impose [1]**   30/13
**imposes [1]**   38/9
**impressive [1]**   32/12
**improper [1]**   27/25
**inappropriate [1]**   14/5
**INC [4]**   1/5 1/6 1/7 4/3
**incidents [1]**   10/25
**inclination [1]**   5/15
**include [1]**   44/8
**included [1]**   56/8
**including [1]**   6/20
**inconsistent [1]**   28/4
**incorrect [1]**   39/25
**increase [2]**   10/19

10/22
**increased [1]**   10/17
**incredible [1]**   31/17
**incumbent [1]**   28/1
**independence [1]**   9/23
**independent [6]**   9/8 12/18 27/5 39/1 41/23 41/23
**INDEX [1]**   3/1
**indicate [1]**   42/19
**indicated [1]**   40/15
**indicates [2]**   37/13 47/23
**indicating [1]**   22/23
**indirect [1]**   14/21
**individuals [1]**   25/6
**information [2]**   28/22 54/2
**initial [1]**   18/12
**initiated [1]**   22/7
**injunction [7]**   1/16 47/5 48/3 50/24 52/3 52/19 54/10
**injunctive [3]**   30/8 38/6 38/8
**injured [1]**   25/25
**injury [2]**   19/9 19/9
**inquiring [1]**   34/11
**inside [1]**   48/15
**insinuating [1]**   52/25
**instead [1]**   17/6
**intended [2]**   14/1 16/12
**interest [25]**   9/15 12/6 13/11 13/12 13/17 14/19 14/21 14/24 15/4 15/5 15/7 15/8 15/16 16/24 18/16 18/20 19/1 22/10 25/25 31/16 39/6 39/14 39/24 40/3 40/16
**interested [2]**   25/11 34/14
**interests [3]**   9/8 12/1 12/10
**interference [2]**   22/8 22/10
**interim [1]**   24/2
**interject [1]**   39/17
**intern [2]**   2/25 4/24
**internal [1]**   18/22
**interrupt [2]**   15/15 35/14
**introduction [1]**   54/6
**investment [4]**   21/9 34/2 43/25 45/16

**I**

**investments [4]**   43/24 44/8 44/10 49/2
**invited [1]**   41/12
**invoking [1]**   31/12
**involuntary [1]**   16/25
**involve [1]**   34/14
**involved [2]**   31/11 49/21
**irreparable [9]**   19/10 19/10 19/25 20/4 20/9 20/11 30/12 32/20 42/16
**irreparably [1]**   22/23
**is [221]**
**Island [1]**   16/18
**Islands [13]**   6/2 6/5 16/15 16/16 17/6 21/25 22/6 28/17 39/18 40/22 41/2 41/5 42/3
**Isn't [1]**   17/5
**issue [9]**   7/25 12/19 15/15 18/12 23/9 26/12 32/13 42/1 48/13
**issued [2]**   14/17 42/8
**issues [5]**   22/2 23/19 23/20 40/11 41/18
**it [106]**
**it's [38]**   5/2 5/10 11/20 15/17 15/23 17/21 18/8 22/10 22/25 24/14 25/22 26/1 26/16 27/21 28/10 28/20 29/15 32/10 33/23 35/1 35/1 36/2 36/22 38/1 42/3 42/23 43/12 44/3 44/3 44/4 44/7 44/14 44/15 48/19 48/22 49/11 49/11 54/11
**item [1]**   34/12
**its [3]**   13/17 13/17 15/3
**itself [2]**   38/24 41/22

**J**

**James [1]**   20/17
**JENNIFER [3]**   2/22 6/3 39/17
**Jernigan [1]**   21/3
**Jim [3]**   21/3 21/10 22/4
**jmcox [1]**   2/5
**job [5]**   12/17 46/19 46/22 47/19 54/22
**Joe [5]**   4/8 5/10 34/24

35/19 53/22
**JOSEPH [1]**   2/4
**JR [1]**   2/10
**judge [23]**   1/22 5/11 5/17 7/3 7/6 7/11 7/16 17/13 18/6 21/3 21/7 25/21 28/14 29/19 40/7 40/14 43/19 45/24 47/6 50/25 51/5 51/25 55/9
**judgment [1]**   43/12
**judiciary [1]**   20/24
**Julie [1]**   21/14
**July [8]**   1/20 3/3 19/14 20/8 20/8 47/4 52/10 56/17
**July 11th [1]**   47/4
**July 2nd [1]**   20/8
**July 4th [1]**   20/8
**June [5]**   11/1 27/17 27/17 41/10 42/5
**June of [1]**   11/1
**jurisdiction [23]**   8/10 8/10 8/13 17/10 17/11 17/12 18/11 18/12 18/14 19/3 19/5 22/14 22/16 30/15 43/13 48/2 51/14 51/15 51/21 51/21 51/23 51/23 52/8
**jurisdictional [2]**   22/21 23/9
**jury [1]**   20/23
**just [40]**   5/11 8/9 8/17 13/19 15/18 15/21 16/6 16/24 20/14 20/17 23/13 25/19 26/1 27/22 28/4 32/12 32/19 33/9 33/11 33/12 34/14 34/17 34/23 35/17 35/23 36/11 36/20 39/18 42/13 44/3 44/17 44/19 48/16 48/18 48/22 50/18 52/7 54/1 54/5 55/4
**justify [2]**   41/15 41/15

**K**

**KANSAS [1]**   1/6
**key [5]**   10/5 11/20 14/15 14/17 20/2
**kickback [2]**   10/3 11/10
**kind [9]**   18/7 25/10 27/18 30/13 33/12 33/13 35/11 42/12

43/18
**Kirschner [1]**   34/5
**know [36]**   7/18 11/12 16/7 16/11 17/1 17/20 17/25 18/11 19/1 19/22 23/15 24/13 25/18 29/10 30/14 31/22 34/14 36/11 36/18 38/7 40/19 43/4 43/11 43/24 44/2 45/8 47/12 51/7 51/8 51/10 52/1 52/4 53/16 53/18 54/15 55/7
**knowledge [1]**   24/21
**known [2]**   25/12 53/17
**knows [3]**   16/9 16/10 34/24
**Kroll [1]**   27/5

**L**

**lack [1]**   13/25
**last [2]**   12/8 49/23
**lastly [1]**   32/23
**later [3]**   5/6 5/12 7/8
**law [12]**   9/12 29/15 29/17 31/10 31/13 32/18 33/24 36/2 36/4 37/13 37/15 44/3
**lawful [1]**   9/24
**lawsuit [1]**   16/17
**lawyer [1]**   19/20
**lawyers [5]**   5/17 7/7 29/24 31/19 53/17
**lawyers' [1]**   42/25
**Layton [3]**   5/22 30/4 35/16
**lead [1]**   34/6
**learner [1]**   46/4
**learning [1]**   18/7
**least [1]**   53/17
**leave [1]**   48/16
**left [2]**   16/7 17/19
**legal [6]**   2/25 10/20 33/10 33/14 37/2 41/3
**lengths [1]**   54/8
**lept [1]**   10/20
**less [3]**   12/24 13/1 50/17
**let [6]**   15/15 18/17 28/6 29/7 37/19 51/10
**let's [12]**   4/4 5/19 16/23 22/16 24/16 42/9 45/6 47/20 50/22 51/13 51/16 52/13
**letter [2]**   37/15 53/14
**level [2]**   13/21 15/13

**L**

license [1]  36/2
lift [1]  9/19
like [14]  7/8 7/21
 20/13 22/5 33/24 36/11
 36/20 42/9 43/6 44/3
 44/4 44/14 46/17 53/25
likelihood [1]  31/24
liking [1]  22/6
limited [1]  24/19
limits [1]  50/16
lines [1]  43/5
liquidation [5]  40/5
 40/6 40/20 41/10 41/19
liquidator [3]  31/3
 31/6 37/6
liquidators [16]  27/7
 27/12 27/19 27/23 28/1
 28/8 28/22 28/22 28/24
 29/5 37/9 38/1 40/5
 40/10 40/15 41/9
listen [6]  36/2 46/11
 47/11 51/11 52/24
 53/16
litigation [4]  19/21
 34/5 34/9 46/16
litigations [2]  33/18
 33/20
little [5]  12/5 22/25
 23/12 43/14 47/9
live [6]  6/16 6/16
 6/21 6/25 43/21 47/16
LLC [8]  1/11 1/12 5/23
 28/15 28/20 35/17
 37/17 37/20
LLCs [2]  37/14 37/16
LLP [2]  2/6 2/13
local [2]  6/14 53/13
locks [1]  38/10
long [2]  16/8 25/11
longstanding [1]  25/15
look [8]  18/1 19/6
 19/7 20/5 20/12 29/14
 41/9 50/22
looking [3]  18/1 18/6
 49/14
Lord [1]  40/25
lot [9]  10/11 10/11
 17/24 17/24 34/9 38/20
 38/21 39/8 44/8
loud [1]  38/15
loved [1]  35/3
lowdown [1]  8/17
LP [1]  28/16
Ltd [2]  1/12 36/17

**M**

ma'am [1]  32/17
machinations [1]  32/12
machine [1]  1/25
made [3]  39/24 40/19
 40/24
main [2]  2/13 11/14
major [1]  51/9
majority [1]  42/7
make [19]  7/6 8/7 17/1
 19/22 23/4 23/6 23/8
 23/19 24/1 31/12 32/8
 32/12 36/5 45/16 46/24
 47/18 47/18 48/12 55/5
making [6]  23/18 23/21
 46/25 48/22 48/22
 52/17
malicious [2]  29/20
 38/24
manage [3]  9/6 44/2
 49/3
management [7]  12/3
 12/15 13/7 13/7 15/2
 23/17 40/16
manager [3]  4/25 13/3
 37/22
manages [2]  44/4 44/5
Mancino [1]  29/23
manner [2]  6/12 55/8
many [4]  10/2 21/12
 22/2 54/16
Maples [1]  30/3
mark [8]  1/10 2/21 4/4
 6/1 21/11 21/24 22/8
 26/18
market [1]  37/23
Mat [1]  35/15
matching [1]  34/12
material [1]  27/13
matter [8]  34/6 39/25
 41/16 42/4 43/12 48/2
 51/21 51/23
matters [4]  31/14
 33/10 41/5 41/9
MATTHEW [4]  2/19 5/22
 40/2 41/8
mature [1]  44/10
may [28]  5/4 5/4 6/20
 10/1 16/11 24/8 24/14
 27/9 27/10 27/11 27/16
 27/16 29/19 30/16 31/2
 31/5 31/6 32/22 33/3
 38/12 39/17 40/3 40/22
 43/11 47/8 48/7 49/18
 52/17

May 31st [1]  33/3
maybe [10]  13/15 30/18
 31/21 43/11 43/12 50/7
 52/5 52/6 52/7 52/18
McCarty [1]  8/22
MCCLEARY [1]  2/16
McENTIRE [5]  2/15 2/16
 4/12 21/1 49/8
MCI [1]  28/15
me [23]  4/22 8/17 12/8
 15/15 18/8 18/17 23/18
 23/20 23/20 28/6 28/11
 29/7 33/17 42/19 43/7
 43/15 46/8 46/9 50/3
 50/4 52/21 52/23 56/12
mean [4]  25/5 29/20
 34/18 45/20
means [5]  6/9 9/25
 16/13 25/25 41/4
meantime [3]  43/6
 49/19 51/15
mechanism [2]  24/15
 33/1
meet [2]  37/25 47/4
member [1]  36/15
members [2]  37/2 37/14
membership [2]  36/15
 37/21
Memorial [2]  54/12
 54/14
mentioned [1]  41/21
met [3]  4/23 26/15
 32/25
might [5]  20/14 23/13
 28/4 44/13 52/20
million [23]  9/2 9/4
 9/16 9/19 10/18 10/20
 10/21 10/23 10/23
 11/18 12/6 12/13 13/17
 15/4 15/5 15/17 28/7
 31/16 32/2 39/6 39/14
 39/24 42/17
mind [1]  19/17
mine [1]  43/16
minute [2]  35/12 49/24
minutes [2]  8/17 15/11
moment [3]  9/21 10/6
 14/13
monetary [2]  20/21
 38/4
money [25]  11/2 15/19
 16/7 22/23 23/5 23/6
 23/22 23/22 26/8 26/16
 27/14 28/4 30/20 32/12
 32/13 33/7 42/23 43/9

# M

**money... [7]** 43/20 44/2 44/5 45/10 45/15 48/16 48/16

**moneys [1]** 35/10

**MONICA [2]** 2/11 4/17

**months [4]** 10/21 31/15 32/20 39/14

**more [16]** 5/5 7/4 8/17 9/2 10/25 12/23 18/10 25/15 34/13 46/2 46/3 46/4 47/6 50/17 52/8 54/24

**morning [4]** 24/11 26/16 32/25 54/14

**MORRIS [2]** 2/6 24/23

**most [1]** 21/16

**motion [4]** 49/24 53/2 53/7 53/23

**motions [2]** 53/8 53/15

**Mountain [5]** 21/9 21/11 33/7 33/11 34/2

**move [5]** 15/21 16/13 43/20 45/11 52/7

**moved [2]** 28/23 43/9

**Mr [8]** 4/9 25/7 26/22 34/17 34/18 38/7 39/2 53/22

**Mr. [76]**

**Mr. Brian [1]** 41/21

**Mr. Cox [2]** 7/12 48/21

**Mr. Diaz [1]** 24/12

**Mr. Dondero [12]** 16/9 19/12 19/25 20/25 21/18 21/21 24/23 24/25 34/24 35/5 43/7 51/6

**Mr. Dondero's [2]** 19/16 33/25

**Mr. Goodman [2]** 32/21 40/13

**Mr. Jim [1]** 22/4

**Mr. Mark [1]** 22/8

**Mr. Matthew [2]** 40/2 41/8

**Mr. McCarty [1]** 8/22

**Mr. McEntire [1]** 49/8

**Mr. Patrick [38]** 9/6 9/18 9/22 10/5 10/10 10/12 11/1 11/9 11/16 11/21 12/2 12/15 12/19 13/5 13/19 13/22 14/17 15/3 15/18 16/9 16/11 16/19 19/13 19/18 19/20 19/23 20/23 25/24 30/20 31/9 31/20 32/4 32/11 34/15 37/12 37/22 43/7 51/7

**Mr. Patrick's [2]** 12/25 37/4

**Mr. Raver [3]** 18/15 19/15 34/15

**Mr. Shaw [2]** 53/24 54/25

**Mr. Shawn [2]** 4/15 24/8

**Mr. Spears [1]** 43/14

**Mr. Warner [2]** 4/11 53/21

**Ms [2]** 25/18 26/14

**Ms. [6]** 18/13 20/5 20/17 25/7 32/23 43/7

**Ms. Diaz [5]** 20/5 20/17 25/7 32/23 43/7

**Ms. Reed [1]** 18/13

**much [2]** 22/17 47/13

**multi [2]** 22/4 35/25

**Multi-crosstalk [1]** 35/25

**multi-front [1]** 22/4

**MURPHY [3]** 2/19 5/22 35/15

**must [1]** 37/23

**my [22]** 4/17 4/21 5/15 5/23 17/20 18/18 19/17 21/9 23/13 24/19 25/20 25/22 35/13 36/2 37/4 40/25 44/13 44/22 45/20 47/19 52/20 56/16

# N

**named [3]** 18/20 36/21 48/3

**names [1]** 31/13

**narrow [1]** 51/13

**national [2]** 23/16 46/16

**nature [1]** 25/15

**near [1]** 32/1

**necessitates [1]** 20/8

**need [22]** 7/4 8/25 15/23 18/4 22/14 24/1 27/1 42/23 42/24 42/25 43/10 43/25 44/1 45/15 45/16 47/6 48/23 51/5 51/6 51/7 51/19 51/24

**Neither [1]** 24/24

**never [6]** 15/22 15/23 16/4 16/6 20/13 22/16

**new [13]** 11/18 11/21 11/23 12/20 12/25 13/5 13/11 13/17 14/18 25/20 27/3 33/22 38/19

**newly [1]** 12/22

**next [5]** 29/8 29/13 43/3 44/11 46/22

**nights [1]** 54/15

**no [36]** 1/3 2/3 2/5 2/10 2/11 2/16 8/2 8/17 15/10 15/19 17/8 18/25 20/10 26/2 26/11 27/15 27/22 28/3 28/3 28/9 28/10 30/11 30/13 34/20 37/2 42/6 45/22 46/9 48/13 49/2 49/2 49/9 49/25 52/11 54/21 56/23

**No. [3]** 4/3 46/19 48/4

**No. 1 [2]** 46/19 48/4

**No. 25-BC01B-0027 [1]** 4/3

**No.24121791 [1]** 2/12

**nobody [6]** 7/19 31/1 47/16 52/9 52/20 52/23

**noise [1]** 17/24

**non [1]** 36/16

**non-party [1]** 36/16

**none [5]** 18/16 18/17 18/20 22/9 49/7

**nonprofit [2]** 11/2 29/24

**normal [3]** 17/21 45/12 48/19

**not [86]**

**note [3]** 8/1 36/20 48/1

**note-taking [1]** 8/1

**noted [2]** 37/4 38/5

**notes [1]** 8/3

**nothing [5]** 9/18 19/25 23/4 26/1 31/17

**notice [1]** 23/5

**noticed [1]** 47/5

**Novak [1]** 50/25

**now [33]** 7/8 9/2 9/17 10/25 11/12 11/23 12/24 13/13 13/15 13/18 14/3 14/7 14/19 14/19 14/22 15/6 15/17 15/18 15/24 16/7 16/13 16/25 17/3 25/15 25/24 26/6 27/8 30/22 31/7 31/8 31/16 32/7 36/18

**number [1]** 33/16

**N**

**numbered [2]** 1/21 56/10

**O**

**o'clock [2]** 47/3 51/3
**object [4]** 35/8 35/9 35/22 42/5
**objection [7]** 21/13 21/15 21/20 24/4 24/7 24/7 24/22
**objections [1]** 21/21
**obligations [1]** 29/12
**obtain [1]** 11/9
**obviously [2]** 19/14 37/18
**occasions [1]** 37/11
**occurred [4]** 11/12 36/20 46/11 56/10
**odd [1]** 39/24
**odds [1]** 53/19
**off [3]** 26/3 46/10 48/20
**offer [1]** 27/15
**offered [2]** 27/11 28/21
**office [1]** 17/19
**officer [1]** 4/16
**offices [1]** 33/24
**official [7]** 6/22 7/24 8/4 10/1 56/4 56/16 56/20
**okay [26]** 4/7 5/14 7/4 7/12 8/14 12/4 14/18 15/1 22/13 27/1 29/7 30/20 30/23 35/18 36/7 42/9 45/6 45/24 46/13 49/7 49/10 49/18 49/23 50/5 54/13 55/2
**old [1]** 27/24
**Olsen [1]** 30/3
**Once [1]** 7/20
**one [37]** 7/6 7/7 7/23 8/3 8/5 10/9 11/1 11/22 18/5 18/5 18/9 18/10 20/14 21/2 21/5 21/9 21/18 22/14 22/20 23/13 24/7 25/21 29/17 29/23 30/19 33/17 33/18 33/25 40/11 43/9 44/15 46/8 48/14 48/21 53/4 53/20 54/24
**ongoing [6]** 24/10 24/19 28/2 33/11 40/6 40/16

**online [1]** 5/24
**only [13]** 13/9 14/21 14/25 15/6 15/7 15/8 24/21 31/8 33/25 35/16 37/14 38/13 51/25
**open [2]** 6/15 56/10
**OPENING [1]** 8/20
**operate [2]** 48/4 48/23
**operate in [1]** 48/23
**operating [2]** 4/16 38/11
**opportunities [1]** 44/13
**opportunity [7]** 5/4 8/12 8/15 23/23 39/20 43/25 53/11
**opposing [1]** 8/8
**order [9]** 1/16 5/8 5/12 8/9 11/9 18/2 20/13 20/19 47/25
**orders [1]** 10/2
**ordinary [10]** 24/21 42/22 42/24 43/21 45/19 48/4 48/12 48/22 48/23 48/25
**organization [10]** 13/22 13/24 16/3 18/22 18/25 18/25 20/25 29/24 32/4 39/2
**organizational [1]** 11/19
**organizations [16]** 8/25 9/9 9/10 10/13 11/2 11/24 12/18 13/3 16/13 23/11 23/19 24/6 25/8 30/14 32/6 39/11
**organizations' [1]** 15/25
**original [6]** 1/16 13/25 15/1 15/3 16/22 16/23
**other [18]** 8/5 10/4 13/22 16/10 18/14 21/5 25/8 33/18 33/24 34/15 35/20 42/21 42/21 43/9 48/8 48/13 53/6 56/7
**otherwise [1]** 40/23
**our [27]** 4/15 4/23 7/7 7/15 9/3 12/4 12/9 12/21 13/14 15/16 17/1 26/19 31/20 31/25 32/6 35/7 35/7 35/8 39/1 39/11 46/19 48/1 48/9 51/20 52/11 53/6 54/22
**out [26]** 9/13 9/19

10/7 10/16 19/3 19/14 20/16 23/13 23/14 23/24 25/21 25/23 38/7 41/22 44/18 45/3 47/7 47/9 48/12 49/3 49/16 50/16 51/6 51/7 53/25 54/4
**outcome [1]** 27/3
**outline [1]** 10/6
**outset [1]** 31/21
**outside [2]** 25/10 45/19
**outstanding [1]** 33/10
**over [22]** 7/20 11/16 12/5 12/10 12/16 13/7 13/23 16/17 16/19 16/25 17/2 17/2 17/3 17/10 17/14 19/5 30/20 33/25 37/6 40/8 52/10 53/17
**Overall [1]** 10/22
**overbroad [1]** 20/15
**overnight [1]** 15/21
**overrule [1]** 21/21
**overruled [1]** 21/13
**overseeing [1]** 41/24
**oversight [6]** 26/24 27/2 27/14 27/20 28/4 30/13
**overview [1]** 9/20
**owe [1]** 37/18
**owed [5]** 10/7 31/20 31/24 37/12 39/2
**own [6]** 8/3 13/1 15/19 16/13 18/16 36/6
**owned [3]** 11/19 12/21 13/8
**owner [5]** 12/25 18/24 18/25 25/16 25/16
**owners [2]** 9/3 9/16
**ownership [5]** 12/10 12/23 13/9 18/20 32/15
**owns [3]** 21/7 28/16 28/17

**P**

**Pacific [1]** 2/17
**page [2]** 3/4 53/14
**paid [5]** 11/10 29/8 33/15 42/25 43/1
**painted [1]** 41/3
**paints [1]** 11/14
**paper [1]** 10/16
**papers [3]** 10/7 11/8 17/1

**P**

PARSONS [1]  2/16
part [9]  10/3 12/8 17/6 24/4 30/24 33/5 33/6 38/24 41/12
parte [1]  45/22
partially [1]  13/14
participants [1]  6/20
participate [1]  24/10
participating [5]  4/24 6/10 8/1 22/1 42/7
particular [2]  19/5 36/8
particularly [1]  38/9
parties [3]  36/19 56/8 56/15
parties' [1]  49/11
partner [1]  5/23
Partners [2]  6/4 39/18
party [2]  36/16 37/7
pass [1]  39/9
past [3]  7/25 11/16 19/3
pathway [1]  10/6
pathway we [1]  10/6
PATRICK [52]  1/10 2/10 4/4 9/6 9/18 9/22 10/5 10/10 10/12 11/1 11/9 11/16 11/21 12/2 12/15 12/19 13/2 13/5 13/9 13/19 13/22 14/17 14/23 14/23 15/3 15/18 16/9 16/11 16/19 19/13 19/18 19/20 19/23 20/23 21/11 22/8 25/24 30/20 30/22 31/9 31/20 32/4 32/11 34/15 34/18 37/12 37/22 38/19 39/2 43/7 50/12 51/7
Patrick's [3]  12/25 37/4 38/7
pattern [3]  10/14 11/14 41/2
pay [1]  43/20
payback [1]  34/13
paying [3]  33/9 42/21 44/3
payment [2]  29/15 29/18
payments [4]  10/19 48/12 48/22 48/23
payroll [4]  29/16 29/17 42/25 45/13
pencil [1]  51/11
pendency [1]  53/24

pending [1]  35/23
people [11]  17/11 25/1 25/5 31/19 31/21 46/2 46/19 46/22 53/18 54/8 54/22
per [2]  10/22 36/19
percent [13]  10/19 12/5 12/10 12/20 12/21 12/24 12/24 12/25 13/1 13/8 32/1 32/7 39/6
perfectly [3]  43/11 47/16 54/5
perhaps [4]  21/5 26/19 34/3 34/13
period [2]  15/14 35/8
permission [1]  6/19
person [9]  6/9 6/10 11/11 19/19 21/11 25/1 31/8 31/24 56/11
personal [5]  8/10 8/12 48/2 51/20 51/23
perspective [1]  31/15
petition [11]  1/16 15/10 21/14 21/17 21/19 23/12 25/23 32/24 32/24 36/24 37/13
Philip [3]  2/24 4/22 5/3
phone [1]  53/9
pick [2]  5/12 8/18
pin [1]  43/13
pitch [2]  45/20 45/21
place [4]  9/1 33/1 42/3 43/9
plaintiff [1]  33/25
plaintiffs [28]  1/8 2/2 4/6 4/10 10/8 11/17 11/18 12/4 12/9 13/1 13/8 14/19 14/20 14/24 15/16 18/16 22/10 25/24 32/6 36/11 36/13 36/25 37/10 37/11 37/19 38/1 38/4 48/10
plaintiffs' [5]  1/16 11/24 12/23 25/3 31/15
plan [3]  22/18 23/4 52/16
platforms [1]  6/24
players [1]  43/7
please [3]  4/5 6/7 7/13
PLLC [1]  2/16
plus [2]  12/25 32/1

point [16]  5/6 12/4 14/7 14/25 15/6 19/4 29/20 31/1 31/6 31/6 35/2 38/18 40/19 41/4 42/6 44/13
pointed [2]  18/11 38/7
points [2]  30/18 39/19
policies [1]  45/15
portion [1]  9/17
portions [2]  24/7 56/7
position [1]  8/2
positions [1]  54/9
possesses [1]  9/18
possibility [1]  43/17
possible [3]  22/17 46/6 47/14
potential [1]  39/12
power [3]  9/23 10/1 32/5
powers [6]  9/13 12/17 13/7 15/3 16/20 25/18
practice [2]  36/4 46/16
preceded [1]  38/23
precedes [2]  11/14 39/3
precisely [1]  13/4
preeminent [1]  29/24
preliminary [1]  52/19
prepare [1]  7/23
PRESENT [1]  2/23
presentation [1]  51/13
presented [3]  20/16 30/6 33/2
president [1]  26/14
presidents [1]  25/8
presiding [2]  1/22 40/8
pressing [1]  34/13
prevent [1]  9/1
prevents [1]  38/10
previously [2]  12/21 36/16
pro [1]  35/23
probably [1]  49/21
problem [7]  9/24 43/22 46/23 46/23 51/9 52/12 54/22
problems [4]  22/19 34/22 47/1 54/18
procedural [1]  54/24
proceed [2]  40/16 42/2
proceeding [4]  6/18 6/22 6/24 22/7
proceedings [19]  1/20

**P**

**proceedings... [18]**
1/24 7/2 22/1 24/18
24/19 25/22 26/3 30/25
32/19 33/12 33/22 37/5
39/19 40/6 40/8 41/13
56/7 56/14
**proceeds [3]** 33/5 48/6
48/7
**process [1]** 28/2
**professional [4]** 36/3
46/18 46/19 55/8
**professionals [2]**
53/19 55/8
**progressed [1]** 41/1
**prohibited [1]** 6/18
**promise [1]** 46/24
**promptly [1]** 53/20
**proposal [1]** 45/7
**proposed [3]** 20/12
45/8 45/9
**proprietary [1]** 28/25
**protect [1]** 39/11
**protocol [5]** 27/11
27/19 28/21 40/12
40/25
**provide [1]** 22/12
**provided [1]** 41/11
**provides [1]** 10/15
**provisions [1]** 39/4
**prudent [1]** 45/16
**public [2]** 6/15 6/25
**purported [1]** 11/21
**purportedly [1]** 36/22
**purpose [3]** 13/25 40/8
43/10
**purposes [1]** 8/3
**pursuing [1]** 52/17
**push [2]** 47/8 51/4
**put [11]** 13/22 16/19
16/24 17/1 19/12 25/23
26/9 26/10 26/10 26/11
46/4

**Q**

**quality [1]** 53/18
**quarterly [1]** 33/13
**quash [2]** 49/24 53/7
**question [17]** 18/18
22/14 28/6 28/11 28/12
28/24 29/7 29/11 30/9
30/21 30/22 31/23 41/6
43/15 43/23 45/18
45/22
**questions [2]** 22/21

51/24
**quickly [2]** 17/20
22/20
**quite [1]** 41/8
**quote [2]** 19/9 37/22

**R**

**raised [2]** 21/12 40/11
**Rancho [1]** 56/21
**rapid [1]** 39/13
**rapidity [1]** 32/9
**Raver [7]** 2/24 4/15
18/15 19/15 24/8 34/15
34/18
**reach [6]** 23/25 43/2
43/5 44/17 47/15 47/19
**reaching [1]** 43/17
**read [3]** 5/15 8/14
23/12
**ready [1]** 52/6
**real [2]** 6/11 6/13
**really [8]** 18/7 19/24
20/24 22/4 22/7 22/10
43/6 50/14
**reason [2]** 25/17 28/24
**reasonable [2]** 48/18
49/4
**reasons [1]** 43/11
**received [1]** 33/8
**receiver [4]** 1/17 5/9
5/11 5/12
**recent [1]** 25/15
**recently [2]** 24/21
40/7
**recognition [1]** 29/1
**recognized [1]** 23/15
**recommendation [1]**
23/20
**record [15]** 1/1 5/20
6/23 7/14 8/7 8/9 21/1
28/5 42/15 42/19 46/10
47/21 49/11 56/9 56/13
**recorded [1]** 6/25
**recording [4]** 6/18
6/22 7/1 8/4
**recover [2]** 28/2 29/1
**recurring [1]** 11/6
**redeem [1]** 15/3
**redemption [6]** 36/13
37/8 37/21 37/23 37/25
39/5
**REED [5]** 2/12 2/20
4/21 5/23 18/13
**refer [1]** 35/17
**reference [1]** 35/17

**referred [2]** 9/9 30/19
**referring [2]** 17/14
36/14
**reflects [1]** 56/14
**refrain [1]** 45/19
**regard [1]** 40/16
**regarding [4]** 18/21
37/8 40/20 48/13
**reinvest [1]** 45/15
**related [2]** 18/14
37/14
**relates [2]** 16/17
45/12
**relevant [1]** 39/19
**relied [1]** 30/7
**relief [10]** 18/3 19/8
20/18 30/8 38/6 38/8
52/20 52/21 52/22
52/23
**rely [1]** 30/11
**remaining [1]** 15/1
**remains [1]** 41/16
**remember [2]** 11/25
18/5
**remote [2]** 15/22 49/22
**repeat [2]** 12/8 18/17
**repeated [1]** 27/16
**repeatedly [3]** 9/13
39/23 40/24
**replacing [1]** 27/7
**reply [1]** 7/2
**report [3]** 25/2 25/3
26/20
**reported [3]** 1/24
11/12 56/12
**reporter [7]** 7/17 31/4
32/16 47/23 56/3 56/4
56/20
**reporter's [4]** 1/1
6/23 56/9 56/13
**reporting [3]** 27/11
27/12 28/21
**reports [2]** 12/19
41/24
**represent [4]** 8/24
24/24 33/21 35/16
**representative [2]**
2/24 4/15
**Representative/Counsel
[1]** 2/24
**represented [1]** 29/23
**representing [2]** 29/22
34/2
**represents [1]** 28/15
**request [7]** 1/17 7/6

**R**

request... [5]  7/14 14/10 18/3 23/6 35/23
requested [2]  11/1 56/8
require [1]  42/3
reservations [1]  43/16
reserve [1]  48/1
resolution [1]  34/22
resolve [6]  22/21 53/14 53/15 53/20 54/8 54/17
resolved [1]  54/11
respect [2]  16/20 37/3
respected [1]  35/6
respectful [1]  50/15
respective [2]  8/16 56/15
respond [2]  51/17 52/14
response [2]  24/16 52/4
responsibility [1]  36/3
restraining [8]  1/16 5/8 5/12 8/9 18/1 20/13 20/19 47/25
restrictions [1]  38/9
restructuring [5]  37/5 41/22 48/5 48/14 49/2
return [1]  49/17
review [1]  7/21
reviewed [1]  19/16
reviewing [1]  18/6
Richards [3]  5/22 30/4 35/16
rid [1]  16/24
right [22]  4/2 4/9 7/7 10/11 12/12 12/13 14/3 14/7 15/16 18/6 19/3 31/7 31/8 35/4 35/11 38/22 41/8 41/18 44/9 50/22 53/10 53/16
righteous [1]  11/11
rightly [1]  18/11
rights [2]  37/2 48/1
room [5]  4/24 18/15 46/9 47/4 51/12
routinely [1]  29/4
RPR [1]  56/19
rule [7]  19/8 24/9 24/14 47/25 49/11 53/5 53/13
rules [3]  6/14 6/15 7/15

rulings [1]  42/13
run [3]  5/1 5/2 34/25
running [1]  35/2
runs [1]  15/18
rush [1]  7/22
Russian [1]  26/10

**S**

safe [2]  24/2 35/10
said [13]  16/3 16/4 16/23 17/1 24/3 25/24 26/3 31/5 37/11 48/21 50/11 54/11 54/13
sale [3]  48/6 48/7 48/20
sales [1]  48/6
Sam [1]  4/19
same [10]  6/2 6/12 6/14 9/15 9/17 21/12 21/18 22/2 23/8 48/8
sanction [1]  40/9
SANTA [1]  1/7
Saturday [2]  54/14 54/20
Saul [1]  4/12
SAWNIE [1]  2/15
say [6]  19/7 27/21 33/20 42/2 48/11 51/16
saying [5]  41/8 44/19 50/1 53/21 53/23
says [8]  17/13 19/8 19/17 19/25 20/14 34/25 37/15 45/8
scary [1]  26/12
schedule [2]  50/20 52/8
scheduling [2]  5/6 54/2
scheme [5]  10/4 11/17 11/20 38/24 39/12
scope [1]  20/12
seat [1]  13/7
seats [1]  10/12
second [3]  11/25 12/19 31/10
secret [1]  11/17
Section [1]  37/17
Section 6.5 [1]  37/17
see [16]  7/8 7/8 8/19 11/15 13/20 15/23 17/8 23/20 28/14 29/14 31/8 34/12 42/6 42/22 51/17 53/24
seeing [1]  42/18
seek [4]  29/1 38/4

38/6 41/15
seeking [2]  36/12 38/8
seem [2]  36/13 38/5
seems [2]  23/12 40/23
seen [4]  9/4 18/15 20/13 22/24
seized [1]  41/13
self [3]  10/15 11/13 14/5
self-dealing [3]  10/15 11/13 14/5
sell [3]  45/11 48/15 48/20
senator [1]  10/1
sense [1]  50/14
sensible [1]  40/15
sentence [1]  20/14
separate [1]  52/16
September [2]  11/7 33/14
September 2023 [1]  11/7
September 30th [1]  33/14
series [1]  9/18
served [3]  8/6 8/11 55/4
service [2]  54/25 55/11
set [3]  15/6 46/14 52/3
settled [1]  54/21
settlement [3]  21/8 21/16 33/7
several [3]  34/22 36/24 37/11
Seyfarth [1]  29/23
shareholder [1]  42/7
shareholders [1]  25/4
shares [4]  12/3 12/20 14/17 15/1
SHAW [5]  2/10 4/14 29/23 53/24 54/25
Shawn [3]  2/24 4/15 24/8
she [6]  18/6 18/6 20/6 21/14 21/17 26/15
sheets [1]  33/2
shopping [1]  21/22
short [3]  15/14 47/1 51/16
shorthand [1]  1/25
should [8]  6/11 17/5 17/6 31/11 31/12 42/1 42/2 50/16

**S**

shouldn't [1]  23/7
show [2]  20/3 52/19
showing [1]  31/24
sic [1]  29/25
side [4]  33/24 35/19
  35/20 37/4
sides [3]  8/16 13/2
  54/11
significant [1]  42/3
simple [2]  15/17 44/3
simply [3]  20/10 27/21
  39/25
since [5]  10/14 27/8
  40/21 40/22 46/13
sir [2]  34/10 50/2
situation [1]  14/22
six [4]  10/21 31/15
  39/14 46/15
slim [1]  53/20
SLOMAN [2]  2/13 29/21
slow [1]  4/5
smell [1]  39/9
SMU [2]  4/24 36/3
so [71]
sold [1]  48/7
sole [4]  31/25 32/1
  36/15 37/22
solve [5]  22/18 46/22
  46/23 47/1 54/22
some [25]  10/4 14/4
  16/9 22/19 23/1 23/10
  25/12 25/15 28/24 30/5
  30/13 31/5 31/6 31/18
  31/21 32/11 35/3 43/2
  43/5 43/16 44/8 45/17
  47/6 51/14 53/25
somebody [1]  47/7
someone [2]  11/9 28/13
something [12]  14/9
  16/17 17/5 22/24 24/14
  25/9 31/3 31/7 32/15
  39/10 46/11 48/17
somewhere [5]  15/22
  22/23 23/7 45/22 46/7
Sonny [1]  21/1
sooner [2]  52/12 52/13
sophisticated [3]  9/18
  29/20 31/19
sorry [4]  27/10 27/17
  28/10 38/15
sort [1]  16/10
sorts [1]  19/24
speak [2]  36/5 38/13
speaking [1]  36/7

Spears [3]  2/24 4/22
  43/14
special [8]  51/24
  52/14 52/15 52/17
  52/18 52/21 55/1 55/3
specific [1]  10/25
specifically [2]  24/11
  29/15
speed [1]  31/18
spell [1]  4/18
spelled [3]  9/13 10/7
  10/16
spend [1]  23/21
spoken [1]  40/13
spreadsheet [1]  33/6
Springboat [1]  21/7
staff [2]  2/24 4/22
stand [2]  21/4 25/23
standard [3]  37/25
  44/14 44/16
standby [1]  25/10
standing [3]  19/4
  26/17 37/7
start [1]  14/2
state [13]  2/3 2/5
  2/10 2/11 2/12 2/16
  10/1 19/9 23/16 32/4
  36/4 56/1 56/5
state-wide [1]  23/16
STATEMENT [1]  8/20
States [3]  17/2 17/4
  21/2
status [2]  26/20 51/3
stay [1]  48/6
stead [1]  19/15
stenographic [1]  1/24
stenographically [1]
  56/11
step [8]  9/22 10/6
  10/8 12/19 14/17 15/2
  18/9 18/10
steps [8]  11/20 14/16
  25/19 28/2 41/3 41/5
  41/14 41/24
steroids [1]  21/23
Steve [2]  23/15 23/15
still [8]  6/15 7/10
  13/8 13/14 43/14 43/15
  48/1 51/12
stipulated [1]  49/1
stockholders [2]  37/1
  37/1
Stomping [1]  12/16
strangers [1]  18/23
strategy [1]  9/20

stream [2]  6/21 6/25
streamed [1]  6/17
streaming [1]  6/16
Street [1]  2/13
strike [1]  47/7
structural [1]  25/19
structure [10]  11/19
  13/4 14/15 25/19 27/3
  27/24 28/14 28/17
  36/19 40/4
struggling [1]  42/15
stuff [4]  15/25 23/17
  38/20 53/25
subject [6]  24/9 24/14
  33/23 48/2 51/21 51/22
submitted [1]  8/15
subsequent [3]  10/9
  10/15 11/15
substantial [1]  34/7
substantiate [1]  30/7
substantive [1]  23/5
success [1]  31/24
successful [1]  33/23
such [1]  38/15
suddenly [1]  13/1
suggest [5]  8/16 36/25
  41/1 50/20 52/7
suggestion [1]  28/3
suit [3]  17/2 17/3
  17/20
Suite [3]  2/6 2/13
  2/17
summons [1]  41/11
supervised [1]  27/23
supervision [3]  27/6
  27/8 40/21
supplement [1]  24/3
support [3]  18/3 38/5
  38/8
supported [1]  9/12
supporting [5]  8/24
  9/10 11/1 23/11 24/5
supposed [1]  17/22
sure [23]  7/22 8/7
  22/24 23/4 23/6 23/8
  23/18 23/21 24/1 24/14
  26/22 28/14 30/17
  31/18 32/8 38/20 39/7
  39/21 43/4 45/16 45/16
  47/10 52/9
surgery [3]  7/7 7/20
  8/23
surprised [1]  19/11
Susan [5]  2/25 4/25
  4/25 7/10 53/9

**S**

**Swiss [1]**  15/21
**sworn [2]**  30/11 30/12

**T**

**table [1]**  4/4
**take [15]**  4/5 8/2 8/16
 13/20 15/20 16/12 17/4
 18/9 26/8 26/9 28/1
 29/1 35/12 43/25 44/1
**taken [5]**  15/24 22/25
 25/19 41/5 41/17
**takes [2]**  42/2 46/23
**taking [3]**  8/1 34/4
 45/19
**talk [9]**  19/1 20/2
 29/19 31/10 44/21
 44/22 53/9 55/2 55/6
**talked [2]**  20/7 46/12
**talking [5]**  34/17
 38/18 38/22 53/22 55/3
**talks [5]**  19/18 19/19
 19/20 20/1 20/6
**target [1]**  34/18
**task [1]**  12/15
**tax [1]**  19/20
**teach [1]**  36/3
**tell [1]**  26/23
**temporary [15]**  1/16
 1/16 5/8 8/8 18/1
 20/13 20/19 35/23 47/5
 47/25 48/3 50/24 52/2
 52/3 54/10
**ten [5]**  8/17 15/10
 35/12 42/9 44/11
**ten-minute [1]**  35/12
**terms [6]**  23/3 26/24
 27/2 27/19 29/15 47/24
**test [1]**  39/9
**testify [1]**  50/13
**testimony [2]**  11/8
 39/8
**TEXAS [13]**  1/5 1/23
 2/7 2/14 2/17 46/14
 56/1 56/2 56/5 56/5
 56/20 56/21 56/23
**than [14]**  8/17 9/2
 12/24 12/24 13/1 13/25
 18/10 23/12 34/13
 34/15 42/21 47/12
 50/17 53/6
**Thank [7]**  6/5 7/2 8/21
 38/16 39/22 45/24 55/9
**Thanks [1]**  7/13
**Thanksgiving [1]**  17/15

**that [348]**
**that's [43]**  5/19 8/4
 10/24 11/22 12/18
 12/20 12/21 13/6 13/15
 14/2 14/2 14/6 15/23
 18/4 19/4 20/2 20/15
 21/25 22/7 26/2 26/2
 26/12 26/12 30/20
 30/24 31/7 34/8 35/18
 36/1 36/6 37/14 39/14
 39/23 40/8 41/3 44/13
 44/15 47/10 47/19
 48/13 48/14 52/22 55/7
**their [16]**  9/5 9/7
 9/14 14/25 14/25 16/3
 19/24 20/9 24/7 32/18
 32/24 37/12 37/24
 46/22 54/8 54/22
**them [15]**  9/19 11/10
 13/24 16/4 16/13 17/22
 25/15 25/17 26/1 33/2
 33/4 33/13 33/23 43/20
 53/6
**then [26]**  8/18 10/14
 13/6 16/20 16/21 16/24
 19/6 20/12 26/1 27/6
 28/17 29/16 33/5 34/4
 34/18 35/23 42/2 47/1
 47/17 47/19 48/14 52/5
 52/13 52/14 53/10
 53/15
**there [73]**
**these [30]**  7/1 8/1
 9/15 10/13 15/16 16/12
 16/18 19/2 19/19 20/21
 20/23 21/12 22/2 22/19
 23/1 24/20 25/12 25/22
 25/24 30/13 31/9 31/12
 32/19 34/8 35/8 35/9
 39/11 41/8 44/2 54/22
**they [71]**
**they're [1]**  37/13
**thing [7]**  8/5 25/21
 29/17 51/25 53/1 54/11
 54/24
**things [11]**  10/2 19/19
 20/6 22/15 22/20 23/1
 35/4 46/18 48/19 54/6
 55/8
**think [28]**  7/4 7/15
 7/18 15/9 17/14 18/3
 22/6 24/5 24/15 25/9
 31/11 31/12 32/14
 33/19 41/21 43/14
 43/19 47/6 47/8 48/11

50/8 50/9 50/10 50/16
 52/2 52/18 53/21 53/22
**thinking [6]**  8/18
 35/12 35/12 42/13
 51/22 51/25
**third [2]**  13/5 48/14
**this [106]**
**Thornton [1]**  27/7
**thoroughly [1]**  5/6
**those [18]**  5/5 10/16
 13/24 18/7 18/23 21/18
 24/18 26/3 28/1 28/19
 32/5 33/12 38/25 40/4
 40/8 40/18 41/13 43/5
**though [1]**  6/11
**thought [2]**  25/25
 28/11
**thoughts [3]**  22/13
 42/13 42/13
**threat [2]**  42/16 42/19
**three [9]**  8/14 25/3
 30/18 31/2 35/8 36/21
 39/11 46/15 53/7
**through [23]**  5/2 5/2
 5/2 5/5 5/11 12/2 12/3
 12/22 14/20 14/25
 14/25 18/14 20/16 29/2
 31/18 33/13 37/22
 38/19 38/20 41/3 43/3
 43/18 53/11
**throw [2]**  23/13 23/24
**throwing [2]**  23/14
 44/18
**thwart [1]**  41/4
**TI [5]**  24/1 24/1 43/3
 47/17 52/6
**Tidwell [1]**  30/2
**time [19]**  5/6 10/8
 15/14 16/8 17/19 17/22
 18/5 23/8 27/18 31/1
 35/4 35/4 46/3 47/7
 50/16 50/17 52/5 52/8
 55/9
**timing [2]**  38/6 52/1
**Tobin [1]**  46/15
**today [18]**  5/7 5/11
 8/25 9/15 14/9 17/17
 17/19 19/13 21/2 22/24
 26/8 34/3 34/4 39/19
 41/16 42/8 52/21 52/24
**together [2]**  49/13
 53/11
**told [1]**  33/9
**tomorrow [3]**  14/9 20/7
 34/4

## T

**too [1]** 47/2
**took [5]** 10/5 10/9 15/18 21/3 39/13
**top [1]** 11/23
**tortious [2]** 22/8 22/10
**total [1]** 33/18
**touch [1]** 20/16
**toward [1]** 38/25
**towards [1]** 10/6
**town [2]** 19/14 47/7
**trading [2]** 44/6 44/7
**transaction [2]** 27/11 28/23
**transactions [6]** 9/19 14/5 14/15 27/13 27/13 48/5
**transcript [2]** 7/24 26/4
**transcription [1]** 56/7
**transfer [3]** 9/1 13/10 13/16
**transferred [1]** 28/1
**treat [2]** 6/11 46/20
**trial [4]** 1/3 39/8 42/2 46/23
**TRO [16]** 8/25 14/10 15/23 17/15 19/6 20/3 26/8 31/23 35/22 36/13 39/9 41/16 42/6 44/14 45/8 52/24
**true [4]** 5/19 37/15 52/22 56/6
**truly [1]** 56/14
**trust [3]** 16/1 21/9 34/3
**trustee [1]** 9/8
**try [6]** 11/9 22/3 35/15 46/1 46/2 51/13
**trying [8]** 13/4 15/13 17/20 20/25 34/21 36/5 50/14 55/4
**turn [2]** 28/16 28/17
**Twenty [1]** 51/1
**Twenty-fourth [1]** 51/1
**two [11]** 11/5 16/18 22/22 25/8 30/18 32/20 33/18 42/13 49/17 50/21 54/12

## U

**U.S [1]** 29/2
**UBS [1]** 33/24
**ultimately [1]** 22/11

**unbeknownst [1]** 21/18
**under [11]** 9/11 9/19 20/3 27/6 27/8 28/7 28/19 40/21 45/17 52/15 53/6
**understand [7]** 15/14 23/20 24/22 25/14 26/13 43/15 45/9
**understanding [10]** 23/10 23/13 23/18 24/9 24/19 24/20 25/20 25/22 27/22 43/8
**understanding is [1]** 24/20
**understood [4]** 15/12 36/10 49/20 52/25
**underway [1]** 32/19
**undiscernible [1]** 53/3
**unilateral [1]** 37/21
**United [3]** 17/2 17/4 21/2
**units [2]** 36/16 37/21
**University [1]** 46/14
**unlawful [2]** 9/25 41/4
**unless [1]** 45/12
**unquote [2]** 19/9 37/22
**unraveled [1]** 35/9
**untangled [1]** 32/9
**until [2]** 23/25 48/2
**unwind [1]** 39/12
**unworkable [1]** 53/19
**up [19]** 5/12 7/25 8/16 8/18 10/24 11/23 17/4 17/6 22/17 34/9 34/21 38/10 38/13 46/5 52/7 52/16 52/19 54/10 54/19
**UPF [1]** 45/17
**upon [3]** 5/15 28/1 30/7
**urgent [1]** 54/11
**us [11]** 7/15 8/14 16/7 18/15 20/8 39/7 39/13 43/3 43/18 47/17 53/25
**use [6]** 6/25 9/24 12/17 13/24 23/22 48/16
**used [3]** 9/18 16/4 48/7
**using [2]** 13/6 15/2

## V

**validity [1]** 41/14
**valuation [2]** 39/8 41/24

**value [5]** 26/2 37/24 48/17 48/18 49/4
**ValueScape [1]** 41/25
**ValueScope [1]** 29/25
**variety [1]** 11/13
**various [3]** 10/13 41/3 41/24
**verbatim [1]** 21/4
**verified [4]** 21/14 21/19 24/12 32/23
**versus [1]** 4/4
**very [11]** 21/24 23/18 24/21 25/14 25/20 31/18 32/11 32/11 34/6 35/15 39/13
**via [2]** 6/9 6/16
**vice [1]** 26/14
**vice-president [1]** 26/14
**videoconference [1]** 56/11
**Viejo [1]** 56/21
**view [3]** 5/5 42/7 52/20
**violated [1]** 10/9
**violates [1]** 38/24
**virtual [1]** 6/10
**virtually [1]** 5/18
**visual [1]** 46/3
**voice [1]** 38/16
**VOL [1]** 3/4
**volume [3]** 1/2 3/2 56/9
**VOLUMES [1]** 1/2
**voluntarily [3]** 27/5 27/11 40/20
**voluntary [1]** 16/19
**vote [1]** 10/2
**VS [1]** 1/9
**vu [1]** 17/14

## W

**wait [2]** 24/23 24/23
**waiving [1]** 8/9
**Walkers [1]** 30/3
**want [25]** 7/22 8/3 8/7 13/20 19/23 22/16 22/20 24/3 31/10 32/12 42/18 43/13 44/19 45/9 47/1 47/11 47/13 48/1 49/13 50/11 50/15 51/20 52/15 52/18 52/18
**wanted [1]** 23/21
**wants [4]** 26/9 26/11

**W**

**wants... [2]**  35/2 36/5
**war [1]**  22/4
**WARNER [5]**  2/3 4/6 4/11 53/21 53/23
**warranted [1]**  30/8
**was [70]**
**wasn't [1]**  15/19
**waste [1]**  9/1
**watching [1]**  6/21
**way [11]**  7/9 15/10 16/10 17/21 19/13 21/5 27/22 27/25 40/15 41/1 46/25
**ways [1]**  36/24
**we [163]**
**we'll [12]**  4/2 5/5 5/12 8/18 26/1 49/7 49/10 51/10 53/9 53/11 53/20 54/14
**we're [21]**  5/7 5/10 5/11 15/12 18/1 23/8 26/7 31/2 34/11 34/17 34/20 34/21 35/12 35/21 38/22 46/12 46/24 47/3 49/23 52/6 52/25
**we've [2]**  17/3 36/18
**Weaver [1]**  30/1
**web [1]**  47/12
**week [5]**  21/2 43/4 49/14 50/1 50/23
**weekend [2]**  54/12 54/14
**weekends [1]**  54/16
**weeks [4]**  11/5 31/3 49/17 54/12
**welcome [1]**  35/5
**well [15]**  5/18 13/15 17/16 18/18 20/14 23/15 25/11 43/23 44/14 45/14 45/18 50/5 51/22 52/9 55/2
**well-recognized [1]**  23/15
**went [2]**  18/6 26/3
**were [25]**  6/11 9/3 9/10 10/23 11/4 16/12 17/14 21/5 25/19 27/5 27/25 28/23 31/25 33/9 33/14 36/16 36/25 37/1 39/2 39/4 40/12 40/17 41/5 49/14 56/11
**what [69]**
**what's [6]**  14/8 14/9

16/14 26/12 33/16 50/14
**whatever [2]**  48/15 54/17
**whatnot [1]**  49/19
**whatsoever [1]**  26/2
**when [11]**  5/6 7/8 10/5 12/16 17/25 18/1 20/22 26/2 33/20 34/4 34/25
**where [14]**  8/19 14/1 14/2 16/7 23/7 26/11 26/16 27/11 28/4 30/10 32/20 32/20 40/12 46/15
**wherever [1]**  26/5
**whether [3]**  20/23 36/19 52/18
**which [36]**  4/23 9/13 11/15 12/2 12/6 13/14 13/19 15/4 18/10 18/10 20/24 21/9 22/9 22/11 22/14 24/5 28/16 28/17 28/21 28/23 30/6 32/9 33/21 34/3 35/17 36/14 36/17 37/16 38/5 40/23 41/13 43/4 44/8 47/8 54/8 56/10
**while [3]**  18/6 22/25 34/11
**Whilst [1]**  40/13
**Whitehill [1]**  1/22
**Whitney [1]**  30/4
**who [17]**  4/15 6/20 9/15 16/10 21/7 21/14 21/18 24/12 25/1 25/5 28/6 30/21 31/8 32/23 34/1 37/22 52/20
**whoever [1]**  35/2
**why [12]**  8/16 15/23 19/9 19/10 21/25 22/7 26/6 31/2 34/8 43/8 43/9 51/15
**wide [1]**  23/16
**wife [1]**  11/4
**will [38]**  7/1 7/2 7/23 9/20 10/6 14/13 22/18 25/9 31/3 31/7 34/6 35/1 35/23 39/7 39/10 41/6 42/1 45/18 46/24 47/8 47/13 47/18 48/3 48/4 48/6 48/16 48/18 48/18 49/16 49/20 49/21 49/21 51/12 52/3 54/4 54/8 54/17 54/25
**wishes [1]**  19/13

**withdrawal [1]**  24/4
**withdrawn [1]**  21/20
**withdrew [2]**  21/17 24/7
**within [2]**  48/8 53/7
**without [3]**  6/18 36/4 44/23
**witness [4]**  26/25 27/1 34/19 56/16
**won't [1]**  44/20
**word [2]**  14/1 20/9
**work [6]**  23/11 23/11 52/9 53/11 53/24 54/4
**workable [1]**  23/4
**working [3]**  15/12 54/15 54/16
**works [3]**  8/19 50/3 51/2
**worried [1]**  26/7
**worth [1]**  26/1
**would [32]**  5/14 6/12 7/8 7/21 9/14 15/22 20/18 22/22 24/10 26/20 27/14 27/20 28/14 28/25 28/25 29/14 33/9 33/15 36/10 36/20 37/8 37/25 38/2 38/3 39/20 40/25 42/6 43/2 43/6 43/19 44/21 44/22
**writing [1]**  56/8
**written [1]**  39/4
**wrong [1]**  36/23
**wrongdoing [1]**  19/24
**wrote [2]**  38/20 38/21

**Y**

**y'all [16]**  4/23 8/2 17/1 23/15 25/12 43/5 43/17 44/17 45/21 47/12 47/15 47/19 49/13 50/1 50/23 54/19
**yeah [5]**  7/23 25/5 44/21 45/5 54/1
**year [4]**  7/19 11/16 29/22 32/22
**years [4]**  32/2 46/15 46/15 53/18
**yes [10]**  5/16 7/11 14/12 31/25 32/17 34/10 38/15 48/11 49/20 50/2
**yet [2]**  5/5 22/25
**yield [1]**  16/20
**Yogi [1]**  17/13

**Y**

**York [1]** 33/22
**you [95]**
**you've [1]** 19/16
**your [39]** 4/25 5/21
 8/3 8/21 8/24 14/10
 24/17 25/2 26/18 26/23
 29/20 30/9 30/16 30/21
 32/14 34/11 35/7 35/14
 35/15 35/18 36/10
 36/11 36/21 36/25 38/5
 38/12 38/17 39/16
 39/22 40/25 42/5 42/17
 45/21 50/15 50/16 51/9
 54/7 54/17 55/9
**yourself [1]** 6/12
**YouTube [1]** 6/16

**Z**

**zero [1]** 39/14

Tab 4

MR 0338

E-filed in the Office of the Clerk
for the Business Court of Texas
7/14/2025 11:05 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | THE BUSINESS COURT OF TEXAS<br><br>FIRST DIVISION |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | Cause No. 25-BC-01B-0027 |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC, and CDH GP, LTD., | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | § | |

## DEFENDANTS' MOTION TO DISMISS AND PLEA TO THE JURISDICTION

**Brian P. Shaw**
  Texas Bar No. 24053473
**Monica E. Gaudioso**
  Texas Bar No. 24084570
**Andrea C. Reed**
  Texas Bar No. 24121791
**Emily H. Owen**
  Texas Bar No. 24116865
**CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202

*Attorneys for Defendants*

MR 0339

# TABLE OF CONTENTS

Table of Contents ...........................................................................................2

Table of Authorities.......................................................................................4

Table of Abbreviations and Defined Terms .............................................7

Summary of the Motion.................................................................................8

Factual Background .....................................................................................10

  A. The Dondero Organizations pleaded themselves out of this Court's jurisdiction...........................................................................................10

  B. Faced with mounting litigation losses, Dondero seeks to control the Charitable DAF to use its resources for his own ends. ...........11

  C. Seeking to gain control of the Charitable DAF for his own purposes, Dondero manufactures allegations of wrongdoing, many of them years old. ..................................................................15

  D. The Dondero Organizations do not own any of the Charitable DAF entities or allege standing facts to support jurisdiction................15

    1. The Charitable DAF Fund ........................................................16

    2. Charitable DAF HoldCo—the Debtor.........................................19

    3. The Current Charitable DAF Fund ...........................................22

  E. This case is Dondero's latest attempt to take control over the Charitable DAF so that he can misuse its assets for his own personal benefit...........................................................................25

Legal Standards ...........................................................................................26

Argument and Authorities ..........................................................................27

  A. This Court does not have statutory subject matter jurisdiction...27

    1. The Dondero Organizations cannot establish subject matter jurisdiction under § 25A.004(b)(4) because they are not "owners." ...................................................................................27

    2. This Court lacks jurisdiction under § 25A.004(b)(2) because the Dondero Organizations don't have standing to sue over the Charitable DAF's governance, governing documents, or internal affairs...................................................................................29

3. The Dondero Organizations do not have standing under § 2 5A.004(b)(5). ..............................................................34

B. The Dondero Organizations do not have standing because their claims, if they had any merit, would belong solely to the Debtor. 35

Conclusion ......................................................................42

## TABLE OF AUTHORITIES

| **Cases** | **Page(s)** |
|---|---|

*In re Ascot Fund Limited,*
603 B.R. 271 (Bankr. S.D.N.Y. 2019) ............................................... 40

*Austin Nursing Center v. Lovato,*
171 S.W.3d 845 (Tex. 2005) ........................................................... 35

*Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.*
[1975] ........................................................................................... 39

*Bickham v. Dallas County,*
612 S.W.3d 663 (Tex. App.—Dallas 2020, pet. denied) ............... 31, 33

*Bland Indep. School Dist. v. Blue,*
34 S.W.3d 547 (Tex. 2000) ............................................................. 27

*In re Bullmore,*
300 B.R. 719 (Bankr. D. Neb. 2003) ................................................ 41

*Cobb v. Cent. States,*
461 F.3d 632 (5th Cir.2006) ........................................................... 39

*In re Dexterity Surgical, Inc.,*
365 B.R. 690 (Bankr. S.D. Tex. 2007) .............................................. 38

*In re Educators Group Health Trust,*
25 F.3d 1281 (5th Cir. 1994) .......................................................... 37

*In re Estate of Devitt,*
758 S.W.2d 601 (Tex. App.—Amarillo 1988, writ denied) ................ 32

*Foss v. Harbottle*
(1843) 67 Eng. Rep. 189, 202 (Eng.) .............................................. 37

*Genssler v. Harris Cnty.,*
584 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2010, no
pet.) .............................................................................................. 30

*Heckman v. Williamson Cnty.*,
   369 S.W.3d 137 (Tex. 2012) ........................................................................ 15

*In re Highland Capital Mgmt., L.P.*,
   No. 19-34054-SGJ11, 2021 WL 3418657 (Bankr. N.D. Tex.
   Aug. 4, 2021) ........................................................................... 11,14,36

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp.*,
   522 F.3d 575 (5th Cir. 2008) ..................................................................... 37

*Jose Carreras, M.D., P.A. v. Marroquin*,
   339 S.W.3d 68 (Tex. 2011) ....................................................................... 33

*JSFN, LLC. V. SJ Properties, LLC*,
   No. 10-16-00362-cv, 2018 WL 1867105 (Tex. App.—Waco
   Apr. 18, 2018, no pet.) ............................................................................ 32

*Matter of Highland Capital Mgmt., L.P.*,
   116 F.4th 422 (5th Cir. 2024) ............................................................. 13, 14

*Moser, Trustee of Estate of Mason v. Dillon Investments,
   LLC*,
   649 S.W.3d 259 (Tex. App.—Dallas 2022, no pet.) ...................... 36, 37

*In re NC12, Inc.*,
   478 B.R. 820 (Bankr. S.D. Tex. 2012) ................................................... 38

*In re Ocean Rig UDW Inc.*,
   570 B.R. 687 (Bankr. S.D.N.Y. 2017) .................................................... 40

*Ritchie v. Rupe*,
   443 S.W.3d 856 (Tex. 2014) .................................................................... 31

*In re SPhinX, Ltd.*,
   351 B.R. 103 (Bankr. S.D.N.Y. 2007) .................................................... 40

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.*,
   852 S.W.2d 440 (Tex. 1993) .................................................................... 26

*Tex. Dept. of Parks and Wildlife v. Miranda*,
   133 S.W.3d 217 (Tex. 2004) .................................................................... 26

*Town of Shady Shores v. Swanson*,
   590 S.W.3d 544 (Tex. 2019) ...................................................................26

*Williams v. Stevens*,
   No. 05-22-00440-CV, 2023 WL 5621835 (Tex. App.—
   Dallas Aug. 31, 2023, no pet.) ................................................................31

## Statutes

26 U.S.C.A. § 170(a)(1) ..................................................................................30

11 U.S.C. § 541(a)(1) .....................................................................................36

TEX. GOV'T CODE § 25A.001(11) ...................................................................28

TEX. GOV'T CODE § 25A.004 .........................................................................31

TEX. GOV'T CODE § 25A.004(b) .....................................................................32

TEX GOV'T CODE § 25A.004(b)(2) .............................................................27, 29

TEX. GOV'T CODE § 25A.004(b)(4) .............................................................27, 28

TEX. GOV'T CODE § 25A.004 (b)(5) ...............................................................27

## Other Authorities

Companies Act, 2025, s.110 ......................................................................39, 41

Companies Act, 2025, s.110 and p.2.1 ...........................................................39

Grand Court. Companies Act, 2025, s.108.......................................................39

Grand Court Rules, O. 15 r. 12A (Cayman Islands 2022)......................38

# TABLE OF ABBREVIATIONS AND DEFINED TERMS

| Term | Definition | Pages |
|------|-----------|-------|
| Charitable DAF | The Charitable DAF Entities collectively | 8 |
| Charitable DAF Entity | DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, or CDH GP, Ltd. individually | 8 |
| The Charitable DAF Fund | Charitable DAF Fund, L.P. | 16 |
| Charitable DAF HoldCo or Debtor | Charitable DAF HoldCo, Ltd. | 9 |
| Dondero Organizations | Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. collectively | 8 |
| Highland | Highland Capital Management, L.P. | 14 |

Defendants Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd. (each a "Charitable DAF Entity," and collectively the "Charitable DAF" or "Charitable DAF Entities") ask the Court to dismiss this action because the Court lacks subject matter jurisdiction over the claims brought by Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (all of which James Dondero swore he serves on the board of directors for—and swore that he is funding this litigation—collectively the "Dondero Organizations").

## SUMMARY OF THE MOTION

This Court lacks subject matter jurisdiction over the claims asserted by the Dondero Organizations on at least two bases: (1) the claims do not fall under the Court's subject matter jurisdiction under the Government Code, and (2) the Dondero Organizations lack standing to bring these claims.

First, the Dondero Organizations' pleading demonstrates that the Government Code's jurisdictional requirements are not met. The Dondero Organizations admit they are not an owner of any Charitable

DAF Entity, only that they had "participating shares" in Charitable DAF HoldCo, Ltd., a different entity in wind-up proceedings in the Cayman Islands ("Charitable DAF HoldCo" or the "Debtor"), which is not a party here. Yet they argue at the same time that their lawsuit falls under this Court's jurisdiction as (1) an action by an owner of an organization brought against that organization; (2) an action alleging the breach of a duty owed to them as owners of an organization; and (3) an action regarding the governance, governing documents, or internal affairs of an organization. It is none of those on its face.

While *someone* could pursue Dondero's unfounded and unmeritorious claims against the Charitable DAF, the Dondero Organizations cannot—they are not the class of litigants entitled to bring an action complaining about the governance, governing documents, or internal affairs of organizations that *they do not own* by their own admission. This Court lacks a statutory basis to exercise subject matter jurisdiction under the Government Code.

The Court also lacks subject matter jurisdiction because the Dondero Organizations do not have standing to bring their claims. The Dondero Organizations do not have a justiciable interest in the claims

they assert because they do not have a sufficient relationship to any Charitable DAF Entity. The only entity that (a) has any relationship to any Charitable DAF Entity and (b) arguably has standing to assert the claims brought by the Dondero Organizations, are the Cayman liquidators of the non-party Debtor.[1] Accordingly, the Charitable DAF respectfully requests that the Court dismiss this suit for lack of subject matter jurisdiction.

## FACTUAL BACKGROUND

### A. The Dondero Organizations pleaded themselves out of this Court's jurisdiction.

The Dondero Organizations' Petition, including Dondero's attached sworn declaration, provides this Court with all it needs to find that it lacks subject matter jurisdiction over *these* claims between *these* parties.

To aid the Court's review of this jurisdictional challenge, the Charitable DAF therefore summarizes the portions of the Dondero Organizations' pleading and sworn proof that pleaded them out of this Court's jurisdiction.

---

[1] Even if these claims were brought by the Cayman liquidators, the Charitable DAF denies that any wrongdoing occurred.

This factual background relies only on the Dondero Organizations' Original Petition and attachments, published and unpublished court opinions and rulings, and other facts subject to judicial notice. It is organized in three sections: (1) general background of this dispute, (2) a brief statement regarding Dondero's oft-repeated, years-old and pretextual false allegations of wrongdoing, and (3) the facts that show the Dondero Organizations pleaded themselves out of this Court.

**B.    Faced with mounting litigation losses, Dondero seeks to control the Charitable DAF to use its resources for his own ends.**

One of the most extraordinary things so far in this case is Dondero's admission in his Declaration that he alone is financing this litigation. Ex. 6 to Orig. Pet. ¶¶ 35-36, Appx. 219-210. Dondero of course claims altruistic intentions. *Id.*

Dondero originally set up the Charitable DAF for "efficient management" such that power over it was "concentrated in one person." Orig. Pet. ⁋ 5.9. Initially Dondero put Grant Scott in place, "Dondero's long-time friend, college housemate, and best man at his wedding" who later "resigned from that role [] after apparent disagreements with Mr. Dondero." *In re Highland Capital Mgmt., L.P.*, No. 19-34054-SGJ11,

2021 WL 3418657, at *1 (Bankr. N.D. Tex. Aug. 4, 2021), *vacated and remanded sub nom. Matter of Highland Capital Mgmt., L.P.*, 98 F.4th 170 (5th Cir. 2024). Now the control person is Mark Patrick, who was *not* Dondero's long-time friend, college housemate, or best man at his wedding. Instead, Mr. Patrick is a tax attorney who Dondero swore is "well-qualified tax counsel." Orig. Pet. ¶ 5.19; *see also id.* Ex. 6 to Orig. Pet ¶ 34, Appx. 219.

Mark Patrick is not in sole control of the Charitable DAF—he ceded unilateral control to "a person named Paul Murphy based in the Cayman Islands …" Ex. 6 to Orig. ¶ 19, Appx. 214. So two individuals currently control the Charitable DAF. *Id.*

Dondero swears that Mr. Patrick "became openly hostile towards the Charities, my affiliated companies, and me." *Id.* ¶ 33, Appx. 219. It is true that, among other things, entities controlled by the Charitable DAF requested that entities controlled by Dondero pay substantial obligations owed to the Charitable DAF, and Dondero refused. *E.g.* Cause No. 25-BC01B-004; *Atlas IDF, LP v. NexPoint Real Estate Partners, LLC, et al*; In the Texas Business Court, First Division (where a Charitable DAF controlled entity demands payment on ~$12M demand notes; Dondero's

entity and sister, as trustee of his trust, refuse to pay the Charitable DAF; and Dondero's sister cross claims against Mark Patrick and Shawn Raver).[2] Seeking payment on ~$12M demand notes—money that would further the Charitable DAF's philanthropic mission—is in no way improper. *See, e.g. Matter of Highland Capital Mgmt., L.P.*, 116 F.4th 422, 429, 439 (5th Cir. 2024) (affirming summary judgment in favor of Highland, the payor, against Dondero and his entities, the payees, on promissory notes for "more than $60 million of unpaid principal and interest").[3]

It is also true that "communications between Mr. Patrick, Skyview, and [Dondero] began to become less frequent" as Mark Patrick and Paul Murphy sought to fortify the independence of the Charitable DAF. Ex. 6 to Orig. Pet. ¶ 20, Appx. 214. For example, NexPoint is Dondero's newest "alternate investment firm," after his former alternative investment

---

[2] Atlas is not owned by the Charitable DAF. A Charitable DAF Subsidiary is the investment manager of Atlas.

[3] In addition to the $60 million notes judgment against him and his entities affirmed by the Fifth Circuit Court of Appeals, and the bankruptcies of Highland and Acis Capital Management, Dondero also faces an action in New York State Court by UBS AG for over $1 billion. Index No. 650744/2023; *UBS Securities LLC v. Dondero et al*, In the Supreme Court of the State of New York, New York County; https://news.bloomberglaw.com/banking-law/ubs-sues-highlands-dondero-over-1-billion-it-won-in-long-fight.

MR 0351

firm, Highland Capital Management, L.P. ("Highland"), was forced to file bankruptcy. *Highland Capital*, 116 F.4th at 429; Ex. 6 to Orig. Pet. ¶ 3, Appx. 210-211. As Dondero notes in his Declaration, at one point "NexPoint provided, without charge, investment ideas to" the Charitable DAF. Ex. 6 to Orig. Pet. ¶ 20, Appx. 214. In the best interests of the Charitable DAF, the Charitable DAF no longer accepts Dondero's "investment ideas," *i.e.* investing in Dondero's deals. Ex. 6 to Orig. Pet. ¶ 20, Appx. 214. In addition, Mark Patrick resigned from his position at Skyview, "a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest." Orig. Pet. ¶ 5.21; *see also In re Highland Capital Mgmt., L.P.*, No. 19-34054-SGJ11, 2022 WL 3959550, at *16 (Bankr. N.D. Tex. Aug. 30, 2022) ("Skyview being owned and operated by individuals previously employed by Highland"). Mark Patrick had no legal obligation to work for Dondero's companies, or to accept their services on behalf of the Charitable DAF, or to have the Charitable DAF make investments in Dondero's self-interested transactions, *i.e.* his "investment ideas." Ex. 6 to Orig. Pet. ¶ 20, Appx. 214.

MR 0352

**C. Seeking to gain control of the Charitable DAF for his own purposes, Dondero manufactures allegations of wrongdoing, many of them years old.**

For purposes of this Motion, the Court is to "construe the plaintiff's pleadings liberally, taking all factual assertions as true …" *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012). Thus the Charitable DAF will not address here the Dondero Organizations' false allegations regarding Mark Patrick. Orig. Pet. ¶¶ 6.1-6.27.

However, as the Dondero Organizations are aware—because they are a party to the proceeding—Mark Patrick refuted in detail and under oath these false allegations in the Cayman proceeding for the Debtor on June 4, 2025. Notably, the other independent director, Paul Murphy, continues to serve the Charitable DAF alongside Mr. Patrick. Ex. 6 to Orig. Pet. ¶ 19, Appx. 214.

**D. The Dondero Organizations do not own any of the Charitable DAF entities or allege standing facts to support jurisdiction.**

The following sections demonstrate each instance where the Dondero Organizations admit they have no ownership interest in any of the Charitable DAF Entities they sued in Business Court, or where the evidence attached to the Petition rebuts their allegations, such that they

MR 0353

cannot rely on the Business Court jurisdictional Sections 25A.004(b)(2), (b)(4), or (b)(5) of the Government Code.

### 1. The Charitable DAF Fund

The Dondero Organizations correctly identify that $270 million in allegedly "stolen" assets are held by non-party Charitable DAF Fund, L.P. ("The Charitable DAF Fund"). Orig. Pet. ¶ 5.2. But as shown in more detail in the chart below, the only direct ownership interests any of the Dondero Organizations ever held were "Participating Shares" in non-party Charitable DAF HoldCo, Ltd. (the Debtor), which was the *limited partner* of the Charitable DAF Fund. *Id.* ¶ 5.3; *see also* Ex. 2-A to Orig. Pet., Appx. 49.[4]

| Pls.' Allegation | Evidence |
|---|---|
| "Non-Party] Charitable DAF Fund, L.P. ("Charitable DAF Fund") was formed to hold donated assets." (Orig. Pet. ¶ 5.2) <br><br> "The Charitable DAF Fund primarily holds assets through a [non-party] wholly owned subsidiary called CLO HoldCo, Ltd. ("CLO HoldCo")." (¶ 5.3) | The Dondero Organizations do not allege that they have a direct ownership interest in the Charitable DAF Fund itself. *See generally* Orig. Pet. |

---

[4] The Dondero Organizations expressly state that they had no ownership interest in the general partner of Charitable DAF Fund, Defendant Charitable DAF Fund GP, LLC. Orig. Pet. §§ 1.2, 3.8, 5.11.

MR 0354

| Pls.' Allegation | Evidence |
|---|---|
| "At the same time the Charitable DAF Fund was created, [non-party] Charitable DAF HoldCo, Ltd ("Charitable DAF HoldCo"),[5] a Cayman Island entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund." (¶ 5.4) | Charitable DAF HoldCo was the limited partner of the Charitable DAF Fund. (Ex. 2-A, Appx. 49). In other words, the Dondero Organizations held "Participating Shares" (described more fully below) in the former limited partner of the Charitable DAF Fund. |
| "Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations,[6] which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo." (¶ 5.5) | The only "economic interest" Charitable DAF HoldCo possessed in the Charitable DAF Fund was to **discretionary** distributions— "Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner[.]" (*Id.* ¶ 4.2(a), Appx. 58) |
| "Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC (the 'Delaware GP'). The Delaware | As the former limited partner in the Charitable DAF Fund, Charitable DAF Holdco was prohibited from participating in the "management of or have any control over [Charitable DAF |

[5] Defendants also define Charitable DAF HoldCo as the Debtor, but the Charitable DAF Entities use "Charitable DAF HoldCo" in the charts because that is how the Dondero Organizations refer to it in the Original Petition.

[6] The "Supporting Organizations" are defined as Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. Orig. Pet. at 1.

| Pls.' Allegation | Evidence |
|---|---|
| GP was the managing general partner in the Charitable DAF Fund." (¶ 5.11) | Fund]'s business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership." (*Id.* ¶ 1.6(b), Appx. 51)<br><br>Charitable DAF HoldCo expressly "consent[ed] to the exercise by the General Partner of the Powers conferred on it by this Agreement." (*Id.*) Beyond that consent, Charitable DAF HoldCo had **no** voting or consent rights, or rights to information, related to the management of Charitable DAF Fund. (*See generally id.*) |

Based on the Dondero Organizations' own pleadings and evidence, the Dondero Organizations held "Participating Shares" (the limited nature of which is described in Section B below) in the limited partner of the Charitable DAF Fund. In essence, the Dondero Organizations were a limited partner of a limited partner of the Charitable DAF Fund. And Charitable DAF HoldCo, as the former limited partner in the Charitable DAF Fund, was only entitled to discretionary distributions from Charitable DAF Fund, determined by the General Partner in its *sole discretion*.

## 2. Charitable DAF HoldCo—the Debtor

Based on the pleadings and evidence presented by the Dondero Organizations themselves, their so-called "Participating Shares" in a non-party—the Debtor currently in wind-up proceedings in the Cayman Islands—entitled them to discretionary dividends determined by the Control Position of the Debtor in their sole discretion. And their continued participation in the Debtor was far from guaranteed.

| Pls.' Allegations | Evidence |
| --- | --- |
| "[M]anagement control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those [Supporting] Organizations but rather in 'Management Shares,' with general partner status. These 'Management Shares' provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations." (¶ 5.8) | Management Shares are defined as "a voting non participating share in the capital of [Charitable DAF HoldCo][.]" (Ex. 2-B at Appx. 71). Management Shares "carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company." (*Id.* ¶ 11)<br><br>"Participating Shares" are defined as "a non-voting, participating, non-redeemable share in the capital of [Charitable DAF HoldCo][.]" (*Id.* at Appx. 72). Participating Shares "shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding- |

| Pls.' Allegations | Evidence |
|---|---|
| | up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles." (*Id.* ¶ 19) |
| "So, the 'Management Shares' exercised control over the assets and over the operations of the Charitable DAF HoldCo, even though they conveyed no economic benefit. [T]he Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the 'Control Position.'" (¶ 5.9, *see also* ¶ 5.10) | The Director(s) of Charitable DAF HoldCo had considerable power: <br><br> "[T]he Directors **may** from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorize payment of the same out of the funds of the Company lawfully available therefor." (*Id.* ¶ 108) "[A]ll dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares." (*Id.* ¶ 113) <br><br> There is no restriction on the dilution of any shares, including Participating Shares, in Charitable DAF Holdco, nor did the Dondero Organizations have any right to notice or input on any dilutive event: |

MR 0358

| Pls.' Allegations | Evidence |
|---|---|
| | • "[T]he Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them[.]" (*Id.* ¶ 7_ |
| | • "[A]ll Shares for the time being unissued shall be under the control of the Directors who may: issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine." (*Id.* ¶ 7(a) ) |
| | • "The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not . . . be deemed to be materially adversely varied or abrogated by, *inter alia,* the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company." (*Id.* ¶ 21) |

| Pls.' Allegations | Evidence |
|---|---|
| | The Dondero Organizations had no information rights—"[N]o Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorized by the Directors or by Ordinary Resolution." (*Id.* ¶ 118.) |

Thus, the Dondero Organizations' so-called "Participating Shares" in the non-party Debtor entitled them to very little except for *discretionary* dividends determined by the Control Position of Debtor in their sole discretion. And Debtor, in turn, was only entitled to discretionary distributions from Charitable DAF Fund as determined by the General Partner in its sole discretion.

### 3. The Current Charitable DAF Fund

James Dondero and Julie Diaz's declarations are riddled with mischaracterizations and mistruths regarding the alleged "dilution scheme and liquidation maneuver" vetted by a bevy of outside counsel and advisors by which the Charitable DAF was restructured beginning

in December 2024.[7] The Charitable DAF denies it committed any wrongdoing in connection with the restructure. As noted above, the Dondero Organizations, as Participating Shareholders *only* in the Debtor, had no right to vote on these transactions, nor did they have any right to any information or notice about them. *See supra* § B. Furthermore, the Participating Shares are subject to express dilution and liquidation rights, which the Dondero Organizations conveniently ignore:

> 21. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

*See* Ex. 2-B to Orig. Pet. § 21, Appx. 76.

> **POWERS AND DUTIES OF DIRECTORS**
>
> 80. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

*Id.* § 80, Appx. 83.

---

[7] For purposes of this Motion, the Charitable DAF will not address the Dondero Organizations' false allegations regarding Mark Patrick's actions, all of which were done in the best interests of the Charitable DAF, and specifically to uphold its charitable purpose.

MR 0361

**WINDING UP**

130. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

    (a)    first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

    (b)    second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such

*Id.* § 132, Appx. 91.

But even so, what is clear from the Dondero Organizations' allegations is they *do not own* any interest in any Charitable DAF Entity. The Dondero Organizations repeatedly disclaim ownership in any Charitable DAF Entity:[8]

- "The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets." Orig. Pet. § 5.41.

- "In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and

---

[8] While the Dondero Organizations bring claims against CDH GP, Ltd., there are no real factual allegations contained in their Petition about this Charitable DAF Entity. *See generally id.* But they do allege that they have no ownership interest in CDH. *Id.* § 3.7; Ex. 1-C.

controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself[.]" *Id.* § 5.42.

- "Patrick formed Defendant DFWCF [], a Delaware non-profit corporation. Patrick named himself [DFWCF's] sole member[.]" *Id.* § 5.43; *see also id.* § 3.4 and Ex. 1-A.

- "On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. . . . As a result . . . Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund." *Id.* § 5.49 (emphasis added).

Thus, nothing in the 71 paragraphs of factual allegations in the Petition changes the fact that the Dondero Organizations have only ever owned one thing—Participating Shares (with extremely limited rights) in the Debtor, which is not a party to this suit and is currently in wind-up proceedings in the Cayman Islands.

**E.  This case is Dondero's latest attempt to take control over the Charitable DAF so that he can misuse its assets for his own personal benefit.**

Dondero admits he is personally financing this litigation and that he sits on the board of his Organizations. Ex. 6 to Orig. Pet. ¶¶ 35-36, Appx. 219-210. He controls this litigation.

MR 0363

## LEGAL STANDARDS

When subject matter jurisdiction is in question, the trial court must determine at its earliest opportunity whether it has jurisdiction before allowing the litigation to proceed. *Tex. Dept. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "To establish subject matter jurisdiction, a plaintiff must allege facts that affirmatively demonstrate the court's jurisdiction to hear the claim." *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019).

When a plea to the jurisdiction is based on the pleadings, the trial court must determine if the plaintiffs have alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). "If the pleadings do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiffs should be afforded the opportunity to amend." *Miranda*, 133 S.W.3d at 226-27. However, if as here "the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id*. at 227.[9]

---

[9] The Court may consider evidence that the Dondero Organizations attached to their Original Petition. *Bland Indep. School Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

**A. This Court does not have statutory subject matter jurisdiction.**

The Dondero Organizations allege this Court has jurisdiction under Government Code § 25A.004(b)(2), (b)(4), and (b)(5). Orig. Pet. ¶ 4.1. But they cannot establish subject matter jurisdiction under any of these subdivisions based on their own pleading. They admit they are not owners of any Charitable DAF Entity, precluding jurisdiction under § 25A.004(b)(4). And as non-owners, they do not have a valid cause of action, and thus cannot invoke jurisdiction, under § 25A.004(b)(2). And the Dondero Organizations failed to sufficiently plead derivative standing to invoke jurisdiction under § 25A.004(b)(5).

**1. The Dondero Organizations cannot establish subject matter jurisdiction under § 25A.004(b)(4) because they are not "owners."**

Under § 25A.004(b)(4), the Business Court has jurisdiction over "an action *by an organization, or an owner of an organization*, if the action: (A) is brought *against* an owner, controlling person, or managerial official of *the organization*; and (B) alleges an act or omission by the person in the person's capacity as an owner, controlling person, or managerial

MR 0365

official of the organization." TEX. GOV'T CODE § 25A.004(b)(4) (emphasis added).

An "owner" is defined as "an owner of an organization" and includes: "(A) a shareholder or stockholder of a corporation or other organization; (B) a general or limited partner of a partnership or an assignee of a partnership interest in a partnership; (C) a member of, or an assignee of a membership interest in, a limited liability company; and (D) a member of a nonprofit organization." TEX. GOV'T CODE § 25A.001(11).

The Dondero Organizations do not fit this definition. The Dondero Organizations name DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd. as Defendants. But the Dondero Organizations' pleadings show they are not "owners" of any of these entities. According to the Original Petition, DFW Charitable Foundation's "sole member" is Mark Patrick. Orig. Pet. ¶ 3.4. CDMCFAD, LLC is "100% own[ed]" by DFW Charitable Foundation. *Id.* ¶ 5.49. Charitable DAF GP, LLC, before its dissolution, was owned by Mark Patrick as its sole managing member. *Id.* ¶ 5.11. And CDH GP, Ltd.'s "100% owner and sole director" is Mark Patrick. *Id.* ¶ 3.7. Thus, §

25A.004(b)(4) does not apply because the Dondero Organizations are not owners, controlling persons,[10] or managerial officials of any Charitable DAF Entity.

Because the Dondero Organizations pleaded they are not "owners" of each of the four Charitable DAF Entities—as that term is defined in the statute—they pleaded themselves out of this Court's jurisdiction under § 25A.004(b)(4).

> **2. This Court lacks jurisdiction under § 25A.004(b)(2) because the Dondero Organizations don't have standing to sue over the Charitable DAF's governance, governing documents, or internal affairs.**

Under § 25A.004(b)(2), the Business Court has jurisdiction over an "action regarding the governance, governing documents, or internal affairs of an organization." TEX GOV'T CODE § 25A.004(b)(2). This ground fails because the Dondero Organizations do not have § 25A.004(b)(2) standing to maintain a cause of action regarding the Charitable DAF's governance, governing documents, or internal affairs.

---

[10] The Dondero Organizations affirmatively plead that "management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with [the Dondero Organizations] but rather in 'Management Shares,'" which "provided the only voting rights for any and all shareholders in Charitable DAF HoldCo." Orig. Pet. ¶ 5.8. So even to the extent the Dondero Organizations may attempt to argue some version of "they have indirect control over the Charitable DAF Entities through the non-party Charitable DAF HoldCo" could confer jurisdiction under these sections, the Dondero Organizations have pleaded out of such jurisdiction.

MR 0367

As discussed above, the Dondero Organizations are not owners of any of the Charitable DAF Entities. Instead, the Dondero Organizations were the limited partner of a non-party limited partner (the Debtor—Charitable DAF HoldCo) of the Charitable DAF Fund, originally set up by Dondero in 2011, that received discretionary distributions to be used for charitable donations. Orig. Pet. ¶¶ 5.1-5.6. Charitable donations, of course, receive favorable tax treatment ultimately benefiting Dondero. *E.g.* 26 U.S.C.A. § 170(a)(1).

Yet the Dondero Organizations now claim this Court has jurisdiction by complaining about the governance, governing documents, or internal affairs of distinct legal entities—the Charitable DAF Entities. *Genssler v. Harris Cnty.*, 584 S.W.3d 1, 8 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Generally, a business entity exists as a separate legal entity . . ."). But a person does not have a cause of action to complain about the internal affairs of distinct entities in which it has no interest. That's the gist of the Dondero Organizations' argument—that they can somehow complain in this Court about the governance, governing documents, or internal affairs of a stranger. No such cause of action exists now, nor was one created by Government Code § 25A.004. The Dondero

Organizations essentially ask this Court to read such a cause of action into the Government Code. The Court cannot.

Standing to sue may be predicated on either statutory or common law. *Bickham v. Dallas County*, 612 S.W.3d 663, 669 (Tex. App.—Dallas 2020, pet. denied). "The legislature may grant private standing to bring [an] action[], but it must do so clearly." *Id*. Courts "apply a strict rule of construction to statutory enforcement schemes and imply causes of action only when the drafter's intent is clearly expressed from the language written." *Id*. (citation modified).

Texas courts are hesitant to read a cause of action into a statute if one is not explicitly created. *See Ritchie v. Rupe*, 443 S.W.3d 856, 875 (Tex. 2014) (refusing to read a cause of action for certain remedies into a statute where such a remedy was not explicitly specified). In line with this hesitation, courts regularly reason that jurisdictional statutes do not create causes of action. *See e.g., Williams v. Stevens*, No. 05-22-00440-CV, 2023 WL 5621835 at *5 (Tex. App.—Dallas Aug. 31, 2023, no pet.) (noting that a "jurisdictional statute establishing that district courts shall have original jurisdiction of civil actions … does not create a cause of action"); *In re Estate of Devitt*, 758 S.W.2d 601, 607 (Tex. App.—Amarillo 1988,

MR 0369

writ denied) (reasoning that a statute providing the appropriate court with jurisdiction to hear a will contest does not create a cause of action for a will contest).

Here the jurisdictional statute provides the Business Court with "civil jurisdiction concurrent with district courts" over a limited list of actions. TEX. GOV'T CODE § 25A.004(b). In other words, it provides that the Business Court is an appropriate forum to litigate certain *existing* causes of action. The jurisdictional statute does not provide a source of duty or otherwise create causes of action. Instead, it simply delineates what falls within the Business Court's limited jurisdiction.

"Without a breach of a legal right belonging to the plaintiff, no cause of action can accrue to his benefit." *JSFN, LLC. V. SJ Properties, LLC*, No. 10-16-00362-cv, 2018 WL 1867105 at *2 (Tex. App.—Waco Apr. 18, 2018, no pet.) (citing *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976)). Plenty of existing causes of action can be maintained in the Business Court under § 25A.004(b)(2). An action by Dondero's Organizations complaining that wholly separate and distinct entities are not being run the way Dondero wishes is not one of them.

MR 0370

Under the Dondero Organizations' interpretation of § 25A.004(b)(2), any stranger to an entity who does not agree with a decision of that entity can challenge that entity's governance, governing documents, or internal affairs. The consequence of such an interpretation would be chaos. Exxon could file suit in this Court against Chevron because its CEO declined to do business with Exxon, under the auspices that Exxon disagreed with the corporate governance decisions and governing documents of Chevron. Such an absurd result was not the legislature's intent when it drafted the Business Court's limited jurisdiction. *See Jose Carreras, M.D., P.A. v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011) ("We also interpret statutes to avoid an absurd result"). Because the Dondero Organizations do not have standing to bring a claim that invokes § 25A.004(b)(2) (and because the provision itself does not create a private right of action that would trigger this Court's jurisdiction), § 25A.004(b)(2) does not confer subject matter jurisdiction over this lawsuit. *See Bickham*, 612 S.W.3d at 670.

### 3. The Dondero Organizations do not have standing under § 25A.004(b)(5).

The Dondero Organizations allege that the Court has jurisdiction under § 25A.004(b)(5)—"an action alleging that an owner, controlling person, or managerial official breached a duty owed to an organization or an owner of an organization by reason of the person's status as an owner, controlling person, or managerial official, including the breach of a duty of loyalty or good faith." *Id*. § 25A.004(b)(5). But the Dondero Organizations: (1) do not state anywhere in their Petition that they are bringing this action derivatively on behalf of any entity in which they had an interest (which may in turn give rise to a fiduciary duty); (2) do not cite to any provision of either the Texas Business Organizations Code, or another state's laws, that would authorize the filing of this suit on behalf of any entity in which they had any interest, and (3) do not demonstrate that they have met any prerequisites for derivative standing under any state's laws. Accordingly, the Dondero Organizations failed to sufficiently plead that the Court has jurisdiction under § 25A.004(b)(5).

But even if they sufficiently pleaded a derivative action on behalf of an entity in which they had an interest, they do not have standing to

bring those claims by virtue of the Cayman wind-up proceeding, addressed in Section B below.

**B.** **The Dondero Organizations do not have standing because their claims, if they had any merit, would belong solely to the Debtor.**

The Dondero Organizations also lack traditional standing to bring their claims, depriving the Court of subject matter jurisdiction.

"A plaintiff must have both standing and capacity to bring a lawsuit." *Austin Nursing Center v. Lovato,* 171 S.W.3d 845, 848 (Tex. 2005). "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome." *Id.*

As they state in their Petition, the Dondero Organizations already filed an involuntary Petition for Winding Up the Debtor—Charitable DAF HoldCo—in the Grand Court of the Cayman Islands.[11] Orig. Pet. ¶ 5.53. And as they admit, the Dondero Organizations "alleged essentially the same facts recounted in this Petition before the Grand

---

[11] As the attachments to the Dondero Organizations' Petition demonstrate, Mark Patrick made no objection to the voluntary liquidation being brought under the supervision of the Grand Court. Orig. Pet. App. 154.

MR 0373

Court." *Id.* ¶ 5.54.[12] The proceedings in the Cayman Islands culminated in the appointment of independent liquidators. *Id.* ¶ 5.51. These liquidators are already empowered to wind-up the Debtor and distribute its assets, if any. The liquidators, appointed by the Grand Court of the Cayman Islands, have *exclusive* standing and power to pursue any claims against the Charitable DAF on behalf of the Debtor arising out of the actions the Dondero Organizations complain of here, if they choose to do so.

This situation is similar to when a domestic entity enters bankruptcy. A bankrupt debtor's assets, including its claims against third-parties, are vested in the bankruptcy estate. *See Moser, Trustee of Estate of Mason v. Dillon Investments, LLC*, 649 S.W.3d 259, 263 (Tex. App.—Dallas 2022, no pet.) (citing 11 U.S.C. § 541(a) and *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008)). The property of

---

[12] This appears to be the Dondero Organizations' pattern—recycle its allegations against Mark Patrick in as many forums as possible and hope they are successful in one of them. As another example, the Dallas Foundation filed an objection to a settlement in the Highland bankruptcy, objecting to the transfer of a promissory note to an entity controlled by the Charitable DAF on similar grounds. *See* Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd, ECF No. 4231, *In re Highland Capital Mgmt., L.P.*, (No. 19-34054-SGJ11). This was withdrawn at the hearing on June 25, 2025, and the settlement was approved by the Bankruptcy Court, the week before this suit was filed in the Business Court. *See* Order Approving Settlement between Highland Entities and the HMIT Entities, ECF No. 4297, *In re Highland Capital Mgmt., L.P.*, (No. 19-34054-SGJ11).

MR 0374

a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The phrase 'all legal or equitable interests of the debtor in property' has been construed broadly, and includes 'rights of action' such as claims based on state or federal law." *Highland Capital Mgmt. LP v. Chesapeake Energy Corp.,* 522 F.3d 575, 584 (5th Cir. 2008). Where a legal claim is vested in a bankruptcy estate, the trustee of that estate "has exclusive standing to bring a claim on behalf of the bankruptcy estate." *Moser*, 649 S.W.3d at 265 (citation modified).

With respect to claims asserted against a corporation's directors and officers, the bankruptcy estate "succeeds to any right of action the debtor corporation may have to recover damages for misconduct, mismanagement, or neglect of duty by a corporate officer or director." *In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir. 1994). Therefore "the trustee may prosecute a cause of action based on the fraud of the officers, directors, or shareholders for fiduciary misconduct, unlawful diversion of assets, or upon a statutory liability created by the law of the state of incorporation." *Id.* If under the law of

the state of formation[13] of an entity in bankruptcy, "the debtor could have raised these claims at the commencement of its case—that is, in these particular circumstances, if the claims are derivative to the corporation—*the claims will belong to the estate*." *In re Dexterity Surgical, Inc.*, 365 B.R. 690, 695 (Bankr. S.D. Tex. 2007) (emphasis added) (citing *In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir.1994); *In re MortgageAmerica Corp.,* 714 F.2d 1266, 1276 (5th Cir.1983)). "If a cause of action belongs to the estate, then the Trustee has exclusive standing to assert the claim." *In re NC12, Inc.*, 478 B.R. 820, 831 (Bankr. S.D. Tex. 2012) (citing *Schertz–Cibolo–Universal City, Indep. Sch. Dist. (In re Educators Grp. Health Trust*), 25 F.3d 1281, 1284 (5th Cir.1994)). The court in *NC12* consequently held "[i]f the Plaintiffs and Intervenors lack standing to bring claims, the Court must dismiss the claims for lack of subject matter jurisdiction." *Id.* (citing *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas*

---

[13] Here, the place of formation of the Debtor is the Cayman Islands. Orig. Pet. ¶ 5.4. Under Cayman law, an organization owns a claim where it sustains an actionable loss, not the organization's owner. *Foss v. Harbottle*, (1843) 67 Eng. Rep. 189, 202 (Eng.). In fact, if an owner wants to pursue a derivative claim before the Grand Court, the owner must obtain leave from the Grant Court. Grand Court Rules, O. 15 r. 12A (Cayman Islands 2022). Therefore, under the law of the place of formation, the claims brought by the Dondero Organizations belong to the Debtor. *See Dexterity Surgical*, 365 B.R. at 695.

*Petroleum),* 522 F.3d 575, 583 (5th Cir.2008) ("If the claims belong to the estate, then it was not error for the bankruptcy court to deny remand (because it has jurisdiction over all property of the estate) and dismiss the claims (because the trustee has exclusive standing to assert claims belonging to the estate)."); *Cobb v. Cent. States,* 461 F.3d 632, 635 (5th Cir.2006) ("[T]he issue of standing is one of subject matter jurisdiction."). In other words, the derivative claims of a debtor's owners belong to the bankruptcy estate, and no one else has standing to assert those claims.

The same is true under the law of the Cayman Islands. In a wind-up conducted under Cayman law, when a court supervised liquidation begins, the debtor is divested of the beneficial ownership of its assets and a statutory trust applies to those assets. *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.* [1975] AC 167, 179. The Grand Court appoints joint official liquidators, who are officers of the Grand Court. Companies Act, 2025, s.108. These liquidators have the power to investigate the debtor's affairs, collect and realize the debtor's assets (if any), and distribute those realizations to those that are entitled to them. Companies Act, 2025, s.110. The liquidators can also (1) bring legal

proceedings in the debtor's name; and (2) take possession of the debtor's property, including taking all proceedings required for this purpose. Companies Act, 2025, s.110, p.1.1 and p.2.1.

In fact, United States courts regularly characterize Cayman liquidation proceedings as "foreign main proceedings" deserving of recognition under chapter 15 of the United States Bankruptcy Code. *See, e.g.*, *In re Ascot Fund Limited*, 603 B.R. 271, 278 (Bankr. S.D.N.Y. 2019) ("[C]ourts in this district have consistently recognized Cayman Islands liquidation proceedings as 'foreign proceedings' for purposes of chapter 15 of the Bankruptcy Code."). This recognition is sweeping. "[U]pon recognition of the foreign proceeding as a 'foreign main proceeding...' the foreign representative may operate the debtor's business and exercise the rights and powers of a trustee under Bankruptcy Code sections 363 and 552." *In re SPhinX, Ltd.*, 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2007) (citing 11 U.S.C. § 1520(a)(1)-(3)). In other words, a Cayman liquidator in a foreign main proceeding under Chapter 15 has the sole right to prosecute a debtor's claims. And Dondero is well aware of this fact—in 2017, when he was President of Highland, a United States bankruptcy court ruled that Cayman liquidation proceedings were foreign main proceedings

under Chapter 15, over Highland's objection. *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 690 (Bankr. S.D.N.Y. 2017); Orig. Pet. Apx. 210 ¶ 3.

The Dondero Organizations' claims center on the Charitable DAF's alleged manipulation of the Debtor by redeeming the Dondero Organizations' Participating Shares in the Debtor for $1.6 million. Orig. Pet. ¶ 5.49. Setting aside (a) that the organizational documents expressly permit this and (b) the Dondero Organizations did not sue in the Business Court derivatively on behalf of the Debtor, because the Debtor is in wind-up proceedings in the Caymans, all of its claims (including the ones here) belong to the insolvency estate. The fact that the liquidation proceedings are pending in the Cayman Islands does not change this fact. *See In re Bullmore*, 300 B.R. 719, 724 (Bankr. D. Neb. 2003) (noting a winding-up proceeding in the Cayman Islands is "analogous" to the filing of a United States bankruptcy case and that the appointment of liquidators "terminated the authority of the directors of the company and put the operation of the company into the hands of the [liquidators] pending final order."); *see also* Companies Act, 2025, s.110. The liquidators, as the Cayman Islands' equivalent to a bankruptcy trustee, have exclusive authority and standing to pursue the claims alleged by the Dondero

MR 0379

Organizations on behalf of the Debtor. The Dondero Organizations therefore lack standing, and the Court does not have subject matter jurisdiction over this lawsuit.

## CONCLUSION

The Charitable DAF stands ready to defend every action it took in the best interests of the Charitable DAF and to uphold its charitable purpose, in the face of a multi-pronged effort by Dondero—often through his proxies—to take control of the Charitable DAF for Dondero's own purposes.

But *who*, if anyone, brings those claims, and *where* they must be brought, are foundational. The Dondero Organizations cannot proceed in this Court because they fail to establish a statutory basis for its jurisdiction. The Dondero Organizations are not owners of the Charitable DAF and lack standing to bring claims against the DAF in the Business Court. If anyone, the Caymanian liquidators on behalf of the Debtor would have exclusive standing to bring the claims asserted by the Dondero Organizations. The Charitable DAF therefore requests that the Court dismiss this case for lack of subject matter jurisdiction.

MR 0380

Respectfully submitted,

/s/ *Brian P. Shaw*
**Brian P. Shaw**
  Texas Bar No. 24053473
  Email:  bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Andrea C. Reed**
  Texas Bar No. 24121791
  Email:  areed@ccsb.com
**Emily H. Owen**
  Texas Bar No. 24116865
  Email:  eowen@ccsb.com
**CARRINGTON, COLEMAN,**
 **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

**ATTORNEYS FOR
DEFENDANTS**

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to BCLR 5 that, exclusive of the contents identified in BCLR 5(a) and inclusive of all footnotes and endnotes, this document contains 7436 words as counted by the word count function of Microsoft Word. I further certify this document complies with the Court's judge-specific guidelines regarding word limits and formatting.

/s/ *Brian P. Shaw*
Brian P. Shaw

**DEFENDANTS' MOTION TO DISMISS AND PLEA TO THE JURISDICTION**—Page 43

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2025, a copy of the foregoing document was electronically served on all counsel of record in accordance with Tex. R. Civ. P. 21a.

/s/ *Brian P. Shaw*
Brian P. Shaw

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brian Shaw on behalf of Brian Shaw
Bar No. 24053473
bshaw@ccsb.com
Envelope ID: 103122585
Filing Code Description: Motions - All Other
Filing Description: DEFENDANTS MOTION TO DISMISS AND PLEA TO THE JURISDICTION
Status as of 7/15/2025 8:57 AM CST

Associated Case Party: The Highland Dallas Foundation, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/14/2025 11:05:56 PM | SENT |
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/14/2025 11:05:56 PM | SENT |

Associated Case Party: DFW Charitable Foundation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 7/14/2025 11:05:56 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Judy Garrison | | jgarrison@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 7/14/2025 11:05:56 PM | SENT |

MR 0383

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brian Shaw on behalf of Brian Shaw
Bar No. 24053473
bshaw@ccsb.com
Envelope ID: 103122585
Filing Code Description: Motions - All Other
Filing Description: DEFENDANTS MOTION TO DISMISS AND PLEA TO THE JURISDICTION
Status as of 7/15/2025 8:57 AM CST

Case Contacts

| Sherry Stewart | | sstewart@ccsb.com | 7/14/2025 11:05:56 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 7/14/2025 11:05:56 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 7/14/2025 11:05:56 PM | SENT |

MR 0384

Tab 5

MR 0385

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § | IN THE TEXAS BUSINESS COURT |
| *Plaintiffs*, | § § § | |
| v. | § § § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § § | |
| *Defendants*. | § | DALLAS, TEXAS |

## PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER

Plaintiffs (together, the "Charitable Owners") file this First Amended Petition, Application for Temporary Injunction, and Emergency Application for Appointment of Receiver, and respectfully show the Court as follows:

### I.     PRELIMINARY STATEMENT

1.1     Defendant Mark Patrick took over $270 million in funding support from some of the best community-based charities in the country. He testified on June 25, 2025 that, by the time his plan was complete, Plaintiffs were left with "nothing."[1]

1.2     Patrick flagrantly violated his fiduciary duties to Plaintiffs, and he redirected the fund's beneficial ownership to a new sham organization he controlled. This follows his pattern of using Plaintiffs' resources to enrich himself at the expense of charities and the communities and

---

[1] *See* June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200).

---

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER     **PAGE 1**

MR 0386

people they benefit. So far, he has paid himself at least $3.9 million in a single year from funds meant to support the charities he betrayed.

1.3    If the Court does not bar Patrick's and the other Defendants' further adverse actions through a receivership, Plaintiffs will lose millions in charitable funds earmarked for the communities they serve.  And, their loss will be at the hands of the very person who was supposed to protect them.  Accordingly, Plaintiffs seek a Temporary Injunction freezing the funds and the appointment of a Receiver over the funds and the organization holding them.

## II.    DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1    Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

2.2    Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III.    PARTIES

3.1    **The Highland Dallas Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Dallas Foundation, Inc. provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of needs.

3.2    **The Highland Kansas City Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Kansas City Foundation, Inc. provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $8 billion in in charitable grants that support a broad range of needs.

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                      PAGE 2

MR 0387

3.3 **The Highland Santa Barbara Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Santa Barbara Foundation, Inc. provides funding to charitable organizations including the Santa Barbara Foundation, established in 1928, which has awarded over $750 Million in charitable grants and supports a broad range of needs.

3.4 **DFW Charitable Foundation** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. It was organized on December 9, 2024, with Defendant Mark Patrick as the DFW Charitable Foundation's sole member and sole director. It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. The DFW Charitable Foundation is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.5 **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Charitable DAF Fund ("Charitable DAF Fund" or the "Fund") structure, as explained more thoroughly below. Patrick resides and at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.6 **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.7 **CDH GP, Ltd**. is a Cayman Island limited company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 3**

MR 0388

3.8　**CHARITABLE DAF GP, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

## IV.　JURISDICTION AND VENUE

4.1　Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and Charitable DAF HoldCo, Ltd;

- and is an action by an owner of an organization, namely the Charitable Owners as participating and beneficial owners of Charitable DAF Holdco, Ltd ("Charitable DAF Holdco") and thereby the Fund in which the Charitable Owners held the sole economic interest, and through a sham transaction, briefly owners of CDMCFAD, LLC, and is brought against a controlling person and managerial entities of the organization, namely Patrick, Charitable DAF, GP, LLC,  CDH GP, Ltd and Patrick's controlled entities, DFW Charitable Foundation, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF GP, LLC's, and CDH GP, Ltd.'s obligations in the capacity of a controlling person and managerial official of Charitable DAF Holdco, Ltd and the Fund.  and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Charitable Owners as a controlling owner of Charitable DAF Holdco,  and thus an equitable owner of CDMCFAD, LLC and Charitable DAF Fund, L.P. by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith;

- and is an action seeking equitable and injunctive relief.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**　　　　　　　　　　　**PAGE 4**

MR 0389

4.2     The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3     The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4     Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition.  Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas.  Defendants all have substantial business operations, assets, and other connections to Texas.  Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas.  Defendants have also consented to the jurisdiction of Texas courts.

4.5     Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas.  On information and belief, the DFW Charitable Foundation, CDH GP, Ltd., Charitable DAF GP, LLC, and CDMCFAD are headquartered in Dallas County.  Dallas County is within the 1st Division of the Texas Business Court.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                             **PAGE 5**

MR 0390

**A.** *The Charitable DAF Fund Structure*

5.1     Highland Capital Management, L.P. ("**Highland**") was an SEC registered investment advisor. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated by Highland's founder, James Dondero, through his charitable trust to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States through several Charitable Owners.  Together, three of those Charitable Owners are the Plaintiffs here.[2]   As with all "supporting organizations," disinterested parties must hold a majority of the voting rights in the Charitable Owners.  So, Mr. Dondero as the original donor held one vote as a director; and the Foundations supported by the Charitable Owners held the remaining two votes and thus control over them.

5.2     To that end, in 2011, the Fund was formed to hold the donated assets.

5.3     The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4     At the same time the Charitable DAF Fund was created, DAF HoldCo, a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5     The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities in California, Missouri, and Texas. The governing documents of the Charitable DAF Fund specifically refer to these Charitable

---

[2] A fourth charitable owner that held less than a 2% interest is not party to this action.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 6**

MR 0391

Owners. Participating shares in Charitable DAF HoldCo were therefore issued to Charitable Owners, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the Charitable Owners owned 100% of the Participating Shares of Charitable DAF HoldCo. The Charitable Owners held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the Charitable Owners owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Charitable Owners are the Plaintiffs in this Lawsuit and held 98.34% of the economic interests in the Fund.

5.6    In turn and as intended, the funds generated by the Charitable DAF Fund enabled the Charitable Owners to provide funding directly to charitable causes foundations in three regions of the United States, primarily through nonprofit organizations. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Charitable Owners and receive regular grants for charitable work ultimately funded by Charitable DAF Fund. For example, funds have supported schools for the needy, children's advocacy, educational and recreational institutions accessible to the public, and important medical facilities and programs. From funding education programs and healthcare services to supporting economic development and community welfare projects, these funds help strengthen the Charitable Owners' ability to serve individuals and families in need.

5.7    Since the Charitable DAF Fund's inception, the Charitable Owners have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Charitable Owners perform irreplaceable

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                                    PAGE 7**

MR 0392

philanthropic work in their communities and/or throughout the nation, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

**B.** *Control of the Charitable DAF Fund*

5.8    The Charitable Owners, via Charitable DAF HoldCo, were the sole economic beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it. Management control of the Charitable DAF Fund and Charitable DAF HoldCo, however, was vested not with those organizations but rather in "Management Shares." The "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But these shares explicitly did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged and was expressly reserved solely to the Charitable Owners (the Plaintiffs).

5.9    Ownership of the general partner in the Charitable DAF Fund and the Management Shares in Charitable DAF HoldCo were concentrated in one person, vested with enormous trust (the "**Control Position**"). The Control Position was expressly obligated to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of the Charitable Owners. The Control Position therefore owed the Charitable Owners fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10    The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. These were the effective governing documents over the Charitable DAF Fund and Charitable DAF Holdco at the time the conduct alleged herein commenced.  The ARLPA and the Articles, from which the Control Position derives its authority, also impose a clear duty

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 8**

MR 0393

upon the Control Position to exercise his powers for the sole benefit of the Charitable Owners (the Plaintiffs).

5.11    For example, the Preamble to the ARLPA states:  "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended and the parties hereto desire for the Partnership to be *for the economic benefit of the Limited Partner and its Charitable Owners* (as defined below) as set forth herein[.]"[3]

5.12    Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Charitable Owners*."[4]

5.13    Section 1.6 (Powers) likewise emphasizes:  "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*."[5]

5.14    The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners." In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Charitable Owners and the Charities they support.

---

[3] Emphasis added
[4] Emphasis added.
[5] Emphasis added.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                              **PAGE 9**

MR 0394

5.15    The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Charitable Owners. The governing documents of the Charitable DAF Fund thus form the foundation of a special factual relationship based on direct and close contact between the Control Position and the Charitable Owners.  The governing documents establish that by virtue of the role and express obligations, the Control Position holds himself out as an agent acting for the benefit of the Charitable Owners and supplies them the information upon which they must rely.  Patrick and the Defendants thus undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them.  As set forth herein, the Parties built upon that foundation through their conduct over years, and it is  this conduct directly pertinent to the instant case.

5.16    Grant Scott was initially selected for the Control Position. Mr. Scott effectively served the Charitable Owners' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of a decade. During this time, the Charitable Owners and their respective charitable foundations made great strides in creating philanthropic, charitable work that was efficient, steady, and reliable, and that grew and built on their progress year after year.

C. *Mark Patrick's Assumption of Control*

5.17    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                          **PAGE 10**

MR 0395

5.18    Mark Patrick, a tax attorney who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.

5.19    On March 25, 2021, Mr. Scott resigned transferring all his management shares and membership interest to Patrick for nominal consideration, and Patrick was appointed as director of Charitable DAF HoldCo. Patrick therefore assumed the Control Position from that date. Patrick then hired Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

### D. *Patrick's Breaches of Fiduciary Duty*

5.20    In 2023, while acting as the sole fiduciary for the Charitable Owners at Charitable DAF Fund and DAF HoldCo, Patrick embarked upon a brazen and calculated conspiracy to defraud the Charitable Owners of their beneficial interest in the $270 Million held by the Charitable DAF Fund, in direct violation of the fiduciary duties imposed by the Charitable DAF Fund's governing documents and by common law.  Patrick further conspired to transfer that entire $270 Million interest to a new entity controlled by Patrick and operated out of his living room in Dallas, Texas.

### E. *Undisclosed Self-Dealing*

5.21    Patrick engaged in a series of ethically and legally dubious conduct prior to embarking upon his grand scheme to defraud the Charitable Owners.  For example, in June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity,

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                          **PAGE 11**

MR 0396

which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

## F. *Attempted Fraudulent Kickback Scheme*

5.22    In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.23    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.24    Mr. Dondero ensured that Charitable Owners were also informed about Patrick's kickback scheme. Despite significant concern, the Charitable Owners had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

## G. *Insider Trading*

5.25    In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview through his self-described "outside compliance counsel" Douglas Mancino to advise the Highland Dallas Foundation, Inc. to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                              **PAGE 12**

MR 0397

5.26    Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.27    Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

## H. *Patrick Raids the Charitable DAF Fund*

5.28    After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Plaintiffs were essentially cut off from any view into the finances of the fund. As of September 2024—the last reliable data accessible to the Plaintiffs prior to filing this Action—the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Plaintiffs and ultimately their supported Charities.

5.29    Prior to Patrick's tenure in the Control Position and for a period thereafter, the Control Position received a reasonable but measured stipend of $60,000 per year, consistent with the nature of the position as a fiduciary for charitable organizations serving those in need.  Patrick's predecessor never awarded himself compensation more than $60,000 per annum.  During that time, the Charitable DAF Fund was a tremendous success, growing in value and contributing to the good works of the Charitable Owners.

5.30    No later than 2024, however, Patrick raided the fund for personal gain.  A review of the Charitable DAF Fund's last accessible financial records—provided in August 2024—showed dramatic and unexplained increases in expenditures:

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                      **PAGE 13**

MR 0398

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.31    This was only a warmup. In September 2024, without advising the Charitable Owners or their supported charities, and without approval from anyone other than himself and his hand-picked second Director-for-hire in the Cayman Islands, Mr. Murphy, Patrick used his authority over Charitable DAF Holdco to award himself an annual salary of $850,000 per year. Patrick also awarded himself a "long-term incentive" payment tied to the fund's returns, amounting to 7.5% of annualized net fund returns in excess of 10% (capped at an annualized 25% return). Then, the next month, on the basis of this "LTI" calculation Patrick awarded himself an "LTI" payment of $975,000 and an "annual discretionary bonus" for 2023 in the amount of 2.5 times his base salary.  The result:  In two months in Fall 2024, Partick awarded himself $3,925,000 in compensation directly from the Charitable DAF Fund that was held for the benefit of the Charitable Owners.  Patrick did this even though the governing documents of the Charitable DAF Fund, by which both his powers and his duties to the Charitable Owners arose, were explicit that the Charitable DAF Fund was to be managed "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners [the Plaintiffs]" and "not for the economic benefit of the General Partner [Patrick]."

5.32    Patrick did all this in secret. Because of the structure of the Charitable DAF Fund and its management, no one supervised his compensation decisions aside, presumably, from his self-appointed fellow Director Murphy.  The beneficiaries of the Charitable DAF Fund were never

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                      **PAGE 14**

MR 0399

advised, and had no opportunity to learn, that in a few short years, Patrick had unilaterally increased his personal compensation from the Charitable DAF Fund by 6,441%. Patrick and the other Defendants provided the Plaintiffs with partial information about the Charitable DAF Fund's finances, doing so through half-truths and partial disclosures that obscured the whole truth from them. Patrick did so despite repeated requests from the Plaintiffs and their counsel and counsel for the Charitable DAF Fund for complete information.

## I. *Patrick Ignores the Charitable Owners' Concerns*

5.33    On November 11, 2024, given what the Charitable Owners already knew, the three major Charitable Owners drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[6]

5.34    The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

5.35    On January 23, 2025, the Charitable Owners again demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. The Plaintiffs requested:

---

[6] Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 15**

MR 0400

- Income Statements for the last for years: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses.

- Listing of Underlying Assets: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.

- Audited Financial Statements: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.

- Current Structure of DAFHoldCo Operations: An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

5.36    The Defendants never acknowledged receipt of this January 23, 2025 email. On January 28, 2025, therefore, the Charitable Owners requested a winding up of the Charitable DAF Fund's assets:

> These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Charitable Owners so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

Importantly, at the time of this communication, Charitable DAF Fund still held the beneficial interest in the Charitable DAF Fund, though (as set forth below, and unknown to the Plaintiffs), that interest was now layered through Patrick's new entity, CDMCFAD.  In other words, at the time the Plaintiffs requested a winding up, there is no question that they remained the 100%

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                    PAGE 16

MR 0401

beneficial owners of the assets in the Charitable DAF Fund and were entitled to the distribution of those assets under the Charitable DAF Fund's governing documents. By contrast, Patrick (whether individually or through one or more of his secretly-created entities) held nothing more than the miniscule par value of the Management Shares.

5.37    As set forth below in more detail, Patrick and the Defendants eventually responded to the Charitable Owners' inquiries by making a series of false statements, promising information and meetings that never arrived, and presenting carefully selected, incomplete information to mislead the Plaintiffs into a false sense of security and delay any decisive action on their part to effect a distribution. Meanwhile, Defendants used that veil of secrecy and misrepresentation to embark upon a conspiracy intended to defraud the Plaintiffs from their entire beneficial interests in the Charitable DAF Fund, before they could act to effect a distribution of its assets.

### J.  *Patrick Conspires to Defraud Three Charities of $270 Million*

5.38    Between November 2024 and the present, internal documents obtained through proceedings in the Cayman Islands reveal that Patrick entered into a conspiracy to defraud the Charitable Owners of their beneficial interest in the $270 Million in assets held by the Charitable DAF Fund. At the outset of the scheme, the Defendants' agents summarized the essence of the task they had been assigned: "Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"[7] The entire premise of Patrick's project was to sever the Charitable Owners and their related Charities from the assets of the Charitable DAF Fund that Patrick was supposed to invest and maintain for their economic benefit, leaving them with worthless shares.

---

[7] Writ of Summons and Statement of Claim, ¶ 80.4, filed on July 15, 2025 at Cause No. FSD2025-0201 in the Grand Court of the Cayman Islands between Charitable DAF HoldCo, Ltd. v. Mark Eric Patrick, et al. (the "CI Statement of Claim")

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                                 **PAGE 17**

MR 0402

5.39     Patrick and the other Defendants first diluted the Charitable Owners' interests in the Charitable DAF Fund to impede them from being able to exercise their right to wind up the Charitable DAF Fund's operations and thereby obtain their equitable share of the $270 Million fund.  Patrick then engaged in a calculated series of moves to defraud the charities of their $270 Million interest in the Charitable DAF Fund.  He did this while a demand to "wind up" the Charitable DAF Fund was pending from the Charitable Owners, and with the express intent of lifting the Charitable DAF Fund's assets away from the Charitable Owners before that wind-up could occur.  In November 2024, Partick and Murphy began to contemplate how they could defraud the charities of their interests in the Charitable DAF Fund. One challenge they identified was the prospect that the Charitable Owners might file a petition in the Cayman Islands to "wind up" Charitable DAF Holdco and its asset (the Charitable DAF Fund), which would then entitle the charities to its proceeds and Patrick to nothing.  But Patrick and Murphy found a solution: By issuing new participation shares in Charitable DAF Holdco to a new "charity" that Patrick himself controlled, they could dilute down the Charitable Owners so they represent a smaller percentage of Holdco's shares.  As expressly contemplated by Patrick and Murphy, this would undermine any future petition to "wind up" because the shares in Charitable DAF Holdco controlled by Partick's new entity could oppose the petition.  Patrick believed that the opposition of his new "charity" to any "winding up" petition could insulate him against any effort by the Charitable Owners to thwart his scheme.[8]

5.40     Accordingly, on December 9, 2024, Patrick formed Defendant DFW Charitable Foundation (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and sole director and its registered address

_____

[8] CI Statement of Claim, ¶ 91.

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                    PAGE 18

MR 0403

was Patrick's home in Dallas. This entity was formed for the express purpose of later diluting down the Charitable Owners and blocking them from opposing the remainder of Patrick's scheme.

5.41    In February 2025, Patrick, Murphy, and the Defendants issued new Participating Shares in Charitable DAF Holdco to the Sham Charity created by Patrick, with the intent and for the express and stated purpose of blocking a possible equitable winding up petition by the Charitable Owners.  Notably, this was after the Charitable Owners had requested in writing that the Charitable DAF Fund be wound up.  In other words, Patrick and the other Defendants issued the shares expressly in order to alter the balance of power between the holders of Participating Shares.  Defendants did this in direct contravention of their express obligations to the Charitable Owners; and his specific knowledge that, under Cayman law, the power to issue shares is a fiduciary power that may only be exercised for proper purposes and may never be deliberately intended to alter the balance of power between shareholders. On February 7, 2025, Patrick issued his newly-formed and personally-created-and-controlled Sham Charity a fifty-one percent (51%) interest in the charitable assets—318 participating shares in Charitable DAF Holdco, more than were held by all the Charitable Owners put together. This sham dilution reduced the Charitable Owners' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) The Highland Dallas Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (ii) The Highland Kansas City Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (iii) The Highland Santa Barbara Foundation, Inc.'s interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[9] interest was diluted from 1.639% to 0.80%.

---

[9] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                              **PAGE 19**

MR 0404

5.42    Patrick and the other Defendants never advised the Charitable Owners of any of these steps, and as set forth below, made affirmative misrepresentations and material omissions to hide them, and to dissuade and delay the Plaintiffs from taking certain specific actions to discover, oppose, or reverse them.  The formation of the new "charity" controlled by Patrick, and the award of 318 new participating shares to that Sham Charity, were all done in secret, with the cooperation of all the Defendants.  Moreover, throughout this very same secret process, as set forth in more detail below, Patrick and the Defendants (directly and through their agents) were falsely presenting a partial picture to the Plaintiffs about these facts, and were falsely representing to the Charitable Owners that (A) the reported increases in expenditures on Director's fees were inaccurate; and (B) the "restructuring" of the fund was proper and for the benefit of the Charitable Owners. Accordingly, Plaintiffs had no opportunity to learn the facts that the Defendants were keeping secret, and in fact the Defendants affirmatively misled the Plaintiffs about them.

5.43    Around the same time, Patrick formed the sham charity, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.44    In secret, and without notice to the Charitable Owners, on December 18, 2024, Patrick caused Charitable DAF HoldCo to transfer to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund.  In turn, Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Charitable Owners, and the Charitable DAF Fund itself (where the $270M assets resided). Suddenly, the Charitable Owners no longer held a 100% beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                        **PAGE 20**

MR 0405

ensured a different and new entity (CDMCFAD) held Charitable DAF Fund. This was a critical step in the plan to "make the Participation Shares [held the Charities] worthless[.]"[10]

5.45  In February 2024, without telling the Charitable Owners, Patrick formed a new entity in the Cayman Islands to replace the General Partner entity managing the Charitable DAF Fund.  The prior General Partner had been a Delaware entity.  Patrick's express directive was that the new General Partner be "hard to find or track or trace.  Or find owners etc.  Strong litigation protection."[11]  By early March 2025, Patrick had formed this new secret entity, and it had replaced the General Partner of the Charitable DAF Fund.  Again, the Charitable Owners were never informed.

5.46  On March 27, 2025, Patrick caused CDMCFAD (the new holder of $270 million in assets) to issue new shares to the Sham Charity, *and only to the Sham Charity*. He issued no additional shares in CDMCFAD to the Charitable Owners. His fraudulent scam was nearly complete.

5.47  Now, only two entities held direct economic interests in CDMCFAD (the entity that now held the $270M Charitable DAF Fund).  Those two entities were Charitable DAF Holdco (still owned 48.5% by the Plaintiffs) and DFW Charitable Foundation.

5.48  Now that Holdco's interest in the Charitable DAF Fund existed only through CDMCFAD, Patrick and Murphy knew that causing Holdco to exchange or redeem its interest in CDMCFAD would sever the Charitable Owners entirely from the Charitable DAF Fund.

5.49  The remaining problem for Patrick and the Defendants was the obvious value of the interests the Charitable Owners held in the Charitable DAF Fund. Valuations of those interests had been performed continuously for years and had consistently, unerringly, and correctly reflected

---

[10] CI Statement of Claim, ¶ 80.4.
[11] CI Statement of Claim, ¶ 82.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 21**

MR 0406

that they were roughly equivalent to the value of the Charitable DAF Fund itself. In other words, as recently as September 2024, they were valued at roughly $270 Million.

5.50    Patrick and the Defendants thus faced a problem.  They had no interest in exchanging the interests of the Charitable Owners in Holdco (and therefore in the Charitable DAF Fund) for equivalent value.  Instead, their goal from the beginning had been to "liquidate" Holdco, "distribute all its assets elsewhere," and "make the Participation Shares [belonging to the Charitable Owners here] worthless[.]"[12] So, to achieve this and to give themselves "cover" for doing so, Patrick and the Defendant embarked on a self-interested, results-oriented, fraudulent exercise in valuation-shopping.

5.51    Thus began a shopping expedition for a valuation firm willing to provide a deflated valuation of Holdco's interest in the Charitable DAF Fund, now held via CDMCFAD.  In January 2025, Patrick's legal counsel in the Cayman Islands, Walkers, approached PricewaterhouseCoopers ("**PwC**"), seeking a valuation of shares in Charitable DAF HoldCo, noting that the Charitable Owners were "potential adverse parties."  In February 2025, Walkers informed PwC that CDMCFAD was inserted into the structure and also requested a valuation of membership interests in CDMCFAD, on the one hand, and of the Participation Shares held by the Charitable Owners in Holdco, on the other.  But PwC gave an unwelcome answer, responding that "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders[.]*"  In other words, PwC's professional guidance was precisely what the Defendants did not want to hear—any fair "redemption" of the Plaintiffs' interest in the Fund would require a payment at or very near the face value of the Fund itself.  A phone call followed wherein PwC asked for clarity about what

---

[12] *See Id.*

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 22**

MR 0407

Mr Patrick was trying to achieve by the Restructuring. After that call, PwC declined the assignment. The Defendants, however, brazenly ignored the guidance they had just obtained and rushed forward to find a more compliant valuator.

5.52    The next stop on Patrick's shopping trip was FTI Consulting in London ("**FTI**"). Walkers again presented the scenario. FTI suggested that depending on the alignment with the Charitable DAF Fund's mission, a discount of approximately 14% on the low end or 95% on the high end. But FTI was also clear that a real valuation in support of a transaction would require a much closer inspection of the specific terms of the transaction, the restructuring of the organizations, and the underlying assets themselves. FTI thus advised that their preliminary analysis could not be used in support of any transaction.

5.53    Patrick was anxious to finish his scheme to steal all the Charitable Owners' interests. On March 17, 2025, Patrick informed and instructed Walkers that they needed to have FTI remove its restriction against using any valuation for the purposes of a transaction. Patrick also disclosed his attempt at a post-hoc justification for his fraudulent, tortious, and unethical conduct: Patrick was seeking "new advice of two separate U.S. Tax counsel" that the "best interests of the Company [was] to have non Dondero holders of its interests." Once again, all of this brazen conduct was hidden from the Plaintiffs.

5.54    Over the next several days, Walkers sought to have FTI issue a valuation opinion that was unrestricted for use to support Patrick's transaction against the Charitable Owners. For its part, Walkers opined to FTI that the directors owed no "overriding duty to act in the shareholders' interest," but only in the "best interest of the company." FTI responded with a pertinent question, "Can you explain how it was in the interests of the company to materially dilute the existing shareholders?" There was never a satisfactory answer.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 23**

MR 0408

5.55     Slightly later, Walkers asked FTI, "please could you delete references to our advice so as to avoid any arguments about waiver of privilege." Walkers further advised FTI that what it really wanted was a "valuation report which may, in connection with a proposed redemption of the membership interests in CDM[CFAD], be disclosed to third parties and relied on to establish fair market value[.]"

5.56     Now realizing that Walkers was hiding the ball, FTI responded: "This is material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM[CFAD] redeem the shares owned in by DAF? . . . We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation we would need to do a more detailed exercise, including valuing the underlying assets." Shortly thereafter, FTI further elaborated: "If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing?"[13] Then FTI touched the point with a needle, in language making it clear that the rigged estimate Defendants were seeking could not survive scrutiny: "[W]hy haven't the participating shareholders triggered a wind-down? If they can trigger a wind down and then in short order receive $300m of distributions, *it does change things re discount*."[14]

5.57     Walkers continued on behalf of Defendants to push FTI to give a valuation opinion that could be used to justify their intended fraud. But, now understanding some of what Defendants intended, FTI refused. FTI closed the book as follows on March 26: "What is the intention of adding that directors should act in the interests of future members*? I am struggling to understand how a director could act in a manner that is beneficial for future shareholders which is not also*

---

[13] CI Statement of Claim, ¶ 134
[14] CI Statement of Claim, ¶ 134 (emphasis added).

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 24**

MR 0409

***helpful for existing shareholders.*** The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work . . . [T]his memo should not be used to support a transaction."[15] So in the end, FTI—like PwC—explained to the Defendants that the Charitable Owners' interests had substantial value given all the facts and circumstances, and it could not issue an opinion for use in a transaction that said otherwise. Again, the Defendants got news they did not want to hear; again, they ignored the guidance received and moved on to find a more malleable partner.

5.58    Patrick's next stop seeking a deflated valuation was ValueScope. Since year-end 2020, ValueScope had provided valuations for Charitable DAF Fund net assets, ranging between $177 million and $277 million, with the most recent being September 2024, at $270 million. Over the same time period, ValueScope had provided fair market value for the Charitable Owners' shares on a per share basis ranging from $481,468 to $782,847, with the September 2024 valuation at $759,614. In other words, ValueScope had valued the Charitable Owners' interests at around $270 Million just six months earlier. Unlike FTI and PwC, however, ValueScope saw its way to applying a 99.2% discount against the Charitable Owners' interests for "Lack of Control" (a situation that had *always* been inherent in the structure of the Fund) and entirely changed its methodology from prior periods. The end result: ValueScope determined that each participating share had a fair market value of $5368 in March 2025, down from $759,614, just several months earlier. According to ValueScope's "work," the Charitable Owners total value was approximately $1.6 million. ValueScope failed in their "valuation" even to address a key point that PwC and FTI had emphasized: The Charitable Owners would acquire the lion's share of $270 Million if they

---

[15] *Id.* ¶ 135 (emphasis added).

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 25**

MR 0410

triggered an equitable wind-up, which they likely had the right to do. But the Defendants were happy to take "yes" for an answer.

5.59    Patrick wasted no time before weaponizing his sham valuation. The April 2 "redemption" outlined below relied extensively on the sham ValueScope report—without ever mentioning ValueScope's sharp change in methodology from years of its earlier reports; without recognizing that ValueScope failed to account for the possibility or right of the Plaintiffs to wind up; without any serious effort to justify the 99.2% reduction in value estimation from the report issued just six months earlier; and without giving the Plaintiffs any chance even to see the report, much less rebut it.

5.60    But, the Defendants also relied upon and cited in the "redemption" the FTI "memo," despite FTI's express assertion and disclaimer that its preliminary work ***could not be used to support a transaction***, and despite FTI's clear advice that the reality of the Charitable Owners' rights to effect a wind up and acquire the value of the Charitable DAF Fund required a substantial necessary adjustment upwards to the estimated value of their shares.

5.61    On April 2, 2025, Patrick and the Defendants caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6 million, a ridiculous transaction bereft of reasonably equivalent value.[16] Their goal—to "make the Participation Shares [belonging to the Plaintiffs here] worthless"—was achieved.[17] CDMCFAD participated directly by "buying" Charitable DAF Holdco's shares; the General Partner entities participated directly by causing the redemption.

5.62    After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFW

---

[16] Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[17] CI Statement of Claim, ¶ 80.4.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                              **PAGE 26**

MR 0411

Charitable Foundation, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Charitable Owners and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[18]

5.63    Before the start of these self-dealing transactions, in October 2024, the Charitable Owners owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Charitable Owners owned Participation Shares worth zero. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Charitable Owners' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Charitable Owners.

### K. *The Defendants' Material Misstatements and Omissions*

5.64    Through this entire conspiracy, from Fall 2024 through May 2025, the Defendants and their agents engaged in an orchestrated effort to mislead the Plaintiffs about their actions and intentions.  The Defendants did so in order to convince the Plaintiffs that the assets in the Charitable DAF Fund were secure; to hide their efforts to "make the Participation Shares worthless" from the Plaintiffs; to falsely convince the Charitable Owners that Defendants' strange corporate "restructuring" acts were in legitimate service to the Charitable DAF Fund's charitable objectives and the needs of the Plaintiffs; and to dissuade or delay any action by the Charitable Owners to protect or secure the value of their beneficial interests in the Charitable DAF Fund, and/or to reverse the dilution of their Participation Shares in Charitable DAF Holdco or the sham

---

[18] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11; (Appx. Pg. 200).

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                      **PAGE 27**

MR 0412

"redemption" of Charitable DAF Holdco by CDMCFAD—by, for instance, the filing of an equitable "winding up" petition.

5.65 Due to the position of trust the governing documents assigned to the Control Position; and due to Patrick's practice of sharing information about the Charitable DAF Fund only through close and direct interactions or transmissions, the Plaintiffs were factually dependent upon the special relationship between them and Patrick—both for any information about the Fund, its assets, and its transactions, and for the protection of the Plaintiffs' interests. The Plaintiffs were required to rely on information and advice that Patrick provided directly to them and depended on him to make material disclosures to them of pertinent information regarding transactions, acquisitions, and the like. This rendered the Plaintiffs unusually vulnerable to material misrepresentations and omissions the Defendants made while they were executing their scheme. By virtue of the governing documents and the Parties' relations over time, Patrick and the Defendants had undertaken, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs entrusted their interests, transactions, affairs, and property to them. The Defendants, for their own benefit, used the position and special inside knowledge they held to take improper and unfair advantage of the Charitable Owners, especially through their material misrepresentations and omissions.

5.66 On or about November 5, 2024, "compliance counsel" for Defendants, Doug Mancino, held a call with outside counsel for the Charitable Owners. In that call, Defendants' counsel represented that the increased legal spend by the Defendants in 2024 was due to the need to settle legal disputes, and that the 2025 legal spend was thus expected to decrease. Defendants' counsel mentioned nothing about increased legal expenditures associated with a massive, contemplated restructuring.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**      **PAGE 28**

MR 0413

5.67    On or about December 11, 2024, even while the Defendants were executing their scheme to render the Participation Shares "worthless," Defendants' counsel arranged for a video call with outside counsel for the Charitable Owners.  In an email the prior day, on December 10, 2024 "compliance counsel" for the Defendants referenced the Charitable Owners' "concerns about depletion of assets" and asserted that, "in fact . . . just the opposite has been happening under the leadership of Paul Murphy and Mark Patrick."  In response, outside counsel for the Charitable Owners emphasized their vulnerability and their inability to independently assess the Defendants' representations, given their reliance on the Defendants:  ""[W]ithout detailed financials, or any financials at all, the Supporting Organizations are left in the unenviable position of having [to] rely on presentations about what parties say the numbers show rather than being able to see precisely the story the numbers tell."

5.68    In the December 11, 2024 video call, the Defendants worked to allay the concerns expressed in the November 2024 no-confidence letter and thereby delay or dissuade any action on the part of the Plaintiffs to petition for an equitable wind-up until Patrick's self-dealing "restructuring" was complete.  Patrick, Murphy, and their agents attended.  The meeting literally happened the same week the Defendants formed CDMCFAD (the entity "inserted" below Holdco to hold the Charitable DAF Fund) and the DFW Foundation (the Sham Charity controlled by Patrick); and just one week before the Defendants executed the fatal transfer of Holdco's interests in the Charitable DAF Fund to CDMCFAD.  At this meeting, the Defendants purported to provide to the Charitable Owners a global survey on their plans for the Charitable DAF Fund. The Defendants presented their purported vision of running the Charitable DAF Fund as a more professional and institutional investment vehicle, for the benefit of its charitable purposes and the Charitable Owners.  They promised to provide more financial information in the future.  Through

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                      **PAGE 29**

MR 0414

this presentation, the Defendants expressed two fundamental messages: First, the Control Position remained dedicated to the duty imposed by the Charitable DAF Fund's governing documents—managing Charitable DAF Fund assets for the benefit of the Charitable Owners; Second, Defendants' "restructuring" was for the purpose of executing that duty in a more professional and institutional manner. These messages were explicitly false, as the Defendants well knew that they were in the very midst of executing their scheme to "make the Participation Shares worthless." And they were false by omission, as the Defendants shared some information but failed to disclose the critical lodestar by which that information could be accurately read: Defendants' pending, concrete acts to subvert the Plaintiffs' interests in Holdco and the Charitable DAF Fund, and the intentions and overall scheme behind those acts.

5.69   The very next day, on December 12, 2024, the Defendants secretly formed CDMCFAD, the entity the Defendants intended to use to replace Charitable DAF Holdco, and ultimately to sever the connection between the Charitable Owners and the Fund.

5.70   Just one day later, on December 13, 2024, "compliance counsel" for the Defendants sent a follow-up email to outside counsel for the Charitable Owners. That correspondence did not disclose the formation or intended use of CDMCFAD. Instead, it encouraged and demanded the Charitable Owners rely on the representations made in the meeting and unilaterally abandon their well-founded concerns on that express basis. The email asserted: "[T]hese two meetings have provided the [Supporting Organizations] with a great deal of transparency regarding governance, financial matters, and independence of Charitable DAF Holdco, Ltd. and its affiliates. (collectively, the DAF). Therefore, we believe it is imperative that each [Supporting Organization] not only retract the November 11 [no confidence] letter in writing but also affirmatively disavow the concerns[.]" The Defendants' counsel further asserted: "The DAF is actively working on one

PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                    PAGE 30

MR 0415

or more development projects from which your [Supporting Organization] clients (and independently their supported organizations) will benefit from financially from Participating Shareholder dividend distributions for many years to come." Again, the Defendants' representatives made these assertions and encouraged and demanded that the Plaintiffs rely upon them, while literally in the midst of executing their plan to permanently sever the Plaintiffs from the very "dividend distributions" referenced in the correspondence.

5.71 On January 30, 2025, Paul Murphy (copying Mark Patrick), acting for the Defendants, sent an email to the Charitable Owners offering additional meetings, and asserting that "we are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF Holdco structure." In the same correspondence, Murphy added: "DAF Holdco holds itself to the highest standards in achieving its goal of maximizing returns in risk adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF Holdco's independence and are advised by best-in-class, independent experts." Defendants sent this promise of "clarity on investments and the DAF Holdco structure" little more than a month after secretly inserting CDMCFAD into that structure as a "blocker" between the Charitable Owners and their interests in the Charitable DAF Fund; and less than a week before executing on their scheme to replace the Charitable DAF Fund's General Partner to better insulate Patrick. Again, Defendants' statement was an express untruth and a failure to perform on an express promise—they had no intent to provide "clarity" to the Plaintiffs, but in fact were in the midst of forming a replacement General Partner entity that was "hard to find or track or trace. Or find owners."[19] And again, these statements omitted the critical facts that would have informed the Plaintiffs of the true landscape.

---

[19] CI Statement of Claim, ¶ 82.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**      **PAGE 31**

MR 0416

Again, Patrick and the Defendants intended by these misrepresentations and omissions to forestall and defeat an effort by the Charitable Owners to secure the value of their Participating Shares. Indeed, they had no regard for any inferences the Charitable Owners would draw from their misstatements and omissions—indeed, they were counting on misdirection.

5.72    On February 4, 2025, Paul Murphy (copying Mark Patrick) sent an additional email note to the Charitable Owners on behalf of the Defendants, promising a further meeting at which the Defendants could "resolve [their] concerns."  The Defendants again failed to provide key details that would render the statements they did make not misleading, misrepresented facts, and expressed a false promise of "working with" the Charitable Owners, hoping to delay or undermine any decisive action on their part to protect their valuable interests in the Charitable DAF Fund. The Defendants represented: "We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so."  This happened at the same time the Defendants were deeply entrenched in executing their plot.  Again, the Defendants made expressly false statements—their "commit[ment]" to "work with" the Charitable Owners; made a false promise to work with the Charitable Owners when the Defendants had no intent to do so, and at the same time, omitted critical facts essential to accurately understand the true nature of the Defendants' actions and commitments.

5.73    On February 14, 2025—one day after the Defendants engaged FTI in an effort to secure a sham valuation reducing the value of the Plaintiffs' interests by more than 99%--"compliance counsel" for the Defendants continued to gaslight the Charitable Owners, asserting that "Charitable [D]AF is not paying Paul or Mark 'millions in director fees."

5.74    On March 17, 2025—while the scheme to defraud the Plaintiff was nearing its end—"compliance counsel" for the Defendants reached out to the Charitable Owners' outside

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                                 **PAGE 32**

MR 0417

counsel, purportedly seeking "a couple of dates for Paul Murphy to make a presentation to your three clients." Plaintiffs' counsel responded with three options for dates the following day. Defendants never set the meeting. At this point, the Defendants were irrevocably committed to the path of severing the Charitable Owners from the Fund, and the only possible purpose for such an overture was to keep the charade begun with earlier promises of cooperation, transparency, and future benefits from the Participation Shares going for just a bit longer—just long enough to consummate the conspiracy.

5.75 The Plaintiffs relied on the misrepresentations of the Defendants throughout the relevant period. That reliance was justified under all the circumstances, including Defendants' course of conduct, Defendants' specific representations, and Defendants' obligations to Plaintiffs arising under the governing documents and common law. Those representations were effective in dissuading and delaying the Plaintiffs from taking action that would have secured to them their interests in the $270 Million Fund, including by discovering and opposing the dilution of their interest in the Charitable DAF Fund and by seeking an equitable winding up to secure their interest.

**L. *The Cayman Island Proceedings***

5.76 On April 2, 2025, again unbeknownst to the Charitable Owners, the Defendants voted to place placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.77 But the Charitable Owners already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Charitable Owners well-founded concerns including their expression of no-confidence; and (3) engaged in a pattern of fraudulent self-dealing.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 33**

MR 0418

5.78    As a result, the Charitable Owners filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*  Absent doing so, the Charitable Owners would not have learned about Patrick's voluntary liquidation.

5.79    Cayman Islands counsel for the Charitable Owners alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFW Charitable Foundation and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.80    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[20]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:
>
> a) the power to present a petition for the winding up of Charitable DAF Fund, LP if so advised;
>
> b) the power to file a summons and to apply for an order appointing provisional liquidators of the Charitable DAF Fund if so advised; and

---

[20] Supervision Order (Appx. Pg. 244-246)

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 34**

MR 0419

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.81    Once appointed to fill the shoes of Charitable DAF Holdco, the Joint Official Liquidators performed an internal investigation, reviewing the documents and correspondence belonging to that entity.  Based on that investigation and in the interests of Charitable DAF Holdco (not a party here), they determined to waive privilege over substantial records now in their control. On July 15, 2025, the Joint Official Liquidators filed a Statement of Claim in the Grand Court of the Cayman Islands on behalf of Charitable DAF Holdco.  The Statement of Claim quotes extensively from the records belonging to Charitable DAF Holdco, which document in detail the conduct of the Defendants in this Action.[21]

## VI.    CAUSES OF ACTION

### Count 1 – Common Law Fraud Against All Defendants

6.1    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.2    The Defendants made material misrepresentations to the Plaintiffs, as set forth above and herein.

6.3    The Defendants made the representations with knowledge of their falsity; or recklessly as a positive assertion, without knowledge of their truth, as set forth above and herein.

6.4    The Defendants intended for the Plaintiffs to rely upon the representations, or to induce reliance upon the representations.  Specifically, amongst other purposes, the Defendants intended that their representations would dissuade or delay the Plaintiffs from discovering or contesting the dilution of their interest in Charitable DAF Holdco; and dissuade or delay the Plaintiffs from filing an equitable winding up petition or taking other decisive action to protect

---

[21] CI Statement of Claim.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 35**

MR 0420

their interest in the Charitable DAF Fund, reverse the dilution, and/or reverse the sham "redemption," all of which would have saved and preserved the value of their interest in the Charitable DAF Fund and defeated the Defendants' scheme to "make the Participation Shares [belonging to the Plaintiffs] worthless[.]"

6.5     Patrick has testified that through their hidden manipulations, at great expense of the funds meant for charitable purposes via the Plaintiffs, the Plaintiffs now own "nothing."

6.6     The Plaintiffs justifiably relied upon the representations, as set forth herein and otherwise, as they knew Defendants were charged by the governing documents of the Charitable DAF Fund to always manage its assets for the economic benefit of the Charitable Owners (the Plaintiffs), and the Defendants repeatedly asserted that the purpose of their actions and the changes in Charitable DAF Fund management were not to harm the Plaintiffs, but to better serve the Plaintiffs through more professional and institutional structures and procedures.

6.7     The Plaintiffs suffered injury and damages as a result of the reliance, and seek actual and exemplary damages in an amount to be determined at trial.

### Count 2 – Fraud by Nondisclosure Against All Defendants

6.8     Paragraphs 1.1 - 5.81 are incorporated as though fully set forth herein.

6.9     The Defendants deliberately failed to disclose certain material facts.

6.10     The Defendants had a duty to disclose those facts to the Plaintiffs, arising from their obligations pursuant to the Charitable DAF Fund's governing documents to always manage the Charitable DAF Fund for the economic benefit of the Plaintiffs.

6.11     The Defendants had a further duty to disclose those facts to the Plaintiffs arising from their fiduciary obligations arising under common law.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 36**

MR 0421

6.12   The Defendants had a further duty to disclose those facts to the Plaintiffs because the Defendants made a partial disclosure that created a false impression, as set forth above and herein, as set forth above and herein.

6.13   The Defendants had a further duty to disclose those facts to the Plaintiffs because they voluntarily disclosed certain information, creating a duty to disclose the whole truth, as set forth above and herein.

6.14   The Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.15   The Defendants knew the Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.16   The Defendants intended that the Plaintiffs act or refrain from acting based on the nondisclosure, as set forth above and herein.

6.17   The Plaintiffs relied on the nondisclosure, which resulted in their injury in the amount to be proven at trial, but which exceeds $250 Million.

### Count 3 – Breach of Fiduciary Duty against Patrick, CDH GP, Ltd., and Charitable DAF GP, LLC

6.18   Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.19   By virtue of Defendants' Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, and his special relationship with Plaintiffs, Patrick owed fiduciary duties to the Plaintiffs.

6.20   The Defendants held a special factual relationship of direct and close reliance with the Plaintiffs, as set forth above, expressed by the governing documents and then by the reality that the Plaintiffs were dependent upon the Defendants to protect their interests in the transactions, finances, and acquisitions of the Fund, and were required to rely (and did rely) on information and

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**   **PAGE 37**

MR 0422

advice the Defendants provided about the Fund. Patrick and the Defendants undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them. On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

6.21    By virtue of their assertions and by virtue of the governing documents empowering them to act, the Defendants expressly and implicitly asserted that they acted on behalf of the Plaintiffs as agents for them in the transactions of the Fund.   On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

6.22    Patrick's position of trust was underscored by the governing documents of the Charitable DAF Fund, which expressed his required fidelity to the Plaintiffs in making all decisions in the Control Position for their economic benefit.

6.23    The Defendants breached their fiduciary duties to the Plaintiffs by diluting and then stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.  In so doing, Defendants for their own benefit used their position and special inside knowledge acquired by them to take improper or unfair advantage of the Plaintiffs.

6.24    The Defendants breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.  Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Charitable Owners.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 38**

MR 0423

6.25    Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.  Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Plaintiffs.

6.26    Patrick breached his fiduciary duty by successfully causing a transfer of assets ultimately from the Plaintiffs to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.27    The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support, including by causing them to lose the value of their Participation Shares at an undervalue. Plaintiffs have suffered damages as a result of Defendants' breach of their fiduciary duties.

### Count 4 – Civil Conspiracy against all Defendants.

6.28    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.29    The Defendants conspired and combined their efforts to effect a common scheme.

6.30    The Defendants sought through that combination to achieve a common object and course of action—to wit, to "make the Participation Shares worthless" and thereby transfer away from the Plaintiffs, and to the Defendants, the entire beneficial ownership of the $270 Million in assets in the Charitable DAF Fund.

6.31    The Defendants took one or more unlawful, overt acts in pursuit of the object and course of action of the combination and conspiracy—to wit, at minimum, fraud, breach of fiduciary duty, conversion, and constructive fraud, as set forth herein.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                                    PAGE 39**

MR 0424

6.32    The Plaintiffs suffered damages as a proximate result of the combination and conspiracy.

### Count 5 - Constructive Fraud Against All Defendants

6.33    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.34    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Tex. Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas 2009). "In constructive fraud the actor's intent is irrelevant." *Id*. "Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary duty." *Id.*

6.35    As a fiduciary, Patrick's and the other Defendants' conduct in diluting the Plaintiffs' interests, selling interests at below-market values, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.36    Plaintiffs have suffered damages as a result of Patrick's fraud.

### Count 6 - Unjust Enrichment Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation

6.37    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.38    A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.39    Patrick, CDMCFAD, and the DFW Charitable Foundation stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 40**

MR 0425

6.40    Patrick, CDMCFAD, and the DFW Charitable Foundation took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with the DFW Charitable Foundation.

6.41    Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.42    Patrick, CDMCFAD, and DFW Charitable Foundation have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damaged by Patrick's unjust enrichment.

### Count 7 – Conversion Against Patrick, CDMCFAD, LLC, CDH GP, Ltd., and DFW Charitable Foundation

6.43    Paragraphs 1.1 – 5.81 are incorporated as if fully restated herein.

6.44    Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the plaintiff demanded the property, and (4) defendant refused the return of the property. *Wells Fargo Bank Northwest, N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 699 (Tex. App.—Dallas 2012 no pet.).

6.45    The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.46    Patrick with the other named Defendants have unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                        **PAGE 41**

MR 0426

all the legal and beneficial economic interests to Patrick's controlled entity, DFW Charitable Foundation.

6.47    The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which all have ignored and refused. Plaintiffs have been damaged as a result of these conversions.

### Count 8 – Imposition of Constructive Trust Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation

6.48    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

6.49    "A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment." *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas, no pet.). "To obtain a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *Id*.

6.50    Patrick through the DFW Charitable Foundation has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of the DFW Charitable Foundation and Patrick.

6.51    All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

### VII.    APPLICATION FOR RECEIVERSHIP

7.1    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                    PAGE 42**

MR 0427

7.2     The Plaintiffs seek the immediate appointment of a receiver over Defendants the DFW Charitable Foundation and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code sections 64.001(a), Texas Business Organizations Code section 11.410, and the Court's inherent equitable powers.

## A. *Texas Civil Practice & Remedies Code*

7.3     Under section 64.001 of the Texas Civil Practice and Remedies Code, a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," or "in any case in which a receiver may be appointed under the rules of equity." TEX. CIV. PRAC. & REM. CODE § 64.001(a)(3), (7).

7.4     A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. *Id*. § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5     A probable interest exists by statute in actions between partners and in actions between joint owners of property. *Id*. § 64.001(a)(3).

7.6     One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App.–Dallas 2024, pet. denied, reh'g denied).

## B. *Texas Business and Organizations Code*

7.7     A court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." TEX. BUS. ORG. CODE § 11.403(a)(3).

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 43**

MR 0428

7.8     Additionally, under Section 11.410 of the Texas Business Organizations Code, a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. *Id*. § 11.410(a).

## C.  *Rules of Equity*

7.9     In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. Texas law makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision. TEX. CIV. PRAC. & REM. CODE § 64.004

## D.  *Receivership Standards Under Texas Law and Equity*

7.10    The appointment of a receiver lies within the discretion of the trial court. *See Spiritas v. Davidoff*, 459 S.W.3d 224, 231 (Tex. App.—Dallas 2015, no pet.).

7.11    The facts alleged in the receivership application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.] 1976, writ dismissed).

7.12    Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

## E.  *The Charitable Owners are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities*

7.13    The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                    **PAGE 44**

MR 0429

7.14    Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.15    Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure. The Plaintiffs have not received any just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.16    Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.17    Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.18    The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.19    The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 45**

MR 0430

7.20    The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.21    The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.22    Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

## VIII – APPLICATION FOR TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP

8.1.    Paragraphs 1.1 - 5.81 are incorporated as if fully restated herein.

8.2.    Plaintiffs seek injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund following a hearing on Plaintiffs' Application for Temporary Injunction , regardless of where they are presently held.  If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.3.    A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**      **PAGE 46**

MR 0431

would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." TEX. CIV. PRAC. & REM. CODE § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties." *Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966). An applicant for the writ must show (1) a probable right to recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued. *See* TEX. CIV. PRAC. & REM. CODE § 65.011; *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002)

8.4.    Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending.  In other words, the adequacy of an available legal remedy must be judged in the circumstances of the particular case, and in such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety. *See Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ).

8.5.    The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                          PAGE 47**

MR 0432

8.6.     Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.7.     Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Injunction is not ordered against the Defendants.  Accordingly, Plaintiffs request the Court freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.8.     The harm to Plaintiffs is imminent, and if the Court does not enjoin the Defendants, they will be irreparably injured, as set forth herein. If the Defendants prevail on the merits, the funds will still be available to them for their use in future.  The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.9.     The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                        **PAGE 48**

MR 0433

**A.** *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.*

8.10.    Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See id*; *Transport Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 552 (Tex. 1953). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58.

8.11.    Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that funds vital philanthropic efforts relied upon by key communities across the nation.   The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B.** *Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.*

8.12.    Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above.  Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *See Staubach*, 667 S.W.2d at 567–68.

8.13.    Plaintiffs have no adequate remedy at law.  Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds.  These losses, as well as others which will inevitably occur if Defendants are

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                        **PAGE 49**

MR 0434

not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seek a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 50**

MR 0435

## VIII.   PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A.   Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B.   Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C.   Impose a Constructive Trust against Patrick, CDMCFAD, LLC and DFW Charitable Fund;

D.   Require the reversal of the dilution scheme and unauthorized asset transfers;

E.   Require recission of improper redemption of shares and share transfers;

F.   Award actual damages in an amount to be proven at trial;

G.   Award exemplary damages as permitted by law;

H.   Award attorneys' fees and costs;

I.   Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**McCarty Law PLLC**

*/s/ Darren McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street, Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                                         **PAGE 51**

MR 0436

Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, July 20, 2025, on all counsel or parties of record.

*/s/ Craig M. Warner*
Craig M. Warner

**PLAINTIFFS' FIRST AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**      **PAGE 52**

MR 0437

# Tab 6

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* | § § | |
| v. | § § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § § | |
| *Defendants.* | § | DALLAS, TEXAS |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND PLEA TO THE JURISDICTION

Craig Warner
Texas Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
Texas Bar No. 04950200
jmcox@duanemorris.com
Jason Boatright
Texas Bar No. 240248138
jeboatright@duanemorris.com
Duane Morris LLP
100 Crescent Ct., Ste. 1200
Dallas, Texas 75201
(214) 257-7213
(214 292-8442 fax

Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

*Attorneys for Plaintiffs*

1

# Table of Contents

Table of Contents ...............................................................2

Table of Authorities..........................................................3

Index of Abbreviations ....................................................5

Introduction and Summary................................................5

Argument...........................................................................6

A.     The Court has jurisdiction under section 25A.004(b)(2). ...............6

    1.     The text of (b)(2) shows there is  jurisdiction. ........................6

    2.     Defendants try to re-write the text of (b)(2). ..........................7

    3.     Plaintiffs have standing under (b)(2); Defendants say otherwise, but they do not cite any relevant law. .................9

        a.     Defendants say Plaintiffs lack *standing* because they have no *cause of action*. That is wrong................10

        b.     Plaintiffs satisfy the legal test for standing. ...............12

        c.     Defendants' policy argument has no merit. Public policy favors Plaintiffs here. ........................................15

B.     The Court has jurisdiction under section 25A.004(b)(4). ..............16

C.     The Court has jurisdiction under section 25A.004(b)(5). .............19

D.     Plaintiffs' causes of action do not belong to the Debtor. ...............21

E.     Defendants' Liquidation Proceedings Argument Is Misplaced and Premature .......................................................................23

F.     Plaintiffs May Assert the Claims in the Complaint......................26

Prayer .................................................................................31

Certificate of Service .........................................................31

Certificate of Compliance..................................................32

## Table of Authorities

### Cases

*Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.*
[1975] AC 167, 179) ...................................................................... 22

*Brown v. City of Houston,*
660 S.W.3d 749 (Tex. 2023) ................................................ passim

*City of Dallas v. TCI W. End, Inc.,*
463 S.W.3d 53, 55 (Tex. 2015) .................................................. 20

*Eagle Prop., Ltd. v. Scharbauer,*
807 S.W.2d 714 (Tex. 1990) ...................................................... 28

*Energy Transfer LP v. Culberson Midstream LLC,* 2024 Tex. Bus.
1, 705 S.W.3d 217 (Tex. Bus. Ct. Oct. 30, 2024) ............................ 6

*Feiner Family Tr. v. VBI Corp.,* No. 07 CIV. 1914 (RPP),
2007 WL 2615448 (S.D.N.Y. Sept. 11, 2007) ......................... 27, 29

*Foss v. Harbottle,*
(1843) 67 Eng. Rep. 189, 202 (Eng.) ...................................... 26, 27

*Garcia v. City of Willis,*
593 S.W.3 201 (Tex. 2019) ....................................... 12, 14, 16, 29

*Heckman v. Williamson Cnty.,*
369 S.W.3d 137 (Tex. 2012) ...................................................... 14

*In re MortgageAmerica Corp.,*
714 F.2d 1266 (5th Cir. 1983) ................................................... 22

*In re Panchakarla,*
602 S.W.3d 536 (Tex. 2020) ..................................................... 7, 9

*In re Tyco Intern., Ltd.,*
340 F. Supp. 2d 94 (D.N.H. 2004) ............................................. 27

*Kohn v. Meehan,* (Transcript Smith Bernal),
at ¶ 101 (Ch. Div. 2003) ........................................................... 28

*Matter of Educators Group Health Tr.,*
25 F.3d 1281 (5th Cir. 1994) ..................................................... 24

MR 0441

*Moser, Tr. of Estate of Mason v. Dillon Investments, LLC,*
    649 S.W.3d 259 (Tex. App.—Dallas 2022, no pet.) ........................ 25

*Peskin v. Anderson,*
    [2001] 1 B.C.L.C. 372 ¶ 34) ........................................................... 27

*San Miguel v. Searcy*, No. 15-24-00026-CV, 2025 WL 353074
    (Tex. App.—15th Dist., Jan. 30, 2025) ........................................... 11

*Sneed v. Webre,*
    465 S.W.3d 169 (Tex. 2015) ........................................................... 18

*Tex. Disposal Sys. Landfill, Inc. v. Travis Cent. Appraisal Dist.,*
    694 S.W.3d 752 (Tex. 2024) ............................................................. 6

*Tex. Propane Gas Assoc. v. City of Houston,*
    622 S.W.3d 791 (Tex. 2021) ............................................................. 6

*Texas Right to Life v. Van Stean,*
    702 S.W.3d 348 (Tex. 2024) ....................................................... 7, 11

*W. Tex. Mun. Power Agency v. Republic Power Partners, L.P.,*
    428 S.W.3d 299 (Tex. App.—Amarillo 2014, no pet.) ................... 19

*Williams v. Stevens*, No. 05-22-00440-CV, 2023 WL 5621835
    (Tex. App.—Dallas Aug. 31, 2023, no pet.) (mem. op.) ................. 10

**Statutes**

11 U.S.C.A. § 1502 (West) ................................................................... 25

11 U.S.C.A. § 1520(a)(1) ...................................................................... 25

TEX. GOV'T CODE § 24.007 ................................................................. 18

TEX. GOV'T CODE § 25.004(b)(2) ............................................. 4, 6, 15, 29

TEX. GOV'T CODE § 25A.004 ............................................................... 18

TEX. GOV'T CODE § 25A.004(a)(11) ..................................................... 17

TEX. GOV'T CODE § 25A.004(b)(4) .................................................. passim

TEX. GOV'T CODE § 25A.004(b)(5) ........................................ 4, 19, 20, 29

TEX. GOV'T CODE § 311.005(13) .......................................................... 17

4

## Index of Abbreviations

| | |
|---|---|
| PTJ | Defendants' Motion to Dismiss and Plea to the Jurisdiction |
| Debtor | DAF HoldCo |

## Introduction and Summary

This Court has jurisdiction under the plain text of Texas Government Code section 25A.004(b)(2), (4), and (5). Defendants do not argue otherwise. Instead, they try to rewrite the text of that statute. They also argue that Plaintiffs lack standing on a legal theory that is not supported by any case, law, or rule.

Accordingly, Defendants try to make jurisdiction about James Dondero—they even call Plaintiffs the "Dondero Organizations"—hoping that this will sway the Court's conclusions about *jurisdiction*. Plaintiffs respectfully submit that this ploy reflects the weakness of Defendants' case. If they had the law, they would not try to rewrite the statute; if they had cases, they would cite some that were binding; and if they had the facts, they would not resort to *ad hominem* framing. This Court has jurisdiction, and the Plea to the Jurisdiction's ("PTJ") peculiar strategy and execution come very close to demonstrating that fact all on its own.

5

MR 0443

<div align="center">**Argument**</div>

Defendants challenge jurisdiction on four grounds. Plaintiffs will respond to each in turn.

**A. The Court has jurisdiction under section 25A.004(b)(2).**

Defendants argue that the Court lacks jurisdiction under section 25A.004(b)(2), but they do not engage with that statute's text, or cite any caselaw that supports their interpretation of it. That failure is fatal to their argument.

**1. The text of (b)(2) shows there is jurisdiction.**

For every judicial proceeding, subject-matter jurisdiction must exist before a court can consider the merits. *Tex. Propane Gas Assoc. v. City of Houston*, 622 S.W.3d 791, 797 (Tex. 2021). Whether a court has subject-matter jurisdiction is a question of law. *Tex. Disposal Sys. Landfill, Inc. v. Travis Cent. Appraisal Dist.*, 694 S.W.3d 752, 757 (Tex. 2024). When courts determine whether the Texas Business Court has subject-matter jurisdiction in a case, their duty is to accurately articulate the meaning of the enacted text, which is section 25.004A of the Texas Government Code. *See Brown v. City of Houston*, 660 S.W.3d 749 (Tex. 2023) (addressing a case about the jurisdiction of the 15th Court of

<div align="center">6</div>

Appeals under H.B. 19). That statute's plain text is the alpha and omega of the interpretive process. *Energy Transfer LP v. Culberson Midstream LLC*, 2024 Tex. Bus. 1, 705 S.W.3d 217, 218 (Tex. Bus. Ct. Oct. 30, 2024) (citing *In re Panchakarla*, 602 S.W.3d 536, 540-41 (Tex. 2020)). The plain meaning of chapter 25A shows this Court has jurisdiction. *See id*. at 219.

This Court has jurisdiction over an action when "the amount in controversy exceeds $5 million" excluding interest, costs, and fees, and the action is "regarding the governance, governing documents, or internal affairs of an organization." TEX. GOV'T CODE § 25.004(b)(2). It is undisputed that the amount in controversy exceeds $5 million and that the action regards the governance and internal affairs of an organization. Pet. at 2 ¶4.4; PTJ at 16. Thus, this Court has subject-matter jurisdiction under section 25A.004(b)(2). *Id*; *see also Panchakarla*, 602 S.W.3d at 540.

2.      **Defendants try to re-write the text of (b)(2).**

Defendants claim that the Court lacks jurisdiction anyway because, they say, Plaintiffs "do not have § 25A.004(b)(2) standing."

However, Defendants do not explain what they mean by that, nor do they cite any caselaw about what "§ 25A.004(b)(2) standing" might be, much less attempt to show how Plaintiffs lack it. The Supreme Court has

7

recently, and repeatedly, told litigants that the concept of "statutory standing" is a misnomer which should be retired. *Texas Right to Life v. Van Stean*, 702 S.W.3d 348, 353–54 (Tex. 2024) (explaining that, while "some of our older opinions use standing as a short-hand reference for a plaintiff's ability to fulfill some statutory prerequisite to bringing suit or recovering on a claim," that "phrasing is regrettable" and must be abandoned (cleaned up)). Thus, the question is not whether there is "§ 25A.004(b)(2) standing," PTJ at 29, but whether the facts alleged fit within the enumerated jurisdiction of this Court. The answer to that question, as already discussed, is yes.

Instead, Defendants say Plaintiffs "are not owners of any Charitable DAF Entities." PTJ at 30. Leaving aside that this action centers around the fact that Defendants acted to wrongfully deprive Plaintiffs of the ownership they had—and as Plaintiffs assert is rightfully still theirs—there is nothing in section 25A.004(b)(2) that suggests a plaintiff has to be an "owner" of anything to have standing to bring an action under that section. TEX. GOV'T CODE § 25A.004(b)(2).

If the Legislature were to amend H.B. 19 to provide something like, "(2) an action <u>by an owner of an organization</u> regarding the governance,

governing documents or internal affair of ~~an~~ <u>that</u> organization," Defendants might be able to venture a legal argument here. But because the Legislature has not written the statute the way Defendants need it to have been written, Defendants have no argument here at all.

The Texas Supreme Court has held that courts must presume that the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted. *Panchakarla,* 602 S.W.3d at 540. And when the text unambiguously answers a question, the court's inquiry ends. *Brown,* 660 S.W.3d at 752. The text of section 25A.004(b)(2) unambiguously answers the question Defendants' inquiry has raised here. Does a plaintiff have to be the owner of an organization at issue in section 25A.004(b)(2)? No, it does not, and that is where the Texas Supreme Court commands that the inquiry end. *Brown,* 660 S.W.3d at 752. Naturally, then, Defendants quickly abandon their dead-end argument and go a very different route instead.

3.   **Plaintiffs have standing under (b)(2); Defendants say otherwise, but they do not cite any relevant law.**

Defendants claim that Plaintiffs lack standing, but they do not cite or discuss the test for standing with respect to section 25A.004(b)(2), nor do they try to show that Plaintiffs fail any such test. PTJ at 29-31.

9

MR 0447

### a. Defendants say Plaintiffs lack *standing* because they have no *cause of action*. That is wrong.

Defendants simply say Plaintiffs lack standing because section 25A.004(b)(2) does not create a cause of action. PTJ at 30-31 (citing *Williams v. Stevens*, No. 05-22-00440-CV, 2023 WL 5621835 at \*5 (Tex. App.—Dallas Aug. 31, 2023, no pet.) (mem. op.)). However, Plaintiffs do not contend that section 25A.004(b)(2) creates a cause of action. Indeed, all of Plaintiffs' causes of action were created elsewhere. *See* Am. Pet. at 37 (breach of fiduciary duty); Am. Pet. at 35 (fraud); Am. Pet. at 40 (unjust enrichment); Am. Pet. at 41 (conversion). Defendants are evidently aware of that; they make no attempt to argue that the Plaintiffs base any of their causes of action on section 25A.004(b)(2). Indeed, it is undisputed that none of Plaintiffs' claims come from section 25A.004(b)(2).

Not only do Defendants fail to even *try* to show that Plaintiffs have based their causes of action on section 25A.004(b)(2), they also fail to explain what the statutory *source* of Plaintiffs' causes of action have to do with standing. If there is any caselaw that suggests standing to sue in the Texas Business Court depends on which statute or common-law

10

principle creates a given cause of action, Defendants do not cite it, and Plaintiffs are not aware of it.

To the contrary, as already explained, Defendants' emphasis on "standing" is inconsistent with modern precedent which emphasized the "critical" distinction between "standing, as that term is properly used, [which] implicates subject-matter jurisdiction, while other issues sometimes referred to as standing, including whether a cause of action exists or whether a given plaintiff has the right to bring such a cause of action, pertain to the merits and generate judgments on the merits." *Texas Right to Life*, 702 S.W.3d at 354-355.

"A plea to the jurisdiction is a dilatory plea that challenges the existence of subject-matter jurisdiction, that is, the court's power to adjudicate the case." *San Miguel v. Searcy*, No. 15-24-00026-CV, 2025 WL 353074, at \*2 (Tex. App.—15th Dist., Jan. 30, 2025). *Here though, Defendants are not truly challenging the Court's power to adjudicate this case, but instead whether Plaintiffs (as opposed to someone else) can pursue the claims pleaded.*

But even on its own, flawed merits, Defendants' "standing" argument should be rejected. In order to show that Plaintiffs lack

11

"standing" under section 25A.004(b)(2), Defendants would have had to cite caselaw for the elements of standing, tie those elements to that statute, and explain why they prevent Plaintiffs from bringing an action in this Court. Defendants seem to know that that is their task: they say Plaintiffs have "no interest" in Defendants and cannot complain about the governance, governing documents, or internal affairs of "a stranger," which are concepts related to a traditional standing analysis. PTJ at 30. But they do not cite any law for those propositions or attempt any legal argument as to how they affect what they call "25A.004(b)(2) standing." PTJ at 29. Plaintiffs, for their part, will perform the necessary legal analysis now.

### b.    Plaintiffs satisfy the legal test for standing.

Standing consists of some interest peculiar to a person individually and not just as a member of the public. *Garcia v. City of Willis*, 593 S.W.3 201, 208 (Tex. 2019). A plaintiff has standing to seek prospective relief only if he pleads facts establishing an injury that is concrete and particularized, actual or imminent, not hypothetical. *Id*. Plaintiffs satisfy every element of standing under that legal test.

12

Plaintiffs' live pleading alleges that they are, and always have been, thoroughly tied to Defendants, and that Plaintiffs have a *$270 million interest* in what Defendants have done to them. *See* Am. Pet. at 5 ¶4.4, 11 ¶5.20. 13 ¶5.28, 17-33 ¶¶5.38-5.75, , 45 ¶7.15 (Charitable DAF Fund); Am. Pet. at 2 ¶1.3, 5 ¶4.4, 11 ¶5.20, 14 ¶5.28, , 17-33 ¶¶5.38-5.75, 48 ¶8.6 (Patrick); Am. Pet. at 2 ¶1.2 (CDH GP); Am. Pet. at 2 ¶1.3, 11 ¶5.20, 17-33 ¶¶5.38-5.75 (Charitable DAF HoldCo); Am. Pet. at 17-33 ¶¶5.38-5.75 (CDMCFAD). Plaintiffs' petition also alleges that they have suffered particularized and concrete injuries from Defendants. *See* Am. Pet. at 39 ¶6.27 (injury from breach of fiduciary duty); Am. Pet. at 36 ¶6.7 (injury arising from common law fraud); Am. Pet. at 37 ¶6.17 (injury arising from fraud by non-disclosure); Am.Pet. at 40 ¶6.36 (damages from constructive fraud); Am. Pet. at 41 ¶6.42 (damages from unjust enrichment); Am. Pet. at 42 ¶6.47 (damages from conversion); Am.Pet. at 40 ¶6.32 (damages from civil conspiracy).

Random members of the public could not allege that they have had their legal, equitable, and beneficial interest in a $270 million charitable fund taken from them by these Defendants; nor could the public allege that Defendants injured them. Plaintiffs, however, most certainly can

13

make those allegations and, more to the point, that is what they have alleged in their live pleading. Because Plaintiffs have demonstrated that they have a justiciable interest distinct from the public and that they have particularized and concrete injuries, Plaintiffs have standing. *See Garcia*, 593 S.W.3 at 208.

Defendants have presented the Court with no argument to the contrary. Even when they cite caselaw on standing elsewhere in their plea, they do not try to show that Plaintiffs lack a distinct justiciable interest or concrete injury. *See* PTJ at 35. Instead, Defendants try to show that Plaintiffs lack an *ownership* interest, and they operate under the assumption that, somehow, lacking an ownership interest is the same as lacking a justiciable interest. *See* PTJ at 25. However, Defendants cite no authority for the idea that standing requires an ownership interest in the entity being sued; that is because there is no such authority. *See, e.g.*, *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 159 (Tex. 2012) (concluding that the plaintiff—who had no ownership interest (or controlling, managerial, or any other interest) in the defendant—had standing). Standing is a distinct constitutional doctrine with a particular

14

set of requirements, *see id.*, and Defendants have *comprehensively* failed to apply any of those requirements to the matter at hand.

### c. Defendants' policy argument has no merit. Public policy favors Plaintiffs here.

Defendants represent to the Court that, if Plaintiffs have standing under their interpretation of section 25A.004(b)(2), "Exxon could file suit in this Court against Chevron because its CEO declined to do business with Exxon" because "Exxon disagreed with the corporate governance decisions and governing documents of Chevron." PTJ at 33. Defendants call this an absurd result that the Legislature did not intend. PTJ at 33. Plaintiffs agree that such a result would be absurd and contrary to the Legislature's intent. The problem with Defendants' scenario, though, is it is nothing like Plaintiffs' case.

Plaintiffs are not suing just because they disagree with Defendants' decisions and governing documents; Plaintiffs are suing because *Defendants took money that Plaintiffs have a legal right to use for the charitable functions that Plaintiffs are required to perform.* Am. Pet. at 17-33 ¶¶5.38-5.75.

It would be absurd to prohibit a plaintiff from seeking redress for a catastrophic legal injury like that one; it would be especially absurd if the

15

prohibition were based on the proposition that the plaintiff did not *own* the defendant. Accordingly, none of Plaintiffs' causes of action impose any such prohibition, nor does section 25A.004(b)(2). Other parts of section 25A.004 include ownership as one of several optional conditions for *subject-matter jurisdiction*, but not for *standing* and, crucially, section 25A.004(b)(2) says nothing about ownership at all. *Compare* TEX. GOV'T CODE § 25A.004(b)(2) *with id.* § 25A.004(b)(4), (5).

The bottom line is that the text of section 25A.004(b)(2) governs the inquiry into whether this Court has subject-matter jurisdiction. *Brown*, 660 S.W.3d at 752. It is undisputed that, under the text of section 25A.004(b)(2) as it was actually written and enacted, there is subject matter jurisdiction here. *See* TEX. GOV'T CODE § 25A.004(b)(2). And although Defendants say there is no standing, they make no argument that is grounded in the legal rules that govern a standing inquiry. *See Garcia*, 593 S.W.3 at 208. Thus, Plaintiffs have authority to bring their claims, and this Court has the power to hear them.

**B.   The Court has jurisdiction under section 25A.004(b)(4).**

Defendants argue that there is no jurisdiction under section 25A.004(b)(4) because Plaintiffs do not own Defendants. PTJ at 28-29.

16

MR 0454

However, Defendants' argument misunderstands Plaintiffs' suit and section 25A.004(b)(4).

Section 25A.004(b)(4) grants jurisdiction to this Court over an "action by an organization, or an owner of an organization" if two conditions are met. TEX. GOV'T CODE § 25A.004(b)(4). First, the action must be "brought against an owner, controlling person, or managerial official of the organization;" and second, it must allege "an act or omission by the person in the person's capacity as an owner, controlling, person, or managerial official of the organization." *Id*. Defendants argue there is no jurisdiction Plaintiffs pleaded that they are not "owners" of the Charitable DAF Entities. PTJ at 29.

However, the premise of Plaintiffs' causes of action is that Defendants "stripped" Plaintiffs' "legal, equitable, and beneficial interests" in DAF Holdco and Charitable DAF Fund, and transferred them to Patrick's sham charity. *See*, e.g., Am. Pet. at 35 ¶¶6.2-6.7; Am. Pet. 36-37 ¶¶ 6.9-6.17; Am. Pet. at 37-38 ¶¶ 6.19-6.27; Pet. at 42 ¶¶ 6.49-6.51. In other words, Plaintiffs were beneficial owners of assets that are now controlled by Defendants. Am. Pet. at 4 ¶4.1. That fits the text of section 25A.004(b)(4) perfectly, and Defendants do not present an

17

MR 0455

argument to the contrary; they simply say that because Plaintiffs no longer own any of the Defendants, there is no jurisdiction. But that is not the premise of Plaintiffs' causes of action and it is not required by the text of section 25A.004(b)(4).

Further, in defining what an "Owner" is, the Legislature stated that "[t]he term includes" the enumerated definitions, but is not limited to them. TEX. GOV'T CODE § 25A.004(a)(11). A statutory definition that "uses the term 'includes,' … does not create a presumption that components not expressed are excluded." *Sneed v. Webre*, 465 S.W.3d 169, 191–92 (Tex. 2015) (quoting TEX. GOV'T CODE § 311.005(13)). In *Sneed*, the Texas Supreme Court relied upon the use of the word "includes" when identifying the "shareholders" who could bring a derivative action as reaching beyond the enumerated examples in the statute to broadly permit derivative actions by those holding claimed equitable or beneficial interests. *Id.* at 192 ("Thus, under article 5.14(A)(2), a shareholder certainly includes 'a beneficial owner whose shares are held in a voting trust or by a nominee on the beneficial owner's behalf,' but a shareholder may also include other types of beneficial ownership—like when a shareholder of a parent holding corporation has a beneficial or equitable

18

ownership interest in a wholly owned subsidiary."). And it seems *rather* unlikely that this Court could lose jurisdiction whenever a defendant uses a complex business structure to take and hide the plaintiff's assets— after all, the text and structure of chapter 25A indicate in no uncertain terms that the whole point of this Court is to hear complex business disputes. *Compare* TEX. GOV'T CODE § 25A.004 *with id.* § 24.007. Such a result would unnecessarily bind up questions of subject-matter jurisdiction with the merits. *W. Tex. Mun. Power Agency v. Republic Power Partners, L.P.*, 428 S.W.3d 299, 308 (Tex. App.—Amarillo 2014, no pet.). Under the causes of action Plaintiffs have pleaded and the plain text of the statute, this Court has jurisdiction. *Id.* § 25A.004(b)(4); Am. Pet. at 4-5, 35-42.

## C.     The Court has jurisdiction under section 25A.004(b)(5).

Defendants say Plaintiffs lack jurisdiction because section 25A.004(b)(5) required Plaintiffs to plead that "they are bringing this action derivatively on behalf of any entity in which they had an interest." PTJ at 34. However, nothing in the text of the statute requires any such thing, and Defendants do not make any legal argument to the contrary. TEX. GOV'T CODE § 25A.004(b)(5). *See also Brown*, 660 S.W.3d at 752

19

(requiring that statutes regarding subject matter jurisdiction be interpreted according to their plain text).

Defendants also note that Plaintiffs have not cited a Texas Business Organizations Code provision that would authorize a derivative filing, and they claim that Plaintiffs have not met any prerequisites for derivative standing. PTJ at 34. Again, though, nothing in Plaintiffs' petition or the text of section 25A.004(b)(5) says anything at all about derivative proceedings. *See Brown*, 660 S.W.3d at 752; TEX. GOV'T CODE § 25A.004(b)(5). Indeed, the Legislature specifically granted this Court jurisdiction over "a derivative proceeding" meeting the $5 million amount in controversy requirement in a different provision. Tex. Gov't Code § 25A.004(b)(1). To accept Defendants' construction of the separate jurisdictional grant in section 25A.004(b)(5) as being limited to derivative proceedings would effectively render it redundant. *City of Dallas v. TCI W. End, Inc.*, 463 S.W.3d 53, 55 (Tex. 2015) ("We consider the statute as a whole, rather then [sic] viewing individual provisions in isolation, and presume the Legislature selected the statute's language with care, choosing each word for a purpose and purposefully omitting words not

20

chosen. We must avoid adopting an interpretation that 'renders any part of the statute meaningless.'" (citations omitted)).

Under section 25.004(b)(5), this Court has jurisdiction in an action alleging that an owner, controlling person, or managerial official breached a duty owed to an organization or an owner of an organization by reason of the person's status as an owner, controlling person, or managerial official, including the breach of a duty of loyalty or good faith, TEX. GOV'T CODE § 25A.004(b)(5). And that is exactly what Plaintiffs' suit alleges. The live petition suit alleges that Patrick was a controlling person and a managerial official, and that he breached duty owed to Plaintiffs, who were beneficial owners, as a controlling owner of DAF HoldCo, Ltd., CDMCFAD, LLC, Charitable DAF, L.P., and DFW Charitable Foundation. Am. Pet. at 4 ¶4.1; Am. Pet. at 35-42. Thus, this Court has jurisdiction under section 25A.004(b)(5).

**D.     Plaintiffs' causes of action do not belong to the Debtor.**

Defendants claim that Plaintiffs lack standing because the Debtor's claims belong to the insolvency estate in the Cayman Islands. PTJ at 41. It may well be the case that the *Debtor's* claims belong in the Caymans, but Defendants cite no legal authority and offer no legal argument that

21

*Plaintiffs'* claims belong to the insolvency estate, or that they must be brought in the Caymans. Although this case and the litigation in the Caymans may involve a lot of the same facts, they do *not* involve the same causes of action, and Defendants do not say that they do.

Instead, Defendants cite American cases for the idea that a trustee has exclusive standing to assert claims that belong to the bankruptcy estate. *See, e.g.*, PTJ at 38 (citing *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1276 (5th Cir. 1983)). They also cite Cayman cases for the idea that a debtor is divested of beneficial ownership of its assets and a statutory trust applies to them when a court supervised liquidation begins. PTJ at 39 (citing *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.* [1975] AC 167, 179). Maybe, maybe not. But that does not mean Plaintiffs' claims—which flow from breaches of duties owed to them, not anyone else—belong to a Caymanian statutory trust.

Plaintiffs have alleged common law fraud, fraud by non-disclosure, and constructive fraud against *them*. Plaintiffs have alleged a breach of fiduciary duties owed directly to *them*. These are harms inflicted directly upon the Plaintiffs, they are not claims the Debtor can bring.

22

MR 0460

Defendants cite no law for the proposition that Plaintiffs' claims are controlled by the Debtor or have to be brought in the Caymans—that is because no such law exists. The rule of decision in this case is chapter 25A of the Texas Government Code, because that is the statute that governs this Court's subject-matter jurisdiction. *See Brown*, 660 S.W.3d at 752. Defendants want Cayman bankruptcy cases to control here through a long and rickety chain of U.S. bankruptcy principles because Defendants cannot show that chapter 25A denies this Court of jurisdiction. However, none of Defendants' cases support the idea that a Cayman bankruptcy proceeding can take jurisdiction away from this Court, especially in a case like this, where the plaintiff is emphatically *not* the administrator of an insolvent estate, and the estate has precisely *none* of the claims asserted here.

## E.    Defendants' Liquidation Proceedings Argument Is Misplaced and Premature

Defendants similarly argue that this Court is divested of jurisdiction because of Caymanian liquidation proceedings. The question is intrinsically flawed because whatever authority a Caymanian liquidation proceeding or U.S. bankruptcy proceeding ultimately exercises, neither

exercise subject-matter jurisdiction-stripping authority over Texas courts.

Defendants' argument is procedurally misplaced because any recognition of Cayman proceedings and determination of property rights will be decisions for a federal bankruptcy court, not this Court. It is legally misplaced because liquidation and bankruptcy proceedings do not factor into this Court's determination of its own jurisdiction. It is also premature because whether any portion of this dispute is litigated in the Grand Court of the Cayman Islands, a federal bankruptcy court, this Court, or some aspects in each, will only be decided when and if a federal bankruptcy court accepts jurisdiction via a chapter 15 bankruptcy proceeding and issues related orders.

This is nothing more than another ploy by Patrick, whose conduct has been egregiously fraudulent, to hold on—at least for a little while longer—to the charitable assets that have feathered his nest for years.

Defendants' authority disposes of their own arguments. A bankruptcy court would ultimately "determin[e] whether certain causes of action are property of the estate," or belong to the Plaintiffs and thus

24

litigated in this Court. *Matter of Educators Group Health Tr.*, 25 F.3d 1281, 1283 (5th Cir. 1994).

Further, this is not a jurisdictional issue as the Dallas Court of Appeals held after an extensive analysis:

> We conclude the supreme court has implicitly overruled its holding in Douglas and this Court's holdings in *Depumpo*, *Shankles*, and *Smith* that a plaintiff lacks constitutional standing to bring a claim that is in the plaintiff's bankruptcy estate and that the trial court lacks jurisdiction over such a claim.
> …
> A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy. In this case, [the plaintiff/appellant] alleged she suffered an injury in fact, resulting from appellee's negligence, and her injuries may be redressed by a favorable judicial decision awarding her damages. Thus, she had constitutional standing to assert her claims. However, she lacked authority to assert her claims because that authority resided in [the] trustee of [the plaintiff/appellant's] bankruptcy estate. *That defect was not jurisdictional.*

*Moser, Tr. of Estate of Mason v. Dillon Investments, LLC*, 649 S.W.3d 259, 272 (Tex. App.—Dallas 2022, no pet.) (emphasis added) (also cited by Defendants). No bankruptcy court has even entertained a question about what claims belong to whom.

Defendants' accompanying argument that Cayman proceedings may become a "foreign main proceeding" is again irrelevant to this Court's

25

jurisdiction. A federal bankruptcy court may, or may not, decide that the Cayman Islands is the "country where the debtor has the center of its main interests." 11 U.S.C.A. § 1502 (West). If so, it would merely give the Joint Official Liquidators certain status under federal bankruptcy law, such as permitting them to "operate the debtor's business and may exercise the rights and powers of a trustee," and invoke the federal automatic stay provision. 11 U.S.C.A. § 1520(a)(1) (West). The same questions about what claims belong to whom and where they should be decided would remain. None of that is a question for this Court now and does not impact its jurisdiction—the only question before the Court now.

## F. Plaintiffs May Assert the Claims in the Complaint

Although immaterial to the determination of standing, Defendants' arguments depend on a flawed assertion that under Cayman law, the Debtor, and not the Plaintiffs here, can bring this action.

Defendants assert that "[u]nder Cayman law, an organization owns a claim where it sustains an actionable loss, not the organization's owner. *Foss v. Harbottle*, (1843) 67 Eng. Rep. 189, 202 (Eng.)." PTJ at 38 n.13. Therefore, Defendants posit, "under the law of the place of formation, the claims brought by the Dondero Organizations belong to the Debtor." *Id*.

26

Critically, and as Defendants left unsaid, "[t]he rule in *Foss v. Harbottle* is subject to four 'exceptions' which permit a shareholder to bring suit when the conduct at issue is: (1) *ultra vires;* (2) requires a special majority to ratify; (3) infringes a shareholder's personal rights; or (4) qualifies as a 'fraud on the minority.'" *In re Tyco Intern., Ltd.*, 340 F. Supp. 2d 94, 98 (D.N.H. 2004); *see also Erie Cnty. Employees Ret. Sys. v. Isenberg*, No. CIV.A. H-11-4052, 2012 WL 3100463, at *4 (S.D. Tex. July 30, 2012) (discussing exceptions to the rule of *Foss v. Harbottle*). Suits to enforce "personal rights" are direct in nature, not derivative, and thus belong to the shareholder and not the company. *Id.*

Cayman law recognizes that shareholders can be owed duties and obligations directly from the controllers of the company where the controller "mak[es] material representations to them; or fail[s] to make material disclosure to them of insider information," or "suppl[ies] to them specific information and advice on which they have relied." *Feiner Family Tr. v. VBI Corp.*, No. 07 CIV. 1914 (RPP), 2007 WL 2615448, at *7 (S.D.N.Y. Sept. 11, 2007) (quoting *Peskin v. Anderson,* [2001] 1 B.C.L.C. 372 ¶ 34). "These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which

27

MR 0465

the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders." *Id.* (quoting *Peskin,* 1 B.C.L.C. 372 ¶ 34). "'Where such a duty exists and breach of it has caused loss to a shareholder directly (e.g., by inducing him to part with his shares at an undervalue), the shareholder may bring an action against the director to recover his loss.'" *Id.* (quoting *Kohn v. Meehan,* (Transcript Smith Bernal), at ¶ 101 (Ch. Div. 2003)).

These descriptions fit the facts alleged here to a tee. Plaintiffs have pled that material representations were made to them; the representations were false and Defendants knew it; Defendants made the representations for the purpose of causing the Plaintiffs to act on them— including by causing Plaintiffs to delay or refrain from moving to wind up the Fund, or otherwise protect themselves from the Plaintiffs dilute-and-sever maneuver; Plaintiffs justifiably did so; and, as a direct result of that reliance and that action, Plaintiffs lost their beneficial interest in the $270 Million Charitable DAF Fund. *See Eagle Prop., Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990) (identifying elements of common law fraud).

28

Plaintiffs have likewise pled that the Defendants intentionally diluted their interest in Charitable DAF Holdco, while lying about it and omitting critical details, for the express purpose of frustrating Plaintiffs' ability to secure the value of their interest in the Fund. Plaintiffs have adequately pled the elements of their fraud claims; and in so doing, have also adequately pled the existence and breach of a special fiduciary duty owed directly by the Defendants to the Plaintiffs under Cayman law.

These misrepresentations were made **to the Plaintiffs**, in an effort to mislead and impact the actions **of Plaintiffs,** in order to dilute and then render worthless the Participation Shares **belonging to the Plaintiffs.** Plaintiffs have also alleged "special circumstances" which "generat[e] fiduciary obligations" to *them*, as well as Defendants' breach of those duties. *Feiner Family Tr.*, 2007 WL 2615448 at *7 (citation omitted). That is "especially" so because the heart of Plaintiffs' claims is that Defendants, "for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders." *Id.* (citation omitted). These are harms inflicted directly upon the Plaintiffs.

29

The question at this stage is not whether Plaintiffs' claims will prove meritorious, or whether some of them may yield to future bankruptcy proceedings. The questions are only whether Plaintiffs have adequately pled facts that establish an injury that is concrete, particularized, and actual or imminent, *Garcia*, 593 S.W.3 at 208, and whether the Texas Business Court statute grants this Court in particular jurisdiction over those claims. The answer to both questions is yes. This Court has jurisdiction over Plaintiffs' claims. TEX. GOV'T CODE § 25A.004(b)(2), (4), (5).

MR 0468

## Prayer

Plaintiffs ask the Court to deny Defendants' Motion to Dismiss and Plea to the Jurisdiction. The Court should conclude that it has jurisdiction in this case.

Respectfully submitted,

Craig Warner
Texas Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
Texas Bar No. 04950200
jmcox@duanemorris.com
Jason Boatright
Texas Bar No. 240248138
jeboatright@duanemorris.com
Duane Morris LLP
100 Crescent Ct., Ste. 1200
Dallas, Texas 75201
(214) 257-7213
(214 292-8442 fax

*/s/ Darren L. McCarty*
Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

*Attorneys for Plaintiffs*

## Certificate of Service

I certify that this response was served on all counsel of record July 21, 2025.

*/s/ Darren L. McCarty*

31

## Certificate of Compliance

I certify that this Response is 5,124 words and complies with Business Court Rule 5. Also, the response is written in Century Schoolbook 14 point font, and it contains the sections required by the Court's Guidelines.

*/s/ Darren L. McCarty*

MR 0470

Tab 7

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
COURT CAUSE NO. 25-BC01B-0027

THE HIGHLAND DALLAS          )     IN THE TEXAS BUSINESS
FOUNDATION, INC., THE        )              COURT
HIGHLAND                     )
KANSAS CITY FOUNDATION,      )
INC.                         )
And                          )
THE HIGHLAND SANTA BARBARA   )
FOUNDATION, INC.,            )
                             )
                             )
        Plaintiffs,          )
                             )          FIRST DIVISION
VS.                          )
                             )
                             )
MARK PATRICK and DFW         )
CHARITABLE                   )
FOUNDATION, CDMCFAD, LLC,    )
CHARITABLE DAF GP, LLC and   )
CDH GP,                      )
Ltd.,                        )
                             )
                             )
        Defendants.          )          DALLAS, TEXAS

-------------------------------

MOTION TO DISMISS

PLEA TO JURISDICTION

-------------------------------

On the 4th of August, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bill Whitehill, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by Aerial M. Holloway via oral stenography.

APPEARANCES

FOR THE PLAINTIFFS,THE HIGHLAND DALLAS FOUNDATION, INC.,
THE HIGHLAND KANSAS CITY FOUNDATION, INC.
And THE HIGHLAND SANTA BARBARA FOUNDATION, INC.:

        DARREN L. MCCARTY
        SBOT: #(24007631)
        MCCARTY LAW PLLC
        316 West 12th Street,
        Suite 400
        Austin,Texas 78701
        Phone:512-827-2902
        Darren@mccartylawpllc.com


FOR THE PLAINTIFFS,THE HIGHLAND DALLAS FOUNDATION, INC.,
THE HIGHLAND KANSAS CITY FOUNDATION, INC.
AND THE HIGHLAND SANTA BARBARA FOUNDATION, INC.:

        CRAIG M. WARNER
        SBOT: #(24084158)
        DUANE MORRIS LLP
        100 Crescent Court,
        Suite 1200
        Dallas, Texas 75201
        Phone:214-257-7200 (ext. 7277)
        Cmwarner@duanemorris.com


        JOSEPH M. COX
        SBOT: #(04950200)
        DUANE MORRIS LLP
        100 Crescent Court,
        Suite 1200
        Dallas, Texas 75201
        Phone:214-257-7200 (ext. 7252)
        Cmwarner@duanemorris.com


        BENJAMIN L. WARDEN
        SBOT: #(24115926)
        DUANE MORRIS LLP
        100 Crescent Court,
        Suite 1200
        Dallas, Texas 75201
        Phone: 214 257-7200 (ext. 7253)
        BWarden@duanemorris.com

A P P E A R A N C E S (CONT.)

FOR THE DEFENDANTS, MARK PATRICK AND DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC AND CDH GP,LTD.:

    BRIAN SHAW
    SBOT: #(24053473)
    ANDREA REED
    SBOT: #(24053473)
    CARRINGTON, COLEMAN, SLOMAN &
    BLUMENTHAL, L.L.P.
    901 Main Street
    Suite 5500
    Dallas, Texas 75202
    Phone:214 -855-3000
    BShaw@CCSB.com

    Andrea Reed
    SBOT: #(24053473)
    CARRINGTON, COLEMAN, SLOMAN &
    BLUMENTHAL, L.L.P.
    901 Main Street
    Suite 5500
    Dallas, Texas 75202
    Phone:214 -855-3120
    AReed@CCSB.com

Also Present:

Julie Diaz - The Dallas Foundation

Torrey Litteton - The Dallas Foundation

Michael Stockhalm- Counsel for plaintiffs

INDEX

(MOTION TO DISMISS

PLEA TO JURISDICTION )

August 4, 2025                                Page, Volume

Appearance..................................3,        1

Proceedings.................................7,        1

General Discussion

With the Court..............................7,        1

Defendants' Motion to Dismiss ............29,        1

Plaintiffs' Plea to the Jurisdiction......50,        1

Defendants' Rebuttal......................90,        1

Plaintiffs' Rebuttal......................94,        1

Courts' Ruling............................94         1

Adjournment..............................101,        1

Reporter's Certificate...................102,        1

EXHIBIT  INDEX

| NO. | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|
| C-1 | Court's Exhibit Chart(Demonstrative) | 9 | 9 | 1 |
| PX-1 | Plaintiffs' Exhibit Chart(Demonstrative) | 49 | 49 | 1 |
| PX-2 | Charities' Allegations (PowerPoint) | 54 | 54 | 1 |

MR 0477

P R O C E E D I N G S

(Open Court, All Parties Present)

THE COURT: We are on the record in Cause Number 25-BC01B-0027, *The Highland Dallas Foundation, Inc., et al, v. Mark Patrick, et al.*

Let's go around the room and make an appearance of counsel, please.

MR. SHAW: Your Honor, Brian Shaw and Andrea Reed with Carrington Coleman, on behalf of Defendants.

THE COURT: And who do you got with you?

MR. SHAW: With Andrea Reed, and --

MR. MCENTIRE: I'm just an observer. That's all.

MR. SHAW: Sawnie McEntire.

THE COURT: Okay.

MR. MCENTIRE: Sawnie McEntire, correct.

MR. MCCARTY: Darren McCarty for the Plaintiff charities. With me, Joe Cox and Craig Warner, my co-counsel; and Julie Diaz, president and CEO of The Dallas Foundation; and her colleague, Torrey Litteton.

THE COURT: We've got a few other folks.

MR. WARDEN: Yes, Your Honor. Ben Warden also with Duane Morris representing the Plaintiffs.

MR. STOCKHALM: Michael Stockhalm, with the

Plaintiffs.

THE COURT: Okay. Great. Y'all have met the folks up here before, and so we won't do that.

This is going to be an interesting morning because I haven't figured out exactly how I'm going to do things yet. We've got the room until at least 1:00 o'clock, maybe longer. Hopefully we won't take that long, but there are a few things that I want to explore.

One, I read everything. That doesn't mean I understand everything, but I've read it all. I think the gist of the case is that the Plaintiffs were getting money that HoldCo distributed from the fund, but the allegation is that Mr. Patrick exercised his ultimate control over the fund, or HoldCo, or both, to distribute the money elsewhere, and the Plaintiffs don't like that, and they want the $270 million back and some other stuff.

Is that basically the gist of it?

MR. MCCARTY: Well, Your Honor, I think there's little bit more to it than that.

THE COURT: Well, I know there is, but I -- but that was just from a high level.

MR. MCCARTY: Well, I would say that they -- that Mr. Patrick, wearing all of his various

hats, disenfranchised the participating shareholders of 100 percent economic interest in a $270 million fund to zero --

THE COURT: Right.

MR. MCCARTY: -- under a calculated plan over the course of a year and a half.

THE COURT: Right. But the gist of it is the Plaintiffs were getting money from basically the fund. Now they're not, and they think Mr. Patrick is legally responsible for that.

MR. MCCARTY: Yes, Mr. Patrick and the other Defendants under which he operated.

THE COURT: Well, under which he operated, yeah.

MR. MCCARTY: Right.

THE COURT: Okay. So we've got that.

So let's mark as a Court exhibit, one of these things that I handed out to you-all.

(Exhibit C-1 was marked and admitted.)

THE COURT: Okay. And that's going to be Court Exhibit 1. It's not evidence of anything. It's just demonstrative to help me try to visualize what's going on, so don't get upset about hearsay or anything like that. It's just me trying to visualize things. I'm a very visual person, and so that's why we're doing

that.

So the blue of Court Exhibit 1 represents the Plaintiffs.

Is everybody good with that?

Green is Charitable HoldCo.

Orange is the DAF -- Charitable DAF Fund.

And I'm not entirely sure who yellow is, but they're downstream from the fund today for sure.

Am I correct that the green HoldCo is the 99 percent, or at least was the limited partner in the partnership known as "the fund"?

MR. MCCARTY:  I would say it slightly differently.

THE COURT:  Okay.

MR. MCCARTY:  It's the limited partners held 100 percent of the economic benefit --

THE COURT:  Right.

MR. MCCARTY:  -- the participating shares. And Mr. Patrick held -- held 100 percent of the managing shares.

THE COURT:  Right.  But it's a limited partnership, correct?

MR. MCCARTY:  I'm sorry --

THE COURT:  The fund is a limited partnership.

MR. MCCARTY: Yes.

THE COURT: It has to have a general partner?

MR. MCCARTY: That's -- well, I'm sorry -- the fund.

THE COURT: Right.

MR. MCCARTY: Right. The fund. General partner was originally Charitable DAF GP.

THE COURT: Right. But my question is it's a limited partnership, so it has to have a general partner, correct?

MR. MCCARTY: And that was the general partner.

THE COURT: Right. Okay. So that general partner is the 1 percent ownership interest?

MR. MCCARTY: All management shares.

THE COURT: Right. And the 99 percent limited partnership interest was what -- you can call it a beneficial ownership or whatever. They were supposed to be the economic -- the green, correct?

MR. MCCARTY: Correct, Your Honor.

THE COURT: All right. So as I'm understanding it, all claims Plaintiffs are asserting have to flow through the green entity; is that correct?

MR. MCCARTY: Yes.

THE COURT: Okay. But the green entity's not a party to this case.

MR. MCCARTY: The green entity is not a party to this case.

THE COURT: The green entity is represented by two JOLs out of the Cayman Islands, correct?

MR. MCCARTY: Well, yes. They have the fund. Or they --

(Simultaneous conversation.)

THE COURT: Well, you're here representing them in a Cayman lawsuit; is that right?

MR. MCCARTY: Am I representing them?

THE COURT: Yes.

MR. MCCARTY: I am not.

THE COURT: Who filed the Complaint in the Cayman Islands?

MR. MCCARTY: Maples & Calder.

THE COURT: Okay. I'm sorry. I thought you were co-counsel in that.

MR. MCCARTY: I am not.

THE COURT: All right. Okay. Fair enough. I just wanted to straighten that out.

MR. MCCARTY: I do not represent the Joint Official Liquidators.

THE COURT: Okay. Somebody does?

MR. MCCARTY: Yes.

THE COURT: And we've established that all claims of Plaintiffs asserting flow through HoldCo, and HoldCo is not a party in this case.

MR. MCCARTY: No, that's --

THE COURT: But you just said earlier that they did.

MR. MCCARTY: Your Honor, the money flowed --

THE COURT: Right.

MR. MCCARTY: -- through HoldCo, but the control of HoldCo and all the others that are Defendants here, who we are suing because of their breaches to us, their fraud --

THE COURT: Right.

MR. MCCARTY: -- and their other fiduciary breaches to us are outside of HoldCo. So they made the decisions. They controlled the HoldCo.

THE COURT: So it's your position that Mr. Patrick owed direct fiduciary duties to your clients?

MR. MCCARTY: That is correct.

THE COURT: Okay.

MR. MCCARTY: Under the Feiner family case out of the Southern District of New York, and that's

exactly how we pled it.

THE COURT: Okay. Just getting things clarified in my mind.

MR. MCCARTY: I understand. It's a complicated case.

THE COURT: It is a complicated case.

So as an aside -- and I'm just going to throw out an idea. And when I throw out an idea, I'm throwing out an idea. It's not a ruling. It's not a suggestion. It's an idea. Somebody has money that can fund things, and I assume it's the fund?

MR. MCCARTY: The fund -- the fund holds a hundred percent of COL HoldCo, and HoldCo owns a bunch of things underneath it.

THE COURT: All right. So this involves a lot of tax issues and corporate structure issues and government issues under Cayman law, perhaps US law, and Texas law, whoever law. A lot of them are Delaware laws.

I know a gentleman, and for full disclosure, he's one of my former law firm partners, Steve Gillis, who is an expert in all of these areas. I'm throwing out an idea of having him appointed as a special master to assist in working through these issues.

You-all don't have to answer that question right this instant because you're going to want to talk about it amongst yourselves and your clients and all that stuff. But it might be helpful to the Court to have Mr. Gillis assist, and he is willing to work at the rate of a thousand dollars an hour, which is substantially less than his normal rate. So I'm just throwing that out there as an idea. I'm just looking for your input on that.

All right. I have very serious concerns about Rule 39, and whether the JOLs and whoever the fund is represented by -- neither of them are here -- are necessary parties, such that the Court can't go forward without their joinder or y'all telling me how I can fashion effective relief that would not affect their rights because there is the Cayman lawsuit going on that asserts many of these same claims and many of these same parties.

MR. MCCARTY: I -- I would suggest if that's a -- sort of a question.

THE COURT: That is a question.

MR. MCCARTY: Okay. I would suggest that the Cayman lawsuit is built upon a number of the same facts, in fact, almost entirely the same facts.

(Simultaneous conversation.)

THE COURT: Exactly. That's the way I --

MR. MCCARTY: However, I would say that our claims are different from the Joint Official Liquidators claims in this sense. There were direct obligations to the participating shareholders, the Plaintiff charities here, not to commit fraud, not to breach fiduciary duties under Cayman law, and they did both of those. And I hope to show the Court in our presentation, those were quite direct.

There was no -- their HoldCo itself was not implicated in those direct communications. And they're very direct, and they're very pointed. And I think when the Court sees that, they will understand the difference between what we are doing here and the Joint Official Liquidators are doing there.

THE COURT: But for right now -- so let's assume that we have two circles: One is the Cayman lawsuit, and one is this lawsuit. There is a substantial overlap of those two circles, where the rights and the claims of the JOLs would be implicated by the outcome of this case, correct?

MR. MCCARTY: While I would say that the facts and circumstances are the same, I would suggest to Your Honor that the Joint Official Liquidators probably understand that there is relief that we are seeking

here, that at least as a legal matter is different.

And I would also suggest that this Court has ultimately -- and this is not for today, I don't think, but ultimately this Court has power to do some things that the Joint Official Liquidators do not necessarily have.

THE COURT: Maybe; but I mean, is there any reason why the JOLs have intervened in this lawsuit, or y'all haven't joined them in this lawsuit?

MR. MCCARTY: Your Honor, I don't believe that the Joint Official Liquidators have made a decision about that.

THE COURT: Okay. But you can make a decision to sue them.

MR. MCCARTY: The Joint Official Liquidators?

THE COURT: Yes.

MR. MCCARTY: Your Honor, I don't think that there is a need to sue HoldCo.

THE COURT: Well, join them as a -- in some capacity.

MR. MCCARTY: Well, but -- but your question begs the question, right? Who -- who are we accusing of malfeasance against my charities?

THE COURT: I get that. But whatever the

outcome in this case is, it seems to me will have some impact on the litigation going on in the Cayman Islands and vice versa, depending upon who gets there first, the outcome of the litigation in the Cayman Islands will have an impact on this case.

MR. MCCARTY: I would also say, Your Honor, and it's important to your question because I don't want to leave anything unsaid --

THE COURT: You can sit down if you want.

MR. MCCARTY: Yeah. So -- thank you.

Importantly, Your Honor, the Cayman liquidators, the official liquidators who are obviously, as you understand, officers of the Court in the Cayman Islands, have not yet been recognized in the United States under a Chapter 15.

THE COURT: Yeah, but they've filed a Chapter 15 proceeding.

MR. MCCARTY: They have filed a proceeding, but they have not received recognition in the US.

THE COURT: What are the odds of that being denied?

MR. MCCARTY: Well, Your Honor, I -- I have no idea. I don't know if they're going to contest it, if the other side is going to contest it. And I don't see any reason why we would contest it, and I don't

believe we will contest it. It is not scheduled right now for a hearing.

And so until they are recognized in the United States, they cannot...

THE COURT: Right. Okay. At some point in the very near future, we need to address Rule 39 and its application in this case, if we can figure out a schedule of how to do that. We want to be efficient, whether it's here or in the Cayman Islands. One place or the other seems to be the appropriate place to do this.

So let's think about and discuss at the end of the day a schedule of how we are going to deal with Rule 39 and whether we have the necessary party issue to deal with it.

Again, these are not rulings. These are just thoughts to throw out there to help you-all guide in your discussions. It seems to me that the Plaintiffs probably have it -- well, let me back up.

There are at least five different categories of subject matter jurisdiction: You know -- you -- you have standing, which is a component of subject matter jurisdiction.

You have statutory subject matter jurisdiction. If you were in federal court, you'd have

federal question or diversity. 25A.004(b), it defines subject matter -- or statutory subject matter jurisdiction.

You can have all sorts of things. I don't think capacity is a matter of subject matter jurisdiction, but those deal with whether we have the correct parties in the case and who really owns the claims.

Now, I noticed going through the Cayman pleading, and I mentioned it before we got started, Paragraph 73.2, romanette (ii) says, "Except it's provided herein." And I think were talking about the Limited Partnership Agreement, "The limited partners," which should be HoldCo and management, right?

"In their capacity as limited partners shall not participate." And I think we're really talking about your clients. "Limited partners shall not participate in the management of or have any control over the partnership's business or shall the limited partners have the power to represent, act for, sign for, or bind the general partner or the partnership."

And so I'm curious how that plays out in this case.

MR. MCCARTY: Well, Your Honor, I think it's fairly straightforward; and again, I'll refer back

to the Feiner family case and Cayman law. Just because there is not power granted under the partnership agreements, just like we have in the United States and in every state, we have other governing law over corporate structures.

And what we have pled, and what is very clear in Cayman law -- and I'm happy to brief this further for the Court -- is that they have -- that Mr. Patrick, as the control person in his various forms, had obligations to my clients that were outside of the partnership agreement.

THE COURT: Okay.

MR. MCCARTY: And -- and just because we can -- of course, we know you can have any sort of articles, governing articles, in Texas, or Delaware, or elsewhere, they don't trump the law. And so when he breaches -- they don't trump the law. The law may provide --

THE COURT: I think -- I'm fairly confident, at least under the Texas Business Organizations Code, that partnership agreements can modify.

MR. MCCARTY: They can. Under Cayman law, it's not the same.

THE COURT: Okay.

MR. MCCARTY: And regardless of the powers granted under the partnership agreement, which was the Amended and Restated Limited Partnership Agreement, they govern the fund, but also govern some of the matters and structure of the fund, despite saying that there were a lot of obligations, et cetera, which we think are important for other reasons.

But despite saying all these obligations, Mr. Patrick certainly did not honor those. And please don't hold me to Mr. Patrick. When I say "Mr. Patrick," Mr. Patrick is all that --

THE COURT: A lot of technical support.

MR. MCCARTY: Right.

So he did not -- you know, obviously did not honor that particular mandate, if you want to call it that, in the Amended and Restated Limited Partnership Agreement. But in addition to that, there is Cayman law, UK Commonwealth law, that applies as an umbrella over that, that says you cannot -- you cannot exercise your powers in a way that breaches certain duties to shareholders, et cetera.

THE COURT: You know, I -- and I'm sure that's correct. That's fairly universal.

MR. MCCARTY: Right.

THE COURT: But this just says who can

represent the limited partners.  Basically it says they don't have the capacity to bring claims on behalf of the partnership.

MR. MCCARTY:  Well, we know this:  The limited partners were able to walk into the Cayman Islands Grand Court and ask for and receive an equitable lining out.

THE COURT:  Right.

MR. MCCARTY:  So they have power.

THE COURT:  Yeah, and that's why we have JOLs because the JOLs are now representing the interest of the fund, the partnership.

MR. MCCARTY:  Well, that is correct because of that action, yes.

THE COURT:  All right.

So one of the other things we're going to need to talk about briefing-wise is what impact this provision of the Limited Partnership Agreement has on this Court's ability to proceed with you-all.  And it may be that there are some causes of action that we can carve out.  You're talking about direct causes of action?

MR. MCCARTY:  Yes.

THE COURT:  Okay.  Maybe that's all we can go forward with.  Maybe not.  I don't know.  And the

folks over here to my left (indicating) haven't had a chance to address anything yet.

MR. MCCARTY: He's listening and taking notes.

MR. SHAW: Judge, I'm loving this right now.

THE COURT: Well love it, because you're about to not love it so much.

But -- so I'm concerned about Rule 39. I'm concerned about this provision of the Limited Partnership Agreement.

Now, I'm just throwing it out for discussion, it seems to me that for having a directed particularized standing type injury, that component of subject matter jurisdiction -- and we need to be clear in the types of subject matter jurisdiction issues we're talking about.

One is statutory jurisdiction. You know, what part of this Government Code 25A.004(b) applies, if any? And particularized injury standing. Two completely different topics.

Now -- and, yeah, I can be persuaded otherwise, but my sense at the moment is the Plaintiffs have, certainly for direct claims, but for some of these corporate claims -- correct. For the direct claims, you

don't -- you know. We'll figure out what section they might go under.

For the claims that flow through the green entity on Court Exhibit Number 1, the Plaintiffs probably have sufficient particularized standing injury there, but I am very concerned about that capacity.

And so one question that I would have is the briefs that are before me, the motion and whatever, the discussion is -- is captioned and labeled jurisdiction, but the substance of it seems to be -- also be about capacity.

MR. MCCARTY: Well, Your Honor -

THE COURT: You can sit down. Whatever is comfortable. Don't feel compelled to stand up.

MR. MCCARTY: I'm sorry. It's --

THE COURT: Then stand up if you want to stand.

MR. MCCARTY: If you want me to sit down, I will. Thank you.

But, Your Honor, the -- first of all, it's not labeled capacity. Capacity can be waived. Your Honor is raising it sua sponte. And I think that's obviously the Court's providence, but this was brought as a matter of standing under the typical three components of standing: Injury, traceability, and

redressability, and under whether this Court has particular subject matter jurisdictions under Chapter 25A.

And so we -- you know, that is what we briefed obviously. I understand the Court's interest in joinder parties and all those other issues, but I think on those two issues, which were -- I -- I know we're both here to talk about today, we -- we believe that without question, we have standing under -- we have standing, and we have subject matter jurisdiction in this Court.

THE COURT: No, I've got that. I -- I guess my question is the substance of the argument seems to talk about both concepts: Injury standing, statutory subject matter jurisdiction, and capacity. I mean, granted the motion's called a motion to dismiss, and there's a lot of discussion about statutory stuff.

MR. MCCARTY: Well, if we wanted --

THE COURT: No, let me finish.

MR. MCCARTY: Sure.

THE COURT: My question is if -- the Supreme Court for the last 30-plus years has been abundantly clear. They want courts, lower courts, to deal with things on the substance, on the merits, as opposed to technicalities. I've learned that.

So if -- in substance, we're talking about both things -- if we're talking about subject matter jurisdiction and its components and capacity, is there anything else that needs to be said to enable the Court to make a ruling on capacity issues, or do you need to brief that separately?

MR. MCCARTY: Well, Your Honor, we can brief it separately, and would be happy to do so. I would suggest to the Court that on our direct claims; which again, I will hopefully make abundantly clear to the Court, there is no question that the Plaintiff charities have the capacity to bring those direct claims.

THE COURT: Well, direct claims, that would seem to be sensical. It's the things that flow through HoldCo and the fund that I am concerned about.

MR. MCCARTY: Well, Your Honor, all of these actions were taken by the control person acting in different capacities, okay? He was acting as the GP of the fund. He was acting as sole managing shareholder of HoldCo. He was acting as the sole member of the DFW Charitable Foundation. He was acting as the sole person in charge of CDMCFAD. He was acting in all of those capacities. All of those are governing capacities, and he set all of the wheels in motion, and thus, absolutely

has liability.

THE COURT: Okay. We're not concerned with liability at this point.

MR. MCCARTY: Well, that's --

THE COURT: We're trying to figure out where these claims are going to go forward. And maybe some of them go forward here, and some of them go forward in the Caymans. Maybe they all go here, maybe they all go there, but I don't want the same claims going on in two places at the same time.

MR. MCCARTY: Well, I would suggest, Your Honor, but liability -- the only reason I mention liability is due to traceability being addressed.

THE COURT: Yeah, I got that.

Okay. Y'all have been very patient and quiet over here to my left (indicating).

MR. SHAW: I have to stand up just so I can work out.

THE COURT: Okay. That's fine. Go to the podium if you want. I am decidedly not a federal Court. I don't want to be a federal Court, so whatever you're comfortable with.

MR. SHAW: Understood, Judge.

THE COURT: Go ahead.

MR. SHAW: We're ready to make argument?

THE COURT: No, I -- just talk about the things that we've been talking about if you want to, or you can proceed to your argument. I think I've laid out some of my thoughts and concerns.

And listen, if y'all want to take ten minutes to regather your thoughts based upon anything that I've said, I'm happy to accommodate that. I want the best picture of an argument that we can get.

MR. SHAW: I will just first comment about what you've said so far, and then if I can get into my argument, I --

THE COURT: Sure.

MR. SHAW: I'll -- I'll move to the -- to the lectern here.

THE COURT: Whatever you are the most comfortable with doing.

MR. SHAW: Judge, in general terms, I wholeheartedly agree with a lot of what you are saying, if not all. On the capacity issue, we would -- would like to brief that --

THE COURT: Okay.

MR. SHAW: -- to have additional briefing if we're going to look at the capacity, we have to look at that as a discrete issue, but we would want to look at that.

THE COURT: Phillip, make sure when we're done that we set some schedules for these agreeable things.

MR. SHAW: We share the Court's concern with regard to Rule 39 and the fact that all the relevant parties are here in order to afford full relief.

And overall, you know, the last comment you made, Judge, about trying the same things that are being tried in other places is our overarching concern. I think that, you know, we made clear that we're not saying that nobody has a right to a cause of action against anybody here. We're not saying that there is no redress. There is a redress. There is just an appropriate time and place for that.

The record, Judge, I think is pretty clear what is actually going on here, right? It's a fight over the control of the charitable DAF, as we referred to it in general.

THE COURT: Right.

MR. SHAW: And, you know, the record that was submitted by the Plaintiffs makes pretty clear that Mr. Patrick and Mr. Murphy are duly authorized control persons for what we call the charitable DAF.

THE COURT: Right.

MR. SHAW: We know that Mr. Dondero is funding the litigation that is proceeding.

Mr. Dondero does not like the status quo. He doesn't like that Mr. Patrick and Mr. Murphy are the control people. We get that. That's the overarching dispute here. There are allegations of wrongdoing, and in our time and place we will dispute that, and we will have a factfinder make a determination on that.

I -- I thought it was interesting that counsel said that what they're seeking is something different than what the JOLs are seeking. They're seeking -- they're seeking a receivership. They want to take over. They want someone else to take over.

So I don't know how we can say that the relief sought here is somehow different than what is being sought in the Chapter 15 or in the Cayman.

And ultimately the question here is, you know, we have these three different actions now: A Cayman liquidation; a Cayman lawsuit has been filed.

THE COURT: You know, maybe we can arrange for this Court to sit in the Cayman Islands?

MR. SHAW: It would be nice. Yeah, after hurricane season, I think. We want to wait until, you know, November or something like that.

But, you know, we have this Delaware

Chapter 15 pending, and now we have this case. So as the Defendants here, what we're simply saying is, you know, does this Court of limited jurisdiction, should this remain the third front in this litigation onslaught?

Should this be another vehicle to tap the resources of the charitable DAF, the charitable DAF that ultimately Mr. Dondero claims he is acting on behalf of? This all costs money. The liquidation costs money in the Caymans, the Chapter 15 costs money in -- in Delaware, and this action costs money as well, ultimately money that can't be provided to the charities.

I also want to make the distinction between the clients that are being represented here. Those are not the ultimate charities.

THE COURT: I got that.

MR. SHAW: Yeah. And so these are these Highland supporting organizations, each of which Mr. Dondero serves as a director.

So we say no, this is -- this is a round-peg-square-hole issue. And I was sitting over here thinking -- it wasn't because I was hungry, but I was thinking about a pretzel. That's all I could think about when I was listening to the conversation. We are

getting into a pretzel because this is the improper procedural method. And what they're doing here wasn't to run around the Caymans or around the due process of things, done right before the 4th of July in order to try to bullrush.

That's why we're having all these issues. That's why we're trying to create causes of action where they don't exist. These are the wrong plaintiffs bringing the wrong claims. They don't have everyone here that needs to be here, and it's in the wrong court.

You know, addressing the statutory construction issue, which obviously is key to determining whether this Court has subject matter jurisdiction. Plaintiffs say this is easy. Just look at the statute, done, done deal, mic drop, we don't even need the Judge, based upon their interpretation of the statute. I think it's a little bit more nuanced, and I think we need you.

This -- you know, and -- and I do want to point to one point issue, too, which is, you know, we referenced a Delaware law. We said that Delaware is currently the preeminent corporate governance venue.

You know, and I appreciate the bravado here, and I want Texas to be the preeminent corporate governance, but I don't think we can spike the ball

quite yet after less than a year. And what -- what is being promoted as an interpretation of this Court's governance as -- as the ability of this Court is really dangerous to that whole concept because what they say is that a stranger to an entity can sue another entity for a corporate governance issue, and I have a problem with that.

The Plaintiffs also offer no limiting principle at all and in particular to B(2). There is no limit. They say if we say it's about corporate governance and we meet the amount of controversy requirement, we're good, and I don't think that's the case.

So to your point, Judge, you talked about standing. We don't have any cases about standing in the context of the Texas Business Courts. And I recognize that the Texas Supreme Court has in recent years talked about standing since the term "standing" has been misused -- well -- and overly broad application.

We don't know quite how the Texas Supreme Court is going to characterize the issues that we've raised here because it hasn't gone up to the Texas Supreme Court yet. So we don't know if the Texas Supreme Court is going to call these issues standing or what they are going to call them; but typically, we are

in a court of general jurisdiction. We're in a district court. And when we're talking about subject matter, we're talking about something different than what we're talking about here.

So but I -- I don't think that label is really what's going to change the day here. I think it's about what the statute says and what claims and causes of action have been alleged here.

I also think it's an important point to talk about the legislative knowledge. When this statute was enacted that the legislature -- and I am quoting from *Paxton v. Annunciation House, Inc.*, which is a 2025 Texas Supreme Court case. The legislature uses statutory language with complete knowledge of existing law and with reference to it.

So when the Texas Legislature enacted the statute that governs this Court's subject matter jurisdiction, it took into account the existing causes of action, the cognizable causes of action that were available in Texas with regard to corporate governance and with regard to the breach of fiduciary duty, and with regard to the other issues that are in the statute. And so we have to read the statute with the recognition of that.

I'm going to take the first, what I believe

is the kind of low-hanging fruit subsections first, and then go to b(2) because b(2) is the broadest, I believe.

THE COURT: Yeah. And just for everybody's benefit, I struggle to see how b(4) and (5) apply on their terms. B(2) is their best shot. That's not to say that I am excluding 4 or 5, but I think their best shot is under b(2).

And just -- my thought is they are within the class of people that the legislature probably contemplated would have the ability to invoke b(2). They're not strangers off the street. They are the beneficial interest of the limited partnership that was created to provide -- to them to provide downstream to charities.

MR. SHAW: My job is to dissuade you from --

THE COURT: Your job is to persuade me otherwise.

MR. SHAW: -- when you pen your opinion. So I will start with these ones because I like these first.

Before -- it says "the organization" I think that term "the organization" is the real key part there.

THE COURT: Okay. Hang on a second. I've

got b(4) in front of me. It's an action by an organization -- that's not -- that's not in our case -- by an owner of an organization, okay? And so they're claiming to be owner of an organization, but I think the only organization that they are arguing to be an owner of is HoldCo, right?

MR. SHAW: Exactly right.

THE COURT: Okay. And so it's brought by them, Plaintiffs, against a controlling person, which I -- I believe they believe is Mr. Patrick of -- and he's acting as a controlling person of HoldCo; is that right?

MR. SHAW: That's exactly right. "The organization."

THE COURT: "The organization." Alleges an act or admission by Mr. Patrick in his capacity as a controlling person of HoldCo.

MR. SHAW: Exactly.

THE COURT: Is that what they're arguing?

MR. SHAW: That's what I understood.

THE COURT: Okay. Address that.

MR. SHAW: Well, the point there is that sub (a) talks about "the organization". So "the organization" is not even a party in this lawsuit.

THE COURT: Yeah.

MR. SHAW: And that's what doesn't make any sense.

THE COURT: Well, there's an owner of HoldCo, and HoldCo's not a party.

MR. SHAW: Correct.

THE COURT: But it seems to me they're complaining about his conduct as a controlling person of HoldCo.

MR. SHAW: As a completely separate entity.

THE COURT: Right, as a completely separate entity, and of the fund, probably, as well, which brings me back to Rule 39, and necessary parties in their capacity, and things like that.

MR. SHAW: Exactly, Your Honor.

THE COURT: Go ahead.

MR. SHAW: So I think that addresses b(4). B(5) is -- I'll call it the -- the loyalty, good faith, breach of fiduciary duty claim or -- or subsection.

THE COURT: Right.

MR. SHAW: You know, we believe that that section encompasses derivative actions. We agree with the Plaintiff that it doesn't only encompass derivative actions.

THE COURT: Correct.

MR. SHAW: It also encompasses actions by

an organization against its officers, directors, and managers.

THE COURT: Now, hang on a second. I think -- I think the test is -- somewhere -- are the Plaintiffs suing the Defendants in Defendants' capacity as a controlling person of an organization of which the Plaintiffs are an owner --

MR. SHAW: Exactly.

THE COURT: -- right? If only the legislature would ask me to write this statute. We'd be a lot better off. Okay. That's b(4); is that --

MR. SHAW: Correct. That's b(4). This has the ownership of provision there.

THE COURT: Okay. Go ahead with b(5).

MR. SHAW: And then b(5) also has an owner requirement. And it also talks about breach of fiduciary duty or loyalty -- it doesn't say breach of fiduciary duty, it says loyalty and good faith, the same thing.

Again, we think that encompasses both derivative action, not exclusively because b(1) has derivative, but also an action by an organization against a director, officer, et cetera, of that organization.

THE COURT: Right.

MR. SHAW: And that's, again, not what we have here.

THE COURT: Not completely.

MR. SHAW: So and again, I -- I go back to that touch point with the *Paxton v. Annunciation* case, which is the legislature was thinking about what is the body of existing corporate law and can someone sue in this capacity when we're interpreting the statute when they were drafting this. They don't point to any analogous case in Texas that would provide them some remedy that's akin to what they are asking for.

So b(2) is where I got a lot of this. And b(2) is obviously a very, very broad statute. And, you know, we have at least one sister Court of this Court that has expressed the broad nature of that Court or of the actual provision.

So what I -- what I think is important is we've talked about what is an action regarding, and then for shorthand, I'm saying corporate governance. What is an action -- quote, action regarding corporate governance?

They say, well, we've alleged facts about corporate governance of two non-parties to this litigation. And it's more than $5 million, and, ergo, this court has subject matter jurisdiction.

THE COURT: Aren't they really asserting a derivative claim?

MR. SHAW: That's how we read it, but they then disavowed that they were asserting a derivative claim.

THE COURT: Aren't you really asserting a derivative claim?

MR. MCCARTY: Absolutely not. And I will demonstrate that, I think.

THE COURT: All right.

MR. SHAW: So, you know, we have these non-party claims, and I go back to this square peg, round hole. That's the problem here, and that's what's creating these issues. So they don't seek any relief against the non-parties that they're claiming that this is about corporate governance. They are not parties, and there are no claims against either of them.

I don't know what ultimately a trial looks like. How do they -- and this goes to the Court's issue with Rule 39, how do you afford relief with regard to the corporate governance of two non-parties? I don't -- I don't know what effect that has at all.

So that's the problem. And I think what we need to go back to is, again, what does "action regarding" mean? Our position is that action regarding

is not just a fact pattern that touches upon corporate governance. That action regarding means that you have alleged a cognizable cause of action regarding corporate governance. That's it. Alleged a cognizable cause of action regarding corporate governance.

THE COURT: What does that mean?

MR. SHAW: It's something that's recognized by Texas law. That -- that you can't -- that -- and that can afford relief; so for example, that --

THE COURT: Well, the Cayman case would be under Cayman law. Internal affairs have --

MR. SHAW: It would be, and I haven't gone through all the different corporate documents. We do have some Delaware entities, we have some -- you know, but for those particular entities, you're right. But these are two -- these are two non-parties, nonparticipants in those entities, battling it out in Texas Business Court with regard to their corporate governance of two entities that are not part of the lawsuit.

So to your question, what does corporate governance look like? What does a cause of action regarding corporate governance look like? Well, it looks typically like a derivative claim or a claim by -- or a direct claim that somebody violated the corporate

governance documents that --

THE COURT: Which by our statute would be, for example, a breach of the partnership agreement or the bylaws, or things like that.

MR. SHAW: Exactly. And, you know, Judge, we go back to look and, you know, the -- that Rook case that we -- that we point to. You know, the Rook case refused to say that the statute only involved internal corporate governance. The Court rejected that.

And I -- from my reading of that case, the Court did that because it says the plain language does not say anything about internal corporate governance; and therefore, I am not going to limit the statute.

THE COURT: Let me ask you this question, a little bit off topic, but what charities are getting the fund of the money now?

MR. SHAW: We are -- no one is right now. We are in the process of naming new charities, but that has not -- and obviously, we have all this going on, so I don't know where that stands as of this moment, but I know that is in process.

THE COURT: Is there any thought to creating a way to get the money back to the original charities and bypasses the supportive organizations?

MR. SHAW: I think that could -- that -- I

don't see why that could not be a part of some resolution at some point. I can't commit to that, but I hear what you're saying.

THE COURT: Wouldn't that make sense as a way to resolve things, is to create a new structure that goes back to the intended beneficiaries?

MR. SHAW: Judge, I've learned a long time ago in this litigation with Highland and others that suggestions like that absolutely sound great. And we -- and I would agree, but I suspect that we would not have an agreement to address that.

THE COURT: That's just an opinion. Let's move on.

MR. SHAW. But this -- this is about control, and that's it.

THE COURT: Right. And I got it.

MR. SHAW: So going back to this action regarding -- I think that -- and if you look at that C-1031 LLC case, which is a Third Division.

THE COURT: Yeah, I'm -- kind of what I'm thinking is according to the partnership agreement, all the money that's in the fund is supposed to go way downstream to these four supported organizations, and if it's not happening, is that not a matter of governance?

MR. SHAW: A matter of governance over any

of the parties that are parties to this case, I would say no because it's --

THE COURT: The governance of HoldCo, and really the fund, I think is the key.

MR. SHAW: I think the question goes back to whether these parties have standing to assert those claims.

THE COURT: All right. But that's a different issue. Okay.

MR. SHAW: Are there corporate governance issues in this case as a -- are there facts alleged? Yes, they allege facts with regard to corporate governance. Our point is, is that that is not enough, that you have to allege causes of action that you can pursue with regard to corporate governance.

THE COURT: But that's a capacity issue.

MR. SHAW: And I hear you, Judge. I don't know whether we call it capacity or whether it's a jurisdictional issue. I think this is -- obviously, we're making law here because there's not any on it, but I don't know the answer to that, whether that is a capacity issue that we challenge through some other mechanism other than a motion to dismiss, or if it is a plea to the jurisdiction verses a dismissal. We've brought it as a motion to dismiss.

THE COURT: Yeah, I'm just reminding people that I'm very mindful of the Supreme Court direction to not get hung up on labels of documents dealing with the substance of the arguments presented, so...

MR. SHAW: And I am with you. I think that the Supreme Court also has a countervailing public policy, that we want to be efficient, that we don't want to try the same thing over and over again. We don't want to have three people pursuing three different -- arguing the same thing in three different venues, and that's why we have standing issues here.

So we're not here to get tripped up on technicalities. This is not a gotcha. This is we need to be efficient, and we need to pursue this. And we're ready to go. We're ready -- we're ready to dispute these allegations. We're ready to fight them and to demonstrate that they're wrong. But we want to do it in the appropriate place, and we don't want to do it in five or six different forums.

We want to do it where it should be held, which is either in the Caymans, or through the Chapter 15, or if the JOLs want to come down here and assert claims, we're happy to dispute them here. Our issue is these Plaintiffs, with these claims, in this Court.

I want to touch upon, just real quickly, the -- that on the court case that we cite out of Delaware, understanding that this Court is not bound by Delaware law, but, you know, it does stand for the premise that a stranger to a corporation does not have the ability or capacity or standing to dispute the corporate governance of a stranger here.

And I think that goes to, you know, our hypothetical -- Exxon, Chevron hypothetical. There's a danger here in a ruling that could creep outside of this particular set of facts and really trip up the jurisdictional basis for this Court.

And again, I -- I point to the fact that there is no limiting principle that is offered by the Plaintiffs at all. They simply say fact pattern regarding corporate governance, you know, amount in controversy, and legality.

So, you know, I've been talking for a while, so I'll -- yeah, I'll conclude. I want to emphasize that, and we've said this from the get-go, we are not saying that no one has a cause of action and that there is not a remedy.

And while we dispute the underlying facts, there is going to be a time and place that we are going to have an up or down before a factfinder. And so be

it.  So be it.

What we want to do is to be good stewards of the DAF's resources.  We want to litigate this in an efficient way in the correct and appropriate forums, and we believe this Court is not the correct and appropriate forum; and therefore, we ask the Court to dismiss the case based upon a lack of subject matter jurisdiction.

THE COURT:  Do you thing that your clients are subject personal jurisdiction in the Cayman Islands?

MR. SHAW:  I've got a lot of clients, so I've got to be careful -- I've got to be careful without a list, and I don't want this to be --

THE COURT:  You don't have to give me an answer right now, but think about that.

MR. SHAW:  I really dislike not giving you an answer, but that one I don't know.

THE COURT:  Well, listen, business court is a different experience.  And what I want to do is have conversations among people so that we can get to the bottom of things.

MR. SHAW:  Understood.  Well, I'm going to stick by my non-answer.

THE COURT:  That's fine.  At this stage, at least, that's a perfectly acceptable answer.

MR. SHAW:  Thank you for your time, Judge.

MR. MCCARTY: Thank you, Your Honor.

I am happy to be in business court, and I appreciate the mission of the court very much. I understood the mission of the court before it was formed. I'm happy to see it formed now.

So with permission, Your Honor, I am going to hand out a few things: One, I'm going to hand out something akin to what you've done, which are structure charts. It's the same structure charts that you see before you.

THE COURT: Right. Okay. I've got those.

MR. MCCARTY: And these are kind of -- the reason I am handing them up is because it will be a little bit easier to follow along with the PowerPoint that I think Mr. Warner is going to help with.

MR. WARNER: May I approach to plug in, Your Honor?

THE COURT: Yes, sure. And let's get those marked for the record.

MR. MCCARTY: And then, Your Honor, I'm going to go ahead and give counsel a couple of copies of this PowerPoint. It's a little more animated.

Would you like a copy?

THE COURT: Sure.

MR. MCCARTY: If you want one.

THE COURT: Yeah.

MR. MCCARTY: And I am a visual person as well, Your Honor, which is one of the reasons why we are doing the PowerPoint because it is a complex issue, but it demonstrates largely the correctness of our claims, and then why we think, obviously, there is standing here and -- the purpose of our claims, and why we are standing here, and why we think this Court has subject matter jurisdiction.

Now, one thing I want to stay off the bat is we have heard that there's been a standing decision in this Court, et cetera, and maybe he meant subject matter jurisdiction, but --

(Off-the-record discussion between counsel.)

THE COURT: Just tell me what slide you're on because I don't have eyes in the back of my head.

MR. MCCARTY: Yeah, I understand. So right now, I'm on the final slide. But standing is a constitutional matter. There's no difference in standing between this Court or any other Court in the State of Texas.

And so I don't think that's an issue. I think 25A is new, and there's subject matter jurisdiction under 25A. But I'll start with that, and

then move into the presentation. And as I go through, hopefully I'll answer all of the questions raised by Mr. Shaw. I am moving to Slide 2.

So we've heard a lot about Mr. Dondero, both in the briefing and somewhat this morning. But Ms. Diaz is here on behalf of The Dallas Foundation, which is one of the main recipients. And these recipients have done a lot of money -- a lot of good with the $270 million that Mr. Dondero gifted these charities, and that is true. Mr. Patrick did not provide the $270 million. Nobody else did.

So to the idea that Mr. Dondero cares about this case -- he cares equally, I'm sure, about this case; however, that is not who controls these charities. And if we eventually get to the point where we talk about it on the merits, I have no doubt that Ms. Diaz is going to explain, as well as some of her colleagues of the other organizations, will explain that they control these supporting organizations, and these supporting organizations, obviously, on their overall organizations.

Okay. With that, I want to move into --

THE COURT: And there's tax code reasons why --

MR. MCCARTY: There's tax code reasons --

and -- and, Your Honor, yeah, that's -- this is a good time to address the question that you had earlier. Could -- could Mr. Patrick, if he wanted to, fund The Dallas Foundation directly? I think the problem with that is the tax code.

THE COURT: Well, it's not a question of Mr. Dondero. I mean, he could do that any time he wants. The question is money that's in the fund.

MR. MCCARTY: Right. Could Mr. Patrick do that without a supporting organization? I don't know that it could, but I'm not a tax lawyer. I'm not a corporate lawyer. I'm just a litigator, so I don't want to get into that too much, but I think there are complications with that.

But again, and I'm jumping way ahead here, but that is one of the reasons why a neutral party should be in place, so that we can start moving charitable funds back to where it needs to go. And make no mistake, the absence of $270 million is making an impact.

THE COURT: Well, I'm sure, yeah.

But the ultimate question is, I think, how did we get money back into the charities where it was intended to go? Isn't that...

MR. MCCARTY: Yes. Absolutely. That is

the question.  Today we'll get through -- I hope get through some of the preliminaries and get us along that road.

So I'm moving to the second side, which is just the claims that show jurisdiction.

Okay.  I'm going to start with some background because the background sets out the claims at issue here.  So we start --  we start -- oh.

THE COURT:  Hang on a second.  Let me number these pages here.  So we --

MR. MCCARTY:  Unfortunately, Your Honor, for your --

THE COURT:  I'm still numbering.

(There was a pause in the proceedings.)

THE COURT:  Okay.  What slide are you on?

MR. MCCARTY:  I am on Slide 4.

Now, there's -- I've tried to save you a headache by giving you these slides.  I thought you would have a monitor.  There are a bunch of slides we sort of animate through.

THE COURT:  Yeah.

MR. MCCARTY:  So I skipped a bunch of animation.  This is not animation, but I'll tell you what it is.

THE COURT:  So we're going to call this

Plaintiff's Exhibit 1?

MR. MCCARTY: Sure.

(PX-1 was marked for and admitted.)

MR. SHAW: And it's demonstrative.

THE COURT: It's just demonstrative.

MR. MCCARTY: Right. Of course -- of course.

So way back in November of 2023, we know that the participating charities, the Highland Foundations, had 100 percent ownership of the economic interest in Charitable DAF HoldCo, okay? We also know that by September of 2024, those interests -- or HoldCo's interests were worth $270 million. And again, the participating shareholders still held all of the ownership interests. And this looks quiet --

THE COURT: All of the economic interests.

MR. MCCARTY: All of the economic interests, that's correct. They held participating shares. They own those participating shares.

So this also looks quiet from November of 2023 to September of '24; however, unfortunately it was not. It was all in the dark to my clients, the charities. But during that time, Mr. Patrick had engaged lawyers to answer certain questions, and I almost think -- this is an important slide.

So this is the next slide.

THE COURT: 5.

MR. MCCARTY: 5. There is no animation here.

I almost think I can begin and end with this slide, because this slide shows everything. This was a work plan generated by a law firm directed by Mr. Patrick. And the work plan in November of '23, well before anybody knew anything, so to speak, this law firm -- this law firm asked the following questions: Can the controlling person -- it's the words -- dilute the shares -- the participation shares; e.g., the participating shares. All their words.

Can the participating person redeem shares; e.g., the participating shares? Okay. Those are questions about governance I would suggest to the Court, no question.

Second -- or last, and really straight to the point, Could HoldCo liquidate, distribute all its assets elsewhere, or otherwise make the participation shares, which belong to my clients, worthless, okay?

That is not a question at this point of whether they did something to shut down and drain money, et cetera, from HoldCo. That is a direct attack on the participating shareholders' interest, the Plaintiffs'

charities' interest --

THE COURT: Uh-huh.

MR. MCCARTY: -- all right? It was how do we make their shares worthless, okay?

Moving to the next --

THE COURT: Just so we're clear if or when the Court reads this record, I just want to interject now that the slides that you gave me, I have marked as PX-1. I've numbered each of the pages in my own handwriting; otherwise, I'm not going to write on them, and they'll be part of the record for this hearing.

MR. MCCARTY: Thank you, Your Honor.

Okay. So -- but what does start happening in 2024? Mr. Patrick began restricting access to the fund records, specifically financial statements, et cetera. And so, in other words, he begins to operate in the dark.

Moving ahead. Now I am sort of getting to what will probably be Slide 6 and bringing in various points in the record. On November 11th of 2024, the supporting organizations, the Plaintiff charities here, sent a letter saying, "We no longer have conference in the governance structure of HoldCo."

And so why did that come out of the blue? Well, I don't want to get into the merits, though it

will certainly be covered in the receivership, too much, but what we have --

THE COURT: A little presumptive.

MR. SHAW: Well, it is presumptive, I'm sorry, Your Honor, so I understand that we have to -- we have to get through this first before we get there. But why did they send a letter on November 11th, 2024?

Well, there was a lack of transparency. But in addition to a lack of transparency, there had been investigations into Mr. Patrick and what he had been up to. So three highlights, low lights, or whatever you want to call them, of what Mr. Patrick was doing at that time was one, he had formed a charity and asked for a donation from the funds of $10,000 a year. What he failed to disclose was that charity was controlled by his family.

The next thing Mr. Patrick did during this time period -- or this earlier time period, was he attempted to provide a tip of non-public material information to one of the funds -- to one of the foundations, such that they could trade one that which, obviously, was a breach of securities law and was a breach of corporate policy, obviously, of Highland Capital.

And finally, and maybe most concerning,

there was credible evidence, a former law-enforcement official, who had a company, was a vendor, that he had been approached by Mr. Patrick to engage in a kickback scheme.

And so all of these things combined with a lack of transparency around financial stability of the fund, $270 million, obviously concerned the charities greatly, and they wanted to fix it, for lack of a better word. Mr. Patrick and the others involved eventually responded, and we will get to that in a minute.

Okay. So the first thing that Mr. Patrick seems to have done in response was to form the DFW Charitable Foundation. That's all he did. He formed an entity in Delaware, and it's sitting there. That was on December 9th, 2024.

The next thing he does two days later, and he has a video call with Mr. Murphy and others, and with my clients, that says we are creating a professional institutional vehicle for the benefit of its charitable purposes and the charitable owners, okay? He's just formed a new charity.

THE COURT: Mm-hmm.

MR. MCCARTY: Two days later, after that representation, Mr. Patrick forms CDMCFAD, which of course, as you know, ultimately became the blocking

mechanism, and ultimately became the replacement for HoldCo, and now owns the fund, at least on paper.

One day later, his counsel, Mr. Patrick's counsel, follows up with the participating shareholders' counsel and says this, "The DAF is actively working on one or more development projects your clients will benefit from for many years to come."  Blatant fraud. They're implementing the scheme right now.

All right.  Six days later, Patrick has HoldCo essentially exchange its interest, so this is -- so six days after, he says, "You'll have it for years to come."

All of this is unbeknownst to my clients, and all of this is with Mr. Patrick is on both sides of the transaction in his governing positions, in his control position.  And at that point, on December 18th, 2024, he has HoldCo exchange its interest in the DAF fund, so it held a hundred percent of interest in the DAF fund.

He had to give it to CDMCFAD, and return -- the triangle completes with CDMCFAD, giving a hundred percent of its interest to HoldCo, right?  So essentially what you have now is you have HoldCo, not the fund, okay?  You have HoldCo, CDMCFAD, and the fund.

THE COURT:  So it sounds like things have

gone full circle.

MR. MCCARTY: Right.

THE COURT: Right. So at this point HoldCo is --

MR. MCCARTY: HoldCo still has a hundred percent interest, but through CDMCFAD --

THE COURT: Right.

MR. MCCARTY: -- which is now a new Delaware entity --

THE COURT: Okay.

MR. MCCARTY: -- all right? Why? Well, what do we do with -- nobody even knew at the time what happened, which would've been an interesting thing for the supporting shareholders to know that their interest had been exchanged, but it's not disclosed, of course.

And we believe that that was done to avoid certain responsibilities that Mr. Patrick had in the Cayman Islands under the new structure.

THE COURT: The difference between Delaware law and Cayman law, you're suggesting?

MR. MCCARTY: Yes, and other governing documents.

So then on January 23rd -- so the holidays passed, we still don't have financial statements. And when I say "we," you have, of course, the shareholders,

the charities, still don't have financial statements, still trying to understand what's going on in the letter. Their letter has been ignored. There's been no response to, you know, the really overarching governance issues. So they, again, demanded clarity into the fund's financial position.

January 28th, having received no response to our owners request, the winding up of the Charitable DAF. Well, that gets -- apparently that gets Mr. Patrick's attention. And then on February 7th, Mr. Patrick uses his control position to issue new shares in The Charitable DAF HoldCo to DFW Charitable Foundation.

So he -- the charitable organization that is formed on December 9th now receives 51 -- 51 percent of that HoldCo, okay? So now 49 percent is owned by the my clients of that HoldCo. 51 percent is owned by -- directly by Mr. Patrick's DFW charitable organization foundation, and of course with no oversight of his own. And that is response number one to the suggestion that that they made here.

THE COURT: Isn't that what the Cayman Island proceeding is all about?

MR. MCCARTY: Well, its certainly based on the same facts, Your Honor.

THE COURT: Yeah. But, I mean, that's the relief that's being sought there.

MR. MCCARTY: Well, they are seeking relief, Your Honor, but we believe that there are direct -- there are direct fiduciary breaches by Mr. Patrick. Mr. Patrick, in November of 2023, asked how he could attack my clients' interests directly, not through fiduciary breaches to the organization itself, but how could he use his control and positions to make my client's shares worthless. How could he do that?

That is a -- and as you see, fraud all along the way. The Highlands -- to keep us from coming to you earlier and asking for an injunction against them from doing all these things, to keep us, our clients, from going to the Cayman Islands and stopping this earlier.

The fact is, I think you probably know already, we did not learn of all this until we finally did file this in the Cayman Islands, and they shut up and said that we don't hold anything; you hold nothing, which is not exactly true.

Okay. Despite the dilution of the Plaintiff charities' interests, Patrick still needed a method to finish them off. So at this point, we still have HoldCo, and we still have CDMCFAD, and then the

fund. And the charities' problem, you know, the charities used to own a hundred percent, still own 49 percent, and what are you going to do about that, because, of course, we can't have that.

So that begins the shopping expedition for an evaluation of my clients' interest, essentially discounting them to nothing. So Mr. Patrick first went to PricewaterhouseCoopers, of course, to get a nice name on there, a fancy name on there, to say that there is really nothing -- there's -- there's really no value here. PricewaterhouseCoopers, not surprisingly, sniffed that out, and rejected Mr. Patrick's overture.

Then they -- Mr. Patrick went to FTI, and then FTI, again, sort of said, Okay, well, what will the discounts be? Well, we can think about that. There's a big range, who knows what the discount of your shared value would be because of lack of control, okay?

So all fine and well, and then Mr. Patrick says, Well, we do want to use this in a transaction, Mr. Patrick's lawyers, I should say. We do want to use this in a transaction, so please remove your limitation that this can't be used in a transaction.

FTI says, Well, wait a minute, that's not what we signed up for and limitation will remain. And so FTI sniffed out the problem, too.

Then Mr. Patrick's lawyers find ValueScope. They go back to well, because ValueScope had been valuing these shares all along, I suspect that they thought that was a stretch because ValueScope had said, I think it's about six months prior only, that the shares were worth, I think it was $225 million.

Well, the reason ValueScope said the shares were worth $225 million instead of $270 million was because there were certain discounts already taken, right? So ValueScope took discounts for lack of control, subject for -- for lack of marketability, which was a bigger discount than lack of control in accordance with their evaluation method.

THE COURT: What are these assets? Are they marketable securities, or...

MR. MCCARTY: No, not -- not generally, Your Honor. They're passive investments.

THE COURT: In what?

MR. MCCARTY: In various -- and you're going to test me here, Your Honor, but they are --

THE COURT: Generally.

MR. MCCARTY: They are real estate investment trusts. There is a life insurance interest. There are many, many --

THE COURT: Is NextPoint involved in those?

MR. MCCARTY: I'm sorry?

THE COURT: Is NextPoint involved with those?

MR. MCCARTY: NextPoint, I do believe, has some involvement, but I'm not -- but if I say that, Your Honor, please don't hold me to it because I have not looked at the holdings.

THE COURT: Somebody's saying yes.

MR. MCCARTY: Okay.

MR. LITTLETON: Yeah, there's -- there's NextPoint involved, as the majority of it is cash. NextPoint, marketable securities, real estate and various other things.

MR. MCCARTY: Okay. I'll get mad at him later for that.

THE COURT: Yeah, don't do that. I asked the question.

MR. MCCARTY: That's right. Thank you, Your Honor, so --

THE COURT: The point here is to get to facts and truth, right?

MR. MCCARTY: Yeah, I understand, Your Honor. Thank you.

Okay. So there are -- yes. To the extent that your question is, is Mr. Dondero's -- if -- for

organizations that he oversees, are the participants lowering the fund? Well, of course because he granted a number of structures into the charitable funds that had been valued at $270 million as late as 2024. There is also, we understand, I believe a number of $140 million in cash in this structure; so it's not just, sort of, passive investments.

THE COURT: Yeah, you don't need a lot of discounts on cash.

MR. MCCARTY: You don't need a lot of discounts on cash, that's right. So anyway, there -- and so in September of 2024, the overall value of participating shareholders had dropped to $225 million.

Then ValueScope comes back on March 26th, about six months later, and says, Actually, now that we understand this control issue better, it's only worth $1.6 million. So 225 million to 1.6 million in six months. We don't understand that the value of the fund particularly changed at that point, but certainly the according to ValueScope it had changed.

So without delay, Mr. Patrick immediately had CDMCFAD redeem the participating shareholders' interest in it for $1.6 million, okay?

So -- and this is, I think, maybe an important point, but that was CDMCFAD redeeming the

interest -- the participating shareholders' interest in it, okay? Not in HoldCo. So the participating shareholders were still an owner in HoldCo, okay?

THE COURT: Right. Where in all these charts does CDMF -- whatever, fit?

MR. MCCARTY: Okay.

THE COURT: Back here?

MR. MCCARTY: Yeah. So if you look at the -- at the second one.

THE COURT: Right.

MR. MCCARTY: So if you look at the top, now it's DFW Charitable Foundation, obviously not shareholders -- participating shareholders --

THE COURT: Okay. I see it now.

MR. MCCARTY: Yeah, not DAF HoldCo. DAF HoldCo is, sort of, out of this structure now. And then everything now goes through CDMCFAD --

THE COURT: Okay.

MR. MCCARTY: -- okay? So that's where it is. And it essentially sits where HoldCo sat. And DFW Charitable Foundation sits where the participating shareholders, the charity claimants here, sat.

THE COURT: Okay.

MR. MCCARTY: Fair enough?

THE COURT: Got it.

MR. MCCARTY: Okay.

So interestingly enough, as sort of a side note, Mr. Patrick, as I understand it, found it somewhat humorous that he had distributed that $1.6 million into bank accounts that the charities never really saw. They belong to the charities, but they were not in their own bank accounts that they would normally operate out of.

So they didn't know -- they didn't even know that the 1.6 million have come in, obviously, which would have raised the question well, why did that happen? Where did that come from?

Okay. According to Mr. Patrick's own testimony about six weeks ago in the bankruptcy proceedings, he made it very clear, "The entity in liquidation(Charitable DAF HoldCo) owns nothing." In other words, he had achieved what he set out to achieve in November of 2023.

THE COURT: I mean, it still owns 99 percent of the interest in the fund, it's just that the money has gone out of the fund. It's gone somewhere else.

MR. MCCARTY: No. It was redeemed out. No, Charitable DAF HoldCo is not in there. It's been redeemed. Its interest has been redeemed. CDH GP, which is the new Delaware -- I'm sorry -- the new

Cayman, or the general partner is still there, but HoldCo is not.

Okay. So moving into the law...

THE COURT: So are the JOLs saying we're going to get this stuff back into HoldCo?

MR. MCCARTY: They are trying to bring -- yes, they are trying to bring value back into the HoldCo. They will seek undoubtably fraudulent transfer, fraudulent transfer on all of these things.

THE COURT: All of these things.

MR. MCCARTY: Yes. We don't know who they will go after. We know certainly that we have a claim against Mark Patrick as the controlling person for his fraud against us, delivering fraudulent statements. They were made to delay our action -- to delay our action, et cetera, at the time.

He will be on the hook for -- we believe he will be on the hook for monetary damages, but and what the -- what the JOLs may do and what they may not do, I don't know, but I do know that what he did to my clients, which is to the Plaintiff charities here, is deliberately work to devalue their shares and defraud them along the way.

Okay. So standing, which I think is really the most important issue that we have before us, and I

hope is clear to the Court, it has nothing to do with it being in business court or any other court in the State of Texas. And we all know the elements of standing, I think, from law school, and I'm sure Your Honor has dealt with them many, many times.

First, we have to have a particularized injury. Unquestionably, when they set out to render the shares worthless, they did. They exchanged $1.6 million for what we believe was at least $225 million in value, and they defrauded my clients to keep them from taking action to prevent that. So we -- my clients are unquestionably injured.

And then it is all traceable to Mr. Patrick, personally, and through the many hats that he wore. It was all him. He orchestrated it.

Was there redressable injury -- is there redressable injury? Yes, we believe there is redressable injury. Number one, we believe the receivership is part of the method to redress the injury. Why is that? Because Mr. Patrick still sits in all of these positions, so it would be that same structure chart, the structure chart that you had before you just a minute ago.

Mark Patrick, he controls the DFW Charitable Foundation. Mark Patrick controls CDH GP,

Limited Partnership, that owns Charitable DAF. Mr. Patrick is the manager of CDMCFAD, et cetera, et cetera, he controls all of it; and removing him, who has proven himself to be anything but an honest fiduciary, it would go a long, long way to address injury here.

We also know -- and again, this is, you know, for hopefully another hearing, that in the -- in late last year, he paid himself $4 million. So -- and nothing right now prevents him from doing that in the usual course of business as time progresses.

He is also, with respect to Mr. Shaw and everybody else who's here, who are quite competent counsel, and all the others that you heard from at the initial TRO hearing, he's paying a lot of lawyers, undoubtedly healthy amounts out of charitable funds.

Should these lawyers be paid? I'm not sure Mr. Patrick -- when I say "paid," should these lawyers be doing all the work that they should to protect the interests of the charitable funds? I don't know that that should be Mr. Patrick's decision. I think that should be a neutral's decision. And again, that's why we think a receivership can help redress the injury here.

Next, Your Honor, whatever claims and whatever Mr. Patrick was ultimately able to pay, and the

other entities that he controls, whether they have money or not, I don't know, do they -- does CDH-GP have money to pay? Mr. Patrick, how much money does he have to pay?

All these people -- all these people and entities participated in the fraud against my clients, and our claims are against those parties. They were -- they were the controlling interest.

So we come to does this court have subject matter jurisdiction? So let's talk about that, and let's talk about first -- do you want to take a break?

THE COURT: Yeah, let's take a little break. Thank you. Let's come back in about ten.

(A recess was taken at 10:23 a.m.)

(Open Court, All Parties Present.)

THE COURT: Okay. What slide are we on now?

MR. MCCARTY: Well, if you'll let me go slightly off script, I want to address something that is I think an issue that's been raised here by our direct claims and whether Cayman law provides for them or not.

So first, I'm just going to quickly quote from the Feiner Family Foundation case because that's something that we have cited in the briefing, but then I also I want to quote from some additional Cayman law,

and I'll give you the cites if you can find them. You probably have better Westlaw access than I do.

THE COURT: Well, fine. I mean, it's -- it's going to tie directly into the issues before us today, as opposed to speaking to your client's preferences?

MR. MCCARTY: Oh, absolutely.

THE COURT: Okay.

MR. MCCARTY: Yeah. Okay. So -- so first from the Feiner Family Trust case, which is cited in our briefing at 2007 Westlaw 2615448, shareholders can be owed duties and obligations directly from the controllers of the company if the controller "makes material misrepresentations to them" -- I'm sorry -- "material misrepresentations to them or fails to make material disclosures to them of insider information, or supplies to that specific information advice on which they have relied."

So that is a basis for a direct claim under Cayman law. "Special circumstances of generating fiduciary obligations, especially in those cases in which the directors for their own benefit, seek to use their position and special inside and knowledge acquired by them to take improper or unfair advantage of the shareholders." So that's Feiner family, and that's what

you have. So I want to give you a couple of other Cayman law cites.

THE COURT: Those claims are still going to involve the nucleus effects that we've been talking about.

MR. MCCARTY: They are, Your Honor. But these are direct claims that the shareholders --

THE COURT: No, I've got that.

MR. MCCARTY: And so that's -- that's what I want to make. And these are different, what I am about to read now, complaints of different circumstances.

So this one is from a case called TIAN RUI, T-I-A-N, R-U-I (International Holding Company Limited) the China Shanshui Cement Group. Shanshui is spelled S-h-a-n-s-h-u-i. It's a 2024 case. The cite is UK-PC-F4. From the Cayman Islands, "A shareholder has a right of action against the company to challenge the allotment of shares by the board of directors on the basis that the allotment was made for improper purpose in circumstances where the allotment will cause detriment to the shareholders."

And so obviously that is a cause of action that directly speaks to -- against the company. And I hope Your Honor picked up on that. And that's

important, but we believe that same concept applies to the control person who are guiding that company's actions. The decision also has the discussion that applies broadly to the exercise of powers by directors.

Secondly, Your Honor, from -- let's see. I think this is from the same case, actually, Your Honor. I'm sorry. This is a little bit on the fly. "The contract between the shareholder of the company contains the implied term that, in exercising the power to allot and issue shares," the director, as the company's agents -- "the directors, as the company's agents, will do so in accordance with their fiduciary duties." And where the directors exercise their powers for the improper purposes, then the act may be voidable -- long word. There may be a challenge by the affected shareholders bringing their own properly constituted action against the company in court, okay?

And again, we're talking about a person who resided on both sides of all the transaction -- transactions, was a 100 percent shareholder, and also the GP of the fund, and now CDMCFAD, and also the DFW Charitable Foundation.

So we believe with all the Feiner family, particularly the case and these other cases, indicate that there is, under Cayman law, a direct cause of

action.

Now, is that a decision necessarily for today? You know, and I don't necessarily know that we have to get into the merits and all of that. But we do believe that it outlines the cause of action, and why we have a direct cause of action.

Okay. Moving back. I'll go back on script, Your Honor. And we are going to be...

THE COURT: Bear in mind the discussion we had earlier this morning.

MR. MCCARTY: I'm sorry?

THE COURT: I've shared with you my views on the statute, so these are my views, as opposed to the statutes.

MR. MCCARTY: Understood. Well, let's talk about 2 -- b(2) because that's where I know you're focused.

I do -- if you will allow me to, I do want to make my case.

THE COURT: No, that's fine.

MR. MCCARTY: But we'll start, of course, at b(2) because that's what the Court is the most interested in, and I understand.

So first let's talk about what it means, governance? And this is from your sister Court.

THE COURT: We're one Court.

MR. MCCARTY: I'm sorry?

THE COURT: We're one Court. We have different divisions, and different judges, but it's really, really important to understand that we're one Court.

MR. MCCARTY: Okay. I appreciate that. Your sister division, is that a proper way to put it?

THE COURT: Absolutely.

MR. MCCARTY: From the *Reed v. Rook* decision.

THE COURT: I'm very familiar with it.

MR. MCCARTY: Yes. It says about governance: "It does not define governance, but defines a governing person as one who is entitled to manage and direct an organization's affairs under the governing documents and governing law. This indicates that governance relates to the management and direction of the entity's affairs under its governing documents" -- and this is critical -- "applicable law," all right?

So it's not -- so governance is not just all about internal documents. Governance is about all the laws that apply to the governance of the company, and these are laws that we think Mr. Patrick breached, and its very obvious .

I have a very, very difficult time understanding how this case could be principally distinguished from the *Reed V. Rook* --

THE COURT: Well, isn't it fair to say that governance involves governing?

MR. MCCARTY: Yes.

THE COURT: So if you're governing the company, it involves governance?

MR. MCCARTY: Yes. And he was clearly governing the company.

So -- and so I think the *Reed v. Rook* case is an important one because it does bear directly on the issues here. I think that in the *Reed v. Rook case*, at least as I understand the case, I haven't seen all the underlying pleadings; but as I understand, the Court's ruling, Reed, the plaintiff was actually not a person who was ever a member of the company or directly involved in the company. That's what my take from the case -- but I -- again, I don't -- or the partnership or whatever it was. But I haven't seen all the ongoing pleadings. That's what -- that's what it says to me.

Now, a big argument about b(2) that I've heard from the other side is there's no limiting principle about b(2). So it could be anything. It could be Chevron -- or Exxon taking on Chevron for --

for its governing documents. Well, that's true today. That case could be brought today. Maybe it could be brought in this court. Probably it could be brought in this court. It certainly could be brought in district courts. I have not seen a case like that in the district courts. I'm sure there has been one before.

But the limited principles are the same as they have always been. You have to have standing, and now you have to be able to supply limiting language.

THE COURT: You have to have capacity.

MR. MCCARTY: And you have to have capacity, assuming the other side brings up capacity, but --

THE COURT: Assume that they have.

MR. MCCARTY: Assume that they have. Yes, you have to have capacity. And I think clearly, Cayman law suggests that we have capacity as shareholders to bring direct causes of action.

Now, I -- I'm kind of reading in, and maybe misappropriately, reading into the idea that Your Honor is concerned because well, the trustee is going to take over, and all that stuff -- not the trustee -- the liquidators are going to take over in this case. Well, they haven't yet. They're not even recognized in the United States.

So as of now -- and there has been no --

THE COURT: I'm not going to tell the Delaware Bankruptcy Judge what to do, but my guess is it's not a difficult bar to cover.

MR. MCCARTY: But then --

THE COURT: Not in my experience, at least.

MR. MCCARTY: But then the Delaware Bankruptcy Court will have to rule that our claims are the property of the liquidation estate.

THE COURT: I think under Chapter 15, once they're recognized, they could come and join this lawsuit if they want.

MR. MCCARTY: They could come and join the lawsuit, absolutely.

THE COURT: They could file their own lawsuit in Delaware or --

MR. MCCARTY: Yes, but -- but none of that strips the jurisdiction of this Court until there is a determination that their --

THE COURT: But we know that there is a lawsuit pending in the Cayman Islands.

MR. MCCARTY: But, Your Honor, we believe we have direct claims -- we do have direct claims --

THE COURT: Okay.

MR. MCCARTY: -- okay? And until another

court says that our direct claims, our property of the estate -- a federal bankruptcy court says that, then we still have capacity.

THE COURT: I'm really not -- I'm focusing on Rule 39.

MR. MCCARTY: Okay.

THE COURT: How do we have two proceedings covering much of the same factual subject matter going on at their time, and not resulting in potentially inconsistent results?

MR. MCCARTY: Sure. Well, I've unfortunately in my career dealt with that many, many times. We can have class-actions dealing with, for instance, unintended acceleration in elements, 300 of them, in fact. And we can have direct claimants saying that they were injured because of unintended acceleration in those elements, those separate claimants, and they have direct claims.

They don't necessarily have to opt out, but it comes from the same nucleus of facts, all right? They are different claims operating from the same nucleus of facts. And that's what we have. That's why we have capacity. No federal bankruptcy court says that it owns -- that the estate owns those claims at this point. And until they do, certainly, there is not a

capacity issue. And, of course, nothing that the federal bankruptcy court does will restrict this Court from jurisdiction, right?

It may impact our capacity in the moment, but as you see in the Moser Trust -- it looks -- the Moser Trust case from the Dallas Court of Appeals, makes it pretty clear that capacity, even if it's overtaken by a Bankruptcy Court for a time, it doesn't necessarily prevail forever, all right?

So these claims could come back. For instance, what if the joint liquidators for some reason say, eh, we've gotten all we needed --

THE COURT: And they abandon the claims?

MR. MCCARTY: Right. That's right. And so here we would be.

THE COURT: Here we would be.

MR. MCCARTY: And right -- and right now the Bankruptcy Court hasn't done anything to take those claims. They haven't even recognized yet the Cayman liquidators. So I understand where the Court is going and its concerns. I think that this Court will likely hear from the liquidators at some point. I can't control their actions, but I suspect that it will.

THE COURT: I suspect we will.

MR. MCCARTY: Yeah. And at that point, I

don't know that the -- I don't necessarily think that the liquidators are going to claim that the actions undertaken by this Court are in any way harmful to them.

THE COURT: Well, we'll see what they say.

MR. MCCARTY: Right. But as of today -- but as of today, we have capacity.

So we got off on capacity, which is an important discussion. But going back for b(2), so the limiting factors in b(2) were the same limiting factors that have always prevailed -- or presided over any sort of action, and continues to this day.

So this Parade of Horribles that we've heard from the other side, they just don't seem real. And frankly, I suspect that if Exxon came to you and said Chevron is violating laws, they would say okay, that's great because they sort of often say this -- okay, great, what's your cause of action.

THE COURT: Right.

MR. MCCARTY: All right. So I don't believe -- well, let me say this: The legislature wrote what it did, and as we all know in Texas, we certainly know, the text of the statute wins the day every time. And the text of the statute --

THE COURT: Most of the time.

MR. MCCARTY: That's actually a fair

statement, Your Honor. It should win the day.

THE COURT: Well, we could have uncertain results.

MR. MCCARTY: Now, we could have uncertain results, but I don't think it's uncertain results here today, to say, at least, because we were certainly not a "stranger" to Mr. Patrick and his roles and his governance through the various entities.

Certainly right now, for instance, DFW Charitable Foundation sits where the participating shareholders used to sit. They are holding, essentially, the powers that my clients used to hold. Mr. Patrick was on both sides of that transaction. As the controlling shareholder, he held 100 percent of the management shares, and as now the owner of the DFW Charitable Foundation.

Mr. Patrick was on both sides of the transaction when HoldCo seeded its interest to CDMCFAE from the fund. Mr. Patrick was on both side of the transaction when he diluted my client's interest in HoldCo to his own charity, his newly created charity, on December 29th, 2024.

So at every turn, we believe -- and the question is really -- now I'm kind of jumping to the next slide, but everything he did was in line with what

he planned to do in November of 2023. And every one of those things was a direct attack on my clients.

MR. MCCARTY: And -- and every one of --

THE COURT: An indirect attack on your clients.

MR. MCCARTY: Well, according to him, he wants to know if he could make the participation shares worthless, which is -- that was his lawyer's question.

THE COURT: Yeah, but he had to go through HoldCo and the fund to do that.

MR. MCCARTY: But it was a direct action aimed at my clients.

And so he, in all of those questions, do -- can the controlling person dilute? Can the controlling person redeem? Can they make the shares worthless? All of those are questions of governance, directly questions of governance asked by lawyers, for lawyers to go research documents in the law.

And so I think it clearly falls under b(2), and I see nothing in b(2) that would, based on its text, exempt my client's claims from this Court's jurisdiction.

So at the risk of moving into an area that I'll get more questions about...

THE COURT: Well, you wouldn't want to pass

this bench, would you?

MR. MCCARTY: No. No. In fact, I actually prefer the other, so thank you.

So b(4) -- I'm sorry -- an action by an organization of owner against a controlling person or a managerial official for acts/omissions in that capacity. So again, $270 million interest for $1.6 million.

THE COURT: You can assume that I've read everything.

MR. MCCARTY: Okay. Well, I'm sorry. Yes, that's fine. I don't see -- I don't see the exception to b(4). I don't see where b(4) says the organization needs to be a party. It needs -- potentially needs to be about the organization.

Let me -- let me read from b(4), because it's easier for me to read off of these. So I'm at the last slide now. B(4) says: "An action by an organization or an owner of an organization" -- we're an owner of an organization, we were -- the supporting boards still have an ownership interest in HoldCo -- "is brought against an owner, controlling person" -- which Mr. Patrick was, no question. He held managing shares, and he was a managerial official. He was a controlling person -- "and alleges an act or omission by the person in the person's capacity" -- controlling shareholder, as

an owner/controller or in a managerial official of the organization.

THE COURT: An organization before this HoldCo, right?

MR. MCCARTY: Well, I would say CDH-GP -- and I -- I'm sorry. I would say, yes, the organization -- yes. So he had a -- he had a controlling interest based on his 100 percent ownership of the management shares. So he was an owner of that organization, of HoldCo.

THE COURT: Well -- yeah, okay.

MR. MCCARTY: Well, I think he would say he was an owner because he owned the management shares.

And second, he was certainly a controlling person by virtue of those managing shares.

THE COURT: Right.

MR. MCCARTY: And we've sued him in those capacities.

THE COURT: Okay.

MR. MCCARTY: All right. Then under b(5): "An action alleging that an owner, controlling person, or managerial official, breached a duty owed to an organization or an owner of the organization." So in other words, a controlling person breached a duty to an owner of an organization. That's Mr. Patrick, and

that's my clients.

"By reason of the person's status as an owner, controlling person," which is how he did it, that's how he committed the fraud. The only way he committed that fraud against us by lying to us about his true intentions was because of his capacity or status as a controlling person, as a managerial official.

So we think we fall thereto. And all through this, we were an owner. And when the breaches occurred, and I think most importantly -- I think this is the point. When the breaches occurred, we were others of the organization. But it doesn't say -- b(5) does not say that we have to sue the organization.

THE COURT: Okay.

MR. MCCARTY: So that's -- I think that is it. Let me see if there was anything else.

I want to respond to one statement that Mr. Shaw said, that this is all about control. This is not all about control. This is about restoring to my clients what they rightfully own.

THE COURT: But your clients -- they're the supporting organizations.

MR. MCCARTY: They are.

THE COURT: But the real people of interest here are the supported organizations.

MR. MCCARTY: I would -- I mean, that's an interesting way for a Court to look at it because in my experiences, the Courts are always more interested in the direct legal relationships, and the direct legal relationship here is between the participating shareholders --

THE COURT: I got that. But the supporting organizations exists for a tax purpose to be a pipeline for getting money to the supported organizations.

MR. MCCARTY: Well, I'm guessing that it's a tax purpose.

THE COURT: Well, that's what they said in the Caymans.

MR. MCCARTY: Yeah. I'm guessing that that's true. I'm not a tax lawyer, so I would hate to represent that, but I --

THE COURT: That's part of the reason why I suggested the idea of getting a tax lawyer who really knows this stuff to tell me.

MR. MCCARTY: Understood.

But I believe that to be the case; and yes, do the supported organizations ultimately benefit from the participating shareholders' interests, legal interests in the entity? Of course they do. Absolutely. No question.

THE COURT: Right. Because the goal is really to support the supported organizations.

MR. MCCARTY: Well, we do want to support the supported organizations. And the way -- the vehicle that was used to do that was through the participating shareholders' interests.

THE COURT: Right.

MR. MCCARTY: And I believe that -- unless there are any other questions, I think -- I think that's all I have for you.

THE COURT: I appreciate it. Yeah.

Mr. Shaw, I believe you have something to say.

MR. SHAW: I have a brief rebuttal.

MR. WARNER: Mr. Shaw, why don't I turn this off for you.

MR. SHAW: Oh, great. Thank you.

Judge, I've discussed the *Paxton v. Annunciation House* case that legislate -- the legislature is aware of the law that existed at the time they enacted the statute. Part of that body of law that the legislature was aware of when they enacted these statutes was Rule 39, Texas Rules of Civil Procedure 39, that requires the joinder of necessary parties.

And so I agree with Mr. McCarty that --

that this is an action regarding the corporate governance of two non-parties. And I would agree with him that this would fall under b(2) if those two entities were parties to the case, but they're not. They're not. And -- and again, we go back to why they're not because ultimately what this was about was -- was an interim. *Rook v. Reed...*

THE COURT: *Rook v. Rook*.

MR. SHAW: *Rook vs. Rook,* I'm sorry. From this Court, it was -- I did not know that, so I just learned something.

THE COURT: Yeah, no, it's -- and I don't want to be pedantic about it, but it's very important in the way we operate that we're viewed as one court.

MR. SHAW: Yeah, it's fascinating.

THE COURT: It has a lot to do with the mechanics in our mission and things like that, but it is an important distinction.

MR. SHAW: Okay. So I -- and I believe that was the lottery case.

THE COURT: Yes, it was.

MR. SHAW: And what I think the important distinction between that case and this case is that the parties whose corporate governance that we're discussing and was at issue was a party to the lawsuit, and that's

in stark contrast to what we have here.  We have two non-entities that they are claiming that this is a -- an action regarding.

And our position is that, you know, we've got to have a cognizable cause of action regarding the corporate governance of a party to the case.  And I think Rule 39 fits in nicely with that paradigm.

So, you know, the issue that we talk about is this, you know, limiting factor, which it would be if you have a party of the case that would be part of the governing action.

I'm going to close with -- I would be remiss not to at least talk a little bit about the righteousness of my client because I've heard a lot about the lack of righteousness.

THE COURT:  Alleged.

MR. SHAW:  Alleged.

THE COURT:  We will talk about the alleged righteousness of --

MR. SHAW:  We'll talk about the alleged righteousness of my client as well.  So suffice it to say that we dispute that there's been any breach of fiduciary duty, any violation of any obligation, that we have worked in earnest with and tried to work with The Dallas Foundation.

And in fact that Mr. Raver was meeting with Louis Phillips, who's a former Bankruptcy Judge, who also represents the DAF, and Ms. Diaz, the morning of the TRO hearing, in order to work towards a resolution. It came at much of a surprise that this action was filed.

Also that -- that the idea here that these supporting organizations always had only a right to a discretionary distribution up to the complete discretion of the general partner.

And then finally, Mr. Dondero received a significant tax savings through the structure, estimated more than $50 million. Our concern and -- and everything that has been animating the actions that we have taken, are for the DAF, and to ensure that the DAF's structure is intact and that it's not attacked by the IRS or other of Mr. Dondero's creditors, of which there are many.

So Mr. Patrick and Mr. Murphy acted in reliance on competent counsel and experts, acted in the best interest using their reasonable business judgment, and the idea that there is this massive fraud is just inaccurate.

Thank you, Judge.

MR. MCCARTY: Can I just respond to one

comment?

THE COURT: Sure.

MR. MCCARTY: And I'm sorry, but I want to make it very clear, we did not file this action while they were discussing resolving this matter. There has been no discussion -- no real discussion to resolve this matter. That discussion was subsequent to the bankruptcy proceedings that The Dallas Foundation and Mr. Patrick were both involved with, not this case.

THE COURT: Okay. All right. Anything else that anybody wants to say?

MR. SHAW: Nothing further from the Defense, Your Honor.

MR. MCCARTY: Nothing more, Your Honor.

THE COURT: Mr. Cox, you've been unusually quiet.

MR. COX: I'm just here. Just trying to be quiet. That's all right. I have questions about stuff.

THE COURT: Mr. McEntire?

MR. MCENTIRE: Not today, sir. Maybe later.

THE COURT: All right. So let's just take stock of kind of where I think we are on some things: One, I think I know what I wanted to do with the Rule 39, but I want to give the parties an opportunity to

brief that.  And so let's -- I think the opening brief on that, Mr. Shaw, should come from you.

MR. SHAW:  Thank you, Your Honor.

THE COURT:  When do you think you can do that?

MR. SHAW:  Seven days from today, Your Honor.

THE COURT:  Seven days from today, we'll have the brief.  Seven days after that, we'll have a response.  That implies that it will be done after that.  In my view of things, things are ripe for a decision after I have a response, but I typically wait for a reply if I think it's going to come.  So we will come up with an order that will include that.  Mr. Spear will get you that.

Capacity.  Any briefing that you all want to discuss on the capacity issues?  I think that was one of the subject matters that one gave a fair reading to the motion to dismiss that was included, although there wasn't a lot of case law that was cited on capacity as such, so...

MR. SHAW:  Should we just do a combined brief on capacity, Your Honor?

THE COURT:  Sure.  That's fine.

Is that fine for you?

MR. MCCARTY:  Sure -- yes.

THE COURT:  Well, it's --

MR. MCCARTY:  My uncertainty only stems from we very much want a receivership hearing.  It's not an empty bag for us.

THE COURT:  Yeah, okay.  That's probably not going to happen until the Rule 39 issue is resolved because I don't know how I can appoint a receiver over entities on the basis of receivership.

MR. MCCARTY:  Well, of course we're not asking that.

THE COURT:  Well, that's kind of what you're asking.

MR. MCCARTY:  That is not.  But, yes, I understand, Your Honor, you want the briefing prepared on the same schedule.

THE COURT:  Okay.  That's fine.  I mean, if you need more time, let me know.  It's summertime.  I understand.

What else do we need to talk about?  They don't need to be long briefs, but --

MR. MCCARTY:  Well, if we can shorten our time on response, I assume that wouldn't be difficult.

THE COURT:  You can -- yeah, when we say seven days to respond, it doesn't mean you have to take

seven days.

MR. MCCARTY:  Can we say three days to reply?

THE COURT:  The score is going to be seven and -- and you're saying three days on a reply?

What do you think?

MR. SHAW:  I don't know what their response is going to look like.

THE COURT:  Yeah, we'll go seven, and then if -- need to do that.  I'm detecting a certain amount of frustration.

MR. MCCARTY:  I'm very frustrated, yes.

THE COURT:  Okay.

MR. MCCARTY:  We have given generous time to this briefing, and we --

THE COURT:  Well, no one has briefed Rule 39.

MR. MCCARTY:  Well, and today is the first day, Your Honor, but...

THE COURT:  Well, but that's something people could have thought about.

MR. MCCARTY:  They certainly could have thought about that.

THE COURT:  Well, listen, my sense is -- well, I will withhold that thought.

MR. MCCARTY: Well, Your Honor, I want to make something plain because my frustration is not simply a lawyer being frustrated. My frustration is this: We have a person, and despite all the accolades that we just heard about Mr. Patrick, and how he wants to preserve charitable assets and all that sort of stuff, he took $4 million.

THE COURT: I heard that. And I heard about all the other things that are alleged.

MR. MCCARTY: We're concerned.

THE COURT: I get that.

MR. MCCARTY: Yes.

MR. COX: But are you finding that this Court has subject matter jurisdiction under b(2)?

THE COURT: I haven't made that ruling yet.

MR. COX: Oh, okay. I just -- are we going to get past that, or are we going to have to brief that again?

THE COURT: No, you don't have to brief that again. That is fully briefed. Trust me.

MR. COX: Okay. All right.

THE COURT: And the understanding -- the capacity of your argument is well, they have capacity because they have direct claims, right? Under Cayman law, they were directed to do so, that the controlling

persons of the entities owe fiduciary duties to the shareholders.

MR. MCCARTY: Yeah. And plus one right now certainly, we have capacity. There is no recognition in the United States for any other plaintiff. I don't want to be -- I'm not trying to be obstructive but it's true, right? And these claims are direct claims.

THE COURT: What's the schedule going on in the bankruptcy case?

MR. MCCARTY: The schedule that's going on right now is there is an agreed -- essentially an agreed injunction, much like our Rule 11, that was entered in the Cayman Islands. We understand that that injunction will be brought to the United States. There is no schedule at the current for the liquidators to be recognized in the United States.

And there will be further briefing in the Cayman Islands after September 18th. I don't know if we have a date yet -- after September 18th on the injunction; so in other words, they have this agreed -- sort of like us, right? We have an agreed injunction there, much like the Rule 11 that's been placed until it's fully briefed and presumably --

THE COURT: So let's do that. Let's go off the record.

(Off-the-record discussion)

THE COURT: Do we have things for the record?

MR. COX: I have a question Judge, on Rule 39:

Is the thought that you believe that there is an indispensable party that's not here and you --

THE COURT: That's my question.

MR. COX: And you want briefing on that one that is indispensable, and then what you can or cannot do based on that fact and whether we can proceed or not proceed if they are indispensable?

THE COURT: My concern is that the -- the rights of HoldCo are at issue.

MR. COX: Understood. I'm just trying to understand where you are so we can brief the right things.

THE COURT: Yeah, no, absolutely. That's my absolute concern is claims and causes of action; rights that appear to belong to HoldCo are also going to be litigated here.

MR. COX: Understood. As you know in Rule 39, it has a procedure, though, that is built in that if they cannot be here, can you still proceed?

THE COURT: Exactly.

MR. COX: And I wanted to know if that's what you want us to focus on or -- however.

THE COURT: Whatever it says right here.

MR. COX: I got it. Okay. I just make sure were on the same page. We had some other questions --

THE COURT: That's how it might apply -- and I mentioned at the very beginning, is there a remedy that we can fashion if they're not here?

MR. COX: Okay. Understood. I just wanted to make sure that we focus on the indispensability of -- the issues here in Rule 39.

THE COURT: That's -- that's one of the issues under Rule 39.

MR. COX: I agree. Thank you.

THE COURT: Anything else?

MR. SHAW: No, Your Honor.

MR. MCCARTY: No, Your Honor.

THE COURT: All right. Great. Thank you.

(The proceedings adjourned at 11:27 a.m.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS  )
COUNTY OF DALLAS    )

I, Aerial M. Holloway, Official Court Reporter in and for the First Business Court of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the copy cost for the preparation of this Reporter's Record is $459.00 and was paid by DUANE MORRIS LLP.

WITNESS MY OFFICIAL HAND this the 7th day of August, 2025.

_/s/_____
Aerial M. Holloway, Texas CSR 12401
Expiration Date: 12/31/2026
Official Court Reporter
Texas Business Court
First District
Dallas County
Dallas Texas



EXHIBIT
C-1
PENGAD 800-631-6989

January 2024



**Plaintiff "Charitable Owners"**
(The Dallas, Kansas City, & Santa Barbara Highland Foundations)
(DE non-profit corps.)

↓ ~98% Participation Shares

**Charitable DAF HoldCo, Ltd.**
(Directors: Patrick & Paul Murphy)
(Cayman)

↓ 99% LP

**Charitable DAF Fund, LP**
("the Fund")
(Cayman)

↓ 100%

**CLO HoldCo. Ltd.**
(Cayman)

↓ 100%

**Assets**

**Defendant Mark Patrick**

— Manager →  ← 100% Management Shares

↓ 100%

**Defendant Charitable DAF GP, LLC**
(DE)

→ 1% GP

PLAINTIFF'S EXHIBIT PX-1 tabbies

August 4, 2025

Plea to the Jurisdiction,
Plaintiff-Charities Presentation



THE BUSINESS COURT OF TEXAS

# The Charities' Allegations Fall Squarely into the Court's Jurisdiction



## Plaintiff Charities



**$270 Million**



**Granted over $42 million to charitable organizations**



**Donations to 275 organizations**

(funding education programs, healthcare services and supporting economic development and community welfare projects)



**Average annual grant payments of $3.7 million**

## Since its inception in 2011:

# The Charities Allege Actions and Claims Showing Standing and Jurisdiction

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.



MR 0578

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.



Sept. 2024 - Known Value of Charitable DAF Fund

100% Ownership Charitable DAF Fund, LP

**$270 Million**

August    September

This framed Defendants' fraudulent, covert activities for over a year.

"Can the controlling person <u>dilute</u> shares, e.g., the Participation Shares?"

*Defendants' lawyers*

"Can the controlling person <u>redeem</u> shares, e.g., the Participation Shares?"

*Defendants' lawyers*

More to the point:

"Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"

*Defendants' lawyers*

100% Ownership Charitable DAF Fund, LP

**Control Position**

**Mark Patrick** Tax Attorney

February    January    December

**Nov. 2023**

"workplan" to raid the fund

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.



**2023** | **2024**

| November | December | January | February | March | April | May | June | July | August | September |

**Sept. 2024 - Known Value of Charitable DAF Fund**

100% Ownership
Charitable DAF Fund, LP

**$270 Million**

100% Ownership
Charitable DAF Fund, LP

**Patrick Begins restricting access to the Fund Records – ultimately foreclosed entirely**

**Nov. 2023**
"workplan" to raid the fund

**Control Position**

**Mark Patrick**
Tax Attorney

MR 0580



Key Points in Defendants' Fraud and Breach of Fiduciary Duties.

MR 0581



Despite the dilution of the Plaintiff Charities' interests, Patrick still needed a method to finish them off.

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.

After being rejected by both PwC and FTI, on March 26, 2025 Patrick finally obtains a negligible value of the Charities' interest via ValueScope.



ValueScope determined that each participating share had **a fair market value of $5,368 in March 2025, down from $759,614, just several months earlier.**

According to ValueScope's "work," the Charitable Owners **total value was approximately $1.6million.**



# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.

**2024**

**2025**

Sept. 2024 Known Value of Charitable DAF Fund

**$270 Million**

100% Ownership
Charitable DAF Fund, LP

**Nov. 11, 2024**
Charitable Organizations letter: *"we no longer have confidence that the governance structures…"*

**Dec. 11, 2024**
**Fraudulent Misrepresentations:**
Δs Video call: *"professional and institutional vehicle, for the benefit of its charitable purposes and the Charitable Owners"* Am Pet. 5.68

**Dec. 13, 2024**
**Fraudulent Misrepresentations:**
Δs Email: *"The DAF is actively working on one or more development projects …your clients will benefit …for many years to come."* Am Pet. 5.69

**Jan. 23, 2025**
Charitable Owners again demanded clarity into the Charitable DAF Fund's financial position. Letter is ignored by Δs.

**Jan. 28, 2025**
Charitable Owners requested a winding up of the Charitable DAF

100% Ownership
Charitable DAF Fund, LP

**$0**

## Patrick Begins restricting access to the Fund Records - ultimately foreclosed entirely

**Control Position**

**Mark Patrick**
Tax Attorney

**Dec. 9, 2024**
Patrick forms Sham Charity: DFW Charitable Foundation
- He's sole member and director
- Headquartered at his residence

**Dec. 12, 2024**
Days later Patrick forms CDMCFAD

**Dec. 18, 2024**
Six days later, Patrick has HoldCo essentially exchange its interest in the DAF Fund to CDMCFAD for 100% ownership of CDMCFAD—Patrick's newly created entity. CDMCFAD adds a layer between the Plaintiff Charities and the DAF Fund.

**Feb. 7, 2025**
Patrick uses control position to issue new shares in Charitable DAF HoldCo to DFW Charitable Foundation and dilute Charities' ownership from 100% to 49%. Charities now own only 49% of the $270 million fund through CDMCFAD.

**April 2, 2025**
Patrick has Holdco redeem its interest in CDMCFAD for $1.6 million.

**Result: DFW Charitable now is the sole beneficiary of CDMCFAD.**

*"Participating Shares" held by Plaintiffs are rendered "worthless."*

September | October | November | December | January | February | March | April | May

MR 0584

# In Patrick's Own Words Under Oath:



"the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing.

*June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25;*

Control Position

Mark Patrick

# Standing



"In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court."

*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012)

# Standing

| Category | Law | Evidence |
|---|---|---|
| **Particularized Injury** | "[I]njury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) | Defendants plan was to "make the participation shares . . . worthless," which they did, exchanging $1.6 million for shares valued at $225 million approximately 6 months earlier – via expressly fraudulent statements and fiduciary breaches directed specifically at the Charities. |
| **Traceable to defendant** | "The injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) | Just as Defendants' lawyers queried, could the "control person" "dilute" and "redeem" on a course to rendering the participation shares worthless? The Control Person, Mark Patrick, wearing his various Defendant hats, did just that. All of it traces back to Defendants. |
| **Redressable Injury** | "[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154–55 (Tex. 2012) | By replacing Mark Patrick with a receiver as the control person, the remainder of the value will be protected. Mark Patrick will be personally, and Defendants corporately responsible for fraud and breaches of fiduciary to the Charities. Defendants can ultimately be held liable on the merits for the lost value to the Plaintiffs of their interest in the $270 Million fund. |



# This Court Has Subject-Matter Jurisdiction

# The Charities' Allegations Fall Squarely into the Court's Jurisdiction

| § 25A.004(b) Element | Sample Petition Allegations | Source (Am. Pet Citation) |
|---|---|---|
| **(2) Action regarding the governance, governing documents, or internal affairs of an organization** | • Issuance of shares altered power structure contrary to fiduciary obligations. | |
| | • Secret formation of CDMCFAD to replace Charitable DAF Holdco and sever connection to Charitable Owners. | ¶ 5.41<br>¶ 5.69 |
| | • Patrick caused CDMCFAD to redeem the Plaintiff Charities' interest for a plainly inadequate $1.6 million | ¶ 5.61 |
| **(4)(A)-(B) Action by an organization or owner against a controlling person or managerial official for acts/omissions in that capacity** | • Redemption of $270M interest for $1.6M orchestrated by Patrick and other controlling entities. | ¶ 5.31 |
| | • Issuance of dilutive shares to DFW Charitable (sham charity) was meant to alter power structure in breach of fiduciary obligations | ¶ 5.61<br>¶ 5.65 |
| | • Secret formation of new entity to circumvent control structure. | ¶ 5.69 |
| **(5) Breach of duty by owner, controlling person, or managerial official (e.g., duty of loyalty or good faith)** | • Defendants intended to render Plaintiffs' shares worthless. | ¶ 5.31 |
| | • Fiduciary obligations under Cayman law were disregarded. | ¶ 5.38<br>¶ 5.41 |
| | • Plaintiffs relied on misrepresentations arising from special fiduciary relationship. | ¶ 5.61<br>¶ 5.65 |
| | • Defendants misled Plaintiffs regarding asset depletion and leadership conduct. | ¶ 5.67<br>¶ 5.75 |

# Business Court Subject Matter Jurisdiction under Chapter 25A

## Texas Business Court sections 25A(b):

(b) Subject to Subsection (c), the business court has civil jurisdiction concurrent with district courts in the following actions in which the amount in controversy exceeds $5 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

. . .

(2) an action regarding the governance, governing documents, or internal affairs of an organization;

\*\*\*

(4) an action by an organization, or an owner of an organization, if the action:

(A) is brought against an owner, controlling person, or managerial official of the organization; and

(B) alleges an act or omission by the person in the person's capacity as an owner, controlling person, or managerial official of the organization;

(5) an action alleging that an owner, controlling person, or managerial official breached a duty owed to an organization or an owner of an organization by reason of the person's status as an owner, controlling person, or managerial official, including the breach of a duty of loyalty or good faith;

---

"Can the controlling person dilute shares, e.g., the Participation Shares?"

*Defendants' lawyers*

"Can the controlling person redeem shares, e.g., the Participation Shares?"

*Defendants' lawyers*

**More to the point:**

"Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"

*Defendants' lawyers*



PLAINTIFF'S EXHIBIT PX-2

**DAF/Rand Structure Chart**
**As of January 2024**

```
The Community                    Santa Barbara        Greater Kansas City      The Dallas
Foundation of North              Foundation           Community                Foundation
Texas (CFNT)                     (nonprofit charity)  Foundation               (nonprofit charity)
(nonprofit charity)                                   (nonprofit charity)

   ⇣ Donor Advised          ⇣ Supporting        ⇣ Supporting          ⇣ Supporting
     Fund Account             Organization         Organization           Organization

HCMLP Charitable      Highland Santa Barbara    Highland Kansas City    Highland Dallas
Fund                  Foundation, Inc.          Foundation, Inc.        Foundation, Inc.
                      (nonprofit nonstock       (nonprofit nonstock     (nonprofit nonstock
                      DE corp.)                 DE corp.)               DE corp.)

   │ 1.639%              │ 32.787%              │ 32.787%                │ 32.787%
     Participation         Participation          Participation           Participation
     Shares                Shares                 Shares                  Shares

            Charitable DAF HoldCo, Ltd.
            (Cayman Islands)
            Directors: Mark Patrick, Paul Murphy
```

Mark Patrick
(Managing Member)

│ 100%

Charitable DAF GP, LLC
(Delaware)
Managing Member: Mark Patrick

100% Management Shares

1% GP

Charitable DAF Fund, LP
(Cayman Islands)
Governed by the GP

99% LP

100%

```
CLO HoldCo, Ltd.
(Cayman Islands)
Directors: Mark Patrick, Paul Murphy

  │ 100%           │ 100%          │ 100%

Liberty CLO       HCT Holdco 2,    MGM Studios
Holdco, Ltd.      Ltd.             Holdco, Ltd.
(Cayman Islands)  (Cayman Islands) (Cayman Islands)

  │ 100%

Liberty Sub, Ltd.
(Cayman Islands)

Directors: Mark Patrick, Paul Murphy
```

Charitable DAF Holdings Corp.
(Delaware)
Directors: Mark Patrick
Officers: Mark Patrick - President

│ 100%                    │ 100%

Rand Advisors, LLC          Allanon Capital
(Delaware)                  Management LLC
                            (Texas)

# Current DAF



Source: Sykes Affidavit p.58, Cayman Proceeding for all entities other than DFW Charitable Foundation. Additional of DFW Charitable based on testimony of Mark Patrick at hearing on June 25, 2025.

Tab 8



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC.; THE HIGHLAND KANSAS CITY FOUNDATION, INC.; and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., *Plaintiffs* | §§§§§§§ | |
| v. | §§ | Cause No. 25-BC01B-0027 |
| MARK PATRICK and DFW CHARITABLE FOUNDATION; CDMCFAD, LLC; CHARITABLE DAF GP, LLC; and CDH GP, LTD., *Defendants* | §§§§§ | |

## ORDER

Pursuant to the court's instructions at the hearing held on August 4, 2025, the parties shall provide additional briefing on issues of capacity and joinder of necessary parties under TEX. R. CIV. P. 39 according to the following schedule:

Within seven days from the signature date of this order, defendants shall provide their opening brief.

Within seven days thereof, plaintiffs shall provide their response.

At that that time, the court shall consider the issue to be ripe for decision. Parties are permitted to file replies/sur-replies.

So ORDERED.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: August 4, 2025

MR 0595

STATE OF TEXAS
BUSINESS COURT OF TEXAS
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE November 21, 2025

Beverly Crumley
BUSINESS COURT CLERK

BY _____ DEPUTY

MR 0596

Tab 9

MR 0597

| | | |
|---|---|---|
| THE HIGHLAND DALLAS | § | THE BUSINESS COURT OF |
| FOUNDATION, INC., | § | TEXAS |
| THE HIGHLAND KANSAS | § | |
| CITY FOUNDATION, INC., | § | FIRST DIVISION |
| and THE HIGHLAND | § | |
| SANTA BARBARA | § | |
| FOUNDATION, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Cause No. 25-BC-01B-0027 |
| | § | |
| MARK PATRICK, DFW | § | |
| CHARITABLE | § | |
| FOUNDATION, CDMCFAD, | § | |
| LLC, CHARITABLE DAF GP, | § | |
| LLC, and CDH GP, LTD., | § | |
| | § | |
| Defendants. | § | |

## <u>NOTICE OF RELATED PROCEEDINGS</u>

Defendants Mark Patrick, DFW Charitable Foundation, CDMCFAD LLC, Charitable DAF GP, LLC, and CDH GP, LTD. ("Defendants") file this Notice of Related Proceedings and request the Court take judicial notice of them pursuant to Texas Rule of Evidence 201.

**NOTICE OF RELATED PROCEEDINGS** – Page 1

MR 0598

The case citations for the attached filings are:

1. The "Cayman Liquidation" – *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*, Cause No. FSD 99 OF 2025 (JAJ), in the Grand Court of the Cayman Islands, Financial Services Division;

| Ex. No. | Document | Date | Appendix |
|---------|----------|------|----------|
| **Cayman Liquidation** | | | |
| 1 | Writ of Summons and Statement of Claim | 7/15/2025 | App 5-87 |
| 2 | Consent Order | 7/31/2025 | App 88-103 |

2. The "Chapter 15 Proceeding" – *In re Charitable DAF HoldCo, Ltd.*, No. 25-11376-BLS (Bankr. D. Del. filed July 21, 2025);

| Ex. No. | Document | Date | Appendix |
|---------|----------|------|----------|
| **Chapter 15 Proceeding** | | | |
| 3 | Docket Sheet | 8/7/2025 | App 104-108 |
| 4 | Petition for Recognition of a Foreign Proceeding, ECF No. 1 | 7/21/2025 | App 109-127 |
| 5 | Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code, ECF No. 3 | 7/21/2025 | App 128-216 |
| 6 | Order Approving Stipulation and Granting Provisional Relief Pursuant to Sections 105(A) and 1519 of the Bankruptcy Code, ECF No. 19 | 8/05/2025 | App 217-245 |

3. The "Highland Bankruptcy" – *In re: Highland Capital Management, L.P.*, No. 19-34054-sgj (Bankr. N.D. Tex.)

| Ex. No. | Document | Date | Appendix |
|---|---|---|---|
| | **Highland Bankruptcy** | | |
| 7 | Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, ECF No. 4291 | 6/27/2025 | App 245-256 |
| 8 | Hearing Transcript of June 25, 2025 on Motion to Extend Duration of Trusts (4213) and Motion to Approve Settlement (4216) | 6/25/2025 | App 257-522 |

Respectfully submitted,

*/s/ Brian P. Shaw*
**Brian P. Shaw**
  Texas Bar No. 24053473
  Email: bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Brent M. Rubin**
  Texas Bar No. 24086834
  Email: brubin@ccsb.com
**Joshua D. Kipp**
  Texas Bar No. 24078793
  Email: jkipp@ccsb.com

MR 0600

**Andrea C. Reed**
  Texas Bar No. 24121791
  Email: areed@ccsb.com
**Emily H. Owen**
  Texas Bar No. 24116865
  Email: eowen@ccsb.com
**CARRINGTON, COLEMAN,**
 **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2025, a copy of the foregoing document was electronically served on all counsel of record in accordance with TEX. R. CIV. P. 21a.

/s/ *Andrea C. Reed*
Andrea C. Reed

MR 0601

Digitally signed by Advance Performance Exponents Inc
Date: 2025.07.15 12:26:05 -05:00
Reason: Apex Certified
Location: Apex



**EXHIBIT**

**1**



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (      )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

**AND**

(1)   **MARK ERIC PATRICK**

(2)   **PAUL MURPHY**

(3)   **CDMCFAD, LLC**

(4)   **DFW CHARITABLE FOUNDATION**

(5)   **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

(6)   **CLO HOLDCO, LTD.**

<u>Defendants</u>

_____

**WRIT OF SUMMONS**

_____

TO:   (1)   **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

(2)      **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3)      **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4)      **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5)      **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6)      **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

**IMPORTANT**

Directions for Acknowledgment of Service are given with the accompanying form

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

CAUSE NO: FSD 201 OF 2025 (  )

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

| | |
|---|---|
| **(1)** | **MARK ERIC PATRICK** |
| **(2)** | **PAUL MURPHY** |
| **(3)** | **CDMCFAD, LLC** |
| **(4)** | **DFW CHARITABLE FOUNDATION** |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** |
| **(6)** | **CLO HOLDCO, LTD.** |

Defendants

_____

**STATEMENT OF CLAIM**

_____

**INTRODUCTION**

1    The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2       The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3       The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**"). At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4       The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5       In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company. In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6       By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**") of the Company, Mr Patrick caused:

6.1     the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

2

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2 the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3 the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4 the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the "**Impugned Transactions**".

7 The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8 Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

3

**THE PARTIES**

<u>The Company</u>

9       The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10      The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11      The Company has been governed by the following memorandum and articles of association from time to time:

11.1      The memorandum and articles of association dated 27 October 2011; and

11.2      The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the "**Articles**") save that the Company reserves the right to challenge the validity of the Articles.

12      Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13      Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

4

14 The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15 The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16 The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17 The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18 On 7 November 2011, the Company issued:

18.1 300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2 100 Management Shares to Grant Scott.

19 On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1 Highland Kansas City Foundation, Inc.;

19.2 Highland Dallas Foundation, Inc.[1]; and

19.3 Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

---

[1]Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

5

20    On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21    On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22    The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23    Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24    As a result of the Impugned Transactions, the Company now has no material assets.

DFW

25    DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26    DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

6

The Fund

27    The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28    The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The Company will rely on the LPA for its applicable full terms and effect.

29    Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30    Until 18 December 2024, the Company was the sole limited partner of the Fund.

31    On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32    The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33    On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34    The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

7

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35    The assets of the Fund were valued at c. $270 million in September 2024.

The New GP

36    The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37    Mr Patrick is the New GP's sole director and sole shareholder.

38    The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

CDM

39    CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40    CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41    Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42    The sole manager of CDM is Mark Patrick.

43    From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

8

44      On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

CLO HoldCo

45      CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46      The directors of CLO Holdco are Messrs Patrick and Murphy.

47      The sole shareholder of CLO Holdco is the Fund.

The Directors

*Mark Patrick*

48      Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1    a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2    the Manager of CDM (the Third Defendant);

48.3    the sole director and the sole member of DFW (the Fourth Defendant);

48.4    the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5    a director of CLO HoldCo (the Sixth Defendant).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

9

49      Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**") from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024.

*Paul Murphy*

50      Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

50.1    a director of the Company;

50.2    a director of CLO HoldCo (the Fifth Defendant); and

50.3    a director of various other entities in the Charitable DAF structure.[2]

51      Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

**THE CHARITABLE PURPOSE OF THE FUND**

52      The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland to enable certain assets, held through the shares in CLO Holdco, to be donated to a charitable foundation.

53      Upon the formation of the Fund, the Company was admitted as a limited partner and, by way of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the Fund.

54      The purpose of the Fund was to make investments for the ultimate benefit of the Original Participating Shareholders and the Charities:

---

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd., HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

10

54.1   The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners…*".

54.2   Clause 1.3 of the LPA provides that "*… the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3   Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4   "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5   Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses…*".

54.6   The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55   The Charities are the following four US charitable or non-profit foundations:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

11

55.1    *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2    *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3    *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4    *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56    The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57    CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58    As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

12

58.1 S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income (**"UBTI"**); and

58.2 the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59 As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60 In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61 The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62 Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63 Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

13

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64      The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1    S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations. The supported organisations must also be s501(c)(3) entities;

64.2    There are three types of supporting organisations, known as "Type I", "Type II" and "Type III". S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each "Type", respectively;

64.3    S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4    S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65      The Supporting Organisations are so controlled by the respective Supported Organisations.

66      The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67      The Certificates of Incorporation provide (amongst other things) that:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

14

67.1    the Supporting Organisation:

(a)    is organised and shall be operated exclusively for charitable, educational and scientific purposes;

(b)    is organised and operated exclusively to support and benefit the particular charity that controls it; and

(c)    is a non-profit non-stock corporation and cannot issue any capital stock;

67.2    no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3    net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68    The Bylaws provide that (amongst other things):

68.1    There are two classes of members of the Supporting Organisations with one member in each such class:

(a)    the institutional member (the **"Institutional Member"**) which shall be the Supported Organisation; and

(b)    the individual member (the **"Individual Member"**) which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2    In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

15

(a)  the Institutional Member is entitled to two votes; and

(b)  the Individual Member is entitled to one vote.

68.3  Institutional membership is not transferable or assignable.

68.4  Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5  Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6  There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69  The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1  the Supported Organisation will provide certain services to the Supporting Organisation;

69.2  the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3  in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

16

70      Mr Dondero sits on the board of each of the Supporting Organisations with two other directors from each of the Supported Organisations respectively.

71      The relationships, rights and obligations created by and between the Supported Organisations and the Supporting Organisations pursuant to the agreements entered into between them were at all material times in summary that:

71.1    the Supported Organisations control the Supporting Organisations through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations;

71.2    the Supporting Organisations support the Supported Organisations by way of making grants to them from time to time from their assets, including any dividends received from the Company;

71.3    the Supporting Organisations have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to the relevant Charity in furtherance of their charitable purposes; and

71.4    while Mr Dondero sits on the board of the Supporting Organisations, he does not control them, as a supermajority of the votes are always held by the respective Charity.

72      The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73      The terms of the LPA grant sole control over the management and distribution of the Fund's assets to the General Partner. The terms of the Articles grant sole control over the management and distribution of the Company's assets to the Management Shareholder.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

17

The LPA

73.1    Clause 1.12

(i)    The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2    Clause 1.6

(i)    *Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(ii)    *Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

18

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

<u>The Articles</u>

73.3    Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4    Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5    Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6    Article 84 (d)

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

19

*The office of Director shall be vacated if the Director…is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7    Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8    Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74    The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1    In or around November 2011:

(a)    Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b)    Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

20

thereby assuming the Control Position from that date.

74.2    In or around 24 March 2021, Mr Scott:

(a)    assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b)    transferred to Mr Patrick the 100 Management Shares in the Company; and

(c)    resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3    On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4    Mr Patrick therefore assumed the Control Position from that date.

74.5    On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6    On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7    Mr Patrick is the sole shareholder and director of the New GP.

74.8    Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

21

75 Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant). Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76 The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1 where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2 where the same individual was a director of the Company;

76.3 where the same individual was the sole shareholder or controller of the General Partner;

76.4 where the same individual was a director of the General Partner;

76.5 where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6 where the same individual was in effective sole control of all assets of the Fund;

76.7 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8 where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

22

MR 0626

76.10  where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11  where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12  in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

Plan to defeat the interests of the Original Participating Shareholders

77  On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78  It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79  The Work Plan stated that (amongst other things):

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

23

79.1    the advice required related to "...*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*..."; and

79.2    "...*we may need to rely on opinions and memoranda in potential future disputes*..."

80    The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1    'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2    'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3    'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4    'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5    'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81    The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1    On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things)*:*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

24

(a)　　the Directors have power under the Articles to issue new Participating Shares that dilute the current Participating Shareholders, but must consider their fiduciary duties (including the duty to act in the best interests of the Company) when issuing such shares;

(b)　　the Participating Shares are non-redeemable;

(c)　　while payment of a dividend or other distribution is at the discretion of the Directors, if the Company were to have distributable reserves available, there may be a question of whether the Directors would be acting in its best interests to not pay some dividend or distribution; and

(d)　　the Directors have fiduciary duties to the Company which are paramount when considering (i) making a distribution and (ii) the distributable reserves available from which to make payments; they must have regard to what is in the Company's best interests, its future cash requirements, and its present and future solvency.

82　　In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.*"

83　　On 27 February 2024, without telling the Supporting Organisations or the Charities, the New GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84　　On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and without telling the Supporting Organisations or the Charities, executed a written consent for the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85    In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1    directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2    expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86    On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1    to increase Mr Patrick's salary to US$850,000 per annum;

86.2    include a long-term incentive ("**LTI**") tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3    the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87    On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1    the Directors resolved (amongst other things) that Mr Patrick would receive:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

26

(a)    an LTI payment of US$975,000; and

(b)    an 'annual discretionary bonus' for 2023 at an amount of 2.5 times his base salary.

87.2    Previously, in or around October 2021, Mr Patrick had signed an 'employment agreement' for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a)    shall receive a base salary of US$850,000;

(b)    shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c)    is eligible for both annual and discretionary bonuses as determined at the 'sole and absolute discretion of the Directors'.

88    Comparatively, Mr Scott's salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors' fees, remuneration and/or benefits.

89    In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund.  Mr Patrick did not do so.

90    On 11 November 2024, Holland and Knight ("**H&K**"), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

27

91      On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations so as to weaken any winding-up petition brought by the Supporting Organisations on just and equitable grounds. Mr Murphy wrote that:

> "*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…*"

92      On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help.

93      On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware, by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the Fund structure. The sole member of DFW was and is Mr Patrick.

94      On 7 February 2025, 318 Participating Shares were issued to DFW.

95      On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved to adopt the Amended and Restated Memorandum and Articles of Association dated 20 February 2025 which, among other things:

95.1    Amended the Memorandum at paragraph 3 to give the Company charitable objects;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

28

95.2    Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3    Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96    The Company reserves its position in respect of the validity of these amendments.

The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM

97    On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98    On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1    "*…would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2    "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

29

98.3 As a Delaware limited liability company (CDM): "…*as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

99.1 The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

99.2 The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

99.3 CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100 On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101 The LLC Agreement, materially provides (amongst other things) that:

*"Fair Market Value shall have the meaning set forth in Section 6.9(b).*

*…*

*The initial Manager shall be Mark Patrick.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

30

MR 0634

…

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

…

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

…

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

31

*Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion."*

102    The Company will rely on the terms of the LLC Agreement for their applicable full terms and effect.

103    The effect of these transactions was that:

103.1  CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the limited partnership interest in the Fund previously held by the Company; and

103.2  The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been its limited partnership interest in the Fund, was exchanged for the CDM Membership Interest

(the **"Restructuring"**)

104    The Restructuring was at an undervalue and not in the interests of the Company (in that the CDM Membership Interest was less valuable than the limited partnership interest that the Company assigned to CDM) because (amongst other things)*:*

104.1  The General Partner owed fiduciary duties to the Company in the Fund, but the Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2  The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e. a "good faith determination of the value".

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

32

MR 0636

105    On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the steps taken by the Company in December 2024 to effect the Restructuring and whether the transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1    refers to the justifications for the decisions taken as set out in the Restructuring Resolutions, and considers that, if called upon to justify the purpose of those decisions, the Directors would need to explain:

(a)    how the penalisation or loss of tax-exempt status any of the current Participating Shareholders could have "*imperil[ed]*" the "*assets*" of the Company;

(b)    the detrimental issues the Company was facing that the Directors believed would be mitigated by the interposition of CDM into the Fund structure; and

(c)    how and/or why the Restructuring would (i) benefit the Company and (ii) reduce the influence of Mr Dondero; and

105.2    considers that a shareholder reviewing the reasons listed in the Restructuring Resolutions "*might suggest that the contents of the resolution are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board*".

Persistent and continual lack of information for the Supporting Organisations

106    On 23 January 2025, having received no response from Mr Murphy to the No-Confidence Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that the Supporting Organisations needed to better understand the Company's/Fund's asset position, and requesting certain information be provided by 10 February 2025.

107    Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors expressing serious concern (i) that the Supporting Organisations' requests for information

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

33

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108     On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

108.1   had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

108.2   are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109     On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: "*[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions.*"

110     On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111     On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112     On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

34

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113     On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114     On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115     Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1   four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2   two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

35

115.3    one (1) week after the Directors and/or the Company redeemed the Company's interest in CDM without telling the Supporting Organisations or the Charities (see below);

115.4    one (1) day after the Directors placed the Company in voluntary liquidation, without telling the Supporting Organisations or the Charities.

Purported Share Issuance and allotment to DFW

116    In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders - "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations.

117    On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the exercise of the power, the Articles grant the Directors power to issue new shares that dilute the Participating Shareholders, and recommended the shares be issued sooner than later, and before any winding up petition was presented, since any alteration to the Company's membership made after the presentation of the petition would be void.

118    On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**"). The Share Issue Resolutions provided that:

118.1    Participating Shareholders had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

36

118.2 Based apparently on U.S. tax advice:

(a) There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

(b) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

(c) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3 The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119 On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1 where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "…*deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2 the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

37

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3   it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4   the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

Plan to redeem the Original Participating Shareholders

120     In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121     At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

38

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122    The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated 7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024 (the "**September 2024 Valuation**").

*PwC and FTI*

123    On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the Supporting Organisations as "*potential adverse parties*".

124    On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure and requested that a second valuation be prepared of all the CDM Membership Interest, which valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

39

MR 0643

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125    On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> "*... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently.*"

*The FTI Memo*

126    On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

40

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127    On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128    On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129    On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130    On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

41

MR 0645

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131    On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

*"Agree we need to finalise the [FTI valuation] reports …We should request any limits on use removed.*

*We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests. After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions …*

*We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*

*Note US LLC would make DFW its sole owner."*

132    The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

42

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133    On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things:

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission". However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*
>
> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders?*
>
> …
>
> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*
>
> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states "Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed".*
>
> …

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

43

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

…

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134     On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

44

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

…

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135    On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

45

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

*FTI: What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction.*"

*March 2025 ValueScope Valuation*

136     Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1   100% Membership Interest in CDM; and

136.2   Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137     The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

46

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138    A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| Valuation Date | DLOC* | DLOM** | Valuation Basis | FMV (100 Shares) |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

*DLOC – Discounted for Lack of Control

**DLOM – Discounted for Lack of Marketability

***DCF – Discounted Cash Flow

139    The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously].  When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.  However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

47

MR 0651

140    ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141    For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> '*Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality*'.

142    Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1    applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2    determined the FMV of 100 Participating Shares to be US$536,784;

142.3    applied a discount of 99.2% for DLOC; and

142.4    applied a discount of 20.00% for DLOM.

143    The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

48

144    Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of 100 Participating Shares in the Company apparently declined from US$75,961,370 to US$536,784, representing a reduction in value of 99.29% in less than a six month period, in which the Restructuring occurred, attributable to a change in valuation basis (amongst other things) from NAV to DCF.

145    Furthermore, ValueScope does not appear to have sense-tested their valuation. Although they identified "total equity" of c. US$270 million and concluded that all of the Participation Shares had a value of only c. US$1.6 million, they did not address themselves to who benefitted from the residual value of c. US$268 million.

Admission and Redemption

146    On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together with the Admission Agreement, the "**Restructure Agreements**"):

146.1    The recitals to the Manager Consent stated that the redemption of the Company's membership interest was justified by reason of alleged attempts by the Supporting Organisations to exert control, and the potential loss of their (i.e. the Supporting Organisations') non-profit and tax-exempt status:

> *"… the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

49

MR 0653

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)"*

146.2 The Manager Consent further stated:

*"WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests"*

146.3 Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4 Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a)     there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. ("**HDF**") due to the undue influence and control exercised over HDF by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

50

(b)      the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

(c)      such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5    Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

(a)      asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

(b)      suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

(c)      concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6    Exhibit E contained two valuation reports:

(a)      The first was a ValueScope valuation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

51

(b)      The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

(i)      expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

(ii)      permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7    On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

(a)      Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(b)      Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147      On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148      On 2 April 2025, the Directors of the Company, by way of written resolution:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

52

MR 0656

148.1 Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2 Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149 The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150 The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1 The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2 The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3 The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4 The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

53

MR 0657

<u>Voluntary Liquidation and Supervision Order</u>

151     On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152     However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations presented a petition seeking the winding up of the Company on a just and equitable basis, under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153     On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition.  Following that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the Court.

154     On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary liquidation of the Company was to be continued under the supervision of the Court pursuant to s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155     At all material times, the Directors, as directors, owed the following duties individually to the Company:

155.1   A fiduciary duty to act *bona fide* in what he considers to be the best interests of the Company (the "**Best Interests Duty**").

155.2   A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

54

155.3   A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4   A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5   A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6   A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7   A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156   With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157   The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

55

## ATTRIBUTION OF KNOWLEDGE AND INTENTION

158     As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

158.1     As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

158.2     As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the "**Manager Consent**") approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

158.3     As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159     Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

## CLAIMS AGAINST THE DEFENDANTS

Breaches of fiduciary and other duty

160     The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

56

Restructuring, including the CDM Assignment

161      The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

<div align="center">PARTICULARS</div>

161.1    The Plaintiff relies on paragraphs 77 to 105 above.

161.2    With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3    Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4    The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

<div align="right">57</div>

161.5 The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b) knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c) knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d) knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8 Further, and in any event, the Directors (and each of them) acted when each of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

58

(a)     knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b)     knew or ought to have known that:

(i)     the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(ii)    the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

(iii)   other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

(iv)    even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

59

       (v)     the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

  (c)    knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162    By reason of the foregoing breaches of duty or any of them:

162.1  The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2  CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3  CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

## Share Issuance

163    The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

<div align="center">PARTICULARS</div>

163.1  The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

60

163.2 The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

(a) diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

(b) inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

(b) knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

(c) knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

61

(d)     knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4   Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5   It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164     By reason of the foregoing breaches of duty or any of them:

164.1   the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2   DFW holds its shares on trust or constructive trust for the Company.

164.3   DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

62

164.4   The Company's register of shareholders shall be rectified accordingly.

Admission and Redemption

165     The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty.  Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1   The Plaintiff relies on paragraphs 120 to 150 above.

165.2   The Directors (and each of them) acted when each of them:

(a)     knew or ought to have known that:

(i)     proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

(ii)    proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(iii)   the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(iv)    proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

63

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v)     the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b)     knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3   Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166     By reason of the foregoing breaches of duty or any of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

64

166.1 DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2 DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Further claims against Mr Murphy</u>

167 In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1 At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2 Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3 Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4 Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5 Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6 Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7 As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

65

MR 0669

Directors' Fees, Remuneration and Expenses

168    The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169    As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170    Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171    Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023.  Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings.  The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172    The Company claims:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

66

172.1 Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2 Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3 Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

Unlawful Means Conspiracy

173 The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1 It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2 The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3 As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4 The conspiracy was a conspiracy to injure the Company.

173.5 The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

67

173.6    The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7    Each of the conspirators intended to injure the Company.  This averment is an inference from all the facts and matters pleaded above.

173.8    As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

<u>Proprietary claim and/or unconscionable receipt</u>

174    The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1    CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2    The knowledge of CDM was and is that of Mr Patrick.

174.3    The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4    CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5    By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

68

Unjust Enrichment

175    In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the Company's expense and is liable to the Company in restitution:

   175.1   The Partnership Interest was transferred on the basis that there was a valid assignment agreement effecting that transfer.

   175.2   That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176    In order to obtain the return to it of the Partnership Interest in the Fund, together with an Account of Profits, the Company does not need as a matter of law to make any allegation of "alter ego" or to lift the corporate veil in relation to CDM or DFW.

177    If, contrary to the paragraph above, the Company does so need, it makes the following allegations for the purposes of all relevant claims or causes of action set out above.

   177.1   CDM is the "alter ego" of Mr Patrick.

   177.2   DFW is the "alter ego" of Mr Patrick.

   177.3   In relation to the receipt of any property by CDM directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

   177.4   In relation to the receipt of any property by DFW directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

69

PARTICULARS

(a)     In relation to CDM:

(i)     Mr Patrick was and is the Manager. There are no other officers or managers.

(ii)    Mr Patrick was and is the managing member.

(iii)   CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

(iv)    CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

(v)     CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b)     In relation to DFW:

(i)     Mr Patrick was and is the 'President'. There are no other officers or managers.

(ii)    Mr Patrick was and is the sole member.

(iii)   Mr Patrick was and is the sole registered director.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

70

(iv)    DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v)    DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi)    DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

<u>Loss and Damage</u>

178    As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1   Its Partnership Interest in the Fund.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

71

178.2 The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3 Excessive Directors' fees or remuneration or emoluments or benefits.

178.4 Improper expenses (if any).

178.5 The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6 The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179 The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180 CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181 The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

72

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

**PRAYER FOR RELIEF**

In the premises, the Company claims:

(1)     Damages or equitable compensation.

(2)     Orders for restitution or disgorgement.

(3)     Orders for the restoration of property to the Company.

(4)     Interlocutory or final injunctions as may be necessary or appropriate.

(5)     Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6)     Orders for the provision of documents or information at an early interlocutory stage.

(7)     Orders for the cancellation of the Share Issuance, as appropriate.

(8)     Rectification of the register of the Company, as appropriate.

(9)     Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10)    An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11)    An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

73

(12)    All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13)    All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14)    All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15)    Interest as above.

(16)    Further or other relief.

(17)    Costs.

DATED  this 15th day of July 2025

*Maples and Calder (Cayman) LLP*

_____

**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

74

**DIRECTIONS FOR ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

182   The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

After completion it must be delivered or sent by post to the Law Courts, PO Box 495G, George Town, Grand Cayman, KY1-1106, Cayman Islands.

183   A Defendant who states in the Defendant's Acknowledgment of Service that the Defendant intends to contest the proceedings must also serve a Defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

If a Statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

If the Defendant fails to serve his Defence within the appropriate time, the Plaintiffs may enter judgment against the Defendant without further notice.

184   A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered.  If a Defendant to an action for a debt or liquidated demand (i.e. a fixed sum) who does not intend to contest the proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiffs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

states, in answer to Question 3 in the Acknowledgment of Service, that the Defendant intends to apply for a stay, execution will be stayed for 14 days after that Defendant's Acknowledgment, but the Defendant must, within that time, issue a Summons for a stay of execution, supported by an affidavit of the Defendant's means. The affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See overleaf for Notes for Guidance**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

2

**Notes for Guidance**

1      Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2      For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to the Defendant.

3      Where the Defendant is sued in a name different from the Defendant's own, the form must be completed by the Defendant with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4      Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "Partner in the firm of (.....................................)" after that Partner's name.

5      Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN THAT PERSON'S OWN, the form must be completed by the Defendant with the addition in paragraph 1 of the description "trading as (...........................)" after that Defendant's name.

6      Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on its behalf.

7      Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian *ad litem*.

8      A Defendant acting in person may obtain help in completing the form at the Courts Office.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

3

MR 0681

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

CAUSE NO: FSD     OF 2025 (    )

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

(1)   **MARK ERIC PATRICK**

(2)   **PAUL MURPHY**

(3)   **CDMCFAD, LLC**

(4)   **DFW CHARITABLE FOUNDATION**

(5)   **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

(6)   **CLO HOLDCO, LTD.**

Defendants

**ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

If you intend to instruct an Attorney to act for you, give that Attorney this form IMMEDIATELY.

Important.  Read the accompanying directions and notes for guidance carefully before completing this form.  If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

1.   State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

2.   State whether the Defendant intends to contest the proceedings (tick appropriate box)

☐   yes                 ☐   no

3.      If the claim against the Defendant is for a debt or liquidated demand, AND the Defendant does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box)

☐yes                 ☐   no

Service of the Writ is acknowledged accordingly

(Signed)........................................................

        Attorney for

2

**Notes on address for service**

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands.  A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, the Defendant must give the Defendant's post office box number and the physical address of the Defendant's residence or, if the Defendant does not reside in the Cayman Islands, the Defendant must give an address in Grand Cayman where communications for the Defendant should be sent.  In the case of a limited company, "residence" means its registered or principal office.

Indorsement by plaintiff's Attorney (or by plaintiff if suing in person) of that Plaintiff's name, address and reference, if any, in the box below.

Maples and Calder (Cayman) LLP
PO Box 309 Ugland House
Grand Cayman KY1-1104

Cayman Islands: CJM/JRN/LRA/TQR/858403-01

Indorsement by defendant's Attorney (or by defendant if suing in person) of that defendant's name, address and reference, if any, in the box below.

3

MR 0684

Digitally signed by Advance Performance Exponents Inc.
Date: 2025.07.31 15:09:53 -05:00
Reason: Apex Certified
Location: Apex





**EXHIBIT**

**2**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

<u>Plaintiff</u>

**AND**

| | | |
|---|---|---|
| **(1)** | **MARK ERIC PATRICK** | |
| **(2)** | **PAUL MURPHY** | |
| **(3)** | **CDMCFAD, LLC** | |
| **(4)** | **DFW CHARITABLE FOUNDATION** | |
| **(5)** | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** | |
| **(6)** | **CLO HOLDCO, LTD.** | |

<u>Defendants</u>

_____

**CONSENT ORDER**

_____

**UPON** the Plaintiff's Summons dated 15 July 2025 (the "**Injunction Summons**")

**AND UPON** the First, Third, Fifth, and Sixth Defendants' Summons of dated 21 July 2025 (the "**Directions Summons**")

**AND UPON** the parties listed therein giving to the Court the undertakings recorded in Schedule A to this Order

MR 0685

**AND UPON** the Injunction Summons and the Directions Summons being listed for hearing on 31 July 2025 before the Honourable Justice Parker

**IT IS ORDERED BY CONSENT** that:

1.   The Injunction Summons shall be adjourned and listed for hearing on the first available date after 18 September 2025 (the "**Hearing**").

2.   The time estimate for the Hearing shall be 2 days.

3.   Directions for evidence in the Injunction Summons shall be as follows:

   (a) The Defendants shall file and serve any evidence in answer by 4.30pm on 28 August 2025;

   (b) The Plaintiff shall (if so advised) serve any evidence in reply by 4.30pm on 11 September 2025.

4.   The Plaintiff shall file an agreed hearing bundle for the Hearing in electronic form by 4pm on the date which is 12 days before the date of the hearing (once listed).

5.   The parties shall file and exchange skeleton arguments by 4pm on the date which is 7 days before the date of the hearing (once listed).

6.   Costs of the Injunction Summons and the Directions Summons are reserved.

7.   Liberty to apply.

DATED this    31    day of July    2025

FILED this    31    day of July    2025

_____

**THE HONOURABLE JUSTICE PARKER**
**JUDGE OF THE GRAND COURT**

Approved as to form and content:

_Maples and Calder (Cayman) LLP_

**Maples and Calder (Cayman) LLP**

Attorneys for the Plaintiff

_Campbells LLP_

**Campbells LLP**

Attorneys for the First, Third, Fifth and Sixth Defendants

_Kobre & Kim (Cayman)_

**Kobre & Kim**

Attorneys for the Second Defendant

_Baker & Partners (Cayman) Limited_

**Baker & Partners LLP**

Attorneys for the Fourth Defendant

**Schedule A**

Undertakings given by the Defendants

1      Pending the determination of the JOLs' Summons, the Defendants[1], and the related entities listed in Schedule B hereto (the "**CDM Entities**") and their respective agents, servants, employees, and representatives, agree and undertake to:

(a) not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of the ordinary course of business;

(b) not to take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

(c) not to take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

(d) not to take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

(e) not to take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third-party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this undertaking, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities; and

(f) not to alter, conceal, or destroy any business records concerning the Defendants or the CDM Entities, including any transfers of funds, assets, receivables, or shares to or from the Defendants or CDM Entities.

2   Further, and to the extent not addressed by the foregoing, the Defendants and the CDM Entities undertake and agree that:

---

[1] Being the First Defendant, Mark Patrick; the Second Defendant, Paul Murphy; the Third Defendant, CDMCFAD, LLC; the Fourth Defendant, DFW Charitable Foundation; the Fifth Defendant, CDH GP, Ltd. as general partner for and on behalf of Charitable DAF Fund, LP, and in its capacity as general partner; and the Sixth Defendant, CLO HoldCo, Ltd.

MR 0688

(a) they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in Charitable DAF Fund, LP (the "**Fund**"), and/or the CDM Entities and/or any assets of the Fund other than in the ordinary course of business; and

(b) they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of this undertaking.

3 From the date of this undertaking to the date of the determination of the JOLs' Summons, the Third, Fourth, Fifth and Sixth Defendants (the "**CDM Defendants**") and the CDM Entities will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$50,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction.

4 From the date of this undertaking to the date of the determination of the JOLs' Summons, the First Defendant and the Second Defendant will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$100,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction.

5 If the JOLs have any queries regarding a transaction (or series of related payments or transactions) and whether it is in the ordinary course of the CDM Defendants' or the CDM Entities' business, the CDM Defendants and the CDM Entities undertake to consult with the JOLs and to provide clarification. For the avoidance of doubt, nothing in this undertaking shall prohibit the Defendants and the CDM Entities from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with these proceedings or the official liquidation of Charitable DAF Holdco, Ltd (In Official Liquidation) [FSD 116 of 2025 (JAJ)], or the Chapter 15 Case (defined below). All such transactions of the CDM Defendants and the CDM Entities will be provided for in the monthly transactions report pursuant to paragraph 6 of this undertaking. However, the Defendants agree that the issue of whether

they are permitted to use funds that derive directly or indirectly from the limited partner interest in the Fund to pay their legal fees and other service providers will be determined at the Hearing (as defined in paragraph 1 of the consent order to which these undertakings are appended).

6    From the date of this undertaking to the date of the determination of the JOLs' Summons, the CDM Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$50,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the CDM Defendants or the CDM Entities for the period 30 June 2024 onwards. Any information of whatever nature relating to any member of the Defendants or the CDM Entities which is provided to the JOLs pursuant to this paragraph 5, shall not be disclosed to or shared with Mr James Dondero, the Supporting Organisations (being Highland Santa Barbara Foundation, Highland Dallas Foundation, and Highland Kansas City Foundation), or any known affiliates or service providers of these individuals / entities, subject to where the JOLs' are required to disclose any such information in the discharge of their duties to the Court or as otherwise required by law.

7    With respect to the chapter 15 case, *In re Charitable DAF Holdco, Ltd (In Official Liquidation)*, United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), Case No. 25-11376 (BLS) (the "**Chapter 15 Case**"), (i) The First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities consent to the entry of an order, in the form and substance appended hereto at Schedule C, in the Chapter 15 Case, recognising and enforcing the above undertakings in the United States; (ii) the JOLs agree to adjourn the hearing to recognise the Cayman Islands liquidation of Charitable DAF Holdco, Ltd. (the "**Company**") as a foreign main proceeding from 14 August 2025, to a date as soon as practicable, based on the Bankruptcy Court's availability, following the conclusion of inter parties hearing regarding the JOL's Summons (such, date, the "**Adjourned Recognition Hearing Date**"); (iii) the JOLs and the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities agree that the deadline to object to recognition of the Cayman Islands liquidation of the Company shall be the date that is 21 days before the Adjourned Recognition Hearing Date and the deadline for JOLs to reply to objections, if any, shall be the date that is 7 days before the Adjourned Recognition Hearing Date.  For

the avoidance of doubt, (i) the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities reserve their rights regarding any relief sought in the Chapter 15 Case, including the relief sought in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative and (II) Related Relief Under Chapter 15 of the Bankruptcy Code*, other than with respect to matters expressly addressed in this undertaking; and (ii) the JOLs reserve their right to seek provisional relief against parties as they deem necessary or appropriate in furtherance of their duties as official liquidators, including in furtherance of their ongoing investigation of the business and affairs of the Company from the date hereof through the Adjourned Recognition Hearing Date.

**Schedule B**

List of CDM Entities

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

(xiv) DFW Charitable Foundation (Delaware)

(xv) CLO HoldCo LLC (Delaware)

(xvi) Rand Advisors LLC (Delaware)

(xvii) CDHC Royse City Land LLC (Texas)

(xviii) Royse City Land Company LLC (Texas)

(xix) CDHC Assets LLC (Texas)

(xx) CDHC Fort Worth Land LLC (Texas)

(xxi) CDHC Stewart Creek LLC (Texas)

(xxii) BVP Property LLC (Delaware with CA registration)

**Schedule C**

Draft form of Chapter 15 order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (In Official Liquidation),[2] | Case No. 25-11376 (BLS) |
| Debtor in a foreign proceeding. | |

**ORDER GRANTING PROVISIONAL RELIEF PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A) AND 1519 TO RECOGNIZE AND ENFORCE AN ORDER ENTERED BY THE CAYMAN COURT IMPLEMENTING AN ASSET PRESERVATION PROTOCOL WITH RESPECT TO THE CDM ENTITIES**

Upon consideration of [a certification of counsel] with respect to the entry by the Cayman Court[3] of an Order Implementing an Asset Preservation Protocol in the Cayman Litigation, dated [July __, 2025] and attached hereto as **Exhibit 1** (the "Asset Preservation Protocol") and it being understood that the JOLs and the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities agree to the terms and form of this order (the "Order") and its entry by the Court; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Asset Preservation Protocol is hereby recognized by this Court and all undertakings as they relate to the First, Third, Fourth, Fifth and Sixth Defendants and the CDM

---

[2] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 263805. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 3] (the "Verified Petition").

Entities, set forth therein are fully enforceable in the United States, including, but not limited to, each of the following:

    a. the First, Third, Fourth, Fifth and Sixth Defendants (as defined in the Asset Preservation Protocol) and the related entities listed in and attached hereto as **Exhibit 2** (the "CDM Entities") and their respective agents, servants, employees, and representatives, agree and undertake to:

        i. not transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of the ordinary course of business;

        ii. not take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

        iii. not take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

        iv. not take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

        v. not take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this undertaking, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities;

MR 0694

      vi.   not alter, conceal, or destroy any business records concerning the First, Third, Fourth, Fifth and Sixth Defendants or the CDM Entities, including any transfers of funds, assets, receivables, or shares to or from the First, Third, Fourth, Fifth and Sixth Defendants or CDM Entities;

b.  Further, and to the extent not addressed by the foregoing, the First, Third, Fourth, Fifth and Sixth and the CDM Entities undertake and agree that:

      i.   they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in Charitable DAF Fund, LP (the "Fund"), and/or the CDM Entities and/or any assets of the Fund other than in the ordinary course of business; and

      ii.  they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of this Order;

c.  From the date of the Asset Preservation Protocol to the date of the determination JOLs' Summons (as defined in the Asset Preservation Protocol), the CDM Defendants (as defined in the Asset Preservation Protocol) and the CDM Entities will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$50,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction;

d.  From the date of the Asset Preservation Protocol to the date of the determination of the JOLs' Summons (as defined in the Asset Preservation

MR 0695

Protocol), the First Defendant (as defined in the Asset Preservation Protocol) will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) he proposes to make at or above US$100,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction;

e. If the JOLs have any queries regarding a transaction (or series of related payments or transactions) and whether it is in the ordinary course of the CDM Defendants' or the CDM Entities' business, the CDM Defendants and CDM Entities undertake to consult with the JOLs and to provide clarification. For the avoidance of doubt, nothing in this undertaking shall prohibit the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with the Cayman Litigation, the Cayman Proceeding or this Chapter 15 Case. All such transactions of the CDM Defendants and the CDM Entities will be provided for in the monthly transactions report pursuant to paragraph 1(f) of this Order. However, the First, Third, Fourth, Fifth and Sixth Defendants agree that the issue of whether they are permitted to use funds that derive directly or indirectly from the limited partner interest in the Fund to pay their legal fees and other service providers will be determined at the Hearing (as defined in the Asset Preservation Protocol);

  f. from the date of the Asset Preservation Protocol to the date of the determination of the JOLs' Summons (as defined in the Asset Preservation Protocol), the CDM Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$50,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the CDM Defendants or the CDM Entities for the period 30 June 2024 onwards. Any information of whatever nature relating to any member of the First, Third, Fourth, Fifth and Sixth Defendants or the CDM Entities which is provided to the JOLs pursuant to this paragraph 1(e), shall not be disclosed to or shared with Mr James Dondero, the Supporting Organizations (being Highland Santa Barbara Foundation, Highland Dallas Foundation, and Highland Kansas City Foundation), or any known affiliates or service providers of these individuals or entities, subject to where the JOLs' are required to disclose any such information in the discharge of their duties to the Cayman Court or as otherwise required by law;

2. Notwithstanding any provision in the Bankruptcy Rules to the contrary (i) this Order shall be effective immediately and enforceable upon entry; (ii) the JOLs are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (iii) the JOLs are authorized and empowered, and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

3. Each of the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities reserve their rights regarding any relief sought in the Chapter 15 Case, including the relief sought

in the Verified Petition, other than with respect to matters expressly addressed in paragraph 1 of this Order. For the avoidance of doubt, the First, Third, Fourth, Fifth and Sixth Defendants (as defined in the Asset Preservation Protocol) and the CDM Entities hereby consent to the recognition and enforcement of the Asset Preservation Protocol in the United States through and including the date of determination of the JOLs' Summons (as defined in the Asset Preservation Protocol) and shall not oppose the continuation of such relief at any hearing for recognition of the Cayman Proceeding. By agreeing to the entry of this order, the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities have not consented to jurisdiction in this Court. All parties' rights are reserved with respect to jurisdiction

4.     This Order is a Final Order within the meaning of 28 U.S.C. § 158(a) and is effective immediately upon entry.

5.     This Order shall be binding on and inure to the benefit of the Debtor, the JOLs, the First, Third, Fourth, Fifth and Sixth Defendants, and the CDM Entities.

6.     To the extent there is any inconsistency between the terms of this Order and the Asset Preservation Protocol, the terms of the Asset Preservation Protocol as they relate to the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities shall control.

7.     This Court shall retain jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order, any request for additional relief or any adversary proceeding brought in and through this Chapter 15 Case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

Dated: [July ___], 2025
     Wilmington, Delaware

_____

MR 0698

Honorable Brendan L. Shannon
United States Bankruptcy Judge

**Exhibit 1**
[Asset Preservation Protocol]

FILED BY Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403.02/83824743)

**LeadSC**



# U.S. Bankruptcy Court
# District of Delaware (Delaware)
# Bankruptcy Petition #: 25-11376-BLS

*Date filed:* 07/21/2025

*Assigned to:* Brendan Linehan Shannon
Chapter 15
Voluntary

| | |
|---|---|
| ***Debtor*** | represented by **Jason Daniel Angelo** |
| **Charitable DAF HoldCo, Ltd** | Reed Smith LLP |
| 68 Fort Street | 1201 North Market Street |
| P.O. Box 31726 | Suite 1500 |
| George Town KY1-1207 | Wilmington, DE 19801 |
| OUTSIDE U. S. | 302-778-7500 |
| Caymen Islands | Fax : 302-778-7575 |
| | Email: JAngelo@reedsmith.com |

**Aaron J. Javian**
Reed Smith LLP
599 Lexington Avenue
24th Floor
New York, NY 10022
212-521-5400
Fax : 212-521-5450
Email: ajavian@reedsmith.com

**Casey D. Laffey**
Reed Smith LLP
599 Lexington Avenue
24th Floor
New York, NY 10022
212-521-5400
Email: claffey@reedsmith.com

**Richard C. Solow**
Reed Smith LLP
599 Lexington Avenue
24th Floor
NY, NY 10022
212-521-5400
Fax : 212-521-5450
Email: rsolow@reedsmith.com

**Ian M. Turetsky**
Reed Smith LLP
599 Lexington Avenue
24th Floor

MR 0701

New York, NY 10022
212-521-5400
Email: ITuretsky@ReedSmith.com

*Foreign Representative*
**Margot MacInnis and Sandipan Bhowmik**
2nd Floor, Century Yard, Cricket Square
P.O. Box 1044
George Town KY1-1102
OUTSIDE U. S.
Caymen Islands

represented by **Jason Daniel Angelo**
(See above for address)

*U.S. Trustee*
**U.S. Trustee**
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
(302)-573-6491

represented by **Joseph James McMahon, Jr.**
United States Department of Justice
Office of the United States Trustee
844 King Street, Suite 2207
Lockbox #35
Wilmington, DE 19801
302-573-6491
Fax : 302-573-6497
Email: joseph.mcmahon@usdoj.gov

| Filing Date | # | Docket Text |
|---|---|---|
| 07/21/2025 | 1 (19 pgs; 5 docs) | Chapter 15 Petition for Recognition of Foreign Proceeding. Fee Amount $1738 Filed by Charitable DAF HoldCo, Ltd, Jason Daniel Angelo. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4) (Angelo, Jason) (Entered: 07/21/2025) |
| 07/21/2025 | 2 | Receipt of filing fee for Petition Foreign Proceeding (Chapter 15)( 25-11376) [misc,volpfp15] (1738.00). Receipt Number A12288037, amount $1738.00. (U.S. Treasury) (Entered: 07/21/2025) |
| 07/21/2025 | 3 (89 pgs; 2 docs) | Exhibit(s) *(Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (related document(s)1) Filed by Charitable DAF HoldCo, Ltd. (Attachments: # 1 Exhibit A) (Angelo, Jason) (Entered: 07/21/2025) |
| 07/21/2025 | 4 (1224 pgs; 96 docs) | Declaration in Support *of Chapter 15 Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (related document(s)3) Filed by Charitable DAF HoldCo, Ltd. (Attachments: # 1 Exhibit Exhibit List # 2 Exhibit 1 # 3 Exhibit 2 # 4 Exhibit 3 # 5 Exhibit 4 # 6 Exhibit 5 # 7 Exhibit 6 # 8 Exhibit 7 # 9 Exhibit 8 # 10 Exhibit 9 # 11 Exhibit 10 # 12 Exhibit 11 # 13 Exhibit 12 # 14 Exhibit 13 # 15 Exhibit 14 # 16 Exhibit 15 # 17 Exhibit 16 # 18 Exhibit 17 # 19 Exhibit 18 # 20 Exhibit 19 # 21 Exhibit 20 # 22 Exhibit 21 # 23 Exhibit 22 # 24 Exhibit 23 # 25 Exhibit 24 # 26 Exhibit 25 # 27 Exhibit 26 # 28 Exhibit 27 # 29 Exhibit 28 # 30 Exhibit 29 # 31 Exhibit 30 # 32 Exhibit 31 # 33 Exhibit 32 # 34 Exhibit 33 # 35 Exhibit 34 # 36 Exhibit 35 # 37 Exhibit 36 # 38 Exhibit 37 # 39 Exhibit 38 # 40 Exhibit 39 # 41 Exhibit 40 # 42 Exhibit 41 # 43 Exhibit 42 # 44 Exhibit 43 # 45 Exhibit 44 # 46 Exhibit 45 # 47 Exhibit 46 # 48 Exhibit 47 # 49 Exhibit 48 # 50 |

MR 0702

| | | |
|---|---|---|
| | | Exhibit 49 # 51 Exhibit 50 # 52 Exhibit 51 # 53 Exhibit 52 # 54 Exhibit 53 # 55 Exhibit 54 # 56 Exhibit 55 # 57 Exhibit 56 # 58 Exhibit 57 # 59 Exhibit 58 # 60 Exhibit 59 # 61 Exhibit 60 # 62 Exhibit 61 # 63 Exhibit 62 # 64 Exhibit 63 # 65 Exhibit 64 # 66 Exhibit 65 # 67 Exhibit 66 # 68 Exhibit 67 # 69 Exhibit 68 # 70 Exhibit 69 # 71 Exhibit 70 # 72 Exhibit 71 # 73 Exhibit 72 # 74 Exhibit 73 # 75 Exhibit 74 # 76 Exhibit 75 # 77 Exhibit 76 # 78 Exhibit 77 # 79 Exhibit 78 # 80 Exhibit 79 # 81 Exhibit 80 # 82 Exhibit 81 # 83 Exhibit 82 # 84 Declaration 83 # 85 Exhibit 84 # 86 Exhibit 85 # 87 Exhibit 86 # 88 Exhibit 87 # 89 Exhibit 88 # 90 Exhibit 89 # 91 Exhibit 90 # 92 Exhibit 91 # 93 Exhibit 92 # 94 Exhibit 93 # 95 Exhibit 94) (Angelo, Jason) (Entered: 07/21/2025) |
| 07/21/2025 | 5 (109 pgs; 6 docs) | Declaration in Support *of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code to the Honorable United States Bankruptcy Judge* (related document(s)3) Filed by Charitable DAF HoldCo, Ltd. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5) (Angelo, Jason) (Entered: 07/22/2025) |
| 07/22/2025 | 6 (34 pgs; 3 docs) | Motion to Allow *for Entry of an Order Scheduling a Hearing on Chapter 15 Petition for Recognition and Related Relief and Specifying Form and Manner of Service of Notice* Filed by Charitable DAF HoldCo, Ltd. (Attachments: # 1 Exhibit A - Notice Order # 2 Exhibit B - Notice List) (Angelo, Jason) (Entered: 07/22/2025) |
| 07/22/2025 | | Filed by U.S. Trustee. (McMahon, Joseph) (Entered: 07/22/2025) |
| 07/22/2025 | | Judge Brendan Linehan Shannon added to case (SH) (Entered: 07/22/2025) |
| 07/23/2025 | 7 (116 pgs; 3 docs) | Certification of Counsel *Submitting Revised Order Scheduling a Hearing on Chapter 15 Petition and Related Relief and Specifying Form and Manner of Service of Notice* (related document(s)6) Filed by Charitable DAF HoldCo, Ltd. (Attachments: # 1 Exhibit A (Revised Proposed Order) # 2 Exhibit B (Blackline)) (Angelo, Jason) (Entered: 07/23/2025) |
| 07/24/2025 | 8 (24 pgs; 3 docs) | Order Scheduling a Hearing on Chapter 15 Petition for Recognition and Related Relief and Specifying Form and Manner of Service of Notice (Related Doc # 6, 7) Order Signed on 7/24/2025. (Attachments: # 1 Exhibit 1 (Form of Notice) # 2 Exhibit 2 (Notice List)) (JMW) (Entered: 07/24/2025) |
| 07/24/2025 | 9 (1 pg) | Motion to Appear pro hac vice *(Casey D. Laffey, Esq.)*. Receipt Number 4742271, Filed by Charitable DAF HoldCo, Ltd. (Angelo, Jason) (Entered: 07/24/2025) |
| 07/24/2025 | 10 (1 pg) | Motion to Appear pro hac vice *(Aaron Javian, Esq.)*. Receipt Number 4742271, Filed by Charitable DAF HoldCo, Ltd. (Angelo, Jason) (Entered: 07/24/2025) |
| 07/24/2025 | 11 (1 pg) | Motion to Appear pro hac vice *(Ian M. Turetsky, Esq.)*. Receipt Number 4742271, Filed by Charitable DAF HoldCo, Ltd. (Angelo, Jason) (Entered: 07/24/2025) |

MR 0703

| | | |
|---|---|---|
| 07/24/2025 | 12<br>(1 pg) | Motion to Appear pro hac vice *(Richard C. Solow, Esq.)*. Receipt Number 4742271, Filed by Charitable DAF HoldCo, Ltd. (Angelo, Jason) (Entered: 07/24/2025) |
| 07/24/2025 | 13<br>(14 pgs) | Certificate of Service (related document(s)1, 3, 8) Filed by Charitable DAF HoldCo, Ltd. (Angelo, Jason) (Entered: 07/24/2025) |
| 07/25/2025 | 14<br>(1 pg) | Order Approving Motion for Admission pro hac vice Casey D. Laffey, Esq. (Related Doc # 9) Order Signed on 7/25/2025. (JMW) (Entered: 07/25/2025) |
| 07/25/2025 | 15<br>(1 pg) | Order Approving Motion for Admission pro hac vice Aaron Javian, Esq. (Related Doc # 10) Order Signed on 7/25/2025. (JMW) (Entered: 07/25/2025) |
| 07/25/2025 | 16<br>(1 pg) | Order Approving Motion for Admission pro hac vice Ian M. Turetsky, Esq. (Related Doc # 11) Order Signed on 7/25/2025. (JMW) (Entered: 07/25/2025) |
| 07/25/2025 | 17<br>(1 pg) | Order Approving Motion for Admission pro hac vice Richard C. Solow, Esq. (Related Doc # 12) Order Signed on 7/25/2025. (JMW) (Entered: 07/25/2025) |
| 08/04/2025 | 18<br>(34 pgs; 2 docs) | Certification of Counsel *Regarding Agreed Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* Filed by Margot MacInnis and Sandipan Bhowmik. (Attachments: # 1 Proposed Form of Order) (Angelo, Jason) (Entered: 08/04/2025) |
| 08/05/2025 | 19<br>(29 pgs; 2 docs) | Agreed Order Granting Provisional Relief Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code (related document(s)18) Order Signed on 8/5/2025. (Attachments: # 1 Exhibit 1 (Stipulation)) (JMW) (Entered: 08/05/2025) |
| 08/05/2025 | 20<br>(14 pgs) | Certificate of Service *(Docket Nos. 18 - 19)* (related document(s)18, 19) Filed by Margot MacInnis and Sandipan Bhowmik. (Angelo, Jason) (Entered: 08/05/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/07/2025 15:58:05 | | | |
| **PACER Login:** | ccsb2018 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 25-11376-BLS Fil or Ent: filed From: 6/6/2025 To: 8/7/2025 Doc From: 0 Doc To: 99999999 Term: included Headers: |

MR 0704

| | | | included Format: html Page counts for documents: included |
|---|---|---|---|
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

MR 0705



**EXHIBIT 4**

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

District of Delaware

Case number (*If known*): _____ Chapter 15

☐ Check if this is an amended filing

## Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding   **12/15**

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).**

---

**1. Debtor's name**

Charitable DAF HoldCo, Ltd

---

**2. Debtor's unique identifier**

**For non-individual debtors:**

☐ Federal Employer Identification Number (EIN)  ___ ___ – ___ ___ ___ ___ ___ ___ ___

☑ Other 263805 . Describe identifier Cayman Registration No. .

**For individual debtors:**

☐ Social Security number: xxx – xx– ____ ____ ____ ____

☐ Individual Taxpayer Identification number (ITIN): **9** xx – xx – ____ ____ ____ ____

☐ Other _____ . Describe identifier _____ .

---

**3. Name of foreign representative(s)**

Margot MacInnis and Sandipan Bhowmik

---

**4. Foreign proceeding in which appointment of the foreign representative(s) occurred**

Grand Court of the Cayman Islands Cause No. FSD 116 of 2025 (JAJ)

---

**5. Nature of the foreign proceeding**

*Check one:*

☐ Foreign main proceeding
☐ Foreign nonmain proceeding
☑ Foreign main proceeding, or in the alternative foreign nonmain proceeding

---

**6. Evidence of the foreign proceeding**

☑ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

☐ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.

_____
_____

---

**7. Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?**

☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)

☑ Yes

---

MR 0706

Debtor  Charitable DAF HoldCo, Ltd
_____
Name

Case number (*if known*)_____

**8.  Others entitled to notice**

Attach a list containing the names and addresses of:

(i)    all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii)   all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii)  all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9.  Addresses**

**Country where the debtor has the center of its main interests:**

Cayman Islands

**Debtor's registered office:**

68 Fort Street
Number        Street

P.O. Box 31726
P.O. Box

George Town  KY1-1207
City           State/Province/Region     ZIP/Postal Code

Cayman Islands
Country

**Individual debtor's habitual residence:**

_____
Number        Street

_____
P.O. Box

_____
City       State/Province/Region    ZIP/Postal Code

_____
Country

**Address of foreign representative(s):**

2nd Floor, Century Yard, Cricket Square
Number        Street

P.O. Box 1044
P.O. Box

George Town KY1-1102
City           State/Province/Region     ZIP/Postal Code

Cayman Islands
Country

**10. Debtor's website** (URL)

https://dafholdco.com/

**11. Type of debtor**

*Check one:*

☑  Non-individual (*check one*):

☐  Corporation.  Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

☐  Partnership

☑  Other.  Specify: Cayman Islands exempted company

☐  Individual

Official Form 401                Chapter 15 Petition for Recognition of a Foreign Proceeding                page 2

MR 0707

Debtor    Charitable DAF HoldCo, Ltd
          _____        Case number (if known)_____
          Name

**12. Why is venue proper in *this district*?**

Check one:

☑ Debtor's principal place of business or principal assets in the United States are in this district.

☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:

_____.

☐ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:

_____.

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✗ /s/ Margot MacInnis                          Margot MacInnis
_____                    _____
Signature of foreign representative            Printed name

Executed on    07/21/2025
               _____
               MM  / DD /  YYYY

✗ /s/ Sandipan Bhowmik                         Sandipan Bhowmik
_____                    _____
Signature of foreign representative            Printed name

Executed on    07/21/2025
               _____
               MM  / DD /  YYYY

**14. Signature of attorney**

✗ /s/ Jason D. Angelo                   Date    07/21/2025
_____                     _____
Signature of Attorney for foreign representative    MM  / DD / YYYY

Jason D. Angelo
_____
Printed name
Reed Smith LLP
_____
Firm name
1201 North Market Street, Suite 1500
_____
Number        Street
Wilmington                                     DE          19801
_____            _____     _____
City                                           State       ZIP Code

(302) 778-7500                                 jangelo@reedsmith.com
_____                    _____
Contact phone                                  Email address

6009                                           DE
_____                    _____
Bar number                                     State

MR 0708

# EXHIBIT 1



**FSD NO. 116 OF 2025 (JAJ)**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

**SUPERVISION ORDER**

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and  the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

*Filed: 09-May-2025 15:00 EST*
*Auth Code: C02067594574*
www.verify.gov.ky File#: 263805
MR 0710

2.      The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|------|---------|-----------------|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588<br>margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588<br>sandipan.bhowmik@uk.gt.com |

3.      The joint official liquidators may act jointly and severally.

4.      The joint official liquidators are not required to give security for their appointment.

5.      The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

a)      the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

b)      the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6.      The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

a)      the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b)      the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c)      the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7.      The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8.      The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9.      The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

*Filed: 09-May-2025 15:00 EST*
*Auth Code: C02067594574*
*www.verify.gov.ky File#: 263805*
MR 0711

10.    The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**
Filed    6  May 2025

_____
**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

*Filed: 09-May-2025 15:00 EST*
*www.verify.gov.ky File#: 263805*
*Auth Code: C02067594574*
MR 0712

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-_____ (___) |
| Debtor in a foreign proceeding. | |

**CORPORATE OWNERSHIP STATEMENT OF**
**THE DEBTOR PURSUANT TO RULE 1007(a)(4) AND 7007.1**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ), hereby files this Corporate Ownership Statement of the Debtor Pursuant to Rule 1007(A)(4) And 7007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in support of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition")[2] for the Debtor, filed contemporaneously herewith.

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

-2-

As of the date of this statement, the Petitioners submit the below list of corporations that hold 10% or more of the ownership interests in the Debtor. No other parent corporation or publicly held corporation owns 10% or more of the ownership interests of the Debtor.

- Highland Dallas Foundation, Inc.: owns 16.05% of the Debtor's Participating Shares

- Highland Kansas City Foundation, Inc.: owns 16.05% of the Debtor's Participating Shares

- Highland Santa Barbara Foundation, Inc.: owns 16.05% of the Debtor's Participating Shares

- DFW Charitable Foundation: owns 51.04% of the Debtor's Participating Shares

- Mark Patrick: owns 100% of the Debtor's Management Shares

*[Remainder of Page Intentionally Left Blank]*

Dated: July 21, 2025
         Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

By:    */s/ Jason D. Angelo* _____
       Jason D. Angelo (No. 6009)
       1201 North Market Street, Suite 1500
       Wilmington, DE 19801
       Telephone: +1.302.778.7500
       Facsimile: +1.302.778.7575
       E-mail: jangelo@reedsmith.com

       -and-

       Casey Laffey, Esq. (*pro hac vice* forthcoming)
       Aaron Javian, Esq. (*pro hac vice* forthcoming)
       Ian M. Turetsky, Esq. (*pro hac vice* forthcoming)
       Richard C. Solow, Esq. (*pro hac vice* forthcoming)
       **REED SMITH LLP**
       599 Lexington Avenue
       New York, NY 100220
       Telephone: +1.212.521.5400
       Facsimile: +1.713.521.5450
       E-mail:  claffey@reedsmith.com
                ajavian@reedsmith.com
                ituretsky@reedsmith.com
                rsolow@reedsmith.com

       *Counsel to Margot MacInnis and Sandipan Bhowmik as Joint Official Liquidators of Chapter 15 Debtor*

-3-

MR 0716

# EXHIBIT 3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-_____ (___) |
| Debtor in a foreign proceeding. | |

**DISCLOSURE PURSUANT TO RULE 1007(a)(4) OF**
**THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ), hereby files this Disclosure Pursuant to Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in support of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition") for the Debtor, filed contemporaneously herewith.

**I.     Administrators in Foreign Proceeding Concerning the Debtor**

1.     The Petitioners are the duly authorized foreign representatives of the Debtor in the Cayman Proceeding.  The Petitioners' address is:

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

-2-

c/o Grant Thornton Specialist Services (Cayman) Limited
2nd Floor, Century Yard, Cricket Square
P.O. Box 1044
Grand Cayman KY1-1102
Cayman Islands

**II.    Entities Against Whom Provisional Relief is Sought Pursuant to 11 U.S.C. § 1519**

2.    N/A

**III.    All Parties to Litigation Pending in the United States in which the Debtor is a Party at the Time of the Filing of the Verified Petition**

3.    Debtor is not a party to any litigation pending in the United States.

*[Remainder of Page Intentionally Left Blank]*

MR 0719

Dated: July 21, 2025          Respectfully submitted,
      Wilmington, Delaware

**REED SMITH LLP**

By:   */s/ Jason D. Angelo*
      Jason D. Angelo (No. 6009)
      1201 North Market Street, Suite 1500
      Wilmington, DE 19801
      Telephone: +1.302.778.7500
      Facsimile: +1.302.778.7575
      E-mail: jangelo@reedsmith.com

      -and-

      Casey Laffey, Esq. (*pro hac vice* forthcoming)
      Aaron Javian, Esq. (*pro hac vice* forthcoming)
      Ian M. Turetsky, Esq. (*pro hac vice* forthcoming)
      Richard C. Solow, Esq. (*pro hac vice* forthcoming)
      **REED SMITH LLP**
      599 Lexington Avenue
      New York, NY 100220
      Telephone: +1.212.521.5400
      Facsimile: +1.713.521.5450
      E-mail:  claffey@reedsmith.com
              ajavian@reedsmith.com
              ituretsky@reedsmith.com
              rsolow@reedsmith.com

      *Counsel to Margot MacInnis and Sandipan Bhowmik as Joint Official Liquidators of Chapter 15 Debtor*

# EXHIBIT 4

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-_____ (___) |
| Debtor in a foreign proceeding. | |

**STATEMENT OF THE FOREIGN REPRESENTATIVES**
**PURSUANT TO SECTION 1515(C) OF THE BANKRUPTCY CODE**

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ), hereby submit this Statement of Foreign Representatives pursuant to Section 1515(c) of the Bankruptcy Code in support of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* for the Debtor, filed contemporaneously herewith.

**I.    Statement of the Foreign Representatives Pursuant to 11 U.S.C. § 1515(c)**

The Petitioners, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

1.      We are the duly authorized "foreign representatives" of the Debtor in the Cayman Proceeding, as that term is defined in section 101(24) of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

2.      The Cayman Proceeding is a "foreign proceeding" as that term is defined in section 101(23) of the Bankruptcy Code.

3.      We have been informed that section 1515(c) of the Bankruptcy Code provides that a "petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

4.      Pursuant to the requirements of section 1515(c) of the Bankruptcy Code, to the best of our knowledge, the Cayman Proceeding is the only known pending "foreign proceeding" with respect to the Debtor as that term is defined in section 101(23) of the Bankruptcy Code.

[*Signature Page Follows*]

2

Dated:  July 21, 2025
      Cayman Islands

                                     */s/ Margot MacInnis*
                       By:   Margot MacInnis
                            Petitioner

                            -and-

                                     */s/ Sandipan Bhowmik*
                       By:   Sandipan Bhowmik
                            Petitioner

EXHIBIT

5

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-11376 (___) |
| Debtor in a foreign proceeding. | |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 2

BACKGROUND .................................................................................................................... 5

A.  Overview of HoldCo and its Stakeholders.................................................................. 5

    i.  The Charitable Structure ...................................................................................... 7

B.  Overview of the Fund ................................................................................................. 9

C.  Key Transactions Precipitating the Debtor's Liquidation ......................................... 10

    i.  The Relevant Transactions................................................................................. 10

        (A)  The LP/LLC Exchange ............................................................................. 11

        (B)  DFW Share Issuance ............................................................................... 12

        (C)  Redemption .............................................................................................. 13

    ii.  The Remuneration Transactions ...................................................................... 15

D.  Lack of Transparency and Misleading Disclosures Provided to Supporting
    Organizations ........................................................................................................... 16

E.  The Cayman Proceeding .......................................................................................... 20

    i.  Conduct of the Cayman Proceeding .................................................................. 21

    ii.  Commencement of the Cayman Litigation......................................................... 23

    iii.  Injunction Application ...................................................................................... 27

        1.  Serious Issues to be Tried ....................................................................... 29

        2.  Balance of convenience ........................................................................... 29

        3.  Disclosure of assets................................................................................. 32

        4.  Cross undertaking in damages ................................................................ 33

F.  The Texas Proceeding.............................................................................................. 33

G.  This Chapter 15 Case............................................................................................... 35

JURISDICTION AND VENUE ............................................................................................. 36

-i-

RELIEF REQUESTED ................................................................................................... 38

BASIS FOR RELIEF REQUESTED .............................................................................. 39

A.     HoldCo Is an Eligible "Debtor" Under Chapter 15 of the Bankruptcy Code ................... 39

B.     The Cayman Proceeding is a Foreign Main Proceeding ................................................... 41

       i.     The Cayman Proceeding Constitutes a "Foreign Proceeding" ............................. 42

       ii.     The Cayman Proceeding is a "Foreign Main Proceeding" ................................... 45

C.     In the Alternative, the Cayman Proceeding Should be Recognized as a Foreign Nonmain Proceeding ......................................................................................................... 49

D.     The Petitioners Satisfy the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code .......................................................................... 50

E.     The Petition Was Properly Filed and Satisfies the Requirements under Section 1515 of the Bankruptcy Code ...................................................................................................... 51

F.     The Petitioners are Entitled to Automatic Relief Under Section 1520 of the Bankruptcy Code ................................................................................................................ 52

G.     The Petitioners are Entitled to Additional Relief Under Section 1521 of the Bankruptcy Code ................................................................................................................ 53

       i.     The Foreign Representative is Entitled to Appropriate Relief Under Sections 1521 (a)(1), (2), (3), (4), (5), (6) and (7) ................................................ 53

       ii.     Injunctive Relief is Appropriate ......................................................................... 54

       iii.     Discovery Relief is Both Necessary and Appropriate to Uncover Assets and Determine Causes of Action .......................................................................... 56

H.     The Injunctive Relief Order, As Entered by the Cayman Court, Should Be Fully Enforced Within the Territorial Jurisdiction of the United States Under Sections 105(a), 1507 and 1521(a)(7) of the Bankruptcy Code and Under Principles of Comity ............................................................................................................................... 59

I.     Recognition of the Injunctive Relief Order is Warranted under Sections 1521(a)(7) and 1507 of the Bankruptcy Code .................................................................................... 63

       i.     Legal Standard for Relief Under Sections 1521(a)(7) and 1507 .......................... 63

       ii.     Recognition of the Injunctive Relief Order is Appropriate under Sections 1521 and 1507 of the Bankruptcy Code ............................................................... 66

J.     Granting the Relief Requested herein, Including Recognition of the Cayman

MR 0727

Proceeding and Injunctive Relief Order, Are Not Manifestly Contrary to U.S. Public Policy ........................................................................................................ 68

NOTICE ........................................................................................................................ 69

CONCLUSION ............................................................................................................. 1

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re ABC Learning Ctr's, Ltd.*,
445 B.R. 318 (Bankr. D. Del. 2010) ................................................................43, 57, 62

*Ackerman v. Levine*,
788 F.2d 830 (2d Cir. 1986)................................................................................62

*Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*,
701 F.3d 1031,1057 (5th Cir. 2012) ....................................................................64

*In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*,
303 B.R. 1 (Bankr. S.D.N.Y. 2003)......................................................................40

*In re Agrokor*,
591 B.R. 163 (Bankr. S.D.N.Y. 2018).............................................................60, 64

*In re Air Berlin PLC & Co. Luftverkehrs KG*,
No. 17-12282 (MEW) (Bankr. S.D.N.Y Aug. 18, 2017)........................................54

*In re AJW Offshore Ltd.*,
488 B.R. 551 (Bankr. E.D.N.Y. 2013)..................................................................57

*American Film Technologies v. Taritero (In re American Film Technologies)*,
175 B.R. 847 (Bankr. D. Del. 1994) .....................................................................66

*Amezcua v. Cortez*,
No. 3D20- 1649 (Fla. 3d DCA Jan. 13, 2021).......................................................65

*In re Ascot Fund Ltd.*,
603 B.R. 271 (Bankr. S.D.N.Y. 2019)...................................................................46

*In re Ashapura Minechem Ltd.*,
480 B.R. 129 (S.D.N.Y. 2012)..............................................................................62

*In re Atlas Shipping A/S*,
404 B.R. 726 (Bankr. S.D.N.Y. 2009)..............................................................59, 60

*In re Avanti Comms. Grp. PLC*,
582 B.R. 603 (Bankr. S.D.N.Y. 2018)...................................................................65

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007)...........................................................45, 49, 59

MR 0729

*In re Bemarmara Consulting A.S.*,
    Case No. 13-13037(KG) (Bankr. D. Del. Dec. 17, 2013)......................................................39, 40

*In re Berau Capital Res. PTE*,
    540 B.R. 80 (Bankr. S.D.N.Y. 2015).......................................................................................37, 40

*In re Betcorp Ltd.*,
    400 B.R. 266 (Bankr. D. Nev. 2009) ........................................................................................42, 43

*In re British American*,
    488 B.R. 205 (Bankr. S.D. Fla 2013) ............................................................................................60

*In re Cell C Proprietary Ltd.*,
    571 B.R. 542 (Bankr. S.D.N.Y. 2017)......................................................................................63, 65

*Cermesoni v. Maneiro*,
    144 So. 3d 627 (Fla. 3d DCA 2014) ..............................................................................................65

*Clarkson v. Coughlin*,
    898 F. Supp. 1019 (S.D.N.Y. 1995)...............................................................................................54

*CohnReznick LLP v. Foreign Representatives of Platinum Partners Value
    Arbitrage Fund L.P. (In re Platinum Partners Value Arbitrage Fund L.P.)*,
    2018 U.S. LEXIS 109684 (S.D.N.Y. 2018)....................................................................................58

*In re Comair Ltd.*,
    No. 21-10298(JLG), 2021 Bankr. LEXIS 3137 (Bankr. S.D.N.Y. Nov. 14,
    2021), appeal dismissed, No. 21 CIV. 10146 (AT), 2023 U.S. Dist. LEXIS
    6146 (S.D.N.Y. Jan. 12, 2023)........................................................................................................56

*In re Countrywide Home Loans, Inc.*,
    384 B.R. 373 (Bankr. W.D. Pa. 2008) ............................................................................................57

*In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R.*,
    2025 Bankr.LEXIS 751 (Bankr. D. Del. April 1, 2025)..................................................................59

*CT Inv. Mgmt v. Cozumel Caribe (In re Cozumel Caribe S.A. de C.V.)*,
    482 B.R. 96 (Bankr. S.D.N.Y. 2012)..............................................................................................60

*In re Daebo Int'l Shipping Co., Ltd.*,
    543 B.R. 47 (Bankr. S.D.N.Y. 2015)..............................................................................................63

*Daewoo Motor America, Inc. v. General Motors Corp.*,
    459 F.3d 1249 (11th Cir. 2006) ......................................................................................................61

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
    737 F.3d 238 (2d Cir. 2013)............................................................................................................40

MR 0730

*In re Farfetch Limited (in Official Liquidation)*,
  Case No. 24-11519 (CTG) (Bankr. D. Del. 2024)................................................37, 45

*Flynn v. Wallace* (*In re Irish Bank Resolution Corp. (In Special Liquidation)*),
  538 B.R. 692 (D. Del. 2015)................................................................................46

*In re Foreign Econ. Indus. Bank*,
  607 B.R. 160 (Bankr. S.D.N.Y. 2019)...................................................................41

*In re Frontera Resources Caucasus Corp. and David Griffin*,
  No. 19-13418 (MEW) (Bankr. S.D.N.Y Oct. 25, 2019)...........................................53

*In re Garcia Avila*,
  296 B.R. 95 (Bankr. S.D.N.Y. 2003)......................................................................54

*In re Global Ocean Carriers Ltd.*,
  251 B.R. 31 (Bankr. D. Del. 2000)........................................................................37

*Gorsoan Ltd. v. Bullock*,
  No. 2020-020803-CA-01 (Fla. 11th Cir. Ct. Feb. 17, 2021)....................................65

*In re Hughes*,
  281 B.R. 224 (Bankr. S.D.N.Y. 2002)................................................................56, 57

*In re IIG Glob. Trade Fin. Fund Ltd.*,
  No. 20-10132 (MEW), 2023 Bankr. LEXIS 1145 (Bankr. S.D.N.Y. April 27,
  2023) ............................................................................................................45

*In re Glitnir banki hf.*, No. 08-14757 SMB, 2011 Bankr. LEXIS 3296 (Bankr.
  S.D.N.Y. Aug. 19, 2011) ...............................................................................56, 57

*In re Ir. Bank Resolution Corp. (In Special Liquidation)*,
  2014 Bankr. LEXIS 1990 (D. Del. April 30, 2014)............................................42, 47

*In re Kane*,
  628 F.3d 631 (3d Cir. 2000).................................................................................56

*Markus v. Rozhkov*,
  615 B.R. 679 (S.D.N.Y. 2020)..............................................................................56

*In re Markus*,
  607 B.R. 379 (Bankr. S.D.N.Y. 2019)................................................................56, 63

*In re Metcalfe & Mansfield Alternative Investments*,
  421 B.R. 685 (Bankr. S.D.N.Y.2010).................................................................60, 62

*In re Millard*,
  501 B.R. 644 (Bankr. S.D.N.Y. 2013)....................................................................44

MR 0731

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
  471 B.R. 342 (Bankr. S.D.N.Y. 2012) ................................................................56

*In re MMG LLC*,
  256 B.R. 544 (Bankr. S.D.N.Y. 2000) ................................................................54

*In re Modern Land (China) Co.*,
  641 B.R. 768 (Bankr. S.D.N.Y. 2022) ................................................................45

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
  714 F.3d 127 (2d Cir. 2013) ........................................................................46, 48

*Nahar v.Nahar*,
  656 So. 2d 225 ........................................................................................................65

*In re Neves*,
  570 B.R. 420 (Bankr. S.D. Fla. 2017) ...............................................................61

*In re Northshore Mainland Servs., Inc.*,
  537 B.R. 192 (Bankr. D. Del. 2015) ..................................................................40

*In re Ocean Rig UDW Inc.*,
  570 B.R. 687 (Bankr. S.D.N.Y. 2017) ..........................................................43, 46

*In re Octaviar Admin Pty.*,
  511 B.R. 361 (Bankr. S.D.N.Y. 2014) ...............................................................37

*In re Oi S.A.*,
  587 B.R. 253 (Bankr. S.D.N.Y. 2018) ....................................................60, 61, 63

*In re Olinda Star, Ltd.*,
  614 B.R. 28 (Bankr. S.D.N.Y. 2020) ............................................................64, 65

*In re Orion Healthcorp, Inc.*,
  596 B.R. 228 (Bankr. E.D.N.Y. 2019) ...............................................................57

*In re Overnight and Control Comm'n of Avćmzit, S.A.*,
  385 B.R. 525 (Bankr. S.D.N.Y. 2008) ..........................................................42, 45

*In re Platinum Partners Value Arbitrage Fund L.P.*,
  583 B.R. 803 (Bankr. S.D.N.Y. 2018) ....................................................56, 57, 58

*Principal Growth Strategies, LLC v. AGH Parent LLC*,
  615 B.R. 529 (D. Del. 2020) ...............................................................................44

*In re Recoton Corp.*,
  307 B.R. 751 (Bankr. S.D.N.Y. 2004) ...............................................................57

-vii-

*In re Rede Energia, S.A.*,
    515 B.R. 69 (Bankr. S.D.N.Y. 2014)........................................................59, 60, 62, 65

*In re Silicon Valley Bank (Cayman Islands Branch)*,
    658 B.R. 75 (Bankr. S.D.N.Y. 2024).................................................................43

*In re SphinX, Ltd.*,
    351 B.R. 103 (Bankr. S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) ....................50, 59

*In re Suntech Power Holdings Co.*,
    520 B.R. 399 (Bankr. S.D.N.Y. 2014)...........................................37, 45, 46, 48

*Swartzwelder v. McNeilly*,
    297 F.3d 228 (3d Cir. 2002).................................................................66

*In re Symington*,
    209 B.R. 678 (Bankr. D. Md. 1997) ................................................................57

*Tahan v. Hodgson*,
    662 F.2d 862 (D.C. Cir. 1981) ....................................................................61

*In re Talal Qais Abdulmunem Al Zawawi*,
    634 B.R. 11 (Bankr. M.D. Fla. 2021); 637 B.R. 663 (M.D. Fla. 2022); appeal
    No. 22-11024, Doc 53-1 (11th Cir. April 3, 2024) ..................................................39

*In re U.S. Steel Canada Inc.*,
    571 B.R. 600 (Bankr. S.D.N.Y. 2017)...............................................................63

*Ungaro-Benages v. Dresdner Bank AG*,
    379 F.3d 1227 (11th Cir. 2004) ...................................................................61

*In re Wilson*,
    413 B.R. 330 (Bankr. E.D. La. 2009) ..............................................................57

*In re Zais Inv. Grade Ltd. VII*,
    455 B.R. 839 (Bankr. D.N.J. 2011) ...............................................................40

**Statutes**

11 U.S.C. § 101(15) ...............................................................................39

11 U.S.C. § 101(24) ...............................................................................50

11 U.S.C. § 105(a) .............................................................................59, 66

11 U.S.C. § 109(a) ................................................................................40

11 U.S.C. § 542(e) ................................................................................56

MR 0733

11 U.S.C. § 1501................................................................................................39, 60

11 U.S.C. § 1501(a)...........................................................................................45, 69

11 U.S.C. § 1501(b)(1) ...........................................................................................45

11 U.S.C. § 1502(1) ................................................................................................39

11 U.S.C. § 1502(2) ................................................................................................49

11 U.S.C. § 1502(4) ................................................................................................46

11 U.S.C. § 1502(5) ...........................................................................................49, 50

11 U.S.C. § 1506......................................................................................................62

11 U.S.C. § 1507......................................................................................................59

11 U.S.C. § 1507(a).................................................................................................64

11 U.S.C. § 1509(b)(3) ...........................................................................................60

11 U.S.C. § 1517(a)(2).............................................................................................50

11 U.S.C. § 1517(b)(1) .......................................................................................41, 46

11 U.S.C. § 1517(b)(2) .............................................................................................49

11 U.S.C. § 1520(a) ...........................................................................................52, 53

11 U.S.C. § 1521......................................................................................................52

11 U.S.C. § 1521(a)(7)..........................................................................58, 59, 63, 66

11 U.S.C. § 1521(e) .................................................................................................54

11 U.S.C. § 1522................................................................................................52, 63

## Regulations

*In re Receivers Hugh Dickson & John Royle for an Ex Parte Order Pursuant to 28 U.S.C. § 1782 for Discovery in Aid of Foreign Proceedings*, Civil Action No. 20-940 (ES) (MAH), 2020 U.S. Dist. LEXIS 71828 (D.N.J. Mar. 10, 2020) ...........................................................................................................44

## Other Authorities

H.R. Rep. No. 109-31(I), (2005)............................................................................62

-ix-

-x-

H.R. Rep. No. 109-31, pt. 1 ....................................................................................................61

H.R. Rep. No. 109-31, pt. 1 (2005)........................................................................................64

Hon. Burton R. Lifland, Una O'Boyle, Esq. and Erin Healy Mautner, Esq.,
*Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-*
*Section Analysis* ...................................................................................................41

MR 0735

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators (the "JOLs") of Charitable DAF HoldCo, Ltd (In Official Liquidation) ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"),[2] which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ) (the "Supervision Order"), by its undersigned United States counsel, Reed Smith LLP ("Reed Smith"), respectfully submit the *Official Form 401 Chapter 15 Petition for Recognition of a Foreign Proceeding* (ECF No. 1) and this *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (together, the "Petition"), the accompanying Declaration of Caroline Moran executed on July 21, 2025 (the "Moran Decl."), and the Declaration of Margot MacInnis executed on July 21, 2025 (the "MacInnis Decl." and, together with the Moran Decl., the "Declarations"), for entry of an order (the "Proposed Order"), substantially in the form attached hereto as Exhibit A, pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"): (a) recognizing the Cayman Proceeding as a foreign main proceeding under sections 1515 and 1517 of the Bankruptcy Code; (b) recognizing the Petitioners as the Debtor's foreign representatives under sections 101(24), 1509 and 1517 of the Bankruptcy Code; and (c) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code.

---

[2] Entitled *In the matter of section 131 of the Companies Act (2025 Revision) and in the matter of Charitable DAF HoldCo Ltd* FSD 116 of 20256 (JAJ).

MR 0736

## PRELIMINARY STATEMENT[3]

1.    On May 6, 2025, the Cayman Court appointed the JOLs, in their capacity as independent fiduciaries and court officers, to liquidate HoldCo under its supervision. Under Cayman law, the JOLs' duties include the collection, realization and distribution of the assets of HoldCo to its creditors and, if there is a surplus, to equity holders. Cayman law affords the JOLs authority to investigate HoldCo's business and affairs in furtherance of their duties.

2.    HoldCo is a Cayman Islands exempted company, formed in 2011 to serve as the sole limited partner of the Charitable DAF Fund, LP (the "Fund"), a Cayman Islands exempted limited partnership established to manage investments for the benefit of certain U.S. tax-exempt charitable organizations. For more than a decade, HoldCo facilitated significant charitable activity in the United States by distributing profits realized from the Fund's investment portfolio, which maintained a net asset value of approximately $270 million, to its ultimate, beneficial interest holders: four large, well established charities serving communities in need in the United States.

3.    Beginning in 2024, HoldCo's directors, Mr. Mark Patrick and Mr. Paul Murphy, executed a series of complex, interrelated transactions—without the knowledge of HoldCo's beneficial interest holders—that resulted in the dilution of HoldCo's beneficial interest holders' stake in HoldCo from 100% to under 50% and the divestment of HoldCo's interest in the Fund in exchange for a membership interest in a Delaware limited liability company that was purported to be redeemed for the sum of approximately $1.6 million. These transactions occurred not long after Mr. Patrick had approved significant increases in his remuneration package.

---

[3] Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them elsewhere in this Petition.

MR 0737

4.      Since their appointment on May 6, 2025, the JOLs have conducted an extensive investigation, which is ongoing, into the facts and circumstances regarding these transactions. Based on the evidence amassed by the JOLs to date, on July 14, 2025, the Cayman Court granted leave to the JOLs to bring claims on behalf of HoldCo against Mr. Patrick, Mr. Murphy and certain other defendants for breaches of fiduciary and other duties, unlawful means conspiracy, unjust enrichment, restitution and other equitable relief and damages by way of filing a "Writ and Statement of Claim" (the "Statement of Claim"). On July 15, 2025, HoldCo proceeded to file the Statement of Claim with the Cayman Court, commencing litigation. At the same time, HoldCo filed an application for (a) a proprietary injunction to prevent the defendants from dealing with HoldCo's assets that are now held or controlled by the defendants together with disclosure orders (the "Injunction Application") and (b) leave to serve US-based defendants the Statement of Claim and the Injunctive Relief Application (the "Leave to Serve Application" and, together with the Injunctive Relief Application, the "Applications"). The Applications have been listed for hearing on July 31, 2025.

5.      The Petitioners now commence this case under chapter 15 of the Bankruptcy Code (this "Chapter 15 Case") to obtain recognition of the Cayman Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code. The basis for recognition is straightforward. HoldCo is subject to official liquidation in the Cayman Islands, its jurisdiction of organization, which is being administered, since May 6, 2025, in accordance with Part V of the Cayman Islands Companies Act (2025 Revision) (the "Companies Act"), a law relating to, among other things, insolvency or the adjustment of debt, by JOLs appointed by the Cayman Court and under the supervision of the Cayman Court.

6.　　Chapter 15 of the Bankruptcy Code was enacted to provide effective mechanisms for dealing with cases of cross-border insolvency such as this one. Its express objectives include fostering: (a) cooperation between United States courts, trustees, examiners, debtors and debtors in possession, and the courts and other competent authorities of foreign countries; (b) greater legal certainty for trade and investment; (c) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; and (d) protection and maximization of the value of the debtor's estate. These goals will be furthered by the granting of chapter 15 recognition here.

7.　　Recognition of the Cayman Proceeding as a foreign main proceeding is crucial for several reasons, including: (a) to assist the JOLs in fulfilling their duty under the relevant provisions of the Companies Act to investigate the assets, affairs, rights, liabilities, and obligations of the Debtor, including, if necessary, by compelling parties in interest to provide information requested by the JOLs; and (b) to prevent the further dissipation of assets that comprise the group of entities and affiliates that were formerly owned, directly or indirectly, by HoldCo and the Fund, including by recognizing and enforcing orders for injunctive relief with respect to persons or entities formerly affiliated with HoldCo as may be entered by the Cayman Court. Each of these reasons is squarely within and consistent with the broader goals underpinning the purpose of chapter 15 recognition. The Petitioners anticipate that the Chapter 15 Case will complement the Debtor's Cayman Proceeding to ensure the effective and economic administration of the Debtor's liquidation efforts.

-4-

MR 0739

**BACKGROUND**

8.      The following is an overview of the Debtor's business, capital structure, events leading to the Cayman Proceeding and this Chapter 15 Case as of the date of the filing of the Petition (the "Petition Date").

**A.      Overview of HoldCo and its Stakeholders**

9.      HoldCo is a Cayman Islands exempted company, incorporated on October 27, 2011. Its registered office is at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.[4] (MacInnis Decl. ⁋ 8, Ex. 3)

10.     HoldCo's share capital is divided into participating shares (the "Participating Shares"), which do not have voting rights but confer the right to participate in HoldCo's profits or assets including by way of the receipt of dividends, and management shares (the "Management Shares"), which have voting rights but confer no other right to participate in HoldCo's profits or assets. Accordingly, holders of Participating Shares (the "Participating Shareholders") have the entirety of the economic interest in HoldCo, whereas the holder of Management Shares (the "Management Shareholder") has the control rights. (MacInnis Decl. ⁋ 9, Ex. 5)

11.     Until recently, four nonprofit corporations collectively held 100% of HoldCo's Participating Shares: Highland Dallas Foundation, Inc. (the "Highland Dallas Foundation"), Highland Kansas City Foundation, Inc. (the "Highland Kansas City Foundation"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation" and, together with Highland Dallas Foundation and Highland Kansas City Foundation, the "Supporting Organizations") and

---

[4] Previously, HoldCo maintained its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

MR 0740

The Community Foundation of North Texas ("CFNT," and, together with the Supporting Organizations, the "Original Participating Shareholders"). (MacInnis Decl. ¶ 10, Ex. 6)

12.    As of the date hereof, HoldCo has one Management Shareholder and five registered Participating Shareholders. The Management Shares in HoldCo are held entirely by Mr. Mark Eric Patrick, a U.S. resident, who is also a director of HoldCo. Mr. Patrick acquired the Management Shares on March 25, 2021, upon taking assignment of the Management Shares previously held by Mr. Grant Scott. HoldCo's second director is Mr. Paul Murphy, a Cayman Islands resident. (MacInnis Decl. ¶ 11, Exs. 6-10)

13.    As of the date hereof, the Participating Shareholders are:

(a)    Highland Dallas Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the Internal Revenue Code of 1986 (the "IRC") incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(b)    Highland Kansas City Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 23, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(c)    Highland Santa Barbara Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(d)    CFNT for the Highland Capital Management, L.P. Charitable Fund at CFNT, a public charity exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Texas, which was issued 5 Participating Shares in HoldCo on August 12, 2015; and

-6-

MR 0741

(e)   DFW Charitable Foundation ("DFW"), a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on December 9, 2024, which was issued 318 Participating Shares in HoldCo on February 7, 2025 ("DFW Share Issuance"). Mr. Patrick is its registered director, president and sole member.[5]

(MacInnis Decl. ¶ 12, Exs. 11-21)

### i.   The Charitable Structure

14.   Four charities held the ultimate economic interest in HoldCo prior to the DFW Share Issuance and held Participating Shares, either directly or indirectly. They are:

(a)   The Dallas Foundation ("TDF") (which controls Highland Dallas Foundation): a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets;

(b)   Greater Kansas City Community Foundation ("GKCCF") (which controls Highland Kansas Foundation): a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds;

(c)   Santa Barbara Foundation ("SBF" and, together with TDF and GKCCF, the "Charities," and each, a "Charity") (which controls Highland Santa Barbara Foundation): a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million; and

(d)   CFNT is a charity established in 1981 which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023. CFNT holds its Participating Shares in HoldCo directly (i.e., without interposing a supporting organization). Prior to the DFW Share Issuance, CFNT held 1.639% of the Participating Shares.

(MacInnis Decl. ¶ 13, Ex. 19)

15.   Each of the Charities held its interests in HoldCo indirectly through Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation respectively (i.e., TDF held its interest through the Participating Shares held by Highland Dallas Foundation, etc.). (MacInnis Decl. ¶ 14, Exs. 23-25)

---

[5] HoldCo contests the validity of the DFW Share Issuance in the Cayman Litigation (defined below).

MR 0742

16.     The Supporting Organizations were incorporated by Mr. James Dondero in November 2011 for the purpose of making charitable donations to their respective charity from the proceeds received by the Supporting Organizations from HoldCo. (MacInnis Decl. ℙ 15, Exs. 26-28)

17.     Each of the Supporting Organizations is "organized and operated exclusively to support and benefit" its relevant, supported Charity. For US tax purposes, each Supporting Organization is classified as a Type I supporting organization of its respective Charity, which means that it is operated, supervised and controlled by that Charity. Consistent with this classification, the governance arrangements of each of the Supporting Organizations affords each Charity two votes and two director-nominees, to the individual member's (Mr. Dondero or his designee's) one vote and one director-nominee. (MacInnis Decl. ℙ 16, Exs. 23-28, 29-31)

18.     HoldCo was formed for tax efficiency purposes to avoid a Charity or Supporting Organization becoming liable for "unrelated business taxable income" ("UBTI") with respect to investments it may wish to make in a hedge fund or private equity fund, here, the Fund, where substantial assets were held. (MacInnis Decl. ℙ17, Ex. 92)

19.     HoldCo was, between November 2011 and December 18, 2024, the sole limited partner of the Fund, a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organizations in the United States, through which it indirectly owned a larger group of entities (collectively, the "DAF Structure"). (MacInnis Decl. ℙ 18)

20.     The role of HoldCo was to facilitate the making of discretionary cash distributions to Participating Shareholders, which would be drawn from the proceeds of investment returns made within asset-holding entities in the DAF Structure. (MacInnis Decl. ℙ 19, Exs. 32-33, 35-36)

-8-

**B.      Overview of the Fund**

21.      The Fund is a Cayman Islands exempted limited partnership formed October 25, 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. The Fund is governed by the Second Amended and Restated Limited Partnership Agreement, dated March 11, 2024 (the "Fund LPA"). Prior to the Relevant Transactions, HoldCo was the sole limited partner of the Fund. (MacInnis Decl. ¶ 20. Exs. 34-36)

22.      The Fund was formed and operates to "make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of [HoldCo] and its Indirect Charitable Owners." (MacInnis Decl. ¶ 21, Ex. 5)

23.      Charitable DAF GP, LLC (the "Original GP"), a Delaware limited liability company registered as a foreign company in the Cayman Islands which was, at the Fund's formation and until March 7, 2024, the general partner of the Fund, at which time it was replaced by CDH GP, LTD (the "New GP" or "CDH"), a Cayman Islands exempt company incorporated on February 27, 2024, by Mr. Patrick, its sole director, at Mr. Patrick's instigation, without notice to the Original Participating Shareholders. (MacInnis Decl. ¶ 22, Exs. 37-39, 94)

24.      The Fund's sole asset is or was its ownership of 100% of the issued share capital, in CLO HoldCo Ltd ("CLO HoldCo"). CLO Holdco is organized as a Cayman Islands exempt company incorporated with limited liability, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. (MacInnis Decl. ¶ 23 Exs. 32-33, 40-43)

25.      Based upon their initial research and investigation, the JOLs understand that the Fund's known subsidiaries, that it holds through CLO HoldCo (as listed in Schedule A of the

-9-

proposed order accompanying the Injunction Application (defined below), the "Fund Entities") are mostly passive investment vehicles holding a mix of assets, including cash, promissory notes, shares in Nexpoint[6] entities, publicly traded stock, real estate, receivables/proceeds from litigation proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates. (MacInnis Decl. ⁋ 24, Ex. 82)

26.     At all relevant times, the Fund had a net asset value of approximately $270 million. (MacInnis Decl. ⁋ 25, Ex. 51)

## C.     Key Transactions Precipitating the Debtor's Liquidation

### i.     The Relevant Transactions

27.     Beginning in 2024, HoldCo's directors, Mr. Patrick and Mr. Murphy (together, the "Directors") executed a series of complex, interrelated transactions without the knowledge or consent of the Original Participating Shareholders. These transactions consisted of (a) HoldCo's contribution of its interest in the Fund to a newly formed entity organized in Delaware, CDMCFAD, LLC ("CDM"), controlled by Mr. Patrick, in exchange for membership interests in CDM that, unlike the Original Participating Shareholders Participating Shares in HoldCo, were redeemable and afforded HoldCo no fiduciary safeguards (the "LP/LLC Exchange"); (b) the DFW Share Issuance, i.e., the purported issuance of 318 participating shares in HoldCo to DFW, a Delaware nonprofit corporation incorporated and controlled by Mr. Patrick, on February 7, 2025, sufficient to make it, rather than the Original Participating Shareholders, the majority owner of HoldCo's participating shares; and (c) the purported redemption of HoldCo's interest in CDM in exchange for approximately $1.6 million on March 27, 2025 (the "Redemption" and, together with

---

[6] Nexpoint is an investment management firm registered with the U.S. Securities and Exchange Commission that was founded by Mr. Dondero, who currently serves as its President.

MR 0745

the LP/LLC Exchange and the DFW Share Issuance, the "Relevant Transactions"). (MacInnis Decl. ⁋ 26, Exs 20-21, 44-46)

(A)     The LP/LLC Exchange

28.     On December 12, 2024, CDM was incorporated as a limited liability company in Delaware. Mr. Patrick was the sole member of CDM. (MacInnis Decl. ⁋ 27 Exs 47-48)

29.     On December 18, 2024, without informing the Supporting Organizations or the Charities, (i) the Directors passed resolutions to transfer HoldCo's entire limited partnership interest in the Fund (the "Fund Partnership Interest") to CDM, in exchange for a contribution by CDM's sole member—Mr. Patrick—of 100% of the issued and outstanding membership interests in CDM; and (ii) HoldCo, CDM, and the New GP entered into a Deed of Assignment and Assumption, executed by Mr. Patrick in three capacities: on behalf of: (x) HoldCo, as Director; (y) CDM, as manager; and (z) the New GP, as Director, pursuant to which (a) HoldCo assigned its entire interest in the Fund to CDM (the "CDM Assignment"), (b) the New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with the Fund LPA, and (c) CDM agreed to exercise its reasonable best endeavors to ensure that 100% of the membership interest in CDM (the "CDM Membership Interest") would be transferred to HoldCo. (MacInnis Decl. ⁋ 28, Exs. 44-45)

30.     The LP/LLC Exchange occurred in at least two stages: (a) first, HoldCo transferred its entire interest in the Fund to CDM; and (b) second, CDM procured the transfer of 100% of its share capital to HoldCo, making HoldCo the sole membership interest holder of CDM rather than the sole limited partner in the Fund. The effect of the LP/LLC Exchange was that: (a) CDM was inserted into the corporate structure as a subsidiary of HoldCo and became the holder of the entire interest in the Fund previously held by HoldCo; and (b) HoldCo became the sole membership interest holder in CDM, resulting in its sole asset—formerly its 100% limited partnership interest

-11-

in the Fund—being exchanged for the CDM Membership Interest. (MacInnis Decl. ¶ 29, Exs. 42, 45-46)

31.     The LP/LLC Exchange prejudiced the interests of HoldCo. The CDM Membership Interest was less valuable than the Fund Partnership Interest because, among other reasons, whereas the New GP had owed fiduciary duties to HoldCo in the Fund, the manager, Mr. Patrick, did not owe any fiduciary duties to CDM; and, unlike the Fund Partnership Interest, the CDM Membership Interest was susceptible to being redeemed by Mr. Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e., a "good faith determination of value." (MacInnis Decl. ¶ 30, Ex. 48)

(B)     DFW Share Issuance

32.     On December 9, 2024, DFW, a nonprofit non-stock corporation, was incorporated in Delaware exclusively for charitable purposes. (MacInnis Decl. ¶ 31, Ex. 49)

33.     On February 7, 2025, without informing the Supporting Organizations or the Charities, the Directors passed resolutions for HoldCo to issue 318 Participating Shares to DFW, which, upon issuance, would allot DFW 51.04% of the Participating Shares of HoldCo. That same day, also without notice to the Supporting Organizations or the Charities, HoldCo issued and allotted 318 Participating Shares to DFW, resulting in DFW holding a 51.04% interest in HoldCo and diluting the Original Participating Shareholders' aggregate shareholding from 100% to 48.96%. (MacInnis Decl. ¶ 32, Exs. 20-21)

-12-

(C)     Redemption

34.     Following the LP/LLC Exchange, ValueScope, Inc. ("ValueScope") was instructed without informing the Supporting Organizations or the Charities to prepare two valuation analyses: (a) the 100% membership interest in CDM; and (b) certain Participating Shares of HoldCo as of March 25, 2025 (the "March 2025 ValueScope Valuations"). Historically, between December 2020 and September 2024, ValueScope conducted a series of valuation analyses of 100 Participating Shares on a net asset value ("NAV") basis at HoldCo's request to determine their fair market value ("FMV"). The final NAV-based valuation prepared by ValueScope prior to the Relevant Transactions was dated January 7, 2025, and gave a valuation of 100 Participating Shares as of September 30, 2024. ValueScope determined that, as of September 30, 2024, the NAV of the Fund was $269.05 million, NAV per share was $882,140, FMV per share was $759,614 and the FMV of 100 Participating shares was $75,961,370. (MacInnis Decl. ¶ 33, Exs. 50-51, 93)

35.     The March 2025 ValueScope Valuations, however: (a) applied a discounted cash flow ("DCF") methodology to estimate the present value of expected future distributions, rather than the asset-based approach used in at least the prior five annual valuations by ValueScope; (b) determined the FMV of 100 Participating Shares to be $536,784; (c) applied a 99.2% discount for lack of control ("DLOC"); and (d) applied a 20.00% discount for lack of marketability ("DLOM"). The DCF model relied on projected future distributions to HoldCo, with those projections based on historical distributions that were also controlled by Mr. Patrick. (MacInnis Decl. ¶ 34, Exs. 50, 93)

36.     Accordingly, the FMV of 100 Participating Shares in HoldCo apparently declined from $75,961,370 on September 30, 2024, to $536,784 on March 25, 2025—a 99.29% reduction in less than six months, coinciding with the LP/LLC Exchange and attributable to the shift in valuation methodology from NAV to DCF. Although the March 2025 ValueScope Valuations

-13-

reports identified "total equity" of approximately $269 million and concluded that all Participating Shares had a combined value of only approximately $1.6 million, the analyses did not address who benefited from the residual value of roughly $267.4 million. (MacInnis Decl. ℙ 35, Ex. 50)

37. On March 27, 2025, without informing the Supporting Organizations or the Charities, HoldCo entered into a letter agreement with CDM (the "Letter Agreement"), pursuant to which HoldCo assigned to CDM various contracts and agreements to which it was a party. On the same day, Mr. Patrick executed, in his capacity as manager of CDM and president of DFW, the following, again without notice to the Supporting Organizations or the Charities: (i) an Admission and Amendment No. 1 Agreement between CDM and DFW, under which DFW was admitted as a member of CDM in exchange for a capital contribution of $1,637,192; and (ii) a Redemption and Amendment No. 2 Agreement under which CDM redeemed HoldCo's CDM shares for the same sum of $1,637,192 (the "Redemption Sum") (together, the "Admission and Redemption"). (MacInnis Decl. ℙ 36, Exs, 52-54)

38. Additionally, on March 27, 2025, Mr. Patrick, in his capacity as manager of CDM, executed a written consent (the "Manager Consent") approving the Admission and Redemption. The Manager Consent stated that the redemption of HoldCo's shares of CDM under the Letter Agreement was justified due to alleged attempts by the Supporting Organizations to exert control, and the potential loss of their nonprofit and tax-exempt status. (MacInnis Decl. ℙ 37, Ex. 55)

39. On April 2, 2025, the Directors, by written resolution: (a) noted the redemption of HoldCo's shareholding in CDM for the Redemption Sum; and (b) resolved to make a shareholder distribution totaling $1,612,192.01 (the "Redemption Distributions"). (MacInnis Decl. ℙ 38, Ex. 46)

-14-

40.    The substantive financial effect of the Redemption was that DFW paid the Redemption Sum to CDM, and HoldCo's shares in CDM were redeemed for that same amount—effectively transferring or selling HoldCo's interest in CDM to DFW for the Redemption Sum. As a result of the Redemption: (a) HoldCo realized its interest in the Fund, which had a NAV of approximately $269.1 million, for only around $1.6 million; (b) HoldCo purported to distribute that approximately $1.6 million to accounts in the name of the Participating Shareholders; (c) the Original Participating Shareholders, being the Supporting Organizations and CFNT were actually or effectively divested of their indirect interest—subject to the discretion of the person holding the Control Position—in the Fund and its underlying assets; and (d) the Original Participating Shareholders, being the Supporting Organizations and CFNT, whose economic interest in HoldCo had been diluted from 100% to 48.96% following the DFW Share Issuance, were entitled to their proportionate share of distributions in the amount of 48.96% of the Redemption Sum. As such, HoldCo had no assets at that time. (MacInnis Decl. ⁋ 39)

**ii.    The Remuneration Transactions**

41.    Following his appointment as director of HoldCo on March 25, 2021, Mr. Patrick resolved to dramatically increase his remuneration (collectively, the "Renumeration Transactions"). Specifically (and among other things):

(a)    Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023.

(b)    On September 13, 2024, the Directors resolved to increase Mr. Patrick's salary to $850,000 per annum and approve a long-term incentive ("LTI") of 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(c)    On or around October 1, 2024:

(i)    The Directors resolved that Mr. Patrick was to receive an LTI payment of $975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

-15-

(ii)  Mr. Patrick signed an "employment agreement" for his position at HoldCo, effective as of March 24, 2021, which provided, among other things, for a base salary of $850,000 and an LTI payment of $4,759,000 for the period from March 24, 2021 to March 24, 2024.

(MacInnis Decl. ¶ 40. Exs. 56-58, 93)

42.  By way of contrast to the remuneration that Mr. Patrick resolved he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately $60,000 per annum. (MacInnis Decl. ¶ 41, Ex. 83)

43.  As regards expenses, expenses overall for the first half of 2024 were around $18.3 million – almost the same amount spent over the entire course of 2023 (i.e., $18.6 million). (MacInnis Decl. ¶ 42, Ex. 56)

**D.  Lack of Transparency and Misleading Disclosures Provided to Supporting Organizations**

44.  As more fully set forth in the Statement of Claim, prior to and during the time when the Directors were consummating the Relevant Transactions, the Directors persistently declined to disclose information regarding their actions and intentions notwithstanding the Supporting Organizations repeated requests. (MacInnis Decl. ¶ 43, Ex. 59)

45.  In November 2023, the Directors sought legal advice under Cayman law regarding the rights and duties of HoldCo's controlling person in connection with various matters including, diluting Participating Shares, redeeming Participating Shares, liquidating HoldCo to distribute its assets elsewhere or otherwise render the Participating Shares worthless, each in the context of potential future disputes with the Original Participating Shareholders. (MacInnis Decl. ¶ 44)

46.  In or around August 2024, the Supporting Organizations were provided with a financial analysis of the Fund's annual expenses, which showed—or appeared to show—a significant increase in expenditures, as described above, both with respect to Directors fees and overall expenses. (MacInnis Decl. ¶ 45, Ex. 56)

-16-

47.     In late October 2024, as a result of concerns from this additional expenditure, the Supporting Organizations requested that Mr. Patrick provide relevant financial information for the HoldCo and the Fund. Mr. Patrick did not do so. (MacInnis Decl. ℙ 46)

48.     On November 11, 2024, Holland and Knight, LLP ("H&K"), U.S. attorneys for the Supporting Organizations, issued a letter to Mr. Murphy advising that the Supporting Organizations no longer had confidence in the governance of HoldCo and/or the Fund and considered that a reorganization of the governance structures was required to protect the charitable efforts of the Supporting Organizations (the "No Confidence Letter"). (MacInnis Decl. ℙ 47, Ex. 60)

49.     On November 26, 2024, Mr. Patrick sought and obtained advice regarding whether HoldCo could issue further Participating Shares to a new nonprofit organization to dilute the Supporting Organizations so as to weaken any winding-up petition brought by the Supporting Organizations on just and equitable grounds. On November 27, 2024, Cayman Islands counsel responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help. Mr. Patrick incorporated DFW as a nonprofit, non-stock corporation in Delaware on December 9, 2024. (MacInnis Decl. ℙ 48, Exs. 49, 61-62)

50.     On December 11, 2024, Mr. Murphy and HoldCo's Cayman counsel gave a presentation to attorneys from H&K on behalf of the Supporting Organizations providing various assurances regarding governance matters being addressed by the Directors. The meeting was, by all accounts, positively regarded. The attorneys on behalf of the Supporting Organizations invited Mr. Murphy to make the same presentation directly to the Supporting Organizations. (MacInnis Decl. ℙ 49, Ex. 63)

MR 0752

51.     Nonetheless, the very next day, Mr. Patrick incorporated CDM and, on December 18, 2024, the Directors consummated the LP/LLC Exchange, each without disclosing the same to the Supporting Organizations. (MacInnis Decl. ¶ 50)

52.     On January 23, 2025, having received no follow-up to the December 11, 2024 meeting with Mr. Murphy, Julie Diaz, the CEO of The Dallas Foundation, sent Mr. Patrick an email advising that the Supporting Organizations needed to better understand HoldCo and the Fund's asset position, and requesting certain information be provided by February 10, 2025. (MacInnis Decl. ¶ 51, Ex. 64)

53.     Having received no response, on January 28, 2025, Ms. Diaz sent a further email to the Directors expressing serious concern: (i) that the Supporting Organization's requests for information continued to be disregarded, and (ii) about the ongoing lack of transparency on the party of the Directors. (MacInnis Decl. ¶ 52, Ex. 64)

54.     On January 30, 2025, Mr. Murphy replied to Ms. Diaz stating that the Directors: (i) had not received the January 23 email, but understood the next step was for the Directors to "present directly" to the Supporting Organizations to address the No-Confidence Letter; and (ii) are coopering with the Supporting Organizations to provide additional information – but "have no legal obligation to do so" and such cooperation "should not be construed as an implicit acknowledgement of any duty to continue providing information to you." (MacInnis Decl. ¶ 53, Ex. 64)

55.     On January 31, 2025, Mr. Michael Stockham of H&K responded to Mr. Murphy noting that he and Mr. Patrick were fiduciaries, managing $270 million in assets for the benefit of charities that support the most vulnerable (i.e., the Charities) and: "[w]hatever your side's obvious

-18-

antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions." (MacInnis Decl. ⁋ 54, Ex. 64)

56.     On February 4, 2025, Mr. Murphy responded that while open to resolving the concerns, they (i.e., the Directors) were struggling to understand the Supporting Organization's change in position. (MacInnis Decl. ⁋ 55, Ex. 64)

57.     On February 7, 2025, H&K responded that the Directors were fiduciaries in control of $270 million for the benefit of charities: "these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees." (MacInnis Decl. ⁋ 56, Ex. 64)

58.     On the same date, without informing the Supporting Organizations, the Directors consummated the purported DFW Share Issuance. (MacInnis Decl. ⁋ 57, Ex. 21)

59.     On February 14, 2025, H&K received a letter from Mr. Mancino, a partner in Seyfarth Shaw LLP ("Seyfarth"), a U.S. law firm apparently engaged by the Fund, which rejected the accuracy of the reported increases in expenditure. On February 27, 2025, H&K responded that his clients were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr. Murphy to make the promised presentation to the Supporting Organizations. H&K responded the next day with three potential dates/times for the proposed call between March 26 and April 3, 2025. Mr. Mancino did not respond. (MacInnis Decl. ⁋ 58, Exs. 21, 70-71, 75)

60.     On March 20, 2025, Mr. Mancio sent a letter purportedly on behalf of HoldCo to the IRS about Mr. Dondero's alleged influence and control over the Supporting Organizations. The letter makes serious and unsubstantiated allegations about the Supporting Organizations,

-19-

absent evidentiary support, including that they each (i.e., all of them): "operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of [HoldCo] to wrest control of [HoldCo] and its assets. . ." (MacInnis Decl. ⁋ 59, Ex. 72)

61.     Commencing on March 27, 2025, the Directors initiated steps to effectuate the Redemption, which they consummated on April 2, 2025, without informing the Supporting Organizations. On that same day, the Directors resolved to place HoldCo into voluntary liquidation and appointed Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd as joint voluntary liquidators. (MacInnis Decl. ⁋ 60, Exs. 46, 55, 65, 73-74)

62.     Notwithstanding the consummation of the Redemption and the commencement of voluntary liquidation of HoldCo the day prior, April 3, 2025, Mr. Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried about the apparent source of confusion. (MacInnis Decl. ⁋ 61, Ex. 76)

**E.     The Cayman Proceeding**

63.     Unaware of the Directors resolution to place HoldCo into voluntary liquidation, on April 23, 2025, the Supporting Organizations presented a petition seeking the winding up of HoldCo on a just and equitable basis under section 92(e) of the Companies Act (the "J&E Petition"). It was only after filing the J&E Petition that the Directors disclosed they had consummated the Relevant Transactions and commenced a voluntary liquidation of HoldCo on April 2, 2025. (MacInnis Decl. ⁋ 62, Exs. 66, 77)

64.     On May 2, 2025, the Supporting Organizations filed a petition seeking an order for the voluntary liquidation of HoldCo—now a debtor—to continue under the supervision of the Cayman Court pursuant to section 131 of the Companies Act (the "Supervision Petition").

-20-

Following a hearing and review of the Supervision Petition, supporting affidavits and affirmations with exhibits, and the documents filed in Cause No. FSD 116 of 2025 (JAJ)—including the J&E Petition and the affidavits of the JOLs confirming their consent to act—the Cayman Court issued the Supervision Order. Pursuant to the Supervision Order, the voluntary liquidation of the Debtor was continued under the supervision of the Cayman Court, and the JOLs were appointed under section 131 of the Companies Act and Order 15, rule 8 of the Companies Winding Up Rules (2023 Consolidation) (the "Winding Up Rules"). (MacInnis Decl. ¶ 63, Exs. 1, 67, 78-79)

65.    Also pursuant to the Supervision Order, the Petitioners were authorized to exercise the following powers, among others, under Part I of Schedule 3 to the Companies Act without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of the Debtor to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which the Debtor is or may arguably be entitled. Moreover, the Petitioners were authorized to seek registration or recognition of themselves and/or the Cayman Proceeding in any U.S. state for any purpose related to the exercise of the above-described powers in the Supervision Order. (MacInnis Decl. ¶ 64, Ex. 78)

i.    **Conduct of the Cayman Proceeding**

66.    The JOLs have diligently performed their duties in progressing the Cayman Proceeding from and after their appointment. The JOLs have taken steps to fulfil their statutory obligations by: filing notice of the winding up with the Cayman Islands Registrar of Companies; circulating notices of the winding up to known stakeholders, service providers of HoldCo, and known contributories of HoldCo; publishing their notice of appointment in the Cayman Islands Gazette and Cayman Compass Newspaper; determining HoldCo should be treated as solvent for

-21-

the purposes of Section 110(4) of the Companies Act, as well as Orders 8 & 9 of the Winding Up Rules; determining the functional currency of the liquidation to be U.S. dollars pursuant to Order 16, Rule 13 of the Winding Up Rules; changing the registered office of HoldCo from Campbells Corporate Services Limited to HSM Corporate Services Ltd; publishing a Report to Contributories on July 2, 2025, and on July 3, 2025, convening the first meeting of contributories held on July 9, 2025. (MacInnis Decl. ⁋ 65, Exs. 68-69, 78-80)

67.      Moreover, to identify, secure and recover HoldCo's books and records, the JOLs have: (a) issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, notifying them of the JOLs appointment and requesting books and records; (b) issued requests to hold an interview with the directors; and (c) held discussions with various parties to discuss the history and financial affairs of HoldCo. (MacInnis Decl. ⁋ 66)

68.      The JOLs have engaged extensively with representatives of various interested parties in connection with, among other things, seeking and obtaining sanction of the Cayman Court to engage Cayman and US counsel.[7] In addition, the JOLs, through counsel, have engaged with representatives of CDM, the New GP, and CLO HoldCo in relation to a potential protocol intended to allay the JOLs' concerns regarding asset dissipation, transparency and asset management while the JOLs progress their investigation. The JOLs, however, do not believe the protocol proposed by CDM, the New GP, and CLO HoldCo would adequately protect HoldCo's position and, to date, the parties have been unable to reach terms of agreement with respect to any protocol. (MacInnis Decl. ⁋ 67, Ex. 81)

---

[7] In respect of which, on June 24, 2025, the Cayman Court sanctioned the engagements of Cayman and US counsel by the JOLs.

MR 0757

69.     Since the date of their appointment, the JOLs have conducted an extensive and detailed investigation into HoldCo's affairs, albeit that those investigations are not yet complete. This has involved a review of HoldCo's books and records (to the extent that they have been able to obtain them and to the extent that they are complete) and numerous inquiries and requests for information directed to persons previously involved with HoldCo. There have, however, been several limitations on the JOLs' investigations in connection with the information requests made from those persons previously involved in the HoldCo, including certain US-based service providers who have asserted that they do not recognize the JOLs authority under the Supervision Order, where the JOLs have not been able to obtain copies of the requested information. Notwithstanding these limitations, the JOLs' investigation has progressed sufficiently to enable them to identify significant areas of concern. (MacInnis Decl. ¶ 68)

### ii.     Commencement of the Cayman Litigation

70.     On July 4, 2025, the JOLs applied to the Cayman Court in the Cayman liquidation proceedings on an *ex parte* basis for sanction to commence litigation proceedings by way of filing a Writ and Statement of Claim (the "Statement of Claim") against the following defendants (collectively, the "Named Defendants"): (1) Mark Eric Patrick; (2) Paul Murphy; (3) CDM; (4)

-23-

MR 0758

DFW; (5) CDH as general partner for and on behalf of the Fund, and in its capacity as New GP; and (6) CLO HoldCo (the "Cayman Litigation").[8] (MacInnis Decl. ₽ 69, Ex. 59)

71.     A further description of each of the Named Defendants is as follows:

(a)     **Mr. Mark Patrick**. Mr. Patrick is a U.S. attorney and was employed as tax counsel by Highland Capital Management, L.P., an investment company founded by Mr. James Dondero, from 2008 – 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a d/b/a Skyview Group from March 2021 to October 2024. He was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore "blocker" company. Mr. Patrick is one of two directors of HoldCo, having been appointed as director on March 25, 2021. In that capacity, he was responsible for the supervision of the day-to-day operations of HoldCo. As director, Mr. Patrick owed, and continues to owe, fiduciary duties to HoldCo. Mr. Patrick was also: (i) the holder of all of the Management Shares in HoldCo; (ii) the manager of CDM; (iii) the sole member and sole director of DFW, which is now the sole member of CDM; (iv) the sole director and sole shareholder of CDH GP, Ltd, the New GP; and (v) a director of CLO HoldCo, the entity through which the Fund holds its assets.

(b)     **Mr. Paul Murphy**. Mr. Murphy was the other director of HoldCo, having been appointed so on April 22, 2021. Mr. Murphy is also a director of CLO HoldCo.

(c)     **CDM**. A limited liability company incorporated in Delaware on December 12, 2024. Mr. Patrick is the Manager of CDM. DFW has been the sole member of CDM since March 27, 2025.

(d)     **DFW**. A nonprofit, non-stock corporation incorporated in Delaware on December 9, 2024, by Mr. Douglas Mancino, a partner in Seyfarth Shaw LLP ("Seyfarth"), a U.S. law firm apparently engaged by the Fund. DFW is

---

[8] In determining whether to commence the Cayman Litigation, the JOLs gave due regard to the Named Defendants' likely defenses with respect to the propriety of the Relevant Transactions and the Remuneration Transactions. At a high level, the JOLs understand that the Named Defendants will seek to justify the Relevant Transactions on three independent grounds: (1) on the basis that the Original Participating Shareholders did not have an economic interest in HoldCo, which was formed simply to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organizations, CFNT or the Charities), such that the Original Participating Shareholders did not lose any cognizable interest because of the Relevant Transactions; (2) the Relevant Transactions were necessary and appropriate to protect HoldCo and its Directors from attempts by Mr. Dondero and the Supporting Organizations to improperly exercise dominion and control over HoldCo's assets, which would expose HoldCo (x) to breaches of US tax law and regulation and (y) claims from third parties that HoldCo and the Fund Entities were alter egos of Mr. Dondero in lawsuits against Mr. Dondero; and (3) on the basis that the Directors relied appropriately on third party valuation reports in effectuating the Redemption at FMV. The JOLs likewise understand that Mr. Patrick intends to rely on a third party report to justify the Remuneration Transactions. On the basis of the investigation conducted by the JOLs to date, the JOLs do not find these defenses and justifications to be availing or credible.

-24-

organized under the General Corporation Law of the State of Delaware exclusively for charitable purposes. The JOLs understand that DFW is now the holder of the majority of the Participating Shares in HoldCo pursuant to the DFW Share issuance on February 7, 2025, and controlled by Mr. Patrick as its sole member.

(e) **The New GP**. A Cayman Islands exempted limited company incorporated on February 27, 2024. It replaced the Original GP as the Fund's current general partner on March 7, 2024, after Mr. Patrick sought advice from Walkers on forming a new entity to replace the Original GP. On February 5, 2024, Shields Legal asked Mr. Patrick whether that entity should be a Cayman LLC or exempted company, to which he responded: "*Doesn't matter to me. Whatever from a strategic point of view – hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection.*"

(f) **CLO HoldCo**. A Cayman Islands exempted limited company. CLO HoldCo is the Fund's only direct subsidiary. The Fund held all of CLO HoldCo's issued shares.

(MacInnis Decl. ⁋ 70)

72.     HoldCo's claims pleaded in the Statement of Claim arise as a result of the breaches by the Directors of their fiduciary duties owed to HoldCo, having caused HoldCo to have dissipated its assets through a combination of (a) the Relevant Transactions and (b) the Remuneration Transactions, all of which were for the benefit of entities controlled by Mr. Patrick or for his benefit, personally. In addition to asserting claims against the Directors for willful breaches of their fiduciary duties to HoldCo, the Statement of Claim asserts claims against: (i) the Named Defendants for unlawful means conspiracy based on the Named Defendants having conspired and combined together to injure HoldCo by unlawful means and HoldCo having suffered loss and damage as a result; (ii) CDM for knowing receipt of HoldCo's property, its partnership interest in the Fund, which had been misappropriated from HoldCo by virtue of the Directors breach of fiduciary duties; and (iii) CDM for unjust enrichment on the basis that it received HoldCo's interest in the Fund without there being a valid assignment or other justification for that receipt, such that it is liable to HoldCo in restitution. (MacInnis Decl. ⁋ 71, Ex. 59)

-25-

73.     At the hearing of the sanction application on July 14, 2025, to obtain an order granting the JOLs sanction to commence the Cayman Litigation, the JOLs were required to satisfy the Cayman Court in the Cayman Proceeding that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) the interests of HoldCo's stakeholders were best served by the JOLs commencing the Cayman Litigation.[9] The Cayman Court granted sanction for the JOLs to commence the Cayman Litigation. (MacInnis Decl. ¶ 72, Ex. 85)

74.     On July 15, 2025, the Debtor proceeded to file the Statement of Claim with the Cayman Court to commence the Cayman Litigation (which has the cause number FSD 201 of 2025 (RPJ)). At the same time the JOLs filed an application for: (a) a proprietary injunction to prevent the Named Defendants from dealing with the assets of the Debtor that are held now held or controlled by the Named Defendant together with disclosure orders ("Injunction Application"); and (b) leave to serve the U.S.-based defendants with the Statement of Claim and Injunction Application ("Leave to Serve Application" and together with the Injunction Application, the "Applications"). (MacInnis Decl. ¶ 73, Exs. 59, 82-83)

75.     Additionally, on July 15, 2025, the Debtor: (1) emailed copies of the Statement of Claim and the Applications to the Cayman Islands attorneys for the Named Defendants and asked them to accept service; and (2) served copies of the Statement of Claim at the Cayman Islands registered addresses of CDH GP, Ltd. and CLO HoldCo, Ltd. The Applications have been listed for hearing on July 31, 2025 (the "Injunction Hearing Date"). (MacInnis Decl. ¶ 74)

76.     The Named Defendants are entitled to participate and be heard on that date. In the event the Named Defendants do not participate, the Cayman Court will hear the Injunction

---

[9] *Re ICP Strategic Credit Income Fund* [2014] 1 CILR 314.

-26-

Application on an *ex parte on notice* basis and, if the Injunction is granted, will schedule an *inter partes* hearing for a later date. (MacInnis Decl. ⁋ 75. Exs. 82-83)

77.     Should the Cayman Court grant the Injunctive Relief Application following the scheduled hearing on the Injunction Hearing date, and issue an order consistent with draft order for relief sought therein (the "Injunctive Relief Order"), the JOLs expect to seek recognition and enforcement of the Injunctive Relief Order against the Named Defendants on a provisional basis pursuant to section 1519 of the Bankruptcy Code pending the recognition of the Cayman Proceeding, at which time the JOLs also seek recognition of the Injunctive Relief Order in this Chapter 15 Case as set forth herein pursuant to sections 1507(a) and 1521(a) of the Bankruptcy Code. (MacInnis Decl. ⁋ 76, Ex. 82)

### iii.     Injunction Application

78.     The Injunction Application seeks orders that:

(a)     the Named Defendants will (i) preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest of (of whatsoever nature) whether held directly or indirectly, in the Fund, the Fund Entities, and/or any assets of the Fund; and (ii) procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets;

(b)     the Named Defendants will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly): (i) by way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) HoldCo, the Fund, DFW, CDM, the New GP, the Fund Entities and/or their wholly owned subsidiaries; or (ii) from any assets of the Fund, the Fund Entities, and/or their wholly owned subsidiaries;

(c)     the Named Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Named Defendant of the above sections (a) and (b); and

-27-

(d)   the Named Defendants shall make ancillary asset disclosures.

(MacInnis Decl. ¶ 77. Ex. 82)

79.   The basis for the injunctive relief sought is that the Named Defendants each own and/or control assets that HoldCo has an equitable proprietary interest in (or at least a seriously arguable case that it does):

(a)   Prior to the Relevant Transactions taking place, HoldCo held the Fund Partnership Interest, and thereby indirectly owned (99%) of all assets held by the Fund through its wholly owned subsidiary, CLO HoldCo (and its subsidiaries).

(b)   After the Relevant Transactions took place, and by reason of the Directors' breaches of fiduciary duty – (i) CDM now holds the Fund Partnership Interest, which continues to hold its assets through CLO HoldCo (and its subsidiaries); (ii) DFW is the sole member of CDM; (iii) Mark Patrick is the sole member of DFW; and (iv) Mark Patrick has full control over DFW, CDM, the New GP (and thus the Fund), and (together with Mr. Murphy) CLO HoldCo. Mr. Patrick therefore has the ability to control and/or deal with the Fund Partnership Interest and the Fund's assets, including any distributions of the Fund's assets received by CDM as its sole limited partner. Mr. Patrick now exercises this control free from the oversight previously exercised by the Supporting Organizations and CFNT through their holding of Participating Shares in HoldCo.

(MacInnis Decl. ¶ 78, Exs. 6, 40, 44-49. 52-55, 84)

80.   Moreover, HoldCo has at least a seriously arguable case that CDM and DFW hold these assets through steps taken by the Directors that amounted to breaches of fiduciary duty, and therefore that these assets are subject to a constructive trust in favor of HoldCo, which is the necessary pre-requisite for the Cayman Court to grant a proprietary injunction restraining the disposition of that property. (MacInnis Decl. ¶ 79, Moran Decl. ¶¶ 40, 42-45)

81.   Under Cayman law, to obtain proprietary injunctive relief, the Debtor must show: (1) the existence of a serious issue to be tried as to whether it has a proprietary interest in the assets (such that the claim would be capable of surviving summary judgment), (2) that the balance of convenience is in favor of granting the injunction; and (3) that it is otherwise just and convenient

-28-

to grant the injunction. Moreover, under Cayman law, a court may order defendants to disclose information if the Debtor demonstrates that it is just and convenient to do so. (MacInnis Decl. ¶ 80, Moran Decl. ¶¶ 42-45)

### 1. Serious Issues to be Tried

82. On July 14, 2025, the Cayman Court granted sanction for the JOLs to file the Statement of Claim and in doing so accepted that the merits of the JOLs' claims satisfied the relevant threshold for the sanction of commencement of claims by official liquidators (which is higher than the 'serious issue to be tried' threshold for a proprietary injunction). (MacInnis Decl. ¶ 81, Ex. 85)

83. The Directors and DFW have put forward explanations as to why the transfer of the Fund Partnership Interest to CDM was legally justifiable, which the JOLs do not believe stand up to scrutiny. (MacInnis Decl. ¶ 82. Exs. 44, 70, 72, 86-87)

### 2. Balance of convenience

84. The JOLs do not believe that the proprietary injunctions they seek would hinder the operation of the Fund or the Fund Entities in any material way. The Fund and the Fund Entities are mostly passive investment vehicles that hold shares or interests in other Fund Entities, cash, debt instruments, receivables, vacant land and/or stock in publicly traded companies. They are not, as far as the JOLs understand, engaged in the active trading of assets or the making of new investments on a frequent basis. (MacInnis Decl. ¶ 83, Ex. 82)

85. Accordingly, the JOLs believe that there is no justification for any new investments or other transactions to be made by any of those entities, beyond payments needed to stay in good standing and comply with their statutory obligations. (MacInnis Decl. ¶ 84)

-29-

86.     Against that backdrop, the JOLs' position is that no dispositions of the assets of the Fund, the Fund Entities or any other subsidiaries above $10,000 need or should be made pending the determination of HoldCo's proprietary claim which, if successful, would see the Fund Partnership Interest returned to HoldCo and HoldCo would therefore wholly own (indirectly) all assets of the Fund, the Fund Entities and their wholly owned subsidiaries. Should any payments or dispositions be made by the Fund, the Fund Entities or any of their wholly owned subsidiaries that have the effect of harming the value of the Fund Partnership Interest, such payment or disposition would render the proprietary relief the JOLs are seeking much less effective. (MacInnis Decl. ₱ 85)

87.     Notwithstanding the above, the JOLs recognize that there may become a need for certain payments or other dispositions of assets to be made to preserve, maintain or improve the value of existing assets held by the Named Defendants, the Fund Entities and/or their wholly owned subsidiaries. Accordingly, the JOLs' proposed order to the Injunctive Relief Application provides for:

(a)     The entity concerned to make a written request to the JOLs to make any such payments, together with full supporting information and documentation as well as an explanation of the rationale for the transaction; and

(b)     The JOLs to decide within 7 days whether to approve or disapprove the proposed transaction.

(MacInnis Decl. ₱ 86. Ex. 82)

88.     The JOLs also recognize that there will likely be a need for certain payments to be made by the Named Defendants, the Fund Entities or their wholly owned subsidiaries that are reasonably necessary in the ordinary course of business to keep the corporate Named Defendants, the Fund Entities or their wholly owned subsidiaries in good standing. The JOLs' proposed order

-30-

to the Injunctive Relief Application allows for any such payments of $10,000 or less to be made. (MacInnis Decl. ₱ 87, Ex. 82)

89.     The JOLs are also unaware of any harm that would be caused to CDM by preserving the status quo in respect of the Fund Partnership Interest. By comparison, if a proprietary injunction is not granted and CDM were to transfer the Fund Partnership Interest to another party or otherwise deal with that interest in some way, HoldCo could be significantly prejudiced. Specifically, HoldCo's proprietary claim to the Fund Partnership Interest could be undermined or become more difficult to enforce. (MacInnis Decl. ₱ 88)

90.     As to whether damages would be an adequate remedy for HoldCo in lieu of proprietary relief, as far as the JOLs' are aware, CDM has no other assets beyond the Fund Partnership Interest and therefore would likely be unable to meet any order for damages made against it. Only an order for CDM (and the other Named Defendants, to the extent they hold assets that derive from the Fund Partnership Interest) to restore HoldCo's property could return HoldCo to the position it would have been in had the improper transactions carried out by the Named Defendants not taken place. The JOLs' believe that the only way to ensure that such an order will be effective at the conclusion of these proceedings is for a proprietary injunction to be granted against the Named Defendants in respect of that property in the interim. (MacInnis Decl. ₱ 89)

91.     Further, as explained above, HoldCo, its Supporting Organizations, the Charities and the Fund are part of a carefully constructed investment structure for: (i) the tax efficient treatment of charitable donations; and (ii) investments to be made for the ultimate benefit of the Charities and CFNT. Without the re-transfer of the Fund Partnership Interest to HoldCo, those parties may be unable to achieve their charitable objectives as effectively or at all. An award of damages in lieu of proprietary relief would mean that HoldCo would hold only cash and no other

-31-

assets or investments, and the Charities and Supporting Organizations would effectively be back to square one in terms of setting up a proper investment structure to carry out their investments and protect their tax-exempt status. (MacInnis Decl. ℙ 90)

### 3.    Disclosure of assets

92.    The JOLs have only limited information as to what assets each of the Named Defendants, Fund Entities and their wholly owned subsidiaries hold. Even so, the JOLs have no way of verifying this information or knowing if it is completely up to date. (MacInnis Decl. ℙ 91)

93.    In circumstances where, in the JOLs' case, a misappropriation of the HoldCo's sole and valuable asset has already occurred, the JOLs believe protection is needed to prevent any further dissipation of assets from occurring in breach of any injunction that is granted. The JOLs believe that this protection can be afforded by way of disclosure orders in support of the injunction requiring the Named Defendants to disclose what assets they each hold and their approximate value. Having that information in hand will allow the JOLs (and the Cayman Court) to effectively police the injunction (in terms of preventing dissipation of Fund assets and thereby preserving the value of the Fund Partnership Interest). (MacInnis Decl. ℙ 92)

94.    In addition, the proposed order in support of the Injunctive Relief Application seeks confirmation as to:

(a)    All of the entities owned directly or indirectly by the Fund, including full details as to their owners, directors, officers or other controllers, and places and details of incorporation. This will allow the JOLs to have a complete picture of the Fund structure.

(b)    All payments by way of salary, bonus, dividend, distribution or other compensation made to Mr. Patrick or Mr. Murphy by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.

(c)    All payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, made by HoldCo, the Fund, DFW, CDM, the New GP, CLO

-32-

MR 0767

HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.

(MacInnis Decl. ₱ 93, Ex. 82)

### 4.    Cross undertaking in damages

95.    The Debtor is not offering to provide a cross-undertaking as to damages in the Injunction Application. This is because in this case, the JOLs are not only acting in the Debtor's best interests, but also in a position analogous to the public interest based on the charitable or non-profit status of at least the underlying Charities, which are the intended recipients of donations made from the Debtor. No cross-undertaking in damages should be required in such circumstances. (MacInnis Decl. ₱ 94)

## F.    The Texas Proceeding

96.    On July 1, 2025, the Supporting Organizations commenced an action (the "TRO Action") against defendants Mark Patrick, DFW, CDM, CDH, and the Original GP (collectively, the "TRO Defendants") by filing *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver* (the "TRO Application") in the Texas Business Court, 1st Division (the "Texas Court"). Among other things, the TRO Action seeks: (1) a temporary restraining order; (2) a temporary injunction; and (3) the appointment of a receiver against some of the TRO Defendants arising from various breaches of fiduciary duties and related claims alleged to be owed to the Supporting Organizations directly. (MacInnis Decl. ₱ 95. Ex. 85)

97.    On July 2, 2025, during the hearing for the TRO Action, in lieu of a decision rendered by the Texas Court, and at the direction of the Texas Court, the parties entered into a Rule 11 Agreement under the Texas Rules of Civil Procedure (the "Rule 11 Agreement"), which the JOLs understand is a binding contract among the parties. The key points of the Rule 11

-33-

Agreement are: (a) that the TRO Defendants shall not make any payments or disbursements other than those in the ordinary course of business; (b) investments and monies must be kept in the existing entities that currently hold those investments and monies, provided that, if any investment is monetized on its own terms, then the entity may prudently reinvest the resulting cash proceeds into liquid securities; and (c) there shall be no changes to the corporate structure of ownership of the TRO Defendants. The Texas Court scheduled a further hearing on the TRO Action on July 24 and 25, 2025. (MacInnis Decl. ¶ 96, Ex. 88)

98.     Following the hearing on July 2, 2025, the parties to the TRO Action amended and modified the Rule 11 Agreement (the "Final Rule 11 Agreement") to: (a) provide the TRO Defendants the opportunity to challenge the Texas Court's jurisdiction (the "Plea") pursuant to a briefing schedule concluding on July 24, 2025; (b) clarify the parties' discovery rights with respect to the TRO Action; and (c) evidence the restrictions imposed upon the activities of the TRO Defendants and their subsidiaries pursuant to the Rule 11 Agreement pending a decision by the Texas Court of the TRO Action and the Plea. On July 14, 2025, the TRO Defendants filed a jurisdictional challenge, asserting that: (1) the Texas Court lacks subject matter jurisdiction to hear the TRO Action; and (2) the Supporting Organizations lack standing, suggesting that the JOLs, on behalf of HoldCo, are the appropriate parties to assert the claims alleged in the TRO Action. (MacInnis Decl. ¶ 97, Ex. 89-90)

99.     The JOLs support the Final Rule 11 Agreement in the near term in that it imposes restrictions on the covered entities regarding asset dissipation in the short term, pending the outcome of the Injunctive Relief Application filed by the JOLs in the Cayman Court and the recognition of relief as may be granted by the Cayman Court in this Chapter 15 Case. The JOLs believe that the Cayman Court is the appropriate forum to adjudicate causes of action that belong

-34-

to HoldCo as asserted in the Cayman Litigation. The JOLs are also cognizant of the need for administrative efficiency in connection with the Cayman Proceeding and their duties to realize upon HoldCo's assets, and, accordingly, reserve rights with respect to coordination and management of the TRO Action, the Cayman Litigation and this Chapter 15 Case. (MacInnis Decl. ⁋ 98, Exs. 59, 89)

## G.      This Chapter 15 Case

100.    On the Petition Date, the Petitioners commenced this Chapter 15 Case. (MacInnis Decl. ⁋ 99)

101.    Consistent with the purpose of official liquidation under Part V of the Companies Act, the Petitioners are also empowered to investigate: (a) the causes for the failure of HoldCo, as necessary, and (b) generally, the promotion, business, dealings and financial affairs of HoldCo. *See* Companies Act, section 110(2). (MacInnis Decl. ⁋ 100, Ex. 78)

102.    Section 97(1) of the Companies Act provides in relevant part that upon the entry of a winding up order against a company, no suit or other proceeding may be commenced or continued against the company except with leave of the Cayman Court and subject to such terms as the Cayman Court might impose. This automatic stay mirrors the stay imposed in United States bankruptcy proceedings and serves to, *inter alia*, facilitate the Petitioners' ability to deal with claims and creditors collectively and comprehensively. (MacInnis Decl. ⁋ 101, Ex. 78)

103.    A general principle underlying the Companies Act and the Cayman Proceeding is that creditors are treated on a *pari passu* basis, subject to certain exceptions.[10] *See* Companies Act, section 140. (MacInnis Decl. ⁋ 102, Ex. 78)

---

[10] For example, see sections 140 and 141 of the Companies Act.

-35-

104.     Cayman liquidation proceedings are fair and equitable insofar as all creditors and interest holders have the opportunity to be heard by the Cayman Court and no creditors will be prejudiced on the sole basis that they are foreign based. All creditors are treated equally, regardless of where they are domiciled. (MacInnis Decl. ℙ 103)

## JURISDICTION AND VENUE

105. The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

106.     Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code are core matters under 28 U.S.C. § 157(b)(2)(P).

107.     This Chapter 15 Case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of the Petition in accordance with section 1515 of the Bankruptcy Code.

108.     The Petitioners confirm their consent, pursuant to rule 7008 of the Bankruptcy Rules and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of final orders or judgments by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

109.     Venue in this district is proper under 28 U.S.C. § 1410(1) because the Debtor has its principal assets in the United States located in Delaware, and 28 U.S.C. §1410(3) because it is

-36-

consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the Petitioners.

110.    With regard to section 1410(1), the Debtor has an ownership interest in a $150,000 advance security retainer deposited with and held by Reed Smith in a trust account located in Wilmington, Delaware with M&T Bank (the "Reed Smith Retainer") in accordance with Delaware Rule of Professional Responsibility 1.5. *See, e.g.*, *In re Farfetch Limited (in Official Liquidation),* Case No. 24-11519 (CTG) [D.I. 46] (Bankr. D. Del. 2024) (establishing venue in Delaware where Debtor held a retainer in the jurisdiction); *In re Berau Capital Res. PTE*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) (finding that an attorney retainer was sufficient to establish venue); *In re Octaviar Admin Pty.*, 511 B.R. 361, 372-74 (Bankr. S.D.N.Y. 2014) (finding that an attorney retainer is sufficient to confer jurisdiction in the United States); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416 (Bankr. S.D.N.Y. 2014) (holding that establishing a deposit account in New York "had the effect of establishing a basis for venue in [the Southern District of New York] under 28 U.S.C. § 1410(1)"); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) (retainers held in escrow by counsel for a debtor in the United States is "property" in the United States).

111.    With regard to section 1410(3): (i) the Debtor's economic stakeholders, the Supporting Organizations, are Delaware nonprofit corporations exempt from taxation under section 501(c)(3) of the Internal Revenue Code, (ii) the Debtor has past direct ownership of CDM, which is organized in Delaware, and (iii) prior to the commencement of the Cayman Proceeding, the Debtor and the Directors engaged Delaware counsel in connection with the Relevant Transactions.

-37-

112.    The statutory predicates for the relief requested in this Petition are sections 101(23)-(24), 105(a), 306, 542(e), 1502, 1504, 1507, 1509, 1510, 1512, 1515, 1516, 1517, 1520, 1521, 1522, and 1524 of the Bankruptcy Code and Bankruptcy Rule 2004.

## RELIEF REQUESTED

113.    The Petitioners have commenced this Chapter 15 Case as an ancillary proceeding to the Cayman Proceeding and respectfully file this Petition contemporaneously with the accompanying documentation required by sections 1504 and 1515 of the Bankruptcy Code.

114.    The Petitioners respectfully request that this Court enter an order, substantially in the form of the Proposed Order attached hereto as Exhibit A, pursuant to sections 105(a), 542(e), 1504, 1507, 1509, 1510, 1515, 1517, 1520 and 1521 of the Bankruptcy Code that:

(a)    recognizes the Cayman Proceeding as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code, or, in the alternative, as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Bankruptcy Code;

(b)    recognizes the Petitioners as the "foreign representatives" as defined in section 101(24) of the Bankruptcy Code;

(c)    recognizes and gives full force and effect in the United States to the Supervision Order and the Injunctive Relief Order, including any and all extensions or amendments thereof authorized by the Cayman Court and extending the protection of such orders;

(d)    grants the Debtor all of the relief afforded pursuant to section 1520 of the Bankruptcy Code, including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property that is now within or in the future is located within the territorial jurisdiction of the United States;

(e)    authorizes the Debtor to conduct the examination of witnesses, the taking of evidence or the delivery of information concerning the Debtors' assets, affairs, rights, obligations or liabilities in accordance with section 1519(a)(3) and 1521(a)(4) of the Bankruptcy Code, Rule 2004 of the Bankruptcy Rules, and the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules;

(f)    authorizes the Debtor to compel all persons that hold recorded information, including books, documents, records, and papers relating to the Debtor's

-38-

property or financial affairs to turnover or disclose such recorded information in accordance with section 542(e), 1521(a)(4) and 1521(a)(7) of the Bankruptcy Code; and

(g)    provides such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

115.    Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between United States courts and foreign courts, to afford greater legal certainty for trade and investment, to protect and maximize the value of debtors' assets, and to facilitate the fair and efficient administration of cross-border insolvencies in a manner that protects the interests of all creditors and other interested parties, including the debtor. 11 U.S.C. § 1501.

116.    Consistent with these principles, the Petitioners commence this action under chapter 15 of the Bankruptcy Code to obtain recognition of the Cayman Proceeding and certain related relief. This Chapter 15 Case seeks to complement the Cayman Proceeding to: (i) investigate, the assets, affairs, and liabilities of the Debtor that are within the territorial jurisdiction of the United States; (ii) ensure the effective and economical administration of the Debtor's liquidation; and (iii) protect against asset dissipation pending the outcome of the Petitioners' continuing investigations and the Cayman Litigation.

### A.    HoldCo Is an Eligible "Debtor" Under Chapter 15 of the Bankruptcy Code

117.    HoldCo qualifies as a "debtor" as such term is defined in section 1502(1), which provides that a debtor is "an entity that is the subject of a foreign proceeding." *See* 11 U.S.C. 1502(1). Here, HoldCo is an "entity," which includes a corporation. *See* 11 U.S.C. §§ 101(15) (definition of "entity," which includes a "person") and 101(41) (definition of "person," which includes a "partnership" and a "corporation"). HoldCo is: (1) a corporate entity organized under the laws of the Cayman Islands; and (2) is the subject of the Cayman Proceeding.

-39-

118.    Accordingly, as courts, including courts in the Third Circuit have held, no further showing is required for HoldCo to qualify as a "debtor" eligible for relief under chapter 15 of the Bankruptcy Code. *See, e.g.*, Transcript of Hearing at 9, 3–18, *In re Bemarmara Consulting A.S.*, Case No. 13-13037(KG) (Bankr. D. Del. Dec. 17, 2013) [D.I. 38] (finding section 109(a) of the Bankruptcy Code to be inapplicable to Chapter 15 because section 109(a) "provides for [debtors]" under the Bankruptcy Code, and it is the foreign representative, and not the debtor in the foreign proceeding, who petitions the court in chapter 15 cases); *see also In re Talal Qais Abdulmunem Al Zawawi*, 634 B.R. 11 (Bankr. M.D. Fla. 2021); 637 B.R. 663 (M.D. Fla. 2022); appeal No. 22-11024, Doc 53-1 (11th Cir. April 3, 2024). Further, "[s]ection 1502 defines [d]ebtor as an entity that is the subject of a foreign proceeding. And there was nothing in that definition in Section 1502 which reflects upon a requirement that [d]ebtor have assets." *Bemarmara Consulting,* at pp. 9. Therefore, section 109(a) of the Bankruptcy Code does not apply and HoldCo qualifies as a debtor under chapter 15.

119.    However, even if, as some courts in other circuits have held, section 109(a) applies to determine whether a foreign debtor is eligible to be a debtor in a chapter 15 case, HoldCo is an eligible debtor. *See, e.g.*, *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 241 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors). Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title." *See* 11 U.S.C. § 109(a). Accordingly, a foreign debtor can satisfy the section 109 requirement by possessing even a nominal amount of property in the United States. *See In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 200 (Bankr. D. Del. 2015) (stating that courts have determined that the property requirement of section 109(a) is satisfied by foreign debtors with "even a minimal amount of property located in the

-40-

United States") (citing *In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*, 303 B.R. 1, 8 (Bankr. S.D.N.Y. 2003)); *In re Berau Capital Res. Pte. Ltd.*, 540 B.R. at 82 (holding that section 109(a) neither requires a specific quantum of property in the United States, nor states when or for how long that property must be located within the United States); *In re Zais Inv. Grade Ltd. VII*, 455 B.R. 839, 842 (Bankr. D.N.J. 2011) (finding that securities and cash pledged as collateral and held by a trustee are nominally the property of a Cayman Island corporation, and that the corporation is therefore an eligible debtor under section 109).

120.    HoldCo is eligible to be a debtor under section 109(a) of the Bankruptcy Code because it has property located in the United States consisting of the Reed Smith Retainer. For these reasons, HoldCo satisfies the requirements to be deemed a debtor under chapter 15 of the Bankruptcy Code whether or not section 109(a) of the Bankruptcy Code applies.

**B.    The Cayman Proceeding is a Foreign Main Proceeding**

121.    The Cayman Proceeding is entitled to recognition as a foreign main proceeding under chapter 15 of the Bankruptcy Code. Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if: (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502(4) and 1517(b)(1) of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517; *see also* Hon. Burton R. Lifland, Una O'Boyle, Esq. and Erin Healy Mautner, Esq., *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-Section Analysis* ("The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings . . . [t]he requirements of this section . . . are all that must be fulfilled to attain recognition"); *see also In re Foreign Econ. Indus. Bank*, 607 B.R. 160, 168 (Bankr. S.D.N.Y. 2019) (internal citations omitted) ("The language of this section makes

-41-

clear that the decision whether to grant recognition is not dependent upon any findings about the nature of the foreign proceeding . . . [i]nstead, if the three requirements of this section are met, the court is obligated to grant recognition."). Section 1517(b) of the Bankruptcy Code provides that a foreign proceeding "shall be recognized . . . (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). Here, as explained below, all requirements for recognition of the Cayman Proceeding, the Petitioners, and this Petition are satisfied.

### i.        The Cayman Proceeding Constitutes a "Foreign Proceeding"

122.    The Cayman Proceeding qualifies as a "foreign proceeding" under chapter 15 of the Bankruptcy Code. Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

123.    Based on this definition, courts have held that a "foreign proceeding" is:

(a)    a proceeding;

(b)    that is either judicial or administrative;

(c)    that is collective in nature;

(d)    that is in a foreign country;

(e)    that is authorized or conducted under a law related to insolvency or the adjustment of debts;

(f)    in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and

(g)    which proceeding is for the purpose of reorganization or liquidation.

*See In re Ir. Bank Resolution Corp. (In Special Liquidation)*, 2014 Bankr. LEXIS 1990, at *40 (D. Del. April 30, 2014) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also*

-42-

*In re Overnight and Control Comm'n of Avćmzit, S.A.*, 385 B.R. 525, 532-33 (Bankr. S.D.N.Y. 2008) (discussing factors). As set forth in the Declarations, the Cayman Proceeding satisfies such requirements and, therefore, qualifies as a "foreign proceeding" for purposes of section 101(23) of the Bankruptcy Code.

124. *First*, the Cayman Proceeding was brought pursuant to section 131 of the Companies Act. *See* Companies Act § 131. For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *Betcorp*, 400 B.R. at 278. Because the Cayman Proceeding operates under such a statutory framework, it satisfies the first factor of section 101(23) of the Bankruptcy Code.

125. *Second*, the Cayman Proceeding is judicial in character. A liquidation proceeding is deemed judicial in character when it involves a court "exercis[ing] its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010). Here, the Cayman Proceeding is subject to the control and supervision of the Cayman Court. Specifically, in the Cayman Proceeding, the Debtor's assets and affairs are subject to the control and supervision of the Cayman Court for the purpose of the liquidation, pursuant to the Supervision Order, which, *inter alia*, (i) appoints the JOLs as joint official liquidators, (ii) authorizes the Petitioners to commence legal proceedings in the name and on the behalf of the Debtor to obtain information or pursue a stay in the Cayman Islands or in the United States, and (iii) permits the Petitioners to present a petition for the winding up of the Fund. *See* Supervision Order ¶¶ 2-6; MacInnis Decl. ¶¶ 63-64.

126. *Third*, the Cayman Proceeding is collective in nature in that it considers the rights of all of the Debtor's creditors and interest holders. *See* Moran Decl. at ¶ 57. A collective

-43-

proceeding is one in which all creditors' interests are adequately and fairly addressed. *See Betcorp Ltd.*, 400 B.R. at 281 (stating that a proceeding is collective where such proceeding "considers the rights and obligations of all creditors" in contrast to a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor"). United States bankruptcy courts have recognized that Cayman liquidation proceedings qualify as collective judicial proceedings for the purposes of chapter 15 recognition. *See In re Silicon Valley Bank (Cayman Islands Branch)*, 658 B.R. 75, 92 (Bankr. S.D.N.Y. 2024) (citing *In re Ocean Rig UDW Inc.,* 570 B.R. 687, 701-02 02 (Bankr. S.D.N.Y. 2017)) ("concluding, among other things, that the Cayman liquidation proceedings commenced under Part V of the Companies Law are unquestionably collective judicial proceedings"); *see also In re Millard*, 501 B.R. 644, 650 (Bankr. S.D.N.Y. 2013) (recognizing a Cayman Liquidation as a collective judicial proceeding irrespective of whether the debtor was solvent or insolvent). The Supervision Order was entered pursuant to Companies Act section 131, which sits within Part V. Therefore, the Court should find that the Cayman Proceeding is a collective one.

127.    *Fourth*, the Cayman Proceeding and the Cayman Court are located in the foreign territory of the Cayman Islands. United States courts have found that a proceeding in the Cayman Islands satisfies the foreign country requirement for the purposes of establishing a foreign proceeding. *See, e.g., Principal Growth Strategies, LLC v. AGH Parent LLC*, 615 B.R. 529 (D. Del. 2020); *In re Receivers Hugh Dickson & John Royle for an Ex Parte Order Pursuant to 28 U.S.C. § 1782 for Discovery in Aid of Foreign Proceedings*, Civil Action No. 20-940 (ES) (MAH), 2020 U.S. Dist. LEXIS 71828 (D.N.J. Mar. 10, 2020).

128.    *Fifth*, as described above, the Companies Act, which governs the Cayman Proceeding, relates to insolvency and the adjustment of debt. *See* Moran Decl, at ¶ 56. Specifically,

-44-

the Cayman Proceeding is governed by Part V of the Companies Act (which is the Cayman Islands statute applicable to corporate insolvencies and liquidations), in which the Debtor's assets and affairs are subject to the supervision of the Cayman Court, for the purpose of liquidation, pursuant to the Supervision Order made by the Cayman Court. *See* Supervision Order, ¶¶ 2-6.

129.    *Sixth*, the Cayman Proceeding subjects the Debtor's assets and affairs to the supervision of the Cayman Court during the pendency of the proceedings. *See* Supervision Order, generally; Moran Decl., at ¶¶ 58-59.

130.    *Finally*, the objective of the Cayman Proceeding is the liquidation of the Debtor. The Petitioners submit that the Supporting Organizations commenced the Cayman Proceeding for the purpose of liquidation, as required by section 101(23) of the Bankruptcy Code. *See* Moran Decl., at ¶¶ 58-59.

131.    As described above, the Cayman Proceeding satisfies all elements required for recognition as a foreign proceeding under section 101(23) of the Bankruptcy Code and applicable case law. United States courts have recognized collective proceedings similar to the Cayman Proceeding as "foreign proceedings" on numerous occasions. *See, e.g., In re Farfetch Limited (in Official Liquidation),* Case No. 24-11519 (CTG) [D.I. 46] (Bankr. D. Del. 2024) (recognizing a Cayman liquidation proceeding as a "foreign proceeding"); *In re IIG Glob. Trade Fin. Fund Ltd.*, No. 20-10132 (MEW), 2023 Bankr. LEXIS 1145 (Bankr. S.D.N.Y. April 27, 2023) (same); *In re Modern Land (China) Co.*, 641 B.R. 768 (Bankr. S.D.N.Y. 2022) (same); *In re Suntech Power Holdings Co.*, 520 B.R. at 399 (same).

ii.    **The Cayman Proceeding is a "Foreign Main Proceeding"**

132.    Chapter 15 of the Bankruptcy Code applies where a foreign representative seeks assistance in a United States Court. 11 U.S.C. § 1501(b)(1). The stated objectives of chapter 15

-45-

include: (i) cooperation between domestic courts and foreign courts in cross-border insolvency cases, (ii) "legal certainty for trade and investment," (iii) protection of all interested parties in a cross-border insolvency, and (iv) "maximization of the value of the debtor's assets." 11 U.S.C. § 1501(a); *see In re Oversight & Control Comm'n. of Avánzit*, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007)). The Petitioners respectfully submit that each of these goals would be best achieved by recognizing that the Cayman Islands are the Debtor's COMI (defined and described below and that the Cayman Proceeding is therefore a "foreign main proceeding").

133. In addition to qualifying as a "foreign proceeding" under section 101(23) of the Bankruptcy Code, the Cayman Proceeding also qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests." *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests"). The relevant time period for determining the location of a debtor's COMI is at or around the date on which the chapter 15 petition is filed. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013); *Flynn v. Wallace (In re Irish Bank Resolution Corp. (In Special Liquidation))*, 538 B.R. 692, 697 (D. Del. 2015); *Ocean Rig UDW Inc.*, 570 B.R. at 705-06; *In re Ascot Fund Ltd.*, 603 B.R. 271, 279 (Bankr. S.D.N.Y. 2019); *In re Suntech Power Holdings Co.*, 520 B.R. at 416.

134. While the term COMI is not expressly defined in the Bankruptcy Code, bankruptcy courts have enumerated factors relevant to the determination of a debtor's COMI.

-46-

135. Delaware courts consider specific factors when assessing a Debtor's COMI. As an initial matter, section 1516 of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered office … is presumed to be the center of the debtor's main interests." Here, the Debtor's registered office is located in the Cayman Islands. Accordingly, the Debtor is entitled to the statutory presumption that its COMI is located in the Cayman Islands.

136. A court will also consider the following factors relevant to determining COMI:

(a)    the location of the debtor's headquarters;

(b)    the location of those who actually manage the debtor;

(c)    the location of the debtor's primary assets;

(d)    the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and/or

(e)    the jurisdiction whose law would apply to most disputes.

*See In re Ir. Bank Resolution Corp. (In Special Liquidation)*, 2014 Bankr. LEXIS 1990, at *138. Considering these factors, and for the reasons provided below, the Debtor's COMI is located in the Cayman Islands.

137. The Debtor was incorporated in 2011 in the Cayman Islands under the laws of the Companies Act. The Debtor has its registered office, and is headquartered, at HSM Corporate Service Ltd., 68 Fort Street, George Town, PO Box 31726, Grand Cayman KY1-1207, Cayman Islands.

138. Since the entry of the Supervision Order in the Cayman Proceeding on May 6, 2025, the Petitioners have assumed sole authority, subject to the supervision of the Cayman Court, to manage the Debtor's assets and administer its estate. *See* MacInnis Decl. ¶¶ 62-64. In connection therewith, the Petitioners have fulfilled their statutory obligations to publish and disseminate notices of HoldCo's winding up and their appointment, obtained sanction from the Cayman Court

-47-

to engage Cayman Islands and U.S. counsel, published a Report to Contributories on July 2, 2025, and, on July 3, 2025, convened the first meeting of contributories held on July 9, 2025, issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, requesting books and records, held discussions with various parties regarding HoldCo's history and financial affairs, and commenced the Cayman Litigation and the Applications. In connection therewith, the Petitioners have made decisions regarding the Cayman Proceeding, retained U.S. counsel to advise the Petitioners on U.S. law matters, and maintained control over the Debtor. *Id*. at ¶¶ 62-68.

139.    The Petitioners have conducted these activities from their office in the Cayman Islands. Moreover, the actions of the Petitioners in connection with the Debtor's estate are subject to supervision by a Cayman Islands judge in the Cayman Court. *See id.*; *see also Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d at 137 ("[A]ny relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis."); *In re Suntech Power Holdings Co.*, 520 B.R. at 416 (A "court may consider the location of the debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI."). Accordingly, the facts support a finding that those who actually manage the Debtor are located in the Cayman Islands.

140.    The Debtor's registered office, current management, accounting, planning, budgeting, and human resources materials are located in the Cayman Islands. As discussed below, discovery is necessary to determine additional information regarding the Debtor's assets other than the Reed Smith Retainer.

-48-

141. Based on the facts and circumstances set forth herein, there are no facts sufficient to rebut the presumption that the Debtor's COMI is in the Cayman Islands. Therefore, the Cayman Proceeding should be recognized as a foreign main proceeding.

142. Certain other factors also support a finding that the Debtor's COMI is located in the Cayman Islands. For instance, the outward appearance of the Debtor's COMI is an important consideration. All of the Debtor's recent activities have been conducted and ascertainable as being in the Cayman Islands. Accordingly, the Cayman Islands can be reasonably ascertainable by the Debtor's creditors and other stakeholders as the Debtor's COMI.

143. Additionally, having commenced the Cayman Litigation, the Debtor certainly holds causes of action in the Cayman Islands. While the Debtor may also hold claims in other jurisdictions, the location of causes of action in the Cayman Islands makes this factor at least neutral.

144. Based on these facts, the totality of the circumstances—particularly, the fact that the Debtor's nerve center has been the Cayman Islands since the appointment of the Petitioners as joint official liquidators—strongly weighs in favor of the conclusion that the Debtor's COMI is located in the Cayman Islands. Because the Cayman Proceeding is pending in the location of the Debtor's COMI, the Cayman Proceeding should be recognized as a foreign main proceeding.

**C.** **In the Alternative, the Cayman Proceeding Should be Recognized as a Foreign Nonmain Proceeding**

145. In the event that this Court determines that the Cayman Proceeding will not be deemed a "foreign main proceeding," it should instead recognize the Cayman Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code. 11 U.S.C. § 1502(5). Under section 1517(b) of the Bankruptcy Code, a foreign proceeding shall be recognized as a foreign nonmain proceeding if it is pending in a country where the debtor has an

-49-

"establishment." *See* 11 U.S.C. § 1517(b)(2). Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a non-transitory economic activity." *See* 11 U.S.C. § 1502(2). The "establishment" requirement is satisfied by conducting business locally. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. at 130-31, *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

146.    The Debtor conducts pertinent economic activity in the Cayman Islands. As noted above, its headquarters is located in the Cayman Islands. Accordingly, the Petitioners submit that at a minimum, the Debtor maintains an establishment in the Cayman Islands where non-transitory economic activity takes place. Moreover, prior to the commencement of the Cayman Proceeding, and while the Debtor was approving the Relevant Transactions, one of the Directors, Mr. Murphy, was resident in the Cayman Islands. As explained above, the Petitioners have been continuing the operation of the Debtor during the winding up of its affairs pursuant to the Cayman Proceeding.

147.    For these reasons, to the extent that this Court finds that the Cayman Proceeding is not a "foreign main proceeding," there are sufficient grounds for this Court to find that the Debtor has an "establishment" in the Cayman Islands and to recognize the Cayman Proceeding as a "foreign nonmain proceeding" per the definition provided in section 1502(5) of the Bankruptcy Code. See *In re SphinX, Ltd.*, 351 B.R. 103, 122 (Bankr. S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) (finding that "no negative consequences would appear to result from recognizing the [foreign] proceedings as nonmain proceedings, that is the better choice.").

**D.    The Petitioners Satisfy the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code**

148.    For recognition under chapter 15, a foreign proceeding must also have a foreign representative. *See* 11 U.S.C. § 1517(a)(2) (providing that a foreign representative shall apply for recognition of the foreign proceeding). The Petitioners submit that this Chapter 15 Case was

-50-

commenced by a duly authorized "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code, which provides as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding. 11 U.S.C. § 101(24).

149.    Pursuant to the Supervision Order, the Cayman Court authorized the appointment of Margot MacInnis and Sandipan Bhowmik as the JOLs, authorized and empowered them to act jointly and severally as the foreign representatives in connection with the Cayman Proceeding. *See* Supervision Order, ¶¶ 2-3. The Cayman Court, by way of the Supervision Order, further granted the JOLs the power to, among other things: (i) commence legal proceedings in the name and on behalf of the Debtor to obtain the information, documents, or examine individuals in the United States; (ii) apply for the preservation, freezing or attachment of assets to which the Debtor is or may be entitled; and (iii) seek registration or recognition of themselves and/or the Cayman Proceeding in any state in the United States for either of the reasons referenced in (i) or (ii). *See Id.* at ¶¶ 5-6. As a result of the authority granted by the Cayman Court and under United States law, the Petitioners are entitled to file this Chapter 15 Case in the United States for the purpose of having themselves, the Cayman Proceeding, the Supervision Order, and other orders of the Cayman Court recognized and enforced in the United States. *See Id.* ¶¶ 2-6.

**E.    The Petition Was Properly Filed and Satisfies the Requirements under Section 1515 of the Bankruptcy Code**

150.    The Petitioners duly and properly commenced this Chapter 15 Case by filing the Petition, accompanied by all fees, documents, and information required by the Bankruptcy Code, Bankruptcy Rules and Local Rules, including: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses

-51-

MR 0786

of all persons or bodies authorized to administer foreign proceedings of the Debtor, (ii) all parties to litigation pending in the United States in which the Debtor is a party at the time of the commencement of the Chapter 15 Case, and (iii) all entities against whom at relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtor's foreign proceedings that are known to the Petitioners; and (d) a certified copy of the Supervision Order.

151.    Accordingly, because the Petition satisfies section 1517 of the Bankruptcy Code, the Court should recognize the Cayman Proceeding in this Chapter 15 Case. Granting such recognition will promote the United States public policy of respecting foreign proceedings as articulated in sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code. For these reasons, the conditions for recognition of the Cayman Proceeding are satisfied under section 1517 of the Bankruptcy Code.

**F.    The Petitioners are Entitled to Automatic Relief Under Section 1520 of the Bankruptcy Code**

152.    Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, *see* 11 U.S.C. § 1520(a), including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to HoldCo and to its property that is located within the territorial jurisdiction of the United States. Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517, the Petitioners respectfully submit that no further showing is required to the extent the Court recognizes the Cayman Proceeding as a foreign main proceeding.

-52-

**G.    The Petitioners are Entitled to Additional Relief Under Section 1521 of the Bankruptcy Code**

153.    Upon recognition of a foreign proceeding, section 1521 of the Bankruptcy Code provides specific grounds for additional relief. Specifically, section 1521 authorizes the Court to grant "any appropriate relief," including "any relief that may be available to a trustee" subject to certain limitations and provided that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. §§ 1521, 1522. Here, the Petitioners respectfully request that this Court grant relief under sections 1521(a)(1), (2), (3), (4), (5), (6) and (7) of the Bankruptcy Code.

**i.    The Foreign Representative is Entitled to Appropriate Relief Under Sections 1521 (a)(1), (2), (3), (4), (5), (6) and (7)**

154.    As stated below, the Petitioners seek further relief upon recognition in the form of availing themselves of discovery rights under the Bankruptcy Code to assist them in their investigation of the assets and affairs of the Debtor, to identify the location of property over which the Debtor has or may assert a proprietary interest, and in their efforts to recover books and records of the Debtor in the possession of third parties to investigate the location of the Fund and other assets of the Debtor. This will help avoid the potential loss of critical evidence relating to the Debtor's assets and liabilities, as well as causes of action against third parties.

155.    First, pursuant to sections 1521(a)(1), (2), and (3), the Petitioners request: (1) that this Court stay the commencement, continuation, or execution of any individual action or proceeding concerning the Debtor's assets, rights, obligations, or liabilities to the extent they have not already been stayed by section 1520(a); and (2) the Court suspend the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a). These provisions are necessary to ensure the Debtor's assets or interests in the United States are not dissipated during the course of the Cayman Proceeding.

-53-

MR 0788

156.    Second, to enable them to identify, protect, and preserve the Debtor's estate for the benefit of all its creditors, the Petitioners request that this Court entrust them with the administration or realization of all or part of the Debtor's assets within the territorial jurisdiction of the United States pursuant to section 1521(a)(5). *See IIG Global Trade Finance Fund Ltd., No. 20-10132 (MEW) (Bankr. S.D.N.Y Jan. 17, 2020)* ECF No. 9 (ordering that the administration or realization of all or parts of the assets of [the debtor] within the territorial jurisdiction of the U.S. is entrusted to its liquidators); *In re Frontera Resources Caucasus Corp. and David Griffin*, No. 19-13418 (MEW) (Bankr. S.D.N.Y Oct. 25, 2019) ECF No. 19 (ordering that the liquidators are entrusted with the administration and realization of [the debtor's] assets within the territorial jurisdiction of the United States); *In re Air Berlin PLC & Co. Luftverkehrs KG*, No. 17-12282 (MEW) (Bankr. S.D.N.Y Aug. 18, 2017) ECF. No. 24 (granting 1521(a)(5) relief). This authority would be consistent with the Petitioners' authority to administer the Debtor's assets under Cayman law.

157.    Finally, as discussed below, the Petitioners request that this Court provide discovery relief pursuant to sections 542(e), 1519(a)(3), 1521(a)(4), 1521(a)(7) of the Bankruptcy Code and Bankruptcy Rule 2004.

### ii.    Injunctive Relief is Appropriate

158.    The standards, procedures, and limitations applicable to an injunction also apply to relief sought under sections 1521(a)(1), (2), (3), and (6) of the Bankruptcy Code. *See* 11 U.S.C. § 1521(e). Generally, to obtain an injunction, a movant must demonstrate the likelihood of irreparable harm. *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995). Irreparable harm in the chapter 15 context exists if there is a risk of disruption to the orderly and fair distribution of assets through dissenting creditor actions to the detriment of other creditors. *See, e.g., In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present

-54-

when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum.") (*quoting* Collier on Bankruptcy ¶ 304.05 (15th ed. Rev. 2003)); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors").

159.    The risk of irreparable harm exists here, particularly in light of the consummation of the Relevant Transactions, which dispossessed the Debtor of its direct and indirect interests in the DAF Structure, and the risk that the Debtor's proprietary interests asserted in the Cayman Litigation could be further dissipated pending the outcome of the Cayman Litigation and the JOLs continuing investigation of the Relevant Transactions and the Remuneration Transactions. It is imperative that the Debtor's assets are protected while the JOLs' investigations are ongoing—recognition of the Injunctive Relief Order (discussed below) is therefore critical.

160.    Absent injunctive relief, the Debtor's efforts to orderly liquidate through the Cayman Proceeding and to maximize value for all stakeholders could be thwarted by the actions of the Named Defendants or other parties in interest, a result that is inconsistent with the Bankruptcy Code. The interests of affected parties under the Cayman Proceeding are sufficiently protected under section 1522(a) of the Bankruptcy Code because all similarly situated parties will be treated equally and fairly during the pendency of the Cayman Proceeding. Moreover, all parties will have the opportunity to be heard in the Cayman Proceeding and the Cayman Litigation. The injunction also will not cause undue hardship or prejudice to the rights of any U.S.-based creditors or other parties in interest and is consistent with principles of comity. Accordingly, the injunction should be granted.

-55-

161. The ultimate goal of the Petitioners is to protect the Debtor and to preserve and maximize realization on the assets of the Debtor for the benefit of its creditors and other stakeholders. The additional relief requested by the Petitioners under sections 1521, 362, and 105 of the Bankruptcy Code will assist the Petitioners in carrying out their duties as joint official liquidators to achieve this goal and will promote the effective administration of the Cayman Proceeding.

iii.   **Discovery Relief is Both Necessary and Appropriate to Uncover Assets and Determine Causes of Action**

162. It is crucial that the Petitioners be permitted to take discovery pursuant to sections 1519(a)(3), 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code. The Petitioners seek discovery to: (i) locate the Fund and uncover related frauds and potential assets of the Debtor; and (ii) determine causes of action against and defenses to third parties. These rules indicate Congress's recognition of the need for foreign debtors to conduct discovery with respect to their assets, liabilities and affairs, including the investigation of potential causes of actions. *See, e.g., In re Comair Ltd.*, No. 21-10298(JLG), 2021 Bankr. LEXIS 3137, at *28 (Bankr. S.D.N.Y. Nov. 14, 2021), appeal dismissed, No. 21 CIV. 10146 (AT), 2023 U.S. Dist. LEXIS 6146 (S.D.N.Y. Jan. 12, 2023); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012); *In re Glitnir banki hf.*, No. 08-14757 SMB, 2011 Bankr. LEXIS 3296 at *19 (Bankr. S.D.N.Y. Aug. 19, 2011); *In re Hughes*, 281 B.R. 224, 229 (Bankr. S.D.N.Y. 2002).

163. Specifically, the discovery of third party causes of action could uncover "contingent property interests" of the Debtor. *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012) (citing *In re Kane*, 628 F.3d 631, 641 n.7 (3d Cir. 2000) (noting that property of the estate "encompasses contingent property interests such as causes of action")). The Petitioners are seeking discovery to promote a significant chapter 15 objective by

-56-

permitting the Petitioners to fulfill their roles. *See In re Markus*, 607 B.R. 379, 390 (Bankr. S.D.N.Y. 2019), *aff'd in part*, vacated in part on other grounds, remanded sub nom. *Markus v. Rozhkov*, 615 B.R. 679 (S.D.N.Y. 2020) (quoting *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 821 (Bankr. S.D.N.Y. 2018)).

164.    Additionally, section 542(e) provides "[s]ubject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." 11 U.S.C. § 542(e). Foreign representatives in chapter 15 cases seeking court-ordered discovery at times seek relief pursuant to section 542(e), which is either directly applicable to chapter 15 cases or, in the alternative, delineate relief which can be granted by the court pursuant to section 1521(a)(4). *See In re Platinum Partners Value Arbitrage Fund, LP*, 583 B.R. 803 (Bankr. S.D.N.Y. 2018); *see also In re AJW Offshore Ltd.*, 488 B.R. 551, 564 (Bankr. E.D.N.Y. 2013) (finding that a foreign representative may seek disclosure pursuant to section 542(e)); *In re ABC Learning Ctr.'s, Ltd.*, 445 B.R. 318, 341 (Bankr. D. Del. 2010) (allowing the right to seek turnover under section 542).

165.    Following sections 542(e) and 1521(a)(4), Bankruptcy Rule 2004 provides an additional ground for a court to authorize discovery in a chapter 15 case, with the stated purpose of determining the nature and extent of the bankruptcy estate. *See In re Glitnir banki hf.*, No. 08-14757 (SMB), 2011 Bankr. LEXIS 3296, at *20 (Bankr. S.D.N.Y. Aug. 19, 2011). "The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (citation omitted).

MR 0792

In particular, discovery under Rule 2004 can be used to "facilitate[s] . . . the unearthing of frauds." *In re Orion Healthcorp, Inc.*, 596 B.R. 228, 235 (Bankr. E.D.N.Y. 2019) (citation omitted). Thus, Rule 2004 can be used as a "pre-litigation discovery device." *In re Wilson*, 413 B.R. 330, 336 (Bankr. E.D. La. 2009). Likewise, a Rule 2004 motion "need not be tied to specific factual allegations between parties." *See In re Symington*, 209 B.R. 678, 684 (Bankr. D. Md. 1997). Rather, Rule 2004 examinations may be "broad, unfettered and in the nature of a 'fishing expedition.'" *See In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008); *see also In re Hughes*, 281 B.R. at 226 (same).

166.    Finally, courts have found that a foreign representative may be authorized to take discovery in accordance with section 542(e) and Bankruptcy Rule 2004 pursuant to sections 1507 and 1521(a)(7). *See CohnReznick LLP v. Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (In re Platinum Partners Value Arbitrage Fund L.P.)*, 2018 U.S. LEXIS 109684, at \*11 (S.D.N.Y. 2018); *Platinum Partners Value Arbitrage Fund*, 583 B.R. at 810. If recognition is granted, section 1507 of the Bankruptcy Code grants the bankruptcy court authority to "provide additional assistance to a foreign representative under this title or under other laws of the United States" provided that such assistance is "consistent with the principles of comity" and satisfies the fairness considerations set forth in section 1507(b). Thus, chapter 15 provides courts with broad, flexible, and pragmatic rules to fashion relief that is "largely discretionary and turns on subjective factors that embody principals of comity." *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. at 810 (Bankr. S.D.N.Y. 2018) (citation omitted). And, section 1521(a)(7) broadly affords a foreign representative "any additional relief that may be available to a trustee . . ." 11 U.S.C. § 1521(a)(7).

MR 0793

167.   Here, the Petitioners must be afforded broad discovery rights in the United States to facilitate their investigations. First, this requires access to all documents relating to the Debtor's property or financial affairs, necessitating the need for section 542(e) relief. Second, the Petitioners must be able to broadly issue Rule 2004 examinations, as well as to be afforded all discovery rights under the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules. Only by affording the Petitioners the necessary tools to complete their investigations will the JOLs be able to maximize distributions such that creditors and interested parties are sufficiently protected.

**H.    The Injunctive Relief Order, As Entered by the Cayman Court, Should Be Fully Enforced Within the Territorial Jurisdiction of the United States Under Sections 105(a), 1507 and 1521(a)(7) of the Bankruptcy Code and Under Principles of Comity**

168.   Upon recognition of the Cayman Proceeding as a foreign proceeding—whether main or nonmain—the Court has the authority to provide additional assistance to the JOLs pursuant to the Bankruptcy Code or other applicable laws of the United States, so long as such relief is consistent with principles of comity. *See* 11 U.S.C. §§ 1507 and 1521(a)(7). Indeed, "[t]he plain language of Bankruptcy Code sections 1521(a) and 1507 give this Court a broad grant of discretion to aid foreign courts in accordance with principles of comity." *See In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R.*, 2025 Bankr.LEXIS 751, at *39 (Bankr. D. Del. April 1, 2025). Additionally, section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

169.   Chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009); s*ee also, In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 333 ("relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity." (citing §§ 1507, 1521, and 1525).). Chapter

-59-

15 of the Bankruptcy Code empowers "courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity." *In re Rede Energia, S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 333-34; *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) ("chapter 15 maintains—and in some respects enhances—the 'maximum flexibility' . . . that section 304 provided bankruptcy courts in handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations.") (internal citations omitted). These principles are embedded in the relief available under Chapter 15, which "provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives in the chapter in accordance with comity." *In re Rede Energia, S.A.*, 515 B.R. at 91.

170.    Accordingly, "[a]fter recognition, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." *In re British American*, 488 B.R. 205, 239 (Bankr. S.D. Fla 2013) (quoting *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009)). Courts are "guided by the principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 696 (Bankr. S.D.N.Y.2010) (citing *In re Atlas Shipping*, 404 B.R. at 738); *see also CT Inv. Mgmt v. Cozumel Caribe (In re Cozumel Caribe S.A. de C.V.)*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012) (noting that comity is a "central tenet" in chapter 15 proceedings); 11 U.S.C. § 1501 (stating that the purpose of chapter 15 is to provide mechanisms for cooperation and comity between courts dealing with cross-border insolvency cases); *see also In re Agrokor*, 591 B.R. 163, 186 (Bankr. S.D.N.Y. 2018) ("Once a case is recognized as a foreign main proceeding, as has already occurred here, Chapter 15

-60-

specifically contemplates that the court will exercise its discretion consistent with principles of comity."); *In re Oi S.A.*, 587 B.R. 253, 264 (Bankr. S.D.N.Y. 2018) ("Chapter 15 … provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity.") (internal quotations and citations omitted).

171. Indeed, section 1509(b)(3) expressly states that upon the foreign representative's recognition, the Court "must grant comity or cooperation to the foreign representative." 11 U.S.C. § 1509(b)(3). Chapter 15's legislative history evidences this principle. Congress has stated that "comity is raised in the introductory language [of Chapter 15] to make clear that it is the central concept to be addressed." *In re Oi*, 587 B.R. at 264 (quoting H.R. Rep. No. 109-31, pt. 1, at 109 (2005), as reprinted in 2005 U.S.C.C.A.N. 88, 172).

172. In *Hilton v. Guyot*, the United States Supreme Court defined comity as follows:

> Comity in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. 113, at 141. "Comity is a common law rule by which courts in the United States give deference to foreign judgments." *In re Neves*, 570 B.R. 420, 426 (Bankr. S.D. Fla. 2017).

173. The proponent of comity bears the initial burden to satisfy the comity considerations set forth in *Hilton v. Guyot*, which considers the following:

> (a) whether the foreign court was competent and used proceedings consistent with civilized jurisprudence; (b) whether the judgment was rendered by fraud; and (c) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just.

*Daewoo Motor America, Inc. v. General Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)).

-61-

174.    The first factor requires the proponent of comity to "describe the process by which the [foreign order] was obtained, why that process is not unfair, and why it does not offend the United States' notions of justice." *In re Neves*, 570 B.R. at 426. Once the proponent of comity satisfies this burden, the burden shifts to the party opposing comity to show that the foreign order "violates American public policy notions of what is decent and just." *Id*. at 427; see also *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (a foreign judgment may not be recognized on comity if its recognition would be "repugnant to fundamental notices of what is decent and just"). This burden is "high and unfrequently met" and is applicable only in "clear-cut cases*." Ackerman v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (citations omitted).

175.    Further, all relief under Chapter 15 is subject to the public policy exception set forth in section 1506. Under section 1506, the Court may refuse "to take an action governed by [Chapter 15] if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. This public policy exception is "narrowly construed, because the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States.'" *In re ABC Learning Ctrs*., 728 F.3d at 309 (quoting H.R. Rep. No. 109-31(I), at 109 (2005) reprinted in U.S.C.C.A.N. 88, 172); *see also In re Ashapura Minechem Ltd*., 480 B.R. 129, 139 n.60 (S.D.N.Y. 2012) (internal quotations omitted) (citation omitted) (explaining that courts have "uniformly" interpreted the public policy exception "narrowly and applied it sparingly")

176.    In considering comity, the relief granted in the foreign proceeding need not be identical to the relief that is available in the United States to be entitled to comity. *See In re Rede Energia*, 515 B.R. at 69. Indeed, the Restatement (Second) of Conflict of Laws states that the

-62-

principle of international comity should not be limited to monetary awards as foreign orders for equitable relief have been afforded comity in the United States. Restatement § 102.

177. In that regard, under principles of comity, courts have recognized injunctions issued by foreign courts, even if such injunctions may not be enforceable in the United States. *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 700 (noting "[p]rinciples of comity in chapter 15 cases support enforcement of the [foreign order] in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.").

I.    **Recognition of the Injunctive Relief Order is Warranted under Sections 1521(a)(7) and 1507 of the Bankruptcy Code**

i.    **Legal Standard for Relief Under Sections 1521(a)(7) and 1507**

178. The Court has authority under sections 1521(a)(7) and 1507 to recognize and enforce the Injunctive Relief Order.

179. Upon recognition of a foreign proceeding, section 1521(a)(7) authorizes the Court to grant "any appropriate relief" at the request of the foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors[,]" including any relief that may be available to a trustee or debtor-in-possession, subject to certain exceptions that do not apply here. 11 U.S.C. § 1521(a)(7); *see In re Cell C Proprietary Ltd.*, 571 B.R. 542, 554 (Bankr. S.D.N.Y. 2017) (noting that the list of "appropriate relief" under section 1521(a) is "non-exhaustive"); *In re Daebo Int'l Shipping Co., Ltd.*, 543 B.R. 47, 52–53 (Bankr. S.D.N.Y. 2015).

MR 0798

180.    The Court has "exceedingly broad" discretion to grant relief under section 1521(a). *In re Markus*, 610 B.R. at 76; *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017) (citation omitted). However, such relief may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). An analysis under section 1522 requires a balancing test of the respective interests. *See In re Oi*, 587 B.R. at 265 (citing various cases).

181.    Furthermore, Section 1507 of the Bankruptcy Code also permits the Court to grant the requested relief as "additional assistance." 11 U.S.C. § 1507(a). *Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031,1057 (5th Cir. 2012) (explaining that section 1507's "broad grant of assistance is intended to be a catchall"); *see also* H.R. Rep. No. 109-31, pt. 1, at 109 (2005) (noting that section 1507 authorizes "additional relief" beyond that available under section 1521 of the Bankruptcy Code). Though the "interplay between the relief available under sections 1507 and 1521 is far from clear," some courts analyze relief under these sections in a two-step approach: first considering relief under section 1521 and, if such relief is not available, then the Court may consider the relief requested under section 1507. *In re Olinda Star, Ltd.*, 614 B.R. 28, 47 (Bankr. S.D.N.Y. 2020) (citing various cases).

182.    To grant "additional assistance" under section 1507, the Court shall consider whether the additional assistance is consistent with principles of comity and whether it satisfies the following fairness considerations set forth in section 1507(b):

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

-64-

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b); *In re Agrokor*, 591 B.R. at 188-89

183.    Courts have recognized and enforced foreign orders under sections 1521 and 1507 to give effect and ensure compliance with the foreign order. Such is the case with foreign confirmation orders or orders to facilitate their implementation. *In re Olinda Star, Ltd*., 614 B.R. at 47-48 (recognizing BVI scheme of arrangement and entering a permanent injunction against acts that would interference with the scheme); *In re Avanti Comms. Grp. PLC*, 582 B.R. 603 (Bankr. S.D.N.Y. 2018) (recognizing and enforcing UK schemes of arrangement which, among other things, granted third party releases); *In re Cell C Proprietary Ltd*., 571 B.R. at 551 (recognizing South African arrangement sanctioned by South African court); *In re Rede Energia S.A*., 515 B.R. at 93-94 (recognizing Brazilian reorganization and confirmation decision and enjoining actions in the United States in contravention of the decision

184.    American courts have also afforded comity to *ex parte* interim injunctions. For instance, in *Gorsoan Ltd. v. Bullock*, No. 2020-020803-CA-01 (Fla. 11th Cir. Ct. Feb. 17, 2021), the court recognized an *ex parte* interim injunction order issued by a Cypriot court freezing Bullock's assets worldwide. In so doing, the court noted its rich history of affording comity to foreign interim injunctions. *Id*. at p. 3; *see also Amezcua v. Cortez*, No. 3D20- 1649, at 6 (Fla. 3d DCA Jan. 13, 2021) (recognizing Mexican embargo order prohibiting transfer of condominium unit); *Cermesoni v. Maneiro*, 144 So. 3d 627, 629 (Fla. 3d DCA 2014); *Nahar v.Nahar*, 656 So. 2d 225, 229 (Fla. 3d DCA 1995.

-65-

### ii. Recognition of the Injunctive Relief Order is Appropriate under Sections 1521 and 1507 of the Bankruptcy Code

185.    Section 1521(a)(7) of the Bankruptcy Code provides the granting of any additional relief – in this case, the recognition of the Injunctive Relief Order – that may otherwise be available to a trustee in bankruptcy. Here, such an Injunctive Relief Order may be enforceable in the United States under section 105(a). *See American Film Technologies v. Taritero (In re American Film Technologies)*, 175 B.R. 847, 855 (Bankr. D. Del. 1994) (utilizing section 105 to issue a preliminary injunction). Additionally, the standard for an injunction in the Cayman Islands is similar to that in the Third Circuit. *See* Moran Decl., at ¶ 42 (discussing the standard for injunctive relief in the Cayman Islands).[11] Indeed, as set forth in the Moran Declaration, the Cayman Court has already determined that (a) the Cayman Litigation had a reasonable prospect of success and (b) that the interests of the Debtor's stakeholders were best served by the JOLs commencing the Cayman Litigation. *See* Moran Decl., at ¶ 32.

---

[11] To determine whether to issue a preliminary injunction, a court must consider: (1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest. *See Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002).

-66-

186. Further, the Named Defendants have been afforded due process and given notice of the Injunctive Relief Application and the Injunction Hearing Date and will have the opportunity to appear at the hearing and respond to the Injunctive Relief Application before relief is granted by the Cayman Court. *See* Moran Decl., at ¶ 35. Moreover, the nature of the relief being sought is similar to the relief that has been raised among the parties in protocol discussions in the Cayman Proceeding and is, in substance, akin to the restrictions that the Named Defendants agreed to assume in the Rule 11 Agreement in the Texas Proceeding. *See* MacInnis Decl., at ¶¶ 68, 97. Therefore, to the extent the Injuncitve Relief Order is entered in the Cayman Islands, it should be recognized by this Court in the interests of comity.

187. In addition, recognition of the Injunctive Relief Order satisfies the relevant equitable and practical considerations outlined in section 1507(b) of the Bankruptcy Code. First, the relief promotes fair and equitable treatment of all creditors by preserving the value of HoldCo's estate for the benefit of all stakeholders, rather than potentially allowing the Named Defendants to obtain an unfair advantage through the dissipation or diversion of assets. Second, recognition ensures that U.S.-based creditors are not exposed to procedural disadvantage in the Cayman Proceeding, as the Injunctive Relief Order operates neutrally to safeguard HoldCo's property pending full adjudication of the claims, rather than favoring any specific jurisdiction or creditor group. Third, the Injunctive Relief Order directly addresses and prevents improper transfers or dissipation of HoldCo's assets, which is essential to maintaining the status quo during the JOLs' ongoing investigation and the Cayman Litigation. Finally, the relief sought supports a distribution framework that is aligned, in substance, with U.S. bankruptcy priorities by ensuring assets are preserved for collective resolution and eventual equitable distribution. These considerations, grounded in the principles of comity and cross-border cooperation, strongly support recognition

-67-

of the Injunctive Relief Order, which represents the Cayman Court's necessary and proportionate response to the JOLs' and the Named Defendants' failure to reach agreement on a protocol to mitigate the risk of asset dissipation pending completion of the JOLs' investigation and the Cayman Litigation.

188. Accordingly, the JOLs seek, should the Cayman Court issue the Injunctive Relief Order, full enforcement of the Injunctive Relief Order within the territorial jurisdiction of the United States to ensure that the mitigation of any risk of asset dissipation—including asset dissipation of funds for the benefit of U.S. charities—pending completion of the JOLs' investigation and the Cayman Litigation is applied consistently across the two relevant jurisdictions, furthering the very goals of international cooperation and assistance to foreign courts and principles of comity.

**J.** **Granting the Relief Requested herein, Including Recognition of the Cayman Proceeding and Injunctive Relief Order, Are Not Manifestly Contrary to U.S. Public Policy**

189. The requested relief herein advances the public policy objectives of chapter 15 of the Bankruptcy Code, including cooperation, fairness, and efficiency, and the protection and maximization of asset value. As set forth in the Moran Declaration, Cayman law provides a structured process for the liquidation of a debtor's assets, involving judicial oversight and opportunity for creditor participation, which is aligned with U.S. principles of due process and fair treatment of creditors. *See* Moran Decl. ¶¶ 29, 64. To aid an orderly liquidation, it is imperative that the Petitioners be afforded the necessary relief to both protect the Debtor's assets and conduct ongoing investigations—this includes recognition of the Cayman Proceeding and Injunctive Relief Order. Absent this Court granting the relief requested herein, there is a significant risk of further asset dissipation—particularly related to the Fund. Therefore, such relief promotes the fair and efficient administration of cross-border insolvency, protects the interests of all creditors and other

-68-

parties in interest, including the Debtor, and maximizes the value of the Debtor's assets. *See* 11 U.S.C. § 1501(a).

## NOTICE

190.    Notice of this Petition has been provided in accordance with the terms set forth in the *Motion of Petitioners for Entry of an Order Scheduling a Hearing on Chapter 15 Petition for Recognition and Related Relief and Specifying Form and Manner of Service of Notice*. The Petitioners submit that such notice is proper, and that no other or further notice need be provided.

-69-

**CONCLUSION**

WHEREFORE, the Petitioners respectfully request the Court to enter an order, substantially in the form attached as **Exhibit A**, granting the requested relief and such other and further relief as may be just and proper.

Dated: July 21, 2025
       Wilmington, Delaware

                       Respectfully submitted,

                       **REED SMITH LLP**

By:   */s/ Jason D. Angelo*
        Jason D. Angelo (No. 6009)
        1201 North Market Street, Suite 1500
        Wilmington, DE 19801
        Telephone: +1.302.778.7500
        Facsimile: +1.302.778.7575
        E-mail: jangelo@reedsmith.com

        -and-

        Casey Laffey, Esq. (*pro hac vice* forthcoming)
        Aaron Javian, Esq. (*pro hac vice* forthcoming)
        Ian M. Turetsky, Esq. (*pro hac vice* forthcoming)
        Richard C. Solow, Esq. (*pro hac vice* forthcoming)
        **REED SMITH LLP**
        599 Lexington Avenue
        New York, NY 100220
        Telephone: +1.212.521.5400
        Facsimile: +1.713.521.5450
        E-mail: claffey@reedsmith.com
             ajavian@reedsmith.com
             ituretsky@reedsmith.com
             rsolow@reedsmith.com

        *Counsel to Margot MacInnis and Sandipan Bhowmik as Joint Official Liquidators of Chapter 15 Debtor*

**VERIFICATION OF PETITION**

I, Margot MacInnis, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

My colleague, Sandipan Bhowmik, and I are the duly appointed Joint Official Liquidators of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands, which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division by an order dated May 6, 2025 (Cause No. FSD 116 of 2025)(JAJ). As such, I have full authority to verify the foregoing Petition on behalf of the Debtor.

I have read the foregoing Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 21, 2025
Cayman Islands

/s/ Margot MacInnis
MARGOT MACINNIS

*Joint Official Liquidator of*
*Charitable DAF HoldCo, Ltd*
*(in Official Liquidation)*

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-11376 (___) |
| Debtor in a foreign proceeding. | |

**ORDER GRANTING RECOGNITION OF FOREIGN**
**MAIN PROCEEDING AND DISCRETIONARY RELIEF**

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators of Charitable DAF HoldCo, Ltd ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ) (the "Supervision Order"), by its undersigned United States counsel, Reed Smith LLP ("Reed Smith") having filed in their capacity as the authorized foreign representatives of HoldCo the Official Form Petition and the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition")[2] and the accompanying Moran Decl. and MacInnis Decl., seeking relief pursuant to chapter 15 of the Bankruptcy Code; and upon due consideration of the Verified Petition, Moran Decl., MacInnis Decl., together with all exhibits thereto, in support of the Verified

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Verified Petition.

Petition, as well as any objections thereto; and a hearing having been held on [DATE], 2025 (the "Hearing") to consider the Verified Petition, at which the Moran Decl. and MacInnis Decl. were received into evidence; and appropriate and timely notice of the filing of the Verified Petition and the Hearing thereon having been given by the Petitioners pursuant to section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all purposes; and no other or further notice being necessary or required; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court finds:[3] (i) it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(a), 11 U.S.C. §§ 109 and 1501 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; (ii) venue is properly located in this district pursuant to 28 U.S.C. §§ 1410(1) and 1410(3); (iii) the Verified Petition was properly filed and served; (iv) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); (v) the Debtor is subject to foreign main proceedings within the meaning of section 1502(4) and 1517(b)(1) of the Bankruptcy Code; (vi) the Petitioners are "persons" and the "foreign representatives" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code; (vii) the Debtor's chapter 15 case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code; (viii) the Debtor has its center of main interests in the Cayman Islands; (ix) the Verified Petition satisfies the requirements of section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Bankruptcy Rules; (x) the Petitioners have demonstrated that the relief requested is necessary and appropriate, in the interests of the public and international comity,

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

MR 0809

consistent with the public policy of the United States, and warranted pursuant to sections 105(a), 362, 542, 1507(a), 1509(b)(2)-(3), 1520, 1521 and 1522 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules and will not cause hardship to creditors of the Debtor or other parties-in-interest that is not outweighed by the benefit of granting that relief; (xi) the interest of the public will be served by this Court's granting of the relief requested by the Petitioners; (xii) all of the relief contained in this Order is within the Court's jurisdiction, is essential to the success of the Cayman Proceeding, confers material benefits on, and is in the best interests of, the Debtor, its creditors, interest holders and other parties-in-interest, and critical and integral to the overall objectives of the liquidation and, with respect to injunctive relief, meets the legal and factual requirements for issuing an injunction; and (xiii) all creditors, interest holders and other parties-in-interest, including the Debtor, are sufficiently protected by the grant of relief ordered hereby in accordance with section 1522(a) of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT:

1. The Verified Petition is granted and any objections thereto are overruled with prejudice.

2. The Debtor's Cayman Proceeding is granted recognition as a foreign main proceeding pursuant to sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3. All relief afforded to a foreign main proceeding automatically upon recognition pursuant to section 1520 of the Bankruptcy Code is granted including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property that is now within or in the future is located within the territorial jurisdiction of the United States.

4. The Petitioners are granted recognition as "foreign representatives" pursuant to section 101(24) of the Bankruptcy Code in respect of the Cayman Proceeding.

- 3 -

5.      Pursuant to sections 1521(a)(1), (2) and (3) of the Bankruptcy Code, all persons and entities, other than the Petitioners and their representatives and agents, are hereby enjoined (to the extent they have not been stayed under section 1520(a)), in each case from:

a.  executing against the assets of the Debtor;

b.  commencing or continuing, including the issuance or employment of process, any judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements or otherwise against the Debtor;

c.  taking or continuing any act to create, perfect or enforce a lien or other security interest, setoff or other claim against the Debtor;

d.  transferring, relinquishing or disposing of any property of the Debtor to any person or entity (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Petitioners; and

e.  commencing or continuing an individual action or proceeding concerning the assets, rights, obligations or liabilities of the Debtor;

provided, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States.

6.      No persons or entities may take any action inconsistent with the Supervision Order, any order entered by the Cayman Court in relation to the Applications, and any orders issued in the Cayman Proceeding identified in the Verified Petition.

7.      No action taken by the Petitioners in preparing, disseminating, applying for, implementing, or otherwise in connection with this Order, any order entered in respect of the Verified Petition, this Chapter 15 Case, any further order for additional relief in this Chapter 15 Case, or any adversary proceedings or contested matters in connection therewith, constitutes a waiver of any immunity afforded to the Petitioners as foreign representatives, including without limitation pursuant to section 1510 of the Bankruptcy Code.

- 4 -

8.    In accordance with sections 1519(a)(3) and 1521(a)(4) of the Bankruptcy Code, Rule 2004 of the Bankruptcy Rules, and the Federal Rules of Civil Procedure, as incorporated by the Bankruptcy Rules, the Petitioners are authorized to conduct the examination of witnesses, the taking of evidence, or the delivery of information concerning the Debtor's assets, affairs, rights, obligations, or liabilities.

9.    In accordance with sections 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code, subject to any applicable privilege, all persons that hold recorded information, including books, documents, records, and papers, relating to the Debtor's property or financial affairs are required to turnover or disclose such recorded information to the Petitioners.

10.    Pursuant to section 1521(a)(5) of the Bankruptcy Code, the administration or realization of all or part of the assets of Debtor within the territorial jurisdiction of the United States is hereby entrusted to the Petitioners and the Petitioners are hereby established as the exclusive representatives of Debtor in the United States.

11.    Pursuant to sections 105(a), 1507, and 1521(a)(7) of the Bankruptcy Code, the Injunctive Relief Order is hereby recognized, given full force and effect and is fully enforceable within the territorial jurisdiction of the United States.

12.    Notwithstanding any provision in the Bankruptcy Rules to the contrary, including, but not limited to, Bankruptcy Rules 7062 and 1018, (A) this Order shall be effective immediately and enforceable upon its entry; (B) the Petitioners are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (B) the Petitioners and the Debtor are authorized and empowered, and may in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

MR 0812

13.     A copy of this Order shall be served in accordance with *Order Scheduling Hearing on Chapter 15 Petitions and Relating Relief and Specifying Form and Manner of Service of Notice* (D.I. ●).  Such service shall be good and sufficient service and adequate notice for all purposes.

14.     This Court shall retain jurisdiction with respect to the effect, enforcement, amendment, or modification of this Order, any request for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

15.     This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

MR 0813



**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD. (In Official Liquidation),[1] | Case No. 25-11376 (BLS) |
| Debtor in a foreign proceeding. | **Re: D.I. 18** |

**ORDER APPROVING STIPULATION AND
GRANTING PROVISIONAL RELIEF PURSUANT TO
SECTIONS 105(A) AND 1519 OF THE BANKRUPTCY CODE**

Upon the certification of counsel (the "Certification") filed by counsel to the JOLs,[2] in their

capacity as the authorized foreign representatives of Charitable DAF HoldCo, Ltd. (the "Debtor"),

the debtor in the above-captioned chapter 15 case (this "Chapter 15 Case"), for entry of an order

(this "Order") approving the *Stipulation and Agreed Order Regarding Provisional Relief Granted*

*Pursuant to Sections 105(a) and 1519 of the Bankruptcy Code* (the "Stipulation") by and among

the JOLs, the Applicable Named Defendants, and the CDM Entities (collectively, the "Parties")

with respect to the *Consent Order* entered by the Cayman Court on July 31, 2025

(the "Cayman Consent Order") approving certain asset preservation protocols set forth in

Schedule A attached thereto (the "Asset Preservation Protocol"); and the Court having found that

(a) it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the District of

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 263805. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Capitalized terms used but not defined in this Order have the meanings ascribed to them in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 3] (the "Verified Petition"), the Certification, the Cayman Consent Order, or the Asset Preservation Protocol, as the context requires.

Delaware, dated as of February 29, 2012, (b) the consideration of the Certification and the Stipulation is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P), and (c) venue is proper in this district pursuant to 28 U.S.C. § 1410; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**:

1. The Stipulation, attached hereto as **Exhibit 1**, is **APPROVED**.

2. The Cayman Consent Order attached to the Stipulation as Exhibit A and the Asset Preservation Protocol set forth in Schedule A thereto are each hereby recognized and given full force and effect on a provisional basis, and all undertakings set forth therein as they relate to the Applicable Named Defendants and the CDM Entities are fully enforceable in the United States.

3. The Recognition Hearing currently scheduled to commence on August 14, 2025, at 11:00 a.m. is adjourned *sine die* to a date (the "Adjourned Recognition Hearing Date") as soon as practicable following the conclusion of the hearing before the Cayman Court on the Injunction Application.

4. The deadline for all parties except the United States Trustee to object to recognition of the Cayman Proceeding as a foreign main proceeding shall be the date that is 21 days before the Adjourned Recognition Hearing Date, and the deadline for the United States Trustee to object to recognition of the Cayman Proceeding as a foreign main proceeding shall be the date that is 14 days before the Adjourned Recognition Hearing Date.

5. The deadline for the JOLs to reply to any such objections shall be the date that is 7 days before the Adjourned Recognition Hearing Date.

6. Notwithstanding any provision in the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the

- 2 -

District of Delaware, or any applicable law to the contrary: (i) this Order is a Final Order within the meaning of 28 U.S.C. § 158(a) and is effective and enforceable immediately upon its entry, and the Parties hereby waive any provision of applicable law staying or delaying the effect of the Approval Order; (ii) the JOLs shall not be subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (iii) the JOLs are hereby authorized and empowered, and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

7.      The rights of each Applicable Named Defendant and the CDM Entity regarding any relief sought in this Chapter 15 Case, including the relief sought in the Verified Petition and with respect to jurisdiction, other than with respect to matters expressly addressed in paragraph 1 of the Cayman Consent Order, are expressly preserved.

8.      This Order is binding on and shall inure to the benefit of the Debtor, the JOLs, the Applicable Named Defendants, and the CDM Entities.

9.      To the extent there is any inconsistency between the terms of this Order, the Stipulation, and the Cayman Consent Order, the terms of the Cayman Consent Order as they relate to the Applicable Named Defendants and the CDM Entities shall control.

10.      This Court retains exclusive jurisdiction to hear and determine any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order, any request for additional relief or any adversary proceeding brought in and through this Chapter 15 Case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of the Bankruptcy Court.

**Dated: August 5th, 2025**
**Wilmington, Delaware**

**BRENDAN L. SHANNON**
**UNITED STATES BANKRUPTCY JUDGE**

- 3 -

**EXHIBIT 1**

<u>Stipulation</u>

(Attached)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD.<br>(In Official Liquidation),[1] | Case No. 25-11376 (BLS) |
| Debtor in a foreign proceeding. | |

**STIPULATION AND AGREED ORDER
REGARDING PROVISIONAL RELIEF PURSUANT TO
SECTIONS 105(A) AND 1519 OF THE BANKRUPTCY CODE**

This stipulation and agreed order (this "Stipulation") is entered into this 4th day of August, 2025, by and among (a) the JOLs,[2] in their capacity as the authorized foreign representatives of the above-captioned debtor (the "Debtor"), (b) Mark Patrick ("Mr. Patrick"); CDMCFAD, LLC ("CDMCFAD"), DFW Charitable Foundation ("DFW"), CDH GP, Ltd. ("CDHGP"), for and on behalf of Charitable DAF Fund, LP (the "Fund") and in its capacity as general partner; and (vi) CLO HoldCo, Ltd. ("CLO" and, together with Mr. Patrick, CDMCFAD, DFW, and CDHGP, collectively, the "Applicable Named Defendants"), and the entities listed on Schedule B to the Cayman Consent Order (the "CDM Entities," and together with the JOLs and the Applicable Named Defendants, collectively, the "Parties"), in each case, through their respective undersigned counsel, who, subject to entry of an order approving this Stipulation (the "Approval Order"), hereby stipulate as follows:

---

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 263805. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Capitalized terms used but not defined in this Order have the meanings ascribed to them in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 3] (the "Verified Petition"), the Cayman Consent Order, or the Asset Preservation Protocol, as the context requires.

**WHEREAS**, on July 24, 2025, the Bankruptcy Court entered an order [D.I. 8] scheduling a hearing on the Verified Petition (the "Recognition Hearing") for August 14, 2025, at 11:00 a.m. (Eastern);

**WHEREAS**, on July 31, 2025, the Cayman Court entered a *Consent Order* (the "Cayman Consent Order"), a copy of which is attached hereto as **Exhibit A**, approving the asset preservation protocol set forth on Schedule A thereto (the "Asset Preservation Protocol");

**WHEREAS**, pursuant to the Cayman Consent Order, the Applicable Named Defendants and the CDM Entities each provided certain undertakings to the Cayman Court regarding the preservation of the assets of the CDM Entities and the Fund (as set forth in full on Schedule A to the Cayman Consent Order);

**WHEREAS**, the Applicable Named Defendants and the CDM Entities each consented to the entry of an order by the Bankruptcy Court granting provisional relief to recognize and enforce the Cayman Consent Order, including the Asset Preservation Protocol, in the United States;

**WHEREAS**, the JOLs agreed to request an adjournment of the Recognition Hearing from August 14, 2025, to a date (the "Adjourned Recognition Hearing Date"), based on the Bankruptcy Court's availability, as soon as practicable following the conclusion of the hearing before the Cayman Court on the Injunction Application; and

**WHEREAS**, the Parties each agreed that (i) the deadline for all parties except the United States Trustee to object to recognition of the Cayman Proceeding as a foreign main proceeding shall be the date that is 21 days before the Adjourned Recognition Hearing Date, (ii) the deadline for the United States Trustee to object to recognition of the Cayman Proceeding as a foreign main proceeding shall be the date that is 14 days before the Adjourned Recognition Hearing Date, and

- 2 -

(iii) the deadline for the JOLs to reply to any such objections shall be the date that is 7 days before the Adjourned Recognition Hearing Date.

**NOW, THEREFORE, IT HEREBY IS STIPULATED AND AGREED, BY AND BETWEEN THE PARTIES, AND UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED THAT:**

1.      The foregoing recitals hereby are incorporated by reference into this Stipulation with the same force and effect as if fully set forth hereinafter.

2.      The Cayman Consent Order, including the Asset Preservation Protocol, shall be recognized and given full force and effect on a provisional basis, and all undertakings set forth therein as they relate to the Applicable Named Defendants and the CDM Entities shall be fully enforceable in the United States, including, without limitation, each of the following:

   a. The Applicable Named Defendants and the CDM Entities and their respective agents, servants, employees, and representatives, each agree and undertake to:

      i. not transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of the ordinary course of business;

      ii. not take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

      iii. not take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

      iv. not take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

      v. not take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this undertaking, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities; and

      vi. not alter, conceal, or destroy any business records concerning the Applicable Named Defendants or the CDM Entities, including any transfers

- 3 -

of funds, assets, receivables, or shares to or from the Applicable Named Defendants or CDM Entities;

b. Further, and to the extent not addressed by the foregoing, the Applicable Named Defendants and the CDM Entities undertake and agree that:

    i. they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in the Fund and/or the CDM Entities and/or any assets of the Fund other than in the ordinary course of business; and

    ii. they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of the Cayman Consent Order;

c. From the date of the Cayman Consent Order to the date of the determination of the Injunction Summons, CDMCFAD, DFW, CDHGP, and CLO (collectively, the "CDM Defendants") and the CDM Entities will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$50,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction;

d. From the date of the Cayman Consent Order to the date of the determination of the Injunction Summons, Mr. Patrick will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) he proposes to make at or above US$100,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction;

e. If the JOLs have any queries regarding a transaction (or series of related payments or transactions) and whether it is in the ordinary course of the CDM Defendants' or the CDM Entities' business, the CDM Defendants and CDM Entities undertake to consult with the JOLs and to provide clarification. For the avoidance of doubt, nothing in this undertaking shall prohibit the Applicable Named Defendants and the CDM Entities from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with the Cayman Litigation, the Cayman Proceeding or this Chapter 15 Case. All such transactions of the CDM Defendants and the CDM Entities will be provided for in the monthly transactions report pursuant to paragraph 1(f) of the Cayman Consent Order. However, the Applicable Named Defendants agree that the issue of whether they are permitted to use funds that derive directly or indirectly from the limited partner interest in the Fund to pay their legal fees and other service providers will be determined at the hearing on the Injunction Application;

- 4 -

f.  From the date of the Cayman Consent Order to the date of the determination of the Injunction Summons, the CDM Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$50,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the CDM Defendants or the CDM Entities for the period June 30, 2024 onwards. Any information of whatever nature relating to any member of the Applicable Named Defendants or the CDM Entities which is provided to the JOLs pursuant to this paragraph 1(e), shall not be disclosed to or shared with Mr James Dondero, the Supporting Organizations (being Highland Santa Barbara Foundation, Highland Dallas Foundation, and Highland Kansas City Foundation), or any known affiliates or service providers of these individuals or entities, subject to where the JOLs are required to disclose any such information in the discharge of their duties to the Cayman Court or as otherwise required by law.

3.  The JOLs shall request that the Bankruptcy Court adjourn the Recognition Hearing from August 14, 2025, to a date (the "Adjourned Recognition Hearing Date"), based on the Bankruptcy Court's availability, as soon as practicable following the conclusion of the hearing before the Cayman Court on the Injunction Application;

4.  The deadline for all parties except the United States Trustee to object to recognition of the Cayman Proceeding as a foreign main proceeding shall be the date that is 21 days before the Adjourned Recognition Hearing Date, and the deadline for the United States Trustee to object to recognition of the Cayman Proceeding as a foreign main proceeding shall be the date that is 14 days before the Adjourned Recognition Hearing Date.

5.  The deadline for the JOLs to reply to any such objections shall be the date that is 7 days before the Adjourned Recognition Hearing Date.

6.  Notwithstanding any provision in the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the District of Delaware, or any applicable law to the contrary, (i) the Parties agree that this Stipulation shall be effective immediately and enforceable upon entry of the Approval Order, which shall be a Final Order within the meaning of 28 U.S.C. § 158(a), and the Parties hereby waive any provision

- 5 -

of applicable law staying or delaying the effect of the Stipulation or the Approval Order; (ii) the JOLs shall not be subject to any stay in the implementation, enforcement, or realization of the relief agreed to in this Stipulation; and (iii) the JOLs shall be authorized and empowered to, and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Stipulation.

7.    Each of the Applicable Named Defendants and the CDM Entities reserve their rights regarding any relief sought in the Chapter 15 Case, including the relief sought in the Verified Petition, other than with respect to matters expressly addressed in paragraph 1 of the Cayman Consent Order.

8.    For the avoidance of doubt, the Applicable Named Defendants and the CDM Entities each hereby consent to the recognition and enforcement of the Cayman Consent Order, including the Asset Preservation Protocol, in the United States through and including the date of determination of the Injunction Summons (as defined in the Cayman Consent Order) and shall not oppose the continuation of such relief at any hearing for recognition of the Cayman Proceeding.

9.    By entering into this Stipulation, neither the Applicable Named Defendants nor the CDM Entities have consented to jurisdiction in the Bankruptcy Court, and all parties' rights are reserved with respect to jurisdiction.

10.    Upon entry of the Approval Order, this Stipulation shall be binding on and inure to the benefit of the Debtor, the JOLs, the Applicable Named Defendants, and the CDM Entities and their respective successors and assigns.

MR 0823

11.     To the extent there is any inconsistency between the terms of this Stipulation and the Cayman Consent Order, the terms of the Cayman Consent Order as they relate to the Applicable Named Defendants and the CDM Entities shall control.

12.     This Stipulation constitutes the entire agreement by and between the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, between the Parties and, except as otherwise expressly provided herein, is not intended to confer upon any other person any rights or remedies hereunder.

13.     Each of the undersigned counsel represents and warrants that it is duly authorized to enter into and be bound by this Stipulation on behalf of each Party it represents.

14.     This Stipulation may be executed in multiple counterparts, any of which may be transmitted by facsimile or electronic mail, and each of which will be deemed an original, but all of which together will constitute one instrument. This Stipulation shall be effective upon electronic execution of the Parties' duly authorized undersigned counsel.

15.     The Parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to hear and determine any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Stipulation and the Approval Order, any request for additional relief or any adversary proceeding brought in and through the Chapter 15 Case, and any request by an entity for relief from the provisions of this Stipulation, for cause shown, that is properly commenced and within the jurisdiction of the Bankruptcy Court.

[*Remainder of Page Intentionally Left Blank.*]

MR 0824

**STIPULATED AND AGREED TO** this 4th day of August, 2025.

| | |
|---|---|
| **REED SMITH LLP** | **RICHARDS, LAYTON & FINGER, P.A.** |

| | |
|---|---|
| */s/ Jason D. Angelo* | */s/ Russell C. Silberglied* |
| Jason D. Angelo (No. 6009) | Russell C. Silberglied (No. 3462) |
| 1201 North Market Street, Suite 1500 | One Rodney Square |
| Wilmington, Delaware 19801 | 920 North King Street |
| Telephone: (302) 778-7500 | Wilmington, Delaware 19801 |
| Facsimile:  (302) 778-7575 | Telephone: (302) 651-7700 |
| E-mail:   jangelo@reedsmith.com | Facsimile:  (302) 651-7701 |
| | Email:  silberglied@rlf.com |
| *Counsel to Margot MacInnis and* | |
| *Sandipan Bhowmik as Joint Official* | *Counsel to the Applicable Named Defendants* |
| *Liquidators of Chapter 15 Debtor* | *and the CDM Entities* |

**EXHIBIT A**

<u>Cayman Consent Order</u>

(Attached)



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

                                    **CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

                    **CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

                                                        Plaintiff

**AND**

| | | |
|---|---|---|
| (1) | **MARK ERIC PATRICK** | |
| (2) | **PAUL MURPHY** | |
| (3) | **CDMCFAD, LLC** | |
| (4) | **DFW CHARITABLE FOUNDATION** | |
| (5) | **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** | |
| (6) | **CLO HOLDCO, LTD.** | |

                                                        Defendants

---

**CONSENT ORDER**

---

**UPON** the Plaintiff's Summons dated 15 July 2025 (the "**Injunction Summons**")

**AND UPON** the First, Third, Fifth, and Sixth Defendants' Summons of dated 21 July 2025 (the "**Directions Summons**")

**AND UPON** the parties listed therein giving to the Court the undertakings recorded in Schedule A to this Order

**Page 2 of 16**

**AND UPON** the Injunction Summons and the Directions Summons being listed for hearing on 31 July 2025 before the Honourable Justice Parker

**IT IS ORDERED BY CONSENT** that:

1    The Injunction Summons shall be adjourned and listed for hearing on the first available date after 18 September 2025 (the "**Hearing**").

2    The time estimate for the Hearing shall be 2 days.

3    Directions for evidence in the Injunction Summons shall be as follows:

   (a) The Defendants shall file and serve any evidence in answer by 4.30pm on 28 August 2025;

   (b) The Plaintiff shall (if so advised) serve any evidence in reply by 4.30pm on 11 September 2025.

4    The Plaintiff shall file an agreed hearing bundle for the Hearing in electronic form by 4pm on the date which is 12 days before the date of the hearing (once listed).

5    The parties shall file and exchange skeleton arguments by 4pm on the date which is 7 days before the date of the hearing (once listed).

6    Costs of the Injunction Summons and the Directions Summons are reserved.

7    Liberty to apply.

DATED this    31    day of July    2025

FILED this    31    day of July    2025

**THE HONOURABLE JUSTICE PARKER**
**JUDGE OF THE GRAND COURT**

Approved as to form and content:

_Maples and Calder (Cayman) LLP_
_____
**Maples and Calder (Cayman) LLP**

Attorneys for the Plaintiff

_Campbells LLP_
_____
**Campbells LLP**

Attorneys for the First, Third, Fifth and Sixth Defendants

_Kobre & Kim (Cayman)_
_____
**Kobre & Kim**

Attorneys for the Second Defendant

_Baker & Partners (Cayman) Limited_
_____
**Baker & Partners LLP**

Attorneys for the Fourth Defendant

**Page 4 of 16**

## Schedule A

Undertakings given by the Defendants

1    Pending the determination of the JOLs' Summons, the Defendants[1], and the related entities listed in Schedule B hereto (the "**CDM Entities**") and their respective agents, servants, employees, and representatives, agree and undertake to:

    (a) not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of the ordinary course of business;

    (b) not to take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

    (c) not to take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

    (d) not to take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

    (e) not to take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third-party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this undertaking, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities; and

    (f) not to alter, conceal, or destroy any business records concerning the Defendants or the CDM Entities, including any transfers of funds, assets, receivables, or shares to or from the Defendants or CDM Entities.

2    Further, and to the extent not addressed by the foregoing, the Defendants and the CDM Entities undertake and agree that:

---

[1] Being the First Defendant, Mark Patrick; the Second Defendant, Paul Murphy; the Third Defendant, CDMCFAD, LLC; the Fourth Defendant, DFW Charitable Foundation; the Fifth Defendant, CDH GP, Ltd. as general partner for and on behalf of Charitable DAF Fund, LP, and in its capacity as general partner; and the Sixth Defendant, CLO HoldCo, Ltd.

(a) they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in Charitable DAF Fund, LP (the "**Fund**"), and/or the CDM Entities and/or any assets of the Fund other than in the ordinary course of business; and

(b) they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of this undertaking.

3      From the date of this undertaking to the date of the determination of the JOLs' Summons, the Third, Fourth, Fifth and Sixth Defendants (the "**CDM Defendants**") and the CDM Entities will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$50,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction.

4      From the date of this undertaking to the date of the determination of the JOLs' Summons, the First Defendant and the Second Defendant will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$100,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction.

5      If the JOLs have any queries regarding a transaction (or series of related payments or transactions) and whether it is in the ordinary course of the CDM Defendants' or the CDM Entities' business, the CDM Defendants and the CDM Entities undertake to consult with the JOLs and to provide clarification. For the avoidance of doubt, nothing in this undertaking shall prohibit the Defendants and the CDM Entities from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with these proceedings or the official liquidation of Charitable DAF Holdco, Ltd (In Official Liquidation) [FSD 116 of 2025 (JAJ)], or the Chapter 15 Case (defined below).  All such transactions of the CDM Defendants and the CDM Entities will be provided for in the monthly transactions report pursuant to paragraph 6 of this undertaking. However, the Defendants agree that the issue of whether

they are permitted to use funds that derive directly or indirectly from the limited partner interest in the Fund to pay their legal fees and other service providers will be determined at the Hearing (as defined in paragraph 1 of the consent order to which these undertakings are appended).

6      From the date of this undertaking to the date of the determination of the JOLs' Summons, the CDM Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$50,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the CDM Defendants or the CDM Entities for the period 30 June 2024 onwards. Any information of whatever nature relating to any member of the Defendants or the CDM Entities which is provided to the JOLs pursuant to this paragraph 5, shall not be disclosed to or shared with Mr James Dondero, the Supporting Organisations (being Highland Santa Barbara Foundation, Highland Dallas Foundation, and Highland Kansas City Foundation), or any known affiliates or service providers of these individuals / entities, subject to where the JOLs' are required to disclose any such information in the discharge of their duties to the Court or as otherwise required by law.

7      With respect to the chapter 15 case, *In re Charitable DAF Holdco, Ltd (In Official Liquidation)*, United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), Case No. 25-11376 (BLS) (the "**Chapter 15 Case**"), (i) The First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities consent to the entry of an order, in the form and substance appended hereto at Schedule C, in the Chapter 15 Case, recognising and enforcing the above undertakings in the United States; (ii) the JOLs agree to adjourn the hearing to recognise the Cayman Islands liquidation of Charitable DAF Holdco, Ltd. (the "**Company**") as a foreign main proceeding from 14 August 2025, to a date as soon as practicable, based on the Bankruptcy Court's availability, following the conclusion of inter parties hearing regarding the JOL's Summons (such, date, the "**Adjourned Recognition Hearing Date**"); (iii) the JOLs and the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities agree that the deadline to object to recognition of the Cayman Islands liquidation of the Company shall be the date that is 21 days before the Adjourned Recognition Hearing Date and the deadline for JOLs to reply to objections, if any, shall be the date that is 7 days before the Adjourned Recognition Hearing Date.  For

the avoidance of doubt, (i) the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities reserve their rights regarding any relief sought in the Chapter 15 Case, including the relief sought in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative and (II) Related Relief Under Chapter 15 of the Bankruptcy Code*, other than with respect to matters expressly addressed in this undertaking; and (ii) the JOLs reserve their right to seek provisional relief against parties as they deem necessary or appropriate in furtherance of their duties as official liquidators, including in furtherance of their ongoing investigation of the business and affairs of the Company from the date hereof through the Adjourned Recognition Hearing Date.

**Page 8 of 16**

## Schedule B

List of CDM Entities

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

(xiv) DFW Charitable Foundation (Delaware)

(xv) CLO HoldCo LLC (Delaware)

(xvi) Rand Advisors LLC (Delaware)

(xvii) CDHC Royse City Land LLC (Texas)

(xviii) Royse City Land Company LLC (Texas)

(xix) CDHC Assets LLC (Texas)

(xx) CDHC Fort Worth Land LLC (Texas)

(xxi) CDHC Stewart Creek LLC (Texas)

(xxii) BVP Property LLC (Delaware with CA registration)

**Schedule C**

Draft form of Chapter 15 order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (In Official Liquidation),[2] | Case No. 25-11376 (BLS) |
| Debtor in a foreign proceeding. | |

**ORDER GRANTING PROVISIONAL RELIEF PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A) AND 1519 TO RECOGNIZE AND ENFORCE AN ORDER ENTERED BY THE CAYMAN COURT IMPLEMENTING AN ASSET PRESERVATION PROTOCOL WITH RESPECT TO THE CDM ENTITIES**

Upon consideration of [a certification of counsel] with respect to the entry by the Cayman Court[3] of an Order Implementing an Asset Preservation Protocol in the Cayman Litigation, dated [July __, 2025] and attached hereto as **Exhibit 1** (the "Asset Preservation Protocol") and it being understood that the JOLs and the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities agree to the terms and form of this order (the "Order") and its entry by the Court; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Asset Preservation Protocol is hereby recognized by this Court and all undertakings as they relate to the First, Third, Fourth, Fifth and Sixth Defendants and the CDM

---

[2] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 263805. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 3] (the "Verified Petition").

Entities, set forth therein are fully enforceable in the United States, including, but not limited to, each of the following:

    a.  the First, Third, Fourth, Fifth and Sixth Defendants (as defined in the Asset Preservation Protocol) and the related entities listed in and attached hereto as **Exhibit 2** (the "CDM Entities") and their respective agents, servants, employees, and representatives, agree and undertake to:

    i.  not transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of the ordinary course of business;

    ii.  not take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

    iii.  not take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

    iv.  not take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

    v.  not take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this undertaking, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities;

vi. not alter, conceal, or destroy any business records concerning the First, Third, Fourth, Fifth and Sixth Defendants or the CDM Entities, including any transfers of funds, assets, receivables, or shares to or from the First, Third, Fourth, Fifth and Sixth Defendants or CDM Entities;

b. Further, and to the extent not addressed by the foregoing, the First, Third, Fourth, Fifth and Sixth and the CDM Entities undertake and agree that:

   i. they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in Charitable DAF Fund, LP (the "Fund"), and/or the CDM Entities and/or any assets of the Fund other than in the ordinary course of business; and

   ii. they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of this Order;

c. From the date of the Asset Preservation Protocol to the date of the determination JOLs' Summons (as defined in the Asset Preservation Protocol), the CDM Defendants (as defined in the Asset Preservation Protocol) and the CDM Entities will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$50,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction;

d. From the date of the Asset Preservation Protocol to the date of the determination of the JOLs' Summons (as defined in the Asset Preservation

MR 0837

**Page 12 of 16**

Protocol), the First Defendant (as defined in the Asset Preservation Protocol) will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) he proposes to make at or above US$100,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction;

e.  If the JOLs have any queries regarding a transaction (or series of related payments or transactions) and whether it is in the ordinary course of the CDM Defendants' or the CDM Entities' business, the CDM Defendants and CDM Entities undertake to consult with the JOLs and to provide clarification.  For the avoidance of doubt, nothing in this undertaking shall prohibit the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with the Cayman Litigation, the Cayman Proceeding or this Chapter 15 Case. All such transactions of the CDM Defendants and the CDM Entities will be provided for in the monthly transactions report pursuant to paragraph 1(f) of this Order.  However, the First, Third, Fourth, Fifth and Sixth Defendants agree that the issue of whether they are permitted to use funds that derive directly or indirectly from the limited partner interest in the Fund to pay their legal fees and other service providers will be determined at the Hearing (as defined in the Asset Preservation Protocol);

MR 0838

f.  from the date of the Asset Preservation Protocol to the date of the determination of the JOLs' Summons (as defined in the Asset Preservation Protocol), the CDM Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$50,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the CDM Defendants or the CDM Entities for the period 30 June 2024 onwards. Any information of whatever nature relating to any member of the First, Third, Fourth, Fifth and Sixth Defendants or the CDM Entities which is provided to the JOLs pursuant to this paragraph 1(e), shall not be disclosed to or shared with Mr James Dondero, the Supporting Organizations (being Highland Santa Barbara Foundation, Highland Dallas Foundation, and Highland Kansas City Foundation), or any known affiliates or service providers of these individuals or entities, subject to where the JOLs' are required to disclose any such information in the discharge of their duties to the Cayman Court or as otherwise required by law;

2.  Notwithstanding any provision in the Bankruptcy Rules to the contrary (i) this Order shall be effective immediately and enforceable upon entry; (ii) the JOLs are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (iii) the JOLs are authorized and empowered, and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

3.  Each of the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities reserve their rights regarding any relief sought in the Chapter 15 Case, including the relief sought

in the Verified Petition, other than with respect to matters expressly addressed in paragraph 1 of this Order. For the avoidance of doubt, the First, Third, Fourth, Fifth and Sixth Defendants (as defined in the Asset Preservation Protocol) and the CDM Entities hereby consent to the recognition and enforcement of the Asset Preservation Protocol in the United States through and including the date of determination of the JOLs' Summons (as defined in the Asset Preservation Protocol) and shall not oppose the continuation of such relief at any hearing for recognition of the Cayman Proceeding. By agreeing to the entry of this order, the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities have not consented to jurisdiction in this Court.  All parties' rights are reserved with respect to jurisdiction

4.     This Order is a Final Order within the meaning of 28 U.S.C. § 158(a) and is effective immediately upon entry.

5.     This Order shall be binding on and inure to the benefit of the Debtor, the JOLs, the First, Third, Fourth, Fifth and Sixth Defendants, and the CDM Entities.

6.     To the extent there is any inconsistency between the terms of this Order and the Asset Preservation Protocol, the terms of the Asset Preservation Protocol as they relate to the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities shall control.

7.     This Court shall retain jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order, any request for additional relief or any adversary proceeding brought in and through this Chapter 15 Case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

Dated: [July ___], 2025
    Wilmington, Delaware

_____

Honorable Brendan L. Shannon
United States Bankruptcy Judge

**Exhibit 1**
[Asset Preservation Protocol]

FILED BY Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403.02/83824743)



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 27, 2025**

United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | **Re: Docket No. 4231** |

**STIPULATION WITHDRAWING OBJECTION OF THE DALLAS FOUNDATION
AND CROWN GLOBAL LIFE INSURANCE, LTD TO MOTION FOR ENTRY OF
AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363
APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING
ACTIONS CONSISTENT THEREWITH**

'       This stipulation (the "Stipulation") is made by and among Hunter Mountain Investment

Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand

Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand

---

[1]       Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service
address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1

MR 0843

GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT,

Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities");

The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada

Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd.

("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation

Parties"); Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or

"Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the

Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the

"Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by

and through their respective undersign counsel.

## RECITALS

**WHEREAS**, on May 19, 2025, the Movants filed that certain *Motion for Entry of an Order

Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT

Entities and Authorizing Actions Consistent Therewith* [Dkt. No. 4216] (the "9019 Motion");

**WHEREAS**, on June 9, 2025, the Foundation Parties filed that certain *Objection* [Dkt. No.

4231] to the 9019 Motion (the "Foundation Objection");

**WHEREAS**, on June 24, 2025, the Foundation Parties and the HMIT Entities entered into

that certain *Settlement Term Sheet* which is annexed hereto as Attachment 1 to this Stipulation (the

"Term Sheet");

**NOW, WHEREFORE, IT IS HEREBY JOINTLY STIPULATED AND AGREED** as

follows:

1.  The Foundation Parties withdraw the Foundation Objection with prejudice in accordance

    with the terms of the Term Sheet annexed hereto as **Attachment 1**.

2

2.  The Foundation Parties, the HMIT Entities, and the Movants agree that the following

language shall be contained in the proposed order on the 9019 Motion:

Notwithstanding anything in the Settlement Agreement or the 9019 Order to the contrary,
none of the Dallas Foundation, EDF, Okada Family, or Crown (the "Foundation Parties")
are or will be included in the definitions of HMIT Releasors or Highland Releasors. For
the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim
against a HMIT Released Party by, through, or under, including derivatively, a Highland
Entity, or against a Highland Released Party by, through, or under, including derivatively,
a HMIT Entity is barred by this Order and the Settlement Agreement.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com
***Counsel for the HMIT Entities***

and

**OKIN ADAMS BARTLETT CURRY LLP**
*By: /s/ David L. Curry*_____
Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
1113 Vine Street, Suite 240
Houston, Texas 77002
Telephone: (713) 28-4100
Facsimile: (346)247-7158

3

Email: mokin@okinadams.com
dcurry@okinadams.com
**ATTORNEYS FOR THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.**

and

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/John A. Morris* _____
Jeffrey N. Pomerantz (admitted pro hac vice)
John A. Morris (admitted pro hac vice)
Gregory V. Demo (admitted pro hac vice)
Jordan A. Kroop (admitted pro hac vice)
Hayley R. Winograd (admitted pro hac vice)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com
- and -

**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

and

4

MR 0846

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
*/s/ Robert S. Loigman*
Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
-and   SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
***Co-Counsel for Marc S. Kirschner, as
Litigation Trustee of the Highland
Litigation Sub-Trust***

### CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this June 25, 2025.

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)

5

MR 0847

<span style="color:red">**Attachment 1**</span>

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| Debtor. | § | |
| | § | |

**BINDING TERM SHEET**

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Trust, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

---

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

|  | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

_____
Julie Diaz, Chief Executive Officer

The HMIT Entities

_____
Mark Patrick

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

## BINDING TERM SHEET

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

---

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties.  In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution").  Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein.  Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025.  For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

MR 0852

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

_____

Julie Diaz, Chief Executive Officer

The HMIT Entities

_____

Mark Patrick

EXHIBIT

**8**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
|  | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) June 25, 2025 |
|  | ) 9:30 a.m. Docket |
|     Reorganized Debtor. | ) |
|  | ) - MOTION TO EXTEND DURATION OF |
|  | )   TRUSTS (4213) |
|  | ) - MOTION TO APPROVE SETTLEMENT |
|  | )   (4216) |
|  | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Highland Capital       John A. Morris
Management Claimant Trust:     PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
                               (212) 561-7760

For the Highland Capital       Hayley R. Winograd
Management Claimant Trust:     Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
                               1700 Broadway, 36th Floor
                               New York, NY  10019
                               (212) 561-7732

For the Highland Capital       Jeffrey N. Pomerantz
Management Claimant Trust:     PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
                                 13th Floor
                               Los Angeles, CA  90067
                               (310) 277-6910

For Marc S. Kirschner,         Robert Scott Loigman
Litigation Trustee:            QUINN EMANUEL URQUHART & SULLIVAN,
                                 LLP
                               295 5th Avenue
                               New York, NY  10016
                               (212) 849-7000

294

MR 0854

2

APPEARANCES, cont'd.:

For the Hunter Mountain          Louis M. Phillips
Entities:                        Amelia L. Hurt
                                 KELLY HART & PITRE
                                 301 Main Street, Suite 1600
                                 Baton Rouge, LA  70801
                                 (225) 381-9643

For the Dugaboy                  Deborah Rose Deitsch-Perez
Investment Trust:                STINSON, LLP
                                 2200 Ross Avenue, Suite 2900
                                 Dallas, TX  75201
                                 (214) 560-2201

For the Dugaboy                  Michael Justin Lang
Investment Trust:                CRAWFORD WISHNEW & LANG, PLLC
                                 1700 Pacific Avenue, Suite 2390
                                 Dallas, TX  75201
                                 (214) 817-4500

For Crown Global Life            David L. Curry, Jr.
Insurance, Ltd. and              OKIN ADAMS, LLP
The Dallas Foundation:           1113 Vine Street, Suite 240
                                 Houston, TX  77002
                                 (713) 228-4100

For Patrick Daugherty:           Andrew K. York
                                 Drake Rayshell
                                 Joshua Smeltzer
                                 GRAY REED & MCGRAW, LLP
                                 1601 Elm Street, Suite 4600
                                 Dallas, TX  75201
                                 (214) 954-4135

For the U.S. Trustee:            Erin Marie Schmidt
                                 OFFICE OF THE UNITED STATES
                                   TRUSTEE
                                 1100 Commerce Street, Room 976
                                 Dallas, TX  75242-1496
                                 (214) 767-1075

Recorded by:                     Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
                                 (214) 753-2062

295

MR 0855

3

Transcribed by:                    Kathy Rehling
                                   311 Paradise Cove
                                   Shady Shores, TX   76208
                                   (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

DALLAS, TEXAS - JUNE 25, 2025 - 9:38 A.M.

THE CLERK: All rise. The United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session, the Honorable Stacey Jernigan presiding.

THE COURT: Good morning. Please be seated.

MR. LANG: Good morning, Judge.

THE COURT: All right. We have Highland settings this morning, Case No. 19-34054. We have two motions: a motion to extend the duration of the Plan Trust, and then a motion under Rule 9019 to approve a settlement between the estate entities and Hunter Mountain entities.

All right. So, lots to get to. Let's quickly get appearances from the participating parties in interest this morning.

MR. MORRIS: Good morning, Your Honor. John Morris; Pachulski Stang Ziehl & Jones. I'm joined by my colleagues Jeffery Pomerantz, Gregory Demo, and Hayley Winograd. And we represent the Highland Capital Management Claimant Trust and Highland Capital Management, LP.

THE COURT: Okay. Good morning. Other appearances?

MR. LOIGMAN: Good morning, Your Honor. Robert Loigman from Quinn Emanuel. We represent the Highland Litigation Trustee, Marc Kirschner.

THE COURT: Good morning.

MS. DEITSCH-PEREZ: Good morning, Your Honor. This

5

is Deborah Deitsch-Perez from Stinson representing the Dugaboy Trust on the motion to extend the duration of the Trust.

THE COURT: Good morning.

MS. DEITSCH-PEREZ: Good morning.

MR. LANG: Michael Lang for Dugaboy Investment Trust on the 9019 motion.

THE COURT: Good morning.

MR. LANG: Good morning.

MR. PHILLIPS: Good morning, Your Honor. Louis M. Phillips and Amelia L. Hurt; Kelly Hart Hallman -- Kelly Hart Pitre, Louisiana trade name, I don't know why -- appearing on behalf of Hunter Mountain Investment Trust and the Hunter Mountain entities in connection with the 9019 motion.

THE COURT: Good morning.

MR. YORK: Good morning, Your Honor. Drew York along with Joshua Smeltzer and Drake Rayshell from Gray Reed on behalf of Patrick Daugherty with regard to the 9019 motion.

THE COURT: Good morning. Ms. Schmidt?

MS. SCHMIDT: Erin Schmidt on behalf of the U.S. Trustee.

THE COURT: Good morning.

MR. CURRY: Good morning, Your Honor. David Curry from Okin Adams on behalf of The Dallas Foundation and Crown Global Life Insurance, Ltd.

THE COURT: Good morning.

298

MR 0858

All right.  Well, let me ask.  I'll start with Mr. Morris, given these are your motions.  Do you have any agreements about how you're going to proceed?  I'm wondering, first off, are we going to have joint presentations, joint evidence on both motions, or are we going to take one at the time?

MR. MORRIS:  Good morning, Your Honor.  Thank you very much for hearing us yesterday.  It's kind of a big day in the case.  We have a milestone that we hope will greatly advance the prosecution of this case, and, frankly, what remains to be done to complete the wind-up of Highland.

There are two motions before the Court.  The first is the motion to extend the Trusts.  That was filed at Docket No. 4213.  We're going to address that one first, Your Honor, because we have a resolution and a stipulation.  There's only one objecting party.  That was the Dugaboy Investment Trust.  And early this morning we reached an agreement whereby Dugaboy is going to withdraw its objection, with prejudice, subject to a stipulation that we will file with the Court but that contains the following terms.

THE COURT:  Okay.

MR. MORRIS:  Number one, Dugaboy agrees to withdraw its objection to the motion, with prejudice.

Number two, the Trusts expect to dissolve by August 11th, 2026, so that no further extension of the duration of the Trusts will be necessary.

MR 0859

THE COURT: Okay.

MR. MORRIS: And number three, Dugaboy hereby preserves and does not waive its right, if any, to object to any further attempts to extend the date by which the Trusts must be dissolved or to extend the duration of the Trusts.

THE COURT: Wait. I don't understand that third one. Could you repeat it?

MR. MORRIS: It's a reservation of rights.

THE COURT: Okay.

MR. MORRIS: And so Dugaboy preserves and does not waive its right, if any, to object --

THE COURT: Well, okay. I'm sorry. Maybe I zoned out or heard something different.

MR. MORRIS: Uh-huh.

THE COURT: I thought number two of the agreement was August 11th, 2026 would be it; there would be no further extensions.

MR. MORRIS: It's a statement of expectation. It's not a representation. It's not a warranty. We do not believe today, based on the facts and circumstances that we know of, that a further extension will be necessary, but we're not waiving the right to seek it if circumstances change or something unforeseen happens. And all Dugaboy is saying is that, okay, we reserve the right, if any, to object.

THE COURT: Okay.

MR. MORRIS:  It's that simple.

THE COURT:  Okay.  It's sort of confusing, right?

MR. MORRIS:  Yeah.

THE COURT:  Okay.

MR. MORRIS:  Perhaps.  If you have any questions, let me try and clarify.

THE COURT:  Well, I guess I'll just start with Ms. Deitsch-Perez.  Would you come to the podium?  We've got I don't know who on the camera, but we want to make sure everyone hears.

MS. DEITSCH-PEREZ:  Okay.  I'll take a stab at --

THE COURT:  Do you confirm what you heard and do you have any clarification of Points 2 and 3?

MS. DEITSCH-PEREZ:  Maybe I can make it clear.  I confirm that is the stipulation that we agreed upon, and I think all that was intended is the Trusts and the Debtor are saying they expect to be done by August 11, 2026, so that they will not need to make this motion again, but they could not and would not promise that they will be done by then.  So Dugaboy is withdrawing the objection to this particular extension but is not waiving the right to object to a further request for an extension.  And that's the sum of it.  Does that make sense to Your Honor?

THE COURT:  It does.

MS. DEITSCH-PEREZ:  Okay.

THE COURT: I'm hoping it'll be over by August 11th, 2026, and we'll see where we are at that time.

Well, one of my reasons for a slight bit of confusion is, in reading the 9019 settlement that is before the Court, I saw that there were some future installments payments, if you will, to HMIT, I think up through 2029, maybe.

MR. MORRIS: Sure.

THE COURT: So I was --

MR. MORRIS: So let me clarify.

THE COURT: Okay.

MR. MORRIS: The only thing that we said that we expect to happen as of, you know, by August 11th, 2026 is that the Trusts will be dissolved. But that is not the end of their life. It is a process. Once you file for dissolution, then you have to complete the wind-down. And completing the wind-down will require the completion of all litigation. It will -- right?

All we're talking about is dissolving the Highland Claimant Trust and the Highland Litigation Subtrust so that what remains after that is the Indemnity Trust. And the Indemnity Trust will be fully funded and will be prepared to go forward. And if we ever get to a point when there's no further litigation, the corpus of that will be distributed to whatever stakeholders are entitled to it at that time.

But when we talk about being done by next year, it doesn't

mean the case will be over. It simply means that the Claimant Trust and the Highland Litigation Subtrust will be dissolved. But they still have to complete the wind-up.

THE COURT: Okay. Gotcha.

MS. DEITSCH-PEREZ: And Dugaboy is reserving its rights to object to -- if something is happening that seems improper or untoward or they're seeking additional relief, obviously, we're not waiving the unknown now.

THE COURT: Okay. Gotcha. All right. Well, I appreciate the resolution of these issues. I assume no other party in interest is going to weigh in since we only had a Dugaboy objection.

MR. MORRIS: That was the only objection we had. I'm prepared to, if Your Honor thinks it's necessary or appropriate, or both, to make a very short proffer. A proffer.

THE COURT: Okay. I'll accept that proffer at this time.

MR. MORRIS: Okay. So, Your Honor, we filed on the docket at No. 4253 Exhibits 1 through 65, and we supplemented our exhibit list at Docket No. 4271 with two additional documents, which are Exhibits 66 and 67. We don't believe there's any objection to any of those documents, and we would respectfully move for their admission into evidence.

THE COURT: All right. Could you repeat the numbers

once again?

MR. MORRIS: Yes, Your Honor. So, for the motion for an order further extending the duration of the Trusts, we have two docket entries that contain Highland's exhibits. The first is Docket No. 4253, and that has Exhibits 1 through 65.

THE COURT: Okay.

MR. MORRIS: And then we supplemented at 4271 with Docket -- with Exhibit Numbers 66 and 67.

THE COURT: All right. I presume there's no objection to these exhibits.

All right. They are admitted.

(Claimant Trust's Exhibits 1 through 67 are admitted into evidence.)

JAMES P. SEERY, JR., PROFFER OF TESTIMONY

MR. MORRIS: Okay. So, Your Honor, if called to testify, James P. Seery, Jr., the Claimant Trustee of the Highland Claimant Trust, would testify as follows.

At Exhibits 63 and 64, Highland filed excerpts of the Litigation Trust and the Litigation Subtrust -- the Claimant Trust and the Litigation Subtrust, and each of those excerpts contain Section 9.1, respectively. That's the section of the Trusts that deal with the extensions that may be necessary from to the original three-year term. And Mr. Seery would testify that he's familiar with those provisions and that he understands the requirements of those provisions include,

among other things, the requirement that all objections to claims and equity interests have been resolved and that all assets that the Trustee believes might yield sufficient value to the estate have been sold.

Mr. Seery would also testify that the Highland estate has a number of assets in its possession today, certain of which will be conveyed to Hunter Mountain if the 9019 motion is approved.

Among those assets, Mr. Seery would testify that, in accordance with the proposed settlement agreement, which is at Exhibit 17, in Paragraph 5(b), the Court will see reference to what's known as the Dugaboy Note. The Dugaboy Note is an asset of the estate that will go to Hunter Mountain if the 9019 motion is approved. If it's not approved, then Mr. Seery would testify that he's got to find another way to dispose of it. But it is an asset with a face amount today of about $17 million, so it has substantial value.

There is a note from Hunter Mountain. That also will be disposed of as set forth in Paragraph 4(a) of the proposed settlement agreement. That note is going to be used to reduce the allowed amount of Hunter Mountain's Class 10 claim if the settlement is approved. But that note is also an asset of the estate. It's worth over $60 million. I believe it actually might be in the fifties. But somewhere in the $50 to $60 million range. And that's an asset that needs to be disposed

MR 0865

of.

The estate has a contingent right to receive certain funds under its settlement with Mr. Okada, and it has the Kirschner Litigation. All of these assets will be disposed of. They're very illiquid assets, I'd call them, and it would be very helpful to the estate in moving this case forward if the 9019 motion is approved.

There are other assets that the estate has that will not be monetized by August 11th and which therefore require the extension of the Trusts. Mr. Seery would testify, if called to the stand, that the pursuit of the sale of these assets will yield proceeds that justified the continued pursuit of their monetization. They include interests in Highland CLO Funding, Ltd. Documents pertaining to that can be found at Exhibits 21 and 25.

The Claimant Trust also owns shares in Highland Capital Management Korea, Ltd. Documents relating to that asset can be found at Exhibits 18 through 20. That's an asset that, if Mr. Seery were to testify, he would say that he has been actively engaged in trying to liquidate that asset, but it's not going to be completed by August 11th.

There's also a note that is due from Highland Capital Management Korea, Ltd. That can be found at Exhibit 67. That's another asset that Mr. Seery has concluded and would testify to that he thinks is valuable for the estate but will

MR 0866

not be monetized by the end of this extension period.

And then there's the bad faith award that the estate obtained against HCRE, which remains on appeal.  The appeal of that order can be found at Exhibit 15.  And there's no further cost, really, to waiting for the Court's decision, but that is an asset of the estate that remains to be monetized.

So there's two buckets of assets, one of which, hopefully, if the 9019 motion is approved, will go to HMIT and that will be helpful.  But there's another bucket of assets that are not implicated by the HMIT settlement that will not be monetized before August 11th that Mr. Seery would testify we need a little bit more time and that's why we're going to extend the Trusts.

Mr. Seery would also testify, finally, that there are claims and equity interests that remain unresolved.  They include Mr. Daugherty's Class 8 claim.  As Your Honor is probably aware at this point, Highland has objected to that claim.  It seeks to disallow, subordinate, that particular claim.  Otherwise, have it monetized for purposes of winding up the estate.

Mr. Daugherty has moved to dismiss that complaint.  That's his right.  But our scheduling order already takes us past August 11th.

And then, finally, we've got Dugaboy's Class 11 interest, which has not yet been allowed.  If the 9019 motion is

307

approved today, we do expect to move quickly to get to that point so that we can finish that up. But we don't foresee that being completed before August 11th, either.

So, in sum, Mr. Seery would testify that, from his perspective, the estate still has assets that are valuable to the estate that will not be monetized by August 11th, and there are still one claim and one equity interest that need to be resolved in order to satisfy the test, you know, to get to the dissolution.

So that would be the sum total of his testimony. That's the completion of the proffer. And unless Your Honor has any objections, we're prepared to move to the next motion.

THE COURT: I have a couple of questions.

MR. MORRIS: Sure.

THE COURT: But first I'm going to go ahead and swear in Mr. Seery --

MR. MORRIS: Great.

THE COURT: -- to affirm this, as well as swear him in for what I'm sure will be future testimony today.

MR. MORRIS: Sure.

MR. SEERY: Would you like me to come --

THE COURT: Well, you can just stand in place. Just make sure we hear you.

(The witness is sworn as to both his proffer and future testimony.)

THE COURT: Okay. Thank you.

All right. My question is probably for you.

THE WITNESS: Uh-huh.

THE COURT: Just confirm my understanding. We have one claim and one --

MR. MORRIS: Equity interest.

THE COURT: -- equity interest to resolve? Mr. Daugherty's Class 8 claim and the Dugaboy what would be Class 11 interest?

MR. MORRIS: That is correct.

THE COURT: Did I hear that correctly, Mr. Seery?

THE WITNESS: That's correct, Your Honor.

THE COURT: Okay. Thank you.

And then my other question is, once again, a clarification. I pulled out of your attachments to your motion to extend the Exhibit B, Unresolved Pending Litigation.

MR. MORRIS: Uh-huh.

THE COURT: And at the time this was filed, May 8th, 2025, it showed nine pending matters at all court levels. And I think two of them now are finished. I'm sorry. This is a long question. But maybe I'm wrong. The first two matters, the recusal matter that was at the Fifth Circuit, as well as the gatekeeper appeal, which I know a motion to stay the mandate was at the Supreme Court, both of those are finished now? Done?

MR. MORRIS: Yes, Your Honor.

THE COURT: Okay. So the nine pending matters is now down to seven. And if the Court were to approve the 9019 today, I understand that, well, it looks like, at a minimum, two more would go away?

MR. MORRIS: Precisely.

THE COURT: We have an appeal at the District Court, what we call the Claims Trading Appeal, where Highland had sued -- I'm sorry, Hunter Mountain had sued Highland and others regarding the claims trading issue, I'll call it. So that would go away?

MR. MORRIS: Yes, Your Honor.

THE COURT: And then let me see what else. I've marked all over my chart.

MR. MORRIS: And then I believe Hunter Mountain's motion for leave to file a complaint in the Delaware Chancery Court --

THE COURT: Ah.

MR. MORRIS: -- to remove Mr. Seery will also be dismissed with prejudice --

THE COURT: Okay.

MR. MORRIS: -- if the 9019 motion is approved.

THE COURT: Okay. So, that, yes, Hunter Mountain v. Seery, the Court issued a stay on that being able to go forward in Delaware.

MR. MORRIS:  Precisely.

THE COURT:  So that would go away.

So, of the nine matters listed, we're down to five.  But I'll hear, I guess, about this later with Mr. Seery, the big what I would call Kirschner adversary against lots of defendants which has been abated for a long, long time now. Hunter Mountain would basically receive that lawsuit with those claims?  The claims against it go away?  And I don't know what we'll hear, I don't know what Hunter Mountain will do with that big adversary, but maybe it doesn't know yet.  I don't know.

MR. MORRIS:  Yeah.

THE COURT:  So, --

MR. MORRIS:  Not a question we've concerned ourselves with, Your Honor.

THE COURT:  Okay.  So that, again, I'm kind of recapping everything.

(Counsel confer.)

MR. MORRIS:  Go ahead, Your Honor.

THE COURT:  So, again, I'm looking at the chart.  If anyone wants to know what I'm looking at, it's at Docket No. 4213-2, filed May 8th.  We're down to the HCRE --

MR. MORRIS:  Appeal.

THE COURT:  -- appeal.

MR. MORRIS:  Uh-huh.  Which is fully briefed and

we're just waiting for a decision.

THE COURT:  Okay.  So that bad faith decision may or may not stick, but it's hanging there on appeal.

MR. MORRIS:  Uh-huh.

THE COURT:  We're down to a Dugaboy -- what we called the Imaging Motion.  Or no?

MR. MORRIS:  Correct.  I guess that's been stayed, but that's out there.

THE COURT:  We have the valuation motion of Dugaboy, but I don't know, is it going to be moot after today?  I don't know what I'm going to hear today as far as the evidence.

MR. MORRIS:  So, that has -- great question -- two plaintiffs in that lawsuit, HMIT and Dugaboy.

THE COURT:  Oh, that's right.  So --

MR. MORRIS:  HMIT is going to dismiss it with prejudice.  Dugaboy will still have an active complaint.

THE COURT:  Appeal.

MR. MORRIS:  My hope is that --

THE COURT:  It's an appeal of --

MR. MORRIS:  Yes.

THE COURT:  Okay.

MR. MORRIS:  My hope is that, because we produced so much valuation information to HMIT, which we then had to make available to Dugaboy because that's the way discovery works, that they'll withdraw that complaint.

THE COURT:  Okay.

MR. MORRIS:  I'm going to make that plea right on the record here, because they've now gotten everything they've asked for.  But that's their decision to make, and it's out there.  But HMIT is withdrawing itself as a party to that lawsuit, but it does remain in Dugaboy's lap.

THE COURT:  Okay.  So those potentially three things?

MR. MORRIS:  Yeah.

THE COURT:  Plus the Daugherty matter?

MR. MORRIS:  Yeah.

THE COURT:  Okay.  Mr. Seery, did I miss something?

THE WITNESS:  One clarification, Your Honor.  My apologies.  One clarification.  In the Class 11 subordinated interests, there's a Dugaboy capital account of $740,000.  There's also the Strand capital account -- both of these are controlled by Mr. Dondero -- of $994,000.  And then Mr. Okada and his affiliates have a combined capital account of $248,000.  So we'll -- I said just Dugaboy, but it's actually Dugaboy, Strand, and then Okada and two family trusts of his.

THE COURT:  Okay.

MR. MORRIS:  And if the 9019 motion is granted, --

THE WITNESS:  It's in the footnote.  It's in the footnote in the motion.

THE COURT:  Yes.  I actually had that in my notes.

MR. MORRIS:  Yeah.

THE COURT: So I glossed over Class 11 just being Dugaboy. There are Strand and Okada.

All right. So I appreciate that clarification. We're down hopefully to very little litigation. But we have no control over higher courts, when they have time to look at it.

MR. MORRIS: Or future litigation, now that the gatekeeper has been curtailed.

THE COURT: Okay. All right.

Anyone wish to say anything about this motion to extend?

All right. Well, based on the pleadings, the argument, the evidence, I do think it is necessary and appropriate and reasonable to extend the duration of the Highland Trusts through August 11th, 2026. The relief is something that is contemplated as a possibility under the trust documents. Moreover, I think the Court has some authority under Bankruptcy Rule 9006(b) and Bankruptcy Code Section 105 to grant this relief.

The evidence shows there are unliquidated assets and some unfinished litigation that must be resolved before the Trust is in a position to wind down. So, again, I think it's necessary, prudent, and in the best interest. The motion is granted, and the Court duly acknowledges the comments with regard to the stipulation of Dugaboy and the estate. All right.

MR. MORRIS: Thank you very much. So, may I move to

the 9019 motion?

THE COURT:  You may.

MR. MORRIS:  Okay.  With respect to the 9019 motion, there were originally three Objecting Parties:  the Dugaboy Investment Trust, Patrick Daugherty, and The Dallas Foundation and an entity called Crown Global.

I'm pleased to report, and I think Your Honor may already be aware, that a settlement has been reached to dispose of The Dallas Foundation and the Crown Global objection.  There is a written agreement to that effect that effectuates that.  And I'd like to just turn the podium over to Mr. Phillips.  Louis Phillips represents the HMIT Entities.  I know Mr. Curry is here on behalf of the objecting parties, The Dallas Foundation, but I think -- I think I'll let Mr. Phillips address, you know, the specific terms of the resolution of that objection.

THE COURT:  All right.  Thank you.  And I will say that my staff reached out yesterday to -- I don't know if it was Mr. Curry or someone in your office -- wanting to know have you delivered exhibit notebooks.  And it was at that point my staff heard, well, we've resolved.

MR. CURRY:  We had just finished.

THE COURT:  Okay.  All right.  So I'm happy to hear what the resolution is.

MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

Phillips on behalf of the Hunter Mountain Investment Trust and the named parties therein.

We had a written stipulation that has been signed by my firm, by Mr. Curry's firm, by the Pachulski firm, and by the Quinn Emanuel firm that is to be submitted to the -- is to be filed on the record. It also contains a reference to a settlement agreement that will be attached. But we will read the stipulation into the record, if Your Honor would allow me to.

THE COURT: All right. You may.

MR. PHILLIPS: And Mr. Curry is here, and he can tell me whether or not I have read correctly, but I think I have it.

THE COURT: Okay. All right.

MR. PHILLIPS: (reading) Now, wherefore, it is jointly -- hereby jointly stipulated and agreed as follows. The Foundation Parties -- Mr. Curry's clients -- withdraw The Foundation Objection, which is a defined term in the stipulation, with prejudice, in accordance with the terms of the term sheet annexed hereto as Attachment 1. And Attachment 1 will be attached to the stipulation.

Paragraph 2. The Foundation Parties, the HMIT Entities -- that's Hunter Mountain Entities and the Movants; that is, Mr. Morris' client and Quinn Emanuel on behalf of the Litigation Subtrust -- agree that the following language shall be

MR 0876

contained in the proposed order on the 9019 motion. And that's clearly the proposed order. This is not dependent upon the motion being granted. Notwithstanding anything in the settlement agreement or the 9019 order to the contrary, none of The Dallas Foundation, EDF, Okada Family, or Crown (The Foundation Parties) are or will be included in the definition of HMIT Releasors or Highland Releasors. For the avoidance of doubt, however, any attempt by The Foundation Parties to assert a claim against an HMIT released party by, through, or under, including derivatively a Highland entity, or against a Highland released party by, through, or under, including derivatively an HMIT entity, is barred by this order and the settlement agreement.

That is the sum and substance of the stipulation. The settlement agreement we don't think needs to be read to the Court because it's a signed settlement agreement that will be attached as Attachment 1 to the stipulation. And I believe I read it correctly.

THE COURT: Mr. Curry, did he read it correctly?

MR. CURRY: Mr. Phillips did read it correctly, Your Honor. And thank you.

And we want to thank Trustee's counsel and Mr. Phillips for working with us to address some very real concerns. And through the stipulation, we still have some work to do, but we have the time to do it, and maybe move it to where we can

actually get it resolved.

THE COURT: Okay. Well, there are some things I am concerned -- well, I should say, all I really feel the need to go into is you're releasing your objection, your clients are, and all of the parties here, parties to the proposed settlement and the estates, the Debtors, Hunter Mountain, are agreeing that your clients are not releasors under the 9019 settlement if the Court approves it.

MR. CURRY: Correct, Your Honor. Unless and except our clients were to attempt to assert a released claim against a released party, and that's what the "provided, however" was to clarify.

MR. PHILLIPS: And this doesn't affect the estate at all. It basically affects the HMI -- the Hunter Mountain entities. But the language that we have read in the stipulation has been agreed to and is contained within the order that will be proposed.

THE COURT: Okay. You said it better than I said it. The estate is releasing claims --

MR. PHILLIPS: I can't believe that, Your Honor, but thank you.

THE COURT: Well, the estate is releasing claims that it has --

MR. PHILLIPS: Correct.

THE COURT: -- or in Trusts have -- I shouldn't have

said the estate.  It's the Trust entities and what's left of the Reorganized Debtors are releasing any claims they have against Hunter Mountain in the proposed settlement --

MR. PHILIPS:  Yes.

THE COURT:  -- if it's approved.  But any direct claims of your clients are not --

MR. CURRY:  Well, direct claims that our client has or derivative claims, for example, against Hunter Mountain that are derivative through Hunter Mountain.

THE COURT:  Okay.  All right.

MR. PHILLIPS:  Yeah.

MR. CURRY:  Yeah.  That was the -- what we were trying to make sure.

THE COURT:  Yes.  All right.  Well, and when I said this is all I care about, what I mean is I don't even know who the heck Crown Insurance is.

MR. PHILLIPS:  Correct.

THE COURT:  There was a very interesting party in interest objection asserted by the Debtor.  And I've learned a lot about a lot of entities during all these years, but that was a new one on me.  I understood that it's somewhere in the framework of the --

MR. PHILLIPS:  Yes, Your Honor.

THE COURT:  -- Charitable DAF.

MR. PHILLIPS:  Let's say it's somewhere in the

universe, Your Honor.

THE COURT: The universe? Okay.

MR. PHILLIPS: The universe. Not necessarily the Charitable DAF or Hunter Mountain.

THE COURT: Okay.

MR. PHILLIPS: But in the universe.

THE COURT: Well, but the point is, we've announced anything relevant to --

MR. PHILLIPS: Correct.

THE COURT: -- the Reorganized Debtor, --

MR. PHILLIPS: Correct.

THE COURT: -- Claimant Trust, Subtrust.

MR. PHILLIPS: And the motion -- and the objections of all these entities are withdrawn with prejudice.

THE COURT: All right.

MR. CURRY: And Your Honor, the one thing that I will note, part of our agreement, and it's in the signed term sheet that you'll see, is that we've agreed that if there's a dispute over the settlement to withdraw our objection, this Court will have at least concurrent jurisdiction to resolve that dispute, because it is a settlement to resolve an objection to a core proceeding.

THE COURT: Okay. Thank you.

MR. PHILLIPS: And we have agreed and we do agree that the Court has jurisdiction. It has jurisdiction.

THE COURT: Okay. For what that is worth.

MR. PHILLIPS: Well, that's what we can agree to.

THE COURT: All right. I appreciate that.

Anyone wish to say anything about what's been announced?

All right. Well, I accept this resolution and withdrawal of --

MR. PHILLIPS: Okay. We will be filing --

THE COURT: -- the objection.

MR. PHILLIPS: We will be filing, at the close of this hearing, this stipulation, and we will be clicking whatever ECF box request that the Court so ordered on the stipulation.

THE COURT: Okay. We will be on the lookout for that.

All right. Well, Mr. Lang, you stood up on behalf of Dugaboy.

MR. LANG: I just want to make the Court aware of a letter that was sent last night that involves this from the Caymans, from Grant Thornton.

MR. PHILLIPS: We object.

MR. LANG: I just want to make the Court -- they were asking for a 45-day that the Joint Liquidators --

MR. PHILLIPS: We object to this, Your Honor. That's not a part of the record. This is a person from outer space. Not outer space, but the Cayman Islands. And it's a letter

that we --

THE COURT:  Coming from someone --

MR. PHILLIPS:  It looks like a letter --

THE COURT:  -- who is called Yosemite Sam, I understand, outside of court.

MR. PHILLIPS:  Yeah.  Yeah.  I didn't want to bring that up, but Mr. Morris --

THE COURT:  Okay.  Well, it's stuck in my brain forever now.

MR. PHILLIPS: -- says it's his favorite cartoon character, so it must be okay.

THE COURT:  Okay.  Well, okay, I don't want to make light.  I think this goes back to what I was saying about there are certain things I care about and certain things I don't care about.  And I read from the pleadings, I haven't heard evidence but I've read from the pleadings that there is a lot going on in the Cayman Islands with regard to what I call the Charitable DAF structure or Hunter Mountain.

MR. LANG:  Yes.

THE COURT:  Parties in that universe.  And I don't plan to exercise any control or jurisdiction over that, so I'm hesitant to hear what it is you want to present.  I don't know, maybe on cross-examination of Mark Patrick today it may or may not be relevant.  But what is it --

MR. LANG:  All they ask for is a 45-day basically

abeyance or continuance of the decision on the 9019, to allow them to investigate and weigh in on it.

MR. PHILLIPS: Your Honor?

MR. LANG: They're Joint Liquidators. That's -- I'm just making the Court aware of the request.

THE COURT: Okay. Well, they're not here to articulate that. So I respect your wanting to be transparent and whatnot, but I'm not going to let it stop me from going forward today. Okay.

MR. LANG: Thank you.

THE COURT: Thank you.

MR. PHILLIPS: Your Honor, if I may be excused, that's our position with respect to the withdrawal. We appreciate Your Honor's attention. Thank you.

THE COURT: Okay. Thank you.

MR. CURRY: Thank you, Your Honor.

THE COURT: Anyone else wish to weigh in?

All right. Well, I do, as I was saying, accept the withdrawal of The Dallas Foundation and related entities' objection to the 9019 settlement.

So does that leave only the Daugherty objection to the settlement? Well, and the Dugaboy.

MR. MORRIS: And the Dugaboy, yes.

THE COURT: And Dugaboy, of course.

MR. MORRIS: That's right.

THE COURT: Okay.

MR. MORRIS: So, --

THE COURT: So how did you want to proceed?

MR. MORRIS: So, the way I propose to proceed, Your Honor, I have an opening statement to make --

THE COURT: Okay.

MR. MORRIS: -- with a PowerPoint presentation to present. I would propose that, as the Movant, I go first. Then we can hear from Dugaboy, we can hear from Mr. Daugherty, and then we can put Mr. Seery on the stand.

Assuming that there is no challenge to Mark Patrick's authority to enter into the settlement agreement on behalf of all of the HMIT entities, I would not plan on calling either Mr. Dondero or Ms. Deitsch-Perez, who are under subpoena here, because the challenge to authority was really coming from The Dallas Foundation. Their objection has now been withdrawn. So as long as Mr. Daugherty -- well, really, as long as Dugaboy doesn't challenge Mr. Patrick's authority to enter into the settlement agreement on behalf of the HMIT entities, I think we'll just put on the one witness and be done.

THE COURT: All right. Just so we know what lies ahead, --

MR. MORRIS: Uh-huh.

THE COURT: -- I don't think that Dugaboy objected to Mr. Patrick's authority. I do recall it was just The

Foundation.

MR. LANG: There was no objection on the -- there was no objection.

THE COURT: Okay. And same with Mr. Daugherty? No objection about the authority of Mark Patrick to enter into the settlement?

MR. YORK: There was no objection.

THE COURT: All right.

MR. MORRIS: All right. May I proceed?

THE COURT: You may proceed.

MR. MORRIS: Okay. So, may I approach, Your Honor? I've got a --

THE COURT: You may. Is this a PowerPoint? And everyone else has it, correct?

(Pause.)

THE COURT: You may proceed.

MR. MORRIS: Thank you, Your Honor. John Morris; Pachulski Stang Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust.

Before I begin, Your Honor, I'd like to move my exhibits into evidence because I will be referring to them in my opening.

THE COURT: All right. So I think I said on Monday the first thing I was going to ask, and I've already blown that, was did you all have good faith discussions regarding

MR 0885

admission of each other's exhibits?  And I did see Mr. Lang filed a day or two ago his list of objections.  It looked like you were like you were down to about nine or eleven exhibits you were objecting to.

(Counsel confer.)

THE COURT:  Out of 123 designations, which I think probably grew overnight to --

MR. MORRIS:  Oh, okay.  Well, --

MR. LANG:  I just have to make clear for the record.

MR. MORRIS:  You go ahead and do that.

MR. LANG:  Your Honor, I've been told that Dugaboy does challenge the authority.  It is not in our objection.

MR. PHILLIPS:  It's not in his --

THE COURT:  Well, can I ask why it was not in your objection?

MR. LANG:  I do not know.  I was not counsel of record when the objection was filed.  I do not know what was known or not known at that time.

THE COURT:  So, --

MR. LANG:  So I guess we just seek leave to --

THE COURT:  -- if you did not have him on -- was Mark Patrick on your exhibit list?  I don't think he was, right?

MR. LANG:  He was not.

THE COURT:  Okay.  So how would you address that? Again, we've had, I know, some back and forth over who was

going to represent Dugaboy on this matter.

MR. LANG: Yes.

THE COURT: I remember the substitutions and whatnot. But --

MR. LANG: We found out late last night that The Foundation was resolving their issue, and that kind of left us in a position.

THE COURT: So what are you saying? You all were relying on --

MR. LANG: Well, the issue had --

THE COURT: -- The Foundation to carry the flag on this one?

MR. LANG: They had raised the issue. They were pursuing the issue. We went through discovery and they were pursuing it. It was already in front of the Court.

THE COURT: All right. What would you like to say, Mr. Morris?

MR. MORRIS: Your Honor, this is more than disappointing. The fact of the matter is Mr. Dondero is funding both the Cayman Islands litigation as well as The Dallas Foundation's prosecution of the objection. The fact that The Dallas Foundation settled doesn't open the door to Mr. Dondero to assert objections that he's never asserted before.

I will tell you what will happen. If Your Honor allows

this, I will have to call Mr. Dondero and Ms. Deitsch-Perez to the stand to offer evidence under subpoena that they personally acknowledge and understand, because Mr. Dondero's signature is on documents that were signed in the year 2025, that Mr. Patrick is authorized to represent HMIT.  I really didn't want to do that.  But if they want to pursue it, I'll have to do my job.

THE COURT:  All right.

MR. LANG:  And I want to clarify one thing.

THE COURT:  Uh-huh.

MR. LANG:  And it goes back to something we already discussed, which is the authority issue is derived from the Cayman Island Joint Liquidators' appointment on May 6th, 2020. And so how that changes the authority, it's -- I think the issue is does he have authority, like Mr. Morris --

THE COURT:  All right.  Well, before I comment, Mr. Phillips, it's your client representative that we're talking about here.  What do you say?

MR. PHILLIPS:  Very disappointing, but -- and further revealing the limits of my imagination.  There is no objection to authority.  There's no evidence of record of objection to authority.  There's no evidence even in The Dallas Foundation's papers about authority.  Dugaboy did not raise objections to authority.  Daugherty did not raise objections to authority.  And Mr. Morris was willing to release Ms.

Deitsch-Perez and Mr. Dondero from subpoena in connection with an order that this Court entered that Hunter Mountain objected to. And outside the Court, the evidence will establish, the evidence submitted by Mr. Morris will establish that Hunter Mountain, through authority of Mr. Patrick, objected to Ms. Deitsch-Perez signing on behalf of Hunter Mountain because she did not seek approval and did not have authorization to sign a stipulation before this Court.

Subsequently, after signing the stipulation and entry of the order, we suggested that we would not deal with Ms. Deitsch-Perez, we would only deal with unconflicted counsel, and we dealt with unconflicted counsel to make an agreement with HCLOM and another of Mr. Dondero's entities to avoid filing a motion for reconsideration before this Court based on the fact that, as we have suggested in the motion that we didn't file, Hunter Mountain's approval was not real.

So Mr. Morris has these people under subpoena because we signed an agreement that Mr. Dondero signed to avoid the filing of a motion for reconsideration before this Court, recognizing that Mr. Patrick had authority for Hunter Mountain to sign the agreement. And so that's the purpose of his subpoena.

But our position is there's no suggestion in pleadings by Dugaboy or Daugherty that challenge the authority of Mr. Patrick to execute on behalf of any of the Hunter Mountain

329

entities. And the one party who, without suggesting an evidentiary basis, but that's fine, they say maybe they did have an evidentiary -- we -- and they withdrew their objection.

THE COURT: Okay. Let me --

MR. MORRIS: Okay. I'm sorry. Just really --

THE COURT: Thirty second.

MR. MORRIS: Really quickly.

THE COURT: Uh-huh.

MR. MORRIS: The letter that Mr. Lang just referred to from the Joint Official Liquidators, addressed to us, asking for an extension of time, doesn't even challenge Mr. Patrick's authority to act today on behalf of the HMIT entities to enter into the settlement agreement. The Joint Official Liquidators wrote to us last night, and they don't say what Mr. Lang is now saying.

MR. PHILLIPS: And the only thing I would say is we got a letter by email from somebody who says, I am who I am. It came through email PDF. We don't challenge the authority. But we would respectfully request -- we're not there. We've made no appearance. We don't challenge the authority. But please wait -- ask the Court to wait the 45 minutes -- 45 days for us. We got a letter. PDF. We don't know who sent it.

THE COURT: Okay.

MR. PHILLIPS: It wouldn't be admissible even if

38

someone tried to introduce it as evidence.

THE COURT: Okay. Let me just say a few things here. This has felt like a very strange sideshow, I'm going to say. When I read The Foundation's objection, I was, again, scratching my head, who in the heck is Crown Insurance? I know who Dallas Foundation is because there have been charts submitted to me in the past, and I know it's part of the I'm going to say Mr. Phillips' client set over the months, the Charitable Foundation structure. But I'm like, how in the heck do these people have standing? Okay? I have to always consider standing. That's every trial judge's first obligation, does this party have standing? Not a creditor. Not an equity holder. But somehow I guess they're going to explain through evidence how they're a person aggrieved by the proposed settlement.

So that's why I kind of -- hopefully, it doesn't sound flippant -- thought this sounded like a sideshow, because this is a stranger, really, to weigh in.

Okay. So now I'm hearing that a party in interest, which Dugaboy is -- I guess some might argue that, but I think they're affected by the settlement, so that makes them a party in interest -- you're making the same argument. And it's because of a rotation of counsel you didn't make it sooner.

Okay. So I'm just trying to be transparent here, tell you what the Court is thinking. I guess what the Court is

331

MR 0891

thinking is Mark Patrick is the client representative, so I'm told by the Movants on the 9019, and you, Mr. Phillips, he's the party representative for Hunter Mountain.

MR. PHILLIPS: Yes, Your Honor.

THE COURT: I don't, I guess, know what harm there is, except a longer hearing, in, okay, put him on the stand to testify about the bona fides of the settlement. It's more evidence. But if you all want to call Mr. Dondero, I'm going to require that.

MR. MORRIS: Your Honor?

THE COURT: I mean, as a counterbalance, since it's appearing from the pleadings to be --

MR. MORRIS: Your Honor, respectfully, Mr. Patrick is not on their witness list. He's not on our witness list.

THE COURT: Wasn't he on somebody's witness list?

MR. MORRIS: He was on The Dallas Foundation's witness list.

THE COURT: Oh.

MR. MORRIS: He's not on their witness list. He's not on our witness list. He should not testify today because they're raising an issue that they didn't raise ever before. This is improper. They should just be shut down here.

THE COURT: I think probably you should be shut down. But I kind of go back and forth, what's the harm in having the representative, the person I'm told is the representative of

MR 0892

Highland?

MR. PHILLIPS: Your Honor?

THE COURT: I could limit it to one hour. And the flip side is that Dondero himself, as I guess the representative of Dugaboy, would have to also take the stand, limited to one hour.

MR. PHILLIPS: I'd like to make one note, Your Honor, about the documents that Mr. Morris has introduced. That document list -- and I don't have the numbers in front of me -- but part of the presentation and the reason Mr. Patrick is not on the Movants' motion -- witness and exhibit list, the documents that have been introduced are all of -- include all of the documents evidencing Mr. Patrick's authority as the control person of the entire Hunter Mountain group.

THE COURT: Which they've stipulated.

MR. PHILLIPS: Which they've stipulated to.

THE COURT: Uh-huh.

MR. MORRIS: And to be clear, Your Honor, they can be found at Exhibits 70 through 104. We've got 34 documents in evidence that establish that Mr. Patrick is authorized to act on behalf of each of the HMIT entities. All that's going to happen is we're now going to spend time dealing with an issue that you already described as a sideshow, and we're going to do it for a party who didn't put Mr. Patrick on a witness list, who hasn't objected on this basis, and we've got a

MR 0893

mountain of evidence that shows that he's completely authorized to do this. I just --

MR. PHILLIPS: To which there's no objection.

MR. MORRIS: And you can also look, Your Honor, at Exhibit 69. That's the agreement that Mr. Dondero signed with Mr. Patrick after he got outed for authorizing Ms. Deitsch-Perez to sign a document on behalf of HMIT without Mark Patrick's knowledge or approval. He signed that. Six months ago. And we're going to have a trial here over whether Mark Patrick is authorized to act on behalf of HMIT?

A VOICE: That was long ago.

MR. MORRIS: This is not -- this is not --

THE COURT: We're not going to have a trial. And I fully acknowledge that I am possibly abusing discretion by allowing this. We have our rules, and our rules were not complied with, and it does feel a little bit like ambush. Okay?

But on the flip side of it, it doesn't seem entirely unreasonable to have the representative, the purported representative of Hunter Mountain, who is the counterparty, if you will, to this very major settlement, take the stand. And I'll limit it. And, again, I condition it on Mr. Dondero, the ultimate beneficiary of the Dugaboy Trust, as it's been represented to me in prior filings, --

MR. MORRIS: Correct.

THE COURT: -- he'll have to stay an equal amount of time on the stand. Okay?

MR. MORRIS: Okay.

THE COURT: Okay. Hang on. I've got my smarter staff member handing me a note. Okay.

(Pause.)

THE COURT: Okay. Well, so that's how we're going to stand.

Now, I am going to address Mr. Daugherty here. We're not going to let Mr. Daugherty cross-examine Patrick. Clearly, his objection has been around, and he never said anything about --

MR. YORK: Certainly not as to authority. However, we should be able to examine him as it relates to the portion of the objection that goes to whether the settlement is in the best interest, given the claims that are being -- the Kirschner claims that are being transferred by Highland to the HMIT entities.

THE COURT: All right. Well, you all are going to have to share your 30 minutes.

MR. YORK: That's fine.

THE COURT: Okay? We're giving 30 minutes to Debtor entities, Highland entities, and Hunter Mountain entities collectively, and 30 minutes to Dugaboy and Daugherty collectively. Okay? So, I'm going to have my law clerk

timing you like you're on the clock.

MR. MORRIS:  Okay.

THE COURT:  Okay?

MR. MORRIS:  May I proceed?

THE COURT:  You may proceed.

MR. MORRIS:  Thank you, Your Honor.  So, appearing at Docket 4255 is the Movants' exhibit list, with Exhibits 1 through 123.  At Docket 4277 are Exhibits 124 and 125.  And at Docket 4280, we've got Exhibit 126.

The Movants respectfully move into evidence all of those documents, with the exception of Exhibits 124 and 125 on Docket No. 4277.  Those are the transcripts of The Dallas Foundation representatives, and since we have reached an agreement and The Dallas Foundation has withdrawn their objection, we are not going to offer those two transcripts into evidence as part of the record in this matter.

But Exhibits 1 through 123, and Exhibit 126, we move into evidence.

THE COURT:  All right.  And as I thought we were going to start talking about a moment ago, Mr. Lang objected to 11 of these 123 designations.  Do those still remain?  If they do, we're just going to see if they want to be I think offered --

MR. LANG:  No, I think we've --

THE COURT:  -- the old-fashioned way, but I think

that might be more efficient.  I have, in your objection, which is at Docket 4273, you objected to Numbers 10, 12, 13, 57 and 59, and then 64 through 69.  Eleven items.

MR. LANG:  Mr. Morris clarified that 12 and 13 are one document.  But I still, I think that, again, for purposes of the authority issue, Exhibit 13 we don't think is relevant.

MR. MORRIS:  Exhibit 13, Your Honor.  We'll just take them one at a time.

THE COURT:  Yes, go ahead and address it.

MR. MORRIS:  Is relevant because it's simply a document that was provided to Highland by Hunter Mountain as part of the negotiations.  And we've been asked to produce all of the documents related to the negotiations.  This is one of the documents that we received.

THE COURT:  Okay.  And do I understand 12 and 13 are actually the same thing, or --

MR. MORRIS:  Yeah.  Well, 12 is the email, 13 is the attachment.

THE COURT:  Okay.  I overrule the relevance objection.  Those will be admitted.

(Claimant Trust's Exhibits 12 and 13 are admitted into evidence.)

MR. LANG:  57.

MR. MORRIS:  57 is also a part of the settlement documents.  It's, I think, an email exchange between Mr. Seery

and UBS, which was one of the Class 9 claimants, and we had to obtain their consent and that's part of the process of getting to the settlement agreement.

MR. LANG:  I think the objection is it doesn't include the attachment.

MR. MORRIS:  It's got all -- it's got numerous attachments on it.

MR. LANG:  To 57?

MR. MORRIS:  Yeah.

MR. LANG:  Mine did not.

MR. MORRIS:  Your Honor, we'll withdraw the exhibit.

THE COURT:  Okay.

MR. MORRIS:  Okay.

THE COURT:  59.  Well, you didn't address #10.

MR. LANG:  Oh, sorry.

THE COURT:  That was the first one.

MR. LANG:  Yeah.

MR. MORRIS:  We'll withdraw #10.

THE COURT:  All right.

MR. MORRIS:  Okay.

THE COURT:  So, 59?

MR. MORRIS:  59?  Your Honor, I'm not surprised they object, because it's at the core of the Court's ability to authorize this settlement.

MR. LANG:  We withdrew that.

MR. MORRIS: Oh, you withdrew that?

MR. LANG: Withdrew.

MR. MORRIS: Oh, okay. They withdrew that.

THE COURT: Okay. So, 59 will be admitted.

(Claimant Trust's Exhibit 59 is admitted into evidence.)

MR. MORRIS: And then I think the last is 64 to 69.

THE COURT: Uh-huh.

MR. MORRIS: We were actually prepared to withdraw those exhibits because we didn't think there was a challenge to authority. Now that there's a challenge to authority, we're going to offer all of those in because they're highly relevant to the acknowledge of Mr. Patrick's authority.

THE COURT: All right. And your objection was solely to relevance?

MR. LANG: The objection was relevance because they predate the May 6th issue in the Caymans, which is what caused the entire structure to -- the authority from the top down to be questioned.

THE COURT: All right. Well, you can cross-examine if you want on those items.

MR. LANG: Okay.

THE COURT: But I find they're relevant so they will be admitted, 64 through 69.

(Claimant Trust's Exhibits 64 through 69 are admitted into evidence.)

339

*[Court Edit: Claimant Trust's Exhibits 1 through 9, 11 through 56, 58 through 123, and 126 are admitted into evidence.]*

THE COURT: All right. And as far as the exhibits of Dugaboy, I think it was just the plan and settlement agreement were all that had been designated. Correct?

MR. LANG: Yes.

MR. MORRIS: No objection.

THE COURT: So, no objection. Those will be admitted.

(Dugaboy Investment Trust's exhibits are admitted into evidence.)

THE COURT: And Daugherty's exhibits?

MR. YORK: Yes, Your Honor. So, Mr. Morris and I conferred yesterday about both sides' exhibits. And my understanding is we've reached an agreement that both sides' exhibits are not objected to. And so therefore we'd move to admit Daugherty's as well.

THE COURT: All right.

MR. YORK: 1 through 42, I believe, it is.

THE COURT: All right. So you confirm?

MR. MORRIS: Yes, Your Honor.

THE COURT: All right. The Court will admit all of Daugherty's 1 through 42, and they appear at Docket Entry 4266.

(Patrick Daugherty's Exhibits 1 through 42 are admitted into evidence.)

THE COURT: All right. Opening statements.

OPENING STATEMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS: All right. Good morning, Your Honor. John Morris; Pachulski Stang Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust.

If we can go to the first slide, Your Honor. This is a 9019 motion. It's not a terribly high bar. What the Movant has to show here is that the settlement agreement was the product of arm's-length, good-faith negotiations, and effectively that it's in the best interests of its stakeholders.

THE COURT: Did you want this put on the screen, or does everyone have a hard copy?

MR. MORRIS: Counsel have a hard copy.

THE COURT: Oh, okay.

MR. MORRIS: Yeah. The evidence is going to show, and there really is no dispute, that the settlement agreement is the product of arm's-length, good-faith negotiations. Mr. Seery is going to testify that the negotiations began in late March and they concluded on May 19th. Exhibits 2 through 57, with the exception of the one or two I just withdrew, reflect the parties' negotiations. Mr. Seery is going to testify that the negotiations were conducted by Zoom, by phone call, there

was one in-person meeting, there was many, many email exchanges that are reflected in the exhibits.

Mr. Seery is going to testify about the substance of the negotiations at a high level. Originally, we had sought to have one agreement with Hunter Mountain and the DAF entities. Mr. Patrick was not comfortable with that. He wanted to run them separately. And there was a DAF agreement that was ultimately entered into but that nobody believed required court approval.

So, once that got completed and one of the Fifth Circuit appeals got dismissed as a result, we moved to the Hunter Mountain discussions. Those discussions were robust. There were issues about the timing of the effectiveness of certain of the benefits under the proposed agreement. Highland wanted the releases, for example, to be effective upon signing. Mr. Patrick was unwilling to agree to anything without this Court's approval.

So there were changes that were made over time in terms of the timing of the transfer of the consideration. There were discussions and negotiations and bids and asks about the amounts that would be paid, when they would be paid, the circumstances under -- that they would be paid. There was an enormous amount of information that was exchanged pursuant to a confidentiality agreement that now became public because it's relevant to the Debtors' burden or the Claimant Trust's

342

burden to carry the day here.

That information included claims information, the trust agreement itself, budgets, asset/liability valuation information, forecasted expenses, because HMIT rightly wondered, you know, what's going to happen to the money? Is it going to be gone before it got its agreed-upon share? So, you know, there will be, I think, indisputable evidence at the end of the day that the settlement is the product of arm's-length, good-faith negotiations.

If we move to the next slide, the evidence will also show that the proposed settlement is indisputably in the best interest of the Highland entities and their stakeholders. Upon court approval, all of the pending litigation that Your Honor identified earlier will be dismissed with prejudice, thereby greatly reducing litigation risk and attendant costs.

The stakeholders will also benefit from the allowance of the HMIT claim at a fixed amount of $337 million. And we will explain -- Mr. Seery will explain to the Court how that number was arrived at.

The estates and their stakeholders will also benefit because, under the proposed settlement, as I indicated earlier, Highland will be able to monetize or otherwise dispose of a number of illiquid assets, including the Dugaboy Note and the estate claims in the Kirschner Litigation. And perhaps most importantly to the estate, we are getting very,

very broad what we refer to as litigation protections from all of the Hunter Mountain entities.  It includes not only a release but a covenant not to sue as well as, you know, we could go through it, but -- but we believe that even if Mr. Dondero or somebody else obtains control of Hunter Mountain, unless somebody sets aside this agreement, those protections are going to inure to the benefit of the Trusts, the Indemnity Trust and all of its stakeholders until the end of time, and nobody is ever going to be able to set this agreement aside because it was negotiated in good faith, it was the product of arm's-length negotiations, and it's fair and reasonable to both sides.

So those litigation protections are paramount and they provide another indicator of the benefits that the Claimant Trust is going to receive.

The next slide, Your Honor, is a demonstrative exhibit, although, as always, we have citations to the very specific documents that are now in the record.  Mr. Seery will describe for you at a high level how the allowed claim of HMIT was calculated, and it's really just based on the limited partners' capital accounts as of the petition date.  And I'll just leave it at that for the moment.  There's no magic to it. It's objectively reasonable.  It's mathematics.  There's really no subjectivity that I'm aware of that goes into this. It's just, hey, let's look at the tax returns, let's look at

MR 0904

the financial statements, and let's look at the partnership agreement, and let's see how the capital account was structured as of the petition date.  And that's how you get to, really, $396 million less the amount of the Dugaboy Note.  I mean, the HMIT note.

The next slide.  With the settlement, the transfer of the Kirschner Litigation is in the best interests of the Movants.  I think Mr. Daugherty somehow suggests that really the best thing to do would be to prosecute that litigation.  We respectfully disagree.  In the Debtors' business -- in the Claimant Trust's business judgment, that would be exactly the wrong thing to do when you are settling with HMIT.

And why is that?  When we commenced the Kirschner Litigation a number of years ago, the Kirschner Litigation represented a potential source of funding for indemnification expenses, and at that time, for the payment in full to creditors.

By 2023, 2024, with the success of the Highland team's monetization of assets, the need to pursue and monetize the Kirschner claims became less clear, so we put it on ice.  And we voluntarily stayed the litigation to conserve resources.

The settlement with HMIT changes everything.  The claims are as valid today as they were yesterday, as they were before we signed the agreement, as they were when we commenced the action.  But they have very different value to Highland when

MR 0905

you're settling with HMIT.  And that's why we're prepared to transfer the claims today.

Why?  Because at this point, unlike when we commenced the action, Class 8 has been paid in full except for Mr. Daugherty's fully-reserved claim, right, in an amount that he agreed to for years and that he ratified and reaffirmed three different times in three different stipulations.  That's the only thing that remains in Class 8.

THE COURT:  And remind me of the dollar amounts on reserve.

MR. MORRIS:  It's approximately $2.5 million.  I can --

THE COURT:  Okay.

MR. MORRIS:  It's -- the dollar amount is specifically set forth --

(Pause.)

MR. MORRIS:  It would be, I believe, in Exhibit 60, --

THE COURT:  Okay.

MR. MORRIS:  -- is the original tolling agreement. And in Paragraph 1 it has the very specific dollar amount. And then in Exhibits 62, 63 -- 61, 62, and 63, those are amendments to the tolling agreement that fully incorporated the original tolling agreement, including the reserve amount. So that amount has been there for years.  Nobody has ever said

anything about it.  Nobody has ever tried to adjust it. Nobody has ever identified a change in circumstances that would suggest a change was appropriate.  But here we are.

So, why is it different and why does the Kirschner Litigation not have so much value to us when we're settling with Class 11?  Because Class 8 has been paid in full.  Class 9 has been paid 80 percent.  If the HMIT settlement is approved, it will receive another 10 percent.  So that all that remains is 10 percent of the Class 9s.

And most importantly, Your Honor, with the settlement with HMIT and the Claimant Trust's receipt of the litigation protections, the need for indemnification expenses is going to be greatly reduced.  We can give the money where it belongs because all we'll have left is Mr. Dondero and Dugaboy.  It really will literally be the only thing.  And we need a lot to deal with that, but not as much as we needed when we had to deal with them and HMIT.

And at the end of the day, once you're settling with HMIT, prosecution of the claims would only benefit HMIT, so why should we undertake the expense of doing that?

Is that clear to Your Honor?

THE COURT:  It is.

MR. MORRIS:  It is?  So, it's -- this has nothing to do -- and you're going to hear questions of Mr. Seery, did you value the Kirschner claims?  Are you giving them away for

free?  No, we didn't value them, because once you're settling with HMIT it doesn't really matter.  Once you have the litigation protections, once you know that HMIT is never going to be an adversary of yours, the monetization of the Kirschner claims would insure to their benefit because they will have an allowed claim of $330 million.  So even if we sued and even if we got a hundred million dollars, that's going to go to them.  Why would we pick up the tab today?  A very different scenario than when we prosecuted the case, when the case was commenced.

So, really, really, in the estate's best interest to get value for those claims.  The value is reflected in the totality of the agreement.  The Court really should look at the body of the consideration that's being received, including the litigation protections.

If we can go to the next slide, Your Honor.  As long as we're on the topic of Mr. Patrick's authority, Mr. Seery is going to testify to the work that he did to satisfy himself that Mr. Patrick was duly authorized to act on behalf of each of the HMIT entities in this case.

The next slide here shows an excerpt from the Hunter Mountain Trust Agreement.  It's Paragraph 7.  And it says, among other things, the Administrator -- who is Mark Patrick -- shall be duly authorized, from time to time, in his sole discretion, to manage the business and affairs of the Trust.

It continues by saying that the Administrator, Mr.

56

Patrick, shall also have the power to settle, compromise, submit to arbitration, or to submit to any court having jurisdiction in any matter, any matters that are in dispute.

So, you know, this is just one document. It's the Hunter Mountain document. We focus on the Hunter Mountain document because that's the only one of the HMIT entities that has a stake in the Claimant Trust. But, again, Your Honor, if you just -- Mr. Seery will, at a high level, confirm that Exhibits 70 through 104 are documents that definitively establish that Mr. Patrick has the authority to enter into each of these agreements on behalf of the HMIT entities.

Not only that, but he will describe, if asked by you or anybody cross-examining him, why nobody has the ability to interfere with the effectuation of his authority. He doesn't have to get anybody's consent. He doesn't have to -- right? This is all just crystal clear. And whatever entity far up the chain may exist, Your Honor should just think of as a shareholder. And if Coca-Cola came in here and they wanted to do a 9019 motion, a shareholder can't come in and stop Coca-Cola from doing that. If they don't like what Coca-Cola is doing, go file a derivative suit. Go sue Coca-Cola in another court at another time. Not that I'm inviting litigation against Mr. Patrick, but by analogy, this is what we're talking about.

There is no restriction on Mr. Patrick's authority. The

349

settlement is fair and reasonable. He has authority under the governing documents to do what he has done here, and that is act in the best interests of the HMIT entities. And so this is just one page. Mr. Seery will explain, you know, just the work that he's done to satisfy himself.

The next slide, Your Honor, there's objections about how somehow the settlement agreement violates the plan or the absolute priority rule, all of that. It's not accurate. I'll just leave it at that in terms of how I characterize it.

The next slide is excerpts of -- I think it's the plan of reorganization, Your Honor. And I think we admitted the plan last night. That's Exhibit 126. And they're -- these excerpts are really important because what they show is that Classes 9 and 10 have the indisputable right to accept less favorable treatment. And that's what they've done. Okay? And I think it's Article III, Section H, Subparts 9 and 10. Holders of Class 9 and 10 interests have the right to accept less favorable treatment.

And if we can go to the next slide, I'll just briefly describe the less favorable treatment that these stakeholders have in fact accepted. As permitted by the plan, holders of Class 9 claims consented to the payment in full of Mr. Daugherty's Class 9 claim and the Class 10 distributions, in accordance with the settlement agreement, before their Class 9 claim is paid in full.

And that's Exhibit 59.  It may be among the most important documents that have been admitted this morning.  Exhibit 59 is the consent of the Class 9 holders other than Mr. Daugherty to accept lesser treatment.

So there's no violation of the plan at all.  HMIT is also accepting less favorable treatment than it might otherwise be entitled to if it ever successfully prosecuted its claim.  It has less favorable treatment because it's agreeing that it's not a Claimant Trust beneficiary, that its rights are limited to the rights that are given to it under the settlement agreement and nowhere else.  It's accepting less favorable treatment because it's agreeing that the Highland entities owe no duty of any kind to any HMIT entity except as provided for in the settlement agreement.  It's accepting restrictions on its ability to transfer its Class 10 interests -- more less-favorable treatment -- as a condition to the first and second distributions.  They have agreed that they are subject to Mr. Seery's determination that the Highland entities are not at that time under any Threat.  "Threat" is a defined term, and it has to do with litigation.

And so if Mr. Seery, in his sole discretion, believes that he needs to conserve resources because he remains years in the future under threat of litigation, he's not going to make the payments to HMIT, and HMIT is okay with that because they understand.

MR 0911

And, of course, in the end, they're accepting less favorable treatment because they're granting to the Claimant Trust the litigation protections.

All stakeholders have been paid in full except for the 10 percent of Class 9 and Mr. Daugherty's Class 8 claim. That claim is the subject of an objection, and as I just walked Your Honor through, it has been fully reserved in an agreed-upon amount for years.

There was some questioning during Mr. Seery's -- one of Mr. Seery's I think three depositions in the last week -- about why he didn't offer Mr. Daugherty the same treatment that he offered to the other Class 9 holders because Mr. Daugherty had about an $800,000 Class 9 claim. Your Honor will see in Exhibit 58 that that claim was paid in full, and Mr. Seery will explain that he found negotiating with Mr. Patrick to be difficult, number one. And number two, it was an amount of money that the estate could afford. And so the other Class 9 claims are substantially bigger, so rather than going through the process of attempting to negotiate with Mr. Daugherty, he just paid it in full. The Claimant Trust had every right to do that. And Mr. Daugherty should not be heard to complain that he actually got everything that he could have ever been entitled to.

THE COURT: And --

MR. MORRIS: Uh-huh?

THE COURT:  I don't mean to get you off-track.

MR. MORRIS:  That's all right.

THE COURT:  But Class 9 claimants, I'm trying to remember who else was in that class.  Was it a UBS --

MR. MORRIS:  UBS.

THE COURT:  -- claim?

MR. MORRIS:  Exactly right.

THE COURT:  Okay.

MR. MORRIS:  And then affiliates of Stonehill and Farallon.

THE COURT:  Okay.

MR. MORRIS:  Because they had purchased --

THE COURT:  They had Class 9 --

MR. MORRIS:  They had purchased originally I think it was Josh Terry, and the Redeemer Committee may have had a piece.  No, no.  No, no, no.  HarbourVest.  HarbourVest had a piece.  Right?  So, HarbourVest sold their claim, including the Class 9 claim.  Josh Terry sold his claim, including his Class 9 claim.  Then there's UBS, who still holds a piece of their claim, and Mr. Daugherty.  So, UBS, if you look at Exhibit 59, you'll see the signatures of UBS and the affiliates of Stonehill and Farallon, who all agreed to accept lesser treatment.

THE COURT:  Okay.

MR. MORRIS:  So, at the end of the day, Your Honor,

MR 0913

the last slide is a slide that I didn't intend to present, frankly, because I didn't ever believe that there was going to be a challenge to authority by anybody other than The Dallas Foundation.  But as long as we have it attached, we might as well see it.

As you can see, Your Honor, in the lower right-hand corner, you can see Hunter Mountain is owned by Beacon Mountain, which is owned by CLO Holdco.  Like, there is no -- and Mr. Patrick controls it.  And it's really on the other side of the ledger, in the DAF house, so to speak, that any of The Dallas Foundation got interested.

Dugaboy is not even on here, by the way.  Like, Dugaboy is nobody.  The people in here who are now going to challenge the authority of Mr. Patrick, no, not on here.  And they're going to do it, they're going to do it without ever having given us notice.

I know Your Honor made your ruling and we'll deal with it, but I don't know if Your Honor was aware of this:  They're not on here.

Your Honor, at the end of the day, this is a really, really easy call to make from our perspective.  We have been waiting for this moment for years.  Finally, a responsible person understands that the way to preserve value is to put the sword down.

Mr. Patrick, I don't know what happened between him and

MR 0914

Mr. Dondero. I don't care. I have no knowledge of that. But clearly he is exercising independence. And that's why we're here, because we finally have somebody who says, you know what, give me everything I can possibly get and I will stop fighting. I wish other people would say that, because then this case would be over. Then the case would really be over.

But getting to a settlement with the Class 10 interest holder who is going to have an allowed claim of $337 million, such that any value in the future is going to go to HMIT, I hope that that -- you know, this is an easy call to make, Your Honor.

I have nothing further at this time, but I look forward to putting Mr. Seery on the stand and making sure that Your Honor has, you know, an adequate, sufficient, overwhelming basis, frankly, to approve this motion.

THE COURT: Okay. I don't mean to stifle you, but --

MR. MORRIS: Yeah.

THE COURT: -- anything more for an opening statement? Mr. Phillips, I'm doing friendlies and then friendlies.

OPENING STATEMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

MR. PHILLIPS: Your Honor, just briefly. Louis M. Phillips on behalf of the Hunter Mountain entities.

We fully embrace and concur with everything that Mr. Morris has told the Court. From our perspective, and the

63

reason that -- and you'll see, the documents include all of the back and forth -- we required the Court approval before the effectiveness of any releases, litigation protections, et cetera, for exactly the reason that we needed the Class 9 to agree. And we obtained -- the Highland entities obtained the approval of the Class 9 creditors to our treatment, and I think that the bona fides of this settlement and the value of the settlement and our -- what we are giving in the settlement is, I think, established beyond even the slightest bit of question by the fact that the Class 9 creditors and the Oversight Board of the Claimant Trust all agreed that it was important enough to the estate to get this settlement with Hunter Mountain Investment Trust that they agreed to allow Hunter Mountain Investment Trust to receive the money set forth in the settlement upon the approval. And we have agreed that, notwithstanding appeal rights of some people who really don't have the right to be here, but that's going to be determined by Your Honor, we're not worried about that. We are giving our releases. And the releases are effective upon approval by this Court. We are not requiring any type of final unappealable order that doesn't -- that waits for years before the releases are effective.

Very importantly, it seems to me, from Your Honor's perspective, and I'm reluctant to suggest that I know about that, but our releases are given upon the approval by this

356

MR 0916

Court of the settlement.  They're not -- if the settlement is reversed on appeal, our releases stay.

So the Class 9s that are above the Class 10 have voted, and they have approved, and Mr. Seery is going to testify about that.  And we think that in and of itself is a monumental accomplishment.  And we appreciate everything Mr. Morris has said.  We agree with everything Mr. Morris has said.  We agree with everything Mr. Morris has said about the absence of true objection.  We agree with everything Mr. Morris has said about the fallacy of suggesting that Mr. Seery had to value the Hunter Mountain -- the Kirschner Litigation proceeds, of which would come to us.

The idea that we need to worry about how much Mr. Dondero entities can pay in connection with the Kirschner Litigation so that we could value the Kirschner Litigation based on what Mr. Dondero can pay, so that to suffice with an objection by Dugaboy maybe that there was no value given.  I mean, that's all backwards.  Value was given as described by Mr. Morris and will be established by the evidence submitted by Mr. Seery's testimony and the documents that are already in evidence.

And that is it from our standpoint, Your Honor.  Thank you.

THE COURT:  Thank you.  All right.  I'll hear from the Objectors.  Daugherty's counsel, are you going to go first?

OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

MR. YORK: Thank you, Your Honor. If I may approach.

THE COURT: You may.

MR. YORK: Good morning, Your Honor. Drew York on behalf of Mr. Daugherty.

We're here today regarding the 9019 and Mr. Daugherty's objection. The 9019 motion should be denied. If you turn to the third slide in there, we say that Highland -- Highland, I'm referring to Highland collectively for the Movants -- attempts to put the cart before the horse. So really what's going on here, Your Honor, is we're just asking the Court to follow the rules of the road that it set forth in the plan, the confirmation order, and, frankly, even Highland to follow the terms of the settlement agreement it entered into with Mr. Daugherty.

None of that is happening here as a result of this proposed settlement that's being presented to you today for consideration.

The first problem with the motion and the proposed settlement is that it violates the absolute priority rule, it violates the express terms of the Court's plan, the confirmation order, as well as the Claimant Trust Agreement, because it attempts to fund the contingent Class 10 claims without first resolving, let alone satisfying, Mr. Daugherty's remaining Class 8 claim.

MR 0918

And then, secondly, the settlement agreement does not satisfy the *Jackson Brewing* factors because it prioritizes the HMIT insiders over the estate creditors, including Mr. Daugherty, and it forfeits potential recovery that would go to the benefit of those to creditors to appease litigation pressure.

So, first, I'm going to talk about why the settlement violates the plan, the confirmation order, and the Trust Agreement.

As everyone is aware, the HMIT entities are asserting a Class 10 claim.

If you turn to the next page, as Mr. Morris has acknowledged and admitted here today, Mr. Daugherty has a remaining Class 8 claim. And, importantly, Your Honor, because Mr. Morris and Highland continue to argue that that claim is fully reserved, I would point out that in the settlement agreement between Mr. Daugherty and Highland the parties characterized that claim as a contingent unliquidated claim. A contingent unliquidated claim. And in fact, they went so far, Highland did, in its adversary complaint on the next slide, Your Honor, to again refer to it as an unliquidated and contingent claim that is dependent on the final outcome of the 2008 audit, including the magnitude of any adjustments.

And so Highland cannot come into this courtroom and on the

one hand argue that that claim is fully reserved, and at the same time admit that it is a contingent unliquidated claim that is subject to a myriad of adjustments depending upon the outcome of that audit.

And in reality, when you look at the tolling agreement, there is nothing that the parties said that that was a fully reserved claim at all.  That's simply not what they agreed to.  They just simply put a number in there, which was put into the reserve account at the time.  But it did not constitute a fully reserved claim at all.

Nor has Highland pointed to anything -- in the plan, the confirmation order, or the Claimant Trust Agreement -- that allows Highland to come in and violate those documents by simply saying that we fully reserved for Mr. Daugherty's claim.

THE COURT:  Okay.  Well, we're going to hear the evidence, but as I understood it, it was an agreed reserved amount.  And I asked earlier, was it $2.5 million or -- I feel like it was an agreed amount plus even some interest, acknowledging there might be time.  I don't remember every detail from this case, but I'm just telling you that's what my memory is.  Am I correct?

MR. YORK:  The --

THE COURT:  Mr. Daugherty agreed, here's what we'll agree is enough to set aside for our ultimately potentially

allowed claim, *x* amount plus interest?  Can you confirm?

MR. YORK:  What the tolling agreement provides is that Mr. Daugherty agreed to provide the tolling of the objection deadline.  Okay.  And Highland then agreed to put $2.56 million into the reserve.

And what the footnote says in the tolling agreement, Exhibit 60, is that the estimated amount of that claim as of -- and let's be clear about this -- as of October 23rd of 2020, was $2.56 million and change.  And that's it.  And I'm happy to have my colleague, Mr. Smeltzer, who is a tax attorney and deals with these issues all the time, can come up and explain why, at the end of the day, this is still a contingent unliquidated claim and it's subject to a myriad of factors that make it that that amount that Highland has set aside is not necessarily going to be a fully-reserved amount.

That is why the parties have -- had called it both in the settlement agreement and the tolling agreement, and Highland has continued to call it -- characterize it in its adversary complaint as a contingent unliquidated claim.  So --

THE COURT:  Okay.  It's hard to wrap my brain around it.  It's a claim that I understood really couldn't be liquidated with certainty until this potential audit of 2008 is final, and there was some discussion of how close to it being final was it.  But I guess -- well, I don't know where I'm going here except to say this could be a contingent

MR 0921

unliquidated claim for a -- you know, it's already, what, 17 years?

MR. YORK: Based -- from when the tax return was filed? I think that's correct, Your Honor.

THE COURT: Okay. Well, this is what the adversary is about, right? I guess they're finally saying it should be estimated, liquidated, pursuant to the Bankruptcy Code and we'll be done.

MR. YORK: Correct. In violation of the terms of the settlement agreement between Mr. Daugherty and Highland. Yes, that's --

THE COURT: Wait. Wait. What?

MR. YORK: So, the settlement agreement between Daugherty and Mr. Highland provides --

THE COURT: Mr. Highland?

MR. YORK: I'm sorry. I apologize. Between Mr. Daugherty and Highland --

THE COURT: Uh-huh.

MR. YORK: -- provides that the -- as long as the IRS audit has not had a final -- there's not a final determination, --

THE COURT: Uh-huh.

MR. YORK: -- then any litigation concerning the validity or the amount of Mr. Daugherty's claim is stayed and cannot be brought before the Court. And that's exactly what

their adversary complaint did, which is -- because they admit in their adversary complaint --

THE COURT:  Well, okay.  I won't pursue this anymore.  But what's an estate to do?  They're getting criticized for the Trust going on too long.  Not by your client, but -- and meanwhile you want, I mean, 2032, are we still going to be waiting on the IRS?

MR. YORK:  I don't know because we don't have any insight into what the IRS audit is.

THE COURT:  Well, it's been 17 years.

MR. YORK:  I understand, Your Honor.

THE COURT:  So, --

MR. YORK:  But the bottom line is this.  The plan -- that Highland entered into the terms of that settlement agreement.

THE COURT:  I'm going to say it right now.  I'm not keeping this estate open until 2032.  I just, I was --

MR. YORK:  I presume that --

THE COURT:  -- kind of flippantly throwing that out there.

MR. YORK:  And --

THE COURT:  But this happens in bankruptcy cases a lot, where you've got a contingent unliquidated claim, and there are provisions in the Bankruptcy Code to say what can be done in that scenario.  The Court can estimate or liquidate.

MR. YORK:  Understood.  Your point to me was -- before was that's why Highland brought the adversary complaint, and I was simply pointing out that, pursuant to the express terms of the agreement that Highland reached with Mr. Daugherty, Highland was -- is not allowed to bring the adversary complaint to challenge the validity or amount of Mr. Daugherty's claim so long as the IRS audit has not been -- had a final determination.  That's exactly what's going on here with the adversary complaint that they have filed.

THE COURT:  Okay.

MR. YORK:  Okay.  So I think Your Honor is familiar with the terms of the plan, the Fifth Amended Plan and the subordination.  But specifically we have two issues.  One begins with the Claimant Trust Agreement in Section 5.1(c), which provides that the equity holders shall not have any rights under the agreement unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all of general unsecured creditor beneficiaries have been paid indefeasibly, in full, including, to the extent applicable, all accrued and unpaid postpetition interest, consistent with the plan, and all disputed claims have been resolved.

That has not happened here and it cannot happen because, for one, Mr. Daugherty's unresolved Class 8 claim, and also the remaining Class 9 claims, as I think you'll hear from Mr. Seery.  And so there are no rights that can be given to the

72

HMIT entities pursuant to -- as a Class 10 holder, an allowed Class 10 holder, pursuant to the Claimant Trust Agreement. So the proposed settlement violates the Claimant Trust Agreement's express terms.

It also violates the Court's confirmation order that was entered at -- specifically on Page 45 of the order, in Subparagraph (a): The holders of the equity interests -- which would be the Class 10 and Class 11 equity interests -- that are junior to the claims in Class 8 and Class 9 will not receive or retain under the plan, on account of such junior claim interest, any property, unless and until the claims -- the claims, not the allowed claims, but the claims -- in Class 8 and Class 9 are paid in full, plus applicable interest.

That's exactly what the settlement that is proposed here is designed to do.

And if you turn two pages in, you'll see that in addition to the assignment of the Kirschner claims, what we're also having under this proposed settlement are interim cash distributions that would be made to the HMIT entities, interim cash distributions that theoretically could be made before the resolution of Mr. Daugherty's Class 8 claim, which would be in violation of the plan, the Claimant Trust Agreement, and the confirmation order.

And that is, as best as they put in their agreement, that's approximately $23 million in cash that would be paid

365
MR 0925

73

out theoretically in those interim distributions.

One of the things that Mr. Morris said in his opening was that they did not -- Mr. Seery did not negotiate with Mr. Daugherty because he was difficult to deal with. Well, that's surprising, Your Honor, considering, on the other hand, Mr. Morris says to the Court that there were repeated tolling agreements or amendments to the tolling agreement that were entered into by Mr. Daugherty willingly and voluntarily to benefit Highland.

And what really happened when Mr. Morris says that there were good-faith arm's-length negotiations, well, there may have been good-faith, arm's-length negotiations between the HMIT entities and Highland, but what happened here was that Highland actually sought to ice out Mr. Daugherty from all of this completely.

And how did that happen? Well, the evidence is going to show that Highland reached out to the other Class 9 creditors over a month in advance of the motion being filed, sought their consent to the proposed settlement, told them that Mr. Daugherty was not going to be a part of it, told them that Mr. Daugherty's Class 8 claim was going to have an adversary complaint filed against it, told them that once that adversary complaint was granted and the claim was disallowed, then those funds would waterfall down to Class 9, so the Class 9 creditors would get that -- those funds that theoretically are

366

part of Mr. Daugherty's Class 8 claim.

So at no point in time prior to the filing of the adversary proceeding, or even prior to the filing of the motion for approval of this proposed settlement, did Highland ever contact Mr. Daugherty to attempt to discuss any of this, because they simply wanted to ice him out.

THE COURT:  Okay.  I'm going to hear evidence.  I don't mean to cut you off, but --

MR. YORK:  Sure.

THE COURT:  -- I was told that Mr. Daugherty was paid $800,000 --

MR. YORK:  With respect to his --

THE COURT:  -- on his Class 9 claim.

MR. YORK:  Correct.

THE COURT:  Is that not true?

MR. YORK:  So, the day --

THE COURT:  Is that true?

MR. YORK:  It is true.  The day after the motion for entry of the proposed settlement was filed, Mr. Demo sent a letter to my office that was a payoff --

THE COURT:  I just wanted to -- I don't need to know every detail.

MR. YORK:  Yes.  Sure.

THE COURT:  Has he been paid?

MR. YORK:  His Class 9 claim was paid in full the day

after the proposed settlement was filed.

THE COURT: Okay. So what is the asserted amount of his Class 8 claim?

MR. YORK: We -- again, both sides do not know because they do not have --

THE COURT: What was the asserted amount in the proof of claim that's been reserved for, the Class 8 proof of claim? What was the asserted amount?

MR. YORK: It was listed as contingent unliquidated. And as I understood it, and Your Honor --

MR. MORRIS: No. I think it's approximately $1.7 million, Your Honor.

MR. DAUGHERTY: That's not true.

THE COURT: $1.7 million?

MR. DAUGHERTY: No.

THE COURT: I would look it up, but I don't know if we --

MR. DAUGHERTY: Your Honor, I'll tell you. It was like $1.45 million, and then the interest to October, which was like another $1.3 million. I'm estimating it. But the total is around $2.6 million, $2.7 million at October/November 2020. Up to that point.

THE COURT: Okay. Well, that's kind of a weird process here for an opening statement. But I'm asking because, you know, I always try to stray people into let's be

pragmatic whenever I can. And a pragmatic approach here might have been, if your client didn't think the reserve was big enough, you all could have a discussion about, oh, instead of $2.56 million, it now should, I don't know, $3 million, whatever you say the number is. And there could have been a give and take, instead of all these people showing up in the court and having an all-day hearing.

So I'm just trying to understand that. And you're saying, okay, violation of the absolute priority, when your client took a full payment on his Class 9 claim without Class 8 being quite paid in full. I'm just trying to be pragmatic here. What would it take to make Mr. Daugherty happy? Again, that's just the bankruptcy judge speaking on Chapter 11 world that's trying to get to a pragmatic result.

MR. YORK: We're happy to have that discussion with the other side. We were -- we --

THE COURT: Well, what --

MR. YORK: Yes.

THE COURT: You can't tell me right now? You're here ready to go to battle over this settlement, and I'm trying to figure out what might happen here that would make you all withdraw your objection. And that's what we do in Chapter 11. If there's a way we can pragmatically resolve things, we do.

MR. YORK: Sure.

THE COURT: And it just, I'm picking on you because

we're talking about a $2.5 or so million claim in a situation where people are wanting the estate wrapped up and it's holding hundreds of millions of dollars, I guess.

MR. MORRIS:  Not that much, Your Honor.

THE COURT:  Not that much anymore.  Not that much anymore.  A lot has been paid out.  But a lot more than $2.56 million, shall we say.

MR. YORK:  Understood, Your Honor.  And I'm happy to have a conversation with Mr. Morris and see if we can reach a number that's agreeable to accept as, you know, the reserve.

THE COURT:  How hard could that be?  I don't mean to be --

MR. YORK:  Happy to do so.  Sure.

THE COURT:  How hard could that be, when we're talking about he's been paid $800,000 on his Class 9 ahead of his Class 8, which, to understand your argument, would be an absolute priority rule problem.  But, you know, --

MR. YORK:  Correct. We indicated that --

THE COURT:  -- no picking and choosing what is problematic here.  And we're talking about $2.56 million is set aside, and we're talking about the prospect of liquidating it and paying whatever is appropriate way before the IRS is finished.  Maybe.  I don't know.  So how hard could it be to figure out --

MR. YORK:  I'm sure we can -- we can have a

MR 0930

conversation real quick and try to see if we can --

THE COURT: Okay. Well, it'll have to be during a break, --

MR. YORK: Sure. Happy to.

THE COURT: -- because we're plowing ahead. Okay. Anything else on your opening statement?

MR. YORK: The only other thing I would point out with respect to the best interests of the estate is that the -- as part of the settlement, the Class 9 holders and the Class 10 holders are actually getting more favorable treatment than Mr. Daugherty's Class 8 claim because of the mutual releases that they're getting pursuant to the terms of the proposed settlement, including the fact that the Class 9 written consent holders who are all -- all have served on the board here are getting those releases as well under the proposed settlement.

THE COURT: It's not a release by your client.

MR. YORK: No, I understand that. I understand that. But they're getting mutual releases from each other on litigation that Highland has -- the Claimant Trust, excuse me, has -- Trustee has, you know, consistently said that they had all of those parties, all of those defendants, dead to rights on.

So, that's all I have.

THE COURT: Okay. I really, I'm trying to focus on

MR 0931

people's standing. Your client has standing. He has a proof of claim that's unresolved. But I'm just trying to understand the economic impact, I guess, on your client. And all I'm hearing is, I don't know, that maybe he thinks more than $2.56 million ought to be reserved. I mean, I'm --

MR. YORK: Given the passage of time, and also given the fact that it's still undetermined as to what's going to happen with that audit and what the penalties might be, considering that the amount that was --

THE COURT: But, again, this is bankruptcy-land. We can't wait around 20 years, 30 years. The Bankruptcy Code contemplates we can at some point estimate --

MR. YORK: Sure.

THE COURT: -- a contingent unliquidated claim.

MR. YORK: I understand.

THE COURT: So I -- all right. Thank you.

MR. YORK: Thank you.

THE COURT: And Mr. Lang?

OPENING STATEMENT ON BEHALF OF THE DUGABOY INVESTMENT TRUST

MR. LANG: We're down to three issues, one of which is the scope of the release, which I think we can work out with Mr. Morris, just to make sure people are carved out, being Dugaboy.

The second issue is the use of the dollar value from the capital account as the basis for the Class 10 claim versus

MR 0932

80

using the -- well, they're using it on the petition date versus using it -- the current capital account balance or the percentage interest of 99.5 percent, because that prevents the class, as structured, class level (inaudible).  And so we have an issue with why they're using the capital account as the basis for the allowed claim, when the plan is silent on how that equity interest is to be valued.

Does that make sense?

THE COURT:  Okay.  You have a problem with the valuation methodology used here, which was taking the capital account balances from --

MR. LANG:  On the petition date.

THE COURT:  -- on the petition date?

MR. LANG:  Versus using the ownership percentage of the equity on, as repeatedly stated, 99.5 percent of Highland is owned by HMIT, .5 is owned by the Class 11.

THE COURT:  Okay.  Well, I'm not sure what -- I guess you'll cross-examine Mr. Seery on different possible methodologies.

MR. LANG:  Yes.

THE COURT:  Okay.

MR. LANG:  And so then the third one is the authority issue on Mr. Patrick's authority to enter into the settlement agreement and the transfer of the Dugaboy Note to Mr. Patrick's entity, HMIT.

373

MR 0933

THE COURT: All right. And, again, I'll just clarify my understanding. Dugaboy -- this came up earlier -- itself has a .1866 percent Class A limited partnership interest?

MR. LANG: I think that's approximately right. Not exact. Is that Mr. Morris' sheet?

THE COURT: It was in several pleadings.

MR. LANG: Okay. Yeah.

THE COURT: Okay. So the question will be, should that be valued at $740,000 or something different?

MR. LANG: More -- there's $65 to $70 million in assets in the estate. There's $20 million in Class 9 debt, is what Mr. Seery -- unpaid Class 9, is what Mr. Seery testified to.

THE COURT: Uh-huh.

MR. LANG: So it's $45 to $50 million would be left after payment of the Class 9. And if they use the ownership percentages, Class 11 gets some money. If they use a $333 million capital account, Class 11 gets nothing.

THE COURT: Okay. I presume that's a material difference, and I'm going to hear about that.

MR. LANG: Yes.

THE COURT: Okay. And then I guess my other thoughts on his interest -- I say his; it's Dugaboy. We tend to equate Dugaboy with Mr. Dondero since we've heard he and his family are the hundred percent beneficiaries. There I guess is a

82

note that is addressed in the settlement.

MR. LANG: Yes.

THE COURT: I called it the $24.2 million note in my --

MR. LANG: That was --

THE COURT: -- preparation, but it's down to --

MR. LANG: Seventeen-ish.

THE COURT: -- $17 million or whatever. So, right now, Highland is a payee on that note, as well as Get Good Trust, and Hunter Mountain under the proposed settlement gets to substitute in as a co-payee.

So I guess I'm just trying to, in my brain, figure out all the, just like I was doing with Mr. Daugherty, the economic impact of this settlement on your client. And have I just addressed the two things in your view?

MR. LANG: Yes.

THE COURT: Okay.

MR. LANG: I believe so.

THE COURT: Okay. Thank you.

All right. Can we start with evidence? At some point, we'll break for lunch, but we'll figure out as we go. I don't want to be inconvenient to people if people have ordered lunch or something.

MR. MORRIS: We are going to be finished with Mr. Seery on direct well before lunch.

375

MR 0935

THE COURT:  Okay.

MR. MORRIS:  Or by lunch, for sure.

THE COURT:  It's 11:30.

MR. MORRIS:  Yeah.

THE COURT:  So, all right.

MR. MORRIS:  I do -- I would be remiss if I didn't point out that Mr. Lang just raised yet another issue, the calculation of the allowed amount of HMIT's Class 10 claim. Nowhere in his pleading.  Again, hearing about this for the first time as I'm standing here.  He raised three issues, only one of which is in their pleading, only one of which I ever heard about from Dugaboy, and that is the scope of the release.

THE COURT:  Okay.  I don't know if it makes a material difference or not.  I am not a mathematician.  But --

MR. MORRIS:  So Highland -- the Movants call Mr. Seery.

THE COURT:  All right.  Mr. Seery, if you could approach the witness box.  I swore you in earlier for purposes of all testimony today, so you are under oath.

MR. SEERY:  Thank you, Your Honor.

JAMES SEERY, CLAIMANT TRUST'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. MORRIS:

Q   Good morning, Mr. Seery.

A    Good morning.

Q    Do you have three binders in front of you?

A    I have four binders in front of me.

Q    Okay.  I just want to make sure you have ours.

A    I think -- yes, sir.

Q    The fourth has the last few exhibits that we filed on the docket.

Should we wait for Mr. Edmond?

THE WITNESS:  That would be good.

THE COURT:  Yes.  I just noticed.  Okay.  The recording is always going, so never fear.

(Pause.)

THE COURT:  All right.

THE WITNESS:  Apologies, Your Honor.

THE COURT:  Oh, I didn't see what happened.  Was there a spill episode?

And please, if people need breaks, let me know.  I sometimes go long without appropriate breaks, so let me know, anybody, if we need to break for bathroom.

MR. MORRIS:  May I proceed, Your Honor.

THE COURT:  You may.

MR. MORRIS:  All right.

BY MR. MORRIS:

Q    Are you comfortable, Mr. Seery?

A    Yes.

377

Q   I want to actually start a little unscripted with the argument that was just made on behalf of Mr. Daugherty.  Did you listen to that?

A   I did, Your Honor.  Yes, I did.  I'll speak to Your Honor.  Yes, I did, Your Honor.

Q   Did Mr. Daugherty have a Class 9 claim?

A   He did have a Class 9 claim.

Q   And what was the value of the Class 9 interest that he held?

A   It was approximately $3.7 million.

Q   And who are the other Class 9 claim holders?

A   There are three -- I'm sorry, there are four other Class 9 holders.  There is Muck Holdings, LLC.  There is Jessup Holdings, LLC.  There is UBS AG.  And there's UBS Securities, LLC.

Q   Okay.  And if you can turn to Exhibit 58, which is in Volume 1.

        A VOICE:  Mr. Morris, what was the exhibit number?

        MR. MORRIS:  It's 58.

        A VOICE:  Thank you.

        MR. MORRIS:  You're welcome.

BY MR. MORRIS:

Q   Do you have that in front of you, sir?

A   Yes.

Q   What is that?

Seery - Direct                      86

A    That is a distribution notice to Mr. Daugherty from the Highland Claimant Trust with the eighth distribution. And I believe this would be related to his Class 9 claim. It may be some 8 -- some Class 8 as well. But March 25 is -- I'm sorry, May 25, my eyes are not that great for close up, this is just related to the payoff of his Class 9 claim. So he'd had a $3.7 million. This was the last -- final payment, so he's been paid in full on his Class 9 claim.

Q    So do I have this right, that before you sent this $800,000-plus to him, he had already received $2.9 million on account of his Class 9 claim?

A    That's approximately correct, yes.

Q    And how many different distributions were made to Mr. Daugherty on account of his Class 9 claim before this last one?

A    Two -- two or three. I believe the way we had phrased and put 8 is our total distributions including 8 and 9. So he had a larger Class 8 claim as well. I think it was approximately $8.25 million. That's been paid in full. His Class 9 claim was getting paid in full by this one.

Q    Okay. And did Mr. Daugherty receive these prior distributions -- withdrawn. Did the other holders of Class 9 claims also receive pro rata their Class 9 distributions at the same time as Mr. Daugherty?

A    Yes. The distributions were pro rata.

MR 0939

Q    Okay.  Did Mr. Daugherty ever return any of the Class 9 checks that he received and say, oh my goodness, it violates the plan and the absolute priority rule and everything else because his Class 8 claim hasn't been paid in full?

A    No, he did not.

Q    Did he -- did he suggest that UBS or Muck or Jessup should return their checks that they received on account of their Class 9 claims because his Class 8 claim had remained unresolved?

A    No, he did not.

Q    Okay.  Let's go to the reason that we're really here today, the agreement itself.  Did you negotiate the settlement on behalf of the Highland entities?

A    Yes, I did.

Q    Can you describe for the Court how that came about?

A    In December, we had a hearing on -- this is a little bit convoluted, I apologize -- but in December we had a hearing on the HCLOM claim in court, and we settled that claim as a $10 million Class 10 interest.

We moved into the new year and we heard some -- at some point that HMIT disagreed with that settlement, even though HMIT had signed that settlement as acceptable to it in form and substance.  And the reason was because HMIT had been the only Class 10 -- not allowed, but the only Class 10 interest in -- under the plan, and defined that way, and we had agreed

pursuant to the plan to put HCLOM in there.

And although HMIT had signed in form and substance acceptable by its attorney, we learned that Mark Patrick had not been consulted and that attorney had simply -- because we were in the room -- had gone in and gotten permission from Mr. Dondero to approve that settlement in form and substance. We didn't know it at the time.

That went away pretty quickly, and we understood that somehow it got resolved.

Shortly after that, sometime I believe in January or early February, there was contact between HMIT counsel and our counsel about a potential settlement. And we had two issues, really, with Mr. Patrick, who controlled two separate entities. There's the DAF entities he controlled and there's the HMIT entities. And we wanted to make sure -- and we had disputes with both of them. We had a Fifth Circuit appeal coming up in DAF and HMIT. And so we were contacted and said, okay, we're willing to settle this if we can get to a place that makes sense to us. And so that was the commencement of those negotiations.

Q    And can you describe -- how long did the negotiations last?

A    Well, there was negotiation around the NDA, which took some time, and I think we probably got that finalized at around the middle to end of March. And then we began

negotiations in earnest during April. And we took pretty much the full month to get these negotiations done, maybe a month and a half.

Q    Can you describe for the Court just how the negotiations were conducted?

A    Well, initially, we ensured that the ground rules would be set. We didn't want to waste our time and expense if we weren't going to reach agreement around particularly litigation protections, because that's essential to us, and having any settlement required that.

Secondly, we then -- from their side, they wanted information. So, pursuant to that NDA, which was rather robust, we provided substantial information.

We then had a -- I believe one or two Zoom calls, and then a face-to-face meeting, and then subsequently a number of Zoom calls with our counsel -- usually, these were always with counsel -- so, our counsel, their counsel, principals, my team, Mr. Patrick and his team, to go through each of the items that we exchanged. And then we worked through a framework to -- back and forth on that to a term sheet, to a negotiated structured settlement along the lines of the one you see.

Q    And did the parties exchange information as part of the process?

A    Yeah. As I explained, we, under our NDA, we gave a lot of

information.  We got information back from Mr. Patrick, Mr. Phillips, their teams, about the structure of their entities, how we could interact with them, who was responsible for each entity.  And that caused us to, frankly, move from just HMIT to a couple other entities to make sure we had full protection.

Q    Did you provide information concerning assets, budgets, expenses, and the like?

A    Yeah.  The detailed information we provided, it was pretty extensive.  So we gave a high-level view of our budget, assuming that we had a settlement with them.  We have an asset list that we keep and where each asset was located.  So, dollars amounts, what kind of form it was in, whether it was cash, whether it was U.S. Treasuries, whether it was, you know, equity interests.  Some couple other assets, as Mr. Morris explained in the opening, had not yet been disposed of.  And the valuations we put on those assets.

Q    Can you turn, I guess, to any volume, and let's just look at the exhibit list.  Are you generally familiar with the documentation concerning the negotiations?

A    Yes.

Q    Can you confirm that Exhibits 2 through 57 are the emails and information that were disclosed between the Highland side and the HMIT side during the negotiations?

A    Yes.  And I -- I could look through 2 through 57 now, but

--

Q    Yeah.

A    -- I have looked through them before, and this is the information back and forth.  We generally exchanged, other than at the face-to-face meeting, we exchanged information on Zoom calls as well, but when we get documents we gave them counsel-to-counsel.

Q    Okay.  And did you instruct me to produce all of the communications with the HMIT side in connection with the discovery requests that were served in this case?

A    Yes.  We had discovery requests that we went through in detail and reviewed them, and we produced in accordance with those requests.

Q    Are you aware of any document that we didn't produce that reflects the parties' negotiations of this agreement?

A    No, not at all.

Q    Can you describe for the Court the general deal points that were negotiated?  Withdrawn.  Who was your counterparty to these negotiations?

A    The principal on the HMIT side is Mr. Mark Patrick.  He had his team.  And I was responsible on our side with my team.

Q    And can you just describe for the Court what the primary negotiating points were between the two teams?

A    Yeah.  Number one for us was dismissal of outstanding litigations.  So we needed, with prejudice, dismissal of those

litigations.  Otherwise, why are we bothering?

Number two, we wanted to make sure that we had litigation protections.  These have been around since -- we came up with them during our mediation.  They're really important to us.  They set up a structure where we can actually count on the estate and the principals of the estate and the indemnified parties of the estate not being attacked.  So that was essential to us.

In exchange, we had to fix their claim and allow it in an amount pursuant to the plan, which requires us to fix an amount.  And that's the Class 10 interest that they have, which is senior to the Class 11 interests under the plan and the Claimant Trust Agreement.

And then the way the Trust is set up in the plan, it's a waterfall.  They -- we advocated for getting everything for us upfront and putting everything for them at the back.  They, understandably, didn't like that as much and wanted distributions upfront.  So we negotiated around those terms.  And I think those are the biggest terms.

We had some assets that we were -- we were -- difficult to monetize that we also were happy to dispose of in this way, with a credit, you know, towards their claim amount.

Q   Did you -- and I may have missed this; I apologize if I did -- but did you also negotiate the amounts and the timing of the distributions that would be made to the HMIT entities?

385

MR 0945

A    Yeah.  That's what I alluded to, where we -- we had hoped to get everything for us upfront, give them everything later. I think it's the *Wimpy* 'For a hamburger you give me today, I'll gladly pay you Tuesday' structure.  That didn't like that as much, so we did work on timing.  And that did bring into consideration the other Class 9 holders and timing with respect to payments to the Class 9.

Q    Was the topic of the allowed amount of HMIT's Class 10 interest the subject of negotiation?

A    The topic of the allowed --

Q    Did you discuss how the amount of its allowed interest would be calculated?

A    Oh, yeah, that was a, you know, a critical part of the -- or, you know, essential part of the structure.  What's the allowed amount they're going to get?  The plan requires an amount fixed for that class.  We had already had a $10 million HCLOM amount allowed into that class.  So we needed to fix that amount.

Q    So let's transition to that particular topic, the calculation of HMIT's Class 10 interest.  Are you familiar with the methodology that was used to arrive at the Class 10 amount?

A    Yes.

Q    Can you tell me the process, before we get to the methodology itself?  Like, what work was done to figure that

out?

A    Well, the structure of limited partnership is that the equity account is treated as what's called a capital account. Each limited partner in a limited partnership has a capital account that tracks their equity interest. As a default rule, it's the amount that a limited partner can expect to get on a sale of the partnership or a liquidation of the partnership. So we used the capital account that had been maintained continuously by Highland to set their capital account amount.

I think the partnership agreement talks about 99-1/2 percent for HMIT. It doesn't talk about dollars because that's kept in the accounting for the partnership. And that amount was consistently kept by Highland up to the petition date. And even after the petition date in the monthly operating reports.

Q    If you take a look back at the exhibit list, I would direct your attention to Page 12 of 15. Actually, it starts at the Page 11. At the bottom, it's got the heading, Capital Account Amounts. Are you familiar with Exhibits 113 through 118? And if you need to look at the exhibits, take your time.

A    Oh, I'm sorry. I thought you told me 15.

Q    No. One -- I did. I mentioned Page 15. But we're just looking at Exhibits 113 to 118.

THE COURT:  113 to what?

MR. MORRIS:  18.

THE COURT:  Okay.

THE WITNESS:  Um, --

MR. MORRIS:  If you look at the index, Your Honor, at the bottom of Page 15 -- 11, you'll see a heading, Capital Accounts --

THE COURT:  Right.

MR. MORRIS:  -- Amounts.  And then that captures Exhibits 113 to 118.

THE WITNESS:  Yes.

BY MR. MORRIS:

Q   Are those the documents that you and your team relied upon in order to calculate the amount of the allowed Class 10 interest for HMIT?

A   These are some of them.  I don't know if you have the tax returns in here and the K-1s.  Oh, here they are.  115.

Q   Yeah.  That's 115?

A   Yeah.  You've got the K-1s for 2018, which fix an amount. Those are signed by Mr. Dondero, and they give the amounts to each partner.  And then you've got the adjustments, because those are done in -- they're 2018 year-end.  They were done in September of 2019, about a month before the filing.

Q   And is that Exhibit 116?

A   It's 115 and 116.  I believe that's -- 116 is 2019, I believe, and that would have been signed postpetition by -- I believe that was signed by Waterhouse.

Q    Okay.

A    So it sets out the K-1.  The numbers that we have are slightly different because they're in the -- they're not middle of the year, but they're for the petition date of 10/16/19.  And there are -- there's economic activity that happens during the year, that you take the year-end from '18 and you have economic activity that would affect, pursuant to the partnership, the capital account of each partner during that year,  fixed it on the petition date, and then it's been forward since.

Q    Did you apply any of your own subjective views or beliefs in the calculation of the amount of the Class 10 interest held by HMIT?

A    No.  This was math.

Q    And did you hear Dugaboy's counsel suggest in the opening that there was a different methodology that perhaps you could have used, a pro rata methodology, instead of the methodology you used?

A    I heard what he said, but it doesn't make any sense.  You can't fix an amount that way.

Q    And do you understand that Dugaboy, under the partnership agreement, is subordinated to HMIT?

A    Dugaboy is subordinated under the partnership agreement for certain distributions.  But importantly for our purposes, they're subordinated under the plan.  So the Class 11

interests are explicitly subordinated to the Class 10

interests, in both the plan and the Claimant Trust Agreement.

Q    Did the Debtor consider putting Dugaboy and HMIT in the

same class?  Back when the plan was being formulated?

A    I -- I don't recall.

Q    Do you recall why they're in separate classes?

A    They -- they're in separate classes because HMIT had a

senior -- a right to senior distributions under the

partnership agreement.  We set it up that way.  Nobody

objected to it.  That was part of the confirmed plan and the

confirmed order.

Q    Thank you very much.  Let's talk for just a moment about

Mr. Patrick's authority.  Before entering into the settlement

agreement, did you do anything to satisfy yourself that Mr.

Patrick had the authority to enter into the settlement

agreement on behalf of each of the HMIT entities?

A    Yes.

Q    What did you do to satisfy yourself?

A    Well, as a default rule, I always look at the agreements

that I'm going to enter into and the organizational docs.  And

we did do that.  We looked at each of the organizational docs

to --

Q    Let me stop you there for a second.  Are those the

documents that are in the exhibit list from 70 through 104?

A    I'd have to check the actual numbers, but --

Q    If you just look at the exhibit list.

A    Oh.

Q    It's at the front.  You'll see on Page 8 of 15 of the exhibit list there's a heading, --

A    Yes.

Q    -- E, Patrick Authority, and then I'm asking you if you are aware of what Exhibits 70 through 104 are?

A    Yes.  So, these, these are -- there's a number of organizational documents that we looked and made sure that Mr. Patrick had authority.

We also knew from our own files that Mr. Patrick, you know, previously had different interests assigned to him, and we know from Mr. Patrick and documents he's given us that John Honis, who was a former controller of some of -- controlled some of these entities and a friend of Dondero's who previously worked at Highland, is on some retail boards, in 2022 transferred those interests to an entity controlled by Mr. Patrick.

Moreover, Mr. Patrick was here in court as the HMIT Administrator, trying to sue the Highland estate.  He testified on behalf of HMIT as the Administrator.  And the documents are very clear that the Administrator has full control of these entities.

Q    We've heard some argument about a Cayman Islands proceeding.  Are you generally aware of what's happening in

the Cayman Islands?

A    I hesitate to say generally aware.  I'm aware that there's a proceeding in the Cayman Islands about involving a blocker corp.  And there's disclosure in this Court about what that entity is.  It's a blocker corp. in the Caymans that prevents the ultimate charitable entities -- and I put that in quotes -- to -- from receiving UBTI, which is Unrelated Business Income.  And in that case, they would have to pay tax on it, and the idea is that they don't want to pay taxes and they don't pay taxes.  So that corp. apparently is in some sort of proceeding.  That's on the DAF side.  That is not on the HMIT side.

Q    Okay.  So, based on the work that you did and the documents that you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT entities?

A    Yes.

Q    And what view did you reach?

A    He has complete authority over each of these entities.  They run up to entities that he controls or he owns.  And he's had that, and it's the structure that was set up a long time ago, and any changes to that structure are just consistent with the documents that let him do these things.  And the proceeding in Cayman, whatever that is, has no impact on Mr. Patrick's authority over these entities or any of the entities

in this chain.

Q   Did you see anything in the diligence that you conducted that required Mr. Patrick to seek anybody's authority, consent, or approval before entering into the settlement agreement on behalf of the HMIT entities?

A   No.  And we could go through each document.  He has complete authority on each of these entities.  And even the objections that were filed that were withdrawn from The Dallas Foundation, they have no -- it's absolutely clear that they have no rights to deal with at all the management of each of these entities.  They don't have an ownership interest in it. Crown issued an annuity policy that's a variable policy.  They have no rights.

Q   All right.  Let's turn to the agreement itself.  Can you tell the Court why you believe that the settlement agreement is in the Claimant Trust's best interests?

A   Number one, this case has been going on for a full five years.  We have spent tens of millions of dollars dealing with vexatious and frivolous litigation and attacks.  The opportunity to settle with a Class 10 holder and allow their claim under the terms of the settlement is extremely valuable because it moves us much, much closer to a potential resolution of this case, which we would all love to resolve.

    Number two, it's fair value for the estate.  We are making sure, while we're paying some money out in front, we have

MR 0953

triggers on the backend payments to ensure that the Indemnity Trust has enough assets to protect parties if there are unforeseen litigations. And I can almost bet there'll be at least one or two of those. So it's really, really valuable in that respect.

Three, it cuts down tremendously on what future expenses could be. Because we have gotten these litigation protections, we've basically walled off a potential avenue to be attacked. And I think the structure of this deal is valuable, not only to the fiduciaries and folks who have been responsible for managing this process and who are indemnified by the Claimant Trust or HCMLP, it also enables us to, down the road, pay off the Class 9s and ultimately make distributions to the Class 10s.

Q   Is one of the other benefits to this agreement is that it enables the Claimant Trust to dispose of certain illiquid assets?

A   Well, that's a -- that is a benefit, because we do have to resolve these claims and dispose of these assets, and we're not in a position to hang around until 2030 or more to do that.

So we've got the Kirschner claims, which would go to HMIT. Again, the way that the waterfall is set up, to the extent that they have value, they are very expensive to pursue. We've spent a ton of money setting them up. We've produced

MR 0954

seven million documents, pages, and received zero in return. We stayed them because we didn't think we needed them for the Class 8 and 9 and it was prudent to do so, and the question was would we need them for indemnification. So disposing of those claims now at this time as part of this settlement, where that value would go to Class 10 anyway, is very valuable.

Q    Had you made any efforts prior to entering into this agreement to monetize or otherwise sell the Dugaboy Note?

A    Yes.

Q    Can you describe for the Court what your efforts were in that regard?

A    So, we set out to try to monetize the Dugaboy Note. I contacted -- we put together what we call a teaser, laying out what we knew about Dugaboy, at least up until the time that Dugaboy was no longer part of our computer system. Laid out what we thought the assets were. There's not a lot of public information. Laid out the amortizing of the note. It's a 3.2 percent-ish, 3.26 percent note, I believe, goes to 2047, '46 on the amortization, 2047. And then presented that to I think it's five different investors in distressed funds. Had no interest whatsoever. One investor laughed at me, which I understood that he was aware of the parties and the principals and the collection efforts that would be difficult on that note.

MR 0955

Seery - Direct                                   103

The note is performing, because if it hadn't performed I would have accelerated on the first second and we would have collected the whole thing. But we've seen that show in the other Notes Litigation. And so we didn't -- we didn't get any reception.

We also reached out to Mr. Dondero, in writing, through D.C. Sauder, and made them an offer and tried to get them to respond, and they indicated they had no interest in the note.

Q    Turning back to the exhibit list, if you can turn your attention to Page 11 of 15 of the exhibit list, is Section F, Exhibits 105 through 112, the documents that reflect the note and your efforts to dispose of the note?

A    Yes.

Q    And let's take a look at Exhibit 112 quickly, since that involves Mr. Dondero. Can you just tell the Court what this exhibit is?

A    Yes. This is an exchange between D.C. Sauder, Matt McGraner, both of whom work for Dondero, and Dave Klos, our CFO. I'd authorized Dave to make an offer to them to see if we could get cash for the Dugaboy Note. And as you see right below the reply from Mr. Klos, which is -- this is friendly, but Mr. Sauder's indication that they have no interest.

Q    Okay. So Highland offered to sell the Dugaboy Note to Mr. Dondero or entities controlled by him, and that offer was rejected without a counteroffer. Do I have that right?

396

MR 0956

A    That's correct.

Q    Okay.  Let's finish up here.  Are you familiar with the objections of Dugaboy and Mr. Daugherty that the settlement somehow violates the plan because it's making distributions to Class 10 before junior classes are paid in full?

A    Yes.  I'm familiar with those.

Q    Do you believe the settlement violates the plan?

A    Not at all.

Q    And why is that?

A    The plan specifically contemplates that -- I don't think it's -- we showed the 9 and 10s, but I think it's any claimant could take less than is being offered by the plan.  What we did very specifically is go to the Class 9 claimants and discuss with them this opportunity to settle with HMIT and what it would take, which included some, as I described earlier, payments upfront.

After being fully informed -- they asked a lot of questions, they pushed back quite a bit, as you can expect that they would -- and we reached agreement with those Class 9 claimants in writing to approve the structure of the deal and the settlement and the concurrent payments, as well as the final small payment to Mr. Daugherty on behalf of his Class 9 claim.

Q    Could I trouble you to turn to Exhibit 59, please, Mr. Seery?

A    I've got it.

Q    Are you familiar with that document?

A    I am, yes.

Q    Can you explain to the Court what that document is?

A    This document is the written consent that we entered into with the Class 9 claimants, approving the settlement agreement as well as the payment to Mr. Daugherty.

Q    Okay.

A    And -- and -- so these -- the payment to Mr. Daugherty would have been non-pro rata, so they agreed to that.  And the concurrent payments under the settlement agreement to Class 10 were agreed to by the Class 9 claim holders.

Q    So looking at Page 2 at the top, do I have this right, that Mr. Daugherty's original Class 9 subordinated claim was in the amount of $3.75 million, and that with the payment described in this document his claim was paid in full?

A    That's correct, yes.

Q    And did he complain that he was getting paid in full but the other Class 9 holders were not?

A    No.  That had never been his complaint.

Q    Did he complain that he was getting paid in full on his Class 9 claim but his Class 8 claim remained unresolved?

A    No.  I think that, as indicated before in my testimony and indicated here, this was the last payment, the 781.  Before that, he'd received almost $3 million on account of his Class

MR 0958

9 claim.  And pro rata with the other Class 9 claimants.

Q    I think you mentioned that your understanding is that, under the plan, creditors can elect to receive less favorable treatment than the plan otherwise provides.  Is that right?

A    That's correct.  And I think that's a pretty standard provision in virtually every plan that I see.

Q    Can we just grab that for a second?  It's the last exhibit, 126, which is probably in the skinny binder, if you have one.

A    Yes.  Do you want me to go to the section?

Q    Yeah.  Just one minute.  I want to make sure the judge is with us.  Give her a second.

         MR. MORRIS:  Are you with us, Your Honor?

         THE COURT:  Yes.

         MR. MORRIS:  Okay.

BY MR. MORRIS:

Q    So if you can turn to Page 23 of Exhibit 126.  Does Section 9, under Treatment, Romanette (ii), is that the provision that you were just describing that gives Class 9 holders the ability to receive such other less-favorable treatment as to which such holder and the Claimant Trust may agree upon in writing?

A    That's correct.

Q    And the same is true with respect to the Class 10 claims, at the top of Page 24?

A    That's also correct, yes.

Q    All right.  And so was the consent that was executed by the Class 9 holders that's Exhibit 59 done in satisfaction of these plan provisions?

A    I'd say it's consistent with these.  They could elect to receive it or not, but this was, you know, did it under this provision and they were entitled to elect to take lesser treatment, if that's what they agree to.

Q    Okay.  Can you describe for the Court why you believe that the Class 9 claim holders are receiving less-favorable treatment under -- as a result of this settlement agreement than they would otherwise be entitled to under the plan?

A    Well, they would be entitled to receive payments in front of any payments that would be made to Class 10.  In addition, they would have been entitled to receive a pro rata distribution of the $800,000 that was paid to Mr. Daugherty, and they agreed to waive those provisions.

Q    Okay.  Is it your understanding that HMIT is also accepting less favorable treatment than it might otherwise receive if it pursued and succeeded in the prosecution of its claim?

A    I suppose, ultimately, if everything was resolved, that they could have gotten a Class 10 interest that wasn't structured along the lines of the settlement agreement.  So the settlement agreement takes some of that structure and what

arguably would be value away from them, and this is the amount that they've agreed to have as their allowed claim, as structured by the settlement agreement.

Q    And is it your understanding that under the settlement agreement HMIT has disavowed any rights under the Claimant Trust Agreement?

A    Under the Claimant Trust Agreement, yes.  They have rights under the settlement agreement to receive distributions, and those will ultimately come from the Indemnity Trust as we wind down the Claimant Trust.

Q    And did HMIT also agree that it would not be a Claimant Trust beneficiary under the Claimant Trust?

A    Yes.  And that's very important to us because we have seen lots of litigation, lots of emails, trying to use these types of structures just to create claims, even when there's literally no basis for it.  I should -- well, I'll control myself.

Q    Yeah.  We can stop there.

        MR. MORRIS:  Your Honor, I have no further questions at this time.

        THE COURT:  All right.  We're going to figure out, are we taking a bathroom break or a short lunch break.  I'll poll the audience and then I'll decide.  Do people want to take maybe a 30 to 45-minute lunch break, or just a bathroom break and keep going?

MR 0961

THE WITNESS: Thirty minutes.

THE COURT: I'll say -- are you going to have any further examination?

MR. PHILLIPS: I'm going to maybe ask one question, just to bring it up. It's already been -- but one question.

THE COURT: Okay. And then what about Dugaboy and Daugherty? Guesstimate how much examination you'll have.

MR. YORK: Fifteen minutes, maybe.

MR. LANG: Twenty minutes or so.

THE COURT: Why don't we take a five-minute bathroom break, --

MR. PHILLIPS: Sure.

THE COURT: -- and then we'll at least finish this witness.

MR. PHILLIPS: Perfect.

THE COURT: All right?

MR. PHILLIPS: Thank you, Your Honor.

THE WITNESS: Thank you.

THE CLERK: All rise.

(A recess ensued from 12:07 p.m. until 12:15 p.m.)

THE CLERK: All rise.

THE COURT: Please be seated.

(Pause.)

THE COURT: All right. Can I get some help rounding people up?

(Pause.)

THE COURT: All right. We're missing -- okay. We're going back on the record in Highland Capital. We still have Mr. Seery on the witness stand. Mr. Phillips, you had examination. You said one question.

MR. PHILLIPS: I did, Your Honor. And I meant it.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. PHILLIPS:

Q   Could you look at Exhibit 118, please?

A   You said 118?

Q   Yes, sir.

A   Certainly.

Q   Did the calculation of the Class 10 claim amount of $336,940,230.58, is that the result of applying the full value to the Highland or Highland Claimant Trust of the HMIT note receivable?

A   Apologies, because I can't read this because it's too small, but I can answer the question.

THE COURT: Would you like this?

THE WITNESS: I think I can answer the question without it.

THE COURT: Okay.

THE WITNESS: The -- what we used was the petition date capital account.

BY MR. PHILLIPS:

Q    Correct.

A    And just like every other claim in bankruptcy, fixed at the petition date.  And what we subtracted from that petition date was the petition date amount principal and interest of that HMIT note which was owed to Highland Capital.

Q    Thank you.

          THE COURT:  All right.  That was one question.

     All right.  Counsel?

          MR. YORK:  Thank you, Your Honor.  Get it organized here.

                    CROSS-EXAMINATION

BY MR. YORK:

Q    Good afternoon, Mr. Seery.

A    Good afternoon.

Q    Would you take a look at Exhibit 1 in Daugherty's witness and exhibit binder?  It's the settlement agreement between Highland and Mr. Daugherty, I believe.

A    Yes, I have it.

Q    All right.  And can you confirm that is the settlement agreement that Highland and Mr. Daugherty entered into in connection with the claims Mr. Daugherty asserted in the bankruptcy?

A    It appears to be, yes.

Q    Would you turn to Section 9, then, which is on Page #11,

starts on Page #11?

A    Yes.

Q    And that relates to a reserved claim that Mr. Daugherty had as part of his proof of claim against Highland in the bankruptcy, correct?

A    That's correct.

Q    And would you agree with me that the second line of Section 9 there of the settlement agreement describes that claim as a contingent unliquidated claim against the Debtor?

A    I would not agree with you on that, no.

Q    Why not?

A    Because it says, Daugherty contends --

Q    Ah.  Daugherty contends.

A    -- he has a contingent unliquidated claim against the Debtor.

Q    Okay.  Well, why don't you then turn with me to Daugherty Exhibit #2, which is the -- which is the -- Highland's adversary complaint that was filed against Mr. Daugherty on I believe May 2nd of 2025.  Correct?

A    I don't recall the specific date and it's blurred at the top.  So if you say so, I'll accept that.

Q    All right.  And if you look at Paragraph 1, the third line, there's a sentence there that says, All of Mr. Daugherty's claims were settled except his unliquidated contingent claim that the Debtor has a continuing and

indefinite obligation to make him whole if a tax refund he apparently received for tax year 2008 on account of his partnership interest is ever successfully challenged by the IRS.

Did I read that correctly?

A    You did read that correctly, yes.

Q    All right.  This reserved claim under the settlement agreement is a Class 8 unsecured claim, correct?

A    It is the claim that he asserted and that we initially classed under Class 8 in a fixed amount for a tax refund which is on his statement that he got that he claims he's entitled to more, which would be unsecured as of the petition date.  I believe the amount on his payment statement from 2009 is $1.475 million.

Q    All right.

THE COURT:  Could you pull the microphone closer to you?

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  Okay.  Good.

MR. YORK:  All right.

BY MR. YORK:

Q    And, again, my question is pretty simple.  And it's a Class 8 unsecured claim, right?

A    It's not a Class 8.  It was in Class 8.  It's been objected to.

MR 0966

Q    Right.

A    So it is not in a class now at all.  We seek to disallow it in its entirety, or, at worst, subordinate it to all creditor claims.

Q    Understood.  But it has been asserted as a Class 8 general unsecured claim, right?

A    He asserted it as that, yes.

Q    Okay.  And is it fair to say that in the adversary complaint, if you go to Page -- I'm sorry, Paragraph 4 -- Highland alleges that:  However, even if Mr. Daugherty's claim is not disallowed in its entire -- I think that should be entirety.  Right?

A    It should be, yes.

Q    It remains contingent on the outcome of the 2008 audit.  Correct?  Did I read that correctly?

A    You did read that correctly, yes.

Q    And the next sentence says, It is unclear when, how, or if the 2008 audit will finally be resolved.  Correct?

A    Correct.

Q    And in fact, if you go to, then, Page #7 of the complaint and you look at Footnote 6, at the very end of that footnote it indicates that Highland has an understanding that the resolution may not be expected until approximately 2029.  Is that correct?

A    The litig... I can't read it because it's small, but the

litigation may not be resolved.  The IRS has already issued a final determination on the audit.

Q    How do you know that?

A    I was advised that by another partner.

Q    Who?

A    Kurt Plumer.

Q    Have you seen the FPAA that was issued by the IRS?

A    No, I have not.

Q    Have you asked for it?

A    Yes.

Q    You did, personally?

A    My lawyers did.

Q    Your lawyers did?

A    Yes.

Q    Okay.  But you -- but you did not, right?  Just to be clear.

A    No, I did not.  My lawyers, acting at my direction, did.

Q    Asked the tax matters partner for Highland for that information?

A    Asked Mr. Daugherty.

Q    Asked Mr. --

A    I think asked you, I'm sorry.

Q    Oh, asked me for that information?

A    Yes.

Q    Well, so tell me, why is Mr. Daugherty -- first off, do

you know if Mr. Daugherty has received the FPAA?

A   I don't know.

Q   Okay.  Do you know if anybody else has received an FPAA?

A   I was told there was a final determination.  I don't know if they've actually received an FPAA.  But I do know that Mr. Daugherty has produced a document where the IRS has requested additional information for him.  Since they hadn't done that for 17 years, I suspect that they've reached a final determination of the audit.

Q   All right.  So you don't know whether an FPAA has actually been issued?

A   I --

Q   True?

A   I don't know.  And for the Court's benefit, that's a Final Partnership something Determination.

Q   Okay.  What -- where --

THE COURT:  F-A --

THE WITNESS:  F-P-P -- I think it's --

MR. YORK:  F-P-A-A.

THE WITNESS:  -- F-P-A-A.

THE COURT:  Okay.  The court reporter will no doubt ask, so good.

BY MR. YORK:

Q   Tell me, where in the universe is it that -- is it Mr. Daugherty's obligation to provide Highland with the FPAA?

409

A   I don't -- I don't think there's any such obligation that I've seen.

Q   And in fact, the IRS audit is handled by the tax matters partner for Highland Capital, correct?

A   The IRS audit for Highland Capital's -- from Highland Capital's position is handled by that. The IRS handles their side.

Q   Right. From Highland's side. Okay. And that tax matters partner is doing that on behalf of Highland Capital, right?

A   I think at this point it's doing it on behalf of the old Highland Capital, not Reorg Highland Capital. We don't have any liability with respect to it, nor do we have any visibility as to what's going on in the tax audit.

Q   So even though, under the partnership agreement, that's the tax matters partner that's referred to, Highland Capital cannot compel that tax matters partner to provide that information to them, if an FPAA actually exists?

A   I don't think so. That partnership agreement is the pre-effective date partnership agreement.

Q   All right.

A   The new Highland Reorg Debtor doesn't have these partners and is not a tax matter partner for those -- those audits.

Q   So let's go back, then, to Paragraph 4 of the adversary complaint that was filed. And I want to look at the next sentence that Highland wrote there. It says: Moreover, if

the claim is not disallowed, it will need to be estimated, after taking into account the likely outcome of the 2008 audit, including adjustments that result therefrom.

Did I read that correctly?

A   You read that correctly.

Q   Have -- has anyone at Highland conducted any analysis as of today to determine what Mr. Daugherty's potential liability would be from that IRS audit if that audit was completed today and all interest and penalties were assessed as of today?

A   Yes.

Q   How much?

A   It would be $1.475 million, the amount of his prepetition claim in his proof of claim. Since it's unsecured, whatever happens with the IRS is not a concern of Highland. His claim is that he didn't get that amount as a refund. Either he got that amount or he got some -- some lower amount. It would be a petition -- prepetition-date amount. And under Texas law, he would be entitled to prejudgment interest from 2009 to the petition date at a rate of five percent.

Q   Which would be how much?

A   It would be approximately $2.2 million in aggregate.

Q   Okay. And there would be -- you're saying there would be no penalties or any other -- any other interests or assessments that would -- Mr. Daugherty would be liable for that Highland would also then be liable for under that claim?

A    No.  There would not.  It would not impact his claim against Highland.  His claim against Highland is simply:  I did not get this refund.

He got the refund.  He's now claiming it might be adjusted.  If the IRS otherwise has penalties, interest against him for his tax attributes somewhere between 2009 and 2019, that wouldn't be subject to his proof of claim and it wouldn't be the responsibility of Highland.

Q    Even if Highland had promised at the time that that refund was made that it would -- it would make him whole with respect to any IRS audit whatsoever?

A    It simply --

MR. MORRIS:  Objection to the form of the question.

THE WITNESS:  It simply didn't do that.

MR. MORRIS:  Yeah.

THE COURT:  Okay.  Overruled.

THE WITNESS:  We can -- you could litigate the claim, but that's just not what it says.

BY MR. YORK:

Q    So you talked earlier about the Class 9 consent that was obtained, and no one from Highland reached out to Mr. Daugherty to try to seek his consent.  Right?

A    That's correct.

Q    Why not?

A    Because I didn't want to.

Q    Why?

A    Because Mr. Daugherty is an extremely difficult person to deal with.  The last time I dealt with Mr. Daugherty on the phone with respect to anything, I had extreme difficulty and got sucked into a stalking lawsuit that I had to testify to that is a complete mess that I want nothing to do with.  So originally my counsel said, have no communication with him.  But with respect to this, we were objecting to his claim.  We knew he would try to hold this up.  You have tried to do that and demanded $20 million.  So that's why we didn't reach out to you.  We just paid the 9 and we have a fully-reserved amount on the 8.

Q    You thought that the stalking case that you were pulled into was completely fabricated, didn't you?

A    I thought that at the time.  I'm not as sure anymore.

Q    Oh, really?

A    Yeah.

Q    Okay.  And you actually also told Mr. Daugherty that Mr. Ellington, who brought that case, was a complete liar and POS, right?

A    I don't know if I used POS, but I do not think Mr. Ellington is an honest person.

        MR. MORRIS:  Your Honor, at some point I'm going to on relevance grounds.  I think we've got a settlement agreement before the Court that we're trying to get approved

today, not to take discovery on any other matters.

THE COURT: Okay. I'm going to overrule to the extent there was an objection, but I think it's appropriate to worry that we're straying down a road that is not relevant. So, --

MR. YORK: Understood.

THE COURT: -- reign it in.

MR. YORK: All right.

BY MR. YORK:

Q   You'd agree that the -- under the terms of the proposed settlement, there will be some interim distributions will be made to the HMIT entities in cash totaling approximately $23 million. Correct?

A   Not necessarily, no.

Q   Why not?

A   Because there's an initial distribution. I believe it's $10 million.

Q   Yes.

A   And then subsequent distributions are predicated on whether there are threats, either outstanding litigation or threats as defined in the agreement.

Q   And so long as those threats don't occur, then those interim -- those additional interim distributions will be made, right?

A   Yes. The Indemnity Trust would make those distributions

414

at those times, and then I have to make -- it's a double

trigger, because it has to be no threats and I have to

determine that the Indemnity Trust had sufficient assets to

meet its obligations for both actual and contingent

indemnification obligations.

Q    But at a minimum, the HMIT entities will receive at least

$10 million?

A    Yes.

Q    On an interim basis?

A    Yes.

Q    All right.  And you'd agree with me that, under the terms

of the plan, the plan provides that the classes get paid in

order of priority, correct?

A    That's correct.

Q    All right.  And if you turn to Daugherty Exhibit 4, which

is the confirmation order, at Page 45.  And Subsection A there

in the middle of that has a sentence that says:  Accordingly,

as the holders of the equity -- excuse me.  Strike that.  Let

me start over.  Are you there yet, Mr. --

A    Now I am.

Q    All right.  Accordingly, as the holders of equity

interests that are junior to the claims in Class 8 and Class 9

will not receive or retain under the plan on account of such

junior claim interest in any property unless and until the

claims in Class 8 and Class 9 are paid in full, plus

MR 0975

applicable interest, --

Did I read all that correctly?

A    Yes.

Q    Okay.  And the term "Claim" there is a capitalized term, right?

A    Yes.

Q    It's not -- it doesn't say allowed claims.  It just says claims.  Right?

A    That's correct.

Q    All right.  All right.  Now, if you'd turn with me to the Claimant Trust Agreement, which is Daugherty Exhibit 5, and go to Section 5(c).  Excuse me.  5.1(c).  I apologize.

A    Yes.

Q    And this is -- this is -- relates to the contingent trust interests associated with the Class 10 and Class 11 limited partnership interests in Highland, correct?

A    Generally, yes.

Q    All right.  And you'd agree with me that, in the -- about four lines down, it says:  The Claimant Trustee shall allocate to each holder of allowed Class 10-B and C limited partnership interests and each holder of allowed Class 11 Class A limited partnership interests a contingent trust interest equal to the ratio that the amount of each holder's allowed Class 10 or Class 11 interest bears to the total amount of the Class 11 or -- Class 10 or Class 11 interest, excuse me, as applicable

under the plan.

Did I read all of that correctly?

A   I believe you did, yes.

Q   All right. And under the terms of the proposed settlement, the HMIT entities are getting an allowed Class 10 interest, correct?

A   That's correct, yes.

Q   All right. And then the next sentence goes on to say: The contingent trust interest shall not vest and the equity holder shall not have any rights under this agreement unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid postpetition interest consistent with the plan and all disputed claims have been resolved. The GUC Payment Certification.

Did I read that correctly?

A   You did, except you used the article "The" before "contingent trust interest" at the start of the sentence.

Q   Fair enough. And the GUC beneficiaries there would be the general unsecured creditor beneficiaries, correct?

A   That's correct.

Q   And this certification has not been issued yet by the Claimant Trustee in this bankruptcy, correct?

A   That's correct.

MR 0977

Q    In part because of Mr. Daugherty's remaining unresolved Class 8 claim, correct?

A    In part, yes.

Q    And also in part because of the remaining Class 9 claimant holders who still have money owed to them on their Class 9 claims?

A    In part, yes.

Q    Okay.  Does the term of the proposed settlement agreement provide those Class 9 consent holders with releases from the HMIT entities?

A    No.

Q    It does not?

A    No.

Q    At all?

A    No.

Q    Even if they were in their capacity serving as board members for Highland Capital?

A    Certain of the Class 9 holders are also on the Oversight Board.  In their capacity as Oversight Board members, yes, they get -- they get broad releases.  UBS, for example, is not.  There are no releases in there for the two UBS entities.

Q    Would you now -- you can set that binder aside.  And if you'd turn with me to Exhibit 60 in the -- Highland's exhibit list.

A    Six zero?

Q    Yes, sir.

A    Yes.

Q    This is a copy of the tolling agreement extending objection deadline between -- that's on -- dated July 27th of 2022 between Mr. Daugherty and Highland Capital Management, LP and Highland Claimant Trust.  Correct?

A    Yes.  That's what it appears to be, yes.

Q    All right.  If you would, go with me to Page 2 at the bottom.  There is a Footnote #3.  Do you see that?

A    Yes.

Q    And that footnote relates to, up above, a defined term called a "Reserved Claim," the Reserved Claim being what was discussed earlier in Mr. Daugherty's settlement agreement with Highland, right?

A    That's correct, yes.

Q    And it states in here that that Reserved Claim means "the contingent and unliquidated claim as referenced in Proof of Claim #205."

     Did I read that portion of the footnote correctly?

A    Yes.

Q    All right.  And it goes further to say that the amount listed there of 2.65 million three hundred -- two point six -- let me start ever.  $2,650,353 is the amount estimated as of October 23, 2020.  Correct?

A    That's correct.

Q   All right.  It doesn't say it's -- anywhere in there that it's a fully -- it fully reserves that unliquidated contingent claim.  Correct?

A   In what you just read, no.

Q   All right.  And if you go to Page 1 -- or, I'm sorry, to Page 3, Paragraph 1, the covenant to reserve where Highland agrees to reserve $2,650,353 on account of the reserved claim, does it say anywhere in there that that is -- fully reserves that contingent unliquidated claim anywhere?

A   It says exactly what it says.  And you read it.

Q   That's not my question.  Does it say --

A   I don't -- well, it says, Further agree to reserve $2.650 [million] on account of the reserved claim in disputed claim reserve.

Q   All right.  Does it say anywhere in there that that is the fully-reserved amount of that claim?

A   Not in that sentence, no.

Q   Thank you.  All right.

MR. YORK:  Your Honor, give me one second.  Let me confer.

THE COURT:  Okay.

(Pause.)

BY MR. YORK:

Q   Mr. Seery, UBS is one of the consent holders, Class 9 consent holders related to the HMIT settlement.  Correct?

A    There are two UBS entities, UBS AG 66 and UBS Securities, LLC.

Q    All right.  Did either of those entities sit on the Unsecured Creditors' Committee in this bankruptcy?

A    A UBS entity did.  I'm not sure which of those did, or whether it was both with one counsel.  I don't -- there's a UBS entity on that Creditors' Committee.

Q    Is the -- are the members of the Unsecured Creditors' Committee within the definition of the Highland released parties under the proposed HMIT settlement?  Do you know?

A    I don't know.  The members of the Creditors' Committee, I believe, have exculpation anyway, so I don't -- I don't -- I don't know if it captures the old members of the Creditors' Committee.  I don't -- for example -- I don't think so.  I don't -- I don't know.

            MR. YORK:  Pass the witness.

            THE COURT:  All right.  Mr. Lang?

            THE WITNESS:  Do you have a separate binder?

            MR. LANG:  No.

            THE WITNESS:  Okay.  Will you be using Mr. Daugherty's binder?

            MR. LANG:  No.

                      CROSS-EXAMINATION

BY MR. LANG:

Q    All right, Mr. Seery.  Just to be clear, the Class B and C

-- or the Class A interests and the -- of Highland under the

plan, they have 99.5 percent of the -- Highland Capital

Management.  Correct?

A    Could --

Q    Sorry.  The Class B and C --

A    Limited partnership interest.

Q    -- shareholder -- limited partnership interests were 99

point -- or, were .5 percent of Highland Capital Management?

A    I -- I'm not trying to be difficult.

Q    No, it's fine.  It's a terrible -- terrible --

A    I don't -- I just don't -- I don't understand your

question.  I apologize.

Q    Okay.  So, at the time of the petition, --

A    Yes.

Q    -- Hunter Mountain Investment Trust owned 99.5 percent of

Highland Capital Management?

A    It owned 99-1/2 percent of the limited partnership

interest in Highland Capital Management.

Q    And the remainder -- and HMIT has the Class 10 claims.

Correct?

A    You said something, the remainder?  The --

Q    Oh, sorry.  The remaining interests are owned by the Class

11 claims under the plan.

A    The remaining partnership interests are among those

entities I testified earlier to, which are Dugaboy, Strand, --

MR 0982

Q    And Okada?

A    -- Mark Okada individually, and two Mark Okada and Pamela Okada trusts.

Q    Okay.  And the total assets in the estate right currently you testified are between $65 to $70 million?

A    I -- off the top of my head, I don't recall, but it -- rough range, it could be in that general vicinity.  That does not include the payments that have to be made to the 9s and expenses.  So I believe there's documents in here that we could go through, if you like.

Q    And I believe you testified that the remaining unpaid 9s are owed approximately $20 million?

A    Approximately $20 million, yes.

Q    Okay.  And the plan does not say that the equity claims for Class 10 and 11 are to be determined by the capital account values of the limited partnership interests in the Debtor LP?

A    That's correct.  It says to set an amount.  It doesn't tell you how to do the amount.

Q    Okay.  And under the settlement agreement, Class 10 interests will be allowed in the amount of $336,940,230.58?

A    Approximately $336 million, yes.

Q    $336 million.  Fair.  And this is the capital account balance as of -- HMIT's capital account balance as of the petition date, less, I believe, the HMIT note?

A    That's correct.  So that amount is the net amount.

Q    The net?  And do you know how the capital account balances were calculated --

A    Yes.

Q    -- on the petition date?

A    Yes.

Q    And how were they calculated?

A    So, you take the 2018 year-end capital account amount, and then there's activity in the company that gets passed through through the partnership.  The partnership agreement -- in this instance, the prepetition Debtor partnership agreement passed through profits and losses on a pro rata basis.  There was activity in the first half of the year that affected that capital account.  You can see that reflected in the year-end auditeds as well as the K-1 statement that -- for 2018 that was given to HMIT.  That would be their 2018 year-end.  That then, from an accounting perspective, was used and brought down to the petition date.  And between the petition date and year-end 2019, there was additional capital activity, the biggest one of which was the reserve -- full reserve for the $50-plus million for the HMIT note.  And so then you'll see the 2009 auditeds that are signed off by Mr. Waterhouse.  And in those interim months, then you also see the gross amount of the partner capital each month in the monthly operating reports.

Q    And correct me if I'm wrong, but I believe you testified that the capital account balances continued to go down after 2019.  So you have the petition date, you have the next year, and did they continue to --

A    I don't think I testified to that.  What I testified to is that there was economic activity in 2019 that affected the year-end '18 to the petition date.  And then from the petition date there was year-end activity -- there was activity from the petition date to year-end '19 that would affect the capital account as reflected in the 2018 auditeds -- they weren't auditeds -- 2018 tax returns signed off by Waterhouse.  The biggest part of that activity was the application or the reserve for the Hunter Mountain Note.

Q    And was there any activity after the 2019 tax return?

A    There was postpetition activity in the partnership, certainly.

Q    And did it reduce the capital accounts during those years?

A    I assume it would have reduced all of the capital accounts pro rata.

Q    Okay.  And why'd you use the petition date as the date to determine the value of the capital accounts?

A    Because this is bankruptcy and that's the date on which you fix all your claims and interests.

Q    If you used -- have you ever used equity ownership percentages to determine the payment to the equity versus

their capital account balances?

A    In this case, or elsewhere?

Q    Elsewhere.

A    I think that's standard.  I can't cite you a specific thing, but typically when a partnership liquidates or a partnership is sold, amounts get distributed pursuant to the capital accounts and -- and -- in up to amounts in the capital accounts.

Q    You would agree, if you use the percentage of ownership, being 99.5 percent for Class 10 and the .5 percent for Class 11, would potentially leave money for the Class 11 creditors to recover?

A    I don't think so.  No, I don't agree with that.

Q    Why do you say that?

A    Because Class 11 is subordinated to Class 10.

Q    Okay.  So explain how, if $60 million exists and you pay $20 million to the Class 9, --

A    Roughly.  Yeah.

Q    Rough.  Just rough math.

A    Okay.

Q    That leaves $40 million.

A    Okay.

Q    Correct?  And if the ownership interests or the allowed claim for HMIT was 99.5 percent, wouldn't that leave .5 percent of $40 million for the remaining creditors?

MR 0986

A    That doesn't make any sense, because 99-1/2 percent of a senior thing means you get everything.  So that Class 10 has to be paid in full before the 11.

In addition, there's already an agreed-upon amount on HCLOM for $10 million.  So how do I give HCLOM $10 million and 99-1/2 percent to somebody else?  There has to be numbers.

Q    But to be clear, the plan does not say that the equity claims are determined on capital accounts.  Correct?

A    That's correct.

Q    All right.

MR. LANG:  No further questions.

THE COURT:  All right.  Any redirect?

MR. MORRIS:  Just one moment, Your Honor.

(Pause.)

MR. MORRIS:  We have no questions, Your Honor.

THE COURT:  All right.  Any redirect from --

MR. PHILLIPS:  No, Your Honor.  Thank you.

THE COURT:  -- the one question?

Okay.  Thank you, Mr. Seery.  You are excused from the witness box.

THE WITNESS:  Thank you, Your Honor.

(The witness steps down.)

THE COURT:  Okay.  I'm going to again take proposals. I can live with a 30-minute lunch break.  I and my staff can. But it's easier for us than all of you.  So do you all want to

427

negotiate for more?

MR. MORRIS: I just wanted to let the Court know that, with that, the Movants rest. We're not -- we're not going to call anybody else.

THE COURT: Okay.

MR. MORRIS: We reserve the right to cross-examine. We reserve the right to call rebuttal witnesses, including Ms. Deitsch-Perez and Mr. Dondero, depending on what testimony is elicited. So we reserve the right to call rebuttal witnesses. But we're not calling anybody further on our direct case, and we rest.

THE COURT: Okay. So let me --

MR. MORRIS: I'll let them --

THE COURT: -- follow up on that point.

MR. MORRIS: Uh-huh.

THE COURT: There had been a discussion of Mr. Patrick.

MR. MORRIS: Uh-huh.

THE COURT: Limited to one total hour. Thirty minutes collectively, Debtor and HMIT. Thirty minutes collectively, Dugaboy and Daugherty.

MR. MORRIS: You know what, Your Honor.

THE COURT: You're -- you're not asking --

MR. MORRIS: No, maybe I -- I forgot that you had told us we could do it, too. So let's take the lunch break,

let us figure it out, we'll let you know when we come back.

THE COURT:  Well, I'm clarifying because I'm deciding --

MR. MORRIS:  Yeah.

THE COURT:  -- who gets to go first.

MR. MORRIS:  Understood.

THE COURT:  Each witness.

MR. MORRIS:  Understood.

THE COURT:  And I presume --

MR. MORRIS:  Understood.

THE COURT:  -- the Debtor/HMIT would go first.

MR. MORRIS:  Yeah.

THE COURT:  And then with regard to Dondero, --

MR. MORRIS:  Yeah.

THE COURT:  -- you all would go first.

MR. MORRIS:  So I withdraw what I said.  Let us confer during the lunch break and we'll figure out who's going first, whether we do rest or whether we put Mr. Patrick on for a short direct.

THE COURT:  Okay.  Which leads me to our lunch break. Do people want to negotiate for more than 30 minutes?  I don't want to make someone collapse if --

MR. MORRIS:  Thirty minutes, or 1:30?

MR. PHILLIPS:  1:30.

MR. MORRIS:  1:30, Your Honor.  It's nice and round.

MR. PHILLIPS:  One clarification, Your Honor. Because I don't -- I don't -- if one side doesn't take the half hour, does that go over to the other side, or --

THE COURT:  No.

MR. PHILLIPS:  No?

THE COURT:  I don't think -- I'm just giving --

MR. PHILLIPS:  Great.  Thank you.

THE COURT:  And my law clerk said maybe I was confusing about that earlier today.

MR. MORRIS:  Yeah.

THE COURT:  One hour total, but 30 minutes each.  And if one collective team doesn't use the whole 30 minutes, we're not --

MR. MORRIS:  Yeah.

THE COURT:  -- giving it to the other side.  Okay?

MR. PHILLIPS:  That was my question.

MR. MORRIS:  Understood, Your Honor.

THE COURT:  And while I'll let you all discuss whatever you want, what I envisioned is you all would go first with Mr. Patrick, --

MR. MORRIS:  Uh-huh.

THE COURT:  -- and then Dugaboy and Daugherty would go first on Mr. Dondero.  But if you all collectively think it makes sense to do something different, I'll hear.

MR. MORRIS:  No.  That makes sense, Your Honor.

MR. PHILLIPS: Thank you, Your Honor.

THE COURT: All right. So we'll come back at 1:30 --

MR. YORK: Yes.

THE COURT: -- and resume.

MR. YORK: Thank you so much.

THE COURT: Okay. Thank you.

THE CLERK: All rise.

(A luncheon recess ensued from 12:51 p.m. until 1:33 p.m.)

THE CLERK: All rise.

THE COURT: Please be seated. All right. We're back on the record in the Highland Capital matter, the Rule 9019 motion for approval of a settlement. When we broke, we were waiting to talk about Mr. Patrick and Mr. Dondero as witnesses. Are they going -- is Patrick going to be your witness?

MR. MORRIS: No, Your Honor. We're going to reserve our 30 minutes for rebuttal.

THE COURT: Okay. Thank you.

All right. I'll hear from the Objectors now.

(Pause.)

MR. YORK: Sorry, Your Honor. I didn't realize they were going to observe. So, --

THE COURT: Well, yes. If you understood what I was saying before the break, I presumed they might want to go first with Mr. Patrick, but it was -- you're the one who

431

wanted him, so if they want to go second, they can go second.

MR. YORK:  Well, --

THE COURT:  Well, I say "you're."  I'm sorry.

MR. LANG:  No, it's okay.

THE COURT:  Mr. Lang wanted to go --

MR. YORK:  Yeah.  So are we definitely doing Mark Patrick now?

MR. PHILLIPS:  No.

MR. YORK:  Oh, okay.

MR. PHILLIPS:  We just rested.

THE COURT:  Okay.

MR. MORRIS:  They can call whoever they want.

THE COURT:  They have rested.  If you don't want to go forward with any witnesses, you don't have to.

MR. YORK:  Oh, we --

THE COURT:  But you had wanted to go forward -- you wanted to question Patrick and I said, if he's going to be a witness, then Dondero should also be a witness.  Okay?  And at most an hour collectively for each witness.  If you don't want to call either one of them, you don't have to call either one of them.

MR. LANG:  We're going to.  I think that they were just going to call Daugherty first.  I didn't know if you had an order that you wanted to do this in.

THE COURT:  Well, no.  I don't care.  I guess I don't

care.  Was Daugherty listed?  I mean, --

MR. YORK:  Yes.

THE COURT:  I'm sorry.  Did you say Daugherty or Dondero?

MR. LANG:  Daugherty.

THE COURT:  Okay.  I'm sorry.  So you want to call Daugherty?

MR. YORK:  Yes.

THE COURT:  And you listed him as a witness?

MR. YORK:  Yes.

THE COURT:  So you may call Daugherty.

MR. YORK:  All right.

MR. MORRIS:  Yes.  I --

MR. YORK:  We'll call Patrick Daugherty, then.

THE COURT:  Okay.

MR. MORRIS:  I don't believe Dugaboy did, but --

MR. YORK:  Right.

MR. MORRIS:  -- if they -- if they want to call him, by all means.

THE COURT:  Okay.

MR. MORRIS:  Yep.

THE COURT:  All right.  Mr. Daugherty, if you could approach the witness box, I will swear you in.  Please raise your right hand.

PATRICK DAUGHERTY, PATRICK DAUGHERTY'S WITNESS, SWORN

THE COURT:  All right.  Please be seated.

THE WITNESS:  Oh, wow.  A lot of water up here.

THE COURT:  Plenty of water for everyone.

DIRECT EXAMINATION

BY MR. YORK:

Q    Good afternoon, Mr. Daugherty.  Could you state your name for the record, please?

A    Patrick H. Daugherty.

Q    Mr. Daugherty, are you a creditor in the Highland Capital bankruptcy?

A    Yes, I am.

Q    All right.  And would you turn to, in the Daugherty exhibit binder, turn to Exhibit 1, please?

A    Yes.

Q    And this is a settlement agreement between you and Highland Capital Management relating to claims -- your proof of claim that you made in this bankruptcy, correct?

A    Yes.

Q    And we looked earlier.  You were in the courtroom for Mr. Seery's testimony, correct?

A    I was.

Q    All right.  And we talked in Section 9 about the defined Reserved Claim in there.  Do you remember that?

A    I did.

Q    All right.  Can you describe what --

A    I consider it the Compensation Claim, but yes.

Q    Can you describe what the Reserved Claim is?

A    Yeah.  Basically, it, background, it dates back to the financial crisis of 2008, 2009.  Highland was on the brink of filing for bankruptcy.  We had a creditor bank led by Bank of America and Scotia, and we were in default.  And so the banks came in, declared default, and basically put a limit or terminated our ability to pay cash bonuses.  And that -- right after Lehman Brothers failed, so call it September 2008 and going into 2009.

And the problem with that is we were losing people right and left.  We had about 22 senior-level guys.  We were down -- and I say guys.  I think there were some women, too.  But we were down to about 12 people.  And they were trying to stem the tide of people running out of the doors in order to save the value of Highland.  We started the year at about $40 billion under management, and by that time, we were -- I think we were as low as $19 or $20 billion under management.

Hedge funds were rolling up.  CLOs did fine.  Private equity did fine.  Retail funds were having problems.  And separate accounts were okay.  But we were definitely a firm in crisis and trying to hold on to people.

So the nature of this compensation claim, you know, every year, everybody except Dondero and Okada would get what's called a compensations and award letter.  Because Dondero and

435

MR 0995

Okada were really the only partners. I think you can kind of see that, given your experience. They were called the founding partners. They were the only ones that got true distributions from the firm annually. Guys like us, you know, the other 12 or so, we got cash bonuses and incentive comp and deferred comp. And, you know, obviously, cash compensation was a big part of our compensation, and they were prohibited from the banks from paying it.

So Dondero, with the help of Rick Swadley and some of the other tax people, I don't know if we used out outside firms or not, they came up with this scheme, if you will, where Highland was going to go and use whatever they came up with with the partnerships and whatnot and then generate a tax refund to the senior-level guys. As or in lieu of the cash bonuses that couldn't be paid, they were going to go make these elections and then we were going to get this money.

And if you look at our awards agreement, it says you're going to get *x* amount of money. And it's in the line that historically is the cash bonus.

Also, when we got like our email or whatever that year from Patrick Boyce, our CFO, he was like, Congratulations, your bonus this year was *x*. And it was whatever that amount was on your compensation and award letter.

Well, several of us had the same accountant, John Garvey, at Bland Garvey. Me, Joe Daugherty, and Davis Deadman. And

we took this concept to our accountant and he's like, man, that's really precedent.  And so you guys are going to have to basically protect yourselves from -- sorry, go ahead.  Make your objection.  I'm sure I'm --

MR. MORRIS:  I just, I just don't remember what the question was at this point and he's testifying to --

THE WITNESS:  Why I got this thing.

THE COURT:  It was --

THE WITNESS:  My apologies.

MR. MORRIS:  -- to conversations and hearsay.

THE COURT:  What is the --

MR. YORK:  Let me ask a question and I'm going to try to --

THE COURT:  -- proof of claim about, was the essence of the question.

MR. YORK:  Yeah.  Right.

THE COURT:  So I sustain.  We're getting a little narrative, shall we say.

THE WITNESS:  My apologies.

MR. YORK:  So, --

THE WITNESS:  I'll tighten it up.

BY MR. YORK:

Q   All right.  So, Mr. Daugherty, what you were getting under this scheme, as you describe it, was a cash bonus that was masked as a refund, correct?

A   Look, Highland paid for it however they're going to pay
for it.  They're the one who created whatever that they did.
But for us, it was a cash bonus.

Q   Okay.

A   But given that I was -- what I was just alluding to, there
were concerns about the tax impacts if the IRS didn't agree
with Highland.  And so what we did is we negotiated for and
got from Dondero -- really, I mean, Jim ultimately made the
decisions at Highland.  He said, look, if you don't -- if this
doesn't work, if it doesn't go through, we'll make you whole.
And so we got that provision in the compensation and award
letter that says if the actual refund deviates materially from
the refund, then you'll get substitute compensation.  And that
was enough for us, --

Q   And --

A   -- and that's what led to this claim.

Q   And was it your understanding that, in terms of making you
whole, that was not just whatever you had to pay back for the
refund, but also interest and penalties?

A   Yeah.

        MR. MORRIS:  Objection.  Leading.

        THE COURT:  Sustained.

        THE WITNESS:  That's fair enough.

BY MR. YORK:

Q   What was your understanding as to what that 'make you

whole' constituted?

A   It was basically to put me and the others back in the position of getting to that number that was listed in the document.  So if there were any interest, penalties, pullbacks from the IRS, then we would be made whole at that -- we'd get back the net of that number.  However, if the IRS was fine with it, we wouldn't get anything.

Q   So there's a chance, depending on how the IRS audit turns out, if the IRS says what Highland did was fine, then you don't owe the IRS anything, right?

A   Yeah.  That's been a critical thing, that I may not owe the IRS anything, and certainly I wouldn't expect Highland to give me anything.

Q   And at that point, what's been reserved as your reserved claim would effectively at that point, from the IRS perspective, the IRS audit perspective, would be a zero dollar amount, right?

A   Yeah.  I mean, more so.  I mean, Jim Seery offered to buy me out with an amount of the reserved claim.  And I said, listen, I'm not looking for a windfall here.  What I'm looking for is to be made whole, --

Q   Right.

A   -- it's my insurance policy on what I earned back in 2008, because the alternative is I will have ended up working for free in 2008, plus have to pay penalties and interest going

forward that could wipe out my net worth.

Q    All right.

A    So I wanted the insurance policy aspect of it.

Q    So you heard Mr. Seery's testimony earlier where he said the total amount you would owe was somewhere in the range of $1.4 to $1.5 million if there was --

A    He's wrong about that, if that's what he said.

Q    Why?

A    At the time -- I think the number he was referencing was in our claim number that I filed back in, I want to say, October 2020.  And the $1.45 million, what was in the compensation -- was the number in the compensation and awards letter.

The other number that I spoke about from the gallery out there was one point -- I don't know, whatever the interest -- whatever I guessed the interest might be.  And then I didn't have anything for penalties.  So, at that particular time, took those numbers and said, okay, if the IRS says no way on all this, this is what I'd have to pay, not including penalties.

Q    All right.  So you've seen today and you listened to the testimony about the footnote in Highland's adversary complaint against you in which they say that the resolution may not be until 2029 of this IRS audit?

A    That's correct.  I've heard that.

Q    All right.

A    I've seen it and heard it.

Q    All right.  As you've sat here today, have you done any calculation back of the napkin to try to estimate what your potential exposure would be to the IRS in terms of interest and penalties as a result of that audit dispute if it wasn't resolved until 2029?

A    Yeah.  I listened to the judge.  I went and ran '33 because that was a number that was just thrown out.  At '33, if it's 2033, it's $7.4 million, and if it's 2029 it's $5.7 million.

Q    What sort of financial impact would that have on you?

A    The latter would pretty much wipe me out.  I'm sorry.  The former would -- the $5.7 million would wipe me out.  The latter would cause me to file for bankruptcy.

Q    Okay.  Mr. Seery also discussed his -- that he had heard through the grapevine that the IRS audit had been resolved. Has anyone from Highland ever told you that the IRS audit is resolved?

A    No one's told me that from anywhere, anyhow, anyway.

Q    Have you had a conver... have you had -- so nobody at all, right?

A    No one at all.

Q    Have you -- did you have a conversation recently with Kurt Plumer over it?

A    I did. I had lunch with him at Hillstone.

Q    Did he mention it at all?

A    No.

Q    All right. Could you turn with me to, in your exhibit binder, Exhibit 8, please?

A    Yeah.

Q    All right. Can you just identify for us what this document is?

A    This is a letter I got from the IRS dated November 20th, 2024, basically telling me that the case is open and I may owe money.

Q    And specifically, if we look at the first paragraph, it says, "Why You're Receiving This Letter," in bold, right?

A    It does.

Q    And then below that it says: We might have to adjust your tax return based on our examination of the Highland Capital Management listed above.

Did I read that part correctly?

A    Yes.

Q    And so is it your understanding that your -- that this is related to the IRS audit of Highland?

A    That is my understanding.

Q    And that your tax return, your personal tax return may be adjusted as a result of that?

A    Mine and my wife's.

Q   Which would mean you're subject to interests and penalties as well?

A   As is she.

Q   Okay.  And is this the only letter you've ever received from the IRS?

A   No.

Q   Related to the Highland Capital Management audit?

A   No.

Q   All right.  Do you receive these periodically?

A   Yes.  The initial one came I want to say about five months after we filed the returns in two thousand -- it was for the calendar year 2008, so it was April 15th, 2009, I want to say. Maybe it was -- I think the first one came around October, late October 2009.

Q   And --

A   Like this.  I can't -- I don't remember it verbatim.

Q   Is this the last communication you have received from the IRS relating to Highland's IRS audit?

A   This was it.  Yeah.

Q   Okay.  Has anyone from the IRS ever told you that an FPAA has been issued --

A   No.

Q   -- with respect to the Highland's audit?

A   No.  I don't even know what that -- I didn't even know what that was.

Q    And you've never received an FPAA from the IRS, right?

A    I have not.

Q    And you've never -- nobody else has ever sent you an FPAA related to the Highland audit, right?

A    No.

MR. MORRIS:  I'm being kind, but this is just --

THE COURT:  It's leading.

MR. MORRIS:  -- testifying from the podium.

THE COURT:  Sustained.

THE WITNESS:  Yeah.

BY MR. YORK:

Q    All right.  Mr. Daugherty, would you turn -- we'll switch topics real quick to the tolling agreement.  Would you turn in Volume 1 of the Highland exhibits to Exhibit 60, please?

A    Volume 1, and then which one, I'm sorry?

Q    Exhibit 60.

A    Yeah.  Yes, I'm there.

Q    Why did you enter into -- well, back up.  Strike that. Start over.  This is the tolling agreement extending a claim objection deadline between you and Highland Capital and the Highland Claimant Trust as of July 27th, 2022, correct?

A    That is correct.

Q    And is it your signature on Page 6 or 7 of the document on the left-hand side?

A    It appears to be, yes.

Q    All right.  Why did you enter in this tolling agreement? Why did you enter into --

A    I'm sorry, what was your question?

Q    Why did you enter into this tolling agreement?

A    Jim Seery had reached out to me in 2022 and said that they had a problem with -- the Court had an objection deadline that was running and that was somewhat inconsistent with the settlement agreement that we had just gotten approved in early March of 2022 that said they couldn't object, they being Highland, object to the legitimacy or amount of my compensation claim.

So he said, look, you know, we're in a little bit of a predicament here.  We can go to the Court or we can try and work this out.  And I'm like, hey, I'm fine to work it out.  I don't want the estate to be burdened or any way.  So we went back and forth on the document, and ultimately I felt that it was the right thing to do.  The spirit of our settlement was, you know, I -- they couldn't -- they couldn't challenge this part of my claim, but the *quid pro quo* was I'm not going to be able to beat them out on a technicality by running in here, saying, ah, the objection deadline, you know, expired.

So his solution seemed to be a reasonable one.  And we worked with their counsel, I think Demo and to some degree Morris, to work that out for them.

Q    How did the estimate come about in Footnote 3?

445

A    I don't know.  Nobody ever asked me about it.  There was no -- Mr. Morris is right, there was no negotiation about it. Because, frankly, I didn't see that as my problem.  They had something to fulfill pursuant to the plan.  And there was no back and forth on that reserve amount with Seery whatsoever. He just said, This is what we're doing and, you know, we're going to put this -- and my perception is I didn't have any right to challenge it other than what was in my settlement agreement.  And I looked at that as a one-time right to go and seek an estimate, and I didn't want to do it that early in the process.

Q    Would you take a look with me at the last recital that's on Page 3 of the document?  All right.  It says, --

A    Oh.  You're going to make me read.  All right.

Q    It says:  Whereas, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, and without any party admitting liability, fault, or wrongdoing, or releasing or waiving any rights or defenses with respect to the reserved claim, the parties desire to enter into this agreement to extend the claim objection deadline solely with respect to the reserved claim to January 11th, 2023 at 5:00 p.m. Central Time, defined as the Objection Deadline.

    Did I read that part correctly?

A    You did.

Q    What was your understanding of this recital provision

being put in here?

A    Well, I think I just kind of summarized it.  There was a problem that the parties didn't, you know, fully recognize could occur that would give me a windfall, and so this was to kind of solve that on an interim basis until we got to a final resolution on this tax refund thing.

I mean, the honest truth, God -- Judge.  Not God, Judge. But the honest-to-God's truth is Seery and I had a very good relationship, and we were going back and forth, and his view was that this thing could get resolved in 2022.

Q    Did you have an understanding as to whether or not you were reserving all rights with respect to your reserved claim under the terms of the tolling agreement?

A    Absolutely I did.  Both in emails and in the document.

Q    All right.

MR. YORK:  Pass the witness.

THE COURT:  All right.  Any cross?  I'm assuming Dugaboy did not have questions.  And, Mr. Daugherty, I should have --

MR. LANG:  No, we do not.

THE COURT:  Okay.  Thank you.  Cross?

CROSS-EXAMINATION

BY MR. MORRIS:

Q    Good afternoon, Mr. Daugherty.  Take your time.

A    How are you, Mr. Morris?

447

Q    Good.  I just have a few questions.  You have been paid in full on your Class 9 claim, correct?

A    Evidently, yes.

Q    And that Class 9 claim was for $3.7 million, correct?

A    I believe it was $3.75 million.

Q    Thank you for the clarification.  Do you recall how many payments you received that resulted in your receipt of $3.75 million?

A    I don't.

Q    When you received those payments, did you tell Mr. Seery -- did you send it back to Mr. Seery out of any concern that your Class 8 claim has not been resolved?

A    No.

Q    When you received those payments, did you object to Mr. Seery or to anybody else that it was improper for the other Class 9 holders to receive the payments when your Class 8 claim had not been resolved?

A    I had no idea what they were receiving.

Q    Did you have any reason to believe that you were receiving a benefit that the other Class 9 claim holders were not receiving?

A    Again, I had no idea what they were receiving, so I can't compare the two.

Q    Okay.  But it is true that you accepted without protest your Class 9 payments, even though your Class 8 claim had not

been resolved, correct?

A    I think that's accurate.

Q    Okay.  I think you mentioned in your proof of claim it had $1.4 million; is that right?

A    Again, I'm cuffing it.  If you could grab it, I'll -- I want to say it was -- the proof of claim had two components, as I mentioned.  There was a, as I mentioned, there was the compensation award amount from my compensation letter of like $1.475 million.

Q    Uh-huh.

A    Don't quote me on that, but close enough.

Q    Approximate.

A    And then an interest component that would take me up to that particular time if the IRS reversed it.

Q    Okay.

A    But no penalties were included.

Q    And that approximately $1.45 million, that's money that you received back in 2009?

A    I didn't get that full amount in 2009.  That was -- I don't want to broaden this up too much, but many times what was promised was not what was delivered.  So I got a lesser amount from the IRS.

Q    How much less did you receive?

A    I want to say, on a net basis, it was just under $1.2 million.

Q   Okay.  And so it's true that you've had the benefit of the $1.2 million for 15 years now?

A   When you say the benefit, what do you mean?

Q   It went into your pocket 15 years ago.

A   Yeah, but it's a contingent liability I have back to the IRS, so I can't say that it's, you know, not without reservations.

Q   But you've had possession of that million and a half dollars now for 15 years, correct?

A   Right.  And with it comes an obligation --

Q   Okay.

A   -- contingent back to the IRS.

Q   Your claim is a prepetition claim; is that right?

A   What do you mean by my claim?  Are you talking about the compensation one?

Q   Yes.

A   Yeah.  I mean, that -- that contractual obligation originated in, well, yeah, February 2009.

Q   It's not an administrative claim, right?

A   I don't believe so, no.

Q   It's just -- it's just a claim that existed prior to the petition date.  Fair?

A   That is fair.

Q   Okay.  With respect to the reserve, you did agree to that amount of the reserve, fair?

A    I did not.  I mean, I -- I signed the document, but I did not agree to that amount.

Q    Well, --

A    I did not negotiate for it or anything like that.

Q    Well, but if you turn to Exhibit 60 that you just looked at, --

A    sure.

Q    -- and you go towards the end of the document, that is your signature on the first Page 7, right?

A    Yeah.  I've already admitted that.

Q    And Paragraph 1 of the agreement that you signed specifically set the reserve at the amount set forth in Paragraph 1, correct?

A    That much is true.

Q    Okay.  And you --

A    You just said, did I agree to it, and I'm like, it was in the document.

Q    It's in the agreement that you signed, correct?

A    For sure.

Q    Okay.  And you've never asked for that amount to be adjusted, correct?

A    I've spoken many times to Mr. Seery and told him that it will need to be adjusted upward as years go by.  We've had quite a dialogue along those lines.

Q    Okay.  But he's never agreed to do that, correct?

A    He said when the time comes, we'll figure out -- listen, we had a very collaborative relationship up until like the last year.  And so it was like, hey, I'm not going to press you.  You don't -- he's fighting off Dondero right and left.  You know, and I'm like, I don't want to get in the middle of all this.  You go do what you've got to do.  We'll both sit tight.  In fact, there was dialogue to that very effect.

Q    Uh-huh.

A    And so this was just all part of sitting tight, thinking that the right thing would be done when we got final analysis to this.

Q    Okay.  So would you just agree with me that, since signing this agreement, you haven't come to court to seek an adjustment --

A    No.

Q    -- of the reserve?

A    I did not want to be a burden.

Q    Okay.  And since signing this agreement back in 2022, you and Mr. Seery have not come to an agreement on any adjustment to the reserve, correct?

A    We have not.

Q    Okay.  Do you believe that you have claims against Highland's employees?

MR. YORK:  I'm going to object on relevance grounds.  Also, outside the scope.

THE COURT:  What is the relevance?

MR. MORRIS:  We're going to get to the $20 million demand in a moment.  I'm laying the foundation.  But we have anybody on anybody --

THE COURT:  But what's the $20 million demand?

MR. MORRIS:  I'll get to it in a moment.

THE WITNESS:  There's --

THE COURT:  I can't figure out if --

MR. MORRIS:  I can make a proffer if you'd like.

THE COURT:  -- that's relevant.

MR. MORRIS:  I can make a proffer, Your Honor.  I'll tell you.  I'll tell you right now.

On June 5th, Mr. York called me and said that Mr. Daugherty asserts that he has claims against the Highland employees, and if Highland didn't pay him $20 million he was going to sue them, and he was going to file this objection together with a petition in the Supreme Court opposing Highland's request to stay the issuance of a mandate in the Fifth Circuit.

MR. YORK:  First off, if Mr. Morris is going to become a witness, we've got a problem here.  Secondly, any sort of communications between us would be 408.  And third, it's not relevant to the issue we're here on today.

THE COURT:  Okay.

MR. MORRIS:  My response to that, Your Honor?

THE COURT: All right. I'm going to allow a little latitude, --

MR. MORRIS: Yeah.

THE COURT: -- but I'm still unclear --

MR. MORRIS: It's about -- it's about three questions.

THE COURT: Okay.

MR. MORRIS: It's about three questions.

THE COURT: You may proceed.

BY MR. MORRIS:

Q    Do you believe you have claims against Highland's employees?

A    Me personally, no.

Q    Okay. Do you -- did you authorize your lawyer to call me and to demand $20 million in exchange for a release and your standing down from filing any objection to this motion?

A    I'm not aware that that ever happened. Nobody demanded anything of you.

Q    Really?

A    Yeah.

Q    Do you know that your lawyer used the number $20 million to me?

A    Oh, I've read the emails back and forth between you.

Q    So why don't you explain to Judge Jernigan what your understanding is as to what your lawyer meant when used $20

million to me.

A    I can't say for sure what he meant, but I can tell you from my perspective what I understood.

Q    What did you understand?

A    I have another entity that I picked up in the settlement with Highland called the Highland Employee Retention Asset Fund.  And again, pursuant to the settlement agreement, I mean -- I guess supposedly, I guess, when I think about it, I do have claims individually, because it's with me, that agreement.

But it said that Highland had to turn over all the books and records of the HERA fund.  And Mr. Morris was on many of those emails.  And they had turned over some of the books and records, but they didn't turn over any of the books and records that implicated Thomas Surgent and David Klos in defrauding HERA in allocating Highland's expenses when they were litigating me, against me, back to HERA.

So I do have a settlement agreement with Highland and these employees, but Highland Employee Retention Assets needs their books and records.  And we've made it very clear to you on numerous emails where you, you know, kind of muscled up on us and said this is all you're going to get and tough if you don't like it or whatever.

And so the deeper we get into this, we did get discovery from others, we found that Highland's been withholding

material information.

So as it relates to -- I mean, you're doing that little squeaky thing, and I think he's a fantastic lawyer, but the reality is you guys have created some damages to HERA that you may be accountable for. Your clients, not you.

Q   Okay. In the four years since we signed the settlement agreement, you've never asserted a breach of contract claim, have you?

A   Well, because we thought you were complying with it. So if you want to go into the details there, in 2022, we were -- asked for more information. 2023, we asked for more information. 2024, we asked for more information. And so those are continuing breaches.

Again, I -- I don't want to go to war with Highland. You're too damn good of an attorney, you're scaring me a little bit. But --

Q   I don't want to.

A   You know, listen. You know I think well of you.

Q   I appreciate that.

A   But, you know, I mean, I just wanted the information. I'm not looking to go to war with you guys. I got enough battles that I've got to fight. And so, you know, I guess a number was thrown out or whatever. I don't know the full context of it. But it wasn't -- it wasn't for this IRS compensation issue.

Q    But what was the -- my last question.  What was the $20 million demand for?

A    Again, it's just a number.  Y'all were having settlement negotiations.  So, I mean, you work off of it.

Q    All right.

MR. MORRIS:  I have no further questions, Your Honor.

THE WITNESS:  Yeah.

THE COURT:  All right.  Any redirect?

MR. PHILLIPS:  I have no questions, Your Honor.

THE COURT:  All right.  Okay.

MR. YORK:  Apologies.  I wanted to make sure.

THE COURT:  Yes.

MR. YORK:  No redirect, Your Honor.

EXAMINATION BY THE COURT

THE COURT:  Okay.  If you've watched Highland hearings, you know the judge sometimes has questions.  I am still trying to understand the 1.4, the 1.2, the 1.475.  I understand broadly that, in essence, a cash bonus was negotiated back in early 2009, I think you said.

THE WITNESS:  Yes.

THE COURT:  After 2008.  And so that's, in essence, what was contractually negotiated.  But I understand there was a hook, if you will, we're calling it a contingency, whatever word you want to use, where if one day there was an IRS audit and I guess Highland had extra liability for 2008, that this

-- I don't know if I understood it or not.

THE WITNESS:  Do you want me to try and guess what you're asking, or --

THE COURT:  Try to guess what I'm asking.  Again, I'm --

THE WITNESS:  The liability -- so, Highland chose to use this tax scheme as a currency to pay us a cash bonus.  From our perspective, we weren't stupid.  We're like, well, okay, that's great, but if the IRS says --

THE COURT:  Okay, I just want to know what -- you say you were contractually entitled to $1.4 million.

THE WITNESS:  That's what I was supposed to get for that bonus year.

THE COURT:  Okay.  But there was a tax contingency, if you will, where -- that's where I want you to jump in.

THE WITNESS:  So, Highland had a tax problem.  They came up with this mechanism to use whatever they were doing with the IRS to create the cash to pay us a bonus.  We looked at it and said, well, this looks fishy -- by the way, every year before that and after that, I've just gotten a cash bonus.  But for this one year, when the banks are saying, no, no, no, we get this.  And so we looked at this and said, look, this sounds fishy, but if you can't pull it off, we need to be made whole.  I can't be in a situation where here I am in 2025 and I may have to pay $5, $6 million to the IRS for the

MR 1018

pleasure of working at Highland.

THE COURT: Okay. See, that's where my disconnect is.

THE WITNESS: Uh-huh.

THE COURT: Because I thought this all turned on a Highland tax return.

THE WITNESS: Oh, no, no. So, Highland did the planning and the creation of the scheme, and I guess ultimately it was Highland's tax return, but it flowed through to us as pass-throughs. K-1s, what have you.

THE COURT: Right.

THE WITNESS: So I guess it's both.

THE COURT: Okay. You were a partner.

THE WITNESS: Well, that's debatable, too. That's debatable, too, because I had a --

THE COURT: Okay. I thought you weren't, but --

THE WITNESS: Well, I wasn't --

THE COURT: But you got -- okay. Let me just skip to, --

THE WITNESS: Yeah.

THE COURT: -- I guess, the important part. You did, you got paid? You said $1.2 million?

THE WITNESS: Yeah. I got a refund back from the IRS for around that amount. Slightly under $1.2 million.

THE COURT: So the contingency you are worried about

that you think gives you a contingent claim against Highland is, what, the IRS comes back and says --

THE WITNESS:  And they say, Give us that money back plus interest plus penalties or we're taking your house.  And it's a very real threat, because this has gone on, as you've noted, forever.  And I went from having a one-point-whatever bonus to possibly having to pay six, seven, eight, I don't know how long this lasts, million dollars back to the IRS for an election that was made by them.  As a substitute for paying me a cash bonus the regular way, they did it this way.  And that's why we put and negotiated for that term in the compensation agreement that said, if for whatever reason the actual refund is different, we get made whole.

THE COURT:  Okay.  I may be overthinking this, I do do that sometimes, but I'm still, I'm trying to understand why your claim would escalate up to, you know, you said maybe $5.7 million if, in 2029, this all plays out with the IRS.

THE WITNESS:  That --

THE COURT:  Because you've gotten the benefit of that money and --

THE WITNESS:  Well, no, because if the IRS says --

THE COURT:  -- return on that.

THE WITNESS:  Sorry.  I didn't mean to interrupt.

THE COURT:  You know what I'm saying?  So I'm trying to figure out why it would grow in the way that you're

MR 1020

suggesting.

THE WITNESS:  Can I respond?

THE COURT:  Yes.

THE WITNESS:  So I've gotten money that the IRS says is not mine.  Right?  And the IRS says --

THE COURT:  And you've had the use of it.

THE WITNESS:  Oh, yes.

THE COURT:  You've presumably invested it and --

THE WITNESS:  Well, no, I mean, you can't --

THE COURT:  Well, you've had the ability to.  Uh-huh.

THE WITNESS:  But you don't want to take risk with something that's not yours, so you're kind of limited, right?  But I have, I have that amount of money.  Here's the problem, Your Honor, with that.  If the IRS says, Give us back our money, here's the interest, here's the principal.  Oh, by the way, if it's $7, $8 million, I can't -- I don't have that.  I've got to file for bankruptcy in order to give the IRS back money that I'm having to pay them for the pleasure that I had of working for Highland in 2008 when I helped save the company and create a lot of the assets that paid all these people in the room.  MGM Studios, Trussway.

THE COURT:  Okay.

THE WITNESS:  Okay.

THE COURT:  Yeah.  We are going beyond this.

THE WITNESS:  Fair enough.

THE COURT: I was just, I'm zeroing in on this because I'm trying to figure out, I mean, it matters to me if that reserve is likely fair enough, the reserve I'm told you agreed to is fair enough. And I'm having trouble figuring out, I mean, if you've had the use of this money for 17 years or whatever that is, why you would get this extra interest add-on that you're -- $5.7 million or whatever it would be. You know, $3 million more.

THE WITNESS: Can I answer that question?

THE COURT: Uh-huh.

THE WITNESS: Because the IRS didn't look at it as my money. They looked at it as their money. And so if you look at the plain language of the compensation award letter, if the actual amount deviates from the amount that was granted, then Highland was going to give me substitute compensation to make me whole. Making me whole includes the penalties and the interest that I would owe the IRS. Because if you look at it any other way, I had to pay money to work at Highland.

THE COURT: Do I have that letter in my evidence?

THE WITNESS: You should. Drew?

THE COURT: Do I? Maybe I'll just cut this off and look at the letter.

MR. YORK: It's at Daugherty 2, and it's at the back of --

THE WITNESS: There's multiple letters, but this is

one of them.

THE COURT: The letter that you say this claim stems from.

THE WITNESS: Sure.

THE COURT: I'll just cut it off and look at that.

THE WITNESS: Yeah, you can tell her where it is.

MR. YORK: So I think it's at the back of the statement on PD-2. It's at the last page, Your Honor.

THE COURT: Which one?

MR. YORK: P -- Daugherty 2.

THE COURT: Oh, 2? I've got emails.

THE WITNESS: P-2? I don't think so.

THE COURT: Okay. We can move on.

MR. YORK: That's fine. We'll work this out.

THE COURT: Before we're done here today, I want to look at the letter to better understand how the claim could grow substantially to --

MR. YORK: Yeah.

THE COURT: -- $5.7 million by 2029. Okay. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're excused.

THE WITNESS: Oh, I found -- I just found it and then I closed it.

THE COURT: Okay. Well, you can --

THE WITNESS: My bad.

THE COURT: -- call my attention to it when you find it.

THE WITNESS: All right.

(The witness steps down.)

THE COURT: All right. Your next witness?

MR. YORK: I believe we're calling Mark Patrick.

THE COURT: All right, Mr. Patrick. All right. Please raise your right hand.

MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT: All right. Please be seated.

And, Courtney, you're going to start the clock going. I show 2:12. I don't know if my clock's right.

You may proceed.

MR. LANG: And, Your Honor, may I hand the witness -- this is from Mr. Morris' opening. May I use this as Exhibit 3?

THE COURT: Oh, okay. You're talking about the back page of his PowerPoint?

MR. LANG: Yes. Org chart.

THE COURT: Yes. I've got it in front of me. And for the record, I'm going to put this PowerPoint, even though it's not an exhibit *per se*, as a demonstrative aid in the file for this matter. And so it's the last item of the Highland PowerPoint. All right.

MR. LANG:  Yes.

DIRECT EXAMINATION

BY MR. LANG:

Q    Mr. Patrick, does this Hunter Mountain Investment Trust org chart that I just handed you accurately reflect the structure of the Hunter Mountain Investment Trust ownership today?

A    Just give me a few moments to review.

Q    Sure.

MR. LEWIS:  Your Honor, I had mentioned early on that we object to this whole line of questioning because it's outside the scope of the objection of Dugaboy.  And I don't want to interrupt, but I want to make sure that my objection is continuing, because this has nothing to do with the objection presented by Dugaboy.

THE COURT:  All right.

MR. PHILLIPS:  So we object to the question.

THE COURT:  Okay.  So the record will reflect basically a running objection from Hunter Mountain?

MR. PHILLIPS:  We would appreciate that, Your Honor.

THE COURT:  Okay.  In light of the failure of Dugaboy to disclose Mark Patrick as a witness, as well as the failure to challenge in a written objection his authority.  Okay.  So I recognized that this was quite a persuasive objection, but given the magnitude, I would say, of what is going on here,

465

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this. All right. But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS: And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT: Okay. Understood.

MR. PHILLIPS: Thank you very much, Your Honor.

THE COURT: All right.

BY MR. LANG:

Q    Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A    Yes, I have.

Q    And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A    I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q    Did you help prepare this chart?

A    No.

Q    No? Okay. So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A    Yes.

Q    And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

correct?

A     Correct.

Q     And CLO Holdco, LLC is owned by CLO Holdco, Limited?

A     That's correct.

Q     And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?

A     Correct.

Q     And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

A     The ultimate beneficial owner is DFW Charitable Foundation.  To my -- to the best of my recollection, I would say that appears accurate.  I'm just not a hundred percent.

Q     Okay.  And --

A     But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner.  And I'm a hundred percent that Dugaboy Investment Trust has no interest in it.  And I'm also a hundred percent that The Dallas Foundation or any --

          MR. LANG:  Judge, I haven't asked --

          THE WITNESS:  -- or any other nonprofit has any --

          MR. LANG:  -- any of these questions.

          THE COURT:  Okay.  There's an objection, nonresponsive.  I sustain.

BY MR. LANG:

Q     Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?

A     (Pause.)  I'm just waiting for a relevancy.  I don't

MR 1027

understand how that's relevant to my authority --

THE COURT: Okay. You're not allowed to make a relevancy objection. Okay.

MR. PHILLIPS: Your Honor, I think the problem is that, if I could, we have made an objection. And our objection, our running objection is founded on relevancy and founded on improper process. So I would like to just tell the Court, and so my client representative can hear it, that the fact that I'm not standing up every time there's a problematic question, --

THE COURT: Okay.

MR. PHILLIPS: -- because every question is problematic, my objection is being maintained to every question that's being asked.

THE COURT: Okay. You understand that, right?

THE WITNESS: I --

THE COURT: There's a running relevancy objection. You're the witness. You can't make the objection. But it's on the record for whatever use it might have down the road.

MR. PHILLIPS: I have objected to every question that's coming in connection with this line of questioning on the basis of relevance.

THE COURT: I got it. I think we all have it.

MR. PHILLIPS: I'm just --

MR. LANG: Understood.

THE COURT: Yes. And you're thinking he's eating into your 30 minutes?

MR. LANG: Yes.

THE COURT: Okay. We've got it.

THE CLERK: I stopped the time.

MR. LANG: So -- thank you.

THE COURT: Did you stop the time for a minute?

THE CLERK: Yes, I did.

MR. LANG: Thank you.

THE COURT: Okay.

BY MR. LANG:

Q    So, to my question, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct? Charitable DAF Holdco, Limited?

A    And where is that on the chart?

Q    I'm asking, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, Limited.

A    Can you show me a corporate document so I know the precise corporation you're referring to?

Q    You're the -- you are the manager of -- or the control person of CDHGP Limited, correct?

A    Again, I'd have to refresh my recollection, but I am the control person over CDMC.

Q    Okay. And CDMC --

A    As well as Charitable DAF Fund. I'll represent that to

you.

Q   Okay.  Was there a transaction in December of 2024 where Charitable DAF Holdco, Limited sold its interest or transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A   I know you're trying to help other litigation and --

MR. PHILLIPS:  Mark.

THE COURT:  Okay.  Nonresponsive.

THE WITNESS:  Your Honor, he's using your time to fish for other litigation to support that --

THE COURT:  Okay.  Okay.  We have a running objection to relevance.  I'm going to say that one more time.  Okay. Just answer the question as best you can.

THE WITNESS:  I'd have to review the corporate documents to refresh my recollection for that time period.

BY MR. LANG:

Q   Up until December of 2024, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF Holdco, Limited, wasn't it?

A   I don't know what entity you're referring to without a refreshment of corporate documents of that entity.  There could be a lot of entities called that.

Q   You're aware that there is a proceeding in the Caymans investigating the December 2024 transaction that sold -- where Charitable DAF Holdco, Limited sold its interest in -- and or

MR 1030

transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A    There are several parts to that question.  So the answer is no.

Q    Are you aware of a proceeding pending in the Caymans involving Charitable DAF Holdco, Limited?

A    Again, I don't know what entity you're referring to.  Show me a -- show me a corporate document.

MR. LANG:  Your Honor, this was on the Foundation's exhibit list.  We cross-designated any document designated as an exhibit by any other party in this case.  And I'd like to hand this to the witness.

MR. MORRIS:  Which exhibit is it?

THE COURT:  Which is -- yes.

MR. LANG:  It was on the -- it was on the DAF -- or, the Foundation's exhibit list.

MR. MORRIS:  They haven't been admitted into evidence and they've withdrawn their objection.  We object, Your Honor.

THE COURT:  Yes, they've not been admitted.

MR. LANG:  Okay.  Well, can I --

MR. PHILLIPS:  We object to that, Your Honor.  We object to any witness --

MR. LANG:  We cross-designated every --

THE COURT:  I already discussed at the beginning what we were admitting and that was not disclosed.

MR 1031

MR. LANG:  Okay.

THE COURT:  As I recall, I said you've only designated the plan and settlement agreement, and the answer was yes.

MR. LANG:  Okay.

BY MR. LANG:

Q    And we're aware that the Joint Official -- are you aware that there is a Joint Official Liquidator appointed over a Charitable DAF entity in the Cayman Islands?

MR. PHILLIPS:  Objection to form.

THE WITNESS:  Again, without more specific --

THE COURT:  Overruled.  Yes.

THE WITNESS:  -- specificity, there could be a thousand different actions that you're referring to, in my mind.

BY MR. LANG:

Q    Are you aware that the Joint Official Liquidators in the Caymans are investigating transactions involving Charitable DAF Fund, LP and Charitable DAF Holdco, Limited?

A    Again, again, I don't specifically know what you're referring to.

MR. PHILLIPS:  Your Honor, may I -- excuse me.  I don't know that my running objection includes an objection to form for each of the questions.  This objection is to form of the questions about, quote, --

THE COURT:  What's wrong with the form?

MR. PHILLIPS:  -- investigation.

THE COURT:  What is wrong with the form of that question?  I'm not clear.

MR. PHILLIPS:  My objection to form is that the question is an open-ended question with an undefined term, investigation.

THE COURT:  Overruled.  I don't think that's a vague term.  So you may answer.

THE WITNESS:  If you show me some document, some complaint or something, I'll be very happy to verify whatever questions related to that.  But just giving me verbal words of entities and names and actions, I don't know precisely what you are talking about.

BY MR. LANG:

Q   Mr. Patrick, who set up the entities in the Hunter Mountain Investment Trust org chart that is sitting in front of you?

A   I'm sorry.  Repeat the question?

Q   Who set up the various entities that are in the org chart that is on your -- on the stand?

MR. PHILLIPS:  Objection to form.  Set up.  What does that mean?

THE WITNESS:  It -- yeah, it's very --

THE COURT:  I think we know what it means.  Creating,

perhaps.

BY MR. LANG:

Q    Created?

A    Who?  Are you asking if I created it?

Q    Did you participate in creating them?

A    Did I participate?  In which ones?

Q    CDMC FAD, LLC.

A    What do you mean by participate?

Q    Were you involved in creating -- did you initiate the creation of CDMC FAD, LLC?

A    Lawyers were.

Q    Did you engage in any capacity on behalf of any entity? Were you involved in engaging the lawyers to set up CDMC FAD, LLC?

A    Yes, I engaged lawyers to set up entities.

        MR. LANG:  Objection.  Nonresponsive.

        THE COURT:  Sustained.

        MR. LANG:  Did you --

        THE COURT:  He asked about this one particular entity, I think.

BY MR. LANG:

Q    Did you --

A    Which entity, again, did you ask?

Q    CDMC FAD, LLC.

A    Yes, I believe I hired a lawyer.

474

Q    And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?

A    Around the end of March of 2025.  I believe.

Q    And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?

A    What do you mean by involved?  How?

THE COURT:  Okay.  I can see what's happening here or I have an impression of what's happening here.  I feel like you're slowing down this process where I've given 30 minutes to this lawyer.  Okay?  And I feel like you're feigning confusion.  I don't mean to be insulting, but that's how it comes across.  Okay?  So I need you to speed up your answers and not be confused about things you shouldn't be confused about.  Okay?

THE WITNESS:  Okay.

THE COURT:  I feel like it's late 1980s *Dondi*.  Does anyone know what I mean by that?  Okay.  We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling.  That's what they did in *Dondi*.  Confusion.  Delay.  Okay?

So I don't mean to chastise you.  I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this.  Okay?

Patrick - Direct 183

THE WITNESS: Understood.

THE COURT: Thank you.

BY MR. LANG:

Q    Okay.  So you were involved in the transaction in which CDMC FAD, LLC acquired 100 percent ownership interest in Charitable DAF Fund, LP in or around March of 2025, correct?

A    Correct.

Q    Who did CDMC FAD, LLC obtain its interests in Charitable DAF Fund, LP from in March of 2025?

A    From an -- from an entity called Charitable DAF Holdco, Ltd.

Q    Charitable DAF Holdco, Ltd., the entity that I asked about earlier, correct?

A    Of the same name.

Q    Yes.  And Charitable DAF Holdco, Ltd. has had Joint Liquidated -- Liquidators, Joint Official Liquidators appointed over it in the Cayman Islands, correct?

A    Yes.

Q    And those Joint Official Liquidators were appointed over Charitable DAF Holdco, Limited in or around May 6th, 2025?

A    In May is what I recall.

MR. LANG:  Your Honor, we'll pass the witness.

THE COURT:  All right.  Do we have any questions?

MR. YORK:  No questions, Your Honor.

THE COURT:  Okay.  Any cross?

MR. MORRIS:  Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q    Mr. Patrick, do you know who initiated the proceedings to get the appointment of the Joint Official Liquidators in the Cayman Islands?

A    The director and myself, we initially filed for a voluntary joint liquidation in May.

Q    And did there come a time when the Cayman court appointed the Joint Official Liquidators?

A    Yes.

Q    Do you know who asked the court to appoint the Joint Official Liquidators?

A    We did, as well as other -- it was an agreement with the participation holders of that entity.

Q    And who are the participation holders of that entity?

A    It was the DFW Charitable Foundation as a 51 percent holder as well as the Highland Dallas Foundation, Highland Santa Barbara Foundation, and the Highland Kansas City Foundation.

Q    And those three foundations that you just mentioned, do you know who controls them?

A    Jim Dondero.

Q    Is it your understanding that Mr. Dondero was funding the litigation in the Cayman Islands?

Patrick - Cross
185

A    Yes.

Q    The Joint Official Liquidators, are you aware of any statement that they've ever made that you are not authorized to act on behalf of any of the HMIT entities?

A    Yeah, they've never made a statement that I'm not authorized to act under any of those entities.

Q    Okay.  Did you receive a letter last night that was purportedly authored by the Joint Official Liquidators?

A    Yes.

Q    Did you review that letter?

A    Yes.

Q    Did that letter refer to today's hearing?

A    Yes.

Q    Are you aware of the Joint Official Liquidators making any appearance in this proceeding?

A    No, I'm not aware they made any appearance in this proceeding.

Q    Based on your recollection of the contents of that letter, did the Joint Official Liquidators challenge your authority to enter into the settlement agreement on behalf of the HMIT entities?

A    No, they did not, because there's no ownership interest.

Q    Okay.  And what do you mean by that?

A    The entity in liquidation owns nothing.  And the DFW Charitable Foundation is the ultimate beneficial owner.

478

MR 1038

Patrick - Cross
186

Q    Are you aware that The Dallas Foundation filed an objection to the settlement agreement on behalf of Empower Dallas Foundation, the Okada Family Foundation, and Crown Global?

A    Yes.

Q    Are you aware that that objection was withdrawn?

A    Yes.

Q    Was the withdrawal of that objection the product of negotiations that your counsel had with lawyers for The Dallas Foundation and Crown Global?

A    Yes, it was.

Q    Did The Dallas Foundation or Crown Global require you to surrender your control position of the HMIT entities as a condition to the withdrawal of their objection?

A    To give up my control?  No.

Q    They didn't ask you to do that, did they?

A    No.  No.

Q    You are the control person for each of the HMIT entities that are party to the settlement agreement, correct?

A    That is correct.

Q    Are you aware of any requirement in any of the governance documents --

          MR. CURRY:  Your Honor, I'm not questioning, but I'm going to object to the line of questioning here about what was asked and what was not received into negotiations, because,

479
MR 1039

frankly, you're getting an imperfect picture there. And I don't think it should be misrepresented. The communications didn't happen with Mr. Patrick.

THE COURT: Okay. I don't know if that objection was a confidential settlement communications.

MR. CURRY: It's a combination of foundation and that he's going into confidential settlement discussions.

MR. MORRIS: Your Honor, it's a very simple question. I'll ask it again.

THE COURT: Okay. We'll let --

BY MR. MORRIS:

Q   To the best of best of your knowledge, Mr. Patrick, did The Dallas Foundation or any of the entities on whose behalf it filed its objection require you to surrender your position as the control person of the HMIT entities in exchange for the withdrawal of their objection?

A   No, they did not.

Q   Thank you. Are you aware -- are you familiar with the governance documents for the HMIT entities?

A   Yes, I am.

Q   Are you aware of any restriction on your ability to act on behalf of those HMIT entities with respect to -- withdrawn. Are you required to obtain the consent of anyone in order to enter into the settlement agreement on behalf of the HMIT entities?

A    No, I am not.  I'm the sole authority and control person for that entity.

Q    And do you believe that you're entering into the settlement agreement on behalf of the HMIT entities in good faith?

A    Yes, I do.

Q    Have you received legal counsel before entering into the agreement?

A    Yes, I have.

Q    Do you believe that you've negotiated the best terms that you could get on behalf of the HMIT entities?

A    Yes, I do.

Q    Do you believe that you received the information that you believed you required in order to make an informed decision before you entered into the settlement agreement on behalf of the HMIT entities?

A    Yes, I did.

          MR. MORRIS:  I have no further questions, Your Honor.

          THE COURT:  All right.  Mr. Phillips, anything from you?

          MR. PHILLIPS:  No questions.

          THE COURT:  Okay.  Any redirect?

          MR. LANG:  Briefly.

          THE COURT:  Uh-huh.

          MR. LANG:  Your Honor, because they mentioned the

letter of last night from Grant Thornton, the Liquidators, I'm going to offer that into evidence as the letter that we talked about this morning. But Mr. Morris directly asked him if he reviewed it and asked him questions about it.

THE COURT: Response?

MR. MORRIS: No objection, Your Honor. Go right ahead.

THE COURT: I'll admit it.

MR. LANG: This is --

THE COURT: Do I have it in my notebook?

MR. LANG: -- Dugaboy --

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. LANG:

Q   Mr. Patrick, I've handed you --

THE COURT: We're going to call this Dugaboy 3?

MR. LANG: Dugaboy 3.

THE COURT: Okay.

(Dugaboy Investment Trust's Exhibit 3 is admitted into evidence.)

BY MR. LANG:

Q   Mr. Patrick, I've handed you a letter. It's from Grant Thornton dated June 24th, 2025. Do you see that?

A   Yes.

Q   And is this a true and correct copy of the letter that you

Patrick - Redirect 190

received or that you reviewed from the Joint Liquidators that you referred to in your answers to Mr. Morris' questions?

A   Well, it's a PDF.  I mean, I'm assuming it's from the Official Liquidators.

Q   But this is the letter you were referring to in your testimony a few minutes ago?

A   Yes.

Q   And do you see on the second paragraph it says that, on May 6th, 2025, the Grand Court of Cayman Islands Financial Services Division appointed Margot MacInnis and Sandipan Bhowmik, each of Grant Thornton Special Services (Cayman) Limited, as the Joint Official Liquidators of the company.  Do you see that?

A   Yes.

Q   And do you see on the second page, it says:  Since our appointment, we have been diligently investigating these transactions, including a corporate transaction that occurred in or around December 2024 where the company transferred a hundred percent of its interest in the Fund to CDMC FAD, LLC, which resulted in the company being the sole member of CDM and subsequent redemptions of the company's interests in CDM.

   Do you see that?

A   Yes.

Q   Is that your understanding of what is happening in the Caymans right now, is investigating these transactions?

MR 1043

A    Correct.

MR. LANG:  Pass the witness.

MR. MORRIS:  May I just have that letter, please?

THE COURT:  Any recross?

MR. MORRIS:  Yeah, just real brief.

RECROSS-EXAMINATION

BY MR. MORRIS:

Q    None of the transactions that you were just asked about has anything to do with any of the HMIT entities, correct?

A    That's absolutely correct.

Q    Okay.  And now that we have the letter in the record, if you could look at the third paragraph.  Do you see --

A    Yeah.

Q    Do you see it refers to the Highland Dallas Foundation, Highland Santa Barbara Foundation, and Highland Kansas City Foundation?

A    Yes.

Q    Are those the three entities that you referred to earlier that are, to the best of your understanding, controlled by Mr. Dondero?

A    Yes.

Q    Okay.  And this is the letter that you said you reviewed and concluded that the Joint Official Liquidators weren't challenging your authority to enter into the agreement on behalf of the HMIT entities; do I have that right?

A    Yes.  Yes, you do.

MR. MORRIS:  I have no further questions, Your Honor.

THE COURT:  Okay.  I have a question or two.

EXAMINATION BY THE COURT

THE COURT:  And again, I apologize if I sounded harsh earlier.  I recognize different people present different ways when they testify.  It just appeared to me that maybe we were slowing things down unnecessarily.  All right?

THE WITNESS:  I apologize, too.  I'm just a little emotionally upset they're using this proceeding for a benefit someplace else.

THE COURT:  Okay.  My question, very general question:  Do you think this settlement is fair and equitable as far as HMIT is concerned?

THE WITNESS:  Absolutely.

THE COURT:  And could you tell me why?

THE WITNESS:  Yeah.  There was no obvious pathway for HMIT to, in my mind, to receive the residual interest of the bankruptcy estate without a settlement with the Debtor.  Otherwise, it just seemed to me that it would go on forever.  And then I balanced that against the existing litigation and the probability of the outcome weighted against the costs, and determined that it made sense from HMIT's perspective to enter into the settlement agreement.

THE COURT:  Okay.  And you understand that, as part

of this, you're giving up some litigation claims that have been waged now for a couple of years or more?

THE WITNESS: That is correct, but I'm also receiving the Kirschner Litigation, which I did negotiate to receive.

THE COURT: Okay. And there was a note that the estate -- I've heard it called at some point the $57 million note that HMIT owed Highland, a December 2015 note -- that basically gets credited against the capital account. You understand that?

THE WITNESS: Yes, I do.

THE COURT: Okay. And then you understand that if I approve this deal, I'm not sure why there's going to be $500,000 to HMIT and then also another $10 million to HMIT, but subsequent payments could get held up if there are litigation threats to the Highland Claimant Trust. You understand that, correct?

THE WITNESS: Yes, I do.

THE COURT: Okay. I just, I have to ask. I'm confused about what's going on here. I thought that -- well, let me just ask this: Would you consider yourself crossways with Mr. Dondero now?

THE WITNESS: No, but I'll answer the question. Upon advice of counsel, I quit Skyview Group. And upon advice of counsel, I terminated the back office services that Skyview Group was providing to the DAF.

THE COURT: Okay. Well, you said you're getting maybe a little emotional because of other litigation. I'm just trying -- I don't understand what all that other --

THE WITNESS: Unrelated -- well, unrelated to that. They're clearly trying to use this forum to benefit their Cayman actions. They hired U.S. counsel called Reed Smith, and they've been begging for an organization chart to issue a variety of frivolous lawsuits against the operating DAF entities. So I do apologize, but that's a little upsetting to me because I know we're going to -- that I've just fed them a list of targets in another unrelated matter.

THE COURT: Okay. Reed Smith. Here we go again with -- they've made an appearance for Mr. Seery in this litigation.

MR. MORRIS: Exactly. And we have raised that issue.

THE COURT: Okay.

MR. MORRIS: And I'm surprised to hear that they think they still have the ability to do this. But we will pursue that later.

THE COURT: Okay. All right. I had nothing further. Thank you, Mr. Patrick.

(The witness steps down.)

THE COURT: All right. So where are we now? I said that, again, just trying to balance the playing field, if Dugaboy was given the ability to question Mr. Patrick, then I

Dondero - Direct                            195

would allow I guess you want to call it rebuttal in the form

of the Debtor, Reorganized Debtor/Claimant to call Mr.

Dondero.  Do you choose to call him?

MR. MORRIS:  I'm not.

THE COURT:  Oh, and I guess I'll allow you, --

MR. MORRIS:  Yeah.

THE COURT:  -- if you want to put on your client

representative, Mr. Lang.

MR. LANG:  We call Jim Dondero.

THE COURT:  All right.  Yes, we are timing.

Please raise your right hand, sir, Mr. Dondero.

JAMES "JIM" DONDERO, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT:  All right.  Thank you.  The time is

running.

THE WITNESS:  Thank you for the time.

DIRECT EXAMINATION

BY MR. LANG:

Q    Mr. Dondero, do you claim that Mr. Patrick lost authority

to enter into the 9019 settlement -- or, the settlement

agreement that's the subject of the 9019 motion today?

A    Yes.

Q    And when do you claim Mr. Patrick lost authority to enter

into that settlement agreement?

A    I think it's best if I give a timeline.  He left Sky --

can I give a --

MR 1048

MR. PHILLIPS: Objection, Your Honor. Nonresponsive.

THE COURT: Overruled. He can give a timeline.

THE WITNESS: He left Skyview in October, November, walked out the door, never talked to anybody again, never talked to the charities again except through counsel. Never collected severance, anything else. Just walked out the door.

As part of Skyview's review of what he'd been working on and what was the nature and what might have been happening, they discovered numerous abnormalities. They discovered--

THE COURT: Do we have an objection?

MR. MORRIS: We do. We're not going to use this opportunity to smear Mr. Patrick. If the notion is that the breach of the ability to act with authority occurred in May, he should start his timeline in May.

THE COURT: Well, I assumed he was just giving background to explain.

THE WITNESS: Yes.

THE COURT: So I'll overrule.

THE WITNESS: Thank you. I'm going to just give you a little bit of background. Everything that I'm stating is in the public record. I won't do anything to besmirch Mark Patrick. It's all in the public record. It's all in the Cayman pleadings. But there was affidavits regarding embezzlements by vendors where he would request overbilling and the money sent to his house.

MR. PHILLIPS: Your Honor, we're talking about documents outside the scope, not identified, not listed. Objection.

THE WITNESS: It's all --

MR. PHILLIPS: This is not a timeline.

THE COURT: This --

THE WITNESS: It's --

THE COURT: Sustained. We don't have anything in the record. This is --

THE WITNESS: Okay. It's all in the public arena. And so is the insider trading.

MR. PHILLIPS: Objection, Your Honor.

THE WITNESS: So, --

THE COURT: Okay. I sustain.

THE WITNESS: Okay. All right.

And then, yeah, and then there was monies missing. There were large amounts of monies missing from the estate. There was unexplained $16 million of expenses in '23.

MR. PHILLIPS: Objection, Your Honor. They're --

THE COURT: Okay. Explain the relevance, Mr. Lang.

MR. LANG: I thought he was just giving a background.

THE COURT: It's getting rather --

THE WITNESS: Okay, Your Honor. Well, --

THE COURT: -- colorful, shall we say. All right?

THE WITNESS: Okay. Without giving specifics

regarding the embezzlement or --

MR. PHILLIPS:  Your Honor?

MR. MORRIS:  We move to strike, Your Honor.

MR. PHILLIPS:  We move to strike all of this.

MR. MORRIS:  We move to strike all of this.

THE COURT:  Okay.  I grant.  We don't have any evidence of embezzlement.

THE WITNESS:  Okay.  All right.  Without detailing any of the bad acts that we -- that it looked like happened from the investigation, we took all the bad acts and all the investigations and we gave them to the three underlying charities.  Let's remember the DAF is a legacy charity I set up 15 years ago, or actually, Mark Patrick did the documentation back when he was a loyal employee.  And it was three -- around $300 million and about $600 million of liability, I mean, legal claims and other things that were meant to be a family legacy, where the donations would help the community.  We've given out more than $50 million over the years.  And the recognition would help our various companies or our families.  That's what it was.  Okay?

Went to the three underlying charities who were the beneficiaries of the DAF as it existed:  Santa Barbara, Dallas Foundation, Kansas City.  These are large charities that have been around for a hundred years.  I don't control them by any form or fashion.  As a matter of fact, the Hunts are $4

MR 1051

billion out of the $6 billion in Kansas City.  I think I'm a hundred million or whatever.  The DAF was a hundred million. I think the Hunts would be disturbed to hear that I control it.

Anyway, so all those charities were beneficiaries.  And so we went to them with all the investigative results.  And at first, they tried to verify, they tried to have an audience with Mark Patrick.  They wanted details.  They wanted what -- financials.  They wanted to know what was happening.  And nothing was forthcoming from Mark Patrick.  He didn't think he owed them any fiduciary responsibilities.

MR. PHILLIPS:  Objection.  Hearsay.

THE WITNESS:  No, that's --

THE COURT:  What is the out-of-court statement?  I'm not sure.

MR. MORRIS:  Mark Patrick thinks that he doesn't owe any fiduciary duties.

MR. PHILLIPS:  They did an investigation.  They tried to do $x$.  They tried to do $y$.

THE COURT:  Oh, okay.  Technically not hearsay, but I think we're getting --

THE WITNESS:  Okay.

THE COURT:  -- a little far beyond the subject matter.  So if we could reign it in, please.

THE WITNESS:  Okay.  In February, they were noted,

492

they were notified, or, in particular, Dallas Foundation was notified that their Empower subsidiary, which owned a hundred percent of the HMIT interests that we were talking about, was transferred to an undisclosed company for a million dollars. Without any transparency, without any understanding of who the new owner was, they filed for receivership in Cayman. To the best of the charity's knowledge and based on all the documentation --

MR. PHILLIPS: Your Honor, objection.

THE COURT: Okay. Let me try to understand the relevance. Do you think I opened this up by asking if there was a falling out essentially between you and Patrick? Is that why you're going into this? Or --

THE WITNESS: No, no, no. No. The falling-out is much bigger than this. But I'm just saying the day receivership was filed was the day Mark Patrick lost authority. And I think anybody would look at it that way. It was for liquidation in the Cayman --

THE COURT: Okay. That's his view and we'll either see the --

THE WITNESS: Okay.

THE COURT: -- documents that support that or not.

THE WITNESS: All right. So, your -- yes. Because the question was when do I think he lost authority. I -- you could make the argument he lost it a lot sooner, because for

493

MR 1053

months beforehand the charities had written him letters saying they wanted their assets distributed in kind, they lost faith in --

THE COURT: Okay.

THE WITNESS: Yeah.

MR. PHILLIPS: Again, Your Honor, objection.

THE COURT: This is hearsay. Okay. I sustain.

THE WITNESS: Okay. Well, they did.

So, eventually, and it takes a lot to get four little old ladies at different charities to get together and agree to file a charity in liquidation, but they did in the Caymans. Okay? And then lo and behold, the response from Mark Patrick was, ha-ha, there are no assets there anymore, I moved them all to my living room --

MR. PHILLIPS: Move to strike, Your Honor.

THE WITNESS: -- at DFW.

MR. PHILLIPS: There's no evidence in the record of this. There was no evidence of any statement. Move to strike.

THE COURT: There's not, right?

THE WITNESS: Well, no, there is, because what Mark Patrick --

THE COURT: Sustained. I don't have it.

MR. PHILLIPS: Your Honor, there is no evidence of any of this.

494

THE WITNESS:  Well, Mark Patrick's testimony, he said -- he said that our receivership was right after his receivership.  He had liquidated and taken all the assets out from Dallas, Santa Barbara, and whatever, and moved it all to his charity.  So when we tried -- when the poor charities in Texas in the U.S. tried to file for liquidation, his response was ha-ha.  And there were no assets there, you know, because he had already filed --

MR. PHILLIPS:  Objection.

THE WITNESS:  He -- he --

THE COURT:  Okay, I've sustained the objection to the ha-ha.  Okay.

THE WITNESS:  Okay.  But he had, he had filed --

MR. PHILLIPS:  Your Honor, please, move to strike.

THE COURT:  Okay.  Let's strike everything after that last question.  Ask your next question.

MR. LANG:  I don't remember what the first question was.

BY MR. LANG:

Q   What happened -- or, what's your understanding of the proceedings in the Caymans?

MR. PHILLIPS:  Your Honor, objection.  Form. Understanding of the proceedings in the Caymans?

MR. LANG:  His understanding is, I mean, his understanding.  What's his endgame?

495

THE COURT: All right. I sustain.

MR. LANG: Okay.

THE WITNESS: The Cayman Islands --

MR. PHILLIPS: Your Honor?

MR. LANG: Hold --

THE COURT: I sustained, so --

THE WITNESS: Oh, sustained. Sorry. Okay.

BY MR. LANG:

Q   What is your endgame with respect to your objection over the authority of Mr. Patrick to enter into the settlement agreement that is subject of the 9019?

A   The three charities in the U.S. are affected materially. Dallas Foundation can't make payroll as of October. Dallas Foundation --

MR. PHILLIPS: Your Honor, I'll object to this testimony. The Dallas Foundation has withdrawn its objection on behalf of -- Dallas Foundation appearing on behalf of Empower, the Okada Family Foundation, and Crown Global. The Dallas Foundation is no longer a party here and did not even object in its -- an individual capacity. Object.

THE COURT: I sustain the objection. They had an objection. They withdrew it.

Moreover, as I announced early on today, I was really questioning their standing to weigh in.

So in light of all of that, I'm not going to allow

testimony regarding the impact there has been on Dallas Foundation as a result of something Mark Patrick may have done.  Okay?

THE WITNESS:  Okay.  I can answer it differently.

THE COURT:  Well, wait for your question.  Okay.

BY MR. LANG:

Q   Well, what -- what is the --

A   What is my goal?

Q   Well, yes, what is your goal?

THE COURT:  Okay.  Yes.  Why are you objecting?  Why is Dugaboy objecting?  How about that?

MR. LANG:  Safely.

THE WITNESS:  Safely.  Without stating where the assets are or might be, they are not with the three charities they were with a year ago.  They have zero.  And I would like to get those assets back.

(Pause.)

THE COURT:  Okay.  Go ahead.  I have a couple of questions, but maybe you'll hit on them.

MR. LANG:  Oh.

BY MR. LANG:

Q   Mr. Dondero, are you asking the Court to -- are you objecting to the settlement agreement that is the subject of the 9019, asking the Court to allow the Joint Liquidators in the Caymans to weigh in on the settlement agreement?

A    Yes.  Or described a little differently, there's no irreparable harm --

MR. PHILLIPS:  Objection.  Nonresponsive.

BY MR. LANG:

Q    Well, let me ask you this:  Are you asking --

THE COURT:  Let him answer.

MR. LANG:  Yes.

THE COURT:  Go ahead and answer.

BY MR. LANG:

Q    Go ahead.

A    There's no irreparable harm for a bit of delay to get to the bottom of where the assets are and what bad deeds have occurred.

Q    Is that the reason why you're objecting, is to delay this for 45 days or so?

A    Well, I believe the HMIT million-dollar transaction in February was a steal.  I believe it was a stolen asset that he -- Mark Patrick's trying to monetize.  And I don't believe it's monetized at nearly its fair value.  And so I believe that it needs to be reviewed.

Q    Are you asking the Court to -- are you objecting simply to allow the Liquidators in the Caymans time to review this transaction and the settlement agreement?

A    Yes.  There needs to be more time.

Q    Okay.

MR 1058

MR. LANG:  I'll pass the witness.

THE COURT:  All right.  Cross?

CROSS-EXAMINATION

BY MR. MORRIS:

Q    Good afternoon, Mr. Dondero.

A    How's it going?

Q    Okay.  You referred to the three underlying charities as being The Dallas Foundation, The Highland Santa Barbara Foundation, and The Highland Kansas City Foundation.  Do I have that right?

A    The three are The Dallas Foundation, Santa Barbara, Kansas City.  There's a holding company or there's an entity below it, below each one that I'm on the board of, but it's separate and distinct from the overall charity.

Q    Okay.  But the ones that are separate and distinct that have the Highland name, --

A    Yes.

Q    -- those are the ones that you control, correct?

A    No.  I'm on the board.  There's three or four people on the board.

Q    Okay.  But --

A    But we don't control.  Otherwise, you know, we would have not recommended the settlement.

Q    Does the Hunt family make their contributions to The Dallas Foundation, The Santa Barbara Foundation, and The

499

Kansas City Foundation, or do they make them to The Highland Dallas Foundation, The Highland Santa Barbara Foundation, and The Highland Kansas City Foundation?

A    Most families do it through DAF, so they probably have their own -- they're just involved with Kansas City, as far as I know.  I don't know if they're involved in any of these others.  But they probably have a Hunt Kansas City.

Q    But the ones with the Highland name are the ones who initiated the proceeding in the Cayman Islands to get the Joint Official Liquidators appointed over this entity down there, right?

A    Yes, I believe so.

Q    And you personally funded that litigation, correct?

A    The charities can't make payroll.

Q    And the charities, did you tell the charities what's happening here?

A    Yes.  They're aware.

Q    When did you tell the charities what's happening here?

A    They've known it for weeks.

Q    And they haven't filed any objection in this court, correct?

A    They thought it was best for Dallas to file it.

Q    And Dallas settled; isn't that right?

A    To the surprise of all the other charities.

Q    Okay.  So today, there's actually no charity who is

objecting to the settlement agreement, correct?

A    Because it was -- she got bludgeoned in depositions over the weekend and it happened last night and nobody was aware of it.

Q    I didn't bludgeon anybody.

A    Well, --

Q    I don't bludgeon people.

A    She switched course after a Sunday full-day deposition or half-day deposition.

Q    Okay.  So the charities that you speak of aren't objecting, correct?

A    Well, if we had more time.  We only had six hours' notice that Dallas fell away.  I think they probably would object.

Q    And you say -- you began to have concerns about Mark Patrick going all the way back to 2023, right?

A    2023?  A little bit, yeah.

Q    And then you had real concerns in 2024, right?

A    Yeah.  I mean, he's an odd duck, but he was really odd towards the end.

Q    Did you file a declara... is one of those public documents you mentioned in the Cayman Islands, that's your affidavit, right?

A    I believe so.

Q    Do you want to grab Binder 3 of 3?

A    Sure.

Q   And turn to Exhibit 119?

A   Yes.

Q   Okay.  And this is the declara... this is the affidavit that you filed in the Cayman Islands?

A   Yes.

Q   And if you turn to Page 4, in Paragraph 25 you begin to recite events concerning Mark Patrick that concerned you, correct?

A   Yes.  I'm glad you're bringing this into evidence.

Q   Yes.  And in the two years since you started having concerns, has anybody sued Mark Patrick for breach of fiduciary duty?

A   No.

Q   Have you recommended to any of these charities:  Mark Patrick is doing wrong, let's go sue him?

A   We were unaware on 90 percent of it until he left.

Q   You were aware of everything that's in your declaration. It says in 2023, you have notice of these emails.  Right?  And you did an investigation in 2024, correct?

A   Yes.  But it took a while to get the affidavits from third parties.

Q   You had the whole investigation done in 2024 and nobody sued Mark Patrick, right?

A   We didn't sue him.  Correct.

Q   You're just mad that you lost control.  Isn't that right?

A No.

Q Turn to Paragraph 33, please.  You accuse Mr. Patrick of misusing material nonpublic inside information.  Is that right?

A Yes.

Q What material nonpublic inside information did he abuse?

A I wasn't involved in the specifics.  My understanding is that he had an awareness of a tender or some financial transaction and then was providing inside information to attorneys and then had them do something.  But I don't -- I don't know the specifics.

Q Sir, under oath, in this affidavit that you submitted to the Cayman Islands, you accuse Mark Patrick of obtaining and abusing material nonpublic inside information.  Can you just tell Judge Jernigan what you had in mind?

A Whatever it says I have in mind.  I'm just saying I didn't remember the specifics.  I can read it, though, if you'd like me to read it.

Q Well, was it something about a put option?

A Yes.

Q Did he tell The Dallas Foundation that it had a put option?  Does that refresh your recollection?

A I don't remember the details.

Q Do you remember who the counterparty was to the put option?

503

A    Counterparty.  One of the mutual funds.

Q    Does it refresh your recollection that it was the Dugaboy?

A    No.

Q    Do you remember, sir?

A    I don't remember.

Q    I'm going to try.  I'm going to try and refresh your recollection.  Do you remember that Mark Patrick suggested to The Dallas Foundation that it could recover millions of dollars if it simply exercised the put option with Dugaboy?

A    My recollection is it was a mutual fund, and it wasn't millions of dollars, but it would disrupt the transaction that was already in place.  That's my recollection.

Q    Okay.

A    And I don't see Dugaboy anywhere in here, by the way.

Q    I know.  I was wondering if you could just -- I asked you, but it doesn't sound like you know specifically what the material nonpublic --

A    Well, --

Q    -- inside information is that you accused Mr. Patrick of abusing at that time.

A    I know it's been reported.  We can get you the details.

Q    Okay.  You, in fact, acted on behalf of HMIT, didn't you?

A    Who is HMIT?

Q    Apologies.  You personally -- there's no question in your mind that Mark Patrick is the Administrator at HMIT, correct?

A    I'm sorry, I'm drawing a blank on HMIT.  What is HMIT?

Q    I apologize.  Hunter Mountain Investment Trust.

A    Oh.  Okay.

Q    I'm calling it HMIT.

A    Okay.  All right.  Sorry.

Q    I probably not saying it clearly.  I apologize.  H-M-I-T.  HMIT, that's what I call it.  Is there something better that you prefer?

A    No, that's fine.  Yeah.

Q    Okay.  So HMIT.  Mark Patrick is the Administrator at HMIT, right?

A    I believe his status, his dirty hands, I believe he's trying to monetize a stolen asset.

        MR. PHILLIPS:  Objection, Your Honor.  Nonresponsive.

        THE COURT:  Sustained.

        THE WITNESS:  No, I -- I saw it.  I don't agree --

        MR. PHILLIPS:  Objection, Your Honor.

        THE COURT:  Sustained.

        MR. PHILLIPS:  Move to strike.

        THE COURT:  Granted.

        THE WITNESS:  I do not agree.

BY MR. MORRIS:

Q    Okay.  Has he -- he was at one time the Administrator.  You would agree with that, right?

A    Yes.

505

Dondero - Cross    213

Q    And did he stop becoming the Administrator in your mind when the Joint Official Liquidators were appointed?

A    Yes.  I believe.

Q    Okay.  So, in your mind, that's when it happened?

Can you describe for the Court the relationship between the entity in the Cayman Islands and HMIT?

A    The entity in the Cayman Island, as far as we knew, was the org structure that all the assets were either in or controlled by in the organizational structure before all the HGEQ things that you went over earlier with Mark Patrick.

Q    Okay.  I'm not asking -- it's my fault.  Do you believe the entity in the Cayman Islands controls HMIT?

A    HMIT was one of the assets that were owned by the charities until it was moved for a million dollar to who know who.

Q    And do you know how many layers there are between the Cayman Islands entity and HMIT?

A    I do not.

Q    Is it fair to -- in your view, do you believe that the Cayman Islands entity had a direct -- withdrawn.  Do you believe that the Cayman Islands entity had an indirect ownership interest in HMIT?

A    We believed it was direct.

Q    Direct.  So it was the owner?

A    Well, it was -- it was the direct before it got moved in

MR 1066

February.

Q    Hasn't Beacon always been the owner of -- the beneficial owner of HMIT?

A    Then it was Beacon that was moved.  There was -- charities were notified in February that, for $1 million, the HMIT was sold to an undisclosed, unknown person.

Q    Do you believe that the entity in the Cayman Islands ever had the ability to control Hunter Mountain Investment Trust?

A    Yeah.  It was an asset in the portfolio.

Q    And do you believe that that gives it the right to control HMIT?

A    Yes.  I think the Liquidators will prove that.  I think they can go back in time on bad acts and bad behavior and they can regroup assets to their rightful owners.

Q    So your concern here is not with corporate authority, it's with the bad acts.  Is that fair?

A    Well, no.  I think you lose your corporate authority when you're fiducially irresponsible or commit corporate crimes.

Q    Okay.  But you've never -- you've never brought a lawsuit accusing him of that.  Fair?

A    I think you'll see a litany of stuff come out of the Cayman Islands.

          MR. PHILLIPS:  Objection.  Nonresponsive.

          MR. MORRIS:  I'm sure we might someday.

          THE COURT:  Sustained.

THE WITNESS: Yeah. But, no. But I have not, no.

BY MR. MORRIS:

Q   Yeah. But you personally, have you ever been the Administrator of Hunter Mountain Investment Trust?

A   Not that I'm aware of.

Q   Have you ever had any role whatsoever with respect to the Hunter Mountain Investment Trust?

A   Not that I -- not that I recall.

Q   Okay. Do you recall last December we were here on some litigation concerning HCLOM's scheduled claim?

A   You have to give me more of a clue.

Q   Remember HCLOM had that $10 million scheduled claim and Highland had filed a bad faith motion and we were all here in court and we wound up settling that matter and HCLOM got a Class 10 interest for $10 million?

A   Yes, I vaguely remember that.

Q   Okay. And you were here and you were representing HCLOM, right?

A   Okay. I don't remember specifics, but, yes, go ahead.

Q   Okay. And do you recall that Highland required Hunter Mountain Investment Trust's consent as part of the transaction?

A   Vaguely.

Q   And you personally authorized that consent back in December, didn't you?

MR 1068

A    No.

Q    Who did?

A    Whoever would have spoke for HMIT at the time.

Q    Okay.  Let's take a look at Exhibit 68, please.

A    So, Binder 2?

Q    Yes, please.

A    Sorry, this says Pat Daugherty.  This is 1 of 3.  This one.  Okay.  Did you say 68?

Q    Yes.

A    It's not in here, either.  68.

Q    So you see that's an order of the Court?

A    Yes.

Q    And this resolves HCLOM's claim?  Take your time.

A    I'll leave it in case someone else needs it.  Okay.

Q    And do you see on the last page of the document there's an electronic signature by Deborah Deitsch-Perez at the Stinson firm as counsel for Hunter Mountain Investment Trust and Dugaboy Investment Trust?  Do you see that?

A    I'm sorry.  I went to the very last page with Mark and I.  Is there another page?  Oh, okay.  Yes.  Okay.

Q    So you see Stinson has signed both on behalf of you personally and HCLOM, and at the bottom, Stinson and Ms. Deitsch-Perez has also signed on behalf of Hunter Mountain Investment Trust and the Dugaboy Investment Trust?  Do you see that?

A    Yes.  But then it's separate on 69, right?

Q    Yeah.  We're just looking at 68.

A    Okay.

Q    Do you know who authorized Ms. Deitsch-Perez to sign her name and tell the Court that the Dugaboy Investment Trust had approved this form of order both as to form and substance? Who acted on behalf of Dugaboy?

A    I have no idea.  I hope she keeps it straight when she's signing stuff.

Q    Well, on whose behalf are you here today?

A    Dugaboy's.

Q    And are you a representative of Dugaboy?

A    Representative?  I'm primary beneficiary until I pass.

Q    And who's the trustee of Dugaboy?

A    I believe it's my sister at the moment.

Q    Does she know you're here today testifying on behalf of Dugaboy?

A    She knows I'm in court.  I didn't -- I wasn't specific.

Q    Did you talk to her about the Dugaboy -- does she -- does she even know about the Dugaboy objection?

A    I don't know.

Q    Okay.  So how about Hunter Mountain Investment Trust?  Do you know who authorized Ms. Deitsch-Perez to sign this document on behalf of Hunter Mountain Investment Trust?

A    When was this?  In December or January?

Q   Yeah.

A   I'm assuming -- I'm assuming Mark Patrick.

Q   Late December.

A   I'm assuming Mark Patrick.  But I don't know.

Q   Did you hear about a week later that Mr. Phillips called your lawyer and accused her of signing this document without authority from Hunter Mountain Investment Trust's authorized representative, Mr. Patrick?

A   In hindsight, he's been in on it for a while, so --

Q   What do you mean, he's been in on it for a while?

A   I think he knows the plan Mark Patrick's been putting in place for quite a while.

Q   But this document was signed without his knowledge or consent; isn't that right?

A   I don't know.

Q   And you had to sign a new agreement with Mark Patrick as the authorized representative of HMIT.  Didn't you do that, sir?

A   I don't know.

Q   Okay.  Let's take a look at guess I guess probably Exhibit 69.  So this is an intercreditor and participation agreement. Do you see that?

A   Yes.

Q   And it's dated January 10th, 2025, correct?

A   Yes.

511

Q    And even though you -- even though Skyview had completed this investigation in which it was alleged that Mr. Patrick misused material nonpublic inside information and he had terminated his relationship with Skyview, you still entered into this agreement with him as the authorized representative of HMIT, correct?

A    Those were different work streams, you know, so they were -- but yes.

            MR. PHILLIPS:  Objection.  Nonresponsive.

            THE COURT:  Sustained.

BY MR. MORRIS:

Q    That is -- that is your signature on the last page, correct?

A    Yeah.  I mean, --

Q    It's a simple question.  That's your signature, right?

A    Yes.

Q    And you understood that you were signing an agreement with Mark Patrick, correct?

A    Yes.

Q    And you signed this agreement in order to avoid Mr. Phillips filing a motion in this court for reconsideration of an order that she signed not knowing that Hunter Mountain had given its consent without authority.  Isn't that right?

A    No, I had no -- none of that --

Q    So what's your memory?  Why do you think you entered into

this agreement?

A    Because the lawyers put it in front of me as a finished product from what had been going on recently.

Q    And you had no understanding of what it was?

A    Not with the innuendo and agenda that you were describing. No.  I mean, I just -- I knew what it generally involved. That's it.

Q    But you would agree with me that you entered into an agreement knowing that Mark Patrick was signing on behalf of Hunter Mountain, correct?

A    Yes.

Q    I mean, it's right below your name, right?

A    Yes.

Q    You couldn't have missed it.

A    Yes.  That part, I'll agree with.

Q    Okay.  And you signed the agreement with Mark acting as the authorized agent and representative of Hunter Mountain, notwithstanding all of the bad acts that you supposedly were aware of at the time.  Correct?

A    Object to aware of at the time.  They were all coming together in parallel work paths.

            THE COURT:  Okay.

            MR. PHILLIPS:  Object.  Nonresponsive.

            THE COURT:  Sustained.  Like I told Mr. Patrick, the witness does not get to object.

THE WITNESS:  Okay.

BY MR. MORRIS:

Q    And just to close the loop, Mr. Dondero, you fully funded The Dallas Foundation's objection, correct?

A    And I made additional donations so that they could pursue bad actors and get their money back.

Q    You funded the litigation so that The Dallas Foundation could pursue their objection, correct?

A    I made additional donations so that they could get some assets back so that they could be a charity again and make donations.

Q    Do you get a tax deduction for that donation?

A    Yes.

Q    Okay.  That's nice.

     Let's just finish up with the Joint Official Liquidators. Have you spoken to them?

A    I do not believe so.

Q    Has anybody acting on your behalf spoken with the Joint Official Liquidators?

A    I don't know.  I think the Joint Official Liquidators are an accounting firm.  I think they're Grant Thornton.  I think people have spoken to the attorneys down there, but I don't know -- I haven't spoken to Grant Thornton and I don't know if anybody else has.

Q    Okay.  Did you see the letter that your counsel marked as

Dondero - Cross 222

the exhibit, the one that was sent last night?

A    I've not heard it -- I've not read it, but I've heard you guys read it today.

Q    Yeah.  Are you aware of the Joint Official Liquidators saying at any time that they didn't believe Mark Patrick had the authority to enter into the settlement agreement on behalf of the HMIT entities?

A    I have not.

Q    Okay.

MR. MORRIS:  No further questions, Your Honor.

THE COURT:  All right.  Mr. Phillips?

MR. PHILLIPS:  Yeah.

THE COURT:  Wait.  What are we at timewise?

THE CLERK:  So their 30 minutes is over.  If you intended to give them 30 minutes for Patrick and --

THE COURT:  Yes.  Yes.  They collectively got 30 minutes.

THE CLERK:  For both of those --

THE COURT:  Yes.

THE CLERK:  -- witnesses.  Okay.  Yes, they're out.

THE COURT:  How much did Mr. Morris use?

THE CLERK:  Well, I don't know.  I just was --

THE COURT:  No, no, no, no.  30 minutes for each side for each Patrick and Dondero.

MR. MORRIS:  About eight minutes.

515

THE CLERK: Yes. Mr. Morris -- I think Mr. Phillips may have asked one question, but Mr. Morris mostly -- 30 minutes.

THE COURT: No. On this witness, Phillips hadn't gone.

THE CLERK: No, not this witness.

THE COURT: Okay. That's all I care about, this witness.

THE CLERK: I don't know this witness.

THE COURT: Okay. Do you have a question, Mr. Phillips?

THE CLERK: I was doing 30 minutes for the total.

THE COURT: No, no, no, no, no.

MR. PHILLIPS: Your Honor, I can resolve this. I can resolve this. We have no questions.

THE COURT: Okay. Thank you. Where are we? Mr. Lang, any redirect?

MR. LANG: I'm not sure.

THE COURT: Okay.

THE WITNESS: The last one.

MR. PHILLIPS: Your Honor, the witness is telling the lawyer what question to ask.

THE COURT: Okay.

MR. LANG: I believe I've already asked, which is the endgame.

THE COURT: Okay. Just let's move on. Anything else? What was the question?

REDIRECT EXAMINATION

BY MR. LANG:

Q   Mr. Dondero, what are you looking to accomplish through this objection?

MR. PHILLIPS: Asked and answered.

THE COURT: Sustained. Sustained. He did. He was asked and answered.

BY MR. LANG:

Q   The endgame in general.

MR. PHILLIPS: Asked and answered.

THE COURT: Answered and answered. Move on.

THE WITNESS: No, no. No, I haven't. No, I --

MR. PHILLIPS: Asked and answered. Move to strike.

THE COURT: You asked him this on your direct earlier.

MR. LANG: I did.

THE WITNESS: But, in general, regarding the --

MR. PHILLIPS: Your Honor?

THE WITNESS: Not just this.

THE COURT: Sustained. Ask another question.

MR. LANG: I don't have any more questions.

THE COURT: Okay. I have a question.

EXAMINATION BY THE COURT

THE COURT:  Here is something that I want to understand.  What I have before me is whether a settlement with Hunter Mountain, a settlement between the Highland entities, the Claimant Trust, the Subtrusts, and the Hunter Mountain entities, seven of them, is fair and equitable, is in the best interest of the estate.  If you were the director, the manager, the representative of Hunter Mountain estate, what would your answer be?

THE WITNESS:  It's not in the ZIP Code.

THE COURT:  It's not in the ZIP Code?

THE WITNESS:  Of fair.  Yes.

THE COURT:  Okay.  Why do you think it's not in the ZIP Code of fair?

THE WITNESS:  Okay.  We filed in Delaware on a $100 million judgment.  Pachulski was our counsel.  They told us --

THE COURT:  I know all this.

THE WITNESS:  It just --

THE COURT:  I'm talking about the settlement in front of me right now.

THE WITNESS:  -- we'd be in and out in three months, right?  We got liquidated instead.  We got liquidated for over $850 million, which not enough people talk about.  Okay?  It would've been $950 million if Seery had done a good job, but it was $850 million we got liquidated for.  Okay?  The POCs were pumped up.  People who supposedly had no claim, all of a

sudden, $300 million.

There's $700 million missing or misallocated from the estate. Okay? There was -- all the original creditors, all the original creditors sold 99 percent of their interest for $160 million. The Farallon and Stonehill went to the beach. There was enough money on the balance sheet. Seery could have given them the $160 million and tossed us the keys. Instead, he had relations, deep relations, undisclosed business relationships with Farallon and Stonehill, --

THE COURT: Okay. I do want you to know --

THE WITNESS: No, but --

THE COURT: -- I've read all this many times.

THE WITNESS: Okay. But so -- so these --

THE COURT: I promise I read every piece of paper submitted.

THE WITNESS: Okay. So, so he sold the POCs to them, and it's been -- they've tripled their money in two and a half years. The professional fees have been $300-odd million. There's interrelationships between all the professionals -- Farallon, Stonehill, Grosvenor, the Hellman & Friedman guys, the Millennium guys who took whatever. All this stuff has to come out.

We're on the edge of a giant RICO case eventually. We're -- that's -- we're on the edge of a giant RICO case. And they should not be giving up their rights for $10, $20 million.

519

It's crazy for them to give up their rights at Dallas Foundation for 10 or 20 million bucks.

There's $700 million missing.  All the original creditors sold for $160 million.  The estate was sold for over $850 million.  Where'd all the money go?  Where'd all the money go and why?  You know.

We get updates quarterly, once in a while, well, this much went out to this law firm, this much went out to this, whatever, but no one looks at the gross amount and where'd all the money go?  And why?  Why did it have to -- why did it have to go down like that?  Why do we have to fire --

THE COURT:  Okay.  I know you have an objection.

THE WITNESS:  -- all the employees?

THE COURT:  This is narrative.

MR. MORRIS:  Yeah.  And --

THE COURT:  I understand all --

MR. MORRIS:  -- I'm not going to cross-examine him, but this is -- this is not accurate.

THE COURT:  I understand all of these arguments.  You know, I --

THE WITNESS:  But I'm just --

THE COURT:  Your lawyers at least know, if you don't know, that we wrote a 100-plus-page opinion on the motion of Hunter Mountain to sue for all of this.  Okay?  So I promise I've heard this and looked at it.  But right now, Hunter

Mountain, through Mark Patrick, you question his authority, but they are ready to lay down their swords and not pursue that motion for leave to sue based on the claims trading, and --

THE WITNESS: Have you seen all the insider trading, Farallon, Stonehill? Have you seen the trading and claims on insider information? Have you seen all that stuff?

THE COURT: I've seen the allegations but I --

THE WITNESS: Well, why would you release all those people right now before the RICO?

THE COURT: So I -- Dugaboy -- you've been asked what is your goal? Dugaboy a .18 limited partnership interest --

THE WITNESS: Correct.

THE COURT: -- that is subordinated to Hunter Mountain. I'm just trying to understand the scenario where it makes sense to keep fighting for years to come.

THE WITNESS: Well, RICO transcends this, right? I mean, RICO brings everybody in. Until we get --

THE COURT: Okay. You think it's -- and my question, why is this not fair and equitable and in the best interest of the estate, you think it's better to litigate several more years and maybe have a chance, you know, --

THE WITNESS: At $600 mill. At $600 million.

THE COURT: -- Hunter Mountain would have a chance to --

THE WITNESS:  $600 million.  Yes.

THE COURT:  Okay.

THE WITNESS:  Versus $20 million now.  But you have to remember, it's all part of -- you have to pay attention to this Mark Patrick stuff.

MR. PHILLIPS:  Your Honor?

THE COURT:  Okay.  Yes.  I asked my question.  I'm trying to understand why Dugaboy, why its position is this is not fair and equitable and in the best interest and in the range of reasonableness.  Those are the buzz words that a judge has to focus on.

THE WITNESS:  It's not fair to the charities.  I still think no one's ever seen --

THE COURT:  The charities aren't parties here.

THE WITNESS:  Not yet.  Give them a little time. They just heard about the settlement yesterday.

THE COURT:  Well, isn't that what the Cayman Islands is all about?  What I do doesn't necessarily affect what's happening there.

THE WITNESS:  Well, no, but you're saying they're not here today.  If you delayed this three weeks, they'd be here. It's just a couple --

THE COURT:  They were here and they chose to withdraw.

THE WITNESS:  One.  One.  Just one charity.  But the

others, if you give them some time, they'll be here.

THE COURT:  Okay.  Okay.  I think you've answered my question, your theory of how this should play out and how you want it to play out.  Okay.  All right.

THE WITNESS:  Thank you.

THE COURT:  That's all.  Thank you.

THE WITNESS:  Thank you for the time.

THE COURT:  Uh-huh.

(The witness steps down.)

THE COURT:  All right.  I think that concludes our evidence, correct?

MR. YORK:  Yes, Your Honor.  At least from Daugherty and --

THE COURT:  Okay.  The Objectors rest.  Any rebuttal?

MR. PHILLIPS:  No, Your Honor.

THE COURT:  Okay.

MR. YORK:  Your Honor, would it be okay if we took a five-minute comfort break?

THE COURT:  Yes.  We may as well turn it into a 10-minute break because that's what's going to happen.  All right.  We'll be back at 3:40.

THE CLERK:  All rise.

(A recess ensued from 3:30 p.m. until 3:44 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  We're back on the

record in Highland Capital.  I will hear closing arguments. And I dangled something out there before lunch and I've never heard any follow-up.  I guess no agreement with Daugherty could be reached on the reserve?

MR. YORK:  Haven't had that conversation, Your Honor.

THE COURT:  You didn't have that conversation?  Oh, well.  Why didn't you have that conversation?

MR. YORK:  We were, during the lunch break, working busily to prepare the rebuttal to Mr. Seery's testimony, --

MR. MORRIS:  Yeah.

MR. YORK:  -- Your Honor.  And so --

THE COURT:  Okay.  You told me you'd talk about it.

MR. MORRIS:  May I proceed, Your Honor?

THE COURT:  I guess I don't matter.  Do I not matter when I suggest something like that?

     Okay.  Go ahead.

     CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS:  Good afternoon, Your Honor.  John Morris; Pachulski, Stang, Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust and on behalf of the Highland Litigation Subtrust.

     I know that we've got Bob Loigman in the courtroom, but I know that -- at least I hope he joins me in this closing argument.  I suspect he does.

     I don't want to be too long here, Your Honor.  We don't

232

have a high burden.  This is a 9019 motion, for goodness' sakes.  I've never been involved in such a contentious 9019 motion in my life.  We had three depositions on Friday.  We had two on Sunday.  I think we had two on Monday.  For a 9019, I've had one witness sit multiple times.

It's been an extraordinary experience.  But at the end of the day, nobody's really challenging the settlement agreement. You've got people challenging, you know, the Cayman Islands. You've got people challenging, is it -- you know, can you jam it in under the plan?  We're not jamming anything under the plan.  We're following the plan provisions.

Nobody's challenging the bona fides of the motion.  Nobody is challenging whether it's the product of good-faith, arm's-length negotiations.

You heard Mr. Seery testify at length about the process. You've got 55 different documents in the record proving that this agreement is the product of arm's-length, good-faith negotiations between parties represented by sophisticated counsel that resulted from an exchange of information, an exchange of proposals, back and forth, and here we are.

It's also in the best interests of the estate.  Really not challenged by anybody.  Nobody is contending that Highland is getting a raw deal here.  Nobody.  And the proof that Highland is getting fair consideration and that this settlement is in the best interest of the Claimant Trust and its stakeholders,

525

MR 1085

it's obvious we are terminating costly, wasteful, and I dare say frivolous litigation. We are disposing of several illiquid assets. We are getting litigation protections that will inure to the benefit of the released parties, the Highland release parties and it will, we believe, provide the protection that we deserve.

It's not just releases. It's covenants not to sue. It's all kinds of bells and whistles in there. Substantial benefits to the estate. And so nobody's really objecting to that.

Nobody's really objecting to the fairness of the settlement to the HMIT parties except for Mr. Dondero, and he's just mad that peace is breaking out. He's just mad because he's not going to be able to litigate anymore. It's not relevant to a 9019 motion. But even if it was, it's ridiculous. It's just ridiculous.

The settlement is fair and reasonable and in the best interest of the creditors. It's the product of good-faith, arm's-length negotiations. And on that alone, it should be approved.

We've had a lot of testimony today about Mark Patrick's authority. The only actual evidence that concerns Mark Patrick's authority are the exhibits in the binder and Jim Seery's testimony about the diligence that he did. And the exhibits in the binder all prove that Mark Patrick has the

authority to act and bind the HMIT entities to the settlement agreement. It's Paragraph 7 of the HMIT trust agreement itself.

Did the objecting parties point you to one single document to support their speculative argument, because it's not anything more than that, that somehow Mark Patrick isn't authorized to do this? There is not a scintilla of evidence that Mark Patrick is not authorized to do this.

And if Your Honor had any concerns about Mr. Patrick, I think he answered them at the end. That he understood exactly what the terms of the agreement are. That he had a reasonable opportunity to consult with counsel and to negotiate. That he knows exactly what he's doing on behalf of these entities. That he believes the best path forward from the HMIT entities is to grab the value today instead of letting it waste.

We welcome Mr. Patrick to the table. It makes a lot of sense. We've been trying to get to this point forever.

Mr. Daugherty. You know, I have no gripes with Mr. Daugherty. I don't know quite what's motivating him these days, but he admitted and the evidence is clear that when he was a Class 9 claim holder, I forget if it's two or three or four occasions, he accepted $3.7 million in multiple payments, without any concern at all as to whether or not it violated the plan, even though his Class 8 claim had remained unresolved.

He didn't send the money back.  He didn't say, Mr. Seery, you can't do this because it violates the plan.  He knowingly and willingly accepted the benefits of being a Class 9 claim holder.  And now he comes and objects on the basis that somehow it's not fair to him as a Class 8 holder?  This is what we call estoppel.  Right?

I wasn't in a position to really make the argument because I didn't quite understand it until today.  Like, how does he come in today and say you can't do this, Your Honor?  You can't allow Class 9 and 10 to get a nickel until he's done, when he himself has accepted millions of dollars before his claim is resolved?  That doesn't sound right to me.  And I don't think the Court should accept that argument.

Just quickly, because I don't want to give it any weight, frankly, but this whole business of the Cayman Islands and the JOLs, the only facts Your Honor has to take into account are that they were appointed before this motion was filed. They've never appeared here.  They've never objected.  And there is no evidence in the record to suggest, let alone to prove, that the JOLs contend that Mark Patrick does not have the authority to enter into the settlement on behalf of the HMIT entities.  There's no evidence of any kind.

What you need to know and need to remember, though, is that whole proceeding in the Cayman Islands is being brought on behalf of not The Kansas City Foundation or The Dallas

236

Foundation, but The Highland Kansas City Foundation, The Highland Dallas. It's Mr. Dondero, and he's funding it, and it says it in Paragraph I think 47 or 48 of his declaration. He's funding all of that. And he funded The Dallas Foundation's objection here.

And that's why he's upset, because they settled last night without telling him because they didn't want any part of this, Your Honor. That's the truth. That's why they're not here. And they, right, they're the people who suggested that maybe something untoward happened and maybe someday -- because this is the way their objection is characterized. Complete speculation.

If you go back and look at the objection, it's someday, somebody might do something and might someday set it aside. That wasn't a proper basis at the time, but we know that Mark Patrick remains in control of the HMIT entities today because nobody has told the Court otherwise. And we know that The Dallas Foundation has withdrawn its objection. As I asked Mr. Patrick, have you been, you know, removed or clipped or terminated or in any way restricted in your capacity as the Administrator and control person of the HMIT entities as a result of the settlement, and the answer was no.

There's nothing to see here, Your Honor, except the opportunity for the Highland Claimant Trust and its affiliated entities in moving this case forward in an enormously positive

529

MR 1089

and constructive direction.

We have the opportunity today to put to rest a lot of pending litigation. We have the opportunity today to put to rest a lot of future potential litigation that undoubtedly would have come to pass had these entities remained under the indirect control of Mr. Dondero, because we know that that was the case.

If you remember, Your Honor, we sat here two years ago, June 8th, 2023, on the evidentiary hearing on Hunter Mountain's motion for leave to bring the claims trading case. And if Your Honor will remember, Mr. Patrick at that time was forced to admit that the entirety of that case came in from Mr. Dondero, that he had no knowledge of any facts that related to anything.

I would ask Your Honor to go and compare The Dallas Foundation's objection with Mr. Dondero's declaration that he filed in the Cayman Islands. I'm not going to say they're verbatim, but they are largely, largely the same. This is just Jim Dondero being Jim Dondero, and that is not a basis to overrule or deny the motion under Rule 9019.

It's a product of good faith negotiations, it is clearly in the best interests of the estate, and we respectfully request that as soon as possible Your Honor grant motion.

THE COURT:  Okay.

MR. MORRIS:  Thank you, Your Honor.

MR 1090

THE COURT: Any closing from the Movant, Co-Movant?

MR. PHILLIPS: Your Honor, thank you very much. Louis M. Phillips on behalf of the --

THE COURT: I don't know if you're the Co-Movant. You're a party to the proposed settlement.

MR. PHILLIPS: I'm not a Co-Movant.

THE COURT: Okay.

MR. PHILLIPS: I'm a party to the settlement.

THE COURT: Uh-huh.

MR. PHILLIPS: I didn't quite make it to that status to be a Co-Movant.

CLOSING ARGUMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

MR. PHILLIPS: But anyway, we appreciate the Court's time. We appreciate the Court's attention. This was, as the evidence established, we provided and were provided an immense amount of information.

Much of the information, certainly the information about Mr. Patrick's control of the HMIT entities, was provided by us. It was reviewed by Mr. Seery. And Mr. Seery made a very strong case for the amount of diligence he did on our side of the equation. It's not nearly as relevant to Your Honor's decision about whether to approve the settlement whether we got a good deal or not, but the deal we got, we think, is very fair.

The deal we got was negotiated with counsel, with

MR 1091

businesspeople who are very sophisticated.  We have agreed on the methodology and of the calculation of our Class 10 claim. The Debtor and the Debtor estate or the Claimant Trust or whoever held the HMIT note got full value for the HMIT note. Any additional value from the HMIT note would come back to HMIT.  The Kirschner Litigation would be for the benefit of HMIT.  The Dugaboy Note would be for the benefit of HMIT.

All of that is being put into a package and is being resolved, affiliated, administered in a very effective and efficient manner.  We are getting some money.  We appreciate. We tried to get more.  We couldn't.  They tried to pay less. We made a deal.

So, Your Honor, I echo and thank Mr. Morris for all of his comments.  I appreciate counsel being involved here today.  We think this is a fair and equitable settlement.  There is no question under 9019 that this settlement should be approved. And the suggestion that this Court should allow itself to just be a vehicle for continued litigation, when we have analyzed it, perhaps from a different perspective, and made the decision that it is time to make our deal now, it is time to take HMIT out of the litigation picture and into the fold of a party in interest of a fixed claim with fixed treatment that's different from the plan, authorized by the plan.  And we appreciate it.

Thank you, Your Honor.

THE COURT: Thank you. All right. Mr. Loigman, we didn't mean to ignore you.

CLOSING ARGUMENT ON BEHALF OF MARC S. KIRSCHNER, LITIGATION TRUSTEE

MR. LOIGMAN: Thank you, Your Honor. Robert Loigman, Quinn Emanuel. You didn't ignore me. Louis was just quicker to jump up than I was.

And I step up solely because you asked whether the Co-Movant had anything to add. And we have nothing further to add to what Mr. Morris said. We agree with it wholly. We think this is a fair and complete settlement, and we would ask that the Court approve the settlement under the 9019 motion.

THE COURT: Thank you.

MR. LOIGMAN: Thank You, Your Honor.

THE COURT: All right. The Objectors?

MR. MORRIS: Your Honor?

THE COURT: Oh.

MR. MORRIS: Just to clarify, the motion was made under 9019 and Section 363. I just don't want that to get lost. That's all.

THE COURT: Okay. 363, use of property. Okay. The Objectors?

CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

MR. YORK: Thank you, Your Honor. I'll be very brief.

I certainly appreciate that the Court desires to have this bankruptcy wrapped up, given how long it's gone on now, for six -- approximately six years in this court. The fact of the matter is that the settlement agreement that Highland proposes to enter into with Hunter Mountain Investment Trust entities violates the express terms of the plan, the confirmation order, and the Claimant Trust Agreement.

And they have not pointed to any language in there or to argue otherwise. Their only argument has been that they've set a reserve aside. And there's no provision in any of those documents that provides that that's an excuse for them to violate the express terms of the confirmation order, the plan, or the Claimant Trust Agreement, including specifically the language that Class 10 claims are not to receive or retain anything under the plan on account of their interest unless and until the Class 8 and Class 9 claims are paid in full plus applicable interest. And --

THE COURT: I really want to understand that argument. Mr. Seery correctly testified that, pretty much in every Chapter 11 plan we see, there's a disputed claim reserve. Well, I guess unless we have really unsophisticated creditors who don't insist on that. But we had sophisticated creditors. So why doesn't that mechanism, which I would call tried and true, we see it in most cases, why doesn't that resolve this issue you're raising?

MR. YORK: Well, --

THE COURT: And I focused in more than maybe I needed to about the nature of Mr. Daugherty's remaining claim, his Class 8 claim. What was the scope? What's the maximum amount it could be? When might it be resolved? Because I think we have a tried-and-true mechanism that addresses his concerns. Tell me why it doesn't.

MR. YORK: Well, --

THE COURT: Really, I want to understand what you think I'm missing.

MR. YORK: Well, so I think twofold, Your Honor. The first is that the dispute reserve that exists normally would be for whatever the amount of the disputed claim is. And here we're dealing with, as both sides have acknowledged, a claim that they at best could estimate, but they don't know for certain, given all of the machinations that could come out of the IRS audit.

And secondly, specifically with respect to the confirmation order, if it had said that the net 10 and 11 claims could be paid as long as the allowed 8 and 9 claims were paid, then the dispute reserve would provide that protection. But that's not what the language in the confirmation order says. It says claims, not allowed claims. And therefore it's referring to all claims, including disputed claims. And --

THE COURT: But we have a disputed claim reserve. Okay. We have a disputed claim reserve.

MR. YORK: There is, yes, there is a reserve.

THE COURT: So is it your argument that I can't approve a settlement like this until Mr. Daugherty's claim has been resolved with certainty, which might be in 2033 or whatever? I can't keep a bankruptcy estate open, allowing administrative expenses to continue to accrue, because of one contingent unliquidated claim that may never even develop.

MR. YORK: Your Honor, I appreciate the Court's frustration with that, but that's the way that the documents are written in terms of the confirmation order. And so it's an --

THE COURT: So the disputed claim reserve is meaningless?

MR. YORK: No, it is not -- a disputed claim reserve exists, but it does not, under the terms of the confirmation order, in terms of allowing the payment of Class 10 and Class 11 claims, those can't be done until the Class 8 claims are resolved.

THE COURT: You would have -- just a moment -- you would have me keep this estate open for as long as it takes, 2033, whatever, without allowing Class 10 and Class 11 theoretically to get anything?

MR. YORK: At least under --

MR 1096

THE COURT: Let's just let the -- with all respect to Mr. Seery, he's charging a handsome amount. It was agreed to or approved by the Court. Let's just let him continue accruing until 2033 because of Mr. Daugherty's prospect of the IRS saying you owe $1.4 million plus interest and penalties, when he's gotten the use of that all? Help me. This doesn't make sense to me.

MR. YORK: Sure. One way this could be solved is that the payments to -- the cash payments, for example, that are to be made to the HMIT entities, under the proposed settlement could be held in abeyance until the resolution of the Class 8 claim. The Court could modify the proposed settlement based on that. That's one way to deal with the issue, for example.

THE COURT: Do what? Hold it in abeyance?

MR. YORK: Yes. For -- the payments to be made to the Hunter Mountain Investment Trust under the proposed settlement could be -- could be done in accordance with the terms of the confirmation order. We'll just hold those payments until such time.

THE COURT: We who? Put it in the Court Registry?

MR. YORK: Or --

THE COURT: Where it will earn 0.18 percent?

MR. YORK: No. No. It can remain within the Claimant Trust until the time at which the Class 8 claim is

finally and fully resolved.

THE COURT: Okay. Meanwhile, I've approved the extension of the Trusts for one year, with Dugaboy saying, we don't think this should happen again and again and again. We reserve our rights. That's not a good solution.

MR. YORK: Your Honor, I understand the Court's frustration, but this is the terms of the plan and the confirmation order that were entered. Highland needs to follow it.

THE COURT: Okay. What about the estoppel argument that I heard Mr. Morris make?

MR. YORK: Well, sure. So, the first time they raise it is here today. And the one thing that -- the difference is that allowing this settlement to go forward is an effective liquidation of the estate versus where things are now, in which any payments that were made is not an effective liquidation. It doesn't expose anyone that would have priority to Class 10 with respect to anything that happens in the future from, you know, not having sufficient funds to deal with it. That's all.

THE COURT: Okay.

MR. YORK: Thank you, Your Honor.

THE COURT: Thank you. All right. Mr. Lang?

CLOSING ARGUMENT ON BEHALF OF DUGABOY INVESTMENT TRUST

MR. LANG: I'll be brief. Your Honor, there are

538

three issues that we've raised.  One is the capital account balance being used for the claim for the Class 10 holders.  The plan does not specify that the capital account balance is to be used.  Allowing the $336 million claim to Class 10 ensures that Class 11 will not ever receive a dime.  That's guaranteed.

Alternatively, upon the satisfaction of the Class 9, the $20 million approximately owed to Class 9, the holders of HMIT should receive 99.5 percent of the total residual.  We think that would be a more fair outcome to the Class 11 claimants.

THE COURT:  Wait, say again?

MR. LANG:  That, so, of total assets, $70 million approximately, $20 million is owed to Class 9.

THE COURT:  Uh-huh.

MR. LANG:  Of the remainder from that, HMIT should receive 99.5 percent of those assets, whatever they are, the value, rather than a $336 million claim.  That was the objection.

THE COURT:  But I didn't get any evidence of a separate way of competing -- of doing that.  I heard credible testimony from Mr. Seery about why he used the math he used and I didn't hear any countervailing evidence of, wait, this is a more fair, realistic way of computing it.  And what I did hear is the .5 percent limited partnership interest of Dugaboy is subordinated in its payment rights under the limited

partnership agreement of Highland.

MR. LANG: It's subordinated under the plan, but yes, the plan does not say to use --

THE COURT: Under the partnership agreement is the reason the plan did it, is what I've been presented.

MR. LANG: I believe Mr. Seery -- and I could be wrong -- I think I heard him say that he has used the other method, but I could have misheard him in the testimony.

THE COURT: Well, that's not what I heard. I heard him emphasizing the fact that the Class 8 interests, including that of Dugaboy, are subordinated with regard to payment rights under the Highland partnership agreement. And so that's why he didn't think it made sense to just apply percentages.

MR. LANG: That's what he testified to.

THE COURT: So I'm just -- anyway, I'm just trying to figure out what the countervailing evidence is here to suggest his methodology is wrong.

MR. LANG: I believe the partner -- or, the plan says that the Class 10, when the GUC certification is a Class 10, and the Class 11 received pro rata, it doesn't specify the account balance is to be used as the number to determine what they receive.

THE COURT: Okay. You want to point out what you are focused on?

MR. LANG:  I believe it's under Treatment.

THE COURT:  Okay.

MR. LANG:  Section --

THE COURT:  I don't want to hunt.  I want you to tell me what the language is that you think is supportive of that.

MR. LANG:  And the second -- I guess the secondary issue that we probably should just get to is the release.  We think it's broad, and just Dugaboy and Dondero are carved out.  And Mr. Morris did send me a proposal last -- yesterday evening that I haven't gotten to.  But that is an objection that we have, is just to make sure that the -- that nobody can argue that the release covers any claim Dugaboy might have, if any.

THE COURT:  Okay.  I think many hours ago I remember this being mentioned.  I guess it was a little bit more broad than just -- I think it was Highland employees.  I don't know.

What is the agreement, Mr. Morris, if you're awake there, on --

MR. MORRIS:  I am awake, Your Honor.  Apologies.

THE COURT:  Okay.  I didn't mean to be flippant.

MR. MORRIS:  Yeah.

THE COURT:  I get punchy and --

MR. MORRIS:  That's okay.  With respect to the release?

THE COURT:  Right.

MR. MORRIS: We don't have an agreement. We have an agreement -- well, I sent a proposal last night, but it didn't get responded to. If they want to accept that proposal, that's terrific.

THE COURT: Okay. I don't know what the agreement says. Are you saying you want to accept what they proposed last night?

MR. LANG: No, I have edits to it. I just couldn't -- I was tied up on another filing last night. I have not been able to get to it today.

THE COURT: Okay. I'm going to make a ruling today. Okay? If it means y'all sit here in the courtroom a while, fine. But just like all of you, I have a mountain of other stuff waiting for me, so I really want to rule today. So, --

MR. LANG: Understood.

THE COURT: Yeah.

MR. LANG: Maybe we can work on it as soon as I'm done and I can get back to 'em --

THE COURT: Okay.

MR. LANG: -- and get back to you.

Your Honor, the -- it's on Page 23 of the plan. It talks about the Class 10 and Class 11, where the partnership interests, that their treatment, they shall receive as pro rata share of the contingent Claimant Trust interests. And all we're asking is that be used or applied as a 99.5/.5

distribution.

(Pause.)

THE COURT: I'm sorry. Go ahead.

MR. LANG: Oh, sorry. I thought you were looking for it.

And the last issue is authority. The only point of the authority argument, Your Honor, is that the Joint Administrators were appointed down in the Caymans to investigate the transaction that moved basically the entire ownership, because it's owned a hundred percent down to HMIT, out. They're investigating the transactions. They have not stipulated to authority. They're looking at everything. They've requested a 45-day delay on this motion. And that's all that -- not even asking to deny the 9019. They were just asking time to basically bless this transaction so that nobody could come back and make an issue of it. But I understand your desire to rule today.

THE COURT: Okay. Any rebuttal?

MR. MORRIS: Yeah, briefly, Your Honor.

REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS: I just want to point the Court to two provisions of the operative documents that I think --

THE COURT: Okay.

MR. MORRIS: -- will resolve even further the issues that we've presented today.

The Claimant Trust Agreement -- and I apologize, I don't know if the whole document is in evidence, but I will respectfully suggest to the Court that the Claimant Trust Agreement provides in Article 5, Section 5.1(c), --

THE COURT: Okay. Let me catch up.

MR. MORRIS: Yes.

(Counsel confer.)

THE COURT: It's not Debtor's Exhibit 5.

MR. MORRIS: Yeah.

THE COURT: Daugherty's Exhibit 5?

MR. MORRIS: It's Daugherty Exhibit 5?

MR. YORK: Yes.

THE COURT: Okay.

MR. YORK: So we have a full copy at Daugherty --

THE COURT: I've got it. Daugherty's Exhibit 5.

MR. MORRIS: Okay. So if you could just go to Page 27, Your Honor. And this is in response to Mr. Lang's argument about the calculation of the allowed claim. You'll see it deals with contingent trust interests. And the very last sentence says the equity trust --

THE COURT: Wait. What page again?

MR. MORRIS: 27.

THE COURT: Okay.

MR. MORRIS: Do you see Section C in the middle is Contingent Trust Interests?

THE COURT: No.

THE CLERK: It's 26 of the Claimant Trust Agreement, 27 of the --

THE COURT: Ah, it's 26. Yes. On the bottom, it's 26; on the top, it's 27 of 38.

MR. MORRIS: Okay.

THE COURT: Okay.

MR. MORRIS: And at the end of Section C, it says explicitly: The equity trust interests distributed to allowed holders of Class A limited partnership interests -- that's Dugaboy --

THE COURT: Uh-huh.

MR. MORRIS: -- shall be subordinated to the equity interests distributed to the allowed holders of Class B and C. That's Hunter Mountain. Okay?

So the trust agreement provides for exactly what we're doing here. Dugaboy is in fact subordinated to HMIT. It doesn't get paid until HMIT gets paid in full. And Mr. Seery I think compellingly testified as to the reasonable calculation that he did based on very objective numbers to determine each respective limited partner's capital account.

With respect to Mr. Daugherty, the plan, which is on the docket at 1943, has a definition of Disputed Claim Reserve. And it states, among other things, that the amount of the disputed claim upon which the disputed claim --

THE COURT: Give me the page number.

MR. MORRIS: I apologize, Your Honor.

THE COURT: I've got it right in front of me.

MR. MORRIS: It's Page 7 of the plan.

THE COURT: Okay. All right. I'm there. The Defined Term.

MR. MORRIS: So the Defined Term "Disputed Claim, Claims Reserve Amount" in the middle says: The amount of the disputed claim upon which the disputed claims reserve is calculated shall be -- they've got an A and then a B -- the amount agreed to by the holder of the disputed claim and the Claimant Trustee or Reorganized Debtor, as applicable. And then it says D: Or is otherwise ordered by the Bankruptcy Court, including an estimated -- an order estimating the disputed claim.

And that last provision is vital, Your Honor, because that is the hook upon which you can always hang your hat when you decide that we are not going to wait until 2023 [sic] when the IRS audit may be resolved, because you have the ability, as ordered by the Bankruptcy Court, including estimating the amount of the disputed claim. Which is one of the causes of action that we've asserted in the complaint. It's either to subordinate -- actually, it's to disallow, to subordinate, or to estimate. Because this case does have to end, Your Honor. We actually think he should be bound by the definition in B.

It is an agreed-upon amount.

I've heard the testimony from Mr. Daugherty that there was no negotiation, but he didn't deny that he signed a document that is called an agreement that sets forth the disputed claim amount. And that is an agreement, and I think that satisfies that definition. And even if it didn't, at some point this case has to end.

Thank you, Your Honor.

THE COURT: Okay. Thank you.

All right. Well, it's been a long day and even a longer case. I think a lot of people were on the receiving end of a little bit of my grumpiness at times today, and I apologize for that.

I always feel compelled to say to the lawyers and parties when I rule from the bench that I can assure you it's not knee-jerk. I can assure you my law clerk and I have read every piece of paper submitted. And we come in here I think well-prepared and we just want to listen to the evidence to see if it supports -- who it supports. So I am going to rule from the bench.

I first want to make clear that with regard to the motion before the Court, the motion which was filed May 19th at Docket Entry 4216, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363, the Court is being asked to approve a very broad settlement that is between what are

defined as the HMIT entities, seven entities in all; Hunter Mountain Investment Trust; as well as Beacon Mountain, LLC; Rand Advisors, LLC; Rand PE Fund 1, LP; Rand PE Fund Management, LLC; Atlas IDF, LP; and Atlas IDF GP, PLLC.  So this proposed compromise and settlement is between all of those Hunter Mountain entities as well as the Reorganized Debtor, the Highland Claimant Trust, the Highland Litigation Subtrust, and the Highland Indemnity Trust.

I first will note that notice has been fulsome, reasonable under the circumstances, to provide due process to anyone affected by the proposed compromise.

The Court would note that the legal standard is a very well-known and established legal standard here.  Among other things, the Court is to look at whether the settlement is fair, reasonable, and in the best interest of the estate; whether it would appear reasonable business judgment has been exercised; is the compromise and settlement within the range of reasonableness?

And this involves looking at, among other things, the probability of success in the litigation -- that would be all the various litigation involving HMIT, if it were to go forward; the complexity and likely duration of further litigation and attendant expense, inconvenience, and delay; and all other factors bearing on the wisdom of the compromise. We know that's *Cajun Electric*, *Jackson Brewing*, *Foster*

256

*Mortgage*, among other cases. I probably left out *AWECO*.

Anyway, applying all of those legal standards here, I do think the evidence was very thorough in showing that the compromise is a product of good faith and arm's-length negotiations. Indeed, it was almost shocking to this Court when I saw the motion, having the history I have with all of the contested issues, adversary proceedings that have transpired over the past few years between Hunter Mountain and the Debtor.

I do think the evidence is that it's fair and equitable and in the best interest of the estate and within the range of reasonableness, given due regard for all of the expense, delay, and likelihood of success.

I'll just briefly recount that, as noted early today, there was an Exhibit B attached to the 9019 motion that listed nine unresolved pending pieces of litigation that the Highland entities are embroiled in. Two of those are now gone. This was filed May 8th, and as of January 25th, they're gone. So seven pieces of litigation, of which two will go entirely away if I approve this settlement. The Kirschner adversary claims against Hunter Mountain will go away.

We have very little, very little, relatively speaking, left in this bankruptcy case to resolve if I approve this settlement. That alone is very, very significant. Again, we have large shall I say issues with Hunter Mountain. Highland

549

MR 1109

says Hunter Mountain owes the Highland entities something like $57.69 million on a note that Hunter Mountain is payor on dated December 21st, 2015.

The flip side of that is that Hunter Mountain was sued by Kirschner in the Kirschner action on various claims, including this $57 million note.  We have had Hunter Mountain file multiple motions for leave to sue Highland, the Claimant Trust, Mr. Seery.  And those have been denied, but are in appeal status or remand status or some further litigation status.

And again, we have numerous issues.  Hunter Mountain having sought valuation.  The Court denied that.  It's on appeal.

So, so much goes away, so much further litigation goes away and we make a monumental step in ending this long-running case if I approve this settlement.

Now, on the flip side of this, I know that Dugaboy, through the voice of Mr. Dondero today, expressed that Hunter Mountain is, I forget the words he used, but not -- this isn't close to being fair and equitable as far as he was concerned for Hunter Mountain.  That Hunter Mountain, in addition to being through with litigation in this bankruptcy-land, would be paid $500,000 within five days.  They would also be paid separately $10 million as an initial distribution, with the hope of two more $6.5 million distributions in '27 and '28.

And it would get a note, which I think has $24 million -- I think it was less than that, $17 or $18 million left on it, perhaps, on which Dugaboy is a maker.  The debtor is one of the two payees.  The Debtor gives up its rights in that note.

It looks like Hunter Mountain is getting a lot.  And again, the way this estate has been liquidated, there is money that can flow to it as a Class 10 equity here, as the evidence has shown.

So I am approving the settlement.  I am specifically overruling the remaining objections of both Dugaboy and Mr. Daugherty.

As far as Mr. Daugherty's argument that the settlement violates the absolute priority rule or violates the terms of the plan or the confirmation order or the trust agreement by, putting words in his mouth, skipping over the full payment of whatever his Class 8 claim is going to be and allowing a subordinate class, Class 10, to get paid, I have flipped and studied the wording of the plan and the confirmation order and the defined term for Disputed Reserve.  And I referred to a disputed reserve as a tried-and-true provision in Chapter 11 plans.  I think it does what needs to happen for precisely this kind of situation, that as long as an appropriate amount is being held in reserve, and the Court can decide what is an appropriate amount, we don't have to hold up a bankruptcy estate for years and years.

So the disputed claim reserve is what allows me to find this is fair and equitable and this isn't some sort of violation of the absolute priority rule.  I think this is precisely the reason the disputed claim reserve mechanism is in place, so that we can get on with the business of getting more people paid sooner.

And based on the evidence I've heard, it is an appropriate amount, I think.  We're doing a lot of crystal-balling, what may or may not ever happen when, but I think, based on all the persuasive evidence I've heard, the Daugherty objection should be overruled.

As far as Dugaboy, I, as noted, am overruling that objection.  I didn't have any persuasive evidence, solid evidence to show me that Mark Patrick doesn't have appropriate corporate governance authority to enter into this settlement agreement.

I realize there's a lot swirling around in the Cayman Islands, and that's going to play out however it plays out.  But as of today, I don't have any evidence that he doesn't have authority currently to enter into the settlement.  And it speaks volumes that The Foundation backed down.  It would seem that they have been convinced that the lack-of-authority argument was not one they wanted to press today.  So that is overruled.

I feel like we have all seen this movie many times before.

I wanted to understand, perhaps I went deeper than I needed to, I know Mr. Phillips thinks I went deeper than I needed in hearing some of the testimony from Mr. Patrick and Mr. Dondero, but I'm just trying to understand what's happening here. Why people who were so lockstep and friendly for years of this case suddenly, when we're right on the brink of maybe the case being put to bed -- I'm optimistic; it's not quite that close -- all of a sudden they're at loggerheads.

And so how many times have I seen this over the years, whether it's a breakdown in business and personal relationships, Mr. Daugherty, Mr. Terry, Grant Scott, now Mark Patrick? I'm probably leaving out someone. I don't know. I feel like I'm watching the same movie. Okay, now these two have parted ways. Now these two have parted ways.

And then, as I recall, when Grant Scott withdrew his objection to the HarbourVest settlement all these years ago, 2020, 2021, which he had been lodging for Charitable DAF, I think it was, --

MR. MORRIS: Yes, Your Honor.

THE COURT: -- then what happens? Well, I think Mark Patrick came in to work or replace Grant Scott, and then a bunch of people ended up getting sued in a different court regarding the settlement I approved, the HarbourVest settlement I approved.

So why am I saying this? I just, I'm trying to understand

things I'll never understand.  I wanted to maybe hear something that would make me better understand what's happened now between Hunter Mountain, Mark Patrick, and Dondero and Dugaboy, because it sure seems like they were on the same team for many years.  But it was very likely irrelevant, as Mr. Phillips kept getting up and down and saying.  I just was seeing if it would lead to something relevant that would bear on the wisdom of this compromise, since that's one of my other legal standards.  I'm supposed to consider all factors that might bear on the wisdom of the compromise.  And so I guess that's where I was going in allowing all of that to come in.

All right.  Well, while everyone is not thrilled with this compromise and settlement, I heartily congratulate the human beings that made it happen, and they know who they are.  Maybe I do, maybe I don't.  But I think it's rather amazing.  And I hope that we are not coming to court for hearings in 2032.  I don't know who among us will be alive.  I'm not going to be alive by then.  Certain people might cheer if that's the case.  But I congratulate the human beings who made this happen.  And you know who you are.  Maybe I do, maybe I don't, but I congratulate you.

All right.  So I reserve the right to supplement or amend this oral bench ruling in a more fulsome written order.  I am asking Mr. Morris and his team to be the scriveners on that order.  And obviously, you're going to run it by the other

lawyers here who participated today.

Is there anything else before we wrap it up?

MR. MORRIS: Just one other thing, Your Honor. And I greatly appreciate your comments.

When we draft the order, are we authorized to say that this settlement is approved not only pursuant to 9019 but to 363? Because there are asset sales that are part of this. We moved under that provision, and I didn't hear Your Honor reference that, --

THE COURT: Okay.

MR. MORRIS: -- but we would like to include that in the order.

THE COURT: You may. And that is precisely why I said I reserve the right to supplement or amend, because many times I get out of here and look at this transcript and, ooh, I forgot to say whatever.

MR. MORRIS: Yeah.

THE COURT: So I meant to say that and I didn't, so you may add that.

MR. MORRIS: And I assume all Your Honor wants is a fairly simple form of order that incorporates --

THE COURT: I do not want a 40-page order.

MR. MORRIS: Right.

THE COURT: Okay?

MR. MORRIS: Just an order that incorporates your

comments on the record, and to the extent that Your Honor wants to amend that, you'll do so at your leisure?

THE COURT: Yes.

MR. MORRIS: Perfect.

THE COURT: All right.

MR. MORRIS: Thank you.

THE COURT: Thank you all. We're adjourned.

MR. PHILLIPS: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 4:38 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

 **/s/ Kathy Rehling**      **06/27/2024**

_____   _____
Kathy Rehling, CETD-444      Date
Certified Electronic Court Transcriber

264

INDEX

PROCEEDINGS      4

OPENING STATEMENTS

By Mr. Morris      48
By Mr. Phillips      62
By Mr. York      64
By Mr. Lang      79

WITNESSES

Claimant Trust's Witnesses

James P. Seery
- Proffer of Testimony by Mr. Morris      11
- Direct Examination by Mr. Morris      83
- Cross-Examination by Mr. Phillips      110
- Cross-Examination by Mr. York      111
- Cross-Examination by Mr. Lang      128

Patrick Daugherty's Witnesses

Patrick Daugherty
- Direct Examination by Mr. York      141
- Cross-Examination by Mr. Morris      154
- Examination by the Court      164

Dugaboy Investment Trust's Witnesses

Mark Patrick
- Direct Examination by Mr. Lang      171
- Cross-Examination by Mr. Morris      184
- Redirect Examination by Mr. Lang      189
- Recross-Examination by Mr. Morris      191
- Examination by the Court      192

James "Jim" Dondero
- Direct Examination by Mr. Lang      195
- Cross-Examination by Mr. Morris      206
- Redirect Examination by Mr. Lang
- Examination by the Court      224
- Recross-Examination by Mr. Morris

557

MR 1117

                                  INDEX
                                 Page 2

EXHIBITS

Claimant Trust's Exhibits (Motion to Extend Duration)

1 through 67                                        Received   11

Claimant Trust's Exhibits (Motion to Approve Settlement)

1 through 123, 126                                   Offered   43
10                                                Withdrawn   45
12                                                 Received   44
13                                                 Received   44
57                                                Withdrawn   45
59                                                 Received   46
64-69                                              Received   46

Dugaboy Investment Trust's Exhibits

Plan and Settlement Agreement                      Received   47
Exhibit 3                                          Received  189

Patrick Daugherty's Exhibits

1-42                                               Received   47

CLOSING ARGUMENTS

By Mr. Morris                                                231
By Mr. Phillips                                              238
By Mr. Loigman                                               240
By Mr. York                                                  240
By Mr. Lang                                                  245
By Mr. Morris                                                250

RULINGS

Motion for an Order Further Extending Duration of Trusts    21
(4213)

MR 1118

INDEX
Page 3

RULINGS, cont'd.

Motion for Entry of an Order Pursuant to Bankruptcy    28/254
Rule 9019 and 11 U.S.C. § 363 Approving Settlement
with HMIT Entities and Authorizing Actions Consistent
Therewith (4216)

END OF PROCEEDINGS                        263

INDEX                                  264-266

Tab 10

E-filed in the Office of the Clerk
for the Business Court of Texas
8/11/2025 6:53 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § | THE BUSINESS COURT OF TEXAS FIRST DIVISION |
| Plaintiffs, | § § | |
| v. | § § | Cause No. 25-BC-01B-0027 |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC, and CDH GP, LTD., | § § § § § § § | |
| Defendants. | § | |

## DEFENDANTS' SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE

**Brian P. Shaw**
  Texas Bar No. 24053473
  Email:  bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Brent M. Rubin**
  Texas Bar No. 24086834
  Email:  brubin@ccsb.com
**Joshua D. Kipp**
  Texas Bar No. 24078793
  Email: jkipp@ccsb.com
**Andrea C. Reed**
  Texas Bar No. 24121791
  Email:  areed@ccsb.com

DEFENDANTS' SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE–Page 1

MR 1121

**Emily H. Owen**
 Texas Bar No. 24116865
 Email: eowen@ccsb.com
**CARRINGTON, COLEMAN,**
 **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202

*Attorneys for Defendants*

# TABLE OF CONTENTS

Table of Contents ...................................................................................3

Table of Authorities...............................................................................4

Table of Abbreviations and Defined Terms ..........................................7

Summary of Supplemental Brief ...........................................................8

Argument and Authorities ...................................................................10

   A.  The Dondero Organizations do not have capacity to bring claims belonging to the Debtor. .......................................................................10

   B.  The Court should dismiss because the Dondero Organizations cannot cure their lack of capacity. .......................................................14

   C.  Under Rule 39, the Debtor must be joined for a full and just adjudication. If joinder is not possible, the Court should dismiss the case in full.............................................................................................16

      1.  The Debtor is an indispensable party under Rule 39(a) and must be joined.............................................................................................17

      2.  Because the Debtor is necessary for a just adjudication, the Court must abate this action. .......................................................24

Conclusion ...........................................................................................26

CERTIFICATE OF COMPLIANCE......................................................28

CERTIFICATE OF SERVICE...............................................................28

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Associated Bankers Credit Co. v. Meis,*
456 S.W.2d 744 (Tex. App.—Corpus Christi 1970, no writ) ..............23

*Austin Nursing Center, Inc. v. Lovato,*
171 S.W.3d 845 (Tex. 2005) ........................................................15

*Bernal v. Garrison,*
818 S.W.2d 79 (Tex. App.—Corpus Christi–Edinburg
1991, writ denied) ....................................................................25

*Conrad Constr. Co., Ltd v. Freedmen's Town Pres. Coal.,*
491 S.W.3d 12 (Tex. App.—Houston [14th Dist.] 2016, no
pet.) ........................................................................................24

*El T. Mexican Rests. v. Bacon,*
921 S.W.2d 247 (Tex. App.—Houston [1st Dist.] 1995, no
writ)........................................................................................10

*Galveston, H. & S.A. Ry. Co. v. Dowe,*
70 Tex. 5 (Tex. 1888)..................................................................9

*Graywest, LLC v. Neely,*
No. 2-06-197-CV, 2007 WL 614036 (Tex. App.—Fort
Worth Mar. 1, 2007, no pet.).....................................................15

*Henderson v. Gordon,*
No. 01-16-01007-CV, 2018 WL 3848777 (Tex. App.—
Houston [1st Dist.] Aug. 14, 2018, no pet.) .................................22

*In re Indep. Fuel Sys. LLC,*
655 B.R. 322 (Bankr. E.D. Tex. 2023) ........................................23

*KCM Fin. LLC v. Bradshaw,*
457 S.W.3d 70 (Tex. 2015) .........................................................23

*Lee v. Ty Equity Grp., Inc.*,
  No. CIV. A. 3:01-CV-0253, 2001 WL 1401395 (N.D. Tex.
  Nov. 8, 2001) ...................................................................................... 18

*Long v. Lopez*,
  115 S.W.3d 221 (Tex. App.—Fort Worth 2003, no pet.).................... 21

*Longoria v. Exxon Mobil Corp.*,
  255 S.W.3d 174 (Tex. App.—San Antonio 2008, pet.
  denied)............................................................................ 18, 22, 24, 25

*Mossler v. Nouri*,
  2010 WL 2133940 (Tex. App.—Austin May 27, 2021, pet.
  denied)...................................................................................................13

*Munters Corp. v. Locher*,
  936 S.W.2d 494 (Tex. App.—Houston [14th Dist.] 1997,
  writ denied) ........................................................................................21

*In re Occidental W. Tex. Overthrust, Inc.*,
  626 S.W.3d 395 (Tex. App.—El Paso 2021, no pet.)..................... 22, 25

*Pike v. Tex. EMC Mgmt., LLC*,
  210 S.W.3d 763 (Tex. 2020) ...................................................... 10, 11, 12

*Richie v. Rupe*,
  443 S.W.3d 856 (Tex. 2014) ............................................................... 11

*Ring & Ring v. Sharpstown Mall Tex., LLC*,
  No. 01-16-00341-CV, 2017 WL 3140121 (Tex. App.—
  Houston [1st Dist.] July 25, 2017, no pet.)......................................... 19

*Royal Petroleum Corp. v. Dennis*,
  332 S.W.2d 313 (Tex. 1960) ............................................................... 18

*In re SPhinX, Ltd.*,
  351 B.R. 103 (Bankr. S.D.N.Y. 2007) ................................................ 16

*Thompson v. Cont'l Airlines*,
  5 S.W.3d 747 (Tex. App.—San Antonio 1999, no pet.).......................21

*Matter of Tr. A & Tr. C. Established Under Bernard L. & Jeannette Fenenbock Living Tr. Agreement, Dated March 12, 2008,*
690 S.W.3d 80 (Tex. 2024) .......................................................20

*White v. Independence Bank, N.A.*,
794 S.W.2d 895 (Tex. App.—Houston [1st Dist.] 1990, writ denied)..................................................................................10

**Statutes**

Bankruptcy Code sections 363 and 552 ......................................16

Cayman Islands Companies Act section 97...............................16

**Other Authorities**

TEX. R. CIV. P. 21a ....................................................................28

TEX. R. CIV. P. 39(a)(2)(i) ........................................................20

TEX. R. CIV. P. 93(2) .................................................................10

Texas Rule of Civil Procedure 1 ................................................9

# TABLE OF ABBREVIATIONS AND DEFINED TERMS

| Term | Definition | Pages |
|---|---|---|
| Cayman Liquidation | Involuntary liquidation proceedings, *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*, Cause No. FSD 99 OF 2025 (JAJ), Grand Court of the Cayman Islands | 7 |
| Chapter 15 Proceeding | Petition for recognition of foreign proceeding, *In re Charitable DAF HoldCo, Ltd.*, No. 25-11376-BLS (Bankr. D. Del. filed July 21, 2025) | 7 |
| Charitable DAF | The Charitable DAF Entities collectively | 17 |
| Charitable DAF Entity | DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, or CDH GP, Ltd. individually | 22 |
| The Charitable DAF Fund | Charitable DAF Fund, L.P. | 17 |
| Debtor or Charitable DAF HoldCo | Charitable DAF HoldCo, Ltd. | 7 |
| Dondero Organizations | Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. collectively | 7 |
| JOLs | The joint official liquidators appointed in the Cayman Liquidation | 7 |

## SUMMARY OF SUPPLEMENTAL BRIEF

The Dondero Organizations' lack of capacity provides this Court with another reason, on top of a lack of subject-matter jurisdiction, to dismiss this case. And even if the Court has subject-matter jurisdiction and the Dondero Organizations have capacity, the Court must abate this case so the Dondero Organizations can add an indispensable party—the Debtor.

First, *capacity*. The Cayman liquidators ("JOLs") are seeking recognition of the Cayman Liquidation through Chapter 15 Proceedings in Delaware bankruptcy court. The JOLs have the *sole* power to bring legal proceedings in the Debtor's name and take possession of the Debtor's property if they make a cogent and successful claim. But the Dondero Organizations ask this Court to award them assets they allege were stolen from the non-party Debtor, the only pertinent entity in which they hold an ownership interest. The Dondero Organizations are emphatic they do not make derivative claims on the Debtor's behalf and are, instead, suing in their individual capacity. But they do not have capacity to do so.

Second, *indispensable parties*. Any relief the Dondero Organizations might obtain belongs to the Debtor, as the alleged owner of the assets. So the Debtor's absence from this suit is a defect in the parties, requiring the Debtor's joinder under Rule 39 for this lawsuit to proceed. If the Dondero Organizations have capacity, the Court must abate the case so the Dondero Organizations can join the Debtor.

The Dondero Organizations—frustrated with the pace of proceedings in the Caymans and in a rush to try to get a TRO right before the Independence Day holiday—created this quagmire with an ill-advised lawsuit before a Court that does not have subject-matter jurisdiction over claims the Dondero Organizations do not own. Piecemeal, wasteful litigation like this is contrary to Texas Rule of Civil Procedure 1, as well as Texas jurisprudence from the Republic of Texas[1] to the enactment of the Texas Business Court in 2024. The Court should dismiss, or in the alternative, abate this case.

---

[1] "Our system of procedure is essentially equitable in its nature, and was designed to prevent more than one suit growing out of the same subject-matter of litigation; and our decisions from the first have steadily fostered this policy." *Galveston, H. & S.A. Ry. Co. v. Dowe*, 70 Tex. 5, 11 (Tex. 1888) (citing *Chevalier v. Rusk*, 1 Tex. (Dallam) 611 (1843)).

<u>**ARGUMENT AND AUTHORITIES**</u>

**A.      The Dondero Organizations do not have capacity to bring claims belonging to the Debtor.**

Capacity is a party's legal authority to prosecute or defend a suit. *El T. Mexican Rests. v. Bacon*, 921 S.W.2d 247, 250 (Tex. App.—Houston [1st Dist.] 1995, no writ). A plaintiff lacks this legal authority when it "is not entitled to recover in the capacity in which [it] sues." TEX. R. CIV. P. 93(2). Applicable here, "[a] corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong in the form of reduced stock value, because all stockholders will be made whole if the corporation obtains compensation." *Pike v. Tex. EMC Mgmt., LLC*, 210 S.W.3d 763, 775 (Tex. 2020) (citation modified). This "prohibition on recovering the lost value of an interest in an organization also applies to limited partners." *Id.* at 775-76. Where the organization has sustained the injury, an owner can only sue on behalf of the organization, not in an individual capacity. *See White v. Independence Bank, N.A.*, 794 S.W.2d 895, 898 (Tex. App.—Houston [1st Dist.] 1990, writ denied).

As the Dondero Organizations repeatedly assert, they plead individual, non-derivative claims.[2] However, all causes of action the Dondero Organizations plead stem from their allegations that Defendants converted $270 million in assets belonging to *the Debtor* and diluted the value of the Dondero Organizations' participating *shares* in the *Debtor*.[3] Thus, the Debtor sustained the alleged injury. The Dondero Organizations attempt to get around the fact that the assets they seek to personally recover were "held by the [Debtor]"[4] by pleading that the Dondero Organizations "held the sole economic interest" of the assets by virtue of their ownership of participating shares in the Debtor.[5] To summarize, the Dondero Organizations' pleaded injury is a reduction in the value of their shares in the Debtor. But they lack capacity to recover those alleged damages. *See Pike*, 210 S.W.3d at 775; *and see Richie v. Rupe*, 443 S.W.3d 856, 887 (Tex. 2014) ("individual stockholders have no separate and independent right of action for injuries suffered by the corporation which merely result in the depreciation of the value of their stock").

---

[2] *See* **Exhibit A**, Transcript of Hearing on Plea to Jurisdiction, 41:1-9.
[3] Pls.' First Am. Pet. ¶¶ 6.4, 6.17, 6.23, 6.30, 6.35, 6.39, 6.45, and 6.50.
[4] Pls.' First Am. Pet. ¶ 5.20.
[5] Pls.' First Am. Pet. ¶ 4.1.

The general rule—that the Dondero Organizations lack capacity—is only fortified by the governing documents attached to the Dondero Organizations' pleading. As holders of mere Participating Shares, the Dondero Organizations held "no right to receive notice of, to attend, to speak at nor to vote at general meetings of the [Debtor]."[6] Instead those rights were vested solely in holders of Management Shares.[7] And all rights to manage the Debtor (prior to the Cayman liquidation) were held by the Directors.[8] The Dondero Organizations cannot establish individual capacity through these terms.

An ownership interest in the Debtor—the Participating Shares—does not authorize the Dondero Organizations to file a lawsuit in their individual capacities seeking the Debtor's assets, which in turn was a partnership interest. *See Pike*, 210 S.W.3d at 775. The Dondero Organizations seek to recover damages personally for the alleged theft of assets that didn't even belong to the Debtor, a non-party business organization. But their own pleadings make clear that not only did they not own the underlying assets, and neither did the Debtor. Their

---

[6] Pls.' Orig. Pet. at App. 76.
[7] *Id*. at App. 75.
[8] *Id*. at App. 83.

repeated allegations that they "own" the Debtor's assets through their ownership of the Debtor does not save their claims. Pleading "ownership" in these assets isn't a factual allegation; it's an incorrect legal conclusion that runs contrary to the Dondero Organizations' actual factual allegations, the organizational documents of the Debtor, and Texas law.

Even if the Debtor actually owned the assets, the Dondero Organizations, as alleged "beneficial owners of [the Debtor]," are not entitled to personally recover the Debtor's allegedly lost assets, regardless of the implications to the value of their Participating Shares. Their allegation that they are the only owners entitled to economic benefit from the Debtor's alleged assets does not change this result. Even where all shareholders file a lawsuit, "it is the corporation that holds its assets, including any causes of action." *Mossler v. Nouri*, 2010 WL 2133940, at *3 (Tex. App.—Austin May 27, 2021, pet. denied). This is, in part, because "any recovery on a corporate cause of action must be available to pay the corporation's debts." *Id.* Here, the Debtor is in a liquidation proceeding in the Cayman Islands, and the JOLs are investigating the same allegations raised in this petition. The JOLs also petitioned in Delaware for Chapter 15 recognition of the Cayman

Liquidation.[9] Under the guise of complaining about theft and personal enrichment by Mr. Patrick, the Dondero Organizations attempt to *personally* usurp for themselves those assets that allegedly belong to the Debtor, depriving both the Debtor and its creditors of their alleged interests. This situation exemplifies why an owner of a business organization cannot maintain a lawsuit in the owner's individual capacity to recover the organization's assets.

The Dondero Organizations do not make a single claim that does not hinge upon their ownership of participating shares in the Debtor. Yet they unequivocally disavow they are making any claim on behalf of the Debtor, such as a derivative claim.[10] This tension is precisely why this lawsuit should be dismissed: the Dondero Organizations do not have capacity to individually pursue the Debtor's claims.

## B. The Court should dismiss because the Dondero Organizations cannot cure their lack of capacity.

To maintain their claims, the Dondero Organizations are required to bring them on behalf of the Debtor. Typically when a plaintiff lacks capacity, "the trial court should abate the case and give the plaintiff a

---

[9] *See* Notice of Related Proceedings at App. 109.
[10] *See* Ex. A, 41:1-9.

reasonable time to cure any defect." *Austin Nursing Center, Inc. v. Lovato*, 171 S.W.3d 845, 853 n.7 (Tex. 2005). However, dismissal is appropriate when the defect cannot be cured. *See Graywest, LLC v. Neely*, No. 2-06-197-CV, 2007 WL 614036 at *3 (Tex. App.—Fort Worth Mar. 1, 2007, no pet.) (citing *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 386 (Tex. 1991)).

The Dondero Organizations cannot cure their lack of capacity. To maintain their claims, they must bring them on behalf of the Debtor. But the JOLs have the exclusive authority to do so. Through the Cayman Liquidation, the JOLs already have the power to bring legal proceedings in the Debtor's name and take possession of the Debtor's property, including instituting and maintaining all proceedings required for this purpose.[11] Companies Act, 2025, s.110, p.1.1 and p.2.1. And the Cayman proceeding is currently in the process of being recognized under Chapter 15.[12]

If it gets recognized under Chapter 15, the JOLs will be able to "operate the [D]ebtor's business and exercise the rights and powers of a

---

[11] *See* Notice of Related Proceedings at App. 88-103 (Ex. 2) and 217-214 (Ex. 6).
[12] *See* Notice of Related Proceedings at App. 109.

trustee under Bankruptcy Code sections 363 and 552." *In re SPhinX, Ltd.*, 351 B.R. 103, 115 (Bankr. S.D.N.Y. 2007) (citing 11 U.S.C. § 1520(a)(1)-(3)). The JOLs will have the sole right to prosecute the Debtor's claims. As a result, even if the Dondero Organizations somehow could have, at some point in the past, met the requirements to file this lawsuit on behalf of the Debtor, they are precluded from doing so now because of the pending liquidation. Any amendment would be futile, and dismissal is appropriate. If the JOLs do not prosecute the Debtor's perceived claims, the correct manner to bring proceedings in the Debtor's name is to obtain sanction from the Cayman Islands Court or seek permission to bring a derivative action on behalf of the Debtor pursuant to section 97 of the Cayman Islands Companies Act.

## C. Under Rule 39, the Debtor must be joined for a full and just adjudication. If joinder is not possible, the Court should dismiss the case in full.

Rule 39 governs the joinder of necessary parties. Rule 39(a) defines the persons who "shall be joined as a party" if possible, while Rule 39(b) instructs courts to "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable" based on four

MR 1136

statutory factors. TEX. R. CIV. P. 39(b). The Court thus has two inquiries

under Rule 39:

> 1)     Is the Debtor needed for a just adjudication?
>
> 2)     Should the case be dismissed if the Debtor cannot be joined, considering whether it would be fair for the action to proceed without the indispensable party.

The Court does not reach the second step if the absent party can be

joined.

## 1. The Debtor is an indispensable party under Rule 39(a) and must be joined.

Under Rule 39(a), for a just adjudication, a party shall "be joined as a

party" if:

> (1) in his absence *complete relief cannot be accorded among those already parties*, or
>
> (2) he *claims an interest* relating to the subject of the action and is *so situated that the disposition* of the action in his absence may
>
>> (i) as a practical matter *impair or impede his ability to protect that interest* or
>>
>> (ii) leave any of the persons already parties *subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations* by reason of his claimed interest. . . .

TEX. R. CIV. P. 39(a) (emphasis added). If a necessary party has not been

joined, a court "shall order" it to be made a party. *Id.* 39(a)(2)(ii). The

proper procedure is to abate the case until the indispensable party has been joined. *Longoria v. Exxon Mobil Corp.*, 255 S.W.3d 174, 180 (Tex. App.—San Antonio 2008, pet. denied).

The Debtor must be joined under both Rule 39(a)(1) and (a)(2). Under subsection (a)(1), the Debtor's absence from this lawsuit prevents the Court from being able to grant complete relief to the existing parties. Because all of the Dondero Organizations' claims are derivative claims, the Debtor is a necessary party that must be joined. *See Lee v. Ty Equity Grp., Inc.*, No. CIV. A. 3:01-CV-0253, 2001 WL 1401395, at \*2 (N.D. Tex. Nov. 8, 2001) (non-party must be joined as necessary where "breach of fiduciary duty clearly are derivative claims").[13] Specifically, the Dondero Organizations pray for relief that cannot be afforded to them by the current Defendants, for example:[14]

- "B. Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;"
- "D. Require the reversal of the dilution scheme and unauthorized asset transfers; and"

---

[13] Texas's joinder Rule 39 is modeled off of Federal Rule 19, nearly verbatim, so Texas state courts consider the opinions of federal courts in Texas as persuasive authority. *See, e.g.*, *Royal Petroleum Corp. v. Dennis*, 332 S.W.2d 313, 317 (Tex. 1960).
[14] Pls.' First Am. Pet. at 51.

- "E. Require recission of improper redemption of shares and share transfers[.]"

Only the Debtor has (or had) authority under its governance documents to dispose of and transfer the assets of the Charitable DAF, as sought in Request "B" above. The Dondero Organizations' request for injunctive relief excludes the Debtor, arguably the party *most* necessary to join. *See Ring & Ring v. Sharpstown Mall Tex., LLC*, No. 01-16-00341-CV, 2017 WL 3140121, at *11 (Tex. App.—Houston [1st Dist.] July 25, 2017, no pet.). This kind of "piecemeal litigation" only "waste[s] judicial resources," but it does not afford Plaintiffs complete relief under Rule 39(a). *See id.*

Requests for relief "D" and "E"—reversing the alleged "dilution scheme" and rescinding the allegedly "improper redemption of shares"— are similarly flawed because they only can be carried out by the Debtor. The Dondero Organizations have Participating Shares in only one entity, the Debtor. This interest arises out of the Debtor's Articles of Association,[15] and no Defendants currently party to this lawsuit can

---

[15] Pls.' Original Pet. at App. 76, ¶ 19; 88, ¶¶ 108-15. The Dondero Organizations attached the Debtor's Amended and Restated Articles of Association dated 19 January 2015, rather than the current amended articles dated 20 February 2025. Regardless of the differences between these amended articles, the Debtor remains the

provide complete relief. *See Matter of Tr. A & Tr. C. Established Under Bernard L. & Jeannette Fenenbock Living Tr. Agreement, Dated March 12, 2008*, 690 S.W.3d 80, 88 (Tex. 2024) (explaining that for non-parties, the court "could not require them to transfer the shares back" if they were not joined). Ordering Defendants to return shares they do "not own or have any control over" is not just improper, it is *impossible. See id.* at 88, 92 (court abuses its discretion by ordering restoration of shares by a defendant who "does not own or control the shares[,] and those who do are not parties."). Because the Debtor is needed in this lawsuit to afford complete relief, it must be joined under Rule 39(a)(1).

The Debtor is also an indispensable party under Subsection (a)(2). The Debtor claims an interest and is situated such that disposition of this action without it "as a practical matter impair[s] or impede[s] [its] ability to protect that interest." TEX. R. CIV. P. 39(a)(2)(i). The Debtor's absence also leaves the Defendants who are "already parties subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *Id.* 39(a)(2)(ii).

---

only DAF entity that grants the Dondero Organizations any shares and rights to distributions.

Under Subsection (a)(2)(ii), proceeding without the Debtor risks multiple, inconsistent obligations given the sheer number of fora where the Dondero Organizations are litigating these same claims. The Dondero Organizations ask for relief in this Court even though they, or their related parties, instituted involuntary liquidation of the Debtor in the Caymans,[16] resulting in a Chapter 15 petition in Delaware.[17] The Dondero Organizations' claims in this case substantially overlap with the claims in the Caymans, increasing the risk that all parties will be subject to conflicting judgments regarding their interests. *Cf. Munters Corp. v. Locher*, 936 S.W.2d 494, 498 (Tex. App.—Houston [14th Dist.] 1997, writ denied) ("The principal function of bankruptcy law is to determine and implement in a single collective proceeding the entitlements of all concerned parties."). And given the Dondero Organizations do not specify whether their claims against Patrick are brought in his individual or official capacity, he is uniquely at risk of conflicting judgments. *See Long v. Lopez*, 115 S.W.3d 221, 227 (Tex. App.—Fort Worth 2003, no pet.).

---

[16] *See* Notice of Related Proceedings at App. 5.
[17] If the Cayman Liquidation receives Chapter 15 recognition, then the trustee *must* be joined, or this case must be dismissed. *See Thompson v. Cont'l Airlines*, 5 S.W.3d 747, 748 (Tex. App.—San Antonio 1999, no pet.).

**DEFENDANTS' SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE**–Page 21

Proceeding without the Debtor also impairs its ability to defend its interests here, which makes its joinder necessary under Subsection (a)(2)(ii). As explained above ad nauseum, the Debtor is the only owner of the claims in this lawsuit. *See Longoria*, 255 S.W.3d at 182 (even if the absent party no longer has title to or possession of the assets in dispute, they still have an interest in the lawsuit). And by filing the Chapter 15 petition for recognition,[18] the Debtor "has an *actual, claimed interest—* not just a potential interest—in the subject matter of the action." *See In re Occidental W. Tex. Overthrust, Inc.*, 626 S.W.3d 395, 401 (Tex. App.— El Paso 2021, no pet.) (citing *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 913 (Tex. 2017)); *Henderson v. Gordon*, No. 01-16-01007-CV, 2018 WL 3848777, at *6 (Tex. App.—Houston [1st Dist.] Aug. 14, 2018, no pet.) (quoting *Claim*, WEBSTER'S THIRD NEW INT'L DICTIONARY (2002)) ("'claim' means 'to *demand recognition* of (as a title, distinction, possession, or power) esp. as a right'") (emphasis added).

Specifically the Debtor has an interest in the subject matter of action because the Dondero Organizations request a constructive trust and a court-appointed receivership targeting the Charitable DAF's

---

[18] *See* Notice of Related Proceedings at App. 109.

assets. Imposing a constructive trust over Patrick, CDMCFAD, LLC, and DFW Charitable Foundation, solely in favor of the Dondero Organizations, impairs any interest the Debtor has in protecting its interests. *See In re Indep. Fuel Sys. LLC*, 655 B.R. 322, 328 (Bankr. E.D. Tex. 2023) (before a plaintiff "can obtain a constructive trust, it must establish that the [assets] are owned by Defendant," so non-parties with an interest in those assets must be joined as necessary parties); *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 88 (Tex. 2015) (finding error when a court grants a constructive trust for assets not definitively traceable as owed to the specific claimant, since that impairs the interests of non-parties).

The Dondero Organizations' receivership request also has a joinder problem. The Debtor is "a necessary and indispensable party" when a receivership will "affect[] its properties." *See Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 747 (Tex. App.—Corpus Christi 1970, no writ). That is true here, even though the Dondero Organizations only request a receiver be appointed over DFW Charitable Foundation and CDMCFAD, LLC.

By the facts as alleged in the Dondero Organizations' pleadings, only the Debtor, not the Dondero Organizations, had *any* property interest in the assets the Dondero Organizations propose placing under receivership, namely the "$270 million in assets."[19] They are not the Dondero Organizations' assets, and never were, since the Dondero Organizations' Participating Shares entitle them only to discretionary distributions, not an equity share of the entire Charitable DAF. Thus the Debtor also must be joined because "all persons or entities *over whose properties a receiver is appointed* are necessary parties." *See id.*

### 2. Because the Debtor is necessary for a just adjudication, the Court must abate this action.

When an absent party fits within Rule 39(a), "the court has a duty to effect the person's joinder." *Longoria*, 255 S.W.3d at 180. The Court must abate this lawsuit and give the Dondero Organizations an opportunity to join the Debtor. *See id.* at 184. And abatement must occur *before* any hearing on the Dondero Organizations' application for a temporary injunction. *See Conrad Constr. Co., Ltd v. Freedmen's Town Pres. Coal.*, 491 S.W.3d 12, 16-17 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding the court abused its discretion by "failing to effect the

---

[19] Pls.' First Am. Pet. ¶¶ 7.2, 7.13-7.21.

joinder of the City or to determine they could not be joined under Rule 39(b) before granting the temporary injunction").

If the Dondero Organizations are unwilling or unable to join all necessary parties, the Court then considers whether "in equity and good conscience the action should proceed" under the factors enumerated under Rule 39(b). *See* TEX. R. CIV. P. 39(b). If the absent party is indispensable, the Court has broad discretion to dismiss the entire case. *Id.*; *see Longoria*, 255 S.W.3d at 184 (court does not abuse its discretion by dismissing the case "when the plaintiff fails to join such a person after given a reasonable opportunity to do so").

Finally, the Court can fully determine that the absent Debtor must be joined on the face of the pleadings. *See, e.g.*, *Bernal v. Garrison*, 818 S.W.2d 79, 82 (Tex. App.—Corpus Christi–Edinburg 1991, writ denied). If the Dondero Organizations present new evidence outside of the pleadings in their response brief, Defendants respectfully request leave to file a reply brief with controverting evidence before the Court renders its decision, whether on the papers or after an evidentiary hearing. *Cf. In re Occidental W. Tex. Overthrust, Inc.*, 626 S.W.3d at 400 ("the existence of necessary parties under Rule 39 is an evidentiary issue").

## CONCLUSION

Defendants request the Court grant their motion to dismiss for lack of jurisdiction, standing, and capacity, and dismiss the Dondero Organization's petition in full. Should the Court determine that some claims should proceed, Defendants respectfully request the Court (1) abate these proceedings until the Debtor and any other necessary parties are properly joined and (2) after abatement, dismiss the case if the Dondero Organizations are unable or unwilling to join all necessary parties.

Respectfully submitted,

/s/ *Brian P. Shaw*

**Brian P. Shaw**
  Texas Bar No. 24053473
  Email:  bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Brent M. Rubin**
  Texas Bar No. 24086834
  Email: brubin@ccsb.com
**Joshua D. Kipp**
  Texas Bar No. 24078793
  Email: jkipp@ccsb.com
**Andrea C. Reed**
  Texas Bar No. 24121791
  Email:  areed@ccsb.com
**Emily H. Owen**
  Texas Bar No. 24116865
  Email:  eowen@ccsb.com
**CARRINGTON, COLEMAN,**
 **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

**ATTORNEYS FOR
DEFENDANTS**

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to BCLR 5 that, exclusive of the contents identified in BCLR 5(a) and inclusive of all footnotes and endnotes, this document contains 3,454 words as counted by the word count function of Microsoft Word. I further certify this document complies with the Court's judge-specific guidelines regarding word limits and formatting.

/s/ *Emily H. Owen*
Emily H. Owen

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2025, a copy of the foregoing document was electronically served on all counsel of record in accordance with TEX. R. CIV. P. 21a.

/s/ *Emily H. Owen*
Emily H. Owen

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
COURT CAUSE NO. 25-BC01B-0027

EXHIBIT

A

| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. And THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | ) ) ) ) ) ) ) ) | IN THE TEXAS BUSINESS COURT |
|---|---|---|
| Plaintiffs, | ) ) | FIRST DIVISION |
| VS. | ) ) | |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | DALLAS, TEXAS |

-------------------------------

MOTION TO DISMISS

PLEA TO JURISDICTION

-------------------------------

On the 4th of August, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bill Whitehill, Judge presiding, held in Dallas, Dallas County, Texas;

Proceedings reported by Aerial M. Holloway via oral stenography.

APPEARANCES

FOR THE PLAINTIFFS,THE HIGHLAND DALLAS FOUNDATION, INC.,
THE HIGHLAND KANSAS CITY FOUNDATION, INC.
And THE HIGHLAND SANTA BARBARA FOUNDATION, INC.:

    DARREN L. MCCARTY
    SBOT: #(24007631)
    MCCARTY LAW PLLC
    316 West 12th Street,
    Suite 400
    Austin,Texas 78701
    Phone:512-827-2902
    Darren@mccartylawpllc.com


FOR THE PLAINTIFFS,THE HIGHLAND DALLAS FOUNDATION, INC.,
THE HIGHLAND KANSAS CITY FOUNDATION, INC.
AND THE HIGHLAND SANTA BARBARA FOUNDATION, INC.:

    CRAIG M. WARNER
    SBOT: #(24084158)
    DUANE MORRIS LLP
    100 Crescent Court,
    Suite 1200
    Dallas, Texas 75201
    Phone:214-257-7200 (ext. 7277)
    Cmwarner@duanemorris.com


    JOSEPH M. COX
    SBOT: #(04950200)
    DUANE MORRIS LLP
    100 Crescent Court,
    Suite 1200
    Dallas, Texas 75201
    Phone:214-257-7200 (ext. 7252)
    Cmwarner@duanemorris.com


    BENJAMIN L. WARDEN
    SBOT: #(24115926)
    DUANE MORRIS LLP
    100 Crescent Court,
    Suite 1200
    Dallas, Texas 75201
    Phone: 214 257-7200 (ext. 7253)
    BWarden@duanemorris.com

A P P E A R A N C E S (CONT.)

FOR THE DEFENDANTS, MARK PATRICK AND DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC AND CDH GP,LTD.:

    BRIAN SHAW
    SBOT: #(24053473)
    ANDREA REED
    SBOT: #(24053473)
    CARRINGTON, COLEMAN, SLOMAN &
    BLUMENTHAL, L.L.P.
    901 Main Street
    Suite 5500
    Dallas, Texas 75202
    Phone:214 -855-3000
    BShaw@CCSB.com

    Andrea Reed
    SBOT: #(24053473)
    CARRINGTON, COLEMAN, SLOMAN &
    BLUMENTHAL, L.L.P.
    901 Main Street
    Suite 5500
    Dallas, Texas 75202
    Phone:214 -855-3120
    AReed@CCSB.com

Also Present:

Julie Diaz - The Dallas Foundation

Torrey Litteton - The Dallas Foundation

Michael Stockhalm- Counsel for plaintiffs

I N D E X

(MOTION TO DISMISS

PLEA TO JURISDICTION )

August 4, 2025                                    Page, Volume

Appearance.................................3,        1

Proceedings...............................7,        1

General Discussion

With the Court............................7,        1

Defendants' Motion to Dismiss ...........29,        1

Plaintiffs' Plea to the Jurisdiction......50,        1

Defendants' Rebuttal......................90,        1

Plaintiffs' Rebuttal......................94,        1

Courts' Ruling............................94          1

Adjournment..............................101,         1

Reporter's Certificate...................102,         1

EXHIBIT   INDEX

| NO. | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|
| C-1 | Court's Exhibit Chart(Demonstrative).....9..........9 | | | 1 |
| PX-1 | Plaintiffs' Exhibit Chart(Demonstrative)....49.........49 | | | 1 |
| PX-2 | Charities' Allegations (PowerPoint)..............54.........54 | | | 1 |

PROCEEDINGS

(Open Court, All Parties Present)

THE COURT: We are on the record in Cause Number 25-BC01B-0027, *The Highland Dallas Foundation, Inc., et al, v. Mark Patrick, et al.*

Let's go around the room and make an appearance of counsel, please.

MR. SHAW: Your Honor, Brian Shaw and Andrea Reed with Carrington Coleman, on behalf of Defendants.

THE COURT: And who do you got with you?

MR. SHAW: With Andrea Reed, and --

MR. MCENTIRE: I'm just an observer. That's all.

MR. SHAW: Sawnie McEntire.

THE COURT: Okay.

MR. MCENTIRE: Sawnie McEntire, correct.

MR. MCCARTY: Darren McCarty for the Plaintiff charities. With me, Joe Cox and Craig Warner, my co-counsel; and Julie Diaz, president and CEO of The Dallas Foundation; and her colleague, Torrey Litteton.

THE COURT: We've got a few other folks.

MR. WARDEN: Yes, Your Honor. Ben Warden also with Duane Morris representing the Plaintiffs.

MR. STOCKHALM: Michael Stockhalm, with the

Plaintiffs.

THE COURT: Okay. Great. Y'all have met the folks up here before, and so we won't do that.

This is going to be an interesting morning because I haven't figured out exactly how I'm going to do things yet. We've got the room until at least 1:00 o'clock, maybe longer. Hopefully we won't take that long, but there are a few things that I want to explore.

One, I read everything. That doesn't mean I understand everything, but I've read it all. I think the gist of the case is that the Plaintiffs were getting money that HoldCo distributed from the fund, but the allegation is that Mr. Patrick exercised his ultimate control over the fund, or HoldCo, or both, to distribute the money elsewhere, and the Plaintiffs don't like that, and they want the $270 million back and some other stuff.

Is that basically the gist of it?

MR. MCCARTY: Well, Your Honor, I think there's little bit more to it than that.

THE COURT: Well, I know there is, but I -- but that was just from a high level.

MR. MCCARTY: Well, I would say that they -- that Mr. Patrick, wearing all of his various

hats, disenfranchised the participating shareholders of 100 percent economic interest in a $270 million fund to zero --

THE COURT: Right.

MR. MCCARTY: -- under a calculated plan over the course of a year and a half.

THE COURT: Right. But the gist of it is the Plaintiffs were getting money from basically the fund. Now they're not, and they think Mr. Patrick is legally responsible for that.

MR. MCCARTY: Yes, Mr. Patrick and the other Defendants under which he operated.

THE COURT: Well, under which he operated, yeah.

MR. MCCARTY: Right.

THE COURT: Okay. So we've got that.

So let's mark as a Court exhibit, one of these things that I handed out to you-all.

(Exhibit C-1 was marked and admitted.)

THE COURT: Okay. And that's going to be Court Exhibit 1. It's not evidence of anything. It's just demonstrative to help me try to visualize what's going on, so don't get upset about hearsay or anything like that. It's just me trying to visualize things. I'm a very visual person, and so that's why we're doing

that.

So the blue of Court Exhibit 1 represents the Plaintiffs.

Is everybody good with that?

Green is Charitable HoldCo.

Orange is the DAF -- Charitable DAF Fund.

And I'm not entirely sure who yellow is, but they're downstream from the fund today for sure.

Am I correct that the green HoldCo is the 99 percent, or at least was the limited partner in the partnership known as "the fund"?

MR. MCCARTY:  I would say it slightly differently.

THE COURT:  Okay.

MR. MCCARTY:  It's the limited partners held 100 percent of the economic benefit --

THE COURT:  Right.

MR. MCCARTY:  -- the participating shares. And Mr. Patrick held -- held 100 percent of the managing shares.

THE COURT:  Right.  But it's a limited partnership, correct?

MR. MCCARTY:  I'm sorry --

THE COURT:  The fund is a limited partnership.

MR. MCCARTY: Yes.

THE COURT: It has to have a general partner?

MR. MCCARTY: That's -- well, I'm sorry -- the fund.

THE COURT: Right.

MR. MCCARTY: Right. The fund. General partner was originally Charitable DAF GP.

THE COURT: Right. But my question is it's a limited partnership, so it has to have a general partner, correct?

MR. MCCARTY: And that was the general partner.

THE COURT: Right. Okay. So that general partner is the 1 percent ownership interest?

MR. MCCARTY: All management shares.

THE COURT: Right. And the 99 percent limited partnership interest was what -- you can call it a beneficial ownership or whatever. They were supposed to be the economic -- the green, correct?

MR. MCCARTY: Correct, Your Honor.

THE COURT: All right. So as I'm understanding it, all claims Plaintiffs are asserting have to flow through the green entity; is that correct?

MR. MCCARTY: Yes.

THE COURT: Okay. But the green entity's not a party to this case.

MR. MCCARTY: The green entity is not a party to this case.

THE COURT: The green entity is represented by two JOLs out of the Cayman Islands, correct?

MR. MCCARTY: Well, yes. They have the fund. Or they --

(Simultaneous conversation.)

THE COURT: Well, you're here representing them in a Cayman lawsuit; is that right?

MR. MCCARTY: Am I representing them?

THE COURT: Yes.

MR. MCCARTY: I am not.

THE COURT: Who filed the Complaint in the Cayman Islands?

MR. MCCARTY: Maples & Calder.

THE COURT: Okay. I'm sorry. I thought you were co-counsel in that.

MR. MCCARTY: I am not.

THE COURT: All right. Okay. Fair enough. I just wanted to straighten that out.

MR. MCCARTY: I do not represent the Joint Official Liquidators.

THE COURT: Okay. Somebody does?

MR. MCCARTY:  Yes.

THE COURT:  And we've established that all claims of Plaintiffs asserting flow through HoldCo, and HoldCo is not a party in this case.

MR. MCCARTY:  No, that's --

THE COURT:  But you just said earlier that they did.

MR. MCCARTY:  Your Honor, the money flowed --

THE COURT:  Right.

MR. MCCARTY:  -- through HoldCo, but the control of HoldCo and all the others that are Defendants here, who we are suing because of their breaches to us, their fraud --

THE COURT:  Right.

MR. MCCARTY:  -- and their other fiduciary breaches to us are outside of HoldCo.  So they made the decisions.  They controlled the HoldCo.

THE COURT:  So it's your position that Mr. Patrick owed direct fiduciary duties to your clients?

MR. MCCARTY:  That is correct.

THE COURT:  Okay.

MR. MCCARTY:  Under the Feiner family case out of the Southern District of New York, and that's

exactly how we pled it.

THE COURT: Okay. Just getting things clarified in my mind.

MR. MCCARTY: I understand. It's a complicated case.

THE COURT: It is a complicated case.

So as an aside -- and I'm just going to throw out an idea. And when I throw out an idea, I'm throwing out an idea. It's not a ruling. It's not a suggestion. It's an idea. Somebody has money that can fund things, and I assume it's the fund?

MR. MCCARTY: The fund -- the fund holds a hundred percent of COL HoldCo, and HoldCo owns a bunch of things underneath it.

THE COURT: All right. So this involves a lot of tax issues and corporate structure issues and government issues under Cayman law, perhaps US law, and Texas law, whoever law. A lot of them are Delaware laws.

I know a gentleman, and for full disclosure, he's one of my former law firm partners, Steve Gillis, who is an expert in all of these areas. I'm throwing out an idea of having him appointed as a special master to assist in working through these issues.

You-all don't have to answer that question right this instant because you're going to want to talk about it amongst yourselves and your clients and all that stuff. But it might be helpful to the Court to have Mr. Gillis assist, and he is willing to work at the rate of a thousand dollars an hour, which is substantially less than his normal rate. So I'm just throwing that out there as an idea. I'm just looking for your input on that.

All right. I have very serious concerns about Rule 39, and whether the JOLs and whoever the fund is represented by -- neither of them are here -- are necessary parties, such that the Court can't go forward without their joinder or y'all telling me how I can fashion effective relief that would not affect their rights because there is the Cayman lawsuit going on that asserts many of these same claims and many of these same parties.

MR. MCCARTY: I -- I would suggest if that's a -- sort of a question.

THE COURT: That is a question.

MR. MCCARTY: Okay. I would suggest that the Cayman lawsuit is built upon a number of the same facts, in fact, almost entirely the same facts.

(Simultaneous conversation.)

THE COURT: Exactly. That's the way I --

MR. MCCARTY: However, I would say that our claims are different from the Joint Official Liquidators claims in this sense. There were direct obligations to the participating shareholders, the Plaintiff charities here, not to commit fraud, not to breach fiduciary duties under Cayman law, and they did both of those. And I hope to show the Court in our presentation, those were quite direct.

There was no -- their HoldCo itself was not implicated in those direct communications. And they're very direct, and they're very pointed. And I think when the Court sees that, they will understand the difference between what we are doing here and the Joint Official Liquidators are doing there.

THE COURT: But for right now -- so let's assume that we have two circles: One is the Cayman lawsuit, and one is this lawsuit. There is a substantial overlap of those two circles, where the rights and the claims of the JOLs would be implicated by the outcome of this case, correct?

MR. MCCARTY: While I would say that the facts and circumstances are the same, I would suggest to Your Honor that the Joint Official Liquidators probably understand that there is relief that we are seeking

here, that at least as a legal matter is different.

And I would also suggest that this Court has ultimately -- and this is not for today, I don't think, but ultimately this Court has power to do some things that the Joint Official Liquidators do not necessarily have.

THE COURT:  Maybe; but I mean, is there any reason why the JOLs have intervened in this lawsuit, or y'all haven't joined them in this lawsuit?

MR. MCCARTY:  Your Honor, I don't believe that the Joint Official Liquidators have made a decision about that.

THE COURT:  Okay.  But you can make a decision to sue them.

MR. MCCARTY:  The Joint Official Liquidators?

THE COURT:  Yes.

MR. MCCARTY:  Your Honor, I don't think that there is a need to sue HoldCo.

THE COURT:  Well, join them as a -- in some capacity.

MR. MCCARTY:  Well, but -- but your question begs the question, right?  Who -- who are we accusing of malfeasance against my charities?

THE COURT:  I get that.  But whatever the

outcome in this case is, it seems to me will have some impact on the litigation going on in the Cayman Islands and vice versa, depending upon who gets there first, the outcome of the litigation in the Cayman Islands will have an impact on this case.

MR. MCCARTY: I would also say, Your Honor, and it's important to your question because I don't want to leave anything unsaid --

THE COURT: You can sit down if you want.

MR. MCCARTY: Yeah. So -- thank you.

Importantly, Your Honor, the Cayman liquidators, the official liquidators who are obviously, as you understand, officers of the Court in the Cayman Islands, have not yet been recognized in the United States under a Chapter 15.

THE COURT: Yeah, but they've filed a Chapter 15 proceeding.

MR. MCCARTY: They have filed a proceeding, but they have not received recognition in the US.

THE COURT: What are the odds of that being denied?

MR. MCCARTY: Well, Your Honor, I -- I have no idea. I don't know if they're going to contest it, if the other side is going to contest it. And I don't see any reason why we would contest it, and I don't

believe we will contest it. It is not scheduled right now for a hearing.

And so until they are recognized in the United States, they cannot...

THE COURT: Right. Okay. At some point in the very near future, we need to address Rule 39 and its application in this case, if we can figure out a schedule of how to do that. We want to be efficient, whether it's here or in the Cayman Islands. One place or the other seems to be the appropriate place to do this.

So let's think about and discuss at the end of the day a schedule of how we are going to deal with Rule 39 and whether we have the necessary party issue to deal with it.

Again, these are not rulings. These are just thoughts to throw out there to help you-all guide in your discussions. It seems to me that the Plaintiffs probably have it -- well, let me back up.

There are at least five different categories of subject matter jurisdiction: You know -- you -- you have standing, which is a component of subject matter jurisdiction.

You have statutory subject matter jurisdiction. If you were in federal court, you'd have

federal question or diversity. 25A.004(b), it defines subject matter -- or statutory subject matter jurisdiction.

You can have all sorts of things. I don't think capacity is a matter of subject matter jurisdiction, but those deal with whether we have the correct parties in the case and who really owns the claims.

Now, I noticed going through the Cayman pleading, and I mentioned it before we got started, Paragraph 73.2, romanette (ii) says, "Except it's provided herein." And I think were talking about the Limited Partnership Agreement, "The limited partners," which should be HoldCo and management, right?

"In their capacity as limited partners shall not participate." And I think we're really talking about your clients. "Limited partners shall not participate in the management of or have any control over the partnership's business or shall the limited partners have the power to represent, act for, sign for, or bind the general partner or the partnership."

And so I'm curious how that plays out in this case.

MR. MCCARTY: Well, Your Honor, I think it's fairly straightforward; and again, I'll refer back

to the Feiner family case and Cayman law. Just because there is not power granted under the partnership agreements, just like we have in the United States and in every state, we have other governing law over corporate structures.

And what we have pled, and what is very clear in Cayman law -- and I'm happy to brief this further for the Court -- is that they have -- that Mr. Patrick, as the control person in his various forms, had obligations to my clients that were outside of the partnership agreement.

THE COURT: Okay.

MR. MCCARTY: And -- and just because we can -- of course, we know you can have any sort of articles, governing articles, in Texas, or Delaware, or elsewhere, they don't trump the law. And so when he breaches -- they don't trump the law. The law may provide --

THE COURT: I think -- I'm fairly confident, at least under the Texas Business Organizations Code, that partnership agreements can modify.

MR. MCCARTY: They can. Under Cayman law, it's not the same.

THE COURT: Okay.

MR. MCCARTY: And regardless of the powers granted under the partnership agreement, which was the Amended and Restated Limited Partnership Agreement, they govern the fund, but also govern some of the matters and structure of the fund, despite saying that there were a lot of obligations, et cetera, which we think are important for other reasons.

But despite saying all these obligations, Mr. Patrick certainly did not honor those. And please don't hold me to Mr. Patrick. When I say "Mr. Patrick," Mr. Patrick is all that --

THE COURT: A lot of technical support.

MR. MCCARTY: Right.

So he did not -- you know, obviously did not honor that particular mandate, if you want to call it that, in the Amended and Restated Limited Partnership Agreement. But in addition to that, there is Cayman law, UK Commonwealth law, that applies as an umbrella over that, that says you cannot -- you cannot exercise your powers in a way that breaches certain duties to shareholders, et cetera.

THE COURT: You know, I -- and I'm sure that's correct. That's fairly universal.

MR. MCCARTY: Right.

THE COURT: But this just says who can

represent the limited partners. Basically it says they don't have the capacity to bring claims on behalf of the partnership.

MR. MCCARTY: Well, we know this: The limited partners were able to walk into the Cayman Islands Grand Court and ask for and receive an equitable lining out.

THE COURT: Right.

MR. MCCARTY: So they have power.

THE COURT: Yeah, and that's why we have JOLs because the JOLs are now representing the interest of the fund, the partnership.

MR. MCCARTY: Well, that is correct because of that action, yes.

THE COURT: All right.

So one of the other things we're going to need to talk about briefing-wise is what impact this provision of the Limited Partnership Agreement has on this Court's ability to proceed with you-all. And it may be that there are some causes of action that we can carve out. You're talking about direct causes of action?

MR. MCCARTY: Yes.

THE COURT: Okay. Maybe that's all we can go forward with. Maybe not. I don't know. And the

folks over here to my left (indicating) haven't had a chance to address anything yet.

MR. MCCARTY: He's listening and taking notes.

MR. SHAW: Judge, I'm loving this right now.

THE COURT: Well love it, because you're about to not love it so much.

But -- so I'm concerned about Rule 39. I'm concerned about this provision of the Limited Partnership Agreement.

Now, I'm just throwing it out for discussion, it seems to me that for having a directed particularized standing type injury, that component of subject matter jurisdiction -- and we need to be clear in the types of subject matter jurisdiction issues we're talking about.

One is statutory jurisdiction. You know, what part of this Government Code 25A.004(b) applies, if any? And particularized injury standing. Two completely different topics.

Now -- and, yeah, I can be persuaded otherwise, but my sense at the moment is the Plaintiffs have, certainly for direct claims, but for some of these corporate claims -- correct. For the direct claims, you

don't -- you know. We'll figure out what section they might go under.

For the claims that flow through the green entity on Court Exhibit Number 1, the Plaintiffs probably have sufficient particularized standing injury there, but I am very concerned about that capacity.

And so one question that I would have is the briefs that are before me, the motion and whatever, the discussion is -- is captioned and labeled jurisdiction, but the substance of it seems to be -- also be about capacity.

MR. MCCARTY: Well, Your Honor -

THE COURT: You can sit down. Whatever is comfortable. Don't feel compelled to stand up.

MR. MCCARTY: I'm sorry. It's --

THE COURT: Then stand up if you want to stand.

MR. MCCARTY: If you want me to sit down, I will. Thank you.

But, Your Honor, the -- first of all, it's not labeled capacity. Capacity can be waived. Your Honor is raising it sua sponte. And I think that's obviously the Court's providence, but this was brought as a matter of standing under the typical three components of standing: Injury, traceability, and

redressability, and under whether this Court has particular subject matter jurisdictions under Chapter 25A.

And so we -- you know, that is what we briefed obviously. I understand the Court's interest in joinder parties and all those other issues, but I think on those two issues, which were -- I -- I know we're both here to talk about today, we -- we believe that without question, we have standing under -- we have standing, and we have subject matter jurisdiction in this Court.

THE COURT: No, I've got that. I -- I guess my question is the substance of the argument seems to talk about both concepts: Injury standing, statutory subject matter jurisdiction, and capacity. I mean, granted the motion's called a motion to dismiss, and there's a lot of discussion about statutory stuff.

MR. MCCARTY: Well, if we wanted --

THE COURT: No, let me finish.

MR. MCCARTY: Sure.

THE COURT: My question is if -- the Supreme Court for the last 30-plus years has been abundantly clear. They want courts, lower courts, to deal with things on the substance, on the merits, as opposed to technicalities. I've learned that.

So if -- in substance, we're talking about both things -- if we're talking about subject matter jurisdiction and its components and capacity, is there anything else that needs to be said to enable the Court to make a ruling on capacity issues, or do you need to brief that separately?

MR. MCCARTY: Well, Your Honor, we can brief it separately, and would be happy to do so. I would suggest to the Court that on our direct claims; which again, I will hopefully make abundantly clear to the Court, there is no question that the Plaintiff charities have the capacity to bring those direct claims.

THE COURT: Well, direct claims, that would seem to be sensical. It's the things that flow through HoldCo and the fund that I am concerned about.

MR. MCCARTY: Well, Your Honor, all of these actions were taken by the control person acting in different capacities, okay? He was acting as the GP of the fund. He was acting as sole managing shareholder of HoldCo. He was acting as the sole member of the DFW Charitable Foundation. He was acting as the sole person in charge of CDMCFAD. He was acting in all of those capacities. All of those are governing capacities, and he set all of the wheels in motion, and thus, absolutely

has liability.

THE COURT: Okay. We're not concerned with liability at this point.

MR. MCCARTY: Well, that's --

THE COURT: We're trying to figure out where these claims are going to go forward. And maybe some of them go forward here, and some of them go forward in the Caymans. Maybe they all go here, maybe they all go there, but I don't want the same claims going on in two places at the same time.

MR. MCCARTY: Well, I would suggest, Your Honor, but liability -- the only reason I mention liability is due to traceability being addressed.

THE COURT: Yeah, I got that.

Okay. Y'all have been very patient and quiet over here to my left (indicating).

MR. SHAW: I have to stand up just so I can work out.

THE COURT: Okay. That's fine. Go to the podium if you want. I am decidedly not a federal Court. I don't want to be a federal Court, so whatever you're comfortable with.

MR. SHAW: Understood, Judge.

THE COURT: Go ahead.

MR. SHAW: We're ready to make argument?

THE COURT: No, I -- just talk about the things that we've been talking about if you want to, or you can proceed to your argument. I think I've laid out some of my thoughts and concerns.

And listen, if y'all want to take ten minutes to regather your thoughts based upon anything that I've said, I'm happy to accommodate that. I want the best picture of an argument that we can get.

MR. SHAW: I will just first comment about what you've said so far, and then if I can get into my argument, I --

THE COURT: Sure.

MR. SHAW: I'll -- I'll move to the -- to the lectern here.

THE COURT: Whatever you are the most comfortable with doing.

MR. SHAW: Judge, in general terms, I wholeheartedly agree with a lot of what you are saying, if not all. On the capacity issue, we would -- would like to brief that --

THE COURT: Okay.

MR. SHAW: -- to have additional briefing if we're going to look at the capacity, we have to look at that as a discrete issue, but we would want to look at that.

THE COURT: Phillip, make sure when we're done that we set some schedules for these agreeable things.

MR. SHAW: We share the Court's concern with regard to Rule 39 and the fact that all the relevant parties are here in order to afford full relief.

And overall, you know, the last comment you made, Judge, about trying the same things that are being tried in other places is our overarching concern. I think that, you know, we made clear that we're not saying that nobody has a right to a cause of action against anybody here. We're not saying that there is no redress. There is a redress. There is just an appropriate time and place for that.

The record, Judge, I think is pretty clear what is actually going on here, right? It's a fight over the control of the charitable DAF, as we referred to it in general.

THE COURT: Right.

MR. SHAW: And, you know, the record that was submitted by the Plaintiffs makes pretty clear that Mr. Patrick and Mr. Murphy are duly authorized control persons for what we call the charitable DAF.

THE COURT: Right.

MR. SHAW: We know that Mr. Dondero is funding the litigation that is proceeding.

Mr. Dondero does not like the status quo. He doesn't like that Mr. Patrick and Mr. Murphy are the control people. We get that. That's the overarching dispute here. There are allegations of wrongdoing, and in our time and place we will dispute that, and we will have a factfinder make a determination on that.

I -- I thought it was interesting that counsel said that what they're seeking is something different than what the JOLs are seeking. They're seeking -- they're seeking a receivership. They want to take over. They want someone else to take over.

So I don't know how we can say that the relief sought here is somehow different than what is being sought in the Chapter 15 or in the Cayman.

And ultimately the question here is, you know, we have these three different actions now: A Cayman liquidation; a Cayman lawsuit has been filed.

THE COURT: You know, maybe we can arrange for this Court to sit in the Cayman Islands?

MR. SHAW: It would be nice. Yeah, after hurricane season, I think. We want to wait until, you know, November or something like that.

But, you know, we have this Delaware

Chapter 15 pending, and now we have this case. So as the Defendants here, what we're simply saying is, you know, does this Court of limited jurisdiction, should this remain the third front in this litigation onslaught?

Should this be another vehicle to tap the resources of the charitable DAF, the charitable DAF that ultimately Mr. Dondero claims he is acting on behalf of? This all costs money. The liquidation costs money in the Caymans, the Chapter 15 costs money in -- in Delaware, and this action costs money as well, ultimately money that can't be provided to the charities.

I also want to make the distinction between the clients that are being represented here. Those are not the ultimate charities.

THE COURT: I got that.

MR. SHAW: Yeah. And so these are these Highland supporting organizations, each of which Mr. Dondero serves as a director.

So we say no, this is -- this is a round-peg-square-hole issue. And I was sitting over here thinking -- it wasn't because I was hungry, but I was thinking about a pretzel. That's all I could think about when I was listening to the conversation. We are

getting into a pretzel because this is the improper procedural method. And what they're doing here wasn't to run around the Caymans or around the due process of things, done right before the 4th of July in order to try to bullrush.

That's why we're having all these issues. That's why we're trying to create causes of action where they don't exist. These are the wrong plaintiffs bringing the wrong claims. They don't have everyone here that needs to be here, and it's in the wrong court.

You know, addressing the statutory construction issue, which obviously is key to determining whether this Court has subject matter jurisdiction. Plaintiffs say this is easy. Just look at the statute, done, done deal, mic drop, we don't even need the Judge, based upon their interpretation of the statute. I think it's a little bit more nuanced, and I think we need you.

This -- you know, and -- and I do want to point to one point issue, too, which is, you know, we referenced a Delaware law. We said that Delaware is currently the preeminent corporate governance venue.

You know, and I appreciate the bravado here, and I want Texas to be the preeminent corporate governance, but I don't think we can spike the ball

quite yet after less than a year. And what -- what is being promoted as an interpretation of this Court's governance as -- as the ability of this Court is really dangerous to that whole concept because what they say is that a stranger to an entity can sue another entity for a corporate governance issue, and I have a problem with that.

The Plaintiffs also offer no limiting principle at all and in particular to B(2). There is no limit. They say if we say it's about corporate governance and we meet the amount of controversy requirement, we're good, and I don't think that's the case.

So to your point, Judge, you talked about standing. We don't have any cases about standing in the context of the Texas Business Courts. And I recognize that the Texas Supreme Court has in recent years talked about standing since the term "standing" has been misused -- well -- and overly broad application.

We don't know quite how the Texas Supreme Court is going to characterize the issues that we've raised here because it hasn't gone up to the Texas Supreme Court yet. So we don't know if the Texas Supreme Court is going to call these issues standing or what they are going to call them; but typically, we are

in a court of general jurisdiction. We're in a district court. And when we're talking about subject matter, we're talking about something different than what we're talking about here.

So but I -- I don't think that label is really what's going to change the day here. I think it's about what the statute says and what claims and causes of action have been alleged here.

I also think it's an important point to talk about the legislative knowledge. When this statute was enacted that the legislature -- and I am quoting from *Paxton v. Annunciation House, Inc.*, which is a 2025 Texas Supreme Court case. The legislature uses statutory language with complete knowledge of existing law and with reference to it.

So when the Texas Legislature enacted the statute that governs this Court's subject matter jurisdiction, it took into account the existing causes of action, the cognizable causes of action that were available in Texas with regard to corporate governance and with regard to the breach of fiduciary duty, and with regard to the other issues that are in the statute. And so we have to read the statute with the recognition of that.

I'm going to take the first, what I believe

is the kind of low-hanging fruit subsections first, and then go to b(2) because b(2) is the broadest, I believe.

THE COURT: Yeah. And just for everybody's benefit, I struggle to see how b(4) and (5) apply on their terms. B(2) is their best shot. That's not to say that I am excluding 4 or 5, but I think their best shot is under b(2).

And just -- my thought is they are within the class of people that the legislature probably contemplated would have the ability to invoke b(2). They're not strangers off the street. They are the beneficial interest of the limited partnership that was created to provide -- to them to provide downstream to charities.

MR. SHAW: My job is to dissuade you from --

THE COURT: Your job is to persuade me otherwise.

MR. SHAW: -- when you pen your opinion. So I will start with these ones because I like these first.

Before -- it says "the organization" I think that term "the organization" is the real key part there.

THE COURT: Okay. Hang on a second. I've

got b(4) in front of me. It's an action by an organization -- that's not -- that's not in our case -- by an owner of an organization, okay? And so they're claiming to be owner of an organization, but I think the only organization that they are arguing to be an owner of is HoldCo, right?

MR. SHAW: Exactly right.

THE COURT: Okay. And so it's brought by them, Plaintiffs, against a controlling person, which I -- I believe they believe is Mr. Patrick of -- and he's acting as a controlling person of HoldCo; is that right?

MR. SHAW: That's exactly right. "The organization."

THE COURT: "The organization." Alleges an act or admission by Mr. Patrick in his capacity as a controlling person of HoldCo.

MR. SHAW: Exactly.

THE COURT: Is that what they're arguing?

MR. SHAW: That's what I understood.

THE COURT: Okay. Address that.

MR. SHAW: Well, the point there is that sub (a) talks about "the organization". So "the organization" is not even a party in this lawsuit.

THE COURT: Yeah.

MR. SHAW: And that's what doesn't make any sense.

THE COURT: Well, there's an owner of HoldCo, and HoldCo's not a party.

MR. SHAW: Correct.

THE COURT: But it seems to me they're complaining about his conduct as a controlling person of HoldCo.

MR. SHAW: As a completely separate entity.

THE COURT: Right, as a completely separate entity, and of the fund, probably, as well, which brings me back to Rule 39, and necessary parties in their capacity, and things like that.

MR. SHAW: Exactly, Your Honor.

THE COURT: Go ahead.

MR. SHAW: So I think that addresses b(4). B(5) is -- I'll call it the -- the loyalty, good faith, breach of fiduciary duty claim or -- or subsection.

THE COURT: Right.

MR. SHAW: You know, we believe that that section encompasses derivative actions. We agree with the Plaintiff that it doesn't only encompass derivative actions.

THE COURT: Correct.

MR. SHAW: It also encompasses actions by

an organization against its officers, directors, and managers.

THE COURT: Now, hang on a second. I think -- I think the test is -- somewhere -- are the Plaintiffs suing the Defendants in Defendants' capacity as a controlling person of an organization of which the Plaintiffs are an owner --

MR. SHAW: Exactly.

THE COURT: -- right? If only the legislature would ask me to write this statute. We'd be a lot better off. Okay. That's b(4); is that --

MR. SHAW: Correct. That's b(4). This has the ownership of provision there.

THE COURT: Okay. Go ahead with b(5).

MR. SHAW: And then b(5) also has an owner requirement. And it also talks about breach of fiduciary duty or loyalty -- it doesn't say breach of fiduciary duty, it says loyalty and good faith, the same thing.

Again, we think that encompasses both derivative action, not exclusively because b(1) has derivative, but also an action by an organization against a director, officer, et cetera, of that organization.

THE COURT: Right.

MR. SHAW: And that's, again, not what we have here.

THE COURT: Not completely.

MR. SHAW: So and again, I -- I go back to that touch point with the *Paxton v. Annunciation* case, which is the legislature was thinking about what is the body of existing corporate law and can someone sue in this capacity when we're interpreting the statute when they were drafting this. They don't point to any analogous case in Texas that would provide them some remedy that's akin to what they are asking for.

So b(2) is where I got a lot of this. And b(2) is obviously a very, very broad statute. And, you know, we have at least one sister Court of this Court that has expressed the broad nature of that Court or of the actual provision.

So what I -- what I think is important is we've talked about what is an action regarding, and then for shorthand, I'm saying corporate governance. What is an action -- quote, action regarding corporate governance?

They say, well, we've alleged facts about corporate governance of two non-parties to this litigation. And it's more than $5 million, and, ergo, this court has subject matter jurisdiction.

THE COURT: Aren't they really asserting a derivative claim?

MR. SHAW: That's how we read it, but they then disavowed that they were asserting a derivative claim.

THE COURT: Aren't you really asserting a derivative claim?

MR. MCCARTY: Absolutely not. And I will demonstrate that, I think.

THE COURT: All right.

MR. SHAW: So, you know, we have these non-party claims, and I go back to this square peg, round hole. That's the problem here, and that's what's creating these issues. So they don't seek any relief against the non-parties that they're claiming that this is about corporate governance. They are not parties, and there are no claims against either of them.

I don't know what ultimately a trial looks like. How do they -- and this goes to the Court's issue with Rule 39, how do you afford relief with regard to the corporate governance of two non-parties? I don't -- I don't know what effect that has at all.

So that's the problem. And I think what we need to go back to is, again, what does "action regarding" mean? Our position is that action regarding

is not just a fact pattern that touches upon corporate governance. That action regarding means that you have alleged a cognizable cause of action regarding corporate governance. That's it. Alleged a cognizable cause of action regarding corporate governance.

THE COURT: What does that mean?

MR. SHAW: It's something that's recognized by Texas law. That -- that you can't -- that -- and that can afford relief; so for example, that --

THE COURT: Well, the Cayman case would be under Cayman law. Internal affairs have --

MR. SHAW: It would be, and I haven't gone through all the different corporate documents. We do have some Delaware entities, we have some -- you know, but for those particular entities, you're right. But these are two -- these are two non-parties, nonparticipants in those entities, battling it out in Texas Business Court with regard to their corporate governance of two entities that are not part of the lawsuit.

So to your question, what does corporate governance look like? What does a cause of action regarding corporate governance look like? Well, it looks typically like a derivative claim or a claim by -- or a direct claim that somebody violated the corporate

governance documents that --

THE COURT: Which by our statute would be, for example, a breach of the partnership agreement or the bylaws, or things like that.

MR. SHAW: Exactly. And, you know, Judge, we go back to look and, you know, the -- that Rook case that we -- that we point to. You know, the Rook case refused to say that the statute only involved internal corporate governance. The Court rejected that.

And I -- from my reading of that case, the Court did that because it says the plain language does not say anything about internal corporate governance; and therefore, I am not going to limit the statute.

THE COURT: Let me ask you this question, a little bit off topic, but what charities are getting the fund of the money now?

MR. SHAW: We are -- no one is right now. We are in the process of naming new charities, but that has not -- and obviously, we have all this going on, so I don't know where that stands as of this moment, but I know that is in process.

THE COURT: Is there any thought to creating a way to get the money back to the original charities and bypasses the supportive organizations?

MR. SHAW: I think that could -- that -- I

don't see why that could not be a part of some resolution at some point. I can't commit to that, but I hear what you're saying.

THE COURT: Wouldn't that make sense as a way to resolve things, is to create a new structure that goes back to the intended beneficiaries?

MR. SHAW: Judge, I've learned a long time ago in this litigation with Highland and others that suggestions like that absolutely sound great. And we -- and I would agree, but I suspect that we would not have an agreement to address that.

THE COURT: That's just an opinion. Let's move on.

MR. SHAW. But this -- this is about control, and that's it.

THE COURT: Right. And I got it.

MR. SHAW: So going back to this action regarding -- I think that -- and if you look at that C-1031 LLC case, which is a Third Division.

THE COURT: Yeah, I'm -- kind of what I'm thinking is according to the partnership agreement, all the money that's in the fund is supposed to go way downstream to these four supported organizations, and if it's not happening, is that not a matter of governance?

MR. SHAW: A matter of governance over any

of the parties that are parties to this case, I would say no because it's --

THE COURT:  The governance of HoldCo, and really the fund, I think is the key.

MR. SHAW:  I think the question goes back to whether these parties have standing to assert those claims.

THE COURT:  All right.  But that's a different issue.  Okay.

MR. SHAW:  Are there corporate governance issues in this case as a -- are there facts alleged?  Yes, they allege facts with regard to corporate governance.  Our point is, is that that is not enough, that you have to allege causes of action that you can pursue with regard to corporate governance.

THE COURT:  But that's a capacity issue.

MR. SHAW:  And I hear you, Judge.  I don't know whether we call it capacity or whether it's a jurisdictional issue.  I think this is -- obviously, we're making law here because there's not any on it, but I don't know the answer to that, whether that is a capacity issue that we challenge through some other mechanism other than a motion to dismiss, or if it is a plea to the jurisdiction verses a dismissal.  We've brought it as a motion to dismiss.

THE COURT: Yeah, I'm just reminding people that I'm very mindful of the Supreme Court direction to not get hung up on labels of documents dealing with the substance of the arguments presented, so...

MR. SHAW: And I am with you. I think that the Supreme Court also has a countervailing public policy, that we want to be efficient, that we don't want to try the same thing over and over again. We don't want to have three people pursuing three different -- arguing the same thing in three different venues, and that's why we have standing issues here.

So we're not here to get tripped up on technicalities. This is not a gotcha. This is we need to be efficient, and we need to pursue this. And we're ready to go. We're ready -- we're ready to dispute these allegations. We're ready to fight them and to demonstrate that they're wrong. But we want to do it in the appropriate place, and we don't want to do it in five or six different forums.

We want to do it where it should be held, which is either in the Caymans, or through the Chapter 15, or if the JOLs want to come down here and assert claims, we're happy to dispute them here. Our issue is these Plaintiffs, with these claims, in this Court.

I want to touch upon, just real quickly, the -- that on the court case that we cite out of Delaware, understanding that this Court is not bound by Delaware law, but, you know, it does stand for the premise that a stranger to a corporation does not have the ability or capacity or standing to dispute the corporate governance of a stranger here.

And I think that goes to, you know, our hypothetical -- Exxon, Chevron hypothetical. There's a danger here in a ruling that could creep outside of this particular set of facts and really trip up the jurisdictional basis for this Court.

And again, I -- I point to the fact that there is no limiting principle that is offered by the Plaintiffs at all. They simply say fact pattern regarding corporate governance, you know, amount in controversy, and legality.

So, you know, I've been talking for a while, so I'll -- yeah, I'll conclude. I want to emphasize that, and we've said this from the get-go, we are not saying that no one has a cause of action and that there is not a remedy.

And while we dispute the underlying facts, there is going to be a time and place that we are going to have an up or down before a factfinder. And so be

it.  So be it.

What we want to do is to be good stewards of the DAF's resources.  We want to litigate this in an efficient way in the correct and appropriate forums, and we believe this Court is not the correct and appropriate forum; and therefore, we ask the Court to dismiss the case based upon a lack of subject matter jurisdiction.

THE COURT:  Do you thing that your clients are subject personal jurisdiction in the Cayman Islands?

MR. SHAW:  I've got a lot of clients, so I've got to be careful -- I've got to be careful without a list, and I don't want this to be --

THE COURT:  You don't have to give me an answer right now, but think about that.

MR. SHAW:  I really dislike not giving you an answer, but that one I don't know.

THE COURT:  Well, listen, business court is a different experience.  And what I want to do is have conversations among people so that we can get to the bottom of things.

MR. SHAW:  Understood.  Well, I'm going to stick by my non-answer.

THE COURT:  That's fine.  At this stage, at least, that's a perfectly acceptable answer.

MR. SHAW:  Thank you for your time, Judge.

MR. MCCARTY:  Thank you, Your Honor.

I am happy to be in business court, and I appreciate the mission of the court very much.  I understood the mission of the court before it was formed.  I'm happy to see it formed now.

So with permission, Your Honor, I am going to hand out a few things:  One, I'm going to hand out something akin to what you've done, which are structure charts.  It's the same structure charts that you see before you.

THE COURT:  Right.  Okay.  I've got those.

MR. MCCARTY:  And these are kind of -- the reason I am handing them up is because it will be a little bit easier to follow along with the PowerPoint that I think Mr. Warner is going to help with.

MR. WARNER:  May I approach to plug in, Your Honor?

THE COURT:  Yes, sure.  And let's get those marked for the record.

MR. MCCARTY:  And then, Your Honor, I'm going to go ahead and give counsel a couple of copies of this PowerPoint.  It's a little more animated.

Would you like a copy?

THE COURT:  Sure.

MR. MCCARTY:  If you want one.

THE COURT: Yeah.

MR. MCCARTY: And I am a visual person as well, Your Honor, which is one of the reasons why we are doing the PowerPoint because it is a complex issue, but it demonstrates largely the correctness of our claims, and then why we think, obviously, there is standing here and -- the purpose of our claims, and why we are standing here, and why we think this Court has subject matter jurisdiction.

Now, one thing I want to stay off the bat is we have heard that there's been a standing decision in this Court, et cetera, and maybe he meant subject matter jurisdiction, but --

(Off-the-record discussion between counsel.)

THE COURT: Just tell me what slide you're on because I don't have eyes in the back of my head.

MR. MCCARTY: Yeah, I understand. So right now, I'm on the final slide. But standing is a constitutional matter. There's no difference in standing between this Court or any other Court in the State of Texas.

And so I don't think that's an issue. I think 25A is new, and there's subject matter jurisdiction under 25A. But I'll start with that, and

then move into the presentation. And as I go through, hopefully I'll answer all of the questions raised by Mr. Shaw. I am moving to Slide 2.

So we've heard a lot about Mr. Dondero, both in the briefing and somewhat this morning. But Ms. Diaz is here on behalf of The Dallas Foundation, which is one of the main recipients. And these recipients have done a lot of money -- a lot of good with the $270 million that Mr. Dondero gifted these charities, and that is true. Mr. Patrick did not provide the $270 million. Nobody else did.

So to the idea that Mr. Dondero cares about this case -- he cares equally, I'm sure, about this case; however, that is not who controls these charities. And if we eventually get to the point where we talk about it on the merits, I have no doubt that Ms. Diaz is going to explain, as well as some of her colleagues of the other organizations, will explain that they control these supporting organizations, and these supporting organizations, obviously, on their overall organizations.

Okay. With that, I want to move into --

THE COURT: And there's tax code reasons why --

MR. MCCARTY: There's tax code reasons --

and -- and, Your Honor, yeah, that's -- this is a good time to address the question that you had earlier. Could -- could Mr. Patrick, if he wanted to, fund The Dallas Foundation directly? I think the problem with that is the tax code.

THE COURT: Well, it's not a question of Mr. Dondero. I mean, he could do that any time he wants. The question is money that's in the fund.

MR. MCCARTY: Right. Could Mr. Patrick do that without a supporting organization? I don't know that it could, but I'm not a tax lawyer. I'm not a corporate lawyer. I'm just a litigator, so I don't want to get into that too much, but I think there are complications with that.

But again, and I'm jumping way ahead here, but that is one of the reasons why a neutral party should be in place, so that we can start moving charitable funds back to where it needs to go. And make no mistake, the absence of $270 million is making an impact.

THE COURT: Well, I'm sure, yeah.

But the ultimate question is, I think, how did we get money back into the charities where it was intended to go? Isn't that...

MR. MCCARTY: Yes. Absolutely. That is

the question.  Today we'll get through -- I hope get through some of the preliminaries and get us along that road.

So I'm moving to the second side, which is just the claims that show jurisdiction.

Okay.  I'm going to start with some background because the background sets out the claims at issue here.  So we start --  we start -- oh.

THE COURT:  Hang on a second.  Let me number these pages here.  So we --

MR. MCCARTY:  Unfortunately, Your Honor, for your --

THE COURT:  I'm still numbering.

(There was a pause in the proceedings.)

THE COURT:  Okay.  What slide are you on?

MR. MCCARTY:  I am on Slide 4.

Now, there's -- I've tried to save you a headache by giving you these slides.  I thought you would have a monitor.  There are a bunch of slides we sort of animate through.

THE COURT:  Yeah.

MR. MCCARTY:  So I skipped a bunch of animation.  This is not animation, but I'll tell you what it is.

THE COURT:  So we're going to call this

Plaintiff's Exhibit 1?

MR. MCCARTY: Sure.

(PX-1 was marked for and admitted.)

MR. SHAW: And it's demonstrative.

THE COURT: It's just demonstrative.

MR. MCCARTY: Right. Of course -- of course.

So way back in November of 2023, we know that the participating charities, the Highland Foundations, had 100 percent ownership of the economic interest in Charitable DAF HoldCo, okay? We also know that by September of 2024, those interests -- or HoldCo's interests were worth $270 million. And again, the participating shareholders still held all of the ownership interests. And this looks quiet --

THE COURT: All of the economic interests.

MR. MCCARTY: All of the economic interests, that's correct. They held participating shares. They own those participating shares.

So this also looks quiet from November of 2023 to September of '24; however, unfortunately it was not. It was all in the dark to my clients, the charities. But during that time, Mr. Patrick had engaged lawyers to answer certain questions, and I almost think -- this is an important slide.

So this is the next slide.

THE COURT: 5.

MR. MCCARTY: 5. There is no animation here.

I almost think I can begin and end with this slide, because this slide shows everything. This was a work plan generated by a law firm directed by Mr. Patrick. And the work plan in November of '23, well before anybody knew anything, so to speak, this law firm -- this law firm asked the following questions: Can the controlling person -- it's the words -- dilute the shares -- the participation shares; e.g., the participating shares. All their words.

Can the participating person redeem shares; e.g., the participating shares? Okay. Those are questions about governance I would suggest to the Court, no question.

Second -- or last, and really straight to the point, Could HoldCo liquidate, distribute all its assets elsewhere, or otherwise make the participation shares, which belong to my clients, worthless, okay?

That is not a question at this point of whether they did something to shut down and drain money, et cetera, from HoldCo. That is a direct attack on the participating shareholders' interest, the Plaintiffs'

charities' interest --

THE COURT: Uh-huh.

MR. MCCARTY: -- all right? It was how do we make their shares worthless, okay?

Moving to the next --

THE COURT: Just so we're clear if or when the Court reads this record, I just want to interject now that the slides that you gave me, I have marked as PX-1. I've numbered each of the pages in my own handwriting; otherwise, I'm not going to write on them, and they'll be part of the record for this hearing.

MR. MCCARTY: Thank you, Your Honor.

Okay. So -- but what does start happening in 2024? Mr. Patrick began restricting access to the fund records, specifically financial statements, et cetera. And so, in other words, he begins to operate in the dark.

Moving ahead. Now I am sort of getting to what will probably be Slide 6 and bringing in various points in the record. On November 11th of 2024, the supporting organizations, the Plaintiff charities here, sent a letter saying, "We no longer have conference in the governance structure of HoldCo."

And so why did that come out of the blue? Well, I don't want to get into the merits, though it

will certainly be covered in the receivership, too much, but what we have --

THE COURT: A little presumptive.

MR. SHAW: Well, it is presumptive, I'm sorry, Your Honor, so I understand that we have to -- we have to get through this first before we get there. But why did they send a letter on November 11th, 2024?

Well, there was a lack of transparency. But in addition to a lack of transparency, there had been investigations into Mr. Patrick and what he had been up to. So three highlights, low lights, or whatever you want to call them, of what Mr. Patrick was doing at that time was one, he had formed a charity and asked for a donation from the funds of $10,000 a year. What he failed to disclose was that charity was controlled by his family.

The next thing Mr. Patrick did during this time period -- or this earlier time period, was he attempted to provide a tip of non-public material information to one of the funds -- to one of the foundations, such that they could trade one that which, obviously, was a breach of securities law and was a breach of corporate policy, obviously, of Highland Capital.

And finally, and maybe most concerning,

there was credible evidence, a former law-enforcement official, who had a company, was a vendor, that he had been approached by Mr. Patrick to engage in a kickback scheme.

And so all of these things combined with a lack of transparency around financial stability of the fund, $270 million, obviously concerned the charities greatly, and they wanted to fix it, for lack of a better word. Mr. Patrick and the others involved eventually responded, and we will get to that in a minute.

Okay. So the first thing that Mr. Patrick seems to have done in response was to form the DFW Charitable Foundation. That's all he did. He formed an entity in Delaware, and it's sitting there. That was on December 9th, 2024.

The next thing he does two days later, and he has a video call with Mr. Murphy and others, and with my clients, that says we are creating a professional institutional vehicle for the benefit of its charitable purposes and the charitable owners, okay? He's just formed a new charity.

THE COURT: Mm-hmm.

MR. MCCARTY: Two days later, after that representation, Mr. Patrick forms CDMCFAD, which of course, as you know, ultimately became the blocking

mechanism, and ultimately became the replacement for HoldCo, and now owns the fund, at least on paper.

One day later, his counsel, Mr. Patrick's counsel, follows up with the participating shareholders' counsel and says this, "The DAF is actively working on one or more development projects your clients will benefit from for many years to come." Blatant fraud. They're implementing the scheme right now.

All right. Six days later, Patrick has HoldCo essentially exchange its interest, so this is -- so six days after, he says, "You'll have it for years to come."

All of this is unbeknownst to my clients, and all of this is with Mr. Patrick is on both sides of the transaction in his governing positions, in his control position. And at that point, on December 18th, 2024, he has HoldCo exchange its interest in the DAF fund, so it held a hundred percent of interest in the DAF fund.

He had to give it to CDMCFAD, and return -- the triangle completes with CDMCFAD, giving a hundred percent of its interest to HoldCo, right? So essentially what you have now is you have HoldCo, not the fund, okay? You have HoldCo, CDMCFAD, and the fund.

THE COURT: So it sounds like things have

gone full circle.

MR. MCCARTY: Right.

THE COURT: Right. So at this point HoldCo is --

MR. MCCARTY: HoldCo still has a hundred percent interest, but through CDMCFAD --

THE COURT: Right.

MR. MCCARTY: -- which is now a new Delaware entity --

THE COURT: Okay.

MR. MCCARTY: -- all right? Why? Well, what do we do with -- nobody even knew at the time what happened, which would've been an interesting thing for the supporting shareholders to know that their interest had been exchanged, but it's not disclosed, of course.

And we believe that that was done to avoid certain responsibilities that Mr. Patrick had in the Cayman Islands under the new structure.

THE COURT: The difference between Delaware law and Cayman law, you're suggesting?

MR. MCCARTY: Yes, and other governing documents.

So then on January 23rd -- so the holidays passed, we still don't have financial statements. And when I say "we," you have, of course, the shareholders,

the charities, still don't have financial statements, still trying to understand what's going on in the letter. Their letter has been ignored. There's been no response to, you know, the really overarching governance issues. So they, again, demanded clarity into the fund's financial position.

January 28th, having received no response to our owners request, the winding up of the Charitable DAF. Well, that gets -- apparently that gets Mr. Patrick's attention. And then on February 7th, Mr. Patrick uses his control position to issue new shares in The Charitable DAF HoldCo to DFW Charitable Foundation.

So he -- the charitable organization that is formed on December 9th now receives 51 -- 51 percent of that HoldCo, okay? So now 49 percent is owned by the my clients of that HoldCo. 51 percent is owned by -- directly by Mr. Patrick's DFW charitable organization foundation, and of course with no oversight of his own. And that is response number one to the suggestion that that they made here.

THE COURT: Isn't that what the Cayman Island proceeding is all about?

MR. MCCARTY: Well, its certainly based on the same facts, Your Honor.

THE COURT: Yeah. But, I mean, that's the relief that's being sought there.

MR. MCCARTY: Well, they are seeking relief, Your Honor, but we believe that there are direct -- there are direct fiduciary breaches by Mr. Patrick. Mr. Patrick, in November of 2023, asked how he could attack my clients' interests directly, not through fiduciary breaches to the organization itself, but how could he use his control and positions to make my client's shares worthless. How could he do that?

That is a -- and as you see, fraud all along the way. The Highlands -- to keep us from coming to you earlier and asking for an injunction against them from doing all these things, to keep us, our clients, from going to the Cayman Islands and stopping this earlier.

The fact is, I think you probably know already, we did not learn of all this until we finally did file this in the Cayman Islands, and they shut up and said that we don't hold anything; you hold nothing, which is not exactly true.

Okay. Despite the dilution of the Plaintiff charities' interests, Patrick still needed a method to finish them off. So at this point, we still have HoldCo, and we still have CDMCFAD, and then the

fund. And the charities' problem, you know, the charities used to own a hundred percent, still own 49 percent, and what are you going to do about that, because, of course, we can't have that.

So that begins the shopping expedition for an evaluation of my clients' interest, essentially discounting them to nothing. So Mr. Patrick first went to PricewaterhouseCoopers, of course, to get a nice name on there, a fancy name on there, to say that there is really nothing -- there's -- there's really no value here. PricewaterhouseCoopers, not surprisingly, sniffed that out, and rejected Mr. Patrick's overture.

Then they -- Mr. Patrick went to FTI, and then FTI, again, sort of said, Okay, well, what will the discounts be? Well, we can think about that. There's a big range, who knows what the discount of your shared value would be because of lack of control, okay?

So all fine and well, and then Mr. Patrick says, Well, we do want to use this in a transaction, Mr. Patrick's lawyers, I should say. We do want to use this in a transaction, so please remove your limitation that this can't be used in a transaction.

FTI says, Well, wait a minute, that's not what we signed up for and limitation will remain. And so FTI sniffed out the problem, too.

Then Mr. Patrick's lawyers find ValueScope. They go back to well, because ValueScope had been valuing these shares all along, I suspect that they thought that was a stretch because ValueScope had said, I think it's about six months prior only, that the shares were worth, I think it was $225 million.

Well, the reason ValueScope said the shares were worth $225 million instead of $270 million was because there were certain discounts already taken, right? So ValueScope took discounts for lack of control, subject for -- for lack of marketability, which was a bigger discount than lack of control in accordance with their evaluation method.

THE COURT: What are these assets? Are they marketable securities, or...

MR. MCCARTY: No, not -- not generally, Your Honor. They're passive investments.

THE COURT: In what?

MR. MCCARTY: In various -- and you're going to test me here, Your Honor, but they are --

THE COURT: Generally.

MR. MCCARTY: They are real estate investment trusts. There is a life insurance interest. There are many, many --

THE COURT: Is NextPoint involved in those?

MR. MCCARTY: I'm sorry?

THE COURT: Is NextPoint involved with those?

MR. MCCARTY: NextPoint, I do believe, has some involvement, but I'm not -- but if I say that, Your Honor, please don't hold me to it because I have not looked at the holdings.

THE COURT: Somebody's saying yes.

MR. MCCARTY: Okay.

MR. LITTLETON: Yeah, there's -- there's NextPoint involved, as the majority of it is cash. NextPoint, marketable securities, real estate and various other things.

MR. MCCARTY: Okay. I'll get mad at him later for that.

THE COURT: Yeah, don't do that. I asked the question.

MR. MCCARTY: That's right. Thank you, Your Honor, so --

THE COURT: The point here is to get to facts and truth, right?

MR. MCCARTY: Yeah, I understand, Your Honor. Thank you.

Okay. So there are -- yes. To the extent that your question is, is Mr. Dondero's -- if -- for

organizations that he oversees, are the participants lowering the fund? Well, of course because he granted a number of structures into the charitable funds that had been valued at $270 million as late as 2024. There is also, we understand, I believe a number of $140 million in cash in this structure; so it's not just, sort of, passive investments.

THE COURT: Yeah, you don't need a lot of discounts on cash.

MR. MCCARTY: You don't need a lot of discounts on cash, that's right. So anyway, there -- and so in September of 2024, the overall value of participating shareholders had dropped to $225 million.

Then ValueScope comes back on March 26th, about six months later, and says, Actually, now that we understand this control issue better, it's only worth $1.6 million. So 225 million to 1.6 million in six months. We don't understand that the value of the fund particularly changed at that point, but certainly the according to ValueScope it had changed.

So without delay, Mr. Patrick immediately had CDMCFAD redeem the participating shareholders' interest in it for $1.6 million, okay?

So -- and this is, I think, maybe an important point, but that was CDMCFAD redeeming the

interest -- the participating shareholders' interest in it, okay? Not in HoldCo. So the participating shareholders were still an owner in HoldCo, okay?

THE COURT: Right. Where in all these charts does CDMF -- whatever, fit?

MR. MCCARTY: Okay.

THE COURT: Back here?

MR. MCCARTY: Yeah. So if you look at the -- at the second one.

THE COURT: Right.

MR. MCCARTY: So if you look at the top, now it's DFW Charitable Foundation, obviously not shareholders -- participating shareholders --

THE COURT: Okay. I see it now.

MR. MCCARTY: Yeah, not DAF HoldCo. DAF HoldCo is, sort of, out of this structure now. And then everything now goes through CDMCFAD --

THE COURT: Okay.

MR. MCCARTY: -- okay? So that's where it is. And it essentially sits where HoldCo sat. And DFW Charitable Foundation sits where the participating shareholders, the charity claimants here, sat.

THE COURT: Okay.

MR. MCCARTY: Fair enough?

THE COURT: Got it.

MR. MCCARTY: Okay.

So interestingly enough, as sort of a side note, Mr. Patrick, as I understand it, found it somewhat humorous that he had distributed that $1.6 million into bank accounts that the charities never really saw. They belong to the charities, but they were not in their own bank accounts that they would normally operate out of.

So they didn't know -- they didn't even know that the 1.6 million have come in, obviously, which would have raised the question well, why did that happen? Where did that come from?

Okay. According to Mr. Patrick's own testimony about six weeks ago in the bankruptcy proceedings, he made it very clear, "The entity in liquidation(Charitable DAF HoldCo) owns nothing." In other words, he had achieved what he set out to achieve in November of 2023.

THE COURT: I mean, it still owns 99 percent of the interest in the fund, it's just that the money has gone out of the fund. It's gone somewhere else.

MR. MCCARTY: No. It was redeemed out. No, Charitable DAF HoldCo is not in there. It's been redeemed. Its interest has been redeemed. CDH GP, which is the new Delaware -- I'm sorry -- the new

Cayman, or the general partner is still there, but HoldCo is not.

Okay. So moving into the law...

THE COURT: So are the JOLs saying we're going to get this stuff back into HoldCo?

MR. MCCARTY: They are trying to bring -- yes, they are trying to bring value back into the HoldCo. They will seek undoubtably fraudulent transfer, fraudulent transfer on all of these things.

THE COURT: All of these things.

MR. MCCARTY: Yes. We don't know who they will go after. We know certainly that we have a claim against Mark Patrick as the controlling person for his fraud against us, delivering fraudulent statements. They were made to delay our action -- to delay our action, et cetera, at the time.

He will be on the hook for -- we believe he will be on the hook for monetary damages, but and what the -- what the JOLs may do and what they may not do, I don't know, but I do know that what he did to my clients, which is to the Plaintiff charities here, is deliberately work to devalue their shares and defraud them along the way.

Okay. So standing, which I think is really the most important issue that we have before us, and I

hope is clear to the Court, it has nothing to do with it being in business court or any other court in the State of Texas. And we all know the elements of standing, I think, from law school, and I'm sure Your Honor has dealt with them many, many times.

First, we have to have a particularized injury. Unquestionably, when they set out to render the shares worthless, they did. They exchanged $1.6 million for what we believe was at least $225 million in value, and they defrauded my clients to keep them from taking action to prevent that. So we -- my clients are unquestionably injured.

And then it is all traceable to Mr. Patrick, personally, and through the many hats that he wore. It was all him. He orchestrated it.

Was there redressable injury -- is there redressable injury? Yes, we believe there is redressable injury. Number one, we believe the receivership is part of the method to redress the injury. Why is that? Because Mr. Patrick still sits in all of these positions, so it would be that same structure chart, the structure chart that you had before you just a minute ago.

Mark Patrick, he controls the DFW Charitable Foundation. Mark Patrick controls CDH GP,

Limited Partnership, that owns Charitable DAF. Mr. Patrick is the manager of CDMCFAD, et cetera, et cetera, he controls all of it; and removing him, who has proven himself to be anything but an honest fiduciary, it would go a long, long way to address injury here.

We also know -- and again, this is, you know, for hopefully another hearing, that in the -- in late last year, he paid himself $4 million. So -- and nothing right now prevents him from doing that in the usual course of business as time progresses.

He is also, with respect to Mr. Shaw and everybody else who's here, who are quite competent counsel, and all the others that you heard from at the initial TRO hearing, he's paying a lot of lawyers, undoubtedly healthy amounts out of charitable funds.

Should these lawyers be paid? I'm not sure Mr. Patrick -- when I say "paid," should these lawyers be doing all the work that they should to protect the interests of the charitable funds? I don't know that that should be Mr. Patrick's decision. I think that should be a neutral's decision. And again, that's why we think a receivership can help redress the injury here.

Next, Your Honor, whatever claims and whatever Mr. Patrick was ultimately able to pay, and the

other entities that he controls, whether they have money or not, I don't know, do they -- does CDH-GP have money to pay? Mr. Patrick, how much money does he have to pay?

All these people -- all these people and entities participated in the fraud against my clients, and our claims are against those parties. They were -- they were the controlling interest.

So we come to does this court have subject matter jurisdiction? So let's talk about that, and let's talk about first -- do you want to take a break?

THE COURT: Yeah, let's take a little break. Thank you. Let's come back in about ten.

(A recess was taken at 10:23 a.m.)

(Open Court, All Parties Present.)

THE COURT: Okay. What slide are we on now?

MR. MCCARTY: Well, if you'll let me go slightly off script, I want to address something that is I think an issue that's been raised here by our direct claims and whether Cayman law provides for them or not.

So first, I'm just going to quickly quote from the Feiner Family Foundation case because that's something that we have cited in the briefing, but then I also I want to quote from some additional Cayman law,

and I'll give you the cites if you can find them. You probably have better Westlaw access than I do.

THE COURT: Well, fine. I mean, it's -- it's going to tie directly into the issues before us today, as opposed to speaking to your client's preferences?

MR. MCCARTY: Oh, absolutely.

THE COURT: Okay.

MR. MCCARTY: Yeah. Okay. So -- so first from the Feiner Family Trust case, which is cited in our briefing at 2007 Westlaw 2615448, shareholders can be owed duties and obligations directly from the controllers of the company if the controller "makes material misrepresentations to them" -- I'm sorry -- "material misrepresentations to them or fails to make material disclosures to them of insider information, or supplies to that specific information advice on which they have relied."

So that is a basis for a direct claim under Cayman law. "Special circumstances of generating fiduciary obligations, especially in those cases in which the directors for their own benefit, seek to use their position and special inside and knowledge acquired by them to take improper or unfair advantage of the shareholders." So that's Feiner family, and that's what

you have. So I want to give you a couple of other Cayman law cites.

THE COURT: Those claims are still going to involve the nucleus effects that we've been talking about.

MR. MCCARTY: They are, Your Honor. But these are direct claims that the shareholders --

THE COURT: No, I've got that.

MR. MCCARTY: And so that's -- that's what I want to make. And these are different, what I am about to read now, complaints of different circumstances.

So this one is from a case called TIAN RUI, T-I-A-N, R-U-I (International Holding Company Limited) the China Shanshui Cement Group. Shanshui is spelled S-h-a-n-s-h-u-i. It's a 2024 case. The cite is UK-PC-F4. From the Cayman Islands, "A shareholder has a right of action against the company to challenge the allotment of shares by the board of directors on the basis that the allotment was made for improper purpose in circumstances where the allotment will cause detriment to the shareholders."

And so obviously that is a cause of action that directly speaks to -- against the company. And I hope Your Honor picked up on that. And that's

important, but we believe that same concept applies to the control person who are guiding that company's actions. The decision also has the discussion that applies broadly to the exercise of powers by directors.

Secondly, Your Honor, from -- let's see. I think this is from the same case, actually, Your Honor. I'm sorry. This is a little bit on the fly. "The contract between the shareholder of the company contains the implied term that, in exercising the power to allot and issue shares," the director, as the company's agents -- "the directors, as the company's agents, will do so in accordance with their fiduciary duties." And where the directors exercise their powers for the improper purposes, then the act may be voidable -- long word. There may be a challenge by the affected shareholders bringing their own properly constituted action against the company in court, okay?

And again, we're talking about a person who resided on both sides of all the transaction -- transactions, was a 100 percent shareholder, and also the GP of the fund, and now CDMCFAD, and also the DFW Charitable Foundation.

So we believe with all the Feiner family, particularly the case and these other cases, indicate that there is, under Cayman law, a direct cause of

action.

Now, is that a decision necessarily for today? You know, and I don't necessarily know that we have to get into the merits and all of that. But we do believe that it outlines the cause of action, and why we have a direct cause of action.

Okay. Moving back. I'll go back on script, Your Honor. And we are going to be...

THE COURT: Bear in mind the discussion we had earlier this morning.

MR. MCCARTY: I'm sorry?

THE COURT: I've shared with you my views on the statute, so these are my views, as opposed to the statutes.

MR. MCCARTY: Understood. Well, let's talk about 2 -- b(2) because that's where I know you're focused.

I do -- if you will allow me to, I do want to make my case.

THE COURT: No, that's fine.

MR. MCCARTY: But we'll start, of course, at b(2) because that's what the Court is the most interested in, and I understand.

So first let's talk about what it means, governance? And this is from your sister Court.

THE COURT: We're one Court.

MR. MCCARTY: I'm sorry?

THE COURT: We're one Court. We have different divisions, and different judges, but it's really, really important to understand that we're one Court.

MR. MCCARTY: Okay. I appreciate that. Your sister division, is that a proper way to put it?

THE COURT: Absolutely.

MR. MCCARTY: From the *Reed v. Rook* decision.

THE COURT: I'm very familiar with it.

MR. MCCARTY: Yes. It says about governance: "It does not define governance, but defines a governing person as one who is entitled to manage and direct an organization's affairs under the governing documents and governing law. This indicates that governance relates to the management and direction of the entity's affairs under its governing documents" -- and this is critical -- "applicable law," all right?

So it's not -- so governance is not just all about internal documents. Governance is about all the laws that apply to the governance of the company, and these are laws that we think Mr. Patrick breached, and its very obvious .

I have a very, very difficult time understanding how this case could be principally distinguished from the *Reed V. Rook* --

THE COURT: Well, isn't it fair to say that governance involves governing?

MR. MCCARTY: Yes.

THE COURT: So if you're governing the company, it involves governance?

MR. MCCARTY: Yes. And he was clearly governing the company.

So -- and so I think the *Reed v. Rook* case is an important one because it does bear directly on the issues here. I think that in the *Reed v. Rook case*, at least as I understand the case, I haven't seen all the underlying pleadings; but as I understand, the Court's ruling, Reed, the plaintiff was actually not a person who was ever a member of the company or directly involved in the company. That's what my take from the case -- but I -- again, I don't -- or the partnership or whatever it was. But I haven't seen all the ongoing pleadings. That's what -- that's what it says to me.

Now, a big argument about b(2) that I've heard from the other side is there's no limiting principle about b(2). So it could be anything. It could be Chevron -- or Exxon taking on Chevron for --

for its governing documents. Well, that's true today. That case could be brought today. Maybe it could be brought in this court. Probably it could be brought in this court. It certainly could be brought in district courts. I have not seen a case like that in the district courts. I'm sure there has been one before.

But the limited principles are the same as they have always been. You have to have standing, and now you have to be able to supply limiting language.

THE COURT: You have to have capacity.

MR. MCCARTY: And you have to have capacity, assuming the other side brings up capacity, but --

THE COURT: Assume that they have.

MR. MCCARTY: Assume that they have. Yes, you have to have capacity. And I think clearly, Cayman law suggests that we have capacity as shareholders to bring direct causes of action.

Now, I -- I'm kind of reading in, and maybe misappropriately, reading into the idea that Your Honor is concerned because well, the trustee is going to take over, and all that stuff -- not the trustee -- the liquidators are going to take over in this case. Well, they haven't yet. They're not even recognized in the United States.

So as of now -- and there has been no --

THE COURT: I'm not going to tell the Delaware Bankruptcy Judge what to do, but my guess is it's not a difficult bar to cover.

MR. MCCARTY: But then --

THE COURT: Not in my experience, at least.

MR. MCCARTY: But then the Delaware Bankruptcy Court will have to rule that our claims are the property of the liquidation estate.

THE COURT: I think under Chapter 15, once they're recognized, they could come and join this lawsuit if they want.

MR. MCCARTY: They could come and join the lawsuit, absolutely.

THE COURT: They could file their own lawsuit in Delaware or --

MR. MCCARTY: Yes, but -- but none of that strips the jurisdiction of this Court until there is a determination that their --

THE COURT: But we know that there is a lawsuit pending in the Cayman Islands.

MR. MCCARTY: But, Your Honor, we believe we have direct claims -- we do have direct claims --

THE COURT: Okay.

MR. MCCARTY: -- okay? And until another

court says that our direct claims, our property of the estate -- a federal bankruptcy court says that, then we still have capacity.

THE COURT: I'm really not -- I'm focusing on Rule 39.

MR. MCCARTY: Okay.

THE COURT: How do we have two proceedings covering much of the same factual subject matter going on at their time, and not resulting in potentially inconsistent results?

MR. MCCARTY: Sure. Well, I've unfortunately in my career dealt with that many, many times. We can have class-actions dealing with, for instance, unintended acceleration in elements, 300 of them, in fact. And we can have direct claimants saying that they were injured because of unintended acceleration in those elements, those separate claimants, and they have direct claims.

They don't necessarily have to opt out, but it comes from the same nucleus of facts, all right? They are different claims operating from the same nucleus of facts. And that's what we have. That's why we have capacity. No federal bankruptcy court says that it owns -- that the estate owns those claims at this point. And until they do, certainly, there is not a

capacity issue. And, of course, nothing that the federal bankruptcy court does will restrict this Court from jurisdiction, right?

It may impact our capacity in the moment, but as you see in the Moser Trust -- it looks -- the Moser Trust case from the Dallas Court of Appeals, makes it pretty clear that capacity, even if it's overtaken by a Bankruptcy Court for a time, it doesn't necessarily prevail forever, all right?

So these claims could come back. For instance, what if the joint liquidators for some reason say, eh, we've gotten all we needed --

THE COURT: And they abandon the claims?

MR. MCCARTY: Right. That's right. And so here we would be.

THE COURT: Here we would be.

MR. MCCARTY: And right -- and right now the Bankruptcy Court hasn't done anything to take those claims. They haven't even recognized yet the Cayman liquidators. So I understand where the Court is going and its concerns. I think that this Court will likely hear from the liquidators at some point. I can't control their actions, but I suspect that it will.

THE COURT: I suspect we will.

MR. MCCARTY: Yeah. And at that point, I

don't know that the -- I don't necessarily think that the liquidators are going to claim that the actions undertaken by this Court are in any way harmful to them.

THE COURT: Well, we'll see what they say.

MR. MCCARTY: Right. But as of today -- but as of today, we have capacity.

So we got off on capacity, which is an important discussion. But going back for b(2), so the limiting factors in b(2) were the same limiting factors that have always prevailed -- or presided over any sort of action, and continues to this day.

So this Parade of Horribles that we've heard from the other side, they just don't seem real. And frankly, I suspect that if Exxon came to you and said Chevron is violating laws, they would say okay, that's great because they sort of often say this -- okay, great, what's your cause of action.

THE COURT: Right.

MR. MCCARTY: All right. So I don't believe -- well, let me say this: The legislature wrote what it did, and as we all know in Texas, we certainly know, the text of the statute wins the day every time. And the text of the statute --

THE COURT: Most of the time.

MR. MCCARTY: That's actually a fair

statement, Your Honor. It should win the day.

THE COURT: Well, we could have uncertain results.

MR. MCCARTY: Now, we could have uncertain results, but I don't think it's uncertain results here today, to say, at least, because we were certainly not a "stranger" to Mr. Patrick and his roles and his governance through the various entities.

Certainly right now, for instance, DFW Charitable Foundation sits where the participating shareholders used to sit. They are holding, essentially, the powers that my clients used to hold. Mr. Patrick was on both sides of that transaction. As the controlling shareholder, he held 100 percent of the management shares, and as now the owner of the DFW Charitable Foundation.

Mr. Patrick was on both sides of the transaction when HoldCo seeded its interest to CDMCFAE from the fund. Mr. Patrick was on both side of the transaction when he diluted my client's interest in HoldCo to his own charity, his newly created charity, on December 29th, 2024.

So at every turn, we believe -- and the question is really -- now I'm kind of jumping to the next slide, but everything he did was in line with what

he planned to do in November of 2023. And every one of those things was a direct attack on my clients.

MR. MCCARTY: And -- and every one of --

THE COURT: An indirect attack on your clients.

MR. MCCARTY: Well, according to him, he wants to know if he could make the participation shares worthless, which is -- that was his lawyer's question.

THE COURT: Yeah, but he had to go through HoldCo and the fund to do that.

MR. MCCARTY: But it was a direct action aimed at my clients.

And so he, in all of those questions, do -- can the controlling person dilute? Can the controlling person redeem? Can they make the shares worthless? All of those are questions of governance, directly questions of governance asked by lawyers, for lawyers to go research documents in the law.

And so I think it clearly falls under b(2), and I see nothing in b(2) that would, based on its text, exempt my client's claims from this Court's jurisdiction.

So at the risk of moving into an area that I'll get more questions about...

THE COURT: Well, you wouldn't want to pass

this bench, would you?

MR. MCCARTY: No. No. In fact, I actually prefer the other, so thank you.

So b(4) -- I'm sorry -- an action by an organization of owner against a controlling person or a managerial official for acts/omissions in that capacity. So again, $270 million interest for $1.6 million.

THE COURT: You can assume that I've read everything.

MR. MCCARTY: Okay. Well, I'm sorry. Yes, that's fine. I don't see -- I don't see the exception to b(4). I don't see where b(4) says the organization needs to be a party. It needs -- potentially needs to be about the organization.

Let me -- let me read from b(4), because it's easier for me to read off of these. So I'm at the last slide now. B(4) says: "An action by an organization or an owner of an organization" -- we're an owner of an organization, we were -- the supporting boards still have an ownership interest in HoldCo -- "is brought against an owner, controlling person" -- which Mr. Patrick was, no question. He held managing shares, and he was a managerial official. He was a controlling person -- "and alleges an act or omission by the person in the person's capacity" -- controlling shareholder, as

an owner/controller or in a managerial official of the organization.

THE COURT: An organization before this HoldCo, right?

MR. MCCARTY: Well, I would say CDH-GP -- and I -- I'm sorry. I would say, yes, the organization -- yes. So he had a -- he had a controlling interest based on his 100 percent ownership of the management shares. So he was an owner of that organization, of HoldCo.

THE COURT: Well -- yeah, okay.

MR. MCCARTY: Well, I think he would say he was an owner because he owned the management shares.

And second, he was certainly a controlling person by virtue of those managing shares.

THE COURT: Right.

MR. MCCARTY: And we've sued him in those capacities.

THE COURT: Okay.

MR. MCCARTY: All right. Then under b(5): "An action alleging that an owner, controlling person, or managerial official, breached a duty owed to an organization or an owner of the organization." So in other words, a controlling person breached a duty to an owner of an organization. That's Mr. Patrick, and

that's my clients.

"By reason of the person's status as an owner, controlling person," which is how he did it, that's how he committed the fraud. The only way he committed that fraud against us by lying to us about his true intentions was because of his capacity or status as a controlling person, as a managerial official.

So we think we fall thereto. And all through this, we were an owner. And when the breaches occurred, and I think most importantly -- I think this is the point. When the breaches occurred, we were others of the organization. But it doesn't say -- b(5) does not say that we have to sue the organization.

THE COURT: Okay.

MR. MCCARTY: So that's -- I think that is it. Let me see if there was anything else.

I want to respond to one statement that Mr. Shaw said, that this is all about control. This is not all about control. This is about restoring to my clients what they rightfully own.

THE COURT: But your clients -- they're the supporting organizations.

MR. MCCARTY: They are.

THE COURT: But the real people of interest here are the supported organizations.

MR. MCCARTY: I would -- I mean, that's an interesting way for a Court to look at it because in my experiences, the Courts are always more interested in the direct legal relationships, and the direct legal relationship here is between the participating shareholders --

THE COURT: I got that. But the supporting organizations exists for a tax purpose to be a pipeline for getting money to the supported organizations.

MR. MCCARTY: Well, I'm guessing that it's a tax purpose.

THE COURT: Well, that's what they said in the Caymans.

MR. MCCARTY: Yeah. I'm guessing that that's true. I'm not a tax lawyer, so I would hate to represent that, but I --

THE COURT: That's part of the reason why I suggested the idea of getting a tax lawyer who really knows this stuff to tell me.

MR. MCCARTY: Understood.

But I believe that to be the case; and yes, do the supported organizations ultimately benefit from the participating shareholders' interests, legal interests in the entity? Of course they do. Absolutely. No question.

THE COURT: Right. Because the goal is really to support the supported organizations.

MR. MCCARTY: Well, we do want to support the supported organizations. And the way -- the vehicle that was used to do that was through the participating shareholders' interests.

THE COURT: Right.

MR. MCCARTY: And I believe that -- unless there are any other questions, I think -- I think that's all I have for you.

THE COURT: I appreciate it. Yeah.

Mr. Shaw, I believe you have something to say.

MR. SHAW: I have a brief rebuttal.

MR. WARNER: Mr. Shaw, why don't I turn this off for you.

MR. SHAW: Oh, great. Thank you.

Judge, I've discussed the *Paxton v. Annunciation House* case that legislate -- the legislature is aware of the law that existed at the time they enacted the statute. Part of that body of law that the legislature was aware of when they enacted these statutes was Rule 39, Texas Rules of Civil Procedure 39, that requires the joinder of necessary parties.

And so I agree with Mr. McCarty that --

that this is an action regarding the corporate governance of two non-parties. And I would agree with him that this would fall under b(2) if those two entities were parties to the case, but they're not. They're not. And -- and again, we go back to why they're not because ultimately what this was about was -- was an interim. *Rook v. Reed...*

THE COURT: *Rook v. Rook*.

MR. SHAW: *Rook vs. Rook,* I'm sorry. From this Court, it was -- I did not know that, so I just learned something.

THE COURT: Yeah, no, it's -- and I don't want to be pedantic about it, but it's very important in the way we operate that we're viewed as one court.

MR. SHAW: Yeah, it's fascinating.

THE COURT: It has a lot to do with the mechanics in our mission and things like that, but it is an important distinction.

MR. SHAW: Okay. So I -- and I believe that was the lottery case.

THE COURT: Yes, it was.

MR. SHAW: And what I think the important distinction between that case and this case is that the parties whose corporate governance that we're discussing and was at issue was a party to the lawsuit, and that's

in stark contrast to what we have here. We have two non-entities that they are claiming that this is a -- an action regarding.

And our position is that, you know, we've got to have a cognizable cause of action regarding the corporate governance of a party to the case. And I think Rule 39 fits in nicely with that paradigm.

So, you know, the issue that we talk about is this, you know, limiting factor, which it would be if you have a party of the case that would be part of the governing action.

I'm going to close with -- I would be remiss not to at least talk a little bit about the righteousness of my client because I've heard a lot about the lack of righteousness.

THE COURT: Alleged.

MR. SHAW: Alleged.

THE COURT: We will talk about the alleged righteousness of --

MR. SHAW: We'll talk about the alleged righteousness of my client as well. So suffice it to say that we dispute that there's been any breach of fiduciary duty, any violation of any obligation, that we have worked in earnest with and tried to work with The Dallas Foundation.

And in fact that Mr. Raver was meeting with Louis Phillips, who's a former Bankruptcy Judge, who also represents the DAF, and Ms. Diaz, the morning of the TRO hearing, in order to work towards a resolution. It came at much of a surprise that this action was filed.

Also that -- that the idea here that these supporting organizations always had only a right to a discretionary distribution up to the complete discretion of the general partner.

And then finally, Mr. Dondero received a significant tax savings through the structure, estimated more than $50 million. Our concern and -- and everything that has been animating the actions that we have taken, are for the DAF, and to ensure that the DAF's structure is intact and that it's not attacked by the IRS or other of Mr. Dondero's creditors, of which there are many.

So Mr. Patrick and Mr. Murphy acted in reliance on competent counsel and experts, acted in the best interest using their reasonable business judgment, and the idea that there is this massive fraud is just inaccurate.

Thank you, Judge.

MR. MCCARTY: Can I just respond to one

comment?

THE COURT: Sure.

MR. MCCARTY: And I'm sorry, but I want to make it very clear, we did not file this action while they were discussing resolving this matter. There has been no discussion -- no real discussion to resolve this matter. That discussion was subsequent to the bankruptcy proceedings that The Dallas Foundation and Mr. Patrick were both involved with, not this case.

THE COURT: Okay. All right. Anything else that anybody wants to say?

MR. SHAW: Nothing further from the Defense, Your Honor.

MR. MCCARTY: Nothing more, Your Honor.

THE COURT: Mr. Cox, you've been unusually quiet.

MR. COX: I'm just here. Just trying to be quiet. That's all right. I have questions about stuff.

THE COURT: Mr. McEntire?

MR. MCENTIRE: Not today, sir. Maybe later.

THE COURT: All right. So let's just take stock of kind of where I think we are on some things: One, I think I know what I wanted to do with the Rule 39, but I want to give the parties an opportunity to

brief that. And so let's -- I think the opening brief on that, Mr. Shaw, should come from you.

MR. SHAW: Thank you, Your Honor.

THE COURT: When do you think you can do that?

MR. SHAW: Seven days from today, Your Honor.

THE COURT: Seven days from today, we'll have the brief. Seven days after that, we'll have a response. That implies that it will be done after that. In my view of things, things are ripe for a decision after I have a response, but I typically wait for a reply if I think it's going to come. So we will come up with an order that will include that. Mr. Spear will get you that.

Capacity. Any briefing that you all want to discuss on the capacity issues? I think that was one of the subject matters that one gave a fair reading to the motion to dismiss that was included, although there wasn't a lot of case law that was cited on capacity as such, so...

MR. SHAW: Should we just do a combined brief on capacity, Your Honor?

THE COURT: Sure. That's fine.

Is that fine for you?

MR. MCCARTY: Sure -- yes.

THE COURT: Well, it's --

MR. MCCARTY: My uncertainty only stems from we very much want a receivership hearing. It's not an empty bag for us.

THE COURT: Yeah, okay. That's probably not going to happen until the Rule 39 issue is resolved because I don't know how I can appoint a receiver over entities on the basis of receivership.

MR. MCCARTY: Well, of course we're not asking that.

THE COURT: Well, that's kind of what you're asking.

MR. MCCARTY: That is not. But, yes, I understand, Your Honor, you want the briefing prepared on the same schedule.

THE COURT: Okay. That's fine. I mean, if you need more time, let me know. It's summertime. I understand.

What else do we need to talk about? They don't need to be long briefs, but --

MR. MCCARTY: Well, if we can shorten our time on response, I assume that wouldn't be difficult.

THE COURT: You can -- yeah, when we say seven days to respond, it doesn't mean you have to take

seven days.

MR. MCCARTY: Can we say three days to reply?

THE COURT: The score is going to be seven and -- and you're saying three days on a reply?

What do you think?

MR. SHAW: I don't know what their response is going to look like.

THE COURT: Yeah, we'll go seven, and then if -- need to do that. I'm detecting a certain amount of frustration.

MR. MCCARTY: I'm very frustrated, yes.

THE COURT: Okay.

MR. MCCARTY: We have given generous time to this briefing, and we --

THE COURT: Well, no one has briefed Rule 39.

MR. MCCARTY: Well, and today is the first day, Your Honor, but...

THE COURT: Well, but that's something people could have thought about.

MR. MCCARTY: They certainly could have thought about that.

THE COURT: Well, listen, my sense is -- well, I will withhold that thought.

MR. MCCARTY: Well, Your Honor, I want to make something plain because my frustration is not simply a lawyer being frustrated. My frustration is this: We have a person, and despite all the accolades that we just heard about Mr. Patrick, and how he wants to preserve charitable assets and all that sort of stuff, he took $4 million.

THE COURT: I heard that. And I heard about all the other things that are alleged.

MR. MCCARTY: We're concerned.

THE COURT: I get that.

MR. MCCARTY: Yes.

MR. COX: But are you finding that this Court has subject matter jurisdiction under b(2)?

THE COURT: I haven't made that ruling yet.

MR. COX: Oh, okay. I just -- are we going to get past that, or are we going to have to brief that again?

THE COURT: No, you don't have to brief that again. That is fully briefed. Trust me.

MR. COX: Okay. All right.

THE COURT: And the understanding -- the capacity of your argument is well, they have capacity because they have direct claims, right? Under Cayman law, they were directed to do so, that the controlling

persons of the entities owe fiduciary duties to the shareholders.

MR. MCCARTY: Yeah. And plus one right now certainly, we have capacity. There is no recognition in the United States for any other plaintiff. I don't want to be -- I'm not trying to be obstructive but it's true, right? And these claims are direct claims.

THE COURT: What's the schedule going on in the bankruptcy case?

MR. MCCARTY: The schedule that's going on right now is there is an agreed -- essentially an agreed injunction, much like our Rule 11, that was entered in the Cayman Islands. We understand that that injunction will be brought to the United States. There is no schedule at the current for the liquidators to be recognized in the United States.

And there will be further briefing in the Cayman Islands after September 18th. I don't know if we have a date yet -- after September 18th on the injunction; so in other words, they have this agreed -- sort of like us, right? We have an agreed injunction there, much like the Rule 11 that's been placed until it's fully briefed and presumably --

THE COURT: So let's do that. Let's go off the record.

(Off-the-record discussion)

THE COURT: Do we have things for the record?

MR. COX: I have a question Judge, on Rule 39:

Is the thought that you believe that there is an indispensable party that's not here and you --

THE COURT: That's my question.

MR. COX: And you want briefing on that one that is indispensable, and then what you can or cannot do based on that fact and whether we can proceed or not proceed if they are indispensable?

THE COURT: My concern is that the -- the rights of HoldCo are at issue.

MR. COX: Understood. I'm just trying to understand where you are so we can brief the right things.

THE COURT: Yeah, no, absolutely. That's my absolute concern is claims and causes of action; rights that appear to belong to HoldCo are also going to be litigated here.

MR. COX: Understood. As you know in Rule 39, it has a procedure, though, that is built in that if they cannot be here, can you still proceed?

THE COURT: Exactly.

MR. COX: And I wanted to know if that's what you want us to focus on or -- however.

THE COURT: Whatever it says right here.

MR. COX: I got it. Okay. I just make sure were on the same page. We had some other questions --

THE COURT: That's how it might apply -- and I mentioned at the very beginning, is there a remedy that we can fashion if they're not here?

MR. COX: Okay. Understood. I just wanted to make sure that we focus on the indispensability of -- the issues here in Rule 39.

THE COURT: That's -- that's one of the issues under Rule 39.

MR. COX: I agree. Thank you.

THE COURT: Anything else?

MR. SHAW: No, Your Honor.

MR. MCCARTY: No, Your Honor.

THE COURT: All right. Great. Thank you.

(The proceedings adjourned at 11:27 a.m.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS  )
COUNTY OF DALLAS    )

I, Aerial M. Holloway, Official Court Reporter in and for the First Business Court of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the original copy cost for the preparation of this Reporter's Record is $1375.00 and was paid by Carrington, Coleman, Sloman & Blumenthal, L.L.P..

WITNESS MY OFFICIAL HAND this the 7th day of August, 2025.

_/s/_ _Aerial Holloway_____
Aerial M. Holloway, Texas CSR 12401
Expiration Date: 12/31/2026
Official Court Reporter
Texas Business Court
First District
Dallas County
Dallas Texas



January 2024

Plaintiff "Charitable Owners"
(The Dallas, Kansas City, & Santa Barbara Highland Foundations)
(DE non-profit corps.)

~98% Participation Shares

Charitable DAF HoldCo, Ltd.
(Directors: Patrick & Paul Murphy)
(Cayman)

99% LP

Charitable DAF Fund, LP
("the Fund")
(Cayman)

100%

CLO HoldCo. Ltd.
(Cayman)

100%

Assets

Defendant Mark Patrick

100%   Manager

Defendant Charitable DAF GP, LLC (DE)

100% Management Shares

1% GP



PENGAD 800-631-6989

EXHIBIT
C-1

PLAINTIFF'S EXHIBIT DM-1 tabbies



August 4, 2025

Plea to the Jurisdiction,
Plaintiff-Charities Presentation



# The Charities' Allegations Fall Squarely into the Court's Jurisdiction



Since its inception in 2011:

## Plaintiff Charities

 $270 Million

 **Granted over $42 million to charitable organizations**

 **Donations to 275 organizations**
(funding education programs, healthcare services and supporting economic development and community welfare projects)

 **Average annual grant payments of $3.7 million**



# The Charities Allege Actions and Claims Showing Standing and Jurisdiction

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.



MR 1255

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.



Sept. 2024 - Known Value of Charitable DAF Fund

100% Ownership Charitable DAF Fund, LP

**$270 Million**

This framed **Defendants'** fraudulent, covert activities for over a year.

"Can the controlling person dilute shares, e.g., the Participation Shares?"

*Defendants' lawyers*

"Can the controlling person redeem shares, e.g., the Participation Shares?"

*Defendants' lawyers*

More to the point:

"Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"

*Defendants' lawyers*

100% Ownership Charitable DAF Fund, LP

**Control Position**

**Mark Patrick** Tax Attorney

**Nov. 2023**

"workplan" to raid the fund



# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.



Despite the dilution of the Plaintiff Charities' interests, Patrick still needed a method to finish them off.

# Key Points in Defendants' Fraud and Breach of Fiduciary Duties.

After being rejected by both PwC and FTI, on March 26, 2025 Patrick finally obtains a negligible value of the Charities' interest via ValueScope.



**VALUESCOPE**
a marshall + stevens company

ValueScope determined that each participating share had **a fair market value of $5,368 in March 2025, down from $759,614, just several months earlier.**

According to ValueScope's "work," the Charitable Owners **total value was approximately $1.6million.**





In Patrick's Own Words Under Oath:

Control Position

Mark Patrick

"the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing.

*June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25;*

# Standing



"In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court."

*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012)

# Standing

| Category | Law | Evidence |
|---|---|---|
| **Particularized Injury** | "[I]njury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) | Defendants plan was to "make the participation shares . . . worthless," which they did, exchanging $1.6 million for shares valued at $225 million approximately 6 months earlier – via expressly fraudulent statements and fiduciary breaches directed specifically at the Charities. |
| **Traceable to defendant** | "The injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012) | Just as Defendants' lawyers queried, could the "control person" "dilute" and "redeem" on a course to rendering the participation shares worthless?  The Control Person, Mark Patrick, wearing his various Defendant hats, did just that.  All of it traces back to Defendants. |
| **Redressable Injury** | "[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"<br><br>*Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154–55 (Tex. 2012) | By replacing Mark Patrick with a receiver as the control person, the remainder of the value will be protected.  Mark Patrick will be personally, and Defendants corporately responsible for fraud and breaches of fiduciary to the Charities. Defendants can ultimately be held liable on the merits for the lost value to the Plaintiffs of their interest in the $270 Million fund. |



# This Court Has Subject-Matter Jurisdiction

# The Charities' Allegations Fall Squarely into the Court's Jurisdiction

| § 25A.004(b) Element | Sample Petition Allegations | Source (Am. Pet Citation) |
|---|---|---|
| (2) Action regarding the governance, governing documents, or internal affairs of an organization | • Issuance of shares altered power structure contrary to fiduciary obligations.<br>• Secret formation of CDMCFAD to replace Charitable DAF Holdco and sever connection to Charitable Owners.<br>• Patrick caused CDMCFAD to redeem the Plaintiff Charities' interest for a plainly inadequate $1.6 million | ¶ 5.41<br>¶ 5.69<br>¶ 5.61 |
| (4)(A)-(B) Action by an organization or owner against a controlling person or managerial official for acts/omissions in that capacity | • Redemption of $270M interest for $1.6M orchestrated by Patrick and other controlling entities.<br>• Issuance of dilutive shares to DFW Charitable (sham charity) was meant to alter power structure in breach of fiduciary obligations<br>• Secret formation of new entity to circumvent control structure. | ¶ 5.31<br>¶ 5.61<br>¶ 5.65<br>¶ 5.69 |
| (5) Breach of duty by owner, controlling person, or managerial official (e.g., duty of loyalty or good faith) | • Defendants intended to render Plaintiffs' shares worthless.<br>• Fiduciary obligations under Cayman law were disregarded.<br>• Plaintiffs relied on misrepresentations arising from special fiduciary relationship.<br>• Defendants misled Plaintiffs regarding asset depletion and leadership conduct. | ¶ 5.31<br>¶ 5.38<br>¶ 5.41<br>¶ 5.61<br>¶ 5.65<br>¶ 5.67<br>¶ 5.75 |

# Business Court Subject Matter Jurisdiction under Chapter 25A

## Texas Business Court sections 25A(b):

(b) Subject to Subsection (c), the business court has civil jurisdiction concurrent with district courts in the following actions in which the amount in controversy exceeds $5 million, excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

. . .

(2) an action regarding the governance, governing documents, or internal affairs of an organization;

\* \* \*

(4) an action by an organization, or an owner of an organization, if the action:

(A) is brought against an owner, controlling person, or managerial official of the organization; and

(B) alleges an act or omission by the person in the person's capacity as an owner, controlling person, or managerial official of the organization;

(5) an action alleging that an owner, controlling person, or managerial official breached a duty owed to an organization or an owner of an organization by reason of the person's status as an owner, controlling person, or managerial official, including the breach of a duty of loyalty or good faith;



"Can the controlling person dilute shares, e.g., the Participation Shares?"

*Defendants' lawyers*

"Can the controlling person redeem shares, e.g., the Participation Shares?"

*Defendants' lawyers*

**More to the point:**

"Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"

*Defendants' lawyers*



PLAINTIFF'S EXHIBIT
PX-2

## DAF/Rand Structure Chart
## As of January 2024

**Mark Patrick** *(Managing Member)*
— 100% →
— 100% Management Shares →

**The Dallas Foundation** *(nonprofit charity)*
‹- Supporting Organization -›
**Highland Dallas Foundation, Inc.** *(nonprofit nonstock DE corp.)*
32.787% Participation Shares

**Greater Kansas City Community Foundation** *(nonprofit charity)*
‹- Supporting Organization -›
**Highland Kansas City Foundation, Inc.** *(nonprofit nonstock DE corp.)*
32.787% Participation Shares

**Santa Barbara Foundation** *(nonprofit charity)*
‹- Supporting Organization -›
**Highland Santa Barbara Foundation, Inc.** *(nonprofit nonstock DE corp.)*
32..787% Participation Shares

**The Community Foundation of North Texas (CFNT)** *(nonprofit charity)*
‹- Donor Advised Fund Account -›
**HCMLP Charitable Fund**
1.639% Participation Shares

**Charitable DAF GP, LLC** *(Delaware)*
Managing Member: Mark Patrick
— 1% GP →

**Charitable DAF HoldCo, Ltd.** *(Cayman Islands)*
Directors: Mark Patrick, Paul Murphy
— 99% LP →

**Charitable DAF Fund, LP** *(Cayman Islands)*
Governed by the GP
— 100% →

**CLO HoldCo, Ltd.** *(Cayman Islands)*
Directors: Mark Patrick, Paul Murphy
— 100% → **MGM Studios Holdco, Ltd.** *(Cayman Islands)*
— 100% → **HCT Holdco 2, Ltd.** *(Cayman Islands)*
— 100% → **Liberty CLO Holdco, Ltd.** *(Cayman Islands)* — 100% → **Liberty Sub, Ltd.** *(Cayman Islands)*

Directors: Mark Patrick, Paul Murphy

**Charitable DAF Holdings Corp.** *(Delaware)*
Directors: Mark Patrick
Officers: Mark Patrick – President
— 100% → **Allanon Capital Management LLC** *(Texas)*
— 100% → **Rand Advisors, LLC** *(Delaware)*

MR 1268

# Current DAF



Source: Sykes Affidavit p.58, Cayman Proceeding for all entities other than DFW Charitable Foundation. Additional of DFW Charitable based on testimony of Mark Patrick at hearing on June 25, 2025.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brian Shaw on behalf of Brian Shaw
Bar No. 24053473
bshaw@ccsb.com
Envelope ID: 104239594
Filing Code Description: No Fee Documents
Filing Description: DEFENDANTS SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE
Status as of 8/12/2025 8:31 AM CST

Associated Case Party: The Highland Dallas Foundation, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/11/2025 6:53:44 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/11/2025 6:53:44 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/11/2025 6:53:44 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/11/2025 6:53:44 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/11/2025 6:53:44 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/11/2025 6:53:44 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/11/2025 6:53:44 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/11/2025 6:53:44 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/11/2025 6:53:44 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Angie Barrera | | abarrera@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/11/2025 6:53:44 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/11/2025 6:53:44 PM | SENT |

Associated Case Party: DFW Charitable Foundation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brent M.Rubin | | brubin@ccsb.com | 8/11/2025 6:53:44 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brian Shaw on behalf of Brian Shaw
Bar No. 24053473
bshaw@ccsb.com
Envelope ID: 104239594
Filing Code Description: No Fee Documents
Filing Description: DEFENDANTS SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE
Status as of 8/12/2025 8:31 AM CST

Associated Case Party: DFW Charitable Foundation

| Brent M.Rubin | | brubin@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
|---|---|---|---|---|
| Rhonda LThomas | | rthomas@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/11/2025 6:53:44 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/11/2025 6:53:44 PM | SENT |

Tab 11

MR 1272

E-filed in the Office of the Clerk
for the Business Court of Texas
8/13/2025 4:55 PM
Accepted by: Beverly Crumley
Case Number: 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § § | THE BUSINESS COURT OF TEXAS FIRST DIVISION |
| Plaintiffs, | § § | |
| v. | § § | Cause No. 25-BC-01B-0027 |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC, and CDH GP, LTD., | § § § § § § § | |
| Defendants. | § | |

## DEFENDANTS' ANSWER TO QUESTION PRESENTED BY COURT ON AUGUST 5, 2025

Defendants Mark Patrick, DFW Charitable Foundation, CDMFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd. answer the Court's question to the parties via email on August 5, 2025:[1]

**Question Presented**:

"[W]hether (i) the Charitable DAF Fund, LP partnership agreement or (ii) the Charitable DAF HoldCo, Ltd. company agreement require that

---

[1] A copy of the Court's email is attached as **Exhibit 1**.

**DEFENDANTS' ANSWERS TO QUESTIONS
PRESENTED BY COURT ON AUGUST 5, 2025** –Page 1

those entities were operated for the express benefit of only the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the HCMLP Charitable Fund and associated supported organizations (The Dallas Foundation, the Greater Kansas City Community Foundation, the Santa Barbara Foundation, and The Community Foundations of North Texas, respectively), or whether the Control Position/GP was allowed to change the benefiting organizations."

**Answer**:

The latter—there is no limitation on the number of organizations that could own Participating Shares in the Debtor, and the Control Position/GP can change the benefiting organizations for the Charitable DAF, as occurred.[2]

History is our guide. The Community Foundation of North Texas (the "Community Foundation") was added as a benefiting organization in

---

[2] Defendants incorporate by reference the defined terms in their Motion to Dismiss, with one exception: Defendants use the term "Charitable DAF" in this filing to mean the entire corporate structure, both current and previous, including but not limited DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd, Charitable DAF HoldCo, Ltd., and Charitable DAF Fund, LP.

2015, long before Mr. Patrick became the Control Person, but years *after* the other Dondero Organizations received Participating Shares.[3]

The addition of a benefiting organization, as occurred before Mr. Patrick became the Control Person, or the restructuring of the Charitable DAF to exclude benefiting organizations that are being abused by Mr. Dondero or otherwise acting inconsistently with the mission of the Charitable DAF, is consistent with the organizational documents for the Charitable DAF. *See* Ex. 2 at ¶¶20-22 (explanation of the overall rationale for the DAF Restructuring and the due diligence that undergirded it).

Without limiting the Charitable DAF's legal positions, *every* iteration of the partnership agreement for Charitable DAF Fund, LP and the company agreement for the Debtor provide the Control Person with the authority to:

(1)    <u>add benefiting organizations</u>:

> 7.    Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:
>
> (a)    issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

---

[3] **Exhibit 2** (documents reflecting subscription in 2015 by the Community Foundation); **Exhibit 3** at ¶98 First Affidavit of Mark Eric Patrick, filed in Cause NO. FSD 116 of 2025 (JAJ); In the Grand Court of the Cayman Islands Financial Services Division.

Plaintiff's Original Petition Apx.74.[4] That is what occurred with the Community Foundation.

(2) <u>or exclude benefiting organizations</u>.

**PARTICIPATING SHARES**

19. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

*Id.* at Apx.76. That is what happened with the Dondero Organizations.

The Dondero Organizations, as mere holders of Participating Shares, had no right to control the Charitable DAF in any way, only "rights in a winding-up or repayment of capital" or to participate in the profits. *Id.* The parties expressly contemplated a winding-up. That is what occurred and is underway in the Caymans via the JOLs, a process in which the Dondero Organizations have rights (and where they should be expending their time instead of before this Court). It is without question that the Dondero Organizations could be removed from the Charitable DAF structure through a wind-up—and that makes sense.

---

[4] For the sake of argument, Defendants cite to the version of the Debtor's Articles cited by the Dondero Organizations in their pleadings, but Defendants note those Articles were subsequently amended, but not to restrict the cited provisions.

For example, if the Dallas Foundation started advocating for Al Qaeda, the Control Person for the Charitable DAF is not stuck being a Al Qaeda-supporter-by-association. Instead, the Control person has and had the authority to dilute or exclude them from the Charitable DAF. *Id.*; *see also, e.g.* Ex. 3 at ¶98. The same is true if the benefiting organizations are being used as a tool of James Dondero to further his personal financial agenda in a way that is inconsistent with the Charitable DAF's Mission:

> Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference.

Plaintiff's Original Petition, Apx.109.

Respectfully submitted,

/s/ *Brian P. Shaw*

**Brian P. Shaw**
  Texas Bar No. 24053473
  Email:  bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Brent M. Rubin**
  Texas Bar No. 24086834
  Email: brubin@ccsb.com
**Joshua D. Kipp**
  Texas Bar No. 24078793
  Email: jkipp@ccsb.com
**Andrea C. Reed**
  Texas Bar No. 24121791
  Email:  areed@ccsb.com
**Emily H. Owen**
  Texas Bar No. 24116865
  Email:  eowen@ccsb.com
**CARRINGTON, COLEMAN,**
 **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to BCLR 5 that, exclusive of the contents identified in BCLR 5(a) and inclusive of all footnotes and endnotes, this document contains 548 words as counted by the word count function of Microsoft Word. I further certify this document complies with the Court's judge-specific guidelines regarding word limits and formatting.

/s/ *Emily H. Owen*
Emily H. Owen

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2025, a copy of the foregoing document was electronically served on all counsel of record in accordance with TEX. R. CIV. P. 21a.

/s/ *Emily H. Owen*
Emily H. Owen



**EXHIBIT 1**

| | |
|---|---|
| **From:** | Philip Spear |
| **To:** | Brian P. Shaw; Darren McCarty; Susan Fox-Bowen; cmwarner@duanemorris.com; jmcox@duanemorris.com; jeboatright@duanemorris.com; Monica Gaudioso; Andrea C. Reed; Emily H. Owen; Brent M. Rubin |
| **Subject:** | [EXTERNAL] 25-BC01B-0027, The Highland Dallas Foundation v. Mark Patrick |
| **Date:** | Tuesday, August 5, 2025 9:37:54 AM |
| **Attachments:** | image001.png |

**WARNING:** This email originated from outside our email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Counsel:

Please respond with the parties' position on whether (i) the Charitable DAF Fund, LP partnership agreement or (ii) the Charitable DAF HoldCo, Ltd. company agreement require that those entities were operated for the express benefit of only the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the HCMLP Charitable Fund and associated supported organizations (The Dallas Foundation, the Greater Kansas City Community Foundation, the Santa Barbara Foundation, and The Community Foundations of North Texas, respectively), or whether the Control Position/GP was allowed to change the benefiting organizations.


Thank you,
Philip




Philip J. Spear
Staff Attorney
Texas Business Court—Dallas, Division 1B
8080 Park Lane, Suite 500
Dallas, TX 75231
(945) 495-1725

MR 1280



**BOARD OF DIRECTORS**

Christopher M. Huckabee
Chair

William L. Dismuke
Vice Chair

Alfred Saenz
Corporate Secretary

James B. DeMoss
Treasurer

Elaine J. Petrus
VP Grants

Cynthia Adams

Michael Appleman

David P. Dorson

Elizabeth S. Fleischer

Ralph D. Heath

Anne Holland

Beth J. Rivers

**CHAIR EMERITI**

Jeff Alexander

Tom Cravens

L. Allen Hodges, III

Leland A. Hodges, Jr.

William A. Landreth, Jr.

Garland M. Lasater, Jr.

Ann Louden

Nicholas Martin, Jr.

Phillip W. McCrury

Nancy E. Jones
President/CEO

July 28, 2015

Board of Directors
Charitable DAF Holdco, Ltd
190 Elgin Avenue,
George Town,
Grand Cayman KY1-9005,
Cayman Islands

Dear Sirs,

**RE: CHARITABLE DAF HOLDCO, LTD (THE "COMPANY")**

The Community Foundation of North Texas ("CFNT"), on behalf of the donor-advised fund established with CFNT known as the Highland Capital Management, L.P. Charitable Fund (the "Fund"), wishes to subscribe for 5 participating shares of nominal or par value of US$0.01 each in the capital of the Company in accordance with the terms and conditions as set out in the Company's Articles of Association (the "**Shares**"), for the subscription price of US$0.05, being the aggregate nominal par value of the Shares. The subscription price shall be paid by us to the Company on the date hereof, or such other date as may be agreed (the "Issue Date").

We hereby request that you allot and issue the Shares to the CFNT to be held as part of the Fund on the Issue Date, credited as fully paid, and register in the name of the Fund in the register of members of the Company as the holder of the Shares.

Kindly confirm your agreement to the provisions of this letter by signing and dating the acknowledgement on the copy which accompanies it.

Sincerely,

Nancy E. Jones,
*President/CEO*
For and on behalf of the Community Foundation of North Texas

The undersigned confirms acceptance of the subscription application, as set out above.

**SIGNED** for and on behalf of **Charitable DAF Holdco, Ltd.:**

Duly Authorised Signatory

Name: Grant James Scott
Title: Director
Date: 8/9/2015

Fort Worth Club Building • 306 West 7th Street, Suite 1045 • Fort Worth, Texas 76102 • Phone 817.877.0702 • Fax 817.632.8711 • www.cfntx.org

**EXHIBIT 2**

CHARITABLE DAF HOLDCO, LTD
(THE "COMPANY")

WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR
OF THE COMPANY DATED *August 12,* 2015

## 1. ISSUE OF SHARES

1.1 **IT IS NOTED** that:

(a) capitalised terms not otherwise defined herein shall have the meaning given to those terms in the Articles of Association of the Company, as may be amended from time to time (the "**Articles**").

(b) the Company has received an application from the Community Foundation of North Texas (the "**Subscriber**") to subscribe for Participating Shares of the Company having a par value of US$0.01 each, in the amount set forth in the table below, at their aggregate nominal par value (the "**Shares**")

| SUBSCRIBER | NO. OF SHARES | SUBSCRIPTION PRICE |
|---|---|---|
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5 Participating Shares | $0.05 |

(c) in the opinion of the Directors, the issuance of the Shares to the Subscriber would be in the best interests of the Company.

1.2 **IT IS RESOLVED** that:

(a) in the opinion of the Directors, the issuance of the Shares to the Subscriber would be in the best interests of the Company.

(b) subject to payment in full being received by the Company, the Shares be and are hereby issued to the Subscriber, fully paid, in accordance with the table set forth above; and

(c) as the Subscriber has not requested the issue of a share certificate, Intertrust Corporate Services (Cayman) Limited, be and is hereby instructed to make the appropriate entries in the Register of Members of the Company in respect of the foregoing issue

## 2. GENERAL AUTHORISATION

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as the Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of

1

the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby

## 3.    RATIFICATION OF PRIOR ACTIONS

3 1    **IT IS RESOLVED** that any and all actions of the Company, or of the Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

*[Signature page follows]*

2

Grant James Scott
**Sole Director**

13056403 1 H0851 120776

**Intertrust**

Registration No.: **263805**

Date of Incorporation: **27 October 2011**

Client No.: **KY059904**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

Share Class: **Participating**

Nominal Value: **USD 0.01**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **The Highland Capital Management Partners Charitable Trust #2** Highland Capital Management, L.P. 13455 Noel Rd, Suite 800 Dallas TX 75240 USA | 7 Nov 2011 | Allotment | 300.00 | 7 Nov 2011 : Allotment of 300.0 Participating share(s) for USD0.01 / share to The Highland Capital Management Partners Charitable Trust #2 pursuant to minutes/resolution dated 07 Nov 2011 | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolution dated 30 Nov 2011 | | | | |
| | | New Certificate | 200.00 | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of 200.0 Participating share(s) | No Cert | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc pursuant to resolution dated 30 Nov 2011 | | | | |
| | | New Certificate | 100.00 | 30 Nov 2011 : New certificate No. 0 issued for remaining balance of | No Cert | | | |

MR 1285

# Intertrust

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | 100.0 Participating share(s) | | | | |
| | | Transfer | (100.00) | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to resolution dated 30 Nov 2011 | | | | |
| | | | | | | Nil | Nil | 30 Nov 2011 |
| **Highland Kansas City Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Kansas City Foundation, Inc pursuant to resolution dated 30 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 100.00 | |
| **Highland Dallas Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Dallas Foundation, Inc pursuant to resolution dated 30 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 100.00 | |
| **Highland Santa Barbara Foundation, Inc** | 30 Nov 2011 | Transfer | 100.00 | 30 Nov 2011 : Transfer of 100.0 Participating share(s) from The Highland Capital Management Partners Charitable Trust #2 to Highland Santa Barbara Foundation, Inc pursuant to | No Cert | | | |



REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| | | | | resolution dated 30 Nov 2011 | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 100 | 100.00 | |
| **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Fort Worth TX 76102 USA | 13 Aug 2015 | Allotment | 5.00 | 13 Aug 2015 : Allotment of 5.0 Participating share(s) for USD0.01 / share to Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT pursuant to minutes/resolution dated 12 Aug 2015 | No Cert | | | |
| | | | | | | 100 | 5.00 | |

Notes:

Digitally signed by Advance Performance Exponents Inc
Date: 2025.06.04 16:17:16 -05:00
Reason: Apex Certified
Location: Apex



EXHIBIT
**3**



**IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**FIRST AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am a registered director, president and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation (**DFW**). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (**Holdco** or **Company**) of which I am both a director and the sole Management Shareholder. The remaining Participating Shareholders of Holdco are Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and HCMLP Charitable Fund (collectively, **Highland Foundations** and also referred to as the **Supporting Organisations**).

2. In addition, I am the sole director of CDH GP Ltd. (**GP**), a Cayman Islands limited company incorporated in or around 7 February 2024 which is the general partner of Charitable DAF Fund LP (**DAF**).

3. This affidavit is provided pursuant to the Orders of Justice Asif KC handed down at the directions hearing on 23 May 2025 (**Directions Order**) made with respect to an

application of the joint official liquidators (**JOLs**) of Holdco issued by Summons dated 22 May 2025 (**JOLs Summons**), and amended as of 30 May 2025 seeking sanction from the Court for the engagement of Cayman attorneys, Cayman conflict counsel and US legal counsel (**Application**).

4.  I am duly authorized to provide this affidavit for and on behalf of DFW to:

    (a)  Oppose the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest;

    (b)  Address the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs; and

    (c)  Oppose the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 herein.

5.  In this affidavit I refer to the supervision hearing on 6 May 2025 (**Supervision Hearing**) at which this Honourable Court brought the voluntary liquidation of Holdco under its supervision on uncontested basis and refer to the order appointing the JOLs on 6 May 2025 as the **Appointment Order**.

6.  The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the contents of this statement are not within my own knowledge, they are true to the best of my knowledge and belief and I have indicated the source of my information.  In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

7.  There is now produced and shown to me a paginated bundle of documents marked "**MP1**". References in this affidavit are to pages in MP1 are in the form [**MP1/page number**].   The majority of the documents comprised in MP1 are materials that I and Mr Paul Murphy requested that our US attorneys compiled and made available in a data room to the JOLs following their appointment.  As such, much of the material referred to in this affidavit is already and has been available since around

MR 1289

9 May 2025 to the JOLs. To illustrate this fact, I exhibit an index to the documents in the data room that was made available to the JOLs (**MP1/ page 1 - 3**).

8. I respond in this affidavit to the Second and Third Affidavits of Ms MacInnes dated 13 and 26 May 2025 respectively (**MacInnes 2** and **MacInnes 3** respectively), that were filed by the JOLs in support of the Application which I have reviewed. I have also reviewed the unsworn, undated and unsealed affidavit of Mr Andrew Johnstone of Johnstone Law (**Johnstone 1**) which was served on Baker and Partners (Cayman) Limited (**Baker & Partners**) as legal counsel to DFW on 26 May 2025. To the extent that any assertion made in Johnstone 1, MacInnes 2 or 3 go unanswered in this my first affidavit in these proceedings, that should not be taken as my agreement, acceptance or acquiescence of the position asserted by Ms MacInnes or Mr Johnstone.

9. There will be matters in this affidavit which relate to certain decisions and actions Mr Murphy and I have taken as directors of Holdco. I have noted that certain critical remarks have been made by Johnstone Law about the fact that I have a played a central role in controlling and managing several entities within the charitable structure of which the Company previously formed part. These remarks are unfounded in circumstances where the DAF Structure and the entities within it have always operated through a single human agent. This was by design so that Mr Dondero was able to draw on the economies of having a single point of contact across the entire structure. My role was exactly the same as that occupied by my predecessor, Mr Grant Scott, however my approach was and remains to ensure that each entity's role in the DAF Structure was professionally managed.

10. In light of the foregoing insofar as this affidavit deals with matters relating to my role in managing Holdco with Mr Murphy as well as other entities within the structure that is because of the architecture of the structure itself.

11. In light of the wider context in which the position of DFW should be considered, I have reviewed the evidence prepared by Johnstone Law in connection with the winding up of Holdco and filed on behalf of the Highland Foundations namely the

First Affidavit of Mr James Dondero filed on 16 April 2025 (**Dondero 1**), the First Affidavit of Ms Julie Diaz (**Ms Diaz**) filed on 16 April 2025 (**Diaz 1**) and the Second Affidavit of Ms Diaz filed on 29 April 2025 (**Diaz 2**), which was relied on by the Highland Foundations for the purposes of the Supervision Hearing. On my review I note there are a number of mischaracterisations and inaccuracies in the evidence relied on by the Highland Foundations.

12. These create an inaccurate picture of DAF, the DAF Structure (as defined below) and Mr Dondero's dealings with the same. To ensure the facts are accurately before the Court on these matters, and where not otherwise addressed in the content of my affidavit, I include in Sections E and F below specific responses to the inaccuracies set out in Dondero 1 and Diaz 1. I realise that the purpose of the Application is not to resolve complex issues of law or fact. However, I believe it is critical for this Honourable Court to have an understanding of the relevant contextual issues, even if disputed, in order to determine both the question of whether the proposed engagement of Johnstone Law will at the very least undermine the appearance of neutrality in dealing with these issues.

13. Equally, the objection of DFW to the engagement by the JOLs of US legal counsel at this juncture requires the Court to appreciate the facts and circumstances which required Mr Murphy and I to implement the DAF Restructuring (defined at paragraph 18 below).

14. This affidavit proceeds as follows:

> (a)  Objections to the JOLs' Summons
>
> (b)  Professional background and dealings with Holdco / DAF
>
> (c)  Function of Holdco and DAF Structure
>
> (d)  DAF as alter ego of Mr Dondero
>
> (e)  Responses to First Affidavit of Ms Diaz
>
> (f)  Responses to First Affidavit of Mr Dondero

### A. OBJECTION TO JOLS' SUMMONS

15. In summary, DFW:

    (a) Opposes the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest.

    (b) Does not object to the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs, subject to the conflict committee of Maples confirming that on considering the ability of Maples to act for the JOLs they gave specific consideration to the prospect that Maples would need to review and opine on the issuance

    (c) Opposes the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 below.

16. DFW objects to the appointment of Johnstone Law as Cayman Islands legal counsel to the JOLs. This opposition is based on Johnstone Law's immediately prior engagement by the Highland Foundations in seeking the just and equitable winding up of Holdco and the appointment of provisional liquidators, on the erroneous basis that the DAF Restructuring was a fraudulent scheme which resulted in assets in excess of US$250 million in value being misappropriated from the Company, to the detriment of the Highland Foundations. For the avoidance of doubt and as explained in Section C of my confirmatory affidavit, the Highland Foundations never had a traditional ownership economic interest in the DAF and its assets; they only had a right to discretionary dividends if and when paid.

17. The Highland Foundations are companies that are owned and controlled by Mr Dondero who is the President, Individual Member and Director of each of the Highland Foundations. The complaints and allegations made by the Highland

Foundations and the arguments advanced on their behalf by Johnstone Law ignore the real prospect that it is Holdco which may have causes of action against the Highland Foundations and/or Mr Dondero, for the reasons articulated below (see also Section D).

18. At the Supervision Hearing the Highland Foundations, through Johnstone Law characterised the following steps as a fraudulent scheme:

    (a)  The allotment of 318 Participating Shares in Holdco to DFW on 7 February 2025 which constituted DFW the single majority Participating Shareholder of Holdco.

    (b)  On 27 March 2025, redeeming Holdco's interest in CDMCFAD LLC.

    (c)  On 2 April 2025, distributing the proceeds of the aforementioned redemption to the Highland Foundations in their capacity as Participating Shareholders.

19. I refer to these steps collectively as the **DAF Restructuring**.

20. I reject any suggestion that the DAF Restructuring was improper, inappropriate or fraudulent.  As I explain in further detail below, the DAF Restructuring was necessary to protect the DAF and its charitable intent from the retaliatory actions that can be traced back to Mr Murphy's and my refusal to accept Mr Dondero's demands to use the DAF's assets to invest in several opportunities that were inappropriate, arguably unlawful and to his personal benefit. I also discuss Mr Dondero's attempts to influence me to transfer approximately US $1.5 million to an offshore firm owned by Mr Dondero to settle outstanding legal fees which were not related to the DAF at paragraph 116(a) below.

21. For the avoidance of doubt and without waiving legal privilege, the DAF Restructuring and each of the steps forming that transaction, was / were undertaken with the benefit of thorough and extensive legal, tax and financial advice from third-party professionals and for the principal purposes of: (i) ensuring the DAF structure continues to fulfill its charitable purpose of supporting

community-focused, non-profit foundations; and (ii) protecting DAF and the DAF Structure from being used by Mr Dondero or attacked by his creditors as his *alter ego*.

22. As a result of Mr Dondero's conduct, the Highland Foundations may not retain their non-profit status under the laws of the US. According to tax advice I sought for and on behalf of Holdco, the Highland Foundations were susceptible to being found as the *alter ego* of Mr Dondero or facilitating other claims against entities within the DAF Structure based on *alter ego* theories which are set out further at Section D, paragraph 78 onwards and paragraphs 145 onwards of this affidavit. Significantly, the Highland Foundations may also have liability as co-conspirators if Mr Dondero is found to have used them in a way which contravenes the US Internal Revenue Code (**IRC**). It was in recognition of this risk that Participating Shares were issued to DFW. As stated in the resolutions authorizing the issuance and allotment to DFW, this was necessary to ensure that DAF could continue to further its charitable mission where, upon advice, it seemed the Highland Foundations could not. I refer to the first affidavit of My Murphy and to Section V(ii) which addresses the DWF share issuance.

    *(i) Objections to Johnstone Law on the basis of a conflict of interest*

23. The question of Johnstone Law's ability to advise the JOLs independently and impartially was a matter I instructed counsel for DFW to raise at the Supervision Hearing. While I had not opposed the making of a supervision order, nor found at that stage there was a need to object to the appointment of Ms MacInnes or Mr Bhowmik as JOLs, it was my firm belief that due to Mr Johnstone's prior engagement for the Highland Foundations he and his firm would not be sufficiently independent to act as legal counsel to the JOLs. My reasonable belief was founded on both my prior experience of how Mr Dondero conducts his arrangements and litigates aggressively (I refer the Court to the examples of such behaviour in Section D *DAF As Alter Ego of Dondero* (below) and to Section IV of Mr Murphy's affidavit); and on the allegations of fraud and misconduct which have been central to the

applications persuade by the Dondero controlled and managed Highland Foundations.

24. At the Supervision Hearing, and as is set out in the letter from Baker & Partners to the JOLs dated 14 May 2025 and exhibited at **MP1/ pages 4 – 7** (**14 May Letter**), the pleadings before the Court charcterised the DAF Restructuring as a *"fraudulent Scheme"* and that the former directors (myself and Mr Murphy) appeared to be *"implementing a calculated and ultimately fraudulent scheme to dissipate the Company's assets to prevent thorough independent investigation"*.

25. The pleadings prepared by Johnstone Law characterise the Highland Foundations as *"victims of the apparent fraud"* and, with specific regard to the skeleton argument that Johnstone Law filed in support of the *ex parte* application for the appointment of provisional liquidators, Johnstone Law addressed the proposition that *"There is no  hard evidence of fraud or defalcation"* by clearly refuting that suggestion as *"not true"* and that *"it will not take the Court long to see that Mr Patrick and Mr Murphy's blocking tactics hide more nefarious conduct"* (see 14 May Letter at **MP1/ pages 4 - 7**).

26. Johnstone Law also prepared and filed Diaz 2 which was given in support of the Highland Foundations application for the voluntary liquidation of the Company to be brought under the supervision of the Grand Court.  In this respect, the terms of relief and basis for the need for supervision was allegedly due to a *"cloud hanging over Mr Patrick and Mr Murphy, as directors of Holdco"* (**Diaz 2, para 15(b)**).  Ms Diaz goes on to incorrectly described the Highland Foundations / Supporting Organisations as *"the owners of 100% of the economic interest in the Company"* and that the need for supervision of the Grand Court is primarily for a *"(a) proper investigation"*  *"...(e) into the allegations of misconduct on the part of the management of the company"* (**Diaz 2, para 15.(a), (e)**).  Ultimately and as I consider to be indicated by the terms of the **Diaz 2 (paragraph (f)**, the  case advanced by Johnstone Law for the Highland Foundations envisaged and anticipated that transactions undertaken by Holdco would likely need to be set aside.

27. While I was not present at the Supervision Hearing I am informed by and understand that in accordance with my instructions, counsel for DFW foreshadowed the potential conflict of interest at the Supervision Hearing. After the DAF Restructuring, and subject any claims accruing to the Company, Holdco has no or de minimis assets. The central issue in the liquidation of Holdco is whether the DAF Restructuring was lawfully carried out by myself and Mr Murphy acting in the best interests of Holdco and exercising our powers as directors for a proper purpose. It simply cannot be the case that Mr Johnstone can review the DAF Restructuring impartially and with a fair-mind having already formed the view that that transaction amounted to a calculated and fraudulent scheme.

28. From my consideration of **Johnstone 1 (paragraphs 14,15 and 17)** I understand that:

   (a)  Mr Johnstone appeared as legal counsel to the Highland Foundations at the Supervision Hearing,

   (b)  After Justice Asif KC made the Supervision Order the engagement of Johnstone Law was terminated and at the same time the Highland Foundations consented to the engagement of Johnstone Law by the JOLs.

   (c)  I understand that the engagement with the JOLs is dated 7 May 2025. Having read MacInnes 2 I understand that the letter of engagement was executed by the JOLs on 13 May 2025 (see **MM2/ page 4**).

   (d)  Mr Johnstone asserts that he *"no longer [has] obligations to the SOs (save for my ongoing duties of confidentiality), and as former client, rather than current clients"* (**Johnstone 1, paragraph 39**) and that there is no *"suggestion that in my capacity as attorney to the SOs, I obtained confidential information that would make it unfair for me to know represent the JOLs"* (**Johnstone 1, paragraph 40**).

29.  As is discussed in detail in Section IV of Mr Murphy's affidavit and Section D below, it was necessary for Mr Murphy and I to implement the DAF Restructuring so as to preserve the DAF assets and charitable standing of the DAF Structure.  Given the potential civil and criminal consequences which may befall Holdco, DAF and its assets there is a real possibility that on investigation into the restructuring claims of Holdco are identified against the Highland Foundations and / or Mr Dondero.

30.  I believe it is highly likely that Mr Johnstone holds confidential information relating to the operations of the Highland Foundations (being owned and controlled entities of Mr Dondero) that are highly relevant to the central issue in the liquidation, as presented by the Highland Foundations themselves.

31.  It appears that the very real potential for Mr Johnstone and his firm's duty of confidentiality to the Highland Foundations as former clients, to conflict with the obligations to their current clients the JOLs has not been addressed in the discussions between Johnstone Law and the Highland Foundations; nor between Johnstone Law and the JOLs.

32.  Significantly Mr Johnstone is *"happy to confirm I have never been instructed by James Dondero and/or JP Seville"*.  This statement itself may refer to the specific terms of any engagement letters entered into by Mr Johnstone and/or his law firm, however, Johnstone Law has  recently been engaged by the Highland Foundations who are under the ownership and control of Mr Dondero in his capacities as the individual member, president, and director of each, not to mention the influence he may wield by promising additional donations.  Furthermore, Mr Dondero has put in evidence for and on behalf of the Highland Foundations in support of the petition to wind up Holdco and it was in that engagement and in part on the evidence of Mr Dondero that Mr Johnstone formed the view that *"it appeared on the evidence available that a fraud had been perpetrated"* (**Johnstone 1, paragraph 35**). Furthermore, as I refer to in paragraph 187 below, there is reason to be concerned that Johnstone Law has been engaged by entities likely to be controlled, owned or associated with Mr Dondero.

33. Insofar as the question of Johnstone Law / Mr Johnstone's independence is addressed in MacInnes 2, Ms MacInnes does not confirm that the JOLs have made independent enquiry or sought the views of legal counsel on the issue of conflict, save for relying on the view of Mr Johnstone.

34. **Johnstone 1, paragraph 41** notes that Mr Johnstone is *"surprised"* that the engagement of his law firm has elicited such opposition from DFW because it is usual for attorneys who have previously acted for the petitioners to take on the role of advising the liquidators. Mr Johnstone explains *"This has the advantage that the attorneys already have considerable understanding of the case, and so do not approach the task from a 'standing start', which saves time and costs"*. This point is also supported at **paragraph 11(a) of MacInnes 2** where Ms MacInnes states it to be her professional experience that liquidators frequently engage the firm of attorneys who acted for the petitioner upon their appointment, and the mere fact that a firm has previously acted for a petitioner does not of itself provide a basis for asserting that a firm lacks independence.

35. I do not accept this is correct in the context of liquidations arising from the breakdown of a shareholder relationship as is the case with Holdco. This evidence disregards the complex issues which arise in the context of this matter. I am informed by Cayman counsel and understand this issue will be addressed in submissions that while that general position as stated in Johnstone 1 and MacInnes 2 may be true where the winding up petition is premised on an undisputed debt, the position here is markedly different. There is a clear and contentious dispute brought by the Highland Foundations in the terms of the just and equitable petition that was filed against Holdco.

36. Insofar as MacInnes 2 asserts that the JOLs have concluded that Johnstone Law is independent and that the position of DFW in objecting to their appointment is without substance I note that:

    (a) It is Mr Johnstone himself who has informed the JOLs that his prior engagement by the Highland Foundations and that his own law firm had

no conflict in acting. The JOLs do not appear to have made independent enquiry into the potential conflict nor taken independent advice on the point (**Paragraphs 11(b)-(d) of MacInnes 2**).

(b) Johnstone Law has also confirmed that they *"have no preconceptions before accepting an engagement by the JOLS, and are not subject to any external pressure or influence"* (**paragraph 11(c) MacInnes 2**). However, it remains the case as per Mr Johnstone's own evidence that he is of the view that a fraud has been perpetrated and *that "that does appear to be an obvious explanation for what has occurred, and because those were my instructions"* (**Johnstone 1, paragraph 35**). I do not accept that fraud was the *"obvious explanation"* let alone a reasonable one had Mr Johnstone considered whether any underlying factual basis was reasonably credible. He does not appear to have considered the extraordinary legacy of the very person behind the Highland Foundations or the person funding his engagement, here Mr Dondero.

37. In the circumstances I fail to see how it could be considered reasonable or fair-minded (as **Johnstone 1 s**uggests at **paragraph 42**) for Johnstone Law's engagement to be sanctioned.

38. I am further informed by the Cayman attorneys to DFW that during the Supervision Hearing, Mr Johnstone submitted to the Court that the submissions of Baker & Partners with regard to the terms of Order ought not to be given weight because DFW is controlled by a person subject to investigation – that person being myself - and suggested I would seek to limit the powers of the liquidators. I refute the negative assertions that have been cast on my character advanced by Johnstone Law in written argument, and further at the Supervision Hearing. Additionally, recognizing that there is an investigation which needs to be conducted into the DAF Restructuring and its propriety, the conclusory view of Mr Johnstone that DFW's views should not be given weight because of that investigation itself indicates a

MR 1299

position of partiality which DFW believes requires that the JOLs have the benefit of independent, unconnected legal counsel.

39. The engagement of Johnstone Law specifically was not a matter that was before the Court at the Supervision Hearing. I understand from legal counsel to DFW that it was submitted at the Supervision Hearing that the identity of Cayman Islands attorneys for the JOLs was not then known, and that Reed Smith were identified during the Supervision Hearing as US legal counsel.

40. However, the terms of the Draft Supervision Order provided to the Court on 6 May 2025 did seek sanction for the JOLs to engage attorneys. I exhibit at **MP1/ page 9 - 11** a copy of the original draft order that was circulated on 6 May. It was this general sanction to engage attorneys that was denied and for which this Honourable Court directed the JOLs to make a sanction application for the specific firms to be engaged and the terms on which that engagement would proceed. Neither Johnstone 1 nor MacInnes 2 or 3 address the non-disclosure of Johnstone Law as proposed Cayman counsel to the JOLs. However, in the absence of independent legal counsel being identified I understand that (i) Johnstone Law's engagement with the Highland Foundations terminated after Supervision Hearing and (ii) Johnstone Law had issued a letter of engagement dated 7 May 2025 to Grant Thornton. There is a necessary inference that at the time of the Supervision Hearing Johnstone Law had been selected to act as Cayman legal counsel to the JOLs.

41. The concerns of DFW have been further compounded by steps immediately taken by the JOLs following their appointment.

42. Firstly, the clear overreach of their powers under the Appointment Order, insofar as the JOLs have sought to exercise authority and jurisdiction over entities which are neither Holdco, nor entities that are owned or controlled by Holdco. In this regard I refer to correspondence issued by the JOLs to Skyview Group (**Skyview,** legally incorporated as Highgate Consulting Group, Inc. and doing business as Skyview Group) dated 9 May 2025, in which the JOLs purported to have authority to request books and records from Skyview not only of Holdco but also to its current and

former subsidiaries (**Skyview Notice**). In doing so the JOLs also sought to exercise their powers in the jurisdiction of the United States where, I am informed by legal counsel, the JOLs have no legal standing or authority. A copy of the notice and correspondence issued to Skyview is exhibited at **MP1/ page 12 - 18**.

43. These steps are value destructive to DAF and its direct and indirect subsidiaries (**DAF Structure**) insofar as the JOLs have caused banks and other service providers to the DAF and related entities to freeze the operative accounts of the DAF. As an example, email correspondence from Hancock Whitney is exhibited at **MP1/ page 19 - 26**. In turn, this prevents DAF from operating its business (i) making (and receiving payments on) investments and (ii) carrying out its charitable purpose and fulfilling obligations which DAF has assumed to support selected charities.

44. Second, on 12 May 2025 Baker & Partners issued a letter to the JOLs identifying the impropriety and overreach of the requests set out in the Skyview Notice. No response to that correspondence has been received. I exhibit at **MP1/ page 27 – 29** a copy of the correspondence issued to the JOLs in response to the Skyview Notice.

45. Following the Supervision Hearing Mr Doug Mancino, a leading US tax attorney whose CV is exhibited at **MP1/ page 30 - 41**, informed me that he had agreed to a meeting with the JOLs. That meeting took place virtually on 12 May 2025 (**12 May Meeting**). I understand from Mr Mancino that Mr Johnstone of Johnstone Law was present at the virtual meeting. Mr Mancino also informed me that he was not informed during the call who Mr Johnstone was or in what capacity he was attending, that Mr Johnstone had represented (or was representing) the Highland Foundations, or that the JOLs had purported to engage Mr Johnstone as their counsel pursuant to a letter of engagement dated 7 May 2025 (despite the court requiring the JOLs to seek court approval for the appointment of legal counsel). I understand there to be a factual dispute relating to the 12 May Meeting and that Mr Mancino will directly address the assertion made in **MacInnes 3 (paragraph 12)** that at that meeting Mr Macino was informed that Mr Johnstone attended in his capacity as the JOLs' attorney.

46. On 14 May 2025, Baker & Partners wrote to ask who Mr Johnstone acted for while attending the 12 May Meeting. That same letter outlined to the JOLs the concern of DFW which arose from the representations made during the course of these proceedings by Mr Johnstone (see **MP1/ page 4 - 7**). As the letter of 12 May 2025 to the JOLs makes clear, DFW has serious and justifiable concerns that where conduct which Mr Johnstone has described as a fraudulent scheme are the very actions that will inevitably be investigated and considered by the JOLs, there is not only the appearance of a conflict but a serious question over the ability of Johnstone Law to impartially advise the JOLs on matters concerning the legality and propriety of the DAF Restructuring.

47. This extends to the very real possibility that on an independent and thorough investigation into the DAF Restructuring, causes of action may have accrued to HoldCo against the Highland Foundations and potentially Mr Dondero. DFW's position will be deeply prejudiced if the JOLs are unable or unwilling to act or even unable or unwilling to consider acting against the Highland Foundations and Mr Dondero. The timing of Johnstone Law's termination as counsel for the Highland Foundations as of 6 May, and appointment by the JOLs pursuant to a letter of engagement dated 7 May, in circumstances where Johnstone Law had already made accusations of fraud makes it difficult, if not impossible, to believe that Johnstone Law can advise the JOLs with a view to ensuring they investigate the affairs of Holdco fairly and independently.

48. Following the 12 May Meeting and the correspondence that was issued by Baker & Partners for DFW and on behalf of the Management Shareholder and directors by Kobre & Kim issued on 14 May 2025 (see **MP1/ page 42 - 44**) Johnstone Law made the Letter Application seeking the sanction of their appointment as legal counsel to the JOLs, without first seeking the formal views of DFW. I do not know if the Highland Foundations who are also participating shareholders of Holdco were notified.

49. I am informed by my legal counsel, without waiving privilege, that the usual course in making a sanction application is for the stakeholders of the liquidation to be

consulted with, and for a hearing to be set down for that application to be heard, including the views of stakeholders. While I also understand that there may be circumstances in which it may be appropriate to seek to have a sanction application determined on the papers, the views of the stakeholders interested in the application should provide their consent to proceeding with an application without sanction.  The fact that the Court properly directed that DFW and all relevant stakeholders be given notice of the application and a hearing set down only indicates that this sanction application was not one suitable to be determined on the papers.

50.     I note at **paragraph 20 of Johnstone 1** that the application for sanction of Johnstone Law was initially *"made by letter to the Court dated 14 May 2025 (**Letter Application**)"*.  At the time of swearing this affidavit I understand that a copy of the Letter Application has been requested from Johnstone Law but not yet provided to DFW.  I refer the Court to **MP1/ page 49 - 47** being a letter from Baker & Partners dated 20 May 2025 (**20 May Letter**) relating to the sanction application made by the JOLs and making specific requests for *"copies of all correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application"*.

51.     I note that **Johnstone 1 (at paragraph 55)** outlines requests for documents and information that were made by Baker & Partners in the 20 May Letter but lists only 3 or the 4 categories that were requested.  Johnstone 1 makes no reference to the request that was made by Cayman counsel for DFW for a copy of Johnstone Law's correspondence with the Court, which would necessarily include the Letter Application.

52.     Significantly, if the concerns of myself and Mr Murphy regarding Mr Dondero's dealings with DAF are found on an independent investigation to have been well founded, there is a real prospect that Holdco would have actions against the Petitioners in respect of distributions that were made which did not actually comply with the charitable purpose for which the assets of DAF ought to have been deployed.  Even in the absence of such causes of action, if my concerns about Mr Dondero, the Highland Foundations are vindicated through an independent

investigation, the JOLs will be required to reach adverse conclusions about Johnstone Law's former clients. Given Johnstone Law at the very least holds confidential information about those parties, it is reasonable to infer that Johnstone Law will be strongly predisposed (or have the appearance of being strongly predisposed) towards their former clients. Indeed, Johnstone Law has already characterised his former clients as the *"victims of fraud."* (**Supplementary Skeleton Argument, 28 April 2025, para, 17**).

53.  Once again, this raises a justifiable concern that Johnstone Law is not in a position to act independently in advising the JOLs to commence proceedings against the former clients of Johnstone Law or take adverse positions against them. Given the pervasive nature of the required investigation into the history of the DAF Structure, its connection with Mr Dondero and indeed DAF Restructuring, I do not see how the issue can be cured by the appointment of Maples as *ad hoc* conflict lawyers.

54.  As I explain in further detail below a serious underlying concern of DFW as well as a concern Mr Murphy and I have held as directors appointed by the Management Shareholder to exercise its entitlements and functions, is that Mr Dondero historically misused DAF, the DAF Structure, and its assets for his own personal U.S. tax advantages and gain and intends to leverage the liquidation of Holdco to ultimately wrongfully require the DAF Structure and its assets.

55.  Furthermore, I understand from the evidence filed by the Highland Foundations that Mr Dondero is funding the JOLs' fees and is privately financing these proceedings including meeting the fees of the Highland Foundations. In circumstances where Johnstone Law has been remunerated by Mr Dondero and indeed where they appear to have acted with certain entities associated with him, this inevitably gives rise to the real prospect that without instructing independent counsel, Johnstone Law and by extension the JOLs may not be in a position to reach fair and impartial findings against Mr Dondero or indeed the Highland Foundations with respect to any investigations of misuse or attempted misuse of the DAF Structure. Such findings would almost certainly be contrary to the position adopted by Johnstone Law on behalf of the Highland Foundations (and ultimately Mr Dondero).

MR 1304

56. Mr Dondero is a serial litigant. Since 2007 he has been locked in substantial litigation with UBS and since 2019 has been pervasively involved in the now infamous "Highland Bankruptcy" Chapter 11 proceeding in Texas. Mr Dondero is currently exposed to a summary judgment determination from the Southern District of New York which may imminently result in an award against him in the amount of US$1.2 billion (as more fully discussed below in paragraph 153). I believe the prospect of such a significant adverse judgment against Mr Dondero provides ample reason for him to seek to have the DAF Restructuring unwound and seek to control – directly or indirectly – that process. In simple terms Mr Dondero may need access to significant liquidity in the short term.

*(ii) Engagement of Maples*

57. I note from the Amended Summons provided by Johnstone Law on 26 May that the JOLs now seek sanction for the appointment of Maples as conflict legal counsel to the JOLs. As noted in **MacInnes 3 (paragraph 19-24)**, Maples were previously retained by the Company to provide advice in connection with the power and ability of the directors of Holdco to issue and allot shares in Holdco to DFW.

58. Given the centrality of the DAF Restructuring and the DFW share issuance to the liquidation of Holdco, I was concerned that Maples would be in a position of conflict to the extent that Maples were instructed by the JOLs to assess or impunge the validity and propriety of the issuance of shares from Holdco to DFW. However, I also understand from both the terms of MacInnes 3 that Maples have cleared conflicts and do not regard the previous, advice provided to the Company as presenting a conflict of interest.

59. In the circumstances, I on behalf of DFW would not object to the engagement of Maples by the JOLs providing confirmation could be provided that the conflict committee had, on considering the engagement for the JOLs, specifically addressed the ability of Maples to advise on the validity and propriety of the share issuance to DFW by Holdco.

MR 1305

*(iii) No requirement for US Counsel at this stage*

60. DFW objects to the application for sanction by the JOLs to engage US counsel at this juncture. As is accepted by the JOLs, Holdco presently holds no assets in Cayman or anywhere else.

61. The issues that are raised by the Highland Foundations and which have been assumed by the JOLs, concern the validity and potential ability to unwind the DAF Restructuring.

62. In due course DFW intends to seek a declaration as to the validity of the DAF Restructuring from this Honorable Court and to make that application within the liquidation. Until such time as a determination has been made that would result in assets being conveyed to the Holdco estate, DFW objects to the sanction and engagement of US counsel for the reason that it is neither proportionate nor necessary.

## B. PROFESSIONAL BACKGROUND AND DEALINGS WITH HOLDCO /DAF

63. I am a US tax attorney and have practiced as US tax counsel from 1998 until 2008. I hold a bachelors degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude).

64. For a significant part of my career through until October 2024 I have been employed by companies connected with or controlled by Mr Dondero. From January 2008 to February 2021 I was employed as Tax Counsel by Highland Capital Management, L.P. (**Highland**). During my employment with Highland, I provided tax consulting advice to Highland and engaged outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures.

65. Contrary to the assertion made by Mr Dondero (**Dondero 1, paragraph 17**) I have not and did not represent Mr Dondero as his personal tax counsel while employed at Highland or at any time thereafter. During this time, I held a license to practice

law but my role within Highland was as a tax professional and not as an attorney and I was assigned to the tax department, not the legal department. To the extent that Mr Dondero required tax or trust advice in respect of his assets, external tax counsel were hired to fulfil that role. It is well understood in the U.S. that attorneys who are employed by a company represent the company and not its officers or directors.

66.    Highland was an entity formerly owned and controlled by Mr Dondero, which was later placed into Chapter 11 Bankruptcy in the United States (**Highland Bankruptcy**).  It is my understanding that the bankruptcy of Highland in 2019 was precipitated by Highland incurring significant exposure in what has been characterised as vexatious and oppressive litigation which Mr Dondero was instrumental in prosecuting.  In particular in 2019 it was expected that a judgment would be made against Highland in favour of certain of its investors in the amount of US$189.3m.  Highland was not in a position to satisfy this judgment and Mr Dondero placed the Company into Chapter 11.  Following the collapse of Highland, Mr Dondero set up a new investment manager under the name NexPoint. Skyview was formed to provide back-office services to NexPoint and its managed funds.

67.    I was employed by Skyview from March 2021 to October 2024.

68.    I note that Mr Dondero refers to many of the former back-office employees of Highland becoming employees of the newly formed Skyview (**Dondero 1, paragraph 7**), Mr Dondero does not accurately describe the business of Skyview. From my time employed by Skyview I understand that almost all the clients of Skyview are entities owned and controlled by Mr Dondero.

69.    Further, the Chief Executive Officer and owner of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland.  During my employment at Skyview it was well understood by those working there including myself, that Mr Dondero had actual control of Skyview.  By way of example, the compensation determination for all of Mr Dondero's companies' employees is carried out in January-to February.  During this time the

MR 1307

Head of Human Resources and a member of the Executive Board of Skyview would attend Mr Dondero's office at the Crescent where he would set the pay of every Skyview employee.

70.  I provided tax advice to Skyview.  In September 2021 my title was formally changed from "Tax Counsel" to "Managing Director, Tax". I requested this title change to make it objectively clear that I was not providing any legal services for Skyview, Mr Dondero, nor any of Mr Dondero's companies, which met no resistance from Skyview.

71.  Contrary to the assertions made in **Diaz 1, para 25(b)**) and **Dondero 1, para 18**, at no point during my tenure at Skyview was I retained by Mr Dondero to advise in respect of his personal tax liability.  As with my employment at Highland, external legal counsel was engaged to advise Mr Dondero in respect of his personal tax affairs and trusts.  I submitted my resignation to Skyview by letter dated 2 October 2024, a copy of which I exhibit at **MP1/ page 48**. The significance of my resignation which I explain in further detail below has a direct correlation to the rapid deterioration of the ensuing interactions with the Highland Foundations.

72.  During the course of my employment with Highland I, along with outside advisor Mr Douglas Mancino (**Mr Mancino**), was instrumental in the establishment of Holdco, DAF and the DAF Structure. Mr Mancino and I exchanged a series of letters exhibited at **MP1/ pages 49 – 52, 53 – 55,  56 – 58  and 59 - 61** commissioned a memorandum exhibited at **MP1/ page 62 - 66** and had in-depth discussions regarding the most advantageous structures, compliance implications, and outreach to potential recipients of the Participating Shares. This runs contrary to **paragraph 9 of Dondero 1**, where Mr Dondero over-states his involvement in establishing the DAF.

73.  Contrary to the assertions made at **paragraphs 8 and 9 of Dondero 1**, Mr Dondero does not have the ability to use or influence the DAF to donate to charitable organizations. Furthermore, DAF entities are all for-profit entities and to the best of my knowledge and belief, Mr Dondero has never donated to.

MR 1308

74. At best, Mr Dondero is an indirect donor to DAF. Specifically, Mr Dondero donated assets to Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"), which was a charitable remainder trust and was required by law to donate all its assets to a charity by a certain date. My understanding is that a few years later, Trust #2 placed all its assets to an entity it owned called CLO HoldCo, Ltd. Trust #2 then contributed CLO HoldCo, Ltd. to Charitable DAF HoldCo, Ltd. in exchange for 300 participating shares in Charitable DAF HoldCo, Ltd. Trust #2 in turn gifted these 300 participating shares to the Highland Foundations. Mr Dondero's "donation" was in fact to Trust #2[1]. I am also aware that Mr Dondero or his trusts have made other donations to Highland Dallas Foundation from my work at Highland and Skyview.

## C. FUNCTION OF HOLDCO AND DAF STRUCTURE

75. The DAF Structure was established in late October 2011 to provide a permanent capital offshore structure that would manage assets on a long-term basis, during which it would make discretionary distributions to the benefit of various charitable entities and their charitable endeavors. The structure was established for the purpose of reorganizing investment assets from Trust#2 and distributing such assets to non-profits when the trust expired per its term, and reducing the burden to pay US federal tax. It was never an investment fund.

76. In my experience these structures serve to mitigate the tax exposure of assets under management, while also permitting any donors of assets to have non-binding input on the investment of such donations and charitable contributions to charitable entities. It is important to stress that these arrangements, to avoid material tax liability and violations of criminal tax laws, must be conducted at arm's length and with strict adherence to the principle that the donor must totally relinquish dominion and control over the contributed assets.

---

[1] In 2011, Mr Dondero also owned and controlled Charitable DAF GP, LLC, a Delaware limited liability company, which was the General Partner of Charitable DAF Fund, LP and effectively had control over the DAF Structure (other than Charitable DAF HoldCo, Ltd.). Mr Dondero could not maintain control of the General Partner because, in order for his charitable deduction that he obtained when he donated assets to Trust #2 to remain legally valid, he had to cede dominion and control of the transferred assets.

77.    From my background as a tax professional advisor I am aware of the importance of avoiding inferences of "dominion and control".  These derive from the fact that under U.S. tax law, when someone donates to charity, they must forfeit "dominion and control" of the donated assets, meaning the donor must completely and irrevocably transfer ownership and control of the property to the charity. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used, directly or indirectly (such as with the DAF Structure). This includes relinquishing any power to change the use or disposition of the donated assets.

78.    Furthermore, for the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. I exhibit at **MP1/ page 16 - 83** a memorandum of advice prepared by Corrington for Holdco addressing the issue of dominon and control of assets provided to charity (**Carrington Memo**).

79.    The charitable distributions to DAF were to be made through the Highland Foundations as the Supporting Organisations of the DAF Structure.  I know from my involvement in establishing the DAF Structure that Mr Dondero is the President, Director, and Individual Member of each Supporting Organisation and wields further influence as a purported donor to the Highland Foundations.   If, for example, the IRS were to make a finding that Mr Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he has benefited from and impose civil penalties, as outline in the Carrington Memo (ref to page in exhibit).

80.    The charitable distributions made would be from the DAF through Supporting Organisations exempt from federal taxation under Section 501(c)(3) of the US IRC providing the DAF structure was administered and managed independently of any donor (including Mr Dondero's in his capacity as an indirect donor through the charitable remainder trust).  At the time Mr Dondero and I discussed the establishment of the DAF Structure, I informed Mr Dondero that the structure required the complete divestiture of assets and that the terms of the DAF and its

related entities could not provide Mr Dondero with any dominion or control over the structure or the distributions made by DAF.

81.    For example, when I articulated to Mr Dondero that the investment income reported to each of the foundations which held the DAF was US $22,875,944 to Highland Dallas Foundation, Inc.; US $22,961,382 to Highland Santa Barbara Foundation, Inc.; and US $22,883,319 to Highland Kansas City Foundation, Inc., Mr Dondero's response was "*They don't think of that money as their own do they???*". In fact, the Highland Foundations as Participating Shareholders were only entitled to cash distributions, if and when made.  Following my review of this correspondence I was concerned that Mr Dondero had evaluated the prospects of DAF to advance financing to his current and future projects in a way which may be contrary to Mr Dondero relinquishing dominion and control in respect of the DAF Structure.  A copy of this email exchange is exhibited at **MP1/ page 84 - 85**.

82.    In fact, the Carrington Memo at **MP1/ page 76** advised that there was a "*significantly heightened risk that the IRS could severely penalize and/or revoke the tax-exempt status of one of more*" of the Supporting Organisations which could in turn imperil the status and assets of the DAF, for the reasons which I explain below.

83.    My concerns which arose at a later date (again, the justifications for which are articulated more fully below) were that should Mr Dondero attempt, through his control of the Highland Foundations, to exert dominion and control over the cash and property that he previously (indirectly) donated to DAF (and for which I understand he claimed personal charitable deductions for U.S. tax purposes) and the IRS  were to make that determination, then the IRS would likely disallow the income and gift tax deductions that Mr Dondero took, and impose civil penalties, such as, a penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663, as referred to in the Carrington Memo (insert page ref from exhibit).

84.    In addition and as mentioned above, I understand that significant penalties can be imposed on self-dealings between a private foundation (such as each of the

Highland Foundations) and a "disqualified person". The term disqualified person" includes an officer, director, or trustee of a foundation. Given Mr Dondero's involvement with the Highland Foundations, and further to the evidence which I give below, by late 2024 I harbored concerns that the IRS may consider Mr Dondero to be a "disqualified person" with respect to each and every Highland Foundation, which could expose each of those entities to revocation by the IRS of its tax-exempt status and possible criminal prosecution.

85. To the extent that the DAF's assets could have been used in such a way, my further concern was that creditors of Mr Dondero could view the DAF as Mr Dondero's financial alter ego under U.S. law. In tun that could expose DAF and its assets to creditor claims unrelated to the DAF Structure. Such claims could risk depleting the pool of assets held by DAF, which would result in depriving current and future charities from the benefit of those assets. I note that significant amounts of DAF's liquid assets are held in the U.S. and whilst I understand (without waiving privilege) that concepts of alter ego are different under Cayman Islands law, that would not prevent attachment of DAF's assets held in the U.S.

86. Quite simply, the assertions made on behalf of the Highland Foundations by the evidence of Ms Diaz show a fundamental misunderstanding of the corporate structure and charitable purpose of DAF. Primarily, the Highland Foundations assume that DAF was a "consolidated entity" when in fact the fundamental scheme of the corporate group intentionally, and necessarily, delineated between control of and economic interest in the DAF Structure.

87. In this regard, Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011 with registration number 263805 (see **MP1/ page 86**). Since its incorporation and until the DAF Restructuring in March 2025 (discussed below) Holdco was the Limited Partner of DAF through which it indirectly owned the entities in the DAF Structure. However, Holdco did not hold voting, control, or management rights in respect of DAF. Its sole purpose was to act as a conduit through which discretionary, charitable donations would pass.

88. DAF, an exempted Cayman Islands limited partnership was controlled and operated by its former general partner, Charitable DAF GP, LLC (**Original GP**) between October 2011 through to the Restructuring. From February 2024 DAF has been operated by the GP. The Original GP was arranged in Delaware and also registered in the Cayman Islands under Part IX of the Companies Act (as revised). The control of the Original GP and the Replacement GP are also explained below.

89. The characterization by the Highland Foundations through the evidence of Ms Diaz of DAF as a 'Fund' (**Diaz 1, paragraph 12**) is therefore misleading and liable to create confusion. DAF is not an investment fund but is a charitable vehicle and properly understood, DAF:

    (a) Did not solicit capital from investors;

    (b) Had / has no subscription agreements through which interests are taken up. Notably, the Highland Foundations did not "subscribe" to DAF in the way, I am informed by counsel (without waiving privilege), commonly used by investment funds in the Cayman Islands, but were granted Participating Shares in Holdco by way of a gift at the inception of the DAF Structure.

    (c) Holdco as Limited Partner had restrictive rights in its participation and management of DAF, including restricted rights to information.

    (d) Had no entitlement to make capital calls against the Supporting Organisations or indeed against Holdco;

    (e) Does not have a registered investment advisor;

    (f) There are no investment hurdles or reporting requirements;

    (g) There are no marketing brochures, private placement memorandums or other materials relating to solicitation for investments;

    (h) The economic substance filing lists business of Holdco; and

MR 1313

(i)     There is no wind down date or term within which shareholders are entitled as of right to distributions.

90.     Accordingly, to describe DAF as a fund, as the JOLs, Mr Johnstone, Mr Dondero and MS Diaz assert, is incorrect.  Holdco was a passive holder and would receive cash distributions from time to time but purposefully did not enjoy any governance or fixed economic rights over the entities comprising the DAF Structure.

91.     The constitutional documents of Holdco and DAF maintained the necessary distinction between the economic interest in the DAF Structure and control over the same.  In the evidence of Ms Diaz the Highland Foundations incorrectly rely on the Amended and Restated Memorandum and Articles of Association of Holdco dated 19 January 2015 (**2015 Articles**) (**Diaz 1, paragraph 15**).  The Articles have been amended and restated twice since the 2015 Articles both as of 24 January 2024 and again since 20 February 2025 (**2025 Articles**).  It is the 2025 Articles which regulate the affairs of Holdco and are exhibited at **MP1/ page 87 - 123**.

92.     Notwithstanding that the Holdco constitution has been amended, the provisions relating to the rights and interest of the shareholders of Holdco have not been modified.  Holdco has issued both Participating Shares and Management Shares. The interests and rights conferred by these shares maintain a distinction between control of Holdco and an economic interest in Holdco.

93.     Management Shares are *"voting, non-participating share in the capital of"* Holdco *"that shall be non-redeemable at the option of the holder but redeemable by"* Holdco.  As stipulated in Art. 11 of the 2025 Articles, the Management Shares *"shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of"* Holdco.  Notably, Management Shares *"confer no other right to participate in the profits or assets of"* Holdco.

94.     In contrast Participating Shares, being those held by the Highland Foundations, are *"a non-voting, participating non-redeemable share in the capital of"* Holdco. Specifically, Participating Shares confer the right upon the Participating Shareholders to participate in the profits or assets of Holdco in accordance with

the terms of the 2025 Articles (**Art. 12, 2025 Articles**), which is subject to the sole discretion of the Directors of Holdco.

95. The distinction between Management and Participating Shareholder rights is evident throughout the 2025 Articles:

    (a) it is for the Directors of Holdco to exercise their sole discretion to consider if a dividend ought to be paid to the Participating Shareholders, or whether the available funds ought to be set aside as a reserve. The Participating Shareholders have no ability to vote on whether a distribution would be made from Holdco (**Arts 102, 105, 2025 Articles**).

    (b) Participating Shares do not confer the right to remove or appoint directors to Holdco. The right to appoint Directors to Holdco is reserved for the Management Shareholder and Directors, whereas the ability to remove Directors of Holdco is limited solely to the Management Shareholder (**Arts 64, 65, 69, 2025 Articles**).

    (c) The Directors of Holdco have discretion to issue further shares in Holdco, and by the 2025 Articles the dilution of the Participating Shares *"shall not be deemed to be materially adversely varied or abrogated by [the]...issue of further Participating Shares"* (**Arts 7, 14, 2025 Articles**).

    (d) Participating Shares do not confer a general right to inspect any account or book or document of Holdco, except in very limited circumstances being if such a right is granted by law or the Directors of Holdco otherwise authorize such inspection (**Art 111, 2025 Articles**).

96. At the time the DAF Structure was being established the limited nature of the Participating Shareholders' rights caused some charities who may have benefitted from the structure to reject the proposed gift of Participating Shares. I travelled and met with various charities, including the Greater Houston Community Foundation and Communities Foundation of Texas. These charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These

charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point.

97.    In contrast, the Dallas Foundation, the Great Kansas City Community Foundation and the Santa Barbara Foundation also undertook extensive due diligence and, through the Highland Foundations, accepted the Participating Shares by way of a gift in full knowledge of the very limited rights conferred by these shares.  Having regard to **paragraph 20(b) of Diaz 1**, it appears that the Highland Foundations are seeking to assert some form of fixed or proprietary economic interests in DAF which they knew were at best (i) discretionary; (ii) subject to dilution; and (iii) not controlling rights.  The assertion of the Highland Foundations in these respects are refuted. The Highland Foundations were cognizant of these limitations when they accepted the gift of Participating Shares. For example, I recall meeting with Mary Jalonick (now-retired former president of The Dallas Foundation, which is supported by the Highland Dallas Foundation, Inc.), who understood the limitations. The current effort by the Supporting Organisations therefore subverts the intention, understanding and terms of the agreement of the parties at the time the Particiapating Shares were gifted by the Company.

98.    The Highland Foundations, Ms Diaz and Mr Dondero were and/or should each have been well aware of the ability of Holdco to issue new Participating Shares. In July 2015, I understand that Mr Dondero had encouraged Grant Scott to cause Holdco to issue 5 Participating Shares to Community Foundation of North Texas (now known as North Texas Community Foundation) in exchange for US$.05. A copy of the correspondence admitting North Texas Community Foundation as a Participating Shareholder is attached at **MP1/ page 120 - 128**. I am aware that Mr Dondero was frustrated with (what he considered to be) the "woke", liberal, California-based Santa Barbara Foundation and their priorities, so Mr Dondero and Lane Britian requested that I find a replacement charity. At the time, I spoke with the El Paso Foundation and the Miami Foundation, who both rejected the gift of Participating Shares. North Texas Community Foundation was willing to accept a modest number of shares (5) to be held in a donor-advised fund account.

MR 1316

99.  I explained to Mr Dondero in November 2014 that the Highland Foundations did not think of DAF's assets as their own and understood they were only entitled to discretionary cash distributions, if and when made. A copy of the email correspondence is exhibited at **MP1/ page 84 - 85**.

100. The operations of DAF are regulated by the Second Amended and Restated Exempted Limited Partnership Agreement of DAF, dated 11 March 2024 (**Amended LPA**).  Again, the Highland Foundations rely on an outdated version of the governance document for the DAF.  A copy of the Amended LPA is exhibited at **MP1/ page 129 - 146**.

## D.  DAF AS ALTER EGO OF JAMES DONDERO

101. From October 2011 until March 2021, Mr Scott was Managing Member and Sole Member of the Original GP and was the holder of the Management Shares issued in Holdco.  As such Mr Scott was the control person over DAF and the related structure (**Control Person**).  The function of the Control Person was and is to ensure DAF made independent investment decisions for the ultimate benefit of charitable beneficiaries and the charities they support.  From my professional experience and expertise I understood that if the Control Person fails to act independently, the charitable and tax-exempt status of the supporting organisations would be compromised.  The mere illusion of lack of independence could also expose DAF and its assets to adverse tax treatment and penalties from the Internal Revenue Service as well as creditors and other adverse parties if independence were not maintained.

102. Prior to 2021 Mr Scott and Mr Dondero were longstanding friends and acquaintances.  I am aware from my associations with both Mr Scott and Mr Dondero that they were college roommates and that Mr Scott acted as Best Man at Mr Dondero's wedding with Rebecca (Becky) Dondero in 2005, which ended in divorce and extensive public litigation all the way to the Supreme Court of Texas. Mr Scott and Mr Dondero continued to be friends following the divorce litigation.

103. In or around March 2021 I approached Mr Scott to assume the role as Control Person of the DAF. This required me to take on the directorship of the Original GP and be registered as holder of the Management Shares issued by Holdco. I assumed the role of Control Person as of 24 March 2021. Therefore, the concept of their being a sole human agent in control of the DAF is one that has represented the status quo since its inception in 2011. The aspersions and innuendos cast by Johnstone Law on behalf of the Highland Foundations and more recently the JOLs are therefore inappropriate and are also consistent with their prevailing inaccurate view that DAF should be regarded as a "consolidated entity."

104. At this time I understood from my conversations with Mr Scott that he and Mr Dondero had suffered a falling out because Mr Scott refused to take a step at the request of Mr Dondero which would have caused him to breach his fiduciary duties to DAF.

105. It is my understanding and belief that Mr Scott's refusal to act at the direction of Mr Dondero angered him and that, as a result of Mr Scott's opposition to Mr Dondero's instructions, Mr Dondero wanted Mr Scott to resign. I exhibit an email from Mr Scott to John Kane on 30 January 2021 at **MP1/ page 147** which, contrary to the assertion made by Mr Dondero at **paragraph 20** of **Dondero 1** that Mr Scott informed him that he wished to resign in March 2021, Mr Dondero and Mr Scott reached a mutual agreement on a call on 30 January 2021 that Mr Scott would resign as a result of being at a "*cross-roads*" with Mr Dondero. In fact, Mr Dondero had stated to Mr Scott that *"The releases and non objection to the plan was all Seery cared about ... accusations of non independence was tweaking and always alleged against all trustees, very hard to prove ... not a real threat but Seery got a lot for it, look what you signed"*. Mr Scott is not prepared to provide me with a copy of the unredacted email due to privilege but has intimated that he would be prepared to give evidence in these proceedings. My understanding is that Mr Dondero did not have the power to remove Mr Scott from his position, but he nonetheless encouraged Mr Scott to resign because he was displeased that Mr Scott had done something to benefit Seery as outlined above (the Highland Capital Management, L.P. chief restructuring officer after Mr Dondero was ousted from Highland Capital Management).

106. The appointment and subsequent resignation of Mr Scott as described by Mr Dondero in **paragraphs 14 and 20-21** of **Dondero 1** is misleading. Contrary to the impression conveyed at **paragraph 14, Dondero 1** while Mr Dondero may have known and regarded Mr Scott for many years as a person of *"great integrity"* Mr Dondero did not select and nor could he select the Control Person of the DAF. To have such a level of decision-making in respect of the DAF Structure would have compromised the charitable standing and purpose of the structure from the outset.

107. At **paragraphs 20-21** of **Dondero 1**, Mr Dondero deposes that Mr Scott volunteered his resignation due to the fact that he was ill-equipped to handle various disputes which had arisen in connection with the Highland Bankruptcy proceedings on foot in the United States. Mr Dondero further and wrongly deposes to the effect that he was consulted on the transfer of Control Person from Mr Scott to myself, and that he was *"happy for Mr Scott to pass the Control Position"* to me.

108. For the avoidance of doubt, Mr Dondero was not consulted regarding my assumption as Control Person. This was a matter communicated by email between Mr Scott and myself. Mr Dondero learnt that I had been appointed as the Control Person on or after the relevant corporate transfers as of 25 March 2021. Once again, the impression wrongly conveyed by Mr Dondero is that the DAF and DAF Structure are subject to or under his control.

109. Mr Dondero's account of how I came to act as the Control Person in these proceedings directly contradicts testimony he gave under oath on June 1, 2021. In that testimony Mr Dondero testified to the fact that I had replaced Mr Scott a month after it happened and Mr Dondero did not know beforehand (see extracts from Mr Dondero's deposition dated 1 June 2021 at **MP1/ page 148 - 158**). Mr Dondero was clear that he learned of my appointment after the fact and that I was the one who told him. As set out in the transcript exhibited at **MP1/ page 149 - 150** Mr Dondero says, *"And unbeknownst to me, [Mark and Grant] agreed, and [Grant] sent over the appropriate documentation...and Grant signed it, and Mark Patrick became the trustee."* Mr Dondero goes on to say that, prior to learning about me taking over for

MR 1319

Grant Scott, Dondero had no knowledge discussions were underway pursuant to which that would occur.

110. After assuming the role of Control Person I quickly formed the belief that Mr Scott had created potential liabilities for DAF and the DAF Structure as a result of failing to manage DAF and its assets independently of Mr Dondero, particularly where I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without due consideration for their appropriateness or any financial due diligence.

111. As set out in my evidence below, I have good reason to consider these investments may in fact have been for Mr Dondero's personal benefit and/or to further Mr Dondero's commercial interests, which were not aligned with the best interests of DAF, or the charitable purposes it was intended to serve. In effect, during Mr Scott's tenure as Control Person both the Highland Foundations and DAF were in effect under the common control of Mr Dondero which enabled Mr Dondero to utilize DAF and its assets as a private line of credit. As examples, (i) NexBank Capital Inc. (**NexBank**), which is a privately held bank where Mr Dondero has a significant ownership interest, sold land to DAF for tax benefits to NexBank, emails of which are exhibited at **MP1/ PAGE 159 - 162** and (ii) Highland (then under the control of Mr Dondero) sold or caused to be sold so many assets to DAF that DAF had no money to fund other proposed Highland investments, emails of which are exhibited at **MP1/ page 163 - 168**.

112. I knew that should this be the case, this would have profound legal, compliance, and tax consequences for DAF and DAF's assets. I also became aware that Mr Scott's compensation for DAF was determined by Mr Dondero without consulting any compensation study or expert advice, a copy of which communication is exhibited at **MP1/ page 169 - 170**.

113. My concerns that Mr Scott may have come under pressure to authorize transactions which may not have been in the best interest of the DAF (but rather Mr Dondero) were duly reinforced when I was unduly pressured by Mr Dondero. In mid-

2024, Mr Dondero (via his employees at NexPoint) proposed various investment opportunities that involved using DAF's assets, which would have been to the benefit of Mr Dondero and/or his affiliates but which in my opinion were not suitable investment opportunities for DAF. These unsuitable investment opportunities included rescue financing for a NexPoint fund in connection with an SASB refinancing and a NexPoint-led Delaware Statutory Trust investment regarding storage facilities. In response to DAF turning down these investment opportunities, Mr Dondero (through his assistant) demanded in August 2024 that I meet him three times per week to discuss DAF management and investments. In accordance with my fiduciary duties to DAF, I refused these demands but strongly suspected Mr Dondero sought to exert control over DAF, contrary to its tax compliance requirements and charitable purpose.

114. My review of the investments and dispositions from DAF revealed that Mr Scott had historically approved every related party transaction between DAF and entities owned or controlled by Mr Dondero. If I were to characterise the history of the way in which Mr Dondero treated DAF and the DAF Structure from 2011 until my appointment in March 2021, Mr Dondero used DAF through influencing Mr Scott's position as Control Person to (i) generate income for Mr Dondero's commercial gain; (ii) provide liquidity to Mr Dondero and his affiliate entities to advance his commercial interests and/or to reduce the tax exposure of Mr Dondero affiliated entities; and (iii) take high risk positions for below market returns in order to generate significant profit for his affiliate entities whilst retaining the upside for Mr Dondero's affiliate entities and continuing to enjoy significant personal tax benefits.

115. With respect to point (i) above:

(a) I understand that Highland had previously charged investment manager fees to DAF. From my review of the investment management arrangement it does not appear that Mr Scott took any step during tenure as DAF's Control Person to independently review or assess the fees that were being charged to DAF.

MR 1321

(b)     As mentioned above, NexPoint is an alternative investment firm founded by Mr Dondero in 2012 and in which Mr Dondero admits he holds an interest (**Dondero 1, paragraph 7**). I also recall in the first month of my tenure as DAF's Control Person, that Mr DC Sauter (general counsel of NexPoint) and Mr Isaac Leventon demanded DAF pay NexPoint a 2% base fee and 20% upside for managing DAF investments. I rejected this demand whilst fully appreciating that paying management fees would be a way for Mr Dondero to circumvent the "dominion and control" issues which would otherwise arise from a tax perspective. I was clear that my role as the DAF's Control Person was not to rubber-stamp Mr Dondero's proposals but rather to advocate for the DAF and its charitable purposes.

(c)     When Mr Dondero or his entities needed capital and wanted to offload an illiquid or undesirable investment at a premium rate, such assets have been sold or donated to the DAF. By way of an example, the DAF currently has exposure of US $85 million to a syndicated debt facility where the borrower's sole investment is two wavelength spectrum licenses issued by the Federal Communications Commission. Such licenses are illiquid and speculative. In this case, I believe Mr Dondero (through both Highland and NexPoint entities) and his affiliates realised they were overleveraged in that investment and required DAF to buy it at par. I do not believe that DAF would be able to sell it at par because a maturity date extension signed in January 2025 required the borrower to pay steep fees and provide an increased interest rate, which are characteristic of troubled debt holdings.

116.  With respect to point (ii) above:

(a)     I recall that in November 2023, Mr Dondero attempted to exert influence over me as the Control Person, by asking me to transfer (on behalf of DAF) approximately US$1.5 million to offshore entities owned by Mr Dondero which I believed would be provided to Sentinel Reinsurance,

MR 1322

Ltd., a Cayman Islands limited company, (Sentinel) (or another entity above it in the Sentinel Structure) which I believe was then majority owned by Mr Dondero. I understand that the transfer was to settle the payment of outstanding legal fees which were wholly unrelated to DAF and its charitable purposes. The effect of this request would have meant that funds would be diverted from DAF and its charitable beneficiaries to further Mr Dondero's unrelated commercial interests. On the basis of advice received from Parsons McEntire McCleary PLLC and without waiving privilege, I determined the proposed transfer would be "impermissible and illegal" (as stated in the Carrington Memo at pages **MP1/ page 68**). It is important to note that at this time there were a number of outstanding lawsuits being conducted in the US in which the DAF Structure was being characterized as the alter ego of Mr Dondero. In accordance with my fiduciary obligations to DAF and in light of the real risk posed to the integrity of the DAF Structure by Mr Dondero's attempts to exert control, I refused to effect the transfer as directed.

(b)    Similarly in the fiscal year 2024, I noted that Mr Dondero was experiencing liquidity issues and did not want Skyview Group to pay my bonus compensation. As such, Mr Dondero directed human resources at Skyview to email Shawn Raver (at the time, an independent consultant who helped me with DAF matters) and instruct him to have the DAF advance 90% of my bonus with Skyview paying the remaining 10%. Under this arrangement, such payments were likely characterized as director fees and is yet another example of how DAF was used by Mr Dondero to resolve third party liquidity issues.

(c)    I understand that NexPoint (and other Dondero entities) had at various intervals sold to DAF its undesirable land situated in flood plains land and directed that investment funds related to Mr Dondero would sell other under or non-performing assets to the DAF to generate liquidity for Mr Dondero's entities. Again, the viability of these transactions does not appear to have been independently evaluated by Mr Scott in his

MR 1323

capacity as the Control Person.  As a general matter, DAF's balance sheet was full of former NexPoint and other Mr Dondero-affiliated investments.

117. I also understand that Mr Dondero directed Mr Scott to send US $1 million of DAF funds to the Tall Pine Group, in order to pay Mr Dondero's affiliates (such as Mr Ellington and Isaac Leventon) their bonuses at a time when paying those bonuses was blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**).  Mr Scott caused DAF to make the US $1 million payment, which was flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ page 172 - 305**).  With respect to point (iii) above, examples of the value destructive dealings and transactions that were imposed on DAF are set out in a report prepared by ValueScope dated 20 November 2024 (**ValueScope Report**).  The ValueScope Report is exhibited at **MP1/ page 307 - 315**.

118. In summary, I observed that NexPoint would devise a scheme whereby it needed capital to consummate an initial investment and would engage DAF to provide bridge financing in exchange for a fixed rate of return with no upside beyond the fixed rate of return or repayment timeline.  Under this arrangement, NexPoint would retain the upside (typically the common equity interests) and DAF would receive a preferred equity that would be extinguished upon repayment with a fixed interest rate.  From industry experience, I do not believe that other lenders would agree to transactions on these terms, which is why I believe NexPoint would attempt to solicit funding from DAF.  In effect, the DAF provided access to millions of dollars of its own assets to support NexPoint's (and by extension Mr Dondero's) commercial ventures.

119. The ValueScope Report also provides an overview of transactions and events (in terms similar to those described above) concerning DAF, which includes reference to the:

MR 1324

**(a) The Campus at Legacy (TCAL) transaction** - This was characterised in the ValueScope Report as "NexPoint's request to DAF shifted US $45 million of downside risk to DAF, while NexPoint retained full upside. Development of TCAL would accrue significant benefits to NexPoint and Dondero by enhancing their adjacent Texas Research Quarter...project" (**TRQ**) (**MP1/ page 308**). By way of background:

(a) In September 2024, NexPoint requested that DAF acquire the TCAL property, which was advertised primarily as a land investment comprising approximately 80 acres, and featuring two office buildings generating approximately US $800,000 in annual net operating income at 59.4% occupancy.

(b) NexPoint had TCAL under contract for US $45 million and it was anticipated that the acquisition would close in November 2024. After closing, I understand (see **MP1/ page 308**) that NexPoint intended to control the TCAL property and gradually wind down the tenant leases, with a view to demolishing the site to construct new life science manufacturing facilities.

(c) TCAL would also be integrated into TRQ, a planned 135-acre life sciences innovation district centered around the former Electronic Data Systems campus in Plano, Texas, United States, which borders the TCAL property.

(d) I understand that NexPoint and its related entities owned substantial debt and equity interests in the TRQ properties.

(e) Due to insufficient cash flows generated from the office buildings on the TCAL property, DAF requested a two-year ground lease with NexPoint as the master tenant as part of the property acquisition. Additionally, DAF required that NexPoint be contractually obligated to purchase TCAL from DAF at the end of the ground lease and requested a security interest.

MR 1325

(f)    However, NexPoint declined, which would have left DAF with full downside exposure and limited upside potential.

(b) **Preferred Dividend Financing**

(a)    In August 2024, NexPoint approached DAF to provide NexPoint Storage Partners (**NSP**), which was managed by NexPoint Advisors, with US $11 million in unsecured financing. DAF was told that the funds were required as a bridge loan for the sale and refinancing of NSP properties. However, DAF learned after conducting some due diligence that the real use was to make a US $6.4 million payment on an upcoming preferred equity dividend payment NSP owed to an investor, Extra Space Storage. DAF ultimately turned down the deal, but this is another example of how Mr Dondero tried to use DAF as a personal banking facility to support his commercial ventures whilst I was the Control Person.

(b)    I also understand from the ValueScope Report that there was a failure to reduce risk in the deal by providing collateral, reducing outstanding NexPoint DST exposure, or by providing any put options.

(c)    The deal structure and the purpose for the funds also changed several times during the 2-week negotiation period.

(c) **Small Bay II DST bridge loan** – with respect to DST investments, the ValueScope Report states that: *"all three DST Investment made under prior leadership failed to be repaid from DST equity raise proceeds after full syndication, as opposed to full repayment on all new DST bridge loans that have been syndicated since Mark Patrick become the control person"* (see **MP1/ page 311**). By way of background and in relation to the Small Bay II DST bridge loan:

(a)    In or around June 2024, Mr Dondero caused NexPoint to demand that DAF roll over its equity from a prior transaction while, simultaneously, Mr Dondero's trust, The Dugaboy Investment Trust (**Dugaboy**), (of which

MR 1326

Mr Dondero's family are the income beneficiaries and his sister, Nancy Dondero, is the trustee) which held a subordinate class of equity in the prior transaction, was paid at closing in full.  In other words, Dugaboy received a payment in full despite being at a lower position in the payment waterfall, and DAF rolled over its investment. The return to Dugaboy was listed at US $13,650,280 and DAF rolled over two classes of equity totaling $6,404,958.

(b) As seen from the ValueScope Report, across the various investments DAF has made in NexPoint entities or NexPoint-related deals, DAF has also faced challenges in obtaining various repayments from NexPoint.

(c) These DST investments followed a similar pattern: DAF provided a DST bridge loan to ensure that the Delaware Statutory Trusts were adequately capitalised from inception, and DAF was to be repaid through the sale of trust equity interests to DST investors.

(d) However, NexPoint would regularly fall behind on these repayments to DAF by several months at a time (which were funds raised from investors). As a result, I negotiated a clause in the Small Bay II DST bridging loan agreement, which required NexPoint to pay DAF the funds that were raised within 5 business days (see an LLC Agreement of NREA SB II Holdings LLC dated 13 June 2024, exhibited at **MP1/ page 316 – 350, and page 319** which provides for the five business day window). Ultimately, Mr Dondero was upset over my handling of the transaction and exercising independence to act for the DAF, as DAF obtained multiple benefits and protections by fighting NexPoint on Small Bay II, as outlined in the ValueScope Report.

(e) At the date of the ValueScope Report, NexPoint had not made any repayments and had retained at least US $8.26 million in funds with respect to Small Bay II and US $0.7 million in funds with respect to Polo Glen DST (described below) that it was contractually obligated to pay to

MR 1327

DAF. In a settlement related to the Highland bankruptcy, I negotiated with Mr Dondero to cause Mr Dondero to release the US $8.26 million (as detailed further in HCLOM Claim Narrative at **MP1/ page 351 – 354)**.

**(d) Polo Glen DST**

(a)     DAF made another bridge loan (which I refer to as the Polo Glen DST bridge loan) in December 2019 part of which, has remained unpaid for approximately five years.

(b)     As far as I am aware, there remains about US $0.7 million which NexPoint has refused to repay to DAF, despite having collected enough in asset management and various other fees to honour the repayment.

(c)     As further stated in the ValueScope Report, I also negotiated a put option to NexPoint and related parties in June 2024 as an option to reclaim the outstanding balance, which NexPoint failed to honour when it was exercised.

120.    In this respect, and contrary to the perception which Mr Dondero seeks to convey in **Dondero 1**, Mr Dondero frequently sought to utilize DAF as a means of generating liquidity for his other commercial ventures which placed DAF and the DAF Structure at risk of being characterized as the alter ego of Mr Dondero. Not only does Mr Dondero seem to be ignorant of the risks he was creating for DAF and the untenable position he was creating for anyone occupying the Control Position, but to compound his flawed thinking, once I pushed back (with the approval of Mr Muphy as independent/oversight director) on his demands, he has proceeded to retaliate by actively taking adversarial position against me and Mr Murphy through the Highland Foundations.  The JOLs do not seem to be remotely attuned to what is happening and have unconditionally adopted a position that can easily be traced back to Mr Dondero through the Highland Foundations for whom Johnstone Law has acted.  DAF is further at risk of being found to be the alter ego of Mr Dondero's *alter ego* given how it has been utilised in legal proceedings arising from Mr Dondero's actions.  As observed in the ValueScope Report: *"All DAF litigation arises*

*from Dondero.  Dondero adversaries have sued DAF, claiming that DAF is an alter ego of Dondero and his various entities.  Certain causes place all of DAF's assets at risk to Dondero creditors and aggrieved parties.  DAF must vigorously defend itself and its assets, which can be costly and time-consuming"*.  The extensive suits in which the DAF has been caught up are divided between those that are cases brought or initiated by adversaries of Dondero and those that were actions at the recommendation of Dondero (see **MP1/ page 313**).

121. DAF's participation in numerous litigious proceedings will also inevitably result in the depletion of DAF's assets, which is to the detriment of the charitable purposes that DAF is meant to support.  Mr Dondero has also been described as a "vexatious litigant" due to numerous and frivolous lawsuits brought by him either directly or indirectly, as discussed further in Mr Murphy's First Affidavit filed which is also being filed in opposition to this sanction application.

122. For the Court's benefit, a summary of these proceedings are as follows:

### Turnover Proceedings - New York County Supreme Court (Index No 650744/23)

123. This claim was brought by UBS Securities LLC and UBS AG London Branch (collectively, **UBS**) to collect on a $1.1 billion judgment UBS had obtained against various Dondero entities. The UBS claim against DAF related to assets acquired by CLO Holdco in December 2010. Mr Dondero is a defendant in these proceedings.

124. Only DAF was dismissed as a defendant in these proceedings by the New York Supreme Court for lack of personal jurisdiction over CLO Holdco. The lawsuit proceeds against the other defendants. Whilst that outcome was positive for DAF, as I have alluded to above insofar as DAF's assets are within the U.S. I understand that if DAF is found to be the alter ego of Mr Dondero, those assets may be at risk of attachment by UBS (see further below).

125. With respect to **paragraph 54** of **Diaz 1**, Ms Diaz omits the fact that Mr Dondero, together with various entities he owns, are being sued by UBS in this action for US $1.1 billion for, among other things, a Cayman Islands Monetary Authority-

MR 1329

regulated company issuing a fraudulent after-the-event insurance policy in order to move assets from an advised fund of Mr Dondero to his company, Sentinel. Mr Dondero's motion to dismiss and motion for discovery in that action were both recently denied, and proceedings have been fast tracked for summary judgment[2].

126.  As such, Mr Dondero will soon face the prospect of having to find and possibly liquidate the necessary assets in order to satisfy a potential billion dollar judgment. This is an important fact to omit, especially where DAF has a significant value of assets under management, which Mr Dondero has repeatedly exploited or tried to exploit in the past, to DAF's actual or potential commercial detriment.

127.  Should a judgment be made against Mr Dondero, there is a risk that DAF's assets could be paid for distribution to creditors and/or UBS, if (a) Mr Dondero assumes control of the DAF; or (b) should creditors successfully argue that the DAF is in fact Mr Dondero's financial alter ego. It is for these additional reasons that establishing independence between DAF and Mr Dondero was critically important to obtain.

***Turnover Proceedings - Bankruptcy Court, Northern District of Texas (Index No 20-03060)***

128.  These proceedings were brought by Acis Capital Management (**Acis**) and Josh Terry (**Mr Terry**) as part of Acis Bankruptcy (**Acis Bankruptcy**).

129.  An action against Mr Scott was also brought in the Acis Bankruptcy, and Mr Scott was indemnified by DAF as former Control Person.

***Declaratory Judgment - District Court, Southern District of New York (Index No 5. 21-11059)***

130.  This action was brought by  Mr Terry, a former business partner of Mr Dondero, alleging that DAF and CLO Holdco did not have standing to bring claims related to

---

[2]  Please note that summary judgment in these proceedings could result in three different outcomes: (1) the Turnover Petition is granted and the property is delivered up to UBS; (2) the Turnover Petition is declined; or (3) the Court finds that there are facts at issue which would result in discovery being ordered and a hearing is listed.

MR 1330

Acis's management of assets held by Highland CLO Funding, Ltd. (of which CLO Holdco held a 49.015% interest).

131. Acis and Mr Terry sought this relief on the basis that, prior to my accession as DAF's Control Person, DAF had fallen into a pattern of commencing multiple lawsuits and then dismissing them before discovery commenced.

132. Notably, I understand that attempts to settle this litigation were hindered by Mr Dondero and / or NexPoint's involvement each of which was against any settlement because I believe they wanted the litigation against Mr Terry to continue.

*Derivative Action - Royal Court of Guernsey (Civil Number 2479)*

133. These proceedings were brought on behalf of a Guernsey domiciled entity called HCLOF seeking the distribution of cash being withheld from HCLOF by Acis , Mr Terry and U.S. Bank**, National Association.**

*Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03073)*

134. The purpose of these proceedings was to seek an Order to reverse the cancellation of DAF's ownership interest in Highland Crusader Fund II, Ltd.

*Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03076)*

135. In these proceedings, DAF was sued by the Litigation Trustee of the Chapter 11 Proceedings of Highland (**Highland Bankruptcy**) in connection with certain contributions received by DAF in 2016.

*Bankruptcy Litigation -  Bankruptcy Court, Northern District of Texas (19-34054)*

136. These proceedings concerned general matters related to the Highland Bankruptcy, including recovery of redemptions payable that were withheld by Highland.

*General Litigation - District Court, Northern District of Texas (24-00498)*

137. This action (styled Highland Employee Retention Assets LLC v. James Dondero et. al.) was brought by Patrick Daugherty (former partner of Highland), who sued

Hunter Mountain Investment Trust, an entity managed by Rand Advisors, LLC, which is a DAF subsidiary, related to actions undertaken by Mr. Dondero.

### *The Business Court of Texas First Division (25-BC01B-0004)*

138. Separately, Atlas IDF, LP, a Delaware limited partnership and, a DAF controlled entity, is suing an entity affiliated with Mr Dondero (NexPoint Real Estate Partners, LLC) and Dugaboy to collect on US $13 million in demand notes, which were guaranteed by Dugaboy (the validity of these guarantees is now being contested in litigation). I understand that through Deborah Dietsch-Perez (Mr Dondero's counsel), Mr Dondero has attempted to delay the hearing in that matter on the basis that he anticipates gaining control of DAF as a result of these Cayman liquidation proceedings (which would enable him to control Atlas in those proceedings). DAF performed a valuation study and discovered that the notes have a heavy discount due to concerns with collectability. In other words, the valuation experts were concerned that Mr Dondero would not pay his debts. Upon demand (with ten days' grace provided), they were not paid; given they are demand notes, that was a default.

139. Mr Dondero has since tried to acquire Atlas's demand notes for US $600,000 (see **MP1/ page 355 to 356**).

140. Atlas will continue to litigate against Mr Dondero for the collection of the demand notes in full.

### *United States District Court for the Northern District of Texas, Dallas Division (3:25-cv-477)*

141. I am also aware of another example whereby Mr Dondero is utilising these Cayman liquidation proceedings in an attempt to delay collection efforts by DAF. In this case DAF is suing another entity affiliated with Mr Dondero to collect on a $1 million debt obligation. Mr Dondero controls an entity, Highland Capital Management Services, Inc., that defaulted on an approximately $1 million promissory note because Mr Dondero directed payment to a personal friend of his, Patrick McCabe (**Mr**

**McCabe**), who Mr Dondero may have believed that DAF owed money to, although I am not aware of any DAF obligation to or demand for payment from McCabe.

142. Broadly speaking, if Mr Dondero is successful at controlling the proceedings brought by DAF, I harbour concerns that he will direct the Highland Foundations to cease litigation and enter into settlements on terms that favour him. As a result, the Highland Foundations would provide Mr Dondero with an improper "private benefit" to the detriment of DAF.

143. Otherwise, I believe DAF has actively settled the other cases it had involvement with in 2025, and that its litigation expenses only relate to those cases mentioned above.

144. Shortly after my appointment as Control Person, Mr Dondero encouraged me to cause DAF to enter into litigation relating to Dondero's former company (Highland - in bankruptcy), which led to me being found liable for sanctions for breaching a gatekeeper order for filing a lawsuit recommended by Mr Dondero. This was later overturned by the U.S. 5th Circuit Court of Appeals.  DAF and I were  frequently referred to as:

    (a)    as an alter ego of Dondero,

    (b)    part of Dondero's web of entities, and

    (c)    under the direct control and influence of Dondero.

145. I also exhibit a letter from Seyfarth Shaw LLP to the IRS dated 20 March 2025 at **MP1/ page 357 - 374** (**Seyfarth Letter**), which notifies the IRS that Mr Dondero has an inappropriate donor relationship with representatives of the Highland Dallas Foundation (**HDF**), which is the Supporting Organization of the Dallas Foundation (which is a tax-exempt community foundation under US law, and whose president is Julie Diaz), which potentially jeopardizes the tax exempt status of HDF. Specifically, the Seyfarth Letter drew the IRS' attention to the fact that Mr Dondero

MR 1333

exerts direct control over HDF as a director, substantial contributor and president, and indirectly through his and his associates' influence over Highland Dallas' supported organization representatives on the HDF Board of Directors and the Dallas Foundation itself.

146. The Seyfarth Letter also provided the IRS with background on Holdco as HDF is a Participating Shareholder of Holdco, and ergo, Mr Dondero's attempts to control Holdco could have impacted HDF financially.

147. Having appreciated the precarious situation DAF and the DAF Structure had been placed in as a result of the conduct of Mr Dondero both generally and in exercising control over the structure, I immediately took the following actions to protect and mitigate against what I would characterise as "Dondero-recommended transactions":

(a) I hired independent law firms (law firms that had not been previously engaged by Mr Dondero) to negotiate with Mr Dondero's investment professionals and counterparty lawyers on every transaction. This is something which, to the best of my knowledge and belief, Mr Scott never did during the decade he acted as the Control Person.

(b) In order to verify any potential investment was properly underwritten, I hired and consulted with investment analysts such as ValueScope to make independent judgments before agreeing to a transaction. I believe that Mr Scott did not take steps to independently verify the potential investment opportunities presented to DAF by Mr Dondero. The ValueScope Report demonstrates the increased value and performance of DAF after I assumed the role of Control Person and retained investment analysts such as ValueScope to negotiate the financial terms for proposed transactions (see *Historical Performance*, ValueScope Report, **MP1/ page 310**). In particular the ValueScope Report notes that *"Under Mark Patrick's leadership, the DAF has delivered higher returns on bridge lending deals to NexPoint DSTs, all*

MR 1334

*while managing risks more effectively than in transactions executed before Mark took over".*

(c)    DAF retained Paul Murphy as an independent director of Holdco and other DAF entities.

(d)    We adopted institutional grade investment committee guidelines.

(e)    We formed an investment committee to advise on investments with best-in-class managers, including the former Head of Harvard's fixed income portfolio.

(f)    By terminating Skyview Group's servicing contract, the DAF saved US $1 million annually in service fees.

148.    I took these steps knowing that the IRS would look favourably on any and all attempts made by the DAF to maintain its independence from Mr Dondero under the circumstances.

149.    However, I realized that, despite the protocols I had established early in 2021, as the variety of litigation against the DAF was filed (including also DAF's litigation against a Guernsey entity, HCLOF referred to above at [x]), that a common theme and refrain was clear: the DAF was regarded as Mr Dondero's alter ego regardless of my legitimate actions to establish systems and protocols to attenuate that conclusion.

150.    Additionally, I followed the various legal actions by UBS against Dondero relating to the Sentinel Fraud (as defined below), and I realized by early 2023 that both the Kirschner complaint against the DAF and potentially a future and significant claim to be brought by UBS (which eventually materialized) could jeopardize the DAF's assets and expose them to Mr Dondero's creditors and adversaries.

151.    It is important to ensure the Court is appraised on the prior business dealings of Mr Dondero insofar as they demonstrate that in conducting his business affairs, Mr Dondero has previously placed himself in positions of influence and control for the

MR 1335

purposes of personal gain through unlawful transaction. This is demonstrated by the adverse rulings that were made against Mr Dondero (amongst others) during the course of the bankruptcy of Sentinel (a Cayman Islands based reinsurance company which is ultimately owned by Mr Dondero and Mr Ellington).

152. In summary, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that the specific transfers of assets to Sentinel during 2017 (set out and defined below as the **2017 Transfers**) were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero. I refer to case *UBS Secs. LLC v Highland Cap. Mgmt. , L.P. ,* (index No. 650097/2009) (Supreme Court of the State of New York, New York County) (the **Underlying Action**).

153. In the Turnover Petition (as defined below) the New York court accepted that the 2017 Transfers took place at a time when the named respondents in the Underlying Action anticipated a US $1.2 billion judgment against them. The judgment was awarded in UBS' favour in the Underlying Action, but since the entry of the judgment, UBS has only been able to collect a fraction of the interest (and none of the principal) on that judgment. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (the **ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action. It was also claimed that the ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following 2017 Transfers (the **Sentinel Fraud**).

154. In connection with the Sentinel Fraud, Stephanie Vitiello (author of the Vitiello memo) and other affiliates of Mr Dondero received an indemnity for their role in the Sentinel Fraud, a copy of which indemnity is attached at **MP1/ page 375 - 384**. It is my understanding that UBS's counsel also used this indemnity as evidence of

Stephanie Vitiello and other affiliates of Mr Dondero participating in the Sentinel Fraud.

155. In *UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Motage Holdings, Ltd* (Index No. 6507 44/2023), the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 (the **Turnover Petition**), finding that the Turnover Petition sufficiently alleged that:

(a) Mr Dondero and Mr Ellington undertook fraudulent conveyances under DCL 276, when they devised and implemented a scheme to move all the remaining assets of, but not limited to, Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland Financial Partners, L.P. that could be subject to an impending judgment to Sentinel (the **2017 Transfers**). To the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied.

(b) Mr Dondero was the alter ego of another corporate vehicle called Mainspring, Ltd and that it was sufficiently alleged that Mr Dondero "*used Mainspring to enter into fake service agreements in order to pay HCM [Highland Capital Management, L.P.] insiders bonuses that they were otherwise ineligible to receive in HCM's bankruptcy*" and "*used Mainspring to reward HCM employees who were loyal to him*".

(c) Mr Dondero "*used his dominance over Mainspring "to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury""*", with respect to allegations that Mr Dondero used his position as the ultimate beneficial owner of Mainspring, "*to compel Sentinel to issue dividends, thereby draining assets that would have otherwise been available for collection by UBS*". To the extent that Mr Dondero pursued a motion to dismiss claims which sought to hold him liable as the alter ego of Mainspring, that motion was dismissed by the Court.

156. In 2022, at a hearing in the Bankruptcy Court for the Northern District of Texas, where the Sentinel fraud was discussed, Judge Stacey Jernigan (**Judge Jernigan**) noted that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it. I exhibit at **MP1/ page 385 – 517,** HCMLP Motion to Withdraw, Case No. 19-34054-sgj-11, Adversary Proceeding 21-3020-sgj.

157. I am also aware that Mr Dondero has a hatred of Judge Jernigan, who has consistently ruled against Mr Dondero. I understand it has been reported that a SEC whistleblower complaint was made against Judge Jernigan and I believe Mr Dondero subsequently directed an employee of one of his entities, Lucy Bannon (who is also an officer of the Highland Dallas Foundation) to leak the SEC whistleblower complaint to the press so they would cover it (see **MP1/ page 670 – 677**).

158. The actions by UBS (which I anticipated) underscore the need for clear independence between Dondero, his entities and affiliates on the one hand, and the DAF, including Holdco on the other.

159. In the middle of 2023, DAF's exposure to Dondero owned and controlled investments exceeded US $100 million. I successfully worked to reduce this exposure throughout 2024. At the end of 2024, exposure was about US $8 million. It was my belief that this exposure posed a material risk to the DAF because it could be used as alter ego evidence. This risk is also reflected in the ValueScope Report.

160. My actions to reduce the DAF's exposure to Dondero owned and controlled investments from US $100 million to US $8 million in the span of 18 months required DAF to turn down multiple deal proposals from Mr Dondero and his entities. In turn this led to increasing frustration from Mr Dondero at the beginning and throughout this period.

161. I managed the DAF while balancing (i) the legal and compliance need to reduce exposure (based on advice of Mr Alex McGeoch and Mr Mancino) to Mr Dondero owned and controlled investments and (ii) avoiding upsetting Mr Dondero and his

MR 1338

affiliates as I was acutely aware of Mr Dondero's litigious nature and believed that Mr Dondero would stop paying amounts due on DAF investments if a clean break between Mr Dondero and DAF was implemented.

162. These concerns were clearly well founded. Immediately following my resignation from Skyview (which was made on advice (privilege in which is not waived) and in order to assert more independence from Mr Dondero to better protect the best interests of the DAF) Mr Dondero directed the entities he controlled to cease all payments to DAF, including US $8 million Mr Dondero owed on a deal called Small Bay II (referred above). In the following months, DAF sent letters attempting collection on three other investments. Mr Dondero has not met any of his obligations under them, requiring DAF to commence three lawsuits against Mr Dondero's entities for payment, each of which are ongoing.

163. Mr Dondero has, several times, commenced extensive, harassive litigation and/or engaged in other misconduct against his former employees and business partners. At **MP1/ page 553**, in the "Plaintiff Highland Employee Retention Assets LLC First Amended Complaint" records that Mr Dondero engaged in similar behavior against Joshua Terry, examples of Dondero and his affiliates' behavior is shown, which includes lying, fraud, and other types of misconduct and/or vexatious litigation against his former business partners Joshua Terry and Patrick Daugherty.

164. For the reasons set out herein, the background leading to the DAF restructuring is both factually and legally complex, as I understand counsel for DWF advanced at the Supervision Hearing.

## E. RESPONSES TO FIRST AFFIDAVITS OF MS DIAZ

165. Save where already covered above, I address inaccuracies in Diaz 1 below. Paragraph references in this section are to paragraphs in Diaz 1.

166. With respect to Ms Diaz's evidence, she is wrong to describe and refer to DAF as a Fund for the reasons set our section x to above.

167. With respect to **paragraph 27 of Diaz 1**, this statement is inaccurate and misleading. I had informed several people affiliated with Highland Dallas Foundation, including Lucy Bannon and Lauren Short (NexPoint employees involved in personal relationships and charitable giving) that my daughter had formed this charity and I had asked whether they could donate US $5,000. Furthermore, no director or officer of Creative HEARTS TX has received or will receive any compensation, as these roles are strictly voluntary.

168. I understand that Ms Bannon and Ms Short approached Mr Dondero and obtained his approval. Creative HEARTS TX was then added to the approved list of charities of the Highland Dallas Foundation, which I had not requested. However, these facts may not have been known to Ms Diaz at the time she swore Diaz 1 and I have done nothing ethically and legally wrong and/or inappropriate as Ms Diaz suggests.

169. With respect to paragraph 28, Fortaris is owned by Kevin Cronin, a private investigator used by Mr Dondero and a trusted advisor of Mr Dondero. As I explain further in this affidavit, Mr Dondero determined my compensation whilst I worked at Skyview. After I assumed the role of Control Person of DAF I performed my functions as an employee of Skyview and as Control Person simultaneously. Accordingly, I was concerned that Mr Dondero would attempt to exert influence over my actions at DAF by controlling my compensation received from Skyview.

170. My concerns were well founded in this regard. As mentioned above, the Court found that it was sufficiently alleged in the Turnover Petition that Mr Dondero had rewarded those who were loyal to him, which was suggestive that Mr Dondero had controlled remuneration as a means of leverage. I also exhibit at **,MP1/ page 708** a confidential update with respect to Mr Dondero's negotiations with the Santa Barbara Foundation (**SB Foundation**) which illustrates how Mr Dondero threatened to withdraw US $1 million of funding to the SB Foundation because it elected to reject channeling funds to causes identified by Mr Dondero in favour of community causes. In response to the threat of having funding withdrawn, SB Foundation

agreed that a full slate of grants would be presented that were desirable to Mr Dondero, and would be allocated to the US $1 million funding.

171. This emerging pattern of coercing others through financial control compounds my concerns that Mr Dondero may leverage the private funding which he is providing to run this liquidation, as a means of influencing the direction of the liquidation itself. He could do so by threatening to withhold funding (which the JOLs and their counsel depend on to cover their costs and expenses) from the JOLs and/or their counsel, thereby placing undue pressure on the JOLs and/or their counsel, which may affect the JOLs and/or their counsel's ability to conduct themselves impartially in this liquidation.

172. As previously mentioned, I had identified that it was imperative that DAF was and was seen to be operated independently from Mr Dondero. Given my employment at Skyview it was my view that I should be paid from DAF in respect of services I provided to DAF and its related entities as the Control Person. Not only would the compensation need to be provided independently of Skyview but the level of compensation would need to be based on an objective third party compensation valuation. An independent compensation review was provided for the role as Control Person. This was then independently verified by Mr Murphy.

173. Given my concerns that the influence and control that was being asserted by Mr Dondero over DAF may have given was giving rise to allegations of DAF being an alter ego of Mr Dondero, I sought to consider ways in which my remuneration in respect of DAF could properly be paid without being subject to Mr Dondero's oversight, precisely because of the alter ego risk. I recall having two brief telephone conversations with Mr Cronin, as I explored whether my compensation (which would be paid by DAF) could be routed through Fortaris. I believed that, given historical payments by Mr Dondero's entities to Mr Cronin and Fortaris, payments by DAF to Fortaris would not raise suspicion with the Skyview employees monitoring DAF's finances. I shared with Mr Cronin an organisational chart and legal advice from Alex McGeoch, a tax expert at Hunton Andrews Kurth LLP, asserting that DAF can independently compensate me.

MR 1341

174. My intention in raising this suggested compensation structure with Mr Cronin was to insulate DAF from potentially significant tax liabilities if the charitable structure of DAF was not operated separately from Mr Dondero. In any event, this arrangement did not come to fruition because Mr Cronin told Mr Dondero about my proposal. However, any actions I took in relation to Mr Cronin were taken in good faith.

175. I may have flippantly said something similar to Dondero 1 where Mr Cronin said "*you can't steal from yourself*". The context was that I was speaking to Mr Cronin and attempting to describe that, in my capacity as DAF's control person, I would be authorizing paying myself and that I was not "stealing" funds from anywhere. The basis for that statement was the written legal advice from Alex McGeoch (long-time DAF counsel) that I provided to Mr Cronin and attached at **MP1/ page 645**.

176. With respect to **paragraphs 29 to 30 of Diaz 1**, I believe that Mr Mancino did not mention material non-public information in his conversation with Mr Rosenberg and only mentioned the share price of NHT, which was public information of a public company. This did not constitute a MNPI and I note that Ms Diaz only says that it "could have" been. Counsel at Eversheds Sutherland, a respected firm with securities law expertise, concluded that the material shared was not MNPI and did not constitute a breach of Skyview's policies and procedures, a copy of which is attached at **MP1/ page 647 - 650**.

177. With respect to paragraphs 31 to 35, Mr Mancino sent Holland & Knight a letter on February 14, 2025 informing them the numbers, specifically that "millions in director fees", were incorrect. He also said that the legal fees (the vast majority were DAF expenses) did not exceed US $10 million in 2024 and that they would continue to fall in 2025 and 2026.

178. My compensation was based on my role as CEO, CIO, and GC of DAF, and not my sole role as a director. As such these fees have been misclassified as "Director fees". It was also calculated based on a third-party independent report which took into account compensation packages for similar roles and responsibilities. The

final decision to approve my compensation was reviewed by Mr Murphy, in his capacity as an independent director, following his consultation with the third party expert. My compensation was only made after Mr Murphy executed written resolutions taking into account all of the relevant matters.

179. Both Mr Dondero and Ms Diaz make much of my "irresponsible management" of DAF by spending too much on expenses. However, US $6 million of the alleged US $18.3 million in expenses are not in fact expenses. Rather, Mr Dondero purposefully omitted that there was also US $6.1 million in income from a NexPoint-led transaction that more than offset the US $6 million in expenses, so Mr Dondero falsely inflated the expense number by omitting the offsetting income and the net gain to DAF from the transaction and those expenses.  These are lease payments a DAF subsidiary receives in connection with an investment led by Mr Dondero called Skorpios (also known as NexPoint Life Science III).  DAF is both lessee and lessor and generates around US $6.1 million per year from the arrangement.  As such, DAF nets a profit each year (US $127,937 in 2024 and US $131,775 is anticipated in 2025, increasing substantially each year and maxing out at $364,815 in year 14), which is reflected in the spreadsheet attached at **MP1/ page 651 - 669** and provided by NexPoint.

180. I also met with Ms Diaz and Torrey Littleton on October 10, 2024 and Ms Diaz did not raise any concerns with respect to those now raised in Diaz 1. At that meeting, I also suggested that I would like audited financials of DAF (which had never been provided before) within the next two years and I had hired a third party accounting service provider for that purpose.  On the same day, I also had a phone call with Debbie Wilkerson, the CEO of the Highland Kansas City Foundation, Inc. who similarly did not raise any concerns with me. Furthermore, on November 20, 2024, ValueScope and Mr Mancino spent several hours presenting to Holland & Knight (counsel to the Highland Foundations) on the finances of DAF, its investments, and its outlook which I understand from discussing with ValueScope and Mr Mancino afterward was received very positively by Holland & Knight.

181. The next communication from the Highland Foundations that I received was the No Confidence Letter (as defined in Diaz 1) which was not actually received until December 2024 and left me in disbelief given that no questions or concerns had been raised with me previously. I was left confused why they had not voiced any concerns with me directly despite repeated affirmative outreach. Regardless, following the No Confidence Letter, on December 11, 2024, Mr Murphy presented to Holland & Knight regarding the DAF's corporate governance and investments, and which I understand was so well received, that Mr Murphy was invited by Michael Stockham, a partner at Holland & Knight, to provide the same presentation directly to the Highland foundation CEOs. The ValueScope Report also shows that the DAF had outperformed the S&P 500 during my tenure at DAF, and the Highland Foundations had been receiving quarterly financial updates from ValueScope for years.

182. With respect to paragraph 38, Ms Diaz had received an asset list via the ValueScope DAF quarterly financial update on January 7, 2025 and I found her request for the same information again on 23 January 2025 to feel quite orchestrated. Historically, these reports were the only information the Highland Foundations received and, in any event, exceeds what they are entitled to under the organizational documents given their status as passive discretionary holders.

183. With respect to paragraphs 46 to 49, the Highland Foundations were not entitled to notice but this change was done to use a Cayman (instead of Delaware) General Partner and to create more independence from Mr Dondero, for all the reasons above. I understand that under Cayman Islands law, a general partner of an exempted limited partnership must be a Cayman-registered entity whether as an exempted company or a company registered under Part IX of the Companies Act.

184. With respect to **paragraphs 50 to 52 of Diaz 1**, Ms Diaz omits to explain Highland Foundations' role in opening the Texas AG (as defined in Diaz 1) investigation but in any event, the Texas AG has taken no action outside of sending an initial letter to request that certain DAF entities preserve documents. I believe the Highland Foundations and Mr Dondero reached out to the Texas AG to open an investigation

MR 1344

and use that as a data point in this matter. Mr Dondero's propensity to abuse a "complaint" filing is well known. As an example, refer to the SEC whistleblower complaint against Judge Jernigan described at **MP1/ page 670 - 677**. DAF is actively attempting to cooperate with Texas AG, but the Texas AG has been non-responsive to repeated requests to meet with me and my advisors.

185. As such, there is no dispute between myself and Mr Dondero, but simply a dispute between Mr Dondero and the assets under DAF's management which he seeks to control. To illustrate that point, in November 2024, I was offered through Mr Dondero's attorneys at the Ashcroft Law Firm (and its partner Johnny Sutton), a Caribbean Island and large sums of money if I agreed to step down from the DAF during a call on 22 November 2024. It was also intimated to me by Ashcroft that this offer was also made on behalf of the Highland Foundations. I believe Mr Dondero's intention in causing his attorneys to propose this was to remove me and insert someone who would not second guess his investment recommendations and would permit Mr Dondero to again use DAF (as was the case under Mr Scott's tenure as Control Person) for Mr Dondero's personal benefit. Needless to say, I turned down Mr Dondero's offer.

186. For these reasons, it is vitally important that the JOLs obtain independent counsel to ensure they are properly and impartially advised. The central issues in this liquidation concern the actions I took, with Mr Muphy's oversight, to attenuate direct and indirect influences from Mr Dondero, including through his control of the Highland Foundations whom Johnstone Law previously represented.

187. Furthermore, I understand that Mr Andrew Johnstone of Johnstone Law contacted My Murphy on February 12, 2025, purporting to represent *"Charitable DAF Fund 2 LP (DAF 2)."* . I understand that Mr Murphy referred this enquiry to Walkers, who were legal counsel to Holdco and DAF at the relevant time.

188. The purpose of this unsolicited outreach was unclear but it is evident that Johnstone Law as DAF 2 lawyers wanted to discuss DAF's assets. Why they wanted to do so and to what end has never been revealed. Critically, even assuming DAF 2

MR 1345

was a legitimate entity (presumably another exempted limited partnership), there is nothing in Johnstone Law's email to indicate (a) who the general partner of DAF 2 was (b) who the limited partners of DAF 2 were and (c) what possible interest any of them would have in confidential information concerning the assets of DAF. As if these concerns were not concerning enough, it subsequently transpired that DAF 2 does not even exist.

189. Following an entity search, Walkers determined that DAF 2 did not exist. I understand that Walkers followed up with Johnstone Law to clarify which entity they represented and where it was domiciled. Johnstone failed to respond to repeated follow ups and failed to provide context. It is my belief that through Johnstone Law, as was the case with Ashcroft, Mr Dondero was seeking to access Mr Murphy as a director of Holdco with a view to exercising control over DAF and its assets.

## F. RESPONSES TO FIRST AFFIDAVIT OF MR DONERO

190. With each section that to the extent I do not specifically respond to the assertions made in Dondero 1 above, I wish to address the inaccuracies of that evidence below. Paragraph references in this section are to references in Dondero 1.

191. With respect to **paragraph 13 of Dondero 1**, there are no restrictions in the organizational documents of DAF that prevent the admission of additional charitable beneficiaries. Furthermore, DAF exists to benefit charities, not only the Highland Foundations.

192. With respect to **paragraphs 29 to 30 of Dondero 1**, I own shares in Holdco in my personal capacity, and any reference to me owning the DAF would be a reference to my ownership of the GP and the HoldCo Management Shares. However, it is completely inaccurate to say that I could pay myself however I pleased; that represents a fundamental misunderstanding of exempted limited partnerships generally but also misunderstands the nature of the DAF structure. I expressed to Mr Dondero that DAF needs to independently determine the value of my services without Mr Dondero's input, or input from an entity controlled by Mr Dondero. My

reasons for this were to reduce any susceptibility to coercion from Mr Dondero (both directly and indirectly), which could have been exercised by interfering with my compensation, and create independence for DAF.

193. In relation to **paragraph 31 of Dondero 1**, it is highly unlikely that the expense summary could have been produced in June 2024 because, due to a lag in reporting times, June numbers would not have been available until later in the year. I received June 2024 numbers in October 2024.

194. With respect to **paragraph 35 of Donder 1**, the Vitiello memo **referred to in Dondero 1** correctly concludes that I did not engage in insider trading under U.S. securities laws. This is in relation to a put option that was not exercised under a contract. Failure to exercise the put option jeopardizes Highland Dallas Foundation's tax-exempt status and, according to the Seyfarth Letter at **MP1/ page 361**, may have been an attempt to protect Mr Dondero from having to address the precipitous fall in fair market value shortly after the gift was made, as there would have been a requirement to file Form 8282 "*Donee Information return*" that would have revealed this information.

195. By way of background with respect to the Put Option, and as explained in the Seyfarth Letter at **MP1/ page 360**:

> *Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.*

> *One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").*

MR 1347

*Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on , December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026...*

196. The Seyfarth Letter concluded that based on public filings with the U.S. Securities and Exchange Commission, REIT had approximately 29,353,66- Units, of which 82.52% were owned by entities affiliated or controlled by Mr Dondero. Furthermore, I understand that the REIT is to be dissolved which means that if the Put Option is not exercised before that point, then, according to the Seyfarth Letter, this will result in a US $9 million "*inappropriate windfall to both Dugaboy and Mr Dondero*".

197. As explained in the Seyfarth Letter at **MP1/ page 360**:

"*The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy.*"

198. It was public information that NHT had declined from a price per unit of $7.67 in December 2019 (when the donation occurred) to $0.20 in August 2024, representing a 99.7% decline. In fact, whilst the figures quoted in the Seyfarth Letter vary slightly, it was calculated that as of 22 November 2024, 1,500,000 Units were only worth $22,500, which is less than 1% of the Put Option value of US $9,285,000. Additionally, NHT disclosed on August 2, 2024 (26 days before I spoke with the Dallas Foundation) in a document titled "Management's Discussion and Analysis

MR 1348

of Financial Condition and Results of Operations that there was "a potential risk about [its] ability to continue as a going concern and, therefore, realize its assets and discharge its liabilities in the normal course of business." A copy of the NHT disclosure is attached at **MP1/ page 678 - 707**. Therefore, the information I disclosed was not "material" or "non-public" and would not have resulted in a violation of U.S. securities laws even if traded upon by Highland Dallas Foundation. This is also confirmed by the Eversheds Memo exhibited at **MP1/ page 647 - 650**.

199. Furthermore, and with reference to the Seyfarth Letter, it is important to not lose sight of the fact that the Put Option was in effect an interest free loan of US$9,285,000 for Mr Dondero and Dugaboy while the Put Option remains outstanding and unexercised.

200. For the purpose of responding to the JOLs' sanctions applications, I do not expand here on the factual inconsistencies which I have identified between the Vitiello memo and Dondero 1 and Diaz 1, but reserve all my rights to do so during the course of these liquidation proceedings.

201. With respect to **paragraph 36 of Dondero 1**, my resignation was not abrupt. It was the culmination of actions I had been working toward to create independence between the DAF and Mr Dondero for almost two years. I was not aware of any investigation or any accusation of wrongdoing on my part. The Vitiello memo was finalized after my resignation, not before.

202. With respect to **paragraph 37 of Dondero 1**, the Skyview services agreement required 180 days' notice to terminate, and was not terminated effective until March 31, 2025. Whilst I have 4 years of investment management experience, DAF also has a wealth of other investment advisors, including:

    (a)    Investment committee

    (b)    Investment advisors

    (c)    Investment houses and banks with investment functions

MR 1349

(d)  Real estate advisors

(e)  Security and portfolio monitoring

203. With respect to **paragraphs 38 to 39 of Dondero 1**, Hunter Mountain's interest was sold to a DAF subsidiary based on an independent third-party valuation report and because it was sold to a DAF subsidiary, there was no dissipation of assets.

204. Furthermore, Mr Dondero's proposal that he is a potential buyer of Hunter Mountain is misleading. Mr Dondero's attorneys (Ms Dietsch-Perez at Stinson) have argued that Hunter Mountain owes Dugaboy and other trusts US $65 million in debt obligations. These debt obligations were released by the plain language of a settlement agreement entered into in 2022, although I understand that Mr Dondero disputes this. Given this dispute, it is doubtful whether Mr Dondero would have paid any meaningful amount for Hunter Mountain, outside of credit bidding the debt he believes he is owed.

205. As mentioned above, a valuation study was performed on the Hunter Mountain interests, and the purchase price is in accordance with this valuation study. The seller made an attempt to find other buyers by contacting distressed asset buyers, but there was little interest given that there was a contingent claim in the Highland Bankruptcy that would not be paid out until litigation ceased.

206. For the purpose of responding to the JOLs' sanctions applications, I do not expand further on the issue here but I again reserve all my rights to do so during the course of these liquidation proceedings.

MR 1350

**CONCLUSION**

207. For the reasons stated above, I respectfully request that the JOLs' sanction application is denied.



SWORN to at   Wise        Texas                    )

on this   4th   day of   June        2025      )

                                                                        )   **MARK     ERIC     PATRICK**

**BEFORE ME:**                                      132662714
                                                           08/27/2028

**NOTARY PUBLIC**

Shannara Franzel

ID NUMBER
132662714
COMMISSION EXPIRES
August 27, 2028

Electronically signed and notarized online using the Proof platform.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brian Shaw on behalf of Brian Shaw
Bar No. 24053473
bshaw@ccsb.com
Envelope ID: 104347995
Filing Code Description: No Fee Documents
Filing Description: DEFENDANTS ANSWER TO QUESTION PRESENTED BY COURT ON AUGUST 5, 2025
Status as of 8/13/2025 5:05 PM CST

Associated Case Party: The Highland Dallas Foundation, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/13/2025 4:55:47 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/13/2025 4:55:47 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/13/2025 4:55:47 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/13/2025 4:55:47 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/13/2025 4:55:47 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/13/2025 4:55:47 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/13/2025 4:55:47 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/13/2025 4:55:47 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/13/2025 4:55:47 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Angie Barrera | | abarrera@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/13/2025 4:55:47 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/13/2025 4:55:47 PM | SENT |

Associated Case Party: DFW Charitable Foundation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brent M.Rubin | | brubin@ccsb.com | 8/13/2025 4:55:47 PM | SENT |

MR 1352

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brian Shaw on behalf of Brian Shaw
Bar No. 24053473
bshaw@ccsb.com
Envelope ID: 104347995
Filing Code Description: No Fee Documents
Filing Description: DEFENDANTS ANSWER TO QUESTION PRESENTED BY COURT ON AUGUST 5, 2025
Status as of 8/13/2025 5:05 PM CST

Associated Case Party: DFW Charitable Foundation

| Brent M.Rubin | | brubin@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
|---|---|---|---|---|
| Rhonda LThomas | | rthomas@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/13/2025 4:55:47 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/13/2025 4:55:47 PM | SENT |

MR 1353

Tab 12

E-filed in the Office of the Clerk
for the Business Court of Texas
8/13/2025 5:17 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

## CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | TEXAS BUSINESS COURT |
| *Plaintiffs,* | §<br>§ | |
| v. | §<br>§ | FIRST DIVISION |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | §<br>§<br>§<br>§<br>§<br>§ | |
| *Defendants.* | § | DALLAS, TEXAS |

## PLAINTIFFS' POSITION ON WHO IS ALLOWED TO CHANGE THE BENEFITTING ORGANIZATIONS

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
Benjamin L. Warden
State Bar No. 24115926
bwarden@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7200 – Telephone
(214) 292-8442 – Facsimile

Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

*Attorneys for Plaintiffs*

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................2

TABLE OF AUTHORITIES.............................................................................3

TABLE OF ABBREVIATIONS........................................................................4

QUESTION PRESENTED...............................................................................5

SUMMARY OF ARGUMENT .........................................................................6

ARGUMENT ....................................................................................................7

    I.    The Charities were the owners and intended beneficiaries of the Fund....................................................7

    II.    The Governing Agreements Must Be Read to Incorporate Cayman Law, as Mandated. ...........................8

        A.    Defendants cannot issue limited partner shares for an improper purpose, to the detriment of the Charities.....................................................................10

    III.    The governing documents do not permit the Defendants to act in contravention of the economic interests of the Charities—including (most obviously) by replacing them with other beneficiaries. .........................12

    IV.    Defendants may not use their formal powers to alter an existing balance of power in the Fund structure because that is *per se* improper. ..........................17

        A.    "Proper purpose" analysis requires factfinding...........17

        B.    Their intent to remove the Charities' rights makes the Defendants past and proposed acts per se improper.................................................................18

    V.    Defendants Abused Their Power to Misallocate Fund Assets and Voluntarily Liquidate.......................................21

    VI.    Under relevant law, the inquiry into whether the Defendants' actions exceeded their powers or otherwise breached their duties as pled requires factual analysis.......22

    VII.    Defendants Have Not Raised This Core Merits Issue .........24

PRAYER ...........................................................................................................26

CERTIFICATE OF SERVICE..............................................................27

CERTIFICATE OF COMPLIANCE...................................................27

## TABLE OF AUTHORITIES

**Cases**

*Alamo Heights Indep. Sch. Dist. v. Clark,*
  544 S.W.3d 755 (Tex. 2018) ....................................................25

*Bland Indep. Sch. Dist. v. Blue,*
  34 S.W.3d 547 (Tex. 2000) ......................................................23

*Davis v. Homeowners of Am. Ins. Co.,*
  700 S.W.3d 837 (Tex. App.—Dallas 2023, no pet.) ..............24

*Eclairs Group Ltd v JKX Oil & Gas plc Glengary
  Overseas Ltd v JKX Oil & Gas plc*, [2015] UKSC 71;
  [2015] Bus LR 1395; [2016] 3 All ER 641,
  2015 WL 7692969 (2015) ....................................... 7, 17, 18, 19

*Feiner Family Tr. v. VBI Corp.,*
  No. 07 CIV. 1914 (RPP), 2007 WL 2615448
  (S.D.N.Y. Sept. 11, 2007) .........................................................8

*Hogg v Cramphorn Ltd,*
  1966 WL 22942 (1963) .............................................................18

*Joe v. Two Thirty Nine Joint Venture,*
  145 S.W.3d 150 (Tex. 2004) ....................................................24

*Peskin v. Anderson,*
  [2001] 1 B.C.L.C. 372 ¶ 34) ......................................................8

*Sw. Airlines Pilots Ass'n v. Boeing Co.,*
  704 S.W.3d 832 (Tex. App.—Dallas 2022) ...........................22

*Tianrui (International) Holding Co. Ltd. V.
  China Shanshui Cement Group Ltd.* [2024],
  2024 WL 04794596, UKPC 36
  (appeal taken from Cayman Islands).........................9, 10, 18

MR 1357

**Rules**

Tex. R. Civ. P. 91a.6 ...............................................................................24

## TABLE OF ABBREVIATIONS

| Term | Abbreviation |
| --- | --- |
| Defendant CDMCFAD, LLC, a Mark Patrick Created Entity | CDMCFAD |
| Plaintiffs Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc. | Charities |
| Ownership of the general partner in the Charitable DAF Fund and the management shares in Charitable DAF HoldCo—concentrated in one person | Control Position/General Partner |
| Amended and Restated Exempted Limited Partnership Agreement | ARLPA |
| Amended and Restated Memorandum and Articles of Association | ARMAA |

4

## QUESTION PRESENTED

Plaintiffs respectfully file this brief in response to the Court's request for: "[T]he parties' position on whether (i) the Charitable DAF Fund, LP partnership agreement or (ii) the Charitable DAF HoldCo, Ltd. company agreement require that those entities were operated for the express benefit of only the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the HCMLP Charitable Fund and associated supported organizations (The Dallas Foundation, the Greater Kansas City Community Foundation, the Santa Barbara Foundation, and The Community Foundations of North Texas, respectively), or whether the Control Position/General Partner was allowed to change the benefiting organizations."

5

## SUMMARY OF ARGUMENT

***No***. Under these facts and Cayman law, the Control Position/General Partner cannot change the benefiting organizations and replace the Indirect Charitable Owners in the manner it did or proposes to do. The operative agreements allow the General Partner to add beneficiaries, but not to raid the value of their shares, especially without a proper purpose.

Regardless of the terms in the corporate agreements, Cayman common law prohibits exercising any specified power for an improper purpose if it harms existing shareholders. Intentionally altering the balance of power, particularly to gain a self-interested advantage and raid the shareholders of the value of their ownership interest, is always an improper purpose. Whether Mr. Patrick had a proper purpose, and the extent of his self-interest, are not pure questions of law, but questions of fact that require discovery before any definitive ruling.

6

## ARGUMENT

### I. The Charities were the owners and intended beneficiaries of the Fund.

In November 2011, Highland Capital Management Partners Charitable Trust #2 distributed the remainder interest in its underlying assets directly to three remainder beneficiaries: the Charities. These entities are "Charities" of, respectively, The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation, and the Plaintiffs here. Through participating shares, each of these Charities received the right to one-third of distributed cash from the underlying charitable assets held in a Cayman fund. The intent from the formation of the Fund was to benefit The Dallas Foundation, the Greater Kansas City Community Foundation, and the Santa Barbara Foundation. For the next fourteen years—except for a one-percent interest gifted to The Community Foundation of North Texas in 2015—solely these three Charities received distributions and support.

In March 2021, Mark Patrick became the managing partner of the Cayman fund. In November 2023, he asked his lawyers how to make the existing Charities' participating shares—their entire ownership interest in the Fund—worthless. In February 2025, he created DFW Charitable

Foundation and issued it participating shares equal to a fifty-one percent interest in the distributions, for the purpose of effecting that scheme. Soon thereafter, he transferred the charitable funds into a new entity in which only his DFW Charitable Foundation held participating shares.

Critically, the Plaintiffs were not just "beneficiaries," but ***owners*** of the economic interests in the Fund, through their ownership of the Participating Shares. Because they were owners, Patrick's scheme could not succeed solely by adding shares. Instead, to make the Charities' ownership interests "worthless," he had to devise and execute a scheme to deliberately raid their value, selling it out for a penny on the dollar.

## II. The Governing Agreements Must Be Read to Incorporate Cayman Law, as Mandated.

Cayman law constrains the Defendants' exercise of formal corporate powers. Those constraints are to be read as integrated into the governing documents by operation of Cayman law. The "constraint [of Cayman law] upon [the] exercise [of the Defendants' powers] is as much a part of that corporate contract as if it had been spelt out word for word in the articles." *Eclairs Group Ltd v JKX Oil & Gas plc Glengary Overseas Ltd v JKX Oil & Gas plc*, [2015] UKSC 71; [2015] Bus LR 1395; [2016] 3

All ER 641, 2015 WL 7692969 (2015).[1] Accordingly, every authority Defendants' claim to have under the governing documents can only be exercised in accordance with Cayman law, and if not, are prohibited just as if the governing documents expressly stated so.

Cayman law also establishes that—in conditions like those here—directors' fiduciary duties include direct duties to shareholders. *See Feiner Family Tr. v. VBI Corp.*, No. 07 CIV. 1914 (RPP), 2007 WL 2615448 (S.D.N.Y. Sept. 11, 2007) (quoting *Peskin v. Anderson,* [2001] 1 B.C.L.C. 372 ¶ 34). ("[I]n special circumstances a director may, in addition to the fiduciary duties owed by him to the company, also owe a duty to individual shareholders personally. Where such a duty exists and breach of it has caused loss to a shareholder directly (e.g., by inducing him to part with his shares at an undervalue), the shareholder may bring an action against the director to recover his loss." (internal quotations omitted)). Cayman law thus recognizes that the acts of directors do not occur in a vacuum, but must be considered against their preexisting duties to the actual shareholders.

---

[1] Copies of all foreign decisions cited herein are included in the attached Appendix for the Court's ease of reference.

9

## A. Defendants cannot issue limited partner shares for an improper purpose, to the detriment of the Charities.

When governing documents provide authority to issue additional shares, the exercise of that power for an improper purpose, to the detriment of existing shareholders, violates Cayman law:

> [I]n other cases, the rights of shareholders are invaded not because the company or its agents have acted contrary to the express terms of the articles of association or other constitutional documents but because the directors, acting as the company's agents, have exercised powers within the letter of their express terms but for improper purposes. All powers conferred on the directors are fiduciary in nature and they are required by equity to exercise such powers for proper purposes. An exercise of a fiduciary power for an improper purpose is a breach of the duty owed by the directors to the company.

*Tianrui (International) Holding Co. Ltd. V. China Shanshui Cement Group Ltd.* [2024], 2024 WL 04794596, UKPC 36 (appeal taken from Cayman Islands). The Privy Council further clarified that the powers subject to this "proper purpose" restraint include the issuance of shares, because improper issuance targets the rights of the existing shareholders:

> It is implicit in the contract constituted by the articles of association that the company's power to allot and issue new shares, delegated by the articles to the directors, will be exercised properly, which is to say by the directors on behalf of the company in accordance with their fiduciary duties. The harmful consequence to the shareholder is the alteration

10

(adverse to him) in the balance of power between the company's shareholders and the particular harm which that does to the value of the rights embedded in his shares.

*Id.* "[A]s an ***intrinsic feature of the contract*** constituted by the memorandum and articles of association, it is implicit that when exercising their powers on behalf of the company the directors will exercise them in accordance with their fiduciary duties, including the duty to exercise powers only for a proper purpose." *Id*. The Privy Council added: "The contract between the shareholder and the company ***contains the implied term that***, ***in exercising the power to allot and issue shares, the directors as the company's agents will do so in accordance with their fiduciary duties.***" *Id* (emphasis added).

Patrick's entire scheme was—and is—improper because it was designed and intended to violate his preexisting fiduciary obligation to act for the economic benefit of the Charities. The governing documents did not give Mark Patrick the power to issue new participating shares as part of a scheme to make the Charities' Participating Shares worthless.

This scheme included, or required, adding a new participating shareholder. The purpose of adding the new shareholder—DFW Foundation—was not nuanced, and it was not charitable. It was to

11

accomplish the goal of the scheme—to gut the Charities' interests and transfer the economic benefit of the $270 Million Fund to Patrick's own entity run out of his home. This scheme accomplished what the law did not allow: The cancellation of the Charities' economic rights.

III.    **The governing documents do not permit the Defendants to act in contravention of the economic interests of the Charities—including (most obviously) by replacing them with other beneficiaries.**

Written into the Charitable DAF Fund, Limited's governing document is that each and every exercise of the formal powers of the General Partner must be "for the economic benefit of the Limited Partner and its Indirect Charitable Owners." ARLPA at 1.[2] Even beyond Cayman law, these admonitions set a standard of conduct and established the confidence and trust that the Charities reposed in Mark Patrick.

The ARLPA, further imposes specific directives upon the General Partner to ensure the needs and operating expenses of the existing Charities are met:

> Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate

---

[2] Note that the current version of the ARPLA, which is dated March 11, 2024, was revised while Defendants were undertaking their scheme to defraud the Charities. These particular provisions are not materially different from earlier versions. However, the Charities reserve their right to challenge the validity of improper revisions.

12

amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses.

ARLPA at 4.2(a).

The ARLPA also provides that in a liquidation of the Fund, the existing Charities have the right to the value of the Fund— notwithstanding the powers of the General Partner:

[D]istributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704- 1(b)(2)(ii)(b)(3).

*Id*. So within its four corners, the ARLPA provides the Charitable Owners with real rights. It imposes real obligations upon the General Partner to maintain an allegiance to the Charitable Owners in order to preserve those rights, along with their economic interests. These provisions cannot be read to apply to "charities in general," because they require the General Partner to consider and address the unique expenses, needs, and account balances of the actual Charities to whom he owes obligations.

The ARLPA does confer upon the General Partner the formal power to admit new partners and issue them participation shares in addition to those held by the existing Charities. *See* ARLPA §§ 1.8, 6.6. Likewise, the

13

Holdco Articles provide the General Partner the technical power to issue shares. *See* ARMAA §§ 14, 21, 28. Yet, as detailed above, those powers are expressly limited by Cayman law as read into the ARPLA and ARMAA, which expressly outlaws actions taken pursuant to a scheme to make the Charities' shares worthless.

The text of the governing documents likewise indicates that Defendants owe obligations to the existing Charities—as set forth above. Section 6.6 of the ARLPA treats "the admission of Partners in accordance with this Agreement" (*i.e.* the power recited in Section 1.8) as part of a laundry list of acts constituting amendments to the agreement. All such amending powers listed in Section 6.6 are subject to express limitations: The General Partner must (1) avoid the appearance of conferring any economic benefit upon himself; (2) ensure that such acts "do[] not adversely affect the [Charities] in any material respect"; and (3) give immediate notice of any such to the Charities:

> [T]he General Partner shall have the right to effect amendments to this Agreement . . . to reflect: . . . admission of Partners in accordance with this Agreement . . . or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that **does not adversely affect the Limited Partners in any material respect**; provided, that in no event shall the General Partner

MR 1368

effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; provided further, that the General Partner shall give notice to the Limited Partners of any such amendment.

ARLPA at ¶6.6.

These conditions indicate counterbalances to the General Partner's powers, including to admit additional Limited Partners (and issue them participation shares). These restraints fit the overall structure of the ARLPA and Cayman law, because they prevent the hollowing out of ARLPA's overriding command that the General Partner act only "for the economic benefit" of the Charities. If the General Partner were free at any time to defenestrate the Fund's actual beneficiaries in favor of an entirely new slate under his control, then the ARLPA language prioritizing the Charities' economic interests and mandating that the General Partner address their specific needs, expenses, and account balances would be an illusory dead letter. An allegiance that the General Partner can transfer to others at will is no allegiance at all.

As set forth in more depth below, the powers under the governing documents are further limited by the Charities' stated rights as owners of the participating shares. For example, the Charities have a clear right

15

to their proportion of the value of the Fund itself in the event of a wind-up. See ARMAA §§ 130-131. Once a wind-up is initiated, the rightly existing owners of the participating shares are entitled to the value of those shares; transfer of that value to others is not permitted.

It is axiomatic that the complete alienation of the Fund from all the existing Charities in favor of an entirely new slate of beneficiaries will adversely affect them in a material way and cannot be reconciled with the duty to care for their economic interests and the legal constraints interposed by Cayman law. Indeed, rendering the Charities' participation shares "worthless" was the stated object of the Defendants' entire scheme, before any new issuance of shares occurred. It is difficult to conceive of a more materially adverse effect and improper purpose than that.

It is likewise obvious that the substitution of the Charities by an entity—DFW Foundation—wholly controlled by the General Partner and controlling person confers an economic benefit upon him, especially given his rapidly increasing compensation packages, resulting in more than $4 million in compensation late last year to himself—from charitable funds.

16

And it is obvious that if the substitution of Patrick's own sham charity had been entirely proper, there would have been no reason to cloak it in secrecy and further obfuscate it through contemporaneous fraudulent statements, rather than freely give notice to the Charities.

## IV. Defendants may not use their formal powers to alter an existing balance of power in the Fund structure because that is *per se* improper.

The "proper purpose" test—a corollary of the duties incorporated into every governing agreement under Cayman law—is important for two reasons. First, it is generally nuanced and requires significant factfinding. Second, it prohibits the Defendants' past and proposed conduct here because the use of the Defendants' formal powers to alter a balance of power in the Fund is always improper.

### A. "Proper purpose" analysis requires factfinding.

In general, an analysis of proper and improper purpose is legally and factually nuanced. Under Cayman law, that analysis involves identifying the directors' subjective reasons for exercising the relevant power—that is, *factfinding* about why they acted as they did. In a case cited favorably by the Privy Council in *Tianrui*, the United Kingdom Supreme Court ruled:

17

> The important point for present purposes is that the proper purpose rule is not concerned with excess of power by doing an act which is beyond the scope of the instrument creating it as a matter of construction or implication. ***It is concerned with abuse of power, by doing acts which are within its scope but done for an improper reason***. It follows that the test is necessarily subjective.

*Eclairs Group Ltd v JKX Oil & Gas plc Glengary Overseas Ltd v JKX Oil & Gas plc*, [2015] UKSC 71; [2015] Bus LR 1395; [2016] 3 All ER 641, 2015 WL 7692969 (2015) (emphasis added). A subjective test turning upon the reasons for the exercise of the Defendants' formal powers requires looking beyond the pleadings, requiring factfinding into those motives—including, most critical, the motive to alter the balance of power in the Fund structure.

## B. Their intent to remove the Charities' rights makes the Defendants past and proposed acts per se improper.

It is equally clear under Cayman law that under the improper purpose test, the intent to alter the balance of power within an entity is *never* a proper purpose for adding shareholders. This is true even if the director believes that ensconcing himself or his clique in control of the entity will be to its ultimate benefit. The Privy Council explained in *Tianrui*:

> It is a term of the corporate contract that, if the exercise of the power to allot and issue new shares by the directors as agents

18

for the company is to be valid and binding as between the individual shareholder and the company, it should comply with all conditions necessary to make it a proper exercise . . . [which] will **necessarily exclude**, for example, an allotment and issue of shares which is **deliberately aimed at altering the balance of power between shareholders**, so as to advance the power of one (or one group) at the expense of another."

*Id.* Documents currently available indicate that the alteration and elimination of the Charities rights as shareholders was the the goal of the Defendants—so their pursuit of that object invalidates every step they take to achieve it.

This is a well-established principle in Cayman and UK jurisprudence. In *Hogg v Cramphorn Ltd*, 1966 WL 22942 (1963), the High Court of Justice held that "directors' powers to issue shares could not properly be exercised for the purpose of defeating an unwelcome takeover bid, even if the board was genuinely convinced, as the current management of a company commonly is, that the continuance of its own stewardship was in the company's interest." *Eclairs Group Ltd v JKX Oil & Gas Plc,* 2015 WL 7692969 (2015).

The improper purpose of altering the balance of power within an entity invalidates the issuance of shares if that purpose was a significant factor in the decision (it need not be the sole factor). This is true even

19

where—unlike here—the formal authority of the directors to issue the shares is clear. Citing *Hogg*, the UK Supreme Court in *Eclairs Group* explained:

> One has to focus on the improper purpose and ask whether the decision would have been made if the directors had not been moved by it. If the answer is that without the improper purpose(s) the decision impugned would never have been made, then it would be irrational to allow it to stand simply because the directors had other, proper considerations in mind as well.

*Id*.

Here, the primary purpose for the Defendants' issuance of additional shares, and their primary purpose in seeking the replacement of the Charities, appears to be their desire to remove the Charities from their positions within the DAF Fund structure. The Defendants expressly discussed their objects, which include eliminating the Charities' entitlements to the Fund proceeds in an equitable wind-up and eliminating their influence over Fund operations. An issuance of Limited Partner interests—participation shares—in order to gut the Charities in favor of Patrick's personal entity is a severe change in the balance of power for no proper purpose, and is *per se* impermissible under Cayman law. It would be impermissible even if Patrick thought altering the

20

Fund's power structure and ensconcing himself would be good for the Fund. Accordingly, the Defendants do not have lawful power to replace the Charities with alternative beneficiaries of their choosing.

## V. Defendants Abused Their Power to Misallocate Fund Assets and Voluntarily Liquidate.

The Defendants improperly redeemed the Charities' shares through a fraudulent multi-step transaction: first improperly diluting their interests in Holdco; then exchanging Holdco's interest in the Fund for CDMCFAD; and finally, a facially undervalued redemption of the Charities' interest in CDMCFAD, which was the Charities' interest in Holdco prior to the fraudulent scheme. The result was not an addition of beneficiaries, but a raid of 99% of the value of actual assets—the participating shares—owned by the Plaintiffs. Had the Defendants' initiation of the liquidation of Holdco been activated properly, the wind-up provisions of the Holdco governing document would have applied. Pursuant to those provisions, the Plaintiff Charities are entitled to "the assets available for distribution among the Shareholders . . . in the following priority: (a) first, in the payment to the holders of Participating Shares and Management Shares, pari passu, of a sum equal to the par value of the Participating Shares or Management Shares held by them;

21

and (b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held." Holdco Articles at ¶ 124.

In other words, the Charities now have the right as owners to obtain relief for their injury from Defendants. The Defendants wrongly raided the participating shares' value. For the reasons set forth in the First Amended Complaint, the Defendants' raid of the value of those shares was contrary to law and must be recompensed.

## VI. Under relevant law, the inquiry into whether the Defendants' actions exceeded their powers or otherwise breached their duties as pled requires factual analysis.

Two critical procedural realities emerge from this framework.

First, taking the allegations of the First Amended Complaint as true (as the current posture dictates), and applying the foregoing legal standards, the Charities have pled facts sufficient to establish that Patrick did not and does not have authority to dilute or replace the Charities in the Fund structure with alternative beneficiaries. Under Cayman Islands law, the Charities have a direct action against Defendants because they defrauded the Charities from their interests in

22

the Fund, in violation of Defendants' fiduciary duties. The face of the governing ARLPA prohibits an issuance of limited partner interests in furtherance of such a scheme, and governing Cayman law precludes it.

The Charities have further pled that Patrick's entire scheme was motivated by improper purposes, including Patrick's intent to alter the power structure of the Fund so as to undermine the interests of the Charities and ensconce (and enrich) himself. The Charities have alleged that this scheme breached Patrick's direct fiduciary duties to the Charities as shareholders and violated common law rules against fraud. Under these circumstances, Patrick has no authority to replace the Charities or dilute their interests, and any act purporting to do so is *ultra vires*.

Second, this is fundamentally a merits inquiry. *Sw. Airlines Pilots Ass'n v. Boeing Co.*, 704 S.W.3d 832, 846 (Tex. App.—Dallas 2022) ("A plea to the jurisdiction does not challenge the merits of a claim, but simply challenges the trial court's subject matter jurisdiction without regard to the merits."), order withdrawn (Jan. 10, 2025), *aff'd*, 2025 WL 1717008 (Tex. June 20, 2025). It requires an analysis of all the evidence regarding Patrick's purposes and intentions, the adverse effects on the

23

Charities, the economic benefits derived by Patrick, the absence of notice to the Charities, and the like. Each of these factors is critical or determinative, as set forth above. Each can only be determined on the merits after discovery. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) ("the proper function of a dilatory plea does not authorize an inquiry so far into the substance of the claims presented that plaintiffs are required to put on their case simply to establish jurisdiction"). This issue is therefore not one of jurisdiction or standing. At this stage, the pleadings are determinative; and the Charities have pled facts that, taken as true, establish that Patrick had and has no authority to do what he did or contemplates doing.

## VII. Defendants Have Not Raised This Core Merits Issue

Answering the Court's question necessarily requires resorting to documents outside the pleadings—including the governing documents. In addition, the parties have not yet conducted discovery, but as explained above, applicable law requires a searching analysis of the intentions and effects of Defendants' actions. A ruling founded upon this briefing would thus not be in accord with Texas procedure or jurisprudence.

24

If Defendants had moved to dismiss the Charities' action under Texas Rule of Civil Procedure 91a, the court could "not consider evidence and must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits permitted by rule 59." *Davis v. Homeowners of Am. Ins. Co.*, 700 S.W.3d 837, 845 (Tex. App.—Dallas 2023, no pet.); *see* Tex. R. Civ. P. 91a.6. No exhibits were included under rule 59 in the Charities' First Amended Petition. Accordingly, the governing documents would not be properly considered by the Court.

Likewise, if Defendants had moved for summary judgment on this question, the Charities would be entitled to additional time for discovery on the issues. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004) ("We have considered the following nonexclusive factors when deciding whether a trial court abused its discretion in denying a motion for continuance seeking additional time to conduct discovery: the length of time the case has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery.").

But the Defendants have not moved for either and no discovery has yet been available. This question was raised *sua sponte* by the Court, but

25

"[w]hen parties have not raised an issue, we should not reach out unnecessarily to decide an issue on our own accord." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 799 (Tex. 2018).

Since Defendants have not invoked any procedural vehicle to obtain relief involving this issue, since the issue is not jurisdictional in nature, and since the answers to the Court's inquiry are inextricably entangled with contested factual and legal questions, any consideration should be reserved by the Court until a relevant motion is ripe for decision.

## PRAYER

Plaintiffs respectfully request that the Court allow the case to proceed to a receivership hearing and to the merits in the ordinary course of Texas civil procedure.

Respectfully submitted,

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
Benjamin L. Warden
State Bar No. 24115926
bwarden@duanemorris.com

*/s/ Darren L. McCarty*
Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

*Attorneys for Plaintiffs*

26

100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7200 – Telephone
(214) 292-8442 – Facsimile

**CERTIFICATE OF SERVICE**

I certify that this brief was served on all counsel of record August 13, 2025.

*/s/ Darren L. McCarty*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief contains 5,056 words in compliance with Business Court Local Rule 5(a).

*/s/ Darren L. McCarty*

27

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 104349685
Filing Code Description: No Fee Documents
Filing Description: 2025.08.13 Plaintiffs' Answer to Court's Question
Posed Aug 5, 2025
Status as of 8/14/2025 8:04 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/13/2025 5:17:29 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/13/2025 5:17:29 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/13/2025 5:17:29 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/13/2025 5:17:29 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/13/2025 5:17:29 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/13/2025 5:17:29 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/13/2025 5:17:29 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/13/2025 5:17:29 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/13/2025 5:17:29 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/13/2025 5:17:29 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/13/2025 5:17:29 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/13/2025 5:17:29 PM | SENT |

Tab 13

E-filed in the Office of the Clerk
for the Business Court of Texas
8/18/2025 10:37 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* | § § | FIRST DIVISION |
| v. | § | |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § | DALLAS, TEXAS |
| *Defendants.* | § § § § | |

## **PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
Benjamin L. Warden
State Bar No. 24115926
bwarden@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7200 – Telephone
(214) 292-8442 – Facsimile

Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

*Attorneys for Plaintiffs*

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................2

TABLE OF AUTHORITIES ...........................................................3

TABLE OF ABBREVIATIONS ......................................................6

INTRODUCTION ..........................................................................6

ARGUMENT ...............................................................................10

I.  The Charities Have Legal Capacity to Recover for Violations of Duties Owed Directly to Them. ..........................................................10

    a.  The Charities have capacity to sue because they have "a personal cause of action and personal injury." ...............................10

    b.  The Charities bring personal claims and allege direct damages… ...............................................................................................12

    c.  The Charities have capacity to sue and recover on their personal claims. .........................................................................................14

II.  Charitable HoldCo's joinder in this case is not required by Rule 39(a). ..........................................................................................17

    a.  Rule 39(a) imposes a heavy burden upon Defendants to prove mandatory joinder ..................................................................17

    b.  The Charities tailored their suit against to bring direct claims against specific Wrongdoers. ............................................................19

    c.  Rule 39(a)(1) is inapplicable. ...................................................20

    d.  Joinder of Charitable HoldCo is not required under Rule 39(a)(2)(i). ..............................................................................................22

        i.  Plaintiffs' claims do not prevent Charitable Holdco from protecting its own interests under Rule 39(a)(2)(i). ........................25

        ii.  Defendants fail to carry their burden of demonstrating that there is a substantial risk of their incurring inconsistent obligations should Charitable Holdco not be made a party pursuant to Rule 39(a)(2)(ii). .........................................................26

MR 1385

    e.    The joinder rule is meant to protect against inconsistent obligations. ...........................................................................27

    f.    Parallel litigations are common, as are separate foreign liquidators and receivers and, despite involving the same facts and circumstances, none require mandatory joinder..............................30

    g.    Defendants try to smuggle merits inquiries into Rule 39. .........32

PRAYER ......................................................................................................33

CERTIFICATE OF SERVICE.....................................................................34

CERTIFICATE OF COMPLIANCE.............................................................34

## TABLE OF AUTHORITIES

**Cases**

*AHW Inv. P'ship v. Citigroup Inc.*,

    980 F. Supp. 2d 510, 517 (S.D.N.Y. 2013)............................................30

*Anglo-Dutch Petroleum Intern., Inc. v. Case Funding Network, LP*, 441 S.W.3d 612, 621 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)..10

*BDO USA LLP v. Litex Industries Limited*, No. 05-15-00358-CV, 2016 WL 3198503 (Tex. App.—Dallas, May 26, 2016) ........................... 14, 15

*Christi Bay Temple v. GuideOne Specialty Mut. Ins. Co.*, 330 S.W.3d 251, 253 (Tex. 2010).................................................................10

*CHU de Quebec - Universite Laval v. DreamScape Dev. Group Holdings, Inc.*, No. 4:21-CV-182-SDJ, 2022 WL 3441872, at *8 (E.D. Tex. Aug. 16, 2022).................................................................................................28

*Collins v. Sydow* (In re NC12, Inc.),

    478 B.R. 820, 832 (Bankr. S.D. Tex. 2012). .......................................30

*Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 912 (Tex. 2017) ....21, 22

*EIS Dev. II, LLC v. Buena Vista Area Ass'n*,

    715 S.W.3d 689 (Tex. 2025) .........................................................22, 23

*Feiner Family Tr. v. VBI Corp.*, No. 07 CIV. 1914 (RPP), 2007 WL 2615448, at *7 (S.D.N.Y. Sept. 11, 2007) .......................................11, 12

3

*Field v. Volkswagenwerk AG,*
　626 F.2d 293, 301 (3d Cir. 1980) ............................................. 18, 21, 32

*Grimes v. Donald*, 673 A.2d 1207, 1212 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ........................29

*Heard v. Moore,*
　101 S.W.3d 726, 728 (Tex. App.—Texarkana 2003, pet. denied) ........18

*Highland Capital Management LP v. Chesapeake Energy Corporation (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008) 30

*Hunter Douglas, Inc. v. Menendez*, No. 4:21-CV-741,
　2022 WL 811067, at *10 (E.D. Tex. Mar. 16, 2022) ........................27, 28

*Immobiliaria Axias, S.A. de C.V. v. Robles Intern. Serv., Inc.,* No. EP-07-CA-00269-KC, 2007 WL 2973483, at 6 (W.D. Tex. Oct. 11, 2007) ......27

*In re Austin Hous. Fin. Corp.,* No. 03-22-00091-CV, 2022 WL 2960796, at *2 (Tex. App.—Austin July 27, 2022, no pet.) .......................... 17, 29

*In re Champion Indus. Sales, LLC*, 398 S.W.3d 812, 823 (Tex. App.—Corpus Christi–Edinburg 2012, no pet.)............................................18

*In re Christopher S. Kappmeyer and Roxana P. Kappmeyer, Relators,* 668 S.W.3d 651, 656 (Tex. 2023) ........................................... 21, 22, 26

*In re Fisher*, 433 S.W.3d 523, 527 (Tex. 2014, orig. proceeding) 11, 14, 16

*In re Occidental W. Tex. Overthrust, Inc.*,
　626 S.W.3d 395, 400 (Tex. App.—El Paso 2021, no pet.).....................17

*In re SMBC Healthcare, LLC,*
　No. 16-2947, 2017 WL 2062992, *14 (S.D. Tex. May 11, 2017)...........16

*In re Smith Barney Transfer Agent Litig.,*
　765 F. Supp. 2d 391, 399 (S.D.N.Y. 2011)..........................................29

*In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1044 (5th Cir. 2012).........23, 25

*In re With Purpose, Inc.,* No. 23-30246-MVL7, 2025 WL 1698694, at *1 (Bankr. N.D. Tex. June 16, 2025)......................................................31

*Kohn v. Meehan*, (Transcript Smith Bernal), at ¶ 101 (Ch. Div. 2003) .12

*Landry v. Exxon Pipeline Co. Mendoza Marine, Inc.,*

4

260 B.R. 769 769, 773 (Bankr. M.D. La. 2001) .....................................31

*Linegar v. DLA Piper*, 495 S.W.3d 276, 279-80 (Tex. 2016 ...................15

*Matter of Tr. A & Tr. C Established Under Bernard L. & Jeannette Fenenbock Living Tr. Agreement*, 690 S.W.3d 80, 86 (Tex. 2024) .......16

*Matter of Tr. A & Tr. C Established Under Bernard L. & Jeannette Fenenbock Living Tr. Agreement*, Dated March 12, 2008, 690 S.W.3d 80, 86 (Tex. 2024).................................................................................8

*Murphy v. Campbell*, 964 S.W.2d 265 (Tex. 1997) ...............................15

*Ortiz v. A.N.P., Inc.*, No. 10-CV-917, 2010 WL 3702595, at *4 (S.D. Tex. Sept. 15, 2010) ...................................................................................19

*Peskin v. Anderson*, [2001] 1 B.C.L.C. 372 ¶ 34 ....................................11

*Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 780 (Tex. 2020) .... 11, 14

*Sanson v. Allstate Tex. Lloyds*, No. 4:17-CV-00733, 2018 WL 3630136, at *2 (E.D. Tex. July 31, 2018).......................... 19, 27

*Shelton v. Exxon Corp.*, 843 F.2d 212, 218 (5th Cir. 1988) ...................27

*Tianrui (International) Holding Co. Ltd. v. China Shanshui Cement Group Ltd.* [2024], 2024 WL 04794596, UKPC 36 (appeal taken from Cayman Islands)..............................................................................13

*Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990); ............................7

*Zemos Logistics, LLC v. BKT Enterprises*, No. 02-23-00049-CV, 2023 WL 8467374, at *4 n.7 (Tex. App.—Fort Worth Dec. 7, 2023, no pet.) 7, 10

**Statutes**

11 U.S.C. § 1520 .....................................................................................23

**Rules**

FED. R. CIV. P. 19 ....................................................................................19

Tex. R. Civ. P. 39(a)......................................................................... passim

Tex. R. Civ. P. 60 ....................................................................................24

## TABLE OF ABBREVIATIONS

| Term | Abbreviation |
|------|-------------|
| Charitable DAF HoldCo, Ltd | Charitable HoldCo |
| Plaintiffs Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc. | Charities |

## INTRODUCTION

Today, what was a $270 million charitable fund remains under the control of Mark Patrick—an individual who, with the help of countless lawyers, told the Charities that Defendants were structuring the fund to benefit the Charities for years to come. But at that very moment, Patrick was executing a scheme behind their backs with the express intent of making the Charities' interests "worthless." As of September 2024, approximately $140 million of that $270 million fund was in cash. We now know that Patrick paid himself at least $4 million of that cash soon after those values were determined. The conduct described in the First Amended Petition warrants the swift consideration and equitable relief

6

this Court can provide under the Texas Rules of Civil Procedure. The Defendants' have answered with repeated dilatory motions.

Meanwhile, all that stands between Patrick and the remainder of the funds are papered agreements that Patrick will not do anything outside the "ordinary course." History indicates that placing any faith in Patrick's fealty to those agreements is the riskiest of bets—a $270 million bet. It would be extraordinary to find any reasonable person who, knowing Patrick's conduct, would put their retirement funds into Patrick's care, much less what is at stake here.

And even if Patrick temporarily curbs his appetite for charitable funds, the Charities are helpless to use them as intended to support countless needs and civic works. Instead, Patrick will continue to use charitable funds as his legal war chest against the appointment of a neutral, court-appointed third party to preserve the funds while the Court scrutinizes Patrick's intricate scheme.

Given this, the Charities are the right parties to protect their own interests. To have capacity to raise their claims, the Charities need only plead "a personal cause of action and personal injury"—that is, a claim that the defendant breached a duty owed to *the plaintiff*, or committed a

7

tort against *the plaintiff. Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) (citation omitted), *superseded by statute on other grounds as stated in Sneed v. Webre,* 465 S.W.3d 169, 185 n.10 (Tex. 2015). Patrick, wearing his different hats, directly defrauded the Charities and breached direct fiduciary duties owed personally to them under Cayman law. The Charities therefore have the legal capacity to sue, recover, and seek the interlocutory protection of the Court.

Likewise, nothing suggests this case cannot go on without the presence of Charitable DAF HoldCo, Ltd ("Charitable HoldCo"), in official liquidation. The Court can provide complete relief to the existing parties on the existing claims without Charitable Holdco. Charitable Holdco has not claimed an interest in the Charities' claims, and in any case will not be impaired in its ability to protect its interests given the robust procedural protections it would have. Neither are the Defendants here threatened with "a 'substantial risk of incurring' multiple or inconsistent obligations[,]" because there is no likelihood they will be faced with mutually contradictory orders from different courts, impossible to mutually obey. *Matter of Tr. A & Tr. C. Established Under Bernard L. &*

8

*Jeannette Fenenbock Living Tr. Agreement, Dated March 12, 2008*, 690 S.W.3d 80, 86 (Tex. 2024) (quoting Tex. R. Civ. P. 39(a)).

The Charities are, as plaintiffs, the masters of their action. They have not sued Charitable HoldCo, which as of now, has no assets; but have rather sued the control person, Patrick, and his puppet entities, to seek recompense against them. Defendants fail to suggest another forum where the Charities' direct actions should be litigated. In this Court, the Charities can receive full relief for their claims.

Charitable HoldCo, for its part, is pursuing its claims through the Cayman Islands Grand Court and has made an appearance in federal bankruptcy court. If recognized in the United States, Charitable HoldCo will have significant protections and mechanisms under federal bankruptcy law. If Charitable HoldCo perceives any interference with its claims or property via this action, it has express avenues to petition the bankruptcy court to protect its interests. This action will not impair or impede Charitable HoldCo's interests; but if Charitable Holdco disagrees, that is a decision for it and the bankruptcy court. Parallel litigation in this posture is commonplace, testament that joinder is unnecessary.

9

Finally, there is nothing that compels this Court to require Charitable HoldCo's presence prior to appointing a receiver. Defendants suggest only that Charitable HoldCo must be brought in because Charitable HoldCo's "properties" (the funds) would be subject to receivership. Def's Br. at 24. That is an interesting admission against Defendants' interests. But Charitable HoldCo knows about this action, this docket, and the receivership petition and it has not taken any steps to intervene. It has many avenues to intervene should it wish to do so. In reality, though, removing Patrick and assigning a responsible neutral receiver to exercise the management shares is *good* for Charitable Holdco, as it secures against further dissipation.

The Charities have the capacity and responsibility to bring this action. And nothing before this Court requires the presence of Charitable HoldCo.

## ARGUMENT

I. **The Charities Have Legal Capacity to Recover for Violations of Duties Owed Directly to Them.**

   a. ***The Charities have capacity to sue because they have "a personal cause of action and personal injury."***

"'A party has capacity to sue when [it] has legal authority to act ... [and] the lack of capacity to sue pertains to the legal right to prosecute

a lawsuit in one's own name.'" *Zemos Logistics, LLC v. BKT Enterprises*, No. 02-23-00049-CV, 2023 WL 8467374, at \*4 n.7 (Tex. App.—Fort Worth Dec. 7, 2023, no pet.) (citation omitted). Defendants, "[a]s the party challenging capacity," bear the burden of proving that the Charities lack the legal authority to bring the claims pleaded in this case. *Christi Bay Temple v. GuideOne Specialty Mut. Ins. Co.*, 330 S.W.3d 251, 253 (Tex. 2010); *Anglo-Dutch Petroleum Intern., Inc. v. Case Funding Network, LP*, 441 S.W.3d 612, 621 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("As the party challenging capacity, Anglo–Dutch had the burden to prove lack of capacity."). In setting up such a challenge, the defendant is obligated to submit "specific proof" demonstrating the plaintiff's lack of capacity. *Christi Bay Temple*, 330 S.W.3d at 253.

To overcome a capacity challenge, a plaintiff need only plead "a personal cause of action and personal injury"—that is, a claim that the defendant breached a duty owed to *the plaintiff*, or committed a tort against *the plaintiff*. *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) (citation omitted). This standard is met where "the plaintiff allege[s] that he suffered damages and nothing in his petition 'affirmatively

<center>11</center>

negates his having been personally aggrieved[.]" *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 780 (Tex. 2020) (*quoting In re Fisher*, 433 S.W.3d 523, 527 (Tex. 2014, orig. proceeding).

   **b.** ***The Charities bring personal claims and allege direct damages.***

The Charities' claims against the Defendants are direct and personal, because they are for torts committed directly against the Charities by the Defendants under the relevant governing law. The Charities therefore have "personal cause[s] of action and personal injury." *Pike*, 610 S.W.3d at 775.

The Charities allege breach by the Defendants of direct fiduciary duties they owed *to the Charities* under Cayman law. Cayman law recognizes that shareholders can be owed duties and obligations directly from the controllers of the company, when the controller "mak[es] material representations to them; or fail[s] to make material disclosure to them of insider information," or "suppl[ies] to them specific information and advice on which they have relied." *Feiner Family Tr. v. VBI Corp.*, No. 07 CIV. 1914 (RPP), 2007 WL 2615448, at \*7 (S.D.N.Y. Sept. 11, 2007) (quoting *Peskin v. Anderson*, [2001] 1 B.C.L.C. 372 ¶ 34). "These events are capable of constituting special circumstances and of

12

generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders." *Id.* (quoting *Peskin*, 1 B.C.L.C. 372 ¶ 34).

Cayman law provides for a direct claim owned personally by the aggrieved shareholder in these circumstances. "'Where such a duty exists and breach of it has caused loss to a shareholder directly (e.g., by inducing him to part with his shares at an undervalue), the shareholder may bring an action against the director to recover his loss.'" *Feiner Family Tr.*, 2007 WL 2615448 at *7 (quoting *Kohn v. Meehan*, (Transcript Smith Bernal), at ¶ 101 (Ch. Div. 2003)).

This is precisely what the Charities assert. The Charities allege that Defendants used material misrepresentations and omissions to hide their dilute-and-sever maneuver. *Feiner Family Tr.*, 2007 WL 2615448 at *7 (direct duties under Cayman law exist where directors or officers "for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders." (citation omitted)).

13

Likewise, it is never a proper exercise of authority for a controller of a Cayman company to act for his own self-interest and deliberately alter the balance of power between shareholders, which is precisely what the charities allege Defendants achieved here. *Tianrui (International) Holding Co. Ltd. v. China Shanshui Cement Group Ltd.* [2024], 2024 WL 04794596, UKPC 36 (appeal taken from Cayman Islands).

Because the Charities have pled a direct, personal injury resulting from duties breached and fraud perpetrated against them personally, and because those well-pled claims are grounded in the governing law here, there is no question the Charities have capacity to raise their claims.

### c. *The Charities have capacity to sue and recover on their personal claims.*

The Defendants rely on inapplicable Texas cases establishing that shareholders may not sue for the mere diminution of the value of their shares pursuant to harms solely against the Company. This ignores entirely the reality that Cayman law governs the Charities' fiduciary duty claim, and that their claims are plainly personal and direct under Cayman law. But even under Texas law, the "rule [Defendants cite] does not, of course, prohibit a stockholder from recovering damages for wrongs

14

done to him individually 'where the wrongdoer violates a duty arising from contract or otherwise, and owing directly by him to the stockholder.'" *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) (citation omitted).

Instead, "to recover in an individual capacity for non-derivative claims, the shareholder need only "prove a personal cause of action and personal injury." *Id.* This standard is met where "the plaintiff allege[s] that he suffered damages and nothing in his petition 'affirmatively negates his having been personally aggrieved[.]" *Pike*, 610 S.W.3d at 780 (quoting *In re Fisher*, 433 S.W.3d 523, 527 (Tex. 2014, orig. proceeding). Because the Charities have properly pled a personal, direct claim under governing Cayman law, they have capacity to raise that claim.

Even under Texas law, it is easy to distinguish between a case solely about share value diminution and claims involving direct misrepresentations to plaintiffs. In *BDO USA LLP v. Litex Industries Limited*, No. 05-15-00358-CV, 2016 WL 3198503 (Tex. App.—Dallas, May 26, 2016), the defendant/appellant made the precise argument Defendants try here. But the Dallas Court of Appeals recognized that the plaintiff had properly alleged that "BDO violated a duty owed directly

15

to Litex," because it cited alleged misrepresentations made directly by the defendant to the plaintiff, to induce its action or inaction. *Litex*, 2016 WL 3198503 at *9. Because "the representation in question was made to Craftmade's shareholders, which included Litex," and because the plaintiff alleged that "if he had known [the truth about [the mispresented facts], it would have acted differently and would not have suffered a loss, the claim was personal. *Id.*

Accordingly, the court ruled that "the evidence does not show Litex is seeking damages personally for a wrong done solely to [the corporation], but rather shows the damages sought by Litex are for wrongs to Litex individually based on violation of duty owing directly by BDO to Litex." *Id. See also Linegar v. DLA Piper*, 495 S.W.3d 276, 279-80 (Tex. 2016) and *Murphy v. Campbell*, 964 S.W.2d 265 (Tex. 1997). "The Texas Supreme Court's opinions in *Wingate*, *Linegar*, and *Murphy* demonstrate that [plaintiffs] have standing to prosecute direct claims in state court for which they allege facts capable of establishing that: (1) [defendants] owed duties to [plaintiffs] individually; (2) [defendants] violated those duties; and (3) those violations damaged [plaintiffs]." *In*

16

*re SMBC Healthcare, LLC*, No. 16-2947, 2017 WL 2062992, *14 (S.D. Tex. May 11, 2017).

Far from "affirmatively negat[ing] [the Charities] having been personally aggrieved," the First Amended Complaint shows "damages sought by [the Charities] for wrongs to [the Charities] individually based on violation of duty owing directly by [the Defendants] to [the Charities]." *Pike*, 610 S.W.3d at 780 (quoting *In re Fisher*, 433 S.W.3d 523, 527 (Tex. 2014, orig. proceeding); *Litex*, 2016 WL 3198503 at *9.

The Charities have capacity.

## II. Charitable HoldCo's joinder in this case is not required by Rule 39(a).

### a. *Rule 39(a) imposes a heavy burden upon Defendants to prove mandatory joinder.*

"Texas Rule of Civil Procedure 39 provides that a person who is subject to service of process shall be joined in an action if (1) the court cannot grant 'complete relief' to the parties in the person's absence or (2) the person 'claims an interest relating to the subject of the action' and a judgment may impair his ability to protect his interest or leave the parties subject to a 'substantial risk of incurring' multiple or inconsistent obligations." *Matter of Tr. A & Tr. C. Established Under Bernard L. & Jeannette Fenenbock Living Tr. Agreement*, 690 S.W.3d 80, 86 (Tex. 2024)

17

MR 1400

(quoting Tex. R. Civ. P. 39(a)). "Under Rule 39, however, the parties' failure to join a person will rarely deprive the court of jurisdiction." *Id.*

A heavy burden lies on Defendants, who must "show that the parties it claimed to be necessary were, in fact, necessary under Rule 39." *In re Occidental W. Tex. Overthrust, Inc.*, 626 S.W.3d 395, 400 (Tex. App.—El Paso 2021, no pet.). A plea in abatement based on nonjoinder "should show definitely and specifically the nature and extent of the interest of such person who is claimed to be a necessary party," and must "give the court definite allegations as to the parties and the interests claimed by them." *In re Austin Hous. Fin. Corp.,* No. 03-22-00091-CV, 2022 WL 2960796, at *2 (Tex. App.—Austin July 27, 2022, no pet.) (internal citations and quotations omitted).

If the Defendants do not show that joinder of an additional party is truly "mandatory" under the four corners of Rule 39, an order requiring such joinder is an abuse of discretion. *Id.*, *citing In re Corcoran*, 401 S.W.3d 136, 140 (Tex.App.—Houston [14th Dist] 2011, orig. proceeding). This is especially likely when the proposed joinder "will delay the trial and greatly increase costs" to the prejudice of plaintiffs. *Id.*

18

## b. *The Charities tailored their suit to bring direct claims against specific Wrongdoers.*

The Charities "are the masters of their suit regarding the claims and parties they choose to pursue." *Heard v. Moore*, 101 S.W.3d 726, 728 (Tex. App.—Texarkana 2003, pet. denied); *see In re Champion Indus. Sales, LLC*, 398 S.W.3d 812, 823 (Tex. App.—Corpus Christi–Edinburg 2012, no pet.) ("The plaintiff is free to tailor her pleadings to eschew those claims which would mandate one forum instead of another forum for litigation of those well-pleaded claims.'" (citations omitted)). The Charities have not named Charitable HoldCo as a defendant and have brought no claims against it.

If "the right of [the Charities] to relief against [Defendants] were established, these parties would be awarded a judgment; if their claims are not sustained, their complaint would be dismissed," but the Court "will be able to grant complete relief as between the parties without the joinder of [Charitable HoldCo]" in either event. *Field v. Volkswagenwerk AG*, 626 F.2d 293, 301 (3d Cir. 1980).[1]

---

[1] "The commentary to Rule 39's amendment states that the purpose of the amendment is to conform joinder practices in State courts to practices followed by federal courts under Rule 19 of the Federal Rules of Civil Procedure." *Kodiak Res., Inc. v. Smith*, 361 S.W.3d 246, 250 (Tex. App.—Beaumont 2012, no pet.); *see McCarthy v. George*, 618 S.W.2d 762, 763 (Tex. 1981) ("Rule 39 is almost an exact

19

### c. *Rule 39(a)(1) is inapplicable.*

Defendants argue that "the Debtor's absence from this lawsuit prevents the Court from being able to grant complete relief to the existing parties" because "all of the [Charities][2] claims are derivative claims, [so] the Debtor is a necessary party that must be joined." Supplemental Brief at 18. As explained above, reflected in the live petition, and in substantial prior briefing, Plaintiffs' claims are direct, not derivative.

In the parlance of Rule 39, "[c]omplete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought." *Sanson v. Allstate Tex. Lloyds*, No. 4:17-CV-00733, 2018 WL 3630136, at *2 (E.D. Tex. July 31, 2018) (*quoting Ortiz v. A.N.P., Inc.*, No. 10-CV-917, 2010

---

copy by Texas of Federal Rule 19, Federal Rules of Civil Procedure."); *McCarthy v. George*, 618 S.W.2d 762, 763 (Tex. 1981); *Clear Lake City Water Auth. v. Clear Lake Utilities Co.*, 549 S.W.2d 385, 390 (Tex. 1977) (citing treatises discussing application of "Federal Rule 19," which is "virtually identical to Rule 39"); *Cooper v. Tex. Gulf Indus., Inc.*, 513 S.W.2d 200, 203 (Tex. 1974) ("Amended Rule 39, effective January 1, 1971, is almost an exact copy by Texas of Federal Rule 19, Federal Rules of Civil Procedure, which is also of recent origin, having been adopted in 1966."). Given this similarity, as Defendants agree, "Texas state courts consider the opinions of federal courts in Texas as persuasive authority." Supplemental Brief at 18 n.13.

[2]Defendants continue to refer to the Charities as the "Dondero Organizations," despite the fact that the Plaintiff Charities are overseen by the leadership of some of the most longstanding and respected charitable foundations in the nation. Defendants' naked appeal to personal prejudice against a non-party charitable donor is self-discrediting.

WL 3702595, at *4 (S.D. Tex. Sept. 15, 2010) (discussing Rule 39's federal analogue, FED. R. CIV. P. 19).

Defendants claim that complete relief cannot be had without naming Charitable HoldCo because "only [it] has (or had) authority under its governance documents to dispose of and transfer the assets of the Charitable DAF." But that ignores that all the assets of the Fund— as well as the management shares governing those assets, and the new participation shares—are *all presently held by the named Defendants in this case*. The Charities bring claims against Defendants who, by virtue of their positions committed the wrongdoing and, even now, remain in control of the fund structure. The Charities can obtain "complete relief" by orders and damages directed at those controllers.

Finally, mere convenience or efficiency of forum is not sufficient. "[T]hat the joinder of [the Charitable HoldCo] to this proceeding would suit [Defendants'] convenience, since it might minimize the delay, expense, and risks involved in the possibility of having to litigate in two forums against different parties" is not the standard under Rule 39. *Field*, 626 F.2d at 301-302.

21

**d. *Joinder of Charitable HoldCo is not required under Rule 39(a)(2)(i).***

Binding Supreme Court precedent demonstrates that Charitable HoldCo holds no interest in this proceeding that will be impaired or impeded.

Rule 39(a)(2) "requires a two-step inquiry. First, does the person whose joinder is sought claim[ ] an interest relating to the subject of the action?" *In re Christopher S. Kappmeyer and Roxana P. Kappmeyer, Relators,* 668 S.W.3d 651, 656 (Tex. 2023). Second, does the person's absence "as a practical matter impair or impede his ability to protect that interest?" Tex. R. Civ. P. 39(a)(2). "If the answer to either of those questions is no, then Rule 39 does not mandate joinder of that person and, in turn, does not authorize the trial court to order that he be made a party." *Kappmeyer*, 668 S.W.3d at 656.

In *Crawford*, the Supreme Court examined what it means to "claim[] an interest relating to the subject of the action." *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 912 (Tex. 2017); Tex. R. Civ. P. 39(a)(2). There, a landowner claimed that XTO Energy was wrongfully paying 44 of his neighbors royalties on mineral interests he owned. *Id.* at 908-909. In deciding whether these neighbors had to be joined under Rule 39, the

22

Supreme Court observed that the ordinary definition of the word "claim" required some active step by the claimant. *Id*. While an absent party does "not need to actually 'c[o]me to court to assert an interest' in order to claim an interest under Rule 39, [b]ut they needed to do *something*, and the adjacent landowners have done nothing." *Id*. at 913 (emphasis in original). Therefore, joinder could not be compelled.

The Court reached similar results in two later cases. *EIS Dev. II, LLC v. Buena Vista Area Ass'n*, 715 S.W.3d 689 (Tex. 2025) ("Rule 39 does not require joinder of a nonparty 'who *potentially* could claim an interest in the subject of the action; it requires joinder, in certain circumstances, of persons who *actually* claim such an interest.'" (citation omitted and emphasis in quote)); *Kappmeyer*, 668 S.W.3d at 657 ("The distinction we highlighted in *Crawford* between persons 'having' an interest that could be claimed and actually 'claiming' that interest" as one that "makes sense in the Rule 39(a)(2) context precisely because it involves compelling their joinder in a lawsuit.").

Here Charitable HoldCo has not taken any "action demanding or asserting [its] interest" in the subject of this action. *EIS Dev. II*, 715 S.W.3d at 702. According to Defendants, "by filing the Chapter 15

23

petition for recognition" in Delaware bankruptcy court, "the Debtor 'has an *actual, claimed interest*— not just a potential interest—in the subject matter of the action.'" Supplemental Brief at 22 (citations omitted).

But this (as with most of Defendants' arguments) hinges on their erroneous insistence that the Charities' causes of action asserted in this case are derivative ones belonging to Charitable HoldCo. All a petition for recognition does is ask the bankruptcy court to recognize that the foreign trustee (in this case, the JOLs) is entitled to act on behalf of the debtor as a matter of foreign law. *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1044 (5th Cir. 2012). Upon recognition, the foreign trustee is granted the same rights and powers over the property of the debtor's estate as a domestic bankruptcy trustee. *Id.* (citing 11 U.S.C. § 1520).

By seeking recognition in Delaware bankruptcy court, the JOLs can be said to have "claimed" an interest in Charitable HoldCo's alienated property. But that claimed interest is legally distinct from the Charities' direct causes of action for violations of duties owed to, and torts committed against, them by Patrick and his puppet entities who are the Defendants here. Claiming an interest in the former is not, as a matter

24

of logic and law, claiming an interest in the latter, which are "the subject of [this] action" under Rule 39(a)(2).

i. *Plaintiffs' claims do not prevent Charitable Holdco from protecting its own interests under Rule 39(a)(2)(i).*

Even claiming an interest in the subject of an action is insufficient, to warrant forced joinder. Charitable HoldCo's non-joinder must also "impair or impede [its] ability to protect that interest." Rule 39(a)(i). The rule requires not merely theoretical or hypothetical impositions, but ones that exist as "a practical matter." Tex. R. Civ. P. 39(a)(i).

Here, as a practical matter, there is zero risk that proceeding with this action will have any negative impact at all on Charitable Holdco.

- Charitable Holdco is represented by able counsel, who is aware of this litigation, and is certainly in a position in protect its interests.

- Procedural mechanisms exist for Charitable Holdco to do so in this litigation if it so wishes. Tex. R. Civ. P. 60.

- Upon recognition by the Delaware bankruptcy court as foreign trustees, the JOLs will also have access to the bankruptcy system, and many of the powers of the trustee to compel a determination of whether any of the claims raised

25

here are property of the Debtor. *In re Vitro*, 701 F.3d at 1044 ("Section 1520 also provides for certain automatic relief upon recognition of a foreign main proceeding, like the one here, including an automatic stay and the power to prevent transfers of the debtor's property.").

The Plaintiff Charities' claims are not the property of Charitable HoldCo, so its interests are not threatened by this litigation. But if Charitable HoldCo takes a different view in the future, it has ample and effective means to intervene. *In re Vitro*, 701 F.3d at 1044. Because the Charities' non-joinder of Charitable HoldCo will not "impair or impede [its] ability to protect that interest," mandatory joinder is improper.

ii. *Defendants fail to carry their burden of demonstrating that there is a substantial risk of their incurring inconsistent obligations should Charitable Holdco not be made a party pursuant to Rule 39(a)(2)(ii).*

The final question under Rule 39 is whether "disposition of the action in [the Debtor's] absence [will] leave any of the current parties 'subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of [its] claimed interest?'" *Kappmeyer*, 668 S.W.3d at 656.

26

Defendants' argument that the "sheer number of fora" where these "same claims" are being litigated creates substantial risk of multiple and inconsistent obligations, Supplemental Brief at 21, misstates both the applicable standard and what the Charities plead in the First Amended Complaint. There is no risk of inconsistent obligations here because: (1) the Defendants' brief fails to understand the meaning of an "inconsistent" obligation under relevant precedent; (2) Plaintiffs' claims are distinct from the potential claims of Charitable Holdco; (3) there is no inconsistency in the relief sought by Plaintiffs here and the relief the Charitable Holdco may seek in future; and (4) basic procedural mechanisms common to parallel matters are applied in the ordinary course of civil litigation to protect against any multiple recoveries in these circumstances.

### e. *The joinder rule is meant to protect against inconsistent obligations.*

Rule 39 is aimed at preventing *inconsistent* obligations. That means obedience to one court would require disobedience to another. "Inconsistent obligations occur when an existing party cannot comply with one court's order without breaching the order of another court that pertains to the same incident." *Sanson v. Allstate Tex. Lloyds*,

27

No. 4:17-CV-00733, 2018 WL 3630136, at *2 (E.D. Tex. July 31, 2018) (citing *Immobiliaria Axias, S.A. de C.V. v. Robles Intern. Serv., Inc.,* No. EP-07-CA-00269-KC, 2007 WL 2973483, at 6 (W.D. Tex. Oct. 11, 2007). They do not occur where there is a possibility that two different suits will end in inconsistent adjudications, *see Immobiliaria Axias* at 6, nor are they found merely because a multiplicity of actions are pending in different fora. *Shelton v. Exxon Corp.*, 843 F.2d 212, 218 (5th Cir. 1988) ("it is the threat of *inconsistent* obligations, not the possibility of multiple litigation . . . that determines Rule 19 considerations"); *Hunter Douglas, Inc. v. Menendez*, No. 4:21-CV-741, 2022 WL 811067, at *10 (E.D. Tex. Mar. 16, 2022) ("Unlike a risk of inconsistent obligations, a risk that a defendant who has successfully defended against a party may be found liable to another party in a subsequent action arising from the same incident does not necessitate joinder of all the parties.").

Defendants fail to articulate a substantial likelihood of being subject to two orders that they could not obey simultaneously. Charitable HoldCo and the Charities may ask for parallel relief, *i.e.*, albeit under different legal theories such that one may be found meritorious and the other not, which creates no conflict, and in either instance, the same

28

relief. Of course, Defendants may assert substantive defenses to what they perceive as specific, unfair inconsistencies, which they have failed to specifically define here.

Defendants do not hypothesize about the risk of inconsistent obligations between the two litigations. Rather, at most, Defendants argue a risk of multiple or inconsistent adjudications, "which does not require joinder under [Rule 39(a)(2)(ii)]". *CHU de Quebec - Universite Laval v. DreamScape Dev. Group Holdings, Inc.*, No. 4:21-CV-182-SDJ, 2022 WL 3441872, at *8 (E.D. Tex. Aug. 16, 2022). Defendants provide no explanation for how they "will be unable to comply with one court's order without breaching the order of another court concerning the same incident." *Id.* "Conclusory assertions [that] merely reflect a risk of inconsistent adjudications or results, [do] not necessitate" joinder. *Hunter Douglas, Inc.*, 2022 WL 811067, at *10. Defendants have not met their burden of showing "definitely and specifically the nature and extent" of allegations and interests impacted by this litigation. *In re Austin Hous. Fin. Corp.,* No. 03-22-00091-CV, 2022 WL 2960796, at *2 (Tex. App.—Austin July 27, 2022, no pet.).

29

**f.** *Parallel litigations are common, as are separate foreign liquidators and receivers and, despite involving the same facts and circumstances, none require mandatory joinder.*

Parallel litigation involving the same facts is commonplace in our judicial system.

Claims arising from the same facts and circumstances against a corporate control person are often available to both the corporation and its shareholders because of separate duties to both. "Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim"—that is, a claim for the company, and separate, different claim for the shareholder. *Grimes v. Donald*, 673 A.2d 1207, 1212 (Del. 1996), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 399 (S.D.N.Y. 2011) ("direct and derivative actions based on the same underlying conduct are not mutually exclusive"). Likewise, a stockholder may "recover[] damages for wrongs done to him individually 'where the wrongdoer violates a duty arising from contract or otherwise, and owing directly by him to the stockholder,'" *Wingate*, 795 S.W.2d at 719 (citation omitted); *AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 517 (S.D.N.Y. 2013).

30

Bringing these separate claims, owned by separate plaintiffs, in different judicial forums, is something that bankruptcy courts are uniquely equipped to address. *See*, *e.g.*, *Collins v. Sydow* (In re NC12, Inc.), 478 B.R. 820, 832 (Bankr. S.D. Tex. 2012). In *Collins*, the bankruptcy court determined that asset-stripping and self-dealing claims belonged to the bankruptcy estate while securities fraud claims, conspiracy to commit fraud, and aiding and abetting securities fraud, were "direct claims owned by the" shareholders and thus to be remanded to state court. *Id.* at 836-37, 841.

Likewise, in *Highland Capital Management LP v. Chesapeake Energy Corporation (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008), the Fifth Circuit addressed "[w]hether a particular state-law claim belongs to the bankruptcy estate" based upon the applicable state law—which would be Cayman law in the present case. The Fifth Circuit noted that "there is nothing illogical or contradictory about saying that [the defendants] might have inflicted direct injuries on both the bondholders and [the debtor] during the course of dealings" in finding that fraud claims should be remanded to state court because the bondholders suffered direct injuries. *Id.* at 587.

31

There are many examples. *See, e.g., In re With Purpose, Inc.,* No. 23-30246-MVL7, 2025 WL 1698694, at \*1 (Bankr. N.D. Tex. June 16, 2025) (determining that fraudulent inducement and negligent misrepresentation claims alleged direct injuries to investors and remanding those claims to state court); *see also Landry v. Exxon Pipeline Co. Mendoza Marine, Inc.,* 260 B.R. 769 769, 773 (Bankr. M.D. La. 2001) (remanding a state court action involving environmental contamination claims, finding that the claims were grounded entirely in state law and did not involve property of the bankruptcy estate). The situation facing this Court is common, bankruptcy courts routinely analyze them, and nothing about this case indicates any substantial risk to the interests of Defendants or Charitable HoldCo.

**g.** ***Defendants try to smuggle merits inquiries into Rule 39.***

Defendants repeatedly argue for joinder on grounds that the Charities cannot rightly obtain the relief they claim. But that is a merits inquiry. Especially irrelevant are Defendants' attacks on the viability of the Charities' requests for a constructive trust and a receiver. Supplemental Brief at 22-23. Even if Defendants are right that the Court cannot impose a constructive trust, that has nothing to do with Rule 39,

32

but is rather a premature merits question. *See Field*, 626 F.2d at 301 (holding unremarkably that if the right to relief were established, "these parties would be awarded a judgment; if their claims are not sustained, their complaint would be dismissed. In either event, the district court will be able to grant complete relief as between the parties without the joinder[.]).

## PRAYER

Plaintiffs respectfully requests that the Court disregard Defendants' position in their Supplemental Brief and Alternative Motion to Abate and enter an Order finding that: (1) Plaintiffs have capacity to assert their claims in this present cause; (2) joinder of DAF HoldCo in the present action is unnecessary, and (3) overruling Defendants Alternative Motion to Abate.

Respectfully submitted,

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
Benjamin L. Warden

*/s/ Darren L. McCarty*
Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

*Attorneys for Plaintiffs*

33

State Bar No. 24115926
bwarden@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7200 – Telephone
(214) 292-8442 – Facsimile

## Certificate of Service

I certify that this Response Brief was served on all counsel of record August 18, 2025.

*/s/ Darren L. McCarty*

## Certificate of Compliance

I certify that this brief contains 5,382 words in compliance with Business Court Local Rule 5(a).

*/s/ Darren L. McCarty*

MR 1417

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 104531505
Filing Code Description: No Fee Documents
Filing Description: 2025.08.18 Pltfs Response to Defs Supp Brief re Joinder and Capacity
Status as of 8/19/2025 8:50 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/18/2025 10:37:43 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/18/2025 10:37:43 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/18/2025 10:37:43 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/18/2025 10:37:43 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/18/2025 10:37:43 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/18/2025 10:37:43 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/18/2025 10:37:43 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/18/2025 10:37:43 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/18/2025 10:37:43 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/18/2025 10:37:43 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/18/2025 10:37:43 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/18/2025 10:37:43 PM | SENT |

Tab 14

E-filed in the Office of the Clerk
for the Business Court of Texas
8/19/2025 6:51 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027



**DuaneMorris®**

*FIRM and AFFILIATE OFFICES*

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

CRAIG M. WARNER, P.C.
PARTNER
DIRECT DIAL: +1 214 257 7277
PERSONAL FAX: +1 214 853 4220
*E-MAIL:* CMWarner@duanemorris.com

*www.duanemorris.com*

August 19, 2025

VIA E-MAIL

Honorable Judge Bill Whitehill
Texas Business Courts--Dallas, Division 1B
8080 Park Lane, Suite 500
Dallas, Texas 75231

> **Re:** **Cause No. 25-BC01B-0027;** ***The Highland Dallas Foundation, Inc., et al. v. Mark Patrick, et al.*; Copies of Cayman Cases.**

Dear Judge Whitehill:

On August 19, 2025, the Court requested we provide copies of (1) the Appendix referenced by Plaintiffs in their brief dated August 13, 2025, and (2) all other copies of the Cayman cases cited by Plaintiffs thus far in the above captioned case. Attached with this letter please find the following:

1. Appendix Containing the Foreign Cases Relied on in Plaintiffs' Brief dated August 13, 2025, detailed below:

   a. *Eclairs Group Ltd v. JKX Oil and Gas plc,* [2016] 3 All ER 641.

   b. *Hogg v. Cramphorn Ltd,* [1966] 3 All ER 420

   c. *Peskin v. Anderson*, [2001] 1 B.C.L.C. 372.

   d. *Tianrui (International) Holding Co. Ltd. v. China Shanshui Cement Group Ltd.* [2024], 2024 WL 04794596, UKPC 36 (appeal taken from Cayman Islands).

2. Additional Foreign Cases Cited in Briefs to Date:

   a. *Kohn v. Meehan*, (Transcript Smith Bernal), at ¶ 101 (Ch. Div. 2003).

   b. *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.,* [1975] AC 167, 179



      c. *Foss v. Harbottle*, (1843) 67 Eng. Rep. 189, 202 (Eng.).

Going forward, we will provide additional copies of cases cited from foreign jurisdictions. Please let us know if the Court requires copies of any additional cases and we will provide them promptly.

Very Respectfully,

DUANE MORRIS LLP

Craig M. Warner
Partner

CMW
Attachments

DM1\16989769.1

MR 1421

# CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs*, | § § | FIRST DIVISION |
| v. MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § § | DALLAS, TEXAS |
| *Defendants*. | § § § § | |

## APPENDIX TO PLAINTIFFS' BRIEF RE: CHANGE POWERS

| Exhibit | Document | Appx. Page Nos. |
|---|---|---|
| Exhibit 1-A | *Eclairs Group Ltd v JKX Oil & Gas plc Glengary Overseas Ltd v JKX Oil & Gas plc, [2015] UKSC 71; [2015] Bus LR 1395*; [2016] 3 All ER 641, 2015 WL 7692969 (2015) | 29-44 |
| Exhibit 1-B | *Hogg v Cramphorn Ltd*, 1966 WL 22942 (1963) | 45-55 |
| Exhibit 1-C | *Peskin v. Anderson*, [2001] 1 B.C.L.C. 372 ¶ 34) | 56-70 |
| Exhibit 1-D | *Tianrui (International) Holding Co. Ltd. V. China Shanshui Cement Group Ltd. [2024], 2024 WL 04794596, UKPC 36* (appeal taken from Cayman Islands) | 71-102 |

# EXHIBIT 1-A

Eclairs Group Ltd v JKX Oil & Gas plc; Glengary Overseas Ltd v JKX Oil & Gas plc

*Overview* | *[2015] UKSC 71,* | **[2016] 3 All ER 641**, | *[2016] 2 All ER (Comm) 413,* | *[2016] 1 BCLC 1,*
| [2015] Bus LR 1395, | (2015) Times, 21 December, | *[2015] All ER (D) 20 (Dec)*

---

## *Eclairs Group Ltd and another v JKX Oil and Gas plc [2016] 3 All ER 641*

[2015] UKSC 71

SUPREME COURT

LORD NEUBERGER P, LORD MANCE, LORD CLARKE, LORD SUMPTION AND LORD HODGE SCJJ

18, 19 MAY, 2 DECEMBER 2015

**Company — Shares — Investigation of share acquisitions and disposals — Power of company to require disclosure of interests in voting shares — Failure to provide information — Restrictions on transfer etc of shares — Articles of association deemed information not provided if board knew or had reasonable cause to believe that information false or materially incorrect — Board imposing restrictions on voting and transfer of shares on basis of inadequate disclosure — Whether beneficial owners of shares held by nominees had standing to bring proceedings — Whether disclosure notices invalid because they sought information not permitted by statute or articles — Whether directors had reasonable cause to believe that responses received incorrect — Whether restrictions invalid because imposed by directors for improper purpose — Companies Act 2006, ss 793, 794.**

The board of directors of JKX, a company listed on the London Stock Exchange, convened an AGM to consider resolutions for the reappointment of directors, approval of their remuneration, the allotment of shares for cash and disapplication of pre-emption rights, and authorising market purchases of the company's shares. Some of those proposals required special resolutions. The claimants, EG Ltd and GO Ltd, held a combined 39% minority shareholding which was sufficient to defeat the special resolutions. The claimants were respectively owned or controlled by K and Z whose opposition to the resolutions was a matter of public knowledge. The board was concerned that JKX was the possible target of a corporate raid by K and Z to gain control of JKX's assets for less than their real worth and issued disclosure notices under *s 793*[a] of the Companies Act 2006 to the claimants, to K and Z and to others seeking particulars of their interests in JKX, the beneficial ownership of their JKX shares and the disclosure of any agreements or arrangements regarding their JKX shares or the exercise of any rights conferred by the holding of those shares. Under s 793 of the 2006 Act a public company had power to serve a disclosure notice on persons known or believed to be interested in the company's shares, requiring such persons to confirm whether or not that was so and to give such 'information about interests in [the] shares' required by the company, and particulars of persons who were parties to an agreement or arrangement relating to the acquisition of the shares or the exercise of any rights attached to the shares. Article 42 of JKX's articles, which supplemented the statutory power in s 794[b] to obtain a court order, empowered the board to serve a restriction notice imposing restrictions on dealings with the company's shares if the recipient of a disclosure notice failed to provide the information

---

[a] Section 793 is described at [9], below.
[b] Section 794 is set out at [10], below.

*[\*642]*

requested within a specified time or if the board knew or had reasonable cause to believe that the information provided was false or materially incorrect. The claimants, K and Z and other recipients of the disclosure notices provided particulars of interests in JKX's shares but denied the existence of any relevant acquisition or voting agreements. The board considered that response to be inadequate because of a failure to disclose certain agreements or arrangements and issued restriction notices under art 42 suspending the claimants' right to vote at general meetings attaching to their JKX sharess and restricting the right to transfer them. The claimants brought proceedings challenging the restriction notices on the grounds, inter alia, that the board had acted for a collateral and improper purpose in issuing the notices, namely to secure the passage of resolutions at the AGM by preventing the claimants blocking them, rather than for the purpose of enforcing the company's demand for information. At first instance the judge held that the claimants were entitled to vote at the AGM because the restriction notices were invalid as they had been imposed for the improper purpose of enhancing the

board's prospects of carrying the resolutions at the AGM. JKX appealed to the Court of Appeal which allowed the appeal and held that the restriction notices were not invalid, on the ground that the purpose or motive of the directors of a public company in serving disclosure and restriction notices under ss 793 and 794 of the 2006 Act and the company's articles was irrelevant, and if restrictions were imposed on a shareholder because the directors knew or had reasonable cause to believe that his response to a disclosure notice was incorrect or inadequate then he was a victim of his own choice not to provide full and accurate answers rather than because of any misuse of the directors' power to issue the notices. The claimants appealed to the Supreme Court.

**Held** – The appeal would be allowed for the following reasons—

(1) The power to restrict the rights attaching to shares by a restriction notice served under art 42 of JKX's articles was wholly ancillary to the statutory power to call for information under s 793 of the 2006 Act. The purposes of art 42 were three-fold: (i) to provide an incentive for a shareholder to comply with a disclosure notice; (ii) to enable the company and its shareholders to have all the relevant information when making decisions about their respective interests; and (iii) to provide a sanction for failure or refusal of a recipient of a disclosure notice to provide the information requested. All of those purposes were directly related to the failure to provide information requisitioned by a disclosure notice. There was in principle a clear line between protecting the company and its shareholders against the consequences of non-provision of the information requested and seeking to manipulate the fate of particular resolutions or to alter the balance of forces at the company's general meetings. The latter were no part of the purpose of art 42, being instead matters for the shareholders, not the board, and the disenfranchising of a predator was not a legitimate purpose of a restriction notice even if it had that consequence in fact. Accordingly, the decision to issue a restriction notice under art 42 required the directors to recognise the difference between the purpose of that decision and its incidental consequences and to exercise their power to issue a restriction notice for the purpose of obtaining information rather than as a defence against a corporate raider (see [30]–[40], [46]–[47], below). Dicta of Millett J in *Re Ricardo Group plc* *[1989] BCLC 566 at 572* applied; dicta of Hoffmann J in *Re TR Technology Investment Trust plc* *[1988] BCLC 256 at 276* considered.

(2) The board of JKX had acted for the wrong purpose in issuing the restriction notices since once they were satisfied that the information requested had not been provided they became interested only in the effect that would have on the outcome of the forthcoming AGM and the protection of the company from a corporate raid by K and Z (see [41]–[44], [46]–[47], below).

Per Lord Sumption (Lord Hodge concurring; Lord Mance, Lord Neuberger and Lord Clarke dubitante pending further argument if and when the issue arose). When directors acted for multiple concurrent purposes, all of which were influential in different degrees but some were proper and others not, the better test of whether the directors' decision ought to be set aside was not what was the principal or primary purpose for which directors made the decision or exercised their power but whether the improper purpose was causative in the sense that but for its presence the decision would not have been made (see [14]–[24], below).

Decision of the Court of Appeal *[2014] 4 All ER 463* reversed.

**Notes** For company notice requiring information about interests in shares, see 14 *Halsbury's Laws* (5th edn) (2016) para 453.

For the *Companies Act 2006, ss 793*, *794*, see 8 *Halsbury's Statutes* (4th edn) (2014 reissue) 1339.

**Cases referred to** *Aleyn v Belchier* (1758) 1 Eden 132, 28 ER 634.

*Anglo-Universal Bank v Baragnon* (1881) 45 LT 362, CA.

*Balls v Strutt* (1841) 1 Hare 146, 66 ER 984, V-C.

*Birley v Birley* (1858) 25 Beav 299, 53 ER 651, Rolls Ct.

*Cannon v Trask* (1875) LR 20 Eq 669, V-C.

*Fraser v Whalley* (1864) 2 H & M 10, 71 ER 361, V-C.

*Hindle v John Cotton Ltd* 1919 56 SLR 625, HL.

*Hogg v Cramphorn Ltd* *[1966] 3 All ER 420*, [1967] 1 Ch 254, [1966] 3 WLR 995.

*Howard Smith Ltd v Ampol Petroleum Ltd* *[1974] 1 All ER 1126*, [1974] AC 821, [1974] 2 WLR 689, PC.

*Lane v Page* (1754) Amb 233, 27 ER 155, LC.

*Mills v Mills* (1938) 60 CLR 150, Aus HC.

*Portland (Duke of) v Topham* (1864) 11 HL Cas 32, 11 ER 1242, [1861–73] All ER Rep 980, HL.

*Pryor v Pryor* (1864) 2 De GJ & Sm 205, 46 ER 353, [1861–73] All ER Rep 616, CA.

*R (on the application of FDA) v Secretary of State for Work and Pensions* [2012] EWCA Civ 332, [2012] 3 All ER 301, [2013] 1 WLR 444.

*R (Smith) v North East Derbyshire Primary Care Trust* [2006] EWCA Civ 1291, [2006] 1 WLR 3315.

*Ricardo Group plc, Re* [1989] BCLC 566.

*Roadchef (Employee Benefits Trustees) Ltd v Hill* [2014] EWHC 109 (Ch), [2014] All ER (D) 04 (Feb).

*TR Technology Investment Trust plc, Re* [1988] BCLC 256.

*Turner's Settled Estates, Re* (1884) 28 Ch D 205, 54 LJ Ch 690, CA.

*Vatcher v Paull* [1915] AC 372, [1914–15] All ER Rep 609, PC.

*Whitehouse v Carlton Hotel Pty Ltd* (1987) 162 CLR 285, (1987) 70 ALR 251, Aus HC.

[*644]

**Appeal**The respondents, Eclairs Group Ltd ('EG Ltd') and Glengary Overseas Ltd ('GO Ltd'), appealed from the decision of the Court of Appeal (Longmore LJ and Sir Robin Jacob; Briggs LJ dissenting) (*[2014] EWCA Civ 640*, [2014] 4 All ER 463) delivered on 13 May 2014 allowing the appeal of the claimant, JKX Oil & Gas plc, against orders of Mann J made on 1 October 2013 further to his judgment of 30 August 2013 (*[2013] EWHC 2631 (Ch)*, [2014] 1 BCLC 202) by which he ruled that restrictions imposed by the directors of JKX, pursuant to *Pt 22* of the Companies Act 2006 and the company's articles of association, on the voting and transfer of shares in which Eclairs and Glengary were beneficially interested, were invalid because the directors acted with an improper purpose. The facts are set out in the judgment of Lord Sumption.

*David Mabb QC* and *Nigel Dougherty* (instructed by *Freshfields Bruckhaus Deringer LLP*) for Eclairs Group Ltd.

*Andreas Gledhill QC* and *Paul Sinclair* (instructed by *Locke Lord (UK) LLP*) for Glengary Overseas Ltd.

*Michael Swainston QC* and *Tony Singla* (instructed by *Allen and Overy LLP*) for JKX Oil & Gas plc.

*Judgment was reserved.*

2 December 2015. The following judgments were delivered.

**LORD SUMPTION**
(Lord Hodge concurring).
**Introduction[1]** This appeal is about an alleged 'corporate raid'. According to the judgment of Mann J *[2013] EWHC 2631 (Ch)*, [2014] 1 BCLC 202 (at [224]), this expression is a 'loose, convenient and pejorative shorthand' which can be applied to a variety of situations, but in this case means an attempt to exploit a minority shareholding in a company to obtain effective management or voting control without paying what other shareholders would regard as a proper price. I shall use the expression in that sense in spite of its pejorative overtones, but only because it is convenient.
**[2]** One of the tools available to a public company seeking to resist the covert acquisition of control by raiders is a statutory disclosure notice calling for information about persons interested in its shares. There are statutory provisions empowering the court to restrict the exercise of rights attaching to shares if those interested in them fail to comply with a disclosure notice. But it is common for the articles of a public company to empower the board to impose such restrictions. The questions at issue on this appeal affect companies which have adopted powers of this kind in their articles. They are, in bald summary, what are the proper purposes for which the board may restrict the exercise of rights attaching to shares, and in what circumstances can the restrictions be challenged on the ground that they were imposed for a collateral purpose?
**[3]** JKX Oil & Gas plc is an English company listed on the London Stock Exchange. It is the parent company of a group whose business consists in the development and exploitation of oil and gas reserves, primarily in Russia and the Ukraine. For reasons which are disputed, and for present purposes irrelevant, the company has not prospered of late. Its difficulties have been

[*645]

reflected in its share price which has fallen to historically low levels. In 2013 the directors of JKX perceived that it had become the target of a raid by two companies, Eclairs and Glengary, both incorporated in the British Virgin Islands. Eclairs is a company controlled by trusts associated with Mr Igor Kolomoisky and Mr Gennadiy Bogolyubov. Mr Kolomoisky is a prominent Ukrainian businessman and politician and Mr Bogolyubov is his business associate. Eclairs beneficially owns some 47m shares amounting to 27.55% of the issued share capital of JKX. Glengary is a company controlled by Mr Alexander Zhukov in which his right-hand man Mr Ratskevych also has a small holding. The company

beneficially owns 19m shares amounting to 11.45% of the issued share capital of JKX. The judge found that Mr Kolomoisky and Mr Bogolyubov had a reputation as corporate raiders. Rather less is known about Mr Zhukov, but the directors of JKX believed him to have had business dealings with Mr Kolomoisky in the past.

[4] Between 2010 and 2012 JKX was trying to raise capital. It encountered some difficulty in raising it from banks and other financial institutions, partly because of the risks associated with investment in the Ukraine, and partly because Mr Kolomoisky's substantial stake in the company proved to be a deterrent. A number of proposals were made for raising capital by the issue and allotment of new shares, but these failed because Mr Kolomoisky opposed them. They would have required shareholders' special resolutions, and Eclairs' holding constituted a blocking minority. On 7 March 2013 Eclairs wrote to JKX calling upon it to convene an extraordinary general meeting to consider ordinary resolutions for the removal of the chief executive, Dr Davies, and the commercial director, Mr Dixon, from the board, and the appointment of three new directors. Enquiries suggested that this move had been concerted between Mr Kolomoisky and Mr Zhukov, and that the proposed new directors were associates of theirs. Newspapers in the Ukraine reported that Mr Kolomoisky was trying to take control of JKX's principal Ukrainian subsidiary.

[5] The company received Eclairs' request on 15 March 2013. Its response was to issue five disclosure notices between 20 and 26 March. On the Eclairs side, they were addressed to Eclairs and Mr Bogolyubov, and on the Glengary side to Glengarry, Mr Zhukov and Mr Ratskevych. On 13 May 2013 further disclosure notices were issued to the same addressees as the March notices plus, on the Eclairs side, Mr Kolomoisky. The notices requested information about the number of shares held, their beneficial ownership and any agreements or arrangements between the various persons interested in them. The responses, which were received promptly, admitted the existence of interests in JKX shares, but denied that the addressees were party to any agreement or arrangement among themselves.

[6] On 23 April 2013 the company convened an AGM for 5 June 2013. The business included the re-election of Dr Davies, the approval of the directors' remuneration report and three resolutions empowering the board to allot shares for cash, to disapply statutory pre-emption rights upon the allotment of shares, and to make market purchases of the company's shares. On 23 May 2013 Eclairs published an advertisement in the *Financial Times* and an open letter to shareholders. In these documents, shareholders were invited to oppose the above five proposed resolutions. Since the resolutions to authorise market purchases and to disapply pre-emption rights required a special resolution, this meant that as matters stood they were certain to fail. The other resolutions

[*646]

required only an ordinary resolution but would be difficult to get through in the face of opposition from two blocks together controlling 39% of the company.

[7] The responses to the second batch of disclosure notices were received on 27 and 28 May 2013. On 30 May a board meeting was held. One director (Mr Miller) was absent, but had given instructions to the chairman as to how he wished to vote, and two others (Dr Davies and Mr Dixon) recused themselves and took no part in the proceedings. The remaining directors considered that the responses to the notices were inadequate because they believed that there were agreements or arrangements between the addressees which they had not disclosed. They resolved to issue restriction notices under powers conferred on the board by the company's articles on the 47m shares in which Eclairs was interested and the 19m shares in which Glengary was interested. The effect of the restriction notices was to suspend the right to vote at general meetings attaching to these shares and to restrict the right of transfer.

[8] On 4 June 2013, the day before the AGM, Eclairs and Glengary began separate proceedings in the Chancery Division challenging the restriction notices. A number of grounds were advanced, most of which were rejected by Mann J and have now fallen away. The one ground which subsists and is now before this court is that the board acted for a collateral, and therefore improper, purpose. It was contended that the only proper purpose for which the power could be exercised was to extract the information, and that the real purpose of the board had been to ensure that the resolutions at the forthcoming AGM would be passed. In the event, the company gave undertakings to David Richards J on the day that the proceedings were commenced, the effect of which was to allow the votes attaching to the 47m and 19m shares to be cast on the resolutions without prejudice to their validity.

**Disclosure notices[9]** The power to issue a statutory disclosure notice originates in s 27 of the Companies Act 1976. That provision was subsequently replaced by s 74 of the Companies Act 1981, and then by s 212 of the 1985 Act. It is now contained in *s 793* of the Companies Act 2006 ('the 2006 Act'). Section 793 empowers a public company to issue a disclosure notice to any person whom it knows or reasonably believes to be interested in its shares. The notice may require that person to disclose (among other things) whether or not it is interested in shares, the nature of that interest if there is one, and whether any persons interested are party to any agreement for the acquisition of interests in shares or the exercise of any rights conferred by the holding of shares. Sections 820–825 of the 2006 Act contain very broadly framed provisions for determining when a person is to be regarded as interested in shares for these purposes. It extends to any legal or equitable interest, or any right to exercise or control the exercise

of any right attaching to shares, or any such right or interest vested in a company under a person's control or in specified categories of close relative, or any control or influence arising from an agreement for the acquisition of shares.

**[10]** Under the statute, the failure of a person interested in shares to comply with a disclosure notice may result in the restriction of the rights conferred by those shares. Section 794(1) provides:

*[\*647]*

'**794 Notice requiring information: order imposing restrictions on shares**
Where—
(a) a notice under section 793 (notice requiring information about interests in company's shares) is served by a company on a person who is or was interested in shares in the company, and
(b) that person fails to give the company the information required by the notice within the time specified in it,
the company may apply to the court for an order directing that the shares in question be subject to restrictions.
For the effect of such an order see section 797.'

Section 797 identifies the restrictions as being that any transfer of the shares is void, no voting rights are exercisable, no further shares may be issued in right of the shares or pursuant to an offer made to their holder, and except in a liquidation no payment of capital or income may be made on the shares.

**[11]** In the case of JKX, corresponding powers were conferred on the board by art 42, which empowered the board to issue a 'restriction notice' whenever a statutory disclosure notice had been issued under s 793 and had not been complied with. It provided (so far as relevant):

'(2) Notwithstanding anything in these articles to the contrary, if (a) a disclosure notice has been served on a member or any other person appearing to be interested in the specified shares, and (b) the Company has not received (in accordance with the terms of such disclosure notice) the information required therein in respect of any of the specified shares within 14 days after the service of such disclosure notice, then the board may (subject to paragraph 7 below) determine that the member holding the specified shares shall, upon the issue of a restriction notice referring to those specified shares in respect of which information has not been received, be subject to the restrictions referred to in such restriction notice, and upon the issue of such restriction notice such member shall be so subject. As soon as practicable after the issue of a restriction notice the Company shall serve a copy of the notice on the member holding the specified shares.
(3) The restrictions which the board may determine shall apply to restricted shares pursuant to this article shall be one or more, as determined by the board, of the following:
(a) that the member holding the restricted shares shall not be entitled, in respect of the restricted shares, to

attend or be counted in the quorum or vote either personally or by proxy at any general meeting or at any separate meeting of the holders of any class of shares or upon any poll or to exercise any other right or privilege in relation to any general meeting or any meeting of the holders of any class of shares,
(b) that no transfer of the restricted shares shall be effective or shall be registered by the Company,
(c) that no dividend (or other moneys payable) shall be paid in respect of the restricted shares and that, in circumstances where an offer of the right to elect to receive shares instead of cash in respect of any dividend is or has been made, any election made thereunder in respect of such specified shares shall not be effective.
(4) The board may determine that one or more of the restrictions imposed on restricted shares shall cease to apply at any time. If the

*[\*648]*

Company receives in accordance with the terms of the relevant disclosure notice the information required therein in respect of the restricted shares all restrictions imposed on the restricted shares shall cease to apply seven days after receipt of the information …'

**[12]** Article 42 differs in a number of respects from ss 794–800 of the 2006 Act, notably in vesting the power to impose restrictions on the board instead of the court. It also contains a definition section which specifies the circumstances in which the board is entitled to treat a response to the notice as non-compliant. Article 42(1)(j) provides:

'(j) for the purposes of paragraphs (2)(b) and (4) of this article the Company shall not be treated as having received the information required by the disclosure notice in accordance with the terms of such disclosure notice in circumstances where the board knows or has reasonable cause to believe that the information provided is false or materially incorrect.'

**[13]** These were the powers which the board of JKX purported to exercise at their meeting on 30 May 2013 and which are now challenged.

**The proper purpose rule[14]** Part 10, Chap 2 of the 2006 Act codified for the first time the general duties of directors. The proper purpose rule is stated in s 171(b) of the 2006 Act, which provides that a director of a company must 'only exercise powers for the purposes for which they are conferred'. The rule thus stated substantially corresponds to the equitable rule which had for many years been applied to the exercise of discretionary powers by trustees. 'It is a principle in this court', Sir James Wigram V-C had observed in *Balls v Strutt* (1841) 1 Hare 146, 'that a trustee shall not be permitted to use the powers which the trust may confer upon him at law, except for the legitimate purposes of the trust.' Like other general duties laid down in the 2006 Act, this one was declared to be 'based on certain common law rules and equitable principles as they

apply in relation to directors and have effect in place of those rules and principles as regards the duties owed to a company by a director': s 170(3). Section 170(4) accordingly provides that the general duties are to be 'interpreted and applied in the same way as common law rules or equitable principles, and regard shall be had to the corresponding rules and equitable principles in interpreting and applying the general duties'.

[15] The proper purpose rule has its origin in the equitable doctrine which is known, rather inappropriately, as the doctrine of 'fraud on a power'. For a number of purposes, the early Court of Chancery attached the consequences of fraud to acts which were honest and unexceptionable at common law but unconscionable according to equitable principles. In particular, it set aside dispositions under powers conferred by trust deeds if, although within the language conferring the power, they were outside the purpose for which it was conferred. So far as the reported cases show, the doctrine dates back to *Lane v Page* (1754) Amb 233, and *Aleyn v Belchier* (1758) 1 Eden 132 at 138, but it was clearly already familiar to equity lawyers by the time that those cases were decided. In *Aleyn's* case, Lord Northington could say in the emphatic way of 18th century judges that 'no point was better established'. In *Duke of Portland v Topham* (1864) 11 HL Cas 32 at 54 Lord Westbury LC stated the rule in these terms:

[*649]

'that the donee, the appointor under the power, shall, at the time of the exercise of that power, and for any purpose for which it is used, act with good faith and sincerity, and with an entire and single view to the real purpose and object of the power, and not for the purpose of accomplishing or carrying into effect any bye or sinister object (I mean sinister in the sense of its being beyond the purpose and intent of the power) which he may desire to effect in the exercise of the power.'

The principle has nothing to do with fraud. As Lord Parker of Waddington observed in delivering the advice of the Privy Council in *Vatcher v Paull [1915] AC 372 at 378*, it—

'does not necessarily denote any conduct on the part of the appointor amounting to fraud in the common law meaning of the term or any conduct which could be properly termed dishonest or immoral. It merely means that the power has been exercised for a purpose, or with an intention, beyond the scope of or not justified by the instrument creating the power.'

The important point for present purposes is that the proper purpose rule is not concerned with excess of power by doing an act which is beyond the scope of the instrument creating it as a matter of construction or implication. It is concerned with abuse of power, by doing acts which are within its scope but done for an improper reason. It follows that the test is necessarily subjective. 'Where the question is one of abuse of powers,' said Viscount Finlay in *Hindle v John Cotton Ltd* 1919 56 SLR 625 at 630, 'the state of mind of those who acted, and the motive on which they acted, are all important'.

[16] A company director differs from an express trustee in having no title to the company's assets. But he is unquestionably a fiduciary and has always been treated as a trustee for the company of his powers. Their exercise is limited to the purpose for which they were conferred. One of the commonest applications of the principle in company law is to prevent the use of the directors' powers for the purpose of influencing the outcome of a general meeting. This is not only an abuse of a power for a collateral purpose. It also offends the constitutional distribution of powers between the different organs of the company, because it involves the use of the board's powers to control or influence a decision which the company's constitution assigns to the general body of shareholders. Thus in *Fraser v Whalley* (1864) 2 H & M 10 the directors of a statutory railway company were restrained from exercising a power to issue shares for the purpose of defeating a shareholders' resolution for their removal. In *Cannon v Trask* (1875) LR 20 Eq 669, which concerned the directors' powers to fix a time for the general meeting, Sir James Bacon V-C held that it was improper to fix a general meeting at a time when hostile shareholders were known to be unable to attend. In *Anglo-Universal Bank v Baragnon* (1881) 45 LT 362 Sir George Jessel MR held that if it had been proved that the power to make calls was being exercised for the purpose of disqualifying hostile shareholders at a general meeting, that would be an improper exercise of the directors' powers. In *Hogg v Cramphorn Ltd [1966] 3 All ER 420*, [1967] 1 Ch 254 Buckley J held that the directors' powers to issue shares could not properly be exercised for the purpose of defeating an unwelcome takeover bid, even if the board was genuinely convinced, as the current management of a company commonly is, that the continuance of its own stewardship was in the company's interest. The company's interest was an additional and not an alternative test for the propriety of a board resolution.

[*650]

[17] In all of these cases, either there was no dispute about the directors' purpose or else the only purpose which could plausibly be ascribed to them was an improper one. But what if there are multiple purposes, all influential in different degrees but some proper and others not? An analogy with public law might suggest that a decision which has been materially influenced by a legally irrelevant consideration should generally be set aside, even if legally relevant considerations were more significant: *R (on the application of FDA) v Secretary of State for Work and Pensions [2012] EWCA Civ 332, [2012] 3 All ER 301*, [2013] 1 WLR 444 (at [67]–[69]) per

Lord Neuberger MR. In some contexts, such as rescission for deceit or breach of the rules relating to self-dealing, equity is at least as exacting. But the proper purpose rule, at any rate as applied in company law, has developed in a different direction. Save perhaps in cases where the decision was influenced by dishonest considerations or by the personal interest of the decision-maker, the directors' decision will be set aside only if the primary or dominant purpose for which it was made was improper. To some extent this is a pragmatic response to the range of a director's functions and the conflicts which are sometimes inseparable from his position. The main reason, however, is a principled concern of courts of equity not just to uphold the integrity of the decision-making process, but to limit its intervention in the conduct of a company's affairs to cases in which an injustice has resulted from the directors' having taken irrelevant considerations into account.

[18] In his seminal judgment in the High Court of Australia in *Mills v Mills* (1938) 60 CLR 150 at 185–186, Dixon J pointed out the difficulties associated with too rigorous an application of the public law test to the decisions of directors:

> 'it may be thought that a question arises whether there must be an entire exclusion of all reasons, motives or aims on the part of the directors, and all of them, which are not relevant to the purpose of a particular power. When the law makes the object, view or purpose of a man, or of a body of men, the test of the validity of their acts, it necessarily opens up the possibility of an almost infinite analysis of the fears and desires, proximate and remote, which, in truth, form the compound motives usually animating human conduct. But logically possible as such an analysis may seem, it would be impracticable to adopt it as a means of determining the validity of the resolutions arrived at by a body of directors, resolutions which otherwise are ostensibly within their powers. The application of the general equitable principle to the acts of directors managing the affairs of a company cannot be as nice as it is in the case of a trustee exercising a special power of appointment. It must, as it seems to me, take the substantial object the accomplishment of which formed the real ground of the board's action. If this is within the scope of the power, then the power has been validly exercised.'

[19] Once one accepts the need to compare the relative significance of different considerations which influenced the directors, the question inevitably arises what is the 'primary' or 'dominant' purpose, and how is it to be identified. One possibility is that it is the 'weightiest' purpose, ie the one about which the directors felt most strongly. The other is that it is the purpose which caused the decision to be made as it was. Of course, the two things are connected. The ordinary inference is that the 'weightiest' purpose (in this sense) will also have been causative, and that minor purposes will not have

been. In most cases the two tests will in practice lead to the same result. But that will not always be so and, as will be seen, it is not necessarily the case here.

[20] The first test seems to me to be difficult to justify, for reasons of both practicality and principle. The practical difficulty was pointed out by Dixon J in the passage which I have quoted. It would involve a forensic enquiry into the relative intensity of the directors' feelings about the various considerations that influenced them. A director may have been influenced by a number of factors, but if they all point in the same direction he will have had no reason at the time to arrange them in order of importance. The attempt to do so later in the course of the dispute is likely to be both artificial and defensive. Moreover, a realistic appreciation of the directors' position will show that it is liable to lead to the wrong answer. Directors of companies cannot be expected to maintain an unworldly ignorance of the consequences of their acts or a lofty indifference to their implications. A director may be perfectly conscious of the collateral advantages of the course of action that he proposes, while appreciating that they are not legitimate reasons for adopting it. He may even enthusiastically welcome them. It does not follow without more that the pursuit of those advantages was his purpose in supporting the decision. All of these problems are aggravated where there are several directors, each with his own point of view.

[21] The fundamental point, however, is one of principle. The statutory duty of the directors is to exercise their powers 'only' for the purposes for which they are conferred. That duty is broken if they allow themselves to be influence by *any* improper purpose. If equity nevertheless allows the decision to stand in some cases, it is not because it condones a minor improper purpose where it would condemn a major one. It is because the law distinguishes between some consequences of a breach of duty and others. The only rational basis for such a distinction is that some improprieties may not have resulted in an injustice to the interests which equity seeks to protect. Here, we are necessarily in the realm of causation. The question is which considerations led the directors to act as they did. In *Hindle v John Cotton Ltd* 1919 56 SLR 625 at 631 Lord Shaw referred to the 'moving cause' of the decision, a phrase taken up by Latham CJ in *Mills v Mills* (1938) 60 CLR 150 at 165. But this cryptic formula does not help much in a case where the board was concurrently moved by multiple causes, some proper and some improper. One has to focus on the improper purpose and ask whether the decision would have been made if the directors had not been moved by it. If the answer is that without the improper purpose(s) the decision impugned would never have been made, then it would be irrational to allow it to stand simply because the directors had other, proper considerations in mind

as well, to which perhaps they attached greater importance. This was the point made by Dixon J in the passage immediately following the one which I have cited from his judgment in *Mills v Mills*:

'But if, except for some ulterior and illegitimate object, the power would not have been exercised, that which has been attempted as an ostensible exercise of the power will be void, notwithstanding that the directors may incidentally bring about a result which is within the purpose of the power and which they consider desirable.'

Correspondingly, if there were proper reasons for exercising the power and it would still have been exercised for those reasons even in the absence of improper ones, it is difficult to see why justice should require the decision to be set aside.

*[\*652]*

[22] Dixon J's formulation has proved influential in the courts of Australia. As the majority (Mason, Deane and Dawson JJ) pointed out in the High Court of Australia in *Whitehouse v Carlton Hotel Pty Ltd* (1987) 162 CLR 285 at 294, (1987) 70 ALR 251 at 257:

'As a matter of logic and principle, the preferable view would seem to be that, regardless of whether the impermissible purpose was the dominant one or but one of a number of significantly contributing causes, the allotment will be invalidated if the impermissible purpose was causative in the sense that, but for its presence, "the power would not have been exercised" …'

I think that this is right. It is consistent with the rationale of the proper purpose rule. It also corresponds to the view which courts of equity have always taken about the exercise of powers of appointment by trustees: see *Birley v Birley* (1858) 25 Beav 299 at 307 (Sir John Romilly MR), *Pryor v Pryor* (1864) 2 De GJ & Sm 205 at 210 (Knight Bruce LJ), *Re Turner's Settled Estates* (1884) 28 Ch D 205 at 217, 219, *Roadchef* (*Employee Benefits Trustees*) *Ltd v Hill [2014] EWHC 109 (Ch), [2014] All ER (D) 04 (Feb)* (at [130]), and generally *Thomas on Powers* (2nd edn, 2012), paras 9.85–9.89.

[23] The leading modern case is *Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126*, [1974] AC 821, a decision of the Privy Council on appeal from New South Wales, which proceeded on the basis that the law was the same in England and in New South Wales. It was another case of a board decision to issue and allot new shares against the background of a takeover bid, although rather unusually it was the directors who wanted the bid to succeed over the opposition of two existing shareholders who together held a majority of the shares. Delivering the advice of the Privy Council, Lord Wilberforce observed (*[1974] 1 All ER 1126 at 1132*–1133, [1974] AC 821 at 834):

'The directors, in deciding to issue shares, forming part of Millers' unissued capital, to Howard Smith acted under cl 8 of the company's articles of association. This provides, subject to certain qualifications which have not been invoked, that the shares shall be under the control of the

directors, who may allot or otherwise dispose of the same to such persons on such terms and conditions and either at a premium or otherwise and at such time as the directors may think fit. Thus, and this is not disputed, the issue was clearly intra vires the directors. But, intra vires though the issue may have been, the directors' power under this article is a fiduciary power: and it remains the case that an exercise of such a power though formally valid, may be attacked on the ground that it was not exercised for the purpose for which it was granted.'

[24] The main interest of the decision for present purposes lies in the fact that it was a case of multiple concurrent purposes. The company was genuinely in need of fresh capital, and the directors had received legal advice that this was the only ground on which they could properly authorise an issue of shares. The number of shares to be issued and the amount of the subscription had been carefully calculated to match the company's capital requirements. After a trial lasting 28 days in which the four directors supporting the share issue gave evidence, Street J had found that the company's need for capital, although urgent, was not yet critical and that its normal practice had been to meet its capital requirements by borrowing rather than issuing shares. For this reason he rejected the evidence of the four directors

*[\*653]*

that their sole purpose was to meet the company's shortage of capital and found that their primary purpose was in fact to dilute the shareholdings of those who opposed the bid. Lord Wilberforce adopted the primary purpose test which had been applied by the judge and affirmed his decision (*[1974] 1 All ER 1126 at 1131*–1132, [1974] AC 821 at 832):

'when a dispute arises whether directors of a company made a particular decision for one purpose or for another, or whether, there being more than one purpose, one or another purpose was the substantial or primary purpose, the court, in their Lordships' opinion, is entitled to look at the situation objectively in order to estimate how critical or pressing, or substantial or, per contra, insubstantial an alleged requirement may have been. If it finds that a particular requirement, though real, was not urgent, or critical, at the relevant time, it may have reason to doubt, or discount, the assertions of individuals that they acted solely in order to deal with it, particularly when the action they took was unusual or even extreme.'

Lord Wilberforce did not express the point in terms of causation, but it is I think clear that by the 'substantial or primary purpose', he meant the purpose which accounted for the board's decision. He approved the judge's adoption of Dixon J's test (*[1974] 1 All ER 1126 at 1131*, [1974] AC 821 at 831–832), and went on to adopt an analysis of the facts based on that test. Although the directors were influenced by the company's need for capital, the decisive factor in *Howard Smith Ltd v Ampol Petroleum Ltd* was that but

for their desire to convert the majority shareholders into a minority, the directors would not have sought to raise capital by means of a share issue, nor at that point of time.

**The judgment of Mann J[25]** In Mann J's view, the only purpose for which the power to impose restrictions was conferred by art 42 was to 'provide a sanction or an incentive to remedy the default' (*[2014] 1 BCLC 202 at [206]*). In a meticulous judgment he went on to make the following findings of fact (at [168]–[179] and [183]–[200]).

(1) He expressed no view of his own on the merits of the dispute between the company and Messrs Kolomoisky and Bogolyubov and their associates. But he found that the board had reasonable cause to believe (whether or not it was right) that they were parties to an agreement or arrangement relating to shares in JKX with a view to carrying out a raid on the company. The board believed that the objective of the raiders was to depress the value of the shares so as to enable them to buy other shares more cheaply and eventually to take control of the company's Ukrainian subsidiary. They regarded the removal of Dr Davies and Mr Dixon and their replacement by inexperienced associates of the raiders as part of that plan. They therefore had reasonable cause to believe that the answers to the disclosure notices had been false.

(2) Of the seven directors who took part in the decision, six gave evidence and were cross-examined. The seventh was not cross-examined in relation to purpose for want of time, and no point was taken on that. Of the six, one was found to have had the primary purpose of extracting the information from the addressees of the disclosure notices. Another took a 'balanced' view which attached substantially the same importance to

[*654]

extracting the information and preventing the raiders from voting against the resolutions at the AGM. The judge summarised the motives of the other four as follows (at [189]):

'While they may (and in all probability actually did) appreciate that the restrictions would have to be lifted if the information was provided, they did not regard the ability to impose restrictions as being one designed to protect the company pending the provision of information;

they regarded it as one which they could use, and did actually use, to get an advantage (the opportunity to pass the resolutions) for its own sake, not linked to the extraction of information. Putting the matter another way, they did not regard the opportunity to get special resolutions passed which would otherwise not be passed (and the increased chance of getting the ordinary ones passed too) as an incidental benefit of imposing restrictions as an incentive to provide information; they elevated it in their minds, and in their purposes, to something with its own independent merit as a way of doing down the "raiders" for the benefit of the shareholders.'

(3) The judge concluded (at [200]):

'The differences between relevant states of mind can be quite subtle in this situation, but I find that the evidence demonstrates that the following purposes, beliefs and states of mind existed among the voting directors:
(a) They all knew that the purpose of the notices was to get information.
(b) They all appreciated that the effect of restrictions would be (unless the information was provided before the AGM) that Eclairs/Glengary would be prevented from voting, with the effect that all the resolutions would be likely to be passed, or that there was a very enhanced prospect of that happening.
(c) They all saw that as operating for the benefit of the company as a whole, and as hindering the cause of the "raiders".
(d) The majority of the voting directors (Mrs Dubin, Mr Moore, Mr Miller and Lord Oxford) saw that as a sort of standalone proper and useful objective, and achieving it was a substantial purpose of voting for the restrictions, separate from the need to have information. Those directors did not have in mind the protection of the company pending the provision of the information; they had in mind protecting the company full stop. The restrictions were thus a useful weapon to be used against the "raiders". The disenfranchisement of the "raiders" at the AGM was not just an incidental effect of the imposition of restrictions; it was the positively desired effect, seen as beneficial to the company in the long term.
(e) The bona fides of those directors, and the genuineness of their desire to benefit the company as a whole, was not challenged, and in my view cannot be challenged.'

(4) It followed that the primary purpose of the board in issuing the restriction notices was to influence or determine the fate of the resolutions before the AGM. The directors (at [227])—

[*655]

'took the opportunity of using the power to alter the potential votes at the forthcoming AGM in order to maximise the chances of the resolutions being passed in a manner which they thought was in the best interests of the company.'

> Since this was beyond the purpose for which the power to impose restrictions was conferred, he set aside the restriction notices and the board resolutions authorising them with effect from the time that they were made.

[26] In the course of final speeches, the judge raised with the parties the question whether the board would have reached the same decision even if they had not taken account of the impact of the restriction notices on the resolutions at the AGM. 'On the basis of what I heard, and the shape of the case before me', he said, he thought it 'likely, and to be frank virtually inevitable' that the board would have reached the same conclusion and imposed the same restrictions even if they had confined themselves to the proper purpose of inducing the addressees of the disclosure notices to comply with them and imposing sanctions for their failure to do so to date. He 'provisionally' concluded that on this alternative factual hypothesis the court would have had a discretion whether to set aside the board resolution and restriction notices, which it might have exercised in favour of the company. The alternative factual hypothesis had not, however, been pleaded or addressed by the relevant witnesses and had formed no part of the company's case. For this reason the judge, having raised the point, refused to allow the company to take it at that late stage. He put the position as follows (at [232]):

> 'on the evidence that I have heard, I find it very hard indeed to believe that the directors would have come to any different conclusion. I deal with this in a short section below in which I consider the facts. However, in circumstances in which the directors have not made such a case in their own evidence-in-chief (or in the pleadings of the company), it would, in the end, be a step too far to allow them to say my purpose was X, but if I had been told that that was an improper purpose and I had to consider a legitimate purpose Y, I would have arrived at the same decision. If that were to be their case then it should have been positively advanced at some stage during the hearing. Although on the evidence I heard I find it difficult to see that the directors would have come to a different decision, nonetheless I can see that the claimants might have wished to have advanced their case differently, perhaps devoting more attention to the earlier events leading up to the service of the notices and what happened, and what the thinking was, between then and the board meeting.'

The 'short section below' was paras [235]–[237]. In these paragraphs, the judge summarised what he would have found if he had allowed the company to advance

the alternative factual hypothesis and had been obliged to deal with it on the basis of the existing evidence. He appears to have done this in case there was an appeal against his refusal to allow the point to be taken. In the event, however, there was no appeal on that point.

**The judgments of the Court of Appeal[27]** The appeals were heard by Longmore and Briggs LJJ and Sir Robin Jacob (*[2014] EWCA Civ 640*, *[2014] 4 All ER 463*, *[2014] 2 BCLC 164*). There was no challenge to the judge's findings of fact. The appeal revolved entirely around their legal significance. By a majority, the court allowed the appeal.

[*656]

[28] The majority (Longmore LJ and Sir Robin Jacob at para [138]) considered that the proper purpose doctrine had 'no significant place in the operation of art 42 or Pt 22 of the 2006 Act'. They appear to have reached this conclusion for three overlapping reasons. The first was that restrictions arising from a shareholder's failure to comply with a disclosure notice did not reflect a 'unilateral' exercise of power by the board. By this they meant that the shareholder could avoid the restrictions by complying with the disclosure notice. 'Why should the law protect him when all he had to do was tell the truth?' (at [136]). Their second reason was that the restrictions on the voting and other rights attaching to the shares was the very thing that art 42 was designed to permit if the directors reasonably considered that the disclosure notices had not been complied with. So once the board had reached that conclusion, there was no further limitation on their power to issue a restriction notice. The majority's third reason was that no limitation on the proper purpose of a restriction notice was expressed, either in Pt 22 of the 2006 Act or in art 42 of JKX's articles. In their view there was no room for the implication of such a purpose, because in the nature of things the statutory disclosure procedure was most likely to be operated at a time of controversy in the company's affairs. They thought (at [141]), that the draftsman was unlikely to have intended a detailed enquiry into the minds of directors 'in what may often be a rapidly changing scene'; and (at [142]) that in a battle for control against predators who were 'up to something subversive but secret' the directors would naturally want to see them disenfranchised. In their view, the result of applying the proper purpose rule would be to emasculate the statutory scheme and the corresponding provisions of art 42. Underlying much of this reasoning was the view expressed in their peroration, that any other view 'would only be an encouragement to deceitful conduct and not something which English company law should countenance' (para [143]).

[29] In a formidable dissent, Briggs LJ set out the rationale for the proper purpose test and the authorities for its application to the exercise of discretionary powers by companies. He accepted the view of Mann J that the purpose of art 42 was to encourage or coerce the

provision of information which had been requested under s 793, with the rider that it was also to prevent the accrual of any unfair advantage to any person as a result of the failure to comply with such a request. Even with that limited expansion, on the judge's findings of fact the directors' decision to impose restrictions under art 42 was improper, and there were no satisfactory reasons why the rule should not be applied to the draconian powers conferred by art 42 of JKX's articles. He added (at [122]):

> 'Furthermore, I consider it important that the court should uphold the proper purpose principle in relation to the exercise of fiduciary powers by directors, all the more so where the power is capable of affecting, or interfering with, the constitutional balance between shareholders and directors, and between particular groups of shareholders. The temptation upon directors, anxious to protect their company from what they regard as the adverse consequences of a course of action proposed by shareholders, to interfere in that way, whether by the issue of shares to their supporters, or by disenfranchisement of their opponents' shares, may be very hard to resist, unless the consequences of improprieties of that kind are clearly laid down and adhered to by the court.'

[*657]

**The proper purpose of article 42[30]** The submission of Mr Swainston QC, who appeared for the company, was that where the purpose of a power was not expressed by the instrument creating it, there was no limitation on its exercise save such as could be implied on the principles which would justify the implication of a term. In particular, the implication would have to be necessary to its efficacy. In my view, this submission misunderstands the way in which purpose comes into questions of this kind. It is true that a company's articles are part of the contract of association, to which successive shareholders accede on becoming members of the company. I do not doubt that a term limiting the exercise of powers conferred on the directors to their proper purpose may sometimes be implied on the ordinary principles of the law of contract governing the implication of terms. But that is not the basis of the proper purpose rule. The rule is not a term of the contract and does not necessarily depend on any limitation on the scope of the power as a matter of construction. The proper purpose rule is a principle by which equity controls the exercise of a fiduciary's powers in respects which are not, or not necessarily, determined by the instrument. Ascertaining the purpose of a power where the instrument is silent depends on an inference from the mischief of the provision conferring it, which is itself deduced from its express terms, from an analysis of their effect, and from the court's understanding of the business context.

**[31]** The purpose of a power conferred by a company's articles is rarely expressed in the instrument itself. It

was not expressed in the instrument in any of the leading cases about the application of the proper purpose rule to the powers of directors which I have summarised. But it is usually obvious from its context and effect why a power has been conferred, and so it is with art 42. Article 42(2) authorises the issue of a restriction notice only in the event that a disclosure notice has been issued under s 793 of the 2006 Act and the company has received either no response or a response which it knows or has reasonable cause to believe is false or materially incorrect. Under art 42(4) in the event that the information is supplied after the restrictions have been imposed (ie that a response has been received which the directors have no reasonable cause to regard as wrong), they are automatically lifted seven days thereafter. Any dividends or other payments in respect of the shares which were withheld while the restrictions were in force will then become payable under art 42(6). As Millett J observed in *Re Ricardo Group plc* [1989] BCLC 566 at 572 about the corresponding power of the court to impose restrictions under what was then *s 216* and *Pt XV* of the Companies Act 1985, these restrictions—

> 'are granted as a sanction to compel the provision of information to which the company is entitled. It follows, in my judgment, that once the information is supplied, any further justification for the continuance of the sanction disappears.'

The inescapable inference is that the power to restrict the rights attaching to shares is wholly ancillary to the statutory power to call for information under s 793.

**[32]** It follows that I accept the view of Mann J that the purpose of art 42 is to provide a 'sanction or incentive' to remedy a failure to comply with the disclosure notice. But I would not limit it to inducing the defaulter to comply, any more than I believe Mann J to have done in this case or Millett J in the *Ricardo Group* case. Otherwise the board would be disabled from imposing restrictions in a case where the defiant obduracy of the defaulter made it

[*658]

obvious that the restrictions would not produce compliance. I would therefore identify the purpose in slightly different terms. In my view art 42 has three closely related purposes. The first is to induce the shareholder to comply with a disclosure notice. This is the purpose which Millett J and Mann J regarded the restrictions as serving, and it is the least that they can have been intended to achieve. Secondly, the article is intended to protect the company and its shareholders against having to make decisions about their respective interests in ignorance of relevant information. As Hoffmann J observed in *Re TR Technology Investment Trust plc* [1988] BCLC 256 at 276, 'the company, through its existing board, is given the unqualified right to insist that contests for the hearts and minds of shareholders are conducted with cards on the table.'

Thirdly, the restrictions have a punitive purpose. They are imposed as sanctions on account of the failure or refusal of the addressee of a disclosure notice to provide the information for as long as it persists, on the footing that a person interested in shares who has not complied with obligations attaching to that status should not be entitled to the benefits attaching to the shares. That is the natural inference from the range and character of restrictions envisaged in art 42(3), which affect not only the right to participate in the company's affairs by voting at general meetings, but the right to receive dividends. These three purposes are all directly related to the non-provision of information requisitioned by a disclosure notice. None of them extends to influencing the outcome of resolutions at a general meeting. That may well be a consequence of a restriction notice. But it is no part of its proper purpose. It is not itself a legitimate weapon of defence against a corporate raider, which the board is at liberty to take up independently of its interest in getting the information.

[33] Basing himself on the observation of Hoffmann J in *Re TR Technology Investment Trust plc*, Mr Swainston argued that the purpose of a restriction notice was related to the non-provision of the information in a broader sense. The argument was that for as long as the addressee of a disclosure notice failed to put his 'cards on the table', the directors were justified in treating the restrictions as a free-standing technique for frustrating the raiders' plans. In my view this extends the purpose of a restriction notice beyond its proper limits. It treats failure to comply with a disclosure notice as no more than a 'gateway' or condition precedent to the directors' right to impose and maintain the restrictions for any purpose which they bona fide conceived to be in the interests of the company, including securing their preferred outcome at the AGM. But as the judge put it (at para [206]), the 'non-provision of information is not to be taken as a justification for opening up a new front against the predator with the benefit of a new weapon.' Otherwise, directors would be entitled to impose restrictions in a case where they attached no importance to the information requisitioned in the disclosure notice. However difficult it may be to draw in practice, there is in principle a clear line between protecting the company and its shareholders against the consequences of non-provision of the information, and seeking to manipulate the fate of particular shareholders' resolutions or to alter the balance of forces at the company's general meetings. The latter are no part of the purpose of art 42. They are matters for the shareholders, not for the board.

[34] We were pressed with a number of arguments about the purpose of art 42 based on an analogy with Pt 22 of the 2006 Act. I did not find these arguments helpful. The two schemes are both directed at an assumed failure to comply with a statutory disclosure notice, and have a number of other points

[*659]

in common. But they differ in a number of respects, some of them significant. Arguments based on language which is to be found in the statute but not in the articles are unlikely to throw any light on the purpose of the latter.

**Does the proper purpose rule apply?[35]** At this stage, two preliminary observations are called for.

[36] The first is that the imposition of restrictions under art 42 is a serious interference with financial and constitutional rights which exist for the benefit of the shareholder and not the company. In the case of listed companies such as JKX a restriction notice is also an interference with the proper operation of the market in its shares, in which there is not only a private but a significant public interest. One would expect such a draconian power to be circumscribed by something more than the directors' duty to act in the company's interest as they may in good faith perceive it.

[37] The second preliminary observation concerns the role of the proper purpose rule in the governance of companies. The rule that the fiduciary powers of directors may be exercised only for the purposes for which they were conferred is one of the main means by which equity enforces the proper conduct of directors. It is also fundamental to the constitutional distinction between the respective domains of the board and the shareholders. These considerations are particularly important when the company is in play between competing groups seeking to control or influence its affairs. The majority of the Court of Appeal were right to identify this as the background against which disclosure notices are commonly issued. But they drew the opposite conclusion from the one which I would draw. They seem to have thought it unrealistic, indeed undesirable, against that background to expect directors to distinguish between the proper purpose of enforcing the disclosure notice and the improper purpose of defeating the ambitions of one group of shareholders. I find this surprising. The decision to impose restrictions under art 42 requires the directors to recognise the difference between the purpose of a decision and its incidental consequence. That certainly calls for care on their part and possibly for legal advice. But there is nothing particularly special in this context about a decision to issue a restriction notice under a provision such as art 42. The directors' task is no more difficult than it was in the many cases like *Howard Smith Ltd v Ampol Petroleum Ltd* in which other fiduciary powers, such as the power to issue shares, have been held improperly exercised because in the face of pressures arising from a battle for control the directors succumbed to the temptation to use their powers to favour their allies. I would agree with the majority of the Court of Appeal that in that situation the board would naturally wish to have the predators disenfranchised. That is precisely why it is important to confine them to the more

limited purpose for which their powers exist. Of all the situations in which directors may be called upon to exercise fiduciary powers with incidental implications for the balance of forces among shareholders, a battle for control of the company is probably the one in which the proper purpose rule has the most valuable part to play.

[38] I therefore approach with some scepticism the suggestion that in this of all contexts the proper purpose rule has no application. Of the three reasons given by the majority of the Court of Appeal, I have already dealt with their second reason, which was essentially a slightly repackaged version of Mr Swainston's 'gateway' argument, and with their third, which is that no limiting purpose can be implied in a case where the directors are likely to exercise their powers for the purpose of disenfranchising a predator. I reject

[*660]

both of them as contrary to principle. I would add that I am unimpressed by the suggestion that it is impractical to examine the state of mind of the directors in a rapidly changing situation such as a takeover bid or an attempted raid. The present proceedings were begun on the day before the AGM. The interests of both parties were sufficiently protected pending the decision by the orders made on the same day by David Richards J, and the dispute was heard by Mann J within seven weeks and decided within three months. In some cases, for example where a tight timetable is imposed under the City Code on Takeovers and Mergers, it may be necessary to accelerate the procedure even more drastically, but the judges of the Chancery Division are perfectly capable of responding to these exigencies as they arise.

[39] That brings me to the majority's first and, I think, main reason, which was that the power to impose restrictions under art 42 was not a 'unilateral' power. The addressees of the disclosure notices had only to answer the questions fully and truthfully to bring the restrictions to an end. I reject this also. The short and principled objection to it was given by Briggs LJ. The limitation of the power to its proper purpose derives from its fiduciary character. If its exercise would otherwise be an abuse, it cannot be an answer to say that the person against whom it is directed had only himself to blame. Moreover, the majority's proposition assumes that that person is the only one whose interests are adversely affected. But that is not right. Other shareholders who agreed with them would be deprived of their support. In *Anglo-Universal Bank v Baragnon* (1881) 45 LT 362 Sir George Jessel MR considered that the proper purpose rule would apply to a board decision to make calls on shareholders if the object was to prevent particular shareholders from voting at general meetings, although any shareholder could remove the disability by paying. There is no trace in this or any other authority of a distinction between unilateral and non-unilateral powers. Moreover, I reject the majority's premise. The problem

cannot always be resolved by unilaterally complying with the disclosure notice. Under a provision in the form of art 42 there may be a deemed non-compliance with a disclosure notice even in a case where the answers are prompt, complete and accurate. This is because the directors may reasonably though erroneously conclude that the answers are defective. This is not a fanciful hypothesis. The 'interest' in shares about which information may be sought under s 793 of the 2006 Act is very broadly defined. It will often be a highly debatable question whether it exists. An alleged omission to disclose a relevant agreement or arrangement between persons with a relevant interest may be just as debatable. An agreement sufficient to give rise to a concert party may be informal. An arrangement may be no more than a nod and a wink or a tacit understanding. Reasonableness in these circumstances is very much in the eye of the decision-maker. It will depend on what other facts or inferences are available to him. With the best will in the world, things may look very different on the other side of the partition. The weapon which the majority's analysis puts into the hands of the board is a blunderbuss whose shot is liable to injure the just and the unjust alike.

[40] That is part of the reason why I am unable to accept the majority's parting assertion (at para [143]) that the application of the proper purpose rule would be an 'encouragement to deceitful conduct' by predators with 'subversive but secret' projects. There is, however, a more fundamental objection to it, which is that it is incoherent once the operation of the rule is properly understood. If the 'deceit' consists simply in the secrecy, ie in the withholding or deemed withholding of the information, a decision to impose

[*661]

restrictions which is based simply on that fact will be entirely consistent with the proper purpose of the power. But secrecy is one thing, subversion another. If the real objection is to the subversion, it is nothing to do with the issue or enforcement of disclosure notices. Directors owe a duty of loyalty to the company, but shareholders owe no loyalty either to the company or its board. Within broad limits, derived for the most part from Pt 30 of the 2006 Act (Protection of Members against Unfair Prejudice) and the City Code on Takeovers and Mergers, they are entitled to exercise their rights in their own interest as they see it and to challenge the existing management for good reasons or bad.

**The present case[41]** What the judge's findings amount to is that although at the critical board meeting the majority genuinely wanted to receive the information which they had requisitioned, once they were satisfied that it had not been provided and turned to consider the issue of restriction notices, they were interested only in the effect that this would have on the outcome of the forthcoming general meeting. They 'did not have in mind the protection of the company pending the provision of

the information; they had in mind protecting the company full stop' (para [200](d)). In any case where concurrent purposes are being considered, they must have been actual purposes in the minds of the directors, not merely possible or hypothetical ones. If the only consideration which actually influenced the decision was an improper one, it is difficult to envisage any basis on which their decision could have been sustained.

**[42]** I have drawn attention earlier in this judgment to the relevance of causation in this field. The judge posed the question (at [228]) whether the notices could be 'saved' on the footing that although the directors' purpose was improper, they would have acted in the same way if the improper considerations had been ignored and they had applied their minds to proper ones. Suppose that the directors had decided to issue the restriction notices as a sanction for the non-provision of the information and to protect the company from the consequences of its non-disclosure pending its provision. Suppose that they also made the decision in order to secure the passing of the resolutions, but would have done the same thing even if that had never entered their minds. On that hypothesis, it would be difficult to regard the impact on the resolutions as a primary consideration. The want of the information would have been a sufficient justification of the restrictions and the resolutions would have been irrelevant, in fact no more than a welcome incidental consequence.

**[43]** That, however, was not the company's case. As summarised by the judge (at [181] and [207]–[208]), their case was that once the raiders had failed to provide the information, the power to make a restriction order could properly be exercised for the purpose of defeating their attempt to influence or control the company's affairs, provided that this was conceived in good faith to be in the company's interests. Indeed it could properly be exercised for the purpose of ensuring the passage of the resolutions at the general meeting in the face of their objections. There was no attempt to justify the decision on some narrower basis if these purposes were found to be improper. Forensic judgments of this kind are often required and they are not easy. This one was no doubt a realistic approach in the face of the facts. But for whatever reason, none of the parties focused on the possibility that the same decision might have been reached without reference to the desire to defeat the raiders, until the judge drew their attention to its possible relevance. By that time it was too late

*[\*662]*

to explore the point with the witnesses. In his judgment (at [235]–[237]), the judge summarised the findings of fact which he would have made if he had allowed the company to rely on the alternative hypothesis that the directors had disregarded their desire to defeat the raiders. He thought that they would have applied their

minds to the right point and made the same decision. But the judge did not allow the company to take the point and there has been no appeal against that refusal. Since his reason for refusing was that the claimants had not had a proper opportunity to challenge the alternative hypothesis in the course of the evidence, it seems to me that the judge's hypothetical alternative findings are not properly before this court.

**[44]** I would allow the appeal and restore the decision of Mann J.

**[45]** In the light of the observations of other members of the court, I should record that while we received no oral argument on the role of causation in identifying the relevant purpose(s) of a board decision, full and helpful written submissions on the point were delivered after the hearing, at the invitation of the court.

**LORD CLARKE**
(Lord Neuberger concurring).
**[46]** I initially intended simply to agree with Lord Sumption's judgment. Like Lord Mance (and Lord Neuberger), I agree with Lord Sumption that the appeal should be allowed for the reasons given in his paras [27]–[43]. I am inclined to agree with the other views expressed by Lord Sumption but there does seem to me to be force in Lord Mance's reservation that not all the points were the subject of full argument and consideration below. In these circumstances I would prefer to defer reaching a final conclusion on the other points identified by Lord Mance until they arise for decision and have been the subject of such argument.

**LORD MANCE**
(Lord Neuberger concurring).
**[47]** I gratefully adopt Lord Sumption's summary of the relevant facts in paras [1]–[13] and of the judgments of Mann J and the Court of Appeal *[2014] 4 All ER 463*, *[2014] 2 BCLC 164* (at [25]–[29]). I also agree with his reasons for allowing this appeal in paras [30]–[44].

**[48]** I have read with interest the discussion of the proper purpose rule in paras [14]–[24]. It accepts an analysis which was suggested in general terms by the judge at first instance, but which became immaterial in the light of his refusal to allow any point on causation to be raised. It was not in those circumstances advanced by any party during the oral hearing before the Supreme Court. The analysis was first revived by the Supreme Court in a draft judgment handed down, but then withdrawn before delivery in the light of the parties' representations.

**[49]** Thereafter, both appellants confirmed that they had argued the case before the Supreme Court on the basis that, if the proper purpose rule applied, the restriction notices fell to be set aside, since the judge had found the notices to have been issued for the principal purpose of improving the prospects of passing at the

forthcoming AGM two special resolutions to authorise market purchases and to disapply pre-emption rights as well as of passing three ordinary resolutions. Eclairs submitted that any issue as to whether a 'but for' test should be applied should in these circumstances await a case where it arose squarely. Eclairs and Glengary each supplied a copy of its submissions to the judge at the trial in 2013, which had suggested a two-pronged alternative analysis, according to which the notices would be set aside if a court concluded

[*663]

either that (a) the principal purpose was to ensure the passing of the resolutions, or (b) even if that was not the principal purpose, the notices would not have been issued but for the wish to ensure the passing of the resolutions. JKX on the other hand sought to use the Supreme Court's 'new development in the law' as a springboard to argue that the appeals should not be allowed and/or that there should be a further hearing on the issue of causation.

[50] I readily accept my part in agreeing to the original draft judgment. But I am now satisfied, having considered the authorities without the benefit of oral or written submissions other than those dating from 2013 submitted by Eclairs and Glengary, that we should not express any firm or concluded views on points which do not arise for decision on this appeal. I will summarise my reasons.

[51] First, it would be helpful to clarify the meaning of *s 171(b)* of the Companies Act 2006, providing that directors may use their powers 'only' for the purposes for which they were conferred. On the face of it this is clear. All purposes in mind must be legitimate. But *Buckley on the Companies Act* (15th edn, 2000, looseleaf edn) at 3 [869] suggests that it itself involves a primary purpose test, commenting:

'What if a power were used for mixed purposes, some good and some bad? According to the old law the exercise would be good if its primary purpose were proper. By virtue of *CA 2006, section 170(4)*, this law should inform the construction of *CA 2006, section 171(b)*. Thus, a director who has exercised powers for mixed purposes has still only exercised them primarily, if not exclusively, for the purposes for which they are conferred and this should be within *CA 2006, section 171(b)*. *CA 2006, section 171(b)* can be construed (as it should be), in accordance with *CA 2006, section 170(4)* to mean that a director must exercise his powers primarily (or substantially) only for the purposes for which they are conferred.'

[52] *Buckley* cites for the 'old law' *Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126*, [1974] AC 821. Lord Sumption (at paras [14] and [21]) treats s 171(b) as requiring a director's power to be used 'with an entire and single view to the real purpose and object of the power', assimilating a director's power in this respect with the exercise of discretionary powers by

trustees. But Dixon J in his judgment in *Mills v Mills* (1938) 60 CLR 150 at 185–186 (which Lord Sumption commends at para [18]), expressly noted that—

'The application of the general equitable principle to the acts of directors managing the affairs of a company cannot be as nice as it is in the case of a trustee exercising a special power of appointment. It must, as it seems to me, take the substantial object the accomplishment of which formed the real ground of the board's action. If this is within the scope of the power, then the power has been validly exercised.'

I would therefore wish to have submissions on the scope of the duty under s 171(b).

[53] Second, whatever the scope of the duty, I understand Lord Sumption's point that the granting of relief in the event of a breach of s 171(b) is a different matter. But here too I think it would both assist and be wise to hear submissions. I do not for my part think that the interpretation which Lord Sumption (in para [24]) puts on Lord Wilberforce's speech in *Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126*, [1974] AC 821is

[*664]

necessarily or clearly what Lord Wilberforce meant. Equally, the passage already quoted from Dixon J's judgment in *Mills v Mills* appears to me far from conclusive, while its later explanation in the High Court in *Whitehouse v Carlton Hotel Pty* (1987) 162 CLR 285 at 294, (1987) 70 ALR 251 at 257 (quoted by Lord Sumption at para [22]) is, at least arguably, consistent with 'but for' causation being viewed either as the only test or as affording an extended basis for the grant of relief, even where the principal purpose was legitimate, as Eclairs and Glengary submitted to the judge. In these circumstances, although I have sympathy with Lord Sumption's view that 'but for' causation offers a single, simple test, which it might be possible or even preferable to substitute for references to the principal or primary purpose, I am not persuaded that we can or should safely undertake what all parties consider would be 'a new development' of company law, without having heard argument.

[54] Third, Lord Sumption expresses the view (in para [20]) that identification of the principal or primary purpose for which directors exercised a power would 'involve a forensic enquiry into the relative intensity of the directors' feelings about the various considerations that influenced them', in relation to which directors' evidence would be 'likely to be both artificial and defensive'. To the extent that that is a difficulty, I cannot see that it exists any the less in relation to a test based on 'but for' causation. Human nature being what it is, that is just as likely to give rise to artificial and defensive attempts to justify what was done. If anything, I would have thought that the principal or primary purpose in mind would be likely to be easier to identify, since it is likely to be reflected in directors' exchanges before

and/or at the time of the decisions under examination, than the answer to a question whether they would have acted as they did without taking into account their main expressed purpose. They will have been less likely to have directed express attention to this: that is, unless well advised by their lawyers, in which case further caution might be necessary about accepting their assertions at face value.

**[55]** Fourth, if a 'but for' test were to be adopted, attention should I think be given to the standard to which the directors, on whom the onus would presumably lie, would have to show that they would have reached the same decision, even if they had not had the illegitimate purpose in mind. Would probability be enough? Or would the test be whether their decision would inevitably have been the same? See eg by analogy the public law test, as stated by May LJ in *R* (*Smith*) *v North East Derbyshire Primary Care Trust* [2006] 1 WLR 3315, and quoted by Lord Neuberger in *R* (*on the application of FDA*) *v Secretary of State for Work and Pensions [2012] EWCA Civ 332*, *[2012] 3 All ER 301*, [2013] 1 WLR 444(at [68]).

Appeal allowed.


Peter Hutchesson  Barrister (NZ).

_____

**End of Document**

# EXHIBIT 1-B

# *Hogg v Cramphorn Ltd and Others [1966] 3 All ER 420*

CHANCERY DIVISION

BUCKLEY J

8, 9, 10, 18 OCTOBER 1963

**Company — Shareholder — Minority shareholder — Representative action — Scheme to confer majority of votes at general meetings on directors and their supporters — Moves to withstand threatened take-over — Whether minority shareholder can validly bring representative action challenging vires of bona fide acts of directors ratifiable in general meeting.**

**Company — Ultra vires — Allotment of preference shares with special voting rights — Establishment of trust for employees — Loans to trustees to purchase preference shares — Moves by directors to withstand threatened take-over — Whether proper exercise of directors' fiduciary powers.**

The share capital of a company incorporated in 1896, carrying on business as corn and seed merchants and horticulturalists, consisted of ninety-six thousand £1 five per cent preference shares and forty thousand £1 ordinary shares; of these 90,293 preference shares and 35,888 ordinary shares had been issued. Each share carried one vote. By art 10 of the company's articles of association its shares were under the control of the directors, who might allot them as they thought fit. About thirty-seven thousand shares were held by the directors and their friends. A reserve of £34,000 was described in the company's balance sheet as "employees' benevolent and pension fund"; this sum, accumulated over years, was the absolute property of the company. In March, 1963, B proposed to the chairman and managing director that B should buy the whole of the issued preference shares at 25s each and the whole of the ordinary shares at 50s each. The take-over seemed to foreshadow a change in the nature of the company's trading, which the directors considered would be unsettling to the company's staff; the directors bona fide believed that the avoidance of acquisition of control by B would benefit the company. To meet the situation the company entered into a trust deed for the benefit of its

employees, and 5,707 preference shares, each carrying ten votes, were issued and allotted to trustees, who were the chairman, a partner in the company's auditors, and an employee of the company. The votes attached to these shares, taken with those of the thirty-seven thousand shares held by the directors and their friends, would amount to a majority of votes at a general meeting. The £5,707 required to pay for the preference shares was provided from the reserve as an interest-free loan to the trustees. Subsequently, in May, 1963, the directors advanced the rest of the reserve (£28,293) to the trustees to enable them to buy preference shares at 25s per share; this loan was not to bear interest. The board circularised shareholders with a view to the acquisition of preference shares by the trustees, explaining the position. The plaintiff, who held fifty ordinary shares in the company, issued writs, suing on behalf of himself and all other shareholders except three defendant shareholders, against the company and the three defendant shareholders, who were the trustees of the trust deed; by these writs the plaintiff claimed that the attachment of the special voting rights to the 5,707 preference shares and their allotment were ultra vires, and that the company's execution of the trust deed was ultra vires. Subsequently B's offer was formally made to the shareholders by circular; it was conditional on ninety per cent acceptance by each class of shareholders, but the condition was not satisfied and the offer lapsed. On the true construction of the articles of association[a] the court found that the directors had no power to attach the special voting rights to the 5,707 preference shares. On the question whether the allotment, etc was an improper use by the directors of their powers,

[a]  See p 426, letter *a*, post.

---

**Held** – (i)(a) it did not follow from the invalidity of the special voting rights attached to the 5,707 preference shares that the allotment of them

*[\*421]*

should be set aside, for the allottees were entitled to elect to retain their preference shares without the

---

special voting rights (see p 426, letter *b*, post).

(b) nevertheless shareholders in general meeting were entitled to pursue what course they chose, so long as the majority did not unfairly oppress a minority, and, therefore, the fact that the directors believed it to be for the benefit of the company that the 5,707 preference shares should be issued with special voting rights did not justify the allotment of these shares by the directors to the trustees without the approval of the shareholders in general meeting, and the allotment was liable to be set aside (see p 428, letters *g* and *h*, post).

(c) a majority of the shareholders in general meeting would have power to ratify the issue of the 5,707 preference shares, and, accordingly, opportunity should be given for the shareholders in general meeting (at which no votes would be cast in respect of the 5,707 preference shares) to decide whether or not to ratify the issue of the shares (see p 429, letter *e*, and p 430, letter *f*, post).

(ii) the execution of the trust deed by the company was also invalid without the confirmation of the shareholders in general meeting for the reason stated in (i)(b) ante, and an opportunity should also be afforded for the shareholders in general meeting to decide whether to ratify the execution of the trust deed (see p 429, letter *g*, post).

(iii) the loan of £28,293 was similarly invalid unless sanctioned by the shareholders in general meeting, for it was an integral part of the scheme for securing to the directors the support of a controlling body of votes (see p 429, letter *i*, and p 430, letter *a*, post).

(iv) since the defendants had throughout maintained that the ten votes attached to each of the 5,707 preference shares were validly attached thereto, the plaintiff was justified in suing in a representative capacity, eg, in regard to the loans made to the trustees, notwithstanding that (in the absence of the special voting rights) these loans were matters which could be validated by a majority at a general meeting of members of the company, because, if the special voting rights had been valid, the majority of votes at such a meeting must have lain with the directors and their supporters (see p 430, letter *e*, post).

**Notes**As to the exercise by directors of the power of issuing shares, see 6 *Halsbury's Laws* (3rd Edn) 295, para 598, note *(f)*; and for cases on the subject, see 9 *Digest* (Repl) 301, 302, *1896–1902*. As to the court's power to interfere where shares are being issued to secure a majority of votes, see 6 *Halsbury's Laws*

(3rd Edn) 420, para 811, note *(u)*.

**Cases referred to in judgment**_Foss v Harbottle_ (1843), 2 Hare, 461, 67 ER 189, 9 *Digest* (Repl) 662, *4382*.

*Fraser v Whalley, Gartside v Whalley* (1864), 2 Hem & M 10, *11 LT 175*, 71 ER 361, 9 *Digest* (Repl) 662, *4383*.

*Piercy v S Mills & Co Ltd [1918–19] All ER Rep 313*, *[1920] 1 Ch 77*, 88 LJCh 509, *122 LT 20*, 9 *Digest* (Repl) 302, *1901*.

*Punt v Symons & Co Ltd [1903] 2 Ch 506*, 72 LJCh 768, *89 LT 525*, 9 *Digest* (Repl) 302, *1900*.

*Royal British Bank v Turquand [1843–60] All ER Rep 435*, (1856), 6 E & B 327, 25 LJQB 317, 2 Jur NS 663, 119 ER 886, 9 *Digest* (Repl) 660, *4374*.

*Trevor v Whitworth [1886–90] All ER Rep 46*, (1887), *12 App Cas 409*, 57 LJCh 28, *57 LT 457*, 9 *Digest* (Repl) 650, *4321*.

**Actions**These were two actions commenced by writs issued on 15 and 20 May 1963, and consolidated by order of Ungoed-Thomas J dated 21 May 1963, in which Samuel Rolleston Hogg, suing on behalf of himself and all other members of

*[\*422]*

the defendant company except the individual defendants was the plaintiff, and Cramphorn Ltd, John Frederick Cramphorn, John Carrington Sheldrake and John Gledhill Cottam were the defendants. The plaintiff sought declarations (i) that a trust deed dated 18 April 1963 and made between the defendant company and the three individual defendants as trustees for constituting a scheme for the benefit of employees of the defendant company pursuant to s 54(1)*(b)* of the Companies Act, 1948, was void, (ii) that an issue of 5,707 preference shares of the company to the individual defendants as such trustees was void; and (iii) that a sum of £28,293 made available by the company to the individual defendants as such trustees between 18 April and 13 May 1963, or the property representing that sum was held in trust for the company. The facts are stated in the judgment.

*R B S Instone* for the plaintiff.

*E I Goulding QC* and *R A K Wright* for the defendants.
*Cur adv vult*

18 October 1963. The following judgment was delivered.

**BUCKLEY J**

read the following judgment. The plaintiff in these consolidated actions, who is the holder of fifty ordinary shares of the defendant company, Cramphorn Ltd, sues on behalf of himself and all other members of the company except the three personal defendants. The defendants are the company and three gentlemen who are trustees of a trust deed to which I shall refer. They are John Frederick Cramphorn (whom I will refer to as Colonel Cramphorn), who is the chairman and managing director of the company, John Carrington Sheldrake, a partner in the firm of accountants who are the company's auditors, and John Gledhill Cottam, an employee of the company. The plaintiff seeks a declaration that the trust deed is void, that the issue of 5,707 preference shares of the company to the personal defendants as trustees of that deed is void and that a sum of £28,293 lent by the company to them as such trustees or the property now representing that sum is held in trust for that company.

The company was incorporated in 1896 to acquire and carry on two businesses of corn and seed merchants, theretofore carried on respectively by Colonel Cramphorn's father and his great-uncle at Brentwood and Chelmsford. Although it is not technically a private company, its shares are not quoted on any stock exchange. Members of Mr Cramphorn's family retain a substantial interest in the company. The business has prospered and grown and is now carried on through about sixty retail branches in East Anglia and the south-east of England. Immediately before the events with which I am concerned, the authorised capital of the company was £136,000, divided into ninety-six thousand five per cent cumulative preference shares of £1 each, of which 90,293 were issued and 5,707 were unissued, and forty-thousand ordinary shares of £1, of which 35,888 were issued and the remainder were unissued. The financial position of the company was strong: its trade was profitable, but the earning yield on the amount of capital employed in the business was not very high. The company's assets included freehold properties which were shown in the company's balance sheet at cost at about £207,000, but were in fact worth considerably more. The directors, their relations and friends, held about thirty-seven thousand of the 126,181 issued shares. Every share, whether preference or ordinary, carried one vote at the meetings of the company.

On 28 March 1963, a Mr Baxter made an oral proposition to Colonel Cramphorn, which was confirmed in writing the following day, to buy the whole of the issued share capital of the company at 25s for each preference share and 50s for each ordinary share. Mr Baxter had no experience of the particular kind of business carried on by the company. He gave Col Cramphorn an assurance that, if he acquired control of the company, it would be his intention to expand its business, but it appeared to Col Cramphorn that there would be a change in the nature of the company's trading. Col Cramphorn formed the view that

*[*423]*

the offer would unsettle the company's staff. Col Cramphorn reported the offer to the board on 3 April. The board took legal advice, and a scheme was devised and put into operation which has resulted in the present proceedings.

The scheme took this form. The company entered into a trust deed, the other parties to which were the three personal defendants, for the benefit of employees. The trustees applied for allotment of the 5,707 unissued preference shares on condition that there should be attached to them ten votes per share on a poll. The board allotted these shares to the trustees at par with such special voting rights. The board made a loan to the trustees out of the company's funds of £5,707 free of interest and not to be repaid until the termination of the scheme contained in the trust deed. The trustees utilised this loan to pay for the shares. The effect of these transactions was to increase the existing voting rights to a total of 183,251 votes. As I have said, the directors and their supporters already controlled about thirty-seven thousand votes. If there are added to these the 57,070 votes conferred or purported to be conferred on the trustees, the directors could rely on the support of about ninety-four thousand votes or more than half of the total. These steps were taken at a board meeting held on 18 April and together constituted a scheme avowedly formulated to meet the situation created by Mr Baxter's offer. The trust deed provided that the trustees should hold the shares on trust to apportion any dividends received thereon amongst employees of the company as the board should direct or, in default of such direction, as the trustees should think fit. It further provided that the trustees should exercise all voting and other rights conferred on them in respect of the shares in accordance with the directions of a majority of them, and that the scheme embodied in the deed should determine at the expiration of one year after notice given by the company, or on the winding-up of the company or at the end of a stated perpetuity period, whereupon the trustees should sell the shares, repay the £5,707 to the company and distribute any balance among employees of the company.

On 18 April 1963, the company's solicitors informed Mr Baxter that the price which he proposed for the ordinary shares was quite inadequate and that the directors did not propose to place his offer before the shareholders. The £5,707 was treated as provided out of a reserve fund of £34,000 described in the company's balance sheet as Employees' Benevolent and Pension Fund. Although so described, this fund was the absolute property of the company. On 14 May 1963, the board resolved to advance £28,293, the balance of this

reserve, to the trustees to enable them to buy preference shares to be held on the trusts of the trust deed at 25s a share, being the price offered by Mr Baxter. This loan also was not to bear interest and was to be repayable on the determination of the scheme embodied in the deed. On or about 9 May 1963, the plaintiff, who was an associate of Mr Baxter, became the registered holder of fifty ordinary shares, of which it appears from the correspondence that he and Mr Baxter were the joint beneficial owners. On 13 May the board circularised all the members of the company who held preference shares only, and some other large holders of preference shares telling them of Mr Baxter's offer. The letter goes on:

> "The possibility that an offer might be made led your directors to consider in particular the position of the company's staff, upon whose loyalty and enterprise the company is very dependent for its success and development. They concluded that an offer such as that to which reference has been made, would have an unsettling effect on the staff and accordingly it was thought they should have a sizeable voice in the affairs of the company. The company had over the years created an 'Employees' Benevolent and Pension Fund' (later called 'The Fund') and the directors decided to use this to establish a scheme whereby some of the company's shares could be acquired for the benefit of the full-time members of the company's staff. Such a scheme has been set up by an appropriate trust deed … "

*[*424]*

The letter then names the trustees and recounts the allotment and payment up of the 5,707 shares, leaving a balance of £28,293 in the fund and proceeds:

> "This balance the company proposes should be used to acquire further preference shares of the company at 25s. a share."

The letter goes on to invite the recipient to sell his preference shares to the trustees.

On 15 May 1963, a circular letter in similar terms was sent to the rest of the company's shareholders. On that day the plaintiff, having become aware of the issue of the 5,707 shares and of the special voting rights attached to them, issued his first writ, claiming that the board's attempt to attach to each of the 5,707 preference shares the right on a poll to ten votes was ultra vires and void and also that the allotment of those shares to the trustees was ultra vires and void. On 20 May 1963, the plaintiff, having then become aware of the contents of the circular letters and so of the existence of the trust deed, issued his second writ, claiming that the company's execution of the trust deed was ultra vires and void. The plaintiff launched a motion in each action. Both motions came before Ungoed-Thomas J on 21 May, when he ordered the actions to be consolidated, and, on certain undertakings being given, made no further order on the motions, apart from giving procedural directions. Both motions were stood over to the trial of the consolidated action, the costs in each case being made costs in the cause. Mr Baxter's offer was formally made to the shareholders by means of a circular letter sent to all the shareholders by Gatehouse Securities Ltd on 22 May 1963. It was conditional on acceptances being received in respect of ninety per cent in nominal value of each class of shares by 14 June 1963. In the event, this condition was never satisfied and the offer has lapsed.

It is conceded that the 5,707 shares were part of 45,500 preference shares created on 11 November 1947, on an increase in the company's capital. It will, I think, be convenient for me to deal first with two short points which arose on the meaning and effect of the resolution for that increase of capital and of the company's articles of association.

By the memorandum of association of the company, its original capital was divided into preference, ordinary and deferred shares and the rights of each class to participate in distributed profits and surplus assets were defined, but nothing was said as to voting rights. The class of deferred shares has since disappeared. The relevant articles are as follows:

> "Article No. 10: The shares shall be under the control of the directors, who may allot or otherwise dispose of the same to such persons, on such terms and conditions, and at such times as the directors think fit. Article 12: The company in general meeting may from time to time increase the capital by the creation of new shares of such amount as may be deemed expedient (subject to the provisions of the memorandum of association and of the articles). Article No. 13: Subject as aforesaid, the new shares shall be issued upon such terms and conditions, and with such rights and privileges annexed thereto as the general meeting resolving upon the creation thereof shall direct, and if no direction be given, as the directors determine; and in particular such shares and any shares forming part of the original capital of the company, may be issued with a preferential or qualified right to dividends and in the distribution of the assets of the company and with a special or without any right of voting (subject to the provisions of the memorandum of association and of the articles). Article No. 14: The directors may, before the issue of any new shares, determine that the same, or any of them, shall be offered in the first instance to all the then members, or to the members and holders of debentures or debentures stock of the company, in proportion to the amount of the capital held or advanced by them, or make any other provisions as to the issue and allotment of new shares, but in default of any such determination, and as far as the same shall

*[*425]*

> not extend, the new shares may be allotted or otherwise disposed of by the directors to such persons, on such terms and conditions, and at such times as the directors may think fit. Article No. 15: Any capital raised by the

creation of the new shares shall, subject as aforesaid, be considered part of the original capital, and shall accordingly be subject to the provisions herein contained with reference to the payment of calls and instalments, transfer and transmission, forfeiture, lien, surrender and otherwise. Article No. 75: On a show of hands, every member shall have one vote only. In case of a poll, every member shall have one vote for every share (whether preference, ordinary or deferred) held by him."

The resolution of 11 November 1947, was in the following terms:

"that the capital of the company be increased from £86,030 (divided into 50,500 preference shares, and 35,500 ordinary shares of £1 each) to £136,030 by the creation of 45,500 preference shares of £1 each to rank equally with the existing preference shares and 4,500 ordinary shares of £1 each to rank equally with the existing ordinary shares."

Counsel for the plaintiff has contended that by using the expression "to rank equally with the existing preference shares", the company in general meeting attached to the new preference shares created by that resolution the same rights in all respects, including voting, as were attached to the then existing preference shares. He says that the company in general meeting have so directed, the directors had no power under art 13 to determine otherwise. In my judgment, however, the words, "to rank equally with", are not appropriate to refer to voting rights. In such a context, I think that the word "rank" suggests considerations of preference or priority or of the absence of preference or priority and, particularly, in respect of such matters as participation in profits and surplus assets. The circumstance that one share carries the right to more votes than another does not involve any consideration of priority. Every vote is equally potent. I consequently am unable to accept this argument of counsel for the plaintiff.

Counsel next submitted that art 75 made the directors incompetent to attach to the 5,707 shares the right to ten votes each on a poll. On the other hand, counsel for the defendants has submitted that this would make the reference to special voting rights in art 13 nugatory and that, consequently, art 75 must be construed in a qualified way, so as to make its operation subject to any special rights attached to particular shares. In effect, counsel for the defendants asks me to read into art 75, by implication, some such words as I do find in art 126 dealing with dividends, viz, "subject to the rights of members entitled to shares issued upon special conditions". In fact, however, art 75, in contra-distinction to art 126, contains no such words, and art 13 does contain the words "Subject to the provisions … of the articles". There is thus no escaping the conclusion that art 13 must be read subject to art 75, but, of course, subject to the latter article as properly interpreted. It is, in these circumstances, difficult, to say the least, to find in art 13 valid grounds for modifying what would

otherwise be the clear meaning of art 75, and it is, in my judgment, impossible to do so, if, when art 75 is properly interpreted it is found that the words "with a special or without any right of voting" in art 13 are not entirely ineffectual. In my judgment the words "every member" in art 75 cannot be read with absolute literalness, for art 80 in clear terms disfranchises any member who is in arrears in respect of calls on his shares. Article 75 must be construed as referring only to members entitled to be present and to vote. It follows that, without conflicting with art 75, the company could issue shares having only a qualified right of voting or no right to vote. It is, therefore, erroneous to say that art 75, construed in this way, renders the reference to voting rights in art 13 nugatory. It follows, I think, that any special right of voting attached to any share under art 13, must be one that is consistent

*[\*426]*

with art 75 and so cannot confer more than one vote in respect of that share. I thus reach the conclusion that the directors have no power to attach to the 5,707 preference shares the special voting rights that they purported to attach to them.

It does not, however, in my opinion follow from this that the plaintiff is entitled on this ground to have the allotment of the 5,707 shares set aside. It may well be that the trustees whose application was conditional on the shares carrying ten votes each on a poll could do so, but I think that they must be entitled to waive non-compliance with this condition and to elect, if they choose, to retain these shares without special voting rights attached. The matter rests, in my judgment, between the trustees and the company. The plaintiff, in my opinion, whether suing on his own behalf or in a representative capacity, is not competent to procure this allotment to be set aside.

I now turn to what has been the main matter of debate in this case, which is whether the allotment of the 5,707 shares was an improper use by the directors of their discretionary and fiduciary power under art 10, to decide to whom these unissued shares should be allotted. Counsel for the plaintiff has submitted that the allotment was made with the primary object of preventing Mr Baxter from obtaining control of the company and ousting the then existing board of directors and that the allotment was accordingly a breach of the directors' fiduciary duties and should be set aside on the authority of *Piercy v S Mills & Co Ltd*. In this connexion, I should, I think, ignore the fact that, as I have held, the directors were incompetent to attach to the shares the special voting rights which they purported to attach to them.

It is common ground that the scheme of which this allotment formed part was formulated to meet the threat, as the directors regarded it, of Mr Baxter's offer. The trust deed would not have come into existence, nor would the 5,707 shares have been issued as they were, but for Mr Baxter's bid and the threat that it constituted

to the established management of the company. It is also common ground that the directors were not actuated by any unworthy motives of personal advantage, but acted as they did in an honest belief that they were doing what was for the good of the company. Their honour is not in the least impugned, but it is said that the means which they adopted to attain their end were such as they could not properly adopt. I am satisfied that Mr Baxter's offer, when it became known to the company's staff, had an unsettling effect on them. I am also satisfied that the directors and the trustees of the trust deed genuinely considered that to give the staff through the trustees a sizeable, though indirect, voice in the affairs of the company would benefit both the staff and the company. I am sure that Col Cramphorn and also probably his fellow directors firmly believed that to keep the management of the company's affairs in the hands of the existing board would be more advantageous to the shareholders, the company's staff and its customers than if it were committed to a board selected by Mr Baxter. The steps which the board took were intended not only to ensure that, if Mr Baxter succeeded in obtaining a shareholding which, as maters stood, would have been a controlling shareholding, he should not secure control of the company but, also, and perhaps primarily, to discourage Mr Baxter from proceeding with his bid at all.

Counsel for the defendants has submitted that a trading company and its board of directors are fully entitled to take an interest in who becomes a member of the company and to arrange or influence matters in such a way that a particular person shall not become a member. In the present case, he says, that the board was entitled to try to kill Mr Baxter's bid, if in doing so they acted in good faith, having regard to what they believed to be the interests of the company, and if the means they employed were lawful. The establishment of an employees' trust was, he says, intra vires the company and intra vires the board under the

*[\*427]*

general delegation of powers to them, and the loan made by the company to the trustees did not in any way conflict with s 54 of the Companies Act, 1948. Counsel for the plaintiff does not dispute the right and power of the company or of the board on a company's behalf to establish in proper circumstances a trust of shares in the company for the benefit of employees, and concedes that the scheme adopted by the board involved no contravention of s 54. Counsel for the defendants says that this scheme was one which conferred a genuine benefit on the employees, in that it conferred on their trustees an influential voice on the counsels of the company, as well as providing some perhaps rather modest financial benefit for employees. There is no doubt that the staff thoroughly appreciated and approved the board's action in establishing the trust. Counsel for the defendants says that the scheme

was rightly regarded by the board as being in the interests of the shareholders both on the ground that it tended to cement the loyalty of the staff and on the ground that it would be likely to prevent the displacement of an experienced management by an inexperienced one. On these grounds he contends that the establishment of the trust fund, the issue of the 5,707 shares with special voting rights and the making of the interest-free loans to the trustees were justified as reasonably incidental to the favourable conduct of the company's business, and so intra vires not only the company, but also the board.

Accepting, as I do, that the board acted in good faith and that they believed that the establishment of a trust would benefit the company and that avoidance of the acquisition of control by Mr Baxter would also benefit the company, I must still remember that an essential element of the scheme, and indeed its primary purpose, was to ensure control of the company by the directors and those whom they could confidently regard as their supporters. Was such a manipulation of the voting position a legitimate act on the part of the directors? Somewhat similar questions have been considered in the well-known cases of *Punt v Symons & Co Ltd* and *Piercy v S Mills & Co Ltd*. In *Punt v Symons* directors had issued shares with the object of creating a sufficient majority to enable them to pass a special resolution depriving other shareholders of special rights conferred on them by the company's articles. In *Piercy v Mills* directors had issued shares with the object of creating a sufficient majority to enable them to resist the election of three additional directors, whose appointment would have put the two existing directors in a minority on the board. In each case the directors were held to have acted improperly. In the earlier case, Byrne J said ([1903] 2 Ch at pp 515, 516):

> "A power of the kind exercised by the directors in this case is one which must be exercised for the benefit of the company: primarily it is given them for the purpose of enabling them to raise capital when required for the purposes of the company. There may be occasions when the directors may fairly and properly issue shares in the case of a company constituted like the present for other reasons. For instance, it would not be at all an unreasonable thing to create a sufficient number of shareholders to enable statutory powers to be exercised; but when I find a limited issue of shares to persons who are obviously meant and intended to secure the necessary statutory majority in a particular interest, I do not think that is a fair and bona fide exercise of the power."

In the later case, Peterson J after citing *Fraser v Whalley, Gartside v Whalley* and *Punt v Symons*, said ([1918–19] All ER Rep at p 316; [1920] 1 Ch at pp 84, 85):

> "The basis of the decisions in these two cases I have referred to is that directors are not entitled to use their

powers of issuing shares merely for the purpose of maintaining their control or the control of themselves and their

[*428]

friends over the affairs of the company, or merely for the purpose of defeating the wishes of the existing majority of shareholders. That is, however, exactly what has happened in the present case. With the merits of the dispute as between the directors and the plaintiff I have no concern whatever. The plaintiff and his friends held a majority of the shares of the company, and they were entitled, so long as that majority remained, to have their views prevail in accordance with the regulations of the company; and it was not, in my opinion, open to the directors, for the purpose of converting a minority in voting power into a voting majority, and solely for the purpose of defeating the wishes of the existing majority, to issue the shares which are in dispute in the present action."

With those observations I respectfully agree. Unless a majority in a company is acting oppressively towards the minority, this court should not and will not itself interfere with the exercise by the majority of its constitutional rights or embark on an enquiry into the respective merits of the views held or policies favoured by the majority and the minority. Nor will this court permit directors to exercise powers, which have been delegated to them by the company in circumstances which put the directors in a fiduciary position when exercising those powers, in such a way as to interfere with the exercise by the majority of its constitutional rights, and in a case of this kind also, in my judgment, the court should not investigate the rival merits of the views or policies of the parties. Thus, in *Fraser v Whalley, Gartside v Whalley*, Sir William Page Wood, V-C said ((1864), 2 Hem & M at p 29):

"I say nothing on the question whether the policy advocated by the directors, or that which I am told is to be pursued by Savin, is the more for the interest of the company",

and in *Piercy v Mills* ([1918–19] All ER Rep at p 316; [1920] 1 Ch at p 84), Peterson J said that he had no concern whatever with the merits of the dispute. It is not, in my judgment, open to the directors in such a case to say, "We genuinely believe that what we seek to prevent the majority from doing will harm the company and, therefore our act in arming ourselves or our party with sufficient shares to outvote the majority is a conscientious exercise of our powers under the articles, which should not be interfered with." Such a belief, even if well-founded, would be irrelevant. A majority of shareholders in general meeting is entitled to pursue what course it chooses within the company's powers, however wrong-headed it may appear to others, provided the majority do not unfairly oppress other members of the company. These considerations lead

me to the conclusion that the issue of the 5,707 shares with the special voting rights which the directors purported to attach to them could not be justified by the view that the directors genuinely believed that it would benefit the company if they could command a majority of the votes in general meetings. The fact that, as I have held, the directors were mistaken in thinking that they could attach to these shares more than one vote each, is, I think, irrelevant. The power to issue the shares was a fiduciary power and if, as I think, it was exercised for an improper motive, the issue of these shares is liable to be set aside.

Counsel for the defendants, however, contends that the present case is distinguishable from those which I have cited in an important respect. In both *Punt v Symons* and *Piercy v Mills*, the majority and minority were already arrayed for battle on a specific issue when the latter attempted to create reinforcements by issuing additional shares. If the question whether that issue should be allowed to stand had been referred to a general meeting at which the newly issued shares were excluded from voting, the resulting answer would in each case have been a negative one. Such a meeting would have served no

[*429]

useful purpose. In the present case, on the other hand, no battle had been joined when the 5,707 shares were issued; the directors were merely fearful that Mr Baxter would acquire control and that in any ensuing battle they would find themselves outnumbered. In the event, as I have said, Mr Baxter's offer lapsed. One cannot say what the result would have been if the directors had sought the approval of a general meeting before making the issue, and it is very possible that if the issue of the shares were now submitted to the company for approval it would be approved.

Counsel for the plaintiff says, no doubt rightly, that the company in general meeting could not by ordinary resolution control the directors in the exercise of the powers under art 10. He goes on to say, I think with less justification, that what they could not ordain a majority could not ratify. There is, however, a great difference between controlling the directors' exercise of a power vested in them and approving a proposed exercise by the directors of such a power, especially where the proposed exercise of the power is of a kind which might be assailed if it had not the manifest approval of the majority. Had the majority of the company in general meeting approved the issue of the 5,707 shares before it was made, even with the purported special voting rights attached (assuming that such rights could have been so attached conformably with the articles), I do not think that any member could have complained of the issue being made; for in these circumstances, the criticism that the directors were, by the issue of the shares, attempting to deprive the majority of their constitutional rights would have ceased to have any

force. It follows, in my opinion, that a majority in a general meeting of the company at which no votes were cast in respect of the 5,707 shares could ratify the issue of those shares. Before setting the allotment and issue of the 5,707 shares aside, therefore, I propose to allow the company an opportunity to decide in general meeting whether it approves or disapproves of the issue of these shares to the trustees. Counsel for the defendants will undertake, on behalf of the trustees, not to vote at such a meeting in respect of the 5,707 shares. The execution of the trust deed and the allotment of the 5,707 shares were, as I have said, integral parts of one scheme, of which the degree of control assured to the directors through the trustees by the creation of the 57,070 votes purported to be attached to these shares was the principal objective. The execution of the deed, is accordingly, in my judgment, tainted with the same vice, if it be a vice, as the issue of the shares. If the issue of the shares is to be set aside, so, I think, must the deed: if the issue of the shares is to stand, so may the deed.

What then of the other preference shares bought by the trustees? The purchase of these shares was not (on the assumption that the special voting rights were effectually attached to the 5,707 shares) necessary to preserve for the board the support of a majority of the votes capable of being cast in general meeting. Nevertheless, these purchases in my judgment, formed a further integral part—although a less important one than the issue of the 5,707 shares—of the same scheme, for I cannot doubt that the reasons for procuring the trustees to offer to buy these shares at 25s each were to forestall criticism by preference shareholders of the directors having burked an opportunity for them to dispose of their preference shares to Mr Baxter at the admittedly advantageous price of 25s a share and to obtain for the trustees the votes attached to these shares as a further means of procuring for the board the support of a controlling interest in the company. I am led, therefore, to the conclusion that the loan of £28,293 to the trustees was tainted with the same vice as the rest of the scheme, that is to say, it was an integral part of a scheme for securing for the directors the support of a controlling body of votes. The loan was not made with the single-minded purpose, or even with the primary purpose, of benefiting the company otherwise than by securing that control of the directors or facilitating their securing that control. Accordingly, although I do not question that the loan

*[\*430]*

was made with honourable intentions, the making of it was not, in my judgment, a conscientious exercise by the directors of their powers to make loans of the company's funds for the purposes of the company's business or purposes reasonably incidental thereto. The loan was, consequently, in my judgment, ultra vires the

directors and invalid unless sanctioned or ratified by the company in general meeting.

Counsel for the defendants has contended that in accordance with the principles discussed in *Foss v Harbottle*, the present action in which the plaintiff is suing on behalf of himself and all the shareholders of the company other than the personal defendants is misconceived except so far as the issue of the 5,707 shares is concerned, because he says that the establishment of the trust and the loans to the trustees, if objectionable on any ground, could, nevertheless, be validated by a majority in a general meeting of the company. I think, however, that it is relevant in this connexion to remember that the defendants have throughout maintained that the right to ten votes per share was validly attached to the 5,707 shares. Had this, contrary to my judgment, been the true view, it is clear that at any general meeting the directors and those who support them would, in consequence of the very transactions complained of by the plaintiff, have been in a position to outvote the plaintiff and the other shareholders who would or might have been concerned to complain that the scheme improperly deprived them of their position as a majority in the company. As all the transactions to which I have referred, including the interest-free loans to the trustees, were in my judgment, integral parts of the scheme of which the allotment of the 5,707 shares with special voting rights formed part, the primary object of which was to deprive those members who were not recognised supporters of the board, of their position as a majority in the company, I am of the opinion that this is a case in which the plaintiff was justified in suing in a representative capacity even in respect of that part of the case which relates to alleged improper dispositions by the directors of moneys belonging to the company in respect of which, prima facie, the company would be the proper plaintiff. If the company in general meeting elects to ratify what the board has done, there will be no objection to the trustees continuing to hold the shares which they have bought on the trusts of the trust deed. Otherwise, the loans to the trustees must be treated as having been made by the directors in excess of their powers, and, since the trustees cannot, I think, in this case rely on the doctrine of *Royal British Bank v Turquand*, the moneys would fall to be treated as having always remained the property of the company held by the trustees on a resulting trust for the company. On this footing, the moneys could not properly be applied in the purchase of the company's own shares (see *Trevor v Whitworth)* and it would be necessary for the trustees to dispose of all the shares which they bought from preference shareholders and to account to the company for the proceeds.

In these circumstances I propose to stand the action over for a specified period to enable the directors, if so advised, to convene a general meeting[b] to

[b] Shareholders in general meeting, convened pursuant to this judgment on 21 November 1963, ratified and approved (a) the establishment by a deed dated 18 April 1963, of a trust establishing a scheme for the acquisition of shares of the company to be held by the trustees for the benefit of its employees; (b) the allotment by the company to the trustees of such deed for cash at par of 5,707 five per cent cumulative preference shares of £1 each on the footing that the holders thereof were entitled to one vote per share on a poll at any general meeting and otherwise ranking pari passu with the existing preference shares in the capital of te company; and (c) the advance by the company to the trustees of an aggregate of £34,000 for the acquisition (inter alia) by allotment of such 5,707 preference shares and the purchase of 18,366 previously existing preference shares in the capital of the company. The shareholders by resolution further ratified and adopted every act and deed done by the directors of the company or the trustees in connexion with these matters

*[\*431]*

consider such resolutions as may be submitted to it. I will consider what order I should make in the light of the proceedings at any such meeting. Counsel for the defendants will undertake that at any such meeting the trustees will not vote in respect of the 5,707 shares, but I do not think that there is any need for me to disfranchise any other shares from voting at the meeting.

Action stood over accordingly.

Solicitors: *Richards, Butler & Co* (for the plaintiff); *Stilgoes* (for the defendants).

Jenifer Sandell Barrister.

---

**End of Document**

# EXHIBIT 1-C

# *Peskin and another v Anderson and others [2001] 1 BCLC 372*

COURT OF APPEAL, CIVIL DIVISION

SIMON BROWN, MUMMERY AND LATHAM LJJ

20, 21 NOVEMBER, 14 DECEMBER 2000

**Director — Fiduciary duty — Club owned by company — Club members were shareholders of company and committee members were directors — Company sold valuable assets and proceeds were distributed to club members — Club members who had resigned claimed that failure to inform them of proposed sale was breach of contract or breach of duty — Whether committee members in breach of club rules — Whether directors of company in breach of fiduciary duty.**

RACL owned the RAC Club and a motoring services business, RACMS. Members of the club were shareholders in RACL. In 1998 RACMS was sold and members of the club received over £34,000 each. The claimants were former members of the club who ceased to be members in the three years before RACMS was sold. On ceasing to be members of the club the claimants ceased to be shareholders in RACL, by virtue of the articles of association of the company, and therefore did not share in the proceeds of sale of RACMS. Under rule 56 of the club rules a member who resigned and reapplied for membership within three years might, if the committee so decided, be re-elected to membership without having to be proposed and seconded under the rules. The claimants took proceedings alleging that once the committee began to reconsider the disposal of RACMS it should have informed former members. The failure to do so was in breach of the contract contained in the club rules, in particular rule 19 which required the committee to report annually on 'the work done by the club'. The claimants relied on letters sent to them after resigning which informed them in accordance with rule 56 that if they wished to rejoin within three years they might do so without undergoing the formalities of election procedure. The claimants applied to amend the statement of claim to add further claimants and to claim against the defendant committee members in their alternative capacity as directors of RACL on the basis that they had a duty as directors to inform former members of the club of the proposed sale of RACMS. The defendants applied to strike out the statement of claim and for the summary determination of points of law under CPR, Pt 24. Neuberger J dismissed the claims on the grounds inter alia that the directors did not on the facts owe any fiduciary duties to members who had ceased to be members of their own choice. The members appealed.

**Held** – Fiduciary duties owed by directors to shareholders only arise if there is a special factual relationship between the directors and the shareholders in the particular case capable of generating fiduciary obligations, such as a duty of disclosure of material facts, or an obligation to use confidential information and valuable commercial opportunities for the benefit of shareholders and not to prefer and promote the directors own interests at the expense of

*[\*373]*

shareholders. In this case there was no distribution contrary to the prohibitions in the memorandums before those prohibitions were deleted under the schemes of arrangement. It was not ultra vires for the directors to authorise expenditure of the company's money on investigating proposals to sell RACMS, or proposals to demutualise the company and distribute assets to members and, for that purpose, to amend the memorandums. Even a provision purporting to entrench the prohibition in the memorandum could lawfully be removed by a

scheme of arrangement. The removal of the prohibition was plainly incidental to the lawful purpose of selling the motoring services business. There was no wrongdoing and no duty to disclose. The judge was right that there were no special circumstances such as to impose a duty on the directors to disclose to the claimants the proposals and plans for demutualisation generally. There was insufficient evidence that the directors were acting wrongfully by benefiting personally from the demutualisation and there was therefore no duty to disclose. In any event the duty would be to make disclosure to the company. Further any breach in relation to personal benefits would not have been causative in relation to claimants' decisions to cease to be members.

**Cases referred to in judgments**

Allen v Hyatt *(1914) 30 TLR 444, PC.*

Brunninghausen v Glavanics *(1999) 46 NSWLR 538, NSW CA.*

Chez Nico *(*Restaurants*) Ltd,* Re *[1992] BCLC 192.*

Coleman v Myers *[1977] 2 NZLR 225, NZ CA.*

Company*,* Re a *(*Case No 005136 of 1986*) [1987] BCLC 82.*

Howard Smith Ltd v Ampol Petroleum Ltd *[1974] 1 All ER 1126, [1974] AC 821, [1974] 2 WLR 689.*

Percival v Wright *[1902] 2 Ch 421.*

RAC Motoring Services Ltd*,* Re *[2000] 1 BCLC 307.*

Stein v Blake *(*No 2*) [1998] 1 BCLC 573, [1998] 1 All ER 724, CA.*

**Appeal**

Former members of the Royal Automobile Club appealed against the decision of Neuberger J of 7 December 1999 in which he refused permission to amend a statement of claim against the respondents which alleged a breach of fiduciary duty owed by the respondents to the appellants in respect of the demutualisation of the Royal Automobile Club Ltd.

Geoffrey Vos QC *and* Daniel Lightman *(instructed by* Class Law*) for the appellants.*

Lord Grabiner QC *and* Craig Orr *(instructed by* Slaughter and May*) for the respondents.*

*Cur adv vult*

14 December 2000. The following judgments were delivered.

**MUMMERY LJ**

**(**giving the first judgment at the invitation of Simon Brown LJ).

**[1]** This is an appeal from the order of Neuberger J on 7 December 1999 under CPR Pt 24. He summarily dismissed claims for damages for breach of duty brought (or intended to be brought) by about 355 former full members

[*374]

of the Royal Automobile Club (the club) against the committee of the club (the committee) and against its holding company. His judgment is now reported in *[2000] 2 BCLC 1.*

**[2]** He refused permission to amend the statement of claim dated 21 July 1998. He refused permission to appeal, which was granted by a single Lord Justice on 19 April 2000.

**[3]** The dispute arises out of the fact that the claimants did not obtain any benefit from the demutualisation of the club. That took place after their membership of the club (and of its holding company) had ceased, either by their retirement from membership or by them allowing their membership to lapse, during the period from 9 July 1995 to 28 March 1998. The substantial sums (£34,161 each) distributed to those who were members of the club at 8 July 1998 stemmed from the sale in mid-1999 of the valuable motoring services business associated with the club and its holding company.

**[4]** It is common ground that the relevant question is whether the claims have a real prospect of succeeding. If they do not, then the judge was right to dismiss them at this stage. If they do, then they should be allowed to proceed to trial in the usual way.

**The club, the companies and the members**

**[5]** The club was a proprietary club. It was not a members' club. It was the property of its holding company, The Royal Automobile Club Ltd (RACL), which was incorporated in 1897 as a company limited by guarantee.

**[6]** The full members of the club were members of RACL. The board of directors of RACL for the time being constituted the committee. The committee was vested with the entire management of the club in accordance with the rules of the club. The rules provided for the submission of an annual report by the committee to the annual general meeting under r 19 and for the election of members. Membership was from year to year ending on 31 December in each year. Subscriptions were due and payable on 1 January in each year. Membership ceased for non-payment of subscriptions. Members were permitted to resign in accordance with a notice procedure in r 56. If a member resigned and reapplied for membership within three years, he might be re-elected without being proposed and seconded, if the committee so decided.

**[7]** RAC Motoring Services (RACMS), which operated the motoring services business, was also owned by RACL. So the full members of the club had an indirect interest in it.

**[8]** The memorandum of association of RACL (the memorandum) contained provisions at the heart of this dispute between the former members and the committee. The objects of RACL stated in clause 3 of the memorandum included:

'(a) To establish, maintain and conduct a club for the encouragement and development in Great Britain of the auto-motor vehicle and other allied industries, and for the accommodation of Members of the Company and their friends, and to provide a club-house or club-rooms, and other conveniences, and generally to afford to Members and their

*[\*375]*

friends all usual advantages, conveniences, and accommodation of a social club and centre of information and advice on all matters pertaining to auto-motor vehicles.

... (m) To sell or dispose of the undertaking of the Company, or any part thereof, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any other company.

... (p) To do all such other things as are incidental or conducive to the attainment of the above objects, or any of them ...'

Clause 4 provided that:

'The income and property of the Company, whensoever derived, shall be applied solely towards the promotion of the objects of the Company as set forth in this Memorandum of Association, and no portion thereof shall be paid or transferred directly or indirectly, by way of dividend, bonus or otherwise howsoever, by way of profit to the Members of the Company. And upon the winding up of the Company, the surplus assets (if any) of the Company or funds arising from the realisation thereof which shall remain, after payment of all the debts and liabilities of the Company, shall not be paid or distributed among Members of the Company, but shall be given, paid or transferred to such public museum or to such institution or

institutions connected with engineering, or with the objects of the Company as the Directors of the Company shall determine at or before the time of dissolution of the Company ...'

Article 67 of the articles of association provided that:

'If upon the winding up or dissolution of the Company there remains ... any property whatsoever, the same shall not be paid to or distributed among the Members of the Company but shall be paid or applied as provided for by the Memorandum of Association.'

Clause 4 of the memorandum of RACMS contained a prohibition on distribution to members in slightly different terms with a further clause 5 which stated that: 'No addition, alteration or amendment shall be made to Clause 4 hereof.'

[9] In mid-1998, after all the claimants had ceased to be members of the club, these prohibitions were deleted from the memorandum of each company by the combined effect of special resolutions and two schemes of arrangement made by the court under *s 425* of the Companies Act 1985 (the 1985 Act).
**The sale of RACMS** *A The negotiations for sale to Cendant*

[10] The defendants' case is that in March 1998 an approach was made to RACL by Cendant Corporation (Cendant) with a view to acquiring the business of RACMS. This is disputed by the claimants. Coincidentally, a proposal to call an EGM, as the first step in a process to demutualise the club and to demerge RACMS, was made in a letter dated 27 March 1998 from the then chairman of RACL, Mr Jeffrey Rose, to all the full members of the

*[\*376]*

club. The board resolved that it would not elect any person as a member of RACL after 27 March 1998. In May 1998 the terms of sale of RACMS to Cendant for £450m were finally agreed.
*B The scheme*

[11] On 4 June 1998 a meeting was held for a scheme of arrangement of RACMS. On 19 June 1998 a meeting was held for a scheme of arrangement of RACL. At that meeting a special resolution was passed for the deletion of clause 4 of the memorandum.

[12] On 8 July Neuberger J approved the schemes of arrangement of RACMS and RACL under s 425 of the 1985 Act: see *Re RAC Motoring Services Ltd [2000] 1 BCLC 307*. The schemes of arrangement became effective on 9 July 1998. They facilitated the transaction for the disposal of RACMS to Cendant and enabled the members to realise their indirect interest in RACMS.

[13] The effect of the scheme was that the members ceased to be members of RACL at the close of business on 8 July 1998. A new company named RAC Acquisitions became the sole member of RACL. RAC Acquisitions itself became a subsidiary of RAC Holdings Ltd (RACH). One share of £1 each in RACH was allotted to each person who was a member of RACL at the close of business on 8 July 1998. That share was later divided into two shares of 50p each.

[14] In addition, each of those former members of RACL became a member of New Club Company Ltd, to which the entire share capital of a company called Club Acquisition Company Ltd (CACL) was transferred. CACL had, while it was a subsidiary of RACL, acquired all the assets of RACL.

[15] The New Club Company, which became and remains the ultimate proprietor of the club, was later renamed 'The Royal Automobile Club Ltd'. RACL was renamed 'RAC Ltd' and was subsequently reregistered as an unlimited company with a share capital, whereupon its name became 'RAC'.
*C The sale to Lex Service*

[16] On 4 February 1999 it was announced that Cendant had decided not to proceed with the purchase in view of conditions imposed by the Secretary of State for Trade and Industry on competition grounds.

[17] On 9 February 1999 Lex Service PLC announced that it was making a bid. On 21 May Lex Service made an

offer to the shareholders in RACH to purchase their shares. That offer became unconditional on 9 July 1999. The sale took place for £437m.

**[18]** The end result was that Lex Service became the holding company of RACH, RACL and RACMS and that the members, in their new capacity as shareholders in RACH, received about £34,000 each direct from Lex Service in respect of the sale of their shares in RACH.
**The proceedings**

**[19]** As the claimants had all ceased to be members of the club and to be members of RACL before the schemes of arrangement took effect, they never became shareholders in RACH. So they never became entitled to receive any part of the benefits flowing from the sale of RACMS to Lex Service.

*[*377]*

**[20]** The majority of the personal defendants were the directors of RACL and the members of the committee at the material time. Four of the defendants only became directors of RACL and members of the committee on or after 1 January 1998, by which time most, if not all, of the claimants had ceased to be members. RACL is a proposed defendant under its new name RAC Ltd.

**[21]** The claims in the draft amended statement of claim were for damages for breach of fiduciary duties of disclosure and for being wrongfully deprived of the opportunity to make a fully informed choice as to whether or not to continue their membership of the club. The basis of the claims was that the defendants, in breach of a fiduciary duty owed by them to the claimants, failed to disclose to them the plans, discussions, proposals, investigations and instructions relating to the demutualisation of the club and the demerger of RACMS, in particular the expenditure by them of the assets of RACL on the proposed cancellation of clause 4 of the memorandum, so as to permit distributions to be made to the members.

**[22]** It is alleged that, if these matters had been disclosed to the claimants before they retired, they could then have made an informed decision about their membership. They would have decided not to retire. Instead, they would have remained members of the club and shareholders in RACL. They would then have been entitled to benefit from the sale of RACMS to Lex Service in 1999.

**[23]** On 7 December 1999 Neuberger J acceded to an application by the defendants under CPR Pt 24 to dismiss the action on the ground that it had no real prospect of success.
**The judgment of Neuberger J**

**[24]** The claims were unsuccessfully advanced to the judge on a number of grounds which have now been dropped from the draft reamended statement of claim.

**[25]** The judge rejected the claimants' contentions that the Rules of the club, (including r 19 which required the committee to report annually 'on the work done by the club'), represented the terms of a contract between the members of the club or between the members and the committee; that r 19 of the club put the committee under an obligation to inform the members about the developments and all likely future developments affecting the club and the company and its subsidiaries, including discussions, investigations and proposals with a view to selling RACMS; and that r 56 (which conferred a discretion on the committee to re-elect a member who had resigned and reapplied for membership within three years of his resignation) entitled former members to be reinstated automatically.

**[26]** As for the remaining claims based on breach of fiduciary duty as pleaded in the draft amended statement of claim, the judge held that they had no real prospect of succeeding. In outline, his reasoning on this issue was as follows:

1. A director does not owe a general fiduciary duty to shareholders of the company.

2. A director of a company could owe a fiduciary duty to shareholders, if he had, in relation to the sale of shares, special knowledge not possessed by the shareholders.

*[\*378]*

3. There was no fiduciary duty in the circumstances of this case. The judge identified eight factors leading him to that conclusion: (1) the absence of any special facts in the relationship of the directors and the members of RACL, which would make the existence of a fiduciary duty more likely; (2) the claimants had resigned membership of their own motion, uninfluenced by any information provided by, or views expressed by, the directors; (3) no specific transaction was in contemplation at the time of the resignations; (4) the defendants did not, in their capacity as directors of RACL, benefit from the claimants ceasing to be members, either directly (eg they did not acquire shares from the members or encourage them to part with their shares) or indirectly (eg by minimising the number of members, so as to increase their share of the proceeds of sale); (5) the alleged interest of the directors in profits from the sale in the form of 'golden hellos and employment contracts' did not impinge on the issue whether they were under a duty to disclose at an early stage the possibility of selling off the RACMS business; (6) the investigation and promotion of proposals for the demutualisation of RACL (including the incurring of costs in relation to the amendments of the memoranda of RACL and RACMS sanctioned by the court) did not involve the directors in the pursuit of an unauthorised and improper object; (7) it was unreasonable for directors to be put in the sort of position which the claimants' contentions would necessarily involve with regard to the disclosure of contemplated arrangements or transactions best kept confidential; and (8) the claimants' arguments would place directors in the unfortunate position of being 'damned if they do and damned if they don't', if they were put under a duty to disclose to the members a contemplated sale which might, or might not, happen.

**Fiduciary duties – the legal principles**

[27] There was no serious dispute between Mr Vos QC, for the claimants, and Lord Grabiner QC, for the committee and RAC Ltd, about the relevant legal principles governing the fiduciary duties of company directors.

[28] For his part, Mr Vos accepted that the fiduciary duties owed by the directors to RACL do not necessarily extend to the individual members of the club and that, in general, directors do not, solely by virtue of the office of director, owe fiduciary duties to the shareholders, collectively or individually.

[29] According to the headnote in *Percival v Wright* [1902] 2 Ch 421that case decided that:

'The directors of a company are not trustees for individual shareholders, and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking.'

[30] The apparently unqualified width of the ruling has, over the course of the last century, been subjected to increasing judicial, academic and professional critical comment; but few would doubt that, as a general rule, it is important for the well-being of a company (and of the wider commercial community) that directors are not overexposed to the risk of multiple legal actions by dissenting minority shareholders. As in the affairs of society, so in the affairs of companies, rule by litigation is not to be equated with the rule of law.

*[\*379]*

[31] For his part, Lord Grabiner accepted that the fiduciary duties owed by the directors to the company do not necessarily preclude, in special circumstances, the coexistence of additional duties owed by the directors to the shareholders. In such cases individual shareholders may bring a direct action, as distinct from a derivative action, against the directors for breach of fiduciary duty.

[32] A duality of duties may exist. In *Stein v Blake and others* (*No 2*) *[1998] 1 BCLC 573 at 576*, 579, *[1998] 1 All ER 724 at 727*, 729 Millett LJ recognised that there may be special circumstances in which a fiduciary duty is owed by a director to a shareholder personally and in which breach of such a duty has caused loss to him directly (eg by being induced by a director to part with his shares in the company at an undervalue), as distinct from loss sustained by him by a diminution in the value of his shares (eg by reason of the misappropriation by a director of the company's assets), for which he (as distinct from the company) would not have a cause of action against the director personally.

**[33]** The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders.

**[34]** These duties may arise in special circumstances which replicate the salient features of well-established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who, depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person. That other person may have entrusted or, depending on all the circumstances, may be treated as having entrusted, the care of his property, affairs, transactions or interests to him. There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders.

*[\*380]*

**[35]** The court has been referred to the valuable and detailed surveys of the authorities, expounding the special circumstances which justify the imposition of fiduciary duties on directors to individual shareholders, in the judgments of Court of Appeal in New Zealand in *Coleman v Myers* [1977] 2 NZLR 225 (especially 323-325, 328-330) and of the Court of Appeal of New South Wales in *Brunninghausen v Glavanics* (1999) 46 NSWLR 538 (especially 547-560). In both of those cases fiduciary duties of directors to shareholders were established in the specially strong context of the familial relationships of the directors and shareholders and their relative personal positions of influence in the company concerned.

**[36]** The cases of *Allen v Hyatt* (1914) 30 TLR 444 at 445 (directors making representations to secure options to purchase shares of shareholders and undertaking to sell shares of shareholders in agency capacity); *Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126 at 1132*-1133, 1135-1136, [1974] AC 821 at 834, 837-838 (directors' use of fiduciary power of allotment of shares for a different purpose than that for which it was granted, and so as to dilute the voting power of the majority shareholding of issued shares); *Re a company (Case No 005136 of 1986) [1987] BCLC 82 at 84*-85; and *Re Chez Nico (Restaurants) Ltd [1992] BCLC 192 at 208*were also cited. See also the discussion in Spencer Bower *Actionable Non-Disclosure* (2nd edn, 1990) pp 417-435.

**[37]** The claims for breach of fiduciary duty owed by the directors to the members of the club are put in several different, though interrelated and overlapping, ways. They have been argued on the appeal by Mr Vos (who did not appear below) with a somewhat different emphasis than before the judge as indicated in a draft reamended statement of claim. This judgment will refer to certain passages in the draft amended statement of claim (which have since been deleted), since they were the pleaded claims before the judge.

**The ultra vires expenditure point**

**[38]** Mr Vos's primary attack on the judgment focused on point (6) in the above summary of the list of factors considered by the judge.

[39] He asserted, and Lord Grabiner accepted, that directors act in breach of the fiduciary duties owed by them to the company, if they participate in the commission of acts ultra vires the company.

[40] Mr Vos went further and asserted that, where all the directors are involved in the same ultra vires act, they are under a duty to disclose to the individual members their intention to commit, and their commissions of, ultra vires acts and the ultra vires intentions and acts of their fellow directors. In such a case proper disclosure by the directors to the company cannot be made. The duty to disclose to the company would lack content, if all the directors are embarked on a course which is ultra vires and benefits them all, but is detrimental to the shareholders at large.

[41] This additional duty to disclose ultra vires intentions and acts to individual shareholders does not, he emphasised, depend on establishing special circumstances justifying an exception to the general rule that fiduciary duties are owed by the directors only to the company. He made separate submissions on that exception to the principle in *Percival v Wright* (above). They are discussed later in this judgment.

*[*381]*

 [42] Further, liability for non-disclosure to the shareholders is not abrogated by s 35 of the 1985 Act, as amended by *s 108(1)* of the Companies Act 1989. It is true that sub-s (1) provides that:

> 'The validity of an act done by a company shall not be called into question on the ground of lack of capacity by reason of anything in the company's memorandum.'

But sub-s (2) provides that:

> 'A member of a company may bring proceedings to restrain the doing of an act which but for subsection (1) would be beyond the company's capacity ... '

and sub-s (3) provides that:

> 'It remains the duty of the directors to observe any limitations on their powers flowing from the company's memorandum; and action by the directors which but for subsection (1) would be beyond the company's capacity may only be ratified by the company by special resolution.'

[43] The claimants' primary case in this court is that the directors of RACL owed a fiduciary duty to disclose to them their ultra vires intentions and acts; and that they acted in breach of duty by not disclosing to them their intentions not to observe, and their failure to observe, the limitations on their powers flowing from the provisions of clause 4 of the memorandum. If there were no such duty of disclosure to the members, the right of the members to seek to restrain the commission of ultra vires acts under s 35(2) of the 1985 Act would be sterilised. Disclosure was also required so that the members could consider whether to ratify under s 35(3) of the 1985 Act the ultra vires acts by special resolution.

[44] Mr Vos reminded the court of the approach which it should take at this early stage (without the benefit of disclosure and evidence) in these unprecedented proceedings: when the full facts are not known and when the legal principles are in a state of development, the court should be cautious in concluding that the claims have no real prospect of succeeding.

[45] The argument was developed in this way. The fiduciary duty of disclosure of ultra vires intentions and acts is owed to the members, because the damage caused by the breach of duty is to the personal interests of the individual shareholders (in this case the retired members), not to the value of the company or its assets or the shares in it.

[46] The directors should have disclosed to the members intended and actual expenditure from 1996 onwards of RACL's assets (eg on professional advice), which was considerable and was committed to the furtherance of complex proposals for the restructuring of the company in order to allow distribution of the proceeds of the intended sale of RACMS among the members of the club.

[47] This was not simply a case of proposing to change the objects of a company, so that it could sell an existing business or engage in a new business. The proposal was for the distribution of the company's property in the face of an express absolute prohibition in clause 4 on the distribution to

members of any part of the property of RACL. That clause is not the same as an object of the company, which may be changed by special resolution. As a matter of construction of clause 4 of the memorandum, that expenditure on the formulation and implementation of the proposal for the sole purpose of demutualisation was ultra vires RACL. That purpose was prohibited.

[48] The directors were in breach of fiduciary duty in committing the company to that ultra vires expenditure and in not disclosing that conduct to the members. The members should have been consulted. The directors should have sought the approval of the members in general meeting about the proposals to investigate and prepare a scheme for demutualisation before assets were expended on that prohibited purpose. Had the claimants been consulted, they would have known about it. They would have decided to remain full members of the club. They could have obtained an injunction under s 35(2) of the 1985 Act; or they could have ratified the expenditure under s 35(3) of the 1985 Act, so as to benefit from the demutualisation. As it was, they made their decision to retire from the club in ignorance of the commitment of the directors to impermissible and significant actual and intended expenditure in pursuing and achieving an expressly prohibited object.

[49] In my judgment, this flight of fancy does not, on the pleaded facts, even make it to the point of take off and should be grounded immediately under CPR Pt 24.

[50] It is not even alleged that the directors caused any distribution of the assets of RACL to be made to members in breach of clause 4 of the memorandum before 8 July 1998, when that clause was cancelled under the scheme of arrangement. It was not ultra vires for the directors to authorise the expenditure of the company's money on investigating proposals to sell RACMS, or on proposals to demutualise the company and distribute assets to the members and, for that purpose, to amend the memorandum. That expenditure was not caught by clause 4. The prohibition in clause 4 did not extend to attempts to change the law of the company by altering the clause or cancelling it from the memorandum, so as to permit what was previously prohibited. Even if it did, such as by a prohibition of the kind to be found in clause 5 of the memorandum of RACMS, the entrenching provision could also be lawfully removed by a scheme of arrangement.

[51] In substance the expenditure complained of in this case is no different from expenditure, which Mr Vos accepts may be permitted, on changing the objects in the memorandum, so as to allow the company to carry on a different business, which is impliedly prohibited until the objects are changed. It is lawful for a company to change its objects and to amend its memorandum by means of the appropriate procedures: s 4 of the 1985 Act (special resolution altering the memorandum with respect to the statement of the company's objects) and s 17 (special resolution altering a condition in the company's memorandum which could have been lawfully contained in the articles of association and cancellation of the condition so far as it is confirmed by the court).

[52] It must follow that it is lawful for the directors to authorise the expenditure of company's money for the purpose of the cancellation of clause 4. That expenditure is reasonably incidental to the attainment or pursuit of the lawful purpose of the cancellation of clause 4 from the

memorandum in the context of giving effect to the overall object permitted in clause 3(m) of selling or disposing of RACMS. I do not agree with Mr Vos's contention that the demutualisation was completely unrelated and irrelevant so far as the sale of RACMS was concerned. The expenditure was not made to achieve a prohibited object. There was no wrongdoing on the part of the directors in relation to the expenditure, which it was their duty to disclose either to the company or to the individual shareholders in RACL.

**The special circumstances point**

[53] Quite apart from the alleged fiduciary duty of directors to disclose their own and each others' intended and actual ultra vires acts to the members, Mr Vos submitted that there was a free-standing fiduciary duty of full

disclosure of the demutualisation and demerger plans, discussions and proposals to the members, as well as to the company, by reason of special circumstances. Had all the members been made aware of these matters, they would not have resigned their membership of the club.

**[54]** It was pleaded in the draft amended statement of claim that the duty of the directors was not to withhold from the members of the club or the company any information, which they obtained as members of the committee or the board and which they knew, or ought to have known, would be, or might be, material to their decisions each year whether or not to renew their membership of the club or to dispose of their interests in the company. Further, in the event that the committee or the board were considering plans for and/or were in the course of conducting negotiations with third parties concerning the disposal of substantial assets of the company, there was a duty to disclose all matters relevant to the interests of the members of the club, or the company, who were contemplating retirement from the club (and thereby a disposal of their interests in the company) in circumstances where they knew, or had reason to believe, that such retiring members were inadequately informed. The directors were in exclusive possession of information, which they had acquired by virtue of their office, affecting the potential financial value of membership of the club and of RACL. The members would not have had that information. In their state of knowledge (or ignorance), the members could only have placed a nil value on their membership.

**[55]** It was also alleged that, for a period of at least 18 months prior to March 1998, the committee had been actively considering taking professional advice concerning and discussing the sale and disposal of RACMS and the possibility of demutualisation of the club and the potential demerger of RACMS. At a meeting in about October 1996 the committee and/or the board is alleged to have considered and rejected a scheme for demutualisation and/or demerger of RACMS, but still continued to seek to formulate a workable plan to that end.

**[56]** As already indicated in the submissions on the ultra vires point, it is alleged that the committee had, in relation to those matters, incurred a liability on behalf of the club and RACL for professional fees, mergers, expenses and disbursements, including a liability in respect of the retainer of Messrs Slaughter and May to prepare a scheme for demutualisation and /or demerger of RACMS.

*[\*384]*

**[57]** Mr Vos submitted that this duty of disclosure to the members fell within an exception to the general rule laid down in *Percival v Wright* (above). The special facts from which it is contended that this fiduciary duty to the members emerges are that knowledge of the proposal by the directors was inside information of which the directors had exclusive possession; that they had acquired the information by virtue of their office; that the information provided knowledge to the directors of the potential financial value of membership of the club and RACL, which was not known to the members; that that knowledge was, contrary to their expectations, that their membership (which could not have been sold or transferred) could have any value; that, by resigning membership, the claimants had given up any right to participate in the substantial assets of RACL; and that they had done so in ignorance of the directors' plans to allow members to benefit from a distribution.

**[58]** I agree with the judge that these factors are insufficient to found a claim for the existence and breach of a fiduciary duty to disclose to the claimants the proposals and plans for demutualisation.

**[59]** There was nothing special in the factual relationship between the directors and the members in this case to give rise to a fiduciary duty of disclosure. In particular there were no relevant dealings, negotiations, communications or other contact directly between the directors and the members; the actions of the directors had not caused the members to retire when they did; and, probably most important of all, prior to March 1998 there was nothing sufficiently concrete and specific, either in existence or in contemplation, for the directors to disclose to the members.

**The benefits to directors and associates point**

**[60]** The third area of alleged fiduciary duty to the members is that the directors failed to disclose to the members of the club that they had committed breaches of duty to RACL, in that they personally and their associates stood to

benefit, and had in fact benefited, from the proposed demerger and demutualisation and that, had they made disclosure of these matters to all the members, as they should have done, the claimants would have chosen to remain members and would have benefited from the distribution of the proceeds of sale of RACMS.

[61] In particular, the draft amended statement of claim pleaded that the members of the committee were under a duty to treat all the members of the club fairly; not to disclose to a third party any information which they had obtained as members of the committee or the board of RACL and which was material to the interests of the members of the club and the company, without first informing all of the members; and not to disclose any such information to some members and not others.

[62] An assortment of personal benefits constituting breaches of the duty to disclose are alleged, though it has to be said that the pleading is short on particulars and the evidence is exiguous. The claimants contend that this is almost bound to be the case in advance of disclosure of documents by the defendants and, indeed, they rely on that as a factor relevant to the court's discretion under CPR Pt 24.

*[*385]*

 [63] The allegations in the draft amended statement of claim may be summarised as follows: there was a conflict of interest between, on the one hand, the interests of the members of the committee and of the board and, on the other hand, the interests of the members, who were ignorant of these material matters; the directors stood to benefit as more existing members retired and gave up their shares in the company; under the Cendant proposal some directors were to receive substantial additional personal benefits in the form of shared bonuses and, in the case of Mr Neil Johnson (the fifth defendant), office as chief executive in the new group; under the sale to Lex Service the directors received undisclosed bonuses and one (Mr Ian Mavor –the twelfth defendant) was to be appointed to a consultancy; some directors were able to, and did, fast track friends into full membership of the club before March 1998, in the knowledge of the intended disposal of RACMS and the distribution of the proceeds; the directors were in a position to, and did, slow down the waiting list for full membership of the club (eg the case of a Mr Malcolm Bissiker) and that would increase the value of their own membership on demutualisation.

[64] At the end of the day, however, these additional allegations add nothing of substance to the arguments already deployed and rejected. The points made on directors' benefits are essentially the same as the other arguments; ie, that it was the duty of the directors to disclose to the members that they were committing, or intending to commit, ultra vires acts (eg by benefiting, or intending to benefit, personally from the distribution of the sale proceeds to the members) and in circumstances which justified an exception to the general rule that the directors' fiduciary duties are owed only to the company. For the above reasons and for the reasons given by the judge, the facts pleaded are insufficient to support the existence of a duty of disclosure to the members.

[65] Even if the allegations were established (and they are strongly disputed by the defendants), the duty to disclose the ultra vires acts in this case would be owed by the directors to the company and not, in the absence of special circumstances, to the individuals members of the club.

[66] I would add that these alleged breaches of duty do not appear to impact on the alleged duty to disclose to the members, before their decision to resign, the plans and proposals to demutualise the club and to demerge RACMS. It was non-disclosure at an earlier stage of those plans and of the alleged ultra vires commitment to expenditure on them, rather than non-disclosure of the personal benefits for directors and associates, that would have affected the opportunity of the members to make an informed decision on membership.

[67] It is also contended that there was a breach of fiduciary duty to shareholders by one of the directors (Mr Johnson), who frequented a Warwickshire shooting club. It was alleged that, in consequence of the disclosure of inside information, about ten members of the shooting club were fast tracked into full membership of the club early in 1998, shortly before demutualisation. The claim was that this involved unfairness between shareholders, as the inside information should have been shared with all the members of the club. That allegation would not, however, justify claims for

*[\*386]*

breach of fiduciary against all the members of the committee. For the reasons already stated, however, this claim does not, in any event, have any real prospect of succeeding against any of the defendants.

**Conclusion**

[68] In my judgment, the claims, as pleaded and as proposed to be amended or reamended, have no real prospect of succeeding at trial against the personal defendants or against the company. The judge was right to make an order under CPR Pt 24. I would dismiss the appeal.

**LATHAM LJ.**

I agree with both judgments.

**SIMON BROWN LJ.**

[69] The club has over 12,000 members. All those who were full members on 8 July 1998 received windfall payments of some £34,000 following the sale of the RAC motor services business. It was for them a happy and unexpected event: until March that year they had had no reason to suppose that their membership was of any financial value whatever.

[70] The appellants represent 355 retired members of the club who resigned (or in a few cases failed to pay their annual subscription) in the three years prior to this payout. To them, understandably, it seemed a less happy event: their chagrin is not difficult to imagine.

[71] The appellants' complaint in these proceedings is against the committee (strictly the board of the company of which all full members of the club were members) and is to the effect that the committee kept from them the various discussions and investigations which led to this payout. Had they known it was in the offing, they would never, of course, have resigned.

[72] They cannot complain simpliciter that the committee should have kept them in the picture: Mr Vos was constrained to recognise that no such general duty is cast upon directors. He has therefore had to argue a more circuitous case. What he asserts is first that the board acted ultra vires and therefore in breach of their fiduciary duty, and secondly that they thereby came under a further duty to disclose their ultra vires conduct to the members. Thus would the members have discovered the financial value of their membership.

[73] The conduct which principally Mr Vos contends to have been ultra vires was the defendants' expenditure of company funds on preparing for the sale of the motor services business and, more particularly, for the scheme of demutualisation which was a necessary precondition of any payment to members. Clause 4 of the memorandum is central to the argument. Let me read only the most material part:

'4. The income and property of the Company, whensoever derived, shall be applied solely towards the promotion of the objects of the Company as set forth in this Memorandum of Association, and no portion thereof shall be paid or transferred directly or indirectly, by way of dividend, bonus or otherwise howsoever, by way of profit to the Members of the Company. And upon the winding up of the Company, the surplus assets (if any) of the Company or funds arising from the realisation thereof which shall remain, after payment of all the debts and

*[\*387]*

liabilities of the Company, shall not be paid to or distributed among Members of the Company, but shall be given, paid or transferred to such public museum or such institution or institutions connected with engineering, or with the objects of the Company as the Directors of the Company shall determine ... '

The objects of the company most relevant to this appeal are:

'3(a) To establish, maintain and conduct a club for the encouragement and development in Great Britain of the auto-motor vehicle and other allied industries, and for the accommodation of Members of the Company and their friends, and to provide a club-house or club-rooms, and other conveniences, and generally to afford to Members and their friends all usual advantages, conveniences and accommodation of a social club and centre of information and advice on all matters pertaining to auto-motor vehicles.

3(m) To sell or dispose of the undertaking of the Company, or any part thereof, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any other company.

3(p) To do all such other things as are incidental or conducive to the attainment of the above objects, or any of them ...'

[74] As I understand the appellants' argument with regard to these clauses it runs essentially as follows: (1) Clause 4 constituted a fundamental prohibition against any form of payment out to members. Any scheme for demutualisation clearly, therefore, required its removal. (2) Demutualisation was distinct from the sale of the motor services business and did not itself fall within any of the objects clauses. In particular it was not to be regarded (within clause 3(p)) as 'incidental or conducive to the attainment of' the sale of the motor services business (within clause 3(m)). (3) The defendants were, therefore, forbidden to apply any company funds towards demutualisation.

[75] The difficulty with this argument is that it appears to overlook the plain fact that, by the same token as a company may seek to change its objects, so too it may seek to change its other rules such as the prohibition constituted by clause 4 in the present case. And if a company can seek to change its rules, then in my judgment it must also be entitled to expend such sums (for example by way of legal fees) as are reasonably incurred in exploring the need for and effecting such change. This, we kept suggesting to Mr Vos in argument, was the complete answer to his case. Not so, he repeatedly submitted, but, I confess, I never came to understand why not. All I can do is to quote verbatim from the last of the relevant passages in the transcript of the argument before us to indicate my difficulty:

'Mr Vos QC: It is, of course, not illegal to change the law of the company. But the question is, whether on the facts ... that expenditure ... was in fact directly spent for the purpose, not just of changing the law of the company, but for the purpose of ensuring that monies were paid to members in violation of the memorandum ... The scheme was not directed at just changing, that was just one small part of the scheme. The scheme was directed at distributing the money to the members indirectly

*[\*388]*

... Let us assume that in order to transfer to the members of the company you have to expend £1m, and let us assume that the assets of the company are £10m, and that the object of the scheme and the proposal is to get the £10m to the members, that is what is intended and that is what is alleged. In order to achieve it, you have to spend £1m and therefore the distribution is only £9m; it can only be. It would be, because you have spent £1m of the £10m of the assets of the company on achieving the purpose ... Assume that is all right, can it really be said that you have not expended that £1m for this prohibited purpose? In our respectful submission, you have obviously expended it for that purpose and it is not an answer to say that the mechanics, the way in which you achieved it, was by changing this provision ...

Mummery LJ: It is spent for the purposes of removing the prohibition.

Mr Vos QC: That is the dispute, with respect. Your Lordship says it is spent just for the purpose of removing the prohibition, and I say it is spent for achieving the prohibited object ... It is an obvious wrong to go about doing something before you change the provision. You have to change it first. That is why s 35(3) says so ...You go to the general meeting, under s 35(3), which assumes you do, and say: "We want to spend money on this *ultra vires* act, may we do so?", and you can have it approved.'

[76] For the life of me, I remain unable to see how payments (say to solicitors) expended to remove a prohibition against making payments to members can themselves be characterised as payments to members in violation of the prohibition, and nor can I see how s 35(2) of the 1985 Act advances the appellants' argument. Section 35(3) provides:

'It remains the duty of the directors to observe any limitations on their powers flowing from the company's memorandum; and action by the directors which but for subsection 1 would be beyond the company's capacity may only be ratified by the company by special resolution.

> A resolution ratifying such action shall not affect any liability incurred by the directors or any other persons; relief from any such liability must be agreed to separately by special resolution.'

Section 35(1) prevents third parties from calling into question the validity of an act done by a company on the ground of lack of capacity by reason of anything in the company's memorandum.

**[77]** Mr Vos's submission on s 35(3) begs rather than answers the question at issue. If, as I think, it is lawful to spend money changing the company's rules, then there can be no occasion to seek ratification of such expenditure from the company (even assuming, which I doubt, that s 35(3) contemplates advance rather than retrospective ratification).

**[78]** I referred earlier to Mr Vos having acknowledged that directors (at least of private companies) are under no general duty to inform shareholders of developments or proposals which may increase the value of their shareholding. Were it otherwise, I for my part would regard this as a prime case for asserting a breach of such duty. After all, nothing could more fundamentally affect the value of club memberships than the demutualisation

*[\*389]*

scheme here devised which overnight transformed a worthless membership into one worth £34,000. But the same surely is true of a company which strikes a rich vein or contemplates takeover; or a building society which contemplates demutualisation. And yet no one suggests that those unlucky enough to miss out on these bonanzas have any claim in law.

**[79]** The RAC's ex-members' cri de coeur is, as I began by saying, understandable. Given, however, that they cannot frontally attack their directors for not keeping them informed – and thereby giving them an opportunity to prolong a membership they had not otherwise thought worth maintaining – it seems to me not merely contrived but unattractive to criticise, not demutualisation itself (the necessary foundation of their damages' claim), but rather the inevitable expense of demutualising. And the same can be said too of their further complaints about the directors gaining personal advantages from the eventual scheme – complaints which might more logically come from members who remained than those who resigned (certainly absent any shred of evidence that the directors were allowing numbers to dwindle to enhance the value of their own individual memberships).

**[80]** Although agreeing with all that Mummery LJ has said I have been anxious in addition to indicate my own basic reasoning for rejecting this claim. One way or another I have no doubt that it is worthless and must fail. I too would dismiss the appeal.

Appeal dismissed with costs. Leave to appeal to the House of Lords refused.

Kenneth Dow Esq Barrister.

---

End of Document

# EXHIBIT 1-D

# Tianrui Holding Co Ltd v China Shanshui Cement Group Ltd

From the Court of Appeal of the Cayman Islands | November 14, 2024 | 2024 WL 04794596

**Search Details**

Search Query: adv: "(2024) UKPC 36"

**Delivery Details**

Date: August 7, 2025 at 3:56 PM
Delivered By: Cate Nash
Client ID: 99999-00091
Status Icons: 👓

MR 1466

**Tianrui (International) Holding Company Ltd v. China Shanshui Cement Group Ltd(Cayman Islands)**

Privy Council Appeal No 0002 of 2023
From the Court of Appeal
of the Cayman Islands
14 November 2024

**Michaelmas Term [2024] UKPC 36**

**2024 WL 04794596**

before Lord Hodge Lord Briggs Lord Sales Lord Leggatt Lord Richards Judgment Given On 14 November 2024

[Analysis](#)

Heard on 12 and 13 March 2024

**Representation**

- Appellant Thomas Lowe KC Tara Taylor Gemma Bellfield Corey Byrne (Instructed by Ogier (Cayman) LLP and Enyo Law LLP ).
- Respondent Tom Smith KC Paul Fradley Adrian Davey (Instructed by Maples and Calder (Cayman) LLP and Freshfields Bruckhaus Deringer LLP (London)).

**Judgment**
Lord Hodge and Lord Briggs:

The issue on this appeal is whether a shareholder, including a minority shareholder, has a personal claim against a company when the directors of the company allot shares for an improper purpose. In particular, does the shareholder have a private right to sue the company for a declaration that the power of the company has been invalidly exercised by the board of directors on the company's behalf?

The allotment of shares can have the effect of altering the balance of voting power between shareholders within the company and the relative economic stakes they have in the company. The allegation in this case is that the allotment was made to reduce the appellant's stake in the company below 25 per cent, thereby removing its negative control so as to assist the other shareholders to consolidate their control over the company. The exercise of the power to issue and allot the shares is alleged to have been in breach of the directors' fiduciary duty owed to the company to exercise their powers for a proper purpose.

It has long been held in cases of high authority, by the Board, the UK Supreme Court, the High Court of Australia and other appellate courts, that in these circumstances proceedings may be brought by shareholders personally, rather than by derivative action on behalf of the company, to challenge such

allotments, notwithstanding that the duty of directors to exercise their powers of allotting shares for proper purposes is owed not to shareholders personally but to the company alone. Although it has never previously been doubted that shareholders personally have standing to bring proceedings in these circumstances, the juridical basis for their standing has not been decided, and barely discussed, in most cases. In the present case, the Court of Appeal, reversing the decision of the first instance judge, held that the claimant shareholders had no personal standing to bring the present claim.

For the reasons set out below, the Board concludes that a shareholder has a right of action against the company to challenge the allotment of shares by the board of directors on the basis that the allotment was made for an improper purpose in circumstances where the allotment will cause detriment to the shareholder.

The appeal comes before the Board against a successful strike out application by the company. The case has been decided in the courts below on assumed facts. The Board also addresses the appeal on the basis of assumed facts which may not be established at trial.

**A summary of the factual background and the assumed facts**

There has been a prolonged battle for control of the respondent company, China Shanshui Cement Group Ltd ("CSCGL"), which is a Cayman Islands exempted company that is also registered in Hong Kong as a non-Hong Kong company. CSCGL's shares are listed on the Hong Kong Stock Exchange ("HKSE"). CSCGL is a holding company of operating subsidiaries which are registered in Hong Kong and the People's Republic of China ("the PRC"). The group is principally engaged in the production, distribution and supply of cement and related construction products in the PRC. CSCGL's principal subsidiary, Shandong Shanshui Cement Group Co, is the sixth largest cement company in the PRC, measured by annual production capacity.

The principal shareholders in CSCGL are (i) the appellant ("Tianrui"), a company incorporated in the British Virgin Islands with a shareholding of 28.16%, (ii) Asia Cement Corporation ("ACC"), a company incorporated in Taiwan with a shareholding of 26.72%, (iii) China National Building Materials Co Ltd ("CNBM"), a company incorporated in the PRC with a shareholding of 16.67%, and (iv) China Shanshui Investment Company Ltd ("CSI"), a company incorporated in Hong Kong with a shareholding of 25.09%.

Each of CSCGL, Tianrui, ACC and CNBM are competitors in the cement production industry in the PRC.

As recorded in the agreed statement of facts and issues, CSCGL's shares were suspended from trading on the HKSE from April 2015 to 31 October 2018. On 23 October 2017, the HKSE gave notice that CSCGL would be delisted unless by 31 October 2018 (i) CSCGL restored its public float above the 25% minimum threshold required by a rule of the HKSE Main Board Listing Rules, and (ii) CSCGL addressed the facts that its auditors, KPMG, had issued a disclaimer of opinion on CSCGL's accounts on the financial years 2015 and 2016 and that the then board of CSCGL had not been able to publish their report for the financial year 2017.

On or about 23 May 2018 a majority of shareholders of CSCGL, including ACC, CNBM and CSI, voted at an extraordinary general meeting of CSCGL to reconstitute the board of directors. The reconstituted board comprised one director from CNBM (Chang Zhangli), one director from ACC (Wu Ling-Ling) and three independent non-executive directors.

Thereafter, CSCGL issued convertible bonds in two tranches. The first tranche, issued to one subscriber on or about 8 August 2018, involved bonds for a total value of US$210,900,000 at a conversion price of HK$6.29 per share. The second tranche was issued to seven subscribers on or about 3 September 2018 for a total of US$320,700,000 at a conversion price of HK$6.29 per share.

CSCGL claims that the proceeds of the bonds were primarily used to repay US$500 million loan notes that were repayable in March 2020 and were fully repaid on 28 November 2018.

After the first bond issue and before the second bond issue, on 30 August 2018, Tianrui filed in the Grand Court of the Cayman Islands a petition to wind up CSCGL on the ground that it would be just and equitable to do so. One of Tianrui's complaints was the improper issue of the shares described below. CSCGL's attempt to strike out that petition failed in the Court of Appeal, which, in a judgment dated 5 April 2019, held that, if Tianrui's allegations in the petition were true, they were capable of establishing that it would be just and equitable to wind up CSCGL.

On or about 6 October 2018 CSCGL (i) entered into deeds of amendment with each of the subscribers of the bonds to accelerate the conversion of US$456,600,000 in principal amount of the first and second bond issues into shares at a reduced "Early Conversion Price" of HK$4.20 per share, and (ii) agreed with the holders of bonds the allotment of 888,980,352 new shares in exchange for some of the bonds.

CSCGL held an adjourned annual general meeting and an extraordinary

general meeting of shareholders on 30 October 2018. At the extraordinary general meeting a majority of the shareholders passed a resolution mandating the directors to allot and issue 1,067,830,759 shares, comprised of the new shares in para 14 above and a further 93,004,771 shares, representing shares relating to the bonds held by persons who had not already agreed to the share conversion referred to in para 14 above. The new shares were issued on 30 October 2018, and restored the public float of CSCGL to 25%. As a result, trading in CSCGL's shares on the HKSE resumed on the following day.

Tianrui does not dispute this brief account of events which, on its face, may appear to be a rational response to the notice which the HKSE gave and which is referred to in para 9 above. But Tianrui says that that is not the whole story. Tianrui pleads in its writ in these proceedings that the bondholders were connected with ACC and CNBM by an undisclosed agreement or concert party to take over voting control of CSCGL. Tianrui pleads that the issue of the bonds and the allotment and issue of the new shares were an improper exercise of CSCGL's power to allot and issue securities. It is alleged that the shares were issued for the purpose of enabling ACC and CNBM to control CSCGL and achieving a dilution of Tianrui's shareholding to under 25% (in fact 21.85%) with the result that Tianrui could no longer block special resolutions. Mr Thomas Lowe KC

for Tianrui submits that if the share issues are valid, Tianrui cannot prevent the merger of CSCGL with another company and it might have to have its shares bought out under section 238 of the Companies Act.

Tianrui's pleadings are made before discovery and before the administration of interrogatories. It explains that the PRC government had imposed restrictions on cement production capacity in 2014 with the result that cement producers could only expand their market shares through taking over other producers and that CSCGL had become a target for takeover. It asserts that in a series of meetings in person in 2015 attended by the directors of ACC and CNBM and telephone conversations it had been agreed that ACC and CNBM would form an alliance to take over CSCGL, that they would make a joint offer for CSCGL's shares and that they would oppose Tianrui's attempts to obtain a greater interest in CSCGL. ACC and CNBM then made a joint offer to purchase the shares of CSCGL on 12 August 2015. ACC, CNBM and CSI used their votes to requisition the extraordinary general meeting in May 2018 at which CSCGL's board was removed and replaced by a board entirely nominated by ACC. It avers that the bond issues and share conversion were concluded in secret, that they were not arm's length transactions and that the subscribers were connected with ACC and/or CNBM.

Tianrui describes the effect and purpose of the convertible bond and share issues in its statement of claim as follows:

"56. As a result of having its shareholding reduced to under 25%, Tianrui is prejudiced as it can no longer block a special resolution in a general meeting of [CSCGL], which requires not less than 75% of the votes in general meeting.

Improper Purpose

57. The Convertible Bonds were issued by the board of [CSCGL] to persons connected with and/or acting in concert with ACC and/ or CNBM for the improper purposes of enabling ACC and CNBM by themselves or with others to control [CSCGL] as set out below.

58. ACC and CNBM entered into a secret or undisclosed

voting agreement about how to exercise votes between ACC and CNBM and the Bond Subscribers and/ or New Shareholders and/or each of them and/or reached an understanding with them and/or each of them."

Tianrui avers that the reconstituted board of CSCGL exercised their power to issue the convertible bonds and new shares for an improper purpose and that those transactions were invalid. Similarly, Tianrui avers that ACC, CNBM and CSI acted for an improper purpose in supporting the resolution at the extraordinary general meeting on 30 October 2018 to grant the specific mandate to issue the shares described in para 15 above.

Tianrui seeks as remedies declarations that the exercise by the directors of CSCGL of the powers (i) to issue the convertible bonds, (ii) to convert the bonds into shares, and (iii) to issue the new shares described in para 15above were each not a valid exercise of the relevant power.

The Board, like the courts below, is required to determine the strike out

application on the basis that Tianrui's averments in paras 16-19 above are assumed to be true.

The court may strike out a statement of case if, among other grounds, the statement of case discloses no reasonable cause of action or is otherwise an abuse of the process of the court: Grand Court Rules, O18, r19.

## the judgments of the Grand Court and the Court of Appeal

CSCGL sought to have both the winding up petition and the writ seeking declaratory relief struck out on various grounds. The Board is not concerned with the challenge to the winding up petition as it has earlier refused permission to appeal the Court of Appeal's judgment referred to in para 13 above. The only challenge to the writ proceedings made before Segal J in the Grand Court which is live before the Board is the challenge that the writ action is an abuse of process because Tianrui does not have standing to sue CSCGL for what are essentially claims arising out of breaches by the reconstituted board of the fiduciary duties which they owed to CSCGL.

In a detailed judgment delivered on 6 April 2020 Segal J rejected this challenge: 2020 (2) CILR 6. In so doing Segal J declined to follow a judgment of Kawaley J in the Grand Court in *Gao v China Biologic Products Holdings, Inc* 2018 (2) CILR 591 (" *Gao* ")

in which the court struck out the writ action by a minority shareholder challenging the exercise by a board of directors of the power to allot and issue shares on the ground that the plaintiff lacked standing to sue the company for a breach of fiduciary duty by the directors which was owed to the company and not to him. Segal J discussed various authorities, which the Board discusses below, and concluded that a minority shareholder had a personal claim against the company and that the appropriate remedy was a declaration, binding on the company, that the allotment and issue of the shares was unlawful. That is the remedy which Tianrui now seeks. He held that it followed from the characterisation of the shareholder's claim as a personal right against the company that the other shareholders could not ratify the acts of the directors. Segal J also rejected the argument that a shareholder did not have a personal claim because the shareholder could obtain redress by a derivative action.

CSCGL appealed that decision. In a judgment dated 1 July 2022 the Court of Appeal (Goldring P, and Field and Morrison JJA) held that an aggrieved shareholder had no personal right of action against the company for the diminution of his voting power caused by the issue of shares in breach of a fiduciary duty owed to the company: 2022 (2) CILR 28. The Court of Appeal reasoned that the central question on the appeal was whether a minority

[Appendix] Page 78

MR 1472

shareholder had standing to sue the company in which it held shares in the face of two possible obstacles. The first was that it was trite law that directors owe their fiduciary duties to the company which appoints them and not to its shareholders. The second possible hurdle was the view that the damage suffered as a result of a breach of fiduciary duty by the directors is damage to the company and not to the shareholder whose voting power has been diminished by the issue of new shares.

Mr Tom Smith KC advanced on behalf of CSCGL the argument that it was the company that suffered the loss and not the aggrieved shareholder (ie the second obstacle). He relied on dicta in the judgment of Harman LJ in Bamford v Bamford [1970] Ch 212 and the judgment of the UK Supreme Court in *Marex Financial Ltd v Sevilleja* [2020] UKSC 31; [2021] AC 39 . The Court of Appeal rejected that argument, holding that the shareholder's loss was separate and distinct from any loss suffered by the company. The argument has not been advanced again before the Board.

In addressing the first possible obstacle, the Court of Appeal considered several authorities which the Board will consider below. They were Fraser v Whalley (1864) 2 H & M 10 ; Punt v Symons & Co Ltd [1903] 2 Ch 506 ; Howard Smith Ltd v Ampol Petroleum Ltd [1974] AC 821 ("Howard Smith") ; *In re a* Company (No 005136 of 1986)

[1987] BCLC 82 (aka *In re Sherborne Park Residents Co Ltd* (" *Sherborne Park* ")); and the judgment of the Supreme Court of South Australia in *Residues Treatment & Trading Co Ltd v Southern Resources Ltd* (1988) 6 ACLC 1160 (" *Residues* "). The Court accepted Mr Smith's submissions that in *Sherborne Park* Hoffmann J had not explained why the shareholder had a personal right of action, in Howard Smith the House of Lords had not discussed how the shareholder could bring a personal claim, and in *Residues* King CJ, while referring to a shareholder's personal right "founded in equity" (p 1165), had failed to provide a principled basis for the conclusion that a shareholder had such a personal right. The Court of Appeal concluded (para 51) that "it remains the law of the Cayman Islands that the postulated aggrieved shareholder has no such personal right of action but must found his claim on a basis that is consistent with the rule in Foss v Harbottle or with the fraud on the minority exception to that rule."

## the issues raised in Tianrui's appeal

Tianrui now appeals to the Board against the striking out of its writ which followed upon this ruling.

In the Board's view, there are four principal questions that need to be addressed on this appeal. They are:

• (i) Bearing in mind that the duty of the directors alleged to have been breached is owed to CSCGL and not to its shareholders, what, if anything, is the shareholder's cause of action?

• (ii) What, if any, distinctive aspects of the shareholder's cause of action mean that it may be pursued notwithstanding the rule in Foss v Harbottle ?

• (iii) Was the impugned exercise of the board's power void or voidable?

• (iv) Was the alleged breach of duty capable of being ratified by a majority of CSCGL's shareholders? If so, what is the consequence of the theoretical availability of ratification for the pursuit of the shareholder's claim in the meantime?

Before addressing the case law relating to a shareholder's personal right of action against a company, the Board summarises the relevant constitutional provisions relating to CSCGL in its memorandum and articles of association and in statute.

## the relevant provisions of Cscgl's constitution

Unless the objects and business of a company are restricted in its memorandum of association, it has power to carry out any object not prohibited by law: Companies Act (2023 rev) ("CA"), section 7(4). When registered, a company's memorandum of association binds the company and its members as if each member had subscribed the memorandum and it contained a covenant on the part of the member, his heirs and administrators to observe all its conditions: CA section 12. Similarly, when registered the articles of association bind the company and its members as if each member had subscribed the articles and it contained a covenant on the part of the member, his heirs and administrators to conform to the regulations contained in the articles: CA section 25. There is, as the Board will explain below, a contract between the company and its members and between its members inter se that the company and its members will observe the conditions of the memorandum and the regulations of the articles of association, but the statutory contract is entered into on terms which are alterable by a 75% majority of the shareholders as vote at a general meeting, through the amendment of those articles by special resolution.

Clause 4 of CSCGL's memorandum of association empowers it to issue convertible bonds. CSCGL's amended and restated articles of association dated 16 May 2014, which were effective until 30 May 2019, gave the board power, in article 3.13, to allot or otherwise dispose of its unissued shares and, in article 11.2, to borrow and to grant securities for CSCGL's debts.

Tianrui in its statement of claim para 13, pleads that it is an implied term of the articles of association that the exercise of such powers of the board cannot result in the valid issue of securities if the exercise was materially affected by an improper motive or purpose.

**the prior case law on the standing of the shareholder**

Underpinning the challenge by CSCGL to the right of Tianrui to bring these proceedings is the so-called "rule in Foss v Harbottle" ((1843) 2 Hare 461 ). This "rule" is made up of two related principles.

The first, known as the "proper plaintiff" principle, is that where a wrong has been done to a company only the company, not an individual shareholder, can take action. A breach by a director or by the board of directors of a duty which is owed to the company is a wrong done to the company, and the general rule is that only the company has a remedy for that breach.

The second principle, which is known as the "majority rule" principle, is that the will of the majority of the shareholders of the company should, as a general rule, prevail in the running of the company's business. Thus, if a transaction can be made binding on the company by a simple majority of shareholders, and that majority does not

want to take action against a director or directors for a breach of duty in relation to it, the majority can, as a general rule, waive the breach or ratify the irregular acts of the director or directors.

There is an exception to the operation of these principles where the wrongdoers are guilty of dishonest conduct or attempting to appropriate or have appropriated to themselves property or opportunities to which the company is entitled or in which other shareholders are entitled to participate, and the wrongdoers are themselves in control of the company. In that event, which is often called "fraud on the minority", the aggrieved shareholder or minority may bring a derivative action seeking relief on behalf of the company in whom the cause of action is vested.

The "rule" in Foss v Harbottle and the exception or exceptions to the "rule" are discussed in many authorities, including Edwards v Halliwell [1950] 2 All ER 1064, 1066-1069 ; and Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204, 219-222 .

The boundaries of the exception or exceptions to the "rule" are ill-defined. In many jurisdictions, the shareholder derivative action has been placed on a statutory basis in order to remove the uncertainties which remain within the common law. For example, in the United Kingdom Part 11 of the Companies Act 2006 has created

a statutory derivative action. The Cayman Islands has preserved the common law rules and the court exercises a degree of control over derivative actions under Order 15, rule 12A of the Grand Court Rules under which, if a defendant in a derivative action has given notice of an intention to defend, the plaintiff must apply to the court for leave to continue the action.

The "rule" in Foss v Harbottle is only part of the picture. The courts have long recognised that a shareholder has personal rights against a company which it can enforce by a personal action. For example, a shareholder has a personal right to vote on a resolution before a company in general meeting and, when his vote has been improperly rejected at a general meeting, is entitled to an injunction against the implementation of the irregularly obtained resolution: Pender v Lushington (1877) 6 Ch D 70, 80-81 per Jessel MR. This right of a shareholder personally to institute proceedings to assert or protect personal rights was the basis of the decision of the Court of Appeal in Edwards v Halliwell. In that case, a trade union had purported to increase the regular contributions payable by members without the resolution passed by a two-thirds majority required by the rules. Two members who were threatened with expulsion from the union for failure to pay the increased contributions were held to be entitled to bring proceedings personally for

a declaration that the increases were invalid. Jenkins LJ said at p 1067, having discussed the rule in Foss v Harbottle:

"In my judgment, this is a case of a kind which is not even within the general ambit of the rule. It is not a case where what is complained of is a wrong done to the union, a matter in respect of which the cause of action would primarily and properly belong to the union. It is a case in which certain members of a trade union complain that the union, acting through the delegate meeting and the executive council in breach of the rules by which the union and every member of the union are bound, has invaded the individual rights of the complainant members, who are entitled to maintain themselves in full membership with all the rights and privileges appertaining to that status so long as they pay contributions

in accordance with the tables of contributions as they stood before the purported alterations of 1943, unless and until the scale of contributions is validly altered by the prescribed majority obtained on a ballot vote. Those rights, these members claim, have been invaded. The gist of the case is that the personal and individual rights of membership of each of them have been invaded by a purported, but invalid, alteration of the tables of contributions. In those circumstances, it seems to me the rule in Foss v Harbottle has no application at all, for the individual members who are suing sue, not in the right of the union, but in their own right to protect from invasion their own individual rights as members."

By contrast, in other cases, the rights of shareholders are invaded not because the company or its agents have acted contrary to the express terms of the articles of association or other constitutional documents but because the directors, acting as the company's agents, have exercised powers within the letter of their express terms but for improper purposes. All powers conferred on the directors are fiduciary in nature and they are required by equity to exercise such powers for proper purposes. An exercise of a fiduciary power for an improper purpose is a breach of the duty owed by the directors to the company. Although the duty is owed to the company, and not to shareholders personally, shareholders whose personal rights are adversely affected by the directors' exercise of the power have been held in the context of a range of different powers to be entitled to maintain a personal action against the company to remedy the wrong done to them.

The House of Lords in a Scottish appeal, Hindle v John Cotton Ltd (1919) 56 Sc LR 625 , allowed an action by a shareholder against the company to proceed to proof (trial) in which the allegations by the shareholder were that the company's directors had acted in bad faith when, after dismissing him from office as managing director, they purported to exercise a power in the company's articles of association to acquire his shares at their nominal value. In In Re Smith and Fawcett Ltd [1942] Ch 304 an executor of a deceased shareholder of a private company, after the directors of the

company refused to register him as a shareholder, applied to the court to have the register rectified. The application failed because the plaintiff had not shown that the directors had exercised their fiduciary powers other than in the interests of the company. More recently, in Eclairs Group Ltd v JKX Oil & Gas plc [2015] UKSC 71; [2015] Bus LR 1395; [2016] 3 All ER 641 , the UK Supreme Court gave a remedy to the beneficial owners of shares, which had asserted a personal right against the company in which they had invested, when the directors of the company had, in breach of their duty to exercise their powers for proper purposes, resolved to issue restriction notices suspending the right to vote at general meeting attached to the shares and to restrict the right to transfer the shares.

The issue at the heart of this appeal, namely the juridical basis of the individual shareholder's standing to bring proceedings to challenge the directors' exercise of a power for improper purpose, arose also in those cases. Given that in each case the shareholder's rights were directly affected by the relevant improper decision, they were obvious cases for intervention by the courts, but there still needs to be a proper legal basis - in short, a cause of action. As we discuss later in this judgment, we consider that, as an intrinsic feature of the contract constituted by the memorandum and articles of association, it is implicit that when exercising their powers on behalf of the company the directors will exercise them in accordance with their fiduciary duties, including the duty to exercise powers only for a proper purpose.

In each of the cases mentioned, the courts have recognised a shareholder's personal right to bring legal proceedings against the company when the directors act to appropriate the shares or to remove or restrict rights attached to them. The circumstances of this appeal are different in the sense that it does not involve the removal or restriction of rights attached to shares. The appeal is concerned with the detriment to a shareholder's ability to exercise the proportionate voting power attached to its shares resulting from the allegedly improper allotment and issue of new shares to other parties. It is necessary to look more closely at the case law which is concerned with personal actions by a shareholder against a company which challenge the allotment and issue of new shares because CSCGL submits that the cases do not establish a proper jurisprudential basis for the recognition of such actions.

In the Cayman Islands, the courts have not accepted the standing of a shareholder to challenge the allotment and issue of shares to others. As the Board has mentioned in para 24 above, in *Gao* Kawaley J struck out a minority shareholder's action against the company on the ground that the

shareholder lacked standing. The Court of Appeal has accepted his reasoning in this case in preference to that of Segal J who accepted that Tianrui had standing.

In the United Kingdom, the courts have for a long time recognised the right of a shareholder to challenge the allotment and issue of shares by a company's directors for an improper purpose, such as to alter the voting power of shareholders. In Fraser v Whalley , Sir William Page Wood V-C granted an injunction against the directors of a company to prevent them from invoking a prior resolution by shareholders to issue shares, which had been made for a superseded purpose, for another, improper purpose of gaining control of a forthcoming general meeting at which it was likely to be proposed that they be removed as directors. The Vice-Chancellor at p 29 concurred with the principle laid down in Foss v Harbottle but stated that the court will intervene when directors "clandestinely and at the last moment use a stale resolution for the express purpose of preventing the free action of the shareholders".

In Punt v Symons & Co Ltd [1903] 2 Ch 506 Byrne J followed Fraser v Whalley in granting an injunction against a company to restrain the holding of a general meeting of the company after the directors had issued shares for the improper purpose of gaining a sufficient majority of votes at that meeting to pass a special resolution to alter the company's articles of association. Byrne J stated (p 517):

> "If I find as I do that shares have been issued under the general and fiduciary power of the directors for the express purpose of acquiring an unfair majority for the purpose of altering the rights of parties under the articles, I think I ought to interfere."

Peterson J in Piercy v S Mills & Co Ltd [1920] 1 Ch 77 reached a similar decision in an action by a majority shareholder against the company and its directors when he granted a declaration that the allotment of shares which the directors had made for an improper purpose was invalid and void. In that case, the plaintiff was a manager of the company who had acquired a majority of its shares and wished to use the voting power of those shares at general meeting to appoint himself and his two brothers as directors in face of opposition from the current directors. In response to his requisitioning of a general meeting, the directors on two occasions allotted shares to their friends to destroy his majority and thereby keep control over the management of

the company. Referring to Fraser v Whalley and Punt v Symons & Co Ltd Peterson J stated, at p 84:

"The basis of both cases is, as I understand, that directors are not entitled to use their powers of issuing shares merely for the purpose of maintaining their control or the control of themselves and their friends over the affairs of the company, or merely for the purpose of defeating the wishes of the existing majority of shareholders."

Holding that the majority shareholders were entitled to have their views prevail in accordance with the company's articles of association, Peterson J granted the declaration invalidating the allotments of the shares.

In Hogg v Cramphorn Ltd [1967] Ch 254 Buckley J addressed a scheme devised by the directors of a company, acting in good faith in what they believed to be the best interests of the company, to thwart a proposal by an investor from outside the company to acquire its whole share capital.

The directors' scheme involved the issue of new preference shares with special voting rights of ten votes per share. Buckley J held that the company's articles of association did not give the directors power to issue shares with enhanced voting rights but recognised that the allottees might elect to accept the shares without the special voting rights attached. He then addressed the wider question of whether the allotment should be set aside, observing that it was common ground that the directors were not motivated by personal advantage but acted in the honest belief that their scheme to prevent the unwanted take-over was for the good of the company. He referred with approval to statements in Fraser v Whalley , Punt v Symons & Co Ltd and Piercy v S Mills & Co Ltd that it was not open to directors to use their power to issue shares in order to interfere with the right of a majority of shareholders to exercise their constitutional rights within the company. Nonetheless, he observed that a majority of the shareholders could have approved the issue of the contested shares and, had it done so, there could have been no force in the argument that the directors were attempting to deprive the majority of their constitutional rights. That being so, a majority in a general meeting of the company at which no votes were cast in respect of the contested shares could ratify the issue of those shares. Buckley J, therefore, rather than setting aside the allotment and issue of the

contested shares, gave the company the opportunity in general meeting to decide whether it approved the issue of those shares, with the owners of the contested shares undertaking not to vote at the meeting in respect of those shares. As the report of the decision records, the shareholders thereafter ratified and approved the allotment of the shares, which had equal voting rights.

Another example of a personal action by shareholders to challenge an allotment of shares allegedly made for an improper purpose is the judgment of the Court of Appeal in Bamford v Bamford [1970] Ch 212 . The directors of a public company allotted a significant block of shares in an attempt to block a take-over bid. Two minority shareholders in the company brought a personal action seeking a declaration that the allotment was invalid. In response, the directors gave notice convening a general meeting of the shareholders of the company to consider a resolution ratifying and approving the allotment. The two shareholders then issued a second writ challenging the validity of any resolution passed at the proposed general meeting. In the event, the resolution ratifying the allotment was passed by a substantial majority vote at the general meeting, the allotted shares not being voted. The two actions were consolidated, and a preliminary issue was tried as to whether the allotment was capable of being ratified and approved by a general meeting of the shareholders of the company. Plowman J answered the question in the affirmative, holding that as the allotment had been approved by a majority of the shareholders, it was validated, even if the directors had acted for an improper motive in making the allotment. The Court of Appeal upheld his conclusion, and approved Buckley J's judgment in Hogg v Cramphorn Ltd. It held that a majority of shareholders at the general meeting could waive and had waived any impropriety on the part of the directors. The allotment, if initially voidable, had been subsequently validated by the shareholders.

Harman LJ regarded the case as being "tolerably plain" (p 237). If the directors, by having regard to the exigencies of the take-over battle had not addressed the single question of the benefit of the company, the allotment would be voidable at the instance of the company because it was a wrong done to the company (p 238). The company in general meeting, which had the right to recall the allotment also had the right to approve it. Russell LJ, who gave the other substantive judgment on the appeal, stated (p 242):

> "It is true that the point before us is not an objection to the proceedings on Foss v Harbottle (1843) 2 Hare

461 grounds. But it seems to me to march in step with the principles that underlie the rule in that case. None of the factors that admit exceptions to that rule appear to exist here. The harm done by the assumed improperly-motivated allotment is a harm done to the company, of which only the company can complain. It would be for the company by ordinary resolution to decide whether or not to proceed against the directors for compensation for misfeasance."

The Board will return to this case in its discussion below. It is sufficient now to observe that in Bamford v Bamford the alleged wrong was not targeted at a shareholder or group of shareholders but was a wrong which affected all shareholders of the company. Russell LJ's dictum that only the company could complain of the harm done must be read in that context.

Before completing this survey of the case law from England and Wales, the Board turns to its judgment in an appeal from the Supreme Court of New South Wales in the well-known case of Howard Smith . The appeal concerned a struggle for the takeover of a company ("Millers") in which Howard Smith and Ampol were the rival parties. Another substantial shareholder in Millers, called Bulkships Ltd, was associated with Ampol and together they held about 55% of Millers' issued share capital. Millers needed more capital. The board of Millers recommended that Ampol's offer for the whole share capital of Millers be rejected as too low after Howard Smith had announced its intention to make a higher offer. Ampol and Bulkships announced their intention to act together in the future operations of Millers and to reject any offer for their shares. Howard Smith then applied to Millers for the allotment of 4.5 million shares and the directors of Millers by majority resolved to make the allotment and immediately issued the shares. The effect of the share issue was to give Millers much needed capital and to reduce Ampol's and Bulkships' combined shareholding to 36.6% of Miller's issued shares, thereby enabling Howard Smith to make an effective takeover offer.

Ampol brought an action against Howard Smith, Millers, 11 directors of Millers and a company which acted as Millers' registrar. Only Ampol and Howard Smith appeared in the appeal before the Board.

The question for the Board was whether the issue of the shares to Howard Smith was valid when the primary object of the directors was to alter the majority shareholding of the issued shares so as to procure the takeover offer by Howard Smith but the directors were not acting for their own personal advantage.

Lord Wilberforce, giving the judgment of the Board, stated (p 834) that the issue of the shares by the directors was intra vires but it was a fiduciary power whose exercise could be attacked on the ground that it was not exercised for the purpose for which it was granted. After referring to Fraser v Whalley , Punt v Symons & Co Ltd , Piercy v S Mills & Co Ltd , and Hogg v Cramphorn Ltd , which were cases in which the directors acted in their self-interest or at least to preserve their own control of management, he observed that the absence of self-interest is not enough to make a share issue valid and that a wider investigation must be made. He continued (p 837):

> "The purpose found by the judge is simply and solely to dilute the majority voting power held by Ampol and Bulkships so as to enable a then minority of shareholders to sell their shares more advantageously. So far

as authority goes, an issue of shares purely for the purpose of creating voting power has repeatedly been condemned … In the leading Australian case of Mills v Mills, 60 CLR 150 , it was accepted in the High Court that if the purpose of issuing shares was solely to alter the voting power the issue would be invalid. And, though the reported decisions, naturally enough, are expressed in terms of their own facts, there are clear considerations of principle which support the trend they establish. The constitution of a limited company normally provides for directors, with powers of management, and shareholders, with defined voting powers having power to appoint the directors, and to take, in general meeting, by majority vote, decisions on matters not reserved for management. Just as it is established that directors, within their management powers,

may take decisions against the wishes of the majority of shareholders, and indeed that the majority of shareholders cannot control them in the exercise of these powers while they remain in office …, so it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers."

The Board therefore concluded that the power to allot and issue shares had been improperly exercised by the issue of shares to Howard Smith. The Board upheld Street J's order setting aside the allotment and ordering the rectification of the company's share register.

The Board observes, as CSCGL has emphasised on this appeal, that Lord Wilberforce recorded (at p 838) that it was not disputed in that case that Ampol as plaintiff had properly brought the action to set aside the allotment and rectify the register. The Board did not address any challenge to Ampol's standing. By contrast, Tianrui's standing to bring the proceedings in this case is the central issue on this appeal.

Returning to jurisprudence in England and Wales, in *Sherborne Park* Hoffmann J explained a jurisprudential basis for a personal action by a shareholder against the improper exercise by directors of the power to allot shares. The reported judgment is an ex tempore judgment in an ex parte application made, in a petition brought under [section 459 of the Companies Act 1985](#) , by the petitioner shareholder for an order that he be indemnified in advance by the company for his costs in the petition. The casus belli was a directors' resolution to issue and allot shares in the company alleged to have been motivated by an improper desire by the directors to alter the balance of voting power in the company. Entitlement to a costs indemnity depended upon the claim being properly constituted as a derivative action, rather than as a personal action by the claimant. In refusing the application, Hoffmann J drew a distinction between a derivative action in which a shareholder sues in

his own name for a wrong done to the company, such as where the directors misappropriate the company's property, and a personal action for a wrong done to a shareholder. A writ challenging an abuse by the directors of their fiduciary power in a wrongful share allotment was a personal action. He stated:

"Although the alleged breach of fiduciary duty by the board is in theory a breach of its duty to the company, the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who its shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder. The allotment is alleged to be an improper and unlawful exercise of the powers granted to the board by the articles of association, which constitute a contract between the company and its members. These are fiduciary powers, not to be exercised for an improper purpose, and it is generally speaking improper —

"for the directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist."

(see Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126

at 1136, [1974] AC 821 at 837 ). An abuse of these powers is an infringement of a member's contractual rights under the articles."

Turning to Australian jurisprudence, in *Mills v Mills* (1938) 60 CLR 150 , which Lord Wilberforce cited in Howard Smith , the High Court of Australia addressed what was in substance a dispute in a family company between two directors, one of whom was the managing director, and the other, his nephew. The uncle's interest was mainly in ordinary shares which carried one vote per share, while the nephew's interest was mainly in preference shares which carried three votes per share. The nephew challenged the resolution of the directors to issue new ordinary fully paid up shares to the holders of ordinary shares. No new shares were issued to the holders of preference shares. This share issue not only altered the balance of voting power of the shareholders in favour of the holders of ordinary shares but also improved the position of ordinary shareholders if a winding up should take place as the preference shares ranked equally with the ordinary shares. The nephew and two other shareholders brought an action on their own behalf and on behalf of the shareholders of the company against the company, the uncle and another director seeking a declaration that the share issue was invalid. The action failed as it was not established that the resolution of the directors was passed in bad faith; the mere fact that the uncle derived some benefit from the passing of the resolution was not sufficient ground for invalidating the share issue when it was not established that the resolution was passed for an improper purpose.

The High Court of Australia rejected a challenge to the right of minority shareholders to seek an order invalidating the exercise by directors of their fiduciary power to allot shares in *Ngurli Ltd v McCann* (1953) 90 CLR 425 ("Ngurli"). The case involved identical transactions in four companies. Simplifying the facts, shares were issued at par for the improper purpose of giving a director and shareholder controlling voting power at meetings of a company and no shares were issued to minority shareholders. The judge at first instance, Mayo J, held that there had been a breach of fiduciary duty by the controlling director but that the wrong had been done to the company and it alone was the proper plaintiff. The Supreme Court of South Australia set aside his order and declared that the allotment and issue of the shares were invalid. The High Court (Williams ACJ, Fullagar and Kitto JJ) dismissed

WESTLAW   © 2025 Thomson Reuters.

an appeal against that order. They held (p 447) that the controlling director in failing to take into account the interests of the minority shareholders when deciding to issue the new shares had acted in breach of his fiduciary duty to consider the interests of the company as a whole and that in those circumstances "the plaintiffs have a clear right to sue in their own names to remedy the breach of trust."

The Supreme Court of South Australia rejected a similar challenge to the standing of a minority shareholder to seek an order invalidating the allotment of shares by directors of a company for an allegedly improper purpose in *Residues* , to which the Board has referred in para 27 above. In the leading judgment of King CJ, with whom Matheson J agreed, the court recognised that the exercise by directors of a power to allot shares for an improper purpose was a breach of their fiduciary duty to the company and that such an allotment was voidable "in the sense that it is valid unless and until disavowed by the company in general meeting or declared invalid by a court in a properly constituted action" (p 1163). The court recognised that to establish standing the statement of claim must raise a cause of action based upon an infringement of the plaintiff's personal rights. King CJ referred to several cases in which a shareholder had successfully challenged allotments of shares made by directors for an improper purpose, including *Ngurli* ,

Howard Smith , and *Whitehouse v Carlton Hotel Pty Ltd* (1987) 162 CLR 285 . The cases, he stated, contained "strong indications … of the recognition of a personal right in a shareholder to be protected against dilution of his voting rights in the company by improper action on the part of the directors." He considered that the principle applied not only to an improper allotment that converted a majority into a minority but also to an improper allotment which "reduces the aggrieved shareholder's voice in the company." (p 1164)

King CJ explained the jurisprudential basis for the personal right in these terms (p 1165):

"The personal right of a shareholder to which I refer is founded, in my opinion, upon general equitable considerations referred to in the cases cited above arising out of membership of a body whose management is in the hands of directors having fiduciary obligations. It is fortified by the nature of the contract between the company and the members constituted by the memorandum and articles of association

and given statutory force by section 78(1) of the Companies Code. I do not mean that the relevant right of a shareholder is founded in contract or that his remedies for infringement are remedies for breach of contract. The shareholder's right is founded in equity and is a right to have the say in the company which accrues to him by virtue of the voting rights which are attached to his shares by his contract with the company, preserved against improper actions by the company or the directors who manage its affairs."

The improper allotment of shares which diminished a shareholder's effective voting power was "a wrong done to the shareholder by the company acting through its agents" and therefore the rule in [Foss v Harbottle](#) did not apply. He drew support for his conclusion from Hoffmann J's judgment in *Sherborne Park* .

King CJ expressed the view that any potential for ratification of the exercise of the power at general meeting would not deprive the plaintiff of standing while the infringement exists. The Board addresses the Company's argument on the potential for ratification in paras 80 – 84 below.

Bollen J in a short judgment concurred and referred to Hoffmann J's "carefully considered dicta" in *Sherborne Park* as giving strong support for his conclusion (p 1168).

**the legal basis of the shareholder's personal action**

The series of English and Australian cases reviewed above shows that courts, applying principles of company law which are not materially different to those in force in the Cayman Islands, have repeatedly recognised the right of one or more shareholders of a company to bring a personal action in their own names against the company (rather than a derivative action on behalf of the company) by way of challenge to the validity of an allotment of shares made on behalf of the company by its directors, based upon the allegation that the directors acted for an improper purpose. In only one (Australian) case, the *Residues* case, has a challenge to the shareholders' standing been addressed and rejected with principled reasons for doing so. Yet in two Cayman cases, *Gao* and the decision of the Court of Appeal in this case, that right to bring such

an action has been asserted but denied. At the heart of each of those decisions was the reasoning that shareholders could not bring a claim in their own right in respect of a breach of fiduciary duty owed by the directors solely to the company. The company was the only proper claimant, and shareholders could only assert the company's claim by way of a derivative action, where the law permitted such an action to be brought and where leave of the court to do so was obtained in accordance with the rules.

The Board's opinion is that *Gao* was wrongly decided, and that the Court of Appeal was wrong to follow it in the present case. A shareholder whose holding is diluted by an improper allotment of shares by the directors may bring a personal claim against the company challenging the validity of that allotment, although in certain circumstances (not applicable here) the claim may be defeated by ratification of the allotment by a majority of the shareholders (other than the allottees) at a general meeting. Since the Board does not entirely agree with the reasoning of King CJ in the *Residues* case for reaching that conclusion, the Board will set out its own reasons. They require the matter to be approached from first principles.

The registration of a person as a shareholder in a company brings with it a bundle of rights. Subject to any special class rights or restrictions, the rights include a proportionate share in the distributed profits of the company and in any distribution of capital. The value per share of the shareholding will follow the fortunes of the company. That which benefits or harms the company will correspondingly increase or reduce the value of the shares.

Subject again to any class restrictions, shares will carry the right to attend and vote at general meetings of the company, and thereby play a part in the exercise of the shareholders' collective power to influence or control the general direction of its affairs. The active power of a shareholder is critically dependent upon the proportion which the shares (of an individual shareholder or group of shareholders acting together) bear to the shares in the company (or the relevant class) as a whole. In companies which are controlled by the majority vote of ordinary shareholders, the possession of a majority of the shares confers control (critically through the power to appoint and remove directors), while possession of more than 25% of the shares confers what is sometimes called negative control, through the ability to block certain steps requiring a special resolution, including the power to alter the articles of association. The value per share of such a block is critically sensitive to dilution, where in particular its percentage falls below 50% or 25% of the whole. The exercise of (or ability to exercise) those rights by individual

shareholders or groups of shareholders is how power over the company's affairs is maintained, and dilution of those shareholding proportions by the allotment and issue of new shares may critically affect the balance of power between shareholders.

The power to issue shares is conferred upon CSCGL by its memorandum of association, but the power to cause the company to allot and issue shares is conferred upon the directors, acting as fiduciaries, by the articles of association. The power is therefore necessarily a fiduciary power and must therefore only be exercised for proper purposes. The proper purposes for the exercise of the power to allot and issue shares include the raising of new capital where that is genuinely considered by the directors to be in the best interests of the company, but there can be other legitimate purposes. No part of those proper purposes includes deliberately altering the balance of power between shareholders. But, of course, an allotment and issue of new shares will frequently have that effect, save where the allotment is made to, and taken up by, all existing shareholders in strict proportion to their existing holdings. Equally, an allotment to the whole of one class of shareholders may alter that balance of power, as is illustrated by the facts of *Mills v Mills* , as explained by Latham CJ at pp 159-160.

The conferment upon the directors of that fiduciary power to allot and issue shares is an important part of the contract between shareholders and the company, constituted by its memorandum and articles: see sections 12 and 25 of the Companies Act (para 31 above). The inevitable consequence of the conferral of a power upon fiduciaries is that it must be exercised for proper purposes: see again *Mills v Mills,* per Dixon J, at pp 185-186, followed in Howard Smith at pp 835-836 and more recently Eclairs , at paras 15ff. Where such a power is conferred by the articles upon fiduciaries, this constraint upon its exercise is as much a part of that corporate contract as if it had been spelt out word for word in the articles. It is a term of the corporate contract that, if the exercise of the power to allot and issue new shares by the directors as agents for the company is to be valid and binding as between the individual shareholder and the company, it should comply with all conditions necessary to make it a proper exercise. These include compliance with the directors' fiduciary duty owed to the company. This is a constraint implied by law as inherent in the relationship between the shareholder and the company.

It is not, of course, any part of the corporate contract that a shareholder's holding will not be diluted, or that nothing will be done by the directors which alters the balance of power between shareholders. The Board may

for example perfectly legitimately decide to issue shares for proper business purposes to new shareholders and that issue, while diluting all existing shareholders' holdings in equal proportions, incidentally alters the balance of power by depriving a shareholder or group of majority control, or of negative control. But it is part of the corporate contract that, if this is to happen, it is done only by a proper exercise of the power, ie one that is exercised bona fide for the benefit of the company as a whole and exercised for the purposes for which the power was conferred. This will necessarily exclude, for example, an allotment and issue of shares which is deliberately aimed at altering the balance of power between shareholders, so as to advance the power of one (or one group) at the expense of another.

This is, in the Board's view, the basis of the shareholder's right to bring an action against the company to challenge an improper exercise of the directors' power to allot and issue shares. It is implicit in the contract constituted by the articles of association that the company's power to allot and issue new shares, delegated by the articles to the directors, will be exercised properly, which is to say by the directors on behalf of the company in accordance with their fiduciary duties. The harmful consequence to the shareholder is the alteration (adverse to him) in the balance of power between the company's shareholders and the particular harm which that does to the value of the rights embedded in his shares. It is an actionable harm because the impropriety in the exercise of the power contravenes the corporate contract binding him and the company, even though the relevant fiduciary duty breached by the directors is not owed to him.

It is precisely in the identification of the corporate contract as the basis of the shareholder's claim against the company that the Board respectfully differs from the otherwise compelling reasoning of King CJ in the *Residues* case in the quotation in para 62 above.

It is correct to say that the constraint which requires the directors to exercise their power to allot and issue shares only for proper purposes is of equitable origin, because it is an aspect of the conduct which equity requires of directors as fiduciaries. This is for example the reason why the exercise of the directors' power to allot and issue shares is only rendered voidable (rather than void) by an equitable impropriety in its exercise, and why a challenge to its exercise may be ineffective against a bona fide purchaser of the issued shares without notice of the impropriety: see again *Residues* , at pp 1162-1163. But the Board does not consider that the breach of an equitable restraint upon the exercise of a power gives rise automatically and without more to an equity to set it aside enjoyed by someone, such as a shareholder, who is

MR 1491

neither the donor nor the beneficiary of the power. What gives the shareholder that right is the corporate contract binding between the shareholder and the company, in which this right not to have his say in the company adversely affected by an improper exercise of the power is embedded.

In that respect the Board prefers the analysis of Hoffmann J in *Sherborne Park* which the Board has quoted in para 58 above. Although this was an ex tempore judgment refusing an ex parte application for a costs indemnity at the outset of an unfair prejudice petition, it is nonetheless compelling and consistent with principle. It chimes with Lord Wilberforce's emphasis in Howard Smith on the contractual constitution of a company in the passage which the Board has set out in para 55 above. The Board agrees with Hoffmann J's pithy analysis of the essential nature of the shareholder's personal action to challenge an improper allotment and issue of shares by directors. Although the action is founded upon the fact of the commission of a breach of fiduciary duty by the directors, the cause of action is that the contract between the shareholder and the company contains the implied term that, in exercising the power to allot and issue shares, the directors as the company's agents will do so in accordance with their fiduciary duties.

In the Board's view this term falls to be implied into the contract between the shareholder and the company and between the shareholders inter se and it arises out of the nature of the contractual constitution of the company. It is a term which is implied as a result of the nature of the contract and the relationship thereby created between the parties to that contract. This involves implication in the sense that the House of Lords discussed in Liverpool City Council v Irwin [1977] AC 239 , see especially Lord Wilberforce at p 254 and Lord Fraser of Tullybelton at p 270. It is a necessary legal incident of the relationship between a shareholder and a company, and between the shareholders inter se.

The Board would add that the right of the shareholder to sue the company is not dependent upon the alteration in the balance of power being adverse only to a minority of shareholders (although it was on the assumed facts of this case). Directors may seek deliberately to deprive a single existing shareholder (or group) of majority control by allotting shares to a favoured outsider. That is what happened in Howard Smith , but the claimant, which was one of a pair of shareholders which together held 55% of the company's shares, nonetheless succeeded. There the majority were determined to resist a take-over bid, and the directors improperly allotted sufficient shares to the bidder to

destroy that majority, so as to facilitate the bid. In both Hogg v Cramphorn Ltd and Bamford v Bamford the directors feared that the majority would succumb to an unwelcome take-over bid. In neither case did this render the shareholders' personal actions improperly constituted. As explained below, the claimants ultimately failed in both cases because the improper issue and allotment of shares by the directors was ratified in general meeting.

Nor by contrast is the personal right to sue dependent upon the claiming shareholders being, or being part of, a majority, as was submitted by Mr Smith, even though that was in fact the position in a number of the cases where a personal claim succeeded. The Board considers that the size of the claimant's shareholding is in principle irrelevant. The Board agrees with the following extract from the judgment of Barwick CJ in *Ashburton Oil NL v Alpha Minerals NL* (1971) 123 CLR 614 ("Ashburton") at p 620:

"The remaining basis of the appellants' claim was that their majority shareholding itself gave them a right to relief in each action which they had commenced. But, in my opinion, the extent of that shareholding in itself gave the appellants no

equity to any of the relief sought in either action. Of course, that shareholding because of its extent might enable the appellants to carry resolutions at general meetings of the company, but always subject to the absence of any relevant oppression of the minority. Though the appellants have the equity of a shareholder to which I have referred, they have, in my opinion, no greater and no differing right because their shareholding is a numerical majority of the issued shares of the company."

What matters is that the claiming shareholder, together in an appropriate case with those other shareholders he claims to represent, have suffered from an interference with their rights as shareholders brought about by the improper issue and allotment.

It is also in principle irrelevant whether or not the company itself has a cause of action against the directors for the breach of the fiduciary duty owed

to it. Usually it will, because the right of the beneficiary to challenge the improper exercise of a fiduciary power, and to seek to set aside the resulting transaction, is not dependent upon proof of loss or damage. To that extent, if the dicta of Hoffmann J in *Sherborne Park* might be thought to suggest that the two types of action are mutually exclusive, the Board respectfully disagrees, even if they may have been on the facts of that case. The Board agrees with the analysis of Professor Gower in his *Principles of Company Law* , 4th ed (1979) at pp 653-654 that a shareholder's action against the company may coexist with an action by the company in respect of the same breach of duty by the directors, so that the availability of the latter by no means excludes the former.

A major plank in Mr Smith's submissions was that one thing which prohibited a shareholder's action against the company was the ever-present theoretical possibility that the offending exercise of power by the directors could be ratified by the members in general meeting. The Board has already acknowledged that, in certain circumstances, ratification may defeat the shareholder's personal claim. It is necessary again to start from first principles. The shareholders of a solvent company may, acting unanimously, ratify any action taken by the directors which falls within the corporate capacity of the company itself. The thing done becomes the act

of the company: see Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd [1983] Ch 258 .

But if the shareholders seek to use their power to act by a majority, then they are constrained by the equitable principle that they may not do so by way of oppression of the dissenting minority: see Allen v Gold Reefs of West Africa Ltd [1900] 1 Ch 656 , Lindley MR at pp 671-672; Cook v Deeks [1916] 1 AC 554 , Lord Buckmaster LC at pp 563-565; Greenhalgh v Arderne Cinemas Ltd [1951] Ch 286 , Evershed MR at p 291; *Peters' American Delicacy Co Ltd v Heath* (1939) 61 CLR 457 ("Peters"), Latham CJ at pp 480-482; *Ashburton* , Barwick CJ at p 620. That constraint is inherent in the power of the majority of a class to bind the minority. Whether it is actionable by the minority having a mere equity of their own to set the majority action aside, or because that constraint is also embedded in the corporate contract, may be a matter for debate, but it makes no practical difference for present purposes.

There have been, and will always be, cases where a personal claim by a shareholder may be defeated by ratification, both before and after proceedings have been begun or even tried. Hogg v Cramphorn Ltd and Bamford v Bamford are well known examples of such cases. In the former the allotment by the directors was

ratified at a general meeting held after the case had been tried and judgment given in the claimant's favour, during an adjournment granted for the purpose, before any final order was made. In Bamford the impugned allotment had been ratified shortly after the issue of the writ challenging the allotment. The ratification was then challenged by a second writ, and the two were consolidated and heard together. In neither case was the ratification held to have involved oppression of a minority. In such cases (unless ratification has occurred before the commencement of proceedings) it may be said that the shareholder has a defeasible claim, but it will rarely be open to the company to say that the claim is demurrable merely because of the theoretical possibility of ratification in the future. The court may well stay a claim as a matter of good case management (as in Hogg v Cramphorn Ltd) to see whether ratification occurs.

There will also be cases where the nature of the breach of duty by the directors is such that ratification will be seen to be impossible, either because it has been attempted without success or because any attempt in the future would be bound to fail. For example, a breach constituted by the directors having the improper purpose of assisting an existing majority to oppress a minority could hardly be ratified by the majority, without itself falling foul of the constraint against majority oppression: see in *Residues*

at p 1167, King CJ's doubt whether the share allotment in that case could be ratified. As Dixon J explained in *Peters,* pp 504ff and especially pp 511-513, the power of the shareholders in general meeting to alter the articles of association must be exercised in a manner which is both within the power and consistent with the contemplated purpose of the power.

No part of this analysis supports Mr Smith's submission that the mere theoretical possibility of ratification is sufficient to deprive the claimant shareholder of a cause of action. If that were so, then there would have been no need for a trial in Hogg v Cramphorn Ltd , still less an adjournment to see whether ratification would succeed. Nor, in Bamford , would there have been any need for a second writ. The possibility of ratification would have been enough to defeat the claim made by the first writ.

## the Law Applied to the Assumed Facts

The Board regards this as a strong case, on the assumed facts, for the availability of a personal shareholder's action, such as is pursued by Tianrui's writ. It is alleged that the disputed share issue was allotted to outsiders who were acting in concert with the majority shareholder group and the directors to consolidate their control over CSCGL, and that the allotment was ratified by the same majority in general meeting. The effect of the dilution of Tianrui's

shareholding was to deprive it of negative control of CSCGL. It was an interference with Tianrui's rights as shareholder to have a say in the collective control of CSCGL's affairs by the shareholders.

It is plain that, if the assumed facts are proved to be true, the directors acted for an improper purpose in the issue and allotment of the disputed shares, and that the purported ratification of their actions was itself vitiated by the intent of the majority to oppress Tianrui as a minority shareholder. It is equally plain, if the assumed concert party between the majority and the recipients of the shares is proved, that the recipients, once identified by discovery and joined as defendants, would be unlikely to be able to resist the setting aside of the allotments on the basis that they are bona fide purchasers without notice of the impropriety.

## Conclusion

It follows that the writ should not have been struck out by the Court of Appeal. The Board will therefore humbly advise His Majesty that this appeal be allowed.

Crown copyright

2024 WL 04794596

**End of Document** © 2025 Thomson Reuters.

## CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* v. | § § | FIRST DIVISION |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § | DALLAS, TEXAS |
| *Defendants.* | § § § § | |

---

**ADDITIONAL FOREIGN CASES CITED TO DATE**

---

| Exhibit | Document |
|---|---|
| Exhibit 2-A | *Kohn v. Meehan*, (Transcript Smith Bernal), at ¶ 101 (Ch. Div. 2003). |
| Exhibit 2-B | *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.* [1975] AC 167, 179 |
| Exhibit 2-C | *Foss v. Harbottle*, (1843) 67 Eng. Rep. 189, 202 (Eng.). |

# EXHIBIT 2-A

# *Kohn v Meehan and another [2003] All ER (D) 315 (Jan)*

Chancery Division

EnglandandWales

Launcelot Henderson QC sitting as a deputy judge of the High Court

31 January 2003

**Companies – Shares – Purchase of shares – Shareholder selling minority shareholding – Shareholder seeking declarations and damages on basis he had not received full consideration to which entitled on sale – Application by defendant to strike out parts of claim.**

The claimant and the first defendant were, at all material times, the directors of O Ltd (the company). The company entered into a settlement agreement with nine other parties, as a result of which new articles of association were introduced. Those articles provided for the service of a 'drag along notice' on the minority shareholders of the company, requiring them to sell their shares to a person contracting to buy 50% or more of the issued share capital of the company. In December 2001, the claimant sold his minority shareholding in its entirety to M Ltd for £1·189m. He later alleged that he had been unaware of negotiations which had taken place between M Ltd and the first and second defendants relating to the sale of shares in the company, and commenced proceedings against the defendants by which he sought declarations and damages on the basis that he had not received the full consideration to which he was entitled on the sale of his shares. In addition, he made allegations of breach of fiduciary duty and fraudulent misrepresentation against the first defendant in relation to the settlement agreement. The first defendant applied for summary judgment under CPR Pt 24 in respect of certain parts of the claim against him or, alternatively, for those parts of the claim to be struck out under CPR 3.4(2) as disclosing no reasonable grounds for bringing them, or being an abuse of the court's process, or otherwise likely to obstruct the just disposal of the action. It was agreed that the general approach which the court was to take on that application was to decide whether the claimant had no real prospect of succeeding on those aspects of its claim.

The application would be allowed.

The first defendant's contentions were made out and, accordingly, the paragraphs at issue would be struck out. It was, inter alia, unnecessary for the claimant to plead as substantive allegations that the drag-along notices served on other minority shareholders were invalid, that they had suffered loss and damage, and so on, and embarrassing for him to plead their treatment as substantive issues in their own right and, expressly or by implication, to ask the court to determine those issues. Further, the claims for breach of fiduciary duty and fraudulent misrepresentation had, in the circumstances of the case, no real prospect of succeeding at trial and would be disposed of summarily in favour of the first defendant.

Catharine Otton-Goulder QC (instructed by Pitmans, Reading) for the claimant.

Robert Anderson (instructed by Kingsley Napley) for the first defendant.
Victoria Parkin   Barrister.Judgment

## CHANCERY DIVISION

31 JANUARY 2003

MR L HENDERSON QC SITTING AS A DEPUTY JUDGE OF THE HIGH COURT

**APPROVED JUDGMENT**

I. direct pursuant to CPR PD 39A para.6.1 that no official shorthand note shall be taken of this judgment and that copies of this version as handed down may be treated as authentic , A i J

**ABBREVIATIONS**

1. In this judgment I shall use the following abbreviations:

| | |
|---|---|
| Omnilabs | Omnilabs Limited, a UK company |
| OGL | Omnilabs Group Limited, a UK subsidiary of Omnilabs |
| Sonetti | Sonetti Investments Limited, a company incorporated in Gibraltar and a wholly-owned subsidiary of Pettmond |
| Pettmond | the Second Defendant, Pettmond Investments Limited, also incorporated in Gibraltar and the parent of Sonetti |
| Mr Meehan | the First Defendant, Mr Graham Meehan |
| Mr Kohn | the Claimant, Mr Eric F. Kohn TD |
| Mr Curtis | Mr Andrew Curtis |
| Unilabs | Unilabs SA, a company registered in Switzerland and a minority shareholder in Omnilabs |
| UGL | Unilabs Group Limited BV, a company registered in the British Virgin Islands and a minority shareholder in Omnilabs |
| UIL | Unilabs International Limited, also registered in the British Virgin Islands and a minority shareholder in Omnilabs |
| Unilabs companies | Unilabs, UGL and UIL |
| MIA | MIA Group Limited, a company incorporated in Australia and the parent of MIA (UK) Limited |
| MIA UK | MIA (UK) Limited, MIA's UK subsidiary |
| "the Settlement Agreement" | the Settlement Agreement relating to Omnilabs dated 19 September 2001 and made between Omnilabs and nine other parties, including OGL, Sonetti, the Unilabs companies and Mr Kohn |
| "the Share Sale Agreement" | the Deed of Share Purchase dated 16 November 2001 and made between Pettmond. (1) MIA (UK) (2) MIA (3) Mr Meehan (4) and Mr Curtis (5), whereby Pettmond agreed to sell all the shares in Sonetti, and to procure the sale of the minority shareholdings in Omnilabs, to MIA (UK). |

**INTRODUCTION**

2. This is an application by the First Defendant, Mr Meehan, seeking summary judgment under CPR 24.2 in respect of certain parts of the claim brought against him in the action, or alternatively that the same parts of the claim

should be struck out pursuant to CPR 3.4(2)(a) and/or (b) as disclosing no reasonable grounds for bringing them or being an abuse of the court's process or otherwise likely to obstruct the just disposal of the action.

3. On the hearing of the application before me Mr Meehan was represented by Mr Robert Anderson of Counsel and the Claimant, Mr Kohn, was represented by Miss Catharine Otton-Goulder QC. The Second Defendant, Pettmond, played no part in the proceedings, but it supports Mr Meehan's application and the parties have agreed that insofar as Mr Meehan's applications are successful the orders made should apply equally to the case against Pettmond.

4. In December 2001 Mr Kohn sold the whole of his substantial minority shareholding in Omnilabs to MIA (UK) for a cash consideration of approximately £1.189m. In the action, which he commenced on 15 April 2002, he first of all claims declarations, and damages to be assessed, against both Defendants, on the basis that he has not received the full consideration to which he was entitled on the sale of his shares. The claim is put in various alternative ways, and involves issues of construction of certain key documents as well as allegations of estoppel, breach of contract and unfair prejudice to Mr Kohn as a shareholder in Omnilabs. The Defendants accept that many aspects of this claim must go to trial, but submit that parts of it (including a major component of the claim for damages, and the allegation of unfair prejudice in its entirety) should be struck out or disposed of summarily in their favour. In addition, Mr Kohn makes allegations of breach of duty and fraudulent misrepresentation against Mr Meehan (but not against Pettmond) in relation to the Settlement Agreement, and alleges that he was thereby induced to enter into it on terms less favourable than he would otherwise have obtained. Mr Meehan submits that the whole of this additional claim should be struck out, essentially on the ground that it is bad in law and discloses no reasonable cause of action.

## THE FACTUAL BACKGROUND

5. I must begin by setting out so much of the factual background as is necessary to an understanding of the issues. Except where I indicate the contrary, these background facts are not controversial.

6. Omnilabs was incorporated in the UK in 1993, and by October 2001 it was the second largest provider of private pathology services in the UK- At all material times both Mr Meehan and Mr Kohn were directors of the company.

7. On 19 September 2001 the Settlement Agreement was entered into, to resolve disputes which had arisen relating to the security held by Unilabs for certain loan notes issued by OGL and an investment in Omnilabs by Sonetti (which then had a stake of about 25 per cent in the company). For present purposes nothing turns on the detail of those disputes, but certain provisions of the Settlement Agreement itself are important:

(1) First, the overall effect of the settlement terms was that Sonetti increased its stake in Omnilabs to just over 75 percent. This was mainly achieved by Sonetti agreeing to buy 683,453 ordinary shares in Omnilabs from OGL for £950,000, and to subscribe about £1.34m in cash for the allotment of a further 1,043,166 ordinary shares in Omnilabs, while at the same time OGL agreed to sell back to Omnilabs over 3 million of its (i.e. Omnilabs') ordinary shares in consideration of a rescheduling of the loans.

(2) Secondly, Mr Kohn agreed to transfer 180,130 of his holding of ordinary shares in Omnilabs back to the company. It was expressly provided that no amount was payable by Omnilabs to Mr Kohn in consideration of this transfer: see clause 2.1.10. The transfer reduced Mr Kohn's holding of ordinary shares in Omnilabs to 249,682, together with 6,791 'W' warrants, and 217,899 "B" warrants issued in February 2001.

(3) Thirdly, the parties agreed to procure that Omnilabs should adopt new Articles of Association in the form set out in Appendix 4 to the Settlement Agreement: see further paragraphs 9 to 13 below.

(4) Fourthly, Omnilabs undertook to set up an executive committee of its Board comprising Mr Kohn and two persons nominated by Sonetti to deal with the day-to-day business of the Group, and also undertook that the Board should consist of not more than seven directors, including three to be nominated by Sonetti (including Mr Meehan and Mr Curtis).

(5) Lastly, by clause 12.1.3 each party agreed that it had no right of action or other remedy in respect of any "Pre-contractual Statements" (as defined) made or given by any person, other than ones expressly set out in the "Settlement Documents" (as defined), and that no party would have the right to rescind any of the Settlement Documents for negligent or innocent misrepresentation or otherwise

"provided always that this clause 12.1 shall not exclude or limit any liability or any right which any party ... may have in respect of Pre-contractual Statements made or given fraudulently or dishonestly or in circumstances where there has been wilful concealment."

8. Mr Meehan was not a party to the Settlement Agreement, but he was in some sense a driving force behind Sonetti and its parent Pettmond, and Mr Kohn alleges that he was beneficial owner of the shares in Sonetti. The nature of his relationship with those companies was not, however, disclosed in the evidence before me, although Mr Meehan has put in no fewer than three witness statements. These statements contain very little by way of factual evidence, and are mainly confined to exhibiting relevant documents.

9. The new Articles of Association of Omnilabs, which were duly adopted on 19 September 2001, included provisions relating to the transfer of shares which in broad terms were clearly designed to protect the interests of minority shareholders on a sale of more than 50 per cent of the shares in Omnilabs or a change in control of the registered holder of more than 50 per cent of the shares in Omnilabs.

10. Article 1. 1 defines a "Trade Sale" as meaning the entering into of a bona fide binding contract for a sale of, and/or change of control of the registered holder of, 50 per cent or more of the issued share capital of the company. "Trade Seller" is then defined as meaning "the member who enters into a bona fide contract to sell Shares and/or for its change of control on a Trade Sale", and "Trade Buyer" is defined as meaning "the person who enters into a bonafide contract to purchase Shares on a Trade Sale". "Shares" are defined as meaning the ordinary shares of 25p each in the capital of Omnilabs.

11. Article 4, which is headed "Transfer of Shares", provides so far as material as follows:

"4.1 Drag Along Rights

On a Trade Sale, the Trade Seller shall be entitled to serve a notice (a "Drag Along Notice") on the other members, including any person who becomes a member within 30 days of the Trade Sale by exercising a warrant or any other securities convertible into Shares:

(a) in the case of a sale, requiring them to sell to the Trade Buyer upon the terms set out in the Drag Along Notice all their respective Shares at the equivalent price per Share and on substantially the same terms and conditions as the Trade Buyer is proposing to offer the Trade Seller (subject to Article 4.3 below...); and

(b) in the case of a change of control, requiring them to sell to the Trade Seller or to the Controller [i.e. the person who acquires control of the registered holder of 50 per cent or more of the issued share capital of Omnilabs on a Trade Sale] upon the terms set out in the Drag Along Notice all their respective Shares at an equivalent price per Share and on substantially the same terms and conditions pro rata and similar to those paid by the Trade Buyer (subject to Article 4.3 below...),

in which case the members shall sell such Shares at such price free from all encumbrances...

…

4.3 Floor Price

In the situation of .. a Drag Along Notice ... being served upon Shareholders then the consideration offered for each of the Shares referred to in such notice shall be equal to at least 80% of the value of each Share which the Trade Seller is offering to sell to the Trade Buyer pursuant to the Trade Sale ("the Floor")."

12. It will be noted that Article 4.1, at least if read literally, does not provide for service of a Drag Along Notice where the "Trade Seller" is not itself a member of Omnilabs, but is instead a company which controls a majority shareholder of Omnilabs and which enters into a contract for the sale of shares in that company to a third party. Such a transaction does not appear to fall within the scope of Article 4.1, because "Trade Seller" is defined as meaning the member (in Omnilabs) who enters into a contract to sell shares (in Omnilabs) and/or for its change of control on a Trade Sale, and "Trade Buyer" is likewise defined by reference to entry into a contract to purchase shares in Omnilabs. Thus although a sale by Sonetti of its majority shareholding in Omnilabs would clearly be caught, and would trigger an obligation to serve Drag Along Notices on the minority shareholders, any sale by Pettmond of more than half its shares in Sonetti would seem not to be caught, even though the effect of such a sale would be to change the ultimate shareholder control of Omnilabs.

13. It should also be noted that Article 4 does not provide for what is to happen if a valid Drag Along Notice is not complied with by the shareholder upon whom it is served.

14. By a side agreement ("the Side Agreement"), evidenced by a letter dated 19 September 2001 from Sonetti to Mr Kohn and counter-signed by Mr Kohn, Sonetti confirmed the agreement between them

"that, in the event of a Trade Sale (as defined in the Articles) and, under the provisions of Article 4, the consideration per share payable to you is less than that received by us for our shares in [Omnilabs], the Floor (as defined in Article 4.3) in respect of your shares in [Omnilabs] shall be at least 90% of the consideration per share received by us."

Similar (but not identical) side agreements were also concluded between Sonetti and some other minority shareholders, including the Unilabs companies.

15. Meanwhile, but according to Mr Kohn without his knowledge, discussions were taking place between MIA (the initials stand for Medical Imaging Australasia) and an associated company of Pettmond called Woodload Investments Limited, also based in Gibraltar, with a view to the sale of the whole of the issued share capital of Sonetti to MIA (UK). On 28 September 2001 MIA and Woodload entered into a Memorandum of Understanding, subject to contract, paragraph 2 of which referred to the discussions between the parties and the recent restructuring of the share capital of Omnilabs, and continued:

"The Seller will procure that, prior to completion of the Proposal, the remaining shareholders in Omnilabs will sell or agree to sell their shareholdings to MIA (UK) so that at completion of the Proposal, MIA (UK) will acquire 100% of Omnilabs".

16. The Memorandum then set out the principal terms of the proposed transaction, including:

(a)  that the purchase price for the shares in Sonetti would be £16.5m (subject to adjustment) initially, together with an earn-out calculated in accordance with a formula linked to the future earnings of Omnilabs over three periods ending on 31 December 2004;

(b)  that 30 per cent of the initial consideration (i.e. £4.95m) would be paid in cash on completion, with the remaining 70 per cent to be satisfied by the issue of fully-paid shares in MIA at a price of A$1.24 per share;

(c)  that the earn-out would also be payable in MIA shares, at the same price of A$1.24 per share; and

(d) that as security for the warranties etc to be given by the seller, 64 per cent of the MIA shares issued at completion would be held in escrow for a period of three years, with half of those shares (i.e. 32 per cent) to be released after one year, half of the remainder (i.e. 16 per cent) to be released at the end of the second year, and the remaining 16 per cent to be released at the end of the third year.

17. The Memorandum recorded that it was the parties' intention to sign a definitive sale and purchase agreement in October 2001, with completion to occur on 31 October.

18. A few days later, on 1 October 2001, MIA made a public ASX (i.e. Australian Stock Exchange) announcement headed "Memorandum of Understanding with Omnilabs Limited - UK Pathology Provider". The announcement said that MIA was pleased to announce a Memorandum of Understanding to acquire Omnilabs, which was the second largest private pathology provider in the UK with revenue of £1 lm. It went on to say that the acquisition by MIA would be achieved through a combination of cash and MIA shares "with the purchase price incorporating a performance driven component." Completion of the transaction was said to be conditional upon due diligence and formal documentation.

19. The negotiations bore fruit, and on 16 November 2001 the Share Sale Agreement was concluded, with Pettmond now the vendor. The Agreement recited the proposed sale and purchase of all the shares in Sonetti; that Sonetti was the beneficial owner of 75.01 per cent of the shares in Omnilabs; that the remaining shares in Omnilabs (defined as "the Balance Securities") were owned by the minority shareholders listed in Schedule 1; and by recital (E) that

"[MIA (UK)] also wishes to purchase the Balance Securities and [Pettmond] wishes to procure the sale of such Balance Securities to [MIA (UK)] by exercising its rights under the Articles of Association of Omnilabs or otherwise."

20. The Share Sale Agreement is a lengthy document running to some 140 pages. Its main provisions broadly reflect the earlier Memorandum of Understanding, but with the possibly significant difference that there is no longer any reference to an earn-out, either as being part of the consideration for the share sale or at all. Clause 2.1.1 provides for the sale of the Sonetti shares, while clause 2.1.2 obliged Pettmond to procure the minority shareholders to sell their holdings in Omnilabs. Clause 3.1 provided that the total consideration payable for both categories of shares (i.e. both the Sonetti shares and the Omnilabs shares) would be £4.95m (less a specified retention) payable on completion and the ordinary shares of MIA to be issued on completion in accordance with clause 6.4. 1.

21. Clause 6.1 provided that completion should take place on the later of "the EGM Date" and 30 November 2001, or such later date as the parties might agree in writing, the EGM Date being defined as "the date of the extraordinary general meeting of Omnilabs called by notice dated today to be held on 8 December 2001 to consider a resolution to amend the Articles of Association of Omnilabs." Clause 6.2 obliged Pettmond at completion to deliver (or procure delivery of) duly executed transfers of all of the shares contracted to be sold, including the Balance Securities. 22. Clause 6.4 provided for the issue of MIA shares on completion to an aggregate value of £11.55m, the value of each MIA share being taken as A$1.24 exchanged into sterling at a specified rate. The effect of this formula was that the number of shares MIA was obliged to issue on completion was, according to a calculation handed in by Mr Anderson, 25,756,500. As foreshadowed by the Memorandum of Understanding, however, 64 per cent of those shares (i.e. 16,484,160) were then to be held as security, and released over the ensuring three years, in accordance with the terms of a Security Agreement ("the Security Agreement") entered into on or about 11 December 2001 between Pettmond and Guardian Trust Australia Limited ("Guardian").

23. Before leaving the Share Sale Agreement, I should note that Pettmond (together with Mr Meehan and Mr Curtis) agreed to give extensive warranties, guarantees and indemnities to MIA, and also to be subject to restrictive covenants for the benefit of MIA: see clauses 10 to 13 and 15 to 17. The retained 64 per cent of the MIA shares issued on completion were provided by Pettmond to Guardian as security for a guarantee given by Guardian to MIA of certain of the obligations undertaken by Pettmond under the Share Sale Agreement, and also under a separate Earn-Out Agreement of the same date.

24. On the same day as the Share Sale Agreement, that is to say 16 November 2001, Mr Kohn in his capacity as a director of Omnilabs signed notices calling an EGM of Omnilabs on 8 December 2001 for the purpose of considering and, if thought fit, passing a Special Resolution to amend the company's Articles by the addition of a new Article 4.4 in the following terms:

"Failure by any Shareholder to comply with the terms of this Article 4 as required pursuant to any Drag Along Notice served upon it shall enable the Company to comply with the Drag Along Notice in such manner as the Directors of the Company determine. To give effect to such Drag Along Notice which has not been complied with the Directors may authorise some person to execute a stock transfer form or other instrument of transfer on that Shareholder's behalf and to do all such things in the name of that Shareholder ... to enable the Shareholder who serves the Drag Along Notice to conduct the Trade Sale referred to in such notice...".

25. Also on 16 November 2001, Mr Kohn in his capacity as a member of Omnilabs signed a form of consent to short notice of the EGM, although in his case such consent was in fact unnecessary because the period of notice required by the Articles was 21 clear days, and there are 21 clear days between 16 November and 8 December.

26. A few days later, on 21 November 2001, Drag Along Notices (or purported Drag Along Notices) were served on Mr Kohn and the other minority share-holders in Omnilabs. Each notice was headed with Sonetti's name and address, and was signed by the same signatory on behalf of both Sonetti and Pettmond. The notice served on Mr Kohn said that it constituted a Drag Along Notice as contemplated by Article 4.1 of the Articles of Omnilabs, and continued:

"We, being the holders currently of 75.01% of the issued share capital in the Company, hereby serve notice of a Trade Sale, which occurred on 16 November 2001, as defined in the Articles of Association of the Company, with MIA (UK) Limited (the "Trade Buyer").

In accordance with Article 4.1 of the Articles of Association of the Company, we hereby give notice that you are required to sell all your Ordinary Shares of 25p each (each a "Share") in the Company (together with any warrants or other securities convertible into shares which you hold or which are registered in your name) to the Trade Buyer free from all encumbrances whatsoever and with full title guarantee at a price of £2.5435 per Share.

This price assumes that no "A" Warrants are subscribed for in the capital of the Company in accordance with their terms.

As you currently hold 249,682 Shares in the Company this represents a payment to you of £635,066.16...

Pursuant to Article 4.3 ... we confirm that currently such price represents an amount equal to at least 80% of the value of each Share being sold to the Trade Buyer."

Mr Kohn was requested to return the enclosed stock transfer form, together with the relative share certificates, as soon as possible and in any event before 30 November to Messrs Norton Rose. The letter concluded by warning

"Failure by you to execute the stock transfer form and promptly comply with the terms of this letter may result in financial loss for which you may be held liable."

27. The Drag Along Notices served on the other minority shareholders were in materially similar terms, apart of course from the details of the recipients' shareholdings.

28. It will be appreciated that the validity of these Drag Along Notices, and hence the alleged obligation on Mr Kohn and the other minority shareholders to sell their shares in Omnilabs to MIA (UK) at the stated price, depended on the Share Sale Agreement being a Trade Sale within the meaning of the Articles of Omnilabs. Since the vendor

under the Share Sale Agreement was Pettmond (not Sonetti), and since the shares actually sold by Pettmond were the shares in Sonetti, not shares in Omnilabs, it is at first sight hard to see how the Share Sale Agreement could have been a Trade Sale for the reasons given in paragraph 12 above. Nevertheless, Mr Kohn says in paragraph 17 of his witness statement that he subsequently "sought to obtain payment of the sums due to [him] pursuant to the Articles and the Side Letter, on the assumption that the Drag Along Notice was valid and the Side Letter was operative."

29. It is pleaded in paragraph 25.2 of Mr Meehan's Defence, and I did not understand it to be disputed by Mr Kohn, that on or about 22 November Mr Kohn signed and returned an executed stock transfer form for the sale of 249,682 shares in Omnilabs to MIA (UK), although in fact the stock transfer form specified an incorrect number of shares, together with a Loan Agreement between Pettmond and Mr Kohn whereby Pettmond agreed to lend him a sum in excess of £300,000 interest free so as to enable him to exercise his "B" Warrants and acquire a further 217,899 shares in Omnilabs, and a charge over his shareholding in Omnilabs in favour of Pettmond as security for he loan.

30. It is then pleaded in paragraph 25.3 of Mr Meehan's Defence that on or about 27 November Mr Curtis (acting on behalf of Sonetti) offered to pay Mr Kohn for his shares partly in cash (30 per cent) and partly in MIA shares (70 per cent), and that Mr Kohn accepted this offer. Mr Kohn does not dispute (and indeed avers) that Mr Curtis made an oral offer to him on or around 21 November to pay for his shares by way of 30 per cent in cash and 70 per cent in MIA shares: see paragraph 24 of his witness statement. It is Mr Kohn's case, in short, that he accepted this offer by an e-mail of 28 November (see paragraph 34 below), and that pursuant to the contract so concluded he was entitled to receive the whole of the 70 per cent in MIA shares at completion, and was to be free to deal with them immediately as he wished. This version of events is disputed by Mr Meehan, who says that Mr Kohn's original agreement to accept 70 per cent of the purchase price for his shares in the form of MIA shares was superseded by an agreement to take the total consideration for his shares in cash after it was pointed out to him that only 36 per cent of his MIA shares would be delivered on completion, with the remainder being released over the ensuing three years.

31. In support of their rival contentions both sides rely on an exchange of e-mails between 27 and 29 November 2001, to which I must now turn. 32. The exchange begins with an e-mail sent by Mr Kohn to Christopher Randall of Norton Rose on 27 November, thanking him for "the forms". These were presumably fresh stock transfer forms which Mr Randall had sent to Mr Kohn, the original forms having been filled in incorrectly. The e-mail continues:

"I     will return to be held to my order, however the forms do not have consideration on them. How should that be filled in as I am receiving 70% shares in MIA and 30% cash[?]".

33. Simon Cox of Norton Rose then replied to Mr Kohn on the same day: "Thanks Eric. We will take instructions on the point raised."

34. On 28 November Mr Kohn sent a further e-mail to Mr Cox, timed 7.14 pm, which I must quote in full:

"I     am sending to Norton Rose tomorrow the 2 correct stock transfer forms signed. The forms are to be held to my order as are Loan & Charge document and to be released, on my receipt of confirmation by [Sonetti] that the consideration of £554,226.11 for 217,899 shares of 25p of [Omnilabs] and £635,066.17 for 249,682 shares of 25p of [Omnilabs] is payable in 30% cash and 70% in shares of MIA "free trading" valued at Aus$1.24 per share and that this represents at least 90% of substantially the same deal as is attributable to Sonetti."

35. Norton Rose evidently then sought instructions from Sonetti and/or Pettmond, and on 29 November Mr Curtis e-mailed Mr Kohn at 4.54 pm in the following terms, which again I must quote in full:

"Dear Eric,

I understand that Norton Rose are holding to your order two stock transfer forms the Loan Agreement and Charge pending clarification of the nature of the consideration that you will receive at completion. On behalf of [Sonetti], I can confirm this to be (at your option):

100% cash i.e. £ 1, 189,292.20; or

70% in MIA shares and 30% cash.

Please note that if you choose the second option only 36% of your shares will be delivered at completion. 50% of the retained balance are due to be released on the first anniversary of completion and a further 25% on each of the second and third anniversaries. As you know, tomorrow is the last day to exercise your warrants. I should be grateful therefore, if you would let me know which option you have chosen as soon as possible."

36. Finally, following a telephone conversation with Mr Randall and Mr Cox, Mr Kohn sent them an e-mail timed 5.48 pm on 29 November saying:

"I will accept the cash, and release "the hold to order" on the basis that you for Sonetti have confirmed to me by phone that the offer is the cash equivalent of the same deal being offered to Sonetti, allowing for the side letter in respect of 90%."

37. I should mention at this point that Mr Kohn says he was still ignorant on 29 November of the terms of the Earn-Out Agreement between Pettmond, MIA (UK) and MIA, although he accepts in paragraph 14 of his witness statement that Mr Curtis had mentioned to him on or about 16 November that there was a management earn-out agreement and he had also read in the press announcement of the deal at about the same time that there was such an agreement. He was not supplied with a copy of the Earn-Out Agreement, however, until 4 December when Norton Rose wrote to his solicitors enclosing copies of it and the Guardian security documentation.

38. Meanwhile, on 3 December the Unilabs companies started proceedings in the Chancery Division of the High Court ("the Unilabs Proceedings") against Sonetti, Omnilabs and Pettmond, claiming (in summary):

(a) that the EGM notice served on Unilabs was invalid, with the result that no EGM of Omnilabs could validly be held on 8 December;

(b) that the Drag Along Notices served on all three companies were likewise invalid, or alternatively that on completion of the Share Sale Agreement Unilabs was entitled to be paid £1,050,000 (that being the minimum amount specified in the relevant side letter), and UIL and UGL were entitled to be paid a price which properly reflected all the terms and conditions on which the Trade Buyer was to acquire the shares in Sonetti; and

(c) that the affairs of Omnilabs were being, or had been, conducted in a manner which was unfairly prejudicial to the interests of the Unilabs companies.

39. The particulars of claim in the Unilabs Proceedings, like those in the present action, were settled by Miss Otton-Goulder QC, and as Mr Anderson points out the allegations are pleaded in a very similar manner to the first part of Mr Kohn's claim in the present action, although there are important differences between the position in which the Unilabs companies found themselves in early December 2001 and the position of Mr Kohn when he started the present action, In particular, Unilabs had not been given 21 clear days' notice of the EGM, and on 3 December 2001 all of the Unilabs companies were still share-holders in Omnilabs.

40. The Unilabs Proceedings were short-lived, as they were settled on 7 December. The terms of settlement are not in evidence, but I was told by Miss Otton-Goulder (and did not understand it to be disputed) that the Defendants more or less capitulated. Certainly no EGM of Omnilabs was ever held; and in paragraph 16 of his witness statement Mr Kohn says he believes Sonetti to have conceded that Unilabs' side agreement was valid, and to have

paid Unilabs the full £1.05m claimed (which was over £700,000 more than the price specified in the Drag Along Notice served on Unilabs). For his part, Mr Meehan relies on the fact that the Unilabs Proceedings were settled, and also confirms that a settlement was reached at the same time with all the other minority shareholders apart from Mr Kohn (see paragraph 6 of his second witness statement).

41. Following the settlement with the other minority shareholders, Mr Kohn remained the only obstacle to completion of the Share Sale Agreement. The evidence does not reveal the precise nature of the claims which he was advancing, but I assume they were along the lines of his allegations in the present action. The parties to the Share Sale Agreement were anxious to complete it as soon as possible, and on 11 December an agreement was reached ("the Kohn settlement") whereby Mr Kohn effectively withdrew all his claims against Sonetti and Omnilabs, thus enabling completion of the Share Sale Agreement to take place, and also agreed to accept the sum of £ 1, 18 9,292.20 in respect of his total holding of shares in Omnilabs, but on the express basis that he reserved all his rights and that Mr Meehan and Pettmond jointly and severally assumed any liability of any nature which Sonetti and/or Omnilabs and/or its group had to Mr Kohn immediately before the Kohn settlement: see paragraphs 34 and 35 of Mr Kohn's witness statement and Norton Rose's letter of 11 December 2001 at p.259 of exhibit "GM1."

**THE ISSUES IN THE PRESENT ACTION**

42. The Particulars of Claim in the present action (dated 12 April 2002) begin by referring to the Settlement Agreement, the new Articles of Omnilabs and the Side Agreement. It is alleged that in concluding the Settlement Agreement and the Side Agreement Sonetti acted both on its own behalf and also for Pettmond as its undisclosed principal. This allegation of undisclosed agency is denied by both Defendants. Issue is also joined on the true construction both of the Articles and of the Side Agreement. Since it is agreed that these issues should go to trial, it is enough for me to say that Mr Kohn contends for a literal construction of the relevant parts of Article 4, such that they could not apply to the Share Sale Agreement, but for a broad construction of the Side Agreement, such that the guaranteed minimum of at least 90 per cent of the consideration received by Sonetti and/or Pettmond would apply to the circumstances of the Share Sale Agreement; while the Defendants adopt the diametrically opposed position of arguing for a broad construction of Article 4, such that it does apply to the Share Sale Agreement, but a narrow construction of the Side Agreement, such that it does not apply (and would have applied only to a sale by Sonetti of shares in Omnilabs).

43. Paragraph 15 of the Particulars of Claim then refers to the Share Sale Agreement and alleges that the consideration for the Sonetti shares included "sums to be paid pursuant to a secret earn-out agreement". This is denied by the Defendants, who also aver that the Earn-Out Agreement was not a secret (having been referred to in MIA's press releases of 1 October and 19 November 2001) and in any event did not provide further consideration for the purchase of the Omnilabs shares, being intended only to reward Omnilabs' management for any future upturn in the company's fortunes following its purchase by MIA (UK). Again, I need say no more about the Earn-Out Agreement as it is agreed that all questions relating to it should go to trial.

44. Paragraphs 16 to 19 of the Particulars of Claim deal with the EGM notices, alleging that neither Mr Kohn nor any of the other minority shareholders received a copy of the notice within the period stipulated by the Articles and that the notices were accordingly invalid. It is further alleged that the purpose of the Special Resolution was to extinguish, or significantly diminish, the rights of minority shareholders under the Settlement Agreement and their respective side agreements, by enabling Omnilabs to comply with the Drag Along Notices in such manner as the directors of Omnilabs might determine.

45. The Defendants' pleaded response to these allegations is to deny the alleged invalidity of the EGM notice so far as Mr Kohn is concerned (because he signed it himself, and anyway agreed to accept short notice), while making no admission as to the purpose of the EGM. It is further pleaded that in any event no EGM was held on 8 December or at all, and no special resolution was passed on that or any other date. Paragraph 20 of each Defence then avers that

"In the premises, Mr Kohn's allegations in respect of the EGM Notice are without justification and irrelevant to any matter in issue in this action and, accordingly, should be struck out."

46. The next section of the Particulars of Claim (paragraphs 20 to 28) deals with the Drag Along Notices served on Mr Kohn and the other minority share-holders. Mr Kohn's primary contention, reflecting the literal construction of the Articles for which he argues, is that the notices were invalid, and he seeks a declaration to that effect. Alternatively, however, he claims that by serving the notice on him in the form which it took Sonetti, Pettmond and Omnilabs acted on an agreed assumption that the true construction of the Articles was (in substance) as pleaded by the Defendants, and they are precluded and/or estopped from contending otherwise, with the result that the notice should to that extent be treated as validly served. He further pleads:

(a) in paragraph 22 that by service of the notice Sonetti, Pettmond and Omnilabs acted on an agreed assumption that the true construction of the Side Agreement was the broad construction referred to above, and are precluded and/or estopped from contending otherwise; and

(b) in paragraph 28 that by service of the Drag Along Notices on the other minority shareholders, including the Unilabs companies, those minority shareholders together with Sonetti, Pettmond and Omnilabs acted on the same agreed assumption as to the true construction of the Articles and are likewise precluded and/or estopped from contending otherwise.

47. The Defendants' response to these allegations, broadly speaking, is:

(a) to deny the relevance of the notices served on the other minority share- holders, reserving the right to apply to strike out the relevant paragraphs of the Particulars of Claim;

(b) to allege as their primary case that the notice served on Mr Kohn was valid and binding (reflecting the broad construction of the Articles for which they contend), but that in offering Mr Kohn in excess of 90 per cent of the value of his shares Sonetti was under no legal obligation to do so (because the Side Agreement is to be narrowly construed); and

(c) to plead in the alternative that if the notice was "technically invalid" Mr Kohn and Sonetti nevertheless acted on the common assumption that it was valid, and following the exchange of c-mails at the end of November it would be inequitable for Mr Kohn to renege on that common assumption.

Finally, and in the further alternative, the estoppel pleaded by Mr Kohn as the alternative to his primary case is adopted by the Defendants: see paragraph 27,3 of each Defence.

48. Paragraph 29 of the Particulars of Claim alleges that the price per share at which, and the terms and conditions on which, MIA (UK) acquired the shares in Omnilabs pursuant to the Share Sale Agreement considerably exceeded the stated consideration of about £2.80 per share because:

(a) 70 per cent of the purchase price was payable in MIA shares, which were valued at A$1.24 at the time of the Agreement but had risen in value to A$1.42 at completion; and

(b) MIA (UK) was also to receive further sums under the "secret earn-out agreement".

49. These allegations are denied by the Defendants, who aver that Mr Kohn's only legal entitlement was to receive the floor price specified in Article 4.3 of the Articles; that he received a consideration for his shares greatly in excess of that floor price; that he initially agreed to accept 70 per cent of the consideration in MIA shares, but changed his mind on 29 November; and that nothing further was due to him in respect of the Earn-Out Agreement.

50. Paragraph 30 of the Particulars of Claim then alleges that if (contrary to Mr Kohn's primary case) Sonetti and Pettmond were entitled on 21 November 2001 to serve a Drag Along Notice on him, the notice was nonetheless invalid and/or in breach of the Settlement Agreement because the consideration payable to him in accordance with

the notice was too low and did not accord with the terms and conditions on which the Trade Buyer was to acquire its shareholding in Omnilabs. Paragraph 31 then repeats the same allegation in relation to the Drag Along Notices served on the other minority shareholders.

51. These allegations too are denied, and the Defendants also aver that para-graph 31 is irrelevant and liable to be struck out.

52. Paragraphs 32 to 34 of the Particulars of Claim allege anticipatory repudiatory breaches of the side agreements of Mr Kohn and the other minority share-holders. These allegations in their turn are denied, and are again averred to be irrelevant and liable to be struck out so far as the minority shareholders are concerned.

53. Paragraph 35 of the Particulars of Claim then alleges that Sonetti and Pettmond were in breach of the Settlement Agreement and/or the Side Agreement in paying him only £1, 189,292.20 for his shares, and paragraph 36 quantifies the loss and damage which he claims under four heads. There is no dispute that the first and fourth heads should go to trial (they reflect the difference between 100 per cent and 90 per cent of the price per share stated in the Share Sale Agreement, and the further sums alleged to be due in respect of the Earn-Out Agreement). The second head claims that Mr Kohn ought to have received 70 per cent of the purchase price in MIA shares at A$1.24 per share, and that he would then have sold all of those shares on completion at A$1.42 per share, thereby realising a profit of about £120,000. The third head claims that alternatively he would have retained some of the MIA shares, and has suffered further loss by reason of the continued rise in their price. Paragraph 37 then pleads that Sonetti and Pettmond were likewise in breach of their contracts with other minority share-holders "by reason of which they also have similarly suffered and will continue to suffer loss and damage."

54. Paragraphs 35 and 36 are denied by the Defendants and Mr Kohn is put to strict proof of his alleged loss and damage. The Defendants go on to say, inter alia, that if he had chosen to accept 70 per cent of the consideration for his Omnilabs shares in the form of shares in MIA he would have been unable to sell all of them on completion, because of the three-year retention provisions, and that the quoted price of MIA shares had in any event fallen to A$0.90 by the date of the Defence in early July 2002. It is then averred that paragraph 37 of the Particulars of Claim is irrelevant and liable to be struck out.

55. Paragraph 38 of the Particulars of Claim is headed "Unfair prejudice" and alleges that the affairs of Omnilabs were conducted in a manner which was unfairly prejudicial to the interests of Mr Kohn and the other minority share-holders; there then follows a list of certain specified acts or omissions (such as the purported service of the EGM notices) which are alleged. to have constituted such prejudice. A corresponding declaration is sought in para- graph 39(2).

56. The allegation of unfair prejudice is denied by the Defendants, who also plead that it is bad in law and should be struck out as an abuse of process because (in short) only a current member of a company may apply to the court, by petition, for an order under *Part XVII* of the Companies Act 1985 on the ground of unfair prejudice; Mr Kohn is not a current member of Omnilabs, and the present proceedings were not brought by petition; and there is no concept of "unfair prejudice" at common law or in equity which might other- wise justify the allegation.

57. Paragraphs 40 to 42 of the Particulars of Claim then deal with the completion of the Share Sale Agreement and the Kohn settlement. It is unnecessary for me to summarise these paragraphs or the response to them.

58. The remainder of the Particulars of Claim is taken up with the claim for breach of duty and fraudulent misrepresentation by Mr Meehan which is pleaded in the following terms:

"43. Further, at all material times, both Mr Kohn and Mr Meehan were directors of Omnilabs, and, accordingly, owed a duty to disclose to the other any negotiations with a third party for a sale of the character and significance to Omnilabs of the [Share Sale Agreement].

44. At all material times before the conclusion of the Settlement Agreement on 19 September 2001 and the [Share Sale Agreement] [on] or about 16 November 2001, and as long as possible thereafter, Mr Meehan:

(1) in breach of his duty owed by him as a director of Omnilabs to Mr Kohn as a fellow-director, deliberately concealed from Mr Kohn the fact that negotiations were on foot for the [Share Sale Agreement], and had been on foot well before 19 September 2001; and

(2) fraudulently represented to him that no such negotiations were on foot.

45. The said representations were false, in that negotiations were on foot for the [Share Sale Agreement] well before 19 September 2001 and continued thereafter until the conclusion of the [Share Sale Agreement] on or about 16 November 2001.

46. Mr Meehan made the said misrepresentations in order to induce Mr Kohn to enter the Settlement Agreement on the terms on which it was concluded.

47. Mr Kohn was induced to enter into the Settlement Agreement by the said misrepresentations insofar as they were made before it was concluded.

48. By reason of Mr Meehan's said misrepresentations and/or breaches of duty, Mr Kohn has suffered loss and damage, in that he would not have concluded the Settlement Agreement on the terms on which it was concluded, but on terms more favourable to him. In particular, he would not have given up the 180,130 shares which he transferred without payment of any sum in respect thereof, notwithstanding the fact that their value was not less than £509,067.38.

49. In the premises, Mr Kohn is entitled to additional damages from Mr Meehan together with interest thereon to be assessed."

59. In response to these allegations, Mr Meehan pleads in paragraphs 39 and 40 of his Defence:

(a) that the allegation of breach of duty in paragraph 43 of the Particulars of Claim is bad in law and should be struck out;

(b) that the allegation of fraudulent misrepresentation is embarrassing for lack of particularity, and breaches paragraph 8.2 of the Practice Direction made pursuant to CPR Part 16 (which provides so far as material that the claimant must specifically set out in his particulars of claim any allegation of fraud, and details of any misrepresentation, where he wishes to rely on them in support of his claim); and

(c) that the allegation is itself made in bad faith, in an attempt to obviate the effect of the "entire agreement clause" set out in clause 12 of the Settlement Agreement (as to which see para-graph 7(5) above).

It is admitted that Mr Meehan did not inform Mr Kohn of the negotiations between Pettmond and MIA which took place prior to 19 September 2001, but averred that he was under no duty to do so and that if Mr Meehan had revealed the fact of such negotiations to Mr Kohn he would (or alternatively might well) have been in breach of his own duties to Pettmond, since Pettmond and MIA had concluded a confidentiality agreement in respect of the negotiations.

60. In paragraph 41 of his Defence, Mr Meehan denies paragraphs 45 to 49 of the Particulars of Claim and goes on to plead as follows:

"4     1. 1 if Mr Kohn had learned of the negotiations in his capacity as a director of Omnilabs ... and had used such knowledge for his own personal advantage... Mr Kohn would thereby have acted in breach of his fiduciary duties to Omnilabs;

41.2 it is specifically denied that, even if Mr Kohn had known of the negotiations, he would have concluded (or would have been able to conclude) the Settlement Agreement on different terms;

41.3 in particular, as at the date of the Settlement Agreement, Omnilabs was in a parlous financial state. Mr Kohn (as a director of, and shareholder in, Omnilabs) was extremely keen for the Settlement Agreement to be concluded, pursuant to which Sonetti invested further significant sums in

Omnilabs. In the absence of such investment, Omnilabs would have failed and Mr Kohn's shareholding therein would have been worthless (as he well knew);

41.4 further, as Mr Kohn well knew, Sonetti was only prepared to make such investment in Omnilabs on condition that it owned in excess of 75% of Omnilabs' issued share capital;

41.5 accordingly, had Mr Kohn not given up 180,130 of his shares, Sonetti's investment would not have taken place and Omnilabs would have failed;

41.6 further, on learning of the negotiations (by, at the latest, 28 September 2001), Mr Kohn was delighted, because he realised that he would receive a significant capital sum (in excess of £1,000,000) for his shares and the Warrants (that until recently would have been almost worthless but for such negotiations succeeding);

41.7…".

61. Mr Meehan's Defence was settled by Miss Barbara Dohmann QC and Mr Anderson. It was accompanied by a Request for Further Information, to which Mr Kohn responded on 18 September 2002. This Further Information amplifies and clarifies Mr Kohn's case in a number of respects, to which I will refer where relevant when I come to discuss the parties' contentions on the present application.

**THE PRESENT APPLICATION**

62. By Application Notice dated 8 October 2002 Mr Meehan seeks summary judgment against Mr Kohn in respect of that part of the claim set out in paragraphs 16 to 19, 26, 28, 29(1), 31, 34, 36(2), 36(3), 37, 38, 39(1)(ii) (in part), 39(2) and 43 to 49 of the Particulars of Claim, together with the corresponding parts of the prayer for relief, and/or that the same parts of the claim and the prayer for relief should be struck out.

63. CPR 24.2 provides so far as material that the court may give summary judgment against a claimant on the whole of a claim or on a particular issue if it considers that the claimant has no real prospect of succeeding on the claim or issue, and there is no other compelling reason why the case or issue should be disposed of at a trial.

64. CPR 3.4(2) provides that the court may strike out a statement of case, or part of a statement of case, if it appears to the court -

"(a) that the statement of case discloses no reasonable grounds for bringing or defending the claim;

(b) that the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings; or...".

65. There is no dispute between the parties about the general approach that the court should adopt to an application of this nature. The "real prospect of succeeding" referred to in CPR 24.2 must be a prospect which is not, to quote paragraph 24.2.3 in the White Book, "false, fanciful or imaginary". In *Swain v Hillman [2001] 1 All ER 91* Lord Woolf MR gave the following guidance at 94a-c:

> "It is important that a judge in appropriate cases should make use of the powers contained in Part 24. In doing so he or she gives effect to the overriding objectives contained in Part 1. It saves expense; it achieves expedition; it avoids the court's resources being used up in cases where this serves no purpose, and I would add, generally, that it is in the interests of justice. If a claimant has a case which is bound to fail, then it is in the claimant's interests to know as soon as possible that that is the position."

However, Lord Woolf added the salutary warning at 95b that:

> "Useful though the power is under Part 24, it is important that it is kept to its proper role. It is not meant to dispense with the need for a trial where there are issues which should be investigated at the trial ... The proper disposal of an issue under Part 24 does not involve the judge conducting a mini-trial, that is not the object of the provisions; it is to enable cases, where there is no real prospect of success either way, to be disposed of summarily."

See too *Three Rivers DC v Bank of England* [2001] UK HL/16, *[2001] 2 All ER 513* at para.[951, pp.542-3, per Lord Hope of Craighead and paras.[158] to [159], pp.567-8, per Lord Hobhouse, both endorsing the guidance given by Lord Woolf in *Swain*.

66. There is obviously a considerable degree of overlap between the grounds for summary judgment in CPR 24.2 and the grounds on which a statement of case may be struck out under CPR 3.4(2), and also between paragraphs (a) and (b) of CPR 3.4(2) itself. In argument before me neither Counsel sought to draw fine distinctions between the different grounds relied on in the Application Notice, and both were content to approach the application on a relatively broad-brush basis in this regard.

67. The parts of the claim which are attacked by Mr Meehan may conveniently be considered under the following five headings:

(1)   the minority shareholders;

(2)   the EGM notice;

(3)   the sale consideration (cash only, or cash and shares);

(4)   unfair prejudice; and

(5)   breach of duty and fraudulent misrepresentation.

**DISCUSSION AND CONCLUSIONS**

**(1) The minority shareholders**

68. This part of the application relates to paragraphs 26, 28, 31, 34 and 37 of the Particulars of Claim, each of which essentially repeats in relation to the other minority shareholders in Omnilabs an allegation that has already been pleaded in relation to Mr Kohn himself. The allegations in question concern the alleged invalidity of the Drag Along Notices (paragraph 26), an alleged agreed assumption about the true construction of the Articles (paragraph 28) and alleged breaches of the Settlement Agreement and/or the relevant side agreements (paragraphs 31, 34 and 37).

69. It is on the face of it very hard to see how Mr Kohn's case could possibly be advanced by establishing that the Defendants were also in breach of their obligations to the other shareholders in the same or a similar way as they are alleged to have been in breach of their obligations to Mr Kohn himself It is axiomatic that Mr Kohn's case must be decided by reference to his personal position and the documents to which he was a party or which concerned him personally. The other shareholders are not parties to the action, and none of these issues are live ones so far as they are concerned because of the settlements reached with them in December 2001: see paragraph 40 above. Nevertheless, Miss Otton-Goulder argued that these allegations are relevant to her client's case and relied on the Further Information where it is said that they are relevant to the construction of the Settlement Agreement, the Articles and the Side Letter, and are also relevant to issues of the Defendant's conduct and Mr Kohn's knowledge of that conduct: see the answers to requests 1 and 2, which are repeated without qualification in response to requests seeking to elicit the precise relevance of the paragraphs in the Particulars of Claim which I am now considering.

70. With regard to the alleged relevance to questions of construction, Mr Anderson argued that none of the matters pleaded in these paragraphs could assist the court in construing the Settlement Agreement, the Articles or the Side Agreement, because each of those agreements was concluded on 19 September 2001 and the matters pleaded all occurred on or after 21 November 2001. Accordingly, he submits, they could not have formed part of the matrix of fact against which the documents fall to be construed: see *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896 at 912g-h per Lord Hoffmann. With regard to the alleged relevance of these paragraphs to issues of conduct and knowledge, Mr Anderson argued that such conduct could only be relevant, if at all, to the claim that Mr Kohn's rights as a shareholder have been unfairly prejudiced, which is itself unsustainable.

71. In oral argument Miss Otton-Goulder stressed that issues of construction and estoppel lie at the heart of Mr Kohn's case, and submitted that the conduct of the parties after 19 September, including how they behaved in relation to the other minority shareholders, might be highly material to the estoppels pleaded on both sides, and not only to the allegation of unfair prejudice.

72. I readily agree that Mr Kohn's claims should be examined at trial in the context of the treatment of the other minority shareholders, and that the allegations of estoppel by convention relied on by Mr Kohn are in principle capable of being supported by evidence of how the other minority share-holders were treated, or themselves behaved, after 19 September 2001. However, it is in my judgment quite unnecessary for this purpose for Mr Kohn to plead as substantive allegations that the Drag Along Notices served on the other minority shareholders were invalid, that they were themselves estopped from making certain contentions, that they themselves suffered loss and damage, and so on. All that is necessary is for Mr Kohn to lead evidence at trial, if so advised, directed to establishing the facts he wishes to rely upon, including if appropriate evidence from the other shareholders. It is in my view both irrelevant and embarrassing for him to plead the treatment of the other shareholders as substantive issues in their own right, and either expressly or by implication to ask the court to determine those issues, especially having regard to the settlement reached with all the other minority shareholders in December 2001. Furthermore, despite Miss Otton-Goulder's submissions I am unable to see any way in which this material could throw any admissible light on the true construction of the documents which were executed on 19 September 2001.

73. For these reasons I have come to the conclusion that these paragraphs of the Particulars of Claim should be struck out, while making it clear (as indeed Mr Anderson accepted) that Mr Kohn will be free at trial to adduce such relevant evidence as he thinks fit in support of his own pleaded case, including (if appropriate) evidence relating to the other minority shareholders.

**(2) The EGM notice**

74. This part of the application relates to paragraphs 16 to 19 inclusive of the Particulars of Claim. Further Information was provided in respect of paragraph 18, confirming that the relevant EGM notice first came into Mr Kohn's possession on 16 November 2001 when it was given to him personally by Mr Curtis in Mr Kohn's office.

75. I have no hesitation in deciding that this part of the claim should be struck out. In my judgment it is simply

absurd for Mr Kohn to claim that the EGM notice served on him was invalid, given that he signed it himself 21 clear days before the proposed meeting and for good measure also signed an unnecessary consent to short service. So far as the other shareholders are concerned, the alleged invalidity of the notices served on them is to my mind irrelevant and embarrassing if put forward as a substantive allegation in the present action for the reasons which I have already given in paragraph 72 above.

76. Again, however, I should make it clear for the avoidance of doubt that in striking out these paragraphs I do not intend to preclude Mr Kohn from relying on the proposed EGM and related matters as background material in support of his claim, or as material on which to cross-examine the Defendants, subject to the usual constraints of relevance and so forth.

**(3) The sale consideration (cash only, or cash and shares)**

77. This part of the application relates to paragraphs 29(1), 36(2), 36(3) and part of 39(1)(ii) of the Particulars of Claim, together with part of paragraph 1(2) of the prayer. The central question I have to consider is whether it is open to Mr Kohn to claim that he should have received 70 per cent of the purchase price for his shares in MIA shares, or whether his contention to that effect is so obviously hopeless that it demonstrably has no real prospect of success.

78. I have already outlined the rival versions of the agreement reached between Mr Curtis and Mr Kohn in paragraph 30 above. In more detail, Mr Kohn alleges in paragraph 12.3 of the Further Information that:

  (a)  Mr Curtis originally made an oral offer to pay for his shares by way of 30 per cent in cash and 70 per cent in shares, on the basis that they were immediately saleable and not subject to any restriction;

  (b)  Mr Kohn's initial intention (during the period from 16 to 29 November 2001) was to accept this offer, to exercise his share warrants, and to pay for the exercise of the warrants by borrowing the necessary money, which he intended to repay with the cash he would receive in respect of the remaining 30 per cent;

  (c)  on 29 November 2001, Mr Curtis by his e-mail of that date to Mr Kohn purported to vary, or unilaterally varied, his earlier offer, to the effect that Mr Kohn now had the option of being paid the whole of his entitlement in cash or of being paid 30 per cent in cash plus 70 per cent in shares whose sale would be restricted over the following three years; and

  (d)  "In the circumstances, as a matter of practicality, Mr Kohn elected to take the 100 per cent in cash without accepting that either Mr Curtis or Mr Meehan [or anybody else] was entitled so to vary the terms of the offer to him".

79. In response to a further request, Mr Kohn says in paragraph 17 of the Further Information that if he had received 70 per cent of his entitlement in unrestricted shares, as he ought to have done, he would immediately have sold them on completion.

80. These allegations now need to be read in conjunction with paragraphs 24 to 30 of Mr Kohn's witness statement. In paragraph 25 he confirms that in the oral offer made to him by Mr Curtis on or about 21 November 2001

  "there were no conditions attached to the shares I was to receive. I was to receive 100 per cent of the shares immediately on completion of the [Share Sale Agreement] and I was to be free to deal with those shares as I wished from the moment that I received them."

Paragraphs 26 and 29 taken together then make it reasonably clear (although I find the wording of paragraph 26 in isolation equivocal) that Mr Kohn claims to have duly accepted Mr Curtis' offer, and to have done so by the e-mail of 28 November quoted in paragraph 34 above. Miss Otton-Goulder helpfully confirmed in oral argument that nothing other than the e-mail of 28 November is relied upon as constituting acceptance of the offer. Accordingly the critical

question is whether this e-mail can plausibly be regarded as an acceptance of the oral offer that Mr Kohn says was made to him by Mr Curtis.

81. On an objective appraisal, I find it impossible to read this e-mail as constituting an unqualified acceptance of the offer allegedly made by Mr Curtis. On a natural reading, it suggests that confirmation was being sought by Mr Kohn of two crucial points on which he required reassurance before committing himself, namely (a) that the consideration would be as stated by him, including 70 per cent in shares of MIA "free trading" and (b) that this represented at least 90 per cent of substantially the same deal as Sonetti was obtaining. There is no wording that looks remotely like acceptance of an earlier offer made by Mr Curtis. Moreover, even if it could somehow be understood as an acceptance, such acceptance was on any view a qualified or conditional one, so when Mr Curtis explained on the following day that 64 per cent of the MIA shares would be retained on completion it must have been plain to Mr Kohn that the condition attached to his acceptance was not satisfied. In whatever way the e-mail is read, it seems to me impossible to argue that it gave rise to a concluded contract for payment as to 70 per cent in "free trading" shares. Moreover, this conclusion appears to be borne out by Mr Kohn's e-mail of 29 November accepting 100 per cent in cash, after Mr Curtis had explained the position to him and he had discussed the matter by telephone with Norton Rose.

82. To my mind the contrast between the language of Mr Kohn's e-mails of 28 and 29 November speaks for itself, and it is also striking that there is no reference in the latter to the contract that Mr Kohn now says he had already concluded by the former, although if that were the true position one would expect him to have protested vigorously. Nor is this a case where oral evidence, or disclosure of documents, might put a different complexion on the matter, because (as I have already said) it is only the e-mail of 28 November that is relied on as constituting acceptance of Mr Curtis' offer. In summary, I am satisfied that Mr Kohn does indeed have no reasonable prospect of success in establishing the contract for which he now contends, and I therefore conclude that Mr Meehan is entitled to summary judgment on this issue.

83. The question still remains, however, whether the relevant paragraphs of the Particulars of Claim should be struck out, or whether they may still provide an arguable basis for quantification of Mr Kohn's loss even in the absence of the agreement with Mr Curtis for which he contends.

84. Paragraph 29(1) of the Particulars of Claim is mainly directed to recording the terms of the Share Sale Agreement, and the rise in value of MIA shares between the date of that agreement and completion. These allegations are in my view potentially relevant, or at least innocuous, and I see no reason to strike them out.

85. As to paragraph 36(2), Miss Otton-Goulder argues that if the Drag Along Notice was valid, and if Sonetti and/or Pettmond had been entitled to compel Mr Kohn to sell his shares at a comparable price and on comparable terms, then the price which he received was less than what he would have received if he had been paid on the same basis as the majority shareholder. On that footing, it is said, he would have received the entitlement to any increase in the share value as and when each tranche could be sold, and accordingly he is entitled to maintain the head of loss pleaded in this sub-paragraph.

86. I reject this submission for two reasons. First, paragraph 36(2) as currently pleaded is predicated on the assumption that Mr Kohn could and would have sold all of his MIA shares immediately after completion, so on any view the sub-paragraph would require substantial amendment to found a claim for loss along the more limited lines indicated above. No such application was made, but if this were the only objection I would in principle be willing to give Mr Kohn an opportunity to make the amendment. Secondly, however, and fundamentally, the contention seems to me impossible to reconcile with Mr Kohn's e-mail of 29 November 2001 accepting 100 per cent in cash as the consideration for his shares. I fully understand that on one argument Mr Kohn claims not to be bound by this apparent agreement; but the argument I am now considering is founded on the proposition that Mr Kohn was obliged to sell his shares on substantially the same terms as Pettmond and/or Sonetti. Those terms undoubtedly included the retention provisions which Mr Curtis put to Mr Kohn in his e-mail of 29 November, and which Mr Kohn clearly rejected in favour of 100 per cent in cash. I am therefore unable to see any scope for quantification of Mr

Kohn's loss by reference to a phased receipt of MIA shares, and I therefore conclude that paragraph 36(2) should be struck out.

87. As to paragraph 36(3), it alleges that Mr Kohn "would have retained some of the said shares". Quite apart from the fact that this sub-paragraph too seems to be predicated on the same assumption as paragraph 36(2), it is in my view unsustainable for the short and simple reason that Mr Kohn's own evidence is that he would not have retained any MIA shares but would have sold them all immediately: see paragraph 17 of the Further Information and paragraph 30 of his witness statement. I therefore conclude that this sub-paragraph too should be struck out.

88. Finally, if sub-paragraphs 36(2) and (3) are struck out it must follow that the relevant part of paragraph 39(1)(ii) should also go.

**(4) Unfair prejudice**

89. I have already summarised in paragraph 56 above the Defendants' pleaded objections to paragraph 38 of the Particulars of Claim. These objections were amplified by Mr Anderson in his Skeleton Argument, referring to authority that the parties cannot agree to clothe the court with a jurisdiction it does not possess. In my judgment these submissions are well-founded and I accept them. It is unnecessary for me to examine them in any detail, because Miss Otton-Goulder did not take issue with them as such, but rather submitted that they betrayed a misunderstanding of the function and relevance of Mr Kohn's plea of unfair prejudice to himself and his fellow minority shareholders. As I understand it, her case was that the affairs of Omnilabs were in fact conducted in a manner that was unfairly prejudicial to the interests of Mr Kohn and his fellow minority shareholders, and he is therefore entitled to obtain a declaration to that effect even though it would now be impossible for him to obtain any substantive relief by way of petition under *section 459* of the Companies Act 1985 because he is no longer a member. In support of this submission she points to the terms of the Kohn settlement, whereby the two Defendants jointly and severally assumed any liability of any nature that Omnilabs had to Mr Kohn immediately before 11 December 2001 (when he was of course still a member of Omnilabs). See too paragraph 19 of the Further Information, where it is averred that Mr Kohn would have continued to be a shareholder but for the Kohn settlement, which preserved the position which he enjoyed immediately beforehand, with the result (so it is submitted) that he cannot "be debarred from seeking the remedies he seeks merely by reason of the fact that he no longer is a shareholder".

90. I am prepared to assume in Mr Kohn's favour (without deciding the point) that in a suitable case the court would have jurisdiction to grant a declaration to a former shareholder that the affairs of the company were conducted in a manner which was unfairly prejudicial to him at a time when he was a share-holder. However, this assumption only leads to the question whether in the present case there would be any point whatever in entertaining an application for such a declaration; and I emphasise that no relief at all is sought by Mr Kohn apart from a declaration in respect of this part of his case. In my judgment no real grounds have been put forward which would justify the court in adopting the highly unusual course of granting a declaration which would be of only retrospective relevance, and could not affect the interests of the parties today in any material respect. Indeed, I would go further and say that it would in my opinion be a waste of the court's time and resources, and an abuse of process, to undertake such an exercise in the present case. Nor does the Kohn settlement take the matter any further, because a mere declaration as to the state of affairs before 11 December 2001 could not be translated into any actual liability as at that date which could now be visited on the Defendants.

91. For these reasons I consider that paragraphs 38 and 39(2) of the Particulars of Claim should be struck out.

**(5) Breach of duty and fraudulent misrepresentation**

92. This part of the application relates to paragraphs 43 to 49 of the Particulars of Claim, which I have already set out in paragraph 57 above.

93. For allegations of this seriousness, the case as originally pleaded in paragraphs 43 to 49 strikes me as thin in

the extreme. Paragraph 43 appears to base the alleged duty of disclosure on nothing more than the mere fact that both Mr Kohn and Mr Meehan were directors of Omnilabs, while paragraph 44(1) apparently confirms that the breach of duty alleged is one owed by Mr Meehan in his capacity as a director of Omnilabs to Mr Kohn in his capacity as a fellow-director. There is no allegation of any fiduciary duty owed by Mr Meehan to Mr Kohn in his capacity as a shareholder, and still less of any special circumstances which might exceptionally give rise to such a duty (see Gore-Browne on Companies, at para.27.3, pp.27-005 to 27.007, for a summary of the case law on this subject). As to paragraph 44(2), not only is the lack of particularity of the alleged fraud a clear breach of paragraph 8.2 of the Practice Direction supplementing CPR Part 16, but no indication whatever is given of the form or nature of the alleged misrepresentation or of the circumstances that are said to have made it fraudulent.

94. A belated effort to remedy these obvious deficiencies was made in paragraphs 20 and 21 of the Further Information, to which I must now turn.

95. Paragraph 20, responding to a request to specify precisely the alleged legal basis for the duty said to be owed by Mr Meehan to Mr Kohn, is again pleaded at a high level of generality. It alleges that the duty arises on a number of alternative grounds, which for clarity I would divide up as follows:

  (a)  the duty arises out of the fact that both were directors of Omnilabs and both owed fiduciary duties to Omnilabs; and/or

  (b)  it was reasonably foreseeable that Mr Meehan's failure to disclose the negotiations which ultimately resulted in the Share Sale Agreement might cause Mr Kohn loss, and the relationship between them was sufficiently proximate that the court would consider it fair, just and reasonable that the law should impose a duty on Mr Meehan to disclose the existence and terms of the negotiations to Mr Kohn; and/or

  (c)  the duty arises by virtue of Mr Meehan being a director and Mr Kohn being a shareholder in Omnilabs, it being reasonably foreseeable that the former's failure to disclose the negotiations might cause Mr Kohn loss, and the relationship between the two of them, as both being directors and shareholders, was again sufficiently proximate to justify the imposition of a duty on Mr Meehan to disclose the existence and terms of the negotiations to Mr Kohn.

It is then averred that "Mr Meehan owns Sonetti's shares beneficially".

96. Paragraph 21 of the Further Information, responding to a request to provide full and proper particulars of the allegation of fraudulent misrepresentation, then states as follows:

"Both Mr Meehan and Mr Kohn were directors of Omnilabs and both held shares in that company. (Mr Meehan owns Sonetti's shares beneficially). Mr Meehan was engaged in negotiations on behalf of Pettmond and Sonetti, with MIA (UK) and MIA, for the sale to them effectively of the majority of the shares in Omnilabs, and/or all the issued shares in Sonetti, from a date unknown to the Claimant, but certainly well before 19 September 2001, until the conclusion of the [Share Sale Agreement] on or about 16 November 2001. As Mr Meehan, Mr Curtis, Pettmond and Sonetti well knew throughout that period, Mr Kohn was unaware of the existence of any such negotiations.

In the circumstances, Mr Meehan owed Mr Kohn a duty to disclose the existence and terms of the negotiations and the proposed terms of the [Share Sale Agreement] as soon as Mr Meehan was aware of them.

Accordingly, the failure to disclose any of those matters to Mr Kohn at any time in the course of the period between the inception of those negotiations ... and 16 November 2001 constituted a continuing misrepresentation to the effect that there were no such negotiations on foot, when in fact, there were.

The representation to that effect was material and intended to, and did, influence the mind of Mr Kohn as to affect his conduct in deciding whether to enter the Settlement Agreement on its terms. As a result of the representation, Mr Kohn altered his position, in that he concluded the Settlement Agreement on the terms on which it was concluded, in the manner set out in paragraph 48 of the Particulars of Claim."

97. With regard to the alleged duty of disclosure, paragraph 20 of the Further Information seems to me to add little to the Particulars of Claim. It is still the relationship between Mr Meehan and Mr Kohn as directors which is primarily relied upon, with an alternative contention (which I have labelled (c) above) which appears to be to the general effect that the duty might also arise by virtue of Mr Kohn alone, or both of them, additionally being shareholders in Omnilabs, coupled with Mr Meehan's alleged beneficial ownership of Sonetti's shares.

98. Paragraph 21 of the Further Information then introduces the further allegation that Mr Kohn was unaware of the existence of the negotiations, and this ignorance on his part was well known to Mr Meehan, Mr Curtis, Pettmond and Sonetti. In paragraph 38 of his witness statement Mr Kohn confirms that he knew nothing of the negotiations.

99. In my judgment this further material still comes nowhere near providing an arguable basis for the alleged duty of care. No case-law has been cited to me by Miss Otton-Goulder in support of the contention that a duty of care might be held to be owed by a director to his co-director or co-shareholder merely by virtue of their mutual relationship as directors and/or shareholders, or merely by virtue of the fact that as directors they both owe fiduciary duties to the company. I would be very surprised if any such authority could be found. Furthermore, as Mr Anderson points out, the alleged duty is to disclose information not for the benefit of the company, but to enable the co-director to use it for his own personal benefit in relation to the company's affairs.

100. Mr Anderson goes on to submit that Mr Meehan owed no duty to Omnilabs to disclose any interest which he had in the Share Sale Agreement, or in the negotiations leading up to it, because Omnilabs was not a party to the Share Sale Agreement. This submission was not controverted by Miss Otton-Goulder, and seems to me to be correct. In particular, the statutory duty of disclosure in *section 317* of the Companies Act 1985 was not engaged, because the Share Sale Agreement was not a contract with Omnilabs. But if that is right, says Mr Anderson, it is inconceivable that Mr Meehan could at the same time have owed a duty to disclose the negotiations to Mr Kohn by virtue of the fact that they were both directors of Omnilabs. I agree.

101. I have already mentioned that in special circumstances a director may, in addition to the fiduciary duties owed by him to the company, also owe a duty to individual shareholders personally. Where such a duty exists and breach of it has caused loss to a shareholder directly (e.g. by inducing him to part with his shares at an undervalue), the shareholder may bring an action against the director to recover his loss. The relevant legal principles have recently been summarised by the Court of Appeal in *Peskin v Anderson* [2001] I BCLC 372 at paragraphs [27] to [37], pp.378e-380e, per Mummery LJ (with whom the other two members of the Court agreed). The nature of the special circum- stances that have to be established was stated by Mummery LJ as follows at 379d:

[33] The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They. Are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders.

[34] These duties may arise in special circumstances which replicate the salient. features of well-established categories of fiduciary relationships. Fiduciary relationships, such as agency, involve duties of trust, confidence and loyalty. Those duties are, in general, attracted by and attached to a person who undertakes, or who,

depending on all the circumstances, is treated as having assumed, responsibility to act on behalf of, or for the benefit of, another person...".

102. Mr Kohn has neither pleaded nor adduced evidence of anything special in the factual relationship between him and Mr Meehan which might lead to a fiduciary duty of disclosure of the type discussed by the Court of Appeal in *Peskin v Anderson*. Nor did I understand Miss Otton-Goulder to submit that any such special relationship or fiduciary duty existed. She pins her case on establishing a common-law duty of care, but again it seems to me inconceivable that such a duty could have existed in circumstances where no fiduciary duty of disclosure was owed by Mr Meehan to Mr Kohn in his personal capacity as a shareholder. Furthermore, this is not a part of Mr Kohn's case where disclosure and/or full evidence might reasonably be expected to improve his position, because he should be able to plead and give evidence at this stage of any special circumstances he relies on as founding the alleged duty.

103. I conclude, therefore, that Mr Kohn's claim for breach of duty has no real prospect of succeeding at trial and should be disposed of summarily in Mr Meehan's favour.

104. This conclusion is also sufficient to dispose of the claim for fraudulent misrepresentation, as the Further Information makes it clear that no positive representation is relied on and the highest Mr Kohn's case can be put is that Mr Meehan deliberately said nothing to him about the negotiations, in the knowledge that he was ignorant of them. Had Mr Meehan been under a duty to disclose the negotiations to Mr Kohn, it might perhaps have been arguable that his failure to do so constituted a continuing misrepresentation to the effect that no such negotiations were in progress, and that in all the circumstances of the case such misrepresentation was not merely an innocent or negligent one but deliberate and dishonest. In the absence of any such duty, however, mere silence cannot constitute a misrepresentation. In my judgment the situation was one where both Mr Meehan and Mr Kohn were at liberty to, and did, pursue their own individual interests.

## CONCLUSION

105. In the result I hold that this application succeeds in full, with the trivial exception that I would not strike out paragraph 29 of the Particulars of Claim. With regard to the surviving parts of the Particulars of Claim, I would ask Counsel to consider (and if possible agree) what case-management directions should be given at this stage.

---

**End of Document**

# EXHIBIT 2-B

## Ayerst (H M Inspector of Taxes) v C & K (Construction) Ltd  50 TC 651

HIGH COURT OF JUSTICE (CHANCERY DIVISION)

26TH AND 27TH NOVEMBER 1973

COURT OF APPEAL

25TH AND 28TH OCTOBER 1974

HOUSE OF LORDS

14TH, 15TH AND 17TH APRIL AND 21ST MAY 1975

**Income tax, Schedule D — Loss in trade — Losses forward — Succession — Company which incurred losses ordered to be wound up — Business subsequently sold as going concern to company of which it owns the share capital — "Subsidiary" — Whether predecessor remained beneficial owner of its assets after commencement of winding-up — Whether successor entitled to relief for predecessor's losses — Finance Act 1954 (2 & 3 Eliz. 2, c. 44), s. 17.**

For many years until 18th January 1963 M Ltd. carried on the business of builders and civil engineering contractors. At that date it had substantial unrelieved trading and losses and capital allowances. On 31st March 1962 a receiver of its property and assets had been appointed by a debenture holder, and on 4th June 1962, on a creditor's petition, an order had been made for its compulsory winding-up. Immediately before the commencement of the winding-up 99 per cent. of the share capital of the Respondent Company was in the legal and beneficial ownership of M Ltd. On 18th January 1963, M Ltd. being still the registered holder of those shares, the receiver, with the concurrence of the liquidator, sold its business as a going concern to the Respondent Company.

On appeal against assessments to income tax under Schedule D for the years 1962-63 and 1963-64, the Company claimed to be entitled to set off the unrelieved losses, etc., of M Ltd., on the ground that it was at the material time, viz. 18th January 1963, a "subsidiary" of M Ltd. within the meaning of *s. 17*, Finance Act 1954. The Company contended that the provision in s. 17(6)(a) that for the purposes of s. 17(5) "ownership" meant beneficial ownership did not extend to the definition of "subsidiary" in s. 17(6)(b). For the Crown it was contended that a company was not a subsidiary of another company for the purposes of s. 17 unless the relevant shares in it were beneficially owned by that other, and that M Ltd. was not the beneficial owner of such shares by reason of the order for its winding-up.

The Special Commissioners upheld the Company's contention.

The Chancery Division held that at the commencement of the winding-up of M Ltd. the Respondent Company ceased to be its subsidiary for the purposes of s. 17, and accordingly that Company was not entitled to the relief claimed.

Commissioners of Inland Revenue v Olive Mill Ltd. *41 TC 77*; [1963] 1 W.L.R. 712 applied.

*[*652]*

In the Court of Appeal the Company did not pursue the contentions which it had advanced below, but contended that immediately before the transfer the trade belonged to M Ltd. as trustee for its creditors and contributories and immediately after the transfer M Ltd. owned its ordinary shares in the Company as such trustee, so that under s. 17(4)(b) and (c) and (5), read with subss. (6)(a) and (7), the trade fell to be treated as belonging to the same persons before and after the transfer.

The Court of Appeal held (1) that the property of a company in liquidation was not held on trust for its creditors and contributories, either by the company or by the liquidator, but the beneficial ownership thereof was in suspense; moreover (2) the conception of a single collective beneficial ownership of a fluctuating body of persons according to their respective but unspecified and unknown rights and interests in the assets of the company could not be introduced into s. 17 since it would make the section unworkable, nor did subs. (7) apply to a fluctuating body who were entitled to capital as well as income under a trust.

Pritchard v M. H. Builders (Wilmslow) Ltd. *45 TC 360*; [1969] 1 W.L.R. 409 approved.

In the House of Lords the Company's only contention was that, since at the commencement of winding-up a company retained the legal ownership of its assets and the beneficial ownership thereof did not become vested in any other person, it must be taken also to retain the beneficial ownership.

Held, in the House of Lords, that on going into liquidation a company ceased to be the beneficial owner of its assets.

## Case

Stated under the *Taxes Management Act 1970, s. 56*, by the Commissioners for the Special Purposes of the Income Tax Acts for the opinion of the High Court of Justice.

1. At a meeting of the Commissioners for the Special Purposes of the Income Tax Acts held on 4th and 5th November 1971, C. & K. (Construction) Ltd. (hereinafter referred to as "the Respondent") appealed against the under-mentioned assessments to income tax made upon it under the provisions of Schedule D of the *Income Tax Act 1952*.

▦*Go to table1*

The grounds of the appeal were that under the provisions of the *Finance Act 1954, s. 17* and *Sch. 3*, the Respondent was entitled to the benefit of losses and capital allowances available to a company called Mactrac Ltd. as hereinafter appeareth and to offset such losses and capital allowances against its profits as computed for the purposes of the said assessments with the result that the said assessments fell to be discharged.

2. The following documents were produced and admitted at the hearing of the appeal:

> (i)    A statement of facts agreed between the parties to the appeal (exhibit A).

*[\*653]*

> (ii)    An agreement (hereinafter referred to as "the first agreement") made on 18th January 1963 between Laurence Rowland Wilkinson, of the first part, Leslie Harry Shipton, of the second part and the Respondent, of the third part (exhibit B).

> (iii)    An agreement (hereinafter referred to as "the second agreement") made on 19th February 1963 between Laurence Rowland Wilkinson of the first part, Leslie Harry Shipton of the second part, Bank of Europe Ltd. of the third part and J. Murphy & Sons Ltd. of the fourth part (exhibit C).

3. There was produced to us at the hearing of the appeal a statement of facts agreed between the parties thereto. We found those facts to be facts relevant to this appeal, and a copy of the said statement of facts is attached to and forms part of this Case (exhibit A).

4. The following additional facts were also admitted at the hearing of the appeal by the parties thereto which we found to be relevant to the appeal.

> (i)    At all times from the incorporation of the Respondent until the commencement of Mactrac Ltd.'s liquidation Mactrac Ltd. was the legal and beneficial owner of at least 99 per cent. of the share capital of Disorods Ltd.

> (ii)    From 18th January 1962 until after 18th January 1963 the share - D holders of Mactrac Ltd. were unchanged.

5. The first agreement referred to in para. 1(9) of the statement of facts (exhibit A) is attached to and forms part of this Case (exhibit B) [1].

---

[1]  Not included in the present print.

6. The second agreement contained, inter alia, the following recitals:

> "1. C. & K. (Construction) Ltd. (hereinafter called 'the Company') was incorporated under the Companies Act 1948 as a private limited company and has an issued share capital of One hundred pounds divided into One hundred shares of One pound each.
> 3. On the Fourth day of June One thousand nine hundred and sixty two a compulsory winding up order was made against Mactrac and on the Seventh day of August one thousand nine hundred and sixty two the Liquidator was appointed Liquidator of Mactrac.
> 4. Mactrac is the beneficial owner of all the shares in the Company and of the said One hundred shares Ninety nine have been registered in the name of Mactrac and the remaining share has been registered in the name of the Receiver.
> 5. The Receiver has agreed with the Purchaser for the consideration and subject to the terms and conditions hereinafter contained to sell to the Purchaser the said One hundred shares in the Company.
> 6. The Company is indebted to Mactrac in the sum of eighty thousand one hundred and eighty six pounds fourteen shillings and ten pence and the Purchaser has agreed to guarantee to the Receiver the payment by the Company to the Receiver of part of the said indebtedness as hereinafter appears and the Receiver has agreed to assign the balance of the said indebtedness to, the Purchaser or as the Purchaser shall direct as hereinafter appears.

*[\*654]*

and provided, inter alia, as follows:

> "The Receiver in pursuance of the powers of sale contained in the Debentures or any other power or powers in that behalf and with approval and concurrence

of the Liquidator shall sell and the Purchase shall purchase free from any charges liens or other incumbrances the One hundred shares of One pound each of and in the capital of the Company at the price of One hundred pounds.

The said shares are sold free from any charges liens or incumbrances and with the benefit of all rights attaching to such shares up to and including the completion date as hereinafter defined.

The purchase shall be completed on the nineteenth day of February One thousand nine hundred and sixty three (hereinafter called 'the Completion Date')".

A copy of the second agreement is attached to and forms part of this Case (exhibit C) [1].

[1] Not included in the present print.

7. It was contended on behalf of the Respondent:

(i)     that by the first agreement the trade formerly carried on by Mactrac Ltd. was sold as a going concern to the Respondent, who thereafter carried on the said business;

(ii)     that the Respondent was at the material times a subsidiary company of Mactrac Ltd., within the meaning of the *Finance Act 1954, s. 17(5)*;

(iii)     that the provisions of the *Finance Act 1954, s. 17*, were thus satisfied and trading losses incurred by Mactrac Ltd. and capital allowances to which Mactrac Ltd. was entitled were available to set off against the profits of the Respondent as computed for the purposes of the assessments under appeal;

(iv)     that the appeal should be allowed and the assessments adjusted accordingly.

8. It was contended on behalf of H.M. Inspector of Taxes:

(i)     that to satisfy the conditions prescribed in the *Finance Act 1954, s. 17(5)*, a parent company, in the instant case Mactrac Ltd., must by virtue of s. 17(6)(a) be the beneficial owner of that proportion of the share capital of its subsidiary in this case the Respondent, as was prescribed in s. 17(6)(b);

(ii)     that Mactrac Ltd. was not the beneficial owner of shares in the Respondent by reason of the winding-up order made on 4th June 1962 and the subsequent appointment of a liquidator;

(iii)     that the provisions of the *Finance Act 1954, s. 17*, were thus not satisfied, and trading losses incurred by Mactrac Ltd. and capital allowances to which Mactrac Ltd. was entitled were not available to set off against the profits of the Respondent as computed for the purposes of the assessments under appeal;

(iv)     that the appeal should be dismissed and the assessments adjusted accordingly.

9. We, the Commissioners who heard the appeal, upon consideration of the evidence adduced and the arguments addressed to us on behalf of the parties and the cases cited to us, namely: In re Oriental Inland Steam Co. (1874) L.R. 9 Ch. 557; Commissioners of Inland Revenue v Olive Mill Ltd. *41 TC 77*; [1963] 1 W.L.R. 712; Wood Preservation Ltd. v Prior *45 TC 112*; [1969] 1 W.L.R. 1077; Pritchard v M.H. Builders (Wilmslow) Ltd. *45 TC 360*; [1969] 1 W.L.R. 409, gave our decision in the following terms, inter alia:

*[\*655]*

The appeals were made by C. & K. (Construction) Ltd. against Schedule D assessments for the years 1962-63 and 1963-64 on the grounds that by the provisions of *s. 17*, Finance Act 1954, it was entitled to losses and capital allowances incurred by a company known as Mactrac Ltd., and to set off such losses and capital allowances against its profits, with the result that the tax fell to be discharged and the assessments fell to be discharged also.

Both parties were agreed that all the conditions required by *s. 17*, Finance Act 1954, were present but for one thing, i.e., that the company which owned and carried on the trade before the change and afterwards were the same except that a liquidation had intervened. Counsel for C. & K. (Construction) Ltd. said that the persons who had owned or carried on the business were the shareholders of the old company (Mactrac Ltd.) and after the business had been sold the owners remained the same by virtue of s. 17(1), (5) and (6) and it was possible to establish the same identity. He said that he had no need to be concerned at what happened when the old company (Mactrac Ltd.) went into liquidation, and produced no argument on that point. The Crown took issue over that, and said that when a company went into liquidation the beneficial ownership was lost. It maintained that the application of s. 17(6)(a) to subs. (5) was to import reference to beneficial ownership; that it was necessary to apply subs. (6)(b) to subs. (5) also after subs. (6)(a), which again imported the concept of beneficial ownership. Subsection (6)(c) brought in the phrasing that had been used in drawing up the 1938 legislation. Reliance was placed on Wood Preservation Ltd. v Prior [1] and Lord Donovan's judgment; and Pritchard v M.H. Builders (Wilmslow) Ltd

2. Arising from those cases the Crown said that the carry-forward provided for by Parliament in *s. 17*, Finance Act 1954, was not available where a liquidator had been appointed.

¹ *45 TC 112*.

² *45 TC 360*.

Counsel for C. & K. (Construction) Ltd. did not quarrel with the Crown until it came to the question of beneficial ownership. He contended that the section referred to ownership, and that ownership was what the shareholders of Mactrac Ltd. had before liquidation. Even if the beneficial ownership was in limbo, then they still had the ownership of C. & K. (Construction) Ltd. and the condition of s. 17 was accordingly satisfied.

If the beneficial ownership was in limbo s. 17(6)(a) could not be applied, and it was necessary to apply subs. (6)(b) as best you could, and it did apply. The rubric of the section referred to "Company reconstructions etc. without change of ownership", and Lord Donovan had expounded on the purpose of s. 17. The proposition that the appointment of a liquidator nullified that was somewhat wide. We felt that if the section could be made to work it should be so used.

In the Crown's opinion, based on the authority of Pritchard v M.H. Builders (Wilmslow) Ltd., on the appointment of a liquidator the beneficial ownership went into limbo. The Crown relied on that because, it said, the shareholders, who were the legal owners, could not thus be the beneficial owners. In our view, however, the shareholders were the legal owners before and after the change. The case could be distinguished from Pritchard v M.H. Builders (Wilmslow) Ltd. The relevant point was not taken in that case, and we did not therefore feel obliged to follow what was then said.

We decided that the appeal succeeded in principle, and we adjourned the case for the agreement of figures.

*[\*656]*

10. On 14th April 1972, the parties having agreed on the basis of our decision in principle set forth above the effect on the assessments under appeal, we determined the appeal by discharging the said assessments.

11. Immediately after our determination of the appeal dissatisfaction therewith as being erroneous in point of law was expressed to us on behalf of H.M. Inspector of Taxes, and in due course we were required to state a Case for the opinion of the High Court of Justice pursuant to the *Taxes Management Act 1970, s. 56*, which Case we have stated and do sign accordingly.

12. The question of law for the opinion of the High Court of Justice is whether on the facts found by us as hereinbefore set forth there was evidence upon which we could properly arrive at our decision and whether on the facts so found our determination of the appeal was correct in law.

N. F. Rowe  Commissioners for the

B. James  Special Purposes of the Income Tax Acts

Turnstile House, 94-99 High Holborn, London W.C.1.
4th January 1973
**Statement of Facts**1. For the purpose of the determination of the appeal to the Special Commissioners against the assessments to income tax under Schedule D made on the Appellant for the years 1962-63 and 1963-64 the following facts are agreed as between the Appellant Company and the Commissioners of Inland Revenue.

(1)  On 9th January 1948 a company was registered as a private company under the name of L. J. McCarthy Ltd. to carry on business as civil engineers.

(2)  On 10th April 1958 pursuant to a special resolution in that behalf passed on 1st April 1958, the name of the company was changed from L. J. McCarthy Ltd. to Mactrac Ltd.

(3)  For many years prior to and until immediately before the change described in para. (9) below Mactrac Ltd. was engaged in carrying on the business of builders and civil engineering contractors. At the date of the said change the unrelieved losses incurred by Mactrac Ltd. in its business of builders and civil engineering contractors amounted to £326,486 and the unrelieved capital allowances amounted to £82,025.

(4)  On 31st March 1962 the holder of debentures issued by Mactrac Ltd., in pursuance of the powers contained in the debentures, appointed Mr. L. R. Wilkinson F.C.A., then of 79 Mosley Street, Manchester 2, receiver of the property and assets of Mactrac Ltd.

(5)  On 4th June 1962 pursuant to a creditor's petition in that behalf presented to the Court on 21st May 1962, an order was made for the winding up of Mactrac Ltd., and on 7th August 1962 Mr. L. H. Shipton, of Messrs. Poppleton & Appleby, 31 Lloyd Street, Manchester 2, was appointed liquidator.

(6)  On 4th July 1960 a company was registered as a private company under the name of Disorods Ltd. to carry on business as civil engineers. The authorised share capital of the Company was £100 divided into 100 shares of £1 each. At all times from incorporation until

the commencement of Mactrac's liquidation Mactrac Ltd. was the legal and beneficial owner of at least 99 per cent. of the shares in Disorods Ltd.

[*657]

(7)    In pursuance of a special resolution passed on 2nd September 1960 the name of the Company was changed from Disorods Ltd. to C. & K. (Construction) Ltd.

(8)    By a resolution passed on 13th September 1960 the authorised share capital of C. & K. (Construction) Ltd. was increased to £10,000 divided into 10,000 shares of £1 each.

(9)    By an agreement dated 18th January 1963 made between Laurence Rowland Wilkinson, receiver of the property and assets of Mactrac Ltd., of the first part, Leslie Harry Shipton, liquidator of Mactrac Ltd., of the second part and C & K (Construction) Ltd., of the third part, the whole of the builders' and civil engineering contractors' business of Mactrac Ltd. was sold as a going concern to C. & K. (Construction) Ltd. and as from the date of the agreement c. & 'L (Construction) Ltd. carried on the said builders' and civil engineering contractors' business.

(10)    At the date of the sale to C. & K. (Construction) Ltd. of the builders' and civil engineering contractors' business previously carried on by Mactrac Ltd the issued share capital of C. & K. (Construction) Ltd. was held as follows: (a) Mactrac Ltd., 99 shares; (b) Mr. Laurence R. Wilkinson, 1 share.

2. (1) On 6th April 1964 assessments to income tax under Schedule D were made on C. & K. (Construction) Ltd. (a) for the year of assessment 1962-63 in the sum of £350, and (b) for the year of assessment 1963-64 in the sum of £1,000. The Appellant lodged notice of appeal against each of these assessments on 22nd April 1964. (2) From 18th January 1962 until after 18th January 1963 the shareholders of Mactrac Ltd. were unchanged.

High Court

The case came before Templeman J. in the Chancery Division on 26th and 27th November 1973, when judgment was given in favour of the Crown, with costs. Rudiwa Estates Ltd. v Commissioner of Stamp Duty [1966] E.A.L.R. 576 (East Africa) was cited in argument

in addition to the cases referred to in the judgment. L.J. Bromley Q.C. and Peter Gibson for the Crown. C.N. Beattie Q.C. and G. R. Bretten for the Company. Templeman J. -This is a dispute between the Revenue and the taxpayer about the construction of _s. 17_ of the Finance Act 1954. The section, which was passed to prevent tax relief being obtained by the deliberate discontinuance of a trade for the purpose of ameliorating the tax, is now sought to be used by the taxpayer to obtain or preserve a tax relief by the contrived continuance of the trade for the purpose of ameliorating the tax. The taxpayer's case is none the worse for that. Mr. Beattie, who appeared for the taxpayer and has great experience in this field, confessed that he was unable to make complete sense and logic of the whole of the section-a difficulty which I felt. Mr. Bromley, for the Crown, loyally cast no such aspersions; but having regard to my reading of the Act and to the authorities which have been necessary to decide other points on it, it occurred to me rather plaintively that this, after nearly twenty years, might be a section which, if time permits, the authorities could well consider tidying up.

[*658]

For many years prior to, and until, 18th January 1963 Mactrac Ltd. carried on the trade of builders and civil engineering contractors, and was the registered holder of 99 issued shares and the beneficial owner of the remaining one issued share in the taxpayer, C. & K. (Construction) Ltd. On 31st March 1962 a receiver of Mactrac Ltd. was appointed by a debenture-holder. On 21st May 1962 a winding-up petition was presented in respect of Mactrac Ltd., and following on that petition a compulsory winding-up order was made by the Court on 4th June 1962. None of these events effected a discontinuance of the trade carried on by Mactrac Ltd. On 18th January 1963 Mactrac Ltd. (in liquidation), by the receiver acting in pursuance of the powers of sale contained in his debenture, and with the approval and concurrence of the liquidator, sold its trade to the taxpayer, C. & K. (Construction) Ltd. This effected a change from Mactrac Ltd. to C. & K. (Construction) Ltd. of the person carrying on the trade, and but for the argument based on s. 17 would effect a discontinuance of the trade carried on by Mactrac Ltd. On 19th February 1963 Mactrac Ltd. (in liquidation), by the receiver, and again with the concurrence of the liquidator, sold the share capital of C. & K. (Construction) Ltd. For the years 1962-63 and 1963-64 the taxpayer, C. & K. (Construction) Ltd., was assessed to income tax under Schedule D. If the trade carried on by Mactrac Ltd. was not discontinued as a result of the sale of the trade to C. & K. (Construction) Ltd., then C. & K. (Construction) Ltd. are entitled to offset losses and capital allowances available to Mactrac Ltd. as a result of carrying on the trade against the profits which were

the origin of the two assessments made for 1962-63 and 1963-64. Hence these proceedings.

The claim by the taxpayer that there was no discontinuance is based, as I have said, on *s. 17* of the Finance Act 1954. Subsection (1)of that section provides:

> "A trade carried on by a company, whether alone or in partnership, shall not be treated for any of the purposes of the Income Tax Acts as permanently discontinued, nor a new trade as set up and commenced, by reason of a change in the year 1954-55 or any subsequent year of assessment in the persons engaged in carrying on the trade, if the company is the person or one of the persons so engaged immediately before the change and on or at any time within two years after the change the trade or an interest amounting to not less than a three-fourths share in it belongs to the same persons as the trade or such an interest belonged to at some time within a year before the change."

Applying that subsection to the present facts, the trade carried on by Mactrac Ltd. shall not be treated as permanently discontinued by reason of the fact that the agreement dated 18th January 1963 effected a change in the person carrying on the trade from Mactrac Ltd. to C. & K. (Construction) Ltd. if the persons to whom the trade belonged within two years after the change are the same as the persons to whom it belonged within one year before the change.

Mr. Beattie regretfully agreed that it is not possible to decide this case in his favour, at any rate in this Court, simply under s. 17(1)and by the light of nature. That is because, before 18th January 1963 and during the preceding year before the change, the trade belonged to Mactrac Ltd. After the change it belonged to C. & K. (Construction) Ltd. Therefore, in order to show that there is no discontinuance, the taxpayer must base its case on some further provision in the nine subsections of s. 17. Both Mr. Beattie, for the taxpayer,

*[\*659]*

and Mr. Bromley, for the Crown, are agreed that at the end of the day, having examined all those subsections diligently, the trade belonged to the same persons after as within one year before the agreement dated 18th January 1963 if and only if C. & K. (Construction) Ltd. was a subsidiary of Mactrac Ltd. on 18th January 1963. So the question which I have to determine is, When is a subsidiary not a subsidiary? The answer, says Mr. Bromley, is that, upon the true construction of s. 17 and for the purposes of that section, a subsidiary ceases to be a subsidiary when the parent company goes into compulsory liquidation.

It is agreed that s. 17(2) and (3) are of no assistance in the present case. Subsection (4) specifies:

> "For the purposes of this section - (a) a trade carried on by two or more persons shall be treated as belonging to them in the shares in which they are entitled to the profits of the trade; (b) a trade or interest therein belonging to

> any person as trustee … shall be treated as belonging to the persons for the time being entitled to the income under the trust".

Neither of those two paragraphs of subs. (4) is directly relevant, except, says Mr. Bromley, that they show that the Legislature is looking to beneficial ownership. Then, para. (c) is in these terms:

> "a trade or interest therein belonging to a company shall, where the result of so doing is that the conditions for subsection (1) or subsection (2) of this section to apply to a change are satisfied, be treated in any of the ways permitted by the next following subsection";

and that points in the direction which the taxpayer must go if, having failed to get within s. 17(1), he seeks to get into the section by another route.

Subsection (5) is in these terms:

> "For the purposes of this section, a trade or interest therein which belongs to a company engaged in carrying it on may be regarded-(a) as belonging to the persons owning the ordinary share capital of the company and as belonging to them in proportion to the amount of their holdings of that capital, or (b) in the case of a company which is a subsidiary company, as belonging to a company which is its parent company, or as belonging to the persons owning the ordinary share capital of that parent company, and as belonging to them in proportion to the amount of their holdings of that capital".

Then it goes on to deal with the situation which arises where the owners of ordinary share capital have a power to secure that the affairs of the company are conducted in accordance with their wishes. That does not apply, so we are back to subs. (5)(a) and (b). It is agreed that para. (a) does not apply. It fits the shareholders of Mactrac Ltd. before the liquidation, but it does not fit them after the liquidation, nor after the change. Mr. Beattie's argument therefore comes down to para. (b), and that applies only in the case of a company which is a subsidiary company. Therefore, to get his argument off the ground, Mr. Beattie must show that C. & K. (Construction) Ltd. was a subsidiary company of Mactrac Ltd. for the purposes of the section. Subsection (6) is a definition and deeming section, and begins with the expression, "For the purposes of the last foregoing subsection", which is subs. (5). Then para. (a) says:

> "references to ownership shall be construed as references to beneficial ownership, and the expression 'ordinary share capital' in relation to a

> *[\*660]*

> company means all the issued share capital (by whatever name called) of the company, other than capital the holders whereof have a right to a dividend at a fixed rate or at a rate fluctuating in accordance with the standard rate of income tax, but have no other right to share in the profits of the company".

Mr. Beattie draws attention to the fact that references to

ownership are construed as references to beneficial ownership only "For the purposes of the last foregoing subsection", and thus, he says, they are of no assistance in construing the next paragraph, which is the most material and important paragraph because it deals with a subsidiary. That paragraph, s. 17(6)(b), is in these terms:

> "a company shall be deemed to be a subsidiary of another company if and so long as not less than three-quarters of its ordinary share capital 15 owned by that other company, whether directly or through another company or other companies, or partly directly and partly through another company or other companies".

Throughout s. 17 it is clear that "ownership" does not mean, and certainly is not confined to, legal ownership. Thus the fact that at the date of the change the shares in C. & K. (Construction) Ltd. were registered in the name of Mactrac Ltd. does not mean that C. & K. must be deemed to be a subsidiary of Mactrac, because that registration, although giving legal title, is not ownership within the meaning of any of the provisions of the section. Mr. Bromley says that ownership means beneficial ownership, and the question now to be determined is whether at the date of the agreement dated 18th January 1963 the shares of C. & K. were beneficially owned by Mactrac. He says that, looking at the whole of the section, whatever s. 17(6)(a) may say ex abundanti cautela, "ownership" means beneficial ownership. Mr. Beattie, shrinking from saying that "ownership" means legal ownership, but conscious of his difficulties if it means beneficial ownership, says that "ownership" in s. 17(6)(b) must be taken in a broad commonsense way and then, if one looks at it in a broad commonsense way, on the date of the agreement it could be said that Mactrac Ltd. owned the ordinary share capital in C. & K. (Construction) Ltd.

I shall have to deal with the question of what happens when a company goes into compulsory liquidation owning various assets, including shares of another company, in a moment, but to proceed with the section, subs. (6)(c) deals with a chain of companies and says:

> "the amount of ordinary share capital of one company owned by a second company through another company or other companies, or partly directly and partly through another company or other companies, shall be determined in accordance with the provisions of Part I of the Fourth Schedule to the Finance Act, 1938".

That Schedule was designed to work through legal into beneficial ownerships where companies and chains of companies were concerned in relation to the National Defence Contribution, and that Schedule was brought into effect by *s. 42* of the Finance Act 1938, which in many ways resembles the provisions of *s. 17* of the Finance Act 1954, save that in s. 17(6)(a) of the 1954 Act references to ownership are stated to be construed as references to beneficial ownership for the purposes of subs. (5) only, but s. 42(3) of the 1938 Act prescribes

that in the whole of that section and Part I of Sch. 4 "references to ownership shall be construed as references to beneficial ownership". Mr. Beattie says that there is a distinction between the 1938 Act, which applied beneficial ownership to

*[\*661]*

the whole of the section, and the 1954 Act, which applied beneficial ownership to subs. (5). Whatever the reason for the change, it is too subtle for me. Having read the whole of s. 17, including the opening words, it seems to me that there can be no half-way house between legal ownership and beneficial ownership; that the section is clearly not limited to legal ownership; and that, when I turn to subs. (6)(b) to find if one company is a subsidiary of another, the expression "ownership" in that case does not confine me to looking merely at the register but compels me to look to see who were the beneficial owners.

Now, when Mactrac Ltd. went into compulsory liquidation the Statute provided, of course, that there should be a liquidator and that he should go in and administer the assets of Mactrac Ltd. in a particular way; namely, upon trust to distribute to the creditors and to the contributories according to their respective interests. The result was first considered in In re Oriental Inland Steam Co. (1874) L.R. 9 Ch. 557. The decision was:

> "When a company has in this country been ordered to be wound up, judgment creditors who are in this country, and have proved under the winding-up, will not be allowed to attach property in India belonging to the company."

The reasons for the decision are relevant here. At page 559, James L.J. said:

> "The English Act of Parliament has enacted that in the case of a winding-up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company; and, being so, it has ceased to be liable to be seized by the execution creditors of the company … There were assets fixed by the Act of Parliament with a trust for equal distribution amongst the creditors. One creditor has, by means of an execution abroad, been able to obtain possession of part of those assets. The Vice-Chancellor was of opinion that this was the same as that of one cestui que trust getting possession of the trust property after the property had been affected with notice of the trust. If so, that cestui que trust must bring it in for distribution among the other cestuis que trust. So I, too, am of opinion, that these creditors cannot get any priority over their fellow-creditors by reason of their having got possession of the assets in this way."

So the execution was prevented because the property had ceased to be the property of the company at the

date of the liquidation, and was affixed in the hands of the company in liquidation and in the hands of the liquidator with a trust to administer in accordance with the Act of Parliament for the benefit of the beneficiaries who were creditors, and, if there were enough to pay them, the contributories, and that equity prevents one beneficiary securing advantage over others of the same status. At page 560, Mellish L.J. said:

> "But, in my opinion, the beneficial interest is clearly taken out of the company. What the statute says in the 95th section is, that from the time of the winding-up order all the powers of the directors of the company to carry on the trade or to deal with the assets of the company shall be wholly determined, and nobody shall have any power to deal with them except the official liquidator, and he is to deal with them for the purpose of collecting the assets and dividing them amongst the creditors. It appears

[*662]

> to me that that does, in strictness, constitute a trust for the benefit of all the creditors and, as far as this Court has jurisdiction, no one creditor can be allowed to have a larger share of the assets than any other creditor."

So, if it is beneficial ownership which is material in order to show that one company is a subsidiary of another, Mactrac Ltd. was not the parent and C.& K. (Construction) Ltd. was not the subsidiary, because the ordinary share capital of C. & K. was not owned beneficially by Mactrac but was held upon the trusts which are mentioned in In re Oriental Inland Steam Co. [1].

[1]  L.R. 9 Ch. 557.

That case was cited in Commissioners of Inland Revenue v Olive Mill Ltd. [2] [1963] 1 W.L.R. 712. That was a case dealing with profits tax, in which a holding company was chargeable to profits tax in respect of its own profits and also in respect of a wholly-owned subsidiary, Spinners. In 1967 both companies were voluntarily wound up. The holding company contended that a similar position should continue after the date of liquidation because after that date it remained as it had been before, an investment company holding investments or property, one of the investments or properties being the shares in the subsidiary, Spinners. The Special Commissioners held that the holding company were entitled to the benefit of a notice which had been given providing that for profits tax purposes the holding company and the subsidiary company's profits should be grouped. Buckley J. held [3]:

[2]  41 TC 77.
[3]  [1963] 1 W.L.R. 712, at p. 173.

> "(1) that from the winding up the holding company's objective was not to hold investments to obtain a benefit, but to realise its assets and distribute the proceeds among creditors and members … (2) That on the passing of the winding-up resolution the

grouping notice became inoperative, first, because the holding company's last accounting period then ended and secondly, because that company then ceased to be the beneficial owner within *s. 42* of the Finance Act 1938" - to which I have already referred - "of the shares in Spinners";

and In re Oriental Inland Steam Co. was followed. The material passage of the judgment is to be found on page 726 [4], where, referring to an appeal which had been made by the subsidiary company, Spinners, in respect of profits tax, Buckley J. said:

[4]  41 TC 77, at pp. 89-90.

> "The appeal in the Spinners' case depends on the question whether or not Spinners remained grouped with the holding company for the purpose of the Finance Act, 1937. The relevant sections for this purpose are section 22 of the Act of 1937, which, by subsection (1), enables a company of which another company is subsidiary to give a grouping notice in respect of the chargeable accounting period in which the notice is given, and that notice continues during all subsequent chargeable accounting periods throughout which the subsidiary company remains a subsidiary of the principal company."

Then he set out *s. 42* of the Finance Act 1938, which defined a subsidiary company as being "a subsidiary of another body corporate if and so long as not less than three-quarters of its ordinary share capital is owned by that other body corporate", and he read the provision to which I have already -alluded; namely, that "references to ownership shall be construed as references -to beneficial ownership". Buckley J. continued:

> "So that the test is whether the parent company is the beneficial owner of not less than three-quarters of the ordinary share capital of the

[*663]

> subsidiary company. It seems to me that in fact the grouping notice ceased to be operative on December 12, 1957, on two grounds. First, on the view that I have taken on the company's appeal, the last accounting period of the holding company ended on that date and, therefore, that company was after that date no longer a company to which the relevant sections were applicable, and the grouping notice would on that ground have then ceased to operate so that Spinners would be assessable in its own right in respect of profits earned after that date. The grouping notice, I think, also falls to the ground for the reason that the holding company on going into liquidation ceased to be the beneficial owner of the shares in Spinners within the meaning of the section that I have just read."

Buckley J. then referred to In re Oriental Inland Steam Co. [1] and to the passages from the judgments of James and Mellish L.JJ. which I have read. He continued [2]:

[1]  L.R. 9 Ch. 557.

[2]  *41 TC 77*, at p. 90.

> "It has not been suggested to me that there has been any subsequent decision indicating that the views of the Lords Justices are not still good law, and it therefore appears to me to be established by the authority of that case that, on the winding-up resolution being passed, the beneficial Interest in the Spinners' shares held by the holding company ceased to reside in the holding company. Consequently Spinners ceased to be a subsidiary of the holding company within the meaning of these statutory provisions."

Of course, in the present case Mr. Beattie says that there is nothing in the *Finance Act 1954* which clamps the test of beneficial ownership on s. 17(6)(b). But that argument I have already rejected, and it seems to me that both the Oriental case and the Olive Mill case serve to show that a company ceases to be beneficial owner of its assets when it goes into compulsory liquidation. Now, if that is right it follows that C. & K. (Construction) Ltd. was not the subsidiary of Mactrac Ltd. after the date of the compulsory winding-up and was not, therefore, the subsidiary of Mactrac at the date of the change in the person carrying on the trade; and if C. & K. was not a subsidiary of Mactrac at the relevant date, then it is common ground that the taxpayer, C. & K., cannot rely on *s. 17(5)(b)* of the Finance Act 1954, and that there is no other paragraph or section to escape from a discontinuance which would otherwise have been effected.

I was referred to two other cases on the general approach to the construction of s. 17. The first was Wood Preservation Ltd. v Prior [3] [1969] 1 W.L.R. 1077, and in particular the views expressed by Lord Donovan at page 1096 [4]. He said:

[3]  *45 TC 112*.

[4]  Ibid., at p. 132.

> "But it is useful to remember that what the legislature was doing in section 17 was allowing one company to carry forward for its own tax benefit the losses of another. It was allowing that to be done where there was a substantial measure of identity between the two companies."

Mr. Bromley submits that there is no such identity in the present case. There are also the observations of Harman L.J. at page 1097 [5], where he said: "Now section 17 of the Finance Act, 1954, deals with

'ownership'. It then goes on to say that where the word 'ownership' is used it means 'beneficial ownership'." Certainly the sentiments expressed by Lord Donovan and the view on the application of "ownership" expressed by Harman L.J. are not inconsistent with the conclusion which I have reached.

[5]  Ibid., at p. 133.

*[\*664]*

I was also referred to Pritchard v M.H. Builders (Wilmslow) Ltd. [1] [1969] 1 W.L.R. 409, where Cross J. said, at page 414, that s. 17(5) "cannot very well apply to an insolvent company in liquidation"; and he made the same comment with regard to subs. (4)(b). But Mr. Beattie points out that the point in issue in the present case was in fact never taken and argued. That case does not really carry the matter any further, except that again I have the comfort of knowing that the conclusion which I have reached is not inconsistent with what was said by Cross J. in the Pritchard case.

In the result, therefore, I come back to the requirement that the taxpayer must show that C. & K. (Construction) Ltd. remained a subsidiary after the date of the compulsory liquidation of Mactrac Ltd., and for that purpose it must be shown that the ordinary share capital of C. & K. remained owned by Mactrac. It is shown that the shares remained registered in the name of Mactrac, but in fact, on the authorities, they were then beneficially owned for the benefit of the creditors and contributories, and not for the moribund and dying company, Mactrac. I therefore accept Mr. Bromley's submission that C. & K. ceased to be a subsidiary and that, it not being a subsidiary, recourse cannot be had to the provisions of s. 17 to satisfy the Court that there was no permanent discontinuance on the change.

Bromley Q.C. - We would ask your Lordship to allow the appeal and to restore the assessments. I mentioned to your Lordship that the figures are not in fact agreed. We would ask your Lordship to remit the case to the Special Commissioners for determination in accordance with your Lordship's judgment.

Templeman J. - That would be right, would it, Mr. Beattie?

Beattie Q.C. - Yes, my Lord.

Bromley Q.C. - And I would ask for the costs, my Lord.

Templeman J. - Yes.

Court of Appeal

The Company having appealed against the above decision, the case came before the Court of Appeal (Stamp and Scarman L.JJ. and Brightman J.) on 25th and 28th October 1974, when judgment was given unanimously in favour of the Crown, with costs.

The following cases were cited in argument in addition to those referred to in Stamp L.J.'s judgment:- Calgary & Edmonton Land Co. Ltd. v Dobinson [1974] Ch. 102; Wood Preservation Ltd. v Prior 45 TC 112; [1969] 1 W.L.R. 1077; Smith v Anderson *(1880)15 Ch.D. 247*; In

re Barleycorn Enterprises Ltd. [1970] Ch. 465.
C.N. Beattie Q.C. and G. R. Bretten for the Company.
L.J. Bromley Q.C. and Peter Gibson for the Crown.
Stamp L.J. -This is an appeal from an Order of Templeman J. The case is reported under the name Ayerst (Inspector of Taxes) v C. & K. (Construction) Ltd. (which company I will call "C. & K.") at [1974] 1 All E.R. 676. Because the facts, so far as they are known, are fully stated in the report, I need not refer to them in this judgment; nor need I refer to the terms of *s. 17* of the Finance Act 1954, which are stated in the judgment of Templeman J.

[1] *45 TC 360*, at p. 366.

[*665]

In this appeal Mr. Beattie, appearing for the taxpayer, felt unable, I have no doubt rightly, to quarrel with the conclusion of the learned Judge that Mactrac had by the effect of its liquidation ceased to be the beneficial owner of the shares in C. & K., which company was accordingly not a subsidiary of Mactrac at the time of the transfer of the trade. He advanced a wholly new argument in support of the appeal, submitting that the persons carrying on Mactrac's trade as well before as after the sale to C. & K. were, within the meaning of s. 17 and by the effect of subs. (4)(b) and (4)(c) and subs. (5) of the section, which were not relied on in the Court below, the same persons, namely, the creditors and shareholders of Mactrac, who it is submitted were collectively the beneficial owners of each of Mactrac's assets within the meaning of the section.

Mr. Bromley, appearing for the Crown, did not object to the new point being raised. The new submissions were, as I have indicated, based on the provisions of s. 17(4)(b) and (c) and (5). Subsection (4)(b) provides:

> "For the purposes of this section - … (b) a trade or interest therein belonging to any person as trustee (otherwise than for charitable or public purposes) shall be treated as belonging to the persons for the time being entitled to the income under the trust."

Looking at the situation immediately prior to the transfer of Mactrac's trade, it was submitted that the trade belonged to Mactrac as trustee and that the creditors and contributories of Mactrac, as the only persons interested in the assets falling to be dealt with in the liquidation, were collectively entitled to the income under a trust. It followed, so it was submitted, that these persons were for the purposes of the section the beneficial owners of Mactrac's trade. Looking at the situation immediately after the transfer, reliance was placed on subs. (4)(c) and subs. (5) taken together. Subsection (4)(c) provides that, for the purposes of the section:

> "a trade or interest therein belonging to a company shall, where the result of so doing is that the conditions for subsection (1)or subsection (2) of this section to apply to a change are satisfied, be treated in any of the ways

permitted by the next following subsection."

That takes one to subs. (5), which provides, so far as relied on by Mr. Beattie:

> "For the purposes of this section, a trade or interest therein which belongs to a company engaged in carrying it on may be regarded-(a) as belonging to the persons owning the ordinary share capital of the company and as belonging to them in proportion to the amount of their holdings of that capital.

Relying on the latter subsection, Mr. Beattie submitted that after the transfer the creditors and shareholders of Mactrac collectively owned the ordinary shares of C. & K. and that accordingly the trade transferred to C. & K. may for the purposes of s. 17 be regarded as belonging again to the creditors and shareholders of Mactrac. So it is said the trade can be regarded as belonging to the same persons immediately after the transfer as it did, by the effect of subs. (4)(b), immediately before. I emphasise in passing that the analysis of the situation immediately after the transfer so advanced depends upon the proposition that, notwithstanding that Mactrac was in liquidation, the creditors and shareholders were the owners of Mactrac's shares in C. & K. within the meaning of subs. (5)(a) and also that the reference to ownership is, by the effect of subs. (6)(a), a reference to beneficial ownership.

[*666]

Similar submissions to those so put forward were rejected by Cross J. in Pritchard v M.H. Builders (Wilmslow) Ltd. [1] *45 TC 360* in circumstances not dissimilar from the facts in this case. Mr. Beattie accepted that in order to succeed in this appeal he must persuade us that that case was wrongly decided. Now, a liquidator in a liquidation has the duties imposed upon him by the Companies Acts. The creditors and contributors are entitled to require him to carry out those duties and to deal with the company's assets in accordance with the statutory provisions. But I cannot equate that right with the beneficial ownership of the assets or of any particular asset falling to be administered in accordance with the Acts. It does not, in my judgment, in the least follow that because a person or collection of persons have the right to have a collection of assets sold and the proceeds applied indirectly for their benefit, he or they are the beneficial owners of each asset. Basic to Mr. Beattie's submission is the proposition that a company in liquidation holds its assets upon trust for its creditors and contributories, and accordingly that the creditors and contributories are the beneficial owners of those assets. Cross J. in the Pritchard case took the view that, once a company is in liquidation, the beneficial ownership of its assets is in suspense. With that view I wholeheartedly agree. To describe those for whose benefit the assets of a company in liquidation fall to be administered as beneficial owners of each of those assets is, in my judgment, a misuse of the English language. The

creditors and shareholders in such a situation have no rights or powers, even collectively, to deal with a single asset or to direct how it shall be dealt with. There is some language in some of the cases we were referred in particular to In re Oriental Inland Steam Co. (1874) L.R. 9 Ch. 557 - to the effect that after liquidation a company's assets are subject to a trust, which no doubt is a convenient way of saying that the assets cease to belong to the company beneficially and become subject to the statutory provisions contained in the Companies Acts. I share the view of Romer J. in Knowles v Scott [1891] 1 Ch. 717that a liquidator does not hold the company's property on trust for its creditors and contributories; and the company itself, stripped as it is of all its rights, powers and obligations in relation to the property, cannot in my judgment be a trustee of it for the creditors and shareholders. The attempt to apply the conception of trustee and cestui que trust to the law relating to the liquidation of companies so as to fix a company as a trustee of its assets for its creditors and contributories must, in my judgment, fail.

¹ [1969] 1 W.L.R. 409.

It follows, in my judgment, that the shares in C. & K. did not, immediately after the transfer of the business to that company, belong to the creditors and shareholders of Mactrac collectively, so as to bring the case within s. 17(5)(a).

That by itself, if right, would be an end of the case. There is, however, another way of approaching the case. The conception of the creditors and shareholders of Mactrac collectively owning the share capital of C. & K. according to their respective rights and interests, in my judgment, ill accords with the concluding words of s. 17(5)(a), providing that the trade may be regarded as belonging to the persons owning the share capital "in proportion to their holdings of that capital". The latter words are no doubt included for the purpose of the computation required to determine whether the condition of subs. (1) is satisfied that at some time within two years from the change a three-fourths share of the trade belonged to the same persons as it belonged to a year before the change. In the instant case the problem is obscured by the fact that the comparison of ownership sought to be made is between the situation

[*667]

existing immediately before the change and that existing immediately afterwards. But once the conception of collective ownership of creditors and shareholders, as Mr. Beattie put it "according to their respective rights and interests", is introduced into the section, it would, as I see it, be in many cases impossible to undertake the necessary inquiry. If subs. (5) and subs. (4)(b) are designed, as I think they are, to assist in the determination of the question whether a specified proportion of the trade belonged at some date to the

same persons as it belonged to at some other date, and if the trade were to be treated by the effect either of subs. (4)(b) or subs. (5) as belonging at each date to the shareholders and creditors of a company in liquidation collectively according to their respective rights and interests, I know not how the inquiry could be answered in a case where between those two dates there had been dealings with those interests by the creditors or shareholders or where, for example, the preferential creditors had been paid in full. In the instant case the problem is, as I have indicated, obscured because the comparison sought to be made is a comparison between the persons owning the trade immediately before and immediately after the transfer. But it would, in my judgment, be contrary to the scheme of the section to introduce the conception of a single collective beneficial ownership of a fluctuating body of persons according to their respective but unspecified and unknown rights and interests in the assets of the company. To do so would, as I see it, make the section unworkable.

Mr. Beattie attempted to deal with the difficulty by referring to s. 17(7). That subsection provides as follows:

> "In determining, for the purposes of this section, whether or to what extent a trade belongs at different times to the same persons, persons who are relatives of one another and the persons from time to time entitled to the income under any trust shall respectively be treated as a single person".

So Mr. Beattie, reiterating his submission that the creditors and shareholders are collectively entitled to the assets, submitted that they were "the persons from time to time entitled to the income under any trust" and so fall to be treated as a single person for the purposes of subs. (1). I can only say, with all respect to that submission, that in the context of the section it would, in my judgment, be a misuse of language to describe a fluctuating body of persons who were collectively entitled as well to capital as income under a trust as persons from time to time entitled to any income under the trust. Even if the assets of the company in liquidation were correctly described as held by the company upon trust for the creditors and shareholders collectively - a view which I have rejected - that trust must relate to capital and income alike. In my judgment, subs. (7) is clearly not directed to meet such a case. I would add, for completeness, that a similar objection applies to the construction sought to be put upon s. 17(4)(b), which likewise is concerned with persons for the time being entitled to the income under the trust.

For these reasons, I would dismiss the appeal.

Scarman L.J. -I agree.

Brightman J. -I agree.

Bromley Q.C. - I would ask your Lordships to dismiss the appeal with costs.

Stamp L.J. - That would be right, would it not, Mr.

Beattie?

[*668]

Beattie Q.C. - Yes, my Lord. I have nothing to say on that. May I respectfully ask your Lordships for leave to appeal to the House of Lords? I would say in principle this is important to liquidators of companies who are frequently in this position of wishing to dispose of a business with tax losses. As regards the law, the House of Lords has not examined the position of a company in liquidation; and it may be that, freed from already binding authority, a different view might be taken.
(The Court conferred.)
Stamp L.J. - Mr. Beattie, we feel in the end that the point of construction on subs. (4)(b) and subs. (7) is fairly clear, and we do not think that it is a case in which we ought to give leave to appeal. You must apply to their Lordships.
Beattie Q.C. - If your Lordship pleases.
The Company having been granted leave by the Appeal Committee of the House of Lords to appeal against the above decision, the case came before the House of Lords (Lord Diplock, Viscount Dilhorne and Lords Kilbrandon and Edmund - Davies) on 14th, 15th and 17th April 1975, when judgment was reserved. On 21st May 1975 judgment was given unanimously in favour of the Crown, with costs.
The following cases were cited in argument in addition to those referred to in Lord Diplock's speech:- In re Farrow's Bank Ltd. *[1921] 2 Ch. 164*; Rudewa Estates Ltd. v Commissioner of Stamp Duties [1966] E.A.L.R. 576; Wood Preservation Ltd. v Prior 45 TC 112; [1969] 1 W.L.R. 1077; Mayor of Drogheda v Holmes (1855) 5 H.L. Cas. 460; Sudeley v Attorney-General *[1897] A.C. 11*; Brooklands Selangor Holdings Ltd. v Commissioners of Inland Revenue [1970] 1 W.L.R. 429; Parway Estates Ltd. v Commissioners of Inland Revenue (1958) 45 TC 135; In re Calgary and Edmonton Land Co. Ltd. [1975] 1 W.L.R. 355; Gerard v Worth of Paris Ltd. [1936] 2 All E.R. 905; In re Paraguassu Steam Tramroad Co., Black & Co.'s Case (1872) L.R. 8 Ch. 254; In re North Carolina Estate Co. Ltd. (1889) 5 T.L.R. 328; In re Central Sugar Factories of Brazil, Flack's Case [1894] 1 Ch. 369; In re Vocalion (Foreign) Ltd. *[1932] 2 Ch. 196*; English Sewing Cotton Co. Ltd. v Commissioners of Inland Revenue [1947] 1 All E.R. 679.
C.N. Beattie Q.C., R. Sykes and G. R. Bretten for the Company.
L.J. Bromley Q.C. and Peter Gibson for the Crown.
Lord Diplock. -My Lords, the only question that has been argued in your Lordships' House is whether when a company is ordered to be wound up under the Companies Act 1948 the effect of the winding-up order is to divest the company of the "beneficial ownership" of its assets within the meaning of that expression as it is used in *s. 17(6)(a)* of the Finance Act 1954.
Under the Income Tax Acts a trader who has sustained a trading loss in any year of assessment, or has incurred expenditure for which he is entitled to claim capital allowances to an amount which exceeds the taxable profits of the trade for that year, is entitled to carry forward the loss or the excess and set it off against his taxable profits of that trade in subsequent years of assessment; but before the *Finance Act 1954* this right of set-off was lost upon his ceasing permanently to carry on the trade. In the case of trading companies *s. 17* of the Finance Act 1954 allowed some piercing of the corporate veil by

[*669]

providing exceptions to the general rule as to cessation. The effect of the exception that is relevant to this appeal is that, where the trade continues to be carried on by a successor that is a subsidiary company of the company that previously carried on the trade, the successor company may avail itself of the right of set-off that would have been available to its predecessor if it had continued to carry on the trade itself. It is not now disputed that upon the true construction of this section a successor company is only to be treated as a subsidiary company of a parent company as predecessor if and so long as not less than three-quarters of its ordinary share capital is in the "beneficial ownership" of the parent company, whether directly or through another company or companies or partly directly and partly through another company or companies. This makes it unnecessary to set out again and analyse the various subsections and paragraphs which justify this conclusion. They are quoted in the judgment of Templeman J. [1] None of them throws any light upon the sense in which the expression "beneficial ownership" is used in s. 17(6)(a) or lends support to the view that it bears any other meaning than that which would have been ascribed to it in 1954 as a term of legal art as descriptive of the proprietary interest in its assets of a company incorporated under the Companies Act 1948 at successive stages of its existence from incorporation to the commencement of winding up and from the commencement of winding up to dissolution. Nor do I find it necessary to restate the particular facts that give rise to this appeal, beyond saying that it concerns two companies: a parent company, which was ordered to be compulsorily wound up, and the Appellant Company, of which all the shares were held by the parent company or its nominee. The parent company had carried on a trade. The trade continued to be carried on after the making of the winding-up order until the assets and goodwill of the trade were transferred to the Appellant Company. After the transfer the shares in the Appellant Company were sold to a third party and the proceeds of sale distributed in the liquidation of the parent company.
[1]  Page 657 ante.

The Appellant Company relies upon *s. 17* of the Finance Act 1954 as entitling it to set off against its taxable

profits from the trade in two years of assessment after the transfer the trading losses and claims to capital allowances which had accrued to the parent company in the years of assessment before the transfer. It is common ground between the parties that the Appellant Company's right to do so depends upon whether its shares were still in the "beneficial ownership" of the parent company at the time of the transfer notwithstanding that by then the parent company had been ordered to be wound up.

My Lords, the making of a winding-up order brings into operation a statutory scheme for dealing with the assets of the company that is ordered to be wound up. The scheme is now contained in Part V of the Companies Act 1948, and extends to voluntary as well as to compulsory winding-up; but in so far as it deals with compulsory winding-up its essential characteristics have remained the same since it was first enacted by the Companies Act 1862. The procedure to be followed when a company is being wound up varies in detail according to whether this is done compulsorily under an order of the court or voluntarily pursuant to a resolution of the company in general meeting, and, in the latter case, whether it is a members' voluntary winding-up or a creditors' voluntary winding-up; but the essential characteristics of the scheme for dealing with the assets of the company do not differ whichever of these procedures is applicable. They remain the same as those of the original statutory scheme in the Companies Act 1862. For the sake of simplicity, in

[*670]

stating the essential characteristics of the statutory scheme I propose to refer only to those sections of the Companies Act 1948 which apply in a compulsory winding-up and to omit those sections which have a corresponding effect in the case of a voluntary winding-up. Upon the making of a winding-up order: (1) The custody and control of all the property and choses in action of the company are transferred from those persons who were entitled under the memorandum and articles to manage its affairs on its behalf to a liquidator charged with the statutory duty of dealing with the company's assets in accordance with the statutory scheme: s. 243. Any disposition of the property of the company otherwise than by the liquidator is void: s. 227. (2) The statutory duty of the liquidator is to collect the assets of the company and to apply them in discharge of its liabilities: s. 257(1). If there is any surplus he must distribute it among the members of the company in accordance with their respective rights under the Memorandum and articles of association: s. 265. In performing these duties In a compulsory winding-up the liquidator acts as an officer of the court: s. 273; and if the company is insolvent the rules applicable in the law of bankruptcy must be followed: s. 317. (3) All powers of dealing with the company's assets, including the power to carry on its business so far as may be necessary for

its beneficial winding-up, are exercisable by the liquidator for the benefit of those persons only who are entitled to share in the proceeds of realisation of the assets under the statutory scheme. The company itself as a legal person, distinct from its members, can never be entitled to any part of the proceeds. Upon completion of the winding-up, it is dissolved: s. 274. The functions of the liquidator are thus similar to those of a trustee (formerly official assignee) in bankruptcy or an executor in the administration of the estate of a deceased person. There is, however, this difference: that, whereas the legal title in the property of the bankrupt vests in the trustee and the legal title to property of the deceased vests in the executor, a winding-up order does not of itself divest the company of the legal title to any of its assets. Though this is not expressly stated in the Act it is implicit in the language used throughout Part V, particularly in ss. 243 to 246, which relate-to the powers of liquidators and refer to 'property … to which the company 15 … entitled", to "property … belonging to the company", to "assets … of the company" and to acts to be done by the liquidator "in the name and on behalf of the company". The question in this appeal is whether the legal title to its property which remains in the company after the commencement of the winding-up still carries with it any beneficial interest in that property, so as to leave the property in the company's "beneficial ownership" within the meaning of _s. 17(6)(a)_ of the Finance Act 1954.

My Lords, the concept of legal ownership of property which did not carry with it the right of the owner to enjoy the fruits of it or dispose of it for his own benefit owed its origin to the Court of Chancery. The archetype is the trust. The "legal ownership" of the trust property is in the trustee, but he holds it not for his own benefit but for the benefit of the cestuis que trust or beneficiaries. Upon the creation of a trust in the strict sense as it was developed by equity the full ownership in the trust property was split into two constituent elements, which became vested in different persons: the "legal ownership" in the trustee, what came to be called the "beneficial ownership" in the cestui que trust. But it did not follow even in equity that a person could only be the legal owner without being at the same time the beneficial owner in cases where it was possible to identify some other person or persons in whom the beneficial ownership had become vested. Executorship of an estate in course of administration provides one example, which does not owe its origin to statute. No one would suggest that an executor, who was not also a legatee, was beneficial

[*671]

owner as well as legal owner of any of the property which was in the full ownership of the deceased before his death. He could not enjoy the fruits of it himself or dispose of it for his own benefit. Yet because an estate while still in course of administration was incapable of

satisfying the technical requirement of a "trust" in equity that there had to be specific subjects identifiable as the trust fund, it was impossible to identify, at any rate in the case of residuary legatees, a person or persons in whom the beneficial ownership in any particular property forming part of the estate was vested: see Commissioner of Stamp Duties (Queensland) v Livingston [1965] A.C. 694, per Viscount Radcliffe, at pages 707-8. Another example, which owes its origin to statute, is to be found in the law of bankruptcy. The legal ownership of the bankrupt's property becomes vested in the trustee in bankruptcy. Here, while the property is still being administered, not only is there a similar absence of specific subjects identifiable as the trust fund, but also the fact that the right to share in the proceeds of realisation of the property is dependent upon the creditor making a claim to prove in the bankruptcy makes it impossible until the time for proof has expired to identify those persons for whose benefit the trustee is administering the property. Both these factors would, in equity, have prevented that property possessing those characteristics of trust properties which have the consequence of vesting the beneficial ownership of any part of the undistributed property in those persons who will eventually become entitled to share in the proceeds of realisation. Nevertheless, as the very word "trustee" used in the statute implies, the beneficial ownership is not vested in him. He cannot enjoy the fruits of it himself or dispose of it for his own benefit. He is under a duty to deal with it as directed by the statute for the benefit of all the creditors who come in to prove a valid claim. It is no misuse of language to describe the property as being held by the trustee on a statutory trust if the qualifying adjective "statutory" is understood as indicating that the trust does not bear all the indicia which characterise a trust as it was recognised by the Court of Chancery apart from statute. The argument advanced for the Appellant Company is that it makes all the difference that, upon the winding-up of a company, the company does not cease to be the legal owner of its property, as does a person who dies or is adjudicated bankrupt. The contention is that so long as a person, in whom the full ownership of property has once been vested, continues to retain the legal ownership he can only be divested of the beneficial ownership as a result of its becoming vested in some other person or persons. This does not occur except where a "trust", in the strict sense as it was recognised in equity, is created in the property. Such a trust is not created by Part V of the Companies Act 1948 upon the making of a winding-up order; since, for the same reasons as apply in the case of bankruptcy, the persons entitled to share in the proceeds of realisation of the company's property are not invested with the beneficial ownership of that property while it is still being administered by the liquidator.

My Lords, I do not see how it can make any relevant

difference that the legal ownership remains in the person in whom the full ownership was previously vested instead of being transferred to a new legal owner. Retention of the legal ownership does not prevent a full owner from divesting himself of the beneficial ownership of the property by declaring that he holds it in trust for other persons. I see no reason why it should be otherwise when an event occurs which by virtue of a statute leaves him with the legal ownership of property but deprives him of all possibility of enjoying the fruits of it or disposing of it for his own benefit.

*[\*672]*

The nature of a company's interest in its assets after a winding-up order had been made first fell to be considered by the Court of Chancery under the Companies Act 1862. It was, perhaps, inevitable that the court should find the closest analogy in the law of trusts. In one of the earliest reported cases, the Delhi Bank's Case (1871)15 S.J. 923, Lord Cairns L.C. puts it:

> ".... the assets of the company from the moment of winding up … become fixed and inalienable; the executive and the direction of the company are unable to alienate them or to part with them for any purpose; they become fixed and impressed with the trust declared by the 98th section [which corresponds to s. 257(1)of the Act of 1948], a trust by which all the assets of the company are to be applied in discharge of the liabilities of the company."

In the following year one finds Mellish L.J. equiparating the status of a company's assets under a winding-up order with the assets of a debtor in bankruptcy or under a decree of the Court of Chancery in an administration suit: In re General Rolling Stock Co. (1872) L.R. 7 Ch. 646, at page 649. The question of the beneficial ownership of the company's property was dealt with explicitly by both James L.J. and Mellish L.J. in In re Oriental Inland Steam Co. (1874) L.R. 9 Ch. 557.

> "The English Act of Parliament has enacted that in the case of a winding-up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company": per James L.J., at page 559.

> "No doubt winding-up differs from bankruptcy in this respect, that in bankruptcy the whole estate, both legal and beneficial, is taken out of the bankrupt, and is vested in his trustees or assignees, whereas in a winding-up the legal estate still remains in the company. But, in my opinion, the beneficial interest is clearly taken out of the company. What the statute says in the 95th section is, that from the time of the winding-up order all the powers of the directors of the company to carry on the trade or to deal with the assets of the company shall be wholly determined, and nobody shall have any power to deal

with them except the official liquidator, and he is to deal with them for the purpose of collecting the assets and dividing them amongst the creditors. It appears to me that that does, in strictness, constitute a trust for the benefit of all the creditors": per Mellish L.J., at page 560.

The authority of this case for the proposition that the property of the company ceases upon the winding-up to belong beneficially to the company has now stood unchallenged for a hundred years. It has been repeated in successive editions of Buckley on the Companies Acts from 1897 to the present day. Nevertheless your Lordships are invited by the Appellant Company to say that it was wrong because it was founded on the false premise that the property is subject to a "trust" in the strict sense of that expression as it was used in equity before 1862.

My Lords, it is not to be supposed that, in using the expression "trust" and "trust property" in reference to the assets of a company in liquidation, the distinguished Chancery Judges whose judgments I have cited and those who followed them were oblivious to the fact that the statutory scheme for dealing with the assets of a company in the course of winding up its affairs

*[\*673]*

differed in several respects from a trust of specific property created by the voluntary act of the settlor. Some respects in which it differed were similar to those which distinguished the administration of estates of deceased persons and of bankrupts from an ordinary trust; another, peculiar to the winding-up of a company, is that the actual custody, control, realisation and distribution of the proceeds of the property which is subject to the statutory scheme are taken out of the hands of the legal owner of the property, the company, and vested in a third party, the liquidator, over whom the company has no control. His status, as was held by Romer J. in Knowles v Scott [1891] 1 Ch. 717, differs from that of a trustee "in the strict sense" for the individual creditors and members of the company who are entitled to share in the proceeds of realisation. He does not owe to them all the duties that a trustee in equity owes to his cestuis que trust. All that was intended to be conveyed by the use of the expression "trust property" and "trust" in these and subsequent cases (of which the most recent is Pritchard v M.H. Builders Ltd. [1] [1969] 1 W.L.R. 409) was that the effect of the statute was to give to the property of a company in liquidation that essential characteristic which distinguished trust property from other property, viz., that it could not be used or disposed of by the legal owner for his own benefit, but must be used or disposed of for the benefit of other persons.

[1]  *45 TC 360*.

My Lords, the expression "beneficial owner" in relation to the proprietary interest of a company in its assets was first used in a taxing statute in 1927. Section 55 of the

Finance Act 1927 provided for relief from capital and transfer stamp duty in cases of reconstruction or amalgamation of companies where shares in a transferee company were issued as consideration for the acquisition of the undertaking of the transferor company. Subsection (6)(a), (b) and (c) made provision for three exceptions to the right to this relief. The exception provided for in para. (b) is expressed to depend upon whether within a period of two years from a specified date "the [transferor] company … ceases, otherwise than in consequence of reconstruction, amalgamation or liquidation, to be the beneficial owner of the shares so issued to it". From this can be inferred a recognition by Parliament that when a company is in liquidation it ceases to be the "beneficial owner" of its assets within the meaning of that expression as used by the draftsman in a taxing statute The expressions "beneficial owner" and "beneficial ownership" appear again in *s. 42(2)(b)* of the Finance Act 1930 in connection with what companies were to be treated as associated companies for the purpose of relief from transfer stamp duty; and in *s. 42* of the Finance Act 1938. This dealt with grouping of profits of parent and subsidiary companies for the purpose of National Defence Contribution. The definition of subsidiary company, which incorporates the reference to the requirement of "beneficial ownership" of its shares by its parent company, is in the same words as the corresponding definition in *s. 17(6)* of the Finance Act 1954. So when those words were repeated in the *Finance Act 1954* not only was there a consistent line of judicial authority that upon going into liquidation a company ceases to be "beneficial owner" of its assets as that expression has been used as a term of legal art since 1874, but also there has been a consistent use in taxing statutes of the expressions "beneficial owner" and "beneficial ownership" in relation to the proprietary interest of a company in its assets which started with the Finance Act 1927, where the context makes it clear that a company upon going into liquidation ceases to be "beneficial owner" of its assets as that expression is used in a taxing statute.

I would dismiss this appeal.

*[\*674]*

Viscount Dilhorne. -My Lords, I have had the advantage of reading the speech of my noble and learned friend Lord Diplock. I agree with it, and that this appeal should be dismissed.

Lord Kilbrandon. -My Lords, I have had the advantage of reading the speech prepared by my noble and learned friend Lord Diplock. I agree with his conclusions, and would therefore dismiss this appeal.

Lord Edmund-Davies. -My Lords, for the reasons appearing in the speech of my noble and learned friend Lord Diplock, I too would dismiss this appeal.

Questions put:

That the Order appealed from be reversed.
The Not Contents have it.
That the Order appealed from be affirmed and the
appeal dismissed with costs.
The Contents have it.
[Solicitors:- Solicitor of Inland Revenue; Masons.]

Ayerst (H M Inspector of Taxes) v C & K (Construction) Ltd  50 TC 651, 50 TC 651

**Table1 (***Return to related document text***)**

| Year | Amount of assessment |
|------|----------------------|
|      | £ |
| 1962-63 | 350 |
| 1963-64 | 1,000 |

**Table1 (***Return to related document text***)**

---

**End of Document**

# EXHIBIT 2-C

## *189  Foss v Harbottle

**Positive/Neutral Judicial Consideration**

**Court**
Court of Chancery

**Judgment Date**
25 March 1843

**Report Citation**
(1843) 2 Hare 461
67 E.R. 189

1843

[461] *March* 4, 6, 7, 8, 25, 1843.

[See *Hallows* v. *Fernie* , 1867-68, L. R. 3 Eq. 532; L. R. 3 Ch. 467; *Hoole* v. *Great Western Railway Company* , 1867, L. R. 3 Ch. 274; *Seaton* v. *Grant* , 1867, 36 L. J. Ch. 642; *Clinch* v. *Financial Corporation* , 1868, L. R. 5 Eq. 482; L. R. 4 Ch. 117; *Atwool* v. *Merryweather* , 1868, L. R. 5 Eq. 467, n.; *Turquand* v. *Marshall* , 1869, L. R. 4 Ch. 386; *Gray* v. *Lewis* (No. 1), 1869-73, L. R. 8 Eq. 541; L. R. 8 Ch. 1050; *Pickering* v. *Stephenson* , 1872, L. R. 14 Eq. 339; *Menier* v. *Hooper's Telegraph Works* , 1874, L. R. 9 Ch. 353; *Ward* v. *Sittingbourne and Sheerness Railway Company* , 1874, L. R. 9 Ch. 492, n.; *Macdougall* v. *Gardiner* (No. 1), 1875, L. R. 20 Eq. 393; L. R. 10 Ch. 606; *Macdougall* v. *Gardiner* (No. 2), 1875, 1 Ch. D. 13; *Russell* v. *Wakefield Waterworks Company* , 1875, L. R. 20 Eq. 480; *Duckett* v. *Gover* , 1877, 25 W. R. 554; *Pender* v. *Lushington* , 1877, 6 Ch. D. 80; *Isle of Wight Railway Company* v. *Tahourdin* , 1883, 25 Ch. D. 333; *Studdert* v. *Grosvenor* , 1886, 33 Ch. D. 535; *La Compagnie de Mayville* v. *Whitley* [1896], 1 Ch. 807; *Tiessen* v. *Henderson* [1899], 1 Ch. 866; *Alexander* v. *Automatic Telephone Company* [1900], 2 Ch. 69; *Burland* v. *Earle* [1902], A. C. 93; *Punt* v. *Symons & Company Ltd.* [1903], 2 Ch. 516.]

Bill by two of the proprietors of shares in a company incorporated by Act of Parliament, on behalf of themselves and all other the proprietors of shares except the Defendants, *190 against the five directors (three of whom had become bankrupt), and against a proprietor who was not a director, and the solicitor and architect of the company, charging the Defendants with concerting and effecting various fraudulent and illegal transactions, whereby the property of the company was misapplied, aliened and wasted; that there had ceased to be a sufficient number of qualified directors to constitute a board; that the company had no clerk or office; that in

© 2025 Thomson Reuters.

such circumstances the proprietors had no power to take the property out of the hands of the Defendants, or satisfy the liabilities or wind up the affairs of the company; praying that the Defendants might be decreed to make good to the company the losses and expenses occasioned by the acts complained of; and praying the appointment of a receiver to take and apply the property of the company in discharge of its liabilities, and secure the surplus: the Defendants demurred.

Held, that, upon the facts stated, the continued existence of a board of directors *de facto* must be intended; that the possibility of convening a general meeting of proprietors capable of controlling the acts of the existing board was not excluded by the allegations of the bill; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of; that therefore the Plaintiffs could not sue in a form of pleading which assumed the practical dissolution of the corporation; and that the demurrers must be allowed.

When the relation of trustee and *cestui que trust* begins, as between the projectors of public companies and such companies.

Some forms prescribed for the government of a corporation may be imperative, and others directory only.

On argument of a demurrer, facts not averred in the bill, and which might possibly have been denied by plea, if they had been averred, intended against the pleader.

The bill was filed in October 1842 by Richard Foss and Edward Starkie Turton, on behalf of themselves and all other the shareholders or proprietors of shares in the company called "The Victoria Park Company," except such of the same shareholders or proprietors of shares as were Defendants thereto, against Thomas Harbottle, Joseph Adshead, Henry Byrom, John Westhead, Richard Bealey, Joseph Denison, Thomas Bunting and Richard Lane; and also against H. Rotton, E. Lloyd, T. Peet, J. Biggs and S. Brooks, the several assignees of Byrom, Adshead and Westhead, who had become bankrupts.

The bill stated, in effect, that in September 1835 certain persons conceived the design of associating for the purchase of about 180 acres of land, situated in the parish of Manchester, belonging to the Defendant, Joseph Denison, and others, and of enclosing and planting the same in an ornamental and park-like manner, and erecting houses thereon with attached gardens and pleasure-grounds, and selling, letting or otherwise disposing thereof; and the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane, agreed to form a joint stock company, to consist of themselves and others, for the said purpose: that in October 1835 **[462]** plans of the land, and a design for laying it out, were prepared; that, after the undertaking had been projected and agreed upon, Denison purchased a considerable portion of the said land of the other original owners with the object of reselling it at a profit, and Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, and one P. Leicester, and several other persons, not members of the association, purchased the said land in parcels of Denison and the other owners, so that at the time of passing the Act of Incorporation Harbottle, Adshead, Byrom, Westhead, Bunting and Lane owned more than half of the land in question, the remainder being the property of persons who were not shareholders: that Denison and the last-named five Defendants made considerable profits by reselling parts of the said land at increased chief rents before the Act was passed.

The bill stated that, between September 1835 and the beginning of 1836, various preliminary steps were taken for enabling the projectors of the said company to set it on foot: that in April 1836 advertisements, describing the objects of the proposed company and the probabilities of its profitable result, were published, in which it was proposed to form the association on the principle of a tontine: that the first eight *191* named Defendants and several other persons subscribed for shares in the proposed company, and, among others, the Plaintiff, Foss, subscribed for two shares, and the Plaintiff, Turton, for twelve shares of £100 each, and signed the contract, and paid the deposit of £5 per share: that at a public meeting of the subscribers called in May 1836 it was resolved that the report of the provisional committee should be received, and the various suggestions therein contained be adopted, subject to the approval of the directors, who were requested to complete such purchases of land, and also such other acts as they might **[463]** consider necessary for carrying the objects of the undertaking into effect; and it also resolved that Harbottle, Adshead, Byrom, Westhead and Bealey should be appointed directors, with power to do such acts as they might consider necessary or desirable for the interests of the company; and Westhead, W. Grant and J. Lees were appointed auditors, Lane architect, and Bunting solicitor: that, in order to avoid the responsibilities of an ordinary partnership, the Defendants Harbottle and others suggested to the subscribers the propriety of applying for an Act of Incorporation, which was accordingly done: that in compliance with such application, by an Act, intituled "An Act for Establishing a Company for the Purpose of Laying Out and Maintaining an Ornamental Park within the Townships of Rusholme, Charlton-upon-Medlock and Moss Side, in the County of Lancaster," which received the Royal assent on the 5th of May 1837 (7 Will. 4), it was enacted that certain persons named in the Act, including Harbottle, Adshead, Bealey, Westhead, Bunting and Denison and others, and all and every such other

persons or person, bodies or body politic, corporate or collegiate, as had already subscribed or should thereafter from time to time become subscribers or a subscriber to the said undertaking, and be duly admitted proprietors or a proprietor as thereinafter mentioned, and their respective successors, executors, administrators and assigns, should be and they were thereby united into a company for the purposes of the said Act, and should be and they were thereby declared to be one body politic and corporate by the name of "The Victoria Park Company," and by that name should have perpetual succession and a common seal, and by that name should and might sue and be sued, plead or be impleaded, at law or in equity, and should and might prefer and prosecute any bill or bills of indictment or information against any person or [464] persons who should commit any felony, misdemeaour, or other offence indictable or punishable by the laws of this realm, and should also have full power and authority to purchase and hold lands, tenements and hereditaments to them, and their successors and assigns, for the use of the said undertaking, in manner thereby directed. [The bill stated several other clauses of the Act. [1] ] *192*

[465] The bill also stated the schedule annexed to the Act, whereby the different plots of the said land, numbered [466] from 1 to 37, were stated to have been purchased by the Victoria Park Company from the various persons whose [467] names were therein set forth, and including the following names:—"Mr. P. Leicester and others;" "Mr. Lacy and another;" "Mr. Lane" and "Mr. Adshead;" that [468] the land so stated to be purchased of "P. Leicester and others" was at the time of passing of the Act vested partly in P. Leicester, and partly in Westhead, Bunting *193* and Byrom, and the land so stated to be purchased of "Mr. Lacy and another" was at the time of the passing of the Act vested partly in Mr. Lacey and partly in Lane.

The bill stated that the purchase and sale of the said land as aforesaid was the result of an arrangement fraudulently concerted and agreed upon between Harbottle, Adshead, Byrom, Westhead, Denison, Bunting and Lane, at or after the formation of the company was agreed upon, with the object of enabling themselves to derive a *194* profit or personal benefit from the establishment of the said company; and that the arrangement amongst the persons who were parties to the plan was that a certain number from amongst themselves should be appointed directors, and should purchase for the company the said plots of land from the persons in whom they were vested, at greatly increased and exorbitant prices: that it was with a view to carry the arrangement into effect that Harbottle, Adshead, Byrom and Westhead procured themselves to be appointed directors, and Denison procured himself to be appointed auditor: that accordingly, after the said plots of land had become vested in the several persons named in the schedule, and before the passing of the Act, the said directors, on behalf of the company, agreed to purchase the same from the persons named in the schedule at rents or prices greatly exceeding those at which the said persons had purchased the same: that after the Act was passed Harbottle, Adshead, Byrom, Westhead and Bealey continued to act as directors of the incorporated company in the same manner as before: that Adshead continued to act as director until the 18th of July 1839, Byrom until the 2d of December 1839, and [469] Westhead until the 2d of January 1840, at which

© 2025 Thomson Reuters.

dates respectively fiats in bankruptcy were issued against them, and they were respectively declared bankrupts, and ceased to be qualified to act as directors, and their offices as directors became vacated.

The bill stated that upwards of 3000 shares of £100 in the capital of the company were subscribed for: that the principle of tontine was abandoned: that before 1840 calls were made, amounting, with the deposit, to £35 per share, the whole of which were not, however, paid by all the proprietors, but that a sum exceeding £35,000 in the whole was paid.

The bill stated that, after the passing of the Act, Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, with the concurrence of Denison and of Bealey, proceeded to carry into execution the design which had been formed previously to the incorporation of the company, of fraudulently profiting and enabling the other persons who had purchased and then held the said land, to profit by the establishment of the company and at its expense; and that the said directors accordingly, on behalf of the company, purchased, or agreed to purchase, from themselves, Harbottle, Adshead, Byrom and Westhead, and from Bunting and Lane, and the other persons in whom the said land was vested, the same plots of land, for estates corresponding with those purchased by and granted to the said vendors, by the original owners thereof, charged with chief or fee-farm rents, greatly exceeding the rents payable to the persons from whom the said vendors had so purchased the same: that of some of such plots the conveyances were taken to the Victoria Park Company, by its corporate name; of others, to Harbottle, Adshead, Byrom, Westhead and Bealey, as directors in trust for the company; **[470]** and others rested in agreement only, without conveyance: that by these means the company took the land, charged not only with the chief rents reserved to the original landowners, but also with additional rents, reserved and payable to Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others: that, in further pursuance of the same fraudulent design, the said directors, after purchasing the said land for the company, applied about £27,000 of the monies in their hands, belonging to the company, in the purchase or redemption of the rents so reserved to themselves, Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others, leaving the land subject only to the chief rent reserved to the original landowners.

The bill stated that the plans of the park were contrived and designed by Lane, in concert with Denison, the directors and Bunting, so as to render the formation of the park the means of greatly increasing the value of certain parcels of land, partly belonging to Denison and partly to Lane, situated on the outside of the boundary line of the park, but between such boundary line and one of the lodges and entrance gates, called Oxford Lodge and Gate, erected on a small part of the same land purchased by the company; and through which entrance, and the land so permitted to be retained by Denison and Lane, one of the principal approaches to the park was made: that the

© 2025 Thomson Reuters.

said land so retained by Denison and Lane was essentially necessary to the establishment of the park, according to the plans prepared by Lane, and the same was virtually incorporated in the park, and houses erected thereon would enjoy *195* all the advantages of the park, and plots thereof were in consequence sold by Denison and Lane for building land at enhanced prices.

[471] The bill stated that, after the purchase of the land as aforesaid, the directors proceeded to carry into effect the design of converting the same into a park, and they accordingly erected lodges and gates, marked out with fences the different crescents, terraces, streets and ways; formed drains and sewers, and made roadways, and planted ornamental trees and shrubs; that they also caused to be erected in different parts of the park several houses and buildings, some of which only were completed; and that the directors alleged the monies expended in the roads, drains and sewers amounted to £12,000, and in the houses and buildings to £39,000, or thereabouts: that the said directors sold and let several plots of land, and also sold and let several of the houses and buildings, and received the rents and purchase-money of the same.

The bill stated that Harbottle, Denison, Bunting and Lane did not pay up their calls, but some of them retained part, and others the whole thereof; Harbottle and Lane claiming to set off the amount of the calls against the chief rents of the lands which they sold to the company, Bunting claiming to set off the same against the chief rents, and the costs and charges due to him from the company; and Denison claiming to set off the amount of the calls against the rents payable to him out of the land which he sold to persons who resold the same to the company.

The bill stated that owing to the large sums retained out of the calls, the sums appropriated by the said directors to themselves, and paid to others in reduction of the increased chief rents, and payment of such rents, and owing to their having otherwise wasted and misapplied a considerable part of the monies belonging to the company, the funds of the company which came [472] to their hands shortly after its establishment were exhausted: that the said directors, with the privity, knowledge and concurrence of Denison, Bunting and Lane, borrowed large sums of money from their bankers upon the credit of the company: that, as a further means of raising money, the said directors, and Bunting and Lane, with the concurrence of Denison, drew, made and negotiated various bills of exchange and promissory notes; and that the said directors also caused several bonds to be executed under the corporate seal of the company for securing several sums of money to the obligees thereof: that by the middle or latter part of the year 1839 the directors, and Bunting and Lane, had come under very heavy liabilities; the chief rents payable by the company were greatly in arrear, and the board of directors, with the concurrence of Denison, Bunting and Lane, applied to the United Kingdom Life Assurance Company to advance the Victoria Park Company a large sum of money by way of mortgage of the lands and hereditaments comprised in the park; but the Assurance Company were advised that the Victoria

© 2025 Thomson Reuters.

Park Company were, by the 90th section of their Act, precluded from borrowing money on mortgage, until one-half of their capital (namely £500,000) had been paid up, and on that ground declined to make the required loan: that the directors, finding it impossible to raise money by mortgage in a legitimate manner, resorted to several contrivances for the purpose of evading the provisions of the Act, and raising money on mortgage of the property of the company, by which means several large sums of money had been charged by way of mortgage or lien upon the same: that to effect such mortgages or charges, the directors procured the persons who had contracted to sells plots of land to the company, but had not executed conveyances, to convey the same, by the direction of the board, to some **[473]** other person or persons in mortgage, and afterwards to convey the equity of redemption to the directors in trust for the company: that the directors also conveyed some of the plots of land which had been conveyed to them in trust for the company to some other persons by way of mortgage, and stood possessed of the equity of redemption in trust for the company: that, for the same purpose, the board of directors caused the common seal of the company to be affixed to several conveyances of plots of land which had been conveyed to the company by their corporate name, and to the directors in trust for the company, whereby the said plots of land were expressed to be conveyed for a pretended valuable consideration to one or more of the said directors absolutely, and the said directors or director then conveyed the same to other persons on mortgage to secure sometimes *196* monies advanced to the said directors, and by them paid over to the board in satisfaction of the consideration monies expressed to be paid for the said prior conveyances under the common seal, sometimes antecedent debts in respect of monies borrowed by the board, and sometimes monies which had been advanced by the mortgagees upon the security of the bills and notes which had been made or discounted as aforesaid: that, in other cases, the said directors and Bunting deposited the title-deeds of parcels of the land and buildings of the company with the holders of such bills and notes to secure the repayment of the monies due thereon, and in order to relieve the parties thereto: that, by the means aforesaid, the directors, with the concurrence of Denison, Bunting and Lane, mortgaged, charged or otherwise incumbered the greater part of the property of the company: that many of such mortgagees and incumbrancers had notice that the said board of directors had not power under the Act to mortgage or charge the property of the company, and that the **[474]** said mortgages, charges and incumbrances were fraudulent and void as against the company, but that the Defendants allege that some of the said incumbrances were so planned and contrived that the persons in whose favour they were created had not such notice.

That the said directors having exhausted every means which suggested themselves to them of raising money upon credit, or upon the security of the property and effects of the company, and being unable by those means to provide for the whole of the monies due to the holders of the said bills and notes, and the other persons to whom the said directors in the said transactions had become indebted as individuals, and to satisfy the debts which were due to the persons in whose favour the said mortgages and incumbrances had been improperly created, and in order to release themselves from the responsibility which they had personally incurred by taking conveyances or demises of parts of the said land to the said directors as individuals in trust for

© 2025 Thomson Reuters.

the company, containing covenants on their parts for payment of the reserved rents, the said directors resolved to convey and dispose of the property of the company, and they accordingly themselves executed and caused to be executed under the common seal of the company, divers conveyances, assignments and other assurances, whereby divers parts of the said lands and effects of the company were expressed to be conveyed or otherwise assured absolutely to the holders of some of the said bills and notes, and some of the said mortgagees and incumbrancers, in consideration of the monies thereby purported to be secured; and also executed, and caused to be executed under the common seal of the company, divers conveyances and assurances of other parts of the said lands to the persons who sold the same to the company, in consideration of their releasing them from **[475]** the payment of the rents reserved and payable out of the said lands: that many of such conveyances had been executed by Harbottle, Adshead, Westhead and Bealey, and a few by Byrom, who had been induced to execute them by being threatened with suits for the reserved rents: that Harbottle, Adshead, Byrom, Westhead and Bealey threatened and intended to convey and assure the remaining parcels of land belonging to the company to the holders of others of the said bills and notes, and to others of the said mortgagees and incumbrancers and owners of the chief rents, in satisfaction and discharge of the said monies and rents due and to become due to them respectively.

The bill stated that, upon the bankruptcy of Byrom, Adshead and Westhead, their shares in the company became vested in the Defendants, their assignees, and that they (the bankrupts) had long since ceased to be, and were not, shareholders in the company: that the whole of the land resold by them was vested in some persons unknown to the Plaintiffs, but whose names the Defendants knew and refused to discover: that, upon the bankruptcy of Westhead, there ceased to be a sufficient number of directors of the company to constitute a board for transacting the business of the company in manner provided by the Act, and Harbottle and Bealey became the only remaining directors whose office had not become vacated, and no person or persons had been appointed to supply the vacancies in the board of directors occasioned by such bankruptcies, and consequently there never had been a properly constituted board of directors of the company since the bankruptcy of Westhead.

That Byrom, Adshead and Westhead, nevertheless, after their respective bankruptcies, executed the several **[476]** absolute conveyances ond other assurances of the lands and property of the company, which were so executed for the purposes and in *197* manner aforesaid, after the directors had exhausted their means of raising money upon credit or upon the security of the property of the company.

That about the end of the year 1839, or commencement of the year 1840, the said directors discharged Brammell, the secretary of the company, and gave up the office taken by the company

© 2025 Thomson Reuters.

in Manchester, and transferred the whole or the greater part of the title-deeds, books and papers of the said company into the hands of Bunting; and from that time to the present the company had had no office of its own, but the affairs of the company had been principally conducted at the office of Bunting.

That the only parts of the land bought by the company which had not been conveyed away either absolutely or by way or mortgage, and the only part of the other property and effects of the company which had not been disposed of and made away with in manner aforesaid, remained vested in, and in the order and disposition of, Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting, in whose custody or power the greater part of the books, deeds and papers belonging to the company which had not been made away with remained: that by the fraudulent acts and proceedings in the premises to which Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting were parties, the property and effects of the said company had been and then were involved in almost inextricable difficulties, and if such property and effects were any longer allowed to remain in their order and disposition, the same would be in danger of being wholly dissipated and irretrievably **[477]** lost: that the said company were then largely indebted to their bankers and other persons who had *bonâ fide* advanced money to the company, and to the builders and other persons who had executed some of the works in the park, and provided materials for the same; while, in consequence of the property of the company having been wasted and improperly disposed of by the directors, there were at present no available funds which could be applied in satisfaction of the debts of the company, and that some of the creditors of the said company had obtained judgments in actions at law brought by them against the company for the amount of their debts, on which judgments interest was daily accumulating.

The bill stated that in the present circumstances of the company, and the board of directors thereof, the proprietors of shares had no power to take the property and effects of the company out of the hands of Harbottle, Adshead, Byron, Westhead, Bealey and Bunting, and they had no power to appoint directors to supply the vacancies in the board occasioned by the said bankruptcies, and the proprietors of shares in the company had no power to wind up, liquidate or settle the accounts, debts or affairs of the company, or to dissolve the company, nor had they any power to provide for and satisfy the existing engagements and liabilities of the company with a view to its continuance, and the prosecution of the undertaking for which it was established without the assistance of the Court: that if a proper person were appointed by the Court to take possession of and manage the property and effects of the company, and if the company were to be repaid the amount of all losses and expenses which it had sustained or incurred by reason of the fraudulent and improper acts and proceedings of the Defendants in the premises, and **[478]** which the Defendants, or any of them, were liable to make good to the said company, as thereinafter prayed; and if the company were decreed to take and have conveyed to them so much of the said land which was retained by Denison and Lane as aforesaid, upon paying or accounting to them for the fair value thereof at the time when the undertaking was first projected;

© 2025 Thomson Reuters.

and Denison and Lane were to pay or account to the said company for the price received by them for so much of the same land as had been sold by them, over and above what was the fair price for the same at the time the undertaking was first projected; and if the mortgages, charges, incumbrances and liens, and the said conveyances and other assurances, by means of which the property and effects of the company had been improperly incumbered and disposed of, which could be redeemed or avoided, as against the persons claiming thereunder, were redeemed and set aside, and the property and effects of the company thereby affected were restored to it, and the Defendants, who had not become bankrupt, and who had not paid up, but ought to have paid up, into the joint stock capital of the company, the amounts of the several calls made by the directors on their respective shares, were to pay up the same, the lands, property and effects of the company would not only be *198 sufficient to satisfy the whole of its existing debts and liabilities, but leave a surplus, which would enable the company to proceed with, and either wholly or in part accomplish, the undertaking for which it was incorporated.

The bill stated that the Defendants concealed from the Plaintiffs, and the other shareholders in the company, who were not personally parties thereto, the several fraudulent and improper acts and proceedings of the said directors and the said other Defendants, and **[479]** the Plaintiffs and the other shareholders had only recently ascertained the particulars thereof, so far as they were therein stated, and they were unable to set forth the same more particularly, the Defendants having refused to make any discovery thereof, or to allow the Plaintiffs to inspect the books, accounts or papers of the company.

The bill charged that Harbottle and Bealey, and the estates of Adshead, Byrom and Westhead, in respect of that which occurred before their said bankruptcies, and Adshead, Byrom and Westhead, as to what occurred since their said bankruptcies, were liable to refund and make good to the company the amount of the losses and expenses which it had sustained in respect of the fraudulent and improper dealings of the said directors of the company with its lands and property: that Denison, Bunting and Lane had counselled and advised the directors in their said proceedings, and had derived considerable personal benefit and advantage therefrom: that Denison, Bunting and Lane were all parties to the said fraudulent scheme planned and executed as aforesaid, by which the several plots or parcels of land in the park were purchased and resold to the said company at a profit and at a price considerably exceeding the real value of the same, and that Denison, Bunting and Lane had derived considerable profit from the increased price or chief rents made payable out of the several plots or parcels of land which were purchased and resold by them in manner aforesaid, and from the monies which were paid to them as a consideration for the reduction of the same chief rents as before mentioned.

© 2025 Thomson Reuters.

The bill charged that several general meetings, and extraordinary general meetings, and other meetings of **[480]** the shareholders of the company, were duly convened and held at divers times, between the time when the company was first established and the year 1841, and particularly on or about the several days or times thereinafter mentioned (naming ten different dates, from July 1837 to December 1839), and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed.

The bill charged that, under the circumstances, Denison, Bunting and Lane, having participated in and personally benefited by and concealed from the other shareholders the several fraudulent and improper acts aforesaid, were all jointly and severally liable together, with the said directors, to make good to the company the amount of the losses and expenses which had been or might be incurred in consequence of such of the said wrongful and fraudulent acts and proceedings as they were parties or privies to: that Harbottle, Byrom, Adshead, Westhead and Bealey, respectively, had still some of the property and effects belonging to the company: that the said last-named Defendants had not paid up the calls due and payable on their respective shares: that the Plaintiffs had as yet paid only three of the calls on their shares, not having paid the remainder in consequence of learning that, owing to some misconduct of the directors, the affairs of the company were in difficulties, the cause of which difficulties the Plaintiffs had but lately, and with considerable difficulty, ascertained to have arisen from the proceedings aforesaid, but in all other respects the Plaintiffs had conformed to the provisions of the Act: that there were not any **[481]** shareholders in the company who had not paid up the calls on their shares besides the Plaintiffs and the said Defendants: that the names and places of abode of the other persons who are not shareholders in the company, but are interested in or liable in respect of any of the said matters, were unknown to the Plaintiffs, and the Defendants ought to discover the same: that the number of shareholders in the company was so great, and their rights and liabilities were so subject to change and fluctuation, by death and otherwise, that it would be impossible to prosecute the suit with effect if they were all made parties thereto. *199*

The bill charged that Bunting claimed a lien upon the documents in his possession belonging to the company for the costs of business done by him as the attorney of the company, but a great part of such business consisted of the fraudulent acts aforesaid; and that he had received out of the funds of the company divers large sums of money exceeding the amount properly due to him: that Bunting had deposited some of the deeds belonging to the company with certain bankers at Liverpool, and, among the rest, the contract executed by the Plaintiffs and the other shareholders before the Act was passed, as a security for the payment of a bill of exchange for £3000, to which Bunting was individually a party, but for which he untruly pretended that the company was responsible; and that the holders of such deeds threatened to sue the Plaintiffs for

© 2025 Thomson Reuters.

the said £3000, as parties to the contract, on the ground that the capital was not paid up; and also that the said directors threatened to cause actions at law to be brought against the Plaintiffs, under the powers of the Act, in the name of Harbottle or Bealey, as the nominal Plaintiff on behalf of the company, for the amount of the unpaid calls on their shares.

[482] The bill charged that Harbottle and Bealey were two directors of the company, but they respectively refused to use or allow either of their names to be used as the nominal Plaintiffs in this suit on behalf of the company; but that Harbottle was a necessary party, not only in respect of his liability, but also as a nominal Defendant on behalf of the company.

After various charges, recapitulating in terms the alleged title of the Plaintiffs to the relief and discovery sought by the prayer, the bill prayed that an account might be taken of all monies received by the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison and Lane, or any of them, for the use of the company, or which but for their wilful default might have been received, and of the application thereof; also an account of the losses and expenses incurred in consequence of the said fraudulent and improper dealings of the Defendants with the monies, lands and property of the company which they or any of them were liable to make good, and that they might be respectively decreed to make good the same, including in particular the profits made by Harbottle, Denison, Bunting and Lane, by buying and reselling the said land, and the profits made by Denison and Lane out of the said land retained by them; and that Denison and Lane might be decreed to convey the residue of the said land to the company, upon payment of the fair value thereof at the time the undertaking was projected: that it might be declared that the said mortgages, charges, incumbrances and liens upon the lands and property created as aforesaid, so far as regards the Defendants who executed the same or were privy thereto, were created fraudulently and in violation of the provisions of the Act, and that Harbottle, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the principal [483] money and interest due and owing upon security of such of the mortgages, charges and liens as were still subsisting, with all costs sustained by the company in relation thereto; and that it might be declared that Harbottle, Adshead, Byrom, Westhead and Bealey, by executing the said conveyances and assurances of the lands and property of the company to the said mortgagees, holders of notes and bills and others, committed a fraudulent breach of trust, and that Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the purchase-money and rents paid by the company for such lands, and expended in building and improving the same, with interest and expenses; and that the monies so recovered from the Defendants might be applied in redeeming and repurchasing the said lands and restoring them to the company. And that inquiries might be directed to ascertain which of the mortgages and incumbrances, and of the conveyances and assurances, of the lands and property of the company could be avoided and set aside as against the persons claiming the benefit thereof, and that proceedings might be taken for avoiding them accordingly. And that an account might be taken of all the property and effects of the company, and the unpaid calls sued

© 2025 Thomson Reuters.                                                                                                                12

for and recovered, and that a sufficient part of such property might be applied in liquidating the existing debts and liabilities of the company, and the residue secured for its benefit. And that, for the purposes aforesaid, a receiver might be appointed to take possession of, recover and get in the lands, property and effects of the company, and for that purpose to sue in *200 the names of Harbottle and Bealey, or otherwise, as occasion might require; and that Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting might be decreed to deliver up to [484] such receiver the property, effects, deeds, muniments and documents belonging to the company. And that the same Defendants might be restrained by injunction from holding, receiving or intermeddling with the property and effects of the company, and from executing, or causing to be executed, under the common seal of the company, any deed or instrument conveying, assigning or disposing of the same. And that Harbottle, Denison, Bunting and Lane might be restrained from entering or distraining upon any of the said lands sold by them to or in trust for the company as aforesaid. And the Plaintiffs thereby offered to pay into Court the amount of the unpaid calls due from them to the company.

The Defendants, Harbottle, Adshead and Westhead, demurred to the bill, assigning for cause want of equity, want of parties and multifariousness; and suggesting that all the proprietors of shares in the company, the assignees of P. Leicester, and the owners of land named in the schedule to the Act, were necessary parties. The Defendant Bealey, the Defendant Denison and the Defendants Bunting and Lane also put in three several demurrers, assigning like causes.

Mr. Lowndes and Mr. Rolt, in support of the demurrers of Harbottle, Adshead and Westhead, and of Bunting and Lane.

Mr. Walker and Mr. Glasse, in support of the demurrers of Bealey and Denison.

Mr. James Russell, Mr. Roupell and Mr. Bartrum, for the bill.

[485] On the part of the Defendants it was contended that the suit complaining of injuries to the corporation was wholly informal in having only some of its individual members, and not the corporation itself, before the Court; that this defect would not be cured by adding the corporation as parties Defendants, for the Plaintiffs were not entitled to represent the corporate body, even as distinguished from the Defendants and for the purpose of impeaching the transactions complained of; and the Plaintiff's bill could not therefore be sustained.

It was further argued that the Plaintiffs, if they had any ground for impeaching the conduct of the Defendants, might have used the name of the corporation; and, in that case, it would have been open to the Defendants, or to the body of directors or proprietors assuming the government of the company, to have applied to the Court for the stay of proceedings, or to prevent the use of the corporate name; and, upon that application, the Court would have inquired into the alleged usurpation or abuse of authority, and determined whether the Plaintiff should be permitted to proceed. Or the suit might have been in the shape of an information by the Attorney-General to correct the alleged abuse of powers granted for public purposes. The statements of fact in the bill, it was also contended, did not support the general charges of fraud upon which the title to relief was founded. Several other points of equity, as applicable to the cases made against the several Defendants, and in respect of the suggested defects of parties, were also made, but the judgment did not turn on these points.

On the part of the Plaintiff, so far as related to the **[486]** point on which the decision proceeded, namely, their right to sustain the bill on behalf of themselves and the other shareholders against the Defendants, without regard to the corporate character of the body, it was argued that the company was not to be treated as an ordinary corporation; that it was in fact a mere partnership, having objects of private benefit, and that it must be governed by rules analogous to those which regulated partnerships or joint stock companies, consisting of numerous persons, but not incorporated. The Act of Incorporation was intended to be beneficial to the company, and to promote the undertaking, but not to extinguish any of the rights of the proprietors *inter se.* The directors were trustees for the Plaintiffs to the extent of their shares in the company; and the fact that the company had taken the form of a corporation would not be allowed to deprive the *cestui que trusts* of a remedy against their trustees for the abuse of their powers. The Act of Incorporation, moreover, expressly exempted the proprietors of the company, or persons dealing with the company, from the necessity of adopting the form of proceeding applicable to a pure corporation; for the 74th section ( *supra* , p. 464, n.) enabled them to sue and be sued *201* in the name of the treasurer, or any one of the directors for the time being: the bill alleged that the two remaining directors had refused to institute the suit, and shewed, in fact, that it would be against their personal interest to do so, inasmuch as they were answerable in respect of the transactions in question; if the Plaintiffs could not, therefore, institute the suit themselves they would be remediless. The directors were made Defendants; and, under the 74th clause of the Act, any one of the directors might be made the **[487]** nominal representative of the company; the corporation was therefore distinctly represented in the suit. The present proceeding was, in fact, the only form in which the proprietors could now impeach the conduct of the body to whom their affairs had been intrusted. The 38th section expressly excluded any proprietor, not being a director, from interfering in the management of the business of the company on any pretence whatever. The extinction of the board of directors by the bankruptcy and consequent disqualification of three of them (sect. 67), and the want of any clerk or office, effectually prevented the fulfilment of the form which the 46th, 47th and 48th sections of the Act required, in order to the due

convening of a general meeting of proprietors competent to secure the remaining property of the company, and provide for its due application.

The following cases were cited during the argument:— *The Charitable Corporation* v. *Sutton* (2 Atk. 400), *Attorney-General* v. *Jackson* (11 Ves. 365), *Adley* v. *The Whitstable Company* (17 Ves. 315; 2 M. & Sel. 53; 19 Ves. 304; 1 Mer. 107, S. C.), *Blackburn* v. *Jepson* (3 Swans. 138), *Hichens* v. *Congreve* (4 Russ. 562), *Blain* v. *Agar* (2 Sim. 289), *Richards* v. *Davies* (2 R. & M. 347), *Ranger* v. *Great Western Railway Company* (1 Railway Cases, 1), *Seddon* v. *Connell* (10 Sim. 58, 79), *Preston* v. *Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335), *Attorney-General* v. *Wilson* (Cr. & Ph. 1), *Wallworth* v. *Holt* (4 Myl. & Cr. 619), *Bligh* v. *Brent* (2 Y: & Coll. 295; *per* Alderson, B.), 6 Viner. Ab. 306, tit. Corporation, U., Bacon, Ab. tit. Statute, I. 2.

**[488]** *March* 25. The Vice-Chancellor [Sir James Wigram]. The relief which the bill in this case seeks, as against the Defendants who have demurred, is founded on several alleged grounds of complaint; of these it is only necessary that I should mention two, for the consideration of those two grounds involves the principle upon which I think all the demurrers must be determined. One ground is that the directors of the Victoria Park Company, the Defendants Harbottle, Adshead, Byrom and Bealey, have, in their character of directors, purchased their own lands of themselves for the use of the company, and have paid for them, or rather taken to themselves out of the monies of the company a price exceeding the value of such lands: the other ground is that the Defendants have raised money in a manner not authorized by their powers under their Act of Incorporation; and especially that they have mortgaged or incumbered the lands and property of the company, and applied the monies thereby raised in effect, though circuitously, to pay the price of the land which they had so bought of themselves.

I do not now express any opinion upon the question whether, leaving out of view the special form in which the Plaintiffs have proceeded in the suit, the bill alleges a case in which a Court of Equity would say that the transactions in question are to be opened or dealt with in the manner which this bill seeks that they should be; but 1 certainly would not be understood by anything I said during the argument to do otherwise than express my cordial concurrence in the doctrine laid down in the case of *Hichens* v. *Congreve* (4 Russ. 562) and other cases of that class. I take those cases to be in accordance with the principles of this Court, and to be founded on **[489]** justice and commonsense. Whether particular cases fall within the principle of *Hichens* v. *Congreve* is another question. In *Hichens* v. *Congreve* property was sold to a company by persons in a fiduciary character, the conveyance reciting that £25,000 had been paid for the purchase; the fact being that £10,000 only had been paid, £15,000 going into the hands of the persons to whom the purchase was entrusted. I should not be in the least degree disposed to

limit the operation of that doctrine in any case in which a person projecting the formation of a company invited the public to join him in the project, on a representation that he had acquired property which was intended to be applied for the purposes of the company. I should strongly incline to hold that to be an invitation to the public to participate in the benefit of the property purchased, on the terms on which the projector had acquired it. The fiduciary *202 character of the projector would, in such a case, commence from the time when he first began to deal with the public, and would of course be controlled in equity by the representation he then made to the public. If persons, on the other hand, intending to form a company, should purchase land with a view to the formation of it, and state at once that they were the owners of such land, and proposed to sell it at a price fixed, for the purposes of the company about to be formed, the transaction, so far as the public are concerned, commencing with that statement, might not fall within the principle of *Hichens* v. *Congreve.* A party may have a clear right to say: "I begin the transaction at this time; I have purchased land, no matter how or from whom, or at what price; I am willing to sell it a certain price for a given purpose." It is not necessary that I should determine the effect of the transactions that are stated to have occurred in the present case. I make these observations only that I may not be supposed, from anything which fell from me during the argu- [490] -ment, to entertain the slightest hesitation with regard to the application, in a proper case, of the principles I have referred to. For the present purpose I shall assume that a case is stated entitling the company, as matters now stand, to complain of the transactions mentioned in the bill.

The Victoria Park Company is an incorporated body, and the conduct with which the Defendants are charged in this suit is an injury not to the Plaintiffs exclusively; it is an injury to the whole corporation by individuals whom the corporation entrusted with powers to be exercised only for the good of the corporation. And from the case of *The Attorney-General* v. *Wilson* (Cr. & Ph. 1) (without going further) it may be stated as undoubted law that a bill or information by a corporation will lie to be relieved in respect of injuries which the corporation has suffered at the hands of persons standing in the situation of the directors upon this record. This bill, however, differs from that in *The Attorney-General* v. *Wilson* in this—that, instead of the corporation being formally represented as Plaintiffs, the bill in this case is brought by two individual corporators, professedly on behalf of themselves and all the other members of the corporation, except those who committed the injuries complained of—the Plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.

It was not, nor could it successfully be, argued that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation. In law the corporation and the aggregate members of the corporation are not the same thing for purposes like this; and the [491] only question can be whether the facts alleged in this case justify a departure from the rule which, *primâ facie* , would require that the corporation

© 2025 Thomson Reuters.

should sue in its own name and in its corporate character, or in the name of someone whom the law has appointed to be its representative.

The demurrers are—first, of three of the directors of the company, who are also alleged to have sold lands to the corporation under the circumstances charged; secondly, of Bealey, also a director, alleged to have made himself amenable to the jurisdiction of the Court to remedy the alleged injuries, though he was not a seller of land; thirdly, of Denison, a seller of land, in like manner alleged to be implicated in the frauds charged, though he was not a director; fourthly, of Mr. Bunting, the solicitor, and Mr. Lane, the architect of the company. These gentlemen are neither directors nor sellers of lands, but all the frauds are alleged to have been committed with their privity, and they also are in this manner sought to be implicated in them. The most convenient course will be to consider the demurrer of the three against whom the strongest case is stated; and the consideration of that case will apply to the whole.

The first objection taken in the argument for the Defendants was that the individual members of the corporation cannot in any case sue in the form in which this bill is framed. During the argument I intimated an opinion, to which, upon further consideration, I fully adhere, that the rule was much too broadly stated on the part of the Defendants. I think there are cases in which a suit might properly be so framed. Corporations like this, of a private nature, are in truth little more than private partnerships; and in cases which may easily be suggested it would be too much to hold that a society **[492]** of private persons associated together in under- *203* takings, which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights, *inter se* , because, in order to make their common objects more attainable, the Crown or the Legislature may have conferred upon them the benefit of a corporate character. If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth* v. *Holt* (4 Myl. & Cr. 635; see also 17 Ves. 320, *per* Lord Eldon) and other cases would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, rules which, though in a sense technical, are founded on general principles of justice and convenience; and the question is whether a case is stated in this bill entitling the Plaintiffs to sue in their private characters. [His Honor stated the substance of the Act, sections 1, 38, 39, 43, 46, 47, 48, 49, 67, 70, 114 and 129 ( *supra*

© 2025 Thomson Reuters.

, p. 464, n. *et seq.* ).] The result of these clauses is that the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within **[493]** the scope of the company's powers, as well as to control the directors in any Acts which they may have originated. There may possibly be some exceptions to this proposition, but such is the general effect of the provisions of the statute.

Now, that my opinion upon this case may be clearly understood, I will consider separately the two principal grounds of complaint to which I have adverted, with reference to a very marked distinction between them. The first ground of complaint is one which, though it might *primâ facie* entitle the corporation to rescind the transactions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of confirmation at the option of the corporation. The second ground of complaint may stand in a different position; I allude to the mortgaging in a manner not authorized by the powers of the Act. This, being beyond the powers of the corporation, may admit of no confirmation whilst any one dissenting voice is raised against it. This distinction is found in the case of *Preston* v. *The Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335).

On the first point it is only necessary to refer to the clauses of the Act to shew that, whilst the supreme governing body, the proprietors at a special general meeting assembled, retain the power of exercising the functions conferred upon them by the Act of Incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the Plaintiffs on the present record. This in effect purports to be a suit by *cestui que trusts* complaining of a fraud committed or **[494]** alleged to have been committed by persons in a fiduciary character. The complaint is that those trustees have sold lands to themselves, ostensibly for the benefit of the *cestui que trusts.* The proposition I have advanced is that, although the Act should prove to be voidable, the *cestui que trusts* may elect to confirm it. Now, who are the *cestui que trusts* in this case? The corporation, in a sense, is undoubtedly the *cestui que trust;* but the majority of the proprietors at a special general meeting assembled, independently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this Court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the Court may be declaring the acts complained of to be void at the suit of the present Plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may *204* defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the

© 2025 Thomson Reuters.

governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority is decisive to shew that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained it must be shewn either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in **[495]** motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those transactions are to be impeached in a Court of Justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights.

[His Honor recapitulated the history and present situation of the company, as it appeared upon the bill.]

I pause here to examine the difficulty which is supposed by the bill to oppose itself to the body of proprietors assembling and acting at an extraordinary general meeting. The 48th section of the Act says that a certain number of proprietors may call such a meeting by means of a notice to be addressed to the board of directors, and left with the clerk or secretary, at the principal office of the company, one month before the time of meeting, or the board is not bound to notice it. The bill says that there is no board of directors properly constituted, no clerk, no principal office of the company, no power of electing more directors, and that, the appointment of the clerk being in the board of directors, no clerk can in fact now be appointed. I am certainly not prepared to go the whole length of the Plaintiff's argument founded upon the 48th section. I admit that the month required would probably be considered imperative; but is not the mode of service directory only? Could the board of directors *de facto* , for the time being, by neglecting to appoint a clerk or have a principal office, deprive the superior body, the body of proprietors, of the power which the Act gives that body over the board of directors? Would not a notice in substance, a notice for example such as the 129th sec- **[496]** -tion provides for in other cases, be a sufficient notice? Is not the particular form of notice which is pointed out by the 48th section a form of notice given only for the convenience of the proprietors and directors? And if an impediment should exist, and, *à fortiori* , if that impediment should exist by the misconduct of the board of directors, it would be difficult to contend with success that the powers of the corporation are to be paralyzed, because there is no clerk on whom service can be made. I require more cogent arguments than I have yet heard to satisfy me that the mode of service prescribed by the 48th section, if that were the only point in the case, is more than directory. The like observations will apply to the place of service; but, as to that, I think the case is relieved from difficulty by the fact that the business of the company is stated to be principally conducted at the office of the solicitors, for I am not aware that there is anything in the statute which attaches

any peculiar character to the spot designated as the principal office. In substance, the board of directors *de facto* , whether qualified or not, carry on the business of the company at a given place, and under this Act of Parliament it is manifest that service at that place would be deemed good service on the company.

If that difficulty were removed, and the Plaintiff should say that by the death or bankruptcy of directors, and the carelessness of proprietors (for that term must be added), the governing body has lost its power to act, I should repeat the inquiries I have before suggested, and ask whether, in such a case also, the 48th section is not directory, so far as it appears to require the refusal or neglect of the board of directors to call a general meeting, before the proprietors can by advertisement call such a meeting for themselves. Adverting to the undoubted powers conferred upon the proprietors to hold special general meetings without the consent and **[497]** against the will of the board of directors, and the permanent powers which the body of proprietors must of necessity have, I am yet to be persuaded that the existence of this corporation (for without a lawful governing body it cannot usefully or practically *205* continue) can be dependent upon the accidents which at any given moment may reduce the number of directors below three. The board of directors, as I have already observed, have no power to put a *veto* upon the will of any ten proprietors who may desire to call a special general meeting; and if ten proprietors cannot be found who are willing to call a special general meeting, the Plaintiffs can scarcely contend that this suit can be sustained. At all events what is there to prevent the corporators from suing in the name of the corporation? It cannot be contended that the body of proprietors have not sufficient interest in these questions to institute a suit in the name of the corporation. The latter observations, I am aware, are little more than another mode of putting the former questions which I have suggested. I am strongly inclined to think, if it were necessary to decide these points, it could not be successfully contended that the clauses of the Act of Parliament which are referred to are anything more than directory, if it be, indeed, impossible from accident to pursue the form directed by the Act. I attribute to the proprietors no power which the Act does not give them: they have the power, without the consent and against the will of the directors, of calling a meeting, and of controlling their acts; and if by any inevitable accident the prescribed form of calling a meeting should become impracticable, there is still a mode of calling it, which, upon the general principles that govern the powers of corporations, I think would be held to be sufficient for the purpose.

It is not, however, upon such considerations that I **[498]** shall decide this case. The view of the case which has appeared to me conclusive is that the existence of a board of directors *de facto* is sufficiently apparent upon the statements in the bill. The bankruptcy of Westhead, the last of the three directors who became bankrupt, took place on the 2d of January 1840: the bill alleges that he thereupon ceased to be *qualified* to act as director, and his office became vacated; but it does not say that he ceased to *act* as a director; nor, although it is said that thenceforward there was no board "properly constituted," is it alleged that there was no board *de facto* exercising

© 2025 Thomson Reuters.

the functions of directors. These, and several other statements of the bill, are pregnant with the admission of the existence of a board *de facto.* By whom was the company governed, and its affairs conducted, between the time of Westhead's bankruptcy and that of the filing of the bill in October 1842? What directors or managers of the business of the company have lent their sanction to the mortgages and other transactions complained of, as having taken place since January 1840, and by which the corporation is said or supposed to be, at least to some extent, legally bound? Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors *de facto* , acting in and carrying on the affairs of the corporation, and whose acting must have been acquiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a board *de facto* , their acts may be valid, although the persons so acting may not have been duly qualified. The 114th section (not stated in the bill) of the Act provides **[499]** that all acts, deeds and things done or executed at any meeting of the directors, by any person acting as a director of the said company, shall, notwithstanding it may afterwards be discovered that there was some defect or error in the appointment of such director, or that such director was disqualified, or being an *interim* director, was disapproved of by an annual general meeting of proprietors, be as valid and effectual as if such person had been duly appointed and was qualified to be a director. The foundation upon which I consider the Plaintiffs can alone have a right to sue in the form of this bill must wholly fail, if there has been a governing body of directors *de facto.* There is no longer the impediment to convening a meeting of proprietors, who by their vote might direct proceedings like the present to be taken in the name of the corporation or of a treasurer of the corporation (if that were necessary); or who, by rejecting such a proposal, would, in effect, decide that the corporation was not aggrieved by the transactions in questions. Now, since the 2d of January 1840, there must have been three annual general meetings of the company held in July in every year, according to the provisions of the Act. These  *\*206*  annual general meetings can only be regulary called by the board of directors. The bill does not suggest that the requisitions of the Act have not been complied with in this respect, either by omitting to call the meeting, or by calling it informally; but the bill, on the contrary, avers that several general meetings and extraordinary general meetings, and other meetings of the shareholders of the company, were duly convened and held at divers times between the time when the company was established and the year 1841; including, therefore, in this period of formality of proceeding, as well as of capacity in constitution, an entire year after Westhead's bankruptcy.

**[500]** Another statement of the bill leading to the same inference—the existence of an acting board—is that which avers that since the year 1839 down, in fact, to the time of filing the bill, that is, during these three years, the company has had no office of its own, but the affairs of the company have been principally conducted at the office of Mr. Bunting. Now this, as I must read it, is a direct admission that the affairs of the company have been carried on by some persons. By whom then have they been carried on? The statute makes the board of directors the body by whom alone those affairs are to be ordered and conducted. There is no other person or set of

persons empowered by the Act to conduct the affairs of the company; and there is no allegation in the bill that any persons, other than the board of directors originally appointed, have taken upon themselves that business. In the absence of any special allegation to the contrary I am bound to assume that the affairs of the company have been carried on by the body in whom alone the powers for that purpose were vested by the Act, namely, a board of directors.

Again the bill alleges that, since the bankruptcy of Westhead, the bankrupts have joined in executing the conveyances of the property of the company to mortgagees. It could only have been in the character of directors that they could confer any title by the conveyance; in that character the mortgagees would have required them to be parties, and it is in that character that I must assume they executed the deeds.

If the case rested here, I must of necessity assume the existence of a board of directors, and in the absence of any allegation that the board *de facto* , in whose acting the company must, upon this bill, be taken to have acquiesced, have been applied to and have refused to ap- **[501]** -point a clerk and treasurer (if that be necessary), or take such other steps as may be necessary for calling a special general meeting, or had refused to call such special general meeting, the bill does not exclude every case which the pleader was bound to exclude in order to justify a suit on behalf of a corporation, in a form which assumes its practical dissolution. But the bill goes on to shew that special general meetings have been holden since January 1840. The bill, as I have before observed, states that several general meetings and extraordinary general meetings have been holden between the establishment of the company and the year 1841, not excluding the year 1840, which was during Westhead's disqualification, "and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the said directors of the company to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings herein complained of was not disclosed;" and the bill specifies some meetings in particular. Against the pleader I must intend that some such meetings may have been holden at a time when there was no board properly constituted, and no clerk or treasurer or principal office of the company, save such as appear by the bill to have existed; and if that were so, the whole of the case of the Plaintiffs, founded on the impracticability of calling a special general meeting, fails. Assuming then, as I am bound to do, the existence, for some time at least, of a state of things in which the company was governed by a board of directors *de facto* , some of the members of which were individually disqualified, and in which, notwithstanding the want of a clerk, treasurer or office, the powers of the proprietors were called into exercise at general meetings, the question is, when did that state of things cease to exist, so as to justify the extraordinary proceeding of the Plain- **[502]** -tiffs by this suit? The Plaintiffs have not stated by their bill any facts to shew that such was not the actual state of things at the time their bill was filed, and, in the absence of any statement to the contrary, I must intend that it was so. *207*

The case of *Preston* v. *The Grand Collier Dock Company* was referred to as an example of a suit in the present form; but there the circumstances were in no respect parallel with the present: the object of that suit was to decide the rights or liabilities of one class of the members of the corporation against another, in respect of a matter in which the corporation itself had no power to vary the situation of either.

I have applied strictly the rule of making every intendment against the pleader in this case —that is, of intending everything to have been lawful and consistent with the constitution of the company, which is not expressly shewn on the bill to have been unlawful or inconsistent with that constitution. And I am bound to make this intendment, not only on the general rule, but also on the rules of pleading which require a Plaintiff to frame his case so distinctly and unambiguously, that the Defendant may not be embarrassed in determining on the form which his defence should assume. *Attorney-General* v. *Corporation of Norwich* (2 Myl. & Cr. 406). The bill, I cannot but observe, is framed with great care, and with more than ordinary professional skill and knowledge; but the averments do not exclude that which, *primâ facie* , must be taken to have been the case, that during the years 1840, 1841 and 1842 there was a governing body, that by such body the business of the company was carried on, that there was no insurmountable impediment to the **[503]** exercise of the powers of the proprietors assembled in general meetings to control the affairs of the company, and that such general meetings were actually held. The continued existence of a board *de facto* is not merely not excluded by the averments, but the statements in the bill of the acts which have been done suppose, and even require, the existence of such a board. Now, if the Plaintiff had alleged that there had been no board of directors *de facto* , and had on that ground impeached the transactions complained of, the Defendants might have met the case by plea, and thereby have defended themselves from answering the bill. If it should be said that the Defendants might now have pleaded that there was a board of directors *de facto* , the answer is that they might then have been told that the fact sufficiently appeared upon the bill, and therefore they ought to have demurred. Uncertainty is a defect in pleading of which advantage may be taken by demurrer. If I were to overrule these demurrers, I might be depriving the Defendants of the power of so protecting themselves; and that because the Plaintiff has not chosen, with due precision, to put forward that fact, which, if alleged, might have been met by plea, but which, not being so alleged, leaves the bill open to demurrer.

I must further observe that, although the bill does, with great caution, attempt to meet every case which, it was supposed, might have been fatal to it upon demurrer, yet it is by allegations of the most general kind, and many of which cannot by possibility be true. It alleges the recent discovery of the acts complained of, but it gives no allegation whatsoever for the purpose of telling when or how such discovery was made, or what led to it. I am bound to give the Plaintiff, on a general demurrer, the benefit of the allegation that the matters complained of have been

© 2025 Thomson Reuters.

recently discovered, whatever the term "re- **[504]** -cently discovered" may mean; but when I look into the schedule to the Act I find that many of those matters must have been known at a very early period in the history of the company. I find also provisions of the Act requiring that books shall be kept in which all transactions shall be fully and fairly stated; and I do not find in the bill anything like a precise allegation that the production of those books would not have given the information, or that there have not been means of seeing those books at least at some time since 1835, or since the transactions in question took place, so that, in point of fact, many of the transactions might and may have been sooner known. These are observations upon which I do not found my judgment, but which I use as explaining why it is I have felt bound in favour of the Defendants to construe this bill with strictness.

The second point which relates to the charges and incumbrances alleged to have been illegally made on the property of the company is open to the reasoning which I have applied to the first point, upon the question whether, in the present case, individual members are at liberty to complain in the form adopted by this bill; for why should this anomalous form of suit be resorted to, if the powers of the corporation may be called into exercise? But this part of the case is of greater difficulty upon the merits. I follow, with entire assent, the opinion expressed by the Vice- *208* Chancellor in *Preston* v. *The Grand Collier Dock Company* , that if a transaction be void, and not merely voidable, the corporation cannot confirm it, so as to bind a dissenting minority of its members. But that will not dispose of this question. The case made with regard to these mortgages or incumbrances is, that they were executed in violation of the provisions of the Act. The mortgagees are not Defendants to the bill, nor does the bill seek to avoid the **[505]** security itself, if it could be avoided, on which I give no opinion. The bill prays inquiries with a view to proceedings being taken *aliunde* to set aside these transactions against the mortgagees. The object of this bill against the Defendants is to make them individually and personally responsible to the extent of the injury alleged to have been received by the corporation from the making of the mortgages. Whatever the case might be, if the object of the suit was to rescind these transactions, and the allegations in the bill shewed that justice could not be done to the shareholders without allowing two to sue on behalf of themselves and others, very different considerations arise in a case like the present, in which the consequences only of the alleged illegal Acts are sought to be visited personally upon the directors. The money forming the consideration for the mortgages was received, and was expended in, or partly in, the transactions which are the subject of the first ground of complaint. Upon this, one question appears to me to be, whether the company could confirm the former transactions, take the benefit of the money that has been raised, and yet, as against the directors personally, complain of the acts which they have done, by means whereof the company obtains that benefit which I suppose to have been admitted and adopted by such confirmation. I think it would not be open to the company to do this; and my opinion already expressed on the first point is that the transactions which constitute the first ground of complaint may possibly be beneficial to the company, and may be so regarded by the proprietors, and admit of confirmation. I am of opinion that this question—the question of confirmation or avoidance—cannot properly be litigated upon this record, regard being had to the existing state and powers of the corporation, and that therefore that part of the bill which seeks to visit the

© 2025 Thomson Reuters.

directors personally with the consequences of the impeached mortgages and charges, the benefit of which **[506]** the company enjoys, is in the same predicament as that which relates to the other subjects of complaint. Both questions stand on the same ground, and, for the reasons which I stated in considering the former point, these demurrers must be allowed.

Hare

## Footnotes

1    The substance of the Act, as stated in the bill, was as follows:—Section 3. The company empowered to purchase the lands mentioned in the schedule; 5. And other lands within a mile from the boundary of the said lands; 15. For a sum or sums in gross, or annual rent service or perpetual rent-charge (notwithstanding the existence of any unperformed contract for the sale of any such lands to the company of proprietors, or any of them). 16. Power to lay out the lands; and build thereon, as the directors might think proper. 18. Capital to be £500,000, and to be applied first, in payment of the expenses of obtaining the Act; and then in payment of the purchase-monies of the lands, and making and maintaining the parks and buildings, and the other purposes of the Act. 19. None of the powers given by the Act to be exercised before £50,000 should be raised. 20. The capital to be divided in 5000 shares of £100 each. 22. The shares to be personal estate. 23, 24, 25, 26, 27. Provisions with respect to the nominees of shareholders, and the duration of the interests of the shareholders, on the principle of tontine. 29. Register of the names and additions of shareholders and their nominees to be kept by the clerk or secretary of the company, and the common seal affixed thereto. 34. Directors to make calls, and enforce payment of the same, such calls not to exceed £10 per share at one time, and to be at least two months from each other: the money to be put into the hands of the treasurer, and applied as aforesaid. 35. Declaration and evidence necessary in actions for calls. 38. That the business affairs and concerns of the company shall, from time to time, and at all times hereafter, be under the control of five shareholders (to be appointed directors), who shall have the entire ordering, managing and conducting of the company, and of the capital, estates, revenue, effects and affairs, and other the concerns thereof, and who shall also regulate and determine the mode and terms of carrying on and conducting the business and affairs of the company, conformably to the provisions contained in this Act; and no proprietor, not being a director, shall, on any account or pretence whatsoever, in any way meddle or interfere in the managing, ordering or conducting the company, or the capital, estates, revenue, effects or other the business, affairs or concerns thereof, but shall fully and entirely commit, entrust and

leave the same to be wholly ordered, managed and conducted by the directors for the time being, and the persons whom they shall appoint, save as hereinafter mentioned. 39. That the said T. Harbottle, J. Adshead, H. Byrom, J. Westhead and R. Bealy shall be the present and first directors of the company. 40. Three directors to constitute a board, and the acts of three or more to be as effectual as if done by the five. 42. Minutes of the proceedings of every board to be entered in a book to be kept by the clerk or secretary at the office of the company. 43. The board of directors for the time being to have full power and authority to appoint or remove the banker, broker, architect, surveyor, solicitor, builder, treasurer and clerk, and also a secretary, and all other agents, officers, clerks and servants. 45. Books of account of all the transactions of the company to be kept, and half-yearly reports and balance-sheets to be made: the proprietors to have access to, and to be at liberty to inspect, all books, accounts, documents and writings belonging to the company, at all reasonable times. 46. That a meeting of the proprietors of the company shall be convened and held on the first Monday in the month of July 1837, and on the same day in every succeeding year, at eleven o'clock in the forenoon, at their office, or such other convenient place in Manchester as the directors may think proper to appoint, of which meeting the clerk or secretary for the time being of the company shall give fourteen days' previous notice, by an advertisement in one of the Manchester newspapers; and each meeting so to be convened and held shall be called "The Annual General Meeting," and the proprietors respectively qualified to act and vote therein, according to the provisions therein contained, and who personally, or by such proxy as hereinafter authorised, shall attend the same shall have full power and authority to decide upon all such matters and questions as by virtue of this Act shall be brought before such annual general meeting. 47. Board of directors empowered to call extraordinary general meetings. 48. That ten or more proprietors of the company for the time being qualified to vote as hereinafter mentioned, or three full fourth parts in number and value of all the proprietors for the time being of the company may, at any time, by writing under their hands, require the board of directors for the time being to call an extraordinary general meeting of the proprietors, and every such requisition shall set forth the object of such extraordinary meeting, and shall be left with the clerk or secretary for the time being at the principal office of the company, at least one calendar month before the time named in the requisition for the meeting to be holden, otherwise the said board shall not be bound to take notice thereof; but in case the directors shall refuse or neglect for fourteen days, after such requisition shall be so left as aforesaid, to call such extraordinary meeting, then the proprietors signing the requisition may, for the purposes mentioned in such requisition, call an extraordinary general meeting of the proprietors, by notice signed by them, and advertised in one or more of the Manchester newspapers, at least fourteen days before the time fixed for holding the meeting; and in every such advertisement the object of such extraordinary meeting, and the day and hour and place in the town of Manchester of holding the same, and the delivery of the requisition to the said board, and of its refusal to call such extraordinary meeting, shall be specified. 65. Two of the directors selected by lot amongst themselves to retire from office at the annual general meeting in July 1841, and be replaced by two qualified proprietors, to be then

elected by the majority of votes at such meeting, and two others, the longest in office, or so selected to retire, at every subsequent annual general meeting; but the retiring directors to be re-eligible. 67. No person shall be a director who shall not be a holder in his own right of the number of shares hereinafter mentioned in the capital of the company, viz., who shall not be a holder of ten shares at least, so long as the total number of the shares shall exceed 500; and from and after the total number of shares of the company shall be reduced to and shall not exceed 100, then who shall not be a holder of five shares at least; and, if any of the then or future directors shall cease to hold the respective number of shares aforesaid in his own right, his office as director shall thereupon and thenceforth become vacated. 68. Directors may vacate by resigning their offices. 70. Board of directors to appoint qualified persons to fill up the offices of directors dying, resigning, removed or becoming disqualified before their time of retirement; such appointments to be subject to the approbation of the next general meeting. 73. Cheques, bills, notes and other negotiable securities to be signed, &c., by the treasurer or such other officer of the company as the board should by minute appoint, and no others to be binding on the company. 74. That all actions, suits and other proceedings at law or in equity to be commenced and prosecuted by or on behalf of the company shall and lawfully may be commenced and instituted or prosecuted in the name of the treasurer, or any one of the directors of the company for the time being, as the nominal Plaintiff for and on behalf of the company; and all actions, &c., against the company shall be commenced and instituted and prosecuted against the treasurer, or any one of the directors of the company for the time being, as the nominal Defendant for and on behalf of the company. 78. Directors to have power to sell or declare forfeited shares for non-payment of debts or liabilities to the company. 83, 84, 85. Shares vested in executors, legatees and assignees of proprietors, upon being transferred and duly registered, and such executors, legatees, assignees, &c., to be liable to calls, &c., as if original proprietors. 90. After one-half of the capital of £500,000 should have been paid up, the board of directors, with the sanction of a general meeting, empowered to borrow at interest any sum or sums of money, not exceeding £150,000 in the whole, on the security of the lands, property and effects of the company, by deed or writing under their common seal: entries of all such mortgages, and the particulars thereof, to be made in a book to be kept by the clerk of the company, and such book to be open for the perusal at all reasonable times of any proprietor or creditor of the company. 93. Mortgagees not required to see to the necessity for or application of the mortgage money. 105. Board of directors, with the sanction of two successive general meetings, and the proportion in number and value of the proprietors and shares therein mentioned, empowered to put an end to the tenure by way of tontine, and discharge the shares from all benefit of survivorship. 107, 108. Power to dissolve the company, and wind up the affairs thereof, in manner therein mentioned, under the sanction of such general meetings. 112. Notices to proprietors sent by post, according to their addresses in the register, to be sufficient. 129. That in all cases wherein it may be requisite or necessary for any person or party to serve any notice, or any writ or other legal proceedings upon the said company, the service thereof upon the clerk or secretary to the company, or any agent or officer employed by the said director, or

leaving the same at the office of such clerk or secretary, agent or officer, or at his last or usual place of abode, or upon any one of the said directors, or delivery thereof to some inmate at his last or usual place of abode, shall be deemed good and sufficient service of the same respectively on the company or their directors.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Dylan Anderson on behalf of Dylan Anderson
Bar No. 24109588
DJAnderson@duanemorris.com
Envelope ID: 104586763
Filing Code Description: No Fee Documents
Filing Description: Letter to Court re: Foreign Cases
Status as of 8/20/2025 8:29 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/19/2025 6:51:38 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/19/2025 6:51:38 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/19/2025 6:51:38 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/19/2025 6:51:38 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/19/2025 6:51:38 PM | SENT |

Tab 15

| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § § | THE BUSINESS COURT OF TEXAS FIRST DIVISION |
|---|---|---|
| Plaintiffs, | § § | |
| v. | § § | Cause No. 25-BC-01B-0027 |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC, and CDH GP, LTD., | § § § § § § § | |
| Defendants. | § | |

## DEFENDANTS' APPENDIX OF FOREIGN AUTHORITY

Defendants Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC, and CDH GP, Ltd. ("Defendants") file this Appendix of Foreign Authority, comprised of all foreign authority cited by Defendants to date.

The attached authorities are:

| No. | Document | Appendix |
|---|---|---|
| 1 | *Foss v. Harbottle* (1843) 67 Eng. Rep. 189, 202 (Eng.) | App. 4-23 |

**DEFENDANTS' APPENDIX OF FOREIGN AUTHORITY** –Page 1

| 2 | *Ayerst (Inspector of Taxes) v. C&K (Construction) Ltd.* [1975] AC 167 (H.L.) | App. 24-38 |
|---|---|---|
| 3 | Companies Act, 2025, s.97 | App. 39 |
| 4 | Companies Act, 2025, s.108 | App. 40 |
| 5 | Companies Act, 2025, s.110 | App. 41-42 |
| 6 | Grand Court Rules, O. 15 r. 12A (Cayman Islands 2022) | App. 43-44 |

Respectfully submitted,

/s/ *Brian P. Shaw*
**Brian P. Shaw**
  Texas Bar No. 24053473
  Email:  bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Brent M. Rubin**
  Texas Bar No. 24086834
  Email: brubin@ccsb.com
**Joshua D. Kipp**
  Texas Bar No. 24078793
  Email: jkipp@ccsb.com
**Andrea C. Reed**
  Texas Bar No. 24121791
  Email:  areed@ccsb.com
**Emily H. Owen**
  Texas Bar No. 24116865
  Email:  eowen@ccsb.com
**CARRINGTON, COLEMAN,**
 **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

**ATTORNEYS FOR
DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2025, a copy of the foregoing document was electronically served on all counsel of record in accordance with TEX. R. CIV. P. 21a.

/s/ *Emily H. Owen*
Emily H. Owen

MR 1572

the petition and schedule, to be given to three distinct classes of creditors : first, the creditors at whose suit the prisoner shall be in custody ; secondly, the other creditors in the schedule ; and, thirdly, all creditors (if any) not named in the schedule ; for, after expressly directing that the Court shall decree notice to be given to the first and second classes, the Act adds, " and to be inserted in the *London Gazette ;* and also, if the said Court shall think fit, in the *Edinburgh* and *Dublin Gazettes,* or either of them ; and also in such other newspaper or newspapers as the said Court shall direct."}

Now, adverting to the scope of the petition, namely, that the prisoner may be discharged from prison in respect of all debts owing at the time of presenting his petition ; that the schedule is to contain all debts and claims ; that notice is to be publicly given of the hearing of the petition, and consideration of the schedule generally, as well as particularly to the creditors therein named ; that any creditor upon proving his debt may oppose the prisoner's discharge, and challenge the correctness of the schedule ; that the Act contemplates the case of the schedule requiring amendment, that its truth may be the subject of examination and report, and that the prisoner is ultimately [460] to swear to the truth of it (considering what the truth so to be sworn to must be), and the different rules for making dividends before and after adjudication, I cannot discover the foundation for the arguments of the Plaintiff's counsel, that no creditors of the insolvent at the time of filing his petition have any interest in his estate under the insolvency, unless the insolvent has volunteered to put their names upon his schedule. The obvious purport of the Act appears to be that all the debts of the insolvent shall be ascertained ; and I presume the Court would not adjudicate that he be discharged unless and until he submitted to make his schedule true.

So far, therefore, as the case depends upon the tender alone, I think the assignees were not guilty of a breach of duty in proceeding to a sale after the tender was made.

In these circumstances, without reference to the question whether the purchase to be effected by the deed was proposed to be made for the benefit of a Plaintiff or of a stranger, and whatever the result of any inquiry as to that fact might be, even supposing the case were now open to any such inquiry, it is impossible that a Court of Equity can say that the assignees were guilty of a breach of trust, of which a purchaser was bound to take notice, because they made no better offer, as a condition upon which the sale should be stayed, than that which was made on their behalf by their solicitor, Mr. Acton, and refused by Mr. Hughes, on the part of the proposed purchaser. The bill must be dismissed as against Babb, with costs, and as against the assignees without costs. I leave the costs of the assignees to the judgment of the Court for the Relief of Insolvent Debtors, to whom it will properly belong to determine, with reference to the question of costs, whether they have or not taken the proper course in dealing with the insolvent's estates.

[461] FOSS *v.* HARBOTTLE. *March* 4, 6, 7, 8, 25, 1843.

[See *Hallows* v. *Fernie,* 1867-68, L. R. 3 Eq. 532 ; L. R. 3 Ch. 467 ; *Hoole* v. *Great Western Railway Company,* 1867, L. R. 3 Ch. 274 ; *Seaton* v. *Grant,* 1867, 36 L. J. Ch. 642 ; *Clinch* v. *Financial Corporation,* 1868, L. R. 5 Eq. 482 ; L. R. 4 Ch. 117 ; *Atwood* v. *Merryweather,* 1868, L. R. 5 Eq. 467, n. ; *Turquand* v. *Marshall,* 1869, L. R. 4 Ch. 386 ; *Gray* v. *Lewis* (No. 1), 1869-73, L. R. 8 Eq. 541 ; L. R. 8 Ch. 1050 ; *Pickering* v. *Stephenson,* 1872, L. R. 14 Eq. 339 ; *Menier* v. *Hooper's Telegraph Works,* 1874, L. R. 9 Ch. 353 ; *Ward* v. *Sittingbourne and Sheerness Railway Company,* 1874, L. R. 9 Ch. 492, n. ; *Macdougall* v. *Gardiner* (No. 1), 1875, L. R. 20 Eq. 393 ; L. R. 10 Ch. 606 ; *Macdougall* v. *Gardiner* (No. 2), 1875, 1 Ch. D. 13 ; *Russell* v. *Wakefield Waterworks Company,* 1875, L. R. 20 Eq. 480 ; *Duckett* v. *Gover,* 1877, 25 W. R. 554 ; *Pender* v. *Lushington,* 1877, 6 Ch. D. 80 ; *Isle of Wight Railway Company* v. *Tahourdin,* 1883, 25 Ch. D. 333 ; *Studdert* v. *Grosvenor,* 1886, 33 Ch. D. 535 ; *La Compagnie de Mayville* v. *Whitley* [1896], 1 Ch. 807 ; *Tiessen* v. *Henderson* [1899], 1 Ch. 866 ; *Alexander* v. *Automatic Telephone Company* [1900], 2 Ch. 69 ; *Burland* v. *Earle* [1902], A. C. 93 ; *Punt* v. *Symons & Company Ltd.* [1903], 2 Ch. 516.]

Bill by two of the proprietors of shares in a company incorporated by Act of Parliament, on behalf of themselves and all other the proprietors of shares except the Defendants,

against the five directors (three of whom had become bankrupt), and against a proprietor who was not a director, and the solicitor and architect of the company, charging the Defendants with concerting and effecting various fraudulent and illegal transactions, whereby the property of the company was misapplied, aliened and wasted ; that there had ceased to be a sufficient number of qualified directors to constitute a board ; that the company had no clerk or office ; that in such circumstances the proprietors had no power to take the property out of the hands of the Defendants, or satisfy the liabilities or wind up the affairs of the company ; praying that the Defendants might be decreed to make good to the company the losses and expenses occasioned by the acts complained of ; and praying the appointment of a receiver to take and apply the property of the company in discharge of its liabilities, and secure the surplus : the Defendants demurred.

Held, that, upon the facts stated, the continued existence of a board of directors *de facto* must be intended ; that the possibility of convening a general meeting of proprietors capable of controlling the acts of the existing board was not excluded by the allegations of the bill ; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of ; that therefore the Plaintiffs could not sue in a form of pleading which assumed the practical dissolution of the corporation ; and that the demurrers must be allowed.

When the relation of trustee and *cestui que trust* begins, as between the projectors of public companies and such companies.

Some forms prescribed for the government of a corporation may be imperative, and others directory only.

On argument of a demurrer, facts not averred in the bill, and which might possibly have been denied by plea, if they had been averred, intended against the pleader.

The bill was filed in October 1842 by Richard Foss and Edward Starkie Turton, on behalf of themselves and all other the shareholders or proprietors of shares in the company called " The Victoria Park Company," except such of the same shareholders or proprietors of shares as were Defendants thereto, against Thomas Harbottle, Joseph Adshead, Henry Byrom, John Westhead, Richard Bealey, Joseph Denison, Thomas Bunting and Richard Lane ; and also against H. Rotton, E. Lloyd, T. Peet, J. Biggs and S. Brooks, the several assignees of Byrom, Adshead and Westhead, who had become bankrupts.

The bill stated, in effect, that in September 1835 certain persons conceived the design of associating for the purchase of about 180 acres of land, situated in the parish of Manchester, belonging to the Defendant, Joseph Denison, and others, and of enclosing and planting the same in an ornamental and park-like manner, and erecting houses thereon with attached gardens and pleasure-grounds, and selling, letting or otherwise disposing thereof ; and the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane, agreed to form a joint stock company, to consist of themselves and others, for the said purpose : that in October 1835 [462] plans of the land, and a design for laying it out, were prepared ; that, after the undertaking had been projected and agreed upon, Denison purchased a considerable portion of the said land of the other original owners with the object of reselling it at a profit, and Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, and one P. Leicester, and several other persons, not members of the association, purchased the said land in parcels of Denison and the other owners, so that at the time of passing the Act of Incorporation Harbottle, Adshead, Byrom, Westhead, Bunting and Lane owned more than half of the land in question, the remainder being the property of persons who were not shareholders : that Denison and the last-named five Defendants made considerable profits by reselling parts of the said land at increased chief rents before the Act was passed.

The bill stated that, between September 1835 and the beginning of 1836, various preliminary steps were taken for enabling the projectors of the said company to set it on foot : that in April 1836 advertisements, describing the objects of the proposed company and the probabilities of its profitable result, were published, in which it was proposed to form the association on the principle of a tontine : that the first eight

named Defendants and several other persons subscribed for shares in the proposed company, and, among others, the Plaintiff, Foss, subscribed for two shares, and the Plaintiff, Turton, for twelve shares of £100 each, and signed the contract, and paid the deposit of £5 per share : that at a public meeting of the subscribers called in May 1836 it was resolved that the report of the provisional committee should be received, and the various suggestions therein contained be adopted, subject to the approval of the directors, who were requested to complete such purchases of land, and also such other acts as they might **[463]** consider necessary for carrying the objects of the undertaking into effect; and it also resolved that Harbottle, Adshead, Byrom, Westhead and Bealey should be appointed directors, with power to do such acts as they might consider necessary or desirable for the interests of the company; and Westhead, W. Grant and J. Lees were appointed auditors, Lane architect, and Bunting solicitor : that, in order to avoid the responsibilities of an ordinary partnership, the Defendants Harbottle and others suggested to the subscribers the propriety of applying for an Act of Incorporation, which was accordingly done : that in compliance with such application, by an Act, intituled "An Act for Establishing a Company for the Purpose of Laying Out and Maintaining an Ornamental Park within the Townships of Rusholme, Charlton-upon-Medlock and Moss Side, in the County of Lancaster," which received the Royal assent on the 5th of May 1837 (7 Will. 4), it was enacted that certain persons named in the Act, including Harbottle, Adshead, Bealey, Westhead, Bunting and Denison and others, and all and every such other persons or person, bodies or body politic, corporate or collegiate, as had already subscribed or should thereafter from time to time become subscribers or a subscriber to the said undertaking, and be duly admitted proprietors or a proprietor as thereinafter mentioned, and their respective successors, executors, administrators and assigns, should be and they were thereby united into a company for the purposes of the said Act, and should be and they were thereby declared to be one body politic and corporate by the name of "The Victoria Park Company," and by that name should have perpetual succession and a common seal, and by that name should and might sue and be sued, plead or be impleaded, at law or in equity, and should and might prefer and prosecute any bill or bills of indictment or information against any person or **[464]** persons who should commit any felony, misdemeaour, or other offence indictable or punishable by the laws of this realm, and should also have full power and authority to purchase and hold lands, tenements and hereditaments to them, and their successors and assigns, for the use of the said undertaking, in manner thereby directed. [The bill stated several other clauses of the Act.(1)]

---

(1) The substance of the Act, as stated in the bill, was as follows :—Section 3. The company empowered to purchase the lands mentioned in the schedule ; 5. And other lands within a mile from the boundary of the said lands ; 15. For a sum or sums in gross, or annual rent service or perpetual rent-charge (notwithstanding the existence of any unperformed contract for the sale of any such lands to the company of proprietors, or any of them). 16. Power to lay out the lands ; and build thereon, as the directors might think proper. 18. Capital to be £500,000, and to be applied first, in payment of the expenses of obtaining the Act ; and then in payment of the purchase-monies of the lands, and making and maintaining the parks and buildings, and the other purposes of the Act. 19. None of the powers given by the Act to be exercised before £50,000 should be raised. 20. The capital to be divided in 5000 shares of £100 each. 22. The shares to be personal estate. 23, 24, 25, 26, 27. Provisions with respect to the nominees of shareholders, and the duration of the interests of the shareholders, on the principle of tontine. 29. Register of the names and additions of shareholders and their nominees to be kept by the clerk or secretary of the company, and the common seal affixed thereto. 34. Directors to make calls, and enforce payment of the same, such calls not to exceed £10 per share at one time, and to be at least two months from each other : the money to be put into the hands of the treasurer, and applied as aforesaid. 35. Declaration and evidence necessary in actions for calls. 38. That the business affairs and concerns of the company shall, from time to time, and at all times hereafter, be under the control of five shareholders (to be appointed directors), who shall have the entire ordering, managing and conducting of the company, and of the capital, estates, revenue.

**[465]** The bill also stated the schedule annexed to the Act, whereby the different plots of the said land, numbered **[466]** from 1 to 37, were stated to have been purchased by the Victoria Park Company from the various persons whose **[467]** names were therein set forth, and including the following names :—" Mr. P. Leicester and others ; " " Mr. Lacy and another ; " " Mr. Lane " and " Mr. Adshead ; " that **[468]** the land so stated to be purchased of " P. Leicester and others " was at the time of passing of the Act vested partly in P. Leicester, and partly in Westhead, Bunting

---

effects and affairs, and other the concerns thereof, and who shall also regulate and determine the mode and terms of carrying on and conducting the business and affairs of the company, conformably to the provisions contained in this Act ; and no proprietor, not being a director, shall, on any account or pretence what-soever, in any way meddle or interfere in the managing, ordering or conducting the company, or the capital, estates, revenue, effects or other the business, affairs or concerns thereof, but shall fully and entirely commit, entrust and leave the same to be wholly ordered, managed and conducted by the directors for the time being, and the persons whom they shall appoint, save as hereinafter mentioned. 39. That the said T. Harbottle, J. Adshead, H. Byrom, J. Westhead and R. Bealy shall be the present and first directors of the company. 40. Three directors to constitute a board, and the acts of three or more to be as effectual as if done by the five. 42. Minutes of the proceedings of every board to be entered in a book to be kept by the clerk or secretary at the office of the company. 43. The board of directors for the time being to have full power and authority to appoint or remove the banker, broker, architect, surveyor, solicitor, builder, treasurer and clerk, and also a secretary, and all other agents, officers, clerks and servants. 45. Books of account of all the transactions of the company to be kept, and half-yearly reports and balance-sheets to be made : the proprietors to have access to, and to be at liberty to inspect, all books, accounts, documents and writings belonging to the company, at all reasonable times. 46. That a meeting of the proprietors of the company shall be convened and held on the first Monday in the month of July 1837, and on the same day in every succeeding year, at eleven o'clock in the forenoon, at their office, or such other convenient place in Manchester as the directors may think proper to appoint, of which meeting the clerk or secretary for the time being of the company shall give fourteen days' previous notice, by an advertisement in one of the Manchester newspapers ; and each meeting so to be convened and held shall be called " The Annual General Meeting," and the proprietors respectively qualified to act and vote therein, according to the provisions therein contained, and who personally, or by such proxy as hereinafter authorised, shall attend the same shall have full power and authority to decide upon all such matters and questions as by virtue of this Act shall be brought before such annual general meeting. 47. Board of directors empowered to call extraordinary general meetings. 48. That ten or more proprietors of the company for the time being qualified to vote as hereinafter mentioned, or three full fourth parts in number and value of all the proprietors for the time being of the company may, at any time, by writing under their hands, require the board of directors for the time being to call an extraordinary general meeting of the proprietors, and every such requisition shall set forth the object of such extraordinary meeting, and shall be left with the clerk or secretary for the time being at the principal office of the company, at least one calendar month before the time named in the requisition for the meeting to be holden, otherwise the said board shall not be bound to take notice thereof ; but in case the directors shall refuse or neglect for fourteen days, after such requisition shall be so left as aforesaid, to call such extraordinary meeting, then the proprietors signing the requisition may, for the purposes mentioned in such requisition, call an extraordinary general meeting of the proprietors, by notice signed by them, and advertised in one or more of the Manchester newspapers, at least fourteen days before the time fixed for holding the meeting ; and in every such advertise-ment the object of such extraordinary meeting, and the day and hour and place in the town of Manchester of holding the same, and the delivery of the requisition to the said board, and of its refusal to call such extraordinary meeting, shall be specified. 65. Two of the directors selected by lot amongst themselves to retire from office at

and Byrom, and the land so stated to be purchased of "Mr. Lacy and another" was at the time of the passing of the Act vested partly in Mr. Lacey and partly in Lane.

The bill stated that the purchase and sale of the said land as aforesaid was the result of an arrangement fraudulently concerted and agreed upon between Harbottle, Adshead, Byrom, Westhead, Denison, Bunting and Lane, at or after the formation of the company was agreed upon, with the object of enabling themselves to derive a

---

the annual general meeting in July 1841, and be replaced by two qualified proprietors, to be then elected by the majority of votes at such meeting, and two others, the longest in office, or so selected to retire, at every subsequent annual general meeting; but the retiring directors to be re-eligible. 67. No person shall be a director who shall not be a holder in his own right of the number of shares hereinafter mentioned in the capital of the company, viz., who shall not be a holder of ten shares at least, so long as the total number of the shares shall exceed 500; and from and after the total number of shares of the company shall be reduced to and shall not exceed 100, then who shall not be a holder of five shares at least; and, if any of the then or future directors shall cease to hold the respective number of shares aforesaid in his own right, his office as director shall thereupon and thenceforth become vacated. 68. Directors may vacate by resigning their offices. 70. Board of directors to appoint qualified persons to fill up the offices of directors dying, resigning, removed or becoming disqualified before their time of retirement; such appointments to be subject to the approbation of the next general meeting. 73. Cheques, bills, notes and other negotiable securities to be signed, &c., by the treasurer or such other officer of the company as the board should by minute appoint, and no others to be binding on the company. 74. That all actions, suits and other proceedings at law or in equity to be commenced and prosecuted by or on behalf of the company shall and lawfully may be commenced and instituted or prosecuted in the name of the treasurer, or any one of the directors of the company for the time being, as the nominal Plaintiff for and on behalf of the company; and all actions, &c., against the company shall be commenced and instituted and prosecuted against the treasurer, or any one of the directors of the company for the time being, as the nominal Defendant for and on behalf of the company. 78. Directors to have power to sell or declare forfeited shares for non-payment of debts or liabilities to the company. 83, 84, 85. Shares vested in executors, legatees and assignees of proprietors, upon being transferred and duly registered, and such executors, legatees, assignees, &c., to be liable to calls, &c., as if original proprietors. 90. After one-half of the capital of £500,000 should have been paid up, the board of directors, with the sanction of a general meeting, empowered to borrow at interest any sum or sums of money, not exceeding £150,000 in the whole, on the security of the lands, property and effects of the company, by deed or writing under their common seal: entries of all such mortgages, and the particulars thereof, to be made in a book to be kept by the clerk of the company, and such book to be open for the perusal at all reasonable times of any proprietor or creditor of the company. 93. Mortgagees not required to see to the necessity for or application of the mortgage money. 105. Board of directors, with the sanction of two successive general meetings, and the proportion in number and value of the proprietors and shares therein mentioned, empowered to put an end to the tenure by way of tontine, and discharge the shares from all benefit of survivorship. 107, 108. Power to dissolve the company, and wind up the affairs thereof, in manner therein mentioned, under the sanction of such general meetings. 112. Notices to proprietors sent by post, according to their addresses in the register, to be sufficient. 129. That in all cases wherein it may be requisite or necessary for any person or party to serve any notice, or any writ or other legal proceedings upon the said company, the service thereof upon the clerk or secretary to the company, or any agent or officer employed by the said director, or leaving the same at the office of such clerk or secretary, agent or officer, or at his last or usual place of abode, or upon any one of the said directors, or delivery thereof to some inmate at his last or usual place of abode, shall be deemed good and sufficient service of the same respectively on the company or their directors.

V.-C. XII.—7

profit or personal benefit from the establishment of the said company; and that the arrangement amongst the persons who were parties to the plan was that a certain number from amongst themselves should be appointed directors, and should purchase for the company the said plots of land from the persons in whom they were vested, at greatly increased and exorbitant prices: that it was with a view to carry the arrangement into effect that Harbottle, Adshead, Byrom and Westhead procured themselves to be appointed directors, and Denison procured himself to be appointed auditor: that accordingly, after the said plots of land had become vested in the several persons named in the schedule, and before the passing of the Act, the said directors, on behalf of the company, agreed to purchase the same from the persons named in the schedule at rents or prices greatly exceeding those at which the said persons had purchased the same : that after the Act was passed Harbottle, Adshead, Byrom, Westhead and Bealey continued to act as directors of the incorporated company in the same manner as before: that Adshead continued to act as director until the 18th of July 1839, Byrom until the 2d of December 1839, and [469] Westhead until the 2d of January 1840, at which dates respectively fiats in bankruptcy were issued against them, and they were respectively declared bankrupts, and ceased to be qualified to act as directors, and their offices as directors became vacated.

The bill stated that upwards of 3000 shares of £100 in the capital of the company were subscribed for: that the principle of tontine was abandoned: that before 1840 calls were made, amounting, with the deposit, to £35 per share, the whole of which were not, however, paid by all the proprietors, but that a sum exceeding £35,000 in the whole was paid.

The bill stated that, after the passing of the Act, Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, with the concurrence of Denison and of Bealey, proceeded to carry into execution the design which had been formed previously to the incorporation of the company, of fraudulently profiting and enabling the other persons who had purchased and then held the said land, to profit by the establishment of the company and at its expense; and that the said directors accordingly, on behalf of the company, purchased, or agreed to purchase, from themselves, Harbottle, Adshead, Byrom and Westhead, and from Bunting and Lane, and the other persons in whom the said land was vested, the same plots of land, for estates corresponding with those purchased by and granted to the said vendors, by the original owners thereof, charged with chief or fee-farm rents, greatly exceeding the rents payable to the persons from whom the said vendors had so purchased the same : that of some of such plots the conveyances were taken to the Victoria Park Company, by its corporate name; of others, to Harbottle, Adshead, Byrom, Westhead and Bealey, as directors in trust for the company; [470] and others rested in agreement only, without conveyance: that by these means the company took the land, charged not only with the chief rents reserved to the original landowners, but also with additional rents, reserved and payable to Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others: that, in further pursuance of the same fraudulent design, the said directors, after purchasing the said land for the company, applied about £27,000 of the monies in their hands, belonging to the company, in the purchase or redemption of the rents so reserved to themselves, Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others, leaving the land subject only to the chief rent reserved to the original landowners.

The bill stated that the plans of the park were contrived and designed by Lane, in concert with Denison, the directors and Bunting, so as to render the formation of the park the means of greatly increasing the value of certain parcels of land, partly belonging to Denison and partly to Lane, situated on the outside of the boundary line of the park, but between such boundary line and one of the lodges and entrance gates, called Oxford Lodge and Gate, erected on a small part of the same land purchased by the company; and through which entrance, and the land so permitted to be retained by Denison and Lane, one of the principal approaches to the park was made : that the said land so retained by Denison and Lane was essentially necessary to the establishment of the park, according to the plans prepared by Lane, and the same was virtually incorporated in the park, and houses erected thereon would enjoy

all the advantages of the park, and plots thereof were in consequence sold by Denison and Lane for building land at enhanced prices.

[471] The bill stated that, after the purchase of the land as aforesaid, the directors proceeded to carry into effect the design of converting the same into a park, and they accordingly erected lodges and gates, marked out with fences the different crescents, terraces, streets and ways; formed drains and sewers, and made roadways, and planted ornamental trees and shrubs; that they also caused to be erected in different parts of the park several houses and buildings, some of which only were completed; and that the directors alleged the monies expended in the roads, drains and sewers amounted to £12,000, and in the houses and buildings to £39,000, or thereabouts: that the said directors sold and let several plots of land, and also sold and let several of the houses and buildings, and received the rents and purchase-money of the same.

The bill stated that Harbottle, Denison, Bunting and Lane did not pay up their calls, but some of them retained part, and others the whole thereof; Harbottle and Lane claiming to set off the amount of the calls against the chief rents of the lands which they sold to the company, Bunting claiming to set off the same against the chief rents, and the costs and charges due to him from the company; and Denison claiming to set off the amount of the calls against the rents payable to him out of the land which he sold to persons who resold the same to the company.

The bill stated that owing to the large sums retained out of the calls, the sums appropriated by the said directors to themselves, and paid to others in reduction of the increased chief rents, and payment of such rents, and owing to their having otherwise wasted and misapplied a considerable part of the monies belonging to the company, the funds of the company which came [472] to their hands shortly after its establishment were exhausted: that the said directors, with the privity, knowledge and concurrence of Denison, Bunting and Lane, borrowed large sums of money from their bankers upon the credit of the company: that, as a further means of raising money, the said directors, and Bunting and Lane, with the concurrence of Denison, drew, made and negotiated various bills of exchange and promissory notes; and that the said directors also caused several bonds to be executed under the corporate seal of the company for securing several sums of money to the obligees thereof: that by the middle or latter part of the year 1839 the directors, and Bunting and Lane, had come under very heavy liabilities; the chief rents payable by the company were greatly in arrear, and the board of directors, with the concurrence of Denison, Bunting and Lane, applied to the United Kingdom Life Assurance Company to advance the Victoria Park Company a large sum of money by way of mortgage of the lands and hereditaments comprised in the park; but the Assurance Company were advised that the Victoria Park Company were, by the 90th section of their Act, precluded from borrowing money on mortgage, until one-half of their capital (namely £500,000) had been paid up, and on that ground declined to make the required loan: that the directors, finding it impossible to raise money by mortgage in a legitimate manner, resorted to several contrivances for the purpose of evading the provisions of the Act, and raising money on mortgage of the property of the company, by which means several large sums of money had been charged by way of mortgage or lien upon the same: that to effect such mortgages or charges, the directors procured the persons who had contracted to sells plots of land to the company, but had not executed conveyances, to convey the same, by the direction of the board, to some [473] other person or persons in mortgage, and afterwards to convey the equity of redemption to the directors in trust for the company: that the directors also conveyed some of the plots of land which had been conveyed to them in trust for the company to some other persons by way of mortgage, and stood possessed of the equity of redemption in trust for the company: that, for the same purpose, the board of directors caused the common seal of the company to be affixed to several conveyances of plots of land which had been conveyed to the company by their corporate name, and to the directors in trust for the company, whereby the said plots of land were expressed to be conveyed for a pretended valuable consideration to one or more of the said directors absolutely, and the said directors or director then conveyed the same to other persons on mortgage to secure sometimes

monies advanced to the said directors, and by them paid over to the board in satisfaction of the consideration monies expressed to be paid for the said prior conveyances under the common seal, sometimes antecedent debts in respect of monies borrowed by the board, and sometimes monies which had been advanced by the mortgagees upon the security of the bills and notes which had been made or discounted as aforesaid : that, in other cases, the said directors and Bunting deposited the title-deeds of parcels of the land and buildings of the company with the holders of such bills and notes to secure the repayment of the monies due thereon, and in order to relieve the parties thereto : that, by the means aforesaid, the directors, with the concurrence of Denison, Bunting and Lane, mortgaged, charged or otherwise incumbered the greater part of the property of the company : that many of such mortgagees and incumbrancers had notice that the said board of directors had not power under the Act to mortgage or charge the property of the company, and that the **[474]** said mortgages, charges and incumbrances were fraudulent and void as against the company, but that the Defendants allege that some of the said incumbrances were so planned and contrived that the persons in whose favour they were created had not such notice.

That the said directors having exhausted every means which suggested themselves to them of raising money upon credit, or upon the security of the property and effects of the company, and being unable by those means to provide for the whole of the monies due to the holders of the said bills and notes, and the other persons to whom the said directors in the said transactions had become indebted as individuals, and to satisfy the debts which were due to the persons in whose favour the said mortgages and incumbrances had been improperly created, and in order to release themselves from the responsibility which they had personally incurred by taking conveyances or demises of parts of the said land to the said directors as individuals in trust for the company, containing covenants on their parts for payment of the reserved rents, the said directors resolved to convey and dispose of the property of the company, and they accordingly themselves executed and caused to be executed under the common seal of the company, divers conveyances, assignments and other assurances, whereby divers parts of the said lands and effects of the company were expressed to be conveyed or otherwise assured absolutely to the holders of some of the said bills and notes, and some of the said mortgagees and incumbrancers, in consideration of the monies thereby purported to be secured ; and also executed, and caused to be executed under the common seal of the company, divers conveyances and assurances of other parts of the said lands to the persons who sold the same to the company, in consideration of their releasing them from **[475]** the payment of the rents reserved and payable out of the said lands : that many of such conveyances had been executed by Harbottle, Adshead, Westhead and Bealey, and a few by Byrom, who had been induced to execute them by being threatened with suits for the reserved rents : that Harbottle, Adshead, Byrom, Westhead and Bealey threatened and intended to convey and assure the remaining parcels of land belonging to the company to the holders of others of the said bills and notes, and to others of the said mortgagees and incumbrancers and owners of the chief rents, in satisfaction and discharge of the said monies and rents due and to become due to them respectively.

The bill stated that, upon the bankruptcy of Byrom, Adshead and Westhead, their shares in the company became vested in the Defendants, their assignees, and that they (the bankrupts) had long since ceased to be, and were not, shareholders in the company : that the whole of the land resold by them was vested in some persons unknown to the Plaintiffs, but whose names the Defendants knew and refused to discover : that, upon the bankruptcy of Westhead, there ceased to be a sufficient number of directors of the company to constitute a board for transacting the business of the company in manner provided by the Act, and Harbottle and Bealey became the only remaining directors whose office had not become vacated, and no person or persons had been appointed to supply the vacancies in the board of directors occasioned by such bankruptcies, and consequently there never had been a properly constituted board of directors of the company since the bankruptcy of Westhead.

That Byrom, Adshead and Westhead, nevertheless, after their respective bankruptcies, executed the several **[476]** absolute conveyances and other assurances of the lands and property of the company, which were so executed for the purposes and in

manner aforesaid, after the directors had exhausted their means of raising money upon credit or upon the security of the property of the company.

That about the end of the year 1839, or commencement of the year 1840, the said directors discharged Brammell, the secretary of the company, and gave up the office taken by the company in Manchester, and transferred the whole or the greater part of the title-deeds, books and papers of the said company into the hands of Bunting; and from that time to the present the company had had no office of its own, but the affairs of the company had been principally conducted at the office of Bunting.

That the only parts of the land bought by the company which had not been conveyed away either absolutely or by way or mortgage, and the only part of the other property and effects of the company which had not been disposed of and made away with in manner aforesaid, remained vested in, and in the order and disposition of, Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting, in whose custody or power the greater part of the books, deeds and papers belonging to the company which had not been made away with remained : that by the fraudulent acts and proceedings in the premises to which Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting were parties, the property and effects of the said company had been and then were involved in almost inextricable difficulties, and if such property and effects were any longer allowed to remain in their order and disposition, the same would be in danger of being wholly dissipated and irretrievably [477] lost : that the said company were then largely indebted to their bankers and other persons who had *bonâ fide* advanced money to the company, and to the builders and other persons who had executed some of the works in the park, and provided materials for the same; while, in consequence of the property of the company having been wasted and improperly disposed of by the directors, there were at present no available funds which could be applied in satisfaction of the debts of the company, and that some of the creditors of the said company had obtained judgments in actions at law brought by them against the company for the amount of their debts, on which judgments interest was daily accumulating.

The bill stated that in the present circumstances of the company, and the board of directors thereof, the proprietors of shares had no power to take the property and effects of the company out of the hands of Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting, and they had no power to appoint directors to supply the vacancies in the board occasioned by the said bankruptcies, and the proprietors of shares in the company had no power to wind up, liquidate or settle the accounts, debts or affairs of the company, or to dissolve the company, nor had they any power to provide for and satisfy the existing engagements and liabilities of the company with a view to its continuance, and the prosecution of the undertaking for which it was established without the assistance of the Court : that if a proper person were appointed by the Court to take possession of and manage the property and effects of the company, and if the company were to be repaid the amount of all losses and expenses which it had sustained or incurred by reason of the fraudulent and improper acts and proceedings of the Defendants in the premises, and [478] which the Defendants, or any of them, were liable to make good to the said company, as thereinafter prayed; and if the company were decreed to take and have conveyed to them so much of the said land which was retained by Denison and Lane as aforesaid, upon paying or accounting to them for the fair value thereof at the time when the undertaking was first projected; and Denison and Lane were to pay or account to the said company for the price received by them for so much of the same land as had been sold by them, over and above what was the fair price for the same at the time the undertaking was first projected; and if the mortgages, charges, incumbrances and liens, and the said conveyances and other assurances, by means of which the property and effects of the company had been improperly incumbered and disposed of, which could be redeemed or avoided, as against the persons claiming thereunder, were redeemed and set aside, and the property and effects of the company thereby affected were restored to it, and the Defendants, who had not become bankrupt, and who had not paid up, but ought to have paid up, into the joint stock capital of the company the amounts of the several calls made by the directors on their respective shares, were to pay up the same, the lands, property and effects of the company would not only be

sufficient to satisfy the whole of its existing debts and liabilities, but leave a surplus, which would enable the company to proceed with, and either wholly or in part accomplish, the undertaking for which it was incorporated.

The bill stated that the Defendants concealed from the Plaintiffs, and the other shareholders in the company, who were not personally parties thereto, the several fraudulent and improper acts and proceedings of the said directors and the said other Defendants, and [479] the Plaintiffs and the other shareholders had only recently ascertained the particulars thereof, so far as they were therein stated, and they were unable to set forth the same more particularly, the Defendants having refused to make any discovery thereof, or to allow the Plaintiffs to inspect the books, accounts or papers of the company.

The bill charged that Harbottle and Bealey, and the estates of Adshead, Byrom and Westhead, in respect of that which occurred before their said bankruptcies, and Adshead, Byrom and Westhead, as to what occurred since their said bankruptcies, were liable to refund and make good to the company the amount of the losses and expenses which it had sustained in respect of the fraudulent and improper dealings of the said directors of the company with its lands and property : that Denison, Bunting and Lane had counselled and advised the directors in their said proceedings, and had derived considerable personal benefit and advantage therefrom : that Denison, Bunting and Lane were all parties to the said fraudulent scheme planned and executed as aforesaid, by which the several plots or parcels of land in the park were purchased and resold to the said company at a profit and at a price considerably exceeding the real value of the same, and that Denison, Bunting and Lane had derived considerable profit from the increased price or chief rents made payable out of the several plots or parcels of land which were purchased and resold by them in manner aforesaid, and from the monies which were paid to them as a consideration for the reduction of the same chief rents as before mentioned.

The bill charged that several general meetings, and extraordinary general meetings, and other meetings of [480] the shareholders of the company, were duly convened and held at divers times, between the time when the company was first established and the year 1841, and particularly on or about the several days or times thereinafter mentioned (naming ten different dates, from July 1837 to December 1839), and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed.

The bill charged that, under the circumstances, Denison, Bunting and Lane, having participated in and personally benefited by and concealed from the other shareholders the several fraudulent and improper acts aforesaid, were all jointly and severally liable together, with the said directors, to make good to the company the amount of the losses and expenses which had been or might be incurred in consequence of such of the said wrongful and fraudulent acts and proceedings as they were parties or privies to : that Harbottle, Byrom, Adshead, Westhead and Bealey, respectively, had still some of the property and effects belonging to the company : that the said last-named Defendants had not paid up the calls due and payable on their respective shares : that the Plaintiffs had as yet paid only three of the calls on their shares, not having paid the remainder in consequence of learning that, owing to some misconduct of the directors, the affairs of the company were in difficulties, the cause of which difficulties the Plaintiffs had but lately, and with considerable difficulty, ascertained to have arisen from the proceedings aforesaid, but in all other respects the Plaintiffs had conformed to the provisions of the Act : that there were not any [481] shareholders in the company who had not paid up the calls on their shares besides the Plaintiffs and the said Defendants : that the names and places of abode of the other persons who are not shareholders in the company, but are interested in or liable in respect of any of the said matters, were unknown to the Plaintiffs, and the Defendants ought to discover the same : that the number of shareholders in the company was so great, and their rights and liabilities were so subject to change and fluctuation, by death and otherwise, that it would be impossible to prosecute the suit with effect if they were all made parties thereto.

The bill charged that Bunting claimed a lien upon the documents in his possession belonging to the company for the costs of business done by him as the attorney of the company, but a great part of such business consisted of the fraudulent acts aforesaid; and that he had received out of the funds of the company divers large sums of money exceeding the amount properly due to him: that Bunting had deposited some of the deeds belonging to the company with certain bankers at Liverpool, and, among the rest, the contract executed by the Plaintiffs and the other shareholders before the Act was passed, as a security for the payment of a bill of exchange for £3000, to which Bunting was individually a party, but for which he untruly pretended that the company was responsible; and that the holders of such deeds threatened to sue the Plaintiffs for the said £3000, as parties to the contract, on the ground that the capital was not paid up; and also that the said directors threatened to cause actions at law to be brought against the Plaintiffs, under the powers of the Act, in the name of Harbottle or Bealey, as the nominal Plaintiff on behalf of the company, for the amount of the unpaid calls on their shares.

[482] The bill charged that Harbottle and Bealey were two directors of the company, but they respectively refused to use or allow either of their names to be used as the nominal Plaintiffs in this suit on behalf of the company; but that Harbottle was a necessary party, not only in respect of his liability, but also as a nominal Defendant on behalf of the company.

After various charges, recapitulating in terms the alleged title of the Plaintiffs to the relief and discovery sought by the prayer, the bill prayed that an account might be taken of all monies received by the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison and Lane, or any of them, for the use of the company, or which but for their wilful default might have been received, and of the application thereof; also an account of the losses and expenses incurred in consequence of the said fraudulent and improper dealings of the Defendants with the monies, lands and property of the company which they or any of them were liable to make good, and that they might be respectively decreed to make good the same, including in particular the profits made by Harbottle, Denison, Bunting and Lane, by buying and reselling the said land, and the profits made by Denison and Lane out of the said land retained by them; and that Denison and Lane might be decreed to convey the residue of the said land to the company, upon payment of the fair value thereof at the time the undertaking was projected: that it might be declared that the said mortgages, charges, incumbrances and liens upon the lands and property created as aforesaid, so far as regards the Defendants who executed the same or were privy thereto, were created fraudulently and in violation of the provisions of the Act, and that Harbottle, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the principal [483] money and interest due and owing upon security of such of the mortgages, charges and liens as were still subsisting, with all costs sustained by the company in relation thereto; and that it might be declared that Harbottle, Adshead, Byrom, Westhead and Bealey, by executing the said conveyances and assurances of the lands and property of the company to the said mortgagees, holders of notes and bills and others, committed a fraudulent breach of trust, and that Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the purchase-money and rents paid by the company for such lands, and expended in building and improving the same, with interest and expenses; and that the monies so recovered from the Defendants might be applied in redeeming and repurchasing the said lands and restoring them to the company. And that inquiries might be directed to ascertain which of the mortgages and incumbrances, and of the conveyances and assurances, of the lands and property of the company could be avoided and set aside as against the persons claiming the benefit thereof, and that proceedings might be taken for avoiding them accordingly. And that an account might be taken of all the property and effects of the company, and the unpaid calls sued for and recovered, and that a sufficient part of such property might be applied in liquidating the existing debts and liabilities of the company, and the residue secured for its benefit. And that, for the purposes aforesaid, a receiver might be appointed to take possession of, recover and get in the lands, property and effects of the company, and for that purpose to sue in

the names of Harbottle and Bealey, or otherwise, as occasion might require ; and that Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting might be decreed to deliver up to **[484]** such receiver the property, effects, deeds, muniments and documents belonging to the company. And that the same Defendants might be restrained by injunction from holding, receiving or intermeddling with the property and effects of the company, and from executing, or causing to be executed, under the common seal of the company, any deed or instrument conveying, assigning or disposing of the same. And that Harbottle, Denison, Bunting and Lane might be restrained from entering or distraining upon any of the said lands sold by them to or in trust for the company as aforesaid. And the Plaintiffs thereby offered to pay into Court the amount of the unpaid calls due from them to the company.

The Defendants, Harbottle, Adshead and Westhead, demurred to the bill, assigning for cause want of equity, want of parties and multifariousness ; and suggesting that all the proprietors of shares in the company, the assignees of P. Leicester, and the owners of land named in the schedule to the Act, were necessary parties. The Defendant Bealey, the Defendant Denison and the Defendants Bunting and Lane also put in three several demurrers, assigning like causes.

Mr. Lowndes and Mr. Rolt, in support of the demurrers of Harbottle, Adshead and Westhead, and of Bunting and Lane.

Mr. Walker and Mr. Glasse, in support of the demurrers of Bealey and Denison.

Mr. James Russell, Mr. Roupell and Mr. Bartrum, for the bill.

**[485]** On the part of the Defendants it was contended that the suit complaining of injuries to the corporation was wholly informal in having only some of its individual members, and not the corporation itself, before the Court ; that this defect would not be cured by adding the corporation as parties Defendants, for the Plaintiffs were not entitled to represent the corporate body, even as distinguished from the Defendants and for the purpose of impeaching the transactions complained of ; and the Plaintiff's bill could not therefore be sustained.

It was further argued that the Plaintiffs, if they had any ground for impeaching the conduct of the Defendants, might have used the name of the corporation ; and, in that case, it would have been open to the Defendants, or to the body of directors or proprietors assuming the government of the company, to have applied to the Court for the stay of proceedings, or to prevent the use of the corporate name ; and, upon that application, the Court would have inquired into the alleged usurpation or abuse of authority, and determined whether the Plaintiff should be permitted to proceed. Or the suit might have been in the shape of an information by the Attorney-General to correct the alleged abuse of powers granted for public purposes. The statements of fact in the bill, it was also contended, did not support the general charges of fraud upon which the title to relief was founded. Several other points of equity, as applicable to the cases made against the several Defendants, and in respect of the suggested defects of parties, were also made, but the judgment did not turn on these points.

On the part of the Plaintiff, so far as related to the **[486]** point on which the decision proceeded, namely, their right to sustain the bill on behalf of themselves and the other shareholders against the Defendants, without regard to the corporate character of the body, it was argued that the company was not to be treated as an ordinary corporation ; that it was in fact a mere partnership, having objects of private benefit, and that it must be governed by rules analogous to those which regulated partnerships or joint stock companies, consisting of numerous persons, but not incorporated. The Act of Incorporation was intended to be beneficial to the company, and to promote the undertaking, but not to extinguish any of the rights of the proprietors *inter se.* The directors were trustees for the Plaintiffs to the extent of their shares in the company ; and the fact that the company had taken the form of a corporation would not be allowed to deprive the *cestui que trusts* of a remedy against their trustees for the abuse of their powers. The Act of Incorporation, moreover, expressly exempted the proprietors of the company, or persons dealing with the company, from the necessity of adopting the form of proceeding applicable to a pure corporation ; for the 74th section (*supra*, p. 464, n.) enabled them to sue and be sued

in the name of the treasurer, or any one of the directors for the time being: the bill alleged that the two remaining directors had refused to institute the suit, and shewed, in fact, that it would be against their personal interest to do so, inasmuch as they were answerable in respect of the transactions in question; if the Plaintiffs could not, therefore, institute the suit themselves they would be remediless. The directors were made Defendants; and, under the 74th clause of the Act, any one of the directors might be made the **[487]** nominal representative of the company; the corporation was therefore distinctly represented in the suit. The present proceeding was, in fact, the only form in which the proprietors could now impeach the conduct of the body to whom their affairs had been intrusted. The 38th section expressly excluded any proprietor, not being a director, from interfering in the management of the business of the company on any pretence whatever. The extinction of the board of directors by the bankruptcy and consequent disqualification of three of them (sect. 67), and the want of any clerk or office, effectually prevented the fulfilment of the form which the 46th, 47th and 48th sections of the Act required, in order to the due convening of a general meeting of proprietors competent to secure the remaining property of the company, and provide for its due application.

The following cases were cited during the argument :—*The Charitable Corporation* v. *Sutton* (2 Atk. 400), *Attorney-General* v. *Jackson* (11 Ves. 365), *Adley* v. *The Whitstable Company* (17 Ves. 315; 2 M. & Sel. 53; 19 Ves. 304; 1 Mer. 107, S. C.), *Blackburn* v. *Jepson* (3 Swans. 138), *Hichens* v. *Congreve* (4 Russ. 562), *Blain* v. *Agar* (2 Sim. 289), *Richards* v. *Davies* (2 R. & M. 347), *Ranger* v. *Great Western Railway Company* (1 Railway Cases, 1), *Seddon* v. *Connell* (10 Sim. 58, 79), *Preston* v. *Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335), *Attorney-General* v. *Wilson* (Cr. & Ph. 1), *Wallworth* v. *Holt* (4 Myl. & Cr. 619), *Bligh* v. *Brent* (2 Y. & Coll. 295; *per* Alderson, B.), 6 Viner. Ab. 306, tit. Corporation, U., Bacon, Ab. tit. Statute, I. 2.

**[488]** *March* 25. THE VICE-CHANCELLOR [Sir James Wigram]. The relief which the bill in this case seeks, as against the Defendants who have demurred, is founded on several alleged grounds of complaint; of these it is only necessary that I should mention two, for the consideration of those two grounds involves the principle upon which I think all the demurrers must be determined. One ground is that the directors of the Victoria Park Company, the Defendants Harbottle, Adshead, Byrom and Bealey, have, in their character of directors, purchased their own lands of themselves for the use of the company, and have paid for them, or rather taken to themselves out of the monies of the company a price exceeding the value of such lands : the other ground is that the Defendants have raised money in a manner not authorized by their powers under their Act of Incorporation ; and especially that they have mortgaged or incumbered the lands and property of the company, and applied the monies thereby raised in effect, though circuitously, to pay the price of the land which they had so bought of themselves.

I do not now express any opinion upon the question whether, leaving out of view the special form in which the Plaintiffs have proceeded in the suit, the bill alleges a case in which a Court of Equity would say that the transactions in question are to be opened or dealt with in the manner which this bill seeks that they should be ; but I certainly would not be understood by anything I said during the argument to do otherwise than express my cordial concurrence in the doctrine laid down in the case of *Hichens* v. *Congreve* (4 Russ. 562) and other cases of that class. I take those cases to be in accordance with the principles of this Court, and to be founded on **[489]** justice and commonsense. Whether particular cases fall within the principle of *Hichens* v. *Congreve* is another question. In *Hichens* v. *Congreve* property was sold to a company by persons in a fiduciary character, the conveyance reciting that £25,000 had been paid for the purchase ; the fact being that £10,000 only had been paid, £15,000 going into the hands of the persons to whom the purchase was entrusted. I should not be in the least degree disposed to limit the operation of that doctrine in any case in which a person projecting the formation of a company invited the public to join him in the project, on a representation that he had acquired property which was intended to be applied for the purposes of the company. I should strongly incline to hold that to be an invitation to the public to participate in the benefit of the property purchased, on the terms on which the projector had acquired it. The fiduciary

V.-C. XII.—7*

character of the projector would, in such a case, commence from the time when he first began to deal with the public, and would of course be controlled in equity by the representation he then made to the public. If persons, on the other hand, intending to form a company, should purchase land with a view to the formation of it, and state at once that they were the owners of such land, and proposed to sell it at a price fixed, for the purposes of the company about to be formed, the transaction, so far as the public are concerned, commencing with that statement, might not fall within the principle of *Hichens* v. *Congreve*. A party may have a clear right to say: "I begin the transaction at this time; I have purchased land, no matter how or from whom, or at what price; I am willing to sell it a certain price for a given purpose." It is not necessary that I should determine the effect of the transactions that are stated to have occurred in the present case. I make these observations only that I may not be supposed, from anything which fell from me during the argu-[490]-ment, to entertain the slightest hesitation with regard to the application, in a proper case, of the principles I have referred to. For the present purpose I shall assume that a case is stated entitling the company, as matters now stand, to complain of the transactions mentioned in the bill.

The Victoria Park Company is an incorporated body, and the conduct with which the Defendants are charged in this suit is an injury not to the Plaintiffs exclusively; it is an injury to the whole corporation by individuals whom the corporation entrusted with powers to be exercised only for the good of the corporation. And from the case of *The Attorney-General* v. *Wilson* (Cr. & Ph. 1) (without going further) it may be stated as undoubted law that a bill or information by a corporation will lie to be relieved in respect of injuries which the corporation has suffered at the hands of persons standing in the situation of the directors upon this record. This bill, however, differs from that in *The Attorney-General* v. *Wilson* in this—that, instead of the corporation being formally represented as Plaintiffs, the bill in this case is brought by two individual corporators, professedly on behalf of themselves and all the other members of the corporation, except those who committed the injuries complained of—the Plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.

It was not, nor could it successfully be, argued that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation. In law the corporation and the aggregate members of the corporation are not the same thing for purposes like this; and the [491] only question can be whether the facts alleged in this case justify a departure from the rule which, *primâ facie*, would require that the corporation should sue in its own name and in its corporate character, or in the name of someone whom the law has appointed to be its representative.

The demurrers are—first, of three of the directors of the company, who are also alleged to have sold lands to the corporation under the circumstances charged; secondly, of Bealey, also a director, alleged to have made himself amenable to the jurisdiction of the Court to remedy the alleged injuries, though he was not a seller of land; thirdly, of Denison, a seller of land, in like manner alleged to be implicated in the frauds charged, though he was not a director; fourthly, of Mr. Bunting, the solicitor, and Mr. Lane, the architect of the company. These gentlemen are neither directors nor sellers of lands, but all the frauds are alleged to have been committed with their privity, and they also are in this manner sought to be implicated in them. The most convenient course will be to consider the demurrer of the three against whom the strongest case is stated; and the consideration of that case will apply to the whole.

The first objection taken in the argument for the Defendants was that the individual members of the corporation cannot in any case sue in the form in which this bill is framed. During the argument I intimated an opinion, to which, upon further consideration, I fully adhere, that the rule was much too broadly stated on the part of the Defendants. I think there are cases in which a suit might properly be so framed. Corporations like this, of a private nature, are in truth little more than private partnerships; and in cases which may easily be suggested it would be too much to hold that a society [492] of private persons associated together in under-

takings, which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights, *inter se*, because, in order to make their common objects more attainable, the Crown or the Legislature may have conferred upon them the benefit of a corporate character. If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth* v. *Holt* (4 Myl. & Cr. 635; see also 17 Ves. 320, *per* Lord Eldon) and other cases would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, rules which, though in a sense technical, are founded on general principles of justice and convenience; and the question is whether a case is stated in this bill entitling the Plaintiffs to sue in their private characters. [His Honor stated the substance of the Act, sections 1, 38, 39, 43, 46, 47, 48, 49, 67, 70, 114 and 129 (*supra*, p. 464, n. *et seq.*).] The result of these clauses is that the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within **[493]** the scope of the company's powers, as well as to control the directors in any Acts which they may have originated. There may possibly be some exceptions to this proposition, but such is the general effect of the provisions of the statute.

Now, that my opinion upon this case may be clearly understood, I will consider separately the two principal grounds of complaint to which I have adverted, with reference to a very marked distinction between them. The first ground of complaint is one which, though it might *primâ facie* entitle the corporation to rescind the trans-actions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of con-firmation at the option of the corporation. The second ground of complaint may stand in a different position; I allude to the mortgaging in a manner not authorized by the powers of the Act. This, being beyond the powers of the corporation, may admit of no confirmation whilst any one dissenting voice is raised against it. This distinction is found in the case of *Preston* v. *The Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335).

On the first point it is only necessary to refer to the clauses of the Act to shew that, whilst the supreme governing body, the proprietors at a special general meeting assembled, retain the power of exercising the functions conferred upon them by the Act of Incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the Plaintiffs on the present record. This in effect purports to be a suit by *cestui que trusts* complaining of a fraud committed or **[494]** alleged to have been committed by persons in a fiduciary character. The complaint is that those trustees have sold lands to themselves, ostensibly for the benefit of the *cestui que trusts*. The proposition I have advanced is that, although the Act should prove to be voidable, the *cestui que trusts* may elect to confirm it. Now, who are the *cestui que trusts* in this case? The corporation, in a sense, is undoubtedly the *cestui que trust;* but the majority of the proprietors at a special general meeting assembled, indepen-dently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this Court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the Court may be declaring the acts complained of to be void at the suit of the present Plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may

defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority is decisive to shew that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained it must be shewn either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in **[495]** motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those trans-actions are to be impeached in a Court of Justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights.

[His Honor recapitulated the history and present situation of the company, as it appeared upon the bill.]

I pause here to examine the difficulty which is supposed by the bill to oppose itself to the body of proprietors assembling and acting at an extraordinary general meeting. The 48th section of the Act says that a certain number of proprietors may call such a meeting by means of a notice to be addressed to the board of directors, and left with the clerk or secretary, at the principal office of the company, one month before the time of meeting, or the board is not bound to notice it. The bill says that there is no board of directors properly constituted, no clerk, no principal office of the company, no power of electing more directors, and that, the appointment of the clerk being in the board of directors, no clerk can in fact now be appointed. I am certainly not prepared to go the whole length of the Plaintiff's argument founded upon the 48th section. I admit that the month required would probably be considered imperative; but is not the mode of service directory only? Could the board of directors *de facto,* for the time being, by neglecting to appoint a clerk or have a principal office, deprive the superior body, the body of proprietors, of the power which the Act gives that body over the board of directors? Would not a notice in substance, a notice for example such as the 129th sec-**[496]**-tion provides for in other cases, be a sufficient notice? Is not the particular form of notice which is pointed out by the 48th section a form of notice given only for the convenience of the proprietors and directors? And if an impediment should exist, and, *à fortiori,* if that impediment should exist by the misconduct of the board of directors, it would be difficult to contend with success that the powers of the corporation are to be paralyzed, because there is no clerk on whom service can be made. I require more cogent arguments than I have yet heard to satisfy me that the mode of service prescribed by the 48th section, if that were the only point in the case, is more than directory. The like observations will apply to the place of service; but, as to that, I think the case is relieved from difficulty by the fact that the business of the company is stated to be principally conducted at the office of the solicitors, for I am not aware that there is anything in the statute which attaches any peculiar character to the spot designated as the principal office. In substance, the board of directors *de facto,* whether qualified or not, carry on the business of the company at a given place, and under this Act of Parliament it is manifest that service at that place would be deemed good service on the company.

If that difficulty were removed, and the Plaintiff should say that by the death or bankruptcy of directors, and the carelessness of proprietors (for that term must be added), the governing body has lost its power to act, I should repeat the inquiries I have before suggested, and ask whether, in such a case also, the 48th section is not directory, so far as it appears to require the refusal or neglect of the board of directors to call a general meeting, before the proprietors can by advertisement call such a meeting for themselves. Adverting to the undoubted powers conferred upon the proprietors to hold special general meetings without the consent and **[497]** against the will of the board of directors, and the permanent powers which the body of proprietors must of necessity have, I am yet to be persuaded that the existence of this corporation (for without a lawful governing body it cannot usefully or practically

continue) can be dependent upon the accidents which at any given moment may reduce the number of directors below three. The board of directors, as I have already observed, have no power to put a *veto* upon the will of any ten proprietors who may desire to call a special general meeting; and if ten proprietors cannot be found who are willing to call a special general meeting, the Plaintiffs can scarcely contend that this suit can be sustained. At all events what is there to prevent the corporators from suing in the name of the corporation? It cannot be contended that the body of proprietors have not sufficient interest in these questions to institute a suit in the name of the corporation. The latter observations, I am aware, are little more than another mode of putting the former questions which I have suggested. I am strongly inclined to think, if it were necessary to decide these points, it could not be successfully contended that the clauses of the Act of Parliament which are referred to are anything more than directory, if it be, indeed, impossible from accident to pursue the form directed by the Act. I attribute to the proprietors no power which the Act does not give them: they have the power, without the consent and against the will of the directors, of calling a meeting, and of controlling their acts; and if by any inevitable accident the prescribed form of calling a meeting should become impracticable, there is still a mode of calling it, which, upon the general principles that govern the powers of corporations, I think would be held to be sufficient for the purpose.

It is not, however, upon such considerations that I **[498]** shall decide this case. The view of the case which has appeared to me conclusive is that the existence of a board of directors *de facto* is sufficiently apparent upon the statements in the bill. The bankruptcy of Westhead, the last of the three directors who became bankrupt, took place on the 2d of January 1840: the bill alleges that he thereupon ceased to be *qualified* to act as director, and his office became vacated; but it does not say that he ceased to *act* as a director; nor, although it is said that thenceforward there was no board "properly constituted," is it alleged that there was no board *de facto* exercising the functions of directors. These, and several other statements of the bill, are pregnant with the admission of the existence of a board *de facto*. By whom was the company governed, and its affairs conducted, between the time of Westhead's bankruptcy and that of the filing of the bill in October 1842? What directors or managers of the business of the company have lent their sanction to the mortgages and other transactions complained of, as having taken place since January 1840, and by which the corporation is said or supposed to be, at least to some extent, legally bound? Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors *de facto*, acting in and carrying on the affairs of the corporation, and whose acting must have been acquiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a board *de facto*, their acts may be valid, although the persons so acting may not have been duly qualified. The 114th section (not stated in the bill) of the Act provides **[499]** that all acts, deeds and things done or executed at any meeting of the directors, by any person acting as a director of the said company, shall, notwithstanding it may afterwards be discovered that there was some defect or error in the appointment of such director, or that such director was disqualified, or being an *interim* director, was disapproved of by an annual general meeting of proprietors, be as valid and effectual as if such person had been duly appointed and was qualified to be a director. The foundation upon which I consider the Plaintiffs can alone have a right to sue in the form of this bill must wholly fail, if there has been a governing body of directors *de facto*. There is no longer the impediment to convening a meeting of proprietors, who by their vote might direct proceedings like the present to be taken in the name of the corporation or of a treasurer of the corporation (if that were necessary); or who, by rejecting such a proposal, would, in effect, decide that the corporation was not aggrieved by the transactions in questions. Now, since the 2d of January 1840, there must have been three annual general meetings of the company held in July in every year, according to the provisions of the Act. These

annual general meetings can only be regulary called by the board of directors. The bill does not suggest that the requisitions of the Act have not been complied with in this respect, either by omitting to call the meeting, or by calling it informally ; but the bill, on the contrary, avers that several general meetings and extraordinary general meetings, and other meetings of the shareholders of the company, were duly convened and held at divers times between the time when the company was established and the year 1841 ; including, therefore, in this period of formality of proceeding, as well as of capacity in constitution, an entire year after Westhead's bankruptcy.

[500] Another statement of the bill leading to the same inference—the existence of an acting board—is that which avers that since the year 1839 down, in fact, to the time of filing the bill, that is, during these three years, the company has had no office of its own, but the affairs of the company have been principally conducted at the office of Mr. Bunting. Now this, as I must read it, is a direct admission that the affairs of the company have been carried on by some persons. By whom then have they been carried on ? The statute makes the board of directors the body by whom alone those affairs are to be ordered and conducted. There is no other person or set of persons empowered by the Act to conduct the affairs of the company ; and there is no allegation in the bill that any persons, other than the board of directors originally appointed, have taken upon themselves that business. In the absence of any special allegation to the contrary I am bound to assume that the affairs of the company have been carried on by the body in whom alone the powers for that purpose were vested by the Act, namely, a board of directors.

Again the bill alleges that, since the bankruptcy of Westhead, the bankrupts have joined in executing the conveyances of the property of the company to mortgagees. It could only have been in the character of directors that they could confer any title by the conveyance ; in that character the mortgagees would have required them to be parties, and it is in that character that I must assume they executed the deeds.

If the case rested here, I must of necessity assume the existence of a board of directors, and in the absence of any allegation that the board *de facto,* in whose acting the company must, upon this bill, be taken to have acquiesced, have been applied to and have refused to ap-[501]-point a clerk and treasurer (if that be necessary), or take such other steps as may be necessary for calling a special general meeting, or had refused to call such special general meeting, the bill does not exclude every case which the pleader was bound to exclude in order to justify a suit on behalf of a corporation, in a form which assumes its practical dissolution. But the bill goes on to shew that special general meetings have been holden since January 1840. The bill, as I have before observed, states that several general meetings and extraordinary general meetings have been holden between the establishment of the company and the year 1841, not excluding the year 1840, which was during Westhead's disqualification, "and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the said directors of the company to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings herein complained of was not disclosed ; " and the bill specifies some meetings in particular. Against the pleader I must intend that some such meetings may have been holden at a time when there was no board properly constituted, and no clerk or treasurer or principal office of the company, save such as appear by the bill to have existed ; and if that were so, the whole of the case of the Plaintiffs, founded on the impracticability of calling a special general meeting, fails. Assuming then, as I am bound to do, the existence, for some time at least, of a state of things in which the company was governed by a board of directors *de facto,* some of the members of which were individually disqualified, and in which, notwithstanding the want of a clerk, treasurer or office, the powers of the proprietors were called into exercise at general meetings, the question is, when did that state of things cease to exist, so as to justify the extraordinary proceeding of the Plain-[502]-tiffs by this suit ? The Plaintiffs have not stated by their bill any facts to shew that such was not the actual state of things at the time their bill was filed, and, in the absence of any statement to the contrary, I must intend that it was so.

The case of *Preston* v. *The Grand Collier Dock Company* was referred to as an example of a suit in the present form; but there the circumstances were in no respect parallel with the present: the object of that suit was to decide the rights or liabilities of one class of the members of the corporation against another, in respect of a matter in which the corporation itself had no power to vary the situation of either.

I have applied strictly the rule of making every intendment against the pleader in this case—that is, of intending everything to have been lawful and consistent with the constitution of the company, which is not expressly shewn on the bill to have been unlawful or inconsistent with that constitution. And I am bound to make this intendment, not only on the general rule, but also on the rules of pleading which require a Plaintiff to frame his case so distinctly and unambiguously, that the Defendant may not be embarrassed in determining on the form which his defence should assume. *Attorney-General* v. *Corporation of Norwich* (2 Myl. & Cr. 406). The bill, I cannot but observe, is framed with great care, and with more than ordinary professional skill and knowledge; but the averments do not exclude that which, *primâ facie*, must be taken to have been the case, that during the years 1840, 1841 and 1842 there was a governing body, that by such body the business of the company was carried on, that there was no insurmountable impediment to the **[503]** exercise of the powers of the proprietors assembled in general meetings to control the affairs of the company, and that such general meetings were actually held. The continued existence of a board *de facto* is not merely not excluded by the averments, but the statements in the bill of the acts which have been done suppose, and even require, the existence of such a board. Now, if the Plaintiff had alleged that there had been no board of directors *de facto*, and had on that ground impeached the transactions complained of, the Defendants might have met the case by plea, and thereby have defended themselves from answering the bill. If it should be said that the Defendants might now have pleaded that there was a board of directors *de facto*, the answer is that they might then have been told that the fact sufficiently appeared upon the bill, and therefore they ought to have demurred. Uncertainty is a defect in pleading of which advantage may be taken by demurrer. If I were to overrule these demurrers, I might be depriving the Defendants of the power of so protecting themselves; and that because the Plaintiff has not chosen, with due precision, to put forward that fact, which, if alleged, might have been met by plea, but which, not being so alleged, leaves the bill open to demurrer.

I must further observe that, although the bill does, with great caution, attempt to meet every case which, it was supposed, might have been fatal to it upon demurrer, yet it is by allegations of the most general kind, and many of which cannot by possibility be true. It alleges the recent discovery of the acts complained of, but it gives no allegation whatsoever for the purpose of telling when or how such discovery was made, or what led to it. I am bound to give the Plaintiff, on a general demurrer, the benefit of the allegation that the matters complained of have been recently discovered, whatever the term "re-**[504]**-cently discovered" may mean; but when I look into the schedule to the Act I find that many of those matters must have been known at a very early period in the history of the company. I find also provisions of the Act requiring that books shall be kept in which all transactions shall be fully and fairly stated; and I do not find in the bill anything like a precise allegation that the production of those books would not have given the information, or that there have not been means of seeing those books at least at some time since 1835, or since the transactions in question took place, so that, in point of fact, many of the transactions might and may have been sooner known. These are observations upon which I do not found my judgment, but which I use as explaining why it is I have felt bound in favour of the Defendants to construe this bill with strictness.

The second point which relates to the charges and incumbrances alleged to have been illegally made on the property of the company is open to the reasoning which I have applied to the first point, upon the question whether, in the present case, individual members are at liberty to complain in the form adopted by this bill; for why should this anomalous form of suit be resorted to, if the powers of the corporation may be called into exercise? But this part of the case is of greater difficulty upon the merits. I follow, with entire assent, the opinion expressed by the Vice-

Chancellor in *Preston* v. *The Grand Collier Dock Company*, that if a transaction be void, and not merely voidable, the corporation cannot confirm it, so as to bind a dissenting minority of its members. But that will not dispose of this question. The case made with regard to these mortgages or incumbrances is, that they were executed in violation of the provisions of the Act. The mortgagees are not Defendants to the bill, nor does the bill seek to avoid the **[505]** security itself, if it could be avoided, on which I give no opinion. The bill prays inquiries with a view to proceedings being taken *aliunde* to set aside these transactions against the mortgagees. The object of this bill against the Defendants is to make them individually and person-ally responsible to the extent of the injury alleged to have been received by the corporation from the making of the mortgages. Whatever the case might be, if the object of the suit was to rescind these transactions, and the allegations in the bill shewed that justice could not be done to the shareholders without allowing two to sue on behalf of themselves and others, very different considerations arise in a case like the present, in which the consequences only of the alleged illegal Acts are sought to be visited personally upon the directors. The money forming the consideration for the mortgages was received, and was expended in, or partly in, the transactions which are the subject of the first ground of complaint. Upon this, one question appears to me to be, whether the company could confirm the former transactions, take the benefit of the money that has been raised, and yet, as against the directors personally, complain of the acts which they have done, by means whereof the company obtains that benefit which I suppose to have been admitted and adopted by such confirmation. I think it would not be open to the company to do this; and my opinion already expressed on the first point is that the transactions which constitute the first ground of complaint may possibly be beneficial to the company, and may be so regarded by the proprietors, and admit of confirmation. I am of opinion that this question—the question of confirmation or avoidance—cannot properly be litigated upon this record, regard being had to the existing state and powers of the corporation, and that therefore that part of the bill which seeks to visit the directors personally with the consequences of the impeached mortgages and charges, the benefit of which **[506]** the company enjoys, is in the same predicament as that which relates to the other subjects of complaint. Both questions stand on the same ground, and, for the reasons which I stated in considering the former point, these demurrers must be allowed.

---

**[506]**    WOODWARD *v.* CONEBEER.    *April* 27, 28, *May* 11, 25, 1843.

[S. C. 1 Hare, 297.]

A Defendant, in custody for not answering, and brought up to have the bill taken *pro confesso* against him, within the time limited by the statute, 1 W. 4, c. 36, s. 15, rule 13, asked for time to put in his answer, and three weeks was thereupon given him, with liberty to apply for his discharge upon having answered. The time fixed by the same rule of the statute for retaining a Defendant in custody, without obtaining the order for taking the bill *pro confesso*, expired during the three weeks : no answer was put in. Held that, in such circumstances, the Defendant was not entitled to his discharge under the 13th rule of the statute, but was remitted to the situation he would have been in if that provision of the statute had not existed.

The process against the Defendant, up to the time that he was committed to the Fleet, *cum causis*, is stated in a former report of proceedings in this cause. (Vol. 1, p. 297.) On the 9th of May 1842 the Defendant was brought up by *habeas corpus*, in order that the bill might be taken *pro confesso* against him : the Defendant then asked for time to put in his answer ; the Plaintiff did not oppose the Defendant's application, and three weeks' time was given.(1) No answer was, however, put in.

---

(1) The Order of the 9th of May 1842 was as follows :—"Whereas by an order, dated the 21st day of February 1842, it was ordered that the Defendant, R. Conebeer,

A.C.

A

[HOUSE OF LORDS]

AYERST (INSPECTOR OF TAXES) . . . . RESPONDENT

AND

C. & K. (CONSTRUCTION) LTD.. . . . . APPELLANTS

B 1975 April 14, 15, 17;          Lord Diplock, Viscount Dilhorne,
        May 21                  Lord Kilbrandon and Lord Edmund-Davies

Revenue—Income tax—Discontinuance of trade—Compulsory
liquidation of company—Business of liquidated company sold
to subsidiary company—Nature of ownership of shares of
subsidiary company held by liquidated company—"Beneficial
C ownership"—Whether discontinuance of trade—Whether
subsidiary company entitled to income tax relief for losses of
liquidated company—Companies Act 1948 (11 & 12 Geo. 6,
c. 38), s. 243—Finance Act 1954 (2 & 3 Eliz. 2, c. 44),
s. 17 (1), (4) (b) (c), (5), (6) (a) (b)
Company—Winding up—Company's assets—Compulsory order—
Whether company retains beneficial ownership of assets—
Companies Act 1948, s. 243

D
By section 17 of the Finance Act 1954:
" (1) A trade carried on by a company, . . . shall not be
treated for any of the purposes of the Income Tax Acts
as permanently discontinued, nor a new trade as set up
and commenced, by reason of a change . . . in the persons
engaged in carrying on the trade, if the company is the
person or one of the persons so engaged immediately
E before the change and on or at any time within two years
after the change the trade . . . belongs to the same persons
as the trade or such an interest belonged to at some time
within a year before the change, . . . (4) For the purposes
of this section—. . . (c) a trade or interest therein belong-
ing to a company shall, where the result of so doing is
that the conditions for subsection (1) . . . of this section
to apply to a change are satisfied, be treated in any of the
F ways permitted by the next following subsection. . (5) For
the purposes of this section, a trade or interest therein
which belongs to a company carrying it on may be
regarded— . . . (b) in the case of a company which is a
subsidiary company, as belonging to a company which is
its parent company, or as belonging to the persons owning
the ordinary share capital of that parent company, . . .
(6) For the purposes of the last foregoing subsection—
G (a) references to ownership shall be construed as references
to beneficial ownership, . . ."

The taxpayer company, registered as a private company,
carried on the business of building and civil engineering. Out
of 100 of its issued shares 99 were owned by M. Ltd., a com-
pany trading as building and civil engineering contractors,
which in 1962 was ordered to be compulsorily wound up. In
H 1963 the whole of its business was sold to the taxpayer
company, which was assessed to income tax under Schedule D
for the years 1962–63 and 1963–64. The taxpayer company
claimed to be entitled under section 17 of the Finance Act 1954
to set off against those assessments the unrelieved losses and

capital allowances of M. Ltd. The special commissioners so
decided. Templeman J., whose judgment the Court of Appeal  A
affirmed, reversed that decision.

On the taxpayer company's appeal : —

*Held*, dismissing the appeal, that when a company was
ordered to be wound up under the Companies Act 1948 the
effect was to divest it of the " beneficial ownership " of its
assets within the meaning of the expression in section 17 (6) (*a*)
of the Finance Act 1954, since it could not use them for its
own benefit, and accordingly the taxpayer company was not  B
entitled to set off the unrelieved losses and capital allowances
of M. Ltd. against its own assessments to income tax (post,
pp. 180F, 181A–D).

*Pritchard* v. *M. H. Builders (Wilmslow) Ltd.* [1969] 1
W.L.R. 409 approved.

Decision of the Court of Appeal [1975] 1 W.L.R. 191;
[1975] 1 All E.R. 162 affirmed.
                                                             C

The following cases are referred to in their Lordships' opinions :

*Albert Life Assurance Co., In re; The Delhi Bank's case* (1871) 15 S.J.
    923.

*Commissioner of Stamp Duties (Queensland)* v. *Livingston* [1965] A.C.
    694; [1964] 3 W.L.R. 963; [1964] 3 All E.R. 692, P.C.

*General Rolling Stock Co., In re* (1872) 7 Ch.App. 646.          D

*Knowles* v. *Scott* [1891] 1 Ch. 717.

*Oriental Inland Steam Co., In re, Ex parte Scinde Railway Co.* (1874)
    9 Ch.App. 557.

*Pritchard* v. *M. H. Builders (Wilmslow) Ltd.* [1969] 1 W.L.R. 409; [1969]
    2 All E.R. 670; 45 T.C. 360.


The following additional cases were cited in argument :             E

*Anglo-Oriental Carpet Manufacturing Co. Ltd., In re* [1903] 1 Ch. 914.

*Barleycorn Enterprises Ltd., In re* [1970] Ch. 465; [1970] 2 W.L.R. 898;
    [1970] 2 All E.R. 155, C.A.

*Brooklands Selangor Holdings Ltd.* v. *Inland Revenue Commissioners*
    [1970] 1 W.L.R. 429; [1970] 2 All E.R. 76.

*Calgary and Edmonton Land Co. Ltd., In re* [1975] 1 W.L.R. 355; [1975]
    1 All E.R. 1046.                                                 F

*Calgary and Edmonton Land Co. Ltd.* v. *Dobinson* [1974] Ch. 102;
    [1974] 2 W.L.R. 143; [1974] 1 All E.R. 484.

*Carron Iron Co.* v. *MacLaren* (1855) 5 H.L.Cas. 416, H.L.(E.).

*Central Sugar Factories of Brazil, In re Flack's case* [1894] 1 Ch. 369.

*Commercial Bank Corporation of India and the East, In re* (1866) 1
    Ch.App. 538.

*English Sewing Cotton Co. Ltd.* v. *Inland Revenue Commissioners* (1947)  G
    176 L.T. 481; [1947] 1 All E.R. 679, C.A.

*Farrow's Bank Ltd., In re* [1921] 2 Ch. 164, C.A.

*Gerard* v. *Worth of Paris Ltd.* [1936] 2 All E.R. 905, C.A.

*Inland Revenue Commissioners* v. *Olive Mill Ltd. (In Liquidation)* [1963]
    1 W.L.R. 712; [1963] 2 All E.R. 130.

*North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328.

*Paraguassu Steam Tramroad Co., In re* (1872) 8 Ch.App. 254.          H

*Parway Estates Ltd.* v. *Inland Revenue Commissioners (Note)* (1958) 45
    T.C. 135, Upjohn J. and C.A.

*Rudewa Estates Ltd.* v. *Commissioner of Stamp Duties* [1966] E.A. 576.

A    *Vocalion (Foreign) Ltd., In re* [1932] 2 Ch. 196.
*Wood Preservation Ltd.* v. *Prior* [1969] 1 W.L.R. 1077; [1969] 1 All
E.R. 364, C.A.

APPEAL from the Court of Appeal.

This was an appeal brought by leave of the House of Lords from an
order made by the Court of Appeal (Stamp and Scarman L.JJ. and
B    Brightman J.) on October 28, 1974, affirming an order made by Temple-
man J. on November 27, 1973, allowing an appeal by the present
respondent, William George Ayerst (H.M. Inspector of Taxes) by way of
case stated from a determination of the Commissioners for the Special
Purposes of the Income Tax Acts. By that determination the special
commissioners had allowed an appeal by the appellant company C. & K.
(Construction) Ltd. against assessments to income tax made upon it under
C    Schedule D in respect of the profits of its trade of building and civil
engineering under the provisions of the Income Tax Act 1952 for the
years 1962–63 and 1963–64. By the order of Templeman J., affirmed
by the Court of Appeal, it was ordered that the assessments be restored
and the case remitted to the special commissioners for them to adjust the
assessments in accordance with his judgment.

D    For many years prior to and until January 18, 1963, Mactrac Ltd.
carried on the trade of builders and civil engineering contractors. Through-
out that period the issued share capital of the appellant company (formerly
Disorods Ltd.) was £100 divided into 100 shares of £1 each. Mactrac was
the legal and beneficial owner of 99 shares and the beneficial owner of the
remaining share. From January 18, 1962, until after January 18, 1963,
the shareholders of Mactrac remained unchanged. On March 3, 1962,
E    a receiver of Mactrac was appointed by a debenture holder. A statement
of affairs was, after the liquidation of Mactrac, prepared by the directors
and secretary and showed an estimated deficiency as to both creditors
and members on March 31, 1962, in the total sum of £389,977. On May
21, 1962, a petition for the compulsory winding up of Mactrac on the
ground of its insolvency was presented by a creditor. On June 4, 1962,
F    a compulsory winding-up order was made against Mactrac. On January
18, 1963, the receiver of Mactrac, acting with the approval of the liquida-
tor, sold its trade to the appellant company. On that date the unrelieved
losses incurred by Mactrac in its trade amounted to £326,486 and its
unrelieved capital allowances amounted to £82,025. On February 19, 1963,
the receiver of Mactrac, acting with the approval of its liquidator, sold
to an outside purchaser the issued share capital of the appellant company.
G    The appellant company was assessed to tax under Case 1 of Schedule D
in the sum of £350 for 1962–63 and in the sum of £1,000 for 1963–64.

The appellant company claimed that it was entitled under section 17
of the Finance Act 1954 to set off against these assessments the unrelieved
losses and capital allowances of Mactrac. The special commissioners
allowed the appeal of the appellant company against the assessments and
H    adjourned the case for the agreement of figures.

*C. N. Beattie Q.C., Richard Sykes* and *Rex Bretten* for the appellant
company. The trade was " carried on " until January 18, 1963, by Mactrac

within section 17 (1). From January 18, 1963, the trade was carried on by the appellant company which under the section is entitled to bring forward the unrelieved losses and capital allowances of Mactrac and set them off against its income tax assessments for 1962–1963 and 1963–1964. Although Mactrac was in liquidation it had not been divested of its beneficial ownership before the transfer. A trade can belong to a person either as trustee or as beneficial owner.

The only question is whether a company in liquidation is beneficial owner of its assets. It is admittedly the legal owner. It remains beneficial owner whether the liquidation is voluntary or compulsory liquidation and whether it is a members' winding up, a creditors' winding up or a compulsory winding up.

A company in liquidation does not hold its assets as trustee. The liquidator is in a fiduciary position, but the assets do not belong to him but to the company. He is neither the legal owner of them nor a trustee: section 133 of the Companies Act 1862 which creates statutory duties but no trust. A company is always holding its assets for the benefit of somebody, since somebody always has an interest in them.

The foundation of the difficulties in the present case is *In re Oriental Inland Steam Co., Ex parte Scinde Railway Co.* (1874) 9 Ch.App. 557 which decided that a company in liquidation is not the beneficial owner of its assets. It is not to be assumed that in enacting it Parliament had in mind every remote decision on beneficial ownership. Reliance is placed on *Knowles* v. *Scott* [1891] 1 Ch. 717.

The assets of a company in liquidation remain its property beneficially, though the liquidator is to deal with them in a special way to ensure that the creditors are paid off in accordance with their priorities and that the surplus is distributed among the contributories in accordance with their interests, but this does not mean that, pending the realisation and distribution of the assets, the company is not the beneficial owner of them: see *In re Farrow's Bank* [1921] 2 Ch. 164, 170 and *Rudewa Estates Ltd.* v. *Commissioner of Stamp Duties* [1966] E.A. 576. It must be wrong to draw a distinction between a case where a company is solvent and one where it is not, because one cannot know which it is until the end of the liquidation. *Calgary and Edmonton Land Co. Ltd.* v. *Dobinson* [1974] Ch. 102, 106, 107 and *In re Calgary and Edmonton Land Co. Ltd.* [1975] 1 W.L.R. 355, 359 show that creditors and contributories of a company in liquidation are not the beneficial owners of the company's assets. Should it be held that neither was the company itself the beneficial owner of its assets, the result would be that the beneficial ownership would be in suspense. *Pritchard* v. *M. H. Builders (Wilmslow) Ltd.* [1969] 1 W.L.R. 409, 414, which is identical with the present case, was wrongly decided.

Beneficial ownership of assets is in suspense during the course of administration: *Commissioner of Stamp Duties (Queensland)* v. *Livingston* [1965] A.C. 694. While the doctrine of suspense of beneficial ownership is necessary in the case of a deceased person, because on his death he is no longer there to be the beneficial owner and those who inherit cannot become beneficial owners until administration has been completed, that doctrine should not be extended to any case in which it is not necessary, e.g., a contract of sale in *Wood Preservation Ltd.* v. *Prior* [1969] 1 W.L.R.

A  1077.  It is not necessary to treat beneficial ownership as in suspense in the case of a company in liquidation, because it remains in existence and is available to be treated as the beneficial owner.

*English Sewing Cotton Co. Ltd.* v. *Inland Revenue Commissioners* (1947) 176 L.T. 481 is authority for saying that, though one's property may be encumbered, one does not cease to be the beneficial owner.  If a man mortgages his house and undertakes not to grant leases, he does not

B  cease to be beneficial owner.  The mere fact that restrictions are imposed by law or contract on his right to use his property does not deprive him of the beneficial ownership.

When property is held in trust the beneficial ownership is necessarily divided.  The beneficial interest in that case is not in suspense but is always somewhere.  The life tenant is not the beneficial owner, nor is the remainder-

C  man, but the two together have the beneficial ownership.  Where there are several beneficiaries under a trust, the beneficial ownership resides in them collectively.

The company acts through its agent, the liquidator, who must carry out his statutory duty.  The beneficial ownership remains in the company.

*Sykes* following.  Under the provisions of the Companies Act 1948 relating to liquidation there is no question of a trust or of suspension of the

D  beneficial ownership.  A liquidation may be voluntary, compulsory or subject to supervision.  A voluntary liquidation may be a creditors' or a members' liquidation.  Both in a voluntary and a compulsory liquidation the company may be either solvent or insolvent.  In a liquidation creditors, post-liquidation creditors and shareholders all have interests in the assets.  The relevant provisions of the Companies Act 1948 are sections 212, 226,

E  227, 228, 231, 232, 243, 244, 245, 257, 265, 273, 281, 282, 285 (2), 296 (2), 301, 302, 303, 307, 309, 316, 319 (5), 333 and 357.

Unlike a deceased person, a company remains alive during a winding up.  It dies only at its dissolution and at the end of the winding up.  Unlike the case of the assets of a bankrupt its assets remain in its ownership after the start of the liquidation.  The liquidator is clothed with the powers of a superior director by a statute which imposes on him particular duties.

F  No one but the company has any beneficial interest in its assets.  The only right of a creditor or a contributory is to require the company to do that which the statute has imposed on it.  The company receives the fruits of its assets (e.g., dividends on shares which it owns).  By its liquidation it can sell assets in order to pay its creditors as and when, through its liquidation, it thinks fit, subject to the limitations imposed by its constitution.

G  There is no question of the fruits of its assets being held on any trust or being enjoyed by anyone but the company.  Under an appropriate constitution the position of a company in liquidation could be similar to that of a company not in liquidation.  There is no suspension of the beneficial ownership of its assets.

If a creditor initiated an execution on a company's assets in a foreign

H  country the question would arise whether the court could exercise its discretion to stop it.  The liquidator might initiate liquidation proceedings in the country where the assets were situated, since most civilised countries have insolvency laws enabling insolvent companies to be liquidated.  As

to the right of a foreign creditor to prosecute his remedy where he thinks fit, see *Carron Iron Co.* v. *MacLaren* (1855) 5 H.L.Cas. 416, 436–437. A creditor in a foreign country is not amenable to the English courts, nor is it possible for the English courts to prevent him from levying execution there and retaining the fruits. But when a creditor amenable to the English courts seeks to levy execution, but has not yet put the execution in train, they can restrain him from doing so. When the execution has been commenced but has not been completed, the English courts will allow him to continue on terms that he accounts to the liquidator for the fruits of the execution. When a creditor amenable to the jurisdiction has completed the execution and is holding the fruits of it, the English courts, without there being a trust of the assets of the company, can require the creditor to disgorge the fruits of the execution. It is a fundamental principle that the creditors must share pari passu. For the courts to take such action it is not necessary that there should be a trust.

*Leonard Bromley Q.C.* and *Peter Gibson* for the respondent. As to the functions of and control over the liquidator, see sections 250 and 251 of the Act of 1948 and rules 59 and 78 of the Companies (Winding up) Rules 1949.

The Companies Act imposes a statutory scheme on the administration of the assets of a company in liquidation, whether compulsory or voluntary: see sections 257 and 302 of the Act of 1948. After the discharge of the liabilities it is the members, and not the company, who take the balance: see section 265 and rule 195 and also sections 309 and 319. On a liquidation the expenses must be paid including the liquidator's remuneration: see *In re Barleycorn Enterprises Ltd.* [1970] Ch. 465.

On beneficial ownership, *Wood Preservation Ltd.* v. *Prior* [1969] 1 W.L.R. 1077 was rightly decided. The question in the present case is whether the quality of such rights as Mactrac had in the assets immediately before and after the transfer in 1963 amount to beneficial ownership, i.e., whether the trade " belongs to the same persons as the trade . . . belonged to at some time within a year before the change." Attention must be directed to the period immediately before and after the transfer. The nature and quality of the rights Mactrac had in its assets immediately before the transfer to C. & K. on January 18, 1963, did not amount to beneficial ownership of those assets.

" Ownership " in section 17 (6) (*b*) and (*c*) means beneficial ownership. Reliance is placed on *Wood Preservation Ltd.* v. *Prior* [1969] 1 W.L.R. 1077, 1096 (Lord Donovan), 1096–1097 (Harman L.J.), 1097 (Widgery L.J.). The right formulation of the question is: Has the company beneficial ownership? That is how Lord Donovan formulated it and what Harman L.J. said indicates the essential quality of the beneficial ownership. A company in liquidation does not have beneficial ownership of its assets. The question is whether Mactrac in liquidation had the right to deal with its assets as its own. Mactrac did not have that and did not have " beneficial ownership." What was said in the *Wood Preservation* case [1969] 1 W.L.R. 1077 was adopted in *Brooklands Selangor Holdings Ltd.* v. *Inland Revenue Commissioners* [1970] 1 W.L.R. 429, 448–450. See also *Parway Estates Ltd.* v. *Inland Revenue Commissioners* (*Note*) (1958) 45 T.C. 135, 148.

A    The effect of the Companies Act is not, in winding up, to impose obligations in personam. It is concerned with the application of the assets which are to be applied under a statutory scheme of administration.

The duties of the liquidator are to be carried out for the benefit of classes of persons who do not include the company as such. The benefits of realisation of the assets are for those who take under the statutory scheme and not the company.

B    In such circumstances the company is not the beneficial owner of the assets.

Reliance is placed on *In re Oriental Inland Steam Co.,* 9 Ch.App. 557, 559. See also *In re Commercial Bank Corporation of India and the East* (1866) 1 Ch.App. 538, 545.

The liquidator had duties in the administration of the assets under the statutory scheme and was obliged to take account of the directions of the creditors: see sections 246 (1) and 257 of the Act of 1948. It had attributes of a trust, though not with all the characteristics of a trust as developed by equity. For over a hundred years the description of trust has often been adopted in describing the statutory scheme, though this may be misleading. There has been imposed on the assets, not on the company, a scheme of administration: see *Halsbury's Laws of England,* 4th ed., vol. 7 (1974),

D    pp. 648–649, paras. 1110 and 1111, which repeat, with small and immaterial changes, what was said in the previous edition. See also pp. 649–650, para. 1112 and p. 683, para. 1180.

In *In re Albert Assurance Co. Ltd.; The Delhi Bank's* case (1871) 15 S.J. 923 was the first statement of principle in relation to what is now section 257 of the Act of 1948. It is cited in *Buckley's Companies Acts,* 13th ed. (1957), p. 512. *In re General Rolling Stock Co.* (1872) 7 Ch.App.

E    646 is significant because the Court of Appeal held that there was a trust, overruling a decision by Lord Romilly M.R.: see also *In re Paraguassu Steam Tramroad Co.* (1872) 8 Ch.App. 254, 260. In *In re Oriental Inland Steam Co.,* 9 Ch.App. 557, 559, 560, James L.J. referred to a trust in terms which made it clear that he was referring to the trust created by the Act and Mellish L.J. said that the beneficial interest was clearly taken out of

F    the company. See also *In re North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328; *Knowles* v. *Scott* [1891] 1 Ch. 717; *In re Central Sugar Factories of Brazil* [1894] 1 Ch. 369 and *In re Anglo-Oriental Carpet Manufacturing Co. Ltd.* [1903] 1 Ch. 914. The cases are consistent and numerous. The relevant passage in *Buckley's Companies Acts,* 7th ed. (1897), p. 282 is to be found in the 2nd ed. (1875) and is repeated in the 13th ed. (1957), p. 498 (see also p. 512).

G    The highest point against the respondent is *In re Farrow's Bank Ltd.* [1921] 2 Ch. 164, 170 but it is no authority on the point whether a company in liquidation has beneficial ownership of its assets. In the judgments there is no reference to *In re Oriental Inland Steam Co.,* 9 Ch.App. 557, and accordingly it cannot be supposed that it was disapproved.

In section 42 (3) of the Finance Act 1938, relating to national defence

H    contribution (the forerunner of profits tax), it is said that in that section and in Part I of Schedule 4 to the Act references to ownership shall be construed as references to beneficial ownership. In section 17 (6) (*a*) of the Finance Act 1954 it was said that for the purposes of subsection (5)

references to ownership were to be construed as references to beneficial A
ownership and by subsection (6) (c) the tracing provisions were related
to Part I of Schedule 4 to the Act of 1938. "Beneficial ownership"
means the same thing in both the Acts. The Act of 1938 also dealt with
beneficial ownership in relation to stamp duties: see section 50. As to
stamp duties, see section 55 of the Finance Act 1927 and section 42 of
the Finance Act 1930, amended by section 27 (2) of the Finance Act 1967.
As to excess profits tax, see sections 12 (1), 14 (1) and 17 of the Finance B
(No. 2) Act 1939. The legislature clearly and consistently refers to "bene-
ficial ownership" in the sense submitted, as established by the authorities.

Gerard v. Worth of Paris Ltd. [1936] 2 All E.R. 905, carries the matter
no further; the circumstances there were wholly exceptional. The English
Sewing Cotton case, 176 L.T. 481, was not wrongly decided but it was not
concerned with liquidation at all and the authorities on winding up were
not cited. See Lord Greene M.R. on "beneficial interest" at p. 484. The C
proper question is not: where is the beneficial interest? It is: has the
company got it? The statutory scheme is for the benefit of persons other
than the company, i.e., for creditors and contributories: and see section 302
of the Companies Act 1948.

In re Oriental Inland Steam Co., 9 Ch.App. 557, was followed in In re
Vocalion (Foreign) Ltd. [1932] 2 Ch. 196, 204, 209 and the relevant part D
of the ratio was followed in Inland Revenue Commissioners v. Olive Mill
Ltd. (in Liquidation) [1963] 1 W.L.R. 712. It was also impliedly followed
in Pritchard v. M. H. Builders (Wilmslow) Ltd. [1969] 1 W.L.R. 409, 414.
Nothing in Livingston's case [1965] A.C. 694, 708, 712 is against the
respondent; the court was not concerned to ask whether the executor had
beneficial ownership. In re Oriental Inland Steam Co., 9 Ch.App. 557, was
rightly decided on the grounds stated in the judgments and nothing in the E
Carron Iron Co. case, 5 H.L.Cas. 416, detracts from it. The right test of
beneficial ownership is the power to deal with property as one's own. It
is not right to call the company a beneficial owner where it has no right
to deal with the property as its own or to benefit from it.

Gibson following. Compare the position of a receiver as agent of a
company with that of a liquidator. The agency of a receiver ends on F
the liquidation of his principal, when a new situation arises and the receiver
thereafter acts as principal. A liquidator is empowered to do certain
things for and on behalf of the company. But it is a strange form of
agency when the principal cannot do what the agent is able to do. In
the usual agency situation (such as a receivership) the agent ceases to be
able to exercise his power when the principal cannot act. This points
to the special fettered status of a company in liquidation. G

In section 17 of the Act of 1954 Parliament has imposed an arbitrary
test, beneficial ownership, which is well known to the legislature. It is
wrong to assume that the test was intended to be satisfied in a liquidation
situation.

Beattie Q.C. in reply. The English Sewing Cotton case, 176 L.T. 481,
is authority for the meaning of "beneficial ownership" and applies to H
section 17 of the Act of 1954. One is not deprived of beneficial ownership
simply because one's property is encumbered. In the case of a tree preserva-
tion order one is deprived of the right to cut it down but not of the beneficial

A  ownership. A company in liquidation, though it must pay its creditors, holds its property for its own benefit. Its assets remain its assets though they must be dealt with in a particular way. As regards beneficial ownership there is no difference between compulsory and voluntary liquidation: see section 302 of the Companies Act 1948. The liquidator has fiduciary duties imposed by statute but is not really a trustee. The beneficial ownership is not in the creditors.

B    In *Brooklands Selangor Holdings Ltd.* v. *Inland Revenue Commissioners* [1970] 1 W.L.R. 429 the company which owned the shares was bound by the scheme entered into to transfer them to someone else. The beneficial ownership had gone when the relevant contract of sale was entered into. The *Parway Estates* case, 45 T.C. 135, was similar. Neither case is of assistance in the present problem. In *In re General Rolling Stock Co.,* 7 Ch.App. 646, 647, 648–649, though the decision of Lord Romilly M.R.

C  was reversed, his reasoning was not attacked.

    A company only ceases to be the beneficial owner of its assets if the beneficial ownership passes to someone else. A man remains the beneficial owner of his property, however much the law may restrain the use of it.

    In *Livingston's* case [1965] A.C. 644 there was no question of equitable ownership.

D
    Their Lordships took time for consideration.

    May 21. LORD DIPLOCK. My Lords, the only question that has been argued in your Lordships' House is whether when a company is ordered to be wound up under the Companies Act 1948 the effect of the winding-up order is to divest the company of the "beneficial ownership" of its

E  assets within the meaning of that expression as it is used in section 17 (6) (*a*) of the Finance Act 1954.

    Under the Income Tax Acts a trader who has sustained a trading loss in any year of assessment or has incurred expenditure for which he is entitled to claim capital allowances to an amount which exceeds the taxable profits of the trade for that year, is entitled to carry forward the loss or the excess

F  and set it off against his taxable profits of that trade in subsequent years of assessment; but before the Finance Act 1954 this right of set-off was lost upon his ceasing permanently to carry on the trade. In the case of trading companies section 17 of the Finance Act 1954 allowed some piercing of the corporate veil by providing exceptions to the general rule as to cessation. The effect of the exception that is relevant to this appeal is that where the trade continues to be carried on by a successor that is a sub-

G  sidiary company of the company that previously carried on the trade, the successor company may avail itself of the right of set-off that would have been available to its predecessor if it had continued to carry on the trade itself.

    It is not now disputed that upon the true construction of this section a successor company is only to be treated as a subsidiary company of a parent

H  company as predecessor if and so long as not less than three-quarters of its ordinary share capital is in the "beneficial ownership" of the parent company whether directly or through another company or companies or partly directly and partly through another company or companies. This

makes it unnecessary to set out again and analyse the various subsections and paragraphs which justify this conclusion. They are quoted in the judgment of Templeman J. None of them throws any light upon the sense in which the expression " beneficial ownership " is used in section 17 (6) (*a*) or lends support to the view that it bears any other meaning than that which would have been ascribed to it in 1954 as a term of legal art as descriptive of the proprietary interest in its assets of a company incorporated under the Companies Act 1948 at successive stages of its existence from incorporation to the commencement of winding up and from the commencement of winding up to dissolution.

Nor do I find it necessary to restate the particular facts that give rise to this appeal, beyond saying that it concerns two companies: a parent company which was ordered to be compulsorily wound up and the appellant company of which all the shares were held by the parent company or its nominee. The parent company had carried on a trade. The trade continued to be carried on after the making of the winding-up order until the assets and goodwill of the trade were transferred to the appellant company. After the transfer the shares in the appellant company were sold to a third party and the proceeds of sale distributed in the liquidation of the parent company.

The appellant company relies upon section 17 of the Finance Act 1954 as entitling it to set off against its taxable profits from the trade in two years of assessment after the transfer, the trading losses and claims to capital allowances which had accrued to the parent company in the years of assessment before the transfer. It is common ground between the parties that the appellant company's right to do so depends upon whether its shares were still in the " beneficial ownership " of the parent company at the time of the transfer notwithstanding that by then the parent company had been ordered to be wound up.

My Lords, the making of a winding-up order brings into operation a statutory scheme for dealing with the assets of the company that is ordered to be wound up. The scheme is now contained in Part V of the Companies Act 1948 and extends to voluntary as well as to compulsory winding up; but in so far as it deals with compulsory winding up its essential characteristics have remained the same since it was first enacted by the Companies Act 1862. The procedure to be followed when a company is being wound up varies in detail according to whether this is done compulsorily under an order of the court or voluntarily pursuant to a resolution of the company in general meeting, and, in the latter case, whether it is a members' voluntary winding up or a creditors' voluntary winding up; but the essential characteristics of the scheme for dealing with the assets of the company do not differ whichever of these procedures is applicable. They remain the same as those of the original statutory scheme in the Companies Act 1862. For the sake of simplicity, in stating the essential characteristics of the statutory scheme I propose to refer only to those sections of the Companies Act 1948 which apply in a compulsory winding up and to omit those sections which have a corresponding effect in the case of a voluntary winding up.

Upon the making of a winding-up order:

A    (1) The custody and control of all the property and choses in action of
the company are transferred from those persons who were entitled under
the memorandum and articles to manage its affairs on its behalf, to a
liquidator charged with the statutory duty of dealing with the company's
assets in accordance with the statutory scheme (section 243).  Any disposi-
tion of the property of the company otherwise than by the liquidator is
void (section 227).

B    (2) The statutory duty of the liquidator is to collect the assets of the
company and to apply them in discharge of its liabilities (section 257 (1) ).
If there is any surplus he must distribute it among the members of the
company in accordance with their respective rights under the memoran-
dum and articles of association (section 265).  In performing these duties
in a compulsory winding up the liquidator acts as an officer of the court
(section 273); and if the company is insolvent the rules applicable in the
C    law of bankruptcy must be followed (section 317).

    (3) All powers of dealing with the company's assets, including the power
to carry on its business so far as may be necessary for its beneficial
winding up, are exercisable by the liquidator for the benefit of those
persons only who are entitled to share in the proceeds of realisation of
the assets under the statutory scheme.  The company itself as a legal
D    person, distinct from its members, can never be entitled to any part of
the proceeds.  Upon completion of the winding up, it is dissolved (section
274).

    The functions of the liquidator are thus similar to those of a trustee
(formerly official assignee) in bankruptcy or an executor in the adminis-
tration of an estate of a deceased person.  There is, however, this differ-
ence: that whereas the legal title in the property of the bankrupt vests
E    in the trustee and the legal title to property of the deceased vests in the
executor, a winding-up order does not of itself divest the company of the
legal title to any of its assets.  Though this is not expressly stated in the Act
it is implicit in the language used throughout Part V, particularly in sections
243 to 246 which relate to the powers of liquidators and refer to " property
. . . to which the company is . . . entitled," to " property . . . belonging
F    to the company," to " assets . . . of the company " and to acts to be done
by the liquidator " in the name and on behalf of the company."

    The question in this appeal is whether the legal title to its property
which remains in the company after the commencement of the winding up
still carries with it any beneficial interest in that property, so as to leave the
property in the company's " beneficial ownership " within the meaning of
section 17 (6) (a) of the Finance Act 1954.

G    My Lords, the concept of legal ownership of property which did not
carry with it the right of the owner to enjoy the fruits of it or dispose of
it for his own benefit, owed its origin to the Court of Chancery.  The
archetype is the trust.  The " legal ownership " of the trust property is in
the trustee, but he holds it not for his own benefit but for the benefit of the
cestui que trust or beneficiaries.  Upon the creation of a trust in the
H    strict sense as it was developed by equity the full ownership in the trust
property was split into two constituent elements, which became vested in
different persons: the " legal ownership " in the trustee, what came to be
called the " beneficial ownership " in the cestui que trust.  But it did not

follow even in equity that a person could only be the legal owner without being at the same time the beneficial owner in cases where it was possible to identify some other person or persons in whom the beneficial ownership had become vested. Executorship of an estate in course of administration provides one example which does not owe its origin to statute. No one would suggest that an executor, who was not also a legatee, was beneficial owner as well as legal owner of any of the property which was in the full ownership of the deceased before his death. He could not enjoy the fruits of it himself or dispose of it for his own benefit. Yet because an estate while still in course of administration was incapable of satisfying the technical requirement of a " trust " in equity that there had to be specific subjects identifiable as the trust fund, it was impossible to identify, at any rate in the case of residuary legatees, a person or persons in whom the beneficial ownership in any particular property forming part of the estate was vested: see *Commissioner of Stamp Duties (Queensland)* v. *Livingston* [1965] A.C. 694, 707–708 *per* Viscount Radcliffe. Another example, which owes its origin to statute, is to be found in the law of bankruptcy. The legal ownership of the bankrupt's property becomes vested in the trustee in bankruptcy. Here, while the property is still being administered, not only is there a similar absence of specific subjects identifiable as the trust fund but also the fact that the right to share in the proceeds of realisation of the property is dependent upon the creditor making a claim to prove in the bankruptcy makes it impossible until the time for proof has expired to identify those persons for whose benefit the trustee is administering the property. Both these factors would, in equity, have prevented that property possessing those characteristics of trust properties which have the consequence of vesting the beneficial ownership of any part of the undistributed property in those persons who will eventually become entitled to share in the proceeds of realisation. Nevertheless, as the very word " trustee " used in the statute implies, the beneficial owner-ship is not vested in him. He cannot enjoy the fruits of it himself or dispose of it for his own benefit. He is under a duty to deal with it as directed by the statute for the benefit of all the creditors who come in to prove a valid claim. It is no misuse of language to describe the property as being held by the trustee on a statutory trust if the qualifying adjective " statutory " is understood as indicating that the trust does not bear all the indicia which characterise a trust as it was recognised by the Court of Chancery apart from statute.

The argument advanced for the appellant company is that it makes all the difference that, upon the winding up of a company, the company does not cease to be the legal owner of its property as does a person who dies or is adjudicated bankrupt. The contention is that so long as a person, in whom the full ownership of property has once been vested, continues to retain the legal ownership he can only be divested of the beneficial ownership as a result of its becoming vested in some other person or persons. This does not occur except where a " trust," in the strict sense as it was recognised in equity, is created in the property. Such a trust is not created by Part V of the Companies Act 1948 upon the making of a winding-up order; since, for the same reasons as apply in the case of bank-ruptcy, the persons entitled to share in the proceeds of realisation of the

A company's property are not invested with the beneficial ownership of that property while it is still being administered by the liquidator.

My Lords, I do not see how it can make any relevant difference that the legal ownership remains in the person in whom the full ownership was previously vested instead of being transferred to a new legal owner. Retention of the legal ownership does not prevent a full owner from divesting himself of the beneficial ownership of the property by declaring that he B holds it in trust for other persons. I see no reason why it should be otherwise when an event occurs which by virtue of a statute leaves him with the legal ownership of property but deprives him of all possibility of enjoying the fruits of it or disposing of it for his own benefit.

The nature of a company's interest in its assets after a winding-up order had been made first fell to be considered by the Court of Chancery under the Companies Act 1862. It was, perhaps, inevitable that the court should C find the closest analogy in the law of trusts. In one of the earliest reported cases, *In re Albert Life Assurance Co., The Delhi Bank's case* (1871) 15 S.J. 923, 924 Lord Cairns puts it:

D " . . . the assets of the company from the moment of winding up, . . . become fixed and inalienable; the executive and the direction of the company are unable to alienate them or to part with them for any purpose; they become fixed and impressed with the trust declared by section 98,"—(which corresponds to section 257 (1) of the Act of 1948)—" a trust by which all the assets of the company are to be applied in discharge of the liabilities of the company."

In the following year one finds Mellish L.J. equiparating the status of a E company's assets under a winding-up order with the assets of a debtor in bankruptcy or under a decree of the Court of Chancery in an administration suit: *In re General Rolling Stock Co.* (1872) 7 Ch.App. 646, 649.

The question of the beneficial ownership of the company's property was dealt with explicitly by both James L.J. and Mellish L.J. in *In re Oriental Inland Steam Co.* (1874) 9 Ch.App. 557:

F " The English Act of Parliament has enacted that in the case of a winding up the assets of the company so wound up are to be collected and applied in discharge of its liabilities. That makes the property of the company clearly trust property. It is property affected by the Act of Parliament with an obligation to be dealt with by the proper officer in a particular way. Then it has ceased to be beneficially the property of the company; . . ." (*per* James L.J. at p. 559).

G " No doubt winding up differs from bankruptcy in this respect, that in bankruptcy the whole estate, both legal and beneficial, is taken out of the bankrupt, and is vested in his trustees or assignees, whereas in a winding up the legal estate still remains in the company. But, in my opinion, the beneficial interest is clearly taken out of the company. What the statute says in section 95 is, that from the time H of the winding-up order all the powers of the directors of the company to carry on the trade or to deal with the assets of the company shall be wholly determined, and nobody shall have any power to deal with them except the official liquidator, and he is to deal with them

for the purpose of collecting the assets and dividing them amongst the creditors. It appears to me that that does, in strictness, constitute a trust for the benefit of all the creditors, . . ." (*per* Mellish L.J. at p. 560).

The authority of this case for the proposition that the property of the company ceases upon the winding up to belong beneficially to the company has now stood unchallenged for a hundred years. It has been repeated in successive editions of *Buckley on the Companies Acts* from 1897 to the present day. Nevertheless your Lordships are invited by the appellant company to say that it was wrong because it was founded on the false premise that the property is subject to a " trust " in the strict sense of that expression as it was used in equity before 1862.

My Lords, it is not to be supposed that in using the expression " trust " and " trust property " in reference to the assets of a company in liquidation the distinguished Chancery judges whose judgments I have cited and those who followed them were oblivious to the fact that the statutory scheme for dealing with the assets of a company in the course of winding up its affairs differed in several aspects from a trust of specific property created by the voluntary act of the settlor. Some respects in which it differed were similar to those which distinguished the administration of estates of deceased persons and of bankrupts from an ordinary trust; another peculiar to the winding up of a company is that the actual custody, control, realisation and distribution of the proceeds of the property which is subject to the statutory scheme are taken out of the hands of the legal owner of the property, the company, and vested in a third party, the liquidator, over whom the company has no control. His status, as was held by Romer J. in *Knowles* v. *Scott* [1891] 1 Ch. 717 differs from that of a trustee " in the strict sense " for the individual creditors and members of the company who are entitled to share in the proceeds of realisation. He does not owe to them all the duties that a trustee in equity owes to his cestui que trust. All that was intended to be conveyed by the use of the expression " trust property " and " trust " in these and subsequent cases (of which the most recent is *Pritchard* v. *M. H. Builders (Wilmslow) Ltd.* [1969] 1 W.L.R. 409) was that the effect of the statute was to give to the property of a company in liquidation that essential characteristic which distinguished trust property from other property, viz., that it could not be used or disposed of by the legal owner for his own benefit, but must be used or disposed of for the benefit of other persons.

My Lords, the expression " beneficial owner " in relation to the proprietary interest of a company in its assets was first used in a taxing statute in 1927. Section 55 of the Finance Act 1927 provided for relief from capital and transfer stamp duty in cases of reconstruction or amalgamation of companies where shares in a transferee company were issued as consideration for the acquisition of the undertaking of the transferor company. Subsection (6) (*a*) (*b*) and (*c*) made provision for three exceptions to the right to this relief. The exception provided for in paragraph (*b*) is expressed to depend upon whether within a period of two years from a specified date the " . . . [transferor] . . . company ceases, otherwise than in consequence of reconstruction, amalgamation *or liquidation*, to be the beneficial owner of

A the shares so issued to it." From this can be inferred a recognition by Parliament that when a company is in liquidation it ceases to be the " beneficial owner " of its assets within the meaning of that expression as used by the draftsman in a taxing statute.

The expressions " beneficial owner " and " beneficial ownership " appear again in section 42 (2) (*b*) of the Finance Act 1930 in connection with what companies were to be treated as associated companies for the purpose of

B relief from transfer stamp duty, and in section 42 of the Finance Act 1938. This dealt with grouping of profits of parent and subsidiary companies for the purpose of national defence contribution. The definition of subsidiary company, which incorporates the reference to the requirement of " beneficial ownership " of its shares by its parent company, is in the same words as the corresponding definition in section 17 (6) of the Finance Act 1954.

C So when those words were repeated in the Finance Act 1954 not only was there a consistent line of judicial authority that upon going into liquidation a company ceases to be " beneficial owner " of its assets as that expression has been used as a term of legal art since 1874, but also there has been a consistent use in taxing statutes of the expressions " beneficial owner " and " beneficial ownership " in relation to the proprietary interest of a company in its assets which started with the Finance Act 1927, where

D the context makes it clear that a company upon going into liquidation ceases to be " beneficial owner " of its assets as that expression is used in a taxing statute.

I would dismiss this appeal.

E VISCOUNT DILHORNE. My Lords, I have had the advantage of reading the speech of my noble and learned friend, Lord Diplock. I agree with it and that this appeal should be dismissed.

LORD KILBRANDON. My Lords, I have the advantage of reading the speech prepared by my noble and learned friend, Lord Diplock. I agree with his conclusions, and would therefore dismiss this appeal.

F LORD EDMUND-DAVIES. My Lords, for the reasons appearing in the speech of my noble and learned friend, Lord Diplock, I too would dismiss this appeal.

*Appeal dismissed.*

Solicitors: *Masons; Solicitor of Inland Revenue.*

G                                                                                      F. C.

H

**Power to stay or restrain proceedings**

**96**.  At any time after the presentation of a winding up petition and before a winding up order has been made, the company or any creditor or contributory may —

(a)  where any action or proceeding against the company, including a criminal proceeding, is pending in a summary court, the Court, the Court of Appeal or the Privy Council, apply to the court in which the action or proceeding is pending for a stay of proceedings therein; and

(b)  where any action or proceeding is pending against the company in a foreign court, apply to the Court for an injunction to restrain further proceedings therein,

and the court to which application is made may, as the case may be, stay or restrain the proceedings accordingly on such terms as it thinks fit.

**Avoidance of attachments and stay of proceedings**

**97**.  (1)  When a winding up order is made or a provisional liquidator is appointed, no suit, action or other proceedings, other than criminal proceedings, shall be proceeded with or commenced against the company except with the leave of the Court and subject to such terms as the Court may impose.

(1A)  Where a winding up order is made or a provisional liquidator is appointed in respect of a company, and there are criminal proceedings pending against the company in a summary court, the Court, the Court of Appeal or the Privy Council —

(a)  the company;

(b)  a creditor of the company;

(c)  a contributory of the company; or

(d)  subject to section 94(4), the Authority, in respect of any company which is carrying on regulated business, may apply to the court in which the proceedings are pending for a stay of the proceedings and the court to which the application is made, may stay the proceedings on such terms as it thinks fit.

(2)  When a winding up order has been made, any attachment, distress or execution put in force against the estate or effects of the company after the commencement of the winding up is void.

**Notice of winding up order**

**98**.  When a winding up order is made, the liquidator shall —

(a)  file a copy of the winding up order with the Registrar; and

(b)  publish notice of the winding up in the Gazette and any newspaper in which the winding up petition was advertised.



## Appointment of official liquidator

**105**. (1)  For the purpose of conducting the proceedings in winding up a company and assisting the Court therein, there may be appointed one or more than one person to be called an official liquidator or official liquidators; and the Court may appoint to such office such person as it thinks fit, and if more persons than one are appointed to such office, the Court shall declare whether any act hereby required or authorised to be done by the official liquidator is to be done by all or any or more of such persons.

(2)  The Court may also determine whether any and what security is to be given by an official liquidator on that person's appointment; and if no official liquidator is appointed, or during any vacancy in such office, all the property of the company shall be in the custody of the Court.

(3)  The liquidator shall, within twenty-eight days of the date upon which the winding up order is made, summon —

(a)  a meeting of the company's creditors if the order was made on the grounds that the company is insolvent; or

(b)  a meeting of the company's contributories if the order was made on grounds other than insolvency,

for the purposes of resolving any other matters which the liquidator puts before the meeting.

(4)  The Court may make an order dispensing with the need to summon a meeting under this section or extending the time within which it shall be summoned.

## Appointment of joint liquidators

**106**. When two or more persons are appointed to the office of liquidator, either provisionally or as official liquidators, they shall be authorised to act jointly and severally, unless their powers are expressly limited by order of the Court.

## Removal of official liquidators

**107**. An official liquidator may be removed from office by order of the Court made on the application of a creditor or contributory of the company.

## Qualifications of official liquidators

**108**. (1)  A foreign practitioner may be appointed to act jointly with a qualified insolvency practitioner.

(2)  Official liquidators are officers of the Court.

## Remuneration of official liquidators and restructuring officers

**109**. (1)  The expenses properly incurred in the winding up, including the remuneration of the liquidator, are , subject to subsection (2), payable out of the company's assets in priority to all other claims.



(2) Where a company is wound up, the expenses properly incurred in any petition for a restructuring officer and during the term of appointment of the restructuring officer appointed —

    (a) under section 91B(3)(a); or

    (b) on an interim basis under section 91C(3), including the remuneration of the restructuring officer, are payable out of the company's assets in priority to all other claims.

(3) There shall be paid to a restructuring officer, including a restructuring officer appointed on an interim basis, and the official liquidator, such remuneration, by way of percentage or otherwise, that the Court may direct acting in accordance with rules made under section 155.

(4) If more than one restructuring officer, including a restructuring officer appointed on an interim basis, is appointed by the Court under section 91B or 91C, the remuneration paid under subsection (3) shall be distributed among the restructuring officers in such proportions as the Court may direct.

(5) If more than one official liquidator is appointed by the Court when a company is wound up, the remuneration paid under subsection (3) shall be distributed among the official liquidators in such proportions as the Court may direct.

## Function and powers of official liquidators

**110**. (1) It is the function of an official liquidator —

    (a) to collect, realise and distribute the assets of the company to its creditors and, if there is a surplus, to the persons entitled to it; and

    (b) to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up.

(2) The official liquidator may —

    (a) with the sanction of the Court, exercise any of the powers specified in Part I of Schedule 3; and

    (b) with or without that sanction, exercise any of the general powers specified in Part 2 of Schedule 3.

(3) The exercise by the liquidator of the powers conferred by this section is subject to the control of the Court, and subject to subsection (5), any creditor or contributory may apply to the Court with respect to the exercise or proposed exercise of such powers (hereinafter referred to as a "sanction application").

(4) In the case of —

    (a) a solvent company, a sanction application may only be made by a contributory and the creditors shall have no right to be heard;

    (b) an insolvent company, a sanction application may only be made by a creditor and the contributories shall have no right to be heard; and



      (c)    a company whose solvency is doubtful, a sanction application may be made by both contributories and creditors and both contributories and creditors shall have a right to be heard.

(5)    For the purposes of exercising the powers specified under paragraph 3 of Part 1 of Schedule 3, a person shall be treated as related to a company if the person —

      (a)    has acted for the company as a professional service provider;

      (b)    is or was a shareholder or director of the company or of any other company in the same group as the company;

      (c)    has a direct or indirect beneficial interest in the shares of the company; or

      (d)    is a creditor or debtor of the company.

.

# General Powers of the Court

## Power to stay winding up

**111.** (1)    The Court may at any time after an order for winding up, on the application either of the liquidator or any creditor or contributory, and on proof to the satisfaction of the Court that all proceedings in the winding up ought to be stayed, make an order staying the proceedings either all together or for a limited time, on such terms and conditions as the Court thinks fit.

(2)    The Court may at any time after the liquidation has commenced under section 116(c), but before the final meeting has been held as provided for in section 127, on the application of the liquidator accompanied by —

      (a)    a special resolution stating that the company will not be wound up and setting out the reasons for such decision;

      (b)    proof of a recall notice published in the Gazette; and

      (c)    such other documents as the Court may consider necessary,

make an order to recall the liquidation, place the company into active status and place the company back into good standing as it was prior to the commencement of liquidation under section 116(c), on such terms and conditions as the Court thinks fit.

(3)    A company shall, within seven days of the making of an order under this section, forward a copy of the order to the Registrar who shall enter it in the records relating to the company.

## Settlement of list of contributories

**112.** (1)    The liquidator shall settle a list of contributories, if any, for which purpose that person shall have power to adjust the rights of contributories amongst themselves.



Cayman Islands Statutes
  Grand Court Act (2015 Revision) (Refs & Annos)
    Grand Court Rules (2023 Revision)
      Volume I - Orders (Refs & Annos)
        Order 15. Causes of Action, Counterclaims and Parties

C.I. Grand Court Rules Volume I Orders, O.15, r.12A

O.15, r.12A. Derivative actions

Currentness

(1) This rule applies to every action begun by writ by one or more shareholders of a company where the cause of action is vested in the company and relief is accordingly sought on its behalf (referred to in this rule as a **derivative action**").

(2) Where a defendant in a derivative action has given notice of intention to defend, the plaintiff must apply to the Court for leave to continue the action.

(3) The application must be supported by an affidavit verifying the facts on which the claim and the entitlement to sue on behalf of the company are based.

(4) Unless the Court otherwise orders, the application must be issued within 21 days after the relevant date, and must be served, together with the affidavit in support and any exhibits to the affidavit, not less than 10 clear days before the return day on all defendants who have given notice of intention to defend; any defendant so served may show cause against the application by affidavit or otherwise.

(5) In paragraph (4), the relevant date means the later of --

  (a) the date of service of the statement of claim;

  (b) the date when notice of intention to defend was given, provided that, where more than one notice of intention to defend is given, that date shall be the date when the first notice was given.

(6) Nothing in this rule shall prevent the plaintiff from applying for interlocutory relief pending the determination of an application for leave to continue the action.

(7) In a derivative action, O.18, r.2(1) (time for service of defence) shall not have effect unless the Court grants leave to continue the action and, in that case, shall have effect as if it required the defendant to serve a defence within 14 days after the order giving leave to continue, or within such other period as the Court may specify.

(8) On the hearing of the application under paragraph (2), the Court may --

  (a) grant leave to continue the action, for such period and upon such terms as the Court may think fit;

  (b) subject to paragraph (11), dismiss the action;

(c) adjourn the application and give such direction as to joinder of parties, the filing of further evidence, discovery, cross examination of deponents and otherwise as it may consider expedient.

(9) If the plaintiff does not apply for leave to continue the action as required by paragraph (2) within the time laid down in paragraph (4), any defendant who has given notice of intention to defend may apply for an order to dismiss the action or any claim made in it by way of derivative action.

(10) On the hearing of such an application for dismissal, the Court may --

(a) subject to paragraph (11), dismiss the action;

(b) if the plaintiff so requests, grant the plaintiff (on such terms as to costs or otherwise as the Court may think fit) an extension of time to apply for leave to continue the action; or

(c) make such other order as may in the circumstances be appropriate.

(11) Where only part of the relief claimed in that action is sought on behalf of the company, the Court may dismiss the claim for that part of the relief under paragraphs (8) and (10), without prejudice to the plaintiff's right to continue the action as to the remainder of the relief and O.18, r.2(1) shall apply as modified by paragraph (7).

(12) If there is a material change in circumstances after the Court has given leave to the plaintiff to continue the action in pursuance of an application under paragraph (2), any defendant who has given notice of intention to defend may make an application supported by affidavit requiring the plaintiff to show cause why the Court should not dismiss the action or any claim made in it by way of derivative action. On such application the Court shall have the same powers as it would have had upon an application under paragraph (2).

(13) The plaintiff may include in an application under paragraph (2) an application for an indemnity out of the assets of the company in respect of costs incurred or to be incurred in the action and the Court may grant such indemnity upon such terms as may in the circumstances be appropriate.

(14) So far as possible, any application under paragraph (13) and any application by the plaintiff under O.14 shall be made so as to be heard at the same time as the application under paragraph (2).

Cayman Islands Laws Grand Court Rules Volume I Orders, O.15, r.12A, CI LAWS GC RULES ORD O.15, r.12A

Current through laws received up to December 31, 2023. See individual laws for details.

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Tab 16

E-filed in the Office of the Clerk
for the Business Court of Texas
8/21/2025 4:13 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

THE HIGHLAND DALLAS § THE BUSINESS COURT OF
FOUNDATION, INC., § TEXAS
THE HIGHLAND KANSAS §
CITY FOUNDATION, INC., § FIRST DIVISION
and THE HIGHLAND §
SANTA BARBARA §
FOUNDATION, INC., §
§
    Plaintiffs, §
§
v. § Cause No. 25-BC-01B-0027
§
MARK PATRICK, DFW §
CHARITABLE §
FOUNDATION, CDMCFAD, §
LLC, CHARITABLE DAF GP, §
LLC, and CDH GP, LTD., §
§
    Defendants. §

## DEFENDANTS' REPLY IN SUPPORT OF THEIR SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE

Copy from re:SearchTX        MR 1615

# TABLE OF CONTENTS

Table of Contents ........................................................................... 2

Table of Authorities ...................................................................... 3

  A.  Neither Cayman nor Texas law gives the Dondero Organizations capacity to bring their claims. ......................................................... 5

  B  The Debtor must be joined under Rule 39 to afford complete relief, avoid inconsistent adjudications, and to prevent its interests from being impaired by its absence. ............................................................ 9

Certificate of Compliance ............................................................ 16

Certificate of Service ................................................................... 16

Copy from re:SearchTX             MR 1616

<u>TABLE OF AUTHORITIES</u>

**Cases**                                                              **Page(s)**

*Crawford v. XTO Energy, Inc.,*
    509 S.W.3d 906 (Tex. 2017) ................................................................ 12

*Feiner Family Tr. v. VBI Corp.,*
    No. 07 CIV. 1914 (RPP), 2007 WL 2615448 (S.D.N.Y. Sept. 11,
    2007) .................................................................................................... 7

*In re Indep. Fuel Sys. LLC,*
    655 B.R. 322 (Bankr. E.D. Tex. 2023) ................................................. 11

*KCM Fin. LLC v. Bradshaw,*
    457 S.W.3d 70 (Tex. 2015) .................................................................. 11

*Lee v. Anthony Lawrence Collection, L.L.C.,*
    47 F.4th 262 (5th Cir. 2022) ............................................................... 15

*Moody v. Moody,*
    613 S.W.3d 707 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) .................. 6

*Peskin v. Anderson,*
    [2001] ................................................................................................... 7

*Richie v. Rupe,*
    443 S.W.3d 856 (Tex. 2014) .......................................................... 9, 13

*Riverside Strategic Cap. Fund I v. CLG Invs.,*
    2025 Tex. Bus. 33 ¶¶ 45–47 (Aug. 19, 2025) ...................................... 5

*Sanson v. Allstate Tex. Lloyds,*
    2018 WL 3630136 (E.D. Tex. July 31, 2018) ...................................... 15

*SummerMoon Holdings LLC v. Tarbox,*
    708 S.W.3d 223 (Tex. Bus. Ct. 2025) ................................................. 12

*Wingate v. Hajdik,*
    795 S.W.2d 717 (Tex. 1990) ................................................................. 9

**Statutes**

TEX. BUS. ORGS. CODE § 11.403 ................................................................ 11

TEX. CIV. PRAC. & REM. CODE § 64.001(a) .............................................. 10

Copy from re:SearchTX          MR 1617

In response to the Court's concerns about capacity and Texas Rule of Civil Procedure 39, the Dondero Organizations argue they have capacity and joined all necessary parties to bring just one of their eight causes of action—breach of fiduciary duty. Despite previously asserting this claim under Texas or Delaware law,[1] the Dondero Organizations now argue that Cayman law applies.[2] The Dondero Organizations' latest attempt to morph their claims still doesn't get their suit past Defendants' threshold challenges. Whether Texas or Cayman law applies, the Dondero Organizations lack capacity to bring their claims. And by focusing exclusively on their claim for breach of fiduciary duty, the Dondero Organizations obscure the need to make the Debtor a party under Rule 39, which becomes apparent based on their other claims and relief sought.

---

[1] *See* Orig. Pet ¶¶6.1–6.8 (citing Texas and Delaware cases on fiduciary duty). The Dondero Organizations' First Amended Petition omits these case citations. Pls.' First Am. Pet. ¶¶ 6.18–6.27 (removing any reference to governing law for the breach of fiduciary duty claim).

[2] Because this Court "considers only allegations in plaintiffs' petition—not allegations made in its response," and the Dondero Organizations did not amend their live petition, "the court need not consider the allegations" that are only "submitted with [their] briefing." *See Riverside Strategic Cap. Fund I v. CLG Invs.*, 2025 Tex. Bus. 33 ¶¶ 45–47 (1st Div.) (Aug. 19, 2025).

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE** – Page 4

**A. Neither Cayman nor Texas law gives the Dondero Organizations capacity to bring their claims.**

By failing to address the claims in their brief on capacity, the Dondero Organizations effectively concede they don't have capacity to bring claims for common law fraud, fraud by nondisclosure, civil conspiracy, constructive fraud, unjust enrichment, conversion, a constructive trust, and application for a receivership. Texas courts address capacity on a claim-by-claim basis. *See Moody v. Moody*, 613 S.W.3d 707, 717–22 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (analyzing capacity on a claim-by-claim basis).

As to breach of fiduciary duty—the only claim the Dondero Organizations now argue they are authorized to bring—they also lack capacity. Their arguments to the contrary misapply case law from various courts.

Citing the *Feiner* case, the Dondero Organizations claim Cayman law provides them, as shareholders, a direct claim for breach of fiduciary duty against "controllers" of the Debtor where they "allege that Defendants used material misrepresentations and omissions to hide their

Copy from re:SearchTX                    MR 1619

dilute-and-sever maneuver."[3] The Dondero Organizations overlook that *Feiner* and the Cayman case it relies on expressly state that any fiduciary duty a director owes a shareholder must arise outside of the director's and shareholder's relationship to the company. *Feiner Family Tr.*, 2007 WL 2615448, at *7 ("[A] director does not owe any fiduciary duties to minority shareholders solely based on his or her relationship to the company."); *Peskin v. Anderson*, [2001] 1 B.C.L.C. 372 ¶ 29 ("The directors of a company are not trustees for individual shareholders and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking."). Instead, a separate duty owed from a director to a shareholder would need to arise out of events bringing "the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations." *Feiner*, 2007 WL 2615448, at *7 (citation modified). The example given by *Feiner* is where "the directors of a company mak[e] direct approaches to … the shareholders in relation to a specific transaction and hold[]

---

[3] Pls.' Resp. to Defs.' Supp. Brief at 13 (citing *Feiner Family Tr. v. VBI Corp.*, No. 07 CIV. 1914 (RPP), 2007 WL 2615448, at *7 (S.D.N.Y. Sept. 11, 2007)).

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE** – Page 6

Copy from re:SearchTX

themselves out as agents for them" and engage in misconduct in such a role. *Id.* (quoting *Peskin*, ¶ 34).

The Dondero Organizations do not allege and cannot allege such direct and close contact or any other circumstances that give rise to a fiduciary duty between Defendants and the Dondero Organizations. Instead, they allege that Patrick, as the "Control Person" of the Debtor, took assets they allege belonged to the Debtor without telling the Dondero Organizations.[4] The Dondero Organizations do not allege their "Participating Shares" gave them any right to be informed of or control any of the Debtor's financial dealings, nor do they allege Patrick engaged in any close or special dealings with them apart from the typical relationship between a director and a holder of non-voting shares.

Taking general quotes out of context, the Dondero Organizations similarly suggest Texas law grants shareholders capacity to bring direct, non-derivative claims against a director as long as the shareholders plead that they suffered damages.[5] But these cases do not stand for this proposition. Rather, they recognize shareholders can "recover[] damages

---

[4] *See* Pls.' First Am. Pet. at 13–14.
[5] Pls.' Resp. to Defs.' Supp. Brief at 13.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE** – Page 7

Copy from re:SearchTX

from wrongs done to him individually where the wrongdoer violates a duty arising from contract or otherwise, and ow[ed] directly by him to the stockholder." *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) (citation modified). "[T]o recover individually, a stockholder must prove a *personal* cause of action and a *personal* injury." *Id.* (emphasis added).

Here, in contrast, the Dondero Organizations' claims all stem from their allegation that Patrick, in the "Control Position" of the Debtor, stole assets from the Debtor, which diminished the value of their preferred shares.[6] This is precisely the type of "injury" that the Supreme Court of Texas does not give shareholders a right to bring direct claims to vindicate: "[I]ndividual stockholders have no separate and independent right of action for injuries suffered by the corporation which merely result in the depreciation of the value of their stock." *Richie v. Rupe*, 443 S.W.3d 856, 887 (Tex. 2014). Therefore, the Court should dismiss the Dondero Organizations' claims for lack of capacity.

---

[6] First Am. Pet. at 37, 45.

Copy from re:SearchTX                    MR 1622

**B.** **The Debtor must be joined under Rule 39 to afford complete relief, avoid inconsistent adjudications, and to prevent its interests from being impaired by its absence.**

The Dondero Organizations argue that the Court can grant complete relief without joining the Debtor because "all the assets of the Fund—as well as the management shares governing those assets, and the new participation shares—are all presently held by the named Defendants in this case."[7] This is incorrect, or at least, is inconsistent with the relief the Dondero Organizations request:

> All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.[8]

The Dondero Organizations seek equitable remedies—including a constructive trust and receivership—over entities that are not parties to this action, including the Debtor (Charitable DAF Holdco, Ltd.) and Charitable DAF Fund, LP, and over assets Defendants do not control. Texas law does not permit imposing a receivership over assets or entities absent from the litigation. *See* TEX. CIV. PRAC. & REM. CODE § 64.001(a)

---

[7] Pls.' Resp. to Defs.' Supp. Brief at 21.
[8] Pls.' First Am. Pet. ¶ 6.51.

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE** – Page 9

Copy from re:SearchTX

(authorizing appointment of a receiver over a corporation that is insolvent, is in imminent danger of insolvency, has been dissolved, or has forfeited its corporate rights"); TEX. BUS. ORGS. CODE § 11.403. Nor does Texas law allow the imposition of a constructive trust over any assets that are owed by a non-party.[9] *See In re Indep. Fuel Sys. LLC*, 655 B.R. 322, 328 (Bankr. E.D. Tex. 2023) (before a plaintiff "can obtain a constructive trust, it must establish that the [assets] are owned by Defendant," so non-parties with an interest in those assets must be joined as necessary parties); *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 88 (Tex. 2015) (finding error when a court grants a constructive trust for assets not definitively traceable as owed to the specific claimant, since that impairs the interests of nonparties). Pursuant to Rule 39(a)(1), the Court cannot grant the relief the Dondero Organizations request without joining the Debtor, as the full relief sought cannot be awarded if necessary parties are absent.

The Dondero Organizations contend that the Debtor has not "claimed an interest" in the subject of this action, which is the required predicate for joinder under Rule 39(a)(2). The record shows otherwise.

---

[9] Defs.' Supp. Brief at 22–23.

Copy from re:SearchTX                    MR 1624

The Debtor, through the JOLs, asserts claims in the Cayman liquidation and in the Chapter 15 Proceeding in Delaware, seeking relief that overlaps with the Dondero Organizations' demands here—including restitution, receivership, and a constructive trust over the same assets.[10] This is not a hypothetical or potential interest; it is an actual, asserted interest in the very subject matter of this action. *See Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 912–13 (Tex. 2017). The other authority cited by the Dondero Organizations is also distinguishable, since each court found that joinder of absent landowners is not required where they never took any action asserting their rights in the properties at issue.[11]

Even if each of the Dondero Organizations' claims are direct, the Debtor still has an actual, claimed interest in the "subject of this action," which the Dondero Organizations confuse with their *causes of action. See C Ten 31 LLC on behalf of SummerMoon Holdings LLC v. Tarbox*, 708 S.W.3d 223, 235 (Tex. Bus. Ct. 2025) (the Texas Supreme Court and the Business Court construe "the term 'action' to refer to a lawsuit or judicial

---

[10] Notice of Related Proceedings – Statement of Claim ¶¶ 162, 164 (App. 067); Verified Petition for Recognition of Foreign Proceeding ¶ 99 (App. 173).

[11] Pls.' Resp. to Defs.' Supp. Brief at 23-24 (first citing *EIS Dev. II, LLC v. Buena Vista Area Ass'n*, 715 S.W.3d 689, 702 (Tex. 2025), then citing *In re Kappmeyer*, 668 S.W.3d 651, 657 (Tex. 2023)).

Copy from re:SearchTX

proceeding generally" and "the term 'claim' to refer to an individual theory of liability or cause of action asserted within a lawsuit"). The Debtor has a *claimed interest* in the receivership request here, since the claims owned by the Debtor point to the same relief sought by the Dondero Organizations. *See, e.g.*, *Richie*, 443 S.W.3d at 873.

Proceeding without the Debtor risks inconsistent obligations for Defendants and impairs the Debtor's ability to protect its interests. The Dondero Organizations and the Debtor both seek control over the same assets, the appointment of receivers, and restitution of funds. For example, the Dondero Organizations ask this Court to impose a constructive trust in their favor only, and appoint a receiver over assets that the Debtor claims an ownership interest in. In the Cayman Liquidation (and US Chapter 15 proceedings), the Debtor seeks the same relief, except for the constructive trust to be held in favor of the Debtor, not the Dondero Organizations, and for any restitution or disgorgement to be paid to the estate, not directly to the Dondero Organizations.[12] If the Debtor in the Caymans and the Dondero Organizations here are both

[12] Notice of Related Proceedings – Statement of Claim ¶¶ 162, 164, and at 76–77 (App. 067, 069, 076); Verified Petition for Recognition of Foreign Proceeding ¶ 72, 80 (App. 163, 166).

Copy from re:SearchTX                          MR 1626

awarded all the relief sought, Defendants will face conflicting orders and inconsistent adjudications that they cannot simultaneously comply with.

The Dondero Organizations' suggestion that parallel proceedings are routine ignores the overlap and mutual exclusivity of the relief sought here. Defendants could be ordered to transfer the same assets, which allegedly include cash, promissory notes, stock, real estate, receivables, and member/shareholder interests[13], to two different parties (the Dondero Organizations here and the Debtor in the Caymans), for example, should both prevail on their unjust enrichment claims against Patrick for excessive compensation and be awarded restitution or disgorgement. Nor can Defendants comply with two receiverships over the same property, each purporting to exercise exclusive control, appointed by different courts, applying the law of (at least) two different forums. This is not a mere risk of parallel litigation in multiple forums; it is the precise "substantial risk of incurring double, multiple, or otherwise inconsistent obligations" that Rule 39(a)(2)(ii) is designed to

---

[13] Notice of Related Proceedings – Consent Order (App. 91); Verified Petition for Recognition of Foreign Proceeding ¶ 25 (App. 148); Order Approving Stipulation and Granting Provisional Relief at 1–3 (App. 217–19).

**DEFENDANTS' REPLY IN SUPPORT OF THEIR SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE** – Page 13

Copy from re:SearchTX

prevent. *See Sanson v. Allstate Tex. Lloyds*, 2018 WL 3630136, at \*2 (E.D. Tex. July 31, 2018).

Finally, if the Court proceeds without the Debtor, any judgment awarding the Dondero Organizations the assets or relief they seek would directly impair the Debtor's interests, as it claims entitlement to the same property and remedies as the Dondero Organizations. Even if the Dondero Organizations' claims are truly personal and direct, the requested relief is mutually exclusive with the relief sought by the Debtor, since the Dondero Organizations want the full $270 million in Charitable DAF assets to be paid to them directly, whereas the Debtor seeks return of any funds to the estate.

Under each of the three prongs of Rule 39(a), standing alone, the Debtor must be joined. At this juncture, the Dondero Organizations bear the burden "if at first glance it appears a 'possibly necessary party is absent,' the burden shifts to the nonmovant to dispute that 'initial appraisal' of the facts." *Lee v. Anthony Lawrence Collection, L.L.C.*, 47 F.4th 262, 266 (5th Cir. 2022) (raising facts meets initial burden).

If the Court has subject-matter jurisdiction over some or all the claims in this action, and the Dondero Organizations have capacity to

Copy from re:SearchTX                MR 1628

bring those claims, the Court should still abate this action to permit the

Dondero Organizations to join the Debtor. If they are unable to do so, the

Court should dismiss.

Respectfully submitted,

/s/ *Brian P. Shaw*
**Brian P. Shaw**
  Texas Bar No. 24053473
  Email: bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Brent M. Rubin**
  Texas Bar No. 24086834
  Email: brubin@ccsb.com
**Joshua D. Kipp**
  Texas Bar No. 24078793
  Email: jkipp@ccsb.com
**Andrea C. Reed**
  Texas Bar No. 24121791
  Email: areed@ccsb.com
**Emily H. Owen**
  Texas Bar No. 24116865
  Email: eowen@ccsb.com
**CARRINGTON, COLEMAN,**
 **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202
(214) 855-3000 – Telephone
(214) 580-2641 – Facsimile

**ATTORNEYS FOR
DEFENDANTS**

Copy from re:SearchTX MR 1629

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to BCLR 5 that, exclusive of the contents identified in BCLR 5(a) and inclusive of all footnotes and endnotes, this document contains 1,988 words as counted by the word count function of Microsoft Word. I further certify this document complies with the Court's judge-specific guidelines regarding word limits and formatting.

/s/ *Andrea C. Reed*
Andrea C. Reed


## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2025, a copy of the foregoing document was electronically served on all counsel of record in accordance with TEX. R. CIV. P. 21a.

/s/ *Andrea C. Reed*
Andrea C. Reed

Copy from re:SearchTX                    MR 1630

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Andrea Reed on behalf of Andrea Reed
Bar No. 24121791
AReed@ccsb.com
Envelope ID: 104696621
Filing Code Description: Answer/Response
Filing Description: 2025.08.21 Defendants' Reply - Supplemental Brief on Capacity and Joinder
Status as of 8/21/2025 4:24 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/21/2025 4:13:50 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/21/2025 4:13:50 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/21/2025 4:13:50 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/21/2025 4:13:50 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/21/2025 4:13:50 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/21/2025 4:13:50 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/21/2025 4:13:50 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/21/2025 4:13:50 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/21/2025 4:13:50 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/21/2025 4:13:50 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/21/2025 4:13:50 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/21/2025 4:13:50 PM | SENT |

Copy from re:SearchTX

MR 1631

Tab 17

E-filed in the Office of the Clerk
for the Business Court of Texas
8/21/2025 5:47 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § | IN THE TEXAS BUSINESS COURT |
| *Plaintiffs*, | § § | |
| v. | § § § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § | |
| *Defendants*. | § | DALLAS, TEXAS |

## <u>NOTICE OF PLEADINGS FILED IN THE CAYMAN LIQUIDATION MATTER</u>

Plaintiffs, The Highland Dallas Foundation, The Highland Kansas City Foundation, and The Highland Santa Barbara Foundation (the "Charities"), provide notice of the attached pleadings filed in the Cayman Liquidation matter:

1. **CAUSE NO.: FSD 116 of 2025 (JAJ) – Summons.**
2. **CAUSE NO.: FSD 116 of 2025 (JAJ) – Fourth Affidavit of Mark Eric Patrick.**

These filings by Patrick (through his control of DFW Charitable) seek the termination and replacement of the Cayman Joint Official Liquidators ("JOLs"). This action by Patrick in the Cayman Islands is troubling and warrants brief context and comment.

Patrick attempts to undermine the independent, court-appointed JOLs. At the same time, he wields these same JOLs as a shield against the Charities in this Texas litigation. His goal appears to be to stall the instant lawsuit pleading deference to the liquidators' ability to protect the interests of the Charities, while simultaneously working to terminate those same liquidators and install a replacement team, in part *because of* the JOLs' decision to seek recognition in Delaware.

To this Court, Patrick and the Defendants assert that the Joint Liquidators are responsible, independent, and best situated to reliably protect the interests of the Charities. In the July 2, 2025 hearing, Mark Goodman appeared on behalf of the Defendants and represented that there was no exigency, because the Joint Liquidators would pursue any necessary asset recovery to the benefit of the Charities. He emphasized that the liquidators have the imprimatur of the Cayman court and would be "duty-bound" to pursue any valid claims to the benefit of the Charities in a Delaware bankruptcy recognition proceeding:

> It's simply not correct to say that there is just no way of understanding what is happening here. The liquidators in Cayman are court-appointed and court-supervised, and they have control of the old structure. So, to the extent transferred away is incumbent upon those liquidators to take steps to recover the assets; and that process is ongoing in Cayman. And this suggestion that there is no control and no oversight of where the money might go is just inconsistent with the record in Cayman[.]

> ****

> The liquidators are collecting the information about the transaction by which the assets were moved; and the liquidators, if they believe there was some reason to question the proprietary of what would be done, would be duty bound to take action to recover that. They can seek recognition in the U.S. through Chapter 15 of the bankruptcy code.

**Hr'g. Tr. 27:21-28:5 & 28:22-29:2**, Business Court Dallas Division 1B, July 2, 2025. In their July 14, 2025 brief on standing, the Defendants sounded the same theme—the joint liquidators, "*independent," responsible, "empowered"*—were on the case, authorized to act if "they choose":

> The proceedings in the Cayman Islands culminated in the appointment of independent liquidators. These liquidators are already empowered to wind-up the Debtor and distribute its assets, if any. The liquidators, appointed by the Grand Court of the Cayman Islands, have exclusive standing and power to pursue any claims against the Charitable DAF on behalf of the Debtor arising out of the actions the [Charities] complain of here, if they choose to do so.

**Defs.' Mot. to Dismiss and Plea to Jurisdiction** at 36 (internal citations omitted). This was all before the JOLs publicly filed their July 15, 2025, Statement of Claim, and Defendants saw that

the liquidators they endorsed were pursuing ends that they did not like. Nonetheless, weeks later, in the hearing on that same standing motion, counsel for the Defendants again asserted that they were happy to grapple with the merits against the JOLs in Delaware or the Cayman Islands:

> We want to do it where it should be held, which is either in the Caymans, or through the Chapter 15, or if the JOLs want to come down here and assert claims, we're happy to dispute them here.

**Hr'g. Tr. 46:20-23,** Business Court Dallas Division 1B, August 4, 2025.

In their August 11, 2025, brief on capacity and joinder, the Defendants did not endorse the JOLs' independence and responsibility, but still suggested (as was in their interest before *this* Court) that the JOLs were the right party and had the power to pursue any claims that might benefit the Charities. The Defendants emphasized that the Delaware recognition proceedings were ongoing. Therefore, the Court should halt the Charities from litigating their own claims:

> Through the Cayman Liquidation, the JOLs already have the power to bring legal proceedings in the Debtor's name and take possession of the Debtor's property, including instituting and maintaining all proceedings required for this purpose. And the Cayman proceeding is currently in the process of being recognized under Chapter 15 If it gets recognized under Chapter 15, the JOLs will be able to "operate the [D]ebtor's business and exercise the rights and powers of a trustee under Bankruptcy Code sections 363 and 552.

**Defs.' Suppl. Br. and Alternative Mot. to Abate** at 15 (internal citations omitted).

At the same time, in the Cayman Islands, Patrick was concocting a plan to replace the JOLs, culminating in this week's lengthy application to remove them. Undoubtedly, Patrick will try to have his replacement liquidators cease the legal action in Delaware. We know this because Patrick expressly argues in the Cayman filing that the Delaware proceedings are so "unnecessary" and wrong-headed that they are a reason to replace the Joint Liquidators. Never mind the Defendants' July 2, 2025, representation to this Court that the JOLs are "duty-bound" to pursue in Delaware any improprieties they identify. Now the JOLs' execution of that "duty" is cause to replace them.

In Texas, Patrick counsels deference to the Delaware proceedings; but in his Cayman Summons and Affidavit, Patrick expressly decries the JOLs' Delaware action, and argues that its very existence is a reason to terminate the JOLs. In other words, pursuing recognition in Delaware is wrong and a new set of liquidators should cease the effort and resume the practice of helping Patrick to essentially make deals with himself:

> Chapter 15 Petition Proceedings were subsequently filed on 21 July 2025 in the United States Bankruptcy Court, the District of Delaware, which would have been unnecessary had the Current JOLs engaged meaningfully in discussions to settle a protocol with the CDM Entities.
>
> ****
>
> "[T]he speed with which [the JOLs] have commenced proceedings in the Cayman Islands and in Delaware, and attempted to interfere with the bankruptcy proceedings in Texas undermines the purpose of the DFW Summons and failing to agree to a protocol (which would have been the more cost efficient means of resolving the scope of the liquidation and any misconceived concerns around dissipation of potential assets) contradicts any assertion that the Current JOLs are acting disinterestedly or independently."

**Fourth Aff. of Mark Eric Patrick** at ¶¶ i-d-106 (p. 48) & ii-11 (p. 54).

Patrick's strategy is clear: Avoid the merits. Use the Joint Liquidators and the Delaware proceeding as a shield against the Charities' direct claims here in Texas, while at the same time attack the liquidators by undercutting the Delaware proceeding in the Cayman Islands. Patrick cites the same facts in support of both efforts. To this Court, he says the "independent" JOLs are "empowered" and "duty-bound" to continue their efforts in Delaware, which are proof that the Charities should not be permitted to pursue their own well-pled direct claims. To the Cayman court, Patrick says the same efforts are proof the JOLs are unfit, lack "independen[ce]", and must be stopped.

Defendants' assertion that this Court should defer to the JOLs and courts elsewhere appears to be a façade. If Patrick succeeds with his arguments across the board, his legal troubles will be

over. Who *does* have the right and status to pursue claims against Patrick and his entities for what he has done to a $270 Million charitable fund? According to Patrick: *No one*.

Finally, it must be noted that this voluntary, aggressive action by Patrick was—again—paid for with charitable funds. Given rates of Cayman counsel, there is no doubt this was an expensive undertaking. But it is all in the ordinary course of business according to Patrick, and therefore just fine. This is yet another reason that the decisions on such expenditures should be made by an independent party answering to this Court and the appointment of a receiver should be at the forefront of the Court's mind.

Dated: August 21, 2025

Respectfully submitted,

**DUANE MORRIS LLP**

/s/ Joseph M. Cox
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

- and -

**MCCARTY LAW PLLC**

Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street
Suite 400
Austin, Texas 78701
512-827-2902

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, August 21, 2025, on all counsel or parties of record.

/s/ Joseph M. Cox
Joseph M. Cox

# EXHIBIT A



ND COURT OF THE CAYMAN ISLANDS

SERVICES DIVISION

CAUSE NO.: **FSD 116 of 2025 (JAJ)**

IN THE MATTER OF SECTION 107 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF ORDER 5 OF THE COMPANIES WINDING UP RULES (2023 CONSOLIDATION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

---

### SUMMONS

---

Let all parties concerned attend before the Honourable Justice Asif KC in Chambers at the Law Courts, George Town, Grand Cayman on                    2025, upon an application by DFW Charitable Foundation (**DFW**) being a non-profit, charitable corporation registered in the State of Delaware, United States of America, under s.501(c)(3) of Title 26 of the United States Code (the Internal Revenue Code 1986) and a contributory of the Company, Charitable DAF Holdco, Ltd (in official liquidation) for the following orders and directions, namely that:

1. Margot MacInnis and Sandipan Bhowmik, the current Joint Official Liquidators of the Company (**Previous JOLs**) be removed as joint official liquidators and Jeffery Stower and Neema Griffin of Teneo (Cayman) Ltd, Ground Floor, Harbour Place, 103 South Church Street, P.O. Box 10245, George Town Grand Cayman, KY1-1003, Cayman Islands be appointed as the replacement joint official liquidators of the Company (**Replacement JOLs**).

This Summons was issued by Baker & Partners (Cayman) Limited, PO Box 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 for and on behalf of DFW Charitable Foundation.

2.  Save for paragraph 2 of the Order dated 6 May 2025 appointing the Previous JOLs (**Appointment Order**), the Appointment Order shall apply mutatis mutandis to the Replacement JOLs.

3.  The Previous JOLs shall, forthwith, deliver to the Replacement JOLs the Company's books and records and a copy of the Previous JOLs' liquidation files.

4.  The Previous JOLs shall, within 28 days of the Replacement Order, prepare and deliver to the Court a report and accounts.

5.  Such other orders and directions as this Court considers appropriate.

6.  Further or other relief.

7.  An order that the costs of and occasioned by this Summons be provided for.

Dated this 19th day of August 2025

*Baker & Partners (Cayman) Limited*

**Baker & Partners (Cayman) Limited**

**TO:**       The Registrar of the Financial Services Division

**AND TO:**   Maples & Calder (Cayman) LLP, Attorneys-at-Law for the Previous JOLs

              Kobre & Kim (Cayman), Attorneys-at-Law Paul Murphy

              Campbells, Attorneys for Mark Patrick (Management Shareholder of the Company) and CDM CFAD LLC; CDH GP, Ltd (as General Partner for and on

This Summons was issued by Baker & Partners (Cayman) Limited, PO Box 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 for and on behalf of DFW Charitable Foundation.

behalf of Charitable DAF Fund, LP and in its capacity as General Partner); CLO Holdco, Ltd.

Carey Olsen, Attorneys-at-Law for Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.

TIME ESTIMATE: The estimated length of the hearing of this Summons is 2 days

This Summons was issued by Baker & Partners (Cayman) Limited, PO Box 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 for and on behalf of DFW Charitable Foundation.

# EXHIBIT B



Fourth Affidavit
Mark Eric Patrick
On behalf of DFW Charitable Foundation
Sworn on 19 August 2025
Exhibit MP4

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO.: FSD 116 of 2025 (JAJ)

IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

---

### FOURTH AFFIDAVIT OF MARK ERIC PATRICK

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am duly authorized to provide this fourth affidavit in these proceedings on behalf of DFW Charitable Foundation (**DFW**).

2. I am the same Mark Patrick who swore and filed my first affidavit for and on behalf of DFW in these proceedings of on 4 June 2025 (**DFW Affidavit**) made in support of DFW's position at the sanction hearing heard by the Grand Court on 24 June 2025 (**Sanction Hearing**).

3. As set out in the DFW Affidavit, I am the registered director and sole shareholder of DFW which is the majority Participating Shareholder of Holdco.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

4.   The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true.  Where the statements made in this affidavit are not within my own knowledge, they are true to the best of my belief, and I have indicated the source of my information.  In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

5.   There is now produced and shown to me a paginated bundle of documents marked "**MP4**". References in this affidavit are to pages in MP4 are in the form [**MP4/Tab [xx]/page [xx]**].

6.   I address herein certain facts and matters that have taken place during the conduct of the liquidation and in light of the events described in Ms MacInnis' Fifth Affidavit filed on 15 July 2025 (**MacInnis 5**), Ms MacInnis' Sixth Affidavit sworn on 11 July 2025 (**McInnis 6**), the First Affidavit of Ms MacInnis filed in the FSD Proceedings (as defined below) and sworn on 15 July 2025 (**FSD Affidavit 1**) and Second Affidavit of Ms MacInnis filed in the FSD Proceedings, sworn on 24 July 2025 (**FSD Affidavit 2**).

7.   DFW reserves the right to provide further evidence to supplement the issues canvassed in this affidavit in support of the application for removal of the Current JOLs.

8.   This affidavit proceeds as follows:

  (a)   Introduction and Background

  (b)   Dondero Control and Influence over the Highland Foundations

  (c)   JOLs lack the requisite impartiality and independence:

    (i)   Misuse of *ex parte* jurisdiction of the Court

    (ii)   Advancement of the interests of the Highland Foundations / Mr Dondero

    (iii)   Funding Arrangements:

      1.   Misleading representations

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref:  DFWC.001.001)

MR 1645

2. Inappropriate in all the circumstances

(iv) Leveraging of the Cayman liquidation and profligate litigation

(d) Appointment of Replacement JOLs

(e) Conclusion

## A. INTRODUCTION AND BACKGROUND

9. This affidavit is made in support of a summons dated and filed on [] August 2025 (**Removal Summons**) which seeks the removal and replacement of the current joint official liquidators Ms Margot MacInnis and Mr Sandipan Bhowmik (**Current JOLs or JOLs**) of Grant Thornton Specialist Services (Cayman) Limited on the terms set out in the Removal Summons. As set out in paragraph 1 of the Removal Summons and paragraphs 193 to 198 below, on seeking the removal of the Current JOLs DFW nominates Mr Jeffrey Stower and Ms Neema Griffin as replacement JOLs (**Replacement JOLs**). Their qualifications are set forth in paragraphs 195 to 196 below.

10. In connection with these matters and for the reasons I set out herein, DFW is of the view that the JOLs have failed to conduct the liquidation of the Company with the requisite independence such that there is a complete breakdown of trust and confidence between the Court's officers and DFW.

11. For the reasons I depose to herein, it is my belief that the conduct of the Current JOLs is such that a fair-minded, objective stakeholder would reasonably conclude that the Current JOLs are lacking the impartiality and independence required for the office such that they should be removed. I provide further detail in respect of these matters in **Section C** below but in summary, the JOLs have:

a. Persistently and without proper cause invoked the Courts jurisdiction *ex parte*

b. Failed to provide full and frank disclosure on making applications on an *ex parte* basis

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

c.  Adopted and pursued the agenda of the Highland Foundations / Mr Dondero to the prejudice of DFW

d.  Failed to engage meaningfully with proposed terms of a Protocol

e.  Made misleading representations regarding the Funding of the JOLs and their advisors

f.  Failed to safeguard the Cayman liquidation process and prevent profligate litigation

g.  Failed to disclose relevant US claims pending against Mr Dondero and Mr Ellington

h.  Operated the liquidation of the Company to the advantage of the Highland Foundations / Mr Dondero

12.  The conduct of the JOLs since their appointment has demonstrated not a circumspect attitude as to the DAF Restructuring and all relevant parties but a biased, concluded view that the transactions comprising the DAF Restructuring were improper exercises by myself and My Murphy of the powers and authority vested in us as directors of the Company.  This is compounded by the fact that in the same breath that the Current JOLs purported to be investigating the DAF Transactions as referred to in their First Report to Contributories as of 2 July 2025 (**First Report**), they had prepared and would imminently seek leave to commence the FSD Proceedings (as defined and addressed in the following paragraph 13). In all the circumstances, it is my honest belief that a fair-minded objective stakeholder would reasonably consider the Current JOLs to lack the requisite impartiality and independence to effectively fulfil the duties conferred on them by their office.

13.  I have given three affidavits in these liquidation proceedings and note that, since my third affidavit was filed the following procedural developments that are relevant to the conduct of the Company's liquidation have occurred:

(a)  **24 June 2025:**

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

(i) Without setting out the legal basis on which they had any interest in the proceedings, the JOLs sought to intervene in a settlement agreement in the Dallas Bankruptcy Court which is accretive to the asset base in the DAF Structure by asking the Dallas Bankruptcy Judge to adjourn the settlement hearing for 45 days and that the judge "*may consider whether a brief adjournment of the Settlement Motion Hearing would be appropriate to afford the JOLs additional time to progress their investigation of the HMIT Entities.*" I exhibit at **MP4/Tab 1/Pages 1 to 3** a copy of that correspondence issued by the JOLs and referred to as the **HMIT Adjournment Letter**.

(ii) This application was made in circumstances where Mr Dondero, on behalf of his family trust – The Dugaboy Trust - had made an identical application on 9 June 2025 which was refused (discuss this further at paragraph 52(b) herein).

(iii) The JOLs request was heavily relied on by The Dugaboy Trust in opposing the settlement application but was rightly ignored by the Dallas Bankruptcy Court and the settlement agreement was approved.

(b) **2 July 2025:**

(i) The Current JOLs issued the First Report

(ii) the Highland Foundations issued a Petition in the Dallas Business Court seeking temporary restraining orders (TRO) and temporary injunction (TRI) and the emergency appointment of a receiver (**TRO Proceedings**).

(iii) The Dallas Business Court heard the TRO Proceedings and declined to make the orders sought by the Highland Foundations and those proceedings remain pending.

(c) **4 July 2025:** the Current JOLs prepared an *ex parte* application seeking leave of the Court to commence proceedings on the (**FSD Sanction**) in the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

form set out in the Writ of Summons subsequently filed on 15 July 2025 (**Writ**) and supported by the fifth affidavit of Ms MacInnis (**MacInnis 5**).

(d) **9 July 2025:** the JOLs convened and conducted the First Meeting of Contributories and constituted a Liquidation Committee.

(e) **11 July 2025:** the Current JOLs issued an *ex parte* Summons seeking sanction for the JOLs to enter into a funding agreement with a Cayman incorporated LLC by the name of Crossvine Litigation Funding LLC (**Crossvine**) (**Funding Application**), which is supported by the sixth affidavit of Ms MacInnes (**MacInnis 6**).

(f) **15 July 2025:** the Current JOLs:

    (i) Filed the Writ, supported by two Affidavits of Ms MacInnis and exhibits (respectively, **FSD Affidavit 1** and **FSD Affidavit 2**; **FSD Exhibit 1** and **FSD Exhibit 2**) (exhibited at **MP4/Tab 2, Tab 3, Tab 4** and **Tab 5 at pages 4 to 1617**) and referred to herein as the **FSD Proceedings**);

    (ii) Made an application for an injunction in support of the FSD Proceedings pursuant to a Summons (**Cayman Injunction**).

(g) **21 July 2025:**

    (i) The Current JOLs filed a Petition seeking Chapter 15 Recognition of their appointment as liquidators of the Company.

    (ii) The CDM Entities, as defendants to the FSD Proceedings, issued a Summons for Directions in respect of the Cayman Injunction.

(h) **31 July 2025**: The Parties to the FSD Proceedings presented a Consent Order to the Hon. Justice Parker providing a procedural timetable for the hearing of the Cayman Injunction along with the summons issued by DFW

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1649

on 9 June 2025, and the Summons issued by the CDM Entities dated 12 July 2025[1].

14. I repeat **sections B, C** and **D** of the **DFW Affidavit** and refer this Honourable Court to **paragraphs 18 to 22, 29, 87 to 96** of the **DFW Affidavit** for background concerning the DAF Restructuring. My evidence canvassing the nature of the dispute relating to the DAF Restructuring can be found at **paragraphs 38, 46, 56, 61 to 62** of **DFW Affidavit**.

15. Furthermore, the validity of the Assignment Agreement (as defined and described further at paragraphs 71 to 73 of Mr Paul Murphy's First Affidavit sworn and filed on 4 June 2025 (**Murphy 1**)) is also in dispute.

16. I also exhibit at **MP4/Tab 6/pages 1618 to 1620** an opinion obtained by CDMCFAD, LLC (**CDM**) from a tax, assurance an advisory firm called Weaver dated 30 May 2025(**Weaver Opinion**). The Weaver Opinion considers the fairness of the redemption proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the Company's redemption of its Limited Partnership interest.

17. The Weaver Opinion concurs with both the ValueScope and FTI conclusions mentioned in **FSD Affidavit 1**. The Weaver Opinion goes further and indicates that the redemption payments made to the Participation Shareholders in the amount of US $1.6 million to the Participating Shareholders (other than DFW), was fair consideration for the Company's redemption of its limited partnership interest in DAF LP (see **MP4/Tab 6/page 1620**).

18. A copy of the Weaver Opinion was provided to the Current JOLs on 1 July 2025 when it was uploaded to a data room hosted by US attorneys, Shields, and which the Current JOLs have access to. The Current JOLs have had the benefit of the Weaver Opinion for some 4 weeks but fail to make any mention of this in their First Report, creating substantial doubt over the assertions made by the Current JOLs in the FSD Proceedings. Further I note that in the evidence for leave to bring the Injunction

---

[1] At the time of swearing this affidavit, the Cayman Injunction has not been listed but the Court has been asked to list the matter for 11-12 November 2025.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

Application, no mention is made of the Weaver Opinion notwithstanding its relevance to the veracity of the claims that are asserted in the Writ which the Injunction Application has been brought to protect.

19. In essence, the dispute at the core of the liquidation of the Company centres on the validity of the DAF Restructuring, which has been mischaracterised as invalid or void and it is wrongfully allegedly by the Current JOLs to be part of a scheme to defraud the Highland Foundations of their alleged interests in the DAF Structure (see **paragraph 14, Diaz 2**).

20. The JOLs have, in certain material instances, simply parroted the complaints expressed by the Highland Foundations in the just and equitable Petition filed on 10 April 2025 - under the influence of Mr Dondero - without properly engaging with the evidence. For example, at **paragraphs 20 and 23, MacInnis 5**, it is asserted that the DAF Restructuring deprived the Highland Foundations, as the Indirect Charitable Owners of *"their interests in the Charitable DAF Fund LP (Fund)"* and that the Highland Foundations were the *"ultimate beneficial owners of the Fund and its substantial investment assets"*. These allegations are lifted from the Highland Foundations allegations set out in the just and equitable petition dated 10 April 2025 which was supported by Dondero 1 and Diaz 1. However, the assertions made in MacInnis 5 do not take into account the evidence outlined in Murphy 1 and the DFW Affidavit which the JOLs have had the benefit of since 4 June and which outline in clear terms (i) that the assets of DAF LP were neither the assets of either the Company nor the Highland Foundations; and (ii) that Dondero was also fully aware that assets and investments held through DAF LP were not the assets or property of the Highland Foundations.

21. Furthermore, at **paragraph 49.1, MacInnis 5**, Ms MacInnis refers to the directors' remuneration of US $600,000 per annum. This again mirrors Ms Diaz's summary of the position (see **paragraph 32(a)** of Diaz 1 which, in turn, is copied directly from Mr Dondero's expense report). Mr Dondero has wrongfully sought to contrast my remuneration described at **paragraph 49.2, MacInnis 5**, with Mr Scott's remuneration (see paragraph 15 of Dondero's 1) in a misplaced attempt to establish that I pose a risk to the Company's assets. The Current JOLs have since adopted that position too, for example, at paragraph 169 of the Writ and Statement of Claim where it is expressly

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

averred that *"[b]y contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000"*. Neither Mr Dondero nor the JOLs have offered any objective evidence to support the inference that Mr Scott was reasonably remunerated during his tenure. In fact, and contrary to the statements of Ms MacInnis, email correspondence between Mr Dondero and Highland Capital Management's General Counsel J.P Sevilla on 31 July 2014 illustrates the arbitrary manner in which Mr Scott's renumeration was determined by Mr Dondero (see **MP4/Tab 7/Pages 1621 to 1622**). This correspondence also suggests that Mr Scott may have been paid from DAF LP's assets for services rendered to unrelated companies such as the Get Good Trust and other trusts. It also fails to take into account the engagement and payment of supposedly third-party service providers, like Highland Consulting Group, Inc. d/b/a Skyview Group (**Skyview**). Skyview – an entity controlled and managed by Scott Ellington, charged baseline fee of US $250,000 but incurred actual costs for administrative services which averaged US $1.5m a year. The engagement was terminated on 2 October 2024. I exhibit at **MP4/Tab 8 and Tab 9/pages 1623 to 1640** Skyview's Service Agreement and Termination Agreement. These are only two of several examples where DAF LP and its subsidiaries have been treated as a bank account by Dondero to pay the bonuses and salaries of individuals not employed by the Company or by the Fund or where entities affiliated or controlled by Mr Dondero and/or Mr Ellington were only too happy to charge large administrative fees as long as it ultimately inured to their personal benefit.

22. Similarly, there is no objective evidence to show that my compensation is unreasonable despite the allegations to the contrary. The only independent evidence on this point is outlined below in the following paragraph, which for reasons known only to the Current JOLs, they have chosen to disregard arbitrarily finding that my defences and justifications on this point not to be *"availing or credible."*[2].

23. I have responded to the allegations in respect of my remuneration in detail (see, for example, **paragraph 173, DFW Affidavit**) and outlined how I followed best practice by commissioning an independent, third-party assessment of the appropriate compensation for my role, which Mr Murphy then reviewed. A report prepared by

---

[2] See Footnote 8 of the Chapter 15 Verified Affidavit.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Heidi Jensen O'Brien of Mercer, a firm which specializes in preparing reports for charitable organisations and are regularly commissioned by advisers and the Internal Revenue Service (**IRS**), is exhibited to **MM-5, pages 555 to 574** and **FSD Exhibit 1, MP4/ Tab 4/pages 1068 to 1087** (**Mercer Report**).  At **paragraph 66, MacInnis 5**, Ms MacInnis does not engage with the substance of the report or its methodology, instead she finds cause to query the timing of the report primarily and the fact that *"the effect of the transactions pursued in reliance on the...Report resulted in a significant cash outflow from the Company."*  This is a conclusory, pejorative statement that fails to stand up to scrutiny nor is it based on expert independent US evidence.

24.  The Writ misrepresents my compensation position when compared with the role that was assumed by Mr Scott.  As is deposed to in the DFW Affidavit, Mr Scott's role and activities in respect of the Company were limited and his remuneration reflected this limitation.  When I assumed the role of Control Person, which included but was not limited to being the registered director of the Company, I took on the responsibility of managing the DAF asset investments; administering the structure and managing significant litigation which had been instigated or induced by the conduct of Mr Dondero (I outline the extensive litigation in the **DFW Affidavit** (**paragraphs 123-141**, and at **paragraphs 35.6, 35.8-3.17**).

25.  In contrast, and as set out in the Mercer Report, which is exhibited at **MM-5, pages 555 to 574**, during Mr Scott's tenure these functions were performed by Highland Capital Management (a Mr Dondero related entity) and then Skyview (which was also under the *de facto* control of Mr Dondero). The Company paid some US $28.5 million over the course of 2014 to 2020. I exhibit at **MP4/Tab 10/page 1641** a summary of fees paid from the DAF Structure to Highland Capital Management / Skyview.  As addressed in the Mercer Report, my rate of compensation reflects not only my role as Director to the Company but also the wider investment management functions I undertook which Mr Scott never assumed (but rather outsourced to Highland Capital Management to the ultimate benefit of Mr Dondero).  Specifically, the Mercer Report acknowledged *"the complexity of my role"* at page 3 of their report, in that I held the following roles with the Company:

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

(a) Chief Executive Officer (which involved managing the Company's operational issues, managing the DAF corporate structure and determining charitable disbursements);

(b) Chief Investment Officer (which involved complex fund management and investment strategy);

(c) Legal (which involved handling complex and contentious litigation and asset recovery); and

(d) Compliance (which involved navigating regulations internationally and across multiple states domestically).

26. Conversely, Mr Scott did not devote his full time and attention to the role of Management Shareholder or General Partner. Mr Scott was and still is to the best of my knowledge, a practicing patent attorney. This was not a full-time job for him and during the same period, Mr Scott also functioned as trustee for some of Mr Dondero's personal trusts, notably the Get Good Trust as reflected in **MP4/Tab 7/page 1621**.

27. Mr Scott was also not involved in active investment management. My understanding is that Mr Scott's duties consisted primarily of approving wires sent for his sign off by Mr Dondero's assistants. I refer to the potential liabilities for the Company and the DAF Structure which I believed were created by Mr Scott's inability to maintain independence from Mr Dondero by virtue of simply authorizing transactions and investments proposed by Mr Dondero at **paragraphs 110 to 143, DFW Affidavit**.

28. On a proper and impartial consideration of the Mercer Report and upon a more meaningful and fuller investigation, the differences in roles this would be apparent to the Current JOLs. It is my belief that they have elected:

(a) to present a misleading account of the very different roles fulfilled by myself and Mr Scott and suggest incorrectly that these roles were in fact the same. I infer that the purpose of this approach is to sustain the allegation that during my management and supervision significant value has been

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

taken out of the DAF Structure, which is in fact contrary to the evidence before the Court (**DFW Affidavit at paragraph 181**); and

(b)     not to have regard to the evidence, diligence, and professional judgment by Mercer in issuing its report. Instead, they cite the US $60,000 paid to Mr Scott (and arbitrarily determined by Mr Dondero) as if it carries more evidential weight than the Mercer Report which was produced independently and featured heavily in the Company's authorisation process.

29.     Separately, Mr Dondero's written evidence in **Dondero 1** regarding the manner in which Mr Scott came to leave his role as control person directly contradicts his sworn oral evidence given during his deposition in separate proceedings (see **paragraph 109 of the DFW Affidavit** sworn on 4 June 2025).   And yet, the Current JOLs have not seen cause to stop and consider what weight (if any) should be given to the information provided by the Highland Foundations / Mr Dondero.  I pause here to note that not only has Mr Dondero provided inconsistent evidence and testimony, as explained further at **paragraph 35.15-35.20, Murphy 1**, he has been described as a vexatious litigant, held in contempt of court, and e restrained by a gatekeeper injunction to prevent vexatious litigation, a matter which he appealed all the way to the U.S. Supreme Court.

30.     In truth, and as deposed to in the DFW Affidavit and Murphy 1, the steps taken to implement the DAF Restructuring were necessary to (i) protect assets diverted from the charitable structure to the satisfaction of Mr Dondero's personal creditors; and (ii) ensure the assets of the structure could be applied in accordance with the terms of the ARLPA insofar as discretionary distributions were made to entities that were *"Indirect Charitable Owners"* providing those persons fulfilled the qualifying criteria of being eligible to receive distributions from the DAF Structure.

31.     As stated in the Company's Memorandum and Articles of Association, dated 20 February 2025 (Article 21) *"If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles."* (see **Exhibit MP1/page 99**). It is my honest belief that had Mr Murphy and I sought to procure the voluntary transfer of the shares held by the Highland Foundations notwithstanding

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

there was a basis and need for us to do so, that request would have been refused. This would further have exposed Mr Murphy and me to retaliatory action from the conduits of Mr Dondero's wishes, and placed us in the position of needing to take action outside of the control and influence of the Highland Foundations in order to fulfil our fiduciary obligations to the Company.

32. A "*Restricted Person*" within the Articles means "*.... any Person holding Participating Shares....which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.*" Specifically, the "*Restricted Person*" clause (b) also requires each Participating Shareholder to be an entity or organization exempt from taxation under Section 501(c)(3) of the Code. With leave of the Court I make reference to **FSD Affidavit Mancino 1** (exhibited at **MP4Tab 11/Pages 1642 to 1687**) at paragraphs 42 to 46 and 154 to 155 below which illustrates the real and immediate concerns which required implementation of the DAF Restructuring and further highlights how the Current JOLs are unable to consider the DAF Restructuring from an independent and unbiased perspective.

33. As is deposed to in the DFW Affidavit and Murphy 1, the information and advice with which I and Mr Murphy were presented at the relevant time indicated that the Highland Foundations came within the meaning of "*Restricted Persons*" which disqualified them from being entitled to receive distributions from the DAF Structure, due to their associations with Mr Dondero which in turn placed the Company at risk of penalties and liabilities. These were not concerns limited to the Supporting Organisations but of material concern to the Company of which Mr Murphy and I were directors, for example:

   (a) The actions previously taken by Mr Dondero and the Highland Foundations could expose the Company, and its now former directors, to potential breaches of US tax laws and regulations especially where Mr Dondero was seeking to exert "*dominion and control*" over the DAF Assets (**paragraph 46.1, Murphy 1**);

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1656

(b)    I believe that Mr Dondero evaluated the prospects of the DAF Structure financing his current and future projects in a way which was contrary to Mr Dondero relinquishing dominion and control in respect of that structure (**paragraph 81, DFW Affidavit**);

(c)    The Company had received advice from Carrington Coleman that "*there was a significantly heightened risk that the IRS could severely penalize and /or revoke the tax-exempt status of one or more*" of the Supporting Organizations which would in turn imperil the assets of the DAF (**paragraph 82, DFW Affidavit**);

(d)    Mr Dondero has an inappropriate donor relationship with the representatives of the Dallas Foundation, which is the Supported Organization of the Highland Dallas Foundation (which is a tax-exempt community foundation under US-tax law, and whose president is Julie Diaz), which potentially jeopardizes the tax-exempt status of the Highland Dallas Foundation (**paragraph 145, DFW Affidavit**).

## B.   DONDERO CONTROL AND INFLUENCE OF THE HIGHLAND FOUNDATIONS

**Governance and structure**

34.   I set out in **paragraphs 17, 22, 29, 32,** of the **DFW Affidavit** the relationship between Mr Dondero and the Highland Foundations. In response to the **FSD Affidavit 1** sworn by Ms MacInnis, I set out herein how the Highland Foundations should be regarded more factually as an instrument of Mr Dondero in the context of this liquidation and the FSD Proceedings, and I identify the inaccuracies in the JOLs' evidence.

35.   As I explain at **paragraph 17 of the DFW Affidavit**, Mr Dondero controls the Highland Foundations. Ms MacInnis attempts to sanitize this relationship in **paragraphs 13-22, FSD Affidavit 1** (see **MP4/Tab 2/page 8 to 13**) to state that Mr Dondero has only 1 of 3 of the board of directors' voting rights for each of the Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc. However, in doing so Ms MacInnis ignores

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

that Mr Dondero is also the President of each of the Highland Foundations, as also deposed to at **paragraph 17, DFW Affidavit**.

36. Under the By-laws governing the Highland Foundations which are exhibited to the FSD Affidavit 1 and referred at **FSD Affidavit 1, Paragraph 18.1 and 18.6** (see **MP4/Tab 2/page 9 and 11**), the President is also the Chief Executive Officer of each of the Highland Foundations and has all powers that are delegated by the Board of Directors. Publicly available information confirms this. My understanding, based on advice of Delaware counsel, is that under the governing law of the Highland Foundations an officer including the President may generally cause a corporation (including the Highland Foundations) to take a wide variety of actions, including bringing lawsuits. It is striking that in the FSD Proceedings, the Current JOLs (see **paragraphs 13-22, FSD Affidavit 1 at MP4/Tab 2/page 8 to 13**) contest at length that Mr Dondero has control over the Highland Foundations due to being only one of three Directors on each of their respective Boards but fail to address the matters which I raise immediately above.

37. It is also my belief that Mr Dondero has leveraged his influence as a donor to the Highland Foundations and President of those foundations to procure both proceedings before the Grand Court and the Dallas Business Courts with a view to taking control over the assets held in the DAF Structure to (i) bring an end to litigation which Mr Murphy and I have properly instituted against Mr Dondero and entities related to him; and (ii) access assets of value to meet potentially significant liabilities accruing to Mr Dondero, not least in the Turnover Petition proceedings instigated by UBS. I refer the Court to **paragraphs 123-127, DFW Affidavit** for a summary of those proceedings.

38. Structurally, the Highland Foundations are the conduits through which specific charitable foundations were supported. For example, the Highland Dallas Foundation provides donations to the Dallas Foundation. To the best of my knowledge, Mr Dondero does not have direct *de jure* control over the Dallas Foundation but in my experience, he is able to exert significant influence over the charitable foundations who previously received distributions from the DAF, through his control of the Highland Foundations. On several occasions, I witnessed Mr Dondero promising additional financial donations to the Highland Foundations in order to extract favors from them, including tax write-offs that benefited him personally like the NHT put option of US

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1658

$9,285,000 described below at paragraph 41. It is immaterial whether Mr Dondero in fact controls the underlying charities, as my concerns as the Company's director stemmed from the extent to which Mr Dondero wielded control and tried to influence to cycle the value of his settling donation from Trust #2 out of the DAF structure and back to businesses and transactions which were either related to or of benefit to him.

39. While FSD Affidavit 1 may give the appearance, at first blush, that the Highland Foundations are independent, in reality and far from keeping it a secret, Mr Dondero's control of the Highland Foundations is public knowledge and seemingly accepted by the Current JOLs. For example, in Highland Dallas Foundation's 2019 and 2020 tax filings, it listed *"300 Crescent Court, Suite 700, Dallas, Texas"*, which was the same address as Highland Capital Management while under Mr Dondero's control and is the newest address for NexPoint, Mr Dondero's current investment group.

40. The JOLs also confirm at **paragraph 11.2 and in footnote 4, FSD Affidavit 1** (see **MP4/Tab 2/Pages 7 and 15**), that NexPoint is an investment management firm of which Mr Dondero is the President, and that Mr Dondero caused the Highland Dallas Foundation to assume the name *"NexPoint Philanthropies Dallas Inc."* in June 2024, rather than do business under the 'Highland' name. This was previously deposed to at **paragraph 66, DFW Affidavit**.

41. The Current JOLs also ignore my evidence at **paragraphs 194 to 199**, of the **DFW Affidavit**, where I set out how Highland Dallas Foundation, Inc. has failed to request US $9,285,000 owed to them by Mr Dondero's personal trust, at a time when, according to Ms MacInnis at **paragraphs 53 to 59**, of the **FSD Affidavit 1** (see **MP4/Tab 2/Pages 31 to 34**), there are holes in the charities balance sheets and they are unable to pay their overheads.

**No economic interest justification**

42. In response to Ms MacInnis' sworn evidence in the FSD Affidavit 1, and so far as her evidence relates to matters of U.S. non-profit corporation and tax law, and the U.S. Internal Revenue Code (the **Code**), Mr Mancino of Seyfarth Shaw LLP (**Seyfarth**), who is considered to be one of the United States' most pre-eminent tax attorneys, swore

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

FSD2025-0116      16      2025-08-19

MR 1659

an affidavit in the FSD proceedings on 30 July 2025 exhibited at **MP4/Tab 11/Pages 1642 to 1687 (FSD Affidavit Mancino 1)**.

43. A copy of Mr Mancino's Curriculum Vitae is exhibited at **DM-1, pages 1 to 12**, filed in these liquidation proceedings.

44. In Mancino 1, he seeks to correct material factual errors and overstatements, and legal errors or distortions of U.S. tax and nonprofit corporation law made throughout FSD Affidavit 1.

45. Such corrections include:

   (a) Each Supporting Organisation was incorporated as a "nonprofit nonstock" corporation under the Delaware General Corporation Law (**DGCL**) in order to meet the organisational requirements for eligibility to be a charitable organisation for U.S. Federal income tax purposes under section 501(a) of the Code (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1645**).

   (b) Nonstock corporations are not authorized to issue capital stock. And, under section 114(d)(3) of the DGCL, a nonprofit nonstock corporation does not have membership interests, which means that the Supporting Organisations, being the Dallas Foundation, the Greater Kansas City Community Foundation and the Santa Barbara Foundation do not have any right to share in the profits and losses of their respective Supporting Organisation, and no Supported Organisation has a right to receive distributions of the Supporting Organisation's assets (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1645**).

46. Holland & Knight LLP expressly acknowledged on a call with Mr Mancino in November 2024 that the then Participating Shareholders of the Company such as the Highland Foundations had no rights (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Pages 1647**). I also note at **paragraphs 64 to 66, Murphy 1** that similar comments were made by representatives of Holland & Knight to Mr Murphy at a presentation he delivered by video conference to Michael Stockham (a litigation partner) and David Rosenberg (non-profit tax partner) on 11 December 2024, who attended on behalf of

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

the Highland Foundations. Mr Stockham commented that he had read the constitutional documents of the Company and anticipated that Walkers (the Company's former Cayman counsel) would tell him that the Highland Foundations essentially had no rights in the Company.

(a) Each Participating Shareholder, upon agreeing to accept the gift of Participating Shares, relinquished any right it might have to any or any specific amount of dividends, any access to information absent a decision of the Directors to exercise discretion to provide information, any right to inspect any of the Company's books and records, any right to compel an audit, and other items enumerated above and otherwise contained in the Amended and Restated Memorandum and Articles of Association (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1644**).

(b) DFW Charitable Foundation is a U.S. tax-exempt organisation classified as a private non-operating (i.e., grant-making) foundation. It played a stewardship role as a controller of the assets formerly held by the Company and disseminating them for proper charitable purposes (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1652**).

(c) My status as sole member is a common practice with U.S. private foundations. This was disclosed to the IRS multiple times in the application for recognition of its section 501(c)(3) exemption filed with the IRS (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Page 1652**).

(d) Mr Mancino also lists out the various restrictions placed on private foundations which represent serious guardrails which debunk the Current JOLs' assertions that DFW is little more than a "creature company" of mine (**FSD Affidavit Mancino 1**; see **MP4/Tab 11/Pages 1652 to 1653**).

47. It is unclear at present what U.S. tax and non-profit corporation advice the Current JOLs have obtained and from whom when the FSD Proceedings were conceived, as there is no mention in the FSD Affidavit 1 affidavit of any specialist tax advice being

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

obtained. However, a thorough investigation should have made these points apparent to the Current JOLs.

48. The original allegations of "bad acts" attested to by Mr Dondero have been thoroughly refuted in evidence submitted in the DFW Affidavit. Mr Dondero testified under oath that *"we took all the bad acts and all the investigations and we gave them to the [Highland Foundations]."*[3] The DFW Affidavit addresses and refutes these allegations.

49. Mr Dondero testifies that he (together with, I understand, his employees at NexPoint and his affiliates at Skyview Group) built a case and facilitated investigations and provided this case to the Highland Foundations. From the outset, before any of the correspondence between myself and DAF, on the one hand, and the Highland Foundations, on the other, Mr Dondero admits and seems to take pride in convincing the Highland Foundations to institute, winding up proceedings without first discussing with me. I described this at **paragraph 185,** of the **DFW Affidavit** and extensively in my **First Affidavit as Sole Holder of the Management Share** sworn on 4 June 2025.

**Hunter Mountain Claim**

50. The control and influence of Mr Dondero over the Highland Foundations is not simply a matter of conjecture and supposition but a matter of factual evidence arising from depositions and sworn testimony of Ms Diaz and Mr Dondero conducted on 22 and 25 June 2025, respectively. These depositions were held in connection with a settlement agreement entered into between HMIT and the Highland Capital Trustee in Bankruptcy in May 2025 (**Hunter Mountain Settlement**). In proceedings titled *In Re Highland Capital Management, L.P,* (case number Case No. 19-34054-sgj11) (**Hunter Mountain Claim**). HMIT's sole beneficiary is an entity called Beacon Mountain, LLC, which is a subsidiary within the DAF Structure. A copy of the Hunter Mountain Settlement is exhibited at **MP4/Tab 12/Pages 1688 to 1699**.

51. Under the terms of the Hunter Mountain Settlement, the DAF Structure will receive:

    (a)    a cash payment in the amount of US $500,000.00

---

[3] See Highland Capital bankruptcy hearing transcript at pg. 198 lines 10-12 and 22-23.

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

FSD2025-0116　　　　　　　　19　　　　　　　　2025-08-19

MR 1662

(b)    the rights to a promissory note payable by Dugaboy (being the personal family trust of Mr Dondero (**DFW Affidavit, paragraph 119(b)**) in an original principal amount of US $24,268,621.69;

(c)    future cash payments as provided therein; and

(d)    the assignment of approximately US $300 million in legal claims to pursue matters covered in the Amended Kirschner Complaint, including actions against Mr Dondero, Mr Ellington and entities owned or controlled or affiliated with Mr Dondero and Mr Ellington.

52.    Mr Dondero has repeatedly sought, both directly and indirectly, to prevent and delay the consummation of the Hunter Mountain Settlement:

(a)    As deposed to at **paragraphs 75-80, Murphy 1**, in November 2024 HCLOM (being an affiliate / controlled party of Mr Dondero) sought to intervene in the Highland Capital Bankruptcy so as to dilute the recoveries of HMIT from Highland Capital, by asserting a claim under a disputed promissory note in the amount of US $12.6 million. It is my belief that the dilution of these recoveries was attempted in bad faith in order that Mr Dondero could place HMIT under financial pressure so as to limit its ability to contest arbitral proceedings commenced by Dugaboy in respect of a promissory note in the amount of US $62.6 million.

(b)    On 9 June 2025, Dugaboy sought from the Dallas Bankruptcy Court an adjournment to the Hunter Mountain Settlement Hearing for a period of 90 days. Justice Jernigan rightly denied this request for the reason that Dugaboy / Mr Dondero had 'de minimis' status in the Highland Capital Bankruptcy to be heard in respect of the Hunter Mountain Settlement.

(c)    On 9 June 2025, the Dallas Foundation also filed an objection to the Hunter Mountain Settlement (**DF Objection**) (see **MP4/Tab 13/Pages 1700 to 1714**). During the course of her deposition on 22 June 2025, Ms Diaz, as President and Chief Executive Officer, was questioned in respect of the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1663

reasons for the objection it became apparent that there was no basis for the DF Objection to be sustained:

(d)    Ms Diaz knew of no lawful basis on which the objection to the Hunter Mountain Settlement could be asserted by Highland Dallas Foundation.

(e)    Ms Diaz, who admitted to approving the filing of the DF Objection also admitted to not having read the Hunter Mountain Settlement to which the DF Objection related.

(f)    In the DF Objection, Ms Diaz referred to the ability of the JOLs (*"Cayman Court-appointed fiduciary"*) to scrutinise the transactions which comprise the DAF Restructuring and claw-back or bring avoidance actions. However, it transpired during deposition that Ms Diaz has no expertise or understanding in respect of the potential claw-back or avoidance actions or of Cayman law and what would be required.

(g)    Ms Diaz had no basis for the assertion made in the DF Objection that Mr Patrick was acting outside the scope of his authority when entering into the Hunter Mountain Settlement.

(h)    Ms Diaz was questioned in a deposition she gave in the proceedings with Case No. 19-34054-sgj11 (**Highland Bankruptcy Proceedings**) on 22 June 2025 (see **MP4/Tab 14/Pages 1715 to 1815**) with respect to the allegations that I disclosed material non-public information as set out in Diaz 1 filed in support of the Petition for winding up the Company dated 9 April 2025, **paragraphs 28 to 30, Diaz 1**. I vigorously refute those allegations (see **paragraphs 176-177, DFW Affidavit**) and it is the case that Ms Diaz had no basis for making this allegation but was following the instructions of Mr Dondero in making such an assertion (see **MP4/Tab 14/Page 1791**):

> *"I'll just tell you the quote he gave us, which was Jim Dondero's spiraling out of control and you need to do this because nothing appears to be what it is"* and *"I don't know [my basis for alleging material nonpublic information]."*

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1664

(i)      As deposed to at paragraph 13 (a)(i) above, on 24 June 2025 the JOLs issued the HMIT Adjournment Letter on 24 June 2025 in which they sought to intervening in the Highland Bankruptcy Proceedings. This interference was without the JOLs having any legal basis for doing so and presented in terms that reflected the previously failed attempts by Dugaboy and the DF Objection to prevent the Hunter Mountain Settlement.

53.      As a result of the deposition of Ms Diaz, the DF Objection was withdrawn. The Hunter Mountain Settlement was approved by Justice Jernigan on 30 June 2025.

(a)      Following the withdrawal of the DF Objection, at the hearing to approve the settlement before Justice Jernigan on 25 June 2025, Mr Dondero gave clear evidence demonstrating the extent to which he can control the Foundations (see **MP4 Tab 15/Pages 1816 to 2081**, for example:

(b)      As to the question of why the other Foundations had not filed objections to the Hunter Mountain Settlement in line with the DF Objection, Mr Dondero stated: *"[Ms. Diaz] got bludgeoned in depositions over the weekend and it happened last night and nobody was aware of it"*. In other words, the only reason why the objection was withdrawn by the Dallas Foundation was because it had acted independently of Mr Dondero's influence and control, and at the time to his knowledge the DF Objection was to stand such that the other Foundations would not need to also object.

(c)      Mr Dondero was questioned specifically in relation to the withdrawal of the DF Objection and stated that:

*"we only had six hours' notice that [Dallas Foundation withdrew its objection]" and "if we had more time...[Highland Foundations] probably would object."*

(d)      In other words, had Mr Dondero had an opportunity to speak with the Highland Foundations, he believes he could have successfully persuaded them to file similarly meritless objections to the Hunter Mountain Settlement Agreement.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

(e) The efforts of Mr Dondero to stymie the Hunter Mountain Settlement have not abated, and on 17 July 2025 Dugaboy issued a motion to delay the implementation of this settlement for a period of 90 days (**Dugaboy Stay,** exhibited at **MP4/ Tab 16/Pages 2082 to 2177**) *"so that it and other parties can investigate the allegations made in the recently filed request for a stay of all Highland bankruptcy proceedings made by the Texas Attorney General, and the complaint (the "JOL Petition") the Joint Official Liquidators ("JOL") of Charitable DAF HoldCo LTD ("Holdco") filed on July 15, 2025, by. That Petition, annexed hereto as Exhibit A, outlines a massive fraudulent scheme"*.

(f) On 21 July 2025, Justice Jernigan denied the request to stay the Highland Bankruptcy proceedings based on this objection.

## C. PARTIALITY AND LACK OF INDEPENDENCE

54. DFW harbours serious concerns regarding the Current JOLs' objectivity and independence which has culminated in a complete collapse of DFW's trust and confidence in the Current JOLs, arising in particular from the following conduct:

     a) Persistent and unnecessary use of *ex parte* proceedings

     b) Failure to provide full and frank disclosure

     c) Funding Arrangements:

         a) Terms of the Funding Agreement

         b) Crossvine is James Dondero

         c) JOLs failure to disclose source of funding

         d) Conflict of Interest in Dondero funding liquidation

         e) Involvement of Scott Ellington

     d) Lack of engagement with Proposed CDM Protocol

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

e) Leveraging of the Cayman liquidation & Advancement of Dondero interests:

    a) Failure to Sanction Highland Foundations

    b) Solvency determination

    c) Avoidance of the DFW Summons

    d) Interference in Texas Bankruptcy Proceedings

f) Inadequate or incomplete investigations:

    a) Limited Interviews

    b) No investigations into US Federal Tax status concerns

    c) No investigation into Dondero related litigation

    d) Utilisation of the DAF LP structure for benefit of Dondero

### e) *Persistent and unnecessary use of ex parte proceedings*

55. To the best of my knowledge and belief, since their appointment on 6 May 2025 the Current JOLs have made at least two and perhaps three *ex parte* applications to the Court. In those instances, the circumstances either did not warrant the application in the first place, or did not warrant that the application be made on an *ex parte* basis.

56. It is my view that the Current JOLs have proceeded *ex parte* not for the preservation of matters in the FSD Proceedings but to deprive DFW of the ability to participate in the proceedings that are envisaged and to obtain a tactical advantage by avoiding due process where possible. From my familiarity with Dondero's litigation strategy (or that of Dondero related entities) this is consistent with his modus operandi.

    i. *Sanction of legal counsel:* I address the sequence of events surrounding the proposed sanctioning of Johnstone Law as legal counsel to the Current JOLs in the **paragraphs 23 to 51, DFW Affidavit**. I do not propose to repeat those

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1667

events in detail and will leave counsel to make submissions from the facts, but it is important to note that the procedural conduct deployed by Johnstone Law on the instructions of the JOLs demonstrated from the outset a biased disposition to the position of the Highland Foundations at the expense (literally and figuratively) of DFW. In particular it is relevant to note that:

a. As of 6 May 2025, Johnstone Law had consulted with the Dondero-controlled Highland Foundations and Current JOLs to settle and agree the engagement of Johnstone Law as legal counsel to the Current JOLs. The terms of the consent provided to Johnstone Law from the Highland Foundations did not permit Johnstone Law to disclose to the Current JOLs confidential information which Johnstone Law came into by reason of their prior engagement by the Highland Foundations. This is deposed to in Johnstone 1.

b. As of 6 May 2025, the proposed engagement of Johnstone Law by the Current JOLs was not shared with DFW nor the Court, notwithstanding that the JOLs had attempted to obtain the blanket power to engage legal counsel by the terms of the Supervision Order without providing terms to the Court or disclosing in pleadings which firm/firms were to be engaged.

c. The Current JOLs, through the Letter Application (defined in **paragraph 50, Johnstone 1**) sought to have the Court sanction the engagement of Johnstone Law as legal counsel to the Current JOLs on an *ex parte* without notice basis (at least to DFW and myself as Management Shareholder), and without a hearing in circumstances where they knew the consent of DFW would not be forthcoming for reason of the submissions made by DFW at the Supervision Hearing, as subsequently committed to writing in correspondence dated 14 May 2025 issued to Johnstone Law by Baker & Partners (I refer the Court to the **paragraph 48, DFW Affidavit**).

d. DFW only became aware that the current JOLs had sought to sanction the engagement of Johnstone Law in the manner described immediately above

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

FSD2025-0116 25 2025-08-19

MR 1668

when, by an email sent on 21 May 2025 from Johnstone Law to DFW's Cayman Islands' legal counsel seeking to agree to directions for a hearing which had been directed by His Honourable Justice Asif KC to consider the sanction of legal counsel. I infer from his Lordship's direction that the Letter Application was not procedurally appropriate in the circumstances, and in my view indicative of an attempt to undermine the position of DFW by denying the procedural fairness which DFW as a stakeholder in the liquidation of the Company would be entitled to.

e. Despite requesting a copy of correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application (I refer to **paragraph 50, DFW Affidavit**), DFW was not provided with a copy of the Letter Application. In fact, legal counsel to DFW was only able to consider the Letter Application when served with the hearing bundles for the Sanction Hearing of 24 June by Maples (the now sole Cayman attorneys to the JOLs). Clearly Maples had been provided with a copy but I do not believe that counsel to any other stakeholder was so provided. I would invite the JOLs to confirm if the Highland Foundations were provided with a copy of the Letter Application prior to service of the hearing bundles by Maples.

f. When I was finally able to consider the Letter Application, I was struck by how similar the substance of that correspondence was to the Second Affidavit of Ms MacInnis, suggesting that the evidence of the Current JOLs was heavily if not entirely drawn from the Letter Application which was prepared by legal counsel which DFW maintains is conflicted having first been engaged by the Highland Foundations, who I know to operate under the significant influence of Mr Dondero, and which is deposed to at **paragraphs 56.i and 57.ii herein**.

g. Although the JOLs eventually resiled from seeking sanction for the engagement of Johnstone Law on the business day before the Sanction Hearing (24 June), it is my belief that the manner in which the Current JOLs sought to obtain sanction for the engagement of Johnstone Law on

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

an *ex parte* basis in the face of known opposition is indicative of conduct which lacks the requisite independence and impartiality.

ii. *Sanction of FSD Proceedings*

a. The JOLs again applied *ex parte* without notice for the Court's sanction to commence the FSD Proceedings (***ex parte* Application 2**). On 22 July 2025 Maples provided a heavily redacted note of the remote hearing for *ex parte* Application 2 (***ex parte* Note**). A copy of that note is **exhibited at MP4/Tab 17/Pages 2182 to 2185**, along with a substantially redacted copy of MacInnis 5 which was sworn in support of that application (**Tab 17/Pages 2186 to 2234**).

b. The extent to which the *ex parte* Note has been redacted makes it incomprehensible such that I cannot ascertain the documents and information that were provided to the Court to obtain leave; the specific leave sought and relief granted by the Court. The Note refers to *"a new affidavit of Michael Murillo"* but which has also not been served on or otherwise provided to DFW. Finally, DFW has not been provided with a copy of the 4 July Summons by which *ex parte* Application 2 was brought nor a copy of the Order as made. I am informed by DFW's Cayman Islands legal counsel to DFW that those documents have been made the subject of confidentiality orders.

c. On 20 July 2025 DFW, through Baker and Partners, specifically raised a query with Maples as to whether the Highland Foundations were put on notice of the JOLs' *ex parte* sanction application, which went unanswered in Maples' response received on 22 July 2025 (see **MP4/Tab 18/Pages 2235 to 2240**). While I note that **paragraph 9 of MacInnis 5** states *"For the following reasons, the JOLs have brought this Application ex parte and respectfully request that is it not appropriate for any of the Company's shareholders to be on notice of the Application"*, it is not apparent what directions were given in this respect, nor if the Highland Foundations were otherwise made aware of *ex parte* Application 2.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

d. Also at **paragraph 9, MacInnis 5** seeks to justify proceeding *ex parte* for leave to commence the FSD Proceedings as to *"Communicate the substance of this application, together with evidence and submissions which addresses its merits would seriously undermine the proper course of the Proposed Proceedings in the event that they are sanction"*. No explanation for this position is given in this regard and, in circumstances where the DFW Summons had been filed with the Court more than a month before, the preparation of the FSD Proceedings (which had clearly been in progress for some time) are unnecessary and in my view a clear attempt of Dondero – through the JOLS - to procure costly litigation that enable an application for an injunction to be made.

e. I understand that *ex parte* Application 2 was granted on 14 July 2025 and on 15 July 2025 the Current JOLs commenced the FSD Proceedings which are:

(i) outside of the liquidation proceedings;

(ii) before a new judge who is unfamiliar with the context of the Current JOLs' appointment and the Company's history or liquidation generally;

(iii) has none of the evidence before him which is already before His Honourable Justice Asif KC;

(iv) with respect to the Cayman Injunction, it is expressly stated by Maples in their correspondence to the Court sent on 15 July 2025 (see **MP4/Tab 19/Pages 2241 to 2244**) to coincide with the timetable of litigation commenced by the Highland Foundation in the Dallas Business Court, which I discuss further below.

iii. *Sanction of Funding Agreement*

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1671

a. At paragraphs 58 to 79 below, I address the Current JOLs' conduct with regard to the question of how the liquidation of the Company has been funded, will be funded and by whom.

b. That the Current JOLs would need to secure funding for the liquidation is not a controversial or new point. Since the Highland Foundations issued the just & equitable winding up Petition, the spectre of Mr Dondero as a funder to those proceedings has been present. In Dondero 1, Mr Dondero himself stated that he would personally provide the funding to the Highland Foundations to pursue the winding up of the Company. As set out in paragraph 68 below, the fact that Mr Dondero has been financing the legal actions of the Highland Foundations recently commenced in respect of the DAF Restructuring was confirmed by Ms Diaz under oath on 22 June 2025. The transcript of the Diaz Deposition was included in a Supplemental Bundle filed by DFW with the Court prior to the Sanction Hearing of 24 June and was at the same time provided to the Current JOLs.

c. I understand from the terms of MacInnis 6 that *an ex parte* application was also made for the purpose of sanctioning the Funding Agreement. I also understand from the terms of MacInnis 6 that the Funding Agreement is structured in such a way that Mr Dondero is ultimately funding the liquidation and the FSD Proceedings (see **paragraph 11, MacInnis 6**).

d. The *ex parte* Note which relates to *ex parte* Application 2 does not, so far as it is possible to discern, address the Funding Agreement. At the date of swearing this affidavit it does not appear that Maples have provided a Summons, Order or note relating to the sanction of the Funding Agreement.

e. Prior to the Funding Agreement being Sanctioned it was also confirmed by Ms Diaz in US proceedings under oath that Dondero is funding the Highland Foundations in the proceedings which have been instituted in connection with the DAF assets and investments. The funding of the liquidation and FSD Proceedings by Dondero directly or indirectly, is a matter of controversy and a situation which DFW would vehemently

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

FSD2025-0116 29 2025-08-19

MR 1672

contest. By proceeding to obtain sanction of the Funding Agreement on an *ex parte* basis the JOLs, have wrongfully deprived DFW of the procedural right to dispute the fact or terms of the Funding Agreement, including the identity of the funding party.

f.  Given the paucity of information provided by the JOLs and their legal counsel as regards the application to sanction the Funding Agreement, I am unable to discern whether the JOLs disclosed to the Court the fact that Dondero had been (and is likely to continue to be) funding the Highland Foundations. This fact which seems material to the propriety of the Funding Agreement is not addressed in the terms of MacInnis 6.

iv.  *Attempt to seek Cayman Injunction ex parte*

a.  The Current JOLS were initially seeking to have the hearing of the Cayman Injunction listed for a date less than 2 weeks from the date on which the Cayman Injunction and FSD Proceedings were filed and served on the parties, including DFW.

b.  It is apparent from Maples' letter to Court dated 15 July 2025 which seeks a listing of the Cayman Injunction that the Current JOLs were willing to proceed on an *ex parte* basis, to do so regardless of the defendants' ability to attend and that the urgency was in part justified to align that hearing with a hearing in the TRO Proceedings issued by the Highland Foundations.

c.  For the reasons explained in paragraphs 98 to 100, in light of both the voluntary Rule 11 Agreement which DFW and the CDM Entities had provided in the TRO Proceedings as of 2 July 2025 and the ongoing willingness of the CDM Entities to enter into a protocol with the Current JOLs, there was simply no basis for the Cayman Injunction to be issued nor to be treated as an urgent application.

d.  On 21 July 2025 the CDM Entities filed a Summons seeking directions in response to the Cayman Injunction which provided *inter alia* undertakings on behalf of DFW and the CDM Entities to the JOLs and preserved the

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

FSD2025-0116                    30                    2025-08-19

MR 1673

Rule 11 Agreement (discussed at paragraphs xx to xx herein) and provided that under correspondence of the same dated to Maples (a copy of the CDM letter dated 21 July 2025 is **exhibited at MP4/Tab 20/Pages 2245 to 2257**). This correspondence from Campbells to Maples highlighted in particular the comments made by the Dallas Business Court at the hearing of the TRO Proceedings that he was *"struggling to find evidence in the record that there is an immediate threat of irreparable harm"*.

    e. As observed in the letter from Campbells on behalf of the CDM Entities dated 21 July 2025 the only inference which could be drawn was that *"the unsustainable assertions of urgency are made in the hope of gaining a perceived strategic advantage in the contemplated litigation"*.

    f. As matters transpired, the Current JOLs and defendants to the FSD Proceedings and Cayman Injunction entered into a Consent Order approved by Parker J in the FSD Proceedings on 31 July 2025 **exhibited at MP4/Tab 21/Pages 2258 to 2273**. I exhibit at **MP4/Tab 22 to Tab 24/Pages 2274 to 2296** relevant correspondence between Campbells and Maples dated 21, 23, 24 and 27 July 2025.

### b) Lack of full and frank disclosure

57. The JOLs have failed to provide full and frank disclosure on seeking *ex parte* relief from the Court as they have failed to bring pertinent evidence which is available to them to the attention of the supervising Judge.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1674

*i.* **DFW Summons**

a. As the Court will be aware, on 9 June 2025 DFW issued a Summons (**DFW Summons**) which sought directions and orders from the Court to provide that (i) the JOLs enter into a Protocol with the CDM Entities and (ii) that an inter partes proceeding be established in the liquidation for the validity of the DAF Restructuring to be determined.

b. Neither the evidence filed in support of the Current JOLs leave to commence the FSD Proceedings nor the evidence in support of the Cayman Injunction make no mention of the DFW Summons. The substantially redacted note of the Hearing as provided by Maples to Baker & Partners on 22 July 2025 does show that scant reference was made to the filing of the DFW Summons and correctly refers to the fact that that Summons as not yet been listed.

c. The JOLs only disclosed the existence of the DFW Summons in the FSD Proceedings in FSD Affidavit 2. That evidence was sworn on 24 July 2025 following a Summons for Direction filed by the CDM Entities on 21 July 2025 (**CDM Directions**), and only after sanction for the FSD Proceedings and Cayman Injunction to be commenced had been granted.

d. The *ex parte* Note provided by Maples shows that Ms Moran of Maples did make mention of the DFW Summons during the ex parge hearing, despite the evidence failing to bring this to the attention of the Court. Ms Moran goes on to dismiss the DFW Summons on the basis that *"this matter is not suitable to be argued inter partes. Rather there is public interest in allowing the JOLs to ensure that a Cayman Islands vehicle has not been used as a vehicle of fraud"*. I find this ironic in light of the Current JOLs apparent failure to investigate Mr Dondero's misuse of the DAF assets and the federal tax concerns which caused myself and Mr Murphy to implement the DAF Restructuring as has previously been explained to this Court.

e. A further reason cited for the FSD Proceedings being issued despite the DFW Summons being extant is that *"North Texas Fund – who is not yet*

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

FSD2025-0116                    32                    2025-08-19

MR 1675

*participating, and their rights would not be protected in an inter partes between defendants and the Supporting Organisations".* In respect of these matters, the Note discloses that the honourable Asif J KC stated he *"will deal with that when it comes up in due course".*

f. While it is properly for counsel to develop argument, the very question of the correct procedural vehicle to determine the validity of the DAF Restructuring ought to be determined is a matter which required argument on an inter partes basis before the FSD Proceedings were commenced, and this appears to have been obfuscated in the presentation of matters in *ex parte* Application 2.

### ii. Prior engagement of Leading Counsel

a. On 22 July 2025, and along with the *ex parte* Note, Maples provided to DFW a copy of the MacInnis 5 affidavit in the heavily redacted form exhibited at [**MP4/Tab 17/pages 2186 to 2234**]. Quite clearly certain of the redactions applied by the Current JOLs' by their legal counsel relate to references to professionals who the Current JOLs have obtained advice in seeking to commence the FSD Proceedings. While I understand that the Current JOLs seek to redact information which may be relevant to the FSD Proceedings of which DFW and myself personally are (amongst others) defendants, I do not consider that there is a justifiable basis to redact the name of legal counsel who advise the Current JOLs in connection with of the liquidation proceedings or the FSD Proceedings.

b. On 30 July 2025 DFW was notified from Maples' correspondence to the Court exhibited at [**MP4/Tab 25/page 2297**] that Mr Andrew Ayers KC would be attending the hearing of the Injunction Summons on behalf of the Current JOLs. I am advised, without waiving privilege to that advice, that no notice of Mr Ayers KC's engagement was provided despite requirements to do so under this Court's practice directions.

c. Mr Ayers KC acted for the Petitioners in these liquidation proceedings and was in attendance at the Supervision Hearing along with Johnstone Law. I also

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

understand that on or around 12 May 2025 Johnstone Law filed an application for the general admission of Mr Ayers KC to the Grand Court, that application being granted on or around 27 May 2025 having been sponsored and supported by Johnstone Law. In circumstances where the engagement of Johnstone Law was resisted because there was a conflict of interest resulting the prior engagement of Johnstone Law by the Highland Foundations (and financial backing of Mr Dondero), Mr Ayres KC equally stands in a position of conflict in these matters and is not in a position to provide the JOLs with independent advice in either the FSD Proceedings or these liquidation proceedings.

d. I invite the JOLs and their legal counsel to provide an account of the decision to deliberately conceal the engagement of Mr Ayres KC which appears to be because they knew or were concerned that DFW would object to the engagement of Mr Ayres KC, as would be its right as a stakeholder in the Company's liquidation. This development comes barely a month after Johnstone Law was stood down as counsel for the Current JOLs, the Current JOLs having spent the first almost 2 months of their appointment and in excess of US $1.4 million in trying to justify the engagement of counsel who were clearly inappropriate in all the circumstances.

e. On 13 August Baker & Partners wrote to Maples to raise that question of Mr Ayres engagement directly. A copy of the letter from Baker & Partners issued on 13 August 2025 is **exhibited at MP4/Tab 26/pages 2298 to 301**. Maples responded for the JOLs in defensive terms on 15 August 2025 and have failed to address the enquiries of DFW as set out in the 13 August correspondence. A copy of Maples letter dated 15 August 2025 is exhibited at **MP4/Tab 27/pages 2302 to 2302**.

*iii. Weaver Opinion*

a. On 1 July 2025 the JOLs were provided with the Weaver Opinion (detailed at paragraph 16 to 18 above). Weaver opined that the proceeds paid to the Highland Foundations in their capacity as Participating Shareholders following the DAF Restructuring was fair. However, in seeking to obtain injunctive relief

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

FSD2025-0116 34 2025-08-19

MR 1677

in the FSD Proceedings and in seeking leave to bring those proceedings, the Current JOLs failed to disclose the existence and terms of the Weaver Opinion.

*iv. Mercer Report*

b. Notwithstanding that the Current JOLs have the Mercer Report and make reference to that report, they fail to draw the Court's attention to the recommendations of Mercer which demonstrates that the level of compensation afforded to me is in line with market standards for the roles I have assumed, as **exhibited at MP4/Tab 4/pages 1068 to 1087.**

*v.   Nature of DAF LP business*

c. The JOLs also mischaracterised DAF LP as passive, whereas I explain at paragraphs 179 to 180 how this is not the case.  Looking upward, towards distribution, the Company would act as a conduit of funds that were declared by the Directors to be dividends and distributable as charitable donations.  Looking downwards, DAF LP has a number of investments in real estate projects, litigation and securities which require active management.

d. Once again, the diverse portfolio of duties that I assumed when taking on the role of 'Control Person' is recognized in the Mercer Report and reflected in my compensation.  It is not simply a case of holding office and paying out distributions as the Current JOLs suggest.

*vi. Failure to disclose DFW responses filed in FSD 116 of 2025 (JAJ)*

a. On a review of the JOLs' skeleton argument filed in the FSD Proceedings with respect to the Cayman Injunction (see **MP4/Tab 28/Pages 2304 to 2362**) (the hearing of which was adjourned by way of a Consent Order made on 31 July 2025, exhibited at **MP4/Tab 21/Pages 2258 to 2273**), I note that it was advanced on behalf of the JOLs at paragraph 25 (see **MP4/Tab 28/Pages  2310 to 2311** that:

*Although the Company does not yet have full details of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as*

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref:  DFWC.001.001)

*follows (and without prejudice to any further facts and matters relating to directors' fees or expenses):*

*[…]*

(2) *Expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).*

b.  The drafting of sub-paragraph 2 closely resembles the drafting of paragraph 31(b) of the Highland Foundations' Winding Up Petition filed on 23 April 2025 in these liquidation proceedings. I further note that the JOLs completely omitted to disclose to the Court in the FSD Proceedings what DFW's response to that allegation was.

c.  In summary, at **paragraph 179, DFW Affidavit**, I explained that US $6 million of the US $18.3 million which are alleged to be expenses are not in fact expenses. Rather, Mr Dondero / the Highland Foundations and now the JOLs, have failed to take into consideration that there was also US $6.1 million in income from the same NexPoint-led transaction that more than offset the US $6 million in expenses. Omitting the income and net gain to DAF LP from that transaction which offsets the amount now claimed by the JOLs to a considerable degree, falsely inflates the expense number.

d.  A full explanation can be found at **paragraph 179, DFW Affidavit**, but there is no indication in either FSD Affidavit 1 or FSD Affidavit 2 that the JOLs have investigated DFW's response to this claim which was also alleged in these liquidation proceedings by the Highland Foundations. The absence of any response to DFW's evidence, in addition to their failure to disclose DFW's response to an identical allegation made in these liquidation proceedings as part of the JOLs' full and frank obligations in the FSD Proceedings, suggests to me that the JOLs' have not investigated DFW's response to this allegation. In fact, as the JOLs' closely repeat what was advanced in the Highland Foundations' Winding Up

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Petition, I also believe this suggests a lack of objectivity and partiality on the JOLs' part.

### v. Non-disclosure of Liquidation Committee

a. When Ms MacInnis swore her fifth affidavit on 10 July 2025 in support of *ex parte* Application 2, she stated at **paragraph 9.1, MacInnis 5** that "*A liquidation committee has not yet been established with respect to the Company*".

b. I am advised (without waiving privilege with respect to that advice) that MacInnis 5 runs contrary to the outcome of the Meeting of Contributors held on 9 July 2025 and that no minutes of that meeting have been circulated.

c. Ms MacInnis later confirms in her affidavit in support of the Funding Agreement at **paragraph 6, MacInnis 6**, that a Liquidation Committee had in fact been formed the day prior on 9 July 2025.

d. No explanation for the discrepancies between the statements made in MacInnis 5 and MacInnis 6 have been volunteered, and no correction was made to this misrepresentation in MacInnis 6.

### c. *Funding Arrangements*

64. Since their appointment, the Current JOLs had until recently refused to confirm how the liquidation is being funded. Counsel for myself acting as Management Shareholder, and counsel for DFW had repeatedly raised the significant question of how and by whom the Current JOLs were being funded. This was more recently pressed by both Campbells in their letter of 29 June 2025 and Baker & Partners' letter of 18 July 2025 (exhibited at **MP4/Tab 29** and **Tab 30/Pages 2363 to 2376**).

65. As mentioned above, on 4 July 2025, I understand that the Current JOLs issued *ex parte* Application 2, and did so without notice to at least DFW. I further understand that the JOLs filed an *ex parte* without notice Summons seeking the Court's sanction to enter into the Funding Agreement (**Funding Sanction Summons**). This application was again made without consultation with or notice to DFW. Even if it is accepted that sanction to commence the FSD Proceedings would be justified (which I do not as the

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

FSD2025-0116        37        2025-08-19

MR 1680

disclosure of that application would in no way have negated the making of the application) I cannot see the proper basis on proceeding with the Funding Sanction Summons *ex parte*, other than for the Current JOLs to obtain sanction of a funding arrangement they knew would be open to justified challenge and opposition.

66. In support of the Funding Sanctions Summons, Ms McInnis filed partially redacted McInnis 6 and exhibit MM-6. **MM-6/pages 1 to 14** exhibit a significantly redacted funding agreement made between Crossvine and the JOLs, dated 11 July 2025 (the **Funding Agreement**). This appears to place the Current JOLs in a position of conflict of interest in respect of their obligations to Crossvine, Ellington and Dondero as the funding parties, and DFW as the majority stakeholder of the purportedly solvent liquidation (or at least a significant stakeholder if the liquidation is in fact insolvent).

*i. Terms of the Funding Agreement*

67. In summary, and from what can be discerned from a review of the partially redacted MacInnis 6 and exhibit MM-6, the Funding Agreement provides that:

    (a) A lump sum will be provided to the Current JOLs by Crossvine for the purposes of funding the Company's liquidation (see **paragraph 11, MacInnis 6**) and the FSD Proceedings (see **paragraph 9.1, MacInnis 6**).

    (b) The amount of funding has been redacted and it is entirely unclear at present from MacInnis 6 and MM-6 whether the Current JOLs can afford to give a cross-undertaking in damages in the FSD Proceedings as required (see **paragraph 9.3, MacInnis 6**).

    (c) There are incremental increases in returns for Crossvine with respect to the amounts which will be paid to it should the Current JOLs make any successful recoveries in the Civil Proceedings. For example, **paragraph 9.7(b)(iii), MacInnis 6** states that were the Current JOLs recover in excess of US $270 million (which the JOLs claim are the Company's rights in the assets held by DAF LP), Crossvine will receive an additional 30% of the amount advanced.

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1681

68.  The basis of the Funding Agreement which are discernible from the heavily redacted evidence that has been provided are markedly different from the terms Mr Dondero had initially agreed to sworn on oath as set out in Dondero 1.

69.  In Mr Dondero's First Affidavit sworn on 9 April 2025 and filed on 16 April 2025 in the Liquidation Proceedings (see **pages 9 to 10, Dondero 1**), Mr Dondero swore with respect to his funding of the liquidation proceedings at paragraph 47 that:

>   *"I have not and will not at any time receive a benefit, not do I have control of these proceedings, because of this funding arrangement... My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support".*
>   [emphasis added]

70.  Notwithstanding this evidence, two days later the prospective uplift, three month avoidance period and terms of non-disclosure on the part of Crossvine were built into the Funding Agreement. In my view and based on my years of experience in managing businesses affected by Mr Dondero the ostensible altruism professed to by Mr Dondero in his affidavit of 9 April should be viewed as circumspect, and even more so having regard to the persistent refusal of the Mr Dondero-funded Current JOLs who had previously refused to enter into a protocol which does not assure that litigation against Mr Dondero is effectively desisted with.

### *ii. Crossvine is James Dondero*

71.  The Current JOLs confirm at **paragraph 11, MacInnis 6** that Crossvine *"is a special purpose vehicle incorporated for the purpose of ultimately Mr Dondero (through the structure outlines above) funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings".*

72.  The Current JOLs also confirm at **paragraph 9.8, MacInnis 6** that the Funding Agreement grants certain information rights to Crossvine with respect to the progress of these proceedings, without detailing what those rights are.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1682

73. This is highly concerning to DFW in light of the fact that Crossvine is another alter ego of Mr Dondero. Should these information rights extend to rights to view disclosure in these proceedings, DFW is firmly of the view that the disclosure information will be abused for collateral purposes by Mr Dondero in other jurisdictions in which he is litigating in. For a comprehensive summary of the litigation currently on foot, see paragraphs 159 to 188 below. Having known Mr Dondero and Mr Ellington for more than ten years, I know that, should these proceedings move adversely to Mr Dondero and Mr Ellington's personal interests, they will not hesitate to default on their obligations to meet their funding commitments, which effectively means that if the JOLs do not aggressively allege fraud and wrongdoing, they will not be paid. This grants Mr Dondero and Mr Ellington significant and improper control over the Current JOLs, who cannot accept money from Mr Dondero and Mr Ellington and be considered to remain fair and impartial.

### iii. JOLs' failure to disclose knowledge of funding

74. In Ms Diaz's deposition at **MP4/Tab 14/Pages 1736 to 1738**, Ms Diaz revealed that it has always been the agreement that Mr Dondero would fund the Company's liquidation on behalf of at least the Highland Dallas Foundation, and this decision was made prior to litigation in the Cayman Islands commencing:

"*Q: Did you learn, when you read Mr. Dondero's declaration in the Cayman Islands, that he's actually funding that litigation on behalf of the supporting organizations?*

*A. No, that's not when I learned that.*

*Q. That's not when you learned it or -- withdrawn. Are you aware that he's funding that litigation?*

*A. Yes.*

*Q. When did you learn that he was funding that litigation?*

*A. Before we got into litigation.*

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

*Q. Is he funding this litigation on behalf of the Dallas Foundation?*

*A. Yes, he is.*

*Q. And how much money did he provide for the funding of this litigation?*

*A. We have not agreed on an amount. As with any of our fundholders', legal expenses will get paid through by the fund. So that's a very common business practice. And it would go until the legal issues ceased.*

*Q. But he's made a commitment to fund -- to personally fund the expenses of the Dallas Foundation in connection with this litigation; is that right?*

*A. Yes."*

75.    It should be noted at the outset that the Funding Agreement was executed 2 days after the first meeting of the Company's contributories which was held at the Current JOLs' offices and virtually on 9 July 2025, during which a Liquidation Committee was formed.  DFW is represented on the Liquidation Committee by Ms Jennifer Colegate of Baker & Partners. A letter of authorisation given by DFW is exhibited at **MP4/Tab 31/Page 2377**.

76.    Neither the existence of discussions concerning the negotiation of the Funding Agreement, nor copies of the draft Funding Agreement, were disclosed at that meeting. This suggests a deliberate attempt to avoid giving the Company's contributories, and in reality the only non-Dondero influenced and controlled contributories i.e. DFW and myself as Management Shareholder an opportunity to review and scrutinize the draft Funding Agreement, its terms and to consider in all the circumstances if the funding as proposed and from whom is appropriate.

77.    In fact, the Current JOLs misled the Company's contributories in their First Report as at 2 July (and provided to DFW on 3 July, see **MP4/Tab32/Pages 2378 to 2398**), when they stated at page 13:

*"6.4.1 As there are insufficient assets with which to meet the fees and expenses of the liquidation, the JOLs are currently exploring third party funding options. The*

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

*JOLs will seek sanction for any funding agreement from the Court in due course…. Should any third party be interested in funding the liquidation, expressions of interest may be sent to CDAF.Core@uk.gt.com."*

78. Furthermore, the JOLs confirmed at **paragraph 13.3, MacInnis 6** that they did not approach any other litigation funders for quotes, despite signalling that it was exploring more than one funding option (i.e. more than one source of funding). That representation is false, misleading and calculated to avoid transparency.

79. This intentional concealment of vital developments and key contractual documents which should be available to the Company's contributories for scrutiny in the liquidation severely undermines DFW's trust and confidence in the Current JOLs. As is clear from the terms of MacInnis 6 and the Funding Agreement, the ultimate identity of the funder has not changed since the Highland Foundations petitioned for the winding up of the Company. Just as Mr Dondero sits behind the legal proceedings instigated by the Highland Foundations in respect of the Company, Mr Dondero sits behind the JOLs in respect of the liquidation and associated litigation now commenced in the Cayman Island.

80. In light of the extensive litigation to which Mr Dondero is exposed to, the Current JOLs have wrongfully thought it prudent and in the best interests of the estate to accept funding from an inescapably conflicted financier, who has a track record of defaulting on financial obligations.

### iv. Conflict of Interest in Mr Dondero funding liquidation

81. It is DFW's position in these liquidation proceedings that Mr Dondero was cycling the donations he made to the charitable enterprises through the Fund. There is evidence before this Court (**see paragraphs 110 to 120, 145 to 146, 170, 194 to 199, DFW Affidavit**) that Mr Dondero exerted a huge amount of control and influence over key personnel such as Ms Diaz, Mr Scott and staff at the Highland Dallas Foundation to direct how his donations were spent.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

82. Abusing the charitable structure put the tax exempt status of the Highland Foundations at risk, which necessitated the DAF Restructure and the voluntary liquidation of the Company.

83. It is therefore notable that Mr Dondero, who previously swore in these proceedings that he would not seek any benefit from the funds recovered on the charities' behalf, now seeks through entities he controls a bounty fee for any recoveries in excess of US $50 million made by the Current JOLs in the FSD Proceedings.

84. If the Court is willing to grant the relief sought in DFW's Removal Summons and replace the JOLs, this will assist in ensuring that the liquidation is insulated to a significant extent from Mr Dondero's influence, on the understanding that the liquidation will be funded from the assets within the DAF Structure, which will ensure the Replacement JOLs' independence.

85. As previously deposed above, the Current JOLs were aware or at least on notice as of the 24 June 2025 that Dondero was funding the Highland Foundations legal actions as per the transcript of Ms Diaz's deposition in the US Bankruptcy Court proceedings which s included in the Supplementary Bundle by Cayman attorneys to DFW.

*v. Involvement of Scott Ellington*

86. I understand from **paragraph 10.1, MacInnis 6** that Mr Scott Ellington is one of the managers of Crossvine, and its sole shareholder is a Texas non-profit called Crossvine Foundation, which is also co-managed by Mr Ellington.

87. Ms MacInnis also confirms at **paragraph 11, MacInnis 6** that Crossvine has been established in order for Mr Dondero to fund the FSD Proceedings and these liquidation proceedings.

88. As stated at **paragraph 69, DFW Affidavit**, Scott Ellington is the Chief Executive Officer and owner of Skyview (Mr Patrick's former employer), the former General Counsel of Highland and a long-standing business associate of Mr Dondero. Despite the appearance of Mr Ellington's ownership and control of Skyview, I deposed at **paragraph 69, DFW Affidavit** that it was in fact Mr Dondero who had actual control

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

of Skyview and that it was he (rather than Mr Ellington) who determined the compensation of every Skyview employee with Skyview's Head of Human Resources.

89. Mr Ellington, together with Mr Dondero, also owns a Cayman Islands based reinsurance company called Sentinel Reinsurance, Ltd (**Sentinel**), and is personally embroiled in the Sentinel Fraud (as described below). As explained in detail at **paragraphs 151 to 156, DFW Affidavit**, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that certain specific transfers of assets to Sentinel during 2017 were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero (**2017 Transfers**).

90. Evidence with respect to the Sentinel Fraud is already before this Court but in summary, a New York court made a preliminary finding that those transfers took place at a time when it was anticipated that a US $1.2 billion judgment would be made in UBS' favour. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (**ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action (as defined at **paragraph 123 in the DFW Affidavit**). The ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following the 2017 Transfers. This scheme has been termed the **Sentinel Fraud**.

91. Mr Ellington is named personally as a defendant in UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Montage Holdings, Ltd (Index No. 6507 44/2023) (**Turnover Proceedings**). In those proceedings, the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 finding that the petition sufficiently alleged that the 2017 Transfers undertaken by Mr Dondero and Mr Ellington were

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

MR 1687

fraudulent conveyances to Sentinel. The New York Supreme Court also held that to the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied, which allowed the US $1.1 billion UBS case to move forward against Mr Dondero and Mr Ellington personally and entities (including Cayman entities) they own and/or control.

92.  The Sentinel Fraud was also discussed at a hearing in the Bankruptcy Court for the Northern District of Texas in 2022, where Judge Stacey Jernigan  implied (after verbalizing certain various implicated criminal statutes) that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it (see **paragraph 156, DFW Affidavit**).

93.  I also deposed at **paragraph 117, DFW Affidavit** that Mr Ellington has previously received moneys from  DAF LP (which is intended for charitable purposes) in the form of a bonus via the Tall Pine Group, at a time when Mr Ellington's ability to receive a bonus had been blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**).  This bonus payment, which derived from US $1 million payment from DAF LP to the Tall Pine Group, had been flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ pages 172 to 305**).

94.  DFW finds it extraordinary that the Current JOLs were satisfied with the due diligence performed on Mr Ellington, despite that allegations of fraud have been made and found against him, and being on notice by virtue of the evidence filed in these liquidation proceedings that he has a history of being unjustly enriched from the Funds' assets.

95.  Taken all together, DFW has grave concerns that Crossvine is the alter ego of Mr Dondero, and has been established as a vehicle by Mr Dondero to fund (a) efforts to claw back a percentage of his own donations from DAF LP and/or entities affiliated with it; (b) efforts to prevent the implementation of the Hunter Mountain Settlement; and (c) efforts to regain control over the Fund, all through the JOLs and by harnessing the powers conferred to them by Appointment Order; and (d) obstruct, impede or

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref:  DFWC.001.001)

FSD2025-0116                    45                    2025-08-19

MR 1688

prevent almost US $300 million in litigation claims against him and others arising from the Kirschner Complaint.

### d) Failure to meaningfully engage with a Protocol

96. Since 16 May 2025, DFW's attorneys and the attorneys of CDMCFAD, LLC (**CDM**) (Campbells LLP) have been attempting to agree a protocol with the JOLs as noted in a letter from Campbells to Maples, dated 29 June 2025 at **MP4/Tab 29/pages 2363 to 2371**. It was CDM who first volunteered a transactional reporting protocol to the Current JOLs in an attempt to assure the JOLs that the businesses of CDM were being operated in an open and transparent way.

97. A few days after this draft protocol was proposed, I caused HMIT to enter into the Hunter Mountain Settlement (discussed further at paragraphs 50 to 53 above) which led to a Settlement Motion (defined and discussed at paragraphs 94 and 97 below) seeking the US Bankruptcy Court's approval of the Hunter Mountain Settlement Agreement.

98. No response was received by the Current JOLs to the protocol suggestion. Instead, they wasted time in seeking to justify the appointment of Johnstone Law so that as of 24 June 2025 (the hearing of the Sanction Summons) no substantive response to the proposed protocol had been received from the JOLs.

99. As the Court observed at the Sanction Application on 24 June 2025 "*something along the lines of the protocol that is floating around seems a sensible way forward*". The Court further observed that "*if there is agreement on a protocol, then the liquidators won't need to pursue Chapter 15 because they'll be confident that the assets are safeguarded.*" A copy of the transcript may be found at **MP4/Tab 33/pages 2399 to 2487** and the specific extracts at **MP4/Tab 33/Page 2454**.

100. At around that time, a Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, Case No. 19-34054-sgj11 (Bankr. N.D.Tex.) [Dkt. 4216] (the **Settlement Motion**) was before the Texas Bankruptcy Court. I have set out above in this affidavit (paragraphs 47 to 50 above) the clear benefits and advantages to the

---

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Company and its contributories and/or creditors by HMIT entering into the Hunter Mountain Settlement.

101. Incredulously, and immediately following the Sanction Hearing of 24 June 2025 rather than following the recommendation of his Honourable Justice Asif KC with respect to entering into a protocol with CDM, on that same day the Current JOLs instead issued the HMIT Adjournment Letter to the attorneys acting in Texas Bankruptcy proceedings and to the US Bankruptcy Trust of Highland Capital, Mr J Seery in connect with the Hunter Mountain Settlement. Notwithstanding that the Hunter Mountain Settlement would result in significant value returning to the DAF Structure the Current JOLs demanded that the Bankruptcy Court defer consideration of the Hunter Mountain Settlement for a period of 45 days to afford the JOLs an opportunity to continue its investigations. A copy of this correspondence is exhibited at **MP4/Tab 1/Pages 1 to 3**.

102. This request closely followed a failed attempt by Dugaboy to object to the approval of the Hunter Mountain Settlement, which was sanctioned by a Court Order dated 30 June 2025 and referred to as the **9019 Order**. Copies of this Objection and the 9019 Order are at **MP4/Tab 34 and Tab 35/Pages 2488 to 2499**. The making of the 9019 Order resulted in the assignment of approximately US $300 million in legal claims to pursue matters covered in the Amended Kirschner Complaint to HMIT and its affiliates. For the benefit of the Court, the 23 defendants to the Amended Kirschner Complaint include Mr Dondero; his long-standing business associate, Mr Ellington, NexPoint Advisors LP; Highland Dallas Foundation; Okada Family Trust; and Dugaboy. A copy of the Dugaboy Motion to Stay the 9019 Order is exhibited at **MP4/Tab 16/Pages 2082 to 2177**. Mr Dondero and Mr Ellington attempt now to use the office of the Current JOLs and these proceedings in the Cayman Islands to prevent the Kirschner claims from moving forward against them. This is a collateral attack with an improper purpose.

103. The stay sought by Dugaboy was not granted and following a review of the First Report at page 12 (see **MP4/Tab 32/Page 2390**) on 1 July 2025, the Highland Foundations (of which the supported organisation the Dallas Foundation had previously withdrawn its objection from the Settlement Motion to approve the Hunter Mountain Settlement independently of Mr Dondero) filed the **TRO Proceedings**. The matter came on for a

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

hearing on 2 July 2025 at which the Highland Foundations failed to persuade the Texas Court that there was any real risk of irreparable harm or dissipation of assets with the Judge concluding that:

> *"I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to move further [sic] away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that."* [see **MP4/TAB 36/Page 2541**].

104. The relevant assets at issue are also further secured by the Rule 11 Agreement pursuant to which the parties named in the TRO Petition, including but not limited to DFW, CDM (and its affiliated entities) and myself personally, have voluntarily agreed to (i) operate in the ordinary course of business; (ii) ensure that the proceeds of any assets remain in the relevant entity (i.e., are not transferred to any other entity within or outside the group); and (iii) not engage in any corporate restructuring.

105. With respect to the Rule 11 Agreement mentioned above, it is pertinent to note that during hearing the TRO Petition the Judge of the Dallas Business Court accurately recognised that the complaints brought by the Highland Foundations related to the DAF Restructuring and transactions that had taken place. There was no evidence before the Honourable Judge in those proceeding that there would be a further restructuring. As the impetus for the DAF Restructuring in the first place is no longer hanging over the DAF Structure, I was comfortable providing the Rule 11 Agreement which includes an undertaking that there will not be a further restructuring of the DAF LP.

106. A hearing in the TRO Proceedings had been scheduled for 4 August 2025. As matters have transpired, the Dallas Business Court has received arguments on jurisdiction in respect of the TRO Proceedings and a ruling remains extant on that issue. There is no threat of immediate harm either there or here. Notwithstanding, legal counsel to CDM and its affiliates made consistent and concerted attempts to reach agreement in respect of the proposed protocol. As recorded in their letter on behalf of CDM to Maples dated 29 June 2025 (see **MP4/Tab 29/Pages 2363 to 2371**) the Current JOLs elected to make the without notice *ex parte* Application 2 to commence the FSD Proceedings, which

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

were issued on 15 July 2025. Chapter 15 Petition Proceedings were subsequently filed on 21 July 2025 in the United States Bankruptcy Court, the District of Delaware (see **MP4/Tab 37/Pages 2578 to 2659**) (**Chapter 15 Petition Proceedings**), which would have been unnecessary had the Current JOLs engaged meaningfully in discussions to settle a protocol with the CDM Entities.

107. In their Verified Petition of the Chapter 15 Petition Proceedings, the JOLs asserted that they act "*on behalf of the Highland Foundations*". The advancement of selective stakeholder interests raises serious questions as to the JOLs' independence, balanced against their prior reluctance to agree a protocol which offered voluntary reporting mechanisms that would have delivered many of the same safeguards the Current JOLs now seek in the FSD Proceedings, without incurring the considerable costs now being borne by the liquidation estate.

108. The terms of protocol as proposed between the JOLs and CDM did not include a stay on the pursuit of current or prospective claims against Mr Dondero and his affiliates that were assigned to HMIT by the terms of the Hunter Mountain Settlement. However, the recent legal actions in the form of the TRO Proceedings and the FSD Proceedings which have been taken by the JOLs at the instigation of the Highland Foundations (who are under the influence of Mr Dondero) do impede the conduct of proceedings against Mr Dondero and entities affiliated with him. I discuss the timing of these proceedings and the partiality of them at paragraphs xx to xx below.

109. For the avoidance of doubt, it is not the case that the parties reached an impasse following which the FSD Proceedings and the Chapter 15 Petition Proceedings became the only options available to the Current JOLs – they failed to reply to Campbells' letter dated 29 June 2025 which contained the most recent proposals as to how best safeguard the DAF assets pending the further investigations as demanded by the Current JOLs. Notably, at this point the representations of the Current JOLs were consistent with them continuing to investigate the DAF Restructuring, which I consider to be misleading and fundamentally different to the commencement of proceedings as set out in the FSD Proceedings.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

MR 1692

110. The Current JOLs' apparent willingness to act in lockstep with the Highland Foundations evident in the alacrity of the FSD Proceedings being commenced is even more concerning given its obvious prejudice to DFW and the former directors of the Company by virtue of the serious nature of claims which the Current JOLs have issued having had less than 3 months in office to investigate the allegations of the Highland Foundations before those actions were issued.

111. As outlined in Campbells' letter dated 21 July 2025 (see **MP4/Tab 20/Pages 2245 to 2257**), Mr Murphy and I have made every effort to agree a protocol to preserve the relevant assets pending the outcome of the JOLs' intended investigations, and we have no intention to either dissipate assets and/or misappropriate assets regardless of the adoption of a protocol and/or the continuation of the Rule 11 Agreement.

112. The Current JOLs remained intransient on insisting on matters which would effectively deprive the defendants in the FSD Proceedings from defending those proceedings. As matters transpired, it was only late on 30 July 2025, and less than 24 hours before the Injunction Summons was to be heard by Parker J that counsel for the JOLs acceded to the terms of a Consent Order and undertaking (**FSD Consent Order**) in substantially the same terms as the Protocol which had been proposed by the CDM Entities in the months since the JOLS were first appointed. While the breadth of undertakings provided address additional procedural matters, such as the adjournment of the Chapter 15 application, the substantial terms and oversight of the operations of the DAF assets and investments as provided for in the FSD Consent Order could have been agreed between DFW, the CDM Entities and the Current JOLs much earlier and certainly before they had elected to incur the expense of the FSD Proceedings and Cayman Injunction.

### e) Leveraging of Liquidation Proceedings: Advancement of Dondero Interests

#### i.    Failure to Sanction Highland Foundations

113. It is notable that the Current JOLs will not challenge the Highland Foundations' proprietary claim in the TRO Proceedings (which competes with the Current JOLs' interests in the Company's assets) despite the clear advantages that the Hunter

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

Mountain Settlement offers to the Company and the DAF Structure more generally (as discussed at paragraphs 50 to 53 above).

114. This failure is despite the correspondence sent from Baker & Partners on 8 July 2025 and 18 July 2025 on behalf of DFW, which sought to establish whether the Current JOLs' would seek to sanction the Highland Foundations from commencing litigation in Texas, in the United States to advance claims against assets which they regard as the Company's and which the JOLs ought, as officers of the Court and trustees of the liquidation process, to be defending. Copies of that correspondence are exhibited at **MP4/Tab 30 and Tab 38/Pages 2372 to 2376 and 2660 to 2661**.

115. Instead, the Current JOLs have launched the FSD Proceedings which are being openly brought to protect the Highland Foundations' alleged claims in the Company's assets in a coordinated manner, for example the Writ at paragraph 17 states: "*On 10 July 2025, the JOLs filed this claim and contemporaneously issued the Injunction Summons. The timing of the application was in part driven by the urgent need to preserve the Fund's assets, in circumstances where the Supporting Organisations had filed a TRO Motion in the Texas Proceedings, and a hearing on that motion was anticipated to take place on or around 29 July 2025*". The Current JOLs were also openly seeking a hearing date which coincides with a hearing in the TRO Proceedings in order to support the Highland Foundations' efforts to freeze the Fund's assets. I discuss this approach in more detail at paragraphs 138 below.

116. The FSD Proceedings have been launched despite what I regard inadequate investigations by the Current JOLs and without interviewing either myself or Mr Murphy before reaching a pre-determined view that the Funds' assets in fact belong to the Highland Foundations. Without interviewing myself or Mr Murphy and having interviewed the Highland Foundations, it is unclear to me how the Current JOLs could claim to be fair and independent.

117. This is another example of the Current JOLs lacking objectivity and adopting a course of conduct underpinned by disparity in the treatment between a contributory of the same class, which has completely compromised DFW's trust and confidence in the Current JOLs' ability to administer this liquidation in a fair and impartial manner.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1694

*ii.*    *Solvency determination*

2.    On 18 July 2025, Baker & Partners wrote to the Current JOLs to raise concerns with respect to the JOLs' declaration in the First Report that the Company was solvent (see **MP4/Tab 30/Pages 2372 to 2376**). Baker & Partners noted that neither the reason or the basis for that determination had been provided, either in the JOLs' First Report or at the Meeting of Contributories held on 9 July 2025, in which Baker & Partners were in attendance.

3.    Baker & Partners stated that they found the Current JOLs' determination "*highly questionable*" given the fact that the Current JOLs had stated at **paragraph 13, MacInnis 2**, that "*there no assets in the estate from which the JOLs may, with sanction, fund their investigations*" and at **page 13** that:

"a. the JOLs and their staff have incurred fees and expenses in the aggregate of US$461,145.11; and

b. legal costs and disbursements in the amount of US$978,916.00."

4.    I understand from my prior dealings with the Company as a former director that the Highland Foundations are not creditors of the Company. This is further reflected in the Report of the Current JOLs. Accordingly, I understand from Cayman legal counsel that the Highland Foundations would have no entitlement to participate in the Liquidation Committee in the Company's insolvent liquidation.

5.    For this reason, a declaration that the Company is still solvent confers a significant advantage to the Highland Foundations, whereas a declaration of insolvency would remove their ability to participate in these proceedings.

6.    Maples responded substantively to Baker & Partners by a letter on 23 July 2025 (see **pages MP4/Tab 39/Pages 2662 to 2665)**, which stated that the solvency determination "*reflects the position that if the Company is successful in the Proceedings, the parties with the economic interest in the liquidation will be its participating shareholders*".

7.    In other words, the JOLs have predetermined their claims to the Fund's assets before completing an adequate investigation and before waiting for the determination of the

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

DFW Summons, in which DFW sought to have the validity of the DAF Restructuring (and therefore the scope of the Company's assets) determined in these liquidation proceedings.

8. The Current JOLs failed to substantively engage with the DFW Summons until the His Honourable Justice Asif KC expressly directed them to do so by email direction dated 16 June 2025 (**MP4/Tab 40 30/Page 2666**) From the timing of the various sanction applications and issuance of the FSD Proceedings, it is in my view apparent that the Current JOLs had no genuine intention in engaging with DFW to seek an economical and efficient resolution to any questions over the DAF Restructuring.

9. That omission is remarkable given the vigour with which the Current JOLs have pursued adverse proceedings against DFW, myself, Mr Murphy and affiliated parties in both Cayman and the United States.

***iii. JOLs' avoidance of DFW Summons***

10. At the Sanction Hearing on 24 June 2025, the transcripts of which is exhibited at **MP4/Tab 33/Pages 2399 to 2487** Leading Counsel for DFW addressed the rationale for the DFW Summons that DFW intended to provide an appropriate roadmap for the resolution of the key issues relating to this liquidation, namely: (i) the validity and efficacy of the DAF Restructuring; (ii) the security and safeguarding of the relevant assets, the DAF Assets; and (iii) the identification of which of the potential parties to the summons have an entitlement to the DAF Assets and the nature of that entitlement. The Current JOLs' FSD Proceedings cut across DFW Summons, the procedural vehicle which DFW put forward as a sensible way to resolve the central issues in this liquidation. This means that related issues which underpin the Current JOLs allegations of (including, but not limited to) unlawful means conspiracy, unconscionable receipt and unjust enrichment are now being side-stepped in this liquidation and are placed for determination before a new justice, who is unfamiliar with these proceedings or the relevant facts and evidence which is already before the Court, for determination.

---

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

11. Whilst the Current JOLs have repeatedly stated that they were at the investigation only stage, the speed with which they have commenced proceedings in the Cayman Islands and in Delaware, and attempted to interfere with the bankruptcy proceedings in Texas undermines the purpose of the DFW Summons and failing to agree to a protocol (which would have been the more cost efficient means of resolving the scope of the liquidation and any misconceived concerns around dissipation of potential assets) contradicts any assertion that the Current JOLs are acting disinterestedly or independently.

*iv. JOLs' interference in the Texas Bankruptcy Proceedings*

12. DFW is concerned that these liquidation proceedings are being leveraged by Mr Dondero (through the Highland Foundations) to circumvent obstacles that have arisen in overseas litigation which is not progressing in Mr Dondero's favour, or which Mr Dondero is unable to successfully oppose.

13. Specifically, in the Hunter Mountain Claim (referred to above at paragraphs 103) I caused the HMIT and its affiliated entities (**HMIT Entities**) to enter into the Hunter Mountain Settlement.

14. On 24 June 2025, which was the eve of the Settlement Motion and the day of the Sanction Hearing, the Foundation Parties and HMIT Entities entered into a Settlement Term Sheet (**Term Sheet**) which was executed by Ms Diaz as the Chief Executive Officer of the Dallas Foundation (and who has filed evidence in these liquidation proceedings).

15. At the same time, and as mentioned above, the Current JOLs also wrote to the trustees of the Highland Capital Management L.P., on 24 June 2025 requesting an adjournment of the Settlement Motion to afford the Current JOLs additional time to progress their investigations of the HMIT Entities, or alternatively, that distributions were deferred to the HMIT Entities so that the Current JOLs could continue their investigations without risk of asset dissipation in connection with the protocol discussions (see **MP4/Tab 1/Pages 1 to 3**).

16. It is important to note that approval from the US Bankruptcy Court had been sought before entering into the settlement with HMIT became effective, and could in no way

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1697

have constituted an attempt at asset dissipation under the supervision of a US Bankruptcy Court.

17. The DF Objection (mentioned at paragraphs 49 and 50 above) was withdrawn by virtue of the *"Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorising Actions Consistent Therewith"* which was filed in the United States Bankruptcy Court For the Northern District of Texas, Dallas Division on 25 June 2025 (the **Stipulation**), exhibited at **MP4/Tab 41/Pages 2667 to 2677**.

18. The Stipulation was subsequently entered on 27 June 2025. As set out in correspondence from Kelly Hart Pitre to David Curry of Okin Adams Bartlett Curry LLP dated 11 July 2025 (see **MP4/Tab 42/Pages 2678 to 2681**, the **KHP Letter**), in accordance with the Term Sheet, the Foundation Parties had agreed to participate in an initial confidential settlement meeting which was scheduled for 2 July 2025.

19. The Term Sheet also provided that Mr Shawn Raver, the Company's former assistant general counsel and chief operating officer was required to:

   (a) review the current "DAF" structure with the Dallas Foundation;

   (b) provide a projected quarterly expense budget to the Foundation Parties (as defined therein);

   (c) continue to provide expense reporting every forty-five (45) days, commencing 5 August 2025; and

   (d) show and present a balance sheet for the DAF as of 30 September 2024, 31 December 2024, and 31 March 2025, including transfers of assets among entities within the DAF corporate structure.

20. As stated in the KHP Letter, Mr Raver prepared the balance sheets as required and prepared a May 2025 working balance sheet, which was beyond the scope of his requirements under the Term Sheet.

---

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

21.    The Highland Dallas Foundation, together with The Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc. instead of conducting the 2 July 2025 meeting as planned, filed the TRO Petition the day before the planned meeting and alleged, incredibly, a lack of transparency. Despite this showing of bad faith, the meeting scheduled for the morning of 2 July 2025 went ahead as scheduled with Ms Diaz appearing by Zoom, and Mr Raver presented all of the information discussed.

22.    As mentioned above, the Current JOLs make no secret of the fact that they are timing the hearing of the Injunction Summons intentionally to coincide with the hearing of the TRO Petition. In Maples' letter to the covering letter Court when filing the Civil Proceedings, Maples (at **MP4/Tab 19/Pages 2241 to 2244**), say the following:

     (a)    **Page 2**: "...*we would be most grateful if you are able to confirm if the Honourable Justice Parker has availability to hear the Application on one of the above dates (with <u>our client's preference</u> being 28 or 29 July 2025 <u>in light of the timetable in the Texas Proceedings</u> referred to below)*";

     (b)    **Page 2**: "*The JOLs have recently become aware that the Supporting Organisations (being the holders of Participating Shares in the Company) issued: (i) a Petition against the First, Third, Fourth and Fifth Defendants to the Proceedings, and the original general partner of the Fund (the* "**Texas Petition**" *and the* "**Texas Defendants**"*); and (ii) an application for a temporary restraining order (*"**TRO Motion**"*), before the Texas Business Court...*"

     (c)    **Page 3**: "*In filing the Texas Petition and TRO Motion, the Supporting Organisations are acting independently of the JOLs. The JOLs were informed of the Texas Petition and TRO Motion only after they were filed by the Supporting Organisations.*"

     (d)    **Page 3**: "*If the jurisdiction challenge is successful, the temporary restraints provided for in the Rule 11 Agreement will be revoked, and the Company will be left with no protection against dissipation of the Fund's assets by the Defendants...*"

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

(e) **Page 3:** *"Accordingly, if the Application is not determined until after the Court's summer recess ends in mid-September 2025, the Company would be significantly prejudiced because there is a real risk that the temporary (albeit incomplete protection provided by the Rule 11 Agreement will no longer be in place by then....The JOLs' therefore have grave concerns that without injunctions being granted by the Honourable Court pending trial, the Defendants may take steps to further dissipate or otherwise harm the value of those assets unjustifiably."*

23. It is remarkable that: (a) the Current JOLs first sought to interfere with the implementation of the Hunter Mountain Settlement Agreement, which can only be in the best interest of the Company; (b) have "tag-teamed" with the Highland Foundations' legal strategy to freeze the Fund's assets; (c) are co-ordinating the FSD Proceedings with the TRO Proceedings, despite the fact that they and the Highland Foundations are claiming to have competing proprietary interests in the same assets; and (d) the Current JOLs intervene to obstruct and/or prevent US $300 million in claims arising from the Kirschner Complaint to be alleged against their funders, Mr Dondero and Mr Ellington.

24. By adopting this co-ordinated buttressing litigation strategy, the Currrent JOLs have lost all objectivity with regards to their Court appointed duties, especially as a draft protocol has been in circulation since 16 May 2025 and no reasons for the failure to agree the last draft Protocol have been provided (see paragraphs 122 above).

25. The reasons for this co-ordinated approach with the Highland Foundations I understand stems from the Current JOLs' concerns that the Company's assets were removed to the detriment of the underlying charities (rather than to the detriment of the Company, which is where the JOLs' concerns should objectively lie (see **paragraph 42, MacInnis 5**)).

26. Indeed, Ms MacInnis in **DFW Affidavit 1** at **paragraphs** 52 to 59 (as set out below), goes into great detail with regards to the effects certain of the Company's transactions have had on the charities, and the resulting impacts these transactions will have on the

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

balance sheets of the Supporting Organisations (see also **paragraphs 42 to 49, MacInnis 5**):

"*Impact on Charities*

*[53] The __JOLs continue to investigate the impact that the Relevant Transactions have on the Charities.__ The Relevant Transactions have reduced the ability the Supporting Organisations and the Charities to meet their charitable objectives …*

*A Hole in the Charities' Balance Sheets*

*[57] The JOLs are also **concerned that the other Supporting Organisations and Charities will also have similar holes** in their balance sheet as a result of the Relevant Transactions.*

*[…]*

*[59] The **JOLs are, therefore, concerned that the Relevant Transactions (particularly the LP/LLC Exchange) will reduce the funds available to the Charities** to meet their obligations to the Supporting Organisations*. **[emphasis added]** "

27. Again, and with respect to Ms MacInnis and Grant Thornton, but I am advised (without waiving privilege in connection with that advice) that the Current JOLs' focus should be on investigating whether the transactions had a detrimental effect on the Company; it is not for the JOLs to bring such claims on the Highland Foundations behalf.

28. The Current JOLs have demonstrated a clear partiality towards the Highland Foundations by bringing the FSD Proceedings and seeking to align the timetable in those Cayman proceedings with the timetable of the TRO Proceedings brought by the Highland Foundations.

29. In light of the strong suggestion that the JOLs are favouring and promoting the interests of one set of contributories over another, I repeat that DFW has lost all trust and confidence in the Current JOLs, and that they have lost their independence and objectivity with regards to the fair, efficient and proper administration of this liquidation.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

FSD2025-0116       58       **2025-08-19**

MR 1701

### f) Inadequate or incomplete investigations

#### ii. Absence of Interviews

30. The Current JOLs have consistently refused to engage in any substantive dialogue with DFW or its representatives.

31. Contrary to **paragraph 24, MacInnis 5**, which states that the Current JOLs have "*conducted an extensive and detailed investigation into the Company's affairs, albeit those investigations are not complete*" DFW has never been invited to participate in any meeting with the Current JOLs.

32. Neither I nor Mr Murphy have been interviewed or asked to provide any information in connection with the Current JOLs' investigations. Whilst myself and Mr Murphy cancelled our initial meeting to speak with the JOLs, the issue of their' retention of Johnstone Law was a live one and the prospect that Johnstone Law would have attended that meeting was very real. However, since Johnstone Law's engagement was terminated by the Current JOLs, the Current JOLs have not asked to meet with, or interview us.

33. This stands in stark contrast to the apparent depth of interaction between the Current JOLs and the Highland Foundations, as evidenced by the detail included in the Current JOLs' affidavit in support of the Injunction Summons and in the Statement of Claim in the Civil Proceedings which is outlined as follows.

    (a) **Paragraph 11 of MacInnis 5**: states that the JOLs have discussions with Ms Julie Diaz, Mr Grant Scott and Mr Joe DePaolo of the Highland Foundations to understand the way in which the Company operated historically. However, how the Company operated and its connection with the DAF Structure is not something that the Highland Foundations as Participating Shareholders could have assisted with;

    (b) **Paragraph 15.2 to 15.5 of MacInnis 5**: states that the JOLs have been provided with documents which are concerned with how an individual can establish a Supporting Organisation and the agreement governing the

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

relationships between a Supporting Organisation and their respective charities. This is unrelated to the investigations they are meant to undertake with respect to the Company, but have collected, reviewed and exhibited documents which relate to the Supporting Organisations, such as:

(c) Certificates of incorporation;

(d) By-laws;

(e) Procedures for Establishment and Operation of Funds and Supporting Organisations;

(f) Internal Revenue Service correspondence confirming that the Supporting Organisations are exempt from federal income tax;

(g) The Internal Revenue Code 1986 (as amended);

(h) A Legal Relationship Agreement (as defined in MacInnis 5); and

(i) An Operating Agreement.

(j) It appears that the scope of the Current JOLs' investigations has gone well beyond the affairs of the Company itself and has extended to investigating the genesis of the Company's stakeholders which is unconnected with the liquidation. Furthermore, it also appears that the Current JOLs' have misdirected their investigations with regards to the tax exempt status of the Supporting Organisations, as it is the nature of the DAF Structure and the effects of the DAF Restructure which should determine the Supporting Organisations' treatment for tax purposes.

34. Moreover, the Current JOLs appear to have repurposed their investigatory powers under the Companies Act into a litigation-driven evidence-gathering exercise, and commenced proceedings in multiple jurisdictions within the space of a few weeks from their appointment.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1703

*ii. No investigation into federal tax status concerns*

35. The Current JOLs' investigations have not touched at all upon whether the DAF Structure was indeed exposed to US federal tax laws, despite extensive evidence given in my affidavit. They brush this aside with reference to a Haynes & Boone memo that focuses on whether the DAF constitutes a "donor advised fund" under the U.S. Internal Revenue Code. As the Current JOLs admit, it is not; the Haynes & Boone memo misstated the facts (as the JOLs implicitly acknowledged) and addressed issues of no relevance given this is not a "donor advised fund." It is also unclear whether the Current JOLs have obtained their own independent tax advice with respect to these concerns.

36. If so, the Current JOLs have not disclosed this advice, or the identity of their advisor.

37. The Current JOLs have also not responded to the extensive evidence I gave with respect to this issue at **paragraphs 188 to 199, DFW Affidavit** and respectfully, Ms McInnis does not have the expertise to address matters on the tax laws of the United States.

38. Additionally, Mancino 1 exhibited at **MP4/Tab 11/Pages 1642 to 1687** corrects material factual errors and overstatements, and legal errors or distortions of U.S. tax and nonprofit corporation law made throughout FSD Affidavit 1.

39. Such corrections include:

    (a)　All entities affiliated with Highland Foundations including not only the Company but also The Dallas Foundation are exposed to material risks and associated defence cost should the audit be commenced.

    b)　The Highland Foundations' failings Mr Mancino refers to in his evidence has in fact resulted in the inurement of its net earnings to Mr Dondero in violation of one of the most fundamental requirements of section 501(c)(3) of the Code.

    c)　The Highland Foundations are operating primarily to serve Mr Dondero's private personal interests, which is also a U.S. tax violation.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1704

    d) Myself and Mr Murphy held a reasonable belief that the Highland Foundations were no longer a section 501(c)(3) organisation due to the various dealings the Highland Foundations' had with Mr Dondero and his affiliated companies (**MP1 at pages 172 to 305**).

    e) The real issue is not the possible imminent revocation of the Highland Foundations' tax exempt status occurring, but rather what a rationale reasonable person would do today acting as a fiduciary in the exercise of his/her duty of care to mitigate future consequences of such a revocation.

    f) It is demanded from myself and Mr Murphy as directors of the Company that we act in accordance with our fiduciary duties of care because we had present knowledge and advice of expert counsel that the tax exemption risks to Highland Foundation were real, materially high, and not speculative.

156. In other words, to have played an "audit lottery" would have run contrary to our obligations as directors.

157. Troublingly, the Current JOLs do not have appeared to address the contents of Mr Mancino's letter 20 March 2025 (and updated on 1 May 2025) to the IRS at all (the **IRS Letter**). Rather than treat concerns raised by an expert in this field as a focal point of their investigations, the Current JOLs have instead elected to dismiss the IRS Letter as simply a calculated tactic "*to manufacture grounds on which the Relevant Transactions could be justified after the fact*" (see **paragraph 76.2, FSD Affidavit 1**).

158. It would seem that the Current JOLs have lost their objectivity with respect to this aspect of the investigation, by dismissing leading expert advice on this matter and without seemingly obtaining independent tax advice of their own, as the Current JOLs not experts in U.S. tax law themselves. The Current JOLs (see e.g. Ms MacInnis 15 July Affidavit at paragraph 71) also ignore valuable advice Mr Murphy and I received from other tax advisors to the extent it was not written and provided to them. While much of it was written, some of it was not; notably, Mr Mancino advised favourably on every step of the DAF Restructuring, yet his advice is not referred to at e.g. Ms MacInnis 15 July Affidavit at paragraph 71 because the Current JOLs have based their

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

conclusions on written materials available to them and have not spoken with me or Mr Murphy to confirm that those written materials encompass all advice and context.

*iii. No investigations into Dondero related litigation*

159. As highlighted at **paragraphs 66, 120 to 143 of DFW Affidavit**, Mr Dondero is involved in extensive and various litigation. Indeed, Highland Capital Management, L.P submitted in *Highland Capital Management, L.P. v NexPoint Advisers, L.P. and NexPoint Asset Management, L.P.* before the Supreme Court of the United States that Mr Dondero and his entities are subject to multiple contempt findings and have filed more than fifty appeals to the district court and Fifth Circuit as 27 May 2025.

160. Furthermore, the Company (whether directly or indirectly) itself is involved with both value protective and value adding litigation as a result of Mr Dondero's prior conduct and breaches, which are summarised as follows:

**CLO Holdco Note**

161. CLO HoldCo, Ltd. (**CLOH**) is the obligor on a promissory note (the **CLOH Note**) currently valued at approximately US $40 million in principal and interest, with a maturity date in December 2025. The note was previously held by Sentinel Reinsurance Ltd. (**Sentinel**), a Cayman Islands reinsurance company owned by Mrs Dondero and Mr Ellington but was assigned to UBS Securities LLC (**UBS**) as part of a settlement whereby Sentinel received a US $10 million cash payment in exchange. CLOH has engaged legal counsel to assess its obligations and potential defences in relation to this claim. The underlying transaction forms part of the broader Sentinel Fraud allegations concerning fraudulent conveyances intended to shield assets from a US $1.2 billion judgment against Mr Dondero and his affiliates.

**Dondero Note Arbitration**

162. As mentioned above, Mr Dondero's personal trust, Dugaboy, filed an arbitration action alleging HMIT owes Mr Dondero's personal trust US $62.6 million pursuant to a promissory note. Further details of this litigation can be found at paragraph 52(a) above.

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1706

**UBS New York State Court lawsuit**

163. As outlined in **paragraphs 123 to 127, DFW Affidavit**, UBS named CLOH as a co-defendant in the US $1.1 billion New York State Court action against Mr Dondero (amongst others).

164. CLOH is the only defendant to successfully obtain dismissal.

165. UBS is appealing that dismissal and may also amend its complaint to allege that CLOH is an alter ego of Mr Dondero, which could expose all DAF assets to collection by UBS in pursuit of its US $1.2 billion judgment.

166. It is therefore essential that the Highland Foundations are not controlled by Mr Dondero because it could lead to substantial harm to DAF's assets.

167. CLOH also believes UBS may amend its petition for leverage in the negotiations for payment on the CLOH Note.

**Defense of Highland Capital bankruptcy settlement**

168. HMIT and its affiliates entered into the Hunter Mountain Settlement Agreement in May 2025, details of which are described above at paragraphs 49 to 50.

169. The Hunter Mountain Settlement represents a massive victory for HMIT and DAF. I believe the Current JOLs either have lost all objectivity with respect to the benefits which will flow from this settlement. The JOLs should be in favour of such huge amounts of funds returning to the DAF Structure, rather than seeking to delay or interfere with it.

170. With respect to value-add litigation, the matters presently on foot are as follows:

**Kirschner Claims**

171. I understand from legal counsel engaged in this litigation that the Kirschner claims involve actions for damages in excess of US $300 million against entities related or affiliated with Mr Dondero and Mr Ellington. All DAF Entities were dismissed as

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

defendants to this action. A copy of the Kirschner Complaint - Chapt 11 Highland Cap Mgmt v Dondero is exhibited at **MP4/Tab 43/Pages 2682 to 2815**.

172. Following approval of the Hunter Mountain Settlement Agreement, HMIT (an entity within the DAF structure) acquired these claims on 7 July 2025, which include a multitude of actions asserted against Mr Dondero, Mr Ellington and their affiliates for a variety of alleged fraudulent activities and schemes that siphoned assets from HCMLP to the pockets of Mr Dondero, Mr Ellington and others.

173. As an example, the Kirschner Complaint describes Mr Dondero's fraudulent activities with respect to Sentinel and by which Mr Dondero ultimately mislead the Cayman Islands Monetary Authority.

174. Highland (in its capacity as a debtor) temporarily stayed prosecution of these claims because Highland believed it had sufficient assets in the bankruptcy estate to pay all creditors at par.

175. I believe HMIT and DAF will receive substantial value from prosecuting these claims, which will benefit charitable causes.

**Atlas Demand Note Lawsuit**

176. I described this matter at **paragraphs 138 to 140, DFW Affidavit**. To reiterate, this is a lawsuit by Atlas IDF, LP (**Atlas**) against NexPoint Real Estate Partners, LLC (**NREP**) for US $13.9 million in promissory notes payable on demand.

177. NREP, a Mr Dondero-controlled entity, has refused to pay on the demand promissory notes despite a demand for payment. Atlas' counsel is actively suing to collect on the notes.

178. NREP has counterclaimed and sued myself and Mr Raver personally, who are indemnified in the matter by Atlas and certain DAF entities. It is important to note that by an order of the Business Court of Texas dated 14 August 2025 exhibited at **MP4/Tab 44/Pages 2816 to 2818**, the claims against myself and Mr Raver were dismissed in their entirety.

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

179. Dugaboy is also a guarantor of this debt obligation. While Atlas is not a DAF subsidiary, DAF is affected because Rand Advisors, LLC (**Rand Advisors**) manages DAF assets, and Charitable DAF Holdings Corp. owns and controls Atlas's general partner and receives investment management fees which benefit DAF.

**Liberty Lawsuit vs. HCMSI**

180. I described this matter at paragraph 141, DFW Affidavit.

181. Liberty CLO HoldCo, Ltd. (**Liberty**) sued Highland Capital Management Services, Inc. (**HCMSI**) for breach of a promissory note with a principal balance of approximately US $1.3 million.

182. HCMSI, a Mr Dondero-controlled entity, defaulted on its payment obligation under the note to Liberty. Liberty's counsel is actively suing to collect on the note.

**NexPoint Polo Glen**

183. This is a lawsuit by Liberty against NexPoint Polo Glen (**Polo Glen**) for breach of contract in the amount of approximately US $700,000.

184. Polo Glen, another Mr Dondero-controlled entity, has refused to satisfy its contractual obligations to repurchase Liberty's membership interest pursuant to a put option agreement.

185. Liberty's counsel is actively pursuing to collect on the breach of contract.

186. The Current JOLs have not adduced any evidence which reveals the existence of the litigation referenced above which represents significant gains for the Company and/or the DAF Structure. As a result, I have had to provide extensive evidence in this regard to appraise the Court. This should have been disclosed by the Current JOLs if they had conducted a thorough investigation.

187. Should the Highland Foundations be successful in the TRO Petition, then the ability for this litigation (the majority of which is against Mr Dondero) will be unable to proceed, to the detriment of the Company, the DAF Structure and ultimately the contributories or

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1709

creditors of the Company. It is unclear whether the Current JOLs had an appreciation of this when they elected to file the FSD Proceedings.

188. If they did, then they arguably acted against the best interests of the minority of the Company's contributories rather than the Company. If they did not, then this confirms that they have conducted a wholly inadequate investigation and are failing in their duties to be fair and independent.

*iv. Use of DAF Structure for the benefit of Dondero*

189. Extensive evidence given by both myself at **paragraphs 111 to 115 and 151 to 156, DFW Affidavit** and the Current JOLs at **paragraph 29, FSD Affidavit 1** (see pages 82 to 83 and 94 to 96 of DFW 1) clearly suggests that the Fund, and more broadly, the charitable structure, was being used to cycle Mr Dondero's donations to purchase interests in businesses related to Mr Dondero or into transactions which lend more favourable commercial terms to entities related to Mr Dondero, whilst all under the shield of US federal tax exemptions.

190. It is also clear from a review of DFW Affidavit 1 that the JOLs have not questioned or sought to look behind these interests before filing the FSD Proceedings. Their investigations appear to extend only to identifying which interests DAF LP's fund structure has in connection with Mr Dondero's related businesses. They do not appear to have taken on board DFW's concerns raised in DFW Affidavit at all.

191. Furthermore, the Current JOLs incorrectly state at **paragraph 27, FSD Affidavit 1** that DAF LP relied on mostly passive investment vehicles which betrays that the Current JOLs' investigations are still embryonic and have not been sufficiently thorough. For example, wealth creation for DAF LP derives from an array of sources, including:

    a) The Hunter Mountain Settlement Agreement secures rights in the Kirshner claims which has a value of up to US $300 million, which DAF LP and its related entities will benefit from.

    b) Debt collection claims against Mr Dondero's companies also represents millions of dollars in returns for the Fund's related entities. ;

THIS AFFIDAVIT is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

192. One of the Fund's related entities, Rand Advisors which operates as an investment management business, manages investor assets worth over US $100 million. These investors are unrelated to DAF LP or the parties in the FSD Proceedings. The management fees which are paid to Rand Advisors are redistributed to DAF LP.

## D. REPLACEMENT JOLs

193. For all the reasons set out above, DFW as a creditor in what it believes is the Company's insolvent liquidation, and as the Company's largest contributory has lost all trust and confidence in the Current JOLs' conduct of this liquidation, which requires them to act fairly, independently, impartially and in the best interests of the Company, rather than a class of the Company's minority contributories.

194. It is therefore proposed that Ms Neema Griffin and Mr Jeffrey Stower of Teneo (whose experience and qualifications are set out below) are appointed as Replacement JOLs as proposed in the terms of the draft Order which is being filed with this application.

195. Ms Griffin is a Managing Director with Teneo Cayman's Advisory business. She has over 18 years of financial advisory and insolvency experience with a specialism in contentious and complex insolvencies, involving high value litigation, fraud investigations and international asset tracing, personal bankruptcies and fund insolvencies. Her wider financial advisory experience includes solvency reviews, M&A mandates and regulatory advisory. Since moving to the Cayman Islands, her industry focus has been on financial services. Ms Griffin is an insolvency appointment taker in the Cayman Islands and is a UK licensed insolvency practitioner. Ms Griffin's sworn Consent to Act is exhibited at **MP4/Tab 45/Pages 2819 to 2823**.

196. Mr Stower is a Senior Managing Director with Teneo in the Cayman Islands. He has over 25 years of experience in Restructuring & Insolvency, the last 16 of which have been spent in the Cayman Islands with a focus primarily on the financial services industry. Mr Stower has a wealth of experience in both cross-border restructurings, inspectorships and insolvencies involving hedge funds, private equity funds, insurance companies, listed holding companies and a range of other offshore structures, acting in a variety of roles including appointments as official liquidator, provisional liquidator,

THIS **AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

FSD2025-0116         68         2025-08-19

MR 1711

voluntary liquidator and controller. He is a qualified insolvency practitioner in the Cayman Islands and is a Fellow of INSOL International. Mr Stower's sworn Consent to Act is exhibited at **MP4/Tab 46/Pages 2824 to 2428**.

197. Ms Griffin and Mr Stower's Consents to Act confirm that they:

a.   Are free of conflicts and clear to act;

b.   Meet the requirements of independent under the Insolvency Practitioners' Regulations (**IPR**);

c.   Meet the residency requirements of the IPR; and

d.   Have the requisite experience to conduct the liquidation of the Company as evident by their resumes exhibited to their Consents to Act.

198. At paragraphs xx t xx above I address the concerns which I, as the sole director of DFW have in connection with the funding of the Current JOLs. I am aware and understand that the Company has limited assets from which the fees and expenses of the Replacement JOLs could be paid.

On their appointment, DFW would be in a position to fund the immediate costs of the Replacement JOLs but, in recognising that the Highland Foundations consider the Replacement JOLs to be under a conflict of interest if funded by DFW, I also recognise that the Replacement JOLs would be best serve by securing third-party funding for the necessary investigations. However, this is properly a matter for the Replacement JOLs to evaluate and seek sanction of in due course.

## E.   CONCLUSION

199. For the avoidance of doubt, DFW objects to any proposal put forward by the JOLs that the costs awarded to DFW in connection with the Sanctions Summons should be offset against any possible recoveries the Current JOLs may make in the future. DFW is entitled to its costs pursuant to the terms of the Order made on 24 June 2025 in these proceedings, the terms of the Order do not provide that DFW's costs should be

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001)

MR 1712

contingent on speculative recoveries being made by the Current JOLs, or upon certain milestones in these proceedings being reached by the Current JOLs.

**SWORN** to at Galveston    Texas    )

on this  19th    day of  August    2025    )

)

MARK ERIC PATRICK    BEFORE ME:

NOTARY PUBLIC



Kenneth Wyatt Lightfoot IV

ID NUMBER
13433248-0
COMMISSION EXPIRES
April 28, 2027

04/28/2027

Electronically signed and notarized online using the Proof platform.

**THIS AFFIDAVIT** is filed by Baker and Partners (Cayman) Limited, attorneys for DFW Charitable Foundation, whose address for service is Buckingham Square, 720 West Bay Road, PO Box 636, Grand Cayman KY1-1107, Cayman Islands (Ref: DFWC.001.001).

MR 1713

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elizabeth Perez on behalf of Joseph Cox
Bar No. 4950200
EPerez@duanemorris.com
Envelope ID: 104703209
Filing Code Description: Notice
Filing Description: 20250821 Notice of filing in Cayman matter
Status as of 8/22/2025 8:41 AM CST

Associated Case Party: The Highland Dallas Foundation, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/21/2025 5:47:51 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/21/2025 5:47:51 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/21/2025 5:47:51 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/21/2025 5:47:51 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/21/2025 5:47:51 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/21/2025 5:47:51 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/21/2025 5:47:51 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/21/2025 5:47:51 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/21/2025 5:47:51 PM | SENT |

Associated Case Party: DFW Charitable Foundation

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brent M.Rubin | | brubin@ccsb.com | 8/21/2025 5:47:51 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/21/2025 5:47:51 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/21/2025 5:47:51 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/21/2025 5:47:51 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/21/2025 5:47:51 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 8/21/2025 5:47:51 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/21/2025 5:47:51 PM | SENT |

Case Contacts

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Elizabeth Perez on behalf of Joseph Cox
Bar No. 4950200
EPerez@duanemorris.com
Envelope ID: 104703209
Filing Code Description: Notice
Filing Description: 20250821 Notice of filing in Cayman matter
Status as of 8/22/2025 8:41 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Angie Barrera | | abarrera@ccsb.com | 8/21/2025 5:47:51 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/21/2025 5:47:51 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/21/2025 5:47:51 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/21/2025 5:47:51 PM | SENT |

Tab 18

E-filed in the Office of the Clerk
for the Business Court of Texas
8/25/2025 3:27 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

**CAUSE NO. 25-BC01B-0027**

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* | § § | FIRST DIVISION |
| v. | § | |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § | DALLAS, TEXAS |
| *Defendants.* | § § § | |

## PLAINTIFFS' SUR-REPLY TO DEFENDANTS' SUPPLEMENTAL BRIEF AND ALTERNATIVE MOTION TO ABATE

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
Benjamin L. Warden
State Bar No. 24115926
bwarden@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7200 – Telephone
(214) 292-8442 – Facsimile

Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

*Attorneys for Plaintiffs*

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................2

TABLE OF AUTHORITIES...................................................................3

TABLE OF ABBREVIATIONS ...............................................................4

ARGUMENT ..................................................................................5

   I.   The Charities Have Capacity to Raise their Claims.......................5

     a.   The Charities have not "conceded" that they lack capacity to bring any of their claims................................................................5

     b.   The record demonstrates the Charities' capacity to bring their claims. ..........................................................................................7

   II.    Rule 39 Does Not Mandate Joiner or the Delay of this Action. .11

     a.   The Court can grant complete relief between the named parties without the joinder of the Charitable DAF Fund or Charitable HoldCo..............................................................................................11

     b.   Plaintiffs seek equitable remedies only over the Defendants and assets they control. ..........................................................................12

     c.   Defendants show no authority supporting their claim that complete relief between the present parties cannot be achieved. ....14

     d.   There is also no obstacle to complete relief on the Charities' claims for money damages.............................................................15

     e.   Charitable Holdco has not claimed an interest in the subject matter of this lawsuit. ....................................................................16

     f.   Joinder is not required under Rule 39(a)(2)(ii) because Defendants fail to demonstrate a "substantial risk" of inconsistent judgments............................................................................................17

     g.   Joinder is not required pursuant to Rule 39(a)(2)(i) because Charitable HoldCo's interests are not imperiled by the Charities' claims. ..............................................................................................20

h.   Even if Defendants had carried their burden as to one of the prongs of Rule 39(a), they ignore that, under Rule 39(b), courts are empowered to shape the relief awarded as between the parties. ......21

PRAYER ....................................................................................................23

CERTIFICATE OF SERVICE ...................................................................24

CERTIFICATE OF COMPLIANCE ...........................................................24

APPENDIX OF FOREIGN AUTHORITY ................................................ 25

**TABLE OF AUTHORITIES**

**Cases**

*Bourne v. Bourne,*
  559 S.W.2d 844, 847 (Tex. App.—Houston [1ˢᵗ Dist.] 1977) ...............22

*BDO USA LLP v. Litex Industries Limited,* No. 05-15-00358-CV, 2016
  WL 3198503 (Tex. App.—Dallas, May 26, 2016). ..............................10

*Eagle Prop., Ltd. v. Scharbauer,* 807 S.W.2d 714, 723 (Tex. 1990)). .......7

*Federal Insurance Company v. Singing River Health System,*
  850 F.3d 187, 201 (5th Cir. 2017) ...................................................21

*Feiner Family Tr. v. VBI Corp.,* No. 07 CIV. 1914 (RPP),
  2007 WL 2615448 (S.D.N.Y. Sept. 11, 2007) .....................................9,10

*Field v. Volkswagenwerk AG,* 626 F.2d 293, 301 (3d Cir. 1980). ...........15

*In re Bridgestone Americas Tire Operations, LLC,*
  459 S.W.3d 565, 573 (Tex. 2015). .....................................................6

*In re Dexterity Surgical, Inc.,*
  365 B.R. 690, 697 (Bankr. S.D. Tex. 2007). ........................................8

*In re Independence Fuel Systems LLC,*
   655 B.R. 322 (Bankr. E.D. Tex. 2023) ..............................................15

*KCM Financial LLC v. Bradshaw,*
  457 S.W.3d 70, 88 (Tex. 2015) .........................................................14

*KSNG Architects, Inc. v. Beasley,*
  109 S.W.3d 894, 898 (Tex. App.—Dallas 2003, no pet.) .......................9

*Moody v. Moody,* 613 S.W.3d 707, 717–22 (Tex. App.—Houston [14th
  Dist.] 2020, pet. denied).................................................................5, 6

3

*Moser, Tr. of Estate of Mason v. Dillon Investments, LLC*, 649 S.W.3d 259, 272 (Tex. App.—Dallas 2022, no pet.). ...........................................6

*Ortiz v. A.N.P., Inc.*, 10–CV–917, 2010 WL 3702595, at *4 (S.D.Tex. Sept. 15, 2010)(internal citations omitted). ................................. 13, 16

*Sanson v. Allstate Tex. Lloyds*, No. 4:17-CV-00733, 2018 WL 3630136, at *2 (E.D. Tex. July 31, 2018) ............................................. 13, 16, 18

*Shutter v. Wells Fargo Bank, N.A.*, 318 S.W.3d 467, 470 (Tex. App.—Dallas 2010, pet. dism'd w.o.j.) ........9

*Skinny Pasta International, Ltd.*, 1:20-CV-669-RP, 2021 WL 8083331 (W.D. Tex, Mar. 26, 2021)..........21

*Smith v. State Farm Fire & Cas. Co.*, 633 F.2d 401, 405 (5th Cir. 1980).....................................................21

*Tianrui (International) Holding Co. Ltd. v. China Shanshui Cement Group Ltd.* [2024], 2024 WL 04794596, UKPC 36 (appeal taken from Cayman Islands)...............................................................................10

## Rules

Fed. R. Civ. P. 19(a)......................................................................... 15, 16

Tex. R. Civ. P. 39(a)........................................................................ passim

Tex. R. Civ. P. 39(b).................................................................21, 22, 23

Tex. R. Civ. P. 93(2)................................................................................6

## TABLE OF ABBREVIATIONS

| Term | Abbreviation |
| --- | --- |
| Charitable DAF HoldCo, Ltd | Charitable HoldCo |
| Plaintiffs Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc. | Charities |

4

# ARGUMENT

## I. The Charities Have Capacity to Raise their Claims

### a. *The Charities have not "conceded" that they lack capacity to bring any of their claims.*

Defendants argue that the Charities have conceded claims for "common law fraud, fraud by nondisclosure, civil conspiracy, constructive fraud, unjust enrichment, conversion, a constructive trust, and application for a receivership" because the Charities have not defended them on a claim-by-claim basis. Reply at 5 (citing *Moody v. Moody*, 613 S.W.3d 707, 717–22 (Tex. App.—Houston [14th Dist.] 2020, pet. denied)). But *Moody* does not suggest any requirement to go through each claim one by one and establish capacity. Defendants are adding requirements that their authorities do not impose.

*Moody* dismissed the suit for "lack of jurisdiction." *Id.* at 722. The court never indicated that claims had to be separately defended. The court itself recognized that its analysis bled between capacity and standing—and did not analyze capacity to bring all claims. *Id.* (stating in "Conclusion" that the plaintiff "lack[ed] standing and/or capacity to pursue her claims"). But standing and capacity are distinctly different analyses.

"[C]apacity to sue, unlike standing, is not a jurisdictional" question. *In re Bridgestone Americas Tire Operations, LLC*, 459 S.W.3d 565, 573 (Tex. 2015). "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Moser, Tr. of Estate of Mason v. Dillon Investments, LLC*, 649 S.W.3d 259, 272 (Tex. App.—Dallas 2022, no pet.). Certainly the Charities were personally aggrieved here and the question of standing is fully briefed and before the Court.

If, as Defendants argue, capacity should be analyzed on a claim-by-claim basis, it is Defendants who have conceded the issue. Capacity is Defendants' issue to raise. Ordinarily, Defendants "must verif[y] by affidavit that the Charities are "not entitled to recover in the capacity in which [they] sue[]." Tex. R. Civ. P. 93(2); *Moody*, 613 S.W.3d at 714 ("a challenge for capacity must be preserved in the trial court by filing a verified denial"). Defendants never have.

In their opening brief here, Defendants did not analyze capacity on a claim-by-claim basis, instead arguing generally about derivative versus direct claims. *See* Def's Supp. Br. at 10-16. The Charities responded to

6

Defendants' argument, demonstrating their direct claims. But nowhere did Defendants indicate, on a claim-by-claim basis, why the Charities lacked capacity—in contrast to what they claim is demanded by *Moody*.

**b. *The record demonstrates the Charities' capacity to bring their claims.***

Nevertheless, the Charities fully explained their capacity. Plaintiffs' First Amended Petition pleads an array of facts which call out specific misrepresentations made by Defendants directly to the Charities. First Amended Petition, ¶¶ 5.37, 5.64-5.75. The Charities' response to Defendants' PTJ likewise argued that "Plaintiffs have pled that material representations were made to them" that were false, and caused the Charities to rely upon those representations to their detriment. Opposition to PTJ at 28 (citing *Eagle Prop., Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990)).

In this round of briefing, the Charities' response to Defendants' supplemental brief emphasized direct breaches of fiduciary duties and direct fraud allegations. Pl's Resp. Br. at 11-17. Defendants do not—indeed, cannot—explain how the Charities can possibly lack capacity to bring suit based upon representations made *to them* personally, that

7

induced *them* to act, or refrain from taking action, and caused *them* millions of dollars in damages.

Similarly, the Charities' unjust enrichment, conversion and constructive trust causes of action are based upon Defendants' plundering of their contingent interests in the assets of the Charitable DAF Fund. Those are personal claims based upon personal injuries to them. First Amended Petition, ¶¶ 5.37, 5.64-5.75, 6.37-6.51.

Defendants urge that these claims "all stem from their allegation that Patrick, in the 'Control Position' of the [Charitable HoldCo], stole assets from [Charitable HoldCo], which diminished the value of their preferred shares." Reply at 8. Charitable HoldCo might have such a cause of action, but that is not the theory of damages alleged in any of the causes of action in the First Amended Complaint. As explained in the Charities' brief, it is a well-accepted principle that a direct and derivative action may be maintained out of the same set of facts—that is, a claim for the company, and separate, different claim for the shareholder. *In re Dexterity Surgical, Inc.*, 365 B.R. 690, 697 (Bankr. S.D. Tex. 2007). The Charities have pled valid causes of action based on facts sufficient in law

8

to assert claims for harms against them, on theories of damages other than the diminution of share value.

To the extent that Defendants challenge Plaintiffs' ability to prevail on the merits of these claims, "[a] plea in abatement may not be used to determine the merits of an action." *KSNG Architects, Inc. v. Beasley*, 109 S.W.3d 894, 898 (Tex. App.—Dallas 2003, no pet.); *see also Shutter v. Wells Fargo Bank, N.A.*, 318 S.W.3d 467, 470 (Tex. App.—Dallas 2010, pet. dism'd w.o.j.) (same).

In reply, Defendants ignore the Charities' demonstration that direct duties under Cayman law exist where directors or officers "for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders." *Feiner Family Tr. v. VBI Corp.*, No. 07 CIV. 1914 (RPP), 2007 WL 2615448 (S.D.N.Y. Sept. 11, 2007) (citation omitted)). Defendants likewise fail to even cite, let alone contradict, the Charities' reliance upon *Tianrui (International) Holding Co. Ltd. v. China Shanshui Cement Group Ltd.* [2024], 2024 WL 04794596, UKPC 36

9

(appeal taken from Cayman Islands).[1] That case recognized a personal cause of action on the part of a shareholder to bring an action where a controller of a Cayman company acts for his own self-interest and deliberately alters the balance of power between shareholders. As these duties are owed directly *to* shareholders, they can be enforced directly *by* shareholders. *Feiner Family Tr.*, 2007 WL 2615448 at *7.

Turning to Texas law, Defendants argue that there is no ability for shareholders to bring direct claims under Texas law, but fail to address *BDO USA LLP v. Litex Industries Limited*, No. 05-15-00358-CV, 2016 WL 3198503 (Tex. App.—Dallas, May 26, 2016). *BDO USA* held that a shareholder properly alleges a duty owed directly to it where it cites alleged misrepresentations made directly by the defendant to the plaintiff, which induce its action or inaction. *Id.* at *9. There, the court of appeals ruled that "the evidence does not show [the plaintiff] is seeking damages personally for a wrong done solely to [the corporation], but rather shows the damages sought by [the plaintiff] as for wrongs to [the

---

[1] An Appendix containing a copy of this foreign decision is attached and incorporated in support of Charities' Sur-Reply.

MR 1726

plaintiff] individually based on violation of [a] duty ow[ed] directly." *Id*. The Charities' claims clear this bar.

Defendants have never attempted to dispute that the Charities have pled facts adequate to maintain their common law fraud, fraud by non-disclosure, conversion, unjust enrichment, and conspiracy claims. Those claims as-pled do not depend upon the mere diminution of share value to state a model for damages. For example, the Charities allege that the Defendants' false representations were calculated to induce the Charities to forgo or delay execution of their option to wind up the Fund, and thereby obtain the actual Fund assets—not just an increase in share value; and that this worked, with the result that the Charities lost the opportunity to effectively wind-up the Fund and collect its assets. The Charities have the capacity to raise losses they have suffered due to this conduct.

II. **Rule 39 Does Not Mandate Joinder or the Delay of this Action.**

a. *The Court can grant complete relief between the named parties without the joinder of the Charitable DAF Fund or Charitable HoldCo.*

Defendants have abandoned their contention that Charitable HoldCo must be joined under Texas Rule of Civil Procedure 39(a)(1)

11

because the Charities' claims are all derivative. Supp. Br. at 18. Defendants now say that "complete relief" between the parties here is not possible because, without joining Charitable HoldCo, the Court cannot grant a receivership or constructive trust over the Charitable DAF Fund's assets. But the Defendants mischaracterize the relief the Charities seek; and the law they cite does not support their construction of Rule 39(a)(1).

**b.** ***Plaintiffs seek equitable remedies only over the Defendants and assets they control.***

Defendants argue that the Court cannot render "complete relief" between the parties because the Charities seek equitable relief—a receivership and constructive trust—over absent entities and "over assets the Defendants do not *control*." Def. Repl. at 9 (emphasis added). This is wrong for two reasons.

First, there is no factual question that the Defendants here—specifically, Patrick, CDMCFAD, and CDH, GP—*control* the Fund and its assets. They still hold the management and participation shares and exercise authority over the Fund. Nothing happens to the Fund assets without their say-so. The Defendants' assertion that they do not "control" the Fund assets is just false.

12

Second, the Charities move *against the Defendants* before this Court, and ask for interim protections to prevent further dissipation of assets by replacing *Defendants' current control* with a receiver responsible to this Court. That is all that is required by Rule 39(a)(1). *Sanson v. Allstate Tex. Lloyds*, No. 4:17-CV-00733, 2018 WL 3630136, at *2 (E.D. Tex. July 31, 2018) ("Complete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought.").

The Charities have consistently explained that they are not asking the Court to take non-parties' assets. *See, e.g.*, Hr'g Tr. 70:18-71:21, Business Court Dallas Division 1B, Aug. 4, 2025. That being so, the prospect of later balancing of the scales is not an obstacle to complete relief between *these Parties*, since "the 'complete relief' provision does not concern "any subsequent relief via contribution or indemnification for which the absent party might later be responsible." *Ortiz v. A.N.P., Inc.*, 10–CV–917, 2010 WL 3702595, at *4 (S.D.Tex. Sept. 15, 2010)(internal citations omitted). The effect of a receivership would be to put a stop to Patrick's faithless management of the Fund, not to directly seize its assets. There is no inconsistency between a receiver safeguarding

13

potentially recoverable assets by assuming these Defendants' *control*, and the JOLs clawing back possession of the Fund, or some portion, for Charitable HoldCo should it ultimately be determined entitled to it.

The equitable relief the Charities seek is tied to the actions taken entirely by the Defendants to this case. The Charities allege that Patrick, CDH GP, CDMCFAD, and DFW Foundation conspired in a series of fraudulent maneuvers by which the Charities' interests were diluted, exchanged, and ultimately purchased through a redemption for a farcical sum of $1.6 million through actions by these Defendants who bear direct responsibility to the Charities. First Amended Petition, ¶¶ 5.37, 5.64-5.75. Patrick and his puppet entities should not have continued control.

### c. *Defendants show no authority supporting their claim that complete relief between the present parties cannot be achieved.*

Defendants cite *KCM Financial LLC v. Bradshaw*, 457 S.W.3d 70, 88 (Tex. 2015), but that is not a case about joinder. It stands, rather, only for the uncontroversial rule that for a plaintiff to prevail on the merits on a constructive trust claim, "some particular property must be identified as to which plaintiff has an equity." The success or failure of a claim on

14

the merits, however, is outside the concerns of Rule 39(a)(1). *Field v. Volkswagenwerk AG*, 626 F.2d 293, 301 (3d Cir. 1980).

Defendants also cite *In re Independence Fuel Systems LLC*, 655 B.R. 322 (Bankr. E.D. Tex. 2023), for the proposition that, under Rule 39(a)(1), "non-parties with an interest in those assets must be joined as necessary parties," otherwise "the full relief sought cannot be awarded." Def. Repl. at 10. While the Court required joinder in that case, it did so under Federal Rule 19(a)(1)(B)(i) (equivalent to Texas Rule 39(a)(2)(i)), finding that, non-joinder of the "unserved non-party, Eastman Midstream, LP, *impairs its ability to protect its interests*[.]" *In re Indep. Fuel Sys. LLC*, 655 B.R. at 328 (emphasis added). As set forth below, there is no obstacle to Charitable HoldCo protecting *its interests*—so *Independence Fuel Systems* does not inform here.

### d. *There is also no obstacle to complete relief on the Charities' claims for money damages.*

A monetary award is not directly tied to Fund assets—the Defendants can be liable for the Charities' losses regardless of who holds the Fund. If the Defendants believe that some future transfer of Fund assets entitles them to an offset against a monetary award, or that they are entitled to contribution from Charitable Holdco, that is a defense they

15

can plead. "Complete relief . . . does not concern 'any subsequent relief via contribution or indemnification for which the absent party might later be responsible.'" *Ortiz*, 2010 WL 3702595 at *4.

For the same reasons, any dispute about what should happen to the Fund assets themselves, once the Charities' interests are restored, goes beyond "relief as between the persons already parties to the action" but rather "as between a present party and the absent party whose joinder is sought." *Sanson v. Allstate Tex. Lloyds*, No. 4:17-CV-00733, 2018 WL 3630136, at *2 (E.D. Tex. July 31, 2018) (*quoting Ortiz*, 2010 WL 3702595 at *4.) (discussing Rule 39's federal analogue, Fed. R. Civ. P. 19).

### e. *Charitable Holdco has not claimed an interest in the subject matter of this lawsuit.*

Defendants argue that Charitable Holdco "has a claimed interest in the receivership request here, since the claims owned by the Debtor point to the same relief sought by the [Charities.]" Def. Repl. at 12. This statement confirms Defendants' acknowledgement that Charitable Holdco has not claimed any interest in the Charities' compensatory and exemplary damages claims. But Defendants vague language about "pointing to" the same relief also fails to demonstrate a likelihood of any specific conflict. The Defendants do not demonstrate that the JOLs have

16

claimed "the same [receivership] relief sought by" the Charities. The Charities seek a receivership over the Defendant entities that are before this Court and the control they exercise; while the JOLs have control over Charitable Holdco. *See, e.g.*, Hr'g Tr. 70:18-71:21, Business Court Dallas Division 1B, Aug. 4, 2025. In the unlikely event that the JOLs sought the same unique assets as the Charities—which Defendants have not demonstrated, and the JOLs' statement of claim does not assert—the JOLs' access to them via a court-appointed receiver, independently bound to follow court orders, would not raise any conflict. Instead, it would ensure orderly process.

In any case, Rule 39(a)(2) is inapplicable unless there is *both* a claimed interest *and* either an impairment of an absent party to protect that interest or substantial risk of inconsistent judgments.

### f. *Joinder is not required under Rule 39(a)(2)(ii) because Defendants fail to demonstrate a "substantial risk" of inconsistent judgments.*

Defendants argue they could be ordered to hand over the same "stock, real estate, receivables," and other actual Fund assets to two different parties (the Charities and Charitable HoldCo). Def. Supp. Brief at 13. But that is not so.

17

Defendants' logic may derive from a false understanding about their personal, direct liability here. For instance, perhaps this Court finds DFW Foundation, CDMCFAD, and Mark Patrick jointly and severally liable to the Charities for $270 million, less $1.6 million. That would not result in any inconsistencies. That would be a compensatory and/or exemplary damages judgment against these Defendants for fiduciary breach or fraud. It would not constitute an order to hand specific property to two different people. Defendants would be liable for the judgment regardless of the location of the Fund assets.

If dual judgments for similar conduct in different lawsuits mandated joinder under Rule 39, affirmative defenses and actions like payment, offset, contribution, and accord-and-satisfaction would be far less popular. In neither situation would these Defendants be unable to "comply with one court's order without breaching the order of another court that pertains to the same incident." *Sanson*, 2018 WL 3630136 at *2 (citation omitted).

There are any number of possible dispositions of the Fund assets, offsets, satisfactions, etc. But neither the Fund nor Charitable HoldCo is

18

before this Court and the Charities do not ask for any direct recovery from either.

Likewise, the Defendants raise the specter of dual receiverships but do not explain why that would lead to inconsistent obligations upon the Defendants. Def. Supp. Brief at 14. If one receiver exercised the management shares and another receiver held the Fund assets, they would certainly need to cooperate, just as would any set of corporate affiliates. But the alleged possibility of friction between the two receivers does not come close to the type of inconsistency required to satisfy Rule 39(a)(2)(ii). There is no inconsistency in having one person in charge of the management shares, and another person holding the Fund assets subject to their exercise. And, in any case, the appointment of a receiver in this case *would not require the Defendants to do anything*, much less anything "inconsistent," because they would be replaced as a decision-maker. The Court taking the keys away is not an order to Defendants to drive to a specific location.

19

**g. *Joinder is not required pursuant to Rule 39(a)(2)(i) because Charitable HoldCo's interests are not imperiled by the Charities' claims.***

For similar reasons, Charitable HoldCo's interests are not imperiled here. Defendants argue Charitable HoldCo's interests are potentially impaired because it "claims entitlement to the same property and remedies" as the Charities. Def. Repl. at 14. But the Defendants fail to explain how that constitutes an impairment requiring joinder, and they do not marshal any legal authority supporting that conclusion.

Charitable HoldCo and the Charities' claims are complementary, not antagonistic. The relief sought here is broadly *good* for the interests of Charitable Holdco. If an interim receiver is installed, Charitable Holdco will be protected against further dissipation authorized by Patrick. If the Charities obtain a monetary judgment against these Defendants, that is payable by the Defendants, not by Charitable Holdco.

Beyond this, the Defendants ignore entirely the Charities' recitation in their original brief of the robust and powerful procedural mechanisms under both federal and Texas law for Charitable HoldCo to protect its interests. Defendants ignore that Charitable HoldCo is also not impaired because it plainly "could intervene in this suit if [it] believed

20

[its] rights would be affected." *Skinny Pasta International, Ltd.*, 1:20-CV-669-RP, 2021 WL 8083331 (W.D. Tex, Mar. 26, 2021) (*citing Smith v. State Farm Fire & Cas. Co.*, 633 F.2d 401, 405 (5th Cir. 1980) (noting that an absent trustee's ability to protect his interest was not significantly impaired where "[i]t is clear from the record that the trustee was aware of this litigation yet did not attempt to be made a party")). When "the plaintiffs can intervene . . . [then] [a]ccordingly, plaintiffs have means to protect their interest." *Federal Insurance Company v. Singing River Health System*, 850 F.3d 187, 201 (5th Cir. 2017) (*citing Smith*, 633 F.2d at 405). Charitable Holdco has the ability to protect its interests, so the "impairment" prong of Rule 39(a)(2)(i) is not implicated here.

**h. *Even if Defendants had carried their burden as to one of the prongs of Rule 39(a), they ignore that, under Rule 39(b), courts are empowered to shape the relief awarded as between the parties.***

The Defendants' arguments also ignore the exhortation of Rule 39(b), which empowers the Court—even if it determines that an absent party meets the criteria for joinder under Rule 39(a)—to nonetheless proceed with the action after considering four factors:

"First, [the Court should consider] to what extent a judgment rendered in the person's absence might be prejudicial to him or those

21

already parties[.]" Tex. R. Civ. P. 39(b). Here, for the reasons set forth herein, there is no prejudice to any absent or present party—Charitable Holdco positively benefits from the relief sought by the Charities here; while the Defendants hold active control in the Fund *through persons and entities properly subject to this Court's jurisdiction* and are thus fairly addressed here.

"Second, [the Court should consider] the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided[.]" *Id*. Here, the Court can easily shape the equitable portion of any judgment by adhering only to *the relief the Charities actually seek*—neutral, responsible control over the participation and management shares and the entities that exercise them; and the opportunity to be heard on the merits of their damages claims. *See Bourne v. Bourne*, 559 S.W.2d 844, 847 (Tex. App.—Houston [1st Dist.] 1977) (despite absence of beneficiaries in divorce dispute over a diamond, court could "shape its decree in such manner as to provide adequate protection for such claims as might be asserted by the beneficiaries of the decedent's estate.")

MR 1738

"[T]hird, [the Court should consider] whether a judgment rendered in the person's absence will be adequate; and fourth, [the Court should consider] *whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder*." *Id* (emphasis added). Again, these factors all favor the continuation of the case even had the Defendants met their burden under Rule 39(a). The Charities have no adequate remedy if this case is stalled, especially since the Defendants are actively working to supplant the JOLs. And there is no question that this Court can shape relief adequate to protect the Charities' interests.

There is no joinder issue here under Rule 39(a). But even if there were, Rule 39(b) empowers the Court to maintain the action and shape relief to ensure it is adequate and complete.

## PRAYER

Plaintiffs respectfully requests that the Court disregard Defendants' position in their Supplemental Brief and Alternative Motion to Abate and enter an Order finding that: (1) Plaintiffs have capacity to assert their claims in this present cause; (2) joinder of Charitable HoldCo in the present action is unnecessary, and (3) overruling Defendants Alternative Motion to Abate.

23

Respectfully submitted,

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
Benjamin L. Warden
State Bar No. 24115926
bwarden@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7200 – Telephone
(214) 292-8442 – Facsimile

*/s/ Darren L. McCarty*
Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that this Sur-Reply Brief was served on all counsel of record August 25, 2025.

*/s/ Darren L. McCarty*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 3,691 words in compliance with Business Court Local Rule 5(a).

*/s/ Darren L. McCarty*

24

# CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* | § § | |
| v. | § | FIRST DIVISION |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § | |
| *Defendants.* | § § § | DALLAS, TEXAS |

## PLAINTIFFS' APPENDIX OF FOREIGN AUTHORITY CITED IN SUPPORT OF SUR-REPLY

| Case No. | Document | Appx. Page Nos. |
|:---:|:---:|:---:|
| 1 | *Tianrui (International) Holding Co. Ltd. v. China Shanshui Cement Group Ltd. [2024],* 2024 WL 04794596, UKPC 36 (appeal taken from Cayman Islands) | 26-56 |

25 (Appendix )

# Tianrui Holding Co Ltd v China Shanshui Cement Group Ltd

From the Court of Appeal of the Cayman Islands | November 14, 2024 | 2024 WL 04794596

**Search Details**

Search Query:   adv: "(2024) UKPC 36"

**Delivery Details**

Date:          August 7, 2025 at 3:56 PM
Delivered By:  Cate Nash
Client ID:     99999-00091
Status Icons:

**Tianrui (International) Holding Company Ltd v. China Shanshui Cement Group Ltd(Cayman Islands)**

Privy Council Appeal No 0002 of 2023
From the Court of Appeal
of the Cayman Islands
14 November 2024

**Michaelmas Term [2024] UKPC 36**

**2024 WL 04794596**

before Lord Hodge Lord Briggs Lord Sales Lord Leggatt Lord Richards
Judgment Given On 14 November 2024

[Analysis]()

Heard on 12 and 13 March 2024

**Representation**

- Appellant Thomas Lowe KC Tara Taylor Gemma Bellfield Corey Byrne (Instructed by Ogier (Cayman) LLP and Enyo Law LLP ).
- Respondent Tom Smith KC Paul Fradley Adrian Davey (Instructed by Maples and Calder (Cayman) LLP and Freshfields Bruckhaus Deringer LLP (London)).

**Judgment**
Lord Hodge and Lord Briggs:

The issue on this appeal is whether a shareholder, including a minority shareholder, has a personal claim against a company when the directors of the company allot shares for an improper purpose. In particular, does the shareholder have a private right to sue the company for a declaration that the power of the company has been invalidly exercised by the board of directors on the company's behalf?

The allotment of shares can have the effect of altering the balance of voting power between shareholders within the company and the relative economic stakes they have in the company. The allegation in this case is that the allotment was made to reduce the appellant's stake in the company below 25 per cent, thereby removing its negative control so as to assist the other shareholders to consolidate their control over the company. The exercise of the power to issue and allot the shares is alleged to have been in breach of the directors' fiduciary duty owed to the company to exercise their powers for a proper purpose.

It has long been held in cases of high authority, by the Board, the UK Supreme Court, the High Court of Australia and other appellate courts, that in these circumstances proceedings may be brought by shareholders personally, rather than by derivative action on behalf of the company, to challenge such

allotments, notwithstanding that the duty of directors to exercise their powers of allotting shares for proper purposes is owed not to shareholders personally but to the company alone. Although it has never previously been doubted that shareholders personally have standing to bring proceedings in these circumstances, the juridical basis for their standing has not been decided, and barely discussed, in most cases. In the present case, the Court of Appeal, reversing the decision of the first instance judge, held that the claimant shareholders had no personal standing to bring the present claim.

For the reasons set out below, the Board concludes that a shareholder has a right of action against the company to challenge the allotment of shares by the board of directors on the basis that the allotment was made for an improper purpose in circumstances where the allotment will cause detriment to the shareholder.

The appeal comes before the Board against a successful strike out application by the company. The case has been decided in the courts below on assumed facts. The Board also addresses the appeal on the basis of assumed facts which may not be established at trial.

**A summary of the factual background and the assumed facts**

There has been a prolonged battle for control of the respondent company, China Shanshui Cement Group Ltd ("CSCGL"), which is a Cayman Islands exempted company that is also registered in Hong Kong as a non-Hong Kong company. CSCGL's shares are listed on the Hong Kong Stock Exchange ("HKSE"). CSCGL is a holding company of operating subsidiaries which are registered in Hong Kong and the People's Republic of China ("the PRC"). The group is principally engaged in the production, distribution and supply of cement and related construction products in the PRC. CSCGL's principal subsidiary, Shandong Shanshui Cement Group Co, is the sixth largest cement company in the PRC, measured by annual production capacity.

The principal shareholders in CSCGL are (i) the appellant ("Tianrui"), a company incorporated in the British Virgin Islands with a shareholding of 28.16%, (ii) Asia Cement Corporation ("ACC"), a company incorporated in Taiwan with a shareholding of 26.72%, (iii) China National Building Materials Co Ltd ("CNBM"), a company incorporated in the PRC with a shareholding of 16.67%, and (iv) China Shanshui Investment Company Ltd ("CSI"), a company incorporated in Hong Kong with a shareholding of 25.09%.

Each of CSCGL, Tianrui, ACC and CNBM are competitors in the cement production industry in the PRC.

As recorded in the agreed statement of facts and issues, CSCGL's shares were suspended from trading on the HKSE from April 2015 to 31 October 2018. On 23 October 2017, the HKSE gave notice that CSCGL would be delisted unless by 31 October 2018 (i) CSCGL restored its public float above the 25% minimum threshold required by a rule of the HKSE Main Board Listing Rules, and (ii) CSCGL addressed the facts that its auditors, KPMG, had issued a disclaimer of opinion on CSCGL's accounts on the financial years 2015 and 2016 and that the then board of CSCGL had not been able to publish their report for the financial year 2017.

On or about 23 May 2018 a majority of shareholders of CSCGL, including ACC, CNBM and CSI, voted at an extraordinary general meeting of CSCGL to reconstitute the board of directors. The reconstituted board comprised one director from CNBM (Chang Zhangli), one director from ACC (Wu Ling-Ling) and three independent non-executive directors.

Thereafter, CSCGL issued convertible bonds in two tranches. The first tranche, issued to one subscriber on or about 8 August 2018, involved bonds for a total value of US$210,900,000 at a conversion price of HK$6.29 per share. The second tranche was issued to seven subscribers on or about 3 September 2018 for a total of US$320,700,000 at a conversion price of HK$6.29 per share.

CSCGL claims that the proceeds of the bonds were primarily used to repay US$500 million loan notes that were repayable in March 2020 and were fully repaid on 28 November 2018.

After the first bond issue and before the second bond issue, on 30 August 2018, Tianrui filed in the Grand Court of the Cayman Islands a petition to wind up CSCGL on the ground that it would be just and equitable to do so. One of Tianrui's complaints was the improper issue of the shares described below. CSCGL's attempt to strike out that petition failed in the Court of Appeal, which, in a judgment dated 5 April 2019, held that, if Tianrui's allegations in the petition were true, they were capable of establishing that it would be just and equitable to wind up CSCGL.

On or about 6 October 2018 CSCGL (i) entered into deeds of amendment with each of the subscribers of the bonds to accelerate the conversion of US$456,600,000 in principal amount of the first and second bond issues into shares at a reduced "Early Conversion Price" of HK$4.20 per share, and (ii) agreed with the holders of bonds the allotment of 888,980,352 new shares in exchange for some of the bonds.

CSCGL held an adjourned annual general meeting and an extraordinary

MR 1745

general meeting of shareholders on 30 October 2018. At the extraordinary general meeting a majority of the shareholders passed a resolution mandating the directors to allot and issue 1,067,830,759 shares, comprised of the new shares in para 14 above and a further 93,004,771 shares, representing shares relating to the bonds held by persons who had not already agreed to the share conversion referred to in para 14 above. The new shares were issued on 30 October 2018, and restored the public float of CSCGL to 25%. As a result, trading in CSCGL's shares on the HKSE resumed on the following day.

Tianrui does not dispute this brief account of events which, on its face, may appear to be a rational response to the notice which the HKSE gave and which is referred to in para 9 above. But Tianrui says that that is not the whole story. Tianrui pleads in its writ in these proceedings that the bondholders were connected with ACC and CNBM by an undisclosed agreement or concert party to take over voting control of CSCGL. Tianrui pleads that the issue of the bonds and the allotment and issue of the new shares were an improper exercise of CSCGL's power to allot and issue securities. It is alleged that the shares were issued for the purpose of enabling ACC and CNBM to control CSCGL and achieving a dilution of Tianrui's shareholding to under 25% (in fact 21.85%) with the result that Tianrui could no longer block special resolutions. Mr Thomas Lowe KC

for Tianrui submits that if the share issues are valid, Tianrui cannot prevent the merger of CSCGL with another company and it might have to have its shares bought out under section 238 of the Companies Act.

Tianrui's pleadings are made before discovery and before the administration of interrogatories. It explains that the PRC government had imposed restrictions on cement production capacity in 2014 with the result that cement producers could only expand their market shares through taking over other producers and that CSCGL had become a target for takeover. It asserts that in a series of meetings in person in 2015 attended by the directors of ACC and CNBM and telephone conversations it had been agreed that ACC and CNBM would form an alliance to take over CSCGL, that they would make a joint offer for CSCGL's shares and that they would oppose Tianrui's attempts to obtain a greater interest in CSCGL. ACC and CNBM then made a joint offer to purchase the shares of CSCGL on 12 August 2015. ACC, CNBM and CSI used their votes to requisition the extraordinary general meeting in May 2018 at which CSCGL's board was removed and replaced by a board entirely nominated by ACC. It avers that the bond issues and share conversion were concluded in secret, that they were not arm's length transactions and that the subscribers were connected with ACC and/or CNBM.

Tianrui describes the effect and purpose of the convertible bond and share issues in its statement of claim as follows:

"56. As a result of having its shareholding reduced to under 25%, Tianrui is prejudiced as it can no longer block a special resolution in a general meeting of [CSCGL], which requires not less than 75% of the votes in general meeting.

Improper Purpose

57. The Convertible Bonds were issued by the board of [CSCGL] to persons connected with and/or acting in concert with ACC and/or CNBM for the improper purposes of enabling ACC and CNBM by themselves or with others to control [CSCGL] as set out below.

58. ACC and CNBM entered into a secret or undisclosed voting agreement about how to exercise votes between ACC and CNBM and the Bond Subscribers and/or New Shareholders and/or each of them and/or reached an understanding with them and/or each of them."

Tianrui avers that the reconstituted board of CSCGL exercised their power to issue the convertible bonds and new shares for an improper purpose and that those transactions were invalid. Similarly, Tianrui avers that ACC, CNBM and CSI acted for an improper purpose in supporting the resolution at the extraordinary general meeting on 30 October 2018 to grant the specific mandate to issue the shares described in para 15 above.

Tianrui seeks as remedies declarations that the exercise by the directors of CSCGL of the powers (i) to issue the convertible bonds, (ii) to convert the bonds into shares, and (iii) to issue the new shares described in para 15above were each not a valid exercise of the relevant power.

The Board, like the courts below, is required to determine the strike out

application on the basis that Tianrui's averments in paras 16-19 above are assumed to be true.

The court may strike out a statement of case if, among other grounds, the statement of case discloses no reasonable cause of action or is otherwise an abuse of the process of the court: Grand Court Rules, O18, r19.

## the judgments of the Grand Court and the Court of Appeal

CSCGL sought to have both the winding up petition and the writ seeking declaratory relief struck out on various grounds. The Board is not concerned with the challenge to the winding up petition as it has earlier refused permission to appeal the Court of Appeal's judgment referred to in para 13 above. The only challenge to the writ proceedings made before Segal J in the Grand Court which is live before the Board is the challenge that the writ action is an abuse of process because Tianrui does not have standing to sue CSCGL for what are essentially claims arising out of breaches by the reconstituted board of the fiduciary duties which they owed to CSCGL.

In a detailed judgment delivered on 6 April 2020 Segal J rejected this challenge: 2020 (2) CILR 6. In so doing Segal J declined to follow a judgment of Kawaley J in the Grand Court in *Gao v China Biologic Products Holdings, Inc* 2018 (2) CILR 591 (" *Gao* ")

in which the court struck out the writ action by a minority shareholder challenging the exercise by a board of directors of the power to allot and issue shares on the ground that the plaintiff lacked standing to sue the company for a breach of fiduciary duty by the directors which was owed to the company and not to him. Segal J discussed various authorities, which the Board discusses below, and concluded that a minority shareholder had a personal claim against the company and that the appropriate remedy was a declaration, binding on the company, that the allotment and issue of the shares was unlawful. That is the remedy which Tianrui now seeks. He held that it followed from the characterisation of the shareholder's claim as a personal right against the company that the other shareholders could not ratify the acts of the directors. Segal J also rejected the argument that a shareholder did not have a personal claim because the shareholder could obtain redress by a derivative action.

CSCGL appealed that decision. In a judgment dated 1 July 2022 the Court of Appeal (Goldring P, and Field and Morrison JJA) held that an aggrieved shareholder had no personal right of action against the company for the diminution of his voting power caused by the issue of shares in breach of a fiduciary duty owed to the company: 2022 (2) CILR 28. The Court of Appeal reasoned that the central question on the appeal was whether a minority

shareholder had standing to sue the company in which it held shares in the face of two possible obstacles. The first was that it was trite law that directors owe their fiduciary duties to the company which appoints them and not to its shareholders. The second possible hurdle was the view that the damage suffered as a result of a breach of fiduciary duty by the directors is damage to the company and not to the shareholder whose voting power has been diminished by the issue of new shares.

Mr Tom Smith KC advanced on behalf of CSCGL the argument that it was the company that suffered the loss and not the aggrieved shareholder (ie the second obstacle). He relied on dicta in the judgment of Harman LJ in Bamford v Bamford [1970] Ch 212 and the judgment of the UK Supreme Court in *Marex Financial Ltd v Sevilleja* [2020] UKSC 31; [2021] AC 39 . The Court of Appeal rejected that argument, holding that the shareholder's loss was separate and distinct from any loss suffered by the company. The argument has not been advanced again before the Board.

In addressing the first possible obstacle, the Court of Appeal considered several authorities which the Board will consider below. They were Fraser v Whalley (1864) 2 H & M 10 ; Punt v Symons & Co Ltd [1903] 2 Ch 506 ; Howard Smith Ltd v Ampol Petroleum Ltd [1974] AC 821 ("Howard Smith") ; *In re a* Company (No 005136 of 1986)

[1987] BCLC 82 (aka *In re Sherborne Park Residents Co Ltd* (" *Sherborne Park* ")); and the judgment of the Supreme Court of South Australia in *Residues Treatment & Trading Co Ltd v Southern Resources Ltd* (1988) 6 ACLC 1160 (" *Residues* "). The Court accepted Mr Smith's submissions that in *Sherborne Park* Hoffmann J had not explained why the shareholder had a personal right of action, in Howard Smith the House of Lords had not discussed how the shareholder could bring a personal claim, and in *Residues* King CJ, while referring to a shareholder's personal right "founded in equity" (p 1165), had failed to provide a principled basis for the conclusion that a shareholder had such a personal right. The Court of Appeal concluded (para 51) that "it remains the law of the Cayman Islands that the postulated aggrieved shareholder has no such personal right of action but must found his claim on a basis that is consistent with the rule in Foss v Harbottle or with the fraud on the minority exception to that rule."

### the issues raised in Tianrui's appeal

Tianrui now appeals to the Board against the striking out of its writ which followed upon this ruling.

In the Board's view, there are four principal questions that need to be addressed on this appeal. They are:

- (i) Bearing in mind that the duty of the directors alleged to have been breached is owed to CSCGL and not to its shareholders, what, if anything, is the shareholder's cause of action?
- (ii) What, if any, distinctive aspects of the shareholder's cause of action mean that it may be pursued notwithstanding the rule in Foss v Harbottle ?
- (iii) Was the impugned exercise of the board's power void or voidable?
- (iv) Was the alleged breach of duty capable of being ratified by a majority of CSCGL's shareholders? If so, what is the consequence of the theoretical availability of ratification for the pursuit of the shareholder's claim in the meantime?

Before addressing the case law relating to a shareholder's personal right of action against a company, the Board summarises the relevant constitutional provisions relating to CSCGL in its memorandum and articles of association and in statute.

## the relevant provisions of Cscgl's constitution

Unless the objects and business of a company are restricted in its memorandum of association, it has power to carry out any object not prohibited by law: Companies Act (2023 rev) ("CA"), section 7(4). When registered, a company's memorandum of association binds the company and its members as if each member had subscribed the memorandum and it contained a covenant on the part of the member, his heirs and administrators to observe all its conditions: CA section 12. Similarly, when registered the articles of association bind the company and its members as if each member had subscribed the articles and it contained a covenant on the part of the member, his heirs and administrators to conform to the regulations contained in the articles: CA section 25. There is, as the Board will explain below, a contract between the company and its members and between its members inter se that the company and its members will observe the conditions of the memorandum and the regulations of the articles of association, but the statutory contract is entered into on terms which are alterable by a 75% majority of the shareholders as vote at a general meeting, through the amendment of those articles by special resolution.

Clause 4 of CSCGL's memorandum of association empowers it to issue convertible bonds. CSCGL's amended and restated articles of association dated 16 May 2014, which were effective until 30 May 2019, gave the board power, in article 3.13, to allot or otherwise dispose of its unissued shares and, in article 11.2, to borrow and to grant securities for CSCGL's debts.

Tianrui in its statement of claim para 13, pleads that it is an implied term of the articles of association that the exercise of such powers of the board cannot result in the valid issue of securities if the exercise was materially affected by an improper motive or purpose.

**the prior case law on the standing of the shareholder**

Underpinning the challenge by CSCGL to the right of Tianrui to bring these proceedings is the so-called "rule in Foss v Harbottle" ((1843) 2 Hare 461 ). This "rule" is made up of two related principles.

The first, known as the "proper plaintiff" principle, is that where a wrong has been done to a company only the company, not an individual shareholder, can take action. A breach by a director or by the board of directors of a duty which is owed to the company is a wrong done to the company, and the general rule is that only the company has a remedy for that breach.

The second principle, which is known as the "majority rule" principle, is that the will of the majority of the shareholders of the company should, as a general rule, prevail in the running of the company's business. Thus, if a transaction can be made binding on the company by a simple majority of shareholders, and that majority does not

want to take action against a director or directors for a breach of duty in relation to it, the majority can, as a general rule, waive the breach or ratify the irregular acts of the director or directors.

There is an exception to the operation of these principles where the wrongdoers are guilty of dishonest conduct or attempting to appropriate or have appropriated to themselves property or opportunities to which the company is entitled or in which other shareholders are entitled to participate, and the wrongdoers are themselves in control of the company. In that event, which is often called "fraud on the minority", the aggrieved shareholder or minority may bring a derivative action seeking relief on behalf of the company in whom the cause of action is vested.

The "rule" in Foss v Harbottle and the exception or exceptions to the "rule" are discussed in many authorities, including Edwards v Halliwell [1950] 2 All ER 1064, 1066-1069 ; and Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204, 219-222 .

The boundaries of the exception or exceptions to the "rule" are ill-defined. In many jurisdictions, the shareholder derivative action has been placed on a statutory basis in order to remove the uncertainties which remain within the common law. For example, in the United Kingdom Part 11 of the Companies Act 2006 has created

a statutory derivative action. The Cayman Islands has preserved the common law rules and the court exercises a degree of control over derivative actions under Order 15, rule 12A of the Grand Court Rules under which, if a defendant in a derivative action has given notice of an intention to defend, the plaintiff must apply to the court for leave to continue the action.

The "rule" in Foss v Harbottle is only part of the picture. The courts have long recognised that a shareholder has personal rights against a company which it can enforce by a personal action. For example, a shareholder has a personal right to vote on a resolution before a company in general meeting and, when his vote has been improperly rejected at a general meeting, is entitled to an injunction against the implementation of the irregularly obtained resolution: Pender v Lushington (1877) 6 Ch D 70, 80-81 per Jessel MR. This right of a shareholder personally to institute proceedings to assert or protect personal rights was the basis of the decision of the Court of Appeal in Edwards v Halliwell. In that case, a trade union had purported to increase the regular contributions payable by members without the resolution passed by a two-thirds majority required by the rules. Two members who were threatened with expulsion from the union for failure to pay the increased contributions were held to be entitled to bring proceedings personally for

a declaration that the increases were invalid. Jenkins LJ said at p 1067, having discussed the rule in Foss v Harbottle:

"In my judgment, this is a case of a kind which is not even within the general ambit of the rule. It is not a case where what is complained of is a wrong done to the union, a matter in respect of which the cause of action would primarily and properly belong to the union. It is a case in which certain members of a trade union complain that the union, acting through the delegate meeting and the executive council in breach of the rules by which the union and every member of the union are bound, has invaded the individual rights of the complainant members, who are entitled to maintain themselves in full membership with all the rights and privileges appertaining to that status so long as they pay contributions

MR 1752

in accordance with the tables of contributions as they stood before the purported alterations of 1943, unless and until the scale of contributions is validly altered by the prescribed majority obtained on a ballot vote. Those rights, these members claim, have been invaded. The gist of the case is that the personal and individual rights of membership of each of them have been invaded by a purported, but invalid, alteration of the tables of contributions. In those circumstances, it seems to me the rule in Foss v Harbottle has no application at all, for the individual members who are suing sue, not in the right of the union, but in their own right to protect from invasion their own individual rights as members."

By contrast, in other cases, the rights of shareholders are invaded not because the company or its agents have acted contrary to the express terms of the articles of association or other constitutional documents but because the directors, acting as the company's agents, have exercised powers within the letter of their express terms but for improper purposes. All powers conferred on the directors are fiduciary in nature and they are required by equity to exercise such powers for proper purposes. An exercise of a fiduciary power for an improper purpose is a breach of the duty owed by the directors to the company. Although the duty is owed to the company, and not to shareholders personally, shareholders whose personal rights are adversely affected by the directors' exercise of the power have been held in the context of a range of different powers to be entitled to maintain a personal action against the company to remedy the wrong done to them.

The House of Lords in a Scottish appeal, Hindle v John Cotton Ltd (1919) 56 Sc LR 625 , allowed an action by a shareholder against the company to proceed to proof (trial) in which the allegations by the shareholder were that the company's directors had acted in bad faith when, after dismissing him from office as managing director, they purported to exercise a power in the company's articles of association to acquire his shares at their nominal value. In *In* Re Smith and Fawcett Ltd [1942] Ch 304 an executor of a deceased shareholder of a private company, after the directors of the

company refused to register him as a shareholder, applied to the court to have the register rectified. The application failed because the plaintiff had not shown that the directors had exercised their fiduciary powers other than in the interests of the company. More recently, in Eclairs Group Ltd v JKX Oil & Gas plc [2015] UKSC 71; [2015] Bus LR 1395; [2016] 3 All ER 641 , the UK Supreme Court gave a remedy to the beneficial owners of shares, which had asserted a personal right against the company in which they had invested, when the directors of the company had, in breach of their duty to exercise their powers for proper purposes, resolved to issue restriction notices suspending the right to vote at general meeting attached to the shares and to restrict the right to transfer the shares.

The issue at the heart of this appeal, namely the juridical basis of the individual shareholder's standing to bring proceedings to challenge the directors' exercise of a power for improper purpose, arose also in those cases. Given that in each case the shareholder's rights were directly affected by the relevant improper decision, they were obvious cases for intervention by the courts, but there still needs to be a proper legal basis - in short, a cause of action. As we discuss later in this judgment, we consider that, as an intrinsic feature of the contract constituted by the memorandum and articles of association, it is implicit that when exercising their powers on behalf of the company the directors will exercise them in accordance with their fiduciary duties, including the duty to exercise powers only for a proper purpose.

In each of the cases mentioned, the courts have recognised a shareholder's personal right to bring legal proceedings against the company when the directors act to appropriate the shares or to remove or restrict rights attached to them. The circumstances of this appeal are different in the sense that it does not involve the removal or restriction of rights attached to shares. The appeal is concerned with the detriment to a shareholder's ability to exercise the proportionate voting power attached to its shares resulting from the allegedly improper allotment and issue of new shares to other parties. It is necessary to look more closely at the case law which is concerned with personal actions by a shareholder against a company which challenge the allotment and issue of new shares because CSCGL submits that the cases do not establish a proper jurisprudential basis for the recognition of such actions.

In the Cayman Islands, the courts have not accepted the standing of a shareholder to challenge the allotment and issue of shares to others. As the Board has mentioned in para 24 above, in *Gao* Kawaley J struck out a minority shareholder's action against the company on the ground that the

MR 1754

shareholder lacked standing. The Court of Appeal has accepted his reasoning in this case in preference to that of Segal J who accepted that Tianrui had standing.

In the United Kingdom, the courts have for a long time recognised the right of a shareholder to challenge the allotment and issue of shares by a company's directors for an improper purpose, such as to alter the voting power of shareholders. In Fraser v Whalley , Sir William Page Wood V-C granted an injunction against the directors of a company to prevent them from invoking a prior resolution by shareholders to issue shares, which had been made for a superseded purpose, for another, improper purpose of gaining control of a forthcoming general meeting at which it was likely to be proposed that they be removed as directors. The Vice-Chancellor at p 29 concurred with the principle laid down in Foss v Harbottle but stated that the court will intervene when directors "clandestinely and at the last moment use a stale resolution for the express purpose of preventing the free action of the shareholders".

In Punt v Symons & Co Ltd [1903] 2 Ch 506 Byrne J followed Fraser v Whalley in granting an injunction against a company to restrain the holding of a general meeting of the company after the directors had issued shares for the improper purpose of gaining a sufficient majority of votes at that meeting to pass a special resolution to alter the company's articles of association. Byrne J stated (p 517):

> "If I find as I do that shares have been issued under the general and fiduciary power of the directors for the express purpose of acquiring an unfair majority for the purpose of altering the rights of parties under the articles, I think I ought to interfere."

Peterson J in Piercy v S Mills & Co Ltd [1920] 1 Ch 77 reached a similar decision in an action by a majority shareholder against the company and its directors when he granted a declaration that the allotment of shares which the directors had made for an improper purpose was invalid and void. In that case, the plaintiff was a manager of the company who had acquired a majority of its shares and wished to use the voting power of those shares at general meeting to appoint himself and his two brothers as directors in face of opposition from the current directors. In response to his requisitioning of a general meeting, the directors on two occasions allotted shares to their friends to destroy his majority and thereby keep control over the management of

the company. Referring to Fraser v Whalley and Punt v Symons & Co Ltd Peterson J stated, at p 84:

> "The basis of both cases is, as I understand, that directors are not entitled to use their powers of issuing shares merely for the purpose of maintaining their control or the control of themselves and their friends over the affairs of the company, or merely for the purpose of defeating the wishes of the existing majority of shareholders."

Holding that the majority shareholders were entitled to have their views prevail in accordance with the company's articles of association, Peterson J granted the declaration invalidating the allotments of the shares.

In Hogg v Cramphorn Ltd [1967] Ch 254 Buckley J addressed a scheme devised by the directors of a company, acting in good faith in what they believed to be the best interests of the company, to thwart a proposal by an investor from outside the company to acquire its whole share capital.

The directors' scheme involved the issue of new preference shares with special voting rights of ten votes per share. Buckley J held that the company's articles of association did not give the directors power to issue shares with enhanced voting rights but recognised that the allottees might elect to accept the shares without the special voting rights attached. He then addressed the wider question of whether the allotment should be set aside, observing that it was common ground that the directors were not motivated by personal advantage but acted in the honest belief that their scheme to prevent the unwanted take-over was for the good of the company. He referred with approval to statements in Fraser v Whalley , Punt v Symons & Co Ltd and Piercy v S Mills & Co Ltd that it was not open to directors to use their power to issue shares in order to interfere with the right of a majority of shareholders to exercise their constitutional rights within the company. Nonetheless, he observed that a majority of the shareholders could have approved the issue of the contested shares and, had it done so, there could have been no force in the argument that the directors were attempting to deprive the majority of their constitutional rights. That being so, a majority in a general meeting of the company at which no votes were cast in respect of the contested shares could ratify the issue of those shares. Buckley J, therefore, rather than setting aside the allotment and issue of the

contested shares, gave the company the opportunity in general meeting to decide whether it approved the issue of those shares, with the owners of the contested shares undertaking not to vote at the meeting in respect of those shares. As the report of the decision records, the shareholders thereafter ratified and approved the allotment of the shares, which had equal voting rights.

Another example of a personal action by shareholders to challenge an allotment of shares allegedly made for an improper purpose is the judgment of the Court of Appeal in Bamford v Bamford [1970] Ch 212 . The directors of a public company allotted a significant block of shares in an attempt to block a take-over bid. Two minority shareholders in the company brought a personal action seeking a declaration that the allotment was invalid. In response, the directors gave notice convening a general meeting of the shareholders of the company to consider a resolution ratifying and approving the allotment. The two shareholders then issued a second writ challenging the validity of any resolution passed at the proposed general meeting. In the event, the resolution ratifying the allotment was passed by a substantial majority vote at the general meeting, the allotted shares not being voted. The two actions were consolidated, and a preliminary issue was tried as to whether the allotment was capable of being ratified

and approved by a general meeting of the shareholders of the company. Plowman J answered the question in the affirmative, holding that as the allotment had been approved by a majority of the shareholders, it was validated, even if the directors had acted for an improper motive in making the allotment. The Court of Appeal upheld his conclusion, and approved Buckley J's judgment in Hogg v Cramphorn Ltd. It held that a majority of shareholders at the general meeting could waive and had waived any impropriety on the part of the directors. The allotment, if initially voidable, had been subsequently validated by the shareholders.

Harman LJ regarded the case as being "tolerably plain" (p 237). If the directors, by having regard to the exigencies of the take-over battle had not addressed the single question of the benefit of the company, the allotment would be voidable at the instance of the company because it was a wrong done to the company (p 238). The company in general meeting, which had the right to recall the allotment also had the right to approve it. Russell LJ, who gave the other substantive judgment on the appeal, stated (p 242):

> "It is true that the point before us is not an objection to the proceedings on Foss v Harbottle (1843) 2 Hare

461 grounds. But it seems to me to march in step with the principles that underlie the rule in that case. None of the factors that admit exceptions to that rule appear to exist here. The harm done by the assumed improperly-motivated allotment is a harm done to the company, of which only the company can complain. It would be for the company by ordinary resolution to decide whether or not to proceed against the directors for compensation for misfeasance."

The Board will return to this case in its discussion below. It is sufficient now to observe that in Bamford v Bamford the alleged wrong was not targeted at a shareholder or group of shareholders but was a wrong which affected all shareholders of the company. Russell LJ's dictum that only the company could complain of the harm done must be read in that context.

Before completing this survey of the case law from England and Wales, the Board turns to its judgment in an appeal from the Supreme Court of New South Wales in the well-known case of Howard Smith . The appeal concerned a struggle for the takeover of a company ("Millers") in which Howard Smith and Ampol were the rival parties. Another substantial shareholder in Millers, called Bulkships Ltd, was associated with Ampol and together they held about 55% of Millers' issued share capital. Millers needed more capital. The board of Millers recommended that Ampol's offer for the whole share capital of Millers be rejected as too low after Howard Smith had announced its intention to make a higher offer. Ampol and Bulkships announced their intention to act together in the future operations of Millers and to reject any offer for their shares. Howard Smith then applied to Millers for the allotment of 4.5 million shares and the directors of Millers by majority resolved to make the allotment and immediately issued the shares. The effect of the share issue was to give Millers much needed capital and to reduce Ampol's and Bulkships' combined shareholding to 36.6% of Miller's issued shares, thereby enabling Howard Smith to make an effective takeover offer.

Ampol brought an action against Howard Smith, Millers, 11 directors of Millers and a company which acted as Millers' registrar. Only Ampol and Howard Smith appeared in the appeal before the Board.

The question for the Board was whether the issue of the shares to Howard Smith was valid when the primary object of the directors was to alter the majority shareholding of the issued shares so as to procure the takeover offer by Howard Smith but the directors were not acting for their own personal advantage.

Lord Wilberforce, giving the judgment of the Board, stated (p 834) that the issue of the shares by the directors was intra vires but it was a fiduciary power whose exercise could be attacked on the ground that it was not exercised for the purpose for which it was granted. After referring to Fraser v Whalley , Punt v Symons & Co Ltd , Piercy v S Mills & Co Ltd , and Hogg v Cramphorn Ltd , which were cases in which the directors acted in their self-interest or at least to preserve their own control of management, he observed that the absence of self-interest is not enough to make a share issue valid and that a wider investigation must be made. He continued (p 837):

> "The purpose found by the judge is simply and solely to dilute the majority voting power held by Ampol and Bulkships so as to enable a then minority of shareholders to sell their shares more advantageously. So far

as authority goes, an issue of shares purely for the purpose of creating voting power has repeatedly been condemned … In the leading Australian case of Mills v Mills, 60 CLR 150 , it was accepted in the High Court that if the purpose of issuing shares was solely to alter the voting power the issue would be invalid. And, though the reported decisions, naturally enough, are expressed in terms of their own facts, there are clear considerations of principle which support the trend they establish. The constitution of a limited company normally provides for directors, with powers of management, and shareholders, with defined voting powers having power to appoint the directors, and to take, in general meeting, by majority vote, decisions on matters not reserved for management. Just as it is established that directors, within their management powers,

MR 1759

may take decisions against the wishes of the majority of shareholders, and indeed that the majority of shareholders cannot control them in the exercise of these powers while they remain in office …, so it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers."

The Board therefore concluded that the power to allot and issue shares had been improperly exercised by the issue of shares to Howard Smith. The Board upheld Street J's order setting aside the allotment and ordering the rectification of the company's share register.

The Board observes, as CSCGL has emphasised on this appeal, that Lord Wilberforce recorded (at p 838) that it was not disputed in that case that Ampol as plaintiff had properly brought the action to set aside the allotment and rectify the register. The Board did not address any challenge to Ampol's standing. By contrast, Tianrui's standing to bring the proceedings in this case is the central issue on this appeal.

Returning to jurisprudence in England and Wales, in *Sherborne Park* Hoffmann J explained a jurisprudential basis for a personal action by a shareholder against the improper exercise by directors of the power to allot shares. The reported judgment is an ex tempore judgment in an ex parte application made, in a petition brought under section 459 of the Companies Act 1985 , by the petitioner shareholder for an order that he be indemnified in advance by the company for his costs in the petition. The casus belli was a directors' resolution to issue and allot shares in the company alleged to have been motivated by an improper desire by the directors to alter the balance of voting power in the company. Entitlement to a costs indemnity depended upon the claim being properly constituted as a derivative action, rather than as a personal action by the claimant. In refusing the application, Hoffmann J drew a distinction between a derivative action in which a shareholder sues in

his own name for a wrong done to the company, such as where the directors misappropriate the company's property, and a personal action for a wrong done to a shareholder. A writ challenging an abuse by the directors of their fiduciary power in a wrongful share allotment was a personal action. He stated:

> "Although the alleged breach of fiduciary duty by the board is in theory a breach of its duty to the company, the wrong to the company is not the substance of the complaint. The company is not particularly concerned with who its shareholders are. The true basis of the action is an alleged infringement of the petitioner's individual rights as a shareholder. The allotment is alleged to be an improper and unlawful exercise of the powers granted to the board by the articles of association, which constitute a contract between the company and its members. These are fiduciary powers, not to be exercised for an improper purpose, and it is generally speaking improper —

> "for the directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist."

(see Howard Smith Ltd v Ampol Petroleum Ltd [1974] 1 All ER 1126

45 (Appendix )

MR 1761

at 1136, [1974] AC 821 at 837 ). An abuse of these powers is an infringement of a member's contractual rights under the articles."

Turning to Australian jurisprudence, in *Mills v Mills* (1938) 60 CLR 150 , which Lord Wilberforce cited in Howard Smith , the High Court of Australia addressed what was in substance a dispute in a family company between two directors, one of whom was the managing director, and the other, his nephew. The uncle's interest was mainly in ordinary shares which carried one vote per share, while the nephew's interest was mainly in preference shares which carried three votes per share. The nephew challenged the resolution of the directors to issue new ordinary fully paid up shares to the holders of ordinary shares. No new shares were issued to the holders of preference shares. This share issue not only altered the balance of voting power of the shareholders in favour of the holders of ordinary shares but also improved the position of ordinary shareholders if a winding up should take place as the preference shares ranked equally with the ordinary shares. The nephew and two other shareholders brought an action on their own behalf and on behalf of the shareholders of the company against the company, the uncle and another director seeking a declaration that the share issue was invalid. The action failed as it was not established that the resolution of the directors was passed in bad faith; the mere fact that the uncle derived some benefit from the passing of the resolution was not sufficient ground for invalidating the share issue when it was not established that the resolution was passed for an improper purpose.

The High Court of Australia rejected a challenge to the right of minority shareholders to seek an order invalidating the exercise by directors of their fiduciary power to allot shares in *Ngurli Ltd v McCann* (1953) 90 CLR 425 ("Ngurli"). The case involved identical transactions in four companies. Simplifying the facts, shares were issued at par for the improper purpose of giving a director and shareholder controlling voting power at meetings of a company and no shares were issued to minority shareholders. The judge at first instance, Mayo J, held that there had been a breach of fiduciary duty by the controlling director but that the wrong had been done to the company and it alone was the proper plaintiff. The Supreme Court of South Australia set aside his order and declared that the allotment and issue of the shares were invalid. The High Court (Williams ACJ, Fullagar and Kitto JJ) dismissed

an appeal against that order. They held (p 447) that the controlling director in failing to take into account the interests of the minority shareholders when deciding to issue the new shares had acted in breach of his fiduciary duty to consider the interests of the company as a whole and that in those circumstances "the plaintiffs have a clear right to sue in their own names to remedy the breach of trust."

The Supreme Court of South Australia rejected a similar challenge to the standing of a minority shareholder to seek an order invalidating the allotment of shares by directors of a company for an allegedly improper purpose in *Residues* , to which the Board has referred in para 27 above. In the leading judgment of King CJ, with whom Matheson J agreed, the court recognised that the exercise by directors of a power to allot shares for an improper purpose was a breach of their fiduciary duty to the company and that such an allotment was voidable "in the sense that it is valid unless and until disavowed by the company in general meeting or declared invalid by a court in a properly constituted action" (p 1163). The court recognised that to establish standing the statement of claim must raise a cause of action based upon an infringement of the plaintiff's personal rights. King CJ referred to several cases in which a shareholder had successfully challenged allotments of shares made by directors for an improper purpose, including *Ngurli* ,

Howard Smith , and *Whitehouse v Carlton Hotel Pty Ltd* (1987) 162 CLR 285 . The cases, he stated, contained "strong indications … of the recognition of a personal right in a shareholder to be protected against dilution of his voting rights in the company by improper action on the part of the directors." He considered that the principle applied not only to an improper allotment that converted a majority into a minority but also to an improper allotment which "reduces the aggrieved shareholder's voice in the company." (p 1164)

King CJ explained the jurisprudential basis for the personal right in these terms (p 1165):

> "The personal right of a shareholder to which I refer is founded, in my opinion, upon general equitable considerations referred to in the cases cited above arising out of membership of a body whose management is in the hands of directors having fiduciary obligations. It is fortified by the nature of the contract between the company and the members constituted by the memorandum and articles of association

and given statutory force by section 78(1) of the Companies Code. I do not mean that the relevant right of a shareholder is founded in contract or that his remedies for infringement are remedies for breach of contract. The shareholder's right is founded in equity and is a right to have the say in the company which accrues to him by virtue of the voting rights which are attached to his shares by his contract with the company, preserved against improper actions by the company or the directors who manage its affairs."

The improper allotment of shares which diminished a shareholder's effective voting power was "a wrong done to the shareholder by the company acting through its agents" and therefore the rule in Foss v Harbottle did not apply. He drew support for his conclusion from Hoffmann J's judgment in *Sherborne Park* .

King CJ expressed the view that any potential for ratification of the exercise of the power at general meeting would not deprive the plaintiff of standing while the infringement exists. The Board addresses the Company's argument on the potential for ratification in paras 80 – 84 below.

Bollen J in a short judgment concurred and referred to Hoffmann J's "carefully considered dicta" in *Sherborne Park* as giving strong support for his conclusion (p 1168).

### the legal basis of the shareholder's personal action

The series of English and Australian cases reviewed above shows that courts, applying principles of company law which are not materially different to those in force in the Cayman Islands, have repeatedly recognised the right of one or more shareholders of a company to bring a personal action in their own names against the company (rather than a derivative action on behalf of the company) by way of challenge to the validity of an allotment of shares made on behalf of the company by its directors, based upon the allegation that the directors acted for an improper purpose. In only one (Australian) case, the *Residues* case, has a challenge to the shareholders' standing been addressed and rejected with principled reasons for doing so. Yet in two Cayman cases, *Gao* and the decision of the Court of Appeal in this case, that right to bring such

MR 1764

an action has been asserted but denied. At the heart of each of those decisions was the reasoning that shareholders could not bring a claim in their own right in respect of a breach of fiduciary duty owed by the directors solely to the company. The company was the only proper claimant, and shareholders could only assert the company's claim by way of a derivative action, where the law permitted such an action to be brought and where leave of the court to do so was obtained in accordance with the rules.

The Board's opinion is that *Gao* was wrongly decided, and that the Court of Appeal was wrong to follow it in the present case. A shareholder whose holding is diluted by an improper allotment of shares by the directors may bring a personal claim against the company challenging the validity of that allotment, although in certain circumstances (not applicable here) the claim may be defeated by ratification of the allotment by a majority of the shareholders (other than the allottees) at a general meeting. Since the Board does not entirely agree with the reasoning of King CJ in the *Residues* case for reaching that conclusion, the Board will set out its own reasons. They require the matter to be approached from first principles.

The registration of a person as a shareholder in a company brings with it a bundle of rights. Subject to any special class rights or restrictions, the rights include a proportionate share in the distributed profits of the company and in any distribution of capital. The value per share of the shareholding will follow the fortunes of the company. That which benefits or harms the company will correspondingly increase or reduce the value of the shares.

Subject again to any class restrictions, shares will carry the right to attend and vote at general meetings of the company, and thereby play a part in the exercise of the shareholders' collective power to influence or control the general direction of its affairs. The active power of a shareholder is critically dependent upon the proportion which the shares (of an individual shareholder or group of shareholders acting together) bear to the shares in the company (or the relevant class) as a whole. In companies which are controlled by the majority vote of ordinary shareholders, the possession of a majority of the shares confers control (critically through the power to appoint and remove directors), while possession of more than 25% of the shares confers what is sometimes called negative control, through the ability to block certain steps requiring a special resolution, including the power to alter the articles of association. The value per share of such a block is critically sensitive to dilution, where in particular its percentage falls below 50% or 25% of the whole. The exercise of (or ability to exercise) those rights by individual

shareholders or groups of shareholders is how power over the company's affairs is maintained, and dilution of those shareholding proportions by the allotment and issue of new shares may critically affect the balance of power between shareholders.

The power to issue shares is conferred upon CSCGL by its memorandum of association, but the power to cause the company to allot and issue shares is conferred upon the directors, acting as fiduciaries, by the articles of association. The power is therefore necessarily a fiduciary power and must therefore only be exercised for proper purposes. The proper purposes for the exercise of the power to allot and issue shares include the raising of new capital where that is genuinely considered by the directors to be in the best interests of the company, but there can be other legitimate purposes. No part of those proper purposes includes deliberately altering the balance of power between shareholders. But, of course, an allotment and issue of new shares will frequently have that effect, save where the allotment is made to, and taken up by, all existing shareholders in strict proportion to their existing holdings. Equally, an allotment to the whole of one class of shareholders may alter that balance of power, as is illustrated by the facts of *Mills v Mills* , as explained by Latham CJ at pp 159-160.

The conferment upon the directors of that fiduciary power to allot and issue shares is an important part of the contract between shareholders and the company, constituted by its memorandum and articles: see sections 12 and 25 of the Companies Act (para 31 above). The inevitable consequence of the conferral of a power upon fiduciaries is that it must be exercised for proper purposes: see again *Mills v Mills,* per Dixon J, at pp 185-186, followed in Howard Smith at pp 835-836 and more recently Eclairs , at paras 15ff. Where such a power is conferred by the articles upon fiduciaries, this constraint upon its exercise is as much a part of that corporate contract as if it had been spelt out word for word in the articles. It is a term of the corporate contract that, if the exercise of the power to allot and issue new shares by the directors as agents for the company is to be valid and binding as between the individual shareholder and the company, it should comply with all conditions necessary to make it a proper exercise. These include compliance with the directors' fiduciary duty owed to the company. This is a constraint implied by law as inherent in the relationship between the shareholder and the company.

It is not, of course, any part of the corporate contract that a shareholder's holding will not be diluted, or that nothing will be done by the directors which alters the balance of power between shareholders. The Board may

for example perfectly legitimately decide to issue shares for proper business purposes to new shareholders and that issue, while diluting all existing shareholders' holdings in equal proportions, incidentally alters the balance of power by depriving a shareholder or group of majority control, or of negative control. But it is part of the corporate contract that, if this is to happen, it is done only by a proper exercise of the power, ie one that is exercised bona fide for the benefit of the company as a whole and exercised for the purposes for which the power was conferred. This will necessarily exclude, for example, an allotment and issue of shares which is deliberately aimed at altering the balance of power between shareholders, so as to advance the power of one (or one group) at the expense of another.

This is, in the Board's view, the basis of the shareholder's right to bring an action against the company to challenge an improper exercise of the directors' power to allot and issue shares. It is implicit in the contract constituted by the articles of association that the company's power to allot and issue new shares, delegated by the articles to the directors, will be exercised properly, which is to say by the directors on behalf of the company in accordance with their fiduciary duties. The harmful consequence to the shareholder is the alteration (adverse to him) in the balance of power between the company's shareholders and the

particular harm which that does to the value of the rights embedded in his shares. It is an actionable harm because the impropriety in the exercise of the power contravenes the corporate contract binding him and the company, even though the relevant fiduciary duty breached by the directors is not owed to him.

It is precisely in the identification of the corporate contract as the basis of the shareholder's claim against the company that the Board respectfully differs from the otherwise compelling reasoning of King CJ in the *Residues* case in the quotation in para 62 above.

It is correct to say that the constraint which requires the directors to exercise their power to allot and issue shares only for proper purposes is of equitable origin, because it is an aspect of the conduct which equity requires of directors as fiduciaries. This is for example the reason why the exercise of the directors' power to allot and issue shares is only rendered voidable (rather than void) by an equitable impropriety in its exercise, and why a challenge to its exercise may be ineffective against a bona fide purchaser of the issued shares without notice of the impropriety: see again *Residues* , at pp 1162-1163. But the Board does not consider that the breach of an equitable restraint upon the exercise of a power gives rise automatically and without more to an equity to set it aside enjoyed by someone, such as a shareholder, who is

MR 1767

neither the donor nor the beneficiary of the power. What gives the shareholder that right is the corporate contract binding between the shareholder and the company, in which this right not to have his say in the company adversely affected by an improper exercise of the power is embedded.

In that respect the Board prefers the analysis of Hoffmann J in *Sherborne Park* which the Board has quoted in para 58 above. Although this was an ex tempore judgment refusing an ex parte application for a costs indemnity at the outset of an unfair prejudice petition, it is nonetheless compelling and consistent with principle. It chimes with Lord Wilberforce's emphasis in Howard Smith on the contractual constitution of a company in the passage which the Board has set out in para 55 above. The Board agrees with Hoffmann J's pithy analysis of the essential nature of the shareholder's personal action to challenge an improper allotment and issue of shares by directors. Although the action is founded upon the fact of the commission of a breach of fiduciary duty by the directors, the cause of action is that the contract between the shareholder and the company contains the implied term that, in exercising the power to allot and issue shares, the directors as the company's agents will do so in accordance with their fiduciary duties.

In the Board's view this term falls to be implied into the contract between the shareholder and the company and between the shareholders inter se and it arises out of the nature of the contractual constitution of the company. It is a term which is implied as a result of the nature of the contract and the relationship thereby created between the parties to that contract. This involves implication in the sense that the House of Lords discussed in Liverpool City Council v Irwin [1977] AC 239 , see especially Lord Wilberforce at p 254 and Lord Fraser of Tullybelton at p 270. It is a necessary legal incident of the relationship between a shareholder and a company, and between the shareholders inter se.

The Board would add that the right of the shareholder to sue the company is not dependent upon the alteration in the balance of power being adverse only to a minority of shareholders (although it was on the assumed facts of this case). Directors may seek deliberately to deprive a single existing shareholder (or group) of majority control by allotting shares to a favoured outsider. That is what happened in Howard Smith , but the claimant, which was one of a pair of shareholders which together held 55% of the company's shares, nonetheless succeeded. There the majority were determined to resist a take-over bid, and the directors improperly allotted sufficient shares to the bidder to

destroy that majority, so as to facilitate the bid. In both [Hogg v Cramphorn Ltd](#) and [Bamford v Bamford](#) the directors feared that the majority would succumb to an unwelcome take-over bid. In neither case did this render the shareholders' personal actions improperly constituted. As explained below, the claimants ultimately failed in both cases because the improper issue and allotment of shares by the directors was ratified in general meeting.

Nor by contrast is the personal right to sue dependent upon the claiming shareholders being, or being part of, a majority, as was submitted by Mr Smith, even though that was in fact the position in a number of the cases where a personal claim succeeded. The Board considers that the size of the claimant's shareholding is in principle irrelevant. The Board agrees with the following extract from the judgment of Barwick CJ in *Ashburton Oil NL v Alpha Minerals NL* (1971) 123 CLR 614 ("Ashburton") at p 620:

> "The remaining basis of the appellants' claim was that their majority shareholding itself gave them a right to relief in each action which they had commenced. But, in my opinion, the extent of that shareholding in itself gave the appellants no

equity to any of the relief sought in either action. Of course, that shareholding because of its extent might enable the appellants to carry resolutions at general meetings of the company, but always subject to the absence of any relevant oppression of the minority. Though the appellants have the equity of a shareholder to which I have referred, they have, in my opinion, no greater and no differing right because their shareholding is a numerical majority of the issued shares of the company."

What matters is that the claiming shareholder, together in an appropriate case with those other shareholders he claims to represent, have suffered from an interference with their rights as shareholders brought about by the improper issue and allotment.

It is also in principle irrelevant whether or not the company itself has a cause of action against the directors for the breach of the fiduciary duty owed

MR 1769

to it. Usually it will, because the right of the beneficiary to challenge the improper exercise of a fiduciary power, and to seek to set aside the resulting transaction, is not dependent upon proof of loss or damage. To that extent, if the dicta of Hoffmann J in *Sherborne Park* might be thought to suggest that the two types of action are mutually exclusive, the Board respectfully disagrees, even if they may have been on the facts of that case. The Board agrees with the analysis of Professor Gower in his *Principles of Company Law* , 4th ed (1979) at pp 653-654 that a shareholder's action against the company may coexist with an action by the company in respect of the same breach of duty by the directors, so that the availability of the latter by no means excludes the former.

A major plank in Mr Smith's submissions was that one thing which prohibited a shareholder's action against the company was the ever-present theoretical possibility that the offending exercise of power by the directors could be ratified by the members in general meeting. The Board has already acknowledged that, in certain circumstances, ratification may defeat the shareholder's personal claim. It is necessary again to start from first principles. The shareholders of a solvent company may, acting unanimously, ratify any action taken by the directors which falls within the corporate capacity of the company itself. The thing done becomes the act

of the company: see Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd [1983] Ch 258 .

But if the shareholders seek to use their power to act by a majority, then they are constrained by the equitable principle that they may not do so by way of oppression of the dissenting minority: see Allen v Gold Reefs of West Africa Ltd [1900] 1 Ch 656 , Lindley MR at pp 671-672; Cook v Deeks [1916] 1 AC 554 , Lord Buckmaster LC at pp 563-565; Greenhalgh v Arderne Cinemas Ltd [1951] Ch 286 , Evershed MR at p 291; *Peters' American Delicacy Co Ltd v Heath* (1939) 61 CLR 457 ("Peters"), Latham CJ at pp 480-482; *Ashburton* , Barwick CJ at p 620. That constraint is inherent in the power of the majority of a class to bind the minority. Whether it is actionable by the minority having a mere equity of their own to set the majority action aside, or because that constraint is also embedded in the corporate contract, may be a matter for debate, but it makes no practical difference for present purposes.

There have been, and will always be, cases where a personal claim by a shareholder may be defeated by ratification, both before and after proceedings have been begun or even tried. Hogg v Cramphorn Ltd and Bamford v Bamford are well known examples of such cases. In the former the allotment by the directors was

ratified at a general meeting held after the case had been tried and judgment given in the claimant's favour, during an adjournment granted for the purpose, before any final order was made. In Bamford the impugned allotment had been ratified shortly after the issue of the writ challenging the allotment. The ratification was then challenged by a second writ, and the two were consolidated and heard together. In neither case was the ratification held to have involved oppression of a minority. In such cases (unless ratification has occurred before the commencement of proceedings) it may be said that the shareholder has a defeasible claim, but it will rarely be open to the company to say that the claim is demurrable merely because of the theoretical possibility of ratification in the future. The court may well stay a claim as a matter of good case management (as in Hogg v Cramphorn Ltd) to see whether ratification occurs.

There will also be cases where the nature of the breach of duty by the directors is such that ratification will be seen to be impossible, either because it has been attempted without success or because any attempt in the future would be bound to fail. For example, a breach constituted by the directors having the improper purpose of assisting an existing majority to oppress a minority could hardly be ratified by the majority, without itself falling foul of the constraint against majority oppression: see in *Residues*

at p 1167, King CJ's doubt whether the share allotment in that case could be ratified. As Dixon J explained in *Peters,* pp 504ff and especially pp 511-513, the power of the shareholders in general meeting to alter the articles of association must be exercised in a manner which is both within the power and consistent with the contemplated purpose of the power.

No part of this analysis supports Mr Smith's submission that the mere theoretical possibility of ratification is sufficient to deprive the claimant shareholder of a cause of action. If that were so, then there would have been no need for a trial in Hogg v Cramphorn Ltd , still less an adjournment to see whether ratification would succeed. Nor, in Bamford , would there have been any need for a second writ. The possibility of ratification would have been enough to defeat the claim made by the first writ.

**the Law Applied to the Assumed Facts**

The Board regards this as a strong case, on the assumed facts, for the availability of a personal shareholder's action, such as is pursued by Tianrui's writ. It is alleged that the disputed share issue was allotted to outsiders who were acting in concert with the majority shareholder group and the directors to consolidate their control over CSCGL, and that the allotment was ratified by the same majority in general meeting. The effect of the dilution of Tianrui's

shareholding was to deprive it of negative control of CSCGL. It was an interference with Tianrui's rights as shareholder to have a say in the collective control of CSCGL's affairs by the shareholders.

It is plain that, if the assumed facts are proved to be true, the directors acted for an improper purpose in the issue and allotment of the disputed shares, and that the purported ratification of their actions was itself vitiated by the intent of the majority to oppress Tianrui as a minority shareholder. It is equally plain, if the assumed concert party between the majority and the recipients of the shares is proved, that the recipients, once identified by discovery and joined as defendants, would be unlikely to be able to resist the setting aside of the allotments on the basis that they are bona fide purchasers without notice of the impropriety.

## Conclusion

It follows that the writ should not have been struck out by the Court of Appeal. The Board will therefore humbly advise His Majesty that this appeal be allowed.

Crown copyright
2024 WL 04794596

**End of Document** © 2025 Thomson Reuters.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 104813159
Filing Code Description: No Fee Documents
Filing Description: 2025.08.25 Charities' Sur-reply re Capacity and Rule 39
Status as of 8/25/2025 3:45 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 8/25/2025 3:27:09 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 8/25/2025 3:27:09 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 8/25/2025 3:27:09 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 8/25/2025 3:27:09 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 8/25/2025 3:27:09 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 8/25/2025 3:27:09 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 8/25/2025 3:27:09 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 8/25/2025 3:27:09 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 8/25/2025 3:27:09 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 8/25/2025 3:27:09 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/25/2025 3:27:09 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 8/25/2025 3:27:09 PM | SENT |

Tab 19

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § | THE BUSINESS COURT OF TEXAS FIRST DIVISION |
| Plaintiffs, | § § | |
| v. | § § | Cause No. 25-BC-01B-0027 |
| MARK PATRICK, DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC, and CDH GP, LTD., | § § § § § § § | |
| Defendants. | § | |

## RESPONSE TO "NOTICE OF PLEADINGS FILED IN THE CAYMAN LIQUIDATION MATTER"

The Charitable DAF files this short response to a document filed by the Dondero Organizations on August 21, 2025, denominated a "Notice of Pleadings Filing in the Cayman Liquidation Matter" (the "Notice"), and respectfully shows the Court as follows:[1]

The Charitable DAF was reluctant to engage further with the Dondero Organizations, mindful of the amount of trees that have already

---

[1] The Charitable DAF incorporates by reference the defined terms in its Plea in Abatement and Motion to Dismiss.

**RESPONSE TO "NOTICE OF PLEADINGS FILING IN THE CAYMAN LIQUIDATION MATTER"** – Page 1

been felled in this case, and the burden that imposes on the Court. But the Charitable DAF nevertheless felt it necessary to make a few brief points.

First, the Dondero Organizations' "Notice" is not a mere notice of filings in the Caymans, but rather a substantive motion. It is inappropriate.

Second, it is misleading. The Charitable DAF is confident the Court will review the entirety of the Cayman filings attached to the Notice. They reflect a common theme: **the Charitable DAF's grave concern over James Dondero's corrupting influence, including his many attempts to gain control over the Charitable DAF** (despite his obligation to relinquish dominion and control over those assets, thereby avoiding millions in federal tax liability). In the Caymans, that takes the form of the current JOLs who are funded by Dondero and appear to be doing his bidding. In the Texas Business Court, that takes the form of the Dondero Organizations, for which Dondero sits on each of their respective boards and for whom he is personally funding this litigation.

The DFW Charitable Foundation seeks removal of the current JOLs, not the termination of the Cayman liquidation process. It seeks

replacement of individuals who have shown a tendency towards bias in breach of their duty to be even-handed, objective, and impartial, with other qualified and independent individuals to assume their office as successor JOLs. There is nothing inconsistent with the approach of the DFW Charitable Foundation in the Caymans and that of the Charitable DAF stateside—quite the contrary.

Finally, the Dondero Organization's apparent close coordination with the current JOLs (see the timing between the Cayman and US filings) drives home both (a) that the Texas Business Court is an improper forum for this dispute and (b) even if it is proper, the Debtor is a necessary party.


[remainder of page intentionally left blank]

Respectfully submitted,

/s/ Brian P. Shaw
**Brian P. Shaw**
  Texas Bar No. 24053473
  Email: bshaw@ccsb.com
**Monica E. Gaudioso**
  Texas Bar No. 24084570
  Email: mgaudioso@ccsb.com
**Brent M. Rubin**
  Texas Bar No. 24086834
  Email: brubin@ccsb.com
**Joshua D. Kipp**
  Texas Bar No. 24078793
  Email: jkipp@ccsb.com
**Andrea C. Reed**
  Texas Bar No. 24121791
  Email: areed@ccsb.com
**Emily H. Owen**
  Texas Bar No. 24116865
  Email: eowen@ccsb.com
**CARRINGTON, COLEMAN,**
 **SLOMAN & BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202

***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2025, a copy of the foregoing document was electronically served on all counsel of record in accordance with TEX. R. CIV. P. 21a.

/s/ Brian P. Shaw
Brian P. Shaw

Tab 20

E-filed in the Office of the Clerk
for the Business Court of Texas
9/2/2025 10:04 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

**CAUSE NO. 25-BC01B-0027**

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § | IN THE TEXAS BUSINESS COURT |
| *Plaintiffs*, | § § | |
| v. | § § § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § § | |
| *Defendants*. | § | DALLAS, TEXAS |

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**

Plaintiffs The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (together, the "Charitable Owners" or "Plaintiffs") file this Second Amended Petition, Application for Temporary Injunction, and Application for Appointment of Receiver, and respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1.1 Defendant Mark Patrick took over $270 million in funding support from some of the best community-based charities in the country. He testified on June 25, 2025, that, by the time his plan was complete, Plaintiffs were left with "nothing."[1]

1.2 Patrick flagrantly violated his fiduciary duties to Plaintiffs, and he redirected the fund's beneficial ownership to a new sham organization he controlled. This follows his pattern of using Plaintiffs' resources to enrich himself at the expense of charities and the communities and

---

[1] *See* June 25, 2025, Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200).

---

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                    PAGE 1

MR 1780

people they benefit. So far, he has paid himself at least $3.9 million in a single year from funds meant to support the charities he betrayed.

1.3    If the Court does not bar Patrick's and the other Defendants' further adverse actions through a receivership, Plaintiffs will lose millions in charitable funds earmarked for the communities they serve.  And their loss will be at the hands of the very person who was supposed to protect them.  Accordingly, Plaintiffs seek a Temporary Injunction freezing the funds and the appointment of a Receiver over the funds and the organization holding them.

## II.    DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1    Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

2.2    Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III.    PARTIES

3.1    **The Highland Dallas Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Dallas Foundation, Inc. provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of needs.

3.2    **The Highland Kansas City Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Kansas City Foundation, Inc. provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $8 billion in in charitable grants that support a broad range of needs.

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER                                    PAGE 2

MR 1781

3.3     **The Highland Santa Barbara Foundation, Inc.** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Highland Santa Barbara Foundation, Inc. provides funding to charitable organizations including the Santa Barbara Foundation, established in 1928, which has awarded over $750 Million in charitable grants and supports a broad range of needs.

3.4     **DFW Charitable Foundation** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.  It was organized on December 9, 2024, with Defendant Mark Patrick as the DFW Charitable Foundation's sole member and sole director.   It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. The DFW Charitable Foundation is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.5     **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Charitable DAF Fund ("Charitable DAF Fund" or the "Fund") structure, as explained more thoroughly below. Patrick resides and at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.6     **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

3.7     **CDH GP, Ltd**. is a Cayman Island limited company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 3**

MR 1782

3.8 **CHARITABLE DAF GP, LLC** is a Delaware limited liability company with headquarters at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254 and has been successfully served with process.

## IV. JURISDICTION AND VENUE

4.1 Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and Charitable DAF HoldCo, Ltd;

- and is an action by an owner of an organization, namely the Charitable Owners as participating and beneficial owners of Charitable DAF HoldCo, Ltd ("Charitable DAF HoldCo") and thereby the Fund in which the Charitable Owners held the sole economic interest, and through a sham transaction, briefly owners of CDMCFAD, LLC, and is brought against a controlling person and managerial entities of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFW Charitable Foundation, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF GP, LLC's, and CDH GP, Ltd.'s obligations in the capacity of a controlling person and managerial official of Charitable DAF HoldCo, Ltd and the Fund.

- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Charitable Owners as a controlling owner of Charitable DAF HoldCo, and thus an equitable owner of CDMCFAD, LLC and Charitable DAF Fund, L.P. by reason of Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith;

- and is an action seeking equitable and injunctive relief.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 4**

MR 1783

4.2    The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3    The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4    Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition.  Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas.  Defendants have also consented to the jurisdiction of Texas courts.

4.5    Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas.  On information and belief, the DFW Charitable Foundation, CDH GP, Ltd., Charitable DAF GP, LLC, and CDMCFAD are headquartered in Dallas County.  Dallas County is within the 1st Division of the Texas Business Court.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 5**

MR 1784

## V. FACTUAL BACKGROUND

### A. *The Charitable DAF Fund Structure*

5.1    Highland Capital Management, L.P. ("**Highland**") was an SEC registered investment advisor. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated by Highland's founder, James Dondero, through his charitable trust to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States through several Charitable Owners.  Together, three of those Charitable Owners are the Plaintiffs here.[2]  As with all "supporting organizations," disinterested parties must hold a majority of the voting rights in the Charitable Owners.  So, Mr. Dondero as the original donor held one vote as a director; and the Foundations supported by the Charitable Owners held the remaining two votes and thus control over them.

5.2    To that end, in 2011, the Fund was formed to hold the donated assets.

5.3    The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4    At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5    The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities in California, Missouri, and Texas. The governing documents of the Charitable DAF Fund specifically refer to these Charitable

---

[2] A fourth charitable owner that held less than a 2% interest is not party to this action.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                      **PAGE 6**

MR 1785

Owners. Participating shares in Charitable DAF HoldCo were therefore issued to Charitable Owners, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the Charitable Owners owned nearly 100% of the Participating Shares of Charitable DAF HoldCo. The Charitable Owners held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the Charitable Owners owned nearly 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Charitable Owners are the Plaintiffs in this Lawsuit and held 98.34% of the economic interests in the Fund.

5.6     In turn and as intended, the funds generated by the Charitable DAF Fund enabled the Charitable Owners to provide funding directly to charitable causes foundations in three regions of the United States, primarily through nonprofit organizations. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Charitable Owners and receive regular grants for charitable work ultimately funded by Charitable DAF Fund. For example, funds have supported schools for the needy, children's advocacy, educational and recreational institutions accessible to the public, and important medical facilities and programs. From funding education programs and healthcare services to supporting economic development and community welfare projects, these funds help strengthen the Charitable Owners' ability to serve individuals and families in need.

5.7     Since the Charitable DAF Fund's inception, the Charitable Owners have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Charitable Owners perform irreplaceable

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 7**

MR 1786

philanthropic work in their communities and/or throughout the nation, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

## B. *Control of the Charitable DAF Fund*

5.8 The Charitable Owners, via Charitable DAF HoldCo, were the sole economic beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it. Management control of the Charitable DAF Fund and Charitable DAF HoldCo, however, was vested not with those organizations but rather in "Management Shares." The "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But these shares explicitly did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged and was expressly reserved solely to the Charitable Owners (the Plaintiffs).

5.9 Ownership of the general partner in the Charitable DAF Fund and the Management Shares in Charitable DAF HoldCo were concentrated in one person, vested with enormous trust (the "**Control Position**"). The Control Position was expressly obligated to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of the Charitable Owners. The Control Position therefore owed the Charitable Owners fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10 The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. These were the effective governing documents over the Charitable DAF Fund and Charitable DAF HoldCo at the time the conduct alleged herein commenced. The ARLPA and the Articles, from which the Control Position derives its authority, also impose a clear duty

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**        **PAGE 8**

MR 1787

upon the Control Position to exercise his powers for the sole benefit of the Charitable Owners (the Plaintiffs).

5.11    For example, the Preamble to the ARLPA states:  "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended and the parties hereto desire for the Partnership to be *for the economic benefit of the Limited Partner and its Charitable Owners* (as defined below) as set forth herein[.]"[3]

5.12    Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Charitable Owners*."[4]

5.13    Section 1.6 (Powers) likewise emphasizes:  "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*."[5]

5.14    The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners." In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Charitable Owners and the Charities they support.

---

[3] Emphasis added
[4] Emphasis added.
[5] Emphasis added.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 9**

MR 1788

5.15    The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Charitable Owners. The governing documents of the Charitable DAF Fund thus form the foundation of a special factual relationship based on direct and close contact between the Control Position and the Charitable Owners.  The governing documents establish that by virtue of the role and express obligations, the Control Position holds himself out as an agent acting for the benefit of the Charitable Owners and supplies them the information upon which they must rely.  Patrick and the Defendants thus undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them.  As set forth herein, the Parties built upon that foundation through their conduct over years, and it is this conduct directly pertinent to the instant case.

5.16    Grant Scott was initially selected for the Control Position. Mr. Scott effectively served the Charitable Owners' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of a decade. During this time, the Charitable Owners and their respective charitable foundations made great strides in creating philanthropic, charitable work that was efficient, steady, and reliable, and that grew and built on their progress year after year.

C.  *Mark Patrick's Assumption of Control*

5.17    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                    **PAGE 10**

MR 1789

5.18    Mark Patrick, a tax attorney who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.

5.19    On March 25, 2021, Mr. Scott resigned transferring all his management shares and membership interest to Patrick for nominal consideration, and Patrick was appointed as director of Charitable DAF HoldCo. Patrick therefore assumed the Control Position from that date. Patrick then hired Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

### D.  *Patrick's Breaches of Fiduciary Duty*

5.20    In 2023, while acting as the sole fiduciary for the Charitable Owners at Charitable DAF Fund and DAF HoldCo, Patrick embarked upon a brazen and calculated conspiracy to defraud the Charitable Owners of their beneficial interest in the $270 Million held by the Charitable DAF Fund, in direct violation of the fiduciary duties imposed by the Charitable DAF Fund's governing documents and by common law.  Patrick further conspired to transfer that entire $270 Million interest to a new entity controlled by Patrick and operated out of his living room in Dallas, Texas.

### E.  *Undisclosed Self-Dealing*

5.21    Patrick engaged in a series of ethically and legally dubious conduct prior to embarking upon his grand scheme to defraud the Charitable Owners.  For example, in June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity,

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 11**

MR 1790

which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

**F.** *Attempted Fraudulent Kickback Scheme*

5.22    In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.23    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.24    Mr. Dondero ensured that Charitable Owners were also informed about Patrick's kickback scheme. Despite significant concern, the Charitable Owners had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

**G.** *Insider Trading*

5.25    In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview through his self-described "outside compliance counsel" Douglas Mancino to advise the Highland Dallas Foundation, Inc. to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                      **PAGE 12**

MR 1791

5.26   Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.27   Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

## H. *Patrick Raids the Charitable DAF Fund*

5.28   After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Plaintiffs were essentially cut off from any view into the finances of the fund. As of September 2024—the last reliable data accessible to the Plaintiffs prior to filing this Action—the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Plaintiffs and ultimately their supported Charities.

5.29   Prior to Patrick's tenure in the Control Position and for a period thereafter, the Control Position received a reasonable but measured stipend of $60,000 per year, consistent with the nature of the position as a fiduciary for charitable organizations serving those in need. Patrick's predecessor never awarded himself compensation more than $60,000 per annum. During that time, the Charitable DAF Fund was a tremendous success, growing in value and contributing to the good works of the Charitable Owners.

5.30   No later than 2024, however, Patrick raided the fund for personal gain. A review of the Charitable DAF Fund's last accessible financial records—provided in August 2024— showed dramatic and unexplained increases in expenditures:

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                          **PAGE 13**

MR 1792

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.31    This was only a warmup. In September 2024, without advising the Charitable Owners or their supported charities, and without approval from anyone other than himself and his hand-picked second Director-for-hire in the Cayman Islands, Mr. Murphy, Patrick used his authority over Charitable DAF HoldCo to award himself an annual salary of $850,000 per year. Patrick also awarded himself a "long-term incentive" payment tied to the fund's returns, amounting to 7.5% of annualized net fund returns in excess of 10% (capped at an annualized 25% return). Then, the next month, on the basis of this "LTI" calculation Patrick awarded himself an "LTI" payment of $975,000 and an "annual discretionary bonus" for 2023 in the amount of 2.5 times his base salary.  The result:  In two months in Fall 2024, Partick awarded himself $3,925,000 in compensation directly from the Charitable DAF Fund that was held for the benefit of the Charitable Owners.  Patrick did this even though the governing documents of the Charitable DAF Fund, by which both his powers and his duties to the Charitable Owners arose, were explicit that the Charitable DAF Fund was to be managed "for the economic benefit of the Limited Partner [DAF HoldCo] and its Charitable Owners [the Plaintiffs]" and "not for the economic benefit of the General Partner [Patrick]."

5.32    Patrick did all this in secret. Because of the structure of the Charitable DAF Fund and its management, no one supervised his compensation decisions aside, presumably, from his self-appointed fellow Director Murphy.  The beneficiaries of the Charitable DAF Fund were never

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER                                                    PAGE 14**

MR 1793

advised, and had no opportunity to learn, that in a few short years, Patrick had unilaterally increased his personal compensation from the Charitable DAF Fund by 6,441%. Patrick and the other Defendants provided the Plaintiffs with partial information about the Charitable DAF Fund's finances, doing so through half-truths and partial disclosures that obscured the whole truth from them. Patrick did so despite repeated requests from the Plaintiffs and their counsel and counsel for the Charitable DAF Fund for complete information.

## I. *Patrick Ignores the Charitable Owners' Concerns*

5.33    On November 11, 2024, given what the Charitable Owners already knew, the three major Charitable Owners drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[6]

5.34    The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

5.35    On January 23, 2025, the Charitable Owners again demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. The Plaintiffs requested:

---

[6] Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**        **PAGE 15**

MR 1794

- Income Statements for the last four years: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses.

- Listing of Underlying Assets: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.

- Audited Financial Statements: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.

- Current Structure of DAFHoldCo Operations: An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

5.36     The Defendants never acknowledged receipt of this January 23, 2025, email. On January 28, 2025, therefore, the Charitable Owners requested a winding up of the Charitable DAF Fund's assets:

> These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Charitable Owners so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

Importantly, at the time of this communication, the Charitable owners via Charitable DAF HoldCo, still held the beneficial interest in the Charitable DAF Fund, though (as set forth below, and unknown to the Plaintiffs), that interest was now layered through Patrick's new entity, CDMCFAD. In other words, at the time the Plaintiffs requested a winding up, there is no question

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 16**

MR 1795

that they remained the 100% beneficial owners of the assets in the Charitable DAF Fund and were entitled to the distribution of those assets under the Charitable DAF Fund's governing documents. By contrast, Patrick (whether individually or through one or more of his secretly-created entities) held nothing more than the miniscule par value of the Management Shares.

5.37 As set forth below in more detail, Patrick and the Defendants eventually responded to the Charitable Owners' inquiries by making a series of false statements, promising information and meetings that never arrived, and presenting carefully selected, incomplete information to mislead the Plaintiffs into a false sense of security and delay any decisive action on their part to effect a distribution. Meanwhile, Defendants used that veil of secrecy and misrepresentation to embark upon a conspiracy intended to defraud the Plaintiffs from their entire beneficial interests in the Charitable DAF Fund, before they could act to effect a distribution of its assets.

**J. *Patrick Conspires to Defraud the Charities of $270 Million***

5.38 Between November 2024 and the present, internal documents obtained through proceedings in the Cayman Islands reveal that Patrick conspired to defraud the Charitable Owners of their beneficial interest in the $270 Million in assets held by the Charitable DAF Fund. At the outset of the scheme, the Defendants' agents summarized the essence of the task they had been assigned: "Could Holdco liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares [belonging to the Plaintiffs here] worthless?"[7] The entire premise of Patrick's project was to sever the Charitable Owners and their related Charities from the assets of the Charitable DAF Fund that Patrick was supposed to invest and maintain for their economic benefit, leaving them with worthless shares.

---

[7] Writ of Summons and Statement of Claim, ¶ 80.4, filed on July 15, 2025 at Cause No. FSD2025-0201 in the Grand Court of the Cayman Islands between Charitable DAF HoldCo, Ltd. v. Mark Eric Patrick, et al. (the "CI Statement of Claim")

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 17**

MR 1796

5.39     Patrick and the other Defendants first diluted the Charitable Owners' interests in the Charitable DAF Fund to impede them from being able to exercise their right to wind up the Charitable DAF Fund's operations and thereby obtain their equitable share of the $270 Million fund. Patrick then engaged in a calculated series of moves to defraud the charities of their $270 Million interest in the Charitable DAF Fund. He did this while a demand to "wind up" the Charitable DAF Fund was pending from the Charitable Owners, and with the express intent of lifting the Charitable DAF Fund's assets away from the Charitable Owners before that wind-up could occur. In November 2024, Patrick and Murphy began to contemplate how they could defraud the charities of their interests in the Charitable DAF Fund. One challenge they identified was the prospect that the Charitable Owners might file a petition in the Cayman Islands to "wind up" Charitable DAF HoldCo and its asset (the Charitable DAF Fund), which would then entitle the charities to its proceeds and Patrick to nothing. But Patrick and Murphy found a solution: By issuing new participation shares in Charitable DAF HoldCo to a new "charity" that Patrick himself controlled, they could dilute down the Charitable Owners so they represent a smaller percentage of HoldCo's shares. As expressly contemplated by Patrick and Murphy, this would undermine any future petition to "wind up" because the shares in Charitable DAF HoldCo controlled by Partick's new entity could oppose the petition. Patrick believed that the opposition of his new "charity" to any "winding up" petition could insulate him against any effort by the Charitable Owners to thwart his scheme.[8]

5.40     Accordingly, on December 9, 2024, Patrick formed Defendant DFW Charitable Foundation (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and sole director and its registered address

---

[8] CI Statement of Claim, ¶ 91.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                        **PAGE 18**

MR 1797

was Patrick's home in Dallas. This entity was formed for the express purpose of later diluting down the Charitable Owners and blocking them from opposing the remainder of Patrick's scheme.

5.41    In February 2025, Patrick, Murphy, and the Defendants issued new Participating Shares in Charitable DAF HoldCo to the Sham Charity created by Patrick, with the intent and for the express and stated purpose of blocking a possible equitable winding up petition by the Charitable Owners.  Notably, this was after the Charitable Owners had requested in writing that the Charitable DAF Fund be wound up.  In other words, Patrick and the other Defendants issued the shares expressly in order to alter the balance of power between the holders of Participating Shares.  Defendants did this in direct contravention of their express obligations to the Charitable Owners; and his specific knowledge that, under Cayman law, the power to issue shares is a fiduciary power that may only be exercised for proper purposes and may never be deliberately intended to alter the balance of power between shareholders. On February 7, 2025, Patrick issued his newly-formed and personally-created-and-controlled Sham Charity a fifty-one percent (51%) interest in the charitable assets—318 participating shares in Charitable DAF HoldCo, more than were held by all the Charitable Owners put together. This sham dilution reduced the Charitable Owners' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) The Highland Dallas Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (ii) The Highland Kansas City Foundation, Inc.'s interest was diluted from 32.787% to 16.05%; (iii) The Highland Santa Barbara Foundation, Inc.'s interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[9] interest was diluted from 1.639% to 0.80%.

---

[9] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 19**

MR 1798

5.42    Patrick and the other Defendants never advised the Charitable Owners of any of these steps, and as set forth below, made affirmative misrepresentations and material omissions to hide them, and to dissuade and delay the Plaintiffs from taking certain specific actions to discover, oppose, or reverse them.  The formation of the new "charity" controlled by Patrick, and the award of 318 new participating shares to that Sham Charity, were all done in secret, with the cooperation of all the Defendants.  Moreover, throughout this very same secret process, as set forth in more detail below, Patrick and the Defendants (directly and through their agents) were falsely presenting a partial picture to the Plaintiffs about these facts, and were falsely representing to the Charitable Owners that (A) the reported increases in expenditures on Director's fees were inaccurate; and (B) the "restructuring" of the fund was proper and for the benefit of the Charitable Owners. Accordingly, Plaintiffs had no opportunity to learn the facts that the Defendants were keeping secret, and in fact the Defendants affirmatively misled the Plaintiffs about them.

5.43    Around the same time, Patrick formed the sham charity, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.44    In secret, and without notice to the Charitable Owners, on December 18, 2024, Patrick caused Charitable DAF HoldCo to transfer to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund.  In turn, Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Charitable Owners, and the Charitable DAF Fund itself (where the $270M assets resided). Suddenly, the Charitable Owners no longer held a 100% beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                **PAGE 20**

MR 1799

ensured a different and new entity (CDMCFAD) held Charitable DAF Fund. This was a critical step in the plan to "make the Participation Shares [held the Charities] worthless[.]"[10]

5.45    In February 2024, without telling the Charitable Owners, Patrick formed a new entity in the Cayman Islands to replace the General Partner entity managing the Charitable DAF Fund. The prior General Partner had been a Delaware entity. Patrick's express directive was that the new General Partner be "hard to find or track or trace. Or find owners etc. Strong litigation protection."[11] By early March 2025, Patrick had formed this new secret entity, and it had replaced the General Partner of the Charitable DAF Fund. Again, the Charitable Owners were never informed.

5.46    On March 27, 2025, Patrick caused CDMCFAD (the new holder of $270 million in assets) to issue new shares to the Sham Charity, *and only to the Sham Charity*. He issued no additional shares in CDMCFAD to the Charitable Owners. His fraudulent scam was nearly complete.

5.47    Now, only two entities held direct economic interests in CDMCFAD (the entity that now held the $270M Charitable DAF Fund). Those two entities were Charitable DAF HoldCo (still owned 48.5% by the Plaintiffs) and DFW Charitable Foundation.

5.48    Now that HoldCo's interest in the Charitable DAF Fund existed only through CDMCFAD, Patrick and Murphy knew that causing HoldCo to exchange or redeem its interest in CDMCFAD would sever the Charitable Owners entirely from the Charitable DAF Fund.

5.49    The remaining problem for Patrick and the Defendants was the obvious value of the interests the Charitable Owners held in the Charitable DAF Fund. Valuations of those interests had been performed continuously for years and had consistently, unerringly, and correctly reflected

---

[10] CI Statement of Claim, ¶ 80.4.
[11] CI Statement of Claim, ¶ 82.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                          **PAGE 21**

MR 1800

that they were roughly equivalent to the value of the Charitable DAF Fund itself. In other words, as recently as September 2024, they were valued at roughly $270 Million.

5.50    Patrick and the Defendants thus faced a problem.  They had no interest in exchanging the interests of the Charitable Owners in HoldCo (and therefore in the Charitable DAF Fund) for equivalent value.  Instead, their goal from the beginning had been to "liquidate" HoldCo, "distribute all its assets elsewhere," and "make the Participation Shares [belonging to the Charitable Owners here] worthless[.]"[12] So, to achieve this and to give themselves "cover" for doing so, Patrick and the Defendant embarked on a self-interested, results-oriented, fraudulent exercise in valuation-shopping.

5.51    Thus began a shopping expedition for a valuation firm willing to provide a deflated valuation of HoldCo's interest in the Charitable DAF Fund, now held via CDMCFAD.  In January 2025, Patrick's legal counsel in the Cayman Islands, Walkers, approached PricewaterhouseCoopers ("**PwC**"), seeking a valuation of shares in Charitable DAF HoldCo, noting that the Charitable Owners were "potential adverse parties."  In February 2025, Walkers informed PwC that CDMCFAD was inserted into the structure and also requested a valuation of membership interests in CDMCFAD, on the one hand, and of the Participation Shares held by the Charitable Owners in HoldCo, on the other.  But PwC gave an unwelcome answer, responding that "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders[.]*"  In other words, PwC's professional guidance was precisely what the Defendants did not want to hear—any fair "redemption" of the Plaintiffs' interest in the Fund would require a payment at or very near the face value of the Fund itself.  A phone call followed wherein PwC asked for clarity about what

---

[12] *See Id.*

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                                    **PAGE 22**

MR 1801

Mr. Patrick was trying to achieve by the Restructuring. After that call, PwC declined the assignment. The Defendants, however, brazenly ignored the guidance they had just obtained and rushed forward to find a more compliant valuator.

5.52 The next stop on Patrick's shopping trip was FTI Consulting in London ("**FTI**"). Walkers again presented the scenario. FTI suggested, depending on the alignment with the Charitable DAF Fund's mission, a discount of approximately 14% on the low end or 95% on the high end. But FTI was also clear that a real valuation in support of a transaction would require a much closer inspection of the specific terms of the transaction, the restructuring of the organizations, and the underlying assets themselves. FTI thus advised that their preliminary analysis could not be used in support of any transaction.

5.53 Patrick was anxious to finish his scheme to steal all the Charitable Owners' interests. On March 17, 2025, Patrick informed and instructed Walkers that they needed to have FTI remove its restriction against using any valuation for the purposes of a transaction. Patrick also disclosed his attempt at a post-hoc justification for his fraudulent, tortious, and unethical conduct: Patrick was seeking "new advice of two separate U.S. Tax counsel" that the "best interests of the Company [was] to have non Dondero holders of its interests." Once again, all of this brazen conduct was hidden from the Plaintiffs.

5.54 Over the next several days, Walkers sought to have FTI issue a valuation opinion that was unrestricted for use to support Patrick's transaction against the Charitable Owners. For its part, Walkers opined to FTI that the directors owed no "overriding duty to act in the shareholders' interest," but only in the "best interest of the company." FTI responded with a pertinent question, "Can you explain how it was in the interests of the company to materially dilute the existing shareholders?" There was never a satisfactory answer.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**      **PAGE 23**

MR 1802

5.55    Slightly later, Walkers asked FTI, "please could you delete references to our advice so as to avoid any arguments about waiver of privilege." Walkers further advised FTI that what it really wanted was a "valuation report which may, in connection with a proposed redemption of the membership interests in CDM[CFAD], be disclosed to third parties and relied on to establish fair market value[.]"

5.56    Now realizing that Walkers was hiding the ball, FTI responded: "This is material change in the purpose and access rights of the report.  Please provide more detail of the transaction.  Is it the case that Mark will make CDM[CFAD] redeem the shares owned in by DAF? . . . We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares.  To do a valuation we would need to do a more detailed exercise, including valuing the underlying assets." Shortly thereafter, FTI further elaborated: "If the firm was wound down, would it result in distributions to the existing participating shareholders?  Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing?"[13]  Then FTI touched the point with a needle, in language making it clear that the rigged estimate Defendants were seeking could not survive scrutiny: "[W]hy haven't the participating shareholders triggered a wind-down?  If they can trigger a wind down and then in short order receive $300m of distributions, *it does change things re discount*."[14]

5.57    Walkers continued on behalf of Defendants to push FTI to give a valuation opinion that could be used to justify their intended fraud.  But, now understanding some of what Defendants intended, FTI refused. FTI closed the book as follows on March 26: "What is the intention of adding that directors should act in the interests of future members*?  I am struggling to understand how a director could act in a manner that is beneficial for future shareholders which is not also*

---

[13] CI Statement of Claim, ¶ 134
[14] CI Statement of Claim, ¶ 134 (emphasis added).

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 24**

MR 1803

*helpful for existing shareholders.* The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work . . . [T]his memo should not be used to support a transaction."[15] So in the end, FTI—like PwC—explained to the Defendants that the Charitable Owners' interests had substantial value given all the facts and circumstances, and it could not issue an opinion for use in a transaction that said otherwise. Again, the Defendants got news they did not want to hear; again, they ignored the guidance received and moved on to find a more malleable partner.

5.58 Patrick's next stop seeking a deflated valuation was ValueScope. Since year-end 2020, ValueScope had provided valuations for Charitable DAF Fund net assets, ranging between $177 million and $277 million, with the most recent being September 2024, at $270 million. Over the same time period, ValueScope had provided fair market value for the Charitable Owners' shares on a per share basis ranging from $481,468 to $782,847, with the September 2024 valuation at $759,614. In other words, ValueScope had valued the Charitable Owners' interests at around $270 Million just six months earlier. Unlike FTI and PwC, however, ValueScope saw its way to applying a 99.2% discount against the Charitable Owners' interests for "Lack of Control" (a situation that had *always* been inherent in the structure of the Fund) and entirely changed its methodology from prior periods. The end result: ValueScope determined that each participating share had a fair market value of $5,368 in March 2025, down from $759,614 just several months earlier. According to ValueScope's "work," the Charitable Owners total value was approximately $1.6 million. ValueScope failed in their "valuation" even to address a key point that PwC and FTI had emphasized: The Charitable Owners would acquire the lion's share of $270 Million if they

---

[15] *Id.* ¶ 135 (emphasis added).

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**     **PAGE 25**

MR 1804

triggered an equitable wind-up, which they likely had the right to do. But the Defendants were happy to take "yes" for an answer.

5.59 Patrick wasted no time before weaponizing his sham valuation. The April 2 "redemption" outlined below relied extensively on the sham ValueScope report—without ever mentioning ValueScope's sharp change in methodology from years of its earlier reports; without recognizing that ValueScope failed to account for the possibility or right of the Plaintiffs to wind up; without any serious effort to justify the 99.2% reduction in value estimation from the report issued just six months earlier; and without giving the Plaintiffs any chance even to see the report, much less rebut it.

5.60 But, the Defendants also relied upon and cited in the "redemption" the FTI "memo," despite FTI's express assertion and disclaimer that its preliminary work ***could not be used to support a transaction***, and despite FTI's clear advice that the reality of the Charitable Owners' rights to effect a wind up and acquire the value of the Charitable DAF Fund required a substantial necessary adjustment upwards to the estimated value of their shares.

5.61 On April 2, 2025, Patrick and the Defendants caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6 million, a ridiculous transaction bereft of reasonably equivalent value.[16] Their goal—to "make the Participation Shares [belonging to the Plaintiffs here] worthless"—was achieved.[17] CDMCFAD participated directly by "buying" Charitable DAF HoldCo's shares; the General Partner entities participated directly by causing the redemption.

5.62 After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFW

---

[16] Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[17] CI Statement of Claim, ¶ 80.4.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 26**

MR 1805

Charitable Foundation, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Charitable Owners and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF HoldCo, Ltd.] owns nothing."[18]

5.63    Before the start of these self-dealing transactions, in October 2024, the Charitable Owners owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Charitable Owners owned Participation Shares worth zero. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Charitable Owners' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Charitable Owners.

### K.   *The Defendants' Material Misstatements and Omissions*

5.64    Through this entire conspiracy, from Fall 2024 through May 2025, the Defendants and their agents engaged in an orchestrated effort to mislead the Plaintiffs about their actions and intentions.  The Defendants did so in order to convince the Plaintiffs that the assets in the Charitable DAF Fund were secure; to hide their efforts to "make the Participation Shares worthless" from the Plaintiffs; to falsely convince the Charitable Owners that Defendants' strange corporate "restructuring" acts were in legitimate service to the Charitable DAF Fund's charitable objectives and the needs of the Plaintiffs; and to dissuade or delay any action by the Charitable Owners to protect or secure the value of their beneficial interests in the Charitable DAF Fund, and/or to reverse the dilution of their Participation Shares in Charitable DAF HoldCo or the sham

---

[18] June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11; (Appx. Pg. 200).

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                              **PAGE 27**

MR 1806

"redemption" of Charitable DAF HoldCo by CDMCFAD—by, for instance, the filing of an equitable "winding up" petition.

5.65 Due to the position of trust the governing documents assigned to the Control Position; and due to Patrick's practice of sharing information about the Charitable DAF Fund only through close and direct interactions or transmissions, the Plaintiffs were factually dependent upon the special relationship between them and Patrick—both for any information about the Fund, its assets, and its transactions, and for the protection of the Plaintiffs' interests. The Plaintiffs were required to rely on information and advice that Patrick provided directly to them and depended on him to make material disclosures to them of pertinent information regarding transactions, acquisitions, and the like. This rendered the Plaintiffs unusually vulnerable to material misrepresentations and omissions the Defendants made while they were executing their scheme. By virtue of the governing documents and the Parties' relations over time, Patrick and the Defendants had undertaken, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs entrusted their interests, transactions, affairs, and property to them. The Defendants, for their own benefit, used the position and special inside knowledge they held to take improper and unfair advantage of the Charitable Owners, especially through their material misrepresentations and omissions.

5.66 On or about November 5, 2024, "compliance counsel" for Defendants, Doug Mancino, held a call with outside counsel for the Charitable Owners. In that call, Defendants' counsel represented that the increased legal spend by the Defendants in 2024 was due to the need to settle legal disputes, and that the 2025 legal spend was thus expected to decrease. Defendants' counsel mentioned nothing about increased legal expenditures associated with a massive, contemplated restructuring.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 28**

MR 1807

5.67    On or about December 11, 2024, even while the Defendants were executing their scheme to render the Participation Shares "worthless," Defendants' counsel arranged for a video call with outside counsel for the Charitable Owners.  In an email the prior day, on December 10, 2024, "compliance counsel" for the Defendants referenced the Charitable Owners' "concerns about depletion of assets" and asserted that, "in fact . . . just the opposite has been happening under the leadership of Paul Murphy and Mark Patrick."  In response, outside counsel for the Charitable Owners emphasized their vulnerability and their inability to independently assess the Defendants' representations, given their reliance on the Defendants:  ""[W]ithout detailed financials, or any financials at all, the Supporting Organizations are left in the unenviable position of having [to] rely on presentations about what parties say the numbers show rather than being able to see precisely the story the numbers tell."

5.68    In the December 11, 2024, video call, the Defendants worked to allay the concerns expressed in the November 2024 no-confidence letter and thereby delay or dissuade any action on the part of the Plaintiffs to petition for an equitable wind-up until Patrick's self-dealing "restructuring" was complete.  Patrick, Murphy, and their agents attended.  The meeting literally happened the same week the Defendants formed CDMCFAD (the entity "inserted" below HoldCo to hold the Charitable DAF Fund) and the DFW Foundation (the Sham Charity controlled by Patrick); and just one week before the Defendants executed the fatal transfer of HoldCo's interests in the Charitable DAF Fund to CDMCFAD.  At this meeting, the Defendants purported to provide to the Charitable Owners a global survey on their plans for the Charitable DAF Fund. The Defendants presented their purported vision of running the Charitable DAF Fund as a more professional and institutional investment vehicle, for the benefit of its charitable purposes and the Charitable Owners.  They promised to provide more financial information in the future.  Through

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                 **PAGE 29**

MR 1808

this presentation, the Defendants expressed two fundamental messages: First, the Control Position remained dedicated to the duty imposed by the Charitable DAF Fund's governing documents—managing Charitable DAF Fund assets for the benefit of the Charitable Owners; Second, Defendants' "restructuring" was for the purpose of executing that duty in a more professional and institutional manner. These messages were explicitly false, as the Defendants well knew that they were in the very midst of executing their scheme to "make the Participation Shares worthless." And they were false by omission, as the Defendants shared some information but failed to disclose the critical lodestar by which that information could be accurately read: Defendants' pending, concrete acts to subvert the Plaintiffs' interests in HoldCo and the Charitable DAF Fund, and the intentions and overall scheme behind those acts.

5.69    The very next day, on December 12, 2024, the Defendants secretly formed CDMCFAD, the entity the Defendants intended to use to replace Charitable DAF HoldCo, and ultimately to sever the connection between the Charitable Owners and the Fund.

5.70    Just one day later, on December 13, 2024, "compliance counsel" for the Defendants sent a follow-up email to outside counsel for the Charitable Owners. That correspondence did not disclose the formation or intended use of CDMCFAD. Instead, it encouraged and demanded the Charitable Owners rely on the representations made in the meeting and unilaterally abandon their well-founded concerns on that express basis. The email asserted: "[T]hese two meetings have provided the [Supporting Organizations] with a great deal of transparency regarding governance, financial matters, and independence of Charitable DAF HoldCo, Ltd. and its affiliates. (collectively, the DAF). Therefore, we believe it is imperative that each [Supporting Organization] not only retract the November 11 [no confidence] letter in writing but also affirmatively disavow the concerns[.]" The Defendants' counsel further asserted: "The DAF is actively working on one

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                                       **PAGE 30**

MR 1809

or more development projects from which your [Supporting Organization] clients (and independently their supported organizations) will benefit from financially from Participating Shareholder dividend distributions for many years to come." Again, the Defendants' representatives made these assertions and encouraged and demanded that the Plaintiffs rely upon them, while literally in the midst of executing their plan to permanently sever the Plaintiffs from the very "dividend distributions" referenced in the correspondence.

5.71 On January 30, 2025, Paul Murphy (copying Mark Patrick), acting for the Defendants, sent an email to the Charitable Owners offering additional meetings, and asserting that "we are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF Holdco structure." In the same correspondence, Murphy added: "DAF Holdco holds itself to the highest standards in achieving its goal of maximizing returns in risk adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF Holdco's independence and are advised by best-in-class, independent experts." Defendants sent this promise of "clarity on investments and the DAF Holdco structure" little more than a month after secretly inserting CDMCFAD into that structure as a "blocker" between the Charitable Owners and their interests in the Charitable DAF Fund; and less than a week before executing on their scheme to replace the Charitable DAF Fund's General Partner to better insulate Patrick. Again, Defendants' statement was an express untruth and a failure to perform on an express promise—they had no intent to provide "clarity" to the Plaintiffs, but in fact were in the midst of forming a replacement General Partner entity that was "hard to find or track or trace. Or find owners."[19] And again, these statements omitted the critical facts that would have informed the Plaintiffs of the true landscape.

---

[19] CI Statement of Claim, ¶ 82.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 31**

MR 1810

Again, Patrick and the Defendants intended by these misrepresentations and omissions to forestall and defeat an effort by the Charitable Owners to secure the value of their Participating Shares. Indeed, they had no regard for any inferences the Charitable Owners would draw from their misstatements and omissions—indeed, they were counting on misdirection.

5.72    On February 4, 2025, Paul Murphy (copying Mark Patrick) sent an additional email note to the Charitable Owners on behalf of the Defendants, promising a further meeting at which the Defendants could "resolve [their] concerns."  The Defendants again failed to provide key details that would render the statements they did make not misleading, misrepresented facts, and expressed a false promise of "working with" the Charitable Owners, hoping to delay or undermine any decisive action on their part to protect their valuable interests in the Charitable DAF Fund. The Defendants represented: "We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so."  This happened at the same time the Defendants were deeply entrenched in executing their plot.  Again, the Defendants made expressly false statements—their "commit[ment]" to "work with" the Charitable Owners; made a false promise to work with the Charitable Owners when the Defendants had no intent to do so, and at the same time, omitted critical facts essential to accurately understand the true nature of the Defendants' actions and commitments.

5.73    On February 14, 2025—one day after the Defendants engaged FTI in an effort to secure a sham valuation reducing the value of the Plaintiffs' interests by more than 99%--"compliance counsel" for the Defendants continued to gaslight the Charitable Owners, asserting that "Charitable [D]AF is not paying Paul or Mark 'millions in director fees."

5.74    On March 17, 2025—while the scheme to defraud the Plaintiff was nearing its end—"compliance counsel" for the Defendants reached out to the Charitable Owners' outside

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                                      **PAGE 32**

MR 1811

counsel, purportedly seeking "a couple of dates for Paul Murphy to make a presentation to your three clients." Plaintiffs' counsel responded with three options for dates the following day. Defendants never set the meeting. At this point, the Defendants were irrevocably committed to the path of severing the Charitable Owners from the Fund, and the only possible purpose for such an overture was to keep the charade begun with earlier promises of cooperation, transparency, and future benefits from the Participation Shares going for just a bit longer—just long enough to consummate the conspiracy.

5.75    The Plaintiffs relied on the misrepresentations of the Defendants throughout the relevant period. That reliance was justified under all the circumstances, including Defendants' course of conduct, Defendants' specific representations, and Defendants' obligations to Plaintiffs arising under the governing documents and common law. Those representations were effective in dissuading and delaying the Plaintiffs from taking action that would have secured to them their interests in the $270 Million Fund, including by discovering and opposing the dilution of their interest in the Charitable DAF Fund and by seeking an equitable winding up to secure their interest.

### L. *The Cayman Island Proceedings*

5.76    On April 2, 2025, again unbeknownst to the Charitable Owners, the Defendants voted to place DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.77    But the Charitable Owners already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Charitable Owners well-founded concerns including their expression of no-confidence; and (3) engaged in a pattern of fraudulent self-dealing.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 33**

MR 1812

5.78    As a result, the Charitable Owners filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Charitable Owners would not have learned about Patrick's voluntary liquidation.

5.79    Cayman Islands counsel for the Charitable Owners alleged essentially the same facts as recounted in this Petition before the Grand Court.

5.80    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[20]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:
>
> a) the power to present a petition for the winding up of Charitable DAF Fund, LP if so advised;
>
> b) the power to file a summons and to apply for an order appointing provisional liquidators of the Charitable DAF Fund if so advised; and
>
> c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

---

[20] Supervision Order (Appx. Pg. 244-246)

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                    **PAGE 34**

MR 1813

5.81    Once appointed to fill the shoes of Charitable DAF HoldCo, the Joint Official Liquidators performed an internal investigation, reviewing the documents and correspondence belonging to that entity.  Based on that investigation and in the interests of Charitable DAF HoldCo (not a party here), they determined to waive privilege over substantial records now in their control. On July 15, 2025, the Joint Official Liquidators filed a Statement of Claim in the Grand Court of the Cayman Islands on behalf of Charitable DAF HoldCo.  The Statement of Claim quotes extensively from the records belonging to Charitable DAF HoldCo, which document in detail the conduct of the Defendants in this Action.[21]

5.82    To this Court, the Defendants have asserted that the Joint Liquidators are responsible and independent. In the July 2, 2025, hearing before this Court, for example, Mark Goodman appeared on behalf of the Defendants and represented that there was no exigency and therefore no justification for the relief sought herein, because the Joint Liquidators would be "duty-bound" to pursue any valid claims to the benefit of the Charities in a bankruptcy recognition proceeding.

5.83    But when the Joint Liquidators took preliminary steps to do so, the Defendants' attitude changed.  On August 18, 2025, Defendants filed a motion in the Grand Court to replace the Joint Liquidators. Undoubtedly, Patrick will try to prevail upon replacement liquidators to cease the JOLs' recognition proceeding now pending in Delaware.  This is clear because Patrick expressly argues in the Cayman filing that the Delaware proceedings are so unnecessary and wrong-headed that they are a reason to replace the Joint Liquidators. Never mind the Defendants' July 2, 2025, representation to this Court that the JOLs are "duty-bound" to pursue any

---

[21] CI Statement of Claim.

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 35**

MR 1814

improprieties they identify. Now Patrick says the JOLs' execution of that "duty" is cause to replace them.

5.84    There is therefore no assurance that relief on the Charities' claims can come from any source other than this Action.  Patrick and the Defendants continue to expend and dissipate the Fund's assets.

## VI.    CAUSES OF ACTION

### Count 1 – Common Law Fraud Against All Defendants

6.1    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.2    The Defendants made material misrepresentations to the Plaintiffs, as set forth above and herein.

6.3    The Defendants made the representations with knowledge of their falsity; or recklessly as a positive assertion, without knowledge of their truth, as set forth above and herein.

6.4    The Defendants intended for the Plaintiffs to rely upon the representations, or to induce reliance upon the representations.  Specifically, amongst other purposes, the Defendants intended that their representations would dissuade or delay the Plaintiffs from discovering or contesting the dilution of their interest in Charitable DAF HoldCo; and dissuade or delay the Plaintiffs from filing an equitable winding up petition or taking other decisive action to protect their interest in the Charitable DAF Fund, reverse the dilution, and/or reverse the sham "redemption," all of which would have saved and preserved the value of their interest in the Charitable DAF Fund and defeated the Defendants' scheme to "make the Participation Shares [belonging to the Plaintiffs] worthless[.]"

6.5    Patrick has testified that through their hidden manipulations, at great expense of the funds meant for charitable purposes via the Plaintiffs, the Plaintiffs now own "nothing."

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                **PAGE 36**

MR 1815

6.6     The Plaintiffs justifiably relied upon the representations, as set forth herein and otherwise, as they knew Defendants were charged by the governing documents of the Charitable DAF Fund to always manage its assets for the economic benefit of the Charitable Owners (the Plaintiffs), and the Defendants repeatedly asserted that the purpose of their actions and the changes in Charitable DAF Fund management were not to harm the Plaintiffs, but to better serve the Plaintiffs through more professional and institutional structures and procedures.

6.7     The Plaintiffs suffered injury and damages as a result of the reliance, and seek actual and exemplary damages in an amount to be determined at trial.

### Count 2 – Fraud by Nondisclosure Against All Defendants

6.8     Paragraphs 1.1 - 5.84 are incorporated as though fully set forth herein.

6.9     The Defendants deliberately failed to disclose certain material facts.

6.10    The Defendants had a duty to disclose those facts to the Plaintiffs, arising from their obligations pursuant to the Charitable DAF Fund's governing documents to always manage the Charitable DAF Fund for the economic benefit of the Plaintiffs.

6.11    The Defendants had a further duty to disclose those facts to the Plaintiffs arising from their fiduciary obligations arising under common law.

6.12    The Defendants had a further duty to disclose those facts to the Plaintiffs because the Defendants made a partial disclosure that created a false impression, as set forth above and herein, as set forth above and herein.

6.13    The Defendants had a further duty to disclose those facts to the Plaintiffs because they voluntarily disclosed certain information, creating a duty to disclose the whole truth, as set forth above and herein.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                              **PAGE 37**

MR 1816

6.14    The Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.15    The Defendants knew the Plaintiffs were ignorant of the true facts and did not have an equal opportunity to discover them, as set forth above and herein.

6.16    The Defendants intended that the Plaintiffs act or refrain from acting based on the nondisclosure, as set forth above and herein.

6.17    The Plaintiffs relied on the nondisclosure, which resulted in their injury in the amount to be proven at trial, but which exceeds $250 Million.

### Count 3 – Breach of Fiduciary Duty against Patrick, CDMCFAD, LLC, CDH GP, Ltd., and Charitable DAF GP, LLC

6.18    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.19    By virtue of Defendants' Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, and his special relationship with Plaintiffs, Patrick owed fiduciary duties to the Plaintiffs.

6.20    The Defendants held a special factual relationship of direct and close reliance with the Plaintiffs, as set forth above, expressed by the governing documents and then by the reality that the Plaintiffs were dependent upon the Defendants to protect their interests in the transactions, finances, and acquisitions of the Fund, and were required to rely (and did rely) on information and advice the Defendants provided about the Fund.  Patrick and the Defendants undertook, and were treated as having assumed, responsibility to act on behalf and for the benefit of the Plaintiffs; and the Plaintiffs were treated as having entrusted their interests, transactions, affairs, and property to them. On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                      **PAGE 38**

MR 1817

6.21    By virtue of their assertions and by virtue of the governing documents empowering them to act, the Defendants expressly and implicitly asserted that they acted on behalf of the Plaintiffs as agents for them in the transactions of the Fund.   On this basis, the Defendants owed further and greater fiduciary duties to the Plaintiffs in their management of the Fund and its assets.

6.22    Patrick's position of trust was underscored by the governing documents of the Charitable DAF Fund, which expressed his required fidelity to the Plaintiffs in making all decisions in the Control Position for their economic benefit.

6.23    The Defendants breached their fiduciary duties to the Plaintiffs by diluting and then stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.  In so doing, Defendants for their own benefit used their position and special inside knowledge acquired by them to take improper or unfair advantage of the Plaintiffs.

6.24    The Defendants breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.  Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Charitable Owners.

6.25    Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.  Again, in so doing, they for their own benefit used their position and special inside knowledge to take improper or unfair advantage of the Plaintiffs.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                           **PAGE 39**

MR 1818

6.26    Patrick breached his fiduciary duty by successfully causing a transfer of assets ultimately from the Plaintiffs to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.27    The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support, including by causing them to lose the value of their Participation Shares at an undervalue. Plaintiffs have suffered damages as a result of Defendants' breach of their fiduciary duties.

### Count 4 – Civil Conspiracy against all Defendants.

6.28    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.29    The Defendants conspired and combined their efforts to effect a common scheme.

6.30    The Defendants sought through that combination to achieve a common object and course of action—to wit, to "make the Participation Shares worthless" and thereby transfer away from the Plaintiffs, and to the Defendants, the entire beneficial ownership of the $270 Million in assets in the Charitable DAF Fund.

6.31    The Defendants took one or more unlawful, overt acts in pursuit of the object and course of action of the combination and conspiracy—to wit, at minimum, fraud, breach of fiduciary duty, conversion, and constructive fraud, as set forth herein.

6.32    The Plaintiffs suffered damages as a proximate result of the combination and conspiracy.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 40**

MR 1819

## Count 5 - Constructive Fraud Against All Defendants

6.33    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.34    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Tex. Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas 2009). "In constructive fraud the actor's intent is irrelevant." *Id*. "Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary duty." *Id.*

6.35    As a fiduciary, Patrick's and the other Defendants' conduct in diluting the Plaintiffs' interests, selling interests at below-market values, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.36    Plaintiffs have suffered damages as a result of Patrick's fraud.

## Count 6 - Unjust Enrichment Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation

6.37    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.38    A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.39    Patrick, CDMCFAD, and the DFW Charitable Foundation stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.40    Patrick, CDMCFAD, and the DFW Charitable Foundation took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with the DFW Charitable Foundation.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                  **PAGE 41**

MR 1820

6.41    Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.42    Patrick, CDMCFAD, and DFW Charitable Foundation have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damaged by Patrick's unjust enrichment.

**Count 7 – Conversion Against Patrick, CDMCFAD, LLC, CDH GP, Ltd., and DFW Charitable Foundation**

6.43    Paragraphs 1.1 – 5.84 are incorporated as if fully restated herein.

6.44    Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the plaintiff demanded the property, and (4) defendant refused the return of the property. *Wells Fargo Bank Northwest, N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 699 (Tex. App.—Dallas 2012 no pet.).

6.45    The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.46    Patrick with the other named Defendants have unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFW Charitable Foundation.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 42**

MR 1821

6.47    The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which all have ignored and refused. Plaintiffs have been damaged as a result of these conversions.

**Count 8 – Imposition of Constructive Trust Against Patrick, CDMCFAD, LLC and DFW Charitable Foundation**

6.48    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

6.49    "A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment." *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas, no pet.). "To obtain a constructive trust, the proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *Id*.

6.50    Patrick through the DFW Charitable Foundation has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of the DFW Charitable Foundation and Patrick.

6.51    All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 43**

MR 1822

## VII.    APPLICATION FOR RECEIVERSHIP

7.1    Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

7.2    The Plaintiffs seek the immediate appointment of a receiver over Defendants CDH GP, Ltd., the DFW Charitable Foundation and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code sections 64.001(a), Texas Business Organizations Code section 11.410, and the Court's inherent equitable powers.

### A.  *Texas Civil Practice & Remedies Code*

7.3    Under section 64.001 of the Texas Civil Practice and Remedies Code, a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," or "in any case in which a receiver may be appointed under the rules of equity." TEX. CIV. PRAC. & REM. CODE § 64.001(a)(3), (7).

7.4    A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. *Id*. § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5    A probable interest exists by statute in actions between partners and in actions between joint owners of property. *Id*. § 64.001(a)(3).

7.6    One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App.–Dallas 2024, pet. denied, reh'g denied).

### B.  *Texas Business and Organizations Code*

7.7    A court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an

PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND
APPLICATION FOR APPOINTMENT OF RECEIVER                                                    PAGE 44

MR 1823

action between "partners or others jointly owning or interested in the property or fund." TEX. BUS. ORG. CODE § 11.403(a)(3).

7.8    Additionally, under Section 11.410 of the Texas Business Organizations Code, a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. *Id*. § 11.410(a).

### C.  *Rules of Equity*

7.9    In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. Texas law makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision. TEX. CIV. PRAC. & REM. CODE § 64.004

### D.  *Receivership Standards Under Texas Law and Equity*

7.10    The appointment of a receiver lies within the discretion of the trial court. *See Spiritas v. Davidoff*, 459 S.W.3d 224, 231 (Tex. App.—Dallas 2015, no pet.).

7.11    The facts alleged in the receivership application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.] 1976, writ dismissed).

7.12    Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                **PAGE 45**

MR 1824

**E.** *The Charitable Owners are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities*

7.13    The Plaintiffs have an ownership and beneficial interest in the participating and management shares and thereby their economic ownership and control of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.14    Patrick's malfeasance, attempted malfeasance, and his deliberate scheme to take the Charitable Owner's economic interest show him to be unqualified to have control over the structure.

7.15    Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick. Patrick accomplished those acts by virtue of his control of the management and participation shares, including those held by the Receivership Entities.

7.16    Charitable DAF Fund was valued at $270 million as recently as September 2024. The Charitable Owners have been stripped of any interest. The Charitable Owners have not received any just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17    The Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets.

7.18    Patrick dominates and controls the Receivership Entities. Through them, he exercises complete control over the Fund and the dissipation of its assets. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 46**

MR 1825

dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. Even further, Patrick has demonstrated a proclivity for dissipating the Fund's assets through imprudent expenses designed to protect himself, as when he caused DFW Charitable Foundation to expend tremendous resources on an effort to supplant the Joint Liquidators in favor of a handpicked replacement that he hopes will stop aggressively pursuing Charitable DAF HoldCo's interests in the Cayman Islands and in Delaware. *See* Plaintiffs' Not. of Filing, Aug. 21, 2025. These wasteful actions are authorized by virtue of the Defendants' control of the Fund through the Receivership Entities. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held. Further decisions about the expenditure of charitable funds should be made by a neutral responsible to this Court, not by Patrick.

7.19    Patrick is using, at great expense, funds meant for charitable purposes as his own legal war chest to preserve his own interests.

7.20    The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.21    The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 47**

MR 1826

7.22 The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.23 The participating shares in Charitable DAF HoldCo as well as assets valued at $270 million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.24 Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

## VIII – APPLICATION FOR TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP

8.1. Paragraphs 1.1 - 5.84 are incorporated as if fully restated herein.

8.2. Plaintiffs seek injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund following a hearing on Plaintiffs' Application for Temporary Injunction , regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.3. A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                          **PAGE 48**

MR 1827

would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." TEX. CIV. PRAC. & REM. CODE § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties." *Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966). An applicant for the writ must show (1) a probable right to recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued. *See* TEX. CIV. PRAC. & REM. CODE § 65.011; *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002)

8.4.     Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending.  In other words, the adequacy of an available legal remedy must be judged in the circumstances of the particular case, and in such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety. *See Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ).

8.5.     The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                        **PAGE 49**

MR 1828

8.6.     Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.7.     Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Injunction is not ordered against the Defendants.  Accordingly, Plaintiffs request the Court freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.8.     The harm to Plaintiffs is imminent, and if the Court does not enjoin the Defendants, they will be irreparably injured, as set forth herein. If the Defendants prevail on the merits, the funds will still be available to them for their use in future.  The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.9.     The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                    **PAGE 50**

MR 1829

**A.** *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.*

8.10.    Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See id*; *Transport Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 552 (Tex. 1953). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58.

8.11.    Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, fraud, constructive fraud, civil conspiracy, unjust enrichment, and conversion. As alleged in more detail above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that funds vital philanthropic efforts relied upon by key communities across the nation.   The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B.**  *Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.*

8.12.    Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above.  Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *See Staubach*, 667 S.W.2d at 567–68.

8.13.    Plaintiffs have no adequate remedy at law.  Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds.  These losses, as well as others which will inevitably occur if Defendants are

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**                                                                 **PAGE 51**

MR 1830

not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seek a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 52**

MR 1831

## VIII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation, CDH GP, Ltd., and CDMCFAD, LLC;

B. Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C. Impose a Constructive Trust against Patrick, CDMCFAD, LLC and DFW Charitable Fund;

D. Require the reversal of the dilution scheme and unauthorized asset transfers;

E. Require recission of improper redemption of shares and share transfers;

F. Award actual damages in an amount to be proven at trial;

G. Award exemplary damages as permitted by law;

H. Award attorneys' fees and costs;

I. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**MCCARTY LAW PLLC**

*/s/ Darren McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street, Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
Benjamin L. Warden

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER**          **PAGE 53**

MR 1832

State Bar No. 24115926
bwarden@duanemorris.com
Dallas, Texas 75201
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, September 2, 2025, on all counsel or parties of record.

*/s/ Craig M. Warner*
Craig M. Warner

**PLAINTIFFS' SECOND AMENDED PETITION, APPLICATION FOR TEMPORARY INJUNCTION, AND APPLICATION FOR APPOINTMENT OF RECEIVER** **PAGE 54**

MR 1833

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Craig Warner on behalf of Craig Warner
Bar No. 24084158
CMWarner@duanemorris.com
Envelope ID: 105121623
Filing Code Description: Amended Filing
Filing Description: Plaintiffs' Second Am. Pet., App. for Receiver, App. for TI
Status as of 9/3/2025 9:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 9/2/2025 10:04:53 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 9/2/2025 10:04:53 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 9/2/2025 10:04:53 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/2/2025 10:04:53 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 9/2/2025 10:04:53 PM | SENT |

Tab 21

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
9/18/2025



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC.; THE HIGHLAND KANSAS CITY FOUNDATION, INC.; and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., *Plaintiffs* | § § § § § § § | |
| v. | § § | Cause No. 25-BC01B-0027 |
| MARK PATRICK and DFW CHARITABLE FOUNDATION; CDMCFAD, LLC; CHARITABLE DAF GP, LLC; and CDH GP, LTD., *Defendants* | § § § § § | |

## ORDER

Before the court are

1.    Defendants' July 14, 2025, Motion to Dismiss and Plea to the Jurisdiction;

2.    Plaintiffs' July 21, 2025, Response to Defendants' Motion to Dismiss and Plea to the Jurisdiction;

3. Defendants' July 25, 2025, Reply in Support of their Motion to Dismiss and Plea to the Jurisdiction;

4. Plaintiffs' July 30, 2025, Surreply to Defendants' Motion to Dismiss and Plea to the Jurisdiction;

5. Defendants' August 11, 2025, Supplemental Brief and Alternative Motion to Abate;

6. Plaintiffs' August 18, 2025, Response to Defendants' Supplemental Brief and Alternative Motion to Abate;

7. Defendants' August 21, 2025, Reply in Support of their Supplemental Brief and Alternative Motion to Abate; and

8. Plaintiffs' August 25, 2025, Sur-reply to Defendants' Supplemental Brief and Alternative Motion to Abate.

Having considered the pleadings, motions, party submissions, and oral arguments, the court makes the following findings and conclusions:

1. Plaintiffs have constitutional standing to assert their claims because they allege an injury to themselves. Additionally, the court has statutory jurisdiction under Texas Government Code § 25A.004(b). Therefore, Defendants' Motion to Dismiss and Plea to the Jurisdiction based on those premises is denied. These are not rulings on (i) the validity of plaintiffs'

-2-

MR 1837

causes of action; (ii) whether plaintiffs are proper parties to assert those causes of action; or (iii) whether all necessary parties are before the court.

2. The court does not at this time decide whether plaintiffs have the legal capacity to assert their causes of action because defendants have not filed a verified denial raising a lack of capacity defense. *See* TEX. R. CIV. P. 93(1).

3. Charitable DAF HoldCo, Ltd.'s joint official liquidators (JOLs) are necessary parties under Texas Rule of Civil Procedure 39(a), they are not parties to this case, and the court cannot provide complete relief in their absence. Accordingly, this case should be abated until when the JOLs become parties, voluntarily or involuntarily.

4. Any further filings must be made by leave of court.

So ORDERED.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: September 18, 2025

-3-

MR 1838

STATE OF TEXAS
BUSINESS COURT OF TEXAS
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE <u>November 21, 2025</u>



Beverly Crumley
BUSINESS COURT CLERK

BY _____ DEPUTY

Tab 22

E-filed in the Office of the Clerk
for the Business Court of Texas
10/22/2025 2:03 PM
Accepted by: Beverly Crumley
Case Number: 25-BC01B-0027

## CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* | § § | |
| v. | § § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § | |
| *Defendants.* | § § | DALLAS, TEXAS |

## PLAINTIFFS' MOTION FOR LEAVE TO FILE
## MOTION FOR RECONSIDERATION AS TO COMPLETE RELIEF

Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

Jason Boatright
Texas Bar No. 240248138
jeboatright@duanemorris.com
Craig Warner
Texas Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
Texas Bar No. 04950200
jmcox@duanemorris.com
Duane Morris LLP
100 Crescent Ct., Ste. 1200
Dallas, Texas 75201
(214) 257-7213
(214 292-8442 fax

*Attorneys for Plaintiffs*

1

Copy from re:SearchTX                    MR 1841

TO THE HONORABLE JUDGE OF THIS COURT:

The Court's September 18, 2025 Order stated that any further filings must be made by leave of Court. Accordingly, Plaintiffs request leave to file their Motion for Reconsideration as to Complete Relief ("Motion").

Plaintiffs request leave to file the Motion because it highlights important points that were not the focus of the parties' earlier briefing. These points go to the heart of the parties' dispositive arguments. As a result, they may change the outcome of the case in one of two ways.

First, the points the Motion raises could change the Court's decision regarding Rule 39 and joinder altogether. Second, they could persuade the Court to change the grounds on which its decision is made. Either way, the Motion is worthy of careful consideration because it would assist the Court in crafting a precedent in this case that is as useful and durable as possible.

The decision to grant leave to file is generally a matter of discretion in other kinds of cases. *See, e.g.*, *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 686 (Tex. 2002). Granting leave here would be an excellent use of the Court's discretion because it would encourage fuller

2

Copy from re:SearchTX                    MR 1842

consideration of the important points the Motion raises and, because the points are limited in scope and clearly presented, granting leave would not waste the resources of the Court or the parties.

## Prayer

Plaintiffs ask the Court to grant leave to file the Motion.

Respectfully submitted,

Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

/s/ Jason Boatright
Texas Bar No. 240248138
jeboatright@duanemorris.com
Craig Warner
Texas Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
Texas Bar No. 04950200
jmcox@duanemorris.com
Duane Morris LLP
100 Crescent Ct., Ste. 1200
Dallas, Texas 75201
(214) 257-7213
(214 292-8442 fax

*Attorneys for Plaintiffs*

## Certificate of Service

This Motion was served on all counsel of record on October 22, 2025.

/s/ Jason Boatright

3

Copy from re:SearchTX

## Certificate of Compliance

This Motion is 237 words and complies with Business Court Rule 5.

It is written in Century Schoolbook 14 point font.

<u>/s/ Jason Boatright</u>

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jason Boatright on behalf of Jason Everett Boatright
Bar No. 24048138
jeboatright@duanemorris.com
Envelope ID: 107163165
Filing Code Description: Motions - All Other
Filing Description: Motion for Leave to File Motion for Reconsideration as to Complete Relief
Status as of 10/22/2025 2:20 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|-------------------|--------|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 10/22/2025 2:03:38 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 10/22/2025 2:03:38 PM | SENT |
| Monica E.Gaudioso | | mgaudioso@ccsb.com | 10/22/2025 2:03:38 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 10/22/2025 2:03:38 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 10/22/2025 2:03:38 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 10/22/2025 2:03:38 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 10/22/2025 2:03:38 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 10/22/2025 2:03:38 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 10/22/2025 2:03:38 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 10/22/2025 2:03:38 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 10/22/2025 2:03:38 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 10/22/2025 2:03:38 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 10/22/2025 2:03:38 PM | SENT |
| Emily H.Owen | | eowen@ccsb.com | 10/22/2025 2:03:38 PM | SENT |
| Andrea C.Reed | | areed@ccsb.com | 10/22/2025 2:03:38 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 10/22/2025 2:03:38 PM | SENT |

Tab 23

## CAUSE NO. 25-BC01B-0027

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC. and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § § | TEXAS BUSINESS COURT |
| *Plaintiffs,* | § § | |
| v. | § § | FIRST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd. | § § § § § | |
| *Defendants.* | § § | DALLAS, TEXAS |

## PLAINTIFFS' MOTION FOR RECONSIDERATION AS TO COMPLETE RELIEF

Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

Jason Boatright
Texas Bar No. 240248138
jeboatright@duanemorris.com
Craig Warner
Texas Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
Texas Bar No. 04950200
jmcox@duanemorris.com
Duane Morris LLP
100 Crescent Ct., Ste. 1200
Dallas, Texas 75201
(214) 257-7213
(214 292-8442 fax

*Attorneys for Plaintiffs*

1

## Introduction

The Court reviewed hundreds of pages of legal briefing before entering its September 18, 2025 Order. Plaintiffs will not reargue all the points the Court has already considered, but they will draw attention to two points that the briefing might have obscured.

In its Order, the Court found that it cannot provide complete relief in the absence of the joint official liquidators, or JOLs, of the Debtor, Charitable DAF Holdco, Ltd. But Defendants never made a relevant argument about complete relief—their arguments on that issue were tied to derivative claims and other concepts that are unrelated to this case. Moreover, Defendants' arguments on complete relief and Rule 39(a)(1) were about the interests of non-parties, not the Defendants. A long line of caselaw is clear that complete relief in this context means complete relief only between the existing parties, not potential relief involving the interests or contribution of non-parties.

To be clear, Plaintiffs are not just arguing that they disagree with Defendants' arguments. Plaintiffs *do* disagree with them and explained why in their briefing, but Plaintiffs ask the Court to focus on the fact that Defendants did not present a relevant argument on complete relief.

2

Copy from re:SearchTX MR 1848

If the Court found good authority on its own, Plaintiffs do not know what it might be. For now, the only relevant authority Plaintiffs are aware of is a long line of cases holding that there must be complete relief between the parties, not non-parties. The Court should reconsider its Order to make sure it is not breaking away from settled precedent.

## Argument

### A.    Defendants did not cite relevant law on complete relief.

Defendants made three arguments regarding complete relief in their briefing on joinder and Rule 39. None of the three arguments applies to the facts or law governing this case.

First, Defendants cite Judge Fish's opinion in *Lee v. Ty Equity Group., Inc.*, No. 3:01-CV-0253, 2001 WL 1401395 (N.D. Tex. Nov. 8, 2001) in their August 11, 2025 Supplemental Brief. Defendants say (at 18) that *Lee* stands for the proposition that the absence of the JOLs prevents complete relief because Plaintiffs' claims are derivative claims. But Plaintiffs have not asserted any derivative claims, and Defendants have never identified one, much less ventured a legal argument to show that any particular claim is a derivative claim. Thus, *Lee* and the

3

argument Defendants cited for it have nothing to do with this case and do not support a finding that the JOLs are needed for complete relief.

Second, Defendants cite (at 19-20) the Texas Supreme Court's opinion in *Matter of Tr. A & Tr. C. Established Under Bernard L. & Jeannette Fenenbock Living Tr. Agreement, Dated March 12, 2008*, 690 S.W.3d 80 (Tex. 2024) for the idea that the JOLs are necessary for complete relief because the Court cannot require them to transfer shares back unless they are joined. But Plaintiffs are not seeking any shares from the Debtor or the JOLs and, even if they were, the JOLs do not have any shares and neither does the Debtor, so joining the JOLs would be pointless rather than necessary. In this way, *Fenenbock* is irrelevant.

Third, Defendants cite two cases (at 10) in their August 21, 2025 Reply for the idea that the JOLs are necessary for a constructive trust. As they note, *In re Indep. Fuel Sys. LLC*, 655 B.R. 322 (Bankr. E.D. Tex. 2023) explained that a plaintiff must establish that assets are owned by the defendant before a plaintiff can obtain a constructive trust. However, Plaintiffs are not seeking a constructive trust over any assets owned by the JOLs or the Debtor, and Defendants have never attempted to demonstrate otherwise. Instead, Defendants cite *KCM Fin. LLC v.*

4

Copy from re:SearchTX

*Bradshaw*, 457 S.W.3d 70 (Tex. 2015), where the Texas Supreme Court held that a constructive trust could not be granted for assets that were not definitively traceable as owed to the claimant. But this case is about whether *Defendants* owe Plaintiffs those assets; neither the JOLs nor the Debtor hold any of the assets in question here. Thus, *Independent Fuel Systems* and *Bradshaw* have nothing to do with the issue of complete relief and joinder under Rule 39.

Defendants' failure to cite a relevant case is not exactly a new point in this case; Plaintiffs pointed out (at 20-21) in their August 8, 2025 Response, for example, that their claims are not derivative and that the Defendants, not the Debtor, hold the assets at issue in this case. But Plaintiffs' focus in the briefing was on making their affirmative case for why joinder was unnecessary, and rightly so. Now Plaintiffs are asking for reconsideration to invite the Court to examine whether Defendants' arguments are really what they might have appeared to be upon initial review or whether, as Plaintiffs have demonstrated, Defendants actually made no relevant argument at all.

## B. Defendants' arguments—and the Court's finding—break from a long line of settled precedent.

Copy from re:SearchTX                    MR 1851

As Plaintiffs pointed out in their Response (at 20), Judge Mazzant held in *Sanson* that "complete relief" refers to relief between persons *already parties to an action and not to an absent party whose joinder is sought*. *Sanson v. Allstate Tex. Lloyds*, No. 4:17-cv-00733, 2018 WL 3630136, at \*4 (E.D. Tex. 2018) (citing *Payan v. Cont'l Tire N. Am., Inc.*, 232 F.R.D. 587, 589 (S.D. Tex. 2005), *Ortiz v. A.N.P., Inc.*, 10-CV-917, 2010 WL 3702595, at \*4 (S.D. Tex. Sept. 15, 2010)). Even an absent party that may owe contribution or have claims against an existing party need not be added under the complete-relief prong of the joinder rule. *Ortiz*, 2010 WL 3702595 at \*4. Plaintiffs respectfully submit that the Court's finding on complete relief disturbs that long line of cases.

Assuming solely for the sake of discussion that Defendants' arguments about joinder were relevant—i.e., if Plaintiffs' claims were derivative or the Debtor held the assets at issue—Defendants' arguments about complete relief would still be premised on the idea that the JOLs should be joined to protect the Debtor's interests. In that case, joinder of the absent party would be required for the sake of the *absent party's* interests. *Cf. Sanson*, 2018 WL 3630136, at \*4. But it is emphatically not the case here that any of Plaintiffs' claims are derivative or ask anything

6

Copy from re:SearchTX                    MR 1852

of the Debtor—and Defendants cannot show otherwise. Instead, Defendants have simply presumed that Plaintiffs' claims are derivative as in *Lee*, or that they seek a constructive trust over an absent party holding assets, as in *Independent Fuel Systems* or *Bradshaw*. But those presumptions are totally false, so the cases Defendants cited have nothing to do with this one.

Nevertheless, the Court's finding on complete relief is consistent with Defendants' position on that issue. Consequently, the finding will encourage the mistaken inference that complete relief is tied to the absent party's interest rather than the interests of the actual parties.

The Court should grant reconsideration and hold a hearing to allow full discussion with the parties regarding this important and no doubt unintended disturbance to what had been well-settled precedent.

Copy from re:SearchTX                    MR 1853

## Prayer

Plaintiffs ask the Court to reconsider its September 18, 2025 Order, hold a hearing on the issue of complete relief, reverse the Order's finding on complete relief, and allow the case to proceed to discovery and trial.

Respectfully submitted,

Darren L. McCarty
Texas Bar No. 24007631
darren@mccartylawpllc.com
McCarty Law PLLC
316 West 12th St., Ste. 400
Austin, Texas 78701
(512) 827-2902

/s/ Jason Boatright
Texas Bar No. 240248138
jeboatright@duanemorris.com
Craig Warner
Texas Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
Texas Bar No. 04950200
jmcox@duanemorris.com
Duane Morris LLP
100 Crescent Ct., Ste. 1200
Dallas, Texas 75201
(214) 257-7213
(214 292-8442 fax

*Attorneys for Plaintiffs*

## Certificate of Service

This Motion was served on all counsel of record on October 22, 2025.

/s/ Jason Boatright

## Certificate of Compliance

This Motion is 1,364 words and complies with Rule 5.

/s/ Jason Boatright

8

Copy from re:SearchTX

Tab 24



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC.; THE HIGHLAND KANSAS CITY FOUNDATION, INC.; and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., *Plaintiffs* | § § § § § § § § | |
| v. | § | Cause No. 25-BC01B-0027 |
| MARK PATRICK and DFW CHARITABLE FOUNDATION; CDMCFAD, LLC; CHARITABLE DAF GP, LLC; and CDH GP, LTD., *Defendants* | § § § § § § | |

## ORDER

The court (i) grants plaintiffs' October 22, 2025, Motion for Leave to File Motion for Reconsideration as to Complete Relief, (ii) deems plaintiffs' Motion for Reconsideration filed, and (iii) denies the same.

The court's September 18, 2025, order held that Charitable DAF HoldCo, Ltd.'s joint official liquidators (JOLs) are indispensable parties under

Texas Rule of Civil Procedure 39(a) and complete relief cannot be granted in their absence. Plaintiffs' motion posits that the court's order ignores plaintiffs' premise that their claims are direct claims.[1] However, in issuing its September 18, 2025, order the court considered and concluded that all of plaintiffs' claims are derivative. Therefore, this court cannot afford the parties here complete relief without the JOLs' joinder.

First, Cayman law governs here because each cause of action is related to HoldCo's internal affairs, a Cayman entity. TEX. BUS. ORG. CODE § 1.102; *see also id.*, § 1.105 (plaintiffs' claims relate to the duties of "governing persons" and its "ownership interests").

Second, under Cayman law, while shareholders may have direct claims when they are deprived of their voting rights as shareholders, plaintiffs never had voting rights in the first place.[2] *Tianrui (Int'l) Holding Co. Ltd. v. China Shanshui Cement Grp. Ltd.*, [2024] UKPC 36, ¶s 85-86. Under *Tianrui*, a board can legitimately dilute shareholders by issuing new shares, despite

---

[1] Motion for Reconsideration at 3-4, 6-7.
[2] *See* 7/1/2025 Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver, Appendix at 76, ¶ 19:

> Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

MR 1857

incidentally altering the balance of power and depriving a shareholder of control rights. *Id.*, ¶ 71.

Accordingly, the court concluded that all of plaintiffs' claims are derivative and that the JOLs are indispensable parties under Rule 39(a).

So ORDERED.

/s/ Bill Whitehill

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: October 31, 2025

MR 1858

STATE OF TEXAS
BUSINESS COURT OF TEXAS
CERTIFIED TO BE A TRUE AND CORRECT COPY
OF THE ORIGINAL IN MY CUSTODY.
GIVEN UNDER MY HAND AND SEAL OF OFFICE
DATE <u>November 21, 2025</u>

Beverly Crumley
BUSINESS COURT CLERK

BY_____DEPUTY

Tab 25

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN



# DuaneMorris®

*FIRM and AFFILIATE OFFICES*

JOSEPH M. COX
PARTNER
DIRECT DIAL: +1 214 257 7252
PERSONAL FAX: +1 214 853 9480
E-MAIL: JMCox@duanemorris.com

*www.duanemorris.com*

HANOI
HO CHI MINH CITY
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

E-filed in the Office of the Clerk
for the Business Court of Texas
7/13/2025 5:09 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

July 11, 2025

Mr. Brian Shaw                                           *Sent via email*
Carrington, Coleman, Sloman, & Blumenthal
901 Main Street, Suite 5500
Dallas, Texas 75202
bshaw@ccsb.com

> **Re:**   **The Highland Dallas Foundation, Inc, et al v. Mark Patrick, et al,**
> **Cause No. 25-BC01B-0027**
> **Rule 11 Agreement**

Dear Mr. Shaw:

Pursuant to Texas Rule of Civil Procedure 11, the parties in this matter The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively "Plaintiffs"), and Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd. (collectively "Defendants"), agree to the following:

(1) The "Covered Entities" as referred to herein is defined to include collectively Charitable DAF Fund, LP and/or any of its subsidiaries, the DFW Charitable Foundation and/or any of its subsidiaries, CDMCFAD, LLC and/or any of its subsidiaries, and/or any of its subsidiaries, and CDH GP, Ltd. and/or any of its subsidiaries.

(2) Defendants shall have until Monday, July 14, 2025, to file a challenge to the court's jurisdiction (the "Plea").

(3) Plaintiffs shall have until Monday, July 21, 2025, to file a response to the Plea.

(4) Defendants shall have until Thursday, July 24, 2025, to file a reply to the Plea.

(5) The Parties agree to the following limits on discovery prior to any hearing on Plaintiffs' application for temporary injunction/appointment of receiver (the "Temporary Injunction")

Copy from re:SearchTX                              MR 1861


in this matter (these limits shall have no effect on any discovery conducted after the Temporary Injunction is decided):

    a. Plaintiffs and Defendants each (not per party) may serve 25 requests for production to the other, may serve 5 interrogatories, may serve 10 requests for admission, and may take 3 depositions (2 of which shall be limited to 3 hours, and one of which shall be limited to 6 hours, the selection of the witness for the six hour deposition to be determined by the party seeking the deposition).

    b. The Parties shall serve all discovery requests no later than Wednesday, July 16, 2025.

    c. Responses to the written discovery and substantial completion of related any related document production shall be served as follows: (1) if the Court denies the Plea as to any Defendant, seven business days after the Court order denying the Plea is entered; (2) if the Court grants the Plea as to all Defendants, then responses to written discovery shall not be due, if at all, until seven business days after the Court's order granting the Plea is reversed or overturned.

    Depositions shall take place within seven days after the written discovery responses and documents are served as set forth in c. above.

(6) If the Court denies the Plea, the Temporary Injunction shall be heard as reasonably practicable after the ruling, unless stayed by an appellate court. If the Plea is granted, but is later reversed or overturned, the same timelines for discovery provided in (5) above shall be followed and the Parties shall then seek to expeditiously set a hearing before the Court.

(7) Pending the Court's decision on the Temporary Injunction or grant of the Plea relating to the Temporary Injunction or Plea), the Covered Entities and their respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for any Covered Entity, agree:

    a. not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares outside of the ordinary course of business;

    b. not take any action to increase the compensation paid to any employee of the Covered Entities;

    c. not to take any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

    d. not to take any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

    e. not to take any action to sell, exchange, or dispossess any asset of one of the Covered Entities unless (i) the sale is to a bona third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide

Copy from re:SearchTX

# DuaneMorris

purchaser is made aware of this Rule 11 Agreement, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the Covered Entities;

    f.  not to alter, conceal, or destroy any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(8) This Agreement shall be filed with the Court and, as provided in the first sentence of this letter, constitutes an enforceable agreement pursuant to Texas Rule of Civil Procedure 11. This Agreement shall expire and be of no force or effect on the earlier of (a) thirty days after a final order of the Court dismissing this case or (b) the Court's ruling on Plaintiffs' current request for a temporary injunction (or as subsequently amended). This does not prevent a party from requesting that a court of appeals issue an order to keep this Rule 11 Agreement in place during the pendency of such appeal or any objection to such request.

    If the terms above accurately reflect our agreement, please acknowledge your agreement by signing below.

    Best regards.

Sincerely,

Joseph M. Cox

AGREED TO FORM AND CONTENT:

_____
Brian Shaw, Counsel for Defendants

JMC/kr
cc:    (all via email)
       Darren McCarty, Esq.
       Craig Warner, Esq.
       Clients

DM1\16831875.1

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Craig Warner on behalf of Craig Warner
Bar No. 24084158
CMWarner@duanemorris.com
Envelope ID: 103064824
Filing Code Description: Notice
Filing Description: Rule 11 Agreement
Status as of 7/14/2025 9:38 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/13/2025 5:09:31 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 7/13/2025 5:09:31 PM | SENT |

Copy from re:SearchTX

MR 1864

Tab 26

## Case Information

# The Highland Dallas Foundation, Inc.,The Highland Kansas City Foundation, Inc.,The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation,CDMCFAD, LLC,Charitable DAF GP, LLC,CDH GP, Ltd.,Mark Patrick

25-BC01B-0027

**Location**
Business Court 1b

**Case Category**
Civil - Other Civil

**Case Type**
Other Civil

**Case Filed Date**
7/1/2025

**Judge**
Whitehill, Bill

**Case Status**
Closed (Inactive)

## Parties [8]

| Type | Name | Nickname/Alias | Attorneys |
|------|------|----------------|-----------|
| Plaintiff | The Highland Dallas Foundation, Inc. | | Benjamin Warden, Craig Warner, Darren McCarty, Jason Boatright, Mr Joseph M. Cox |
| Plaintiff | The Highland Kansas City Foundation, Inc. | | Benjamin Warden, Craig Warner, Darren McCarty, Jason Boatright, Mr Joseph M. Cox |
| Plaintiff | The Highland Santa Barbara Foundation, Inc. | | Benjamin Warden, Craig Warner, Darren McCarty, Jason Boatright, Mr Joseph M. Cox |
| Defendant | DFW Charitable Foundation | | Andrea Reed, Emily Owen, Joshua Kipp, Monica Gaudioso, Mr Brent Rubin, Mr Brian Shaw, JR |
| Defendant | CDMCFAD, LLC | | Andrea Reed, Emily Owen, Joshua Kipp, Monica Gaudioso, Mr Brent Rubin, Mr Brian Shaw, JR |
| Defendant | Charitable DAF GP, LLC | | Andrea Reed, Emily Owen, Joshua Kipp, Monica Gaudioso, Mr Brent Rubin, Mr Brian Shaw, JR |
| Defendant | CDH GP, Ltd. | | Andrea Reed, Emily Owen, Joshua Kipp, Monica Gaudioso, Mr Brent Rubin, Mr Brian Shaw, JR |
| Defendant | Mark Patrick | | Andrea Reed, Emily Owen, Joshua Kipp, Monica Gaudioso, Mr Brent Rubin, Mr Brian Shaw, JR |

## Hearings [5]

| Date/Time | Hearing Type | Judge | Location | Result |
|-----------|--------------|-------|----------|--------|
| 7/2/2025 02:00 PM | Temporary Restraining Order | Whitehill, Bill | Division 1B Conference Room | Held |
| 7/24/2025 09:00 AM | Temporary Injunction Hearing | Whitehill, Bill | SMU Dedman School of Law | *Canceled - Agreed Resolutions* |
| 7/25/2025 09:00 AM | Temporary Injunction Hearing | Whitehill, Bill | SMU Dedman School of Law | *Canceled - Agreed Resolutions* |
| 8/4/2025 09:00 AM | Plea to Jurisdiction | Whitehill, Bill | SMU Dedman School of Law | Held |
| 8/18/2025 10:00 AM | Scheduling Conference | Whitehill, Bill | 1st Floor Conference Room | *Canceled - Judge Ordered* |

## Events [46]

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 7/1/2025 | Filing | O | | *No Documents* (i) |
| 7/1/2025 | Filing | OP | Plaintiffs' Original Petition, Application for TRO and Temp Injunction and Emergency Request for Appt of Reciever | Plaintiffs' Original Petition, Application for TRO and Temp Injunction and Emergency Request for App.pdf |

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 7/1/2025 | Filing | PO | Temporary Restraining Order and Order setting Hearing for Temporary Injunction | Proposed Temporary Restraining Order and Order setting Hearing for Temporary Injunction.pdf |
| 7/1/2025 | Filing | CIS | Business Court Case Information Sheet | Business Court Case Information Sheet.pdf |
| 7/2/2025 | Hearing | Temporary Restraining Order | - | - |
| 7/2/2025 | Filing | NOT | Notice to Opposing Counsel Re: Temp Restraining Order | Notice to Opposing Counsel Re: Temporary Restraining Order.pdf |
| 7/2/2025 | Filing | AOC | Notice of Appearance | Notice of Appearance.pdf |
| 7/2/2025 | Filing | M | Plaintiffs Motion for Expedited Discovery | Plaintiffs Motion for Expedited Discovery.pdf |
| 7/2/2025 | Filing | PO | Order Granting Motion for Expedited Discovery | Proposed Order Granting Motion for Expedited Discovery.pdf |
| 7/7/2025 | Filing | AOC | Notice of Appearance Emily Owen | Notice of Appearance Emily Owen.pdf |
| 7/14/2025 | Filing | NOT | Rule 11 Agreement | Rule 11 Agreement.pdf |
| 7/14/2025 | Filing | MTD | Defendant's Motion to Dismiss and Plea to the Jurisdiction | Defendant's Motion to Dismiss and Plea to the Jurisdiction.pdf |
| 7/15/2025 | Filing | AOC | Notice of Appearance Brent M Rubin | Notice of Appearance Brent M Rubin.pdf |
| 7/21/2025 | Filing | AMEND | Plaintiff's First Amended Petition, App for Temp Inj, Emergency Request for App of Receiver | Plaintiff's First Amended Petition, App for Temp Inj, Emergency Request for App of Receiver.pdf |
| 7/21/2025 | Filing | AOC | Notice of Appearance Joshua D. Kipp | Notice of Appearance Joshua D. Kipp.pdf |
| 7/21/2025 | Filing | ACR | Plaintiffs' Response to Defendants' Motion To Dismiss and Plea to Jurisdiction | Plaintiffs' Response to Defendants' Motion To Dismiss and Plea to Jurisdiction.pdf |
| 7/24/2025 | Hearing | Temporary Injunction Hearing | - | - |
| 7/24/2025 | Filing | NOH | Notice of Hearing for Motion to Dismiss and Plea to the Jurisdiction | Notice of Hearing for Motion to Dismiss and Plea to the Jurisdiction.pdf |
| 7/24/2025 | Filing | NOT | Notice of Statement of Claim | Notice of Statement of Claim.pdf |
| 7/25/2025 | Hearing | Temporary Injunction Hearing | - | - |
| 7/25/2025 | Filing | ACR | Reply Brief in Support of Defendants' Motion to Dismiss and Plea to the Jurisdiction | Reply Brief in Support of Defendants' Motion to Dismiss and Plea to the Jurisdiction.pdf |
| 7/30/2025 | Filing | ACR | Plaintiffs' Surreply to Defendants' Motion to Dismiss and Plea to the Jurisdiction | Plaintiffs' Surreply to Defendants' Motion to Dismiss and Plea to the Jurisdiction.pdf |
| 8/4/2025 | Hearing | Plea to Jurisdiction | - | - |
| 8/4/2025 | Filing | ORD | Order on Additional Briefing | Order on Additional Briefing.pdf |
| 8/6/2025 | Filing | AOC | Notice of Appearance of Ben Warden | Notice of Appearance of Ben Warden.pdf |
| 8/7/2025 | Filing | NOT | Notice of Related Proceedings | Notice of Related Proceedings.pdf |

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 8/11/2025 | Filing | BRI | Defendants' Supplemental Brief and Alternative Motion to Abate | Defendants' Supplemental Brief and Alternative Motion to Abate.pdf |
| 8/13/2025 | Filing | ACR | Defendants' Answer to Question presented by Court on August 5 2025 | Defendants' Answer to Question presented by Court on August 5 2025.pdf |
| 8/13/2025 | Filing | ACR | Plaintiffs' Position on who is allowed to change the Benefitting Organization | Plaintiffs' Position on who is allowed to change the Benefitting Organization.pdf |
| 8/18/2025 | Hearing | Scheduling Conference | - | - |
| 8/18/2025 | Filing | ACR | Plaintiffs' Response to Defendants' Supplemental Brief and Alt Mot to Abate | Plaintiffs' Response to Defendants' Supplemental Brief and Alt Mot to Abate.pdf |
| 8/19/2025 | Filing | LTR | Letter to Court re: Foreign Cases | Letter to Court re: Foreign Cases.pdf |
| 8/20/2025 | Filing | NOT | Notice of correction to citation in August 13, 2025 brief | Notice of correction to citation in August 13, 2025 brief.pdf |
| 8/20/2025 | Filing | ATCH | Defendants' Appendix of Foreign Authority | Defendants' Appendix of Foreign Authority.pdf |
| 8/21/2025 | Filing | ACR | Defendants' Reply - Supplemental Brief on Capacity and Joinder | Defendants' Reply - Supplemental Brief on Capacity and Joinder.pdf |
| 8/21/2025 | Filing | NOT | Notice of filing in Cayman matter | Notice of filing in Cayman matter.pdf |
| 8/25/2025 | Filing | ACR | Plaintiffs' Sur-Reply to Supp Brief and Motion to Abate | Plaintiffs' Sur-Reply to Supp Brief and Motion to Abate.pdf |
| 8/27/2025 | Filing | ACR | Response to Notice of Pleadings filed in the Cayman Liquidation Matter | Response to Notice of Pleadings filed in the Cayman Liquidation Matter.pdf |
| 9/2/2025 | Filing | AMEND | Plaintiffs' Second Amended Petition, App for Temp Injunction and App for Receiver | Plaintiffs' Second Amended Petition, App for Temp Injunction and App for Receiver.pdf |
| 9/11/2025 | Filing | VL | Brian Shaw Vacation Letter | Brian Shaw Vacation Letter.pdf |
| 9/11/2025 | Filing | NOT | Notice of Related Proceedings (Chapter 15 Bankruptcy) | Notice of Related Proceedings (Chapter 15 Bankruptcy).pdf |
| 9/18/2025 | Filing | ORD | Order | Order.pdf |
| 10/22/2025 | Filing | MOTAO | Motion for Leave to File Motion for Reconsideration as to Complete Relief | Motion for Leave to File Motion for Reconsideration as to Complete Relief.pdf |
| 10/22/2025 | Filing | PO | Proposed Order Granting Motion for Leave to File Motion for Reconsideration as to Complete Relief | Proposed Order Granting Motion for Leave to File Motion for Reconsideration as to Complete Relief.pdf |
| 10/31/2025 | Filing | ORD | Order | Order (mtn for leave, mtn for reconsideration).pdf |
| 10/31/2025 | Filing | M | Plaintiffs' Motion For Reconsideration As To Complete Relief | Attachment - Plaintiffs' Motion For Reconsideration As To Complete Relief.pdf |

© 2025 Tyler Technologies, Inc. | All Rights Reserved

Version: 2025.9.2.1644



# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 108511223
Filing Code Description: Sworn Record
Filing Description: 2025.11.26 - Mandamus Record
Status as of 11/26/2025 3:55 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brian Shaw | 24053473 | bshaw@ccsb.com | 11/26/2025 3:13:06 PM | SENT |
| Brian Shaw | 24053473 | bshaw@ccsb.com | 11/26/2025 3:13:06 PM | SENT |
| Brian Shaw | 24053473 | bshaw@ccsb.com | 11/26/2025 3:13:06 PM | SENT |
| Brian Shaw | 24053473 | bshaw@ccsb.com | 11/26/2025 3:13:06 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Elizabeth Perez | | eperez@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Elizabeth Perez | | eperez@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Elizabeth Perez | | eperez@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 11/26/2025 3:13:06 PM | SENT |
| The Honorable William Whitehill | | BCdivision1b@txcourts.gov | 11/26/2025 3:13:06 PM | SENT |
| Darren McCarty | | darren@mccartylawpllc.com | 11/26/2025 3:13:06 PM | SENT |
| Darren McCarty | | darren@mccartylawpllc.com | 11/26/2025 3:13:06 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Benjamin Warden on behalf of Benjamin Warden
Bar No. 24115926
BWarden@duanemorris.com
Envelope ID: 108511223
Filing Code Description: Sworn Record
Filing Description: 2025.11.26 - Mandamus Record
Status as of 11/26/2025 3:55 PM CST

Case Contacts

| Darren McCarty | | darren@mccartylawpllc.com | 11/26/2025 3:13:06 PM | SENT |
|----------------|--|---------------------------|-----------------------|------|
| Darren McCarty | | darren@mccartylawpllc.com | 11/26/2025 3:13:06 PM | SENT |